EXHIBIT B

## INTRODUCTION

1.      Plaintiffs here assert claims against J.P. Morgan Chase & Co. ("J.P. Morgan"), Wells Fargo Bank National Association ("Wells Fargo"), and Stifel, Nicolaus & Company, Incorporated ("Stifel") (Defendants are sometimes collectively referred to herein as "Defendants" or "Defendant Underwriters.") Plaintiffs' claims against Defendants, like other aspects of the Flint water litigation, arise from the poisoning of Plaintiffs, who were all minors,[1] residents and water users of the City of Flint, during the period when Flint utilized the Flint River as a primary water source without implementing proper corrosion controls.

2.      Generally speaking, the Flint water litigation has proceeded against two groups of defendants: various government officials involved in the decision to switch Flint's drinking water source ("Government Defendants") and certain environmental engineering companies ("Engineering Defendants"). Further investigation and discovery have revealed new defendants in a category of their own: J.P. Morgan Chase, Wells Fargo, and Stifel, institutions that underwrote a 2014 municipal bond sale, which aided and abetted the perpetration of the violation of Plaintiffs' firmly established constitutional right to bodily integrity.

---

[1]      Each of the Plaintiffs named herein were minors at the time of the underlying conduct made the basis of this complaint and their claims are not currently time-barred under Michigan law.

1

3.     In the spring of 2014, J.P. Morgan Chase, Wells Fargo, and Stifel underwrote the bond sale that financed and enabled Flint's participation in the Karegnondi Water Authority ("KWA"). The City of Flint badly needed the funds: it had a significant obligation and zero ability to meet it. Without the 2014 bond financing, Flint would not have been able to bear its portion of the cost of constructing the KWA pipeline, and the other KWA entities would not have been able to bear the cost for Flint. In short, without the bond financing, Flint would not have been able to join the KWA, and the KWA would not have been able to commence construction.

4.     Against the backdrop of the need to secure financing for Flint's participation in the KWA, the Government Defendants used an Administrative Consent Order regarding remediation of a lime sludge lagoon, which in theory could be used by the Flint Water Treatment Plant ("WTP"),[2] as a pretext for Flint's larger participating in the KWA bond sale financing: Remediating the lime sludge lagoon might have cost between $1 million to $8 million; the bonds issued for Flint's contribution to the KWA, the real reason, was for approximately $85 million.

---

[2]     The lagoon had in-fact not been used for decades for its intended purpose, but instead had been used during that period as a garbage dump. Flint had received at least two notices to clean the lagoon over the previous 15 years and had never taken action to do so because it had no real need to and did not have the money to do so.

5.    J.P. Morgan Chase, Wells Fargo, and Stifel knew about the farce that was the Administrative Consent Order, in addition to other facts, such as  that the Flint River would be used as an interim source of drinking water for Flint for the foreseeable future, as well as the hazards to human health presented by the Flint River's highly corrosive water and Flint's aging network of lead service lines, Flint's inability to pay for necessary upgrades to the Flint WTP, the lack of even a plan to upgrade the Flint WTP, the lack of any intention on the part of the Government Defendants to implement corrosion control, and the fact that Flint's residents and water users would begin consuming raw, untreated, and deleterious water shortly after the switch in April 2014.

6.    Yet, J.P. Morgan Chase, Wells Fargo, and Stifel agreed to underwrite the bond financing that enabled the switch anyway. They agreed to and facilitated a plan for Flint to leave the Detroit Water and Sewerage Department ("DWSD") and enter the KWA, and they knew that a necessary element of the plan was the use of raw, untreated Flint River water as an interim drinking water source, which would expose Flint's residents and water users to lead-poisoning and legionella bacteria. J.P. Morgan Chase, Wells Fargo, and Stifel each engaged in conscience-shocking behavior by underwriting Flint's participation in the KWA—and thus the poisoning of Flint's children, residents, and other users—knowing full well there would be drastic and dire health consequences to the children of Flint.

7.     Without the underwriting from J.P. Morgan Chase, Wells Fargo, and Stifel, the City of Flint would have had no choice but to continue purchasing water from DWSD, from whom it had been purchasing water for decades. If Flint had continued purchasing water from DWSD, no children would have been lead-poisoned and no lives would have been ruined, lost, and otherwise forever changed.

8.     The additional claims and facts set forth as part of Plaintiffs' short form complaint are intended to supplement the facts set forth in the Amended Master Long Form Complaint (ECF Dkt. 186) ("Amended Master Complaint"). Additionally, Plaintiffs incorporate those facts set forth in the Amended Master Complaint by reference. However, for the ease of the Court and the parties, some of the most relevant facts from the Amended Master Complaint are repeated here.

## JURISDICTION

9.     J.P. Morgan Chase is a Delaware Corporation with its principal executive offices located at 383 Madison Ave., New York, New York 10017.

10.     This Court may exercise specific personal jurisdiction over J.P. Morgan Chase because the acts that form the basis of Plaintiffs' complaint against J.P. Morgan Chase occurred, in substantial part, in the State of Michigan, and Plaintiffs' claims against J.P. Morgan Chase arise out of relate to J.P. Morgan's

substantial contacts in Michigan and purposeful availment of the benefits and protections of Michigan's laws.

11.     J.P. Morgan Chase is subject to personal jurisdiction under Michigan's long-arm statute because the acts and omissions that form the basis of Plaintiffs' claims against J.P. Morgan Chase constitute the transaction of business in Michigan, the doing or causing an act to be done, and consequences to occur, in Michigan resulting in tortious harm to Plaintiffs, and entering into a contract for services to be performed or materials to be furnished in Michigan by J.P. Morgan Chase.

12.     Wells Fargo is a nationally chartered bank with principal executive offices at 101 North Phillips Avenue, Sioux Falls, South Dakota.

13.     This Court may exercise specific personal jurisdiction over Wells Fargo because the acts that form the basis of Plaintiffs' complaint against Wells Fargo occurred, in substantial part, in the State of Michigan, and Plaintiffs' claims against Wells Fargo arise out of relate to Wells Fargo's substantial contacts in Michigan and purposeful availment of the benefits and protections of Michigan's laws.

14.     Wells Fargo is subject to personal jurisdiction under Michigan's long-arm statute because the acts and omissions that form the basis of Plaintiffs' claims against Wells Fargo constitute the transaction of business in Michigan, the doing or

causing an act to be done, and consequences to occur, in Michigan resulting in tortious harm to Plaintiffs, and entering into a contract for services to be performed or materials to be furnished in Michigan by Wells Fargo.

15. Stifel is a Delaware corporation with its principal executive office located at 501 North Broadway, St. Louis, Missouri 63102.

16. This Court may exercise specific personal jurisdiction over Stifel because the acts that form the basis of Plaintiffs' complaint against Stifel occurred, in substantial part, in the State of Michigan, and Plaintiffs' claims against Stifel arise out of relate to Stifel's substantial contacts in Michigan and purposeful availment of the benefits and protections of Michigan's laws.

17. Stifel is subject to personal jurisdiction under Michigan's long-arm statute because the acts and omissions that form the basis of Plaintiffs' claims against Stifel constitute the transaction of business in Michigan, the doing or causing an act to be done, and consequences to occur, in Michigan resulting in tortious harm to Plaintiffs, and entering into a contract for services to be performed or materials to be furnished in Michigan by Stifel.

18. This Court has subject matter jurisdiction of Plaintiffs' claims against J.P. Morgan Chase, Wells Fargo, and Stifel under 28 U.S.C. §§ 1331 and 1343.

19. Additionally, the Court may exercise supplemental jurisdiction over Plaintiffs' non-federal claim under 28 U.S.C. § 1367(a).

6

20.     Venue is appropriate under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## STATEMENT OF FACTS

21.     From approximately 1964 to 2014, the City of Flint purchased water from the DWSD.[3] During this 50-year span, flint water users enjoyed safe, clean, fresh water in their homes, businesses, schools, hospitals and other places of public services.

22.     Motivated principally by the actions, political pressure and efforts of Genesee County Drain Commissioner Jeffrey Wright, in 2009, the communities of Flint, Genesee County, Sanilac County, Lapeer County and the City of Lapeer, formed the KWA to explore the development of a water delivery system that would draw water from Lake Huron and serve as an alternative to water delivered by the DWSD.

23.     All parties to the KWA knew that the cost and amount of construction would be significant.

---

[3]     The DWSD is presently known as the Great Lakes Water Authority, and common abbreviated as "GLWA." However, throughout the litigation of the Flint Water Cases, the entity has gone by its old name and the abbreviation DWSD. This Complaint will likewise use the abbreviation DWSD.

24.     To supply Lake Huron water to its contracting members, the KWA would be required to construct a lake water intake,[4] sixty-three miles of pipe from the intake plant to Flint, and two pump stations.

25.     The projected construction cost of building the KWA water system was approximately $300 million.

26.     By the spring of 2013, Wright had secured 30-year commitments from KWA member communities—except for Flint—to purchase millions of gallons of water. These commitments were necessary in order to sell $280 million worth of bonds to finance the project.

27.     In the spring of 2013, Officials from the State of Michigan, Genesee County, Lapeer County, Sanilac County, and the City of Flint (collectively, the "Issuers") reached out to J.P. Morgan Chase, Wells Fargo, and Stifel to secure financing through a bond sale for the KWA's construction and a meeting was scheduled to discuss the viability of the project and Defendant Underwriters' participation in bonding to help fund it.

28.     The State of Michigan and Flint officials that attended the meeting expressed the goal of Flint joining the KWA.

29.     Without the financing from J.P. Morgan Chase, Wells Fargo, and Stifel, the City of Flint would not have been able to pay its portion to join the

---

[4]     Ultimately, the intake facility was financed from a $35 million bond sale in October 2013.

8

KWA and therefore would have had no choice but to continue purchasing water from the DWSD.

30.     J.P. Morgan Chase was made aware of this fact during the meeting.

31.     Wells Fargo was made aware of this fact during the meeting.

32.     Stifel was made aware of this fact during the meeting.

33.     J.P. Morgan Chase, Wells Fargo, and Stifel agreed to underwrite the bond sale.[5]

34.     The underwriting ultimately became the "Series 2014A" bond sale.

35.     When a municipality issues bonds, one method of conducting the bond sale is through a negotiated dealer agreement.

36.     This is called a "negotiated sale" because the issuer and the underwriter work closely together and privately negotiate the terms of the bond sale.

37.     A negotiated bond sale fosters confidentiality between the issuer and the underwriter.

---

[5]     The terms of the agreement are set forth in a 2014 Official Statement of the Karegnondi Water Authority, Counties of Genesee, Lapeer, Sanilac, and State of Michigan, for $220,500,000 Water System Supply Bonds (Karegnondi Water Pipeline), Series 2014A, dated April 4, 2014, attached hereto as Exhibit 1, as well as in the Supplement to the Official Statement, dated May 1, 2014, attached hereto as Exhibit 2. The identities of the underwriters are noted on page 1 of both Exhibits 1 and 2.

38.    In a negotiated sale, the issuer sells all of the bonds to one or more underwriters, and the underwriter or underwriters in turn resell them to investor clients or on an open securities market.

39.    The underwriter in a negotiated sale works closely with the issuer's financing team to determine the financing parameters, with the goal of attracting investors to meet the issuer's requirements.

40.    Part of what the underwriter does in working with the issuer is to tailor the bond sale's terms to the interests of the underwriter's institutional investor clients.

41.    One reason for using a negotiated sale instead of other sales methods, such as a competitive sale, is because of the poor credit and limited financial solvency of the issuer of the bonds.

42.    Under the circumstances that existed at all material times, Flint had poor credit and limited (if any) financial solvency.

43.    However, because there is an absence of competitive bidding by potential underwriters, the bond issuer in a negotiated sale typically has less negotiating power.

44.    An underwriter in a negotiated sale typically purchases the bonds on a discount and becomes an interested party to the transaction.

45.    Pursuant to MSRB Rule G-17, underwriters of municipal bonds have

a duty to deal fairly with all persons and not engage in deceptive, dishonest, or unfair practices.

46.   An underwriter implicitly represents that there is a reasonable basis for the opinions the underwriter offers, and implicitly represents that the underwritten project will be completed, including all subsidiary actions necessary for the completion of the larger project.

47.   Dealing fairly with all persons requires conducting a reasonable investigation and determining reasonably ascertainable facts about the municipal bond sale.

48.   In the United States, approximately $400,000,000,000 in municipal bonds are issued annually.

49.   A sizeable portion of these municipal bonds go to infrastructure projects, including water utilities.

50.   In 2016 alone, nearly $38,000,000,000 in municipal bonds were issued for water infrastructure projects.[6]

51.   Any reasonable underwriter dealing in water infrastructure projects is aware that America has an aging public water infrastructure, which often means a significant amount of lead pipes and water service lines.

---

[6]   See NACWA, *Tax Exempt Municipal Bonds*, available at: https://www.nacwa.org/advocacy-analysis/campaigns/tax-exempt-municipal-bond-resource-hub.

52.    This was also the case at all times dating back to before 2013.

53.    Additionally, any reasonable underwriter would be familiar with the centralized water distribution that is common to public water utilities.

54.    This was also the case at all times dating back before 2013.

55.    Part and parcel of centralized water distribution is a centralized water treatment facility that ensures the water distributed to customers and water users is safe to drink.

56.    Any reasonable underwriter either employs an internal public water expert or else retains a consultant with significant public water expertise. The expert has an intimate knowledge of regional water hydrology, public water systems, engineering, water treatment, and water chemistry, among other things.

57.    This was also the case at all times dating back before 2013.

58.    J.P. Morgan Chase employs such an internal public water expert or retains such an external public water consultant who provides guidance and subject matter expertise on municipal water infrastructure as a part of municipal bond underwriting.

59.    Wells Fargo employs such an internal public water expert or retains such an external public water consultant who provides guidance and subject matter expertise on municipal water infrastructure as a part of municipal bond underwriting.

60.    Stifel employs such an internal public water expert or retains such an external public water consultant who provides guidance and subject matter expertise on municipal water infrastructure as a part of municipal bond underwriting.

61.    One risk than an underwriter considers is potential litigation.

62.    The Series 2014A bond sale was a negotiated bond sale.

63.    Defendant Underwriters purchased the bonds at a substantial discount.

64.    Defendant Underwriters purchased all of the bonds.

65.    During the same time the Issuers were negotiating the bond sale with J.P. Morgan Chase, Wells Fargo, and Stifel, Flint executed a financing contract with the KWA on August 1, 2013.[7] Flint would be required to pay its pro rata portion of the $300,000,000 contract.

66.    Flint's share was about $85 million.

67.    Flint was to be responsible for approximately 34.2% of the debt service on the KWA's construction.

68.    J.P. Morgan Chase, Wells Fargo, and Stifel were made aware of the terms of the August 1, 2013 KWA financing contract.

69.    J.P. Morgan Chase, Wells Fargo, and Stifel were themselves provided key information about the KWA system and then shared advice with the Issuers

---

[7]    *See* December 2017 Three Party Agreement, attached hereto as Exhibit 3.

about the KWA system, its components, and how the system and its components would be financed.

70.    Flint had little if any financial ability to meet its potential commitments under the KWA.

71.    Beginning in 2011, Flint was placed under the authority of an emergency manager. It would remain under emergency management until 2015.

72.    This was not the first time Flint had been placed under State economic control: Flint was placed under State economic management for two years between 2002 and 2004.

73.    Indeed, Flint was a notable example of the economic hardship that follows deindustrialization.

74.    In short, it was well known that Flint was a financially distressed city.

75.    It was clear that Flint would not be able to bear its portion—$85 million—of the KWA construction cost.

76.    Indeed, upon information and belief, throughout the underwriting process, J.P. Morgan Chase, Wells Fargo, and Stifel each had unfettered access to Flint's financial records.

77.    Without Flint's participation in the KWA project, everyone involved on the underwriting side, including executives, agents and employees of J.P. Morgan Chase knew that it was doubtful that the project could be financed.

78.     Without Flint's participation in the KWA project, everyone involved on the underwriting side, including executives, agents and employees of Wells Fargo knew that it was doubtful that the project could be financed.

79.     Without Flint's participation in the KWA project, everyone involved on the underwriting side, including executives, agents and employees of Stifel knew that it was doubtful that the project could be financed.

80.     It was anticipated that if the financing for the KWA project was secured by April of 2014, the project could be completed by the end of 2016.

81.     Ultimately, the KWA pipeline was completed in November 2017.[8]

82.     The construction timeline would prove crucial for Flint.

83.     At all material times, J.P. Morgan Chase was aware that the Flint River would be utilized as an interim water source beginning in April 2014 through completion of the KWA.

84.     At all material times, Wells Fargo was aware that the Flint River would be utilized as an interim water source beginning in April 2014 through completion of the KWA.

85.     At all material times, Stifel was aware that the Flint River would be utilized as an interim water source beginning in April 2014 through completion of the KWA

---

[8]     By that time, Flint was no longer part of the KWA. However, Flint is still contractually required to pay its portion of the debt service.

86.     Unlike the finished water from DWSD, the water to be delivered to Flint from the Flint River would be raw, requiring considerable treatment at the Flint WTP.

87.     At all material times this information was known by J.P. Morgan Chase.

88.     At all material times this information was known by Wells Fargo.

89.     At all material times this information was known by Stifel.

90.     All individuals involved in the decision-making process regarding participation in the bond sale for J.P. Morgan Chase knew that if Flint stayed with the DWSD as its water source, the Flint WTP would not have to be upgraded.

91.     On the other hand, they all knew that if Flint went with KWA, the Flint WTP would have to be upgraded to treat the raw water coming from Lake Huron.

92.     All individuals involved in the decision-making process regarding participation in the bond sale for Wells Fargo knew that if Flint stayed with the DWSD as its water source, the Flint WTP would not have to be upgraded.

93.     On the other hand, they all knew that if Flint went with KWA, the Flint WTP would have to be upgraded to treat the raw water coming from Lake Huron.

94.    All individuals involved in the decision-making process regarding participation in the bond sale for Stifel knew that if Flint stayed with the DWSD as its water source, the Flint WTP would not have to be upgraded.

95.    On the other hand, they all knew that if Flint went with KWA, the Flint WTP would have to be upgraded to treat the raw water coming from Lake Huron

96.    Likewise, when it became apparent that the Flint River would be used as an interim water source, it was well known that the water would have to be treated by the Flint WTP.

97.    At all material times it was well known that the Flint WTP could not handle the raw Flint River water without substantial upgrades.

98.    At all material times this information was known by J.P. Morgan Chase.

99.    At all material times this information was known by Wells Fargo.

100.    At all material times this information was known by Stifel.

101.    The Flint WTP, which had originally been constructed in 1917, had been "mothballed" in 1965 when Flint changed water sources from the Flint River to pre-treated water provided by DWSD. Flint had opted for DWSD water in 1965 after a 1964 U.S. Geological Survey report noted high levels of chloride in the

Flint River, which raised concerns about the capacity of the Flint River to provide safe drinking water under the then-current arrangement.

102.   At all material times this information was known by J.P. Morgan Chase.

103.   At all material times this information was known by Wells Fargo.

104.   At all material times this information was known by Stifel.

105.   At all material times Flint's water was thus seriously corrosive.

106.   At all material times this information was known by J.P. Morgan Chase.

107.   At all material times this information was known by Wells Fargo.

108.   At all material times this information was known by Stifel.

109.   In 2013 and 2014, Flint had an aging network of predominately lead piping and service lines.

110.   At all material times this information was known by J.P. Morgan Chase.

111.   At all material times this information was known by Wells Fargo.

112.   At all material times this information was known by Stifel.

113.   In 2013 and 2014, Flint had a centralized water distribution network that flowed through the then-supplementary Flint WTP.

18

114.   Any reasonable water expert would inquire into what upgrades had been made to the Flint WTP or what concrete plans were in the works to upgrade the Flint WTP in anticipation of utilizing the Flint River as a water source.

115.   There were in-fact no significant upgrades to the FWTP between 1965 and 2014.

116.   At all material times J.P. Morgan Chase was aware that necessary upgrades to the Flint WTP had not been made and could not be made in time for the City's utilization of the Flint River as a water source.

117.   At all material times Wells Fargo was aware that necessary upgrades to the Flint WTP had not been made and could not be made in time for the City's utilization of the Flint River as a water source.

118.   At all material times Stifel was aware that necessary upgrades to the Flint WTP had not been made and could not be made in time for the City's utilization of the Flint River as a water source

119.   Any reasonable expert would inquire into what Flint's plan to implement corrosion control would be in anticipation of utilizing the Flint River as a water source.

120.   Upon information and belief, J.P. Morgan Chase was made aware, through its internal public water expert or its external public water consultant, that there was no practical way to implement proper corrosion controls to treat water

from the Flint River, in the short time before the Flint WTP was to become fully operational utilizing the Flint River as the primary water source for the citizens of Flint.

121.   Upon information and belief, Wells Fargo was made aware, through its internal public water expert or its external public water consultant, that there was no practical way to implement proper corrosion controls to treat water from the Flint River, in the short time before the Flint WTP was to become fully operational utilizing the Flint River as the primary water source for the citizens of Flint.

122.   Upon information and belief, Stifel was made aware, through its internal public water expert or its external public water consultant, that there was no practical way to implement proper corrosion controls to treat water from the Flint River, in the short time before the Flint WTP was to become fully operational utilizing the Flint River as the primary water source for the citizens of Flint.

123.   Flint and State officials did not intend to and could not properly implement corrosion control as part of the switch to Flint River water in the short time before the Flint WTP was to become fully operational utilizing the Flint River as the primary water source for the citizens of Flint.[9]

---

[9]     These officials would later represent (misleadingly) to the EPA that corrosion control was unnecessary because the Flint WTP was a "new source," not a reactivated source.

124.   Any reasonable water expert would understand that, without appropriate corrosion control technology or methods, highly corrosive water would strip away protective biofilm in lead pipes and cause lead to leach into the drinking water.

125.   At all material times this information was known by J.P. Morgan Chase.

126.   At all material times this information was known by Wells Fargo.

127.   At all material times this information was known by Stifel.

128.   In 2011, Flint officials commissioned a study to determine if the Flint River could be safely used by the city as the primary source of drinking water.

129.   The "Analysis of the Flint River as a Permanent Supply for the City of Flint, July 2011" ("2011 Report"), prepared by two private engineering firms cautioned against the use of the Flint River water and the dormant Flint WTP, which would cost millions of dollars to upgrade.

130.   At all material times this information was known by J.P. Morgan Chase, and J.P. Morgan Chase was provided access to the 2011 Report prior to its participation in the bonding process made the basis of this lawsuit.

131.   At all material times this information was known by Wells Fargo, and Wells Fargo was provided access to the 2011 Report prior to its participation in the bonding process made the basis of this lawsuit.

132.   At all material times this information was known by Stifel, and Stifel was provided access to the 2011 Report prior to its participation in the bonding process made the basis of this lawsuit.

133.   Use of the Flint River as a primary drinking source was rejected in 2011.

134.   At all material times this information was known by J.P. Morgan Chase.

135.   At all material times this information was known by Wells Fargo.

136.   At all material times this information was known by Stifel.

137.   Throughout 2012, DWSD presented to Kurtz, Wright, Dillon, Walling and the Governor compelling arguments, based on numerous studies, demonstrating that from a cost and water reliability standpoint, Flint needed to continue to receive water from DWSD.

138.   At all material times this information was known by J.P. Morgan Chase.

139.   At all material times this information was known by Wells Fargo.

140.   At all material times this information was known by Stifel.

141.   In late 2012, the independent engineering firm of Tucker, Young, Jackson and Tull ("TYJT") was hired to assess whether it would be cost-effective

for Flint to switch from water supplied by DWSD and join the KWA water delivery system.

142. In February 2013, TYJT concluded that it would be more cost-effective for Flint on both a short term and long-term basis to continue to be supplied with water from DWSD.

143. At all material times this information was known by J.P. Morgan Chase, and J.P. Morgan Chase was provided access to the 2013 TYJT Report prior to its participation in the bonding process made the basis of this lawsuit.

144. At all material times this information was known by Wells Fargo, and Wells Fargo was provided access to the 2013 TYJT Report prior to its participation in the bonding process made the basis of this lawsuit.

145. At all material times this information was known by Stifel, and Stifel was provided access to the 2013 TYJT Report prior to its participation in the bonding process made the basis of this lawsuit.

146. On March 27, 2013, MDEQ officials, sensing that Flint was on the verge of joining the KWA, acknowledged that the decision to switch the water source for Flint was not based on a scientific assessment of the suitability of the Flint River water.

147. At all material times this information was known by J.P. Morgan Chase.

148.   At all material times this information was known by Wells Fargo.

149.   At all material times this information was known by Stifel.

150.   During the negotiation and investigation of the Series 2014A bond issuance, J.P. Morgan Chase became aware that Flint had little ability to finance its bonding obligations, let alone any other substantial obligations which were not being financed through the bond sale.

151.   During the negotiation and investigation of the Series 2014A bond issuance, Wells Fargo became aware that Flint had little ability to finance its bonding obligations, let alone any other substantial obligations which were not being financed through the bond sale.

152.   During the negotiation and investigation of the Series 2014A bond issuance, Stifel became aware that Flint had little ability to finance its bonding obligations, let alone any other substantial obligations which were not being financed through the bond sale.

153.   During the negotiation and investigation of the Series 2014A bond issuance, J.P. Morgan Chase became aware that the Flint River water was seriously corrosive due in part to pollution from industrial discharges and runoff from Flint's roads.

154.   During the negotiation and investigation of the Series 2014A bond issuance, Wells Fargo became aware that the Flint River water was seriously

corrosive due in part to pollution from industrial discharges and runoff from Flint's roads.

155.   During the negotiation and investigation of the Series 2014A bond issuance, J.P. Morgan Chase became aware that the Flint River water was seriously corrosive due in part to pollution from industrial discharges and runoff from Flint's roads.

156.   During the negotiation and investigation of the Series 2014A bond issuance, J.P. Morgan Chase became aware that Flint had originally started purchasing water from DWSD because of the corrosivity of the Flint River.

157.   During the negotiation and investigation of the Series 2014A bond issuance, Wells Fargo became aware that Flint had originally started purchasing water from DWSD because of the corrosivity of the Flint River.

158.   During the negotiation and investigation of the Series 2014A bond issuance, Stifel became aware that Flint had originally started purchasing water from DWSD because of the corrosivity of the Flint River.

159.   During the negotiation and investigation of the Series 2014A bond issuance, J.P. Morgan Chase became aware that that Flint had an aging water infrastructure of predominately lead service lines.

160.   During the negotiation and investigation of the Series 2014A bond issuance, Wells Fargo became aware that that Flint had an aging water infrastructure of predominately lead service lines.

161.   During the negotiation and investigation of the Series 2014A bond issuance, Stifel became aware that that Flint had an aging water infrastructure of predominately lead service lines.

162.   During the negotiation and investigation of the Series 2014A bond issuance, J.P. Morgan Chase became aware that the Flint WTP had been mothballed in 1965 and that no meaningful upgrades had been made in the last 50 years.

163.   During the negotiation and investigation of the Series 2014A bond issuance, Wells Fargo became aware that the Flint WTP had been mothballed in 1965 and that no meaningful upgrades had been made in the last 50 years.

164.   During the negotiation and investigation of the Series 2014A bond issuance, Stifel became aware that the Flint WTP had been mothballed in 1965 and that no meaningful upgrades had been made in the last 50 years.

165.   During the negotiation and investigation of the Series 2014A bond issuance, J.P. Morgan Chase became aware that it was actually in Flint's financial best interest to remain with DWSD and not participate in the KWA or the municipal bond sale that would finance the KWA's construction.

166.   During the negotiation and investigation of the Series 2014A bond issuance, Wells Fargo became aware that it was actually in Flint's financial best interest to remain with DWSD and not participate in the KWA or the municipal bond sale that would finance the KWA's construction.

167.   During the negotiation and investigation of the Series 2014A bond issuance, Stifel became aware that it was actually in Flint's financial best interest to remain with DWSD and not participate in the KWA or the municipal bond sale that would finance the KWA's construction.

168.   Furthermore, the terms of the dubious March 20, 2014 Administrative Consent Order were made known to J.P. Morgan Chase, Wells Fargo, and Stifel.

169.   Like many other water treatment plants, the Flint WTP softened the water it treated.

170.   One method of softening water is with lime.

171.   A byproduct of softening water with lime is lime sludge, which requires long-term disposal options.

172.   The City of Flint maintained an "open dump" for disposing lime sludge at 5200 Bray Road, Genesee Township, Genesee County, Michigan, despite the fact that little to no sludge was being dumped there at any point relative in time to the underlying facts made the basis of this lawsuit.

173.    The March 20, 2014 Administrative Consent Order was used as a pretext for the issuance of bonds.

174.    At all material times this information was known by J.P. Morgan Chase.

175.    At all material times this information was known by Wells Fargo.

176.    At all material times this information was known by Stifel.

177.    The Administrative Consent Order was signed by Peter Bade, Chief Legal Officer of the City of Flint, and Bryan Feighner, Chief of the Michigan Department of Environmental Quality's Office of Waste Management and Radiological Protection on or about March 20, 2014.

178.    The Administrative Consent Order purported to require Flint to use raw water from the Flint River and to undertake an $8,000,000 upgrade to the Flint WTP to safely handle the Flint River water.

179.    At all material times this information was known by J.P. Morgan Chase.

180.    At all material times this information was known by Wells Fargo.

181.    At all material times this information was known by Stifel.

182.    Indeed, the April 2014 Official Statement notes that $8,000,000 of upgrades and renovations were necessary for the Flint WTP to function properly and safely: "Flint will be required to make an estimated $8,000,000 in

Case 4:20-cv-12726-MFL-DRG   ECF No. 1-2   filed 10/07/20   PageID.90   Page 30 of 726

improvements to convert the plant from stand-by to fully operational and to accommodate the flow of water from the System." Exhibit 1, at 11.

183.   However, the $8,000,000 worth of required upgrades to the Flint WTP were not being financed through the Series 2014A municipal bond sale, nor was there enough time to begin, let alone complete and implement, the upgrades before the end of April 2014, nor could Flint afford the upgrades without taking on more debt.

184.   At all material times this information was known by J.P. Morgan Chase and it was known that without taking on a substantial amount of debt Flint could not afford these upgrades.

185.   At all material times this information was known by Wells Fargo and it was known that without taking on a substantial amount of debt Flint could not afford these upgrades.

186.   At all material times this information was known by Stifel and it was known that without taking on a substantial amount of debt Flint could not afford these upgrades.

187.   According to a permit issued by the MDEQ, the City of Flint's application proposed various "[i]mprovements to the City of Flint Lime Sludge Lagoons . . . to allow lime sludge from the Flint WTP to be stored during the interim period when the plant [would] be treating Flint River water."

188.   At all material times this information was known by J.P. Morgan Chase.

189.   At all material times this information was known by Wells Fargo.

190.   At all material times this information was known by Stifel.

191.   The anticipated cost of making necessary improvements to the lime sludge lagoon was actually a mere $3 million (though Flint could not afford that amount either).[10]

192.   The portion of the bond financing for Flint was for more than $85 million dollars—approximately the cost of Flint's anticipated share of construction of the KWA pipeline.

193.   Upon information and belief, proceeds from the Series 2014A bond sale also did not pay for the $3 million lime sludge lagoon.

194.   J.P. Morgan Chase, Wells Fargo, and Stifel all understood that the Administrative Consent Order was a pretext to permit Flint to be a part of the KWA Series 2014A bond sale.

195.   J.P. Morgan Chase, Wells Fargo, and Stifel all understood at the time they underwrote the bonds that if Flint entered the KWA, it would necessarily cease receiving water from the DWSD.

---

[10]   Estimates of the cost of remediating the lime sludge lagoon varied within a range of $1 million to $8 million, but $3 million was the most common estimate. Flint could not afford to remediate the lime sludge lagoon at any price.

196.   J.P. Morgan Chase, Wells Fargo, and Stifel all understood at the time of the bond financing that if Flint left the DWSD, the Flint River would serve as an interim water source and that the Flint WTP would be required to treat the water, since raw Flint River water contains excessive chloride, which can strip a protective film from pipes and cause lead from aging pipes to leach into drinking water.

197.   J.P. Morgan Chase, Wells Fargo, and Stifel all understood at the time each approved the bond financing that the Flint River had previously been considered and rejected as unsafe in 2011.

198.   J.P. Morgan Chase, Wells Fargo, and Stifel all understood at the time each approved the bond financing that the Flint WTP was not capable of treating the raw Flint River water without significant upgrades.

199.   At all material times, J.P. Morgan Chase, Wells Fargo, and Stifel were aware that no later than April 30, 2014, the FWTP was going to become fully operational for the purpose of utilizing the Flint River as a primary water source, without the necessary upgrades to do so safely and without the proper corrosion controls.

200.   Since J.P. Morgan Chase, Wells Fargo, and Stifel were underwriting the KWA's bond financing, they had access to detailed information about Flint's

finances and general fund, and each knew that Flint did not have access to funding to pay for $8,000,000 of upgrades.

201.   When J.P. Morgan Chase, Wells Fargo, and Stifel were determining whether to underwrite the KWA Series 2014A bond sale, no credible information was received to suggest that Flint had any intention of expeditiously upgrading the Flint WTP.

202.   In point of fact, the Flint WTP was never upgraded.

203.   Moreover, J.P. Morgan Chase, Wells Fargo, and Stifel understood at the time they approved financing that there were no plans to adequately upgrade the Flint WTP prior to the switch, and that consumption of water by end users, and in particular children, including Plaintiffs, would result in serious, irreversible bodily harm.[11]

204.   When J.P. Morgan Chase, Wells Fargo, and Stifel approved the Series 2014A bond sale on April 4, 2014, the Administrative Consent Order was 14 days old, neither Flint, nor Emergency Manager Darnell Earley, nor any official from the State of Michigan expressed any intention to construct the necessary upgrades for the Flint WTP to function safely.

---

[11]   It was also contemplated that Genesee County would construct its own water treatment plant, which would function alongside Flint's WTP and also treat Flint's water. *See* Exhibit 2, at 12. However, there was not any concrete plan to construct the plan at that time. Ultimately, Genesee County's water treatment plant was completed and became operational in November 2017.

205.   Indeed, no reasonable underwriter employing or retaining a public water infrastructure expert would have believed that the Flint WTP could be comprehensively upgraded in the short time period—less than a month—before the switch to the Flint River as a primary drinking source.

206.   J.P. Morgan Chase, Wells Fargo, and Stifel understood that the State of Michigan, Darnell Earley, Jeffrey Wright, and the City of Flint intended to use raw and untreated water (with no corrosion control) from the Flint River as an interim source of drinking water in Flint until construction on the KWA pipeline could be completed.

207.   J.P. Morgan Chase, Wells Fargo, and Stifel therefore understood that if the negotiated bond sale financing the KWA (including Flint's participation in the KWA) was approved, Flint would begin receiving raw, untreated water from the Flint River and would continue to receive that raw and untreated water for years before the Flint WTP was completed—all at a cost of $8,000,000 that J.P. Morgan Chase, Wells Fargo, and Stifel knew Flint could not afford.

208.   Any minimal (let alone reasonable or thorough) investigation would have shown the health hazards inherent in the raw Flint River water, which was at that time not treatable by the Flint WTP.

209.   J.P. Morgan Chase, Wells Fargo, and Stifel certainly knew of the health hazards and decided that the money they stood to make on the deal was well worth the impact on the residents of Flint.

210.   J.P. Morgan Chase, Wells Fargo, and Stifel did not turn a "blind eye" to the risks, their eyes were wide open. They simply did not care. There was simply too much money to be made to be concerned with the health and welfare of an impoverished community.

211.   Any minimal (let alone reasonable or thorough) investigation would have shown that lead leaching into drinking water and causing widespread and permanent lead poisoning was within the scope of risks created by the reckless plan to leave DWSD and use the Flint River as an interim water source.

212.   During their investigation into the bonding project, J.P. Morgan Chase, Wells Fargo, and Stifel were intimately aware of the above facts.

213.   Consequently, it was foreseeable that approving the bond financing, which included financing Flint's portion of the KWA's construction costs, would result in Flint leaving the DWSD in a manner that necessarily entailed the use of raw and untreated Flint River water, exposing Flint's residents and water users to lead.

214.   Yet, J.P. Morgan Chase, Wells Fargo, and Stifel all agreed to underwrite the Series 2014A bonds as part of a negotiated bond sale anyway.

215.   J.P. Morgan Chase, Wells Fargo, and Stifel all therefore agreed and supported the general objective of the Series 2014A bond financing, which was the construction of the KWA pipeline and Flint's full participation in the KWA and ultimately use of the KWA water.

216.   However, a necessary component of the plan to complete construction of the KWA pipeline and ensure Flint's full participation in the KWA included as a necessary component the use of raw and untreated water from the Flint River without corrosion control for an extended period of time.

217.   J.P. Morgan Chase, Wells Fargo, and Stifel all therefore agreed to and were part of a plan that included, as a necessary component, exposing Flint's residents and water users to dangerously corrosive water that was passing through lead pipes.

218.   The plan, of which J.P. Morgan Chase, Wells Fargo, and Stifel were all a part, was certain to deprive the residents, children, and water users of their clearly established right to bodily integrity.

219.   J.P. Morgan Chase, Wells Fargo, and Stifel all agreed to a plan they knew would result in the deprivation of Flint residents' and water users' clearly established right to bodily integrity.

220.   By purchasing all of the Series 2014A bonds (at a discount) and then reselling them, J.P. Morgan Chase, Wells Fargo, and Stifel stood to make a

substantial profit and were therefore interested in the Series 2014A bond sale's approval.

221.   By approving the Series 2014A bond financing that would finance Flint's portion of the construction of the KWA, and thus its entry into the KWA, J.P. Morgan Chase, Wells Fargo, and Stifel ensured that Flint's residents and water users would begin receiving dangerous and unpotable water.

222.   J.P. Morgan Chase, Wells Fargo, and Stifel were necessarily major components of the switch from DWSD water to Flint River water, if not the most major components (they had the money to make it happen and stood to make the most money when it happened).

223.   J.P. Morgan Chase, Wells Fargo, and Stifel's underwriting of such a large bond sale enabled the Government Defendants to carry out the plan that led to thousands of Flint's residents, children, and other water users to be tragically lead-poisoned and exposed to legionella bacteria.

## COUNTS

**COUNT XIII:**
**CONSPIRACY TO VIOLATE PLAINTIFFS' CLEARLY ESTABLISHED RIGHT TO BODILY INTEGRITY UNDER THE FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE, THROUGH 42 U.S.C. § 1983 AGAINST J.P. MORGAN CHASE, WELLS FARGO, AND STIFEL**

224.   Plaintiffs re-allege and incorporate by reference all allegations previously alleged in the Amended Master Long Form Complaint and in this Short Form Complaint as if fully alleged herein.

225.   Plaintiffs have a clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to bodily integrity.

226.   There was a single plan, of which J.P. Morgan Chase, Wells Fargo, and Stifel were conspirators, to finance Flint's participation in the KWA even though it was apparent that raw and untreatable water from the Flint River would be used as an interim water source.

227.   J.P. Morgan Chase, Wells Fargo, and Stifel took an overt action in agreeing to finance the City of Flint's participation in the KWA through the Series 2014A bond sale.

228.   Likewise, several Government Defendants carried out overt acts as a part of the plan. Namely, they engineered and carried out the switch from DWSD water to raw Flint River water.

229.   Because the switch of water sources to the Flint River would have been impossible without J.P. Morgan Chase, Wells Fargo, and Stifel's financing of the City of Flint's entry into the KWA, J.P. Morgan Chase, Wells Fargo, and Stifel's financing of the KWA was a but-for cause and a proximate cause of the switch to the Flint River and of the injuries that directly resulted therefrom.

230.   The conduct of J.P. Morgan Chase, Wells Fargo, and Stifel, acting under color of law, endangered and/or threatened Plaintiffs' fundamental liberty interest to bodily integrity as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

231.   J.P. Morgan Chase, Wells Fargo, and Stifel were all aware that their conduct in underwriting a bond sale to construct a pipeline, which necessarily would entail using raw and untreated Flint River water as an interim water source for Flint, could result in the deprivation of Plaintiffs' fundamental due process rights to bodily integrity.

232.   J.P. Morgan Chase, Wells Fargo, and Stifel deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiffs by providing funding for the transition to the KWA, which necessarily entailed using the corrosive water from the Flint River without an updated and upgraded Flint Water Treatment Plant, with deliberate indifference to the known risks of harm that result from the ongoing exposure to contaminated water to Plaintiffs.

233.   J.P. Morgan Chase, Wells Fargo, and Stifel had the opportunity to reflect and deliberate before they acted and/or failed to act.

234.   As a direct and proximate result of the unconstitutional acts of J.P. Morgan Chase, Wells Fargo, Stifel, and other Defendants, as alleged in the Amended Master Complaint, and this Short Form Complaint, Plaintiffs have suffered violations of their fundamental rights to bodily integrity, property and liberty interest, including but not limited to:

a.   Serious and in some cases life-threatening and irreversible bodily injury;

b.   Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

c.   Pain and suffering;

d.   Embarrassment, outrage, mental anguish, fear and mortification, and stress-related physical symptoms.

235.   J.P. Morgan Chase's conduct was both reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. § 1988.

## COUNT XIV:
## PROFESSIONAL NEGLIGENCE
## AGAINST J.P. MORGAN CHASE, WELLS FARGO, AND STIFEL

236.   Plaintiffs re-allege and incorporate by reference all allegations previously alleged in the Amended Master Long Form Complaint and in this Short Form Complaint as if fully alleged herein.

237.   Pursuant to MSRB Rule G-17, Defendants J.P. Morgan Chase, Wells Fargo, and Stifel had a duty to deal fairly with all persons and not engage in deceptive, dishonest, or unfair practices.

238.   Under the common law, all persons have a duty to avoid causing foreseeable harm to third persons.

239.   An underwriter implicitly represents that there is a reasonable basis for the opinions the underwriter offers, and implicitly represents that the underwritten project will be completed, including all subsidiary actions necessary for the completion of the larger project.

240.   Dealing fairly with all persons requires conducting a reasonable investigation and determining reasonably ascertainable facts.

241.   J.P. Morgan Chase, Wells Fargo, and Stifel all involved themselves in the KWA construction plan in a manner that greatly exceeded the ordinary bond underwriter relationship.

242.   Defendants knew or should have known that the Flint River would be

used as an interim water source in Flint while the transition to the KWA took place.

243.  Defendants knew or should have known that the Flint River was corrosive and presented a serious health hazard to the citizens and water users of Flint.

244.  Defendants knew or should have known that, as an older city, Flint used a significant amount of lead service lines for water.

245.  Defendants knew or should have known that the Flint WTP required millions of dollars of upgrades to be able to function safely.

246.  Defendants knew or should have known that there was no agreed-upon plan in place to upgrade the Flint WTP before corrosive water from the Flint River began to pass through it, which meant that the corrosive Flint River water would be effectively untreated as it passed through lead pipes on its way to Flint's citizens and water users.

247.  Defendants breached their duty by failing to require that the bond issuers—the State of Michigan, Genesee, Lapeer, and Sanilac Counties, and the City of Flint—agree to immediately upgrade the Flint WTP so that it could function safely.

248.  Defendants breached that duty by failing to require that the bond issuers—the State of Michigan, Genesee, Lapeer, and Sanilac Counties, and the

City of Flint—set forth a concrete plan to begin and complete the necessary upgrades to the Flint WTP before corrosive water from the Flint River began to pass through the Flint WTP.

249.   Defendants breached their duty by failing to disclose that there was no funding mechanism in place to pay for the upgrades necessary for the Flint WTP to function safely.

250.   Defendants breached that duty by failing to disclose that there was in fact no plan to begin or complete the necessary upgrades to the Flint WTP before corrosive water from the Flint River began to pass through the Flint WTP.

251.   It was readily foreseeable that severe injuries and other harm would result from financing a significant municipal project that would expose Flint's citizens and water users to untreated corrosive water, which would pass through lead service lines, for multiple years.

252.   J.P. Morgan Chase, Wells Fargo, and Stifel therefore breached their duty to avoid causing foreseeable harm to third persons.

253.   As a direct and proximate result of the negligence of J.P. Morgan Chase, Wells Fargo, and Stifel, as alleged in the Amended Master Complaint, and this Short Form Complaint, Plaintiffs have suffered serious injuries, including but not limited to:

    a.   Serious and in some cases life-threatening and irreversible bodily injury;

b.    Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

c.    Pain and suffering;

d.    Embarrassment, outrage, mental anguish, fear and mortification, and stress-related physical symptoms.

254.    Plaintiffs are therefore entitled to damages.

255.    J.P. Morgan Chase, Wells Fargo, and Stifel were reckless and grossly negligent, entitling Plaintiffs to award of exemplary damages.

## **RELIEF REQUESTED**

256.    Plaintiffs demand judgment against J.P. Morgan Chase, Wells Fargo, and Stifel for:

a.    Compensatory damages;
b.    Punitive Damages;
c.    Exemplary Damages;
d.    Equitable relief;
e.    Declaratory judgment;
f.    Pre-judgment and post-judgment interest;
g.    Attorneys' fees and litigation expenses; and
h.    Any other relief the Court deems appropriate.

Dated: October 7, 2020

Respectfully submitted,

**LEVY KONIGSBERG LLP**

/s/ Corey M. Stern
Corey M. Stern
Renner K. Walker
800 Third Ave., 11th Fl.
New York, New York 10022
(212) 605-6200

cstern@levylaw.com
rwalker@levylaw.com

*Attorneys for the Plaintiffs*

Exhibit 1 to Exhibit B

NEW ISSUE **Rating:** See "RATING" herein
Book-Entry-Only

*In the opinion of Miller, Canfield, Paddock and Stone, P.L.C., Bond Counsel, under existing law, assuming compliance with certain covenants by the Issuer, the interest on the Bonds is excludable from gross income for federal income tax purposes and the Bonds and the interest thereon are exempt from all taxation by the State of Michigan or by any taxing authority within the State of Michigan, except inheritance and estate taxes and taxes on gains realized from the sale, payment or other disposition thereof. See "TAX MATTERS" and "FORM OF APPROVING OPINION" herein for a description of certain provisions of the Internal Revenue Code of 1986, as amended (the "Code"), which may affect the tax treatment of interest on the Bonds for certain Bondholders.*



### KAREGNONDI WATER AUTHORITY
### COUNTIES OF GENESEE, LAPEER AND SANILAC
### STATE OF MICHIGAN

### $220,500,000
### WATER SUPPLY SYSTEM BONDS
### (KAREGNONDI WATER PIPELINE), SERIES 2014A

**Dated: Date of Delivery** **Principal Due: November 1, as shown on Inside Cover Page**

The Water Supply System Bonds (Karegnondi Water Pipeline), Series 2014A (the "Bonds") are issued under the provisions of Act 233, Public Acts of Michigan, 1955, as amended, and a resolution adopted by the Board of Trustees of the Karegnondi Water Authority, Counties of Genesee, Lapeer and Sanilac, State of Michigan (the "Issuer") on November 20, 2013. The Bonds are being issued for the purpose of paying a portion of the cost of acquiring and constructing the Issuer's Water Supply System (the "System") to serve initially the City of Flint and the County of Genesee (individually a "Local Unit" and collectively, the "Local Units"), funding a debt service reserve account, paying capitalized interest and paying the costs of issuing the Bonds. The Bonds are to be issued in anticipation of, and are payable primarily as to principal and interest from, payments (the "Contractual Payments") to be made by the Local Units to the Issuer pursuant to a Contract among the Issuer and the Local Units dated as of August 1, 2013 (the "Contract"). The Contractual Payments will be in installments that will equal the principal and interest payments on the Bonds. Further, each Local Unit has pledged its limited tax full faith and credit for the payment of its Contractual Payments and is obligated, to the extent necessary, as a first budget obligation to levy ad valorem taxes on all taxable property within its boundaries for such purpose, subject to applicable constitutional, statutory and charter tax limitations. Each Local Unit is expected to make its Contractual Payments from revenues collected from charges imposed on the customers of its respective water supply system. The County of Genesee in the Contract has pledged to make all payments that the City of Flint fails to make to the Issuer under the Contract. The Issuer has irrevocably pledged the Contractual Payments for the payment of the principal of and interest on the Bonds.

The Bonds are issuable only as fully registered Bonds without coupons, and when issued, will be registered in the name of Cede & Co., as Bondholder and nominee for The Depository Trust Company ("DTC"), New York, New York. DTC will act as securities depository for the Bonds. Purchases of beneficial interests in the Bonds will be made in book-entry only form, in the denominations of $5,000 or any integral multiple thereof. Purchasers will not receive certificates representing their beneficial interest in Bonds purchased. So long as Cede & Co. is the Bondholder, as nominee of DTC, references herein to the Bondholders or registered owners shall mean Cede & Co., as aforesaid, and shall not mean the Beneficial Owners of the Bonds. See *BOOK-ENTRY ONLY SYSTEM* herein.

Interest on the Bonds will be payable semiannually on May 1 and November 1 of each year commencing on November 1, 2014. The Bonds will be registered Bonds, of the denomination of $5,000 or multiples thereof not exceeding for each maturity the principal amount of such maturity. The principal and interest shall be payable at the corporate trust office of The Huntington National Bank, Grand Rapids, Michigan or such other transfer agent as the Issuer may hereafter designate by notice mailed to the registered owner not less than sixty (60) days prior to any change in interest payment date (the "Transfer Agent"). Interest shall be paid when due by check mailed to the registered owner as shown by the registration books as of the fifteenth day of the month preceding the payment date for each interest payment. Payment of principal and interest to Beneficial Owners shall be made as described in *BOOK-ENTRY ONLY SYSTEM* herein.

The Bonds are subject to redemption at par, as described herein.

The Bonds are offered when, as and if issued by the Issuer and subject to receipt of the approving opinion of Miller, Canfield, Paddock and Stone, P.L.C., Detroit, Michigan, Bond Counsel. Certain legal matters will be passed upon for the Underwriters by their counsel, Dickinson Wright PLLC, Troy and Lansing, Michigan. It is expected that delivery of the Bonds through DTC will be made in New York, New York on or about April 16, 2014.

THIS COVER PAGE CONTAINS CERTAIN INFORMATION FOR QUICK REFERENCE ONLY. IT IS NOT A SUMMARY OF THIS ISSUE. INVESTORS MUST READ THE ENTIRE OFFICIAL STATEMENT TO OBTAIN INFORMATION ESSENTIAL TO THE MAKING OF AN INFORMED INVESTMENT.

### J.P. Morgan

**Wells Fargo Securities** **Stifel, Nicolaus & Company, Incorporated**

Dated: April 1, 2014

**MATURITY SCHEDULE**

**WATER SUPPLY SYSTEM BONDS (KAREGNONDI WATER PIPELINE), SERIES 2014A**

**SERIAL BONDS**
**(Base CUSIP§: 48563U)**

| Year | Amount | Interest Rate | Yield | CUSIP§ | Year | Amount | Interest Rate | Yield | CUSIP§ |
|---|---|---|---|---|---|---|---|---|---|
| 2017 | $2,000,000 | 3.000% | 1.460% | AA9 | 2024 | $5,595,000 | 5.000% | 3.660%* | AY7 |
| 2017 | $2,105,000 | 5.000% | 1.460% | AR2 | 2025 | $5,875,000 | 5.000% | 3.820%* | AZ4 |
| 2018 | $1,300,000 | 4.000% | 1.870% | AB7 | 2026 | $6,165,000 | 5.000% | 3.940%* | BA8 |
| 2018 | $2,975,000 | 5.000% | 1.870% | AS0 | 2027 | $6,475,000 | 5.250% | 4.050%* | AF8 |
| 2019 | $2,000,000 | 3.000% | 2.320% | AC5 | 2028 | $6,815,000 | 5.250% | 4.110%* | AG6 |
| 2019 | $2,475,000 | 5.000% | 2.320% | AT8 | 2029 | $7,175,000 | 5.250% | 4.200%* | AH4 |
| 2020 | $2,000,000 | 4.000% | 2.780% | AD3 | 2030 | $7,550,000 | 5.250% | 4.290%* | AJ0 |
| 2020 | $2,655,000 | 5.000% | 2.780% | AU5 | 2031 | $7,945,000 | 5.250% | 4.380%* | AK7 |
| 2021 | $2,000,000 | 3.000% | 3.050% | AE1 | 2032 | $8,365,000 | 5.250% | 4.450%* | AL5 |
| 2021 | $2,870,000 | 5.000% | 3.050% | AV3 | 2033 | $8,800,000 | 4.500% | 4.670% | AM3 |
| 2022 | $5,075,000 | 5.000% | 3.310% | AW1 | 2034 | $9,200,000 | 5.250% | 4.570%* | AN1 |
| 2023 | $5,325,000 | 5.000% | 3.490% | AX9 | 2035 | $9,680,000 | 5.250% | 4.620%* | AP6 |

**TERM BONDS**

| Year | Amount | Interest Rate | Yield | CUSIP§ |
|---|---|---|---|---|
| 2040 | $56,590,000 | 5.250% | 4.740%* | BB6 |
| 2043 | $41,490,000 | 5.000% | 4.890%* | AQ4 |

*Yield to the November 1, 2023 first call date

§ Registered trademark of American Bankers Association.  CUSIP numbers are provided by Standard & Poor's, CUSIP Service Bureau, a division of The McGraw-Hill Companies, Inc. The CUSIP numbers listed above are being provided solely for the convenience of Bondholders only at the time of issuance of the Bonds and the Issuer does not make any representation with respect to such number or undertake any responsibility for its accuracy now or at any time in the future.  The CUSIP number for a specific maturity is subject to being changed after the issuance of the Bonds as a result of various subsequent actions including, but not limited to, a refunding in whole or in part of such maturity.

# KAREGNONDI WATER AUTHORITY
G-4610 Beecher Road
Flint, Michigan 48532-2617
(810) 732-7870
Fax: (810) 732-9773

## BOARD OF TRUSTEES
*Dayne Walling, Chairperson*
*Greg Alexander, Vice Chairperson*
*Jamie Curtis*
*Joshua Freeman*
*Larry Green*
*Richard E. Hammel*
*Ted Henry*
*Marilyn Hoffman*
*Dale Kerbyson*
*Steve Landaal*
*Sheldon Neely*
*Joseph Suma*
*Thomas Svrcek*
*Tracey Tucker*
*Paula Zelenko*

## CHIEF EXECUTIVE OFFICER
*Jeffrey Wright*

## PROFESSIONAL SERVICES

**TRANSFER AGENT** ..............................................*The Huntington National Bank*

**BOND COUNSEL** ..............................*Miller, Canfield, Paddock and Stone, P.L.C.*

**FINANCIAL ADVISOR** ..........................*Stauder, BARCH & ASSOCIATES, Inc.*

iii

No dealer, broker, salesman or other person has been authorized by the Issuer to give any information or to make any representations, other than those contained in this Official Statement, and, if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information set forth in this Official Statement has been obtained from the Issuer, the County of Genesee, the City of Flint and other sources which are believed to be reliable, including The Depository Trust Company with respect to the information contained under the heading BOOK-ENTRY ONLY SYSTEM, but is not guaranteed as to accuracy or completeness by, and is not to be construed as a representation by, the Issuer. The information and expressions of opinion in this Official Statement are subject to change without notice, and neither the delivery of this Official Statement nor any sale made under this Official Statement shall, under any circumstances, create any implication that there has been no change in the affairs of the parties referred to above or that the other information or opinions are correct as of any time subsequent to the date of this Official Statement. The Transfer Agent has not participated in the preparation of this Official Statement and assumes no responsibility for it.

The Underwriters have provided the following sentence for inclusion in this Official Statement.  The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

**IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY ISSUER. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVER-ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF THE BONDS AT A LEVEL ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.**

———————————

This Official Statement contains forward-looking statements, which can be identified by the use of the future tense or other forward-looking terms such as "may," "intend," "will," "expect," "anticipate," "plan," "management believes," "estimate," "continue," "should," "strategy," or "position" or the negatives of those terms or other variations of them or by comparable terminology. In particular, any statements express or implied, concerning future receipts of federal grants or the ability to generate cash flow to service indebtedness are forward-looking statements.  Investors are cautioned that reliance on any of those forward-looking statements involves risks and uncertainties and that, although the Issuer's management believes that the assumptions on which those forward-looking statements are based are reasonable, any of those assumptions could prove to be inaccurate.  As a result, the forward-looking statements based on those assumptions also could be incorrect, and actual results may differ materially from any results indicated or suggested by those assumptions.  In light of these and other uncertainties, the inclusion of a forward-looking statement in this Official Statement should not be regarded as a representation by the Issuer or that its plans and objectives will be achieved.  All forward-looking statements are expressly qualified by the cautionary statements contained in this paragraph.  The Issuer undertakes no duty to update any forward-looking statements.

# TABLE OF CONTENTS

PURPOSE ............................................................................................................................. 1

SECURITY ............................................................................................................................ 2
    Contractual Payments ....................................................................................................... 2
    Debt Service Reserve Account .......................................................................................... 2

ESTIMATED SOURCES AND USES OF FUNDS ............................................................... 3

THE BONDS ......................................................................................................................... 4

PRIOR REDEMPTION OF BONDS .................................................................................... 4
    Optional Redemption ........................................................................................................ 4
    Mandatory Redemption of Term Bonds ........................................................................... 4

DEBT SERVICE SCHEDULE .............................................................................................. 6

KAREGNONDI WATER AUTHORITY SYSTEM ............................................................... 6
    The System ....................................................................................................................... 7
    Interim Water Supply Arrangements for Genesee and Flint ............................................. 10
    Related Facilities .............................................................................................................. 11

REPORT OF THE ENGINEERING CONSULTANT .............................................................. 12

BONDHOLDERS' RISKS ....................................................................................................... 13
    Assumptions With Regard to Local Unit Revenues .......................................................... 13
    Inability to Finance the System; System Completion Risk ............................................... 13
    Financial Condition of the City of Flint and Genesee for future Obligations to Issuer ......... 15

LITIGATION ......................................................................................................................... 16
    Pending Litigation ............................................................................................................ 16
    Other Litigation ............................................................................................................... 16

TAX MATTERS ..................................................................................................................... 18
    Tax Treatment of Accruals on Original Issue Discount Bonds .......................................... 19
    Amortizable Bond Premium ............................................................................................. 19
    Market Discount ............................................................................................................... 20
    Information Reporting and Backup Withholding ............................................................... 20
    Future Developments ........................................................................................................ 20

APPROVAL BY THE MICHIGAN DEPARTMENT OF TREASURY ................................... 21

BOND COUNSEL'S RESPONSIBILITY .............................................................................. 21

CONTINUING DISCLOSURE .............................................................................................. 21

LEGAL OPINION .................................................................................................... 22

FINANCIAL ADVISOR ........................................................................................... 23

UNDERWRITING ................................................................................................... 23

RATING .................................................................................................................. 24

OTHER MATTERS ................................................................................................. 25


APPENDIX A    County of Genesee - General Financial,  Economic and
              Statistical Information ............................................................................. A-1
APPENDIX B    County of Genesee – Audited Financial Statements .................................... B-1
APPENDIX C    City of Flint – General Financial, Economic and
              Statistical Information  .......................................................................... C-1
APPENDIX D    City of Flint – Audited Financial Statements .............................................. D-1
APPENDIX E    Form of Continuing Disclosure Undertakings ............................................. E-1
APPENDIX F    Form of Approving Opinion ........................................................................ F-1
APPENDIX G    Book-Entry-Only System ........................................................................... G-1
APPENDIX H    Contract ..................................................................................................... H-1
APPENDIX I    Report of the Engineering Consultant .......................................................... I-1

**OFFICIAL STATEMENT**

**KAREGNONDI WATER AUTHORITY**
**COUNTIES OF GENESEE, LAPEER AND SANILAC**
**STATE OF MICHIGAN**
**$220,500,000**
**WATER SUPPLY SYSTEM BONDS**
**(KAREGNONDI WATER PIPELINE)**
**SERIES 2014A**

The purpose of this Official Statement, which includes the cover page and Appendices, is to furnish information in connection with the issuance and sale by the Karegnondi Water Authority, Counties of Genesee, Lapeer and Sanilac, State of Michigan (the "Issuer") of its Water Supply System Bonds (Karegnondi Water Pipeline), Series 2014A (the "Bonds") in the aggregate principal amount of $220,500,000.

**PURPOSE**

The Bonds are issued under the provisions of Act 233, Public Acts of Michigan, 1955, as amended ("Act 233"), and a resolution authorizing the issuance of the Bonds (the "Resolution") adopted by the Board of Trustees of the Issuer on November 20, 2013.  The Bonds are being issued for the purpose of paying a portion of the cost of acquiring and constructing the Issuer's Water Supply System (the "System") that is being established for the purpose of supplying raw water to its member communities, funding the Debt Service Reserve Account as hereinafter described, paying capitalized interest on the Bonds and paying the costs of issuing the Bonds. The Issuer was incorporated in October, 2010 pursuant to Act 233 by the County of Genesee ("Genesee"), the County of Lapeer, the County of Sanilac, the City of Flint ("Flint") and the City of Lapeer for the purpose of providing its member communities with a new source of water. Although the Issuer was incorporated in 2010, planning and design for the System in its present configuration began in 2001.

The System is expected ultimately to supply raw water for the three county area consisting of over 2,232 square miles and a population of over one half million residents, but the System will initially provide raw water to Genesee and Flint (individually a "Local Unit" and collectively, the "Local Units").  Currently, Genesee and Flint receive finished water from the City of Detroit, through its Detroit Water and Sewerage Department ("DWSD"), but Flint expects that it will no longer receive water from DWSD after April 17, 2014 and as a result, Genesee is pursuing a separate contract for an interim water supply from DWSD.  Genesee and Flint participated in the establishment of the Issuer in order to have a more reliable supply of water at rates that they expect ultimately to be less than what would otherwise be payable to DWSD.  For a description of the proposed System and the interim arrangements for water supply for Genesee and Flint until the System is completed and operational, see the heading KAREGNONDI WATER AUTHORITY SYSTEM herein.

1

## SECURITY

*Contractual Payments*

      The Bonds are being issued in anticipation of, and are payable primarily as to principal and interest from, payments (the "Contractual Payments") to be made by the Local Units to the Issuer pursuant to the Karegnondi Water Authority Financing Contract among the Issuer and the Local Units dated as of August 1, 2013 (the "Contract"). The Contractual Payments will be in installments that will equal the principal and interest payments on the Bonds. Further, each Local Unit has pledged its limited tax full faith and credit for the payment of its Contractual Payments and is obligated, to the extent necessary, as a first budget obligation to levy ad valorem taxes on all taxable property within its boundaries for such purpose, subject to applicable constitutional, statutory and charter tax limitations as to rate and amount. After credit is given to Genesee for payment of the principal of and interest on the Genesee Bonds (as described under the heading KAREGNONDI WATER AUTHORITY – The System below), Genesee is responsible for paying approximately 66% of the principal of and interest due on the Bonds, and Flint is responsible for paying approximately 34% of the principal of and interest on the Bonds. In addition, pursuant to the Contract, if Flint fails to make any of its Contractual Payments when due, Genesee is obligated under the Contract to make such Contractual Payments within one day of being notified of Flint's failure to pay. Further, the Issuer is obligated under the Contract to undertake all legal action and make use of all remedies available under the Contract to enforce the payment obligations of Flint under the Contract.

      Each Local Unit expects to make its Contractual Payments from revenues collected from charges imposed on the customers of its respective water supply system. The water supply system of Genesee is hereinafter referred to as the "Genesee System" and the water supply system of Flint in hereinafter referred to as the "Flint System." The Issuer has irrevocably pledged the Contractual Payments for the payment of the principal of and interest on the Bonds. See The Report of the Engineering Consultant in APPENDIX I for a description of the Genesee System and the Flint System.

      The rights or remedies of bondholders may be affected by bankruptcy, insolvency, fraudulent conveyance or other laws affecting creditors' rights generally, now existing or hereafter enacted, and by the application of general principles of equity, including those relating to equitable subordination.

      A copy of the Contract is included as APPENDIX H. For additional information on Genesee, see APPENDIX A and APPENDIX B hereto, and for additional information on Flint, see APPENDIX C and APPENDIX D hereto.

*Debt Service Reserve Account*

      Pursuant to the Resolution, the Issuer has established a Debt Retirement Fund, and within the Debt Retirement Fund has established a Debt Service Reserve Account. All Contractual Payments as received are required to be deposited in the Debt Retirement Fund and used to pay the principal of and interest on the Bonds. The Debt Service Reserve Account will be funded from the proceeds of the Bonds in an amount equal to $15,237,437.50, which is equal to the lesser of (1) maximum annual principal and interest requirements during any calendar year on the

Bonds then outstanding, (2) ten percent (10%) of the original principal amount of the Bonds, and (3) one hundred twenty-five percent (125%) of the average annual principal and interest requirements during any calendar year on the Bonds then outstanding (the "Reserve Account Requirement"). Moneys in the Debt Service Reserve Account shall be used solely for the payment of the principal of and interest on the Bonds when due whenever and to the extent that the Contractual Payments being held by the Issuer shall be insufficient for such purposes.

There shall be credited to the Debt Service Reserve Account beginning on the first day of the month following any month in which the amount in the Debt Service Reserve Account shall be less than an amount equal to the Reserve Account Requirement as a result of the failure of a Local Unit to pay its Contractual Payments, and continuing on the first day of each month thereafter, an amount equal to one-thirty-sixth (1/36) of any deficit therein, until the amount on deposit is equal to the Reserve Account Requirement; however, if the amount on deposit in the Debt Service Reserve Account is less than 100% of the Reserve Account Requirement as a result of investment losses with respect to the Debt Service Reserve Account, commencing on the first day of the month following such evaluation, and continuing on the first day of each month thereafter, an amount equal to one-fourth (1/4) of the amount necessary to restore the Debt Service Reserve Account to 100% of the Reserve Account Requirement, unless and until the amount on deposit in the Debt Service Reserve Account shall equal 100% of the Reserve Account Requirement. Further, if a Local Unit fails to pay its Contractual Payment causing a shortfall and the Debt Service Reserve Account is drawn upon to pay the Bonds, the replenishment of such Debt Service Reserve Account shall be an obligation of the Local Unit that failed to pay such Contractual Payment, in the manner described in the preceding sentence; provided, however, if Flint fails to fulfill its obligation to replenish the Debt Service Reserve Account, as with the failure to make Contractual Payments under the Contract, Genesee has agreed in the Contract to make such payments.

## ESTIMATED SOURCES AND USES OF FUNDS

*Sources of Funds*

| | |
|---|---|
| Par amount of Bonds | $220,500,000.00 |
| Net Original Issue Premium | 11,815,544.05 |
| Total Sources | $232,315,544.05 |

*Use of Funds*

| | |
|---|---|
| Deposit to Construction Fund | $187,137,367.59 |
| Capitalized Interest | 28,282,364.06 |
| Deposit to Debt Service Reserve Account | 15,237,437.50 |
| Costs of Issuance | 712,000.00 |
| Underwriters' Discount | 946,374.90 |
| Total Uses | $232,315,544.05 |

3

## THE BONDS

The Bonds will be dated the date of delivery thereof, will bear interest from the date of delivery at the rates and will mature in the amounts and on the dates set forth on the inside cover page of this Official Statement and will be subject to redemption prior to maturity as described below.  Interest on the Bonds will be payable semiannually on May 1 and November 1 of each year commencing on November 1, 2014.  Interest on the Bonds shall be computed using a 360-day year and twelve 30-day months.

The Bonds will be issued as fully registered Bonds as described in APPENDIX G, BOOK-ENTRY-ONLY SYSTEM.  Subject to the provisions for the book-entry system, the principal of and any redemption premium on the Bonds will be payable upon surrender thereof at the designated office of the Transfer Agent, and interest will be payable by check or draft mailed by the Transfer Agent to the registered owners of the Bonds as shown on the registration books of the Issuer maintained by the Transfer Agent as of the close of business on the fifteenth day of the calendar month preceding the month in which the interest payment is due.  The Transfer Agent also may pay interest on Bonds by wire transfer or such other method as is acceptable to the Transfer Agent and the Bondholder to whom payment is being made.

## PRIOR REDEMPTION OF BONDS

### *Optional Redemption*

Bonds maturing in the years 2017 to 2023, inclusive, shall not be subject to redemption prior to maturity.  Bonds or portions of Bonds in multiples of $5,000 maturing in the year 2024 and thereafter shall be subject to redemption prior to maturity, at the option of the Issuer, in any order of maturity and by lot within any maturity, on any date on or after November 1, 2023, at par and accrued interest to the date fixed for redemption.

### *Mandatory Redemption of Term Bonds*

The Bonds maturing in the years 2040 and 2043 (the "Term Bonds") shall be subject to annual mandatory redemption on November 1 of the following years and in the following amounts, at par, plus accrued interest to the date of mandatory redemption.

Term Bonds due November 1, 2040

| Redemption Dates | Principal Amounts |
|---|---|
| November 1, 2036 | $10,190,000 |
| November 1, 2037 | $10,725,000 |
| November 1, 2038 | $11,290,000 |
| November 1, 2039 | $11,880,000 |
| November 1, 2040 (Maturity) | $12,505,000 |
| TOTAL | $56,590,000 |

4

Term Bonds due November 1, 2043

| Redemption Dates | Principal Amounts |
|---|---|
| November 1, 2041 | $13,160,000 |
| November 1, 2042 | $13,820,000 |
| November 1, 2043 (Maturity) | $14,510,000 |
| TOTAL | $41,490,000 |

When Term Bonds are purchased by the Issuer and delivered to the Transfer Agent for cancellation or are redeemed in a manner other than by mandatory redemption, the principal amount of Term Bonds affected shall be reduced by the principal amount of the Term Bonds so purchased or redeemed in the order determined by the Issuer.

In case less than the full amount of an outstanding Bond is called for redemption, the Transfer Agent, upon presentation of the Bond called for redemption, shall register, authenticate and deliver to the registered owner of record a new Bond in the principal amount of the portion of the original Bond not called for redemption.

Notice of redemption shall be given to the registered owner of any Bond or portion thereof called for redemption by mailing of such notice not less than thirty (30) days prior to the date fixed for redemption to the registered address of the registered owner of record.  A Bond or portion thereof so called for redemption shall not bear interest after the date fixed for redemption, whether presented for redemption or not, provided funds are on hand with the Transfer Agent to redeem said Bond or portion thereof.

[The remainder of this page intentionally left blank]

## DEBT SERVICE SCHEDULE

The following schedule sets forth the principal and interest payable with respect to the Bonds.

| Fiscal Year Ended 12/31 | Principal | Interest | Total P&I |
|---|---|---|---|
| 2014 | | $6,027,389* | $6,027,389 |
| 2015 | | 11,127,488* | 11,127,488 |
| 2016 | | 11,127,488* | 11,127,488 |
| 2017 | $4,105,000 | 11,127,488 | 15,232,488 |
| 2018 | 4,275,000 | 10,962,238 | 15,237,238 |
| 2019 | 4,475,000 | 10,761,488 | 15,236,488 |
| 2020 | 4,655,000 | 10,577,738 | 15,232,738 |
| 2021 | 4,870,000 | 10,364,988 | 15,234,988 |
| 2022 | 5,075,000 | 10,161,488 | 15,236,488 |
| 2023 | 5,325,000 | 9,907,738 | 15,232,738 |
| 2024 | 5,595,000 | 9,641,488 | 15,236,488 |
| 2025 | 5,875,000 | 9,361,738 | 15,236,738 |
| 2026 | 6,165,000 | 9,067,988 | 15,232,988 |
| 2027 | 6,475,000 | 8,759,738 | 15,234,738 |
| 2028 | 6,815,000 | 8,419,800 | 15,234,800 |
| 2029 | 7,175,000 | 8,062,013 | 15,237,013 |
| 2030 | 7,550,000 | 7,685,325 | 15,235,325 |
| 2031 | 7,945,000 | 7,288,950 | 15,233,950 |
| 2032 | 8,365,000 | 6,871,838 | 15,236,838 |
| 2033 | 8,800,000 | 6,432,675 | 15,232,675 |
| 2034 | 9,200,000 | 6,036,675 | 15,236,675 |
| 2035 | 9,680,000 | 5,553,675 | 15,233,675 |
| 2036 | 10,190,000 | 5,045,475 | 15,235,475 |
| 2037 | 10,725,000 | 4,510,500 | 15,235,500 |
| 2038 | 11,290,000 | 3,947,438 | 15,237,438 |
| 2039 | 11,880,000 | 3,354,713 | 15,234,713 |
| 2040 | 12,505,000 | 2,731,013 | 15,236,013 |
| 2041 | 13,160,000 | 2,074,500 | 15,234,500 |
| 2042 | 13,820,000 | 1,416,500 | 15,236,500 |
| 2043 | 14,510,000 | 725,500 | 15,235,500 |
| TOTAL | $220,500,000 | $219,133,064 | $439,633,064 |

*Capitalized interest; paid from Bond proceeds.

## KAREGNONDI WATER AUTHORITY SYSTEM

The Issuer is expected ultimately to supply raw water for the three county area (Genesee, Lapeer and Sanilac) consisting of over 2,232 square miles and a population of over one half million residents.   The Issuer will supply metered, untreated water to each contracting member. The actual cost for appurtenances and maintenance of the System will be allocated based on water sold and each contracting member will be responsible for its proportional share of the cost. Each contracting member will be responsible for treating and distributing treated water to its individual customers.

6

The Issuer currently has entered into two water purchase contracts (the "Water Purchase Contracts"), effective October 1, 2013: one with Flint to supply up to 18 mgd and one with the Genesee County Drain Commissioner, as County Agency of Genesee under Act 342, Public Acts of Michigan, 1939, as amended (the "County Agency"), on behalf of Genesee, to supply 42 mgd. The charges to be paid by Flint and the County Agency in the Water Purchase Contracts are broken down into two distinct portions: an annual fixed or capital fee and an annual commodity or operations and maintenance fee. Flint and the County Agency expect to pay such charges from the revenues of their respective water supply systems as an operation and maintenance expense in the same manner that each presently pays for water furnished by DWSD.

The size of the System is based on the volume identified in the Water Purchase Contracts and any additional water purchase contracts entered into with additional parties, up to a maximum of 85 mgd, the Issuer's permit limit. Each contracting party will be responsible for the annual fixed fee regardless of the amount of water taken. The other members of the Issuer had until October 16, 2013 to enter into a water purchase contract with the Issuer at the same rates set forth in the Water Purchase Contracts. No additional water purchase contracts were entered into on or before such date and as a result, members entering into water purchase contracts with the Issuer subsequent to such date will pay any incremental costs associated with accommodating their water purchase contracts.

### The System

To supply water to its contracting members, the Issuer will be required to construct a lake intake on Lake Huron, approximately 63 miles of pipe from the intake plant to the City of Flint and 2 pump stations, one of which will be located near the intake facility. Such facilities collectively constitute the System. The engineering design of the System is to withdraw water from Lake Huron and pump it to a standpipe in Lynn Township in St. Clair County, and from there the water will be pumped to a site in Oregon Township in Lapeer County, approximately 14 miles east of Flint, which site will contain a 150 million gallon earthen reservoir and Genesee's new water treatment plant (discussed below). The reservoir and new treatment plant will be owned by Genesee. Raw water flowing to the site in Oregon Township will be directed to Flint's water treatment plant and to Genesee's water treatment plant and reservoir. Figure 1 shows the location of the System facilities, the Flint water treatment plant and the proposed Genesee treatment plant and reservoir.

[The remainder of this page intentionally left blank]

Figure 1



Source: www.karegnondi.com



Source: Water and Waste Advisory Board Meeting Slide Show – April 10, 2013; Genesee County

The intake facility and the site therefor (the "Genesee Project") were financed through the issuance of bonds by Genesee in the principal amount of $35,000,000 in October, 2013 (the "Genesee Bonds"), with the understanding that Genesee would make the Genesee Project available to the Issuer for use by the Issuer as part of the System. Genesee is solely responsible for paying the principal of and interest on the Genesee Bonds from the net revenues derived from the users of the Genesee System and Genesee has pledged its limited tax full faith and credit as additional security for the Genesee Bonds. The lake intake is currently under construction, the County Agency having supervised the design of the facility and the receipt and award of construction bids for the facility. The lake intake is expected to be completed in October, 2014.

The Issuer has retained the services of the County Agency to administer the design and construction of the System. In addition, it is expected that the Issuer will also contract with the County Agency for operation and maintenance of the System after the System is completed and fully operational. The County Agency has significant experience in planning, operating and managing wastewater systems, having been responsible for planning, operating and managing the Genesee System since 1972. The County Agency currently employs approximately 128 people in connection with the operation and management of the Genesee System, and it is

8

expected that from this group, 5 full time equivalent employees will be involved in the operation and maintenance of the System.  The Issuer is not expected to have any full time employees.

On behalf of the Issuer, the County Agency has acquired 40 acres of land with 100 feet of frontage on Lake Huron in Sanilac County for the intake plant and pump station and 40 acres of land on the northwest corner of Martin Road and Hull Road in Lynn Township in St. Clair County for the standpipe and second pump station.  The County Agency has also acquired approximately 76 acres of land on the northeast corner of Marathon Road and Stanley Road in Oregon Township in Lapeer County to serve as the site for Genesee's new water treatment plant and reservoir.

In anticipation of the construction of the System, the County Agency has obtained a permit from the Michigan Department of Environmental Quality ("MDEQ") authorizing the withdrawal of up to 85 million gallons per day ("mgd") from Lake Huron.  Such permit will not need to be renewed at any time while the Bonds are outstanding.  In addition, the County Agency has hired project managers which have to date secured the route of the pipe line, identified all environmental issues and prepared preliminary permits for the entire 63-mile route, and also has retained consulting firms to complete the design of the remaining System facilities.

The County Agency has commissioned the design of the two pump stations and 63 miles of pipeline (36" to 66" in size).  The design and construction is broken up into seven individual projects.  They are as follows:

Lake Huron Pump Station
12 miles of 66-inch transmission main
12 miles of 66-inch transmission main
Intermediate Pump Station and Standpipe
12 miles of 60-inch transmission main
13 miles of 60-inch transmission main
14 miles of 36-inch transmission main

Since the contractor needs 15 months of good weather to complete each pipeline project, the pipeline projects were broken down into projects for a construction period of 15 months each. The design of the pipelines is 60 percent complete.  The pipelines will be bid in a staggered format beginning in April, 2014 through September, 2014.  Each contract will be awarded within two months of bid opening.  Final pipeline contracts will be awarded no later than November, 2014, and with a 15-month construction period, the final pipeline is expected to be completed on or before March, 2016.

The System facilities call for 63 miles of large diameter piping, and the Issuer recognized that with limited capacity in the United States to produce the needed materials within the necessary time frame for construction, alternative methods of procurement would be required.  In 2013, the Issuer Authority requested proposals for large diameter piping and valves, and in October, 2013, the Issuer entered into a contract with American Cast Iron Pipe Company (ACIPCO) for the delivery of all 66-inch diameter, 60-inch diameter, and 36-inch diameter pipe. In addition, ACIPCO will provide all large diameter valves for the pipeline and pump station yard piping and valves.

9

The Issuer has acquired all lands and easements necessary for construction of the System. In January 2014, MDEQ held four public hearings with regard to the Issuer's wetland crossing permit.  MDEQ has participated in the 30 percent, 60 percent and 90 percent reviews of the design, and its comments have been incorporated.  Upon 100% design completion of each pipeline project, the Issuer will submit an application to MDEQ for its construction permit for such project.  In addition, the Issuer will submit for its local permits from the local road commissions and soil erosion enforcement agencies. The Issuer expects to receive all such permits for the construction of the System in time to complete the System as anticipated.

The design of the two pump stations is 90 percent complete.  Final site plans have been submitted to the local municipalities, and bids for the pump stations are expected to be received in April, 2014, with the contracts to be awarded no later than June, 2014.  There is a 22-month construction schedule for the pump stations, and they are expected to be completed and in operation on or before May, 2016.

Based upon the foregoing, the System is expected to be available for service no later than May 1, 2016.  Each contract for construction has a completion date of at least 30-days prior to May 1, 2016 and a liquidated damage clause for failure to complete on a timely basis.  Each contract identifies substantial completion (operation of the pipeline) and final completion (pipeline, clean-up, and paperwork).  The County Agency can begin operation of the pipeline on behalf of the Issuer after substantial completion but prior to final completion.

The estimated construction costs for the System, including the lake intake and site financed by Genesee, are $268,844,053 based on water purchase contracts of 60 mgd.  The Issuer and the Local Units have entered into the Contract, whereby the Issuer has agreed to issue the Bonds and other bonds of the Issuer, in an aggregate amount not to exceed $300,000,000 (collectively, the "System Bonds"), to finance the remaining facilities for the System in anticipation of the Contractual Payments to be made by the Local Units as provided therein.  The estimated construction costs of the remaining facilities for the System is $233,725,381, and the amount of System Bonds to be issued to finance the costs of the remaining System facilities, including capitalized interest, amounts to fund the Debt Service Reserve Account, and issuance costs, is estimated to be $300,000,000.  The Contract is contemplated in the Water Purchase Contracts and sets forth the manner in which the capital costs of the System facilities will be allocated.  Under the Contract, Flint and Genesee are responsible for paying 34.2% and 65.8%, respectively, of the debt service on the System Bonds.  This allocation takes into account and credits Genesee for financing and being responsible for the payment of 100% of the costs of the Genesee Project.  In addition, in the event and to the extent that Flint fails to pay its share of the debt service on the System Bonds, Genesee will be responsible for making up the shortfall.  Flint and Genesee each expects to make such payments from the revenues to be derived from the customers of the Genesee System and the Flint System, respectively, but each has pledged its limited tax full faith and credit to the making of such payments.

### Interim Water Supply Arrangements for Genesee and Flint

Flint has purchased treated water from DWSD for approximately 30 years. The County Agency has a contract with Flint that requires Flint to purchase water from DWSD and provide that water to the County Agency.  Historically, the County Agency has not had a contract directly with DWSD.

10

On April 17, 2013, DWSD notified Flint that it was terminating its contract with Flint for the supply of water in one (1) year as required by the contract. As a result, no later than April 17, 2014, Flint intends to begin withdrawing water from the Flint River, treat the water in its water treatment plant and then make such treated water available to the customers of the Flint System until the System is completed and operational.  After the notification from DWSD, Flint sought another source of water and determined to use its water treatment plant to provide water to its customers.  In order to do so it negotiated an administrative consent order with MDEQ that permitted the temporary use of the Flint River (the "ACO"). The ACO requires Flint to either undertake a public improvement project to connect to the System or undertake other public improvements to continue to use the Flint River. In order to comply with the ACO, Flint has determined that connecting to the System is the most cost effective means to obtain untreated water and to comply with the ACO.

However, the Flint River will not be able to supply the volume of water needed to provide water to the customers of the Genesee System.  Inasmuch as the County Agency has a valid contract with Flint for the supply of water via DWSD, Flint is contractually obligated to continue to purchase water from DWSD in order to supply water to the County Agency. This may be accomplished, notwithstanding Flint utilizing the Flint River for a water source, by Flint continuing to purchase water from DWSD and directing the water to be transmitted directly to the County Agency by isolation valves currently installed in the Flint System.

In January, 2014, the County Agency entered into contract negotiations with DWSD to secure a water supply directly from DWSD for the customers of the Genesee System without using Flint as a pass through, until the System has been completed and is operational.  DWSD representatives have indicated that in the event that an agreement cannot be reached with the County Agency during these negotiations, DWSD will continue to supply water to the County Agency via Flint without a contract in place.  The County Agency and DWSD are negotiating two separate contracts, the first to satisfy Genesee's need for a short-term (3 year) contract for the supply of water during the time in which the System is being constructed, and the second that would require DWSD to provide a long-term emergency stand-by service to ensure the delivery of water to customers of the Genesee System if the System fails at any time in the future. Although no assurances can be made as to the eventual outcome of contract negotiations, both parties are negotiating in good faith.

In the event that the County Agency and DWSD are unable reach agreement on a proposed short-term contract for the supply of water during the construction period for the System, the County Agency has the ability to adjust Genesee's rates to the extent necessary, but cannot predict with certainty the price to be paid by customers of the Genesee System for water from DWSD until the System is completed and operational.  See BONDHOLDERS' RISKS herein.

### Related Facilities

In order to provide finished water to its customers, Flint expects to utilize its existing water treatment plant, which is currently operating in a back-up role with a capacity of 36 mgd and will be permitted to treat water drawn from the Flint River until the System is operational. Flint will be required to make an estimated $8,000,000 in improvements to convert the plant from stand-by to fully operational and to accommodate the flow of water from the System.

Additional improvements to Flint's water treatment plant may be made in the future.  In order to provide finished water to Genesee's customers, the County Agency will be required to build a new water treatment plant, reservoir, pump station and approximately 5 miles of watermain running from the new treatment plant to Genesee's main distribution facility at Henderson Road, at an estimated cost of $60,000,000.  The County Agency has acquired 76 acres approximately 14 miles east of the City of Flint in Oregon Township in Lapeer County, which is expected to serve as the site of Genesee's new water treatment plant, reservoir and pump station.  In addition, on or before April 17, 2014, the County Agency expects to acquire 9 miles of 72-inch watermain from Flint, which will be used to support Genesee's distribution system to its customers.  The new water treatment plant, reservoir, pump station and watermain are expected to be constructed and fully operational on or before May 1, 2016, the date on which the System is expected to be fully operational.

The completion date for the System is projected for May 1, 2016, at which time Flint expects to cease pumping water from the Flint River and the County Agency expects to discontinue purchasing water from DWSD, and Flint and the County Agency expect to begin purchasing water from the Issuer  and producing their own water.

## REPORT OF THE ENGINEERING CONSULTANT

Jones & Henry Engineers, Ltd., Toledo, Ohio, has prepared the Report of the Engineering Consultant, dated as of March 17, 2014, a copy of which is attached hereto as Appendix I.  The Report of the Engineering Consultant describes key factors that will affect water rates to be charged by Flint and the County Agency to customers of the Flint System and the Genesee System, respectively, from 2014 through 2018, and sets forth the assumptions on which the conclusions in the Report are based.

As set forth in the Report of the Engineering Consultant, the long term projections comparing the rates to be charged by KWA to Flint and the County Agency for use of the System plus other expenses related to operating, maintaining and improving their current treatment systems compared with rates historically charged to Flint and the County Agency by DWSD for comparable service show more stable rates from KWA for customers of both the Flint System and the Genesee System.  Most of the future expenses for the Flint System and the Genesee System are expected to be capital which will not increase annually and operating costs which will increase annually due to inflation.  DWSD charges to Flint and the County Agency, which historically have constituted a significant portion of both Flint's and the County Agency's total water expenses, have increased annually at a rate greater than the rate of inflation.  Rates are not expected to increase under KWA as they have under DWSD, and with appropriate rate increases Flint and the County Agency will be able to pay their respective share of the debt service on the System Bonds and the operation and maintenance expenses of the System plus other expenses related to operating, maintaining and improving, respectively, the Flint System and the Genesee System.

The Report of the Engineering Consultant should be read in its entirety for a complete understanding of the assumptions and conclusions contained therein.  As noted in the Report of the Engineering Consultant, any conclusions are subject to uncertainties, and some assumptions used to develop the conclusions will not be realized, and unanticipated events and circumstances

may occur.  Therefore, there could be differences between the conclusions and the actual results and those differences could be material.

## BONDHOLDERS' RISKS

The following discussion of some of the risk factors associated with the Bonds is not, and is not intended to be, exhaustive, and such risks are not necessarily presented in the order of their magnitude.

This Official Statement does not describe all of the risks of an investment in the Bonds and the Underwriters disclaim any responsibility to advise prospective investors of such risks as they exist at the date of this Official Statement or as they change from time to time.  Prospective investors should consult their own legal and tax advisors as to the risks associated with an investment in the Bonds and the suitability of investing in the Bonds in light of their particular circumstances.  Prospective investors should be able to bear the risks relating to an investment in the Bonds and should carefully consider, among other factors, the matters described below.

### *Assumptions With Regard to Local Unit Revenues*

Certain assumptions have been made with regard to the ability of Genesee and Flint to charge and collect revenues from the customers of the Genesee System and the Flint System, respectively, in amounts sufficient to pay their respective Contractual Payments.  These assumptions are believed to be reasonable, but to the extent that such revenues are not sufficient to enable Genesee and/or Flint to pay their Contractual Payments, the Contractual Payments would nevertheless be required to be paid from the general fund of Genesee and/or Flint, which could strain such general fund.  The assumptions are based on factors beyond Genesee's and Flint's control and there is no assurance that these projections will be achieved.  Many factors may prevent the projections from being achieved.  These include yearly changes in water consumption, population, population growth, household income, competitive facilities, accessibility, absorption, occupancy, vacancy and market penetration.

NO GUARANTEE CAN BE MADE THAT THE PROJECTIONS CONTAINED HEREIN WILL CORRESPOND WITH THE RESULTS ACTUALLY ACHIEVED IN THE FUTURE BECAUSE THERE IS NO ASSURANCE THAT ACTUAL EVENTS WILL CORRESPOND WITH THE ASSUMPTIONS MADE IN FORMULATING THE PROJECTIONS. ACTUAL OPERATING RESULTS MAY BE AFFECTED BY MANY FACTORS, INCLUDING, BUT NOT LIMITED TO, INCREASED COSTS, LOWER THAN ANTICIPATED REVENUES, CHANGES IN EMPLOYEE RELATIONS, APPLICABLE GOVERNMENTAL REGULATION, ECONOMIC AND DEMOGRAPHIC TRENDS, AND COMPETITION.

### *Inability to Finance the System; System Completion Risk*

As described under the heading KAREGNONDI WATER AUTHORITY SYSTEM, the System is intended initially to supply raw water for customers of the Genesee System and the Flint System.   If for any reason the Issuer is unable to acquire, construct, complete or place the System in service, the System facilities to be financed with the proceeds of the Bonds will not be

useful to the Genesee System or the Flint System unless Genesee and/or Flint constructs its own pipeline.  At this time, it is unclear whether Genesee and/or Flint would undertake constructing its own pipeline.

The rates and charges currently established by Genesee and Flint are projected to be sufficient to pay the Contractual Payments and their share of the principal of and interest on the Bonds.  However, if the System is not placed in service, the additional costs associated with paying for the debt service on the Bonds without a tangible benefit to be derived from the System could ultimately have an adverse effect on the ability of Genesee and Flint to generate sufficient revenues from the customers of their respective water supply systems and their ability to pay their share of debt service on the Bonds.

In order to provide customers for the System, the County Agency and Flint have entered into the Water Purchase Contracts.  Genesee and Flint have also entered into the Contract, under which they are responsible for paying their respective share of the Bonds and the second series of the System Bonds to be issued to finance the costs of the remaining System facilities (approximately $80,000,000).  Genesee's share of the Bonds and the approximately $80,000,000 of the second series of the System Bonds will be the entire amount if Flint fails to fulfill its obligation to pay its Contractual Payments under the Contract for any reason.

Genesee and Flint each faces potential exposure to its general fund and to the rates and charges to be paid by its water customers served by the Genesee System and Flint System, respectively, for the debt service associated with the Genesee Bonds (only in the case of Genesee) and up to an estimated $300,000,000 for the System Bonds if for any reason the remaining System facilities are not completed. The remaining System facilities could fail to be completed because of an inability to gain market access for the financing for all or part of such facilities, cost overruns in construction, or acts of God.

Genesee intends for its obligations with respect to the Genesee Bonds and the System to be paid for by rates and charges from the users of the Genesee System.  If Flint fails to pay its share of the System Bonds, either from rates and charges to users of the Flint System or from its general fund, Genesee would be responsible for making up the shortfall.  If Genesee's general fund is needed to pay a significant portion of the System Bonds, it could cause significant financial strain on Genesee.

As noted under the heading KAREGNONDI WATER AUTHORITY SYSTEM, in order for Flint to provide finished water to its customers, it needs to undertake approximately $8,000,000 in improvements to its existing water treatment plant.  If Flint is unable to timely complete such improvements for any reason (including without limitation, a referendum on the financing, an inability to gain market access for the financing for the improvements, cost overruns in construction, or acts of God), Flint may be unable to generate sufficient rates and charges from its customers to cover its share of the debt service on the System Bonds as provided in the Contract.  Without sufficient rates and charges, it is unclear whether Flint's general fund will have sufficient funds to fulfill its obligations under the Contract, which in turn could strain Genesee's general fund or the amount of rates and charges to be charged to Genesee's customers.

14

Finally, similar to Flint, Genesee needs to construct a water treatment plant, reservoir, pump station and 5 miles of watermain at an estimated cost of $60,000,000 as described under the heading KAREGNONDI WATER AUTHORITY SYSTEM in order to provide finished water to its customers.  If Genesee is unable to timely complete the new treatment plant, reservoir, pump station and watermain for any reason (including without limitation, an inability to gain market access for the financing, cost overruns in construction, or acts of God), Genesee may be unable to generate sufficient rates and charges from its customers to cover its share of the debt service on the System Bonds as provided in the Contract, which could strain Genesee's general fund.

***Financial Condition of the City of Flint and Genesee for future Obligations to Issuer***

Flint is currently operating under a State-appointed Emergency Manager under the Local Financial Stability and Choice Act, Act No. 436, Public Acts of Michigan, 2012 ("Act 436").  Flint's options to improve its fiscal health are limited.  The United States Bankruptcy Code, 11 U.S.C. Section 101, *et. seq.* (the "Bankruptcy Code") does not authorize municipalities to be subject to involuntary bankruptcy cases.  Flint must be specifically authorized to be a debtor under chapter 9 of the Bankruptcy Code by State law or by a governmental officer or organization empowered by State law to authorize Flint to be a debtor under chapter 9 of the Bankruptcy Code.  Act 436 provides such authorization after Flint first complies with certain requirements set forth therein.  The effect of a Flint bankruptcy on its obligations to the Issuer is unknown at this time, including without limitation its obligations to continue to make payments to the Issuer under its Water Purchase Contract with the Issuer and under the Contract.  If Flint fails to fulfill its payment obligations under the Contract for any reason, including a bankruptcy filing by Flint, Genesee will be required to pay Flint's share of the debt service on the System Bonds.  While this provides protection for the Issuer, such payments could cause significant financial strain on the general fund of Genesee and the net revenues of the Genesee System, potentially limiting the extent of this protection.  Similarly, if Flint fails to fulfill its payment obligation under its Water Purchase Contract, the Issuer could be obligated to continue supplying raw water to Flint without payment for a period of 60 days, or longer in the event of a Flint bankruptcy case.

For a discussion of litigation that could affect Flint's financial condition and the rates that are charged to customers of the Flint System, see the heading LITIGATION – Other Litigation herein, and for a discussion of the financial condition of Flint see the information under the heading "Update on City of Flint Financial Position" in APPENDIX C.

Although no Act 436 proceedings have ever occurred with respect to Genesee, nor has the Michigan Department of Treasury ever indicated the intent to begin such proceedings, if Genesee were to experience severe financial difficulties, the same analysis that applies to Flint applies with respect to the County Agency's and Genesee's respective obligations under the Water Purchase Contract and the Contract.

# LITIGATION

## *Pending Litigation*

The Issuer has no litigation pending or, to its knowledge, threatened, wherein an unfavorable decision, ruling or finding would adversely affect the issuance of the Bonds or materially affect the Issuer's ability to pay the principal of and interest on the Bonds.

## *Other Litigation*

### *Flint Health Care Retirement Benefits*

Flint's Emergency Manager has issued several orders under Act 436 which modified existing contracts and collective bargaining agreements with respect to health care benefits of municipal retirees. While the modifications stand to save Flint $5 million per year and potentially more in future years, the changes also shift some out-of-pocket medical expenses to retirees.

As a result of such orders, a class action lawsuit has been filed by individual retired municipal workers, their eligible spouses, dependents, and the United Retired Governmental Employees ("URGE"), an organization that represents the interests of municipal retirees (collectively, the "Plaintiffs") seeking injunctive relief and damages under 42 U.S.C. § 1983, against Flint, its current and former Emergency Managers, its Retirement Officer Manager, and its Finance Director (collectively, "Defendants"). (Welch et al v. Brown, et al. Case No.12-13808, Judge Arthur Tarnow, ED Michigan). According to Plaintiffs, Defendants violated the Contract and Bankruptcy Clauses of the United States Constitution and deprived them of a property interest without due process or just compensation. The class has not yet been certified by the federal district court.

Plaintiffs requested a preliminary injunction to enjoin Defendants from modifying the contracts and ordinances governing their health-care benefits and to restore any already modified agreements to the status quo ante. Defendants maintain that reducing retiree benefits is a necessary change to avoid bankruptcy. The federal district court was not persuaded by Defendants' position based on the evidence and argument presented and granted preliminary injunctive relief to the Plaintiffs. Defendants appealed to the United States Court of Appeals for the Sixth Circuit. The Sixth Circuit reviewed the matter and affirmed the district court's order granting preliminary injunctive relief. (COA Case # 13-1476 decided 1/3/14).

The Sixth Circuit made clear the door remains open for Flint to prove its case, stating that "additional fact finding may illuminate whether the orders were indeed appropriate under the circumstances of this case." The Welch case comes down to whether Flint's modifications of retiree healthcare benefits were reasonable and necessary to remedy the economic problems facing Flint. In order to prove that, Flint must show that the modifications were virtually the only choice it had to avoid significant social harm, including:

1. That bankruptcy was/is imminent if the changes were not made;
2. That Flint was/is contemplating bankruptcy if it cannot modify the retiree healthcare benefits;

3.    That alternative strategies to addressing the economic problems have been considered and will not work to address the economic problems; and

4.    That the alternatives proposed by the Plaintiffs to address the economic problems will not work.

Flint intends to vigorously contest this litigation and pursue all available remedies to have the orders of the Emergency Manager sustained.  If the Plaintiffs ultimately prevail in this litigation, Flint projects that it will incur an additional $5 million annually for retiree health care costs and that it will be in an extremely precarious financial position, with insufficient resources to meet basic functions.  This projection of $5 million in additional costs could increase significantly based on future increases in premium costs that the City's modifications require be borne by retirees. The health care changes as well as all of the other changes made by the Emergency Manager were deemed to be necessary for Flint to avoid insolvency.  Flint is unable to predict the outcome of this litigation at this time.  See the information under the heading "Update on City of Flint Financial Position" in APPENDIX C.

*Flint Water Rates*

On August 15, 2011, the Mayor of Flint directed a rate increase for Flint's water and sewer rates because the City was spending more to provide water and sewer services than it was receiving in user funds.  Flint increased rates for 2012 by approximately 35 percent.    The President of the Flint Council, William Kincaid, and others filed an original action in the Michigan Court of Appeals, Kincaid v City of Flint, alleging that the fee increases were unconstitutional taxes levied without the approval of the electors of Flint that violated the Headlee Amendment to the Michigan Constitution.  Flint filed a motion for summary disposition, arguing that there was no issue of fact that the fees charged were proportionate to the costs of providing water and sewer service, and as such were valid user fees, not taxes.  Flint introduced evidence that the fee increases were required to pay the projected costs of the water and sewer systems for Fiscal Year 2012.  The Michigan Court of Appeals agreed that the water and sewer fees charged by the City were valid user fees, not disguised taxes, as they were proportionate to the costs of providing service.  As such, the Headlee Amendment did not apply.  The plaintiffs filed an application for leave to appeal the decision to the Michigan Supreme Court, and for peremptory reversal of the Court of Appeals' decision.   The Supreme Court denied the application for leave to appeal.

The plaintiffs then filed an action in Genesee County Circuit Court alleging that water rate increases which were accomplished by a directive dated August 15, 2011 were implemented in a manner that was in violation of a Flint ordinance which required that action to modify water rates be done on or before April 15 of the year in which it was to take effect.  Additionally, the plaintiffs alleged that the City failed to create a first lien in favor of bondholders for water and sewer funds, as required by the Revenue Bond Act (Act 94, Public Acts of Michigan, 1933, as amended).  The Court granted Flint's motion for summary disposition, finding that the powers of the Emergency Manager pursuant to Act 4, Public Acts of Michigan, 2011 rendered the alleged violation of the Flint ordinance moot and dismissed the claim with respect to the Revenue Bond Act.  The plaintiffs have since filed an appeal with the Court of Appeals, which is currently pending.  Flint is unable to predict the outcome of this litigation at this time.

## TAX MATTERS

In the opinion of Miller, Canfield, Paddock and Stone, P.L.C., Bond Counsel, under existing law, the interest on the Bonds is excludable from gross income for federal income tax purposes and is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations.  It should be noted, however, that with respect to corporations (as defined for federal income tax purposes) such interest is taken into account in determining adjusted current earnings for the purpose of computing the alternative minimum tax imposed on such corporations.  Bond Counsel is also of the opinion that, under existing law, the Bonds and the interest thereon are exempt from all taxation by the State of Michigan or by any taxing authority within the State of Michigan, except inheritance and estate taxes and taxes on gains realized from the sale, payment or other disposition thereof.  Bond Counsel will express no opinion regarding any other federal or state tax consequences arising with respect to the Bonds and the interest thereon.

The opinion on federal and State of Michigan tax matters is based on the accuracy of certain representations and certifications, and continuing compliance with certain covenants, of the Issuer contained in the transcript of proceedings and which are intended to evidence and assure the foregoing, including that the Bonds are and will remain obligations the interest on which is excludable from gross income for federal and State of Michigan income tax purposes. The Issuer has covenanted to take the actions required of it for the interest on the Bonds to be and to remain excludable from gross income for federal income tax purposes, and not to take any actions that would adversely affect that exclusion.   Bond Counsel's opinion assumes the accuracy of the Issuer's certifications and representations and the continuing compliance with the Issuer's covenants.  Noncompliance with these covenants by the Issuer may cause the interest on the Bonds to be included in gross income for federal income tax purposes retroactively to the date of issuance of the Bonds.  After the date of issuance of the Bonds, Bond Counsel will not undertake to determine (or to so inform any person) whether any actions taken or not taken, or any events occurring or not occurring, or any other matters coming to Bond Counsel's attention, may adversely affect the exclusion from gross income for federal and State of Michigan income tax purposes of interest on the Bonds or the market prices of the Bonds.

The opinion of Bond Counsel is based on current legal authority and covers certain matters not directly addressed by such authority.  It represents Bond Counsel's legal judgment as to the excludability of interest on the Bonds from gross income for federal and State of Michigan income tax purposes but is not a guarantee of that conclusion.  The opinion is not binding on the Internal Revenue Service ("IRS") or any court.  Bond Counsel cannot give and has not given any opinion or assurance about the effect of future changes in the Internal Revenue Code of 1986, as amended (the "Code"), the applicable regulations, the interpretations thereof or the enforcement thereof by the IRS.

Ownership of the Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, corporations subject to the branch profits tax, financial institutions, certain insurance companies, certain S corporations, individual recipients of Social Security or Railroad Retirement benefits and taxpayers who may be deemed to have incurred (or continued) indebtedness to purchase or carry the Bonds.  Bond Counsel will express no opinion regarding any such consequences.

***Tax Treatment of Accruals on Original Issue Discount Bonds***

Under existing law, if the initial public offering price to the public (excluding bond houses and brokers) of a Bond is less than the stated redemption price of such Bonds at maturity, then such Bond is considered to have "original issue discount" equal to the difference between such initial offering price and the amount payable at maturity (such Bonds are referred to as "OID Bonds"). Such discount is treated as interest excludable from federal gross income to the extent properly allocable to each registered owner thereof. The original issue discount accrues over the term to maturity of each such OID Bond on the basis of a constant interest rate compounded at the end of each six-month period (or shorter period) from the date of original issue with straight-line interpolations between compounding dates. The amount of original issue discount accruing during each period is added to the adjusted basis of such OID Bonds to determine taxable gain upon disposition (including sale, redemption or payment on maturity) of such OID Bonds.

The Code contains certain provisions relating to the accrual of original issue discount in the case of purchasers of OID Bonds who purchase such OID Bonds after the initial offering of a substantial amount thereof. Owners who do not purchase such OID Bonds in the initial offering at the initial offering prices should consult their own tax advisors with respect to the tax consequences of ownership of such OID Bonds.

All holders of the OID Bonds should consult their own tax advisors with respect to the allowance of a deduction for any loss on a sale or other disposition of an OID Bond to the extent such loss is attributable to accrued original issue discount.

***Amortizable Bond Premium***

For federal income tax purposes, the excess of the initial offering price to the public (excluding bond houses and brokers) at which a Bond is sold over the amount payable at maturity thereof constitutes for the original purchasers of such Bonds (collectively, the "Original Premium Bonds") an amortizable bond premium. Bonds other than Original Premium Bonds may also be subject to an amortizable bond premium determined generally with regard to the taxpayer's basis (for purposes of determining loss on a sale or exchange) and the amount payable on maturity or, in certain cases, on an earlier call date (such bonds being referred to herein collectively with the Original Premium Bonds as the "Premium Bonds"). Such amortizable bond premium is not deductible from gross income. The amount of amortizable bond premium allocable to each taxable year is generally determined on the basis of the taxpayer's yield to maturity determined by using the taxpayer's basis (for purposes of determining loss on sale or exchange) of such Premium Bonds and compounding at the close of each six-month accrual period. The amount of amortizable bond premium allocable to each taxable year is deducted from the taxpayer's adjusted basis of such Premium Bonds to determine taxable gain upon disposition (including sale, redemption or payment at maturity) of such Premium Bonds.

All holders of the Premium Bonds should consult with their own tax advisors as to the amount and effect of the amortizable bond premium.

19

*Market Discount*

The "market discount rules" of the Code apply to the Bonds.  Accordingly, holders acquiring their Bonds subsequent to the initial issuance of the Bonds will generally be required to treat market discount recognized under the provisions of the Code as ordinary taxable income (as opposed to capital gain income).  Holders should consult their own tax advisors regarding the application of the market discount provisions of the Code and the advisability of making any of the elections relating to market discount allowed by the Code.

*Information Reporting and Backup Withholding*

Information reporting requirements apply to interest paid after March 31, 2007 on tax-exempt obligations, including the Bonds.  In general, such requirements are satisfied if the interest recipient completes, and provides the payor with, a Form W-9, "Request for Taxpayer Identification Number and Certification," or unless the recipient is one of a limited class of exempt recipients, including corporations.  A recipient not otherwise exempt from information reporting who fails to satisfy the information reporting requirements will be subject to "backup withholding," which means that the payor is required to deduct and withhold a tax from the interest payment, calculated in the manner set forth in the Code.  For the foregoing purpose, a "payor" generally refers to the person or entity from whom a recipient receives its payments of interest or who collects such payments on behalf of the recipient.

If an owner purchasing the Bonds through a brokerage account has executed a Form W-9 in connection with the establishment of such account no backup withholding should occur.  In any event, backup withholding does not affect the excludability of the interest on the Bonds from gross income for federal income tax purposes.  Any amounts withheld pursuant to backup withholding would be allowed as a refund or a credit against the owner's federal income tax once the required information is furnished to the IRS.

*Future Developments*

Bond Counsel's engagement with respect to the Bonds ends with the issuance of the Bonds and, unless separately engaged, bond counsel is not obligated to defend the Issuer in the event of an audit examination by the IRS.  The IRS has a program to audit tax-exempt obligations to determine whether the interest thereon is includible in gross income for federal income tax purposes.  If the IRS does audit the Bonds, under current IRS procedures, the IRS will treat the Issuer as the taxpayer and the beneficial owners of the Bonds will have only limited rights, if any, to obtain and participate in judicial review of such audit.

NO ASSURANCE CAN BE GIVEN THAT ANY FUTURE LEGISLATION OR CLARIFICATIONS OR AMENDMENTS TO THE CODE, IF ENACTED INTO LAW, WILL NOT CONTAIN PROPOSALS WHICH COULD CAUSE THE INTEREST ON THE BONDS TO BE SUBJECT DIRECTLY OR INDIRECTLY TO FEDERAL OR STATE OF MICHIGAN INCOME TAXATION, ADVERSELY AFFECT THE MARKET PRICE OR MARKETABILITY OF THE BONDS, OR OTHERWISE PREVENT THE HOLDERS FROM REALIZING THE FULL CURRENT BENEFIT OF THE STATUS OF THE INTEREST THEREON.  BOND COUNSEL EXPRESSES NO OPINION REGARDING ANY PENDING OR PROPOSED FEDERAL OR STATE OF MICHIGAN TAX LEGISLATION.

FURTHER, NO ASSURANCE CAN BE GIVEN THAT ANY ACTIONS OF THE INTERNAL REVENUE SERVICE, INCLUDING, BUT NOT LIMITED TO, SELECTION OF THE BONDS FOR AUDIT EXAMINATION, OR THE COURSE OR RESULT OF ANY EXAMINATION OF THE BONDS, OR OTHER BONDS WHICH PRESENT SIMILAR TAX ISSUES, WILL NOT AFFECT THE MARKET PRICE OF THE BONDS.

INVESTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE TAX CONSEQUENCES OF THEIR ACQUISITION, HOLDING OR DISPOSITION OF THE BONDS, INCLUDING THE IMPACT OF ANY PENDING OR PROPOSED FEDERAL OR STATE OF MICHIGAN TAX LEGISLATION.

## APPROVAL BY THE MICHIGAN DEPARTMENT OF TREASURY

The Issuer has received a letter from the Department of Treasury of the State of Michigan, dated February 28, 2014, approving the issuance of the Bonds as provided in the Revised Municipal Finance Act, Act No. 34, Public Acts of Michigan, 2001, as amended.

## BOND COUNSEL'S RESPONSIBILITY

The fees of Miller, Canfield, Paddock and Stone, P.L.C. ("Bond Counsel") for services rendered in connection with its approving opinion are expected to be paid from Bond proceeds. Except to the extent necessary to issue its approving opinion as to the validity of the Bonds and tax matters relating to the Bonds and the interest thereon, and except as stated below, Bond Counsel has not been retained to examine or review, and has not examined or reviewed, any financial documents, statements or materials that have been or may be furnished in connection with the authorization, issuance or marketing of the Bonds and accordingly will not express any opinion with respect to the accuracy or completeness of any such financial documents, statements or materials.

Bond Counsel has reviewed the statements in this Official Statement under the headings entitled "PURPOSE," "SECURITY," "THE BONDS," "PRIOR REDEMPTION OF BONDS," "TRANSFER OUTSIDE BOOK-ENTRY-ONLY SYSTEM," "TAX MATTERS," "APPROVAL   BY THE MICHIGAN DEPARTMENT OF TREASURY," "BOND COUNSEL'S RESPONSIBILITY," and "CONTINUING DISCLOSURE" (first two paragraphs only).  Bond Counsel has not been retained to review and has not reviewed any other portions of the Official Statement for accuracy or completeness, and has not made inquiry of any official or employee of the Issuer or any other person and has made no independent verification of such other portions hereof, and further has not expressed and will not express an opinion or belief as to any such other portions hereof.

## CONTINUING DISCLOSURE

Prior to the delivery of the Bonds, the Issuer and each Local Unit will execute a Continuing Disclosure Undertaking (individually an "Undertaking" and collectively, the "Undertakings") for the benefit of the holders of the Bonds or Beneficial Owners to send certain information annually and to provide notice of certain events to certain information repositories pursuant to the requirements of Rule 15c2-12(b)(5) (the "Rule") adopted by the Securities and

Exchange Commission under the Securities Exchange Act of 1934. The information to be provided on an annual basis, the events which will be noticed on an occurrence basis, and the other terms of the Undertaking are set forth in *APPENDIX E-FORM OF CONTINUING DISCLOSURE UNDERTAKINGS* to this Official Statement.

A failure by the Issuer or a Local Unit to comply with its Undertaking will not constitute an event or default under the Resolution authorizing the issuance of the Bonds and holders of the Bonds or Beneficial Owners are limited to the remedies described in the Undertakings.

Genesee discovered in the summer of 2013 it had failed to comply with certain of its continuing disclosure obligations under previous undertakings entered into pursuant to the Rule with respect to annual information filings required for fiscal years 2008-2010. Genesee was required to file this information within a period of time specified in each previous undertaking after the end of the fiscal year which ends on September 30. The filings were subsequently made for fiscal year 2008 in December 2010, for fiscal year 2009 in June 2010 and for fiscal year 2010 in December 2011 for the Genesee's sewer, water supply, capital improvement and general obligation bonds. The filings for fiscal years 2008-2010 were subsequently made for the Issuer's building authority bonds on July 23, 2013. Genesee has filed its annual audited financial statements for fiscal years 2011 and 2012 on a timely basis.

In addition, Genesee failed to provide notice of certain underlying rating changes that occurred in 2010 affecting its sewer, water supply, building authority, capital improvement and general obligation bonds. Genesee subsequently filed notice of these rating changes and the current ratings on those bonds with a filing dated July 16, 2013. Furthermore, Genesee failed to provide notice of certain insured rating downgrades affecting its sewer, water supply and building authority bonds, of which Genesee was not separately notified by the relevant rating agencies, and which resulted from a series of widely reported downgrades of the applicable municipal bond insurer for those bonds. Genesee subsequently filed notice of these rating changes and the current ratings on those bonds with a filing dated July 16, 2013. Genesee has taken steps to assure that it will comply with its Undertaking and its previous undertakings, including the annual filing requirements, in the future. Genesee entered into an agreement in October, 2011 with Stauder, Barch & Associates, Inc. to serve as disclosure agent and assist Genesee in completing all required filings on a timely basis.

Flint has not entered into any previous continuing disclosure undertakings under the Rule.

A failure by the Issuer or either Local Unit to comply with its Undertaking must be reported by the Issuer or such Local Unit in accordance with the Rule and must be considered by any broker, dealer or municipal securities dealer before recommending the purchase or sale of the Bonds in the secondary market. Consequently, such failure may adversely affect the transferability and liquidity of the Bonds and their market price.

## LEGAL OPINION

Legal matters incident to the authorization, issuance and sale of the Bonds are subject to the approval of Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan,

Bond Counsel.  A copy of the opinion of Bond Counsel will be furnished with the Bonds, which opinion will be substantially in the form set forth in APPENDIX F.

## FINANCIAL ADVISOR

Stauder, Barch & Associates, Inc., Ann Arbor, Michigan, (the "Financial Advisor") has been retained by the Issuer to provide certain financial advisory services including, among other things, preparation of portions of the deemed "final" Preliminary Official Statement and the final Official Statement (the "Official Statements"). The information contained in the Official Statements was prepared in part by the Financial Advisor and is based on information supplied by various officials from records, statements and reports required by various local county or state agencies of the State of Michigan in accordance with constitutional or statutory requirements.

To the best of the Financial Advisor's knowledge, all of the information contained in the Official Statements, which it assisted in preparing, while it may be summarized is (i) complete and accurate; (ii) does not contain any untrue statement of material fact; and (iii) does not omit any material fact, or make any statement which would be misleading in light of the circumstances under which these statements are being made.  However, the Financial Advisor has not and will not independently verify the completeness and accuracy of the information contained in the Official Statements.

The Financial Advisor's duties, responsibilities and fees arise solely from that as financial advisor to the Issuer and they have no secondary obligations or other responsibility.  The Financial Advisor's fees are expected to be paid from Bond proceeds.

## UNDERWRITING

The Bonds are being purchased by the Underwriters listed on the cover page of this Official Statement.  The Underwriters have agreed, subject to certain conditions, to purchase all of the Bonds from the Issuer at an underwriters' discount of $946,374.90 from the initial offering prices set forth in this Official Statement. The Underwriters are obligated to purchase all of the Bonds, if any are purchased, the obligation to make such purchase being subject to certain terms and conditions set forth in the Bond Purchase Agreement with respect to the Bonds, the approval of certain legal matters by counsel and certain other conditions.  The initial public offering prices of the Bonds may be changed from time to time by the Underwriters.  The Bonds may be offered and sold by the Underwriters to certain dealers (including dealers depositing the Bonds in unit investment trusts, some of which may be managed by the Underwriters) and certain dealer banks and banks acting as agents at prices lower than the public offering prices set forth in this Official Statement.

J.P. Morgan Securities LLC ("JPMS"), one of the Underwriters of the Bonds, has entered into a negotiated dealer agreement ("Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings, at the original issue prices. Pursuant to the Dealer Agreement (if applicable to this transaction), CS&Co. will purchase Bonds from JPMS at the original issue price less a negotiated portion of the selling concession applicable to any Bonds that CS&Co. sells.

Wells Fargo Securities is the trade name for certain securities-related capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Bank, National Association ("WFBNA"). WFBNA, one of the underwriters of the Bonds, has entered into an agreement (the "Distribution Agreement") with its affiliate, Wells Fargo Advisors, LLC ("WFA"), for the distribution of certain municipal securities offerings, including the Bonds.   Pursuant to the Distribution Agreement, WFBNA will share a portion of its underwriting or remarketing agent compensation, as applicable, with respect to the Bonds with WFA.  WFBNA also utilizes the distribution capabilities of its affiliates, Wells Fargo Securities, LLC ("WFSLLC") and Wells Fargo Institutional Securities, LLC ("WFIS"), for the distribution of municipal securities offerings, including the Bonds.   In connection with utilizing the distribution capabilities of WFSLLC, WFBNA pays a portion of WFSLLC's expenses based on its municipal securities transactions.  WFBNA, WFSLLC, WFIS, and WFA are each wholly-owned subsidiaries of Wells Fargo & Company.

The Underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities.  The Underwriters have, from time to time, and may in the future perform, various investment banking services for the Issuer for which it received or will receive customary fees and expenses.

In the ordinary course of its various business activities, the Underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank loans and/or credit default swaps) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities may involve securities and instruments of the Issuer.

## RATING

Moody's Investors Service has assigned the Bonds a rating of "A2," and Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc., has assigned the Bonds a rating of "A+."  No application was made to any other rating agency for the purpose of obtaining an additional rating on the Bonds.  Any explanation of the significance of each such rating may only be obtained from the rating agency.  Generally, a rating agency bases its rating on such information and materials and on investigations, studies and assumptions by the rating agency.  There is no assurance that such rating will continue for any given period of time or that it will not be revised downward or withdrawn entirely by such rating agency, if in the judgment of the rating agency circumstances so warrant.  Any such downward revision or withdrawal of such rating may have an adverse effect on the market price of the Bonds.

**OTHER MATTERS**

All information contained in this Official Statement is subject, in all respects, to the complete body of information contained in the original sources thereof.  In particular, no opinion or representation is rendered as to whether any projection will approximate actual results, and all opinions, estimates and assumptions, whether or not expressly identified as such, should not be considered statements of fact.

KAREGNONDI WATER AUTHORITY

By: /s/ Jeffrey Wright_____
       Jeffrey Wright, Chief Executive Officer

25

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX A**

**COUNTY OF GENESEE**
**GENERAL FINANCIAL, ECONOMIC AND STATISTICAL INFORMATION**

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX A**

# COUNTY OF GENESEE

# GENERAL FINANCIAL INFORMATION

**AREA**

The County of Genesee covers an area of approximately 643 square miles.

**POPULATION**

The population of the County is as follows:

| | |
|---|---|
| 2010 U.S. Census | 425,790 |
| 2000 U.S. Census | 436,141 |
| 1990 U.S. Census | 430,459 |

**PROPERTY VALUATIONS**

Article IX, Section 3, of the Michigan Constitution, limits the proportion of true cash value at which property can be assessed to a percentage not to exceed 50% of true cash value. The Michigan Legislature by statute has provided that property shall be assessed at 50% of its true cash value, except as described in the paragraphs below. The Michigan Legislature or the electorate may at some future time reduce the percentage below 50% of true cash value.

On March 15, 1994, the electors of the State approved an amendment to the Michigan Constitution permitting the Legislature to authorize ad valorem taxes on a non-uniform basis. The legislation implementing this constitution amendment added a new measure of property value known as "taxable value." Since 1995, taxable property has had two valuations -- State equalized valuation ("SEV") and taxable value. Property taxes are levied on taxable value. Generally, the taxable value of property is the lesser of (a) the taxable value of property in the immediately preceding year, adjusted for losses, multiplied by the lesser of the inflation rate or 1.05, plus additions, or (b) the property's current SEV. Under certain circumstances, therefore, the taxable value of property may be different from the same property's SEV. When property is sold or transferred, taxable value is adjusted to the SEV, which under existing law is 50% of the current true cash value. The taxable value and SEV of new construction is equal to current SEV. The taxable value and SEV of existing property are also adjusted annually for additions and losses.

Responsibility for assessing taxable property rests with the local assessing officer of each township and city. Any property owner may appeal the assessment to the local assessor, the local Board of Review and ultimately to the Michigan Tax Tribunal.

In addition to limiting the annual increase in taxable value, the Michigan Constitution mandates a system of equalization for assessments. Although the assessors for each local unit of government within a county are responsible for actually assessing at 50% of true cash value, adjusted for taxable value purposes, the final SEV and taxable value are arrived at through several steps. Assessments are established initially by the municipal assessor. Municipal assessments are then equalized to the 50% levels as determined by the County Department of Equalization. Thereafter, the State equalizes the various counties in relation to each other. SEV is important, aside from its use in determining taxable value for the purpose of levying ad valorem property taxes, because of its role in the spreading of taxes between overlapping jurisdictions, the distribution of various State aid programs, State revenue sharing and in the calculation of debt limits.

Property that is exempt from property taxes (e.g., churches, governmental property, public schools) is not included in the SEV or taxable value data in this Official Statement. Property granted tax abatements under Act 198, Public Acts of Michigan, 1974, as amended, is recorded on a separate tax roll which is subject to tax abatement. The valuation of tax abated property is based upon SEV but is not included in either the SEV or taxable value data in this Official Statement except as noted.

*Historical Valuation*

| Year | State Equalized Valuation | Taxable Valuation |
|------|---------------------------|-------------------|
| 2013 | $8,996,549,108 | $8,591,144,574 |
| 2012 | 9,183,568,010 | 8,805,229,871 |
| 2011 | 9,950,805,569 | 9,450,208,638 |
| 2010 | 10,798,912,285 | 10,135,718,671 |
| 2009 | 12,466,321,796 | 11,386,079,390 |
| 2008 | 13,698,999,172 | 11,829,074,332 |
| 2007 | 14,156,934,349 | 11,849,655,646 |
| 2006 | 13,695,827,367 | 11,320,948,189 |

| | |
|---|---|
| 2013 Taxable Valuation | $8,591,144,574 |
| Plus:  2013 IFT Valuation | 62,645,572* |
| 2013 Total Taxable Valuation | $8,653,790,146 |

\* Millage is levied at half rate against the IFT Taxable Valuation. See "Tax Abatements" below
Source: Genesee County Equalization Dept

*Per Capita Valuation*

| | |
|---|---|
| 2013 Per Capita Taxable Valuation | $20,176.95 |
| 2013 Per Capita State Equalized Valuation | $21,129.08 |
| 2013 Per Capita Estimated True Cash Valuation | $42,258.15 |

*Tax Abatements*

Under the provisions of Act 198 of the Public Acts of Michigan, 1978 ("Act 198"), plant rehabilitation districts and/or industrial development districts may be established.  Businesses in these districts are offered certain property tax incentives to encourage restoration or replacement of obsolete facilities and to attract new facilities in the area.  The industrial facilities tax ("IFT") is paid, at a lesser effective rate and in lieu of ad valorem property taxes, in such facilities for a period of up to 12 years.  Qualifying facilities are issued abatement certificates for this period.

After expiration of the abatement certificate, the then-current SEV of the facility is returned to the ad valorem tax roll.  The owner of such facility may obtain a new certificate, provided it has complied with the provisions of Act 198.

The 2013 Taxable Value for all IFT abated property within the County is $62,645,572.  The total for new IFT Taxable Valuation is $57,658,772 and $4,986,800 is new Renaissance Zone IFT Taxable Valuation;  millage is levied at half the rate on the new amount. The total for rehab IFT Taxable Valuation is $3,100,000; millage is levied at full rate on this amount.

*Tax Increment Authorities*

Act 450 of the Public Acts of Michigan, 1980, as amended, (the "TIFA Act"), Act 197 of the Public Acts of Michigan, 1975, as amended, (the "DDA Act"), Act 281 of the Public Acts of Michigan, 1986, as amended, (the "LDFA Act") and Act 381 of the Public Acts of Michigan, 1996, as amended (the "BRDA Act") (together the "TIF Acts") authorize the designation of specific districts known as Tax Increment Finance Authority ("TIFA") Districts, Downtown Development Authority ("DDA") Districts, Local Development Finance Authority ("LDFA") Districts or Brownfield Redevelopment Authority ("BRDA") Districts.  Such districts are authorized to formulate tax increment financing plans for public improvements, economic development, neighborhood revitalization and historic preservation within the district.

Tax increment financing permits the TIFA, DDA, LDFA, or BRDA to capture tax revenues attributable to increases in value ("TIF Captured Value") of real and personal property located within an approved development area while any tax increment financing plans by an established district are in place.  These captured revenues are used by the districts and are not passed on to the local taxing jurisdictions.

*Tax Base Composition*

A breakdown of the County's 2013 Taxable Valuation by class and use is as follows:

| By Class | Valuation | Total |
|---|---|---|
| Real Property | $7,922,862,283 | 92.22% |
| Personal Property | 668,282,291 | 7.78 |
| TOTAL | $8,591,144,574 | 100.00% |

| By Use | | |
|---|---|---|
| Agricultural | $122,092,317 | 1.42% |
| Commercial | 1,712,997,352 | 19.94 |
| Industrial | 250,527,317 | 2.92 |
| Residential | 5,837,245,297 | 67.94 |
| Personal Commercial | 299,882,029 | 3.49 |
| Personal Industrial | 140,761,800 | 1.64 |
| Personal/Utility | 227,638,462 | 2.65 |
| TOTAL | $8,591,144,574 | 100.00% |

Source: Genesee County Equalization Dept

## Property Tax Reform Proposals

On December 20, 2012, Governor Snyder signed into law a package of bills reforming personal property tax in Michigan. The legislation exempts commercial and industrial personal property of each owner with a combined taxable value in a local taxing unit of less than $40,000 from ad valorem taxes beginning in 2014. All eligible manufacturing personal property purchased or put into service beginning in 2013 and used more than 50% of the time in industrial processing or direct integrated support becomes exempt beginning in 2016. The legislation extends certain personal property tax exemptions and tax abatements for technology parks, industrial facilities and enterprise zones that were to expire after 2012, until the newly enacted personal property tax exemptions take effect. The legislation authorizes local units to specially assess commercial and industrial real property to replace revenue lost due to the personal property tax exemptions for police, fire, ambulance and jail operations. The legislation also includes a formula to reimburse certain local governments for a portion of lost personal property tax revenue from use tax moneys to the extent the local unit has a reduction in taxable value of more than 2.3% as a result of the personal property tax exemption. For such reimbursement provisions to become effective, however voters would need to approve a change in the state distribution of use tax in the August 2014 primary election. If voters approve the redistribution, a portion of the use tax would be directed to a newly created statewide Metropolitan Areas Metropolitan Authority which would redistribute that revenue to qualifying local units. If voters fail to approve the use tax redistribution, the above personal property tax reform acts will be repealed and the local reimbursement act and the special assessment act will not go into effect. The final impact of this legislation cannot be determined at this time.

The ultimate nature, extent and impact of any other future amendments to Michigan's property tax laws on the County's finances cannot be predicted. Purchasers of the Bonds should consult with their legal counsel and financial advisors as to the consequences of any such legislation on the market price or marketability of the Bonds, the security therefor and the operations of the County.

**MAJOR TAXPAYERS**

The ten major taxpayers in the County and their 2013 Taxable Valuation and Industrial Facilities Tax valuations are as follows:

| Taxpayer | Product/Service | Taxable Valuation | + | IFT Valuation | = | Total Valuation |
|---|---|---|---|---|---|---|
| Consumers Energy | Utility | $221,742,449 | | $0 | | $221,742,449 |
| General Motors Corp. | Automotive | 96,569,800 | | 9,386,600 | | 105,956,400 |
| Genesee Valley Partners LP | Investments | 49,129,300 | | 0 | | 49,129,300 |
| Wal-Mart/Sam's Club | Retail/grocery | 41,076,788 | | 0 | | 41,076,788 |
| Edward Rose Assoc. ETAL | Construction | 25,660,242 | | 0 | | 25,660,242 |
| Meijer Inc./Goodwill Co., Inc. | Retail/grocery | 25,407,943 | | 0 | | 25,407,943 |
| Comcast | Retail cable | 19,356,902 | | 0 | | 19,356,902 |
| Magna | Automotive | 6,770,800 | | 11,123,600 | | 17,894,400 |
| Michigan Electric Trans. Co. | Utility | 15,979,400 | | 0 | | 15,979,400 |
| Kroger | Grocery | 14,617,238 | | 0 | | 14,617,238 |
| TOTAL | | $516,310,862 | | $20,510,200 | | $536,821,062 |

The 2013 Taxable Valuations of the above taxpayers excluding IFT valuation represent 6.01% of the County's 2013 Taxable Valuation of $8,591,144,574. The Total Valuations including IFT valuation represent 6.20% of the 2013 Total Taxable Valuation of $8,653,790,146.

**TAX RATES (Per $1,000 of Valuation)**

Each school district, county, township, special authority and city has a geographical definition which constitutes a tax district. Since local school districts and the county overlap either a township or a city, and intermediate school districts overlap local school districts and county boundaries, the result is many different tax rate districts.

| *Genesee County* | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 |
|---|---|---|---|---|---|---|---|
| County Operating | 5.5072 | 5.5072 | 5.5072 | 5.5072 | 5.5072 | 5.5072 | 5.5072 |
| County Parks & Recreation | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 |
| County Paramedics | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 |
| Senior Services | 0.7000 | 0.7000 | 0.7000 | 0.7000 | 0.7000 | 0.7000 | 0.7000 |
| Uninsured Health Care | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| Veterans | 0.1000 | 0.1000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| COUNTY'S TOTAL | 8.2766 | 8.2766 | 8.1766 | 8.1766 | 8.1766 | 8.1766 | 8.1766 |

| *Other Tax Rates:* | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 |
|---|---|---|---|---|---|---|---|
| Airport Authority | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 |
| District Library | 0.9981 | 0.9981 | 0.9981 | 0.7481 | 0.7481 | 0.7481 | 0.7481 |
| Genesee ISD | 3.5341 | 3.5341 | 3.5341 | 3.5341 | 3.5341 | 3.5341 | 3.5341 |
| Mott Community College | 2.8596 | 2.8596 | 2.8596 | 2.6796 | 2.6796 | 2.6796 | 2.6796 |

**TAX RATE LIMITATION**

Article IX, Section 6, of the Michigan Constitution of 1963 provides in part:

"Except as otherwise provided in this Constitution, the total amount of general ad valorem taxes imposed upon real and tangible personal property for all purposes in any one year shall not exceed 15 mills on each dollar of the assessed valuation of property as finally equalized."

Section 6 further provides that, by a majority vote of the qualified electors of a county, the 15 mill limitation may be increased to a total not to exceed 18 mills, and that the millages of the local units involved shall then be permanently fixed within that greater millage rate limitation.

Act 62, Public Acts of Michigan, 1933, as amended, defines "local units" as "counties, townships, villages, cities, a first class school district (only Detroit schools), community college districts, intermediate school district, and all other divisions, districts, and organizations of government that are or may be established by law and that have the power to levy taxes against property located within their respective areas, except villages and cities for which there are provisions in their charters or general law fixing maximum limits on the power to levy taxes against property."

A-4

The amount of mills allocated to the County, townships in the County and the intermediate school districts have been fixed by vote as follows:

| Units of Government | Rates |
|---|---|
| County of Genesse | 5.6800 |
| Townships | 1.0000 |
| Intermediate School District | 0.2000 |
| TOTAL | 6.8800 |

In addition, Article IX, Section 6, permits the levy of millage in excess of the above for operating purposes for a specified period of time provided that said increase is approved by a majority of the qualified electors of the local unit.

The County is authorized to levy the following tax rates:

| | Millage Authorized | 2013 Maximum Allowable Millage after Rollback* | Expiration Date of Levy |
|---|---|---|---|
| Operating | 5.6800 | 5.5072 | n/a |
| County Parks | 0.4847 | 0.4847 | 12/31/2016 |
| County Paramedics | 0.4847 | 0.4847 | 12/31/2016 |
| Senior Services | 0.7000 | 0.7000 | 12/31/2015 |
| Uninsured Health Care | 1.0000 | 1.0000 | 12/31/2019 |
| Veterans | 0.1000 | 0.1000 | 12/31/2021 |

\* See "CONSTITUTIONAL ROLLBACK AND ASSESSMENT CAPS" herein.
Source: Genesee County

## CONSTITUTIONAL ROLLBACK AND ASSESSMENT CAPS

Article IX, Section 31 of the Michigan Constitution requires that if the total value of existing taxable property (State Equalized Valuation) in a local taxing unit, exclusive of new construction and improvements, increases faster than the U.S. Consumer Price Index from one year to the next, the maximum authorized tax rate for that local taxing unit must be reduced through a Millage Reduction Fraction unless new millage is authorized by a vote of the electorate of the local taxing unit.

## TAX LEVIES AND COLLECTIONS

The County's fiscal year begins October 1 and ends September 30. Its property taxes are due July 1 and December 1 of each fiscal year and are payable without penalty or interest on or before the following September 14 and February 14, respectively. All real property taxes remaining unpaid on March 1st of the year following the levy are turned over to the County Treasurer for collection. Genesee County annually pays from its 100% Tax Payment Fund delinquent taxes on real property to all taxing units in the County, including the County's, shortly after the date delinquent taxes are returned to the County Treasurer for collection.

A history of tax levies and collections for the County are as follows:

| Fiscal Year | Total Tax Levy | Collections to March 1, of Following Year | | Collections Plus Funding to September 30, of Following Year | |
|---|---|---|---|---|---|
| 2012 | $77,487,325 | $72,746,879 | 93.88% | $77,487,325 | 100.00% |
| 2011 | 83,767,765 | 78,101,948 | 93.24 | 83,767,765 | 100.00 |
| 2010 | 93,767,535 | 86,508,053 | 92.26 | 93,767,535 | 100.00 |
| 2009 | 97,004,331 | 90,979,934 | 93.79 | 97,004,331 | 100.00 |
| 2008 | 96,962,513 | 91,098,930 | 93.95 | 96,962,513 | 100.00 |

The 100% Tax Payment Fund is financed through the issuance of General Obligation Limited Tax Notes (GOLTNs) by the County. The ability of the County to issue such GOLTNs is subject to market conditions at the time of offering. In addition, Act 206 of 1893, as amended, provides in part that: "The primary obligation to pay to the county the amount of taxes and interest thereon shall rest with the local taxing units, and if the delinquent taxes which are due and payable to the county are not received by the county for any reason, the county has full right of recourse against the taxing unit to recover the amount thereof and interest thereon..." Each year, a tax sale is held by the County at which lands delinquent for taxes assessed in the third year preceding the sale, or in a prior year, are sold for the total of the unpaid taxes of those years.

Source: Comprehensive Annual Financial Report and County of Genesee

**REVENUES FROM THE STATE OF MICHIGAN**

The County receives revenue sharing payments from the State of Michigan under the State Revenue Sharing Act of 1971, as amended (the "Revenue Sharing Act"), on a per capita basis. The County's revenue sharing distribution is subject to annual legislative appropriation and may be reduced or delayed by Executive Order during any State fiscal year in which the Governor, with the approval of the State Legislature's appropriation committees, determines that actual revenues will be less than the revenue estimates on which appropriations were based.

The State's ability to make revenue sharing payments to the County in the amounts and at the times specified in the Revenue Sharing Act is subject to the State's overall financial condition and its ability to finance any temporary cash flow deficiencies. Act 357, Public Acts of Michigan, 2004 ("Act 357") amended the General Property Tax Act to temporarily eliminate statutory revenue sharing payments to counties by creating a reserve fund, against which counties could draw in lieu of annual revenue sharing payments, paid for by the permanent advancement of the counties' property tax levy from December to July each year, beginning in 2005. ("Revenue Sharing Reserve Fund") Under Act 357, a county would resume receiving state revenue sharing payments in the first year in which the county's property tax revenue reserve was less than the amount the county would have otherwise received in state revenue sharing payments. The County resumed receiving revenue sharing payments during its fiscal year ended September 30, 2012.

Under the fiscal year 2014 budget, signed into law on June 13, 2013 by Governor Snyder, 80% of county revenue sharing payment distributions are made pursuant to the Revenue Sharing Act and 20% are distributed through an incentive-based program similar to the Economic Vitality Incentive Program established in fiscal year 2012 for cities, villages and townships. The county program is known as the County Incentive Program ("CIP"), under which eligible counties may receive distributions for complying with "best practices" such as increasing transparency and consolidating services. Eligible counties are those that would be eligible to resume receiving state revenue sharing payments under Act 357. Under the fiscal year 2014 CIP, an eligible county can receive (i) one-third of the money it is eligible for if it meets requirements for accountability and transparency, including making a citizen's guide to its finances, a performance dashboard and a debt service report available for public viewing; (ii) another one-third if it develops plans to increase its existing level of collaboration and consolidation, both internally and with neighboring jurisdictions; and (iii) a final third if it develops and certifies an unfunded accrued liability plan. The unfunded accrued liability plan, which replaced the requirement in fiscal year 2013 to modify employee compensation plans, must be certified by June 1, 2014 for the County to receive all of the money that it is eligible for from the final component in clause (iii) above. Any portion of the CIP that the County would be eligible to receive would be subject to certain benchmarks that the County would need to meet, and there can be no assurance of what amount, if any, the County would receive under the CIP program. The County anticipates meeting the requirements for clauses i, ii, and iii to receive fiscal year 2014 payments.

**General Fund Revenues From the State**

Prior to 2013 the County exhausted its Revenue Sharing Reserve Fund during the 2011/2012 fiscal year. The County received $7,541,499 in State Revenue Sharing payments during FY 2012/2013 and will rely on the State of Michigan for future Revenue Sharing payments for 2014 year estimates.

| Fiscal Year Ended September 30 | Revenue Sharing Payments** |
|---|---|
| 2014 Estimate [1] | $7,901,562 |
| 2013 | 7,541,499 |
| 2012 | 7,487,510 |
| 2011 | 9,847,817 |
| 2010[2] | 10,548,185 |

** Amounts do not include state gas and weight tax distributions.

[1] Estimate from the State of Michigan

[2] The County's fiscal year revenues include draws from the revenue generated from the State-created reserve fund. See "County Reserve Fund" above.

Source: Web site http://treasury.state.mi.us

**Purchasers of the Bonds should be alert to further modifications to revenue sharing payments to Michigan local governmental units, to the potential consequent impact upon the County's general fund condition, and to the potential impact upon the market price or marketability of the Bonds resulting from changes in revenues received by the County from the State.**

**LABOR FORCE**

A breakdown of the number of employees of the County and their affiliation with organized groups is as follows:

| Bargaining Unit | Number | Contract Expiration |
|---|---|---|
| AFSCME | | |
| 496-00 Clerical | 239 | 09/30/2015 |
| 496-01 Technical | 143 | 09/30/2015 |
| 496-02 GVRC Workers | 20 | 04/01/2015 |
| 496-03 Drain Service | 5 | 12/31/2015 |
| 496-10 Mobile Meals | 17 | 09/30/2010* |
| 916-05 & 916-06 Sheriff Supervisory | 28 | 12/31/2014 |
| 916-01, 02, 03, 04, 08, 09, 10 Supervisors | 38 | 06/30/2015 |
| P.O.A.M. | | |
| (Police Officers & Jail Security) | 208 | 06/30/2014 |
| Judicial Secretaries Association | 9 | 12/31/2014 |
| Teamsters | | |
| Local 214 (Park Maintenance) | 7 | 06/30/2015 |
| Local 214 (Friend of the Court) | 6 | 12/31/2013* |
| Professional Court Officers Association | 34 | 12/31/2015 |
| Non Union | | |
| Full-Time Employees | 102 | n/a |
| Seasonal Employees | 206 | n/a |
| Elected Officials | 31 | n/a |
| TOTAL | 1,093 | |

*In negotiations.

**RETIREMENT PLANS**

The County maintains two distinct retirement plans for its employees. A defined benefit plan is available in accordance with the Genesee County Employees Retirement System Ordinance (the "*GCERS Plan*"). A defined contribution plan is available in accordance with the Genesee County Defined Contribution Pension Plan (the "*DC Plan*"). All County employees, except members of AFSCME Mobile Meals Drivers and AFSCME Seasonal Parks Employees, are participants in either the GCERS Plan or the DC Plan. Employees hired prior to the effective date of the DC plan to their respective employee group, which for most employees was July 1, 1996, were permitted to elect between the GCERS Plan and the DC Plan. Most employees hired between 1996 and 2006 had the option of selecting the GCERS Plan or the DC Plan. All employees hired after 2006 must select the DC Plan for retirement. For information regarding retirement plans, see APPENDIX B.

*GCERS Plan* - This is a contributory multi-employer defined benefit pension plan. County employees represented by the various bargaining units are required to contribute from 0.5% to 9.0% of all compensation, including overtime. The County provides contributions at actuarially determined rates. During 2013, employer contribution rates ranged from 16.87% to 53.48% of covered payroll. For the year ending December 31, 2012, contributions from the multi-employers totaled $14,398,417 and affected employees contributed $2,321,841 for an aggregate multi-employer/employee total of $16,720,258.

*DC Plan* - This is a contributory, single employer defined contribution plan with assets of $104,345,310 as of September 30, 2012. County employees are required to contribute between 3.0% and 7.0% of covered payroll. The County offers a defined contribution pension plan as an alternative to the defined benefit pension plan. The International City Managers Association (ICMA) Retirement Corporation administers the plan, and the County Board of Commissioners has authority over plan provisions and contribution requirements. All employees are eligible to participate in this plan, if not participating in the Defined Benefit Plan. The County is required to contribute 8 to 10% of eligible employees' annual covered payroll, and employees are required to contribute between 3% and 7% of covered payroll. Employees are vested after 5 years of service. During the year ended September 30, 2013, employer and employee contributions to the plan were $2,705,916 and $1,617,428, respectively.

*Other Post-Retirement Benefits* - The County performed an actuarial valuation of the other post-retirement benefits liability for the year ended September 30, 2012. At that time the actuarial accrued liability was determined to be $308,208,023 and the funding value assets was $43,313,587, resulting in an unfunded actuarial accrued liability of $264,894,436. The annual required contribution (ARC) as a percentage of payroll (based on 30-year amortization of the unfunded liability) was 50.15% or $18,549,049.

The County has been working to systematically increase contributions into the VEBA to eventually equal the ARC. Beginning in fiscal year 2002/2003, the County began contributing 3% of gross payroll into a fund designated for retiree health care. This was increased to 5% in the 2003/2004 fiscal year, to 10% in the 2006/2007 fiscal year, 20% in the 2007/2008 fiscal year, 22.5% in the 2008/2009 fiscal year, 20% in the 2009/2010 fiscal year, 24% in the 2010/2011 fiscal year and 24% in the 2011/2012 fiscal year. In 2004, the County created a VEBA trust to specifically designate the funds that had been contributed for retiree health care. Also, all collective bargaining agreements as well as the non-union personnel policies include a provision that requires all employees to make a contribution of 1% to 3% of pre-tax gross wages, which is paid to the VEBA as employer contributions for the funding of retiree health care benefits (OPEB). These contributions resulted in an OPEB obligation for the period ending September 30, 2013 in an amount of $29,409,706. The OPEB obligation is the cumulative difference between the ARC and the actual amount contributed.

**DEBT STATEMENT**(as of April 2, 2014 and including the Bonds described herein)

Each series of bonds marked "LT" is payable in the first instance from a specified source and is payable from the general funds of the County in the event of insufficiency of the specified source. The County is not authorized to levy taxes beyond constitutional and statutory tax rate limitations with respect to the bonds marked "LT".

DIRECT DEBT

| *General Obligation Bonds* | Dated Date | Outstanding Gross Amount | Unit Share Amount | County's Share |
|---|---|---|---|---|
| Sewer, Fenton Twp.-Rolston/Ripley, LT | 11/01/96 | $400,000 | $400,000 | 0 |
| Drain, Atlas Twp. Project A#1610, LT | 12/01/00 | 150,000 | 150,000 | 0 |
| Capital Improvement, LT | 11/01/04 | 1,765,000 | 0 | $1,765,000 |
| Sewer Fenton Twp. Ser A&B, LT | 12/01/04 | 550,000 | 550,000 | 0 |
| Sewer Refunding, LT | 02/01/05 | 4,000,000 | 4,000,000 | 0 |
| Sewer Refunding, Lt. Morris, LT | 12/22/05 | 1,695,000 | 1,695,000 | 0 |
| Drain, Meyers, LT | 08/01/06 | 375,000 | 248,400 | 126,600 |
| Sewer, Western Trunk No. 1, LT | 09/01/06 | 2,775,000 | 2,775,000 | 0 |
| Sewer Refunding No. 3, LT | 11/16/07 | 4,305,000 | 4,305,000 | 0 |
| Qual. Energy Conservation Bonds, LT | 12/01/10 | 7,175,784 | 0 | 7,175,784 |
| Gilkey Creek and Branch Drain Drainage District, LT | 12/01/11 | 2,395,000 | 2,343,268 | 51,732 |
| Water, Fenton Rd. Watermain Project, LT | 04/08/11 | 859,000 | 859,000 | 0 |
| SUB-TOTAL GENERAL OBLIGATION BONDS | | $26,444,784 | $17,325,668 | $9,119,116 |
| *Building Authority Bonds* | | | | |
| Refunding, Series 1998, LT | 07/01/98 | $   155,000 | 0 | $   155,000 |
| Building Authority, Refunding, LT | 06/23/05 | 8,415,000 | 0 | 8,415,000 |
| Brownfield Redev. Ref. LT | 11/20/07 | 12,110,000 | 0 | 12,110,000 |
| Refunding, LT | 04/12/12 | 4,430,000 | 0 | 4,430,000 |
| SUB-TOTAL BUILDING AUTHORITY BONDS | | $25,110,000 | $0 | $25,110,000 |
| *Revenue Bonds with GO Pledge* | | | | |
| Sewer, Western Trunk Relief, LT | 08/01/03 | $2,585,000 | $0 | $2,585,000 |
| Water, LT | 08/01/03 | 3,585,000 | 0 | 3,585,000 |
| Water, LT | 10/01/03 | 15,730,000 | 0 | 15,730,000 |
| Water, LT | 09/01/04 | 13,260,000 | 0 | 13,260,000 |
| NE Sewer, Series 2005A - SRF, LT | 06/23/05 | 15,210,000 | 0 | 15,210,000 |
| NE Sewer, Series 2005B - SRF, LT | 09/22/05 | 10,640,000 | 0 | 10,640,000 |
| NE Sewer, Series 2006A - SRF, LT | 09/21/06 | 2,065,000 | 0 | 2,065,000 |
| NE Sewer, Series 2006B - SRF, LT | 12/14/06 | 5,650,000 | 0 | 5,650,000 |
| NE Sewer, Series 2006C - SRF, LT | 12/14/06 | 3,175,000 | 0 | 3,175,000 |
| Water, Series 2007, LT | 01/01/07 | 5,100,000 | 0 | 5,100,000 |
| Sewer, Northeast Ext., Series B, LT | 09/01/07 | 6,665,000 | 0 | 6,665,000 |
| Sewer, Northeast Ext., 2007A, LT | 09/20/07 | 8,180,000 | 0 | 8,180,000 |
| Sewer District No. 3, LT | 12/01/07 | 4,920,000 | 0 | 4,920,000 |
| Sewer, Sewage Disposal, LT | 02/12/09 | 13,075,000 | 0 | 13,075,000 |

A-8

| | | | | |
|---|---|---|---|---|
| NE Sewer, LT | 01/22/10 | 12,790,000 | 0 | 12,790,000 |
| Sewer No. 3 Revenue Bonds, LT | 01/22/10 | 955,000 | 0 | 955,000 |
| Sewer, Interceptors and Treatment Facilities LT (Ser A) | 04/08/11 | 1,330,000 | 0 | 1,330,000 |
| Sewer, Interceptors and Treatment Facilities LT (Ser B) | 07/28/11 | 4,825,000 | 0 | 4,825,000 |
| Sewage Disp. Series C, Refunding, LT | 09/14/11 | 4,965,000 | 0 | 4,965,000 |
| Water Supply System Revenue Bonds, LT | 10/03/13 | 35,000,000 | 0 | 35,000,000 |
| **TOTAL REVENUE BONDS** | | $169,705,000 | $0 | $169,705,000 |

*Michigan Transportation Fund Bonds*

| | | | | |
|---|---|---|---|---|
| MTF Notes, NO COUNTY CREDIT | 11/01/06 | $580,000 | 0 | $580,000 |
| MTF Notes, NO COUNTY CREDIT | 10/01/07 | 1,970,000 | 0 | 1,970,000 |
| MTF Notes, NO COUNTY CREDIT | 08/01/08 | 2,305,000 | 0 | 2,305,000 |
| MTF Notes, NO COUNTY CREDIT | 09/01/09 | 2,085,000 | 0 | 2,085,000 |
| **TOTAL MICHIGAN TRANSPORTATION FUND BONDS** | | $6,940,000 | $0 | $6,940,000 |

Share of Authority Issued Bonds:

| | | | | |
|---|---|---|---|---|
| Water Supply System Bonds, Series 2014 A, LT | 04/16/14 | 220,500,000 | 0 | 220,500,000 |

Share of County Issued Bonds:

| | | | | |
|---|---|---|---|---|
| Utilities Drainage | 12/01/11 | 46,656 | 0 | 46,656 |
| **TOTAL DIRECT DEBT** | | $448,746,440 | $17,325,668 | $431,420,772 |

| | |
|---|---|
| LESS: Self Supporting Authority Contract Bonds | (220,500,000) |
| Revenue Bonds | (169,705,000) |
| Michigan Transportation Fund Bonds/Notes | (6,940,000) |
| | ($397,145,000) |

| | |
|---|---|
| **TOTAL NET DIRECT DEBT** | $34,275,772 |

OVERLAPPING DEBT

| Municipality | County's Share |
|---|---|
| Cities | $42,414,877 |
| Townships | 43,954,796 |
| Villages | 1,089,013 |
| School Districts | 365,853,767 |
| Intermediate School Districts | 17,060 |
| Community College | 42,960,045 |
| Bishop Airport Authority | 10,430,000 |

| | |
|---|---|
| NET OVERLAPPING DEBT | $506,719,558 |
| NET DIRECT & OVERLAPPING DEBT | $540,995,330 |

Source: Municipal Advisory Council of Michigan

**DEBT RATIOS**

*Per Capita (425,790)*

| | |
|---|---|
| Net Direct Debt | $80.50 |
| Net Direct and Overlapping Debt | $1,270.57 |

*Ratio to 2013 Taxable Valuation ($8,591,144,574)*

| | |
|---|---|
| Net Direct Debt | 0.40% |
| Net Direct and Overlapping Debt | 6.30% |

A-9

*Ratio to 2013 State Equalized Valuation ($8,996,549,108)*

| | |
|---|---|
| Net Direct Debt | 0.38% |
| Net Direct and Overlapping Debt | 6.01% |

*Ratio to 2013 Estimated True Cash Value ($17,993,098,216)*

| | |
|---|---|
| Net Direct Debt | 0.19% |
| Net Direct and Overlapping Debt | 3.01% |

## DEBT HISTORY

The County has no record of default.

## FUTURE FINANCING

The County has entered into a contract with the Karegnondi Water Authority and the City of Flint pursuant to which the Authority will issue an additional $80,000,000 of bonds over the next 3 to 15 months in anticipation of payments to be made by the County and the City of Flint to finance a raw water supply project to serve the County, the City of Flint and several other municipalities. The County will make a limited tax general obligation pledge of the County on 100% of these bonds. The County also anticipates issuance of approximately $60,000,000 of water revenue bonds with a limited tax general obligation pledge of the County to finance construction of a new water treatment plant and related facilities to treat water from the new raw water supply within the next 6 to 12 months.  The County may issue an estimated $18,000,000 to $31,000,000 of water revenue refunding bonds with a limited tax general obligation pledge in the next 6 to 12 months to refund certain outstanding water revenue bond issues for debt service savings.

## COMPENSATED ABSENCES

As of September 30, 2013, the County's governmental activities statement of net position included a liability for vacation and other employee compensated absences of $4,217,266.

## SHORT TERM BORROWING

The County has in the years 1974 through 2013 issued short-term notes in order to establish the 100% Tax Payment Fund. Notes issued in each of the above years have been in a face amount which has been less than the actual  real property tax delinquency.  The primary security for these notes is the collection of the delinquent taxes pledged to the payment of principal of and interest on the notes issued.  The County has pledged its full faith and credit and limited taxing power to the payment of the principal and interest on notes issued since 1975. Notes in the amount of $39.9 million were issued by the County during the fiscal year ended September 30, 2013.

The County Landbank Authority has entered into a $3,000,000 line of credit with a bank and the County has pledged its limited tax full faith and credit on the line.

## LEASE OBLIGATIONS

The County is party to numerous operating leases and aggregate rental expenses which were approximately $74,535 during the year ended September 30, 2013, exclusive of the amount paid to a related organization.

## LEGAL DEBT MARGIN* (as of April 2, 2014 and including the Bonds described herein)

| | | |
|---|---|---|
| 2013 State Equalized Valuation - excluding IFT values | | $8,996,549,108 |
| Debt Limit - 10% of State Equalized Valuation | | 899,654,911 |
| Amount of Direct Debt Outstanding | $448,746,440 | |
| Less:     No County Credit Pledged Bonds/Notes | (6,940,000) | |
| Total Subject to Debt Limit | | 441,806,440 |
| Additional Debt Which Could Be Legally Incurred | | $457,848,471 |

A-10

# GENERAL ECONOMIC INFORMATION

**LOCATION AND AREA**

Genesee County is located in the central-eastern portion of Michigan's lower peninsula, and covers an area of 643 square miles. The City of Flint is the county seat.

The County is located the following distances from these commercial and industrial areas:

|     |                            |
|-----|----------------------------|
| 36  | miles south of Bay City    |
| 50  | miles north of Ann Arbor   |
| 67  | miles west of Port Huron   |
| 104 | miles east of Grand Rapids |

**FORM OF GOVERNMENT**

The County is governed by a legislative body consisting of nine members forming the County Board of Commissioners, each of whom is elected for terms of two years from districts of approximately equal population. County officials include the County Treasurer, County Clerk/Register, Prosecuting Attorney, Drain Commissioner, and Sheriff. These officials are elected at large for four-year terms.

Administration of the County is divided by the State of Michigan Constitution (the "State Constitution") among various officials all elected at large according to purpose and by various appointed officials. The County Treasurer is the chief custodian of the County moneys, collector of County taxes, Treasurer for the County Drainage Districts, disbursing agent for certain tax funds to local communities and school districts. The duties of the County Clerk/Register are primarily record keeping in nature and include such duties as clerk of the Circuit Court and Board of Commissioners and keeping and maintaining records of births, deaths, marriages, discharges of military personnel, records of deeds, mortgages, surveys, recording of plats, notices of liens and bills of sales. The Prosecuting Attorney prosecutes violations of state criminal law within the County. The County Drain Commissioner administers the location, construction and maintenance of drains in the County. The Sheriff's duties involve the charge and custody of the County jail, the serving of processes, and law enforcement in unincorporated areas. The Board of Commissioners has created the office of County Controller. The County Controller is appointed by the Board of Commissioners and the responsibilities of the office include, but are not limited to: budget preparation and control; all accounting and auditing.

**POPULATION BY AGE**

The 2010 U.S. Census estimate of population by age for Genesee County is as follows:

|                    | Number    | Percent  |
|--------------------|-----------|----------|
| Total Population   | 425,790   | 100.00%  |
| 0 through 19 years | 118,966   | 27.94    |
| 20 through 64 years| 248,630   | 58.39    |
| 65 years and over  | 58,194    | 13.67    |
| Median Age         | 38.5 years |         |

**INCOME**

The 2010 U.S. Census estimate of household income for Genesee County is as follows:

|                        | Number    | Percent  |
|------------------------|-----------|----------|
| HOUSEHOLDS BY INCOME   | 166,539   | 100.00%  |
| Less than $10,000      | 20,651    | 12.40    |
| $10,000 to $14,999     | 11,491    | 6.90     |
| $15,000 to $24,999     | 22,982    | 13.80    |
| $25,000 to $34,999     | 21,150    | 12.70    |
| $35,000 to $49,999     | 26,313    | 15.80    |
| $50,000 to $74,999     | 30,810    | 18.50    |
| $75,000 to $99,999     | 14,989    | 9.00     |
| $100,000 to $149,999   | 13,823    | 8.30     |
| $150,000 to $199,999   | 2,665     | 1.60     |
| $200,000 or more       | 1,665     | 1.00     |
| Median Income          | $41,951   |          |
| Mean Income            | $49,079   |          |

**EMPLOYMENT CHARACTERISTICS***

The following companies located in the County offer employment opportunities for residents.

| Company | Product/Service | No. of Employed [1] |
|---|---|---|
| *Within Genesee County (500 or more employees)* | | |
| Genesys Health Care System | Health care | 3,265 |
| McLaren Health Care Corporation | Hospital & other health care | 3,014 |
| General Motors Corp. Assembly | Automotive parts & bodies | 2,821 |
| Hurley Medical Center | Medical center | 2,811 |
| Baker College | Higher Education | 2,800 |
| Square D | Computer programming services | 2,500 |
| Flint Metal Center, Vehicle Mfg. Operating Div. | Metal fabrication | 2,180 |
| A I Flint LLC | Car Parts and accessories | 1,500 |
| General Motors Corp. (Stamping facility) | Stamping plant | 1,415 |
| United States Postal Service | US Postal Service | 1,200 |
| Genesee County (full time employees) | Government | 1,093 |
| Delphi Corp. | Spark plugs & odometers | 1,000 |
| Meijer Inc. | Retail | 1,000 |
| General Motors Corp., Powertrain Div. | Engines & gears & transmissions | 961 |
| Genesee Intermediate Schools | Education | 950 |
| Mott Community College | Higher education | 949 |
| Flint Community Schools | Educational services | 820 |
| JPMorgan Chase Bank | Finance | 800 |
| FirstMerit Bank | Banking | 780 |
| Nu Vision Inc. | Optical goods retail | 766 |
| Carman-Ainsworth Community Schools | Education | 706 |
| Peregrine | Manufacturing | 684 |
| E L Hollingsworth & CO | Freight and logistics | 646 |
| Sears, Roebuck & Co. | Retail sales | 600 |
| United Retired Govt. Employees | Labor Organizations | 600 |
| Creative Foam Corp. | Plastic products | 600 |
| Flint, City of | Municipality | 596 |
| Genova Products (HQ) | Plastic pipes | 570 |
| Vemco, Inc. | Automobile parts & accessories | 500 |
| TRW Automotive | Brake systems | 500 |
| Flint Specialty Services | Freight and logistics | 500 |

[1] The approximate number of employees listed are as reported in these sources: 2013 Michigan Manufacturers Directory, Manta Company Intelligence website, the Michigan Economic Development Council ("MEDC"), and individual employers.

*Due to reporting time lags and other factors inherent in collecting and reporting such information, the numbers may not reflect recent changes in employment levels, if any.

**EMPLOYMENT BREAKDOWN**

The 2010 U. S. Census reports the occupational breakdown of persons 16 years and over for Genesee County is as follows:

| PERSONS BY OCCUPATION | Number | Percent |
|---|---|---|
| PERSONS BY OCCUPATION | 151,813 | 100.00% |
| Professional Specialty Occupations | 45,895 | 30.23 |
| Service Occupations | 31,444 | 20.71 |
| Sales & Office Occupations | 40,133 | 26.44 |
| Natural Resources, Construction, and Maintenance Occupations | 10,498 | 6.92 |
| Transportation & Material Moving Occupations | 23,843 | 15.71 |

The breakdown by industry for persons 16 years and over for Genesee County is as follows:

| PERSONS BY INDUSTRY | Number | Percent |
|---|---|---|
| | 151,813 | 100.00% |
| Agriculture, Forestry, Fishing, Hunting & Mining | 607 | 0.40 |
| Construction | 6,528 | 4.30 |
| Manufacturing | 20,950 | 13.80 |
| Wholesale Trade | 4,099 | 2.70 |
| Retail Trade | 21,861 | 14.40 |
| Transportation | 7,591 | 5.00 |
| Information | 1,366 | 0.90 |
| Finance, Insurance, & Real Estate | 7,894 | 5.20 |
| Professional & Management Services | 12,145 | 8.00 |
| Educational, Health & Social Services | 39,320 | 25.90 |
| Arts, Entertainment, Recreation and Food Services | 15,333 | 10.10 |
| Other Professional and Related Services | 8,350 | 5.50 |
| Public Administration | 5,769 | 3.80 |

## UNEMPLOYMENT

The Michigan Employment Security Commission, Research and Statistical Division, reports unemployment averages for the County of Genesee (not seasonally adjusted) as compared to the State of Michigan as follows:

| | County of Genesee | State of Michigan |
|---|---|---|
| 2014 Year to Date (January) | 9.5% | 8.1% |
| 2013 Annual Average | 9.7 | 8.8 |
| 2012 Annual Average | 9.5 | 9.1 |
| 2011 Annual Average | 11.5 | 10.4 |
| 2010 Annual Average | 14.0 | 12.5 |

## TRANSPORTATION

The Genesee County region provides maximum accessibility by freeway, rail and air.  Four multi-lane expressways converge in the City of Flint.  Interstate 75 is a direct route between northern Michigan and Florida, while I-69 provides direct connections to Canada and Chicago.  I-475 provides a north-south link between Mount Morris and Grand Blanc.  US-23 provides a direct route to Ann Arbor and the Ohio State line as well as the Upper Peninsula.  The ease of travel provided by these major highways has resulted in 24 of the 35 major motor freight carriers who serve Genesee County establishing local terminals.

Rail passenger service is provided daily by Amtrak, freight service is provided by CSX Transportation Line for north-south service, and the CN North America/Grand Trunk for east-west service.  Truck freight service is furnished by 36 commercial trucking companies.  Greyhound and Indian Trails Bus Lines offer nationwide passenger service to areas outside of the Mass Transportation Authorities service area.

Bishop International Airport provides regularly scheduled jet service by various airlines.

Source:  Flint Area Chamber of Commerce and Bishop International Airport Authority.

## HIGHER EDUCATION

Several colleges offer a wide range of educational opportunities to area residents.

*C. S. Mott Community College*, established in 1923, was named after Flint's greatest philanthropist, automotive pioneer Charles Stewart Mott.  It is the largest higher education institution in Genesee County.  Through Mott, students may select from 100 career and transfer programs.  Advanced degrees from Wayne State, Ferris State, Central Michigan and Eastern Michigan universities are available on the Mott Campus.  The main campus is in Flint.  Fenton is the site of Southern Lakes Campus.

*Baker College of Flint* is the largest of seven schools in the statewide Baker College system, offering both two-and four-year degrees in accounting, business management, drafting, electronic engineering, fashion merchandising and interior design among many others.

*Detroit College of Business-Flint* is part of the Davenport/Detroit College Education System, comprising the largest independent college system in the State of Michigan. Both bachelor and associate degrees are offered, with many students obtaining professional work experience in their chosen field while qualifying for a degree.

*Kettering University* is a technical university offering bachelor's and master's degrees in engineering and management.

*Spring Arbor College-Flint*, a private Christian liberal arts institution, offers bachelor degrees in management of human resources, health services and gerontology. Its programs are set up around the students' family and work hours and grants credits for work experience, thus attracting many older students and business people.

*The University of Michigan-Flint* is a satellite campus of the University of Michigan. The University offers a traditional college setting with nearly 60 baccalaureate programs and masters degrees in art and business. One of the nation's most modern urban campuses, UM-Flint has expanded its facilities through the addition of a $20 million, state-of-the art Frances Wilson Thompson Library which opened in 1994.

*Michigan State University-College of Human Medicine, Flint Campus,* blends the academic resources of a major land-grant university medical school with the educational and clinical resources of four major community based teaching hospitals, Hurley Medical Center, McLaren Regional Medical Center, Genesys Regional Medical Center and St. Joseph Campus.

Flint serves as the home of Hurley Medical Center School of Nursing and the Michigan School for the Deaf.

Source: City of Flint, Genesee Economic Area Revitalization, Inc., and the Flint Area Chamber of Commerce.

## CULTURAL/RECREATIONAL

The area has numerous recreational facilities for its residents, including golf courses, a soap-box derby facility, artificial ice rinks, stadiums, soccer fields, ball fields, tennis courts, basketball courts, horseshoe courts, shuffleboard courts, a lawn bowling green, football fields, playgrounds, and a rugby field. Parks of various sizes provide picnic areas as well as play fields.

**The Cultural Center**, located just two blocks east of downtown Flint, consists of a group of eight buildings which bring together the area's cultural, educational, performance, and literary heritage. Most of the buildings were built in the 1950's with donations from area residents. Included in the Center are the following:

**DeWaters Art Center** houses the Flint Institute of Arts with paintings, sculpture, Renaissance tapestries and antique French paper weights among the many items displayed.

**Robert T. Longway Planetarium** has astronomy exhibits, ultraviolet and fluorescent murals, and provides stargazing under the dome in its Star Theater.

**Sloan Museum** has a variety of permanent and changing exhibits. One section portrays the settlement of Genesee County with dioramas of historical scenes. Another section is devoted to the automotive history of Flint and features more than 60 cars and carriages. The health section explains functions of the human body through audiovisual presentations. Also featured is a doll gallery with over 200 dolls displayed.

The 2001-seat **Whiting Auditorium** hosts the Flint Symphony Orchestra and stage presentations from abroad, as well as from this country.

A variety of theater, music, special exhibits and attractions are provided through the University of Michigan, the Flint Community Players, Center Stage Productions and other community groups. Of special interest is the Children's Museum, a hands-on learning center that offers 50 career related exhibits and the Labor Museum and Learning Center of Michigan. The Labor Museum presents an interpretation of the story of labor from its nineteenth century roots to the present with special emphasis on Flint's role in Michigan's labor history.

Other major attractions located within the County include the Antique World Mall, a special gallery of antiques and collectibles, Riverbank Park, a project which has transformed 4-1/2 blocks of downtown (Flint) river frontage into a landscaped community park featuring a 750-seat amphitheater, grand fountain, fish ladder, Archimedes' screw, flowing water walls, islands, flower gardens, picnic sites, and walking and biking paths. Windmill Place houses ethnic foods from around the world in addition to craft and retail shops.

Carriage Town is a 35 square block area whose streets and buildings span the incredible careers of a group of men. The area is a step back into history with a lesson for tomorrow.

Located throughout the County are lakes, picnic, and play areas, local museums and shops of interest to area travelers including Crossroads Village and Huckleberry Railroad, which features daily demonstrations of blacksmithing, wood-carving, yarn spinning and other activities performed by artisans, craftsmen and townspeople, as our ancestors did more than 100 years ago.  The Genesee Belle, a paddlewheel boat is in service on Mott Lake, at Crossroads Village. Pennywhistle Place, a fascinating children's creative play center is adjacent to Crossroads Village as is the Mott Children's Farm.  Operated by the Genesee County Parks and Recreation Commission from May through September, this park has become a favorite of local residents and travelers alike.

**UTILITIES**

Telephone service is provided  by AT&T, Century and Verizon.  Water and sewer service is provided through municipal systems in the cities and individual systems in the rural areas.

**BANKING**

The following banks have branches located within the County according to the Accuity American Financial Directory, July - December 2013.

| Bank | Main Office | Total State-Wide Deposits |
|---|---|---|
| Bank of America | Charlotte, NC | N/A |
| Fifth Third Bank | Cincinnati, OH | N/A |
| First Merit Bank | Akron, OH | N/A |
| BestBank, A Division of Guaranty Bank | Milwaukee, WI | N/A |
| Comerica Bank | Dallas, TX | N/A |
| Flagstar Bank, FSB | Troy, MI | $8,771,046,000 |
| First Michigan Bank | Troy, MI | 1,755,761,000 |
| Chemical Bank | Midland, MI | 4,921,683,000 |
| The State Bank | Fenton, MI | 278,800,000 |
| Community State Bank | St. Charles, MI | 180,284,000 |
| Hantz Bank | Southfield, MI | 108,093,000 |
| JPMorgan Chase Bank, National Association | Columbus, OH | N/A |
| PNC Bank | Pittsburgh, PA | N/A |
| Independent Bank | Ionia, MI | 2,193,408,000 |
| Oxford Bank | Oxford, MI | 243,627,000 |

**Genesee County, Michigan**
**Summaries of General Fund Adopted Revenue and Expenditure Budget**
**Fiscal Year 2012/2013 and 2013/2014**

| | 2012/13 Amended Budget | 2013/14 Adopted Budget |
|---|---|---|
| **REVENUE** | | |
| Taxes | $44,470,857 | $43,314,532 |
| Licenses and Permits | 1,027,414 | 1,027,000 |
| Intergovernmental Revenue (Note A) | 8,873,830 | 17,243,913 |
| Charges for Services | 8,760,228 | 8,618,079 |
| Fines & Forfeitures | 1,723,439 | 1,775,250 |
| Miscellaneous Revenue (Note A) | 14,792,146 | 7,582,457 |
| **TOTAL REVENUE** | $79,647,914 | $79,561,231 |
| **EXPENDITURES** | | |
| Management & Planning | $10,866,324 | $9,826,592 |
| Administration of Justice | 24,185,011 | 26,050,375 |
| Law Enforcement & Community Protection | 18,517,307 | 18,505,960 |
| Human Services | 15,965,900 | 16,034,421 |
| General Support | 10,113,372 | 9,143,883 |
| **TOTAL EXPENDITURES** | $79,647,914 | $79,561,231 |
| **REVENUE OVER (UNDER) EXPENDITURES** | **$0** | **$0** |
| FUND BALANCE BEGINNING OF YEAR | $11,809,385 | $11,746,279 |
| FUND BALANCE END OF YEAR | $11,809,385 * | $11,746,279 * |

Note A - State revenue sharing of $7,620,146 was included in miscellaneous revenue in the 2012/13 amended budget.

    *There is an obligation due to the general fund as reported by the Controller in an amount of $7,830,989 as shown in the County's most recent annual financial statements. The County Treasurer will make a determination on an annual basis of the surplus funds held in the Delinquent Tax Fund. Based on historical determinations of surplus, the County Controller has determined that there should be sufficient surplus to repay the general fund in four years.

**APPENDIX B**

**GENESEE COUNTY DRAIN COMMISSIONER**
**DIVISION OF WATER AND WASTE SERVICES**
**AUDITED FINANCIAL STATEMENTS**

**COUNTY OF GENESEE**
**AUDITED FINANCIAL STATEMENTS**

*Attached are the audited financial statements for the Genesee County Drain Commissioner, Division of Water and Waste Services (the "Division") for the fiscal year ended December 31, 2012, and the audited financial statements for the County of Genesee (the "County") for the fiscal year ended September 30, 2013. The auditors for the Division and the County have not been asked to consent to the use of information from such financial statements in either the Preliminary Official Statement or the Official Statement and have not conducted any subsequent review of such financial statements.*

[THIS PAGE INTENTIONALLY LEFT BLANK]



Plante & Moran, PLLC
27400 Northwestern Highway
P.O. Box 307
Southfield, MI 48037-0307
Tel: 248.352.2500
Fax: 248.352.0018
plantemoran.com

**Independent Auditor's Report**

To the Board of Directors
Genesee County Drain Commissioner
    Division of Water and Waste Services

**Report on the Financial Statements**

We have audited the accompanying financial statements of the Enterprise Fund, Internal Service Funds, and business-type activities of the Genesee County Drain Commissioner Division of Water and Waste Services (the "Division") as of and for the year ended December 31, 2012 and the related notes to the financial statements, which collectively comprise the Genesee County Drain Commissioner Division of Water and Waste Services' basic financial statements as listed in the table of contents.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the respective financial position of the Enterprise Fund, Internal Service Funds, and business-type activities of the Genesee County Drain Commissioner Division of Water and Waste Services as of December 31, 2012 and the respective changes in its financial position and, where applicable, cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

To the Board of Directors
Genesee County Drain Commissioner
    Division of Water and Waste Services

*Other Matters*

*Required Supplemental Information*

Accounting principles generally accepted in the United States of America require that the management's discussion and analysis on pages 3-11 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board, which considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplemental information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

*Supplemental Information*

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise the Genesee County Drain Commissioner Division of Water and Waste Services' basic financial statements. The supplemental information, as identified in the table of contents, is presented for the purpose of additional analysis and is not a required part of the basic financial statements.

The supplemental information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the basic financial statements or to the basic financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the other supplemental information is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

**Report on Summarized Comparative Information**

We have previously audited the Genesee County Drain Commissioner Division of Water and Waste Services' December 31, 2011 financial statements, and we expressed an unmodified audit opinion on those audited financial statements in our report dated June 25, 2012. In our opinion, the summarized comparative information presented herein as of and for the year ended December 31, 2011 is consistent, in all material respects, with the audited financial statements from which it has been derived.



May 14, 2013

Praxity
MEMBER
GLOBAL ALLIANCE OF
INDEPENDENT FIRMS

1

2

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Management's Discussion and Analysis

The County established a County Agency through the County Improvement Act (Public Act 342). The County designated the Drain Commissioner as the County Agency. The County Agency created the Division of Water and Waste Services (the "Division") as its vehicle to perform required duties. The Division provides public utility services of water and wastewater treatment in parts of Genesee, Saginaw, Shiawassee, Oakland, Lapeer, and Livingston counties. The Division's mission is to distribute water and collect and treat wastewater in such a manner that is in compliance with all state and federal regulations and to maintain the lowest cost to customers. Additionally, the Genesee County Board of Commissioners designated the Division as the county enforcing agency for soil erosion in Genesee County.

The Division is responsible for the administration, operation, maintenance, and construction of infrastructure and treatment facilities for the communities located in Genesee County for the sanitary system and water supply. The Division is divided into four distinct cost centers. These cost centers, which include Interceptor and Treatment, Water, District No. 3, and District No. 7, have been developed based upon revenue, responsibility, and definable core functions. In addition, the Division offers construction management and system operation and maintenance services to local communities.

Some of the key administrative and engineering duties of both the sanitary sewer operation and the water department operation include comprehensive system planning, interaction and regulation of development, implementing capital improvement projects, and system budget management. The administration team is responsible for the overall operation of the utility's services, engineering, and soil erosion in Genesee County. It is this department's responsibility to secure, allocate, and monitor funding, personnel, and equipment resources for the Division to ensure safe, reliable, and efficient operation of the utility.

The primary functions of the support services area are to efficiently and uniformly provide support to the various operations departments. These services are grouped into categories as follows: safety, human resources, finance, permits, soil erosion, construction, inspection, and information technology.

**The Operation and Maintenance Department** - The Operation and Maintenance (O&M) department has two primary functions: sanitary sewer interception and transportation and water transmission. It also performs contracted O&M for the local communities. To ensure that these primary functions are met, O&M performs the following tasks:

- Preventive maintenance of the water and sewer infrastructure and appurtenances
- Staking of water and sewer infrastructure (Miss Dig)
- Jetting/Televising of sanitary sewers
- Inspection of water and sewer infrastructure
- Responds to customer complaints (i.e., plugged sewers, high bills, etc.)
- Installs, reads, and repairs water meters, repairs broken water mains, and coordinates the repair of sanitary sewers, sewer main taps, and cut and cap water and sewer services
- Provides after-hours emergency response as needed

3

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Management's Discussion and Analysis (Continued)

**Sewage Treatment Facilities** - The core function of all treatment facilities is to effectively and efficiently treat sewage in compliance with regulations established by their NPDES (National Pollutant Discharge Elimination System) permit. The facilities maintain good working relationships with customers and elected officials of the districts to achieve the goals of accountability, transparency, and credibility. These activities include the following:

- Facility operation and maintenance
- Analytical support to ensure compliance with discharge limits and industrial pretreatment
- Providing training in plant operation, maintenance, safety, and regulatory compliance
- Residuals management
- Addition of various treatment chemicals and/or use of other treatment alternatives
- Planning for plant improvements, equipment replacement, and upgrades
- Emergency response planning
- Storage lagoon operation and maintenance
- Discharge limitations and monitoring
- Pollutant minimization
- Operation of an Industrial Pretreatment Program (IPP)

The sanitary sewer treatment operations are responsible for the collection and transmission of effluent through the sewer interceptor lines to the three disposal plants under the Division's jurisdiction. These plants are the Linden Facility (District No. 3), the Bird Road Lagoons (District No. 7), and the Anthony Ragnone Treatment Plant (ARTP) (Districts No. 1, 2, 5, and 6). In addition to serving large portions of Genesee County, the Division has contracts for sewer treatment outside of its jurisdiction with Shiawassee, Lapeer, Saginaw, Oakland, and Livingston counties.

ARTP provides sewage treatment for the majority of the Division's service area, with Districts No. 3 and No. 7 providing service for several outlying areas. And while the District No. 3 and No. 7 facilities are two distinctly separate operations, they are combined administratively due to their proximity to one another.

The Division also manages two programs that impact its treatment facilities:

- **Biosolids Disposal** - Each treatment plant is responsible for disposing wastewater treatment plant biosolids in a manner that is considered beneficial reuse, in particular, biosolids application on farmland. The ARTP accomplished this goal in 2012 by applying 6,473 dry tons of stabilized biosolids on approximately 2,500 acres of approved fields. In 2012, District No. 3 applied 1,145 dry tons of stabilized biosolids on approximately 900 acres of approved fields.

4

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**
<div align="right">Management's Discussion and Analysis (Continued)</div>

- **Industrial Pretreatment Program** - The Division regulates and monitors industrial and nondomestic dischargers to the wastewater system. The Division reviews applications, issues discharge permits, verifies compliance, calculates fees and surcharge bills for the customers, as well as enforces regulations through discharge permits, which protect the wastewater treatment facilities and the environment. An arsenic program for drinking water systems was implemented to ensure compliance with MDEQ regulations. The ordinance also allows for best management practices (BMP) in regulating silver and mercury from over 750 physician and dental offices and grease and oil from approximately 1,400 restaurants. Inter-jurisdictional agreements and the sewer use ordinance have been distributed to the municipalities, and the local unit of government approval process is ongoing. At this time, there are approximately 15 significant industrial facilities and one categorical user that pay surcharges for the cost of treating various substances they discharge to the Division.

**Water Supply** - The water supply department is responsible for acquisition of water from the Detroit Water and Sewerage Department via the City of Flint. The Division transmits potable water to local communities, which in turn supply their residential, commercial, and industrial customers. The Division also contracts with certain local municipalities to operate and maintain their water systems, as well as provide billing services.

The Division maintains a distribution system consisting of over 600 miles of water mains. It also installs water connections and performs turn-ons/offs at the request of its communities, services and changes water meters, and oversees the backflow prevention program. In order to provide an uninterruptible supply of safe drinking water, this department provides forward thought to:

- Identify and evaluate water supply alternatives to meet normal and emergency needs
- Prepare cost estimates to construct, operate, and maintain selected alternatives
- Determine water treatment and pumping requirements

**Objectives and Achievements**

The main objectives of the Division are to maintain high quality services along with residential and commercial water and sewer rates that are fair and cost effective to all concerned. Although not required by law, the Division maintains a yearly budget of income and expenses for all cost centers. The budget is reviewed and approved by an advisory board. Each community that is a customer of the Division has a seat on the advisory board, which meets monthly to provide guidance to the Division.

The rising cost of water from the Detroit Water and Sewerage Department (DWSD) to the City of Flint, and there in turn to the Division and its community customers, continues to be of great concern. From 2002 to 2013, the average yearly DWSD cost of water increased 9.06 percent. This cost from Detroit is passed through to the Division with no markup from the City of Flint. Instead, a monthly flat rate of $114,000 is paid to the City of Flint which also provides for up to 5.2 million gallons per day in emergency backup water supply.

5

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**
<div align="right">Management's Discussion and Analysis (Continued)</div>

Due to concern over reliability and this rising cost of water from DWSD, the Division has been coordinating an interjurisdictional initiative for developing an alternative water supply system from Lake Huron. Communities currently supplied by DWSD that are participating in this initiative include the City of Flint, Genesee County, Sanilac County, and the Greater Lapeer County Utilities Authority (GLCUA).

As such, a new governmental entity, the Karegnondi Water Authority (KWA), was incorporated on October 1, 2010, with the purpose of developing this new water supply. At formation, it was comprised of the following five governmental units: Genesee County Drain Commissioner, Lapeer County, the City of Lapeer, Sanilac County, and the City of Flint. After construction of a new pipeline, it will then be KWA's responsibility to provide a supply of untreated Lake Huron water to all contracting municipalities.

As of December 31, 2012, KWA has not incurred any transactions that would have a financial impact on the Division. At the time of this report, both the City of Flint and the Advisory Board of the Genesee County Drain Commissioner Division of Water and Waste Services have voted to sign capacity contracts with KWA.

**Rate Structure**

During 2012, the Division continued a review of its rate structure, with the goal of adjusting rates beginning in 2013. A Division goal is to review and set water and sewer rates on a five-year basis in order to maintain stable and fiscally responsible utility rates. The Division has been able to keep its portion of water and sewer rates constant since its last rate increases in 2008 and 2009. Part of the rate structure requires automatic adjustments based upon DWSD's rate increases to the City of Flint, which are typically passed on to the Division's customers in September of each year.

**Grant Acquisitions**

- The Division was allocated funds of $863,500 for the Vortex Grit Tank No. 2 Project at District No. 3 in September 2011. The funds were allocated from the Department of the Army under Section 219 of the Water Resources Development Act of 1992. Public Law 102-580, as amended, specifies the cost-sharing requirements applicable. During 2012, the Division received $289,991 of contributed capital toward the project.

6

B-3

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

**Management's Discussion and Analysis (Continued)**

- The Division was allocated funds as part of the Kearsley Creek Interceptor Project in 2006 and in 2008. The Department of the Army and the Division entered into a project cooperation agreement for the design of approximately 22 miles of interceptor sanitary sewer lines, associated to pump stations and associated appurtenances pursuant to Section 219(f)(59) of the Water Resources Development Act of 1992, Public Law 102-580 as amended, which authorized the Secretary of the Army to provide design and construction assistance for environmental infrastructure improvements to Genesee County, Michigan. During 2012, the Division made the decision not to move forward with the construction of this project, expensed the project to date, and made a final recording of $218,434 for contributed capital.

- State of Michigan Revolving Fund Program loans were approved in prior years for $1,445,000 to fund the ARTP Switchgear project, $14,544,000 to fund the Pump Station #1 and ARTP Blowers and Clarifiers projects, and $933,515 to fund the Fenton Road Water Main Project. A total of $345,440, $2,382,209, and $29,111 was collected, respectively, for these projects during 2012.

**Using this Annual Report**

This annual report consists of a series of financial statements. The statement of net position, the statement of revenue, expenses, and changes in net position, and the statement of cash flows provide information about the activities of the Division as a whole and assist in presenting a longer-term view of its finances.

B-4

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

**Management's Discussion and Analysis (Continued)**

**Condensed Financial Information**

The following tables present condensed information about the Division's financial position compared to the prior year:

| | December 31 | | Increase | |
| | 2012 | 2011 | (Decrease) | Percent Change |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets | $ 26,350,746 | $ 24,633,437 | $ 1,717,309 | 7.0 % |
| Restricted assets | 543,333 | 5,459,054 | (4,915,721) | (90.0) |
| Noncurrent lease receivable | 25,759,265 | 28,668,516 | (2,909,251) | (10.1) |
| Capital assets | 322,899,623 | 321,952,707 | 946,916 | 0.3 |
| Other noncurrent assets | 835,548 | 2,169,783 | (1,334,235) | (61.5) |
| Total assets | 376,388,515 | 382,883,497 | (6,494,982) | (1.7) |
| **Liabilities** | | | | |
| Current liabilities | 16,269,157 | 15,420,478 | 848,679 | 5.5 |
| Liabilities payable from restricted assets | 243,008 | 3,509,475 | (3,266,467) | (93.1) |
| Other noncurrent liabilities | 5,832,566 | 7,276,880 | (1,444,314) | (19.8) |
| Long-term debt | 159,837,896 | 167,452,099 | (7,614,203) | (4.5) |
| Total liabilities | 182,182,627 | 193,658,932 | (11,476,305) | (5.9) |
| **Net Position** | | | | |
| Net investment in capital assets | 181,595,040 | 178,661,325 | 2,933,715 | 1.6 |
| Restricted | 3,098,940 | 3,098,052 | 888 | - |
| Unrestricted | 9,511,908 | 7,465,188 | 2,046,720 | 27.4 |
| Total net position | $ 194,205,888 | $ 189,224,565 | $ 4,981,323 | 2.6 |

| | December 31 | | Increase | |
| | 2012 | 2011 | (Decrease) | Percent Change |
|---|---|---|---|---|
| Revenue from operations | $ 52,560,768 | $ 50,021,535 | $ 2,539,233 | 5.1 % |
| Interest on operating cash and receivables | 43,217 | 35,427 | 7,790 | 22.0 |
| Total revenue | 52,603,985 | 50,056,962 | 2,547,023 | 5.1 |
| Sludge disposal charges | 1,228,262 | 1,098,897 | 129,365 | 11.8 |
| Cost of water | 11,779,406 | 12,947,738 | (1,168,332) | (9.0) |
| Operating and maintenance | 21,825,607 | 18,853,461 | 2,972,146 | 15.8 |
| Administrative and depreciation | 12,208,067 | 12,283,110 | (75,043) | (0.6) |
| Total operating expenses | 47,041,342 | 45,183,206 | 1,858,136 | 4.1 |
| Other nonoperating expense | 2,201,438 | 2,432,996 | (231,558) | (9.5) |
| Change in net position - Before capital contributions | 3,361,205 | 2,440,760 | 920,445 | 37.7 |
| Capital contributions | 1,620,118 | 268,228 | 1,351,890 | 504.0 |
| Change in net position | $ 4,981,323 | $ 2,708,988 | $ 2,272,335 | 83.9 |

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

*Management's Discussion and Analysis (Continued)*

**Major Capital Assets and Debt Activity**

Construction projects completed by the Division totaled $36,835,568 during 2012. This resulted in a reclassification of the construction costs of this amount from a nondepreciable to depreciable asset. The ARTP Clarifiers Project was the largest completed during 2012, valued at $11,924,394.

The Division also increased its capital assets by $1,111,693 due to the completion of the Fenton Road Water Main project, which was funded by two local community customers.

Use of restricted County Capital Improvement Fees (CCIF) to pay debt service and the reduction of restricted receivables from other governmental entities has been the past practice of the Division. Underfunding has occurred and was considered in the initial planning of the CCIF program. CCIF will continue to be collected after retirement of the bond to restitute the fund in full.

**Financial Review**

In analyzing the Genesee County Drain Commissioner Division of Water and Waste Services' financial position, it is important to recognize the mission of the agency, which has been previously stated. A discussion of the significant financial activity during the current year is as follows:

**Statement of Net Position**

- Current assets increased by $1.7 million in the current year due to an increase in cash and equivalents, current accounts receivable, and prepaid expenses.

- Current liabilities increased by approximately $850,000 from the prior year. The main portion of this increase is due to a rise in the current portion of long-term debt, while a smaller amount is due to the timing of accounts payable transactions.

- Liabilities payable from restricted assets decreased significantly again in 2012, from $3.5 million in 2011 to $243,000 at the end of 2012. This continued decrease once again is due to several projects being completed during the year.

- Other noncurrent liabilities decreased by approximately $9.0 million. This was primarily due to a reduction in long-term debt of approximately $7.6 million.

- Combined unrestricted net position increased by approximately $2.0 million, with increases occurring in each of the four divisions. Of significant note, District No. 3 moved from an unrestricted deficit position in 2011 of ($252,524) to a positive ending 2012 position of $130,124.

9

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

*Management's Discussion and Analysis (Continued)*

**Statement of Revenue, Expenses, and Changes in Net Assets**

- Operating revenue increased by 5.1 percent during 2012, with water sales accounting for the majority of this increase. The increase in water sales is largely due to the increase in the pass-through rate from DWSD, while a warm and dry summer did produce an increase in water demand. Operating expenses increased slightly less, at a 4.1 percent rate.

- Two of the Division's largest expenses, water costs and utilities, were reduced on a fiscal basis in 2012. However, this calendar year reduction in costs does not fully represent the true yearly ongoing cost of these two expenses. As noted in last year's audit report letter dated June 25, 2012, the Division made a change to accounts payable invoice timing which resulted in an overstatement of expenses for 2011. After review by the Division's new finance officer, the Division concurred with the auditors and moved to correct the situation in 2012. To do so required a subsequent understatement in expenses for both the cost of water and for utilities in 2012. Going forward, a policy has been put in place which will ensure that 12 months of expenses are properly incurred in each calendar year.

- Contractual services increased by approximately $4.0 million in 2012, primarily due to increased engineering and legal work performed for the interceptor and treatment, and water supply divisions. In particular, the Division decided not to move forward with a construction project for interceptor and treatment which resulted in a reclassification of CIP to contractual services, accounting for $2.5 million of the overall increase.

- Depreciation increased by approximately $770,000 due to project completion in 2012 and the associated CIP having been converted to depreciable assets.

The following table shows the trend in interceptor and treatment sewage disposal revenue compared to total flow volumes for the Division's main ARTP treatment facility:

| | Year Ended December 31 | | | |
|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 |
| I&T sewage disposal revenue | $ 22,579,898 | $ 22,596,773 | $ 22,014,199 | $ 22,785,153 |
| Total flow (thousands of gallons) | 11,979,000 | 9,518,000 | 11,726,740 | 9,540,064 |
| Average revenue per thousands of gallons trated | $       1.88 | $       2.37 | $       1.88 | $       2.39 |

10

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Management's Discussion and Analysis (Continued)

The following table shows the trend in water sales compared to volume of water purchased and volume of water sold, with the resulting water efficiency rate:

|  | Year Ended December 31 | | | |
|  | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Water sales revenue (wholesale and retail) | $ 19,809,718 | $ 21,202,820 | $ 21,697,903 | $ 23,012,087 |
| Volume of water purchased (cu. ft.) | 616,325,400 | 616,632,200 | 621,182,300 | 630,152,800 |
| Volume of water sold (cu. ft.) | 594,736,958 | 585,092,058 | 581,675,986 | 551,198,996 |
| Water efficiency rate | 96% | 95% | 94% | 87% |

### Contacting the Division's Management

This financial report is intended to provide our constituents, sewer/water users, and bondholders with a general overview of the Genesee County Drain Commissioner Division of Water and Waste Services' accountability for the money it receives. These financial statements are included as a component unit of Genesee County and should be viewed as part of the government-wide financial statements. If there are questions about this report or if additional information is needed, we welcome anyone to contact the Drain Commissioner or the director of the Division.

B-6

11

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Statement of Net Position – Proprietary Fund Types

|  | December 31, 2012 | | | December 31, 2011 |
|  | Enterprise Fund | Internal Service Fund | Total | Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents (Note 2) | $ 12,796,815 | $ 1,139,582 | $ 13,936,397 | $ 13,380,794 |
| Accounts receivable | 8,812,458 | - | 8,812,458 | 8,255,907 |
| Current portion of leases receivable | 2,940,000 | - | 2,940,000 | 2,825,000 |
| Due from other governmental units | - | - | - | 2,000 |
| Inventory | 75,625 | - | 75,625 | 52,658 |
| Prepaid expenses and other assets | 493,266 | - | 493,266 | 87,078 |
| Other assets | 93,000 | - | 93,000 | 30,000 |
| Total current assets | 25,211,164 | 1,139,582 | 26,350,746 | 24,633,437 |
| Noncurrent assets: | | | | |
| Restricted cash and cash equivalents | - | - | - | 4,592,588 |
| Restricted accounts receivable | 243,008 | - | 243,008 | 532,653 |
| Restricted - Due from other governmental units | 300,325 | - | 300,325 | 333,813 |
| Leases receivable - Net of current portion | 25,759,265 | - | 25,759,265 | 28,668,516 |
| Local unit construction in progress | 156,500 | - | 156,500 | 1,413,161 |
| Capital assets (Note 3): | | | | |
| Assets not subject to depreciation | 55,779,523 | - | 55,779,523 | 86,934,064 |
| Assets subject to depreciation - Net of depreciation | 264,520,174 | 2,599,926 | 267,120,100 | 235,018,643 |
| Unamortized bond issuance costs | 679,048 | - | 679,048 | 756,622 |
| Total noncurrent assets | 347,437,843 | 2,599,926 | 350,037,769 | 358,250,060 |
| Total assets | 372,649,007 | 3,739,508 | 376,388,515 | 382,883,497 |
| **Liabilities** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued expenses | 5,031,387 | 1,472 | 5,032,859 | 4,823,168 |
| Due to other governmental units | 241,300 | - | 241,300 | 237,310 |
| Due to State of Michigan | 149,998 | - | 149,998 | - |
| Current portion of long-term debt (Note 4) | 10,845,000 | - | 10,845,000 | 10,360,000 |
| Total current liabilities | 16,267,685 | 1,472 | 16,269,157 | 15,420,478 |
| Noncurrent liabilities: | | | | |
| Liabilities related to restricted assets | 243,008 | - | 243,008 | 3,509,475 |
| Unearned leases | 156,500 | - | 156,500 | 1,524,185 |
| Other postemployment benefit obligation (Note 6) | 5,676,066 | - | 5,676,066 | 5,752,695 |
| Long-term debt - Net of current portion (Note 4) | 159,837,896 | - | 159,837,896 | 167,452,099 |
| Total noncurrent liabilities | 165,913,470 | - | 165,913,470 | 178,238,454 |
| Total liabilities | 182,181,155 | 1,472 | 182,182,627 | 193,658,932 |
| **Equity** - Net position | | | | |
| Net investment in capital assets | 178,995,114 | 2,599,926 | 181,595,040 | 178,661,325 |
| Restricted | 3,098,052 | - | 3,098,052 | 3,098,052 |
| Unrestricted | 8,374,686 | 1,138,110 | 9,512,796 | 7,465,188 |
| Total net position | $ 190,467,852 | $ 3,738,036 | $ 194,205,888 | $ 189,224,565 |

The Notes to Financial Statements are an Integral Part of this Statement.

12

**B-7**

## Genesee County Drain Commissioner
## Division of Water and Waste Services

### Statement of Revenue, Expenses, and Changes in Net Position
### Proprietary Fund Types

| | Enterprise Fund | Internal Service Fund | Total | December 31, 2011 Total |
|---|---|---|---|---|
| | December 31, 2012 | | | |
| **Operating Revenue** | | | | |
| Charges for sales and service: | | | | |
| Sale of water | $ 23,104,124 | $ - | $ 23,104,124 | $ 21,697,903 |
| Sewage disposal charges | 26,708,222 | - | 26,708,222 | 26,028,846 |
| Billing services | 146,171 | - | 146,171 | |
| Water meter sales | 46,694 | - | 46,694 | 64,662 |
| Sewer and pumping station - Operation and maintenance | 1,197,219 | - | 1,197,219 | 1,197,219 |
| Other operating revenue | 1,358,338 | - | 1,358,338 | 1,032,905 |
| Total operating revenue | 52,560,768 | - | 52,560,768 | 50,021,535 |
| **Operating Expenses** | | | | |
| Cost of water | 11,779,406 | - | 11,779,406 | 12,947,738 |
| Sludge disposal service | 1,228,262 | - | 1,228,262 | 1,098,897 |
| Cost of insurance claims and expenses | 277,414 | - | 277,414 | 388,005 |
| Repairs and maintenance | 2,314,611 | 65,905 | 2,380,516 | 1,584,188 |
| Personnel services | 15,207,816 | - | 15,207,816 | 16,672,169 |
| Other supplies and expenses | 995,794 | - | 995,794 | 1,044,117 |
| Contractual services | 4,620,263 | - | 4,620,263 | 622,620 |
| Utilities | 3,241,481 | - | 3,241,481 | 4,288,957 |
| Depreciation | 6,849,102 | 461,288 | 7,310,390 | 6,536,515 |
| Total operating expenses | 46,514,149 | 527,193 | 47,041,342 | 45,183,206 |
| **Operating Income (Loss)** | 6,046,619 | (527,193) | 5,519,426 | 4,838,329 |
| **Nonoperating Revenue (Expenses)** | | | | |
| Community bond interest income | 1,263,136 | - | 1,263,136 | 1,356,456 |
| Community bond interest expense | (1,263,136) | - | (1,263,136) | (1,356,456) |
| Miscellaneous income | 930,054 | - | 930,054 | 635,689 |
| Miscellaneous expense | (45,582) | (1,756) | (47,338) | (158,115) |
| Capital interest and fee expense | (3,103,857) | - | (3,103,857) | (2,910,570) |
| Investment income | 43,217 | - | 43,217 | 35,427 |
| Gain on sale of assets | - | 19,703 | 19,703 | - |
| Total nonoperating (expense) revenue | (2,176,168) | 17,947 | (2,158,221) | (2,397,569) |
| **Income (Loss)** - Before capital contributions and operating transfers | 3,870,451 | (509,246) | 3,361,205 | 2,440,760 |
| **Capital Contributions** | 1,620,118 | - | 1,620,118 | 268,228 |
| **Transfers In** | 45,632,133 | - | 45,632,133 | 37,662,791 |
| **Transfers Out** | (45,518,311) | (113,822) | (45,632,133) | (37,662,791) |
| **Increase (Decrease) in Net Position** | 5,604,391 | (623,068) | 4,981,323 | 2,708,988 |
| **Net Position** - Beginning of year | 184,863,461 | 4,361,104 | 189,224,565 | 186,515,577 |
| **Net Position** - End of year | $ 190,467,852 | $ 3,738,036 | $ 194,205,888 | $ 189,224,565 |

The Notes to Financial Statements are an
Integral Part of this Statement.       13

## Genesee County Drain Commissioner
## Division of Water and Waste Services

### Statement of Cash Flows - Proprietary Fund Types

| | Enterprise Fund | Internal Service Fund | Total | December 31, 2011 Total |
|---|---|---|---|---|
| | December 31, 2012 | | | |
| **Cash Flows from Operating Activities** | | | | |
| Receipts from customers | $ 52,079,220 | $ 28,183 | $ 52,107,403 | $ 56,647,903 |
| Payments to suppliers and others for goods and services | (25,544,057) | (295,873) | (25,839,930) | (32,126,627) |
| Payments for salaries and employee benefits | (14,771,454) | - | (14,771,454) | (9,449,173) |
| Net cash provided by (used in) operating activities | 11,763,709 | (267,690) | 11,496,019 | 15,072,103 |
| **Cash Flows from Capital and Related Financing Activities** | | | | |
| Purchases of capital assets | (8,722,477) | (476,857) | (9,199,334) | (17,995,616) |
| Contribution from local units for construction | - | - | - | 1,219,720 |
| County capital improvements fee | 968,219 | - | 968,219 | 630,783 |
| Collections of leases receivable from municipalities | 4,030,844 | - | 4,030,844 | 4,014,604 |
| Proceeds from issuance of bonded debt | 3,418,569 | - | 3,418,569 | 24,872,946 |
| Principal paid on bond maturities | (10,534,250) | - | (10,534,250) | (17,708,000) |
| Interest paid on bonds and other long-term liabilities | (4,371,165) | - | (4,371,165) | (4,277,392) |
| Operating transfer | 113,822 | (113,822) | - | - |
| Net cash used in capital and related financing activities | (15,096,438) | (590,679) | (15,687,117) | (9,242,955) |
| **Cash Flows from Investing Activities** - Investment income | 154,113 | - | 154,113 | 56,557 |
| **Net (Decrease) Increase in Cash and Cash Equivalents** | (3,178,616) | (858,369) | (4,036,985) | 5,885,705 |
| **Cash and Cash Equivalents** - Beginning of year | 15,975,431 | 1,997,951 | 17,973,382 | 12,087,677 |
| **Cash and Cash Equivalents** - End of year | $ 12,796,815 | $ 1,139,582 | $ 13,936,397 | $ 17,973,382 |
| **Balance Sheet Classification of Cash and Cash Equivalents** | | | | |
| Cash and cash equivalents | $ 12,796,815 | $ 1,139,582 | $ 13,936,397 | $ 13,380,794 |
| Restricted cash and cash equivalents | - | - | - | 4,592,588 |
| Total cash and cash equivalents | $ 12,796,815 | $ 1,139,582 | $ 13,936,397 | $ 17,973,382 |
| **Reconciliation of Operating Income (Loss) to Net Cash from Operating Activities** | | | | |
| Operating income (loss) | $ 6,046,619 | $ (527,193) | $ 5,519,426 | $ 4,838,329 |
| Depreciation | 6,849,102 | 461,288 | 7,310,390 | 6,536,515 |
| Write-off of construction in progress | 2,369,806 | - | 2,369,806 | - |
| Changes in assets and liabilities: | | | | |
| Receivables | (457,645) | 1,998 | (455,647) | 2,154,890 |
| Other | - | (1,756) | (1,756) | - |
| Inventories | (22,967) | - | (22,967) | (9,359) |
| Prepaid and other assets | (550,877) | 81,689 | (469,188) | 106,151 |
| Accounts payable | (2,874,252) | (309,901) | (3,184,153) | 1,374,259 |
| Internal balances | (26,185) | 26,185 | - | - |
| Due from other governmental units - Net | (30,292) | - | (30,292) | 71,318 |
| Accrued and other liabilities | 460,400 | - | 460,400 | - |
| Net cash provided by (used in) operating activities | $ 11,763,709 | $ (267,690) | $ 11,496,019 | $ 15,072,103 |

**Noncash Investing, Capital, and Financing Activities** - During the year ended December 31, 2012, the Enterprise Fund had $1,111,693 and $508,425 contributed to the water and sewer systems by local communities and a grant, respectively.

14

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Notes to Financial Statements
December 31, 2012

**Note 1 – Summary of Significant Accounting Policies**

The Genesee County Drain Commissioner Division of Water and Waste Services (the "Division") was organized in September 1965 under Public Act No. 342 of 1939 of the State of Michigan (amended in 1967). The Division's major operations are the construction and operation of water and waste systems in Genesee County, Michigan (the "County") and certain areas in surrounding counties. Construction is financed with proceeds from the sale of bonds and federal and state grants. The operating activities are financed primarily through user charges to municipalities in the systems.

The financial statements of the Division have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) as applied to governmental units. The Governmental Accounting Standards Board (GASB) is the accepted standard-setting body for establishing governmental accounting and financial reporting principles. The more significant of the Division's accounting policies are described below:

**Reporting Entity** - Included within the reporting entity are the following:

- Genesee County Sewage Disposal Systems Nos. 1, 2, 5, and 6 (interceptors and treatment facilities)

- Genesee County Sanitary Sewage Disposal Systems Nos. 3 and 7

- Genesee County water supply systems

- Genesee County Division of Water and Waste Services - Vehicle and Equipment Fund (Internal Service Fund)

- Genesee County Division of Water and Waste Services - Insurance Fund (Internal Service Fund)

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Notes to Financial Statements
December 31, 2012

**Note 1 – Summary of Significant Accounting Policies (Continued)**

In evaluating how to define the Division for financial reporting purposes, management has considered all potential component units. The decision to include a potential component unit in the reporting entity was made by applying the criteria set forth in GAAP. The basic, but not the only, criterion for including a potential component unit within the reporting entity is the governmental body's ability to exercise oversight responsibility. The most significant manifestation of this ability is financial interdependency. Other manifestations of the ability to exercise oversight responsibility include, but are not limited to, the selection of governing authority, the designation of management, the ability to significantly influence operations, and accountability for fiscal matters. The other criterion used to evaluate potential component units for inclusion or exclusion from the reporting entity is the existence of special financing relationships, regardless of whether the Division is able to exercise oversight responsibilities. Based on the application of these criteria, there are no component units to be included in these basic financial statements.

**Measurement Focus, Basis of Accounting, and Financial Statement Presentation** - The basic financial statements are reported using the economic resources measurement focus and the accrual basis of accounting. Revenue is recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. Grants and similar items are recognized as revenue as soon as all eligibility requirements imposed by the provider have been met.

The Division reports the following major proprietary fund:

- The Enterprise Fund is used to account for operations that are financed and operated in a manner similar to private business enterprises, where the costs (expenses, including depreciation) of providing water and sewer services to the general public on a continuing basis are financed through user charges.

Additionally, the Division reports the following Internal Service Fund:

- The Internal Service Fund accounts for financing of goods and services provided by one department to other departments of the Division on a cost-plus basis as well as risk management services provided to other departments on a cost-reimbursement basis.

As a general rule, the effect of interfund activity has been eliminated from the basic financial statements. Exceptions to this general rule are charges between the Division's water and sewer function and various other functions of the Division. Eliminations of these charges would distort the direct costs and program revenue reported for the various functions concerned.

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Notes to Financial Statements
December 31, 2012

**Note 1 – Summary of Significant Accounting Policies (Continued)**

Proprietary funds distinguish operating revenue and expenses from nonoperating items. Operating revenue and expenses generally result from providing services and producing and delivering goods in connection with a proprietary fund's principal ongoing operations. The principal operating revenue of the Division's proprietary fund relates to charges to customers for sales and services. Operating expenses for proprietary funds include the cost of sales and services, administrative expenses, and depreciation on capital assets. All revenue and expenses not meeting this definition are reported as nonoperating revenue and expenses.

**Bank Deposits and Investments** - Cash and cash equivalents are considered to be cash on hand, demand deposits, and short-term investments with a maturity of three months or less when acquired. Investments are stated at fair value, based on quoted market prices.

**Short-term Financial Instruments** - The fair value of short-term financial instruments, including cash and cash equivalents, trade accounts receivable and payable, accrued receivables, and accrued liabilities, is equal to the carrying amounts in the accompanying basic financial statements due to the short maturity of such instruments.

**Receivables and Payables** - Outstanding balances between funds are reported in the basic financial statements as "internal balances." All trade receivables are shown as net of an allowance for uncollectible amounts.

**Inventories** - Inventories consist primarily of water meters and grinder pumps, valued at cost, using the first-in, first-out method. The cost of supply inventory is recorded as an expense when consumed rather than when purchased.

**Leases Receivable** - Leases receivable consist of amounts due to the Division from various municipalities for construction activity. The Division constructs assets for various municipalities under Act 342. Under this act, the County issues bonds and constructs assets on behalf of municipalities. These assets are then leased by the municipalities over the life of the bonds. Lease payments approximate the debt service requirements of the associated bonds.

**Local Unit Construction in Progress** - Local unit construction in progress represents construction of water and sewer distribution and collection systems performed by the Division for local communities. The projects are recorded as an asset during the construction phase and are offset by an unearned lease. When the projects are substantially complete, the asset and unearned lease are removed from the basic financial statements and an asset is recorded by the local community.

**Restricted Assets** - Certain assets are restricted by the Division's bond ordinances for capital outlay. In addition, unspent bond proceeds and County capital improvement fees are restricted for the construction of water collection and sewage disposal systems projects. When an expense is incurred that allows the use of restricted assets (such as bond debt principal and interest), those assets are applied before utilizing any unrestricted assets.

In 2011, of the total restricted cash and cash equivalents of $4,592,588, $3,384,138 was restricted for construction and $1,208,450 was restricted for debt service. Of the total restricted accounts receivable of $532,653, $264,688 was county capital improvement fees restricted for construction and $267,965 was interest receivable from communities restricted for debt service. The total amount restricted due from other governmental units of $333,813 was restricted for construction.

In 2012, there are no restrictions on cash.

**Postemployment Benefits** - In addition to the pension benefits described in Note 5, the Division provides postemployment health care, dental, and life insurance benefits after retirement through a contractual agreement. The Division is responsible for 100 percent of the cost of postemployment benefits and funds these costs as they are incurred. Postemployment benefits for retired employees were $1,514,865 and $1,426,481 for the years ended December 31, 2012 and 2011, respectively. The total number of eligible retirees amounted to 82 and 83 individuals during December 31, 2012 and 2011, respectively.

**Compensated Absences** - The Division's employees are granted vacation leave bi-annually based on length of service and 80 hours of personal leave each January 1. Upon termination or resignation, employees are paid accumulated vacation at current salary rates. Upon retirement, employees are paid accumulated vacation and up to 112 hours of personal leave at current salary rates. At December 31, 2012 and 2011, the Division has recorded a liability of approximately $431,000 and $426,000, respectively, for accumulated vacation leave.

**Unearned Leases** - Unearned leases represent cash and investments and construction in progress recorded on the Division's books belonging to the municipalities participating in the water collection and sewage disposal system.

**Use of Estimates** - The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

**Note 1 – Summary of Significant Accounting Policies (Continued)**

**Property, Plant, and Equipment** - Additions to property, plant, and equipment are recorded at cost or, if donated, at their estimated fair value at the time of donation. Repairs and maintenance are recorded as expenses; renewals and betterments are capitalized. The sale or disposal of fixed assets is recorded by removing cost and accumulated depreciation from the accounts and charging the resulting gain or loss to income. Depreciation has been calculated on each class of property using the straight-line method based on the estimated useful lives of the assets, as follows:

| | |
|---|---|
| Land improvements and underground networks | 25-100 years |
| Buildings | 10-50 years |
| Machinery and equipment | 3-25 years |

**Comparative Data/Reclassifications** - Comparative total data for the prior year has been presented in the financial statements in order to provide an understanding of the changes in the financial position and operations. Certain amounts presented in the prior year data have been reclassified in order to be consistent with the current year's presentation.

**Reporting Change** - During the year, the Division adopted GASB Statement No. 63, *Financial Reporting of Deferred Outflows of Resources, Deferred Inflows of Resources, and Net Position*. The statement incorporates deferred outflows of resources and deferred inflows of resources, as defined by GASB Concepts Statement No. 4, into the definitions of the required components of the residual measure of net position, formerly net assets. The statement also provides a new statement of net position format to report all assets, deferred outflows of resources, liabilities, deferred inflows of resources, and net position. The statement impacts the format and reporting of the balance sheet.

**Note 2 – Deposits and Investments**

Michigan Compiled Laws Section 129.91 (Public Act 20 of 1943, as amended) authorizes local governmental units to make deposits and invest in the accounts of federally insured banks, credit unions, and savings and loan associations that have offices in Michigan. The law also allows investments outside the state of Michigan when fully insured. The local unit is allowed to invest in bonds, securities, and other direct obligations of the United States or any agency or instrumentality of the United States; repurchase agreements; bankers' acceptances of United States banks; commercial paper rated within the two highest classifications, which mature not more than 270 days after the date of purchase; obligations of the State of Michigan or its political subdivisions, which are rated as investment grade; and mutual funds composed of investment vehicles that are legal for direct investment by local units of government in Michigan.

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

**Note 2 – Deposits and Investments (Continued)**

The Division has designated one bank for the deposit of its funds. The investment policy adopted by the board in accordance with Public Act 196 of 1997 has authorized investment in bonds and securities of the United States government and bank accounts and CDs, but not the remainder of state statutory authority as listed above. The Division's deposits and investment policies are in accordance with statutory authority.

The Division's cash and investments are subject to custodial credit risk, which are examined in more detail below:

**Custodial Credit Risk of Bank Deposits** - Custodial credit risk is the risk that in the event of a bank failure, the Division's deposits may not be returned to it. The Division does not have a deposit policy for custodial credit risk. At year end, the Division had $1,092,031 of bank deposits (certificates of deposit, checking, and savings accounts) that were uninsured and uncollateralized. The Division believes that due to the dollar amounts of cash deposits and the limits of FDIC insurance, it is impractical to insure all deposits. As a result, the Division evaluates each financial institution with which it deposits funds and assesses the level of risk of each institution; only those institutions with an acceptable estimated risk level are used as depositories.

The unlimited FDIC insurance program expired on December 31, 2012. Starting January 1, 2013, the Division's uninsured deposits increased significantly.

B-11

## Genesee County Drain Commissioner
## Division of Water and Waste Services

**Notes to Financial Statements**
**December 31, 2012**

### Note 3 - Capital Assets

Capital asset activity of the Division's proprietary fund type at December 31, 2012 was as follows:

| | Balance January 1, 2012 | Reclassifications* | Additions | Disposals | Balance December 31, 2012 |
|---|---|---|---|---|---|
| **Enterprise Fund:** | | | | | |
| Capital assets not being depreciated: | | | | | |
| Land | $ 871,021 | $ - | $ - | $ - | $ 871,021 |
| Construction in progress | 86,046,793 | (36,835,568) | 8,097,276 | (2,399,999) | 54,908,502 |
| Subtotal | 86,917,814 | (36,835,568) | 8,097,276 | (2,399,999) | 55,779,523 |
| Capital assets being depreciated: | | | | | |
| Distribution and collections system | 278,985,859 | 29,806,472 | 1,895,257 | - | 310,687,588 |
| Buildings and equipment | 5,419,064 | 7,045,346 | 435,029 | - | 12,899,439 |
| Vehicles | 382,261 | - | - | - | 382,261 |
| Subtotal | 284,787,184 | 36,851,818 | 2,330,286 | - | 323,969,288 |
| Accumulated depreciation: | | | | | |
| Distribution and collections system | (48,921,258) | - | (6,327,670) | - | (55,248,928) |
| Buildings and equipment | (3,423,902) | - | (406,918) | - | (3,830,820) |
| Vehicles | (254,852) | - | (114,514) | - | (369,366) |
| Subtotal | (52,600,012) | - | (6,849,102) | - | (59,449,114) |
| Net capital assets being depreciated | 232,187,172 | 36,851,818 | (4,518,816) | - | 264,520,174 |
| Net capital assets | $ 319,104,986 | $ 16,250 | $ 3,578,460 | $ (2,399,999) | $ 320,299,697 |

| | Balance January 1, 2012 | Reclassifications | Additions | Disposals | Balance December 31, 2012 |
|---|---|---|---|---|---|
| **Internal Service Funds:** | | | | | |
| Capital assets not being depreciated - | | | | | |
| Construction in progress | $ 16,250 | $ (16,250) | $ - | $ - | $ - |
| Capital assets being depreciated - | | | | | |
| Buildings and equipment | 8,628,852 | - | 229,743 | (352,730) | 8,505,865 |
| Accumulated depreciation - Buildings and improvements | (5,797,381) | - | (461,288) | 352,730 | (5,905,939) |
| Net capital assets being depreciated | 2,831,471 | - | (231,545) | - | 2,599,926 |
| Net capital assets | 2,847,721 | (16,250) | (231,545) | - | 2,599,926 |
| Total proprietary funds capital assets | $ 321,952,707 | $ - | $ 3,346,915 | $ (2,399,999) | $ 322,899,623 |

* $16,250 in renovations on an office building were originally recorded as construction in progress in the Internal Service Fund. Subsequent to completion, the amount was reclassed from the Internal Service Fund to the Enterprise Fund.

21

## Genesee County Drain Commissioner
## Division of Water and Waste Services

**Notes to Financial Statements**
**December 31, 2012**

### Note 3 - Capital Assets (Continued)

**Construction Commitments** - The Division has active construction projects at year end. The projects include improvements and extensions to the water and sewage disposal systems. At year end, the Division's commitments with contractors are as follows:

| | Spent to Date | Remaining Commitment |
|---|---|---|
| Interceptor and treatment facilities | $ 35,147,898 | $ 544,915 |
| Sewage disposal system - District No. 3 | 1,835,728 | 10,541 |
| Sewage disposal system - District No. 7 | 24,394 | 20,075 |
| Water supply system | 4,001,252 | 2,193,395 |
| Total | $ 41,009,272 | $ 2,768,926 |

### Note 4 - Long-term Debt

The Division issues bonds to provide for the construction of water and waste systems in Genesee County and certain areas in surrounding counties. General obligation bonds are direct obligations and pledge the full faith and credit of the Division. Revenue bonds involve a pledge of specific income derived from the acquired or constructed assets to pay debt service and require certain financial covenants to be met.

Long-term debt activity for the year ended December 31, 2012 can be summarized as follows:

| | Number of Issues | Interest Rate Ranges | Principal Maturity Ranges | Beginning Balance * | Additions | Reductions | Ending Balance * | Due Within One Year |
|---|---|---|---|---|---|---|---|---|
| **Genesee County Drain Commissioner bonds payable:** | | | | | | | | |
| Interceptor and treatment facilities | 13 | 1.625%-5.00% | 2031 | $ 99,311,556 | $ 3,388,570 | $ (6,180,000) | $ 96,520,126 | $ 6,310,000 |
| District No. 3 | 2 | 2.50%-4.50% | 2030 | 6,430,000 | - | (270,000) | 6,160,000 | 285,000 |
| Water supply system | 4 | 2.50%-5.125% | 2033 | 40,245,000 | - | (1,260,000) | 38,985,000 | 1,310,000 |
| | | | | 145,986,556 | 3,388,570 | (7,710,000) | 141,665,126 | 7,905,000 |
| **Community-related bonds payable:** | | | | | | | | |
| Interceptor and treatment facilities | 2 | 4.00%-4.35% | 2026 | 5,235,000 | - | (375,000) | 4,860,000 | 390,000 |
| District No. 3 | 6 | 2.50%-7.375% | 2024 | 25,355,000 | - | (2,415,000) | 22,940,000 | 2,510,000 |
| Water supply system | 1 | 2.50 | 2031 | 903,516 | 29,999 | (34,250) | 899,265 | 40,000 |
| Subtotal | | | | 31,493,516 | 29,999 | (2,824,250) | 28,699,265 | 2,940,000 |
| Total bonds payable | | | | $ 177,480,072 | $ 3,418,569 | $ (10,534,250) | $ 170,364,391 | $ 10,845,000 |

* Long-term debt balance excludes bond discount/premium of $318,505 and $332,027 at December 31, 2012 and 2011, respectively.

22

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Notes to Financial Statements
December 31, 2012

**Note 4 – Long-term Debt (Continued)**

Total interest expense for the year was approximately $5.8 million, of which approximately $1.5 million was capitalized as part of construction in progress. Annual debt service requirements to maturity for the above obligations are as follows:

| Years Ending December 31 | Business-type Activities | | |
|---|---|---|---|
| | Principal | Interest | Total |
| 2013 | $ 10,845,000 | $ 5,654,333 | $ 16,499,333 |
| 2014 | 11,180,000 | 5,317,264 | 16,497,264 |
| 2015 | 11,540,000 | 4,966,431 | 16,506,431 |
| 2016 | 11,645,000 | 4,604,434 | 16,249,434 |
| 2017 | 10,830,000 | 4,250,159 | 15,080,159 |
| 2018-2022 | 48,350,000 | 16,663,484 | 65,013,484 |
| 2023-2027 | 46,570,000 | 8,859,989 | 55,429,989 |
| 2028-2032 | 17,869,391 | 2,250,274 | 20,119,665 |
| 2033 | 1,535,000 | 75,406 | 1,610,406 |
| Total | $ 170,364,391 | $ 52,641,774 | $ 223,006,165 |

**Future Revenue Pledged for Debt Payment**

**Revenue Bond** - The Division has pledged substantially all revenue, net of operating expenses, to repay the above Genesee County Drain Commissioner water and sewer revenue bonds. Proceeds from the bonds provided financing for the construction of the water and waste systems described above. The bonds are payable solely from the net revenue of the water and sewer system. The remaining principal and interest to be paid on the bonds total $115,370,449. During the current year, net revenue of the system was $12,895,721 compared to the annual debt requirements of $7,623,037.

**Note 5 – Defined Benefit Pension Plan**

**Plan Description** - The Division participates in the Genesee County Employees' Retirement System (GCERS), which is a contributory agent multiple-employer defined benefit plan for pension and disability benefits that covers substantially all employees of Genesee County. Each employer has the ability to negotiate and/or establish benefits through personal policies. The authority to establish and amend the benefit provisions of the plan is governed by Act No. 156, Public Acts of 1851, as amended by the State of Michigan. GCERS issues a publicly available financial report that includes financial statements and required supplemental information for the Division. That report may be obtained by writing to Genesee County Employees' Retirement System, 1101 Beach, Flint, MI 48502 or by calling 1-800-949-2627.

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Notes to Financial Statements
December 31, 2012

**Note 5 – Defined Benefit Pension Plan (Continued)**

**Funding Policy** - The County's funding policy provides for periodic employer contributions at actuarially determined rates that, expressed as percentages of annual covered payroll, are designed to accumulate sufficient assets to pay benefits when due. The normal cost is determined using an attained age actuarial funding method.

**Annual Pension Cost** - For the years ended December 31, 2012 and 2011, the Division's annual pension cost of $1,531,645 and $1,763,782, respectively, was equal to the Division's required and actual contribution. The annual required contributions were determined as part of the actuarial valuations at December 31, 2010 and December 31, 2009 using the individual entry age actuarial cost method.

**Actuarial Methods and Assumptions** - In the December 31, 2011 actuarial valuation, the individual entry age actuarial cost method was used. Significant actuarial assumptions used include (a) a rate of return on the investment of present and future assets of 8.00 percent per year compounded annually and (b) projected salary increases of 3.00 percent to 7.03 percent per year compounded annually. Both (a) and (b) included an inflation component of 3.00 percent. The actuarial value of the Division's assets was determined using techniques that smooth the effects of short-term volatility in the market value of investments over a four-year period. The Division's unfunded actuarial accrued liability is being amortized as a level percentage of projected payroll on an open basis, with the remaining amortization period of 25 years at December 31, 2011.

**Schedule of Funding Progress**

| Actuarial Valuation Date | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) (b) | Unfunded AAL (UAAL) (b-a) | Funded Ratio (Percent) (a/b) | Covered Payroll (c) | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| 12/31/06 | $ 37,578,528 | $ 42,770,145 | $ 5,191,617 | 87.9 % | $ 8,245,848 | 63.0 % |
| 12/31/07 | 38,979,791 | 44,748,462 | 5,768,671 | 87.1 | 7,823,724 | 73.7 |
| 12/31/08 | 37,329,643 | 46,855,482 | 9,525,839 | 79.7 | 8,420,060 | 113.1 |
| 12/31/09 | 36,627,952 | 49,055,966 | 12,428,014 | 74.7 | 8,130,143 | 152.9 |
| 12/31/10 | 35,600,950 | 50,285,901 | 14,684,951 | 70.8 | 7,610,890 | 192.9 |
| 12/31/11 | 32,632,128 | 48,896,200 | 16,264,072 | 66.7 | 7,312,770 | 222.4 |

B-12

23

24

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Notes to Financial Statements
December 31, 2012

**Note 5 – Defined Benefit Pension Plan (Continued)**

**Schedule of Employer Contributions**

| Fiscal Year Ended | Actuarial Valuation Date | Contribution Rate as Percentage of Valuation Payroll | Annual Pension Cost (APC) | Actual Reported Contribution | Percentage of ARC Contributed |
|---|---|---|---|---|---|
| 12/31/10 | 12/31/08 | 17.76 % | $ 1,744,861 | $ 1,744,861 | 100 % |
| 12/31/11 | 12/31/09 | 18.81 | 1,763,782 | 1,763,782 | 100 |
| 12/31/12 | 12/31/10 | 16.62 | 1,531,645 | 1,531,645 | 100 |

**Note 6 – Other Postemployment Benefits**

**Plan Description** - The Division provides retiree health care, dental, life, and vision benefits to eligible employees and their spouses and dependents through the Municipal Employees' Retirement System. This is an agent multiple-employer defined benefit plan administered by the Division. The benefits are provided under collective bargaining agreements.

**Funding Policy** - The collective bargaining agreements do not require employee contributions. The Division has no obligation to make contributions in advance of when the insurance premiums are due for payment (in other words, this may be financed on a "pay-as-you-go" basis). However, as shown below, the Division has made contributions to advance-fund these benefits, as determined by the Division.

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Notes to Financial Statements
December 31, 2012

**Note 6 – Other Postemployment Benefits (Continued)**

**Funding Progress** - For the year ended December 31, 2012, the Division has estimated the cost of providing retiree healthcare benefits through an actuarial valuation as of December 31, 2010. The valuation computes an annual required contribution, which represents a level of funding that, if paid on an ongoing basis, is projected to cover normal cost each year and amortize any unfunded actuarial liabilities over a period not to exceed 30 years. This valuation's computed contribution and actual funding are summarized as follows:

|  | 2012 | 2011 |
|---|---|---|
| Annual required contribution (recommended) | $ 3,818,480 | $ 3,933,831 |
| Interest on the prior year's net OPEB obligation | 230,108 | 127,528 |
| Less adjustment to the annual required contribution | (101,338) | (78,511) |
| Annual OPEB cost | 3,947,250 | 3,982,848 |
| Amounts contributed: |  |  |
| Payments of current premiums | (1,523,879) | (1,337,004) |
| Advance funding | (2,500,000) | (81,360) |
| Total contributions | (4,023,879) | (1,418,364) |
| (Decrease) increase in net OPEB obligation | (77,629) | 2,564,484 |
| OPEB obligation - Beginning of year | 5,752,695 | 3,188,211 |
| OPEB obligation - End of year | $ 5,675,066 | $ 5,752,695 |

The net OPEB obligation is recorded in the basic financial statements as part of noncurrent liabilities.

The annual OPEB costs, the percentage contributed to the plan, and the net OPEB obligation for the current and preceding year were as follows:

| Fiscal Year Ended | Annual OPEB Costs | Percentage Contributed | Net OPEB Obligation |
|---|---|---|---|
| 12/31/10 | $ 2,641,753 | 55.87 % | $ 3,188,211 |
| 12/31/11 | 3,982,848 | 35.61 | 5,752,695 |
| 12/31/12 | 3,947,250 | 101.94 | 5,676,066 |

The Division approved a prefunding plan in 2012 and remitted $2.5 million to the trust during the year. Going forward, $1.2 million will be remitted to the trust per year until the liability is funded.

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Notes to Financial Statements
December 31, 2012

**Note 6 – Other Postemployment Benefits (Continued)**

The funding progress of the plan is as follows:

| Actuarial Valuation Date | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) (b) | Unfunded AAL (UAAL) (b-a) | Funded Ratio (Percent) (a/b) | Covered Payroll (c) | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| 12/31/08 | $  - | $ 35,394,879 | $ 35,394,879 | - | $ 8,420,060 | 420.36 % |
| 12/31/10 | - | 51,474,408 | 51,474,408 | - | 7,610,890 | 676.33 |
| 9/30/12 | 2,333,369 | 37,819,976 | 35,486,607 | 6.17 % | 7,312,770 | 485.27 |

The schedule of employer contributions is as follows:

| Fiscal Year Ended | Actuarial Valuation Date | Annual Required Contribution (ARC) | Percentage of ARC Contributed | Contribution Rate as Percentage of Valuation Payroll |
|---|---|---|---|---|
| 12/31/10 | 12/31/08 | $ 2,641,753 | 55.87 % | 32.43 % |
| 12/31/11 | 12/31/10 | 3,982,848 | 35.61 | 50.59 |
| 12/31/12 | 12/31/10 | 3,947,250 | 101.94 | 50.59 |

**Actuarial Methods and Assumptions** - Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment, mortality, and the healthcare cost trend. Amounts determined regarding the funded status of the plan and the annual required contributions of the employer are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future.

Projections of benefits for financial reporting purposes are based on the substantive plan (the plan as understood by the employer and the plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and plan members to that point. The actuarial methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspective of the calculations.

In the December 31, 2010 actuarial valuation, the individual entry age actuarial cost method was used. The actuarial assumptions included a 4.0 percent investment rate of return (net of administrative expenses) and an annual healthcare cost trend rate of 5.0 percent. The UAAL is being amortized as a level percentage of projected payroll over 30 years.

27

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Notes to Financial Statements
December 31, 2012

**Note 7 – Risk Management**

The Division is exposed to various risks of loss related to property loss, torts, errors and omissions, and employee injuries (workers' compensation), as well as medical benefits provided to employees. The Division is partially self-insured for medical benefits and has purchased commercial insurance for the remaining medical benefits and other risks of loss. Settled claims relating to the commercial insurance have not exceeded the amount of insurance coverage in any of the past three fiscal years.

The Division estimates the liability for medical claims that have been incurred through the end of the fiscal year, including claims that have been reported as well as those that have not yet been reported. The liability is included with accounts payable and other accrued expenses in the statement of net position. Changes in the estimated liability for the past two fiscal years were as follows:

|  | 2012 | 2011 |
|---|---|---|
| Unpaid claims - Beginning of year | $ 290,676 | $ 261,162 |
| Incurred claims, including claims incurred but not reported | 2,208,189 | 2,559,231 |
| Claim payments | (2,038,825) | (2,529,717) |
| Unpaid claims - End of year | $ 460,040 | $ 290,676 |

**Note 8 – Upcoming Accounting Pronouncements**

In March 2012, the GASB issued Statement No. 65, *Items Previously Reported as Assets and Liabilities*, which is required to be implemented for financial statements for periods beginning after December 15, 2012. Statement No. 65 establishes accounting and financial reporting standards that reclassify, as deferred outflows and inflows of resources, certain items that were previously reported as assets and liabilities. This statement also provides other financial reporting guidance related to the impact of the financial statement elements deferred outflows of resources and deferred inflows of resources. Statement No. 65 will be implemented for the Division as of December 31, 2013.

28

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

**Notes to Financial Statements**
**December 31, 2012**

**Note 8 – Upcoming Accounting Pronouncements (Continued)**

In June 2012, the GASB issued two new pension standards, GASB Statement No. 67, *Financial Reporting for Pension Plans*, and No. 68, *Accounting and Financial Reporting for Pensions*. These new standards significantly revise the current accounting and reporting for pensions, both from an employer perspective as well as from a plan perspective. Employers providing defined benefit pensions to its employees must now, under these new standards, recognize their unfunded pension benefit obligation as a liability for the first time, and to more comprehensively and comparably measure the annual costs of pension benefits. This net pension liability that will be recorded on the government-wide, proprietary, and discretely presented component units statements will be computed differently than the current unfunded actuarial accrued liability, using specific parameters set forth by the GASB. The statement also enhances accountability and transparency through revised and expanded note disclosures and required supplemental information (RSI). Statement No. 67 is required to be adopted for December 31, 2013 and Statement No. 68 one year later.

**Supplemental Information**

B-15

B-16

## Genesee County Drain Commissioner
## Division of Water and Waste Services

### Statement of Net Position – Proprietary Fund Types

| | Interceptor and Treatment Facilities | Sewage Disposal Systems District No. 3 | Sewage Disposal Systems District No. 7 | Water Supply Systems | Total (December 31, 2012) | December 31, 2011 Total |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ 3,364,946 | $ 269,995 | $ 80,105 | $ 9,081,769 | $ 12,796,815 | $ 11,382,843 |
| Accounts receivable | 5,062,899 | 314,269 | 154,197 | 3,281,093 | 8,812,458 | 8,253,909 |
| Current portion of leases receivable | 390,000 | 2,510,000 | - | 40,000 | 2,940,000 | 2,825,000 |
| Due from other governmental units | - | - | - | - | - | 2,000 |
| Inventory | - | - | - | 75,625 | 75,625 | 52,658 |
| Prepaid expenses | 236,811 | 39,375 | 5,419 | 211,661 | 493,266 | 5,389 |
| Other assets | - | - | - | 93,000 | 93,000 | 30,000 |
| Total current assets | 9,054,656 | 3,133,639 | 239,721 | 12,783,148 | 25,211,164 | 22,551,799 |
| Noncurrent assets: | | | | | | |
| Restricted cash and cash equivalents | - | - | - | - | - | 4,592,588 |
| Restricted accounts receivable | 33,615 | 203,770 | - | 5,623 | 243,008 | 532,653 |
| Restricted – Due from other governmental units | - | 300,325 | - | - | 300,325 | 333,813 |
| Leases Receivable - Net of current portion | 4,470,000 | 20,430,000 | - | 859,265 | 25,759,265 | 28,648,516 |
| Local unit construction in progress | - | - | - | 156,500 | 156,500 | 1,413,161 |
| Capital assets: | | | | | | |
| Assets not subject to depreciation | 52,813,000 | 604,823 | 1,415 | 2,360,285 | 55,779,523 | 86,917,814 |
| Assets subject to depreciation - Net of depreciation | 172,348,963 | 28,322,095 | 414,484 | 63,434,632 | 264,520,174 | 232,187,172 |
| Unamortized bond issuance costs | 657,879 | 21,169 | - | - | 679,048 | 756,622 |
| Total noncurrent assets | 230,323,457 | 49,882,182 | 415,899 | 66,816,305 | 347,437,843 | 355,402,339 |
| Total assets | 239,378,113 | 53,015,821 | 655,620 | 79,599,453 | 372,649,007 | 377,954,138 |
| **Liabilities** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable and accrued expenses | 2,017,833 | 240,188 | 22,066 | 2,751,300 | 5,031,387 | 4,228,728 |
| Due to other governmental units | 241,300 | - | - | - | 241,300 | 237,310 |
| Internal balances | - | - | - | - | - | 26,185 |
| Due to State of Michigan | 149,998 | - | - | - | 149,998 | - |
| Current portion of long-term debt | 6,700,000 | 2,795,000 | - | 1,350,000 | 10,845,000 | 10,360,000 |
| Total current liabilities | 9,109,131 | 3,035,188 | 22,066 | 4,101,300 | 16,267,685 | 14,852,223 |
| Noncurrent liabilities: | | | | | | |
| Liabilities related to restricted assets | 33,615 | 203,770 | - | 5,623 | 243,008 | 3,509,475 |
| Unearned leases | - | - | - | 156,500 | 156,500 | 1,524,185 |
| Other postemployment benefit obligation | 3,483,846 | 553,652 | 94,518 | 1,544,050 | 5,676,066 | 5,752,695 |
| Long-term debt - Net of current portion | 94,808,826 | 26,328,956 | - | 38,700,114 | 159,837,896 | 167,452,099 |
| Total noncurrent liabilities | 98,326,287 | 27,086,378 | 94,518 | 40,406,287 | 165,913,470 | 178,238,454 |
| Total liabilities | 107,435,418 | 30,121,566 | 116,584 | 44,507,587 | 182,181,155 | 193,090,677 |
| **Equity - Net position** | | | | | | |
| Invested in capital assets - Net of related debt | 129,171,016 | 22,764,131 | 415,899 | 26,644,068 | 178,995,114 | 175,813,604 |
| Restricted | - | - | - | - | - | 3,098,052 |
| Unrestricted | 2,771,679 | 130,124 | 123,137 | 5,349,746 | 8,374,686 | 5,951,805 |
| Total net position | $ 131,942,695 | $ 22,894,255 | $ 539,036 | $ 35,091,866 | $ 190,467,852 | $ 184,863,461 |

31

## Genesee County Drain Commissioner
## Division of Water and Waste Services

### Statement of Revenue, Expenses, and Changes in Net Position (Divisional Detail) - Enterprise Fund

| | Interceptor and Treatment Facilities | Sewage Disposal Systems District No. 3 | Sewage Disposal Systems District No. 7 | Water Supply Systems | Total (December 31, 2012) | December 31, 2011 Total |
|---|---|---|---|---|---|---|
| **Operating Revenue** | | | | | | |
| Charges for sales and service: | | | | | | |
| Sale of water | $ - | $ - | $ - | $ 23,104,124 | $ 23,104,124 | $ 21,697,903 |
| Sewage disposal charges | 22,785,153 | 3,201,467 | 721,602 | - | 26,708,222 | 26,028,846 |
| Billing services | 146,171 | - | - | - | 146,171 | - |
| Water meter sales | - | - | - | 46,694 | 46,694 | 64,662 |
| Sewer and pumping station - Operation and maintenance | 1,197,219 | - | - | - | 1,197,219 | 1,197,219 |
| Other operating revenue | 484,869 | 162,795 | 1,447 | 709,227 | 1,358,338 | 880,452 |
| Total operating revenue | 24,613,412 | 3,364,262 | 723,049 | 23,860,045 | 52,560,768 | 49,869,082 |
| **Operating Expenses** | | | | | | |
| Cost of water | - | - | - | 11,779,406 | 11,779,406 | 12,947,738 |
| Sludge disposal service | 986,087 | 242,175 | - | - | 1,228,262 | 1,098,897 |
| Cost of insurance claims and expenses | 125,273 | 29,052 | 4,608 | 118,481 | 277,414 | 237,060 |
| Repairs and maintenance | 1,383,070 | 299,042 | 172,738 | 459,761 | 2,314,611 | 2,367,433 |
| Personnel services | 8,915,314 | 1,390,428 | 227,729 | 4,474,345 | 15,207,816 | 16,672,169 |
| Other supplies and expenses | 665,619 | 44,321 | 30,610 | 255,244 | 995,794 | 1,033,489 |
| Contractual services | 3,437,616 | 129,178 | 26,770 | 1,026,699 | 4,620,263 | 622,620 |
| Utilities | 2,196,573 | 389,106 | 145,146 | 510,656 | 3,241,481 | 4,288,957 |
| Depreciation | 4,258,784 | 717,785 | 22,722 | 1,849,811 | 6,849,102 | 6,142,303 |
| Total operating expenses | 21,968,336 | 3,441,087 | 630,323 | 20,474,403 | 46,514,149 | 45,410,666 |
| **Operating Income (Loss)** | 2,645,076 | (76,825) | 92,726 | 3,385,642 | 6,046,619 | 4,458,416 |
| **Nonoperating Revenue (Expenses)** | | | | | | |
| Community bond interest income | 207,194 | 1,031,715 | - | 24,227 | 1,263,136 | 1,356,456 |
| Community bond interest expense | (207,194) | (1,031,715) | - | (24,227) | (1,263,136) | (1,356,456) |
| Miscellaneous income | 250,899 | - | - | 679,155 | 930,054 | 635,689 |
| Miscellaneous expense | (45,582) | - | - | - | (45,582) | (158,115) |
| Capital interest and fee expense | (1,060,572) | (222,242) | - | (1,821,043) | (3,103,857) | (2,910,570) |
| Investment income | 13,622 | 1,102 | 145 | 28,348 | 43,217 | 33,575 |
| Total nonoperating (expense) revenue | (841,633) | (221,140) | 145 | (1,113,540) | (2,176,168) | (2,399,421) |
| **Income (Loss) - Before capital contributions and operating transfers** | 1,803,443 | (297,965) | 92,871 | 2,272,102 | 3,870,451 | 2,058,995 |
| **Capital Contributions** | 218,434 | 289,991 | - | 1,111,693 | 1,620,118 | 268,228 |
| **Transfers In** | 41,889,990 | 1,759,884 | 1,138 | 1,981,121 | 45,632,133 | 37,559,040 |
| **Transfers Out** | (41,835,356) | (1,751,915) | - | (1,931,040) | (45,518,311) | (37,662,791) |
| **Increase (Decrease) in Net Position** | 2,076,511 | (5) | 94,009 | 3,433,876 | 5,604,391 | 2,223,472 |
| **Net Position - Beginning of year** | 129,866,184 | 22,894,260 | 445,027 | 31,657,990 | 184,863,461 | 182,639,989 |
| **Net Position - End of year** | $ 131,942,695 | $ 22,894,255 | $ 539,036 | $ 35,091,866 | $ 190,467,852 | $ 184,863,461 |

32

B-17

## Genesee County Drain Commissioner
## Division of Water and Waste Services

### Statement of Cash Flows (Divisional Detail) - Enterprise Fund

| | Interceptor and Treatment Facilities | Sewage Disposal Systems District No. 3 | Sewage Disposal Systems District No. 7 | Water Supply Systems | Total December 31, 2012 | Total December 31, 2011 |
|---|---|---|---|---|---|---|
| **Cash Flows from Operating Activities** | | | | | | |
| Receipts from customers | $ 24,357,589 | $ 3,349,295 | $ 689,402 | $ 23,682,934 | $ 52,079,220 | $ 52,060,797 |
| Payments to suppliers and others for goods and services | (9,209,198) | (1,281,626) | (393,676) | (14,659,557) | (25,544,057) | (28,444,732) |
| Payments for salaries and employee benefits | (8,551,259) | (1,590,520) | (251,767) | (4,377,908) | (14,771,454) | (9,449,173) |
| Net cash provided by operating activities | 6,597,132 | 477,149 | 43,959 | 4,645,469 | 11,763,709 | 14,166,892 |
| **Cash Flows from Capital and Related Financing Activities** | | | | | | |
| Purchases of capital assets | (5,813,739) | (132,755) | (5,660) | (2,770,323) | (8,722,477) | (17,461,991) |
| Contribution from local units for construction | - | - | - | - | - | 1,219,720 |
| County capital improvement fees | 250,899 | - | - | 717,320 | 968,219 | 630,783 |
| Collections of leases receivable from municipalities | 581,769 | 3,444,824 | - | 4,251 | 4,030,844 | 4,014,604 |
| Proceeds from issuance of bonded debt | 3,388,570 | - | - | 29,999 | 3,418,569 | 24,872,946 |
| Principal paid on bond maturities | (6,555,000) | (2,685,000) | - | (1,294,250) | (10,534,250) | (17,708,000) |
| Interest paid on bonds | (1,282,408) | (1,254,377) | - | (1,834,380) | (4,371,165) | (4,277,392) |
| Operating transfer | 54,634 | 7,969 | 1,138 | 50,081 | 113,822 | (103,751) |
| Net cash used in capital and related financing activities | (9,375,275) | (619,339) | (4,522) | (5,097,302) | (15,096,438) | (8,813,081) |
| **Cash Flows from Investing Activities -** Investment income | 16,161 | 1,102 | 145 | 136,705 | 154,113 | 54,705 |
| **Net (Decrease) Increase in Cash and Cash Equivalents** | (2,761,982) | (141,088) | 39,582 | (315,128) | (3,178,616) | 5,408,516 |
| **Cash and Cash Equivalents -** Beginning of year | 6,126,928 | 411,083 | 40,523 | 9,396,897 | 15,975,431 | 10,566,915 |
| **Cash and Cash Equivalents -** End of year | $ 3,364,946 | $ 269,995 | $ 80,105 | $ 9,081,769 | $ 12,796,815 | $ 15,975,431 |
| **Balance Sheet Classification of Cash and Cash Equivalents** | | | | | | |
| Cash and investments | $ 3,364,946 | $ 269,995 | $ 80,105 | $ 9,081,769 | $ 12,796,815 | $ 11,382,843 |
| Restricted cash and cash equivalents | - | - | - | - | - | 4,592,588 |
| Total cash and cash equivalents | $ 3,364,946 | $ 269,995 | $ 80,105 | $ 9,081,769 | $ 12,796,815 | $ 15,975,431 |
| **Reconciliation of Operating Income (Loss) to Net Cash from Operating Activities** | | | | | | |
| Operating income (loss) | $ 2,645,076 | $ (76,825) | $ 92,726 | $ 3,385,642 | $ 6,046,619 | $ 4,458,416 |
| Depreciation | 4,258,784 | 717,785 | 22,722 | 1,849,811 | 6,849,102 | 6,142,303 |
| Write-off of construction in progress | 2,369,806 | - | - | - | 2,369,806 | - |
| Changes in assets and liabilities: | | | | | | |
| Receivables | (398,295) | 289,034 | (33,269) | (315,115) | (457,645) | 2,122,207 |
| Inventories | - | - | - | (22,967) | (22,967) | (9,359) |
| Prepaid and other assets | (235,536) | (39,200) | (5,268) | (270,873) | (550,877) | (34,320) |
| Accounts payable | (2,549,230) | (109,552) | - | (215,470) | (2,874,252) | 1,418,138 |
| Due to (from) other governmental units - Units | 155,998 | (41,794) | (32,574) | (111,922) | (30,292) | 71,318 |
| Accrued and other liabilities | 364,055 | (92) | - | 96,437 | 460,400 | - |
| Internal balances | (13,526) | (262,207) | (378) | 249,926 | (26,185) | (1,811) |
| Net cash provided by operating activities | $ 6,597,132 | $ 477,149 | $ 43,959 | $ 4,645,469 | $ 11,763,709 | $ 14,166,892 |

**Noncash Investing, Capital, and Financing Activities -** During the year ended December 31, 2012, the Enterprise Fund had $1,111,693 and $508,425 contributed to the water and sewer systems by local communities and a grant, respectively.

33

## Genesee County Drain Commissioner
## Division of Water and Waste Services

### Statement of Net Position - Internal Service Funds

| | December 31, 2012 Equipment Fund | December 31, 2012 Insurance Fund | December 31, 2012 Total | December 31, 2011 Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ 1,138,432 | $ 1,150 | $ 1,139,582 | $ 1,997,951 |
| Accounts receivable | - | - | - | 1,998 |
| Prepaid expenses | - | - | - | 81,689 |
| Total current assets | 1,138,432 | 1,150 | 1,139,582 | 2,081,638 |
| Noncurrent assets - Capital assets - Assets subject to depreciation - Net of depreciation | 2,599,926 | - | 2,599,926 | 2,847,721 |
| Total assets | 3,738,358 | 1,150 | 3,739,508 | 4,929,359 |
| **Liabilities** - Current liabilities | | | | |
| Accounts payable and accrued expenses | 322 | 1,150 | 1,472 | 594,440 |
| Internal balances | - | - | - | (26,185) |
| Total liabilities | 322 | 1,150 | 1,472 | 568,255 |
| **Equity** - Net position | | | | |
| Invested in capital assets - Net of related debt | 2,599,926 | - | 2,599,926 | 2,847,721 |
| Unrestricted | 1,138,110 | - | 1,138,110 | 1,513,383 |
| Total net position | $ 3,738,036 | $ - | $ 3,738,036 | $ 4,361,104 |

34

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Statement of Revenue, Expenses, and Changes in Net Position
### Internal Service Funds

| | Equipment Fund Combined | Insurance Fund Combined | Total | December 31, 2011 Total |
|---|---|---|---|---|
| | December 31, 2012 | | | |
| **Operating Revenue** | | | | |
| Other operating revenue | $ - | $ - | $ - | $ 152,453 |
| Billing to Enterprise Fund | - | - | - | 4,400,159 |
| Total operating revenue | - | - | - | 4,552,612 |
| **Operating Expenses** | | | | |
| Cost of insurance claims and expenses | - | - | - | 3,767,859 |
| Repairs and maintenance | 65,905 | - | 65,905 | - |
| Other supplies and expenses | - | - | - | 10,628 |
| Depreciation | 461,288 | - | 461,288 | 394,212 |
| Total operating expenses | 527,193 | - | 527,193 | 4,172,699 |
| **Operating (Loss) Income** | (527,193) | - | (527,193) | 379,913 |
| **Nonoperating Revenue** | | | | |
| Miscellaneous expense | (1,756) | - | (1,756) | - |
| Investment income | - | - | - | 1,852 |
| Gain on sale of assets | 19,703 | - | 19,703 | - |
| Total nonoperating revenue | 17,947 | - | 17,947 | 1,852 |
| **(Loss) Income** - Before operating transfers | (509,246) | - | (509,246) | 381,765 |
| **Transfers In** | - | - | - | 103,751 |
| **Transfers Out** | (16,250) | (97,572) | (113,822) | - |
| **(Decrease) Increase in Net Position** | (525,496) | (97,572) | (623,068) | 485,516 |
| **Net Position** - Beginning of year | 4,263,532 | 97,572 | 4,361,104 | 3,875,588 |
| **Net Position** - End of year | $ 3,738,036 | $ - | $ 3,738,036 | $ 4,361,104 |

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Statement of Cash Flows - Internal Service Funds

| | Equipment Fund | Insurance Fund | Total | December 31, 2011 Total |
|---|---|---|---|---|
| | December 31, 2012 | | | |
| **Cash Flows from Operating Activities** | | | | |
| Receipts from customers | $ 26,185 | $ 1,998 | $ 28,183 | $ 4,587,106 |
| Payments to suppliers and others for goods and services | (67,339) | (228,534) | (295,873) | (3,681,895) |
| Net cash (used in) provided by operating activities | (41,154) | (226,536) | (267,690) | 905,211 |
| **Cash Flows from Capital and Related Financing Activities** | | | | |
| Purchase of capital assets | (476,857) | - | (476,857) | (533,625) |
| Operating transfer | (16,250) | (97,572) | (113,822) | 103,751 |
| Net cash used in capital and related financing activities | (493,107) | (97,572) | (590,679) | (429,874) |
| **Cash Flows from Investing Activities** - Investment income | - | - | - | 1,852 |
| **Net (Decrease) Increase in Cash and Cash Equivalents** | (534,261) | (324,108) | (858,369) | 477,189 |
| **Cash and Cash Equivalents** - Beginning of year | 1,672,693 | 325,258 | 1,997,951 | 1,520,762 |
| **Cash and Cash Equivalents** - End of year | $ 1,138,432 | $ 1,150 | $ 1,139,582 | $ 1,997,951 |
| **Balance Sheet Classification of Cash and Cash Equivalents** | $ 1,138,432 | $ 1,150 | $ 1,139,582 | $ - |
| **Reconciliation of Operating (Loss) Income to Net Cash from Operating Activities** | | | | |
| Operating (loss) income | $ (527,193) | $ - | $ (527,193) | $ 379,913 |
| Depreciation | 461,288 | - | 461,288 | 394,212 |
| Changes in assets and liabilities: | | | | |
| Receivables | - | 1,998 | 1,998 | 32,683 |
| Other | (1,756) | - | (1,756) | - |
| Prepaid and other assets | - | 81,689 | 81,689 | 140,471 |
| Accounts payable, accrued expenses, and deferred revenue | 322 | (310,223) | (309,901) | (43,879) |
| Internal balances | 26,185 | - | 26,185 | 1,811 |
| Net cash (used in) provided by operating activities | $ (41,154) | $ (226,536) | $ (267,690) | $ 905,211 |

B-18

# Genesee County Drain Commissioner
# Division of Water and Waste Services

**Summary of Bonds Payable**
**Year Ended December 31, 2012**

B-19

| Description of Issue | Principal Outstanding January 1, 2012 | Issued During the Year | Retired During the Year | Principal Outstanding December 31, 2012 | 2013 Principal | 2013 Interest | 2014 Principal | 2014 Interest | 2015 Principal | 2015 Interest | 2016 Principal | 2016 Interest | 2017 Principal | 2017 Interest | Later Principal | Later Interest | Total Principal | Total Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Capital and Treatment Facilities** | | | | | | | | | | | | | | | | | | |
| **Genesee County Drain Commissioner Bonds Payable:** | | | | | | | | | | | | | | | | | | |
| **Series 2003 $9,000,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Division Western Trunk Relief project. Due serially in various amounts ranging from $350,000 to $2,350,000 through 2018 with interest rates from 2.00% to 4.50% | $ 3,485,000 | $ - | $ (440,000) | $ 3,045,000 | 460,000 | 132,288 | 480,000 | 113,888 | 495,000 | 93,488 | 515,000 | 72,450 | 535,000 | 49,275 | 560,000 | 25,200 | 3,045,000 | 486,589 |
| **Series 2005A $22,180,000** State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Northeast Extension Sewer project. Fully drawn May 2007. Due in amounts ranging from $950,000 to $1,285,000 through 2026 with interest rate of 1.625% | 17,280,000 | - | (1,025,000) | 16,255,000 | 1,045,000 | 264,144 | 1,060,000 | 247,163 | 1,080,000 | 229,938 | 1,095,000 | 212,388 | 1,115,000 | 194,594 | 10,860,000 | 901,145 | 16,255,000 | 2,049,372 |
| **Series 2005B $15,505,000** State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee for Division project. Fully drawn May 2007. Due in amounts ranging from $660,000 to $900,000 through 2026 with interest rate of 1.625% | 12,090,000 | - | (720,000) | 11,370,000 | 730,000 | 178,831 | 740,000 | 166,888 | 755,000 | 154,741 | 765,000 | 142,391 | 780,000 | 129,838 | 7,600,000 | 569,075 | 11,370,000 | 1,341,764 |
| **Series 2006A $3,015,000** State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Division Northeast Extension Sewer project. Fully drawn October 2007. Due in amounts ranging from $120,000 to $160,000 through 2027 with interest rate of 1.625% | 2,325,000 | - | (130,000) | 2,195,000 | 130,000 | 35,669 | 130,000 | 33,556 | 135,000 | 31,444 | 135,000 | 29,250 | 140,000 | 27,056 | 1,525,000 | 139,749 | 2,195,000 | 296,724 |
| **Series 2006B $7,705,000** State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Division Northeast Extension Sewer project. Fully drawn July 2008. Due in amounts ranging from $330,000 to $445,000 through 2027 with interest rate of 1.625% | 6,355,000 | - | (350,000) | 6,005,000 | 355,000 | 97,581 | 365,000 | 91,813 | 370,000 | 85,881 | 375,000 | 79,869 | 380,000 | 73,775 | 4,160,000 | 380,737 | 6,005,000 | 809,656 |

# Genesee County Drain Commissioner
## Division of Water and Waste Services

**Summary of Bonds Payable (Continued)**
**Year Ended December 31, 2012**

B-20

| Description of Issue | Principal Outstanding January 1, 2012 | Issued During the Year | Retired During the Year | Principal Outstanding December 31, 2012 | 2013 Principal | 2013 Interest | 2014 Principal | 2014 Interest | 2015 Principal | 2015 Interest | 2016 Principal | 2016 Interest | 2017 Principal | 2017 Interest | Later Principal | Later Interest | Total Principal | Total Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Series 2006C $4,235,000** State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Division Northeast Extension Sewer project. Fully drawn January 2008. Due in amounts ranging from $185,000 to $250,000 through 2027 with interest rate of 1.625% | $ 3,575,000 | $ - | $ (200,000) | $ 3,375,000 | $ 200,000 | $ 54,844 | $ 205,000 | $ 51,394 | $ 200,000 | $ 48,363 | $ 210,000 | $ 44,901 | $ 215,000 | $ 41,319 | $ 2,340,000 | $ 214,500 | $ 3,375,000 | $ 455,651 |
| **Series 2007 $10,500,000** State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Division Northeast Extension Sewer project. Fully drawn in December 2010. Due in amounts ranging from $450,000 to $610,000 through 2028 with interest rate of 1.625% | 9,130,000 | - | (470,000) | 8,660,000 | 480,000 | 136,825 | 480,000 | 128,984 | 495,000 | 121,022 | 500,000 | 112,938 | 510,000 | 104,731 | 6,190,000 | 569,482 | 8,660,000 | 1,173,982 |
| **Series 2007B $8,000,000** Revenue Bonds backed by the full faith and credit of County of Genesee. Bond proceeds used for Division Northeast Extension Sewer project. Due serially and term in amounts ranging from $240,000 to $600,000 through 2028 with interest rates from 4.00% to 4.40% | 7,240,000 | - | (280,000) | 6,960,000 | 295,000 | 289,578 | 310,000 | 277,778 | 325,000 | 265,378 | 340,000 | 252,378 | 360,000 | 238,778 | 5,330,000 | 1,479,235 | 6,960,000 | 2,803,125 |
| **Series 2007A $15,000,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Division Northeast Extension Sewer project. Due serially and term in amounts ranging from $475,000 to $1,150,000 through 2029 with interest rates from 2.75% to 5.00% | 14,050,000 | - | (475,000) | 13,575,000 | 500,000 | 607,188 | 525,000 | 593,438 | 525,000 | 577,688 | 600,000 | 561,281 | 625,000 | 541,031 | 10,800,000 | 3,768,282 | 13,575,000 | 6,648,908 |
| **Series 2010A $14,544,000** State Revolving Fund Program Revenue Bonds backed by the full faith and credit of County of Genesee. Bond proceeds used for Pump Station #1, ARTP Blower Revamp, and ARTP Clarifiers. $794,876 remaining to be drawn. Due in amounts ranging from $569,000 to $919,000 through 2030 with interest rate of 2.50% | 10,508,950 | 2,521,176 | (585,000) | 12,445,126 | 600,000 | 314,223 | 615,000 | 299,878 | 630,000 | 284,503 | 645,000 | 268,753 | 660,000 | 252,628 | 9,295,126 | 1,618,911 | 12,445,126 | 3,040,896 |
| **Series 2011A $1,445,000** State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for ARTP Switchgears. Fully drawn in October 2012. Due in amounts ranging from $55,000 to $90,000 through 2031 with interest rate of 2.50% | 577,606 | 867,394 | (55,000) | 1,390,000 | 60,000 | 34,685 | 60,000 | 33,250 | 60,000 | 31,750 | 60,000 | 30,250 | 65,000 | 28,750 | 1,085,000 | 214,500 | 1,390,000 | 373,185 |
| **Series 2011B $4,825,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for N&SS 3E. Due serially and term in amounts ranging from $180,000 to $405,000 through 2031 with interest rates from 3.00% to 5.00% | 4,825,000 | - | - | 4,825,000 | - | 201,500 | - | 201,500 | - | 201,500 | 180,000 | 198,800 | 185,000 | 193,325 | 4,460,000 | 1,550,820 | 4,825,000 | 2,547,445 |
| **Refunding Series 2011C $7,870,000** Revenue Bonds backed by the full faith and credit of County of Genesee. Refunded Series 2000, $6,000,000 ARTP Grit Removal bond and Series 2002A, $11,000,000 ARTP Enhancement bond. Due in amounts ranging from $1,000,000 to $1,500,000 through 2017 with interest rates from 3.00% to 2.25% | 7,870,000 | - | (1,450,000) | 6,420,000 | 1,455,000 | 116,250 | 1,465,000 | 87,150 | 1,500,000 | 57,500 | 1,000,000 | 32,500 | 1,000,000 | 11,250 | - | - | 6,420,000 | 304,750 |
| Total Genesee County Drain Commission bonds payable | 99,311,556 | 3,388,570 | (6,180,000) | 96,520,126 | 6,310,000 | 2,965,706 | 6,440,000 | 2,326,880 | 6,575,000 | 2,183,096 | 6,420,000 | 2,038,179 | 6,370,000 | 1,886,550 | 64,205,126 | 11,431,636 | 96,520,126 | 22,332,047 |

# Genesee County Drain Commissioner
# Division of Water and Waste Services

B-21

| Description of Issue | Principal Outstanding January 1, 2012 | Issued During the Year | Retired During the Year | Principal Outstanding December 31, 2012 | 2013 Principal | 2013 Interest | 2014 Principal | 2014 Interest | 2015 Principal | 2015 Interest | 2016 Principal | 2016 Interest | 2017 Principal | 2017 Interest | Later Principal | Later Interest | Total Principal | Total Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Interceptor and Treatment Facilities** | | | | | | | | | | | | | | | | | | |
| **Community-related Bonds Payable:** | | | | | | | | | | | | | | | | | | |
| **Refunding Series 2003 $2,900,000** County of Genesee Limited Tax General Obligation Bonds. Refunded Series 1999, $3,800,000 Bonds for Mt. Morris Township Sanitary Sewer System project. Due serially in amounts ranging from $15,000 to $315,000 through 2019 with interest rates from 4.00% to 4.25% | $ 2,175,000 | $ - | $ (235,000) | $ 1,940,000 | $ 245,000 | $ 75,431 | $ 255,000 | 65,183 | $ 265,000 | 54,523 | $ 275,000 | 43,453 | $ 285,000 | 31,901 | $ 615,000 | 24,382 | $ 1,940,000 | 294,875 |
| **Series 2006 $3,665,000** County of Genesee Limited Tax General Obligation Bonds for Community Western Trunk Extension Sewer Phase II project. Due serially in amounts ranging from $110,000 to $285,000 through 2026 with interest rates from 4.00% to 4.35% | 3,060,000 | - | (140,000) | 2,920,000 | 145,000 | 118,335 | 155,000 | 112,335 | 165,000 | 105,935 | 170,000 | 99,235 | 180,000 | 92,235 | 2,105,000 | 435,276 | 2,920,000 | 963,351 |
| Total community-related bonds payable | 5,235,000 | - | (375,000) | 4,860,000 | 390,000 | 193,768 | 410,000 | 177,518 | 430,000 | 160,458 | 445,000 | 142,688 | 465,000 | 124,136 | 2,720,000 | 461,658 | 4,860,000 | 1,260,226 |
| Total interceptor and treatment facilities bonds payable | $ 104,546,556 | $ 3,388,570 | $ (6,553,000) | $ 101,380,126 | $ 6,700,000 | $ 2,659,474 | $ 6,850,000 | $ 2,504,398 | $ 7,005,000 | $ 2,343,554 | $ 6,865,000 | $ 2,100,867 | $ 7,035,000 | $ 2,010,686 | $ 66,925,126 | $ 11,893,294 | $ 101,380,126 | $ 23,592,373 |
| **District No. 3** | | | | | | | | | | | | | | | | | | |
| **Genesee County Drain Commissioner Bonds Payable:** | | | | | | | | | | | | | | | | | | |
| **Series 2007 $6,000,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Treatment Plant Improvement project. Due serially in various amounts ranging from $195,000 to $470,000 through 2027 with interest rates from 4.00% to 4.90% | $ 5,385,000 | $ - | $ (225,000) | $ 5,160,000 | $ 240,000 | $ 214,538 | $ 250,000 | 204,738 | $ 265,000 | 194,438 | $ 275,000 | 183,638 | $ 290,000 | 172,338 | $ 3,840,000 | 918,095 | $ 5,160,000 | 1,887,785 |
| **Series 2010A $1,089,000** State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for District #3 Digester Phase I. Fully drawn in September 2011. Due in amounts ranging from $44,000 to $70,000 through 2030 with interest rate of 2.50% | 1,045,000 | - | (45,000) | 1,000,000 | 45,000 | 25,000 | 45,000 | 23,875 | 45,000 | 22,750 | 50,000 | 21,625 | 50,000 | 20,375 | 765,000 | 140,875 | 1,000,000 | 254,500 |
| Total Genesee County Drain Commission bonds payable | 6,430,000 | - | (270,000) | 6,160,000 | 285,000 | 239,538 | 295,000 | 228,613 | 310,000 | 217,188 | 325,000 | 205,263 | 340,000 | 192,713 | 4,605,000 | 1,058,970 | 6,160,000 | 2,142,285 |

# Genesee County Drain Commissioner
## Division of Water and Waste Services

B-22

| Description of Issue | Principal Outstanding January 1, 2012 | Issued During the Year | Retired During the Year | Principal Outstanding December 31, 2012 | 2013 Principal | 2013 Interest | 2014 Principal | 2014 Interest | 2015 Principal | 2015 Interest | 2016 Principal | 2016 Interest | 2017 Principal | 2017 Interest | Later Principal | Later Interest | Total Principal | Total Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **District No. 3** **Community-related Bonds Payable:** | | | | | | | | | | | | | | | | | | |
| Series 1996 $1,240,000 County of Genesee Limited Tax General Obligation Bonds for Fenton Township Rolston and Ripley Road Arms project. Due serially in amounts ranging from $25,000 to $100,000 through 2017 with interest rates from 5.00% to 7.375% | $ 575,000 | $ - | $ (75,000) | 500,000 | 100,000 | 24,750 | 100,000 | 19,250 | 100,000 | 13,750 | 100,000 | 8,250 | - | - | 100,000 | 2,750 | 500,000 | 68,750 |
| Refunding Series 1996A $12,940,000 Revenue Bonds backed by the full faith and credit of the County of Genesee. Refunded Series 2005, $6,000,000 District No. 3 Treatment Plant Improvement bond. Due serially in various amounts ranging from $75,000 to $1,355,000 through 2016 with interest rates from 2.50% to 5.00% | 6,705,000 | - | (1,350,000) | 5,355,000 | 1,350,000 | 238,819 | 1,345,000 | 164,694 | 1,330,000 | 99,500 | 1,325,000 | 33,125 | - | - | - | - | 5,355,000 | 536,138 |
| Series 2003 $4,000,000 County of Genesee Limited Tax General Obligation Bonds for Fenton Township Sewage Disposal System project. Due serially in amounts ranging from $125,000 to $250,000 through 2024 with interest rates from 2.50% to 4.50% | 2,925,000 | - | (200,000) | 2,725,000 | 200,000 | 109,775 | 200,000 | 102,775 | 200,000 | 95,775 | 225,000 | 88,525 | 225,000 | 80,088 | 1,675,000 | 297,425 | 2,725,000 | 774,363 |
| Series 2004A $8,000,000 County of Genesee Limited Tax General Obligation Bonds for Fenton Township Sewage Disposal System project. Due serially in amounts ranging from $250,000 to $700,000 through 2024 with interest rates from 4.00% to 5.00% | 6,250,000 | - | (350,000) | 5,900,000 | 350,000 | 244,500 | 400,000 | 225,750 | 400,000 | 207,750 | 400,000 | 191,750 | 450,000 | 174,750 | 3,900,000 | 650,125 | 5,900,000 | 1,694,625 |
| Series 2004B $4,600,000 County of Genesee Limited Tax General Obligation Bonds for Fenton Township Sewage Disposal System project. Due serially in amounts ranging from $100,000 to $400,000 through 2024 with interest rates from 4.00% to 5.00% | 3,950,000 | - | (150,000) | 3,800,000 | 150,000 | 157,250 | 150,000 | 149,750 | 200,000 | 142,000 | 300,000 | 132,000 | 300,000 | 120,000 | 2,700,000 | 421,000 | 3,800,000 | 1,122,000 |
| Refunding Series 2007 $5,615,000 County of Genesee Limited Tax General Obligation Bonds. Partially refunded Series 1998, $7,140,000 Bonds for City of Fenton, Fenton Township, and City of Linden Sewage Disposal System project. Due serially in amounts ranging from $20,000 to $915,000 through 2019 with interest rate of 4.00% | 4,950,000 | - | (290,000) | 4,660,000 | 350,000 | 179,300 | 440,000 | 163,400 | 540,000 | 143,800 | 395,000 | 121,100 | 910,000 | 91,000 | 1,820,000 | 72,600 | 4,660,000 | 771,200 |
| Total community-related bonds payable | 25,355,000 | - | (2,415,000) | 22,940,000 | 2,510,000 | 944,394 | 2,635,000 | 825,619 | 2,770,000 | 702,575 | 2,940,000 | 574,750 | 1,885,000 | 465,838 | 10,195,000 | 1,443,900 | 22,940,000 | 4,957,076 |
| Total District No. 3 bonds payable | $ 31,785,000 | $ - | $ (2,685,000) | 29,100,000 | 2,795,000 | 1,183,933 | 2,930,000 | 1,054,232 | $ 3,080,000 | $ 919,763 | 3,270,000 | 788,013 | 2,225,000 | 658,551 | 14,800,000 | 2,502,870 | 29,100,000 | 7,094,361 |

# Genesee County Drain Commissioner
# Division of Water and Waste Services

## Summary of Bonds Payable (Continued)
## Year Ended December 31, 2012

B-23

**Water Supply Systems**

| Description of Issue | Principal Outstanding January 1, 2012 | Issued During the Year | Retired During the Year | Principal Outstanding December 31, 2012 | 2013 Principal | 2013 Interest | 2014 Principal | 2014 Interest | 2015 Principal | 2015 Interest | 2016 Principal | 2016 Interest | 2017 Principal | 2017 Interest | Later Principal | Later Interest | Total Principal | Total Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Genesee County Drain Commissioner Bonds Payable:** | | | | | | | | | | | | | | | | | | |
| **Series 2003 $9,000,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Water Tower project. Due serially in various amounts ranging from $435,000 to $775,000 through 2018 with interest rates from 3.50% to 4.375% | $ 4,835,000 | $ - | $ (615,000) | $ 4,220,000 | $ 635,000 | $ 163,361 | $ 660,000 | $ 137,461 | $ 490,000 | $ 110,116 | $ 715,000 | $ 80,956 | $ 745,000 | $ 49,924 | $ 775,000 | $ 16,953 | $ 4,220,000 | 558,771 |
| **Series 2003B $18,000,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for North Water Loop III project. Due serially and term in various amounts ranging from $175,000 to $10,085,000 through 2033 with interest rates from 4.00% to 5.125% | 16,290,000 | - | (270,000) | 16,020,000 | 290,000 | 783,763 | 310,000 | 772,163 | 325,000 | 759,763 | 345,000 | 746,763 | 365,000 | 732,963 | 14,385,000 | 6,964,662 | 16,020,000 | 10,760,077 |
| **Series 2004 $14,960,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for North Water Loop III project. Due serially in various amounts ranging from $200,000 to $1,000,000 through 2020 with interest rates from 3.00% to 5.00% | 13,720,000 | - | (225,000) | 13,495,000 | 235,000 | 614,338 | 240,000 | 606,700 | 240,000 | 598,300 | 250,000 | 588,700 | 260,000 | 578,700 | 12,270,000 | 4,348,300 | 13,495,000 | 7,335,038 |
| **Series 2007 $6,000,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for North Water Loop III project. Due serially and term in various amounts ranging from $150,000 to $450,000 through 2033 with interest rates from 4.00% to 4.40% | 5,400,000 | - | (150,000) | 5,250,000 | 150,000 | 227,478 | 150,000 | 221,328 | 160,000 | 214,953 | 160,000 | 208,153 | 160,000 | 201,353 | 4,470,000 | 1,994,696 | 5,250,000 | 3,067,961 |
| Total Genesee County Drain Commission bonds payable | 40,245,000 | - | (1,260,000) | 38,985,000 | 1,310,000 | 1,788,940 | 1,360,000 | 1,737,652 | 1,415,000 | 1,683,132 | 1,470,000 | 1,624,572 | 1,530,000 | 1,562,940 | 31,900,000 | 13,224,611 | 38,985,000 | 21,721,847 |
| **Community-related Bonds Payable:** | | | | | | | | | | | | | | | | | | |
| **Series 2011 $933,515** Drinking Water Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Fenton Road Watermain - Bristol to Maple. Fully drawn in July 2012. Due in amounts ranging from $34,250 to $39,265 through 2031 with interest rate of 2.50% | 903,516 | 29,999 | (34,250) | 899,265 | 40,000 | 21,987 | 40,000 | 20,982 | 40,000 | 19,982 | 40,000 | 18,982 | 40,000 | 17,982 | 699,265 | 128,378 | 899,265 | 228,293 |
| Total water supply systems bonds payable | $ 41,148,516 | 29,999 | (1,294,250) | 39,884,265 | $ 1,350,000 | $ 1,810,927 | $ 1,400,000 | $ 1,758,634 | $ 1,455,000 | 1,703,114 | 1,510,000 | 1,643,554 | 1,570,000 | 1,580,922 | 32,599,265 | 13,452,989 | 39,884,265 | 21,950,140 |
| Total Genesee County Drain Commission bonds payable | 145,986,556 | 3,388,570 | (7,710,000) | 141,665,126 | 7,905,000 | 4,494,184 | 8,095,000 | 4,293,145 | 8,300,000 | 4,083,416 | 8,215,000 | 3,868,014 | 8,440,000 | 3,642,203 | 100,710,126 | 25,815,217 | 141,665,126 | 46,196,179 |
| Total community-related bonds payable | 31,493,516 | 29,999 | (2,824,250) | 28,699,265 | 2,940,000 | 1,160,149 | 3,085,000 | 1,024,119 | 3,240,000 | 883,015 | 3,430,000 | 736,420 | 2,390,000 | 607,956 | 13,614,265 | 2,033,936 | 28,699,265 | 6,445,594 |
| Total - All bonds payable | $ 177,480,072 | $ 3,418,569 | $ (10,534,250) | $ 170,364,391 | $ 10,845,000 | $ 5,654,333 | $ 11,180,000 | $ 5,317,264 | $ 11,540,000 | 4,966,431 | $ 11,645,000 | $ 4,604,434 | $ 10,830,000 | $ 4,250,159 | $ 114,324,391 | $ 27,849,153 | $ 170,364,391 | $ 52,641,773 |



**Plante & Moran, PLLC**
27400 Northwestern Highway
P.O. Box 307
Southfield, MI 48037-0307
Tel: 248.352.2500
Fax: 248.352.0018
plantemoran.com

May 14, 2013

Mr. Jeff Wright
Genesee County Drain Commissioner
   Division of Water and Waste Services
G-4608 Beecher Road
Flint, Michigan 48532

We have audited the financial statements of the Enterprise Fund and Internal Service Fund of the Genesee County Drain Commissioner Division of Water and Waste Services (a component unit of Genesee County, Michigan) (the "Division") as of and for the year ended December 31, 2012 and have issued our report thereon dated May 14, 2013. We have also audited the federal awards of the Division for the year ended December 31, 2011 and issued our report dated May 14, 2013. Professional standards require that we provide you with the following information related to our audit.

### Our Responsibility Under U.S. Generally Accepted Auditing Standards

As stated in our engagement letter dated November 12, 2012, our responsibility, as described by professional standards, is to express an opinion about whether the financial statements prepared by management with your oversight are fairly presented, in all material respects, in conformity with U.S. generally accepted accounting principles. Our audit of the financial statements does not relieve you or management of your responsibilities. Our responsibility is to plan and perform the audit to obtain reasonable, but not absolute, assurance that the financial statements are free of material misstatement.

As part of our audit, we considered the internal control of Genesee County Drain Commissioner Division of Water and Waste Services (the "Division"). Such considerations were solely for the purpose of determining our audit procedures and not to provide any assurance concerning such internal control.

We are responsible for communicating significant matters related to the audit that are, in our professional judgment, relevant to your responsibilities in overseeing the financial reporting process. However, we are not required to design procedures specifically to identify such matters.

Our audit of the Division's 2011 financial statements has been conducted in accordance with *Government Auditing Standards*, issued by the Comptroller General of the United States. Under *Government Auditing Standards*, we are obligated to communicate certain matters that come to our attention related to our audit to those responsible for the governance of the Division, including compliance with certain provisions of laws, regulations, contracts, grant agreements, certain instances of error or fraud, illegal acts applicable to government agencies, and significant deficiencies in internal control that we identify during our audit. Toward this end, we issued a separate letter dated June 25, 2012 regarding our consideration of Division's internal control over financial reporting and separate letter dated May 14, 2013 regarding our consideration on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements.

1


Praxity
GLOBAL ALLIANCE OF
INDEPENDENT FIRMS

Mr. Jeff Wright
Genesee County Drain Commissioner
   Division of Water and Waste Services

May 14, 2013

### Planned Scope and Timing of the Audit

We performed the audit according to the planned scope and timing previously communicated to you in our meeting about planning matters on December 12, 2012.

### Significant Audit Findings

#### Qualitative Aspects of Accounting Practices

Management is responsible for the selection and use of appropriate accounting policies. In accordance with the terms of our engagement letter, we will advise management about the appropriateness of accounting policies and their application. The significant accounting policies used by the Division are described in Note 1 to the financial statements. No new accounting policies were adopted and the application of existing policies was not changed during 2012 other than that the Division adopted GASB Statement No. 63, *Financial Reporting of Deferred Outflows of Resources, Deferred Inflows of Resources, and Net Position*. As a result, there were very minor revisions to the terminology and reporting of the statement of net position.

We noted no transactions entered into by the Division during the year for which there is a lack of authoritative guidance or consensus.

There are no significant transactions that have been recognized in the financial statements in a different period than when the transaction occurred.

Accounting estimates are an integral part of the financial statements prepared by management and are based on management's knowledge and experience about past and current events and assumptions about future events. Certain accounting estimates are particularly sensitive because of their significance to the financial statements and because of the possibility that future events affecting them may differ significantly from those expected. The most sensitive estimates affecting the financial statements were the recording of unbilled revenue, the postemployment benefit liability calculation, the pension disclosures, and the calculation of the self-insurance (IBNR) liability.

Management's estimate of the unbilled revenue is based on amounts billed subsequent to year end. We evaluated the key factors and assumptions used to develop the unbilled revenue in determining that it is reasonable in relation to the financial statements taken as a whole.

Management's estimate of the postemployment benefit liability and defined benefit pension costs is based on certain assumptions made by the actuary. We evaluated the key factors and assumptions used to calculate the liability in determining that it is reasonable in relation to the financial statements taken as a whole.

Management's estimate of the self-insurance liability is based on the quarterly billings received from BCBS. We evaluated the key factors and assumptions used to calculate the receivable in determining that it is reasonable in relation to the financial statements taken as a whole.

2

B-24

Mr. Jeff Wright                                                          May 14, 2013
Genesee County Drain Commissioner
    Division of Water and Waste Services

The disclosures in the financial statements are neutral, consistent, and clear.

*Difficulties Encountered in Performing the Audit*

We encountered no significant difficulties in dealing with management in performing and completing our audit.

*Disagreements with Management*

For the purpose of this letter, professional standards define a disagreement with management as a financial accounting, reporting, or auditing matter, whether or not resolved to our satisfaction, that could be significant to the financial statements or the auditor's report

We are pleased to report that no such disagreements arose during the course of our audit.

*Corrected and Uncorrected Misstatements*

Professional standards require us to accumulate all known and likely misstatements identified during the audit, other than those that are trivial, and communicate them to the appropriate level of management.

We did not detect any misstatements as a result of audit procedures.

*Significant Findings or Issues*

We generally discuss a variety of matters, including the application of accounting principles and auditing standards, business conditions affecting the Division, and business plans and strategies that may affect the risks of material misstatement with management each year prior to retention as the Division's auditors.  However, these discussions occurred in the normal course of our professional relationship and our responses were not a condition of our retention.

*Management Representations*

We have requested certain representations from management that are included in the management representation letter dated May 14, 2013.

*Management Consultations with Other Independent Accountants*

In some cases, management may decide to consult with other accountants about auditing and accounting matters, similar to obtaining a "second opinion" on certain situations.  If a consultation involves application of an accounting principle to the Division's financial statements or a determination of the type of auditor's opinion that may be expressed on those statements, our professional standards require the consulting accountant to check with us to determine that the consultant has all the relevant facts. To our knowledge, there were no such consultations with other accountants.

3

Mr. Jeff Wright                                                          May 14, 2013
Genesee County Drain Commissioner
    Division of Water and Waste Services

This information is intended solely for the use of Mr. Jeff Wright, Genesee County Drain Commissioner, and management of Genesee County Drain Commissioner Division of Water and Waste Services and is not intended to be and should not be used by anyone other than these specified parties.

**Other Information** - Per Bulletin 6 issued by the State Department of Treasury, the State made some revisions to the Michigan qualifying statement as well as changes to the filing process. It is our understanding that the Division is considering issuing debt in the coming year, and would need to file a qualifying statement in order to initiate the process.

The bulletin details the revisions made to the form, changes in the electronic filing process, and provides information on the new process to submit a reconsideration request.

The qualifying statement is now Form 5047.  The new form and link to the online filing are available at www.michigan.gov/municipalfinance.  You can also find Bulletin 6 by following this same link.

Very truly yours,

**Plante & Moran, PLLC**

Leslie J. Pulver

4

[THIS PAGE INTENTIONALLY LEFT BLANK]

Plante & Moran, PLLC
Suite 1A
111 E. Court St.
Flint, MI 48502
Tel: 810.767.5350
Fax: 810.767.8150
plantemoran.com

Independent Auditor's Report

To the Board of Commissioners
Genesee County
Flint, Michigan

**Report on the Financial Statements**

We have audited the accompanying financial statements of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of Genesee County, Michigan (the "County") as of and for the year ended September 30, 2013, and the related notes to the financial statements, which collectively comprise Genesee County's basic financial statements as listed in the table of contents.

***Management's Responsibility for the Financial Statements***

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

***Auditor's Responsibility***

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America and in accordance with the standards applicable to financial audits contained in *Goverment Auditing Standards* issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement. The financial statements of the following entities were not audited in accordance with *Government Auditing Standards*: Economic Development Corporation of the County of Genesee and Genesee County Storm Water Management System.

Our responsibility is to express opinions on these financial statements based on our audit. We did not audit the financial statements of Genesee County Community Mental Health Services, a major governmental fund of the County, which represents 37.6 and 15.1 percent of the assets and revenue, respectively, of the governmental funds. We also did not audit the financial statements of Genesee County Planning Commission, a non-major governmental fund of the County, which represents less than 1 percent of both the assets and revenues of the governmental funds. We also did not audit the financial statements of Genesee County Road Commission, a discretely presented component unit of the County, which represents 30.5 percent and 19.6 percent, respectively, of the assets and revenues of the component units. We also did not audit the financial statements of the Economic Development Corporation, a discretely presented component unit of the County, which represents less than 1 percent of both the assets and revenues of the component units. We also did not audit the financial statements of Genesee Health Systems Authority, a discretely presented component unit of the County, which represents 9.6 and 62.5 percent of the assets and revenue, respectively, of the component units. Those financial statements were audited by other auditors, whose report has been furnished to us, and our opinion, insofar as it relates to the amounts included for Genesee County Community Mental Health Services, Genesee County Planning Commission, Genesee County Road Commission, the Economic Development Corporation, and the Genesee Health Systems Authority, is based solely on the report of the other auditors.



Praxity MEMBER GLOBAL ALLIANCE OF INDEPENDENT FIRMS





An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinions.

***Opinions***

In our opinion, based on our audit and the report of other auditors, the financial statements referred to above present fairly, in all material respects, the respective financial position of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of Genesee County as of September 30, 2013 and the respective changes in its financial position and, where applicable, cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

***Emphasis of Matter***

As explained in Note C, the financial statements include investments valued at $191,881,667 (41 percent of total investments for the aggregate remaining funds) at September 30, 2013 and at $156,308,416 (34 percent of total investments for the aggregate remaining funds) at September 30, 2012, whose fair values have been estimated by management in the absence of readily determinable market values. Management's estimates are based on information provided by fund managers and the partnership general partners. Our opinion has not been modified with respect to this matter.

***Other Matters***

*Required Supplemental Information*

Accounting principles generally accepted in the United States of America require that the management's discussion and analysis and the major fund budgetary comparison schedules, as identified in the table of contents, be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board, which considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplemental information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

To the Board of Commissioners
Genesee County

*Other Information*

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise Genesee County's basic financial statements. The combining statements, as identified in the table of contents as other supplemental information, are presented for the purpose of additional analysis and are not a required part of the basic financial statements.

The combining statements, identified in the table of contents as other supplementary information, are the responsibility of management and were derived from and relate directly to the underlying accounting and other records used to prepare the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the basic financial statements or to the basic financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the basic financial statements as a whole.

The introductory section and statistical section, as identified in the table of contents, have not been subjected to the auditing procedures applied in the audit of the basic financial statements, and accordingly, we do not express an opinion or provide any assurance on them.

**Other Reporting Required by *Government Auditing Standards***

In accordance with *Government Auditing Standards*, we have also issued our report dated March 18, 2014 on our consideration of Genesee County's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, grant agreements, and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering Genesee County's internal control over financial reporting and compliance.

*Plante & Moran, PLLC*

March 18, 2014

## MANAGEMENT'S DISCUSSION AND ANALYSIS

## GENESEE COUNTY

As management of Genesee County, we offer readers of the Genesee County's financial statements this narrative overview and analysis of the financial activities of Genesee County for the fiscal year ended September 30, 2013. We encourage readers to consider the information presented here in conjunction with additional information that we have furnished in our letter of transmittal, which can be found at the beginning of this report.

**Financial Highlights**

- The assets of Genesee County exceeded its liabilities at the close of the most recent fiscal year by $119,467,297 (net position). Of this amount, $13,493,362 (unrestricted net position) may be used to meet the government's ongoing obligations to citizens and creditors.
- The government's total net position decreased by $25,645,496. Governmental activities decreased by $28,366,573 while Business-type activities increased by $2,721,077; the overall decrease is attributed to a decrease in Primary Government revenues, resulting primarily from the transfer of Mental Health operations to Genesee Health Services, a newly established Mental Health Authority.
- As of the close of the current fiscal year, Genesee County's governmental funds reported combined ending fund balances of $29,977,381 a decrease of $15,853,798 in comparison with the prior year. Approximately 21% of this total amount, $6,300,649, is available for spending at the government's discretion (unassigned fund balance).
- At the end of the current fiscal year, unassigned fund balance for the General Fund was $9,455,182, 16% of total General Fund expenditures.
- Genesee County's total debt was increased by the issuance of delinquent tax notes in the amount of $39,900,000 during the current fiscal year for various projects and refunding issues which was offset by total payments of $54,381,571.

**Overview of the Financial Statements**

This discussion and analysis is intended to serve as an introduction to Genesee County's basic financial statements. Genesee County's basic financial statements included three components: 1) government-wide financial statements, 2) fund financial statements, and 3) notes to the financial statements. This report also contains other supplementary information in addition to the basic financial statements.

**Government-wide Financial Statements.** The government-wide financial statements are designed to provide readers with a broad overview of Genesee County's finances, in a manner similar to a private-sector business.

The statement of net position presents information on all Genesee County's assets and liabilities, with the difference between the two reported as net position. Over time, increases or decreases in net position may serve as a useful indicator of whether the financial position of Genesee County is improving or deteriorating.

The statement of activities presents information showing how the government's net position changed during the most recent fiscal year. All changes in net position are reported as soon as the underlying event giving rise to the change occurs, regardless of the timing of related cash flows. Thus, revenues and expenses are reported in this statement for some items that will only result in cash flows in future fiscal periods (e.g., uncollected taxes and earned but unused vacation leave).

Both of the government-wide financial statements distinguish functions of Genesee County that are principally supported by taxes and intergovernmental revenues (government activities) from other functions that are intended to recover all or a significant portion of their costs through user fees and charges (business-type activities). The governmental activities of Genesee County include legislative, management and planning, administration of justice, law enforcement, human services, community enrichment, general support, and other. The business-type activities of Genesee County include Parks and Recreation System, Jail Commissary, Parking Meter and Delinquent Tax Revolving Fund.

The government-wide financial statements include not only Genesee County itself (known as the primary government), but also eight legally separated component units for which Genesee County is financially accountable. Financial information for these component units is reported separately from the financial information presented for the primary government itself.

The government-wide financial statements can be found as Exhibit A-1 and A-2 of this report.

**Fund Financial Statements.** A fund is a grouping of related accounts that is used to maintain control over resources that have been segregated for specific activities or objectives. Genesee County, like other state and local governments, uses fund accounting to ensure and demonstrate compliance with finance-related legal requirements. All of the funds of Genesee County can be divided into three categories: governmental funds, proprietary funds, and fiduciary funds.

**Governmental Funds.** Governmental funds are used to account for essentially the same functions reported as governmental activities in the government-wide financial statements. However, unlike the government-wide financial statements, governmental fund financial statements focus on near-term inflows and outflows of spendable resources, as well as on balances of spendable resources available at the end of the fiscal year. Such information may be useful in evaluating a government's near-term financing requirements.

Because the focus of governmental funds is narrower than that of the government-wide financial statements, it is useful to compare the information presented for governmental funds with similar information presented for governmental activities in the government-wide financial statements. By doing so, readers may better understand the long-term impact of the government's near-term financing decisions. Both the governmental fund balance sheet and the governmental fund statement of revenues, expenditures, and changes in fund balances provide a reconciliation to facilitate this comparison between governmental funds and governmental activities.

Genesee County maintains individual governmental funds. Information is presented separately in the governmental fund balance sheet and in the governmental fund statement of revenues, expenditures, and changes in fund balances for the General Fund and four special revenue funds, all of which are considered to be major funds. Data from the other governmental funds are combined into a single, aggregated presentation. Individual fund data for each of these non-major governmental funds is provided in the form of combining statements elsewhere in this report.

**MANAGEMENT'S DISCUSSION AND ANALYSIS**

**GENESEE COUNTY**

Genesee County adopts an annual appropriated budget for its General Fund. A budgetary comparison statement has been provided for the General Fund to demonstrate compliance with this budget.

The basic governmental fund financial statements can be found on Exhibit A-3 and A-4 of this report.

**Proprietary Funds.** Genesee County maintains two different types of proprietary funds. Enterprise funds are used to report the same functions presented as business-type activities in the government-wide financial statements. Genesee County uses enterprise funds to account for its Parks and Recreation System, Jail Commissary, Parking Meter and Delinquent Tax Revolving Fund. Internal service funds are an accounting device used to accumulate and allocate costs internally among Genesee County's various functions. Genesee County uses internal service funds to account for its fleet of vehicles, building and grounds maintenance, Self Insured Medicals, Property and Casualty and other Administrative Services. Because all of these services predominantly benefit governmental rather than business-type functions, they have been included within governmental activities in the government-wide financial statements.

Proprietary funds provide the same type of information as the government-wide financial statements, only in more detail. The proprietary fund financial statements provide separate information for the Parks and Recreation System, Jail Commissary, Parking Meter and Delinquent Tax Revolving Fund. Conversely, all internal service funds are combined into a single, aggregated presentation in the proprietary fund financial statements. Individual fund data for the internal service funds is provided in the form of combining statements elsewhere in this report.

The basic proprietary fund financial statements can be found at Exhibit A-6, A-7, and A-8 of this report.

**Fiduciary Funds.** Fiduciary funds are used to account for resources held for the benefit of parties outside the government. Fiduciary funds are not reflected in the government-wide financial statement because the resources of those funds are not available to support Genesee County's own programs. The accounting used for fiduciary funds is much like that used for proprietary funds.

The basic fiduciary fund financial statements can be found at Exhibit A-9 and A-10 of this report.

**Component Units Presented.** The government-wide financial statements include not only Genesee County itself (known as the primary government), but also eight legally separated component units for which Genesee County is financially accountable. Financial information for these component units is reported separately from the financial information presented for the primary government itself.

The basic component unit financial statements can be found at Exhibit A-11 and A-12 of this report.

**Notes to the Financial Statements.** The notes provide additional information that is essential to a full understanding of the data provided in the government-wide and fund financial statements. The notes to the financial statements can be found at Exhibit A-13 of this report.

**Other Information.** In addition to the basic financial statements and accompanying notes, this report also presents certain required supplementary information concerning Genesee County's progress in funding its obligation to provide pension benefits to its employees. Required supplementary information can be found in Exhibit A-13 of this report.

The combining statements referred to earlier in connection with non-major governmental funds and internal service funds are presented immediately following the required supplementary information on pensions. Combining and individual fund statements and schedules can be found at Exhibit C of this report.

**Government-wide Financial Analysis**

As noted earlier, net position may serve overtime as a useful indicator of a government's financial position. In the case of Genesee County, assets exceeded liabilities by $119,467,297 at the close of the most recent fiscal year.

A significant portion of Genesee County's net position (63%) reflects its investment in capital assets (e.g., land, buildings, machinery, and equipment), less any related debt used to acquire those assets that is still outstanding. Genesee County uses these capital assets to provide services to citizens; consequently, these assets are not available for future spending. Although Genesee County's investments in its capital assets are reported net of related debt, it should be noted that the resources needed to repay this debt must be provided from other sources, since the capital assets themselves cannot be used to liquidate these liabilities.

**GENESEE COUNTY'S NET POSITION**

| | Governmental Activities | | Business-type Activities | | Total | |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 | 2013 | 2012 |
| Current and other assets | $76,130,833 | $134,990,452 | $55,608,797 | $59,154,978 | $131,739,630 | $194,145,430 |
| Capital assets | 95,124,850 | 95,495,274 | 3,359,580 | 3,887,056 | 98,484,430 | 99,382,330 |
| Total assets | 171,255,683 | 230,485,726 | 58,968,377 | 63,042,034 | 230,224,060 | 293,527,760 |
| Long-term liabilities outstanding | 61,161,047 | 55,397,578 | 36,161,184 | 42,569,174 | 97,322,231 | 97,966,752 |
| Other liabilities | 12,501,025 | 49,127,964 | 933,507 | 1,320,251 | 13,434,532 | 50,448,215 |
| Total liabilities | 73,662,072 | 104,525,542 | 37,094,691 | 43,889,425 | 110,756,763 | 148,414,967 |

| | Governmental Activities | | Business-type Activities | | Total | |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 | 2013 | 2012 |
| Net position: | | | | | | |
| Net investment in capital assets | $71,579,693 | $69,930,626 | $3,313,080 | $3,815,056 | $74,892,773 | $73,745,682 |
| Restricted | 19,786,947 | 23,334,199 | 11,294,215 | 10,816,391 | 31,081,162 | 34,150,590 |
| Unrestricted | 6,226,971 | 32,695,359 | 7,266,391 | 4,521,162 | 13,493,362 | 37,216,521 |
| Total net position | $97,593,611 | $125,960,184 | $21,873,686 | $19,152,609 | $119,467,297 | $145,112,793 |

An additional portion of Genesee County's net position (26%) represents resources that are subject to external restrictions on how they may be used. The remaining balance of unrestricted net position ($13,493,362) may be used to meet the government's ongoing obligations to citizens and creditors.

At the end of the current fiscal year, Genesee County is able to report positive balances in all three categories of net position, both for the government as a whole, as well as for its separate governmental and business-type activities. The same situation held true for the prior fiscal year.

The government's total net position decreased by $25,645,496. This decrease represents Governmental activities which is attributed primarily to the transfer of Mental Health operations to Genesee Health Services, a newly established Mental Health Authority.

**Governmental Activities.** Governmental activities decreased Genesee County's net position by $28,366,573, key elements affecting this change are as follows:

**Genesee County's Change in Net position**

| | Governmental Activities | | Business-type Activities | | Total | |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 | 2013 | 2012 |
| Revenues: | | | | | | |
| Program revenues: | | | | | | |
| Charges for services (A) | $43,056,628 | $127,332,255 | $13,937,979 | $14,179,074 | $56,994,607 | $141,511,329 |
| Operating grants and contributions (A) | 81,285,904 | 113,688,537 | - | - | 81,285,904 | 113,688,537 |
| Capital grants and contributions | | | | | | |
| General revenues: | | | | | | |
| Taxes | 72,790,031 | 81,473,016 | - | - | 72,790,031 | 81,473,016 |
| Use of money and investments | 504,347 | 988,717 | 71,437 | 117,882 | 575,784 | 1,106,599 |
| Other intergovernmental revenues | 16,031,090 | 3,915,651 | - | - | 16,031,090 | 3,915,651 |
| Other unrestricted revenues | 8,173,635 | 8,398,465 | - | - | 8,173,635 | 8,398,465 |
| Total revenues | 221,841,635 | 335,796,641 | 14,009,416 | 14,296,956 | 235,851,051 | 350,093,597 |
| Expenses: | | | | | | |
| Legislative | 981,519 | 1,023,886 | - | - | 981,519 | 1,023,886 |
| Management and planning | 12,901,085 | 5,302,148 | - | - | 12,901,085 | 5,302,148 |
| Administration of justice | 38,949,070 | 40,587,961 | - | - | 38,949,070 | 40,587,961 |
| Law enforcement/commun. protec. | 36,508,812 | 32,423,243 | - | - | 36,508,812 | 32,423,243 |
| Human services (A) | 130,931,244 | 242,432,706 | - | - | 130,931,244 | 242,432,706 |
| Community enrichment/develop | 16,255,901 | 17,005,313 | - | - | 16,255,901 | 17,005,313 |
| General support services | - | - | - | - | - | - |
| Other | - | - | - | - | - | - |
| Interest on long-term debt | 1,101,895 | 1,361,032 | - | - | 1,101,895 | 1,361,032 |
| Commissary | - | - | 340,779 | 323,556 | 340,779 | 323,556 |
| Delinquent Tax | - | - | 4,757,339 | 5,113,306 | 4,757,339 | 5,113,306 |
| Parks & Recreation Enterprise | - | - | 951,103 | 888,622 | 951,103 | 888,622 |
| Parking Meter | - | - | 349,854 | 65,795 | 349,854 | 65,795 |
| Total Expenses | 237,629,526 | 340,136,289 | 6,399,075 | 6,391,279 | 244,028,601 | 346,527,568 |
| Increase (decrease) in net position | | | | | | |
| before transfers | (14,608,480) | (4,339,648) | 7,610,341 | 7,905,677 | (6,998,139) | 3,566,029 |
| Transfers | 4,889,264 | 5,687,129 | (4,889,264) | (5,687,129) | - | - |
| Special item – transfer of operations | | | | | | |
| to Genesee Health Systems | (17,467,946) | | | | (17,467,946) | 20,349,315 |
| Change in net position | (28,366,573) | 1,347,481 | 2,721,077 | 2,218,548 | (25,645,496) | 3,566,029 |
| Beginning of year net position (as restated) | 125,960,184 | 124,612,703 | 19,152,609 | 16,934,061 | 145,112,793 | 141,546,764 |
| End of year net position | $97,593,611 | $125,960,184 | $21,873,686 | $19,152,609 | $119,467,297 | $145,112,793 |

(A) Decrease due primarily to reporting Genesee Health Services as a discretely presented component unit effective January 1, 2013.

- Implementation of GASB 34 requirements has changed the presentation of this report and is reflected in the net asset balances.
- Reductions in tax revenue collections and program grants has forced cutbacks in many areas.

## MANAGEMENT'S DISCUSSION AND ANALYSIS

## GENESEE COUNTY

- Due to careful budgeting and a transfer from the Delinquent Tax Fund, Genesee County's General Fund has seen a $570,402 increase in fund balance.
- Taxes decreased by $8,682,985 during the year. Most of this decrease is property taxes due to weak residential growth and a weak housing market.
- Operating grants for governmental activities remain a large part of the overall budget. These grants support a variety of community services in the county.

**Business-type activities.** The net position for business-type activities increased by $2,721,077. Key elements of this increase are as follows.

- The decrease in transfer of funds to Governmental activities for support of general operating expenditures and debt service requirements are reflected in this increase.

#### Financial Analysis of the Government's Funds

As noted earlier, Genesee County uses fund accounting to ensure and demonstrate compliance with finance-related legal requirements.

**Governmental funds.** The focus of Genesee County's governmental funds is to provide information on near-term inflows, outflows, and balances of available resources. Such information is useful in assessing Genesee County's financing requirements. In particular, unassigned fund balance may serve as a useful measure of a government's net resources available for spending at the end of the fiscal year.

As of the end of the current fiscal year, Genesee County's governmental funds reported combined ending fund balances of $29,977,381, an decrease of $15,853,798 in comparison with the prior year. Approximately 21% of this total amount, ($6,300,649) constitutes unassigned fund balance, which is available for spending at the government's discretion.

The General Fund unassigned fund balance totaled $9,455,182, while total fund balance increased to $12,316,681. As a measure of the General Fund's liquidity, it may be useful to compare both unassigned fund balance and total fund balance to total fund expenditures. Unassigned fund balance represents 16% of total General Fund expenditures, while total fund balance represents 21% of that same amount.

At the end of the current fiscal year, the total fund balance of county health was increased to $2,539,048. The fund balance represents 19% of total county health expenditures.

The increase in the fund balances of Genesee County's governmental funds were as the result of the following:

- General Fund - The Genesee County Board of Commissioner passed a 2012/2013 General Fund budget anticipating the use of $0 of fund balance. During 2012/2013 General Fund revenues were more than budgeted revenues by $712,096 while expenditures exceeded the budget by $313,364.
- County Health - In the 2012/2013 fiscal year, the County Health Department anticipated expenditures of $15,432,755. The actual amount of expenditures was $13,566,386. This variance, combined with other variances in revenue items resulted in the Health Department fund balance increasing by $1,278,936.
- Community Action Resource Department – The fund balance of the Community Action Resource Department decreased during the 2012/2013 fiscal year by a total of $544,196. This decrease was attributable to maximus changes in the funding levels from the Federal and State governments throughout the fiscal year.

**Proprietary funds.** Genesee County's proprietary funds provide the same type of information found in the government-wide financial statements, but in more detail.

Unrestricted net position at the end of the year amounted to $7,266,391. The total increase in net position for all proprietary funds was $2,721,077. Other factors concerning the finances of these funds have already been addressed in the discussion of Genesee County's business-type activities.

#### General Fund Budgetary Highlights

During the year, the County board amended the budget to take into account events during the year. General Fund's expenditures and appropriations budget was increased in total by $1,292,729. The major budgetary increases/decreases are summarized as follows:

- A negative variance of $197,065 in various General Fund revenues occurred due to the anticipated revenue received for fines and forfeitures and uses of money.

- A $213,240 increase was allocated to the Board of Commissioners department to cover costs of attorney fees related to discussions of union contract changes and usage of delinquent tax funds.

- A total increase of 3,531,270 was allocated to Other expenses to cover furlough days savings being less than anticipated due to delays in union contract settlements.

- A $261,459 increase was allocated to various departments to cover Capital Outlay which is allocated during the year on an as needed basis.

- A $193,701 increase was appropriated to the various Internal Service departments to cover additional costs of overtime which is budgeted in the General Fund and allocated on a monthly basis based on departmental need.

Overall during the year, actual General Fund revenues were more than the amended budgetary estimates and expenditures exceeded the amended budget, resulting in a small increase in fund balance that was less than the final amended budget amount.

#### Capital Asset and Debt Administration

**Capital assets.** Genesee County's investment in capital assets for its governmental and business type activities as of September 30, 2013, amounts to $98,484,430 (net of accumulated depreciation). This investment in capital assets included land, buildings and system, improvements, machinery and equipment, and park facilities.

Additional information on Genesee County's capital assets can be found in Note D in Exhibit A-13 of this report.

**Debt.** At the end of the current fiscal year, Genesee County had total bonded debt outstanding of $260,287,117. Of this amount, $116,886,416 comprises debt backed by the full faith and credit of the government, $318,505 is special assessment debt for which the government is liable in the event of default by the property owners subject to the assessment and $7,210,000 is Michigan Transportation bonds for which are payable with Act 51 money.

Genesee County's total debt, including component units, decreased by $12,564,144 during the current fiscal year. The key factor in this decrease was due to normal debt retirement in the fiscal years budget. Genesee County maintains an "A+" rating from Standard & Poor's and an "A2" rating from Moody's for general obligation debt.

State statutes limit the amount of general obligation debt a governmental entity may issue to 10 percent of its total assessed valuation. The current debt limitation for Genesee County is $899,354,911, which is significantly in excess of Genesee County's outstanding general obligation debt.

Additional information on Genesee County's long-term debt can be found in Note E of Exhibit A-13 of this report.

#### Economic Factors and Next Year's Budgets and Rates

- The unemployment rate for Genesee County is currently 8.4 percent, which is an decrease from a rate of 11.2 percent a year ago. This decrease is attributed to local conditions and is reflective of state and national trends.
- The government expects to see reduced funding from State agencies due to a reduction in tax collections as seen in a nation-wide trend of state and local revenues.
- Inflationary trends in the region compare favorably to national indices.
- Goals to achieve concessions in current union negotiations continue (decreases in longevity wages and changes to co-pays for health care).
- Continuation of the instituted hiring freeze.

All of these factors were considered in preparing Genesee County's budget for the 2013 fiscal year.

#### Request for Information

The financial report is designed to provide a general overview of Genesee County's finances for all those with an interest in the government's finances. Questions concerning any of the information provided in this report or requests for additional financial information should be addressed to the Office of the Controller, County of Genesee, 1101 Beach Street, Flint, MI 48502.

**This Page was Intentionally Left Blank**

B-31

# BASIC
# FINANCIAL STATEMENTS

**STATEMENT OF NET POSITION**

**SEPTEMBER 30, 2013**

**GENESEE COUNTY**                                                                          **Exhibit A-1**

B-32

| ASSETS | Governmental Activities | Business-type Activities | Total | Component Units |
|---|---|---|---|---|
| Cash and cash equivalents | $ 5,258,652 | $ 1,906,853 | $ 7,165,505 | $ 70,731,664 |
| Investments | 15,354,194 | 7,359,519 | 22,713,713 | 32,777,451 |
| Current and delinquent taxes receivable | | | | |
| (net allowance $1,116,143) | 13,998,293 | 43,643,971 | 57,642,264 | |
| Special assessments receivable | | | | 43,744,763 |
| Interest and accounts receivable | | | | |
| (net allowance $2,994,243) | 14,736,768 | 4,579,064 | 19,315,832 | 12,177,670 |
| Due from other governmental units | 14,931,026 | 4,260,328 | 19,191,354 | 9,395,089 |
| Due from component unit | 520,076 | 466,518 | 986,594 | 225,000 |
| Due from primary government | | | | 26,359 |
| Internal balances | 6,665,352 | (6,665,352) | | |
| Inventory | 1,305,644 | 34,448 | 1,340,092 | 2,498,017 |
| Prepayments | 1,148,212 | 23,448 | 1,171,660 | 1,548,042 |
| Unamortized cost of issuance | | | | 679,048 |
| Other assets | 114,307 | | 114,307 | 2,581,801 |
| Restricted assets: | | | | |
| Cash | | | | 4,850,094 |
| Deposits and employee advances | 333,309 | | 333,309 | 1,604,423 |
| Net OPEB asset | | | | 658,197 |
| Long term advances to component unit | 1,765,000 | | 1,765,000 | |
| Local unit construction in progress | | | | 156,500 |
| Investment in joint venture | | | | 3,893,843 |
| Intangible assets - Net | | | | 12,188 |
| Capital assets not being depreciated | 11,398,753 | 3,145,718 | 14,544,471 | 57,804,898 |
| Capital assets (net of accumulated depreciation) | 83,726,097 | 213,862 | 83,939,959 | 480,248,309 |
| **Total assets** | 171,255,683 | 58,968,377 | 230,224,060 | 725,613,356 |
| LIABILITIES | | | | |
| Accounts payable | 4,291,505 | 398,736 | 4,690,241 | 23,104,542 |
| Accrued payroll | 3,439,970 | 13,980 | 3,453,950 | 106,485 |
| Other accrued liabilities and deposits | 440,281 | 520,786 | 961,067 | 3,183,974 |
| Accrued interest payable | 287,815 | | 287,815 | 277,286 |
| Due to other governmental units | 3,805,586 | 5 | 3,805,591 | 21,376,428 |
| Due to primary government | | | | 986,594 |
| Due to component unit | 26,359 | | 26,359 | 225,000 |
| Long-term advances from primary government | | | | 1,765,000 |
| Unearned revenue | 209,509 | | 209,509 | 11,126,145 |
| Liabilities payable from restricted assets: | | | | |
| Accounts payable | | | | 759,195 |
| Noncurrent liabilities: | | | | |
| Net OPEB obligation | 29,095,022 | 314,684 | 29,409,706 | 5,676,066 |
| Current portion debt | 7,635,759 | 8,928,500 | 16,564,259 | 14,587,242 |
| Long term debt | 24,430,266 | 26,918,000 | 51,348,266 | 187,781,313 |
| **Total liabilities** | 73,662,072 | 37,094,691 | 110,756,763 | 270,955,270 |
| NET POSITION | | | | |
| Net investment in capital assets | 71,579,693 | 3,313,080 | 74,892,773 | 378,952,538 |
| Restricted: | | | | |
| Special Revenue: | | | | |
| Community development | 14,305,564 | | 14,305,564 | |
| Community enrichment and development | 356,692 | | 356,692 | |
| Drug forfeiture | 43,759 | | 43,759 | |
| Emergency medical services | 720,963 | | 720,963 | |
| Health care services | 571,809 | | 571,809 | |
| Planning-solid waste activities | 296,065 | | 296,065 | |
| Senior services | 2,904,020 | | 2,904,020 | |
| Social services | 116,299 | | 116,299 | |
| Veterans millage | 471,776 | | 471,776 | |
| Retirement of delinquent tax notes payable | | 10,345,404 | 10,345,404 | |
| Parks & recreation non expendable | | 948,811 | 948,811 | |
| Programs | | | | 10,649,495 |
| Debt service | | | | 3,158,660 |
| Unrestricted | 6,226,971 | 7,266,391 | 13,493,362 | 61,897,385 |
| **Total net position** | $ 97,593,611 | $ 21,873,686 | $ 119,467,297 | $ 454,658,086 |

The notes to the financial statements are an integral part of this statement    21

[THIS PAGE INTENTIONALLY LEFT BLANK]

**STATEMENT OF ACTIVITIES - GOVERNMENTAL, BUSINESS-TYPE,
AND COMPONENT UNITS
FOR THE YEAR ENDED SEPTEMBER 30, 2013**

**GENESEE COUNTY**                                      Exhibit A-2

| | | Program Revenues | | | Net (Expense) Revenue and Changes in Net Position | | | |
| | | | | | Primary Government | | | |
| Functions/Programs | Expenses | Charges for Services | Operating Grants and Contributions | Capital Grants and Contributions | Governmental Activities | Business-type Activities | Total | Component Units |
|---|---|---|---|---|---|---|---|---|
| **Primary government:** | | | | | | | | |
| **Governmental activities:** | | | | | | | | |
| Legislative | $ 981,519 | 51,762 | | | $ (929,757) | | $ (929,757) | |
| Management and planning | 12,901,085 | 4,993,877 | 1,247,126 | | (6,660,082) | | (6,660,082) | |
| Administration of justice | 38,949,070 | 4,853,624 | 9,505,889 | | (24,589,557) | | (24,589,557) | |
| Law enforcement and community protection | 36,508,812 | 1,775,139 | 2,470,462 | | (32,263,211) | | (32,263,211) | |
| Human services | 130,931,244 | 26,945,416 | 64,863,400 | | (39,122,428) | | (39,122,428) | |
| Community enrichment and development | 16,255,901 | 4,436,810 | 3,199,027 | | (8,620,064) | | (8,620,064) | |
| Interest on long-term debt | 1,101,895 | | | | (1,101,895) | | (1,101,895) | |
| **Total governmental activities** | 237,629,526 | 43,056,628 | 81,285,904 | $ 0 | (113,286,994) | $ 0 | (113,286,994) | $ 0 |
| **Business-type Activities:** | | | | | | | | |
| Commissary | 340,779 | 534,689 | | | | 193,910 | 193,910 | |
| Delinquent Tax | 4,757,339 | 12,727,040 | | | | 7,969,701 | 7,969,701 | |
| Parks and Recreation Enterprise | 951,103 | 353,734 | | | | (597,369) | (597,369) | |
| Parking Meter | 349,854 | 322,516 | | | | (27,338) | (27,338) | |
| **Total business-type activities** | 6,399,075 | 13,937,979 | 0 | 0 | 0 | 7,538,904 | 7,538,904 | 0 |
| **Total primary government** | $ 244,028,601 | $ 56,994,607 | $ 81,285,904 | $ 0 | (113,286,994) | 7,538,904 | (105,748,090) | 0 |
| **Component units:** | | | | | | | | |
| Road Commission | 38,229,602 | 8,067,639 | 28,955,789 | | | | | (1,206,174) |
| Water and Waste Services | 51,455,673 | 52,560,768 | | $ 1,620,118 | | | | 2,725,213 |
| Economic Development Corporation | 22,087 | | | | | | | (22,087) |
| Drains | 4,267,568 | 646,792 | | 1,650,770 | | | | (1,970,006) |
| Land Bank Authority | 8,778,607 | 5,796,756 | 4,136,740 | 26,892 | | | | 1,181,781 |
| Brownfield Authority | 577,222 | 270,004 | | | | | | (307,218) |
| Storm Water Management System | 407,292 | | 290,269 | | | | | (117,023) |
| Genesee Health System Authority | 106,718,421 | 4,143,468 | 97,587,625 | 2,775,000 | | | | (2,212,328) |
| Total Component Units | $ 172,226,470 | $ 63,417,788 | $ 102,014,634 | $ 6,072,780 | | | | (1,927,842) |

| | Governmental Activities | Business-type Activities | Total | Component Units |
|---|---|---|---|---|
| **General Revenues:** | | | | |
| Current property taxes | 69,503,562 | | 69,503,562 | |
| State liquor tax | 3,263,945 | | 3,263,945 | |
| State cigarette tax | 22,524 | | 22,524 | |
| Use of money and investments | 504,347 | 71,437 | 575,784 | 1,757,481 |
| Other unrestricted intergovernmental revenues | 16,031,090 | | 16,031,090 | 1,808,843 |
| Other unrestricted revenues | 8,173,635 | | 8,173,635 | |
| Unrestricted contributions | | | | 4,797,438 |
| Transfers | 4,889,264 | (4,889,264) | | |
| Total general revenues and transfers | 102,388,367 | (4,817,827) | 97,570,540 | 8,363,762 |
| Special item - transfer of operations to Genesee Health Services | (17,467,946) | | (17,467,946) | 20,349,315 |
| Change in net position | (28,366,573) | 2,721,077 | (25,645,496) | 6,435,920 |
| Net position - beginning | 125,960,184 | 19,152,609 | 145,112,793 | 427,872,851 |
| Net position - ending | $ 97,593,611 | $ 21,873,686 | $ 119,467,297 | 454,658,086 |

The notes to the financial statements are an integral part of this statement.

22                                                          23

B-33

**BALANCE SHEET - ASSETS**
**GOVERNMENTAL FUNDS**

**GENESEE COUNTY**                                                 **Exhibit A-3-1**

| | | | | September 30, 2013 | | | | |
|---|---|---|---|---|---|---|---|---|
| | General | Mental Health 12/31/12 | | County Health | Community Action Resource Department | Community Development | Other Governmental Funds | Total Governmental Funds |
| Cash and cash equivalents - Note C | $ | $ | | $ | $ | $ 347,110 | $ 4,199,477 | $ 4,546,587 |
| Current and delinquent taxes receivable | 13,998,293 | | | | | | | 13,998,293 |
| Investments - Note C | | | | | | | 6,252,595 | 6,252,595 |
| Interest and accounts receivable | 585,722 | | | 230,823 | | 13,674,560 | 167,401 | 14,658,506 |
| Due from other governmental units | 2,195,233 | | | 141,407 | 3,362,789 | 418,437 | 8,544,324 | 14,662,190 |
| Due from other county funds -- Note L | 15,473,922 | | | 3,294,333 | 134,334 | | 7,291,712 | 26,194,301 |
| Due from component unit -- Note L | 500,000 | | | 19,040 | | 311 | 725 | 520,076 |
| Inventory | | | | | 485,062 | 638,400 | 137,018 | 1,260,480 |
| Prepayments | 20,690 | | | 22,020 | | | 4,173 | 46,883 |
| Other assets | | | | | 109,080 | | 5,227 | 114,307 |
| Deposits and employee advances | 333,309 | | | | | | | 333,309 |
| Long term advance to component unit | | | | | | | 1,765,000 | 1,765,000 |
| Long-term advances | 1,840,809 | | | | | | | 1,840,809 |
| TOTAL ASSETS | $ 34,947,978 | $ 0 | | $ 3,707,623 | $ 4,091,265 | $ 15,078,818 | $ 28,367,652 | $ 86,193,336 |

B-34

The notes to the financial statements are an integral part of this statement.

**BALANCE SHEET - LIABILITIES AND FUND EQUITIES**
**GOVERNMENTAL FUNDS**

**GENESEE COUNTY**                                                                          **Exhibit A-3-2**

September 30, 2013

| | General | Mental Health 12/31/12 | | County Health | Community Action Resource Department | Community Development | Other Governmental Funds | Total Governmental Funds |
|---|---|---|---|---|---|---|---|---|
| Accounts payable | $ 588,249 | $ | $ | 153,228 | $ 863,019 | 255,556 | $ 1,876,403 | $ 3,736,455 |
| Accrued payroll | 966,327 | | | 424,675 | 111,270 | | 555,007 | 2,057,279 |
| Other accrued liabilities and deposits | 5,245 | | | | | | 256,261 | 261,506 |
| Due to other governmental units | 0 | | | 211,665 | | 358,714 | 2,470,429 | 3,040,808 |
| Due to other county funds -- Note L | 16,222,684 | | | 297,525 | 3,412,680 | 132,625 | 5,271,713 | 25,337,227 |
| Due to component unit -- Note L | | | | | | 26,359 | | 26,359 |
| Deferred revenue | 4,848,792 | | | 81,482 | 147,962 | 13,667,164 | 3,010,921 | 21,756,321 |
| TOTAL LIABILITIES | 22,631,297 | 0 | | 1,168,575 | 4,534,931 | 14,440,418 | 13,440,734 | 56,215,955 |
| Fund equities: | | | | | | | | |
| Fund balances - Notes F, G and S: | | | | | | | | |
| Nonspendable | 1,861,499 | | | 22,020 | 485,062 | 638,400 | 1,906,041 | 4,913,022 |
| Restricted | | | | | | | 5,481,383 | 5,481,383 |
| Committed | | | | | | | 74,994 | 74,994 |
| Assigned | 1,000,000 | | | 2,517,028 | | | 9,690,305 | 13,207,333 |
| Unassigned | 9,455,182 | | | | (928,728) | | (2,225,805) | 6,300,649 |
| TOTAL FUND EQUITIES | 12,316,681 | 0 | | 2,539,048 | (443,666) | 638,400 | 14,926,918 | 29,977,381 |
| TOTAL LIABILITIES AND FUND EQUITIES | $ 34,947,978 | $ 0 | | $ 3,707,623 | $ 4,091,265 | $ 15,078,818 | $ 28,367,652 | $ 86,193,336 |

B-3-5

The notes to the financial statements are an integral part of this statement.

**RECONCILIATION OF THE BALANCE SHEET OF GOVERNMENTAL FUNDS
TO THE STATEMENT OF NET POSITON**

**GENESEE COUNTY**                                         **Exhibit A-3-3**

|  | September 30, 2013 |
|---|---|
| Fund balances of governmental funds | $    29,977,381 |
| Amounts reported for governmental activities in the statement of net position are different because: | |
| Capital assets used in governmental activities are not financial resources and, therefore are not reported in the funds | 95,124,850 |
| Other long-term assets are not available to pay for current-period expenditures and, therefore, are deferred in the funds: | |
| Property taxes | 4,763,452 |
| Grant receivable | 15,018,360 |
| Rental income from component units | 1,765,000 |
| Net position held in internal service funds are classified as held for governmental activities but are not reported in the funds.  This amount is the net position exclusive of capital assets and long-term debt which are reported elsewhere in this reconciliation | 8,815,004 |
| Net OPEB asset | 0 |
| Net OPEB liability | (29,095,022) |
| Long-term liabilities, including long-term notes, bonds payable and accrued interest payable are not due in the current period, and therefore, are not reported in the funds | (28,775,414) |
| Net position of governmental activities | $     97,593,611 |

**This Page was Intentionally Left Blank**

The notes to the financial statements are an integral part of this statement.

B-36

STATEMENT OF REVENUES, EXPENDITURES AND
CHANGES IN FUND BALANCES
GOVERNMENTAL FUNDS

**GENESEE COUNTY**                                    **Exhibit A-4**

Fiscal Year Ended September 30, 2013

| | General | Mental Health 12/31/12 | County Health | Community Action Resource Department | Community Development | Other Governmental Funds | Total Governmental Funds |
|---|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | | |
| Taxes—Note H | $ 45,261,951 | $ | $ | $ | $ | $ 24,439,051 | $ 69,701,002 |
| Licenses and permits | 909,814 | | 1,031,767 | | | 6,740 | 1,948,321 |
| Fines and forfeitures | 1,564,789 | | | | | 104,845 | 1,669,634 |
| Use of money and property | 58,600 | | | | | 445,747 | 504,347 |
| Federal grants—Note G | 223,108 | 1,231,478 | 5,262,724 | 22,841,798 | 3,366,735 | 25,517,422 | 58,443,265 |
| State grants—Note G | | 4,477,801 | 2,770,726 | 1,403,379 | | 10,890,711 | 19,542,617 |
| Other intergovernmental revenues | 14,276,577 | | 527,339 | | | 5,391,666 | 20,195,582 |
| Charges for services | 10,721,032 | 27,841,645 | 355,765 | | | 7,096,472 | 46,014,914 |
| Other | 813,083 | 785,018 | 1,817,978 | 4,039,962 | 109,446 | 1,143,816 | 8,709,303 |
| TOTAL REVENUES | 73,828,054 | 34,335,942 | 11,766,299 | 28,285,139 | 3,476,181 | 75,036,470 | 226,728,985 |
| **Expenditures:** | | | | | | | |
| Current operations: | | | | | | | |
| Legislative | 922,513 | | | | | | 922,513 |
| Management and planning | 7,693,035 | | | | | | 7,693,035 |
| Administration of justice | 22,747,986 | | | | | 12,428,509 | 35,176,495 |
| Law enforcement and community protection | 21,577,256 | | | | | 11,871,620 | 33,448,876 |
| Human services | 1,234,017 | 35,247,757 | 13,566,386 | 28,857,356 | | 40,103,507 | 119,009,023 |
| Community enrichment and development | | | | | 4,362,381 | 14,687,753 | 19,050,134 |
| General support services | | | | | | | 0 |
| Other | 2,696,188 | | | | | 638,458 | 3,334,646 |
| Capital outlay | 235,905 | 81,028 | | 250,810 | | 2,981,819 | 3,549,562 |
| Contribution to Component Units-Mental Health Services | 2,775,000 | | | | | | 2,775,000 |
| Debt service: | | | | | | | |
| Principal payments | | | | | | 2,365,000 | 2,365,000 |
| Interest | | | | | | 1,249,358 | 1,249,358 |
| TOTAL EXPENDITURES | 59,881,900 | 35,328,785 | 13,566,386 | 29,108,166 | 4,362,381 | 86,326,024 | 228,573,642 |
| REVENUES OVER (UNDER) EXPENDITURES | 13,947,054 | (992,843) | (1,800,087) | (823,027) | (886,200) | (11,289,554) | (1,844,657) |
| **Other financing sources (uses):** | | | | | | | |
| Transfers-In | 6,723,572 | 925,000 | 3,079,023 | 640,742 | | 17,591,779 | 28,960,116 |
| Transfers-Out | (20,100,224) | | | (361,911) | | (5,039,176) | (25,501,311) |
| TOTAL OTHER FINANCING SOURCES (USES) | (13,376,652) | 925,000 | 3,079,023 | 278,831 | 0 | 12,552,603 | 3,458,805 |
| Special item - transfer of operations to Genesee Health Services | | (17,467,946) | | | | | (17,467,946) |
| NET CHANGE IN FUND BALANCES | 570,402 | (17,535,789) | 1,278,936 | (544,196) | (886,200) | 1,263,049 | (15,853,798) |
| Fund balance at beginning of year | 11,746,279 | 17,535,789 | 1,260,112 | 100,530 | 1,524,600 | 13,663,869 | 45,831,179 |
| FUND BALANCE AT END OF YEAR | $ 12,316,681 | $ 0 | $ 2,539,048 | $ (443,666) | $ 638,400 | $ 14,926,918 | $ 29,977,381 |

The notes to the financial statements are an integral part of this statement.

B-37

30                                                                                       31

**RECONCILIATION OF THE STATEMENT OF REVENUES, EXPENDITURES,
AND CHANGES IN FUND BALANCES OF GOVERNMENTAL FUNDS
TO THE STATEMENT OF ACTIVITIES**

**GENESEE COUNTY**                                        **Exhibit A-5**

**Fiscal Year Ended September 30, 2013**

| | |
|---|---:|
| Net change in fund balances--total governmental funds | $    (15,853,798) |
| Amounts reported for governmental activities in the statement of activities are different because: | |
| Governmental funds report capital outlay as expenditures, however, in the statement of activities the cost of assets is allocated over their useful lives and reported as depreciation expense.  Details of the difference are: | |
| -Capital outlay | 3,706,103 |
| -Loss on Disposals | (198,029) |
| -Depreciation expense | (4,138,670) |
| Decrease in net OPEB asset | (1,604,133) |
| Increase in net OPEB liability | (9,100,225) |
| Revenues in the statement of activities that do not provide current financial resources are not reported as revenues in the funds | (3,672,558) |
| Change in accrued interest | 153,399 |
| The payment of principal on long-term debt consumes current financial resources of the governmental funds.  However, on the statement of net position, repayment of principal is recorded as a reduction to long-term debt payable and does not have any effect on net position | 2,339,500 |
| The activities of the internal service funds are considered part of governmental activities on the statement of changes in net position but are not reported in the funds | 1,838 |
| Change in net position of governmental activities | $     (28,366,573) |

The notes to the financial statements are an integral part of this statement.

32

B-38

This Page was Intentionally Left Blank

33

**BALANCE SHEET--PROPRIETARY FUNDS**

**GENESEE COUNTY**                                   **Exhibit A-6**

| | Business Type Activities - Delinquent Taxes | September 30, 2013 — Enterprise Funds Non-Major Enterprise Funds | Total | Governmental Activities- Internal Service Funds |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **CURRENT ASSETS** | | | | |
| Cash and cash equivalents | $ 509,189 | $ 1,397,664 | $ 1,906,853 | $ 712,065 |
| Investments | 6,410,708 | 948,811 | 7,359,519 | 9,101,599 |
| Current and delinquent property taxes receivable, less allowance for uncollectibles of $1,050,316 | 43,643,971 | | 43,643,971 | |
| Interest and accounts receivable, less allowance $2,338,560 | 4,579,064 | | 4,579,064 | 78,262 |
| Due from other governmental units | 4,186,972 | 73,356 | 4,260,328 | 268,836 |
| Due from other county funds | 1,215,270 | | 1,215,270 | 7,073,878 |
| Due from component unit | 466,518 | | 466,518 | |
| Supplies inventory | | 34,448 | 34,448 | 45,164 |
| Prepayments | 23,448 | | 23,448 | 1,101,329 |
| TOTAL CURRENT ASSETS | 61,011,692 | 2,477,727 | 63,489,419 | 18,381,133 |
| **CAPITAL ASSETS** | | | | |
| Construction in progress | | | | 40,938 |
| Land | 2,439,608 | 706,110 | 3,145,718 | 193,496 |
| Land improvements | | 3,086,571 | 3,086,571 | |
| Buildings and improvements | | 1,181,214 | 1,181,214 | 2,481,824 |
| Equipment | 507,486 | 3,920,856 | 4,428,342 | 10,293,291 |
| TOTAL CAPITAL ASSETS | 2,947,094 | 8,894,751 | 11,841,845 | 13,009,549 |
| Less allowances for depreciation | 444,960 | 8,037,305 | 8,482,265 | 10,225,664 |
| TOTAL CAPITAL ASSETS, NET | 2,502,134 | 857,446 | 3,359,580 | 2,783,885 |
| TOTAL ASSETS | $ 63,513,826 | $ 3,335,173 | $ 66,848,999 | $ 21,165,018 |
| **LIABILITIES** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Accounts payable | $ 346,562 | $ 52,174 | $ 398,736 | $ 555,050 |
| Accrued payroll | | 13,980 | 13,980 | 1,382,691 |
| Other accrued liabilities and deposits | 464,663 | 56,123 | 520,786 | 178,775 |
| Due to other governmental units | 5 | 0 | 5 | 764,778 |
| Due to other county funds | 7,862,897 | 17,725 | 7,880,622 | 1,265,600 |
| Compensated absences | | | | 3,578,426 |
| Current portion of notes/bonds payable | 8,900,000 | 28,500 | 8,928,500 | 1,567,058 |
| TOTAL CURRENT LIABILITIES | 17,574,127 | 168,502 | 17,742,629 | 9,292,378 |
| **LONG-TERM DEBT** | | | | |
| Net OPEB obligation | 100,934 | 213,750 | 314,684 | |
| General and workers' compensation claim/Liability | | | | 2,561,998 |
| Long-term advance | | | | 1,840,809 |
| Notes/bonds payable exclusive of current portion | 26,900,000 | 18,000 | 26,918,000 | 650,483 |
| TOTAL LONG-TERM DEBT | 27,000,934 | 231,750 | 27,232,684 | 5,053,290 |
| TOTAL LIABILITIES | 44,575,061 | 400,252 | 44,975,313 | 14,345,668 |
| **NET POSITION:** | | | | |
| Restricted for: | | | | |
| Retirement of delinquent tax notes payable | 10,345,404 | | 10,345,404 | |
| Parks & recreation non-expendable | | 948,811 | 948,811 | |
| Capital improvement | | | | 89,786 |
| Net investment in capital assets | 2,502,134 | 810,946 | 3,313,080 | 2,768,013 |
| Unrestricted | 6,091,227 | 1,175,164 | 7,266,391 | 3,961,551 |
| TOTAL Net Position | $ 18,938,765 | $ 2,934,921 | $ 21,873,686 | $ 6,819,350 |

The notes to the financial statements are an integral part of this statement.

B-39

34                                                                              35

**STATEMENT OF REVENUES, EXPENSES AND CHANGES IN
FUND NET POSITION--PROPRIETARY FUNDS**

**GENESEE COUNTY**                     **Exhibit A-7**

| | Fiscal Business Delinquent Taxes | Year Ended September 30, 2013 Type Activities - Enterprise Funds Non-Major Enterprise Funds | Total | Governmental Activities- Internal Service Funds |
|---|---|---|---|---|
| Operating revenues: | | | | |
| Charges for sales and services | $ 12,727,040 | $ | $ 12,727,040 | $ 25,099,514 |
| Ticket, permit & concession sales | | 1,210,939 | 1,210,939 | |
| TOTAL OPERATING REVENUES | 12,727,040 | 1,210,939 | 13,937,979 | 25,099,514 |
| Operating expenses: | | | | |
| Salaries and fringe benefits | 437,897 | 612,655 | 1,050,552 | 5,182,498 |
| Supplies and other operating expenses | 3,955,036 | 922,706 | 4,877,742 | 20,340,732 |
| Depreciation | 101,497 | 102,775 | 204,272 | 1,085,240 |
| TOTAL OPERATING EXPENSES | 4,494,430 | 1,638,136 | 6,132,566 | 26,608,470 |
| OPERATING INCOME (LOSS) | 8,232,610 | (427,197) | 7,805,413 | (1,508,956) |
| Non-operating revenues (expenses): | | | | |
| Investment earnings | 4,050 | 67,387 | 71,437 | 199,343 |
| Interest expense | (262,909) | (3,600) | (266,509) | (1,099) |
| Gain (loss) on sale of property and equipment | | | | 552,091 |
| Contribution to Component Units-Land Bank Authority & Brownfield | (670,000) | | (670,000) | |
| TOTAL NON-OPERATING REVENUES (EXPENSES) | (928,859) | 63,787 | (865,072) | 750,335 |
| INCOME (LOSS) BEFORE TRANSFERS | 7,303,751 | (363,410) | 6,940,341 | (758,621) |
| Transfers-in | | 545,000 | 545,000 | 760,459 |
| Transfers-out | (4,735,164) | (29,100) | (4,764,264) | |
| TOTAL TRANSFERS | (4,735,164) | 515,900 | (4,219,264) | 760,459 |
| CHANGE IN NET POSITION | 2,568,587 | 152,490 | 2,721,077 | 1,838 |
| Net position at beginning of year | 16,370,178 | 2,782,431 | 19,152,609 | 6,817,512 |
| NET POSITION AT END OF YEAR | $ 18,938,765 | $ 2,934,921 | $ 21,873,686 | $ 6,819,350 |

The notes to the financial statements are an integral part of this statement.

B-40

**STATEMENT OF CASH FLOWS-
PROPRIETARY FUNDS**

**GENESEE COUNTY**                                   **Exhibit A-8**

| | Business Type<br>Delinquent<br>Taxes | Fiscal Year Ended September 30, 2013<br>Activities - Enterprise Funds<br>Non-Major<br>Enterprise<br>Funds | Total | Governmental<br>Activities-<br>Internal<br>Service<br>Funds |
|---|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | | |
| Cash received from customers | $ 39,151,903 | $ 1,211,388 | $ 40,363,291 | $ 24,974,703 |
| Cash payment for delinquent taxes | (24,818,278) | | (24,818,278) | |
| Cash payments to suppliers for goods and services | (4,709,998) | (902,189) | (5,612,187) | (21,088,027) |
| Cash payments to employees for services | | (530,590) | (530,590) | (4,701,583) |
| Other operating revenues | 1,108,676 | | 1,108,676 | |
| NET CASH PROVIDED (USED) FOR OPERATING ACTIVITIES | 10,732,303 | (221,391) | 10,510,912 | (814,907) |
| | | | | |
| CASH FLOWS FROM NONCAPITAL FINANCING ACTIVITIES: | | | | |
| Borrowing under delinquent tax notes payable | 39,900,000 | | 39,900,000 | |
| Repayments under delinquent tax notes payable | (46,400,000) | | (46,400,000) | |
| Interest paid on delinquent tax notes payable | (273,278) | | (273,278) | |
| Advances (repayments) to other governmental units, County units and funds | 2,670,798 | | 2,670,798 | 1,544,909 |
| Transfer to current unit | (670,000) | | (670,000) | |
| Transfers-in from other funds | | 545,000 | 545,000 | 760,459 |
| Transfers-out to other funds | (4,735,164) | (29,100) | (4,764,264) | |
| NET CASH PROVIDED BY NONCAPITAL FINANCING ACTIVITIES | (9,507,644) | 515,900 | (8,991,744) | 2,305,368 |
| | | | | |
| CASH FLOWS FROM CAPITAL AND RELATED FINANCING ACTIVITIES: | | | | |
| Acquisition and construction of capital assets | 344,220 | | 344,220 | (1,169,857) |
| Principal paid on long-term debt | | (25,500) | (25,500) | (501,929) |
| Interest paid on long-term debt | | | | (1,099) |
| Proceeds from sale of long-term debt | | | | 46,935 |
| NET CASH PROVIDED BY (USED FOR) CAPITAL AND RELATED FINANCING ACTIVITIES | 344,220 | (25,500) | 318,720 | (1,625,950) |
| | | | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | | |
| Purchase of investment securities | (59,401,349) | | (59,401,349) | (5,536,260) |
| Proceeds from sale and maturities of investment securities | 56,500,000 | | 56,500,000 | 5,784,484 |
| Interest and dividends on investments earnings (loss) | 4,050 | (4,761) | (711) | 199,681 |
| NET CASH PROVIDED BY (USED FOR) INVESTING ACTIVITIES | (2,897,299) | (4,761) | (2,902,060) | 447,905 |
| NET DECREASE IN CASH AND CASH EQUIVALENTS | (1,328,420) | 264,248 | (1,064,172) | 312,416 |
| Cash and cash equivalents at beginning of year | 1,837,609 | 1,133,416 | 2,971,025 | 399,649 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 509,189 | $ 1,397,664 | $ 1,906,853 | $ 712,065 |
| | | | | |
| RECONCILIATION OF OPERATING INCOME (LOSS) TO NET CASH PROVIDED<br>BY (USED FOR) OPERATING ACTIVITIES: | | | | |
| Operating income (loss) | $ 8,232,610 | $ (427,196) | $ 7,805,414 | $ (1,508,958) |
| Adjustments to reconcile operating income (loss) to net cash provided by<br>(used for) operating activities: | | | | |
| Depreciation | 101,497 | 102,775 | 204,272 | 1,085,239 |
| Provision for uncollectible accounts | (63,456) | | (63,456) | |
| Change in assets and liabilities: | | | | |
| (Increase) decrease in current and delinquent property taxes receivable | 2,700,320 | | 2,700,320 | (180,234) |
| (Increase) decrease in interest and accounts receivable | 78,397 | | 78,397 | 327,931 |
| (Increase) decrease in supplies inventory | | (1,649) | (1,649) | (7,449) |
| Increase in net OPEB liability | 34,745 | 82,765 | 117,510 | |
| (Increase) decrease in prepayment and other current assets | | | | 16,533 |
| Increase (decrease) in accounts payable and related items | (351,810) | (31,616) | (383,426) | (249,978) |
| Increase (decrease) in accrued payroll | | (22,335) | (22,335) | 480,379 |
| Increase (decrease) in other accrued liabilities and deposits | | 75,865 | 75,865 | (778,370) |
| Net cash provided by (used for) operating activities | $ 10,732,303 | $ (221,391) | $ 10,510,912 | $ (814,907) |
| | | | | |
| Noncash investing activities - increase in fair value of investments | | 72,148 | 72,148 | |

The notes to the financial statements are an integral part of this statement.

B-42

**GENESEE COUNTY EMPLOYEES' FIDUCIARY FUNDS**
**STATEMENT OF FIDUCIARY NET POSITION**
**FIDUCIARY FUNDS**

**GENESEE COUNTY**                                                    Exhibit A-9

| | September 30, 2013 | |
|---|---|---|
| | Total Pension and Employee Fringe Benefit (VEBA) Trust Fund | Agency Funds |
| ASSETS | | |
| Cash and short-term cash investments.................................. | $ 31,225,499 | $ 22,028,939 |
| Cash and investments held as collateral for securities lending........ | 3,211,330 | |
| TOTAL CASH AND CASH EQUIVALENTS | 34,436,829 | 22,028,939 |
| Receivables: | | |
| Prepaid expenses.................................................... | 176,214 | |
| Other receivables................................................... | 565,862 | 3,655 |
| Accrued interest and dividends...................................... | 2,392,777 | |
| TOTAL RECEIVABLES | 3,134,853 | 3,655 |
| Investments at fair value: | | |
| U.S. government securities.......................................... | 72,917,991 | |
| Foreign govts. and agencies........................................ | 99,630,175 | |
| Corporate bonds.................................................... | 48,582,942 | |
| Common stocks..................................................... | 73,783,276 | |
| Preferred stocks.................................................... | 112,496 | |
| Money market...................................................... | 570,065 | |
| Mutual funds....................................................... | 97,357,238 | |
| Real estate........................................................ | 23,839,634 | |
| Hedge fund of funds................................................ | 40,017,051 | |
| TOTAL INVESTMENTS | 456,810,868 | |
| TOTAL ASSETS | 494,382,550 | 22,032,594 |
| LIABILITIES | | |
| Accounts payable................................................... | 28,759,578 | 22,032,594 |
| IBNR liability...................................................... | 501,818 | |
| Amounts due broker under securities lending agreement.............. | 3,231,440 | |
| TOTAL LIABILITIES | 32,492,836 | 22,032,594 |
| NET POSITION | | |
| Held in trust for pension benefits | | |
| and other purposes................................................ | $ 461,889,714 | $ |

The notes to the financial statements are an integral part of this statement.

40

**GENESEE COUNTY**
**STATEMENT OF CHANGES IN FIDUCIARY NET POSITION**

**GENESEE COUNTY**                                                    Exhibit A-10

| | Fiscal Year Ended September 30, 2013 |
|---|---|
| | Total Pension and Employee Benefit Trust Fund |
| ADDITIONS | |
| Contributions: | |
| Employer........................................................... | $ 23,922,670 |
| Plan members...................................................... | 3,463,274 |
| Total contributions............................................. | 27,385,944 |
| Investment earnings: | |
| Net increase | |
| in fair value of investments....................................... | 44,560,920 |
| Interest............................................................ | 5,273,920 |
| Dividends.......................................................... | 3,145,251 |
| Total investment earnings...................................... | 52,980,091 |
| Less investment expense........................................... | 2,254,321 |
| Net investment earnings........................................ | 50,725,770 |
| Total additions................................................ | 78,111,714 |
| Securities lending income: | |
| Interest and fees.................................................. | 27,341 |
| Borrower rebates and bank fees.................................... | 27,159 |
| Net securities lending income.................................. | 54,500 |
| Total additions................................................ | 78,166,214 |
| DEDUCTIONS | |
| Benefits............................................................ | 53,979,220 |
| Refunds of contributions........................................... | 270,198 |
| Administrative expenses............................................ | 314,672 |
| Transfer to other pensions plans................................... | 3,090,929 |
| Total deductions............................................... | 57,655,019 |
| Change in net position......................................... | 20,511,195 |
| Net position - Held in trust for pension benefits and other purposes - beginning of the year........ | 441,378,519 |
| Net position - Held in trust for pension benefits and other purposes - end of the year............... | $ 461,889,714 |

The notes to the financial statements are an integral part of this statement.

41

**STATEMENT OF NET POSITION**
**COMPONENT UNITS**

**GENESEE COUNTY**                                        Exhibit A-11

| | Road Commission 9/30/12 | Water and Waste Services 12/31/12 | Economic Development Corporation 09/30/13 | Drains 9/30/13 | Land Bank Authority 9/30/13 | Brownfield Authority 09/30/13 | Storm Water Management System 09/30/13 | Genesee Health System Authority 09/30/13 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | |
| Cash and cash equivalents | 8,490,782 | 13,936,397 | 648,407 | 4,238,997 | 1,656,186 | 18,155 | 473,477 | 41,269,263 | 70,731,664 |
| Investments | 15,190,537 | | | | 201,629 | 970,000 | 100,000 | 16,315,285 | 32,777,451 |
| Special Assessments and Lease Receivable | 4,667,139 | 28,699,265 | | 4,846,447 | 5,531,912 | | | | 43,744,763 |
| Interest and accounts receivable | 81,465 | 8,812,458 | | | 697,274 | | | 2,479,240 | 12,177,670 |
| Due from other governmental units | 6,781,036 | 300,325 | 107,233 | 418,866 | | | 929 | 1,893,933 | 9,395,089 |
| Current portion of land contract | | | | | | 225,000 | | | 225,000 |
| Due from primary government | | | | | 26,359 | | | | 26,359 |
| Advances to other funds | | | | | 1,604,423 | | | | 1,604,423 |
| Inventory | 1,284,832 | 75,625 | | 60,812 | 1,076,748 | | | | 2,498,017 |
| Prepayments | 322,098 | 493,266 | | | 740 | | | 731,938 | 1,548,042 |
| Unamortized cost of issuance | | 679,048 | | | | | | | 679,048 |
| Other assets | | 93,000 | | | 13,801 | 2,475,000 | | | 2,581,801 |
| Restricted Assets: | | | | | | | | | |
| Cash and cash equivalents | 4,546,470 | 243,008 | | | 60,616 | | | | 4,850,094 |
| Local unit construction in progress | | 156,500 | | | | | | | 156,500 |
| Net OPEB asset | 56,123 | | | | | | | 602,074 | 658,197 |
| Investment in joint venture | | | | | 3,893,843 | | | | 3,893,843 |
| Intangible assets - Net | | | | | 12,188 | | | | 12,188 |
| Capital assets not being depreciated | 959,211 | 55,779,523 | | | 84,308 | | | 981,856 | 57,804,898 |
| Capital assets net of depreciation | 180,023,271 | 267,120,100 | | 22,778,909 | 7,347,345 | | | 2,978,684 | 480,248,309 |
| TOTAL ASSETS | 222,402,964 | 376,388,515 | 755,640 | 32,126,794 | 22,424,609 | 3,688,155 | 574,406 | 67,252,273 | 725,613,356 |
| | | | | | | | | | |
| **LIABILITIES** | | | | | | | | | |
| Accounts payable | 1,673,037 | 5,032,859 | 1,798 | 83,544 | 351,826 | | 66,881 | 15,894,597 | 23,104,542 |
| Accrued payroll | | | | 11,125 | 95,360 | | | | 106,485 |
| Other accrued liabilities and deposits | 680,744 | | | 582,970 | 46,785 | | | 642,190 | 1,952,689 |
| Accrued interest payable | | | | 29,453 | | 247,833 | | | 277,286 |
| Due to other governmental units | | 391,298 | | | | | | 20,985,130 | 21,376,428 |
| Due to Primary Government | | | | 500,000 | 467,554 | | | 19,040 | 986,594 |
| Funds held in escrow | | | | | | 225,000 | | | 225,000 |
| Advances from other funds | | | | | 1,231,285 | | | | 1,231,285 |
| Unamortized note premium | | | | | | 389,289 | | | 389,289 |
| Unearned revenue | 2,244,190 | 156,500 | | | 61,660 | | | 8,663,795 | 11,126,145 |
| Payable from restricted assets: | | | | | | | | | |
| Accounts payable | 509,507 | 243,008 | | 6,680 | | | | | 759,195 |
| Long-term advance from primary government | | | | | 1,765,000 | | | | 1,765,000 |
| Net OPEB obligation | | 5,676,066 | | | | | | | 5,676,066 |
| Current portion debt | 2,180,798 | 10,845,000 | | | 443,296 | 255,000 | | 863,148 | 14,587,242 |
| Long-term debt | 10,412,741 | 159,837,896 | | 3,165,437 | 1,498,267 | 12,110,000 | | 367,683 | 187,392,024 |
| TOTAL LIABILITIES | 17,701,017 | 182,182,627 | 1,798 | 4,379,209 | 5,961,033 | 13,227,122 | 66,881 | 47,435,583 | 270,955,270 |
| | | | | | | | | | |
| **NET POSITION** | | | | | | | | | |
| Net investment in capital assets | 169,457,482 | 181,595,040 | | 19,613,472 | 4,326,004 | | | 3,960,540 | 378,952,538 |
| Restricted for: | | | | | | | | | |
| Programs | | | 736,680 | 60,812 | 229,750 | | 507,525 | 9,114,728 | 10,649,495 |
| Debt service | | 3,098,052 | | | 60,616 | | | | 3,158,668 |
| Unrestricted (deficit) | 35,244,465 | 9,512,796 | 17,162 | 8,073,301 | 11,847,206 | (9,538,967) | | 6,741,422 | 61,897,385 |
| TOTAL NET POSITION (DEFICIT) | 204,701,947 | 194,205,888 | 753,842 | 27,747,585 | 16,463,576 | (9,538,967) | 507,525 | 19,816,690 | 454,658,086 |

The notes to the financial statements are an integral part of this statement.

# STATEMENT OF ACTIVITIES
## COMPONENT UNITS

**GENESEE COUNTY**          Exhibit A-12

### Program Revenues

| | Expenses | Charges for Services | Operating Grants and Contributions | Capital Grants and Contributions | Road Commission 9/30/13 |
|---|---|---|---|---|---|
| Component units: | | | | | |
| Road Commission | $ 38,329,602 | $ 8,067,639 | $ 28,955,789 | $ | $ (1,206,174) |
| Water and Waste Services | 51,455,673 | 52,560,768 | | 1,620,118 | |
| Economic Development Corporation | 22,087 | | | | |
| Drains | 4,267,568 | 646,792 | | 1,650,770 | |
| Land Bank Authority | 8,778,607 | 5,796,756 | 4,136,740 | 26,892 | |
| Brownfield Authority | 577,222 | 270,004 | | | |
| Storm Water Management System | 407,292 | | 290,269 | | |
| Genesee Health System Authority | 106,718,421 | 4,143,468 | 97,587,625 | 2,775,000 | |
| Total Component Units | $ 172,226,870 | $ 63,417,788 | $ 102,014,634 | $ 6,072,780 | (1,206,174) |
| | | | | | |
| Revenues: | | | | | |
| Taxes: | | | | | |
| Use of money and investments | | | | | 383,791 |
| Other intergovernmental revenues | | | | | |
| Unrestricted contributions | | | | | 1,215,798 |
| Total general revenues and transfers | | | | | 1,599,589 |
| Special item - transfer of operations to Genesee Health Services | | | | | |
| Change in net position | | | | | 393,415 |
| Net position - beginning of the year (deficit) as restated | | | | | 204,308,532 |
| Net position - end of year (deficit) | | | | | $ 204,701,947 |

### Net (Expense) Revenue and Changes in Net Position — Component Units

| | Water and Waste Services 12/31/12 | Economic Development Corporation 9/30/13 | Drains 09/30/13 | Land Bank Authority 9/30/13 | Brownfield Authority 09/30/13 | Storm Water Management System 09/30/13 | Genesee Health System Authority 09/30/13 | Total |
|---|---|---|---|---|---|---|---|---|
| Component units: | | | | | | | | |
| Road Commission | $ | $ | $ | $ | $ | $ | $ | $ (1,206,174) |
| Water and Waste Services | 2,725,213 | | | | | | | 2,725,213 |
| Economic Development Corporation | | (22,087) | | | | | | (22,087) |
| Drains | | | (1,970,006) | | | | | (1,970,006) |
| Land Bank Authority | | | | 1,181,781 | | | | 1,181,781 |
| Brownfield Authority | | | | | (307,218) | | | (307,218) |
| Storm Water Management System | | | | | | (117,023) | | (117,023) |
| Genesee Health System Authority | | | | | | | (2,212,328) | (2,212,328) |
| Total Component Units | 2,725,213 | (22,087) | (1,970,006) | 1,181,781 | (307,218) | (117,023) | (2,212,328) | (1,907,842) |
| | | | | | | | | |
| Revenues: | | | | | | | | |
| Taxes: | | | | | | | | |
| Use of money and investments | 1,326,056 | 4,301 | 1,054 | 717 | 2,620 | 1,114 | 37,828 | 1,757,481 |
| Other intergovernmental revenues | | | | 1,808,843 | | | | 1,808,843 |
| Unrestricted contributions | 930,054 | | | 1,009,711 | | | 1,641,875 | 4,797,438 |
| Total general revenues and transfers | 2,256,110 | 4,301 | 1,054 | 2,819,271 | 2,620 | 1,114 | 1,679,703 | 8,363,762 |
| Special item - transfer of operations to Genesee Health Services | | | | | | | 20,349,315 | 20,349,315 |
| Change in net position | 4,981,323 | (17,786) | (1,968,952) | 4,001,052 | (304,598) | (115,909) | (532,625) | 6,435,920 |
| Net position - beginning of the year (deficit) as restated | 189,224,565 | 771,628 | 29,716,537 | 12,462,524 | (9,234,369) | 623,634 | | 427,872,851 |
| Net position - end of year (deficit) | $ 194,205,888 | $ 753,842 | $ 27,747,585 | $ 16,463,576 | $ (9,538,967) | $ 507,525 | $ 19,816,690 | $ 454,658,086 |

The notes to the financial statements are an integral part of this statement.

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                                 **EXHIBIT A-13**

**NOTE A – DESCRIPTION OF COUNTY OPERATIONS, REPORTING ENTITY, AND FUND TYPES**

The County of Genesee, Michigan was incorporated on March 18, 1835 and covers an area of approximately 642 square miles with the county seat located in the City of Flint. The County operates under an elected Board of Commissioners (9 members) and provides services to its more than 425,000 residents in many areas including law enforcement, administration of justice, community enrichment and development, and human services. Education services are provided to citizens through more than 198 schools in 21 local school districts, 5 colleges, and a district library; such districts, colleges, and library are separate governmental entities whose financial statements are not included herein, in accordance with The Governmental Accounting Standards Board Codification Section 2100.

As required by generally accepted accounting principles, these financial statements represent Genesee County (the primary government) and its component units. The component units discussed below are included in the County's reporting entity because of the significance of their operational or financial relationships with the County.

Blended Component Units:

Genesee County Building Authority - Legally separate entity established for the sole purpose of issuing bonded debt to finance construction of County buildings. The entire Building Authority is appointed by the County Board of Commissioners.

Genesee County Employees Retirement System - Legally separate entity established to account for employee and employer contributions, investment income, accumulated assets and payments to beneficiaries. The Pension board has five ex-official Commissioners due to their positions held in the county and four elected employee Commissioners, with services provided almost exclusively for the County and its employees. The Retirement System has a calendar fiscal year end. It was determined by the County that it would be extremely impractical for the Retirement System to change to a September 30th fiscal year end.

Discretely Presented Component Units:

Genesee County Road Commission - An entity responsible for constructing and maintaining the primary and local road system within the County. Its three-member board is appointed by the County Board. The County Board can significantly influence the operations of the Road Commission Board.

Water and Waste Services - An entity established by the County pursuant to State law to provide for water and waste management services. The County appoints the lone board member/member-director and has the ability to remove the manager-director if they so choose. The County approves and would be secondarily liable for any debt issuances. Water and Waste Services has a calendar year. The County has determined that it would be impractical for Water and Waste Services to change to a September 30th fiscal year end.

Economic Development Corporation - An entity responsible for the administration of the Revolving Loan Program. This loan program makes low interest loans available to businesses located within Genesee County. The Board of the Economic Development Corporation (EDC) is appointed by the Board of Commissioners. The Board of Commissioners can remove Board members of the EDC if they so choose. The Corporation has converted to a September 30th fiscal year end from a calendar year end.

Drains - These separate legal entities represent drainage districts established pursuant to Act 40, P.A. 1956, as amended, the Michigan Drain Code. The oversight of these districts is the responsibility of the Genesee County Drain Commissioner, an elected position that is funded by Genesee County. The County lends its full faith and credit towards payment of the Special Assessment bonds issued for the projects. The County can significantly influence the operations of the Drain Commission since the County Board of Commissioners approves the Drains budgets.

Genesee County Land Bank Authority – An entity which accounts for the activities of the Authority consisting of acquisition of properties via the delinquent tax state statute sales of property to individuals, commercial entities and nonprofit organizations, rental of properties to individuals, rehabilitation and demolition of properties in preparation for sale or future development. The entity is comprised of seven members appointed by the County Board. The County Board can significantly influence the operations of the Land Bank Authority Board.

Brownfield Authority – An entity governed by a nine-member Board. The Board is appointed by each member of the County Board. The Brownfield Authority was created to provide a means for financing remediation of Brownfield (environmentally contaminated) sites within the County. The County issued bonds to provide capital for the revitalization of environmentally distressed, blighted, and functionally obsolete properties within the County. The County approves and would be secondarily liable for any debt issuances.

Storm Water Management System – An entity established by the County pursuant to Act 342, Public Acts of Michigan, 1939. Genesee County Storm Water Management System is responsible for administration services necessary to enable the County and the cities, villages, townships, and charter townships located within the County to comply with the Phase II Regulations established by the United States Environmental Protection Agency (EPA) in the Federal Register on December 8, 1999. The Drain Commissioner's Office was designated and appointed as the "County Agency" for the System to manage and operate the System.

Genesee Health Services (Agency), formerly known as Genesee County Community Mental Health Authority - On August 29, 2012, the Board of Commissioners of Genesee County, Michigan approved a resolution to establish a community mental health authority (a separate entity) to assume the activities of the Agency, effective January 1, 2013. The Agency is reported as a discretely presented component unit effective January 1, 2013.

Complete financial statements of the individual component units (excluding Drains, Brownfield Authority and Building Authority which are included in this financial report) can be obtained from their respective administrative offices.

46

**NOTE B – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Government-wide and fund financial statements:** The County is following GASB Statement No. 34, *Basic Financial Statements and Management's Discussion and Analysis – for State and Local Governments*. The standard requires government-wide and fund financial statements. The government-wide financial statements (i.e., the statement of net position and the statement of changes in net position) report information on all of the non-fiduciary activities of the primary government and its component units. For the most part, the effect of inter fund activity has been removed from these statements. Governmental activities, which normally are supported by taxes and intergovernmental revenues, are reported separately from business-type activities, which rely to a significant extent on fees and charges for support. Likewise, the primary government is reported separately from certain legally separate component units for which the primary government is financially accountable.

The statement of activities demonstrates the degree to which the direct expenses of a given function or segment are offset by program revenues. Direct expenses are those that are clearly identifiable with a specific function or segment. Program revenues include 1) charges to customers or applicants who purchase, use, or directly benefit from goods, services, or privileges provided by a given function or segment and 2) grants and contributions that are restricted to meeting the operational or capital requirements of a particular function or segment. Taxes and other items not properly included among program revenues are reported instead as general revenues.

Separate financial statements are provided for governmental funds, proprietary funds, fiduciary funds, and the component units even though the fiduciary fund statements are excluded from the government-wide financial statements. Major individual governmental funds and major individual enterprise funds are reported as separate columns in the fund financial statements.

**Measurement focus, basis of accounting and financial statement presentation:** The government-wide financial statements are reported using the economic resources measurement focus and the accrual basis of accounting, as are the proprietary fund and fiduciary fund financial statements. Revenue is recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. Property taxes are recognized as revenue in the year for which they are levied. Grants and similar items are recognized as revenue as soon as all eligibility requirements imposed by the provider have been met.

**Revenue recognition policies:** Governmental fund financial statements are reported using the current financial resources measurement focus and the modified accrual basis of accounting. Revenue is recognized as soon as it is both measurable and available. Revenue is considered to be available if it is collected within the current period or soon enough thereafter to pay liabilities of the current period. For this purpose, the County considers revenues to be available if they are collected within sixty (60) days of the end of the current fiscal period with the exception of the Special Revenue funds Genesee County Community Action Resources Department (GCCARD), Health Department and Community Development which are ninety (90) days. Expenditures generally are recorded when a liability is incurred, as under accrual accounting. However, debt service expenditures, as well as expenditures related to compensated absences and claims and judgments, are recorded only when payment is due. Revenues, which are considered measurable, but not available, are recorded as a receivable and deferred revenue. Revenues for 2013 include property taxes levied principally on December 1, 2012 and substantially collected in early 2013. The "2012 property taxes" assessed on December 31, 2012, become a lien on December 1, 2012, and are to be collected principally by February 28, 2013. Also, for the year ended September 30, 2007 the state legislature eliminated state-shared revenues to Counties. As a compromise, the legislature allowed counties to move the property tax levy to a July 1 date. As a result, the July 1, 2013 levy is also recognized as revenue for the year ended September 30, 2013 to the extent that it is available. Other significant revenue susceptible to accrual include expenditure reimbursement type grants, certain inter-governmental revenues and operating transfers.

The government reports the following major governmental funds:

The General Fund is the government's primary operating fund. It accounts for all financial resources of the general government, except those required to be accounted for in another fund.

The Mental Health Fund accounts for the operations of the County's Mental Health services, the main revenue sources are State grants and charges for services. On August 29, 2012, the Board of Commissioners of Genesee County, Michigan approved a resolution to establish a community mental authority (a separate entity) to assume the activities of the Agency, effective January 1, 2013. The Agency is reported as a major fund for 3 months ending December 31, 2012 then as a discretely presented component unit effective January 1-September 30, 2013.

The County Health Fund accounts for the operations of providing health protection and health services, the main revenue sources are Federal and State grants.

The Community Action Resource Department Fund accounts for the programs designed to provide health and human services to low income individuals, the main revenue source is federal grants.

The Community Development Fund accounts for Housing and Urban Development grant awards that are allocated to all local units of government (excluding City of Flint) for projects benefiting low and moderate income persons or projects defined as having an urgent need.

The government reports the following major enterprise funds:

The Delinquent Tax Revolving Enterprise Fund accounts for the activities of revolving tax purchase program whereby the County purchases the outstanding taxes from each local taxing unit. The County, in turn collects those delinquent taxes along with penalties and interest.

The government reports the following fiduciary funds:

47

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                      **EXHIBIT A-13**

The Pension Trust Fund accounts for employee and employer pension contributions, investment income, accumulated assets, and payments to beneficiaries.

The Trust and Agency Funds account for assets held by the County as an agent for individuals, private organizations, other governments, and other funds.

The Employees' Fringe Benefits (VEBA) Fund accounts for employee and employer contributions, investment income, accumulated assets, set aside with the intent to accumulate adequate funds to defray part of the cost of retiree medical benefits in future years.

Additionally, the government reports the following fund types:

Internal service funds account for various services such as data processing, purchasing, and other administrative services, fleet management, buildings and grounds maintenance, the self funded property/casualty program and the self funded prescription drug and medical program. These services are provided to other County departments on a cost reimbursement basis.

Agency Funds account for assets held by the County in an agency capacity.

As a general rule, the effect of inter fund activity has been eliminated from the government-wide financial statements.

Proprietary funds distinguish operating revenue and expenses from non-operating items. Operating revenue and expenses generally result from providing services and producing and delivering goods in connection with a proprietary fund's principal ongoing operations. The principal operating revenue of the proprietary funds relates to charges to customers for sales and services. Operating expenses for proprietary funds include the cost of sales and services, administrative expenses, and depreciation on capital assets. All revenue and expenses not meeting this definition are reported as non-operating revenue and expenses.

Fiduciary funds are used to account for resources held for the benefit of parties outside the government. Fiduciary funds are not reflected in the government-wide financial statements because the resources of those funds are not available to support Genesee County's own programs. The accounting used for fiduciary funds is much like that used for proprietary funds.

**Employee Vacation:** County employees are granted vacation in varying amounts based on length of service. Vacation pay is accrued and fully vested when earned; upon termination, with a few bargaining unit exceptions, employees are paid accumulated vacation at full rates to a limit of 150% of their current annual earned vacation.

**Long-term Advances:** Long-term advances from the General Fund to other funds are commonly made to finance new activities during their initial operations. General Fund fund balance is reserved for such advances to reflect the amount of fund balance not currently available for expenditure.

**Budgets and Budgetary Accounting:** Budgets shown in the financial statements were prepared on the same modified accrual basis used to reflect actual results. The County employs the following procedures in establishing the budgetary data reflected in the financial statements:

- Prior to July 1, County departments, in conjunction with the Controller's Office, prepare and submit their proposed operating budgets for the fiscal year commencing October 1. The operating budget includes proposed expenditures and resources to finance them.

- A public hearing is conducted to obtain taxpayers comments.

- Prior to September 30, the budget is legally enacted through passage of a resolution.

- After the budget is adopted, the Finance Committee of the Board of Commissioners is authorized to transfer budgeted amounts between accounts within a department. However, any revisions that alter the total expenditures of a department or fund must be approved by the Board of Commissioners.

- Formal budgetary integration is employed as a management control device during the year for the General Fund and the Special Revenue Funds. Formal budgetary integration is not employed for other governmental type funds as effective management control is achieved through alternative procedures.

- Budgets for the General and Special Revenue Funds are adopted on a basis consistent with generally accepted accounting principles (GAAP). Budgeted amounts are as originally adopted, or as amended by the Board of Commissioners during the year. Individual amendments were not material in relation to the original appropriations, which were amended. Appropriations unused at September 30 are not carried forward to the following year. The budgets for the General and Special Revenue Funds are adopted at the departmental level, and total fund level, respectively. For the Special Revenue Fund budget presentations in Exhibits B3-B4 and D3-D4 more detail is presented than required by the adopted budget.

| General Fund | Total<br>Total Revenue | Expenditures |
|---|---|---|
| Amounts per operating statement | $73,828,952 | $59,881,900 |
| Animal Shelter Fund budgeted separately from the<br>General Fund | (2,747) | (967,582) |
| Medical Examiner Fund budgeted separately from the<br>General Fund | (189,769) | (1,181,652) |
| Amounts per budget statements | $73,636,438 | $57,732,666 |

**Cash and Cash Equivalents:** The County considers cash equivalents as short-term highly liquid investments that are both readily convertible to cash and have maturities of 90 days or less when purchased to minimize the risk of changes in value due to interest rate changes.

**Investments:** Investments are stated at fair values. Fair value is determined based on quoted market prices except for money market funds, which are valued at amortized cost. Unrealized appreciation or depreciation on investments due to changes in market value are recognized in fund operations each year.

**Inventories/Prepaids:** Inventories are stated at cost on a first-in, first-out basis for governmental funds and the lower of cost on a first-in, first-out basis or market for proprietary funds. The cost of inventory items in governmental funds is recorded as an expenditure at the time of purchase, except for certain Special Revenue Funds, and the Water and Waste Services component unit where inventories are expensed when used. Inventory in the Land Bank Authority represents land inventory held for resale.

**Encumbrances:** Encumbrance accounting, under which purchase orders, contracts, and other commitments for the expenditure of monies are recorded in order to reserve that portion of the applicable appropriation, is employed as an extension of formal budgetary integration in the governmental funds. There were no encumbrances at the end of the year since there were no outstanding amounts due on contracts or other commitments for the current year and the small number of purchase orders that were outstanding at the end of the year were cancelled and reissued in the subsequent year.

**Restricted Assets:** When both restricted and unrestricted resources are available for use, it is the County's policy to use restricted resources first, then unrestricted resources as they are needed.

**Capital Assets:** Capital assets, which include property, plant, equipment, infrastructure assets (e.g., roads, bridges, sidewalks, and similar items), are reported in the applicable governmental or business-type activities column in the government-wide financial statements. Capital assets are defined by the government as assets with an initial individual cost of more than $1,000 and an estimated useful life in excess of one year. Such assets are recorded at historical cost or estimated historical cost if purchased or constructed. Donated capital assets are recorded at estimated fair market value at the date of donation.

Interest incurred during the construction of capital assets of business type activities is included as part of the capitalized value of the assets constructed. During the current year, no interest expense was capitalized as part of the cost of assets under construction.

Capital assets are depreciated using the straight-line method over the estimated useful lives of the related assets. The estimated useful lives are:

| | |
|---|---|
| Land Improvements | 10 years |
| Buildings and Improvements | 25-50 years |
| Equipment | 3-20 years |
| Infrastructure | 20-50 years |

**Long-term Obligations:** In the government-wide financial statements and proprietary fund types in the fund financial statements, long-term debt and other long-term obligations are reported as liabilities in the applicable governmental activities, business type activities or proprietary fund type statement of net position. Bond premiums and discounts, as well as issuance costs, are deferred and amortized over the life of the bonds using the effective interest method. Bonds payable are reported net of the applicable bond premium or discount. Bond issuance costs are reported as deferred charges and amortized over the term of the related debt. In the fund financial statements, governmental fund types recognize bond premiums and discounts, as well as bond issuance costs, during the current period. The face amount of debt issued is reported as other financing sources. Premiums received on debt issuances are reported as other financing sources while discounts are reported as other financing uses. Issuance costs are reported as debt service expenditures.

In the fund financial statements, governmental funds report the following components of fund balance:

- Nonspendable – Amounts that are not in spendable form or are legally or contractually required to be maintained intact.

- Restricted – Reservations of fund balance for amounts that are not available for appropriation or are legally restricted by outside parties, constitutional provisions, or enabling legislation for use for a specific purpose.

- Committed – Amounts that have been formally set aside by the Board of Commissioners for use for specific purposes. Commitments are made and can be rescinded only via resolution of the Board.

- Assigned – Intent to spend resources on specific purposes expressed by the Board of Commissioners.

- Unassigned – Amounts not otherwise categorized above and available to be spent for any purpose.

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                                                    **EXHIBIT A-13**

When an expense is incurred for purposes for which both restricted and unrestricted net position or fund balance are available, the County's policy is to first apply restricted resources.  When an expense is incurred for purposes for which amounts in any of the unrestricted fund balance classifications could be used, it is the County's policy to spend funds in this order: committed, assigned and unassigned.

**NOTE C – DEPOSITS AND INVESTMENTS**

Michigan Compiled Laws Section 129.91 (Public Act of 1943, as amended), authorizes local governmental units to make deposits and invest in the accounts of federally insured banks, credit unions, and savings and loan associations that have offices in Michigan. The local unit is allowed to invest in bonds, securities, and other direct obligations of the United States; repurchase agreements; bankers' acceptances of United States banks; commercial paper rated within the two highest classifications, which mature not more that 270 days after the date of purchase; obligations of the State of Michigan or its political subdivisions, which are rated as investment grade; and mutual funds composed of investment vehicles that are legal for direct investment by local units of government in Michigan.

The Pension Trust Fund is also authorized by Michigan Public Act 314 of 1965, as amended, to invest in certain reverse repurchase agreements, stocks, diversified investment companies, annuity investment contracts, real estate leased to public entities, mortgages, real estate, debt or equity of certain small businesses, certain state and local government obligations and certain other specified investment vehicles. The Employees' Fringe Benefit (VEBA) Fund is authorized by Michigan Public Act 149 of 1999 to invest in similar types of investments as the pension fund.

State statues as they relate to group Self-Insurance Pools (Public Act 2118 of 1956, as amended) authorizes the Pool to invest in obligations of the U.S. Treasury and U.S. agencies, deposit agreements with federally insured financial institutions within the State of Michigan, commercial paper, common stocks, real estate, repurchase obligations of the U.S. Government and U.S. agencies, banker's acceptances of U.S. banks, common stocks, and mutual funds comprised of the above authorized investments.  The Pool has adopted the above as its investment policy and has authorized the following depositories: FirstMerit Bank and Beacon Investment Company.

The County has designated three banks for the deposit of its funds.  The investment policy adopted by the Board in accordance with Public Act 196 of 1997 has authorized investments as allowed under State statutory authority as listed above.  The County's cash and investments are subject to several types of risk which are examined in more detail as follows:

**Custodial credit risk of bank deposits –** Custodial credit risk is the risk that in the event of a bank failure, the government's deposits may not be returned to it.  The government does not have a deposit policy for custodial credit risk.  At year end, the County had $10,013,070 of bank deposits (certificates of deposit, checking and savings accounts) that were uninsured and uncollateralized.  The County believes that due to the dollar amounts of cash deposits and the limits of FDIC insurance, it is impractical to insure all deposits.  Insuring or collateralizing all cash deposits would also result in a significant decrease in the investment returns for the County.  Consistent with the investment policy that is prepared by the County Treasurer's Office and approved by the County Board of Commissioners, the County evaluates each financial institution it deposits funds with and assesses the level of risk of each institution; only those institutions with an acceptable estimated risk level are used as depositories.

**Custodial credit risk of investments –** Custodial credit risk is the risk that, in the event of the failure of the counterparty, the County will not be able to recover the value of its investments or collateral securities that are in the possession of an outside party.  The County does not have a policy for custodial credit risk.  At year end, the following investment securities were uninsured and unregistered, with securities held by the counterparty or by its trust department or agent but not in the County's name:

| Investment Type | Carrying Value | How Held |
|---|---|---|
| U.S. gov or agency bond or note (self insurance) | $  1,439,473 | Counterparty's trust dept |
| Corporate bonds (self insurance) | 1,690,364 | Counterparty's trust dept |
| Corporate stocks (self insurance) | 3,560,920 | Counterparty's trust dept |
| Mutual funds (self insurance) | 483,104 | Counterparty's trust dept |
| U.S. gov or agency bond or note (VEBA) | 6,239,499 | Counterparty's trust dept |
| Corporate bonds (VEBA) | 8,100,735 | Counterparty's trust dept |
| Corporate stock (VEBA) | 7,091,313 | Counterparty's trust dept |
| Foreign gov and agency (VEBA) | 24,191,655 | Counterparty's trust dept |
| U.S. gov or agency bond or note (pension) | 66,678,492 | Counterparty's trust dept |
| Foreign gov and agency (pension) | 75,438,520 | Counterparty's trust dept |
| Corporate bonds (pension) | 40,482,207 | Counterparty's trust dept |
| Corporate stocks (pension) | 66,751,963 | Counterparty's trust dept |

**Interest rate risk –** Interest rate risk is the risk that the value of investments will decrease as a result of a rise in interest rates.  The County's investment policy does not restrict investment maturities, other than commercial paper which can only be purchased with a 270-day maturity.  At year end, the average maturities of investments are as follows:

| Type of Investment | Fair Value | Less than One Year | 1-10 Years | Over Ten Years |
|---|---|---|---|---|
| U.S. gov or agency bond or notes (self insurance) | $1,439,473 | $589,104 | $850,369 | |
| Corporate bonds (self insurance) | 1,690,364 | 156,164 | 1,534,200 | |
| Money market funds (self insurance) | 384,652 | 384,652 | | |
| U.S. gov or agency bond or notes (VEBA) | 1,850,428 | 1,352,963 | 497,465 | |
| Corporate bonds (VEBA) | 6,132,648 | | 6,132,648 | |
| Foreign gov (VEBA) | 523,050 | | 523,050 | |
| Asset backed (pension) | 1,771,067 | | | 1,771,067 |

50

| Type of Investment | Fair Value | Less than One Year | 1-10 Years | Over Ten Years |
|---|---|---|---|---|
| U.S. gov or agency bond or notes (pension) | 1,996,146 | | 1,804,434 | 191,712 |
| U.S. gov mortgage backed (pension) | 1,751,441 | | | 1,752,441 |
| U.S. gov tips | 1,700,730 | | 1,700,730 | |
| Corporate bonds (pension) | 30,113,931 | 309,640 | 21,170,016 | 8,634,276 |
| Foreign corporate (pension) | 8,890,792 | 948,795 | 7,083,737 | 858,264 |
| Foreign gov (pension) | 3,605,883 | | 2,823,433 | 782,450 |
| Private placement (pension) | 8,597,210 | 66,831 | 7,452,964 | 1,077,414 |

**Credit risk –** Credit risk is the risk that the government will not be able to recover the value of its securities. The County follows state law which limits investments in commercial paper to the top two ratings issued by nationally recognized statistical rating organizations. The County has no investment policy that would further limit its investment choices for general County funds. The pension funds are allowed to invest in longer maturity corporate bonds in accordance with state law. As of year end, the credit quality ratings of debt securities not explicitly guaranteed by the U.S. Government are as follows:

| Investment | Fair Value | Rating | Rating Organization |
|---|---|---|---|
| U.S. gov agency securities (self insurance) | $1,439,473 | AA+ | S&P |
| Money Market (self insurance) | 743,923 | Not Rated | N/A |
| Corporate bonds (self insurance) | 356,733 | A- | S&P |
| Corporate bonds (self insurance) | 578,058 | BBB+ | S&P |
| Corporate bonds (self insurance) | 413,244 | BBB | S&P |
| Corporate bonds (self insurance) | 341,328 | BBB- | S&P |
| Corporate bonds (VEBA) | 489,995 | AA | S&P |
| Corporate bonds (VEBA) | 1,900,217 | A | S&P |
| Corporate bonds (VEBA) | 2,899,011 | BBB | S&P |
| Corporate bonds (VEBA) | 843,125 | BB | S&P |
| Private Placement (VEBA) | 250,000 | A | S&P |
| Foreign government bonds (VEBA) | 227,250 | BB | S&P |
| Foreign government bonds (VEBA) | 295,800 | Not Rated | N/A |
| U.S. gov agency securities (VEBA) | 801,329 | AA | S&P |
| U.S. gov agency securities (VEBA) | 1,049,099 | Not Rated | N/A |
| Asset backed (pension) | 186,298 | AAA | S&P |
| Asset backed (pension) | 231,038 | AA | S&P |
| Asset backed (pension) | 342,822 | A | S&P |
| Asset backed (pension) | 82,007 | BB | S&P |
| Asset backed (pension) | 86,460 | B | S&P |
| Asset backed (pension) | 842,441 | CCC and Below | S&P |
| Corporate bonds (pension) | 1,791,871 | AA | S&P |
| Corporate bonds (pension) | 9,678,165 | A | S&P |
| Corporate bonds (pension) | 13,079,008 | BBB | S&P |
| Corporate bonds (pension) | 4,269,674 | BB | S&P |
| Corporate bonds (pension) | 1,040,498 | B | S&P |
| Corporate bonds (pension) | 250,425 | CCC and Below | S&P |
| Corporate CMO (pension) | 4,291 | Not Rated | N/A |
| Corporate CMO (pension) | 1,280,414 | AAA | S&P |
| Corporate CMO (pension) | 1,751,643 | BBB | S&P |
| Corporate CMO (pension) | 150,916 | BB | S&P |
| Corporate CMO (pension) | 158,811 | B | S&P |
| Corporate CMO (pension) | 950,462 | CCC and Below | S&P |
| Corporate CMO (pension) | 2,532,038 | Not Rated | N/A |
| Private placements (pension) | 507,860 | AAA | S&P |
| Private placements (pension) | 422,908 | AA | S&P |
| Private placements (pension) | 1,814,891 | A | S&P |
| Private placements (pension) | 1,946,055 | BBB | S&P |
| Private placements (pension) | 1,192,037 | BB | S&P |
| Private placements (pension) | 634,089 | B | S&P |
| Private placements (pension) | 2,079,370 | Not Rated | N/A |
| Foreign corporate bonds (pension) | 382,740 | AAA | S&P |
| Foreign corporate bonds (pension) | 382,454 | AA | S&P |
| Foreign corporate bonds (pension) | 1,737,429 | A | S&P |
| Foreign corporate bonds (pension) | 3,166,474 | BBB | S&P |
| Foreign corporate bonds (pension) | 421,724 | BB | S&P |
| Foreign corporate bonds (pension) | 252,787 | B | S&P |
| Foreign corporate bonds (pension) | 2,547,184 | Not Rated | N/A |
| Foreign government bonds (pension) | 651,345 | A | S&P |
| Foreign government bonds (pension) | 1,257,176 | BBB | S&P |
| Foreign government bonds (pension) | 1,697,362 | Not Rated | N/A |

51

B--47

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                                 **EXHIBIT A-13**

| Investment | Fair Value | Rating | Rating Organization |
|---|---|---|---|
| U.S. government agency (pension) | 1,872,855 | AA | S&P |
| U.S. government agency (pension) | 52,528 | BBB | S&P |
| U.S. government agency (pension) | 70,764 | Not Rated | N/A |
| U.S. government mortgage backed (pension) | 1,752,441 | Not Rated | N/A |
| U.S. government other (pension) | 1,213,547 | Not Rated | N/A |
| U.S. government TIPS (pension) | 1,700,730 | Not Rated | N/A |
| U.S. government treasuries, notes and bonds (pension) | 53,191,344 | Not Rated | N/A |

**Foreign currency risk** – Foreign currency risk is the risk that an investment denominated in the currency of a foreign country could reduce its U.S. dollar value, as a result of changes in foreign currency exchange rates. The pension system does not restrict the amount of investments in foreign currency. The following securities are subject to foreign currency risk:

| | Fair Value (in $) |
|---|---|
| Euro | $   35,453 |
| Canadian Dollar | 192,117 |
| Great British Pounds | 10,493,792 |
| Mexican Peso | 61,930 |
| Norwegian Krones | 2 |
| Hong Kong Dollar | 3,360,395 |
| Philippine Peso | 164,323 |
| South African Rand | 18 |
| Swedish Krona | 150,810 |
| Taiwan Dollar | 234,117 |
| Turkish Lira | 200,332 |

All of the System's investment subject to foreign currency risk relate to a single comingled fund which held many different foreign currency securities. The system owns a portion of the comingled fund.

**Securities lending** – As permitted by state statutes and under the provisions of a securities lending authorization agreement, the System lends securities to broker-dealers and banks for collateral that will be returned for the same securities in the future. The System's custodial bank manages the securities lending program and receives cash as collateral. Borrowers are required to deliver collateral for each loan equal to not less than 100 percent of the market value of the loaned securities. During the year ended December 31, 2012, only United States currency was received as collateral.

The System did not impose any restrictions during the fiscal year on the amount of loans made on its behalf by the custodial bank. The System presently owns $246,496 of Sigma Finance Medium Term Note which is a defaulted investment. The System elected to repay the liability over a five-year period. There were no other failures by any borrowers to return loaned securities or pay distributions thereon during the fiscal year.

The Genesee County Employees' Retirement System and the borrower maintain the right to terminate all securities lending transactions on demand. The cash collateral received on each loan was invested, together with the cash collateral of other lenders, in an investment pool. The average duration of the investments in the cash collateral pool are deemed to mature on the cash collateral pool's next business day as per the Reinvestment Guidelines, with the exception of the Sigma Medium Term Note (impaired). Because the loans are terminable on demand, their duration did not generally match the duration of the investments made with cash collateral. On December 31, 2012, the System had no credit risk exposure to borrowers with the exception of Sigma Finance. The collateral based on cost and the fair market value of the underlying securities on loan for the System as of December 31, 2012 was $3,211,330 and $3,194,952 respectively, which consisted of short-term money market mutual funds and U.S. corporate commercial paper.

**NOTE D–CAPITAL ASSETS**

Capital asset activity at September 30, 2013 is summarized as follows:

| Governmental activities: | Balance Oct. 1, 2012 | Additions | Disposals | Reclassifications and Adjustments | Balance Sept. 30, 2013 |
|---|---|---|---|---|---|
| Capital assets not being depreciated | | | | | |
| Land | $ 11,349,565 | $ | $ | $ | $ 11,349,565 |
| Construction in progress | 15,572 | 49,188 | 15,572 | | 49,188 |
| Subtotal | 11,365,137 | 49,188 | 15,572 | | 11,398,753 |
| Capital assets being depreciated: | | | | | |
| Land improvements | 8,806,199 | 110,473 | | | 8,916,672 |
| Buildings and improvements | 120,714,083 | 1,806,847 | | (154,076) | 122,520,930 |
| Machinery and equipment | 27,585,901 | 2,925,491 | 650,819 | | 29,706,497 |
| Subtotal | 157,106,183 | 4,842,811 | 650,819 | (154,076) | 161,144,099 |

**Governmental activities:**

| | Balance Oct. 1, 2012 | Additions | Disposals | Reclassifications and Adjustments | Balance Sept. 30, 2013 |
|---|---|---|---|---|---|
| Less accumulated depreciation for: | | | | | |
| Land improvements | 36,702 | 3,022 | | | 39,724 |
| Buildings | 52,787,550 | 3,435,939 | | | 56,223,489 |
| Machinery and equipment | 20,151,794 | 1,784,949 | 627,878 | (154,076) | 21,154,789 |
| Subtotal | 72,976,046 | 5,223,910 | 627,878 | (154,076) | 77,418,002 |
| Governmental activities | | | | | |
| Capital assets, net of depreciation | $ 95,495,274 | $ (331,911) | $ 38,513 | $ | $ 95,124,850 |

| Business type activities: | Balance Oct. 1, 2012 | Additions | Disposals | Reclassifications | Balance Sept. 30, 2013 |
|---|---|---|---|---|---|
| Capital assets not being depreciated: | | | | | |
| Land | $ 3,502,006 | $ | $ 344,210 | $ (12,078) | $ 3,145,718 |
| Capital assets being depreciated: | | | | | |
| Buildings | 1,181,215 | | | | 1,181,215 |
| Land improvements | 3,074,493 | | | 12,078 | 3,086,571 |
| Machinery and equipment | 4,274,265 | | | 154,076 | 4,428,341 |
| Subtotal | 8,529,973 | | | 166,154 | 8,696,127 |
| Less accumulated depreciation for: | | | | | |
| Buildings | 1,107,483 | 23,013 | | | 1,130,496 |
| Land improvements | 3,074,493 | | | 12,078 | 3,086,571 |
| Machinery and equipment | 3,962,947 | 148,175 | | 154,076 | 4,265,198 |
| Subtotal | 8,144,923 | 171,188 | | 166,154 | 8,482,265 |
| Business type activities | | | | | |
| Capital assets, net of depreciation | $ 3,887,056 | $ (171,188) | $ 344,210 | $ (120,078) | $ 3,359,580 |

Depreciation expense was charged to programs of the primary government as follows:

Governmental activities:

| | |
|---|---|
| Administration of Justice | $ 1,153,244 |
| Law Enforcement and Community Protection | 923,508 |
| Human Services | 556,295 |
| Community Enrichment and Development | 373,845 |
| General Support Services | 127,328 |
| Other | 1,004,450 |
| Internal service fund depreciation is charged to the various functions based on their usage of the assets | 1,085,240 |
| Total governmental activities | $ 5,223,910 |

Business type activities:

| | |
|---|---|
| Delinquent tax revolving | $ 101,497 |
| Parks and Recreation | 69,691 |
| Total business type activities | $ 171,188 |

In addition, land with an approximate value of $5,000,000 used by Parks and Recreation is leased at nominal costs from the Nature Conservatory and the City of Flint under long-term arrangements.

**NOTE E – DEBT (including current portions)**

Long-term debt of the County is as follows:

| Government Activities: | Balance Oct. 1, 2012 | Additions | Reductions | Balance Sept. 30, 2013 | Due within One Year |
|---|---|---|---|---|---|
| Internal Service Fund Equipment Notes | $ 19,491 | $ | $ (3,618) | $ 15,873 | $ 4,189 |
| Capital Improvement Bonds 2011, Proceeds were used to Renovate various County Buildings | 845,000 | | (240,000) | 605,000 | 65,000 |
| 2.9% Genesee County Refunding Bonds, Bonds maturing on or prior to May 1, 2022 shall not be subject to redemption prior to maturity. Bonds maturing on or after May 1, 2022 may be subject to prior redemption | 4,830,000 | | (400,000) | 4,430,000 | 440,000 |
| JCI Energy Bonds 2010, Debt was issued to perform numerous Energy efficiency improvements on most County Buildings | 7,815,784 | | (300,000) | 7,515,784 | 340,000 |
| 3.7% to 5.0% Genesee County Building Authority Bonds, Series 2000, Callable after May 1, 2008, | 168,000 | | (59,500) | 108,500 | 66,500 |
| 4.75% to 5.7% Genesee County Bonds Series 2004-B Capital Improvement Bonds, Bonds maturing before April 1, 2014 not subject to redemption prior to maturity | 1,810,000 | | (45,000) | 1,765,000 | 45,000 |

B-48

NOTES TO FINANCIAL STATEMENTS

**GENESEE COUNTY**                                               **EXHIBIT A-13**

Long-term debt of the County is as follows continues:

| | Balance Oct. 1, 2012 | Additions | Reductions | Balance Sept 30, 2013 | Due within One Year |
|---|---|---|---|---|---|
| 3.00% to 5.00% Genesee County Refunding Bonds Bonds maturing on or prior to May 1, 2015 shall not be subject to redemption prior to maturity.  Bonds maturing on or after May1, 2016 may be subject to prior redemption.. | 9,595,000 | | (1,180,000) | 8,415,000 | 1,240,000 |
| 6.34% Capital Improvement Bonds, Series 2008 maturing on or prior to November 1, 2018 not be subject to Redemption prior to maturity.............................. | 805,000 | | (115,000) | 690,000 | 115,000 |
| Total Bonds and Notes .................................... | 25,888,275 | | (2,343,118) | 23,545,157 | 2,315,689 |
| Self-Insurance Claim Liability............................ | 4,549,999 | 1,527,914 | (1,953,046) | 4,124,867 | 1,562,869 |
| Self-Insured Medicals ...................................... | 248,971 | 11,285 | (81,481) | 178,775 | 178,775 |
| Compensated absences.................................... | 4,715,536 | 3,080,116 | (3,578,426) | 4,217,226 | 3,578,426 |
| Total Governmental Activities ........................... | 35,402,781 | 4,619,315 | (7,956,071) | 32,066,025 | 7,635,759 |
| Business Type Activities | | | | | |
| Parks and Recreation Fund: | | | | | |
| 3.7% to 5.0% Genesee County Building Authority Bonds, Series 1998, Callable after May 1, 2008, at par plus accrued interest to date.................. | 72,000 | | (25,500) | 46,500 | 28,500 |
| Delinquent Tax Fund: | | | | | |
| 5.0% to 9.7% Delinquent tax notes ................... | 42,300,000 | 39,900,000 | (46,400,000) | 35,800,000 | 8,900,000 |
| Total Business-type Activities .......................... | 42,372,000 | 39,900,000 | (46,425,500) | 35,846,500 | 8,928,500 |
| Total Long-term Debt ...................................... | $ 77,774,781 | $44,519,315 | ($54,381,571) | $67,912,525 | $16,564,269 |

Genesee County lends its full faith and credit for bond issues that are repaid through special assessments. The County is not obligated in any manner for special assessment debt. The amount of special assessment debt is detailed within the notes for the Component Unit under which the projects originated.

Delinquent property taxes receivable are pledged as collateral for the repayment of the outstanding delinquent tax notes – (See Note H).

Typically, the General Fund and all Special Revenue Funds liquidate liability for compensated absences.

The annual requirements to pay principal and interest on the obligations outstanding at September 30, 2013 are as follows:

| | Governmental Activities | | Business-Type Activities | |
|---|---|---|---|---|
| | Principal | Interest | Principal | Interest |
| 2014 ............................................... | $2,315,689 | $ 1,129,243 | $28,500 | $ 2,325 |
| 2015 ............................................... | 2,406,457 | 1,018,522 | 18,000 | 900 |
| 2016 ............................................... | 2,494,742 | 903,097 | | |
| 2017 ............................................... | 2,617,485 | 783,381 | | |
| 2018 ............................................... | 2,745,000 | 657,725 | | |
| 2019/2023................................................ | 7,470,000 | 1,651,633 | | |
| 2024/2028................................................ | 2,765,784 | 485,091 | | |
| 2029/2033................................................ | 590,000 | 144,501 | | |
| 2034/2038................................................ | 140,000 | 7,980 | | |
| TOTALS ...................................... | $23,545,157 | $ 6,781,173 | $46,500 | $ 3,225 |

By statute, the County general obligation debt is restricted to 10% of the equalized value of all property in the County.  Certain obligations, such as special assessment notes, are not subject to this limitation.  At September 30, 2013, the County's debt limit amounted to $899,354,911 and indebtedness subject to the limitation aggregated $117,204,921.

**NOTE F – CONTINGENCIES, CLAIMS, RISK MANAGEMENT, AND LITIGATION**

There are various legal actions pending against the County. Management has evaluated the likely outcome of various actions and has concluded that it is not appropriate to record any amount as a liability as of September 30, 2013.

The County is totally self-insured for workers' compensation for all losses, up to $500,000 each occurrence, and self-insured for property and liability insurance claims up to $50,000 and $350,000, respectively, for specific losses.  The County is insured for the amount of claims in excess of such limitation to a maximum of replacement cost for property and $20,000,000 for liability claims.  The County is self-insured for the first $50,000 of catastrophic coverage for auto physical damage per location.  The County is exposed to various risks of loss related to torts, errors and omissions, and employee injuries (workers' compensation), as well as medical benefits provided to employees.

The County paid losses within its self-insured retention through an Internal Service Fund.  Net position for this fund as of September 30, 2013 was $10,015,263 with $4,124,867 accrued as a liability for incurred losses and expenses.  An actuarial study projected a required reserve of $0.0 million for 2013.  The County's Risk Manager provides employee accident prevention training and various risk control techniques through a

continuing education program.  There were no reductions in reinsurance coverage or settlements in excess of insurance coverage over the past three years.

A reconciliation of the claims liability for the years ended September 30, 2013 and 2012 is as follows:

| | Year Ended 9/30/13 | Year Ended 9/30/12 |
|---|---|---|
| Claims Liability (beginning of year)..................... | $4,549,999 | $3,682,890 |
| Claims incurred during the period ..................... | 1,851,619 | 2,212,643 |
| Changes in estimate for claims of prior periods... | (323,705) | 11,646 |
| Payments on claims......................................... | (1,953,046) | (1,357,180) |
| Claims liability (end of year).............................. | $ 4,124,867 | $4,549,999 |

Several complaints for alleged discriminatory employment practices have also been filed against the County.

A portion of the fund balance of the General Fund has been assigned to provide for a possible loss resulting from the unfavorable outcome of any claims and litigation.  See Note G, which follows.

The County provides a funding mechanism for the payment of the costs of pharmaceuticals and medical insurance for employees.  The County contracts with a third party administrator to provide claims processing with the cost of the claims reimbursed from these funds.  Net position for this fund as of September 30, 2013 was $2,378,404 with $178,775 accrued as a liability for incurred losses and expenses.

A reconciliation of the claims liability (workers compensation, property & liability, and auto claims) for the years ended September 30, 2013 is as follows:

| | Pharmaceuticals | Medical | Total Insurance |
|---|---|---|---|
| Claims liability (beginning of year)..................... | $ 18,915 | $ 230,056 | $ 248,971 |
| Claims incurred during the period ..................... | 37,657 | (26,372) | 11,285 |
| Changes in estimate for claims of prior periods... | | | |
| Payments on claims......................................... | (27,936) | (53,545) | (81,481) |
| | $ 28,636 | $ 150,139 | $ 178,775 |

**NOTE G – GENERAL FUND  FUND BALANCE CLASSIFICATIONS AND DEFICITS**

The County receives funds from various federal and state units to finance specific grants.  The final determination of revenue amounts is subject to audit by the responsible agencies.  Grant fund balance deficits, to the extent not liquidated by future operations, will be absorbed by the General Fund.  Additionally, the County is a defendant in numerous legal actions of which Corporation Counsel is not able to provide information as to the probable outcome and extent of potential liability, if any.  As a result of these and other matters discussed in Note F, above, the County has established an assignment of fund balance in the General Fund in the amount of $1,000,000 to provide for any audit adjustments of grant revenues, grant fund balance deficits and possible losses resulting from other contingencies, claims, and litigation.

The fund balance of the General Fund has also been classified as nonspendable for a long-term receivable due from the Vehicles and Equipment Internal Service Fund in the amount of $1,840,809 and prepaids in the amount of $20,690.

The following funds were in a deficit at year end:

| | |
|---|---|
| Component Unit: | |
| Brownfield Authority | $9,538,967 |
| Major Special Revenue: | |
| Community Action Resource Department | 443,666 |
| Nonmajor Special Revenue: | |
| Administration of Justice | 583,117 |
| Internal Service Funds: | |
| Administrative Services | 1,954,981 |
| Vehicles and Equipment | 804,008 |

**NOTE H – PROPERTY TAXES**

The County property tax is levied each July 1 on the assessed valuation of property located in the County as of the preceding December 31.  On December 1, the property tax attachment is an enforceable lien on property and is payable by the last day of the next February following.  Assessed values are established annually by the County and are equalized by the State at an estimated 50% of current market value.  Real property in Genesee County for the 2012 levy was assessed at $8,996,549,108 and equalized at $8,996,549,108 representing 50% of estimated current market value.  The County operating tax rate is currently 5.5072 mills with an additional 0.4847 mills voted each for parks and paramedics 0.7 mills for senior services 1 mill for health services and 0.1 mills for veterans.

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**  **EXHIBIT A-13**

By agreement with various taxing authorities, the County purchases at face value the real property taxes receivable returned delinquent each March 1. These receivables ($46,643,971 at September 30, 2013) are pledged to a bank for payment of notes payable, the proceeds of which were used to liquidate the amounts due the General Fund and various other funds and governmental agencies for purchase of the receivables and to provide funds for current operations. Subsequent collections on delinquent taxes receivable, plus interest and collection fees thereon and investment earnings, are used to extinguish the debt.

Collections of delinquent taxes, which include interest, penalties, fees and investment earnings, amounting to $39,151,903 in 2013, are used to service the notes payable. Principal and interest paid on the notes payable in 2013 amounted to $46,673,278.

**NOTE I – RETIREMENT PLANS**

**DEFINED BENEFIT PLAN - -**

**PLAN DESCRIPTION AND PROVISIONS**

The County administers a contributory agent multi-employer defined benefit pension plan known as the Genesee County Employees Retirement System (GCERS). The plan is included as a pension trust fund in the County's Comprehensive Annual Financial Report. GCERS issues a publicly available annual financial report that includes financial statements and required supplementary information for the system as a whole. This report can be obtained from the Retirement Coordinator at the County's administrative offices, located at 1101 Beach Street, Flint, MI 48502.

GCERS was organized pursuant to Section 12a of Act 156, State of Michigan Public Acts of 1851 (MSA 5.33(1); MCLA 46.12a) as amended. GCERS was established by ordinance in 1946, beginning with general County employees and the County Road Commission. Genesee County Water and Waste Services joined the system in 1956, Genesee County Community Mental Health joined in 1966, the City of Mt. Morris in 1969, and the Genesee District Library in 1980. The GCERS is regulated under the Genesee County Employees' Retirement System Ordinance, the sections of which have been approved by the State of Michigan Pension Commission. All new-hire general County and Community Mental Health employees may only join the defined contribution plan.

The plan provides for vesting of benefits after 8 years of service. Generally, participants may elect normal retirement with 20 to 25 years of credited service, regardless of age, or at age 60 with 8 or more years of credited service. Retirement benefits vary by employer group, and are payable monthly. Generally, the retirement benefit is equal to the employee's final average compensation times the sum of 2.5% for each year of credited service. All employers allow members to elect a deferred annuity providing a lifetime benefit. The length of service required to elect the deferred annuity is either 8 or 15 years, depending on the date of employment and employer group.

Membership in the plan at December 31, 2012, the date of the latest actuarial valuation, was comprised of 840 active plan members, 82 inactive vested members and 1,638 retirees and beneficiaries.

**ANNUAL PENSION COST**

The annual pension cost (APC), percentage of APC contributed, and net pension obligation (NPO), for the fiscal years ended September 30, 2013, 2012, and 2011, are summarized as follows:

| Fiscal Year End | Annual Pension Costs (APC) | % of APC Contributed | Net Pension Obligation (Asset) |
|---|---|---|---|
| 09/30/11 | $12,390,596 | 100.0% | 0 |
| 09/30/12 | 12,232,054 | 100.0% | 0 |
| 09/30/13 | 14,736,420 | 86.4% | 0 |

**ACTUARIAL METHODS AND ASSUMPTIONS**

In the December 31, 2012 actuarial valuation (the most recent actuarial) the individual entry age cost method was used. Significant actuarial assumptions used include an (1) 8.0% investment rate of return, (2) projected salary increases of 3.0% - 7.03% that includes inflation at 3.0%, and (3) postretirement benefit increases depending on benefit group. The actuarial value of assets was determined using techniques that smooth the effects of short-term volatility over a four-year period. The amortization method being used is a level percentage-of-payroll on an open basis. The remaining amortization period for unfunded actuarial accrued liability is 25 years.

**FUNDING PROGRESS**

| | 12/31/2010 | 12/31/2011 | 12/31/2012 |
|---|---|---|---|
| Actuarial Valuation as of | | | |
| Actuarial Value of Assets | $401,700,454 | $365,262,318 | $387,979,375 |
| Actuarial Accrued Liability (Entry Age) | 564,033,044 | 549,929,631 | 559,390,939 |
| Unfunded AAL | 162,332,590 | 184,667,313 | 171,411,564 |
| Funded Ratio | 71.2% | 66.4% | 69.4% |
| Covered Payroll | 57,794,546 | 52,236,539 | 49,736,813 |
| UAAL as a % of Covered Payroll | 280.9% | 353.5% | 344.6% |

**DEFINED CONTRIBUTION PLAN - -**

The County offers a defined contribution pension plan as an alternative to the defined benefit pension plan. The International City Managers Association (ICMA) Retirement Corporation administers the plan, and the County Board of Commissioners has authority over plan provisions and contribution requirements. All benefit employees are eligible to participate in this plan, if not participating in the Defined Benefit Plan. The County is required to contribute 8% to 10% of eligible employees' annual covered payroll, and employees are required to contribute between 3% and 7% of covered payroll. Employees are fully vested after 5 years of service. During the year ended September 30, 2013, employer and employee contributions to the plan were $2,705,916 and $1,617,428, respectively.

**HEALTH BENEFITS PLAN AND TRUST - -**

**PLAN DESCRIPTION AND PROVISIONS – Genesee County OPEB**

Genesee County provides other post-employment benefits (medical, optical, dental and life insurance) to County retirees who meet eligibility requirements. This is a single employer defined benefit plan administered by the County. The benefits are provided under collective bargaining agreements to union employees and by resolution of the County Board of Commissioners for employees not covered under collective bargaining agreements. The valuation for this benefit plan has been conducted in accordance with generally accepted actuarial principles and practices. Data concerning active members, retirees and beneficiaries was provided by Genesee County. This plan does not issue separate stand alone financial statements.

**FUNDING POLICY**

The County performed an actuarial valuation of the other post-retirement benefits liability for the year ended September 30, 2012. At that time the liability was determined to be $308,208,023 with the computed contribution as a percentage of payroll (based on 30-year amortization of the unfunded liability) to be 34.32% or $18,549,049.

The County has been working to systematically increase contributions to the VEBA to eventually equal the ARC (annual required contribution). Beginning in fiscal year 2002/2003, the County began contributing 3% of gross payroll into a fund designated for retiree health care. This was increased to 5% in the 2003/2004 fiscal year, to 10% in the 2006/2007 fiscal year, 20% in the 2007/2008 fiscal year, 22.5% in the 2008/2009 fiscal year, 20% in the 2009/2010 fiscal year, 24% in the 2010/2011, 2011/2012 and 2012/2013 fiscal years. In 2004 the County created a VEBA trust to specifically designate the funds that had been contributed for retiree health care. Also, in 2005 and 2006, all collective bargaining agreements as well as the non-union personnel policies included a provision that requires all employees to make a contribution of 1%-3% of pre-tax gross wages, which is paid to the VEBA as employer contributions for the funding of retiree health care benefits (OPEB). These contributions resulted in an OPEB obligation for the period ending September 30, 2013 in an amount of $29,409,706.

**FUNDING PROGRESS**

| | Fiscal Year Ended September 30 | | |
|---|---|---|---|
| | 2011 | 2012 | 2013 |
| Annual required contribution (recommended) | $ 18,708,000 | $18,549,049 | $18,549,049 |
| Interest on the prior year's net OPEB obligation | 317,634 | 797,853 | 1,211,518 |
| Adjustment to the annual required contribution | | (443,250) | (1,018,580) |
| Annual OPEB cost | 19,025,634 | 18,903,652 | 18,741,987 |
| Amount contributed | 9,698,547 | 12,009,195 | 9,524,252 |
| (Increase) in net OPEB Liability | (9,327,087) | (6,894,457) | (9,217,735) |
| OPEB Liability – beginning of year | (3,970,427) | (13,297,514) | (20,191,971) |
| OPEB Asset (obligation) – end of year | $ (13,297,514) | $(20,191,971) | $(29,409,706) |

| | Fiscal Year Ended September 30 | | |
|---|---|---|---|
| | 2011 | 2012 | 2013 |
| Annual OPEB Costs | $19,025,634 | $18,903,652 | $18,741,987 |
| Percentage contributed | 51% | 64% | 51% |
| Net OPEB obligation | (13,297,514) | (20,191,971) | (29,409,706) |

| | Plan Year Ended September 30 | | |
|---|---|---|---|
| Valuation Date September 30 | 2007 | 2010 | 2012 |
| Value of Assets at September 30 | $ 30,427,079 | $ 41,579,396 | $43,313,587 |
| Actuarial Accrued Liability | 179,150,908 | 286,696,396 | 308,208,023 |
| Unfunded AAL | 148,723,829 | 245,117,000 | 264,894,436 |
| Funded Ratio | 17% | 15% | 19% |
| Annual Covered Payroll | $ 58,387,145 | 58,028,000 | 36,987,137 |
| Ratio of UAAL to Covered Payroll | 2.55% | 422.41% | 716.18% |

**ACTUARIAL METHODS AND ASSUMPTIONS**

Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employments, mortality, and healthcare cost trends. Amounts determined regarding the funded status of the plan and the annual required contributions of the employer are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future.

B-51

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                              **EXHIBIT A-13**

Projections of benefits for financial reporting purposes are based on the substantive plan (the plan as understood by the employer and the plan member) which is formally detailed in the collective bargaining agreements and County Board resolutions.  These collective bargaining agreements and resolutions include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and plan members to that point.  The actuarial methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspectives of the calculations.

In the September 30, 2012 actuarial valuation, the individual entry age actuarial cost method was used.  The actuarial assumptions included a 6% investment rate of return (net of expenses), which is the expected long-term investment return on plan assets, and an annual healthcare cost trend rate of 8% in year one, decreasing by 0.5% annually until year 7 and then remaining at 5%.  The UAAL is being amortized as a level percentage of projected payroll on an open basis.  The remaining amortization period at September 30, 2013 was 30 years.

**PLAN DESCRIPTION AND PROVISIONS – Genesee County Community Mental Health**

The Genesee County Community Mental Health Retiree Health Care Plan (the "Plan") is a single-employer defined benefit healthcare plan administered by Mental Health (the "Agency") a major fund included Genesee County's financial report.  The Plan provides health insurance benefits, including medical, prescription, dental, and optical coverage to certain retirees and their beneficiaries, which are advance-funded on a discretionary basis.  The Plan was closed to new hires as of May 2008.  The valuation for this benefit plan has been conducted in accordance with generally accepted actuarial principles and practices.  Data concerning active members, retirees and beneficiaries was provided by Genesee County Community Mental Health.  This plan does not issue separate stand alone financial statements.

**FUNDING POLICY**

The contribution requirements of Plan members and the Agency are established and may be amended by the Agency Board of Directors.  The required contribution is based on actuarially determined finance rates, with an additional amount to prefund benefits as determined annually by the Agency.  For the three month period ended December 31, 2012, the Agency contributed $1,316,026 to the Plan, $483,524 of which was to fund current year benefits.  Plan members receiving benefits contributed $0.

**ACTUARIAL METHODS AND ASSUMPTIONS**

Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future.  Examples include assumptions about future employment, mortality, and the healthcare cost trend.  Actuarially determined amounts are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future.

Projections of benefits for financial reporting purposes are based on the substantive plan (the Plan as understood by the employer and Plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of benefit costs between the employer and Plan members to that point.  The actuarial methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspective of the calculations.

In the December 31, 2012 actuarial valuation, the projected unit credit actuarial cost method was used.  The actuarial assumptions include:  (a) a rate of return on investments of 8.0%: (b) projected salary increases of 5.0% attributable to inflation: (c) additional projected salary increases ranging form 0.0% to 4.03%, depending on age, attributable to seniority/merit; and (d) projected healthcare benefit increases of 4.5% to 9.0%.  The actuarial value of assets was determined based on market value.  The unfunded actuarial accrued liability is being amortized as a level dollar amount over 30 years on a closed basis.  The remaining amortization period at December 31, 2012, the date of the latest actuarial valuation, was 10 years.

On August 29, 2012, the Board of Commissioners of Genesee County, Michigan approved a resolution to establish a community mental authority (a separate entity) to assume the activities of the Agency, effective January 1, 2013.  The Agency is reported as a discretely presented component unit effective January 1, 2013.

**NOTE J – LEASES**

The County is party to numerous operating leases, aggregate rental expenses which were approximately $74,535 for the year ended September 30, 2013 exclusive of the amount paid to a related organization described below.  Minimum future rental payments under existing leases are not significant.

The Genesee County Community Mental Health Services is committed under various leases for building and office space and vehicles.  These leases are considered for accounting purposes to be operating leases and contain renewal options of two to three years.  Rental expenditures for the three month period ended December 31, 2012 are $93,127.

58

**NOTE K – RECEIVABLES**

Governmental funds report deferred revenue in connection with receivables for revenues that are not considered to be available to liquidate liabilities of the current period.  Governmental funds also defer revenue recognition in connection with resources that have been received, but not yet earned.  At the end of the current fiscal year, the various components of deferred revenue and unearned revenue reported in the governmental funds were as follows:

| Primary Government | Unavailable | Unearned |
|---|---|---|
| Property taxes | $4,763,452 | |
| Grant revenue | 15,018,360 | $209,509 |
| Long-term receivable | 1,765,000 | |

| Component units | | Unearned |
|---|---|---|
| Road projects | | $2,244,190 |
| Unearned leases | | 156,500 |
| Grant revenue | | 8,725,455 |

**NOTE L – INDIVIDUAL FUND INTERFUND RECEIVABLE AND PAYABLE BALANCES AND TRANSFERS**

Interfund Receivable and Payables:

| | Interfund Receivable | Interfund Payable |
|---|---|---|
| **Government Funds:** | | |
| **General Fund:** | | |
| County Health | | $ 2,453,920 |
| Genesee County Community Action Resource Department | 3,217,961 | |
| Enterprise | 7,830,989 | 1,003,685 |
| Non-major Special Revenue | 3,203,774 | 7,042,704 |
| Debt Service | 18,019 | |
| Capital Projects | 84,355 | |
| Internal Service | 1,118,824 | 5,722,375 |
| Total General Fund | 15,473,922 | 16,222,684 |
| **County Health:** | | |
| General Fund | 2,453,920 | |
| Genesee County Community Action Resource Department | | 7,751 |
| Non-major Special Revenue | 840,413 | |
| Internal Service | | 289,774 |
| Total County Health | 3,294,333 | 297,525 |
| **Genesee County Community Action Resource Department:** | | |
| General Fund | | 3,217,961 |
| County Health | 7,751 | |
| Non-major Special Revenue | 126,583 | |
| Internal Service | | 194,719 |
| Total Genesee County Community Action Resource Department | 134,334 | 3,412,680 |
| **Community Development:** | | |
| General Fund | | 132,296 |
| Non-major Special Revenue | | 329 |
| Internal Service | | |
| Total Community Development | | 132,625 |
| **Non-major Special Revenue Funds:** | | |
| General Fund | 7,042,704 | 3,203,774 |
| County Health | | 840,413 |
| Genesee County Community Action Resource Department | | 126,583 |
| Community Development | 132,296 | |
| Non-major Special Revenue | 103,310 | 103,310 |
| Enterprise | | 211,585 |
| Internal Service | | 509,087 |
| Total Non-major Special Revenue Funds | 7,278,310 | 4,994,752 |
| **Non-major Debt Service:** | | |
| General Fund | | 18,019 |
| Debt Service | 1,605 | 1,605 |
| Capital Project | 9,283 | |
| General Fund | 2,514 | 0 |
| Total Non-major Debt Service Funds | 13,402 | 19,624 |

59

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**

**EXHIBIT A-13**

| Interfund Receivable and Payables continued: | Interfund Receivable | Interfund Payable |
|---|---|---|
| Capital Projects: | | |
| General Fund | | 84,355 |
| Debt Service | | 9,283 |
| Internal Service | | 163,699 |
| Total Non-major Debt Service Funds | | 257,337 |
| Total Governmental Funds | 26,194,301 | 25,337,227 |
| | | |
| Enterprise: | | |
| Delinquent Tax: | | |
| General Fund | 1,003,685 | 7,830,989 |
| Non-major Special Revenue | 211,585 | |
| Internal Service | | 49,633 |
| Total Delinquent Tax | 1,215,270 | 7,880,622 |
| Total Business Type Activity | 1,215,270 | 7,880,622 |
| | | |
| Internal Service Funds: | | |
| General Fund | 5,722,375 | 1,118,824 |
| County Health | 289,774 | |
| Genesee Community Action Resource Department | 194,719 | |
| Community Development | 329 | |
| Non-major Special Revenue | 509,087 | 2,514 |
| Debt Service | 163,699 | |
| Capital Projects | 49,633 | |
| Enterprise | | |
| Internal Service | 144,262 | 144,262 |
| Total Internal Service Funds | 7,073,878 | 1,265,600 |
| Total Interfund Receivables/Payables | $34,483,449 | $34,483,449 |

Note —The inter fund receivables/payables exist due to the fact that the County uses a pooled cash management account for substantially all funds.

| Due to/from primary government and component units: | Interfund Receivable | Interfund Payable |
|---|---|---|
| Component unit Land Bank Authority | $ 26,359 | $ 466,518 |
| Primary Government Non-major Special Revenue Community Development | | 26,359 |
| Primary government Delinquent Taxes | 466,518 | 0 |
| Total Primary Government and Component Unit Interfund Receivables/Payables | $ 492,877 | $ 492,877 |

| Long-term Advances: | | |
|---|---|---|
| Primary Government - Hughes & Hatcher Debt Service Fund | $1,765,000 | $ |
| Component unit – Land Bank Authority | | 1,765,000 |
| Primary Government – General Fund | 1,804,809 | |
| Primary Government – Vehicles and Equipment | | 1,804,809 |
| Total Primary Government and Component Unit Long-term Advances | $3,569,809 | $3,569,809 |

| Interfund Transfers In and Out | Transfers In | Transfers Out |
|---|---|---|
| Major Funds: | | |
| General: | | |
| Mental Health | $ | $ 925,000 |
| County Health | | 2,658,158 |
| Enterprise | 4,734,725 | |
| Non-major Special Revenue | 1,956,569 | 13,623,786 |
| Debt | 18 | 2,751,216 |
| Capital | 32,260 | |
| Internal | | 142,064 |
| Total General Fund | 6,723,572 | 20,100,224 |
| | | |
| Mental Health: | | |
| General | 925,000 | |
| Total Mental Health | 925,000 | |
| | | |
| County Health: | | |
| General | 2,658,158 | |
| Non-major Special Revenue | 420,865 | |
| Total County Health | 3,079,023 | 0 |

| Interfund Transfers In and Out | Transfers In | Transfers Out |
|---|---|---|
| Genesee County Community Action Resource Department (GCCARD) | | |
| County Health | | |
| GCCARD | | |
| Non-major Special Revenue | 640,742 | |
| Debt | | 361,911 |
| Total GCCARD | 640,742 | 361,911 |
| | | |
| Non-major Special Revenue | 13,623,786 | 1,956,569 |
| County Health | | 420,865 |
| GCCARD | | 640,742 |
| Enterprise | | 545,000 |
| Debt | 197,412 | 17,460 |
| Capital | | |
| Non-major Special Revenue | 610,894 | 610,894 |
| Internal | | 454,257 |
| Total Non-major Governmental Funds | 14,432,092 | 4,645,787 |
| | | |
| Debt: | | |
| General | 2,751,216 | 18 |
| County Health | | |
| GCCARD | 361,911 | |
| Debt | | |
| Capital | | |
| Non-major Special Revenue | 17,460 | |
| Enterprise | 29,100 | |
| Total Debt Service Funds | 3,159,687 | 18 |
| | | |
| Capital Project: | | |
| General | | 32,260 |
| Non-major Special Revenue | | 197,412 |
| Debt | | 163,699 |
| Total Capital Projects Funds | | 393,371 |
| Total Governmental Funds | 28,960,116 | 25,501,311 |
| | | |
| Enterprise: | | |
| General | | 4,734,725 |
| Debt | | 29,100 |
| Non-major Special Revenue | 545,000 | |
| Enterprise | | |
| Internal | | 439 |
| Total Enterprise Funds | 545,000 | 4,764,264 |
| | | |
| Internal Services: | | |
| General | 142,064 | |
| Debt | 439 | |
| Non-major Special Revenue | 454,258 | |
| Capital Projects | 163,699 | |
| Total Internal Service Funds | 760,459 | |
| Total Transfers In/Out | $30,265,575 | $30,265,575 |

Transfers between funds were primarily for operating purposes. Other transfers were made to close funds.

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                                **EXHIBIT A-13**

**NOTE M - EXCESSES OF EXPENDITURES OVER APPROPRIATIONS**

Excesses of expenditures over appropriations in individual funds are presented below:

| Fund | Excess Expenditures |
|---|---|
| **General Fund** | |
| Board of Commissioners | $ 4,170 |
| Treasurer | 20,979 |
| Drain Commission | 2,777 |
| Equalization | 4,465 |
| Circuit Court | 62,639 |
| District Court | 87,939 |
| Probate Court | 11,245 |
| Prosecutor | 19,597 |
| Sheriff Administration | 22,903 |
| Sheriff Marine Division | 858 |
| Detective Division | 7,177 |
| Other: | |
| Other | 416,700 |
| Appropriations: | |
| Administration of Justice Funds | 11,473 |
| Law Enforcement Funds | 60,000 |
| Debt Service | 61,879 |
| **Community Action Resource Department** | 537,565 |
| **Other Non-major Governmental Funds** | |
| Accommodation Ordinance Tax | 290,905 |
| Community Enrichment and Development | 2,454,239 |
| Drug Forfeitures | 53,744 |
| Health Care Services | 1,781,687 |
| Law Enforcement | 1,067,263 |
| Parks and Recreation | 930,818 |

**NOTE N - COMPONENT UNIT DISCLOSURES**

**Deposits and investments:**

All of the County's component unit deposits and investments are governed by the following:

Michigan Compiled Laws Section 129.91 (Public Act 20 of 1943, as amended) authorizes local governmental units to make deposits and invest in the accounts of federally insured banks, credit unions, and savings and loan associations that have offices in Michigan.  The County's component units are allowed to invest in bonds, securities, and other direct obligations of the State of Michigan or any agency or instrumentality of the United States; repurchase agreements; bankers' acceptances of United States banks; commercial paper rated within the two highest classifications, which mature not more that 270 days after the date of purchase; obligations of the State of Michigan or its political subdivisions, which are rated as investment grade; and mutual funds composed of investment vehicles that are legal for direct investment by local units of government in Michigan.

The Road Commission has designated two banks for the deposit of its funds.  The investment policy adopted by the Board of each component unit is in accordance with Public Act 196 of 1997.  All component unit deposits and investment policies are in accordance with statutory authority.  The cash and investments of component units are subject to the same types of risks as detailed in Note C.  These risks are examined in more detail below:

Custodial credit risk of bank deposits - None of the component units have a deposit policy for custodial credit risk.  At year end, the Road Commission had $28,728,590 of bank deposits (checking and high balance savings accounts) that were uninsured and uncollateralized.  At year end, the Economic Development Corporation had $91,932 of bank deposits (checking and high balance savings accounts) that were uninsured and uncollateralized.  At year end, the Water and Waste Services Division had $1,092,031 of bank deposits (checking and high balance savings accounts) that were fully uninsured.  At year end, the Drain Commission had $393,059 of bank deposits (checking and high balance savings accounts) that were uninsured and uncollateralized.  At year end, the Land Bank Authority had $1,531,245 of bank deposits (checking and savings accounts) that were uninsured and uncollateralized.  At year end, the Brownfield Authority did not have any bank deposits (checking and savings accounts) that were uninsured and uncollateralized.  At year end, the Storm Water Management System had $223,477 of bank deposits (checking and savings accounts) that were uninsured and uncollateralized.  At year end, the Genesee Health System had $41,283,786 of bank deposits (checking and savings accounts) that were uninsured and uncollateralized.

Interest rate risk - Interest rate risk is the risk that the value of investments will decrease as a result of a rise in interest rates.  The Commission's investment policy does not restrict investment maturities, other than commercial paper which can only be purchased with a 270-day maturity.  At year end, the average maturities of investments are as follows:

| Road Commission: | | |
|---|---|---|
| Investment | Fair Value | Less than one year |
| Mutual funds | $19,430,602 | $19,430,602 |
| | | |
| Land Bank Authority: | | |
| Investment | Fair Value | Less than one year |
| Governmental security pooled fund | $1,531,245 | $1,531,245 |
| | | |
| Genesee Health System: | | |
| Investment | Fair Value | Less than one year |
| Governmental security pooled fund | $8,564,000 | $8,564,000 |
| Mutual funds | 7,751,285 | 7,751,285 |

Credit risk – State law limits investments in commercial paper to the top two ratings issued by nationally recognized statistical rating organizations.  The Commission has no investment policy that would further limit its investment choices.  As of year end, the credit quality ratings of debt securities (other than the U.S. government) are as follows:

| Road Commission: | | | Rating |
|---|---|---|---|
| Investment | Fair Value | Rating | Organization |
| MERS total Market Fund | $19,430,602 | N/A | N/A |
| | | | |
| Land Bank Authority: | | | Rating |
| Investment | Fair Value | Rating | Organization |
| Governmental security pool | $1,531,245 | N/A | N/A |
| | | | |
| Genesee Health System: | | | Rating |
| | Fair Value | Rating | Organization |
| Governmental security pooled fund | $8,564,000 | N/A | N/A |
| Mutual funds | 7,751,285 | N/A | N/A |

**ROAD COMMISSION:**
**Long-term Debt:**  The long-term debt for the Genesee County Road Commission is presented below:

| | Balance October 1, 2012 | Additions | Reductions | Balance September 30, 2013 |
|---|---|---|---|---|
| MTF notes | $ 8,710,000 | $ | $(1,500,000) | $ 7,210,000 |
| SIB Loan | 249,092 | | ( 249,092) | |
| Recovery Zone Bond | 4,880,000 | | ( 565,000) | 4,615,000 |
| Total notes and leases | 13,839,902 | | (2,314,092) | 11,525,000 |
| Compensated absences | 1,074,030 | | ( 5,491) | 1,068,539 |
| Total long-term debt | $14,913,122 | $ | $(2,319,583) | $12,593,539 |

The outstanding bonds and notes payable at September 30, 2013, and matured interest thereon, are payable to the State of Michigan from the proceeds of state-collected taxes returned to the Road Commission as Act 51 monies.  In the case of default, the state treasurer is authorized to withhold future disbursements of Act 51 monies due the Road Commission until the defaulted payments are recovered by the State.

For certain outstanding notes, special assessments have also been levied on specific properties abutting certain road improvements.  The collection of the assessments has been pledged as additional security for the payment of the bonds.  The detail of general obligation bonds and loans payable is shown below:

| Obligation Payables | Final Payment Due | Interest Rate or Range | Annual Principal Payment or Range | Outstanding Balance Sept. 30, 2013 | Due Within One Year |
|---|---|---|---|---|---|
| Michigan Transportation Fund notes: | | | | | |
| 2006A Issue | August 1, 2016 | 4.00% | $270,000-295,000 | $ 850,000 | $270,000 |
| 2007 Issue | September 30, 2017 | 3.70-4.00 | 465,000-525,000 | 1,970,000 | 465,000 |
| 2008 Issue | August 1, 2018 | 3.00-4.00 | 410,000-515,000 | 2,305,000 | 410,000 |
| 2009 Issue | August 1, 2019 | 2.00-3.30 | 320,000-380,000 | 2,085,000 | 320,000 |
| Total Notes | | | | 7,210,000 | 1,465,000 |
| Recovery Zone Bond 2010 Issue | August 1, 2020 | 4.34 | 575,000-665,000 | 4,315,000 | 575,000 |
| Compensated absences | | | | 1,068,539 | 140,798 |
| | | | | $12,593,539 | $2,180,798 |

B-54

## NOTES TO FINANCIAL STATEMENTS

**GENESEE COUNTY**                                                                 **EXHIBIT A-13**

Annual requirements to pay principal and interest on the outstanding obligations at September 30, 2013, are as follows:

|  | Long-term debt |
|---|---|
| Year Ended 9-30-2014 ............................................. | $2,487,493 |
| 9-30-2015 ................................................................ | 2,486,748 |
| 9-30-2016 ................................................................ | 2,486,197 |
| 9-30-2017 ................................................................ | 2,181,607 |
| 09-30-2018 .............................................................. | 1,639,016 |
| 09-30-2019 – 09-30-2022 ......................................... | 1,788,255 |
| Amount representing interest ................................... | (1,544,316) |
| Subtotal .................................................................. | $11,525,000 |

Act 143, Public Acts of State 1943, provides that total bonds and notes outstanding under this Act cannot exceed 40% of the sum of the revenues derived from state collected taxes returned to the county for county road purposes for the last preceding five calendar years and not specifically allocated for other purposes. As of September 30, 2012, the Road Commission is within the statutory limit of Act 143.

**Future Revenues Pledged for Debt Payment:** The Road Commission Board has irrevocably appropriated and pledged the money received and to be received by the County from the Michigan Transportation Fund (the "Transportation Fund") for highway and road purposes pursuant to Act 51, Public Acts of Michigan, 1951, as amended ("Act 51") to the extent necessary to pay the above principal of and interest on the Michigan Transportation Notes. Proceeds from the bonds provided financing for the construction of the road projects. During the current year, Act 51 revenues were $20,688,883 compared to the annual debt requirements of $2,881,580.

**Property and Equipment:** The following table summarizes the changes in the components of the Road Commission's capital assets:

|  | Balance Oct. 1, 2012 | Additions | Deletions | Balance Sept. 30, 2013 |
|---|---|---|---|---|
| Capital assets not being depreciated: |  |  |  |  |
| Land and improvements ............... | $ 478,816 | $ | $ | $ 478,816 |
| Construction in progress .............. | 152,523 | 479,185 | 152,523 | 479,185 |
| Depletable assets ........................ | 1,210 |  |  | 1,210 |
| Subtotal ...................................... | 632,549 | 479,185 | 152,523 | 959,211 |
| Capital assets being depreciated: |  |  |  |  |
| Land improvements ...................... | 2,150,742 | 105,340 |  | 2,256,082 |
| Buildings and improvements.......... | 9,633,661 | 118,443 |  | 9,752,104 |
| Equipment: |  |  |  |  |
| Road............................................ | 26,327,112 | 1,900,296 | 1,644,128 | 26,583,280 |
| Shop............................................ | 497,410 | 77,603 |  | 575,013 |
| Engineering ................................. | 92,577 | 34,077 |  | 126,654 |
| Yard and Storage ........................ | 557,311 | 47,727 |  | 605,038 |
| Office .......................................... | 1,322,627 | 165,904 | 48,602 | 1,439,929 |
| Subtotal ...................................... | 40,581,440 | 2,449,390 | 1,692,730 | 41,338,100 |
| Capital assets not being depreciated continued: |  |  |  |  |
| Infrastructure-Roads .................... | 352,102,236 | 16,215,462 |  | 368,317,698 |
| Infrastructure-Bridges.................. | 29,504,795 | 762,207 |  | 30,267,002 |
| Subtotal ...................................... | 422,188,471 | 19,427,059 | 1,692,730 | 439,922,800 |
| Less accumulated depreciation for: |  |  |  |  |
| Land improvements ...................... | (544,911) | (106,703) |  | (651,614) |
| Buildings and improvements.......... | (6,346,475) | (312,254) |  | (6,658,729) |
| Equipment: |  |  |  |  |
| Road............................................ | (20,566,710) | (2,154,796) | (1,448,470) | (21,273,036) |
| Shop............................................ | (363,780) | (20,398) |  | (384,178) |
| Engineering ................................. | (81,242) | (5,027) |  | (86,269) |
| Yard and storage......................... | (501,266) | (6,481) |  | (507,747) |
| Office .......................................... | (894,645) | (129,762) | (48,602) | (975,805) |
| Subtotal ...................................... | (29,299,029) | (2,735,421) | (1,497,072) | (30,537,378) |
| Infrastructure-Bridges.................. | (7,639,854) | (753,228) |  | (8,393,082) |
| Infrastructure-Roads .................... | (208,646,967) | (12,322,102) |  | (220,969,069) |
| Subtotal ...................................... | (245,585,850) | (15,810,751) | (1,497,072) | (259,899,529) |
| Total net capital assets................ | $177,235,170 | $ 4,095,493 | $ 348,181 | $180,982,482 |

### POST-EMPLOYMENT BENEFITS—

### PLAN DESCRIPTION

The Road Commission provides retiree health-care benefits to eligible employees and their spouses. This is a single employer defined benefit plan administered by the Road Commission. The benefits are provided under collective bargaining agreements.

### FUND POLICY

The collective bargaining agreements require the Road Commission to pay the insurance premium/claim costs of the retiree and spouse until death. The Commission obtains health care coverage for retirees through private insurers. Upon eligibility for Medicare, the Road Commission will pay the difference between the plan costs and the amount covered by Medicare. The Road Commission has no obligation to make contributions in advance of when the insurance premiums or claims are due for payment (in other words, this may be financed on a "pay-as-you-go" basis).

### FUNDING PROGRESS

For the year ended September 30, 2012, the Road Commission has estimated the cost of providing retiree health-care benefits through an actuarial valuation as of September 30, 2012. The valuation computes an annual required contribution, which represents a level of funding that, if paid on an ongoing basis, is projected to cover normal cost each year and amortize any unfunded actuarial liabilities over a period not to exceed 30 years. This valuation's computed contribution and actual funding are summarized as follows:

|  | Fiscal Year Ended September 30 | | |
|---|---|---|---|
|  | 2011 | 2012 | 2013 |
| Annual required contribution (recommended) | $4,494,838 | $4,536,548 | $4,501,630 |
| Interest on the prior year's net OPEB obligation | 131,733 | 102,137 | 88,459 |
| Less adjustment to the annual required contribution | (218,502) | (165,462) | (141,299) |
| Annual OPEB cost | $4,408,069 | $4,473,223 | $4,448,790 |
| Amount contributed: |  |  |  |
| Payments of current premiums | (2,611,228) | (2,708,943) | (2,684,373) |
| Advance funding | (2,191,456) | (2,000,000) | (3,000,000) |
| Decrease in net OPEB obligation | (394,615) | (235,720) | (1,235,583) |
| OPEB obligation – beginning of year | 1,756,446 | 1,361,831 | 1,179,459 |
| OPEB obligation (asset) – end of year | $ 1,361,831 | $1,126,111 | $ (56,124) |

|  | Fiscal Year Ended September 30 | | |
|---|---|---|---|
|  | 2011 | 2012 | 2013 |
| Annual OPEB Costs | $4,408,069 | $4,473,223 | $4,448,790 |
| Percentage contributed | 107% | 104% | 128% |
| Net OPEB obligation | $1,361,831 | $1,126,111 | $ (56,124) |

The funding progress of the plan as of the most recent valuation date is as follows:

|  | Fiscal Year Ended September 30 | | |
|---|---|---|---|
|  | 2011 | 2012 | 2013 |
| Unfunded AAL | $44,716,286 | $42,584,913 | $56,659,252 |
| Actuarial value of plan assets | 7,998,488 | 14,074,339 | 14,074,339 |
| Actuarial accrued liability | $52,714,774 | 56,659,252 | 42,584,913 |
| Funded | 15% | 25% | 25% |
| Annual covered payroll – December 31, | $9,023,093 | $8,713,876 | $8,713,876 |
| Ratio of UAAL to covered payroll | 496% | 489% | 489% |

### ACTUARIAL METHODS AND ASSUMPTIONS

Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment, mortality, and the healthcare cost trend. Amounts determined regarding the funded status of the plan and the annual required contributions of the employer are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future. The schedule of funding progress, presented as required supplementary information following the notes to the financial statements, presents multiyear trend information about whether the actuarial value of plan assets is increasing or decreasing over time relative to the actuarial accrued liabilities for benefits.

Projections of benefits for financial reporting purposes are based on the substantive plan (the plan as understood by the employer and the plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and plan members to that point. The actuarial methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspective of the calculations.

In the September 30, 2012, actuarial valuation, the projected unit credit actuarial cost method was used. The actuarial assumptions included a 7.5 percent investment rate of return (net of administrative expenses), which is a blended rate of the expected long-term investment returns on plan assets and on the employer's own investments calculated based on the funded level of the plan at the valuation date, and an annual healthcare cost trend rate of 8.5 percent initially, reduced by decrements to an ultimate rate of 4.5 percent after four years. Both rates included a 4.0 percent inflation assumption. At the point in time that the Road Commission begins funding the plan, the actuarial value of assets will be determined using techniques that spread the effects of short-term volatility in the market value of investments over a multiple year period. The UAAL is being amortized as a level percentage of projected payroll on a closed 30-year basis. The remaining amortization period at September 30, 2012 was 26 years.

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                      **EXHIBIT A-13**

**WATER AND WASTE SERVICES:**

**Long-term Debt:** The summary of long-term debt transactions for the Water and Waste Services for the year ended December 31, 2012 is presented below:

| | Balance Jan. 1, 2012 | Additions (Reductions) | Balance Dec. 31, 2012 | Due In One Year |
|---|---|---|---|---|
| 1.625% to 6.0% Interceptor and treatment facilities | $ 104,546,556 | $ 3,388,570 (6,555,000) | $101,380,126 | $6,700,000 |
| 2.5% to 7.375% District No. 3 | 32,688,516 | 29,999 (2,719,250) | 29,999,265 | 2,835,000 |
| 2.50% to 5.00% Water supply system | 40,245,000 | (1,260,000) | 38,985,000 | 1,310,000 |
| Subtotal | 177,480,072 | (7,115,681) | 170,364,391 | 10,845,000 |
| Unamortized note premium | 408,948 | ( 90,443) | 318,505 | 22,584 |
| | $177,889,020 | $ 7,206,124 | $170,682,896 | $10,867,584 |

The annual requirements to pay principal and interest on the outstanding obligations for Water and Waste Services at December 31, 2012 are as follows:

| | Principal | Interest | Total |
|---|---|---|---|
| 2013 | $ 10,845,000 | $5,654,333 | $16,499,333 |
| 2014 | 11,180,000 | 5,317,264 | 16,497,264 |
| 2015 | 11,540,000 | 4,966,431 | 16,506,431 |
| 2016 | 11,645,000 | 4,604,434 | 16,249,434 |
| 2017 | 10,830,000 | 4,250,159 | 15,080,159 |
| 2018-2022 | 48,350,000 | 16,663,484 | 65,013,484 |
| 2023-2027 | 46,570,000 | 8,859,989 | 55,429,989 |
| 2028-2032 | 17,869,391 | 2,250,274 | 20,119,665 |
| 2033 | 1,535,000 | 75,406 | 1,610,406 |
| Total | $170,364,391 | $52,641,774 | $223,006,165 |

**Future Revenues Pledged for Debt Payment:** The Water and Waste Services Division has pledged substantially all revenue of the Water and Sewer Fund, net of operating expenses, to repay the above Genesee County Drain Commissioner water and sewer revenue bonds. Proceeds from the bonds provided financing for the construction of the water and waste systems described above. The bonds are payable solely from the net revenues of the water and sewer system. The remaining principal and interest to be paid on the bonds total $115,370,449. For the year ended December 31, 2012, net revenues of the system were $12,895,721 compared to the annual debt requirements of $7,623,037.

In the next 6 to 12 months the County may issue an estimated $18,000,000 to $31,000,000 of water revenue refunding bonds with a limited tax general obligation pledge to refund certain outstanding water revenue bond issues for debt service savings.

Karegnondi Water Authority – See Note Q

**Capital Assets -** The summary of capital assets for Water and Waste Services at December 31, 2012 is displayed on the following page:

| | Balance Jan. 1, 2012 | Additions | Reclassifications | Balance Dec. 31, 2012 |
|---|---|---|---|---|
| Proprietary fund capital assets | | | | |
| Enterprise Funds: | | | | |
| Capital assets not being depreciated: | | | | |
| Land | $ 871,021 | $ | $ | $ 871,021 |
| Construction in progress | 86,046,793 | 5,697,277 | (36,835,568) | 54,908,502 |
| Subtotal | 86,917,814 | 5,697,277 | (36,835,568) | 55,779,523 |
| Capital assets being depreciated: | | | | |
| Distribution & collections systems | 278,985,859 | 1,895,257 | 29,806,472 | 310,687,588 |
| Vehicles | 382,261 | | | 382,261 |
| Buildings and equipment | 5,419,064 | 435,029 | 7,045,346 | 12,899,439 |
| Subtotal | 284,787,187 | 8,027,563 | 36,851,818 | 323,969,288 |
| Proprietary fund capital assets | | | | |
| Less accumulated depreciation for: | | | | |
| Distribution & collections systems | (48,921,258) | (6,327,670) | | (55,248,928) |
| Vehicles | (254,852) | (114,514) | | (369,366) |
| Buildings and equipment | (3,423,902) | (406,918) | | (3,830,820) |
| Subtotal | (52,600,012) | (6,849,102) | | (59,449,114) |
| Net capital assets being depreciated | 232,187,172 | (4,518,816) | 36,851,818 | 264,520,174 |
| Total capital assets – Net of depreciation | 319,104,986 | 1,178,461 | 16,250 | 320,299,697 |

| | Balance Jan. 1, 2012 | Additions | Reclassifications | Balance Dec. 31, 2012 |
|---|---|---|---|---|
| Internal Service Funds: | | | | |
| Capital assets not being depreciated- | | | | |
| Construction in progress | 16,250 | | (16,250) | |
| Capital assets being depreciated – | | | | |
| Buildings and equipment | 8,628,852 | (122,987) | | 8,505,865 |
| Less accumulated depreciation – | | | | |
| Buildings and equipment | (5,797,381) | (108,558) | | (5,905,939) |
| Net capital assets being depreciated | 2,831,471 | (231,545) | (16,250) | 2,599,926 |
| Total proprietary fund capital assets | $321,952,707 | $ 946,916 | $ 0 | $322,899,623 |

**POST-EMPLOYMENT BENEFITS—**

**PLAN DESCRIPTION**

The Water and Waste Services Division provides retiree healthcare, dental, life, and vision benefits to eligible employees and their spouses through the Municipal Employees' Retirement System. This is an agent multiple employer defined benefit plan administered by the Division. The benefits are provided under collective bargaining agreements.

**FUND POLICY**

The collective bargaining agreements do not require employee contributions. The Division has no obligation to make contributions in advance of when the insurance premiums are due for payment (in other words, this may be financed on a "pay-as-you-go" basis). However, as shown below, the Division has made contributions to advance-fund these benefits, as determined by the Division.

**FUNDING PROGRESS**

For the year ended December 31, 2012, the Division has estimated the cost of providing retiree healthcare benefits through an actuarial valuation as of December 31, 2010. The valuation computes an annual required contribution, which represents a level of funding that, if paid on an ongoing basis, is projected to cover normal cost each year and amortize any unfunded actuarial liabilities over a period not to exceed 30 years. This valuation's computed contribution and actual funding are summarized as follows:

| | Fiscal Year Ended December 31 | | |
|---|---|---|---|
| | 2010 | 2011 | 2012 |
| Annual required contribution (recommended) | $2,587,823 | $3,933,831 | $3,818,480 |
| Interest on the prior year's net OPEB obligation | 121,341 | 127,528 | 230,108 |
| Less adjustment to the annual required contribution | (67,411) | (78,511) | (101,338) |
| Annual OPEB cost | 2,641,753 | 3,982,848 | 3,947,250 |

| | Fiscal Year Ended December 31 | | |
|---|---|---|---|
| | 2010 | 2011 | 2012 |
| Amount contributed: | | | |
| Payments of current premiums | (1,395,270) | (1,337,004) | (1,523,879) |
| Advance funding | (80,595) | (81,360) | (2,500,000) |
| (Increase) Decrease in net OPEB obligation | (1,165,888) | (2,564,484) | 76,629 |
| OPEB obligation – Beginning of year | (2,022,323) | (3,188,211) | (5,752,695) |
| OPEB obligation – end of year | $(3,188,211) | $(5,752,695) | $(5,676,066) |

| | Fiscal Year Ended December 31 | | |
|---|---|---|---|
| | 2010 | 2011 | 2012 |
| Annual OPEB Costs | $2,641,753 | $3,982,848 | $3,947,250 |
| Percentage contributed | 55.87% | 35.61% | 101.94% |
| Net OPEB obligation | $3,188,211 | $5,752,695 | $5,676,066 |

The funding progress of the plan as of the most recent valuation date is as follows:

| | Fiscal Year Ended December 31 | | |
|---|---|---|---|
| | 2010 | 2011 | 2012 |
| Unfunded AAL | $35,394,879 | $51,474,408 | $35,486,607 |
| Actuarial value of assets | 0 | 0 | 2,333,369 |
| Actuarial accrued liability | 25,394,879 | 51,474,408 | 37,819,976 |
| Funded | 0% | 0% | 6.17% |
| Annual covered payroll – December 31 | $8,420,060 | $7,610,890 | $7,312,770 |
| Ratio of UAAL to covered payroll | 420.36% | 676.33% | 485.27% |

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                                                                    **EXHIBIT A-13**

**ACTUARIAL METHOD AND ASSUMPTIONS**

Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment, mortality, and the healthcare cost trend. Amounts determined regarding the funded status of the plan and the annual required contributions of the employer are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future.

Projections of benefits for financial reporting purposes are based on the substantive plan (the plan as understood by the employer and the plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and plan members to that point. The actuarial methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspective of the calculations.

In the December 31, 2010 actuarial valuation, the individual entry age actuarial cost method was used. The actuarial assumptions included an 4.0 percent investment rate of return (net of administrative expenses) and an annual healthcare cost trend rate of 5.0 percent. The UAAL is being amortized as a level percentage of projected payroll over 30 years.

In 2012, the Division approved a prefunding plan and per the plan $2,500,000 was remitted to the trust in 2012 and $1,200,000 per year will be remitted starting in 2013.

**DRAIN COMMISSION:**

The summary of long-term debt transactions for the Drain funds for the year ended September 30, 2013, is presented below:

|  | Balance Oct. 1, 2012 | Additions (Reductions) | Balance Sept. 30, 2013 | Due in One Year |
|---|---|---|---|---|
| Citizens Bank | $ 200,000 | $ (50,000) | $ 150,000 | $ 50,000 |
| 3.69% to 6.85% Genesee County Special Assessment debt with governmental commitment | 292,926 | 335,097 (147,586) | 480,437 | 146,546 |
| 4.0 to 4.25% Genesee County Drainage District #408 Series 2006 Bonds | 500,000 | (125,000) | 375,000 | 125,000 |
| 2.0% to 3.15% Genesee County Drainage District Bonds #0017 Series 2011 Bonds | 2,395,000 | (235,000) | 2,160,000 | 235,000 |
|  | $3,387,926 | $ (222,489) | $3,165,437 | $ 556,546 |

The annual requirements to pay principal and interest on the outstanding obligations for the Drain funds at September 30, 2013, are as follows:

| 2013/2014 | $641,679 |
|---|---|
| 2014/2015 | 593,601 |
| 2015/2016 | 557,656 |
| 2016/2017 | 347,453 |
| 2017/2018 | 340,395 |
| 2019-2022 | 1,024,411 |
|  | 3,505,195 |
| Amount representing interest | (339,758) |
|  | $3,165,437 |

The following is a summary of capital assets for the Drain fund at September 30, 2013:

|  | Balance Oct. 1, 2012 | Additions | Deletions | Balance Sept. 30, 2013 |
|---|---|---|---|---|
| Capital assets being depreciated: |  |  |  |  |
| Equipment | $1,540,647 | $ 55,791 | $ | $ 1,596,438 |
| Infrastructure | 24,848,689 | 58,327 |  | 24,907,016 |
| Drain System Retrospective | 29,376,026 |  |  | 29,376,026 |
| Capital assets not being depreciated: |  |  |  |  |
| Construction in Progress | 750,989 | 826,564 | (42,273) | 1,535,280 |
| Subtotal | 56,516,351 | 940,682 | (42,271) | 57,414,760 |
| Less Allowance for Depreciation .. |  |  |  |  |
| Equipment | (1,440,040) | (102,501) |  | (1,542,541) |
| Infrastructure | (10,781,114) | (2,180,308) |  | (12,961,422) |
| Drain System Retrospective | (20,131,888) |  |  | (20,131,888) |
| Subtotal | (32,353,402) | (2,282,809) |  | (34,635,851) |
| Net capital assets being depreciated | 23,411,960 | (2,168,391) |  | 21,243,629 |
| Total Capital Assets |  |  |  |  |
| Net of depreciation | $24,163,309 | $ (1,342,127) | $ (42,273) | $ 22,778,909 |

During 2006, the Drain Commission complied with the provisions of GASB Statement 34 relative to the retroactive adjustment to capitalize infrastructure back to 1980.

68

**LAND BANK AUTHORITY:**

The summary of long-term debt transactions for the Genesee County Land Bank Authority for the year ended September 30, 2013, is presented below:

|  | Balance Oct.1, 2012 | Additions | (Reductions) | Balance Sept. 30, 2013 | Due in One Year |
|---|---|---|---|---|---|
| Promissory Note – Genesee County | $ 510,742 | $ | $ (102,149) | $ 408,593 | $ 102,149 |
| Berridge Place Project | 540,000 |  | (260,000) | 280,000 | 280,000 |
| Land Bank Center | 1,810,000 |  | (45,000) | 1,765,000 | 45,000 |
| GCLB-Berridge Planc, LLC LISC note payable | 1,360,475 |  | (138,709) | 1,221,766 | 16,147 |
| Line of credit | 200,000 |  | (200,000) | 0 |  |
| Total note leases | 4,421,217 |  | (745,858) | 3,675,359 | 443,296 |
| Compensated absences | 36,338 |  | (5,134) | 31,204 |  |
| Total long-term | $4,457,555 | $ | $ (750,992) | $3,706,563 | $ 443,296 |
|  | $3,675,359 |  |  |  |  |

The annual requirements to pay principal and interest on the outstanding obligations at September 30, 2013, are as follows:

| 2014 | $ 662,959 |
|---|---|
| 2015 | 1,549,682 |
| 2016 | 249,022 |
| 2017 | 249,950 |
| 2018 | 143,598 |
| 2019-2023 | 723,805 |
| 2024-2028 | 737,830 |
| 2029-2033 | 734,055 |
| 2034 | 147,977 |
|  | 5,198,878 |
| Amount representing interest | (1,523,519) |
|  | $3,675,359 |

The following is a summary of capital assets for the Genesee County Land Bank Authority at September 30, 2013:

|  | Balance Oct.1, 2012 | Additions | Disposals | Balance Sept. 30, 2013 |
|---|---|---|---|---|
| Capital assets not being depreciated: |  |  |  |  |
| Land | $ 84,308 | $ | $ | $ 84,308 |
| Construction in progress-Bldgs | |  |  |  |
| Subtotal | 84,308 |  |  | 84,308 |
| Capital assets being depreciated: |  |  |  |  |
| Buildings and improvements | 8,946,972 | 4,792 | (149,835) | 8,801,929 |
| Machinery and equipment | 166,024 |  |  | 166,024 |
| Office equipment | 197,239 |  |  | 197,239 |
| Vehicles | 150,524 | 10,523 |  | 161,047 |
| Subtotal | 9,460,759 | 15,315 | (149,835) | 9,326,239 |
| Less Accumulated depreciation: |  |  |  |  |
| Buildings and improvements | (1,340,153) | (312,199) | 83,251 | (1,569,101) |
| Maintenance and equipment | (96,812) | (72,938) |  | (169,750) |
| Office equipment | (95,632) | (4,160) |  | (99,792) |
| Vehicles | (103,346) | (36,905) |  | (140,251) |
| Subtotal | (1,635,943) | (426,202) | 83,251 | (1,978,894) |
| Net capital assets being depreciated | 7,824,816 | (410,887) | 66,584 | 7,437,345 |
| Total capital assets – Net of depreciation | $ 7,909,124 | $ (410,887) | $ (66,584) | $ 7,431,653 |

The Authority's 1 percent ownership interest in 607 East Second Avenue, LLC (LLC) is accounted for in the statement of net assets as an equity investment. 607 East Second Avenue, LLC was created to account for the redevelopment of the old Durant Hotel. The total projected cost of the development was approximately $35,590,000, with a total contribution of $18,380,819 from the Authority. The Authority's capital contributions sources were from grants, Brownfield TIF bonds, and sale of state historic and state Brownfield tax credits. The Authority has recorded a loss on impairment of the fair value of its investment below cost in the amount of $16,441,819 to bring the investment balance to $1,939,000.

Subsequent to September 30, 2013, the Authority entered into a $3,000,000 line of credit with a bank and the County has pledged its limited tax full faith and credit on the line.

69

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                                 **EXHIBIT A-13**

**BROWNFIELD AUTHORITY:**

The summary of long-term debt transactions for the Genesee County Brownfield Authority for the year ended September 30, 2013 is presented below:

| | Balance Oct. 1, 2012 | Additions | (Reductions) | Balance Sept. 30, 2013 | Due In One Year |
|---|---|---|---|---|---|
| Unamortized note premium | $   406,984 | | ($  17,695) | $    389,289 | $17,695 |
| 3.0% to 5.0% Genesee County Brownfield Authority . Series 2005 Tax Increment Bonds, Subject to redemption prior to maturity | 12,610,000 | | (245,000) | 12,265,000 | 255,000 |
| Total | $ 13,016,984 | $ | ($ 262,695) | $12,754,289 | $272,695 |

The annual requirements to pay principal and interest on the outstanding obligations at September 30, 2013, are as follows:

| | |
|---|---|
| 2014 | $   843,500 |
| 2015 | 852,900 |
| 2016 | 861,500 |
| 2017 | 874,200 |
| 2018 | 880,575 |
| 2019-2023 | 4,523,500 |
| 2024-2028 | 4,747,125 |
| 2029-2033 | 4,980,500 |
| 2034-2035 | 2,059,500 |
| | 20,623,300 |
| Amount representing interest | (8,258,300) |
| | $12,365,000 |

**GENESEE HEALTH SYSTEM:**

**Property and Equipment:**  The following table summarizes the changes in the components of the Genesee Health Systems capital assets:

| | Transfer of Beginning Balance | Additions | Deletions | Ending Balance |
|---|---|---|---|---|
| Capital assets not being depreciated: | | | | |
| Construction in progress | $    34,888 | $  946,968 | $ | $   981,856 |
| Capital assets being depreciated: | | | | |
| Building improvements | 2,225,580 | 677,627 | | 2,903,207 |
| Vehicles and equipment | 2,046,565 | 147,830 | (24,680) | 2,169,715 |
| Subtotal | 4,226,005 | 825,457 | (24,680) | 5,072,922 |
| Less accumulated depreciation for: | | | | |
| Building improvements | (474,137) | (137,416) | | (611,553) |
| Vehicles and equipment | (1,413,050) | (94,315) | 24,680 | (1,482,685) |
| Subtotal | (1,817,430) | (231,731) | 24,680 | (2,094,238) |
| Net capital assets being depreciated | 2,384,958 | 593,726 | | 2,978,684 |
| Total capital assets, net of depreciation | $ 2,419,846 | $ 1,540,694 | $ | $ 3,960,540 |

During the nine month period ended September 30, 2013, all the assets of Genesee County Community Mental Health Agency were transferred to the authority.  This transfer is reflected above as a transfer of beginning balances.

**POST-EMPLOYMENT BENEFITS-**

**PLAN DESCRIPTION**

The Genesee Health System retiree healthcare plan (the "Plan") is a single-employer defined benefit healthcare plan provides health insurance benefits, including medical, prescriptions, dental, and optical coverage to certain retirees and their beneficiaries, which are advance-funded on a discretionary basis.  It is a single-employer defined benefit healthcare plan administered by the Authority, which was closed to new hires as of May 2008. Plan assets are held in trust by a third party administrator.

**FUND POLICY**

The contribution requirements of Plan members and the Authority are established and may be amended by the Authority Board of Directors. The required contribution is based on actuarially determined financed rates, with an additional amount to prefund benefits as determined annually by the Agency.  For the nine month period ended September 30, the Authority contributed $7,729,092 to the Plan, while plan members receiving benefits contributed $0.

**FUNDING PROGRESS**

The Authority's annual other postemployment benefit (OPEB) cost (expense) is calculated based on the annual required contribution of the employer (ARC). The ARC was calculated using the projected unit credit actuarial cost method.  The ARC represents a level of finding that, if paid on an ongoing basis, is projected to cover normal cost each year and amortize any unfunded actuarial liabilities (or funding excess) over a period not to exceed thirty years.

The following table shows the components of the Authority's annual OPEB cost for the nine month period, the amount actually contributed to the Plan, and changes in the Authority's net OPEB asset:

| | |
|---|---|
| Annual required contribution | $ 7,437,503 |
| Interest on net OPEB asset | (96,248) |
| Adjustment to annual required contribution | 247,286 |
| Net OPEB cost (expense) | $ 7,588,541 |
| Amount contributed: | |
| Payment of current premiums | 7,729,092 |
| Change in net OPEB obligation | 140,551 |
| Net OPEB asset, beginning of the year | 461,523 |
| Net OPEB asset, end of the year | $   602,074 |

| | Fiscal Year Ended September 30 | | |
|---|---|---|---|
| | 2011 | 2012* | 2013*** |
| Annual OPEB costs | $5,308,643 | $8,772,109 | $1,740,748 | $7,377,734 |
| Percentage contributed | 151.5% | 73.4% | 75.6% | 104.8% |
| Net OPEB asset | $1,179,411 | $1,604,133 | $1,179,411 | $ 602,074 |

*During the year ended September 30, 2012, the Authority switched from a 30 year amortization period to a 10 year amortization period.
**This represents the three month period ended December 31, 2012.
*** This represents the nine month period ended September 30, 2013.

The funding progress of the plan as of the most recent valuation date is as follows:

| | |
|---|---|
| Unfunded AAL | $56,477,931 |
| Actuarial value of plan assets | 14,599,442 |
| Actuarial accrued liability | 41,878,489 |
| Funded | 25.8% |
| Annual covered payroll | $17,335,736 |
| Ratio of UAAL to covered payroll | 242% |

**ACTUARIAL METHODS AND ASSUMPTIONS**

Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future.  Examples include assumptions about future employment, mortality, and the healthcare cost trend.  Actuarially determined amounts are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future.

Projections of benefits for financial reporting purposes are based on the substantive plan (the Plan as understood by the employer and Plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and Plan members to the point.  The actuarial methods and assumptions used to include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspective of the calculations.

In the December 31, 2011 actuarial valuation, the projected unit credit actuarial cost method was used.  The actuarial assumptions includes: (a) a rate of return on investments of 8.0%: (b) projected salary increases of 5.0% attributable to inflation: (c) additional projected salary increases ranging from 0.0% to 4.03%, depending on age, attributable to seniority/merit: and (d) projected healthcare benefit increases of 4.5% to 9.0%.  The actuarial value of assets was determined based on market value.  The unfunded actuarial accrued liability is being amortized on a level dollar basis over 25 years on a closed basis.  The remaining amortization period at December 31, 2011, the date of the latest actuarial valuation, was 10 years.

## NOTES TO FINANCIAL STATEMENTS

**GENESEE COUNTY**                                                    **EXHIBIT A-13**

### NOTE O - RESTATEMENT OF NET POSITION

**Restatement:**  Net position and fund balances at September 30, 2012, were restated to correct beginning balances.  Net position and fund balances were restated for the following reasons:

1) To properly account for the year end change from December to September.
2) To properly account for refund of payments for special assessments, overpayment received from the State, and an adjustment to the net OPEB obligation to reflect the balance in the actuarial valuation.

| Component units: | As Previously Reported | Adjustments | Restated Amounts |
|---|---|---|---|
| Net Position | | | |
| Economic Development | $    813,204 | $    (41,576) [1] | $    771,628 |
| Road Commission | $ 204,416,884 | $ (108,352) [2] | $ 204,308,532 |

### NOTE P - GASB UPCOMING ACCOUNTING PRONOUNCEMENTS DISCLOSURE

In March 2012, the GASB issued GASB Statement No. 65, *Items Previously Reported as Assets and Liabilities*, which is required to be implemented for financial statements for periods beginning after December 15, 2012.  Statement No. 65 establishes accounting and financial reporting standards that reclassify, as deferred outflows and inflows of resources, certain items that were previously reported as assets and liabilities.  This statement also provides other financial reporting guidance related to the impact of the financial statement elements deferred outflows of resources and deferred inflows of resources.  Statement No. 65 will be implemented for the County's 2014 fiscal year.

In June 2012, GASB Statement No. 67, *Financial Reporting for Pension Plans*, was issued by the Governmental Accounting Standards Board.  This new standard, which replaces the requirements of GASB Statements No. 25, *Financial Reporting for Defined Benefit Pension Plans and Note Disclosures for Defined Contribution Plans* and No. 50, *Pension Disclosures*, establishes standards for financial reporting that outline the basic framework for separately-issued pension plan financial reports and specifies the required approach to measuring the liability of employers and certain non-employer contributing entities, about which information is required to be disclosed.  GASB Statement No. 67 is required to be adopted for years beginning after June 15, 2013.  For the County, this standard will be adopted for the year ended September 30, 2014.

In June 2012, the GASB issued GASB Statement No. 68, *Accounting and Financial Reporting for Pensions*.  Statement No. 68 requires governments providing defined benefit pensions to recognize their unfunded pension benefit obligation as a liability for the first time, and to more comprehensively and completely measure the annual costs of pension benefits.  This net pension liability that will be recorded on the government-wide, proprietary and discretely presented component units statements will be computed differently than the current unfunded actuarial accrued liability, using specific parameters set forth by the GASB.  The statement also enhances accountability and transparency through revised note disclosures and required supplementary information (RSI).  The County is currently evaluating the impact this standard will have on the financial statements when adopted.  The provisions of the statement are effective for financial statements for the year ended September 30, 2015.

### NOTE Q - KAREGNONDI WATER AUTHORITY

Effective August 1, 2013, the County entered into an agreement with the Karegnondi Water Authority (KWA) and the City of Flint to issue debt to acquire, construct, and operate a water supply system (System).   The debt will not exceed $300,000,000.  The County's share of the debt is 65.8 percent or an amount not to exceed $197,400,000.  As of the date of the audit report, the debt has not been issued.

The intake facility and the site for the System were financed through the issuance of bonds by the County in the principal amount of $35,000,000 in October, 2013, with the understanding that the County would make the intake facility available to KWA for use by KWA as part of the System.  The County has pledged its limited tax full faith and credit as additional security for the bonds.  The intake facility is currently under construction and is expected to be completed in October, 2014.

In order to provide finished water to the County's customers, the County will be required to build a new water treatment plant, reservoir, pump station and approximately 5 miles of water main.  To finance the construction cost, the County anticipates issuance of approximately $60,000,000 of water revenue bonds with a limited tax general obligation pledge of the County.  The new water treatment plant, reservoir, pump station and water main are expected to be constructed and fully operational on or before May 1, 2016, the date on which the System is expected to be fully operational.

Effective October 1, 2013 the County entered into a contract with KWA to supply up to 42 million gallons per day of untreated water.  The charges to be paid by the County consist of an annual fixed or capital fee and an annual commodity or operations and maintenance fee.  The County expects to pay such charges from the revenues of its water supply system as an operation and maintenance expense in the same manner that it presently pays for water furnished by the Detroit Water and Sewerage Department (DWSD).

The County is also a voting member of KWA.  The County joined KWA in 2013 based on the expectation that the purchase of water for the County will be more economical in the future than continuing to purchase water from the DWSD.

### Note R - PENSION, EMPLOYEES' FRINGE BENEFIT (VEBA) AND QUALIFIED EXCESS BENEFIT ARRANGEMENT (QEBA) TRUST FUNDS

| | General Employees Retirement System | Employees' Qualified Excess Benefit Arrangement (QEBA) | Employees' Fringe Benefit (VEBA) | Total |
|---|---|---|---|---|
| Statement of Net Position: | | | | |
| Cash and investments | $ 444,425,721 | $ | $ 46,821,976 | $ 491,247,697 |
| Other assets | 2,854,857 | | 279,996 | 3,134,853 |
| Liabilities | (28,328,589) | | (4,164,247) | (32,492,836) |
| Net Position | 418,951,989 | | 42,937,725 | 461,889,714 |
| Statement of Changes in Net Position: | | | | |
| Investment Income | 47,787,800 | | 2,992,469 | 50,780,269 |
| Contributions | 16,720,259 | | 10,665,685 | 27,385,944 |
| Benefit payments | (40,062,306) | | (13,916,914) | (53,979,220) |
| Other decreases | (3,632,436) | (983) | (42,379) | (3,675,798) |
| Change in Net Position | $   20,813,317 | $   (983) | $   (301,139) | $ (20,511,195) |

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                          **EXHIBIT A-13**

NOTE S - FUND BALANCE CONSTRAINTS

The detail of the various components of fund balance is as follows:

| | General Fund | County Health | Community Action Resource Department | Community Development | Other Governmental Funds | Total |
|---|---|---|---|---|---|---|
| **Fund Balances:** | | | | | | |
| **Nonspendable:** | | | | | | |
| Long-term advance to Internal Service Fund | $ 1,840,809 | | | | | $ 1,840,809 |
| Long-term advance to Component Unit | | | | | $ 1,765,000 | 1,765,000 |
| Prepayments: | 20,690 | $ 22,020 | | | 4,023 | 46,733 |
| Inventory: | | | $ 485,062 | $ 638,400 | 137,018 | 1,260,480 |
| **Restricted for:** | | | | | | |
| Non-Major Special Revenue: | | | | | | |
| Community Enrichment and Development | | | | | 356,692 | 356,692 |
| Drug Forfeiture | | | | | 43,759 | 43,759 |
| Emergency Medical Services | | | | | 720,963 | 720,963 |
| Health Care Services | | | | | 571,809 | 571,809 |
| Solid Waste Planning Activities | | | | | 296,065 | 296,065 |
| Senior Services | | | | | 2,904,020 | 2,904,020 |
| Social Services | | | | | 116,299 | 116,299 |
| Veterans Millage | | | | | 471,776 | 471,776 |
| **Committed to:** | | | | | | |
| Non-Major Special Revenue: | | | | | | |
| Planning Commission: | | | | | | |
| Contractual disallowances | | | | | 59,994 | 59,994 |
| Local match on grant | | | | | 15,000 | 15,000 |
| **Assigned to:** | | | | | | |
| Costs and settlements of contractual | | | | | | |
| disallowances, claims and litigation | 1,000,000 | | | | | 1,000,000 |
| Programs: | | | | | | |
| Mental Health | | | | | | - |
| County Health | | 2,517,028 | | | | 2,517,028 |
| Non-Major Special Revenue: | | | | | | |
| Child Care | | | | | 3,873,041 | 3,873,041 |
| Community Enrichment and Development | | | | | 588 | 588 |
| Law Enforcement | | | | | 205,835 | 205,835 |
| Parks and Recreation | | | | | 4,816,894 | 4,816,894 |
| Planning Commission | | | | | | |
| -Compensated absences | | | | | 65,346 | 65,346 |
| Capital Projects: | | | | | | |
| Capital Improvement | | | | | 721,280 | 721,280 |
| Jail Site Remediation | | | | | 7,321 | 7,321 |
| **Unassigned:** | $ 9,455,182 | | $ (928,728) | | | 8,526,454 |
| Administration of Justice | | | | | (583,117) | (583,117) |
| Law Enforcement | | | | | (29,900) | (29,900) |
| Planning | | | | | 97,322 | 97,322 |
| Hughes & Hatcher Center Debt Service | | | | | (1,710,110) | (1,710,110) |
| Total fund balances | $ 12,316,681 | $ 2,539,048 | $ (443,666) | $ 638,400 | $ 14,926,918 | $ 29,977,381 |

**REQUIRED**

**SUPPLEMENTARY**

**INFORMATION**

**GENERAL AND MAJOR FUNDS**

B-59

74                                                                                                    75

This Page was Intentionally Left Blank

B-60

**SCHEDULE OF REVENUES AND TRANSFERS IN BUDGET AND ACTUAL -- GENERAL FUND REQUIRED SUPPLEMENTARY INFORMATION**

**GENESEE COUNTY**                                                                 Exhibit B-1

| | Fiscal Year Ended September 30, 2013 | | | |
|---|---|---|---|---|
| | Original Budgeted Amounts | Final Budgeted Amounts | Actual | Variance with Final Budget Positive (Negative) |
| OPERATING REVENUE | | | | |
| TAXES | | | | |
| Current property taxes | $ 43,459,630 | $ 44,652,148 | $ 45,261,951 | $ 609,803 |
| LICENSES AND PERMITS | | | | |
| Dog licenses | 710,000 | 617,448 | 666,466 | 49,018 |
| Other | 158,050 | 248,676 | 243,348 | (5,328) |
| TOTALS | 868,050 | 866,124 | 909,814 | 43,690 |
| FINES AND FORFEITURES | | | | |
| Ordinance fines and costs | 1,980,993 | 1,738,676 | 1,538,459 | (200,217) |
| Bond forfeitures | 39,500 | 23,090 | 26,330 | 3,240 |
| TOTALS | 2,020,493 | 1,761,766 | 1,564,789 | (196,977) |
| USE OF MONEY AND PROPERTY | | | | |
| Interest earned | 245,000 | 58,688 | 58,600 | (88) |
| OTHER INTERGOVERNMENTAL REVENUES | | | | |
| Federal revenue | 235,000 | 216,615 | 223,108 | 6,493 |
| Probate judges salaries | 285,010 | 188,390 | 206,271 | 17,881 |
| Revenue sharing | 7,620,146 | 7,541,499 | 7,541,499 | |
| State liquor tax | 2,943,273 | 3,125,820 | 3,263,945 | 138,125 |
| State cigarette tax | 2,640 | 22,524 | 22,524 | |
| Other | 3,530,264 | 3,241,981 | 3,239,591 | (2,390) |
| TOTALS | 14,616,333 | 14,336,829 | 14,496,938 | 160,109 |
| CHARGES FOR SERVICES | | | | |
| Animal Shelter | 81,400 | 52,311 | 55,193 | 2,882 |
| District Court | 3,486,279 | 2,630,706 | 2,693,118 | 62,412 |
| Friend of the Court | 679,971 | 679,971 | 679,971 | |
| Probate Court | 145,200 | 148,806 | 148,529 | (277) |
| Probation fees | 33,000 | 33,698 | 33,490 | (208) |
| County Treasurer | 584,500 | 903,327 | 899,203 | (4,124) |
| County Clerk | 1,212,470 | 1,266,056 | 1,282,100 | 16,044 |
| Register of Deeds | 1,550,700 | 1,724,931 | 1,683,310 | (41,621) |
| Sheriff | 1,665,062 | 1,857,664 | 1,902,480 | 44,816 |
| Other services | 2,019,461 | 1,297,544 | 1,311,818 | 14,274 |
| TOTALS | 11,458,043 | 10,595,014 | 10,689,212 | 94,198 |
| OTHER REVENUE | 593,249 | 572,483 | 655,134 | 82,651 |
| TOTAL OPERATING REVENUE | 73,260,798 | 72,843,052 | 73,636,438 | 793,386 |
| TRANSFERS IN | | | | |
| Enterprise Funds | 3,622,642 | 4,868,642 | 4,734,725 | (133,917) |
| Special Revenue Funds | 1,719,604 | 1,936,203 | 1,956,570 | 20,367 |
| Capital Projects Funds | | | 32,259 | 32,259 |
| Debt Service Funds | | 17 | 18 | 1 |
| TOTAL TRANSFERS IN | 5,342,246 | 6,804,862 | 6,723,572 | (81,290) |
| | $ 78,603,044 | $ 79,647,914 | $ 80,360,010 | $ 712,096 |

NOTE - The budgetary basis is the same as reported by generally accepted accounting principles.

76                                              77

**SCHEDULE OF EXPENDITURES AND APPROPRIATIONS**
**BUDGET AND ACTUAL -- GENERAL FUND**
**REQUIRED SUPPLEMENTARY INFORMATION**

**GENESEE COUNTY**                                          Exhibit B-2

B-61

| | Original Budgeted Amounts | Final Budgeted Amounts | Actual | Variance with Final Budget Positive (Negative) |
|---|---|---|---|---|
| **LEGISLATIVE** | | | | |
| Board of Commissioners | $ 705,103 | $ 918,343 | $ 922,513 | $ (4,170) |
| **MANAGEMENT AND PLANNING** | | | | |
| Board Coordinator | 247,778 | 244,208 | 241,514 | 2,694 |
| Boundary Commission | 200 | | | |
| County Clerk | 2,749,011 | 2,435,402 | 2,345,564 | 89,838 |
| County Treasurer | 1,489,518 | 1,442,774 | 1,463,753 | (20,979) |
| Drain Commission | 1,246,486 | 1,210,390 | 1,213,167 | (2,777) |
| Elections Clerk | 672,516 | 740,468 | 724,161 | 16,307 |
| Equalization | 1,069,270 | 913,157 | 917,622 | (4,465) |
| GIS | 187,473 | 174,192 | 170,580 | 3,612 |
| Register of Deeds | 564,609 | 635,418 | 616,674 | 18,744 |
| TOTALS | 8,226,861 | 7,796,009 | 7,693,035 | 102,974 |
| **ADMINISTRATION OF JUSTICE** | | | | |
| Adult Probation | 339,656 | 330,006 | 329,855 | 151 |
| Circuit Court | 10,625,168 | 9,924,755 | 9,987,394 | (62,639) |
| District Court | 6,188,268 | 5,385,439 | 5,473,378 | (87,939) |
| Jury Board | 278,581 | 259,093 | 258,148 | 945 |
| Probate Court | 2,137,938 | 2,046,618 | 2,057,863 | (11,245) |
| Prosecutor | 4,437,370 | 4,436,214 | 4,455,811 | (19,597) |
| Court Services | 200,384 | 185,620 | 185,537 | 83 |
| TOTALS | 24,207,365 | 22,567,745 | 22,747,986 | (180,241) |
| **LAW ENFORCE/ COMMUNITY PROTECTION** | | | | |
| Office of Emergency Preparedness | 166,373 | 154,685 | 154,330 | 355 |
| Sheriff Administration | 2,882,042 | 2,892,873 | 2,915,776 | (22,903) |
| Sheriff Marine Division | 45,675 | 24,228 | 25,086 | (858) |
| Detective Division | 524,011 | 879,553 | 886,730 | (7,177) |
| Sheriff Security | 17,763,165 | 16,885,505 | 16,627,752 | 257,753 |
| TOTALS | 21,381,266 | 20,836,844 | 20,609,674 | 227,170 |
| **HUMAN SERVICES** | | | | |
| Veterans Burial | 46,276 | 15,716 | 15,716 | |
| Veterans Information Center | 129,157 | 36,735 | 36,649 | 86 |
| TOTALS | 175,433 | 52,451 | 52,365 | 86 |

NOTE - The budgetary basis is the same as the basis required by generally accepted accounting principles.

| | Original Budgeted Amounts | Final Budgeted Amounts | Actual | Variance with Final Budget Positive (Negative) |
|---|---|---|---|---|
| **OTHER** | | | | |
| Other | $ (1,251,782) | $ 2,279,488 | $ 2,696,188 | $ (416,700) |
| Contribution to Component Unit - Mental Health Servic | 2,775,000 | 2,775,000 | 2,775,000 | |
| TOTALS | 1,523,218 | 5,054,488 | 5,471,188 | (416,700) |
| **CAPITAL OUTLAY** | | | | |
| Circuit Court | | 200,609 | 200,605 | 4 |
| County Sheriff | | 9,450 | 6,172 | 3,278 |
| District Court | | 22,600 | | 22,600 |
| Prosecutors | | 28,800 | 27,903 | 897 |
| All others | | | 1,225 | (1,225) |
| TOTALS | | 261,459 | 235,905 | 25,554 |
| **TOTAL EXPENDITURES** | 56,219,246 | 57,487,339 | 57,732,666 | (245,327) |
| **APPROPRIATIONS** | | | | |
| Special Revenue: | | | | |
| Administration of Justice Funds | 3,435,597 | 3,465,203 | 3,476,676 | (11,473) |
| Child Care | 9,627,151 | 9,550,470 | 9,550,470 | |
| Community Enrichment and Development Funds | 104,966 | 36,385 | 22,710 | 13,675 |
| County Health | 2,680,597 | 2,658,158 | 2,658,158 | |
| Law Enforcement Funds | 98,375 | 103,850 | 103,847 | 3 |
| Mental Health | 925,000 | 865,000 | 925,000 | (60,000) |
| Parks and Recreation | 61,011 | 61,011 | 61,011 | |
| Planning Commission | 408,572 | 393,572 | 393,572 | |
| Social Services | 15,500 | 15,500 | 15,500 | |
| TOTALS | 17,356,769 | 17,149,149 | 17,206,944 | (57,795) |
| Debt Service and Capital Projects: | | | | |
| Debt Service Funds | 2,650,782 | 2,689,337 | 2,751,216 | (61,879) |
| | 2,650,782 | 2,689,337 | 2,751,216 | (61,879) |
| Internal Service: | | | | |
| Administrative Services | | 85,513 | 67,133 | 18,380 |
| Vehicles and Equipment | | 5,410 | 4,489 | 921 |
| Building and Grounds | | 102,778 | 70,442 | 32,336 |
| TOTALS | | 193,701 | 142,064 | 51,637 |
| **TOTAL APPROPRIATIONS** | 20,007,551 | 20,032,187 | 20,100,224 | (68,037) |
| **TOTAL EXPENDITURES AND APPROPRIATIONS** | $ 76,226,797 | $ 77,519,526 | $ 77,832,890 | $ (313,364) |

NOTE - The County implemented GASB No. 54 in the current year, refer to Note B.  As a result, the Animal Shelter and Medical Examiner Funds merged with the General Fund for reporting purposes but are budgeted as separate funds.

SCHEDULE OF REVENUES AND OTHER SOURCES--BUDGET AND ACTUAL--
MAJOR SPECIAL REVENUE FUNDS
REQUIRED SUPPLEMENTARY INFORMATION

**GENESEE COUNTY**  Exhibit B-3

| | Fiscal Year Ended September 30, 2013 | | | |
| --- | --- | --- | --- | --- |
| | Original Budgeted Amounts | Final Budgeted Amounts | Actual | Variance with Final Budget Positive (Negative) |
| **GENESEE HEALTH SERVICES 12/31/12** | | | | |
| General Fund appropriation | $ 3,700,000 | $ 3,700,000 | $ 925,000 | $ (2,775,000) |
| Federal grants | 6,214,695 | 6,253,628 | 1,231,478 | (5,022,150) |
| State grants | 21,277,601 | 21,277,601 | 4,477,801 | (16,799,800) |
| Charges for services | 119,886,149 | 120,891,957 | 27,841,645 | (93,050,312) |
| Other | 1,382,000 | 1,364,000 | 785,018 | (578,982) |
| TOTALS | $ 152,460,445 | $ 153,487,186 | $ 35,260,942 | $ (118,226,244) |
| **COUNTY HEALTH** | | | | |
| General Fund appropriation | $ 3,147,478 | $ 3,125,039 | $ 3,079,023 | $ (46,016) |
| Licenses and permits | 992,630 | 992,630 | 1,031,768 | 39,138 |
| Federal grants | 1,009,430 | 5,304,849 | 5,262,724 | (42,125) |
| State grants | 8,477,053 | 4,265,613 | 2,770,726 | (1,494,887) |
| Charges for services | 160,313 | 217,313 | 355,765 | 138,452 |
| Other | 945,111 | 1,359,838 | 2,345,317 | 985,479 |
| TOTALS | $ 14,732,015 | $ 15,265,282 | $ 14,845,323 | $ (419,959) |
| **COMMUNITY ACTION RESOURCE DEPARTMENT** | | | | |
| Federal grants | $ 24,477,400 | $ 24,477,400 | $ 22,841,798 | $ (1,635,602) |
| State grants | 654,697 | 654,697 | 1,403,379 | 748,682 |
| Other | 3,131,758 | 3,131,758 | 4,039,962 | 908,204 |
| Transfers in | | | 640,742 | 640,742 |
| TOTALS | $ 28,263,855 | $ 28,263,855 | $ 28,925,881 | $ 662,026 |
| **COMMUNITY DEVELOPMENT** | | | | |
| Federal grants | $ 3,366,735 | $ 3,366,735 | $ 3,366,735 | $ — |
| Other | 109,446 | 109,446 | 109,446 | |
| TOTALS | $ 3,476,181 | $ 3,476,181 | $ 3,476,181 | $ — |

NOTE - The budgetary basis is the same as the basis required by generally accepted accounting principles.

SCHEDULE OF EXPENDITURES AND OTHER USES--BUDGET AND ACTUAL--
MAJOR SPECIAL REVENUE FUNDS
REQUIRED SUPPLEMENTARY INFORMATION

**GENESEE COUNTY**  Exhibit B-4

| | Fiscal Year Ended September 30, 2013 | | | |
| --- | --- | --- | --- | --- |
| | Original Budgeted Amounts | Final Budgeted Amounts | Actual | Variance with Final Budget Positive (Negative) |
| **GENESEE HEALTH SERVICES 12/31/12** | | | | |
| Board administration | $ 11,165,232 | $ 11,616,649 | $ 2,891,772 | $ 8,724,877 |
| Managed care | 23,299,672 | 22,142,242 | 2,088,620 | 20,053,622 |
| Residential services | 30,398,585 | 30,398,585 | 7,442,990 | 22,955,595 |
| Adult services | 29,025,515 | 29,240,791 | 7,337,280 | 21,903,511 |
| Clinical services | 7,436,792 | 7,479,885 | 1,315,059 | 6,164,826 |
| State hospitals | 8,079,896 | 8,079,896 | 1,883,559 | 6,196,337 |
| Developmental disabilities | 25,040,498 | 25,407,114 | 5,341,139 | 20,065,975 |
| Inpatient services | 9,160,857 | 9,160,857 | 3,493,016 | 5,667,841 |
| Substance abuse services | 9,872,386 | 10,043,218 | 2,380,671 | 7,662,547 |
| Employee benefits | | 1,073,561 | 1,073,651 | |
| Capital outlay | | 81,028 | 81,028 | |
| TOTALS | $ 153,479,435 | $ 154,723,826 | $ 35,328,785 | $ 119,395,131 |
| **COUNTY HEALTH** | | | | |
| Personnel services | $ 5,877,507 | $ 5,857,075 | $ 5,308,506 | $ 548,569 |
| Fringe benefits | 4,105,071 | 4,081,949 | 3,375,957 | 705,992 |
| Supplies and services | 4,858,859 | 5,478,409 | 4,881,923 | 596,486 |
| Capital outlay | 14,322 | 15,322 | | 15,322 |
| TOTALS | $ 14,855,759 | $ 15,432,755 | $ 13,566,386 | $ 1,866,369 |
| **COMMUNITY ACTION RESOURCE DEPARTMENT** | | | | |
| Personnel services | $ 12,168,622 | $ 12,168,622 | $ 6,819,016 | $ 5,349,606 |
| Fringe benefits | 6,394,700 | 6,394,700 | 3,971,261 | 2,423,439 |
| Supplies and services | 10,314,488 | 10,314,488 | 18,067,079 | (7,752,591) |
| Capital outlay | 55,437 | 55,437 | 250,810 | (195,373) |
| Transfers out | | | 361,911 | (361,911) |
| TOTALS | $ 28,933,247 | $ 28,933,247 | $ 29,470,077 | $ (536,830) |
| **COMMUNITY DEVELOPMENT** | | | | |
| Supplies and services | $ 891,494 | $ 891,494 | $ 891,494 | $ — |
| Program grants | 3,470,886 | 3,470,886 | 3,470,886 | |
| TOTALS | $ 4,362,380 | $ 4,362,380 | $ 4,362,380 | $ — |

NOTE - The budgetary basis is the same as the basis required by generally accepted accounting principles.

**PENSION AND OPEB SYSTEM SCHEDULE OF FUNDING PROGRESS**
**REQUIRED SUPPLEMENTARY INFORMATION**

**GENESEE COUNTY**                                                                 Exhibit B-5

The schedule of funding progress for the Pension System as of December 31 is as follows:

| Actuarial Valuation Date | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded AAL (UAAL) | Funded Ratio (Percent) | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| 2007 | $ 461,349,321 | $ 514,859,339 | $  53,510,018 | 89.6% | $ 68,341,150 | 78.3% |
| 2008 | $ 439,812,757 | $ 527,639,697 | $  87,826,940 | 83.4% | $ 67,720,817 | 129.69% |
| 2009 | $ 424,482,866 | $ 543,307,372 | $ 118,824,506 | 78.1% | $ 65,511,481 | 181.38% |
| 2010 | $ 401,700,454 | $ 564,033,044 | $ 162,332,590 | 71.2% | $ 57,794,546 | 280.88% |
| 2011 | $ 365,262,318 | $ 549,929,631 | $ 184,667,313 | 66.4% | $ 52,236,539 | 353.52% |
| 2012 | $ 387,979,375 | $ 559,390,939 | $ 171,411,564 | 69.4% | $ 49,736,813 | 344.64% |

The schedule of employer contributions for the Pension System as of December 31 is as follows:

| Fiscal Year Ended | Actuarial Valuation Date | Annual Required Contribution | Percentage Contributed |
|---|---|---|---|
| 2007 | 2005 | $12,996,937 | 100% |
| 2008 | 2006 | $11,949,881 | 100% |
| 2009 | 2007 | $12,096,241 | 100% |
| 2010 | 2008 | $12,727,882 | 100% |
| 2011 | 2009 | $11,942,380 | 100% |
| 2012 | 2010 | $14,354,446 | 100% |

The information presented above was determined as part of the actuarial valuations at the dates indicated.  Additional information as of December 31, 2012, the latest actuarial valuation, follows:

| | |
|---|---|
| Amortization method | Level percent-of-payroll, Open |
| Amortization period | 25 years |
| Asset valuation method | 4-year smoothed market |
| Actuarial assumptions: | |
| Investment rate of return | 8.00% |
| Projected salary increases | 3.00% to 7.03% |
| Includes inflation at | 3% |
| Cost of living adjustments | None |

The schedule of funding progress for the OPEB System as of September 30 is as follows:

| Actuarial Valuation Date | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded AAL (UAAL) | Funded Ratio (Percent) | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| 2007 | $  30,427,079 | $ 179,150,908 | $ 148,723,829 | 17.0% | $ 58,387,145 | 2.55% |
| 2010 | $  41,579,396 | $ 286,696,396 | $ 245,117,000 | 15.0% | $ 58,028,000 | 422.41% |
| 2012 | $  43,313,587 | $ 308,208,023 | $ 264,894,436 | 9.0% | $ 36,987,137 | 716.18% |

The schedule of employer contributions for the OPEB System as of September 30 is as follows:

| Fiscal Year Ended | Actuarial Valuation Date | Annual Required Contribution | Percentage Contributed |
|---|---|---|---|
| 2011 | 2010 | $18,708,000 | 52% |
| 2012 | 2012 | $18,549,049 | 65% |
| 2013 | 2012 | $18,549,049 | 51% |

The information presented above was determined as part of the actuarial valuations at the dates indicated.  Additional information as of September 30, 2012, the latest actuarial valuation, follows:

| | |
|---|---|
| Amortization method | Level percent-of-payroll |
| Amortization period | 30 years |
| Actuarial assumptions: | |
| Investment rate of return | 8.00% |
| Projected salary increases | 3% |
| Medical inflation rate | 8%, Graded down to 5% in 0.5% increments over 7 years |
| Cost of living adjustments | None |

82

B-63

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX C**

**CITY OF FLINT**
**GENERAL FINANCIAL, ECONOMIC AND STATISTICAL INFORMATION**

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX C**

# CITY OF FLINT

# GENERAL FINANCIAL INFORMATION

**UPDATE ON CITY OF FLINT FINANCIAL POSITION**

On December 1, 2011, five months into fiscal year 2012, Michigan's Governor placed the City of Flint (the "City") under the operation of an emergency manager (the "Emergency Manager") pursuant to former Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"). This decision was based on the recommendation of a state appointed review team, whose recommendation was made in part because of a consistent deficit in the General Fund, the decline in pooled cash, unrealistic budgeting, and unfunded liabilities for postemployment benefits.

In 2012, the Legislature enacted Act 436, Public Acts of Michigan, 2012 ("Act 436"), which repealed Act 72 and provides that an emergency manager appointed under Act 72, or any other former Act authorizing the state appointment of emergency managers, and serving immediately prior to the effective date of Act 436 shall continue to fulfill his or her powers and duties under Act 436. Despite changes in the laws providing for the appointment of an emergency manager since December 2011, and the appointment of three different emergency managers since then, the City remains under the control of a state appointed manager.

Emergency managers exercise direct control over the City's financial and operational matters and are authorized to "act for and in the place and stead of the governing body and the office of chief administrative officer" of the City of Flint. This status is expected to continue for at least the next twelve months, or until the Governor, acting on the recommendation of the Emergency Manager, determines that the financial emergency is over. In that event, governance and management of the City would be returned to the locally elected officials. However, governance and management of the City by the locally elected officials will be overseen by a Transition Advisory Board, who will be charged with assuring that the plans and operations put into place by the Emergency Manager to restore financial solvency - including a two year budget - are followed. An emergency manager who has served for at least 18 months under Act 436 may also be removed by a two-thirds vote of the City Council and approval of the Mayor. A local government whose emergency manager is removed by City Council action and which remains in a state of financial emergency will be placed in a mediation process with creditors and other interested parties pursuant to Act 436.

Fiscal year 2012 financial statements showed a General Fund deficit of $19.2 million, and the goal of the Emergency Manager has been to formulate plans and implement actions that eliminate the deficit and restructure the City's cost base to allow for future financial solvency.

Preparation of the fiscal year 2013 budget began with an initial projected gap of more than $25 million and acknowledgment of a $19.2 million General Fund deficit. The FY13 budget was ultimately balanced through a mixture of significant revenue increases, significant expenditure decreases, and steps taken to reduce legacy costs. Revenue increase included a 25 percent increase in water and sewer rates, passage of a 6 mill property tax increase for police and fire, establishment of a special assessment district for street lighting, and implementation of a fee sufficient to cover the cost of waste collection. Expenditure reductions included elimination of 20 percent of the City's workforce, compensation decreases equivalent to a 20 percent wage reduction for remaining employees, and the restructuring of health and retirement benefits for current employees and retirees necessary to develop a credibly balanced spending plan.

The goal of the Emergency Manager was more than achieved, as the financial statements as of June 30, 2013 show that revenues exceeded expenses in the General Fund by $6.3 million. This resulted in the City's accumulated $19.2 million deficit as of June 30, 2012 being reduced to less than $12.9 million as of June 30, 2013.

In addition, the actions taken to restructure healthcare benefits for current employees and retirees had a significant impact on reducing both current costs and long-term liabilities. The 20 percent reduction in the workforce required significant reorganizational activities focused on reducing current costs. Long term liabilities were reduced by eliminating traditional defined benefit pension programs for new employees in favor of hybrid plans; by moving the City's retirement system into a state wide retirement system; by restructuring health insurance benefits for current employees and placing retirees into those same plans; and by eliminating the promise of retiree health care for new employees in favor of providing retiree medical

savings accounts. Much of the positive financial result in FY13 came from these actions. The restructuring, which was implemented during the course of FY12, reduced the City's OPEB liabilities alone from nearly $900 million to less than $325 million.

The City's cash flow also improved significantly. Cash flow in December 2011 was projected at approximately $13 million in comparison to current cash on hand as of June 30, 2013 in excess of $43 million.

The FY14 budget was designed and implemented with the same goals in mind - operating within the constraints of available revenues; restructuring operations and cost factors to enhance future financial stability and continuing to reduce the remaining $12.9 million deficit. The FY14 budget was constructed with the specific intent of further reducing the deficit by a minimum of $1 million, by budgeting expenses at $1 million less than projected revenues. As of January 31, 2014, seven months into the FY14 year, revenues and expenses are on target.

Efforts are ongoing to reduce the deficit by more than $1 million in the current year and to finalize a plan to eliminate the remaining deficit within the next five years. A draft deficit elimination plan to accomplish this is currently under review by the Michigan Department of Treasury.

The efforts of the City to regain financial solvency have been aided by support from the State of Michigan. State police troopers have been placed in the City to support local law enforcement efforts, and funds have been allocated to enhance prosecution activities and to operate the City's lock up. The Governor's recently released proposed budget continues this support.

The work of the emergency managers has not been without conflict. A significant legal challenge has been made to the decision to move retirees from their historical health insurance plans into the same plans offered current employees. This action resulted in an initial cost reduction of $3.5 million to the City and imposed deductibles and co-pays on retirees. This challenge is currently pending in federal court. If the challenge is ultimately upheld, it will pose a significant challenge to the City in its efforts to regain and maintain financial solvency. See "Litigation" in the Official Statement.

The future financial solvency of the City may also be challenged by a continuing structural deficit. An independent assessment by independent financial consultants in draft form, concluded that the City faced significant legacy and other structural challenges. As part of the planning for future financial solvency, five year projections and a strategic plan were developed. This exercise indicated a significant financial challenge forthcoming in FY15, due primarily to the possible ending of a major grant supporting fire fighting resources. Years after FY16 continue to show a continuing gap between revenues and projections. Should those projections come to pass, there will be a significant challenge. However, should the major grant be continued in 2015, should the impact of the structural changes made continue to have impact, and should the economy improve more than projected (in terms of property values, income tax, and state shared revenues), the gap will be more manageable.

The most important challenge to be addressed will be instituting structural changes in the organization of the City to foster financial solvency as a core value and to assure that future governance and management of the City is conducted in a financially responsible manner. To this end, the current Emergency Manager has created a Governance Task Force, charged with developing recommended changes to current ordinances, procedures, and the Charter. The recommendations of the Task Force are anticipated within six months.

If the City's financial status were to deteriorate further, the City's options to improve its fiscal health may be limited. The United States Bankruptcy Code, 11 U.S.C. Section 101, et. seq. (the "Bankruptcy Code") does not authorize municipalities to be subject to involuntary bankruptcy. The City must be specifically authorized to be a debtor under chapter 9 of the Bankruptcy Code by state law or by a governmental officer or organization empowered by state law to authorize the City to be a debtor under chapter 9 of the Bankruptcy Code.

Act 436 provides such authorization after the City first complies with certain requirements set forth therein, and only with the approval of the Emergency Manager (if one is currently serving) and the Governor. Specifically, Act 436 provides that if, "in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and the state treasurer that the local government be authorized to proceed under chapter 9. If the governor approves of the recommendation, the governor shall inform the state treasurer and the emergency manager in writing of the decision.... The governor may place contingencies on a local government in order to proceed under chapter 9. Upon receipt of the written approval, the emergency manager is authorized to proceed under chapter 9."

**AREA**

The City covers an area of approximately 32.8 square miles.

**POPULATION**

The population for the City of Flint is as follows:

| | |
|---|---|
| 2010 U.S. Census | 102,434 |
| 2000 U.S. Census | 124,943 |
| 1990 U.S. Census | 140,761 |

**PROPERTY VALUATIONS**

Article IX, Section 3, of the Michigan Constitution, limits the proportion of true cash value at which property can be assessed to a percentage not to exceed 50% of true cash value. The Michigan Legislature by statute has provided that property shall be assessed at 50% of its true cash value, except as described in the paragraphs below. The Michigan Legislature or the electorate may at some future time reduce the percentage below 50% of true cash value.

On March 15, 1994, the electors of the State approved an amendment to the Michigan Constitution permitting the Legislature to authorize ad valorem taxes on a non-uniform basis. The legislation implementing this constitution amendment added a new measure of property value known as "taxable value." Since 1995, taxable property has had two valuations -- State equalized valuation ("SEV") and taxable value. Property taxes are levied on taxable value. Generally, the taxable value of property is the lesser of (a) the taxable value of property in the immediately preceding year, adjusted for losses, multiplied by the lesser of the inflation rate or 1.05, plus additions, or (b) the property's current SEV. Under certain circumstances, therefore, the taxable value of property may be different from the same property's SEV. When property is sold or transferred, taxable value is adjusted to the SEV, which under existing law is 50% of the current true cash value. The taxable value and SEV of new construction is equal to current SEV. The taxable value and SEV of existing property are also adjusted annually for additions and losses.

Responsibility for assessing taxable property rests with the local assessing officer of each township and city. Any property owner may appeal the assessment to the local assessor, the local Board of Review and ultimately to the Michigan Tax Tribunal.

In addition to limiting the annual increase in taxable value, the Michigan Constitution mandates a system of equalization for assessments. Although the assessors for each local unit of government within a county are responsible for actually assessing at 50% of true cash value, adjusted for taxable value purposes, the final SEV and taxable value are arrived at through several steps. Assessments are established initially by the municipal assessor. Municipal assessments are then equalized to the 50% levels as determined by the Genesee County Department of Equalization. Thereafter, the State equalizes the various counties in relation to each other. SEV is important, aside from its use in determining taxable value for the purpose of levying ad valorem property taxes, because of its role in the spreading of taxes between overlapping jurisdictions, the distribution of various State aid programs, State revenue sharing and in the calculation of debt limits.

Property that is exempt from property taxes (e.g., churches, governmental property, public schools) is not included in the SEV or taxable value data in this Official Statement. Property granted tax abatements under Act 198, Public Acts of Michigan, 1974, as amended, is recorded on a separate tax roll which is subject to tax abatement. The valuation of tax abated property is based upon SEV but is not included in either the SEV or taxable value data in this Official Statement except as noted.

*Historical Valuation*

| Year | State Equalized Valuation | Taxable Value |
|---|---|---|
| 2013 | $795,172,400 | $776,654,903 |
| 2012 | 969,129,800 | 917,513,440 |
| 2011 | 1,191,515,300 | 1,112,393,943 |
| 2010 | 1,393,042,600 | 1,274,306,976 |
| 2009 | 1,648,408,800 | 1,452,387,463 |

|  |  |
|---|---|
| 2013 Taxable Value | $776,654,903 |
| Plus:  2013 IFT | 33,149,000 |
| Total Estimated Equivalent Value | $809,803,903 |
| Less:  2013 DDA Captured Value | (579,595) |
| Net Estimated 2013 Valuation | $808,065,118 |

Source: City of Flint

*Per Capita Valuation*

| | |
|---|---|
| 2013 Per Capita Taxable Value | $7,582.00 |
| 2013 Per Capita State Equalized Valuation | $7,762.78 |
| 2013 Per Capita Estimated True Cash Value | $15,525.56 |

*Tax Abatements*

Under the provisions of Act 198 of the Public Acts of Michigan, 1974 ("Act 198"), plant rehabilitation districts and/or industrial development districts may be established. Businesses in these districts are offered certain property tax incentives to encourage restoration or replacement of obsolete facilities and to attract new facilities to the area. An industrial facilities tax ("IFT") is paid, at a lesser effective rate and in lieu of ad valorem property taxes, on such facilities for a period of up to 12 years. Qualifying facilities are issued abatement certificates for specific periods.

After expiration of the abatement certificate, the then-current SEV of the facility is returned to the ad valorem tax roll. The owner of such facility may obtain a new certificate, provided it has complied with the provisions of Act 198.

The 2013 Taxable Value for the properties which have been granted IFT abatements within the School District's boundaries is $33,149,000 which is subsequently taxed at half rate.   For further information see "PROPERTY VALUATIONS - Historical Valuations" herein.

*Tax Increment Authorities*

Act 450 of the Public Acts of Michigan, 1980 (the "TIFA Act"), Act 197 of the Public Acts of Michigan, 1975 (the "DDA Act"), Act 281 of the Public Acts of Michigan, 1986 (the "LDFA Act") and Act 381, of the Public Acts of Michigan, 1996 (the "Brownfield Act") (together the "TIF Acts") authorize the designation of specific districts known as Tax Increment Finance Authority ("TIFA") Districts, Downtown Development Authority ("DDA") Districts, Local Development Finance Authority ("LDFA") Districts or Brownfield Redevelopment Authority ("BRDA") Districts, authorized to formulate tax increment financing plans for public improvements, economic development, neighborhood revitalization, historic preservation and environmental cleanup with the district.

Tax increment financing permits the TIFA, DDA, LDFA, or BRDA to capture tax revenues attributable to increases in value ("TIF Captured Value") of real and personal property located within an approved development area while any tax increment financing plans by an established district are in place.   These captured revenues are used by the District and are not passed on to the local taxing jurisdictions.

The City of Flint has one DDA district that captures operating millage. The 2013 captured taxable value is $579,595.

***Tax Base Composition***

A breakdown of the City's 2013 Taxable Value by class and use is as follows:

| **By Class** | **Taxable Value** | **Percent of Total** |
|---|---|---|
| Real Property | $622,052,503 | 80.09% |
| Personal Property | 154,602,400 | 19.91 |
| | | |
| TOTAL | $776,654,903 | 100.00% |

| **By Use** | | |
|---|---|---|
| Commercial | $181,351,218 | 23.35% |
| Industrial | 77,833,577 | 10.02 |
| Residential | 362,867,708 | 46.72 |
| Personal Commercial | 54,273,600 | 6.99 |
| Personal Industrial | 52,558,400 | 6.77 |
| Personal Utility | 47,770,400 | 6.15 |
| | | |
| TOTAL | $776,654,903 | 100.00% |

Source: City of Flint

**Property Tax Reform Proposals**

On December 20, 2012, Governor Snyder signed into law a package of bills reforming personal property tax in Michigan. The legislation exempts commercial and industrial personal property of each owner with a combined taxable value in a local taxing unit of less than $40,000 from ad valorem taxes beginning in 2014. All eligible manufacturing personal property purchased or put into service beginning in 2013 and used more than 50% of the time in industrial processing or direct integrated support becomes exempt beginning in 2016. The legislation extends certain personal property tax exemptions and tax abatements for technology parks, industrial facilities and enterprise zones that were to expire after 2012, until the newly enacted personal property tax exemptions take effect. The legislation authorizes local units to specially assess commercial and industrial real property to replace revenue lost due to the personal property tax exemptions for police, fire, ambulance and jail operations. The legislation also includes a formula to reimburse certain local governments for a portion of lost personal property tax revenue from use tax moneys to the extent the local unit has a reduction in taxable value of more than 2.3% as a result of the personal property tax exemption. For such reimbursement provisions to become effective, however voters need to approve a change in the state distribution of use tax in the August 2014 primary election. If voters approve the redistribution, a portion of the use tax would be directed to a newly created statewide Metropolitan Areas Metropolitan Authority which would redistribute that revenue to qualifying local units. If voters fail to approve the use tax redistribution, the above personal property tax reform acts will be repealed and the local reimbursement act and the special assessment act will not go into effect. The final impact of this legislation cannot be determined at this time.

The ultimate nature, extent and impact of any other future amendments to Michigan's property tax laws on the City's finances cannot be predicted. Purchasers of the Bonds should consult with their legal counsel and financial advisors as to the consequences of any such legislation on the market price or marketability of the Bonds, the security therefor and the operations of the City.

## MAJOR TAXPAYERS

The ten largest taxpayers in the City of Flint and their 2013 Taxable Value totals and Industrial Facilities Tax Valuation totals are as follows:

| Taxpayer | Product/Service | Taxable Value | + | IFT Valuation | = | Total Valuation |
|----------|-----------------|--------------:|---|--------------:|---|----------------:|
| Consumers* | Utility | $51,454,247 | | $0 | | $51,454,247 |
| General Motors | Automotive | 47,820,558 | | 9,386,600 | | 57,207,158 |
| Delphi | Automotive | 12,067,500 | | 0 | | 12,067,500 |
| Barrette | Outdoor living | 10,102,700 | | 0 | | 10,102,700 |
| 4405 Continental | Distribution center | 6,418,860 | | 0 | | 6,418,860 |
| IINN | Office space | 5,251,400 | | 0 | | 5,251,400 |
| Comcast | Cable operator | 5,106,000 | | 0 | | 5,106,000 |
| Saginaw & Court | Office/Finance | 4,160,735 | | 0 | | 4,160,735 |
| Citizens Bank | Finance | 3,363,904 | | 0 | | 3,363,904 |
| PPG | Manufacturing | 3,201,900 | | 0 | | 3,201,900 |
| TOTAL | | $148,947,804 | | $9,386,600 | | $158,334,404 |

\* Consumers Energy is contesting the multipliers used for assessing their personal property taxes with the State Tax Tribunal.  The City has determined that the outcome will have little effect on City revenue. See "PERSONAL PROPERTY TAX ASSESSMENTS AND APPEALS" below.

The 2013 Taxable Valuations of the above taxpayers excluding IFT valuation represent 19.18% of the City's 2013 Taxable Valuation of $776,654,903. The Total Valuations including IFT valuation represent 6.20% of the 2013 Total Taxable Valuation of $809,803,903.

Source: City of Flint

## PERSONAL PROPERTY TAX ASSESSMENTS AND APPEALS

Since the 1960's, Michigan personal property tax assessments have been based on the use of one or more of several different multiplier tables formulated by the State Tax Commission against taxpayer reported original cost, depending on the assessor's view of the average life of the personal property.  The Michigan State Tax Commission has approved revisions to the State's personal property tax tables which are effective for the year 2000 and which may reduce overall personal property tax revenues in some jurisdictions.  The State Tax Tribunal has informally indicated that it may allow the new multipliers to be applied retroactively in pending personal property tax appeals.  In anticipation of the new multipliers, many personal property taxpayers filed appeals of their existing tax assessments. In an unpublished, non-precedential opinion, the Michigan Court of Appeals, in *Valassis Communications v. City of Livonia*, recently affirmed a decision of the Michigan Tax Tribunal that the personal property multipliers, which became effective in 2000, could be used to determine the true cash value of the subject property for the 1999 tax year.  In its unpublished opinion, the Michigan Court of Appeals held that the controlling factor is whether the method used most accurately reflects the property's true cash value.  The Court of Appeals determined that based on the facts of the case, the old multipliers (in effect for the 1999 tax year) did not accurately reflect the property's true cash value and that the 2000 multipliers more accurately reflected the property's true cash value.

## CONSTITUTIONAL ROLLBACK AND ASSESSMENT CAPS

Article IX, Section 31 of the Michigan Constitution requires that if the total value of existing taxable property (State Equalized Valuation) in a local taxing unit, exclusive of new construction and improvements, increases faster than the U.S. Consumer Price Index from one year to the next, the maximum authorized tax rate for that local taxing unit must be reduced through a Millage Reduction Fraction unless new millage is authorized by a vote of the electorate of the local taxing unit.

## TAX RATES (Per $1,000 of Valuation)

Under Michigan statutes, the property tax base used for levies authorized for the City is the same as that used for school district, county, township, special authority, and city levies.  Each school district, county, township, special authority and city has a geographical definition which constitutes a tax district.  Since local school districts and the county overlap either a township or a city, and intermediate school districts overlap local school districts and county boundaries, the result is many different tax rate districts.

| *City of Flint* | 2013 | 2012 | 2011 | 2010** | 2009 |
|---|---|---|---|---|---|
| Operating | 7.5000 | 7.5000 | 7.5000 | 7.5000 | 7.5000 |
| Neighborhood Police | 2.0000 | 2.0000 | 2.0000 | 2.0000 | 2.0000 |
| Paramedic Service | 0.5000 | 0.5000 | 0.5000 | 0.5000 | 0.5000 |
| Refuse*** | 0.0000 | 3.0000 | 3.0000 | 3.0000 | 3.0000 |
| Public Improvements | 2.5000 | 2.5000 | 2.5000 | 2.5000 | 2.5000 |
| Parks & Recreation | 0.5000 | 0.5000 | 0.5000 | 0.5000 | 0.5000 |
| Police and Fire | 6.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| | | | | | |
| City of Flint Total Millage | 19.0000* | 16.0000 | 16.0000 | 16.0000 | 16.0000 |

Note: The City's property tax rates may be increased only by a majority vote of the City's electors voting in a City election.

* Under Charter & Applicable State Law - Under the Michigan Home Rule Cities Act, a Home Rule City is allowed to extend the operating millage not to exceed two percent (2% or 20 mills) of assessed value of all real and personal property in the City.

** An additional 6.7100 mills was placed on the 2010-11 winter roll as a one-time Court -Ordered Levy to pay the Genesee Towers judgment.

*** The Direct City Taxes increased by 6.0 mills with the addition of the Public Safety Millage and decreased by 3.000 mills with the elimination of the Waste Collection Millage.

Source: City Audit Dept. / City Assessor

**TAX RATE LIMITATION**

The City is authorized to levy the following tax rates:

| | Millage Authorized | Maximum Allowable Millage after Rollback | Expiration Date of Levy |
|---|---|---|---|
| Operating | 7.5000 | 7.5000 | Indefinite |
| Police | 2.0000 | 2.0000 | 06/30/2017 |
| Public Improvements | 2.5000 | 2.5000 | Indefinite |
| Paramedic Service | 0.5000 | 0.5000 | 06/30/2016 |
| Parks & Recreation | 0.5000 | 0.5000 | 12/31/2016 |
| Police & Fire | 6.0000 | 6.0000 | 07/02/2016 |

**TAX LEVIES AND COLLECTIONS**

The City's fiscal year begins July 1 and ends June 30.  City property taxes are due in three equal installments on July 1, October 1 and February 1. The installments bear a penalty and begin to accrue interest if not paid by August 1, November 1 and March 1 respectively.  All real property taxes remaining unpaid on March 1st of the year following the levy are turned over to the County Treasurer for collection.  Genesee County annually pays from its Tax Revolving Fund delinquent taxes on real property to all taxing units in the County, including the City's, shortly after the date delinquent taxes are returned to the County Treasurer for collection.  The payments from this fund have resulted in collections of taxes approaching 100% for all taxing units.

A history of tax levies and collections for the City for the last five completed years  is as follows:

| Year Ending | Total Tax Levy | Collections to March 1, of Following Year | | Collections to June 30, of Following Year | |
|---|---|---|---|---|---|
| 2013 | $28,192,664 | $19,113,565 | 67.80%* | $24,134,164 | 85.60% |
| 2012 | 18,022,915 | 14,245,037 | 79.04 | 15,866,017 | 88.03 |
| 2011 | 21,029,361 | 16,565,947 | 78.78 | 19,431,043 | 92.40 |
| 2010 | 22,864,857 | 18,580,520 | 81.26 | 21,950,721 | 96.00 |
| 2009 | 25,297,684 | 20,838,394 | 82.37 | 24,075,213 | 95.17 |

*partial year as of March 1.

The Tax Revolving Fund is financed through the issuance of Delinquent Tax Anticipation Notes (DTANs).  Although the County anticipates the continuance of this program, the ability to issue such DTANs is subject to Michigan Department of Treasury approval and market conditions at the time of offering.  In addition, Act 206 of 1893, as amended, provides in part that:  "The primary obligation to pay to the County the amount of taxes and interest thereon shall rest with the local taxing units, and if the delinquent taxes which are due and payable to the County are not received by the County for any reason, the County has full right of recourse against the taxing unit to recover the amount thereof and interest thereon..."  On the first Tuesday in May in each year, a tax sale is held by the County at which lands delinquent for taxes assessed in the third year, preceding the sale, or in a prior year are sold for the total of the unpaid taxes of those years.

The General Property Tax Act was amended by Act 123, Public Acts of Michigan of 1999 ("Act 123") which made extensive revision to the procedures for collection of delinquent real property taxes.  In general, for real property taxes levied after December 31, 1998, all County Treasurers hold a tax lien sale on the second Monday in May (26 months after taxes were returned as delinquent).  Act 123 has the effect of shortening the process for collection of delinquent real property taxes from approximately six years (including statutory redemption periods) to approximately two years from the date taxes are returned to the County Treasurer as delinquent.

**FEES AND CHARGES**

In fiscal year 2013, the City of Flint implemented a special assessment for street lighting and an annual fee for garbage collection.  The street light assessment is projected to generate $2.85 million and is expected to continue into the future.  The $2.85 million pays for the cost of the City's street lighting program and frees up revenue for use for public safety expenses of the City.  The City also eliminated its 3 mill rubbish collection millage and replaced the property tax with an annual fee of $143.  This fee based system is designed to cover the costs of rubbish collection whereas the 3 mill property tax required unplanned transfers from the general fund by as much as $1.5 million a year.  This new fee, coupled with the outsourcing of the City's rubbish collection, is projected to eliminate the general fund subsidy of rubbish collection.

**REVENUES FROM THE STATE OF MICHIGAN**

The City receives revenue sharing payments from the State of Michigan under the State Constitution and the State Revenue Sharing Act of 1971, as amended.  The revenue sharing payments are composed of two components - a constitutional distribution and a statutory distribution.  The constitutional distribution is mandated by the State Constitution and distributed on a per capita basis to townships, cities and villages.  The amount of the constitutionally mandated revenue sharing component distributed to the City can vary depending on the population of the City and the receipt of sales tax revenues by the State.

The statutory distribution is authorized by legislative action and distribution is subject to annual State appropriation by the State Legislature.  Statutory distributions may be reduced or delayed by Executive Order during any State fiscal year in which the Governor, with the approval of the State Legislature's appropriations committees, determines that actual revenues will be less than the revenue estimates on which appropriations were based.

On June 13, 2013, Governor Snyder signed into law the budget for fiscal year 2014.  Similar to fiscal year 2013, the budget replaces the statutory distribution for cities, villages and townships with an incentive-based revenue sharing program known as the Economic Vitality Incentive Program ("EVIP"), that will be distributed to municipalities that comply with "best practices" such as increasing transparency and consolidating services.  The fiscal year 2014 budget does not alter the constitutional component, and includes an increased constitutional revenue sharing distribution to cities, villages and townships of approximately $737,000,000 from the fiscal year 2013 distribution of $722,000,000.  Under the EVIP program, an eligible municipality such as the City can receive (i) one-third of the money it is eligible for if it meets requirements for accountability and transparency, including making a citizen's guide to its finances, a performance dashboard and a debt service report available for public viewing; (ii) another third if it develops plans to increase its existing level of cooperation, collaboration and consolidation, both internally and with neighboring jurisdictions; and (iii) a final third if it develops and certifies an unfunded accrued liability plan.  The unfunded accrued liability plan, which replaced the requirement in fiscal year 2013 to modify employee compensation plans, must be certified by June 1, 2014 for the City to receive all of the money that it is eligible for from the final component described in clause (iii) above.  Any portion of the EVIP that the City would be eligible to receive would be subject to certain benchmarks that the City would need to meet, and there can be no assurance of what amount, if any, the City would receive under the proposed EVIP program. The City received EVIP payments totaling $6,182,769 for fiscal year 2013, and is anticipating it will receive $6,182,769 for fiscal year 2014 payments.

C-8

Purchasers of the Bonds should be alerted to further modifications to revenue sharing payments to Michigan local governmental units, to potential consequent impact on the City's general fund condition, and to the potential impact upon the market price or marketability of the Bonds resulting from changes in revenues received by the City from the State.

The following table sets forth the annual revenue sharing payments and other moneys received by the City for the fiscal years ended June 30, 2010 through June 30, 2013, and the estimated revenue sharing payments to be received in the fiscal year ending June 30, 2014.

| Fiscal Year Ended June 30 | Constitutional Revenue Sharing Payments | Statutory Revenue Sharing/EVIP Payments | Total |
|---|---|---|---|
| 2014 (estimate) | $7,640,908 | $6,480,642 | $14,121,550 |
| 2013 | 7,484,413 | 6,182,769 | 13,667,182 |
| 2012 | 7,332,602 | 5,770,584 | 13,103,186 |
| 2011 | 6,888,992 | 9,535,096 | 16,424,088 |
| 2010 | 7,917,588 | 8,506,500 | 16,424,088 |

Source: Web site http://treasury.state.mi.us

**CITY INCOME TAX**

On January 1, 1965, a local income tax at a rate of 1% on all income of residents and corporations and 1/2% on income earned in the City by nonresident became effective through the enactment of the Uniform City Income Tax Ordinance, as prescribed by Act 248, Public Acts of Michigan, 1964. The income tax is imposed for general revenue purposes and may be used for general governmental functions or capital improvement expenditures.

The following is the amount of City income tax collected annually for the last five years.

| Fiscal Year Ended June 30 | Net Income Tax |
|---|---|
| 2013 | $14,674,274 |
| 2012 | $14,839,999 |
| 2011 | $14,396,346 |
| 2010 | $13,551,247 |
| 2009 | $14,277,939 |

**LABOR FORCE**

The City of Flint has a history of contract settlement without strikes. A breakdown of the number of employees of the City of Flint and their affiliation with organized groups is as follows:

| Employees | Full Time Number | Part Time Number | Affiliation | Contract Expiration |
|---|---|---|---|---|
| Clerical/Labor | 224 | 18 | AFSCME Local 1600 | 06/30/2014 |
| Supervisory/Professional | 47 | 0 | AFSCME Local 1799 | 06/30/2014 |
| Police Patrol | 84 | 0 | Flint Police Officers Assn. | 06/30/2014* |
| Police Sergeants | 36 | 0 | Teamsters Local 129 | 06/30/2014 |
| Police Captains & Lieutenants | 8 | 0 | Flint Police Cap'ts & L'ts. Assn. | 06/30/2014 |
| Firefighters | 114 | 6 | Int'l. Assn. of Firefighters No. 352 | 06/30/2014 |
| Exempt Employees | 38 | 5 | Non-Affiliated | |
| Appointees/Elect | 16 | 0 | Non-Affiliated | |
| TOTAL | 567 | 29 | | |

* Contract terms imposed per PA4

**PENSION FUND**

The Flint Employees' Retirement System (FERS) is a defined benefit pension plan that provides retirement benefits to certain City retirees. The FERS was established and is governed by City ordinance, with the board of trustees comprised of City officials and retirees. The FERS is reported as a Pension Trust Fiduciary Fund. During the year ended June 30, 2013, the board was disbanded and the investments in FERS were transferred out to Municipal Employees' Retirement Systems (MERS). The FERS fund was closed and MERS will now take on the fiduciary responsibility of the plan.

C-9

Contributions to the plans for the last five years are as follows:

| Year Ended June 30 | General, Police and Fire Benefit Groups | Year Ended June 30 | Hurley Medical Center Benefit Group* |
|---|---|---|---|
| 2013 | $11,641,714 | 2013 | $3,268,075 |
| 2012 | 8,058,450 | 2012 | 6,503,942 |
| 2011 | 5,505,305 | 2011 | 5,505,003 |
| 2010 | 3,889,397 | 2010 | 8,896,382 |
| 2009 | 6,803,233 | 2009 | 7,694,335 |

Funding status and funding progress:

| Actuarial Valuation Year Ended | Actuarial Value of Assets (a) | Actuarial Accrued Liability Individual Entry Age (AAL) (b) | Unfunded (Overfunded) AAL (UAAL) (b-a) | Funded Ratio (a/b) | Covered Payroll (c) | UAAL as % of Covered Payroll ((b-a)/c) |
|---|---|---|---|---|---|---|
| 6/30/2006 | 782,098 | 1,023,599 | 241,501 | 76.4 | 146,634 | 164.7 |
| 6/30/2007 | 801,533 | 1,071,781 | 270,248 | 75.2 | 157,012 | 172.1 |
| 6/30/2008 | 670,366 | 841,266 | 170,900 | 79.7 | 89,636 | 190.7 |
| 6/30/2009 | 623,292 | 873,088 | 249,796 | 71.4 | 89,636 | 278.7 |
| 6/30/2010 | 567,215 | 835,052 | 267,837 | 67.9 | 68,968 | 388.3 |
| 6/30/2011 | 506,504 | 829,380 | 322,876 | 61.1 | 63,063 | 512.0 |

See Appendix D - See City of Flint Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2013, Note 11 - Retirement Plans

**Other Post Employment Benefits (OPEB)**

The City provides retiree healthcare benefits to eligible employees and their spouses through the Retiree Health Care Trust Fund. Benefits are provided to public safety and general employees. Currently, the plan has 2,339 members, including 506 employees in active service, 0 terminated employees not yet receiving benefits, and 1,833 retired employees and beneficiaries currently receiving benefits.

The funding progress of the plan as of the most recent valuation data is as follows:

| Actuarial Valuation Date | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) (b) | Unfunded AAL (UAAL) (b-a) | Funded Ratio (Percent) (a/b) | Covered Payroll (c)* | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| 7/1/2012 | $ 166,903 | $320,180,757 | $320,013,854 | 0.1 | $ - | - |
| 7/1/2011 | - | 366,832,597 | 366,832,597 | - | 37,339,842 | 982.0 |
| 7/1/2010 | - | 862,302,934 | 862,302,934 | - | 36,252,274 | 2,379.0 |
| 7/1/2009 | - | 774,606,738 | 774,606,738 | - | 41,166,662 | 1,882.0 |

* For actuarial valuation date 7/1/12, the annual required contribution calculation is based on a flat dollar amount.

See Appendix D - City of Flint Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2013, Note 12 - Other Postemployment Benefits

**DEBT STATEMENT** (as of April 2, 2014 and including the Bonds described herein)

Each series of bonds marked "LT" is payable in the first instance from a specified source and is payable from the general funds of the City in the event of insufficiency of the specified source.  The City is not authorized to levy taxes beyond constitutional and statutory tax rate limitations with respect to the bonds marked "LT".

DIRECT DEBT

|  | Dated Date | Amount Outstanding |  |
|---|---|---|---|
| *General Obligation Bonds* |  |  |  |
| Fiscal Stabilization Bonds, LT | 04/13/11 | $7,620,000 |  |
| Capital Improvement, Public Garage/Parking, LT | 12/28/07 | 8,955,000 | $16,575,000 |
| *Authority Revenue Bonds - No City Pledge* |  |  |  |
| Hurley Medical Center, Refunding, SSAuth | 06/11/03 | 5,150,000 |  |
| Hurley Medical Center, Series 2010, SSAuth | 03/25/10 | 33,215,000 |  |
| Health Care Faciliites, Equipment | 09/30/11 | 3,716,906 |  |
| Hurley Medical Center, Series 2013A, SSAuth | 04/02/13 | 21,940,000 |  |
| Hurley Medical Center, Series 2013B, SSAuth | 04/02/13 | 36,035,000 | 100,056,906 |
| *City Revenue Bonds* |  |  |  |
| MI Bond Bank - Water  DWRF Series 1999 | 09/30/99 | 2,928,994 |  |
| MI Bond Bank - Water  DWRF Series 2000 | 09/28/00 | 3,700,000 |  |
| MI Bond Bank - Water  DWRF Series 2001 | 09/28/01 | 4,731,408 |  |
| MI Bond Bank - Water  DWRF Series 2003 | 09/25/03 | 11,599,934 | 22,960,336 |
|  |  |  |  |
| *Share of Authority Issued Bonds* |  |  |  |
| Water Supply System Bonds, Series 2014 A, LT | 04/16/14 | 75,411,000 | $75,411,000 |

| TOTAL DIRECT DEBT |  |  | $215,003,242 |
|---|---|---|---|
| Less: | Revenue Bonds | (123,017,242) |  |
|  | Revenue Supported Authority Bonds | (75,411,000) | (198,428,242) |

| NET DIRECT DEBT | $16,575,000 |
|---|---|

OVERLAPPING DEBT

| Percent | Municipality | Amount Outstanding | City's Share |
|---|---|---|---|
| 7.68% | Carman Ainsworth S/D | $40,208,000 | $3,087,974 |
| 100.00 | Flint S/D | 12,760,000 | 12,760,000 |
| 1.33 | Swartz Creek S/D | 12,615,000 | 167,780 |
| 8.81 | Genesee County | 74,170,696 | 6,534,438 |
| 8.32 | Genesee ISD | 46,050,000 | 3,831,360 |
| 8.81 | Mott Community College | 10,430,000 | 918,883 |

| NET OVERLAPPING DEBT |  | 27,300,435 |
|---|---|---|
| NET DIRECT AND OVERLAPPING DEBT |  | $43,875,435 |

Source:  Municipal Advisory Council of Michigan

**DEBT RATIOS**

| *Per Capita (102,434)* |  |
|---|---|
| Net Direct Debt | $161.81 |
| Net Direct and Overlapping Debt | $428.33 |

| *Ratio to 2013 Taxable Value ($776,654,903)* |  |
|---|---|
| Net Direct Debt | 2.13% |
| Net Direct and Overlapping Debt | 5.65% |

*Ratio to 2013 State Equalized Valuation ($795,172,400)*

| | |
|---|---|
| Net Direct Debt | 2.08% |
| Net Direct and Overlapping Debt | 5.52% |

*Ratio to 2013 Estimated True Cash Value ($1,590,344,800)*

| | |
|---|---|
| Net Direct Debt | 1.04% |
| Net Direct and Overlapping Debt | 2.76% |

\* Preliminary, subject to change.

## DEBT HISTORY

The City has no record of default.

## FUTURE FINANCING

The City has entered into a contract with the Karegnondi Water Authority and the County of Genesee pursuant to which the Authority will issue an additional $80,000,000 of bonds over the next 3 to 15 months in anticipation of payments to be made by the County and the City to finance a raw water supply project to serve the County, the City and several other municipalities. The City will make a limited tax general obligation pledge of the City on approximately 30% of these bonds.

## LEGAL DEBT MARGIN

Section 7-302 of the City Charter, adopted November 4, 1975, limits "net" debt to 7% of the assessed value of all real and personal property in the City, but does not define "net" debt. The following computation is based on previous practice and is consistent with the requirements of State of Michigan Public Act 279 of 1909.

| | | |
|---|---|---|
| 2013 State Equalized Valuation - excluding IFT values | | $795,172,400 |
| Debt Limit - 10 % of State Equalized Valuation | | $79,517,240 |
| Amount of Direct Debt Outstanding | $215,003,242 | |
| Less: Revenue Bonds and Exempt Authority Bonds | (198,428,242) | |
| Total Subject to Debt Limit | | 16,575,000 |
| Additional Debt Which Could Be Legally Incurred | | $62,942,240 |

C-12

# GENERAL ECONOMIC INFORMATION

**LOCATION AND AREA**

The City of Flint, county seat of Genesee County, has a land area of approximately 32.8 square miles and is located in the southeastern portion of Michigan's Lower Peninsula, 70 miles northwest of the City of Detroit.  Lake Huron lies approximately 65 miles to the east of the City, while the Saginaw Bay is about 40 miles to the north.

As an important durable goods producer, the City is located the following distances from these commercial and industrial areas of Michigan:

| | |
|---|---|
| 35 | miles northwest of Pontiac |
| 36 | miles south of Saginaw |
| 50 | miles northeast of Lansing |
| 54 | miles north of Ann Arbor |
| 70 | miles northwest of Detroit |
| 99 | miles east of Grand Rapids |

**EMPLOYMENT CHARACTERISTICS\***

The following companies located in the City and surrounding communities offer employment opportunities for residents.

| Company | Product/Service | No. of Employed |
|---|---|---|
| *Within City of Flint* | | |
| McLaren Health Care Corporation | Hospital & other health care | 3,014 |
| Hurley Medical Center | Medical center | 2,811 |
| Baker College | Higher education | 2,800 |
| General Motors Corp. /Assembly | Truck & bus assembly | 2,100 |
| A I Flint LLC | Car parts and accessories | 1,500 |
| Genesys Health Care System | Health care | 1,000 |
| General Motors Corp., Powertrain Div. | Engines & gears & transmissions | 961 |
| Genesee Intermediate Schools | Education | 950 |
| Mott Community College | Higher education | 949 |
| Flint Community Schools | Educational services | 820 |
| Meijer Inc. (2 stores) | Department store | 800 |
| First Merit Bank | Banking | 780 |
| Carman Ainsworth | Education | 706 |
| General Motors Corp./ South Flint | Automotive engines | 663 |
| E L Hollingsworth & CO | Freight and logistics | 646 |
| Creative Foam Corp. | Plastic products | 600 |
| City of Flint | Municipality | 596 |
| Genova Products (HQ) | Plastic pipes | 570 |
| General Motors Corporation | Customer care center | 500 |
| Flint Special Services, Inc. | Freight and logistics | 500 |
| Kettering University | Higher education | 425 |
| Sears, Roebuck & Co. | Retail sales | 400 |
| Home Depot (3 stores) | Home center | 350 |
| Kroger (3 stores) | Supermarket | 350 |
| Coca Cola Bottling | Bottling facility | 300 |
| Lowe's (2 stores) | Home center | 300 |

C-13

| | | |
|---|---|---|
| Oakley Industries Sub Assembly (HQ) | Auto parts | 300 |
| Cable TV-Flint | Cable service | 250 |
| Goodwill Industries Of Mid-Michigan (HQ) | Job training/ vocational | 250 |
| Bill Thomas' Halo Burger, Inc. (HQ) | Restaurant | 230 |
| United States Postal Service | US Postal Service | 210 |
| Target (2 Stores) | Department store | 200 |
| The Flint Journal | Newpaper | 180 |
| Corsair Engineering | Shipping containers | 150 |
| Allied Waste Service | Waste management | 150 |
| Mott Children's Health Center | Healthcare | 150 |
| Beecher Community Schools | Education | 135 |
| Barrette Outdoor Living, Inc. | Lattice panels | 125 |
| Koegel Meats, Inc. | Meat processing | 100 |
| Monroe Truck Equipment | Truck equipment | 100 |
| Genesee Packaging, Inc. | Light assembly | 100 |
| H-Care | Durable medical equipment | 100 |
| Comcast Cable | Cable service | 100 |

The approximate number of employees listed are as reported in these sources: 2013 Michigan Manufacturers Directory, Manta Company Intelligence website, the Michigan Economic Development Council ("MEDC"), and individual employers.

*Due to reporting time lags and other factors inherent in collecting and reporting such information, the numbers may not reflect recent changes in employment levels, if any.

## POPULATION BY AGE

The 2010 U.S. Census estimate of population by age for the City of Flint is as follows:

| | Number | Percent |
|---|---|---|
| Total Population | 102,434 | 100.00% |
| 0 through 19 years | 31,750 | 31.00 |
| 20 through 64 years | 59,685 | 58.26 |
| 65 years and over | 10,999 | 10.74 |
| | | |
| Median age | 33.6 years | |

## INCOME

The 2010 U.S. Census estimate of household income for the City of Flint is as follows:

| | Number | Percent |
|---|---|---|
| HOUSEHOLDS BY INCOME | 41,175 | 100.00% |
| Less than $10,000 | 8,864 | 21.53 |
| $10,000 to $14,999 | 3,797 | 9.22 |
| $15,000 to $24,999 | 7,060 | 17.15 |
| $25,000 to $34,999 | 5,452 | 13.24 |
| $35,000 to $49,999 | 5,988 | 14.54 |
| $50,000 to $74,999 | 5,260 | 12.77 |
| $75,000 to $99,999 | 2,751 | 6.68 |
| $100,000 to $149,999 | 1,597 | 3.88 |
| $150,000 to $199,999 | 299 | 0.73 |
| $200,000 or more | 107 | 0.26 |
| | | |
| Median Income | $26,621 | |
| Mean Income | $35,631 | |

C-14

**EMPLOYMENT BREAKDOWN**

The 2010 U. S. Census reports the occupational breakdown of persons 16 years and over for the City of Flint as follows:

| | Number | Percent |
|---|---|---|
| PERSONS BY OCCUPATION | 30,196 | 100.00% |
| Professional Specialty Occupations | 6,801 | 20.97 |
| Service Occupations | 8,819 | 23.70 |
| Sales & Office Occupations | 7,334 | 22.44 |
| Construction & Maintenance Occupations | 1,815 | 8.18 |
| Transportation & Material Moving Occupations | 5,427 | 24.57 |

The breakdown by industry for persons 16 years and over for the City of Flint is as follows:

| | Number | Percent |
|---|---|---|
| PERSONS BY INDUSTRY | 30,196 | 100.00% |
| Agriculture, Forestry, Fishing, Hunting & Mining | 160 | 0.53 |
| Construction | 1,155 | 3.83 |
| Manufacturing | 4,354 | 14.42 |
| Wholesale Trade | 613 | 2.03 |
| Retail Trade | 3,852 | 12.76 |
| Transportation | 1,318 | 4.36 |
| Information | 550 | 1.82 |
| Finance, Insurance, & Real Estate | 1,323 | 4.38 |
| Professional & Management Services | 2,168 | 7.18 |
| Educational, Health & Social Services | 8,853 | 29.32 |
| Arts, Entertainment, Recreation & Food Services | 3,079 | 10.20 |
| Other Professional and Related Services | 1,409 | 4.67 |
| Public Administration | 1,362 | 4.51 |

**UNEMPLOYMENT**

The Michigan Employment Security Commission, Research and Statistical Division, reports unemployment averages for the City of Flint as follows:

| | City of Flint |
|---|---|
| 2014 YTD (January) | 16.7% |
| 2013 Annual Average | 17.0 |
| 2012 Annual Average | 16.6 |
| 2011 Annual Average | 19.0 |
| 2010 Annual Average | 23.5 |

**BANKING**

The following banks have branches located within the City according to the Accuity American Financial Directory, July - December 2013.

| Bank | Main Office | Total State-Wide Deposits |
|---|---|---|
| First Place Bank | Warren, OH | N/A |
| The Huntington National Bank | Columbus, OH | N/A |
| Bank of America | Charlotte, NC | N/A |
| Fifth Third Bank | Cincinnati, OH | N/A |
| First Merit Bank | Akron, OH | N/A |
| Flagstar Bank, FSB | Troy, MI | $8,771,046,000 |
| Chemical Bank | Midland, MI | 4,921,683,000 |
| JPMorgan Chase Bank, National Association | Columbus, OH | N/A |

**City of Flint**
**Summary of General Fund Adopted Revenue and Expenditure Budget**
**Fiscal Year Ending June 30, 2014**

| Revenue | FY14 Amended 11/1/2013 | FY14 Amended 2/17/2014 |
|---|---|---|
| Property Tax | $4,619,941 | $4,719,941 |
| Income Tax | 14,210,000 | 14,210,000 |
| Federal Revenue | - | - |
| State Revenue | 15,375,985 | 14,986,814 |
| Licensing and Permits | 1,303,626 | 1,303,626 |
| Fines and Forfeitures | 1,677,550 | 2,041,635 |
| Charges for Services | 9,090,867 | 10,434,516 |
| Other Revenue | 6,676,498 | 6,851,584 |
| **Total Revenue** | $52,954,467 | $54,548,116 |
| | | |
| **Expenditures** | | |
| | | |
| General Government | $8,295,108 | $8,229,910 |
| District Court | 5,194,307 | 5,194,307 |
| Public Safety | 35,035,993 | 36,694,840 |
| Infrastructure | 2,889,889 | 2,889,889 |
| Governance | 539,170 | 539,170 |
| Other Expenditures | - | - |
| **Total Expenditures** | $51,954,467 | $53,548,116 |
| | | |
| **Revenue Over (Under) Expenditures** | $1,000,000 | $1,000,000 |
| | | |
| Fund Balance Beginning of Year | ($12,895,642) | ($12,895,642) |
| | | |
| **Fund Balance End of Year** | ($11,895,642) | ($11,895,642) |

Note: Flint reduced its expected expenditures by $1,000,000 as a budget control mechanism to help ensure that the City reduces its structural deficit.

**APPENDIX D**

**CITY OF FLINT**
**AUDITED FINANCIAL STATEMENTS**

*Attached are the audited financial statements for the City of Flint for the fiscal year ended June 30, 2013. The auditors for the City have not been asked to consent to the use of information from such financial statements in either the Preliminary Official Statement or the Official Statement and have not conducted any subsequent review of such financial statements.*

[THIS PAGE INTENTIONALLY LEFT BLANK]



Plante & Moran, PLLC
Suite 1A
111 E. Court St.
Flint, MI 48502
Te: 810.767.5910
Fax 810.767.3430
plantemoran.com

Independent Auditor's Report

To the Emergency Manager, Honorable Mayor,
    and Members of the City Council
City of Flint
Flint, Michigan

**Report on the Financial Statements**

We have audited the accompanying financial statements of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of the City of Flint (the "City") as of and for the year ended June 30, 2013 and the related notes to the financial statements, which collectively comprise the City's basic financial statements as listed in the table of contents.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditor's Responsibility*

Our responsibility is to express opinions on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.   The financial statements of Hurley Medical Center, the Downtown Development Authority, the Economic Development Corporation, and the Flint Area Enterprise Community were not audited under *Government Auditing Standards*.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinions.

1



To the Emergency Manager, Honorable Mayor,
    and Members of the City Council
City of Flint
Flint, Michigan

*Opinions*

In our opinion, the financial statements referred to above present fairly, in all material respects, the respective financial position of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of the City as of June 30, 2013 and the respective changes in its financial position and cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

*Emphasis of Matter*

As discussed in Note 20 to the basic financial statements, the beginning net position/fund balance has been restated to correct a misstatement. Our opinion is not modified with respect to this matter.

*Other Matters*

*Required Supplemental Information*

Accounting principles generally accepted in the United States of America require that the management's discussion and analysis, pension system schedules of funding progress and employer contributions, and the major fund budgetary comparison schedules, as identified in the table of contents, be presented to supplement the basic financial statements.  Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board, which considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplemental information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

*Other Supplemental Information*

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise the City's basic financial statements. The other supplemental information, introductory section, and statistical section, as identified in the table of contents, are presented for the purpose of additional analysis and are not a required part of the basic financial statements.

The other supplemental information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the basic financial statements or to the basic financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America.  In our opinion, the other supplemental information is fairly stated in all material respects in relation to the basic financial statements as a whole.

The introductory and statistical sections have not been subjected to the auditing procedures applied in the audit of the basic financial statements and, accordingly, we do not express an opinion or provide any assurance on it.

2

To the Emergency Manager, Honorable Mayor,
   and Members of the City Council
City of Flint
Flint, Michigan

**Other Reporting Required by *Government Auditing Standards***

In accordance with *Government Auditing Standards*, we have also issued our report dated December 17, 2013 on our consideration of the City of Flint, Michigan's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, grant agreements, and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance.  That report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the City's internal control over financial reporting and compliance.

*Plante & Moran, PLLC*

December 17, 2013

**Management's Discussion and Analysis**

D-2

3

**City of Flint, Michigan**

### Management's Discussion and Analysis

Following is a brief overview and analysis of the financial statements for the City of Flint, Michigan (the "City") for the 2013 fiscal year, which began on July 1, 2012 and ended on June 30, 2013. The reader is encouraged to not only consider the comments made here but to review the statements in their entirety.

The City provides a full range of municipal services, including police and fire protection, construction and maintenance of streets, sidewalks, and other infrastructure, maintenance and operation of water and sewer systems, maintenance of parks, and waste collection. These activities comprise the majority of the City's governmental and business-type activities.

In addition to governmental and business-type activities, the financial statements include the activities of Hurley Medical Center, Flint Downtown Development Authority, Flint Economic Development Corporation, and Flint Area Enterprise Community. While part of the City government, these entities are presented as "discrete component units" because of their independent management authority. In previous years, Hurley Medical Center has been included as a business-type activity of the City government, but a review of its status has concluded that it can be more appropriately presented as a discrete component unit.

**Financial Highlights**

In fiscal year 2013, the City billed $187.7 million in taxes, fees, and grants for governmental and business-type activities, and spent $170.0 million to provide the services. During the course of the year, the City acquired capital assets totaling $5.1 million in governmental activities and $1.7 million in building improvements and equipment in business-type activities. At the end of the year, the assets of the City governmental and business-type activities totaled $356.4 million and liabilities totaled $238.6 million, for net position totaling $117.8 million. However, net unrestricted net position totaled a negative $150.1 million. The majority of the negative unrestricted net position reflects the $158.9 million liability for unfunded retiree healthcare liabilities; the business-type activities reflected $8.3 million in unrestricted net position.

On December 1, 2011, five months into fiscal year 2012, the governor of the state of Michigan placed the City of Flint into state receivership and appointed an emergency manager. This decision was based on the recommendation of a state appointed review team, whose recommendation was made in part because of a consistent deficit in the General Fund, the decline in pooled cash, unrealistic budgeting, and unfunded liabilities for postemployment benefits.

Although there have been several changes since December 2011, in the laws providing for the appointment of an emergency manager, and there have been three different emergency managers since then, the City has remained under the control of a state appointed manager. These managers exercise direct control of the City's financial and operational matters and have been authorized to "act for and in the place and stead of the governing body and the office of chief administrative officer of the City of Flint."

**City of Flint, Michigan**

### Management's Discussion and Analysis (Continued)

With the fiscal year 2012 half complete at the time the emergency manager was appointed, it was clear that significant long-term solutions to the City's financial condition could not be achieved in the remainder of that fiscal year. Addressing any significant reductions at that time would have required unthinkable reductions in the level of public safety and other essential City services, and would have been done in an atmosphere of crisis. As a result, it was determined to contain spending as much as possible for the balance of fiscal year 2012, while building a credible spending plan for fiscal year 2013 and laying the necessary groundwork for substantially reducing the City's cost base for fiscal year 2013 and beyond. Consequently, the fiscal year 2012 financial statements showed a $19.2 million General Fund deficit, an increase of $11.9 million.

Faced with an initial projected gap of more than $25 million, the fiscal year 2013 budget was balanced through a mixture of significant revenue increases, significant expenditure decreases, and steps taken to reduce legacy costs. Reports submitted to the state treasurer detailed the 25 percent increase in water and sewer rates, passage of a 6 mill property tax increase for police and fire, which is recorded in a separate public safety special revenue fund and the monies are restricted as such on the government-wide statement of net position, establishment of a special assessment district for street lighting, elimination of 20 percent of the City's workforce, compensation decreases equivalent to a 20 percent wage reduction for remaining employees, and the restructuring of health and retirement benefits for current employees and retirees necessary to develop a credibly balanced spending plan.

The efforts of the emergency managers and City staff were focused on assuring that, at the end of fiscal year 2013, expenses would not exceed revenues. This goal was more than achieved, as the financial statements as of June 30, 2013 show that revenues exceeded expenses in the General Fund by $6.3 million. This will result in the City's accumulated $19.2 million deficit as of June 30, 2012 being reduced to less than $13 million as of June 30, 2013.

Additionally, the City's cash flow improved significantly. Cash flow in December 2011 was projected at approximately $13 million in comparison to current cash on hand as of June 30, 2013 in excess of $43 million.

Finally, the actions taken to restructure healthcare benefits for current employees and retirees have had a significant impact on current costs and long-term liabilities. Much of the positive financial result in FY13 came from these actions. The restructuring, which was implemented during the course of FY12, had the additional benefit of reducing the City's OPEB liabilities by more than $500 million, as reflected in 2012 financial statements.

As spending patterns have been revised to be in accord with available revenues, it has also become possible to focus on additional efforts to reduce and quickly eliminate the accumulated deficit. A formal plan to eliminate the remaining deficit within the next few years will be submitted shortly to the Department of Treasury for consideration.

D-3

**City of Flint, Michigan**

### Management's Discussion and Analysis (Continued)

**Overview of the Financial Statements**

This discussion and analysis is intended to serve as an introduction to the City's basic financial statements. The City's basic financial statements comprise three components: (1) government-wide financial statements, (2) fund financial statements, and (3) notes to the financial statements. This report also contains other supplemental information in addition to the basic financial statements themselves.

Table I summarizes the major features of the City's financial statements, including the portion of the City government they cover and the types of information they contain. The remainder of this overview section of management's discussion and analysis explains the structure and contents of each of the statements.

D-4

**City of Flint, Michigan**

### Management's Discussion and Analysis (Continued)

Table I - Major Features of the City of Flint, Michigan's Government-wide and Fund Financial Statements

| Type of Statements | Government-wide | Governmental Funds | Proprietary Funds | Fiduciary Funds |
|---|---|---|---|---|
| Scope | Entire City government (except fiduciary funds) and the City's component units | The activities of the City that are not proprietary or fiduciary, such as police, fire, and parks | Activities the City operates similar to private businesses: the water and sewer system | Instances in which the City is the trustee or agent for someone else's resources, such as the retirement plan for City employees |
| Required financial statements | • Statement of net position<br>• Statement of activities | • Balance sheet<br>• Statement of revenues, expenditures, and changes in fund balances | • Statement of net position<br>• Statement of revenues, expenses, and changes in fund net position<br>• Statement of cash flows | • Statement of fiduciary net position<br>• Statement of changes in fiduciary net position |
| Accounting basis and measurement focus | Accrual accounting and economic resources focus | Modified accrual accounting and current financial resources focus | Accrual accounting and economic resources focus | Accrual accounting and economic resources focus |
| Type of asset/liability information | All assets and liabilities, both financial and capital, short term and long term | Only assets expected to be used up and liabilities that come due during the year or soon thereafter, no capital assets included | All assets and liabilities, both financial and capital, and short term and long term | All assets and liabilities, both short term and long term; the City's funds do not currently contain capital assets, although they can |
| Type of inflow/outflow information | All revenues and expenses during year, regardless of when cash is received or paid | Revenues for which cash is received during or soon after the end of the year, expenditures when goods or services have been received and payment is due during the year or soon thereafter | All revenues and expenses during year, regardless of when cash is received or paid | All revenues and expenses during year, regardless of when cash is received or paid |

**City of Flint, Michigan**

**Management's Discussion and Analysis (Continued)**

**Government-wide Financial Statements**

The government-wide financial statements are designed to provide readers with a broad overview of the City's finances, in a manner similar to a private sector business.

The statement of net position presents information on all of the City's assets and liabilities, with the difference between the two reported as net position. Over time, increases or decreases in net position may serve as a useful indicator of whether the financial position of the City is improving or deteriorating.

The statement of activities presents information showing how the City's net position changed during the most recent fiscal year. All changes in net position are reported as soon as the underlying event giving rise to the change occurs, regardless of the timing of related cash flows. Thus, revenues and expenses are reported in this statement for some items that will only result in cash flows in future fiscal periods (e.g., uncollected taxes and earned but unused vacation leave).

Both of the government-wide financial statements distinguish functions of the City that are principally supported by taxes and intergovernmental revenues (governmental activities) from other functions that are intended to recover all or a significant portion of their costs through user fees and charges (business-type activities). The governmental activities of the City include general government, police, fire, transportation, public works, parks and recreation, and community enrichment and development. The business-type activities of the City include the water system and sewer system.

The government-wide financial statements include not only the City itself (known as the primary government), but also the legally separate component units of Hurley Medical Center, Downtown Development Authority, Economic Development Corporation, Atwood Stadium Building Authority, and the Flint Area Enterprise Community, for which the City is financially accountable. Financial information for these component units is reported separately from the financial information presented for the primary government itself. The government-wide financial statements can be found on pages 20-23 of this report.

**Fund Financial Statements** - A fund is a grouping of related accounts that is used to maintain control over resources that have been segregated for specific activities or objectives. The City of Flint, like other state and local governments, uses fund accounting to ensure and demonstrate compliance with finance-related legal requirements. All of the funds of the City can be divided into three categories: governmental funds, proprietary funds, and fiduciary funds.

**City of Flint, Michigan**

**Management's Discussion and Analysis (Continued)**

**Governmental Funds** - Governmental funds are used to account for essentially the same functions reported as governmental activities in the government-wide financial statements. However, unlike the government-wide financial statements, governmental fund statements focus on near-term inflows and outflows of spendable resources, as well as on balances of spendable resources available at the end of the fiscal year. Such information may be useful in evaluating a government's near-term financing requirements. Because the focus of governmental funds is narrower than that of the government-wide financial statements, it is useful to compare the information presented for governmental funds with similar information presented for governmental activities in the government-wide financial statements. By doing so, readers may better understand the long-term impact of the government's near-term financing decisions. Both the governmental fund balance sheet and the governmental fund statement of revenues, expenditures, and changes in fund balances provide a reconciliation to facilitate this comparison between governmental funds and governmental activities.

The City maintains 20 individual governmental funds. Information is presented separately in the governmental fund balance sheet and in the governmental fund statement of revenues, expenditures, and changes in fund balances for the General Fund, Federal Grants Fund, and the Public Improvement Fund. Data from the other 17 governmental funds are combined into a single, aggregated presentation. Individual fund data for each of these nonmajor governmental funds is provided in the form of combining statements elsewhere in this report.

The City adopts an annual appropriated budget for its General Fund. A budgetary comparison statement has been provided for the General Fund to demonstrate compliance with this budget.

The basic governmental fund financial statements can be found on pages 24-27 of this report.

**Proprietary Funds** - The City maintains two different types of proprietary funds. Enterprise funds are used to report the same functions presented as business-type activities in the government-wide financial statements. The City uses enterprise funds to account for its water and sewer activities. Internal service funds are an accounting device used to accumulate and allocate costs internally among the City's funds. The City uses internal service funds to account for its data processing, central maintenance garage, fringe benefits, and self-insurance activities. Because these services predominantly benefit governmental rather than business-type activities, they have been included within governmental activities in the government-wide financial statements.

Proprietary funds provide the same type of information as the government-wide financial statements, only in more detail. The proprietary fund financial statements provide separate information for the Water and the Sewer Funds, both of which are considered to be major funds of the City. Conversely, the internal service funds are combined into a single, aggregated presentation in the proprietary fund financial statements. Individual fund data for the internal service funds is provided in the form of combining statements elsewhere in this report. The basic proprietary fund financial statements can be found on pages 28-31 of this report.

D-5

8

9

## City of Flint, Michigan

### Management's Discussion and Analysis (Continued)

**Fiduciary Funds** - Fiduciary funds are used to account for resources held for the benefit of parties outside the government. Fiduciary funds are not reflected in the government-wide financial statements because the resources of those funds are not available to support the City's own programs. The accounting used for fiduciary funds is much like that used for proprietary funds. The basic fiduciary fund financial statements can be found on pages 32 and 33 of this report.

**Notes to the Financial Statements** - The notes provide additional information that is essential to a full understanding of the data provided in the government-wide and fund financial statements. The notes to the financial statements can be found on pages 37-88 of this report.

**Other Information** - In addition to the basic financial statements and accompanying notes, this report also presents certain required supplemental information concerning the City's progress in funding its obligation to provide pension benefits to its employees. Required supplemental information can be found on pages 89-95 of this report.

The combining statements referred to earlier in connection with nonmajor governmental funds and internal service funds are presented immediately following the required supplemental information on pensions. Combining and individual fund statements and schedules can be found on pages 97-122 of this report.

### Government-wide Financial Analysis

Net position may serve, over time, as a useful indicator of a government's financial position (see Table 2). Total assets of the City are $356.4 million. Total net position (total assets less total liabilities) is $117.8 million, of which the largest portion of $231.9 million reflects its net investment in capital assets (e.g., land, buildings, streets, sidewalks, machinery, and equipment), less depreciation and any related debt used to acquire those assets that is still outstanding. The City uses these capital assets to provide services to citizens; consequently, these assets are not available for future spending. Although the City's net investment in its capital assets is reported net of related debt, it should be noted that the resources needed to repay this debt must be provided from other sources, since the capital assets themselves cannot be used to liquidate these liabilities.

Of the remaining portion of the City's total net position, $36.0 million represents resources which are subject to external restrictions on how they may be used. The unrestricted deficit at year end was $150.1 million, which is down from 2012 deficit of $178.6 million. There is no remaining balance of unrestricted net position that may be used to meet the government's ongoing obligations to citizens and creditors. Net position is divided between governmental activities and business-type activities. Governmental activities show a $158.4 million deficit in unrestricted net position. The $158.4 million deficit results from the increase in the short-term and long-term liabilities, mainly $129.6 million in postemployment healthcare liability, which increased by $1.9 million in total from 2012.

## City of Flint, Michigan

### Management's Discussion and Analysis (Continued)

Table 2-City of Flint's Net Position
(In Millions)

| | Governmental Activities | | Business-type Activities | | Total Primary Government | |
|---|---|---|---|---|---|---|
| | **2012** | **2013** | **2012** | **2013** | **2012** | **2013** |
| Current and other assets | $ 32.1 | $ 48.6 | $ 32.5 | $ 49.9 | $ 64.6 | $ 98.5 |
| Capital assets | 166.7 | 155.5 | 110.1 | 102.4 | 276.8 | 257.9 |
| Total assets | $ 198.8 | $ 204.1 | $ 142.6 | $ 152.3 | $ 341.4 | $ 356.4 |
| Long-term liabilities outstanding | $ 160.9 | $ 160.5 | $ 52.7 | $ 50.9 | $ 213.6 | $ 211.4 |
| Other liabilities | 19.1 | 17.1 | 8.6 | 10.1 | 27.7 | 27.2 |
| Total liabilities | $ 180.0 | $ 177.6 | $ 61.3 | $ 61.0 | $ 241.3 | $ 238.6 |
| Net position: | | | | | | |
| Net investment in capital assets | $ 164.5 | $ 153.3 | $ 84.2 | $ 78.6 | $ 248.7 | $ 231.9 |
| Restricted | 24.4 | 31.6 | 5.6 | 4.4 | 30.0 | 36.0 |
| Unrestricted | (170.1) | (158.4) | (8.5) | 8.3 | (178.6) | (150.1) |
| Total net position | $ 18.8 | $ 26.5 | $ 81.3 | $ 91.3 | $ 100.1 | $ 117.8 |

Business-type activities have $91.3 million of total net position. Business-type activities do not encumber at year end and normally do not appropriate net position as part of the budget process.

**Governmental Activities** - Changes in net position (see Table 3) provide some insight into current year activities as compared to those of the prior year. Total net position for governmental activities increased by $7.7 million. Revenues in 2013 were $12.7 million higher than in 2012. This increase in revenue is mainly due to a public safety millage passed by the voters and increase in state grant revenues in 2013. The 2013 expenses were $8.6 million lower than in 2012. The decrease in expenses was largely in part due to reduction in the cost of healthcare expenses.

**Business-type Activities** - Total net position increased by $10.0 million in business-type activities. The main reason for the increase was due to the City increasing the water and sewer user rates in the latter part of fiscal year 2012. The increased rates, along with a delay in making budgeted capital improvements, have played a vital role in sustaining the fiscal year's budget.

**City of Flint, Michigan**

### Management's Discussion and Analysis (Continued)

Table 3-City of Flint's Changes in Net Position
(in Millions)

| | Governmental Activities | | Business-type Activities | | Total Primary Government | |
|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2012 | 2013 | 2012 | 2013 |
| **Revenues** | | | | | | |
| **Program Revenues:** | | | | | | |
| Charges for services | $ 16.5 | $ 17.6 | $ 68.0 | $ 80.1 | $ 84.5 | $ 97.7 |
| Operating grants and contributions | 20.9 | 14.2 | 0.0 | 0.0 | 20.9 | 14.2 |
| Capital grants and contributions | 13.3 | 21.9 | 0.0 | 0.0 | 13.3 | 21.9 |
| **General revenues:** | | | | | | |
| Income taxes | 14.8 | 14.7 | 0.0 | 0.0 | 14.8 | 14.7 |
| Property taxes | 14.3 | 21.7 | 0.0 | 0.0 | 14.3 | 21.7 |
| State shared revenues | 13.1 | 13.7 | 0.0 | 0.0 | 13.1 | 13.7 |
| Other | 1.9 | 3.7 | 0.3 | 0.1 | 2.2 | 3.8 |
| Total revenues | 94.8 | 107.5 | 68.3 | 80.2 | 163.1 | 187.7 |
| **Expenses** | | | | | | |
| Legislative | 1.2 | 0.3 | 0.0 | 0.0 | 1.2 | 0.3 |
| Judicial | 3.7 | 5.1 | 0.0 | 0.0 | 3.7 | 5.1 |
| General government | 10.8 | 7.5 | 0.0 | 0.0 | 10.8 | 7.5 |
| Public safety | 49.1 | 43.0 | 0.0 | 0.0 | 49.1 | 43.0 |
| Public works | 26.0 | 23.0 | 0.0 | 0.0 | 26.0 | 23.0 |
| Parks and recreation | 4.5 | 2.9 | 0.0 | 0.0 | 4.5 | 2.9 |
| Community development | 14.7 | 20.0 | 0.0 | 0.0 | 14.7 | 20.0 |
| Interest on long-term debt | 1.4 | 1.0 | 0.0 | 0.0 | 1.4 | 1.0 |
| Water | 0.0 | 0.0 | 42.5 | 42.0 | 42.5 | 42.0 |
| Sewer | 0.0 | 0.0 | 25.3 | 25.2 | 25.3 | 25.2 |
| Total Expenses | 111.4 | 102.8 | 67.8 | 67.2 | 179.2 | 170.0 |
| Transfers | 3.0 | 3.0 | (3.0) | (3.0) | 0.0 | 0.0 |
| Changes in net position | (13.6) | 7.7 | (2.5) | 10.0 | (16.1) | 17.7 |
| Net position - Beginning - as restated | 32.4 | 18.8 | 83.8 | 81.3 | 263.0 | 246.9 |
| Net position - End | $ 18.8 | $ 26.5 | $ 81.3 | $ 91.3 | $ 246.9 | $ 264.6 |

**Analysis of Fund Financial Statements**

As noted earlier, the City uses fund accounting to ensure and demonstrate compliance with finance-related legal requirements.

**Governmental Funds** - The focus of the City's governmental funds is to provide information on near-term inflows, outflows, and balances of expendable resources. Such information is useful in assessing the City's financing requirements. In particular, unreserved fund balance may serve as a useful measure of a government's net resources available for spending at the end of the fiscal year.

The City's governmental funds show an operating surplus (or fund balance) of $7.2 million as of June 30, 2013. This is a significant turnaround from the deficit of $7.3 million. During the year, the City residents voted and approved a public safety millage that generated $5.6 million to stabilize staffing for the police and fire departments. In addition, the energy company conducted a three-year audit of the City's streetlights bill; the results of the audit were a $1 million credit back to the City. In 2012, the emergency manager ratified new changes to employee and retiree benefits that took full effect in fiscal year 2013. These changes resulted in a significant decrease in healthcare costs. The reduction in costs was credited back across all funds to departmental budgets.

The reduction of the $19.2 million deficit for the General Fund in fiscal year 2012 to $12.9 million in 2013 was a result of projecting a realistic budget and managing it. Managing the General Fund has been difficult due to significant reductions in property tax revenues, income tax revenues, and state-shared revenues. However, the emergency manager and his team took the necessary and difficult steps needed to reduce costs.

The remaining governmental funds have a fund balance of $20.1 million, of which virtually all is invested in infrastructure and equipment or restricted for specific purposes. The largest fund balances among the governmental funds are the public safety, $5.1 million, and local and major streets, $4.5 million. Other special revenue funds are maintained primarily to demonstrate accountability. Federal and state laws place restrictions on how these funds can be spent.

State law requires the preparation of a deficit elimination plan for all fund deficits, unless current assets of the fund exceed current liabilities. While the past two deficit elimination plans have addressed deficits in the General Fund, Water Supply Fund, Downtown Development Authority, and Economic Development Authority, it will only be necessary for the City to address in the 2013 plan, the remaining $12.9 million deficit in the General Fund. A plan is being prepared and will be submitted to the Department of Treasury when this report is filed. However, the Economic Development Corporation will be filing its own deficit elimination plan to address the $148,895 deficit.

**Proprietary Funds** - The City's proprietary funds provide the same type of information found in the government-wide financial statements, but in more detail.

Total net position in the Water Fund is $26.4 million, an increase of $6.8 million from the previous year. Unrestricted net position is no longer negative. Net operating income is also improved from $2.3 million to $8.6 million. The positive change is attributable mostly to increases in rates. The Water Fund has a bond reserve account of $2.4 million and an equipment reserve account of $2.0 million.

Net position in the Sewer Fund is $64.8 million, an increase of $3.1 million from 2012. Net operating income was a positive $6.8 million.

Additional rate increases averaging 25 percent were implemented as part of the fiscal year 2013 budget in order to improve the financial solvency of the water and sewer systems.

# City of Flint, Michigan

## Management's Discussion and Analysis (Continued)

**Capital Assets and Debt Administration**

**Capital Assets** - The City's net investment in capital assets for its governmental and business-type activities as of June 30, 2013 amounts to $257.9 million (net of accumulated depreciation), a net decrease of $18.8 million. This net investment in capital assets includes land, buildings and system improvements, machinery and equipment, park facilities, roads, highways, and bridges (see Table 4). Additional information on the City's capital assets can be found in Note 6.

Table 4-City of Flint's Capital Assets - net of depreciation
(in Millions)

| | Governmental Activities | | Business-type Activities | | Total Primary Government | |
|---|---|---|---|---|---|---|
| | **2012** | **2013** | **2012** | **2013** | **2012** | **2013** |
| Land | $   14.3 | $   14.3 | $   0.8 | $   0.8 | $   15.1 | $   15.1 |
| Construction in progress | - | 0.1 | 1.3 | 1.3 | 1.3 | 1.4 |
| Building and system | 5.8 | 5.4 | 33.7 | 31.4 | 39.5 | 36.8 |
| Improvements other than buildings | 4.2 | 3.8 | 3.9 | 3.6 | 8.1 | 7.4 |
| Machinery and equipment | 5.8 | 4.6 | 70.4 | 65.3 | 76.2 | 69.9 |
| Roads and sidewalks | 136.5 | 127.3 | - | - | 136.5 | 127.3 |
| Total | $   166.6 | $   155.5 | $   110.1 | $   102.4 | $   276.7 | $   257.9 |

The City governmental activities made major capital improvements during 2013:

- Streets and enhancement    $ 2.9 million
- Trails    0.1 million
- Signs and signals    0.7 million

Total capital improvements, as a result of governmental activities, were $5.1 million. Depreciation was $15.6 million.

The City's business-type activities also made very little capital improvements during 2013. This was due to reduced available funds.

**Debt Administration** - Debt is administered through three debt service funds and the Public Improvement Fund. In addition, the Water Fund services debt for bonds issued for plant improvements (see Table 5).

**General Obligation Bonds** - The City issued $10 million in General Obligation Bonds in fiscal year 2008 on behalf of the Flint Downtown Development Authority for construction of the new Rutherford parking structure. The DDA has pledged a portion of state-shared revenue as security for the bond. The DDA has pledged net revenue from the parking operations for the repayment of the bond. However, in the City's approved deficit elimination plan, it was determined by the City that the DDA's commitment to funding its portion of the debt service for the parking ramp was unrealistic given the decline in property values and revenues expected to be received through operations were not realized. The City as the guarantor is making the debt service payments.

**Long-term Debt** - At year end, the City had $34.8 million in bonds and notes and compensated absences outstanding for governmental activities and $24.4 million in bonds and notes and compensated absences outstanding for business-type activities. Additional information on the City's long-term debt can be found in Note 9.

Table 5-City of Flint's Long-term Debt
(in millions)

| | Governmental Activities | | Business-type Activities | | Total Primary Government | |
|---|---|---|---|---|---|---|
| | **2012** | **2013** | **2012** | **2013** | **2012** | **2013** |
| General Obligation Bonds | $   9.5 | $   9.2 | $   - | $   - | $   9.5 | $   9.2 |
| Revenue Bonds and Notes | - | - | 25.9 | 23.8 | 25.9 | 23.8 |
| Other Notes | 21.4 | 20.8 | - | - | 21.4 | 20.8 |
| Capital Leases | 0.7 | 0.4 | - | - | 0.7 | 0.4 |
| Accrued Annual and Sick Pay | 5.3 | 4.4 | 0.6 | 0.6 | 5.9 | 5.0 |
| Total | $   36.9 | $   34.8 | $   28.5 | $   24.4 | $   63.4 | $   59.2 |

**Limitations on Debt** - The State limits the amount of general obligation debt the City can issue to 7 percent of the assessed value of all taxable property within the City's corporate limits. The City's legal debt limit is $115.4 million. The amount of debt available to the City (unused portion of the debt limitation) is $102.6 million. The City can issue bonds through the Michigan Municipal Bonding Authority's state-shared revenue program. The program pledges the City's future state-shared revenues.

**Bond Ratings** - There are no current ratings for the City. Prior ratings were withdrawn as the City's financial position led to consideration of the City being placed into receivership. Moody's Investors Service last rated the City's general obligation unlimited bonds at Ba1, with a stable outlook in February 2006.

# City of Flint, Michigan

## Management's Discussion and Analysis (Continued)

## City of Flint, Michigan

### Management's Discussion and Analysis (Continued)

**Economic Factors and Next Year's Budget and Rates**

Flint and Genesee County are moving aggressively to restore our region's position as a center of innovation and entrepreneurship in the public and private sectors. Our new leadership is partnering to engage our strong anchor assets in higher education, life sciences/health care, and advanced manufacturing to make our region a superior place for business investment, policy experimentation, and multi-sector partnerships. We are starting to be recognized for our growth and reinvention. Kiplinger referred to Flint in April 2011 *"For some particularly hard-hit metro areas, 2011 will bring a dramatic turnaround -- new investment by businesses, growth in the number of jobs, and a reblooming of hope."*

Our overall objective is to create a sustainable region with new jobs, strong neighborhoods, and great schools. This will be achieved through private and public collaboration and harnessing of the community's capacity for diversification, innovation, and entrepreneurship.

Flint and Genesee County aim to be one of Michigan's major success stories by moving from prolonged recession to rapid recovery and growth. Our region intends to lead the way with measurable achievements over the next three to five years as follows:

- Doubling export activity and generating new jobs
  - As GM truck and engine sales increase, a portion is destined for international markets
  - Area manufacturers have increased exporting in 2012-2013 with funding support from the Michigan State Trade Export Program (STEP)
- Increasing enrollments across our higher education institutions
  - The University of Michigan - Flint has achieved record enrollment in 2012 and 2013 with dramatic increases in international students
  - Kettering University, Mott Community College, and Baker College - Flint have received national recognition
- Attracting and retaining mobile talent and young families
  - Downtown Flint is reported as the fastest growing neighborhood in Genesee County
- Stabilizing property values and local tax revenues
- Reducing unemployment and poverty
  - Flint and Genesee County saw some of the fastest decline in unemployment in the state of Michigan in 2013
- Improving health outcomes, quality of life, and environmental sustainability
  - Commit to Fit is a growing Flint-based initiative that promotes "healthy habits."

*"Steady Job Growth Will Continue for Genesee, Lapeer, Livingston, Macomb, Oakland, St. Clair, and Shiawassee Counties"* according to the February 2013 economic forecast by the University of Michigan Institute for Research on Labor, Employment and the Economy. The report forecasted job growth of approximately 78,000 from 2013-2015 and highlighted the creation of 75,000 new jobs in the past three years. The study predicts new jobs in professional services and trade/transportation/utilities, as well as private education and health. Many of these positions will be within commute distance from Flint and Genesee County. The report also predicted 0.9 percent job growth per year for Flint and Genesee County.

Jobs and business opportunities are increasing because of the continued collaboration among our key economic sectors, governments, and non-profits. Despite the ongoing recession, last year the region created and retained 569 jobs through the direct efforts of the Flint and Genesee Chamber of Commerce, our lead economic development agency. In fact, public and private joint efforts have supported:

- More than $1 billion in General Motors investment in the past three years

- Over $500 million in new non-GM investment in the past three years

- Continuing investment in downtown Flint with announcements of more than $200 million from 2011-2013, including over $100 million in new higher education assets

Further, City suppliers have increased their federal contracting wins over 1,300 percent in the last five years. Finally, federal investment is also growing. Recent awards include $20 million for blight elimination from the U.S. Troubled Asset Relief Program, $550,000 from EPA for Chevy in the Hole site clean-up and environmental remediation training at Mott Community College, and $140,000 for a four-county regional CEDS plan. These combine with $33 million from the EPA to clean up the Buick City Brownfield, a HUD challenge planning grant, a SAFER grant, and several research and development grants.

At the core of our region, the City has restored some of its manufacturing strength while expanding its institutions of higher education and health care. Recently, a milestone was reached by the area's colleges and universities. Total enrollment is now nearly 34,000 students in undergraduate through doctoral programs. Many new businesses, housing options, and restaurants have been created as part of the downtown Flint investments. The formerly all-commuter downtown has been transformed into a vibrant scene where 3,600 college students are living in newly developed multi-institution residence halls and lofts. Notably, two landmark hotels that had been closed for business (the Hyatt Regency and Durant) are fully renovated and now house college students, faculty, and professionals.

Flint and Genesee County have attracted strong new businesses such as Rassini Brakes, Senderra RX, Environmental Wood Solutions, and most recently, American Cast Iron Pipe, the last two of which are locating in the City. American has announced plans to build a facility on the northern portion of the former Buick City complex and create 60 new jobs.

## City of Flint, Michigan

### Management's Discussion and Analysis (Continued)

City of Flint staff have collaborated with the economic development team at the Flint and Genesee Chamber to support the growth of area businesses including: Powers Catholic High School (private), CFI Medical, Sustainable Environmental Technologies, McLaren Flint Proton Beam, McLaren Flint Laboratory, and Barrette Outdoor Living, as well as General Motors Truck Assembly and General Motors Flint Engine South.

Diplomat Specialty Pharmacy, the fastest growing firm of its type in the United States, continues to grow ahead of plans at their new corporate headquarters in Flint. Plans include the creation of 1,100 new jobs by 2016. The company produces, packages, and distributes pharmaceutical products to chronically ill patients across the country. Diplomat and the Insight Institute for Neurosurgery and Neuroscience acquired the entirety of the former GM Great Lakes Technology Center, a 1,000,000 square foot complex in Flint.

In health care, Genesys Health System recently established a new $3 million clinic in downtown Flint with 10 new jobs and 60 transferred from a neighboring municipality. The main campus of Genesys continues to be a significant medical asset in Grand Blanc. Hurley Hospital established a new children's hospital and completed a $30 million new emergency and trauma care facility. McLaren Health System expanded its destination medicine offerings by investing over $78 million in a new proton beam cancer treatment facility and patient residence. All three hospitals are actively engaged in medical education and research activities at their facilities.

The Flint and Genesee Chamber of Commerce, formerly the Genesee Regional Chamber of Commerce, was tapped to lead tourism efforts in Flint and Genesee County in 2012. In order to expand community marketing to appeal to both investors and visitors, the Chamber led a market research project and developed a new campaign to shape the image of the area. The conclusion: Flint and Genesee need a partner brand that highlights the strengths of both. March 2013 marked the culmination of the Chamber's efforts to build a brand partnership between Flint and Genesee. They have created a campaign to market the region as a desirable destination for events, vacation, or business. *"See what's possible"* is a rallying cry that invites travelers and investors to see what the County has to offer. The campaign plays off the word "see" and features iconic destinations and human moments through compelling imagery.

**Budgets** - The placement of the City into state receivership emphasizes the City's precarious financial position. Flint is an urban center which has been faced with a very significant loss in employment base in addition to the well-known problems of all mature urban centers. The City will be challenged for several more years to determine how it can restore its financial solvency and provide at least a basic level of City services while at the same time participating in the activities which will result in Flint being an attractive place for residents, students, businesses, and visitors.

## City of Flint, Michigan

### Management's Discussion and Analysis (Continued)

The challenges are many, including:

- Continuing decline in property values, made more dire by the phase-out of personal property tax
- Minimal increases in income tax revenues as unemployment and poverty remain high
- An aging and reduced workforce, resulting in an increase in the ratio of retirees to active employees, affecting pension and health care costs
- Aging sewer, water, street, and sidewalk infrastructure
- Continuing high levels of crime
- Reduced population

There are, however, many positive steps being taken which give strong hope that the City will regain its financial solvency and be a key part of restoring the community of Flint, including:

- Strong partnership with entities such as the Greater Regional Flint Chamber of Commerce, Prima Civitas, and the State of Michigan to promote economic development
- Strong support - financial and otherwise - from the Mott Foundation to support many activities helping to restore Flint
- Diversification of Flint's economic base, especially in higher education and health care
- Support of city residents to financially support city initiatives, as evidenced by recent passage of a 6 mill public safety stabilization millage
- Support from the State of Michigan to assist the City, including increases in state trooper presence and assisting financially in reopening the City's lockup
- Willingness by those managing the City to make the necessary decisions to restore financial solvency, as evidenced by the implementation of a fiscal year 2013 budget which raised revenues and cut expenses sufficiently to assure that expenses will not exceed revenues
- Taking steps to improve and maintain long-term financial solvency, including reducing the workforce by nearly 20 percent; restructuring health benefits in a manner which reduced OPEB liabilities by nearly 2/3; reduced pension benefits; significantly raised water and sewer rates while implementing new fees for trash pick-up and street lights; and restructuring the way in which City services are provided
- Working collaboratively with other municipalities to consider sharing of services, as evidenced by five recent applications to the State for financial support in implementing shared services
- Completed a five-year strategic plan and budget in conjunction with the City's fiscal year 2015 budget.

**Requests for Information** - This financial report is designed to provide a general overview of the City of Flint, Michigan's finances for all those with an interest in the government's finances. Questions concerning any of the information provided in this report or requests for additional financial information should be addressed to the Office of the Finance Director, City of Flint, 1101 South Saginaw Street, Room #203, Flint, Michigan 48502.

**City of Flint, Michigan**

Statement of Net Position
June 30, 2013

|  | Primary Government | | | |
|  | Governmental Activities | Business-type Activities | Total | Component Units |
| --- | --- | --- | --- | --- |
| **Assets** | | | | |
| Pooled cash and investments (Note 3) | $ 25,610,907 | $ 10,408,305 | $ 36,019,212 | $ - |
| Cash and cash equivalents (Note 4) | 1,305,461 | 858,151 | 2,163,612 | 11,648,142 |
| Investments (Note 4) | 937,543 | - | 937,543 | 49,444,802 |
| Receivables (net of allowance, where applicable) (Note 5): | | | | |
| Property taxes receivable | 1,461,019 | - | 1,461,019 | - |
| Receivables from sales to customers on account | - | 22,940,950 | 22,940,950 | 70,201,583 |
| Accrued interest receivable | 11,195 | - | 11,195 | 261,587 |
| Accounts (net of allowance of $85,376) | - | - | - | 694,337 |
| Other receivables | 3,619,197 | 387 | 3,619,584 | 704,500 |
| Due from other governmental units | 8,798,817 | 109,866 | 8,908,683 | - |
| Loan receivable | 10,560,338 | - | 10,560,338 | 288,912 |
| Due from component units (Note 7) | 5,600,346 | - | 5,600,346 | - |
| Internal balances (Note 7) | (9,948,800) | 9,948,800 | - | - |
| Inventory | 169,903 | 1,136,255 | 1,306,158 | 5,223,959 |
| Prepaid costs | 84,152 | - | 84,152 | 2,757,869 |
| Restricted assets (Note 10) | 380,675 | 4,385,534 | 4,766,209 | 44,722,843 |
| Investment in joint ventures | - | - | - | 7,029,993 |
| Other assets | - | 70,654 | 70,654 | 3,619,977 |
| Capital assets (Note 6): | | | | |
| Assets not subject to depreciation | 14,446,152 | 2,045,361 | 16,491,513 | 22,226,500 |
| Assets subject to depreciation | 141,078,393 | 100,399,785 | 241,478,178 | 107,823,304 |
| Cash held with agent | - | - | - | 550,000 |
| **Total assets** | 204,115,298 | 152,304,048 | 356,419,346 | 327,198,308 |

**City of Flint, Michigan**

Statement of Net Position (Continued)
June 30, 2013

|  | Primary Government | | | |
|  | Governmental Activities | Business-type Activities | Total | Component Units |
| --- | --- | --- | --- | --- |
| **Liabilities** | | | | |
| Accounts payable | $ 4,569,703 | $ 5,613,046 | $ 10,182,749 | $ 19,583,965 |
| Due to other governmental units | 454,952 | - | 454,952 | 100,000 |
| Due to primary government (Note 7) | - | - | - | 9,866,795 |
| Deposits and advances | 559,723 | 580,684 | 1,140,407 | 32,600 |
| Accrued liabilities and other | 4,071,015 | 1,188,571 | 5,259,586 | 33,393,514 |
| Unearned revenue (Note 5) | 920,414 | - | 920,414 | 3,500 |
| Other current liabilities | 1,111,183 | - | 1,111,183 | - |
| Noncurrent liabilities: | | | | |
| Due within one year: | | | | |
| Payable from restricted assets | - | - | - | 446,578 |
| Claims payable - Current (Note 16) | 854,776 | - | 854,776 | 3,779,561 |
| Current portion of long-term debt (Note 9) | 4,498,378 | 2,703,175 | 7,201,553 | 5,608,530 |
| Due in more than one year: | | | | |
| Claims payable (Note 16) | 641,000 | - | 641,000 | 38,268,025 |
| Net pension obligation | - | - | - | 3,268,705 |
| Net OPEB obligation (Note 12) | 129,627,657 | 29,274,057 | 158,901,714 | 3,432,051 |
| Long-term debt (Note 9) | 30,319,787 | 21,675,336 | 51,995,123 | 102,540,405 |
| **Total liabilities** | 177,628,588 | 61,034,869 | 238,663,457 | 220,324,229 |
| **Net Position** | | | | |
| Net investment in capital assets | 153,329,640 | 78,604,810 | 231,934,450 | 37,165,197 |
| Restricted for: | | | | |
| Roads | 4,515,164 | - | 4,515,164 | - |
| Capital projects | 7,683,362 | - | 7,683,362 | - |
| Street lighting | 213,421 | - | 213,421 | - |
| Revolving loan program | - | - | - | 1,960,671 |
| Police | 1,299,438 | - | 1,299,438 | - |
| Public safety | 5,118,343 | - | 5,118,343 | - |
| Community development | 11,619,405 | - | 11,619,405 | 96,691 |
| Parks and recreation | 136,003 | - | 136,003 | - |
| Economic development | 555,643 | - | 555,643 | - |
| Building inspection | 400,968 | - | 400,968 | - |
| Debt service | 7,163 | 2,384,034 | 2,391,197 | - |
| Capital replacement | - | 2,001,500 | 2,001,500 | - |
| Donor restricted and other | - | - | - | 5,618,014 |
| Unrestricted | (158,391,840) | 8,278,835 | (150,113,005) | 62,033,506 |
| **Total net position** | $ 26,486,710 | $ 91,269,179 | $ 117,755,889 | $ 106,874,079 |

# City of Flint, Michigan

**Statement of Activities**
**Year Ended June 30, 2013**

D-12

| Functions/Programs | Expenses | Program Revenues — Charges for Services | Operating Grants and Contributions | Capital Grants and Contributions | Governmental Activities | Business-type Activities | Total | Component Units |
|---|---|---|---|---|---|---|---|---|
| **Primary government:** | | | | | | | | |
| **Governmental activities:** | | | | | | | | |
| General government | $ 7,533,423 | $ 10,652,009 | $ 776,454 | $ 3,818 | $ 3,898,858 | $ - | $ 3,898,858 | $ - |
| Judicial | 5,095,682 | 1,696,157 | 228,170 | - | (3,171,355) | - | (3,171,355) | - |
| Public safety: | | | | | | | | |
| Police | 25,078,577 | 1,724,215 | 916,145 | 4,672,971 | (17,765,246) | - | (17,765,246) | - |
| Fire | 10,713,612 | 154,096 | - | - | (10,559,516) | - | (10,559,516) | - |
| Building inspection | 4,017,923 | 2,062,378 | 134,287 | 1,733,108 | (88,150) | - | (88,150) | - |
| Emergency dispatch | 3,230,298 | 1,301,826 | 13,763 | - | (1,914,709) | - | (1,914,709) | - |
| Public works | 5,543,366 | 940 | - | - | (5,542,426) | - | (5,542,426) | - |
| Legislative | 347,098 | - | - | - | (347,098) | - | (347,098) | - |
| Community development | 19,981,427 | 1,659 | 3,206,127 | 15,187,633 | (1,586,008) | - | (1,586,008) | - |
| Parks and recreation | 2,864,223 | 10,075 | 233,743 | - | (2,620,405) | - | (2,620,405) | - |
| Transportation | 17,434,875 | 64,085 | 8,704,549 | 274,530 | (8,391,711) | - | (8,391,711) | - |
| Interest on long-term debt | 1,021,815 | - | - | - | (1,021,815) | - | (1,021,815) | - |
| **Total governmental activities** | 102,862,319 | 17,667,440 | 14,213,238 | 21,872,060 | (49,109,581) | - | (49,109,581) | - |
| **Business-type activities:** | | | | | | | | |
| Water | 42,089,874 | 49,903,868 | - | 99,240 | - | 7,913,234 | 7,913,234 | - |
| Sewage Disposal Division | 25,185,405 | 30,169,235 | - | - | - | 4,983,830 | 4,983,830 | - |
| **Total business-type activities** | 67,275,279 | 80,073,103 | - | 99,240 | - | 12,897,064 | 12,897,064 | - |
| **Total primary government** | $ 170,137,598 | $ 97,740,543 | $ 14,213,238 | $ 21,971,300 | (49,109,581) | 12,897,064 | (36,212,517) | - |
| **Component units:** | | | | | | | | |
| Downtown Development Authority | $ 2,336,347 | $ 1,226,697 | $ - | $ - | - | - | - | (1,109,650) |
| Atwood Stadium Building Authority | - | - | - | - | - | - | - | - |
| Economic Development Corporation | 244,042 | 108,343 | 43,749 | 47,436 | - | - | - | (44,514) |
| Flint Area Enterprise Community | 334,967 | - | 12,876 | - | - | - | - | (322,091) |
| Hurley Medical Center | 374,396,459 | 372,503,295 | - | - | - | - | - | (1,893,164) |
| **Total component units** | $ 377,311,815 | $ 373,838,335 | $ 56,625 | $ 47,436 | - | - | - | (3,369,419) |
| General revenues: | | | | | | | | |
| Property taxes | | | | | 21,722,352 | - | 21,722,352 | 412,068 |
| Income taxes | | | | | 14,674,274 | - | 14,674,274 | - |
| State-shared revenue (unrestricted) | | | | | 13,667,182 | - | 13,667,182 | - |
| Interest (unrestricted) | | | | | 445,325 | 945 | 446,270 | (1,052,987) |
| Cable franchise fees (unrestricted) | | | | | 1,084,668 | - | 1,084,668 | - |
| Other miscellaneous income (unrestricted) | | | | | 1,203,070 | 52,537 | 1,255,607 | 968,221 |
| Gain on sale of fixed assets | | | | | 1,046,990 | - | 1,046,990 | - |
| **Total general revenues** | | | | | 53,843,861 | 53,482 | 53,897,343 | 327,302 |
| **Transfers** | | | | | 2,990,000 | (2,990,000) | - | - |
| **Change in Net Position** | | | | | 7,724,280 | 9,960,546 | 17,684,826 | (3,042,117) |
| **Net Position** - As restated - Beginning of year (Note 20) | | | | | 18,762,430 | 81,308,633 | 100,071,063 | 109,916,196 |
| **Net Position** - End of year | | | | | $ 26,486,710 | $ 91,269,179 | $ 117,755,889 | $ 106,874,079 |

The Notes to Financial Statements are an Integral Part of this Statement.

22    23

**City of Flint, Michigan**

<div style="text-align:right">

**Governmental Funds**
**Balance Sheet**
**June 30, 2013**
</div>

| | General Fund | Federal Grants Fund | Public Improvement Fund | Nonmajor Funds | Total |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and cash equivalents (Note 4) | $ 441,848 | $ 214,420 | $ - | $ 258,559 | $ 914,827 |
| Investments (Note 4) | - | 937,543 | - | - | 937,543 |
| Receivables (Note 5): | | | | | |
| Property taxes receivable | 868,389 | - | 184,192 | 408,438 | 1,461,019 |
| Accrued interest receivable | - | - | - | 11,195 | 11,195 |
| Other receivables | 3,585,149 | 7,400 | - | 24,372 | 3,616,921 |
| Due from other governmental units | 3,304,348 | 3,963,428 | - | 1,531,041 | 8,798,817 |
| Notes and leases receivable | - | 10,074,000 | - | 486,338 | 10,560,338 |
| Due from component units net of allowance (Note 7) | 148,895 | 550,000 | 4,901,451 | - | 5,600,346 |
| Due from other funds (Note 7) | - | - | - | 1,812,097 | 1,812,097 |
| Restricted assets (Note 10) | - | 380,675 | - | - | 380,675 |
| Pooled cash and investments (Note 3) | 642,400 | - | 2,767,994 | 11,328,814 | 14,739,208 |
| **Total assets** | $ 8,991,029 | $ 16,127,466 | $ 7,853,637 | $ 15,860,854 | $ 48,832,986 |
| **Liabilities and Fund Balances (Deficit)** | | | | | |
| **Liabilities** | | | | | |
| Accounts payable | $ 1,873,197 | $ 951,137 | $ 3,517 | $ 877,964 | $ 3,705,815 |
| Due to other governmental units | 454,952 | - | - | - | 454,952 |
| Due to other funds (Note 7) | 6,312,097 | 2,492,039 | - | 26,556 | 8,830,692 |
| Advances from other funds (Note 7) | 10,800,000 | - | - | - | 10,800,000 |
| Deposits and advances | - | - | - | 559,723 | 559,723 |
| Accrued liabilities and other | 1,346,253 | 86,521 | 166,641 | 1,938,929 | 3,538,344 |
| Deferred revenue (Note 5) | 1,100,172 | 11,695,414 | 184,192 | 722,980 | 13,702,758 |
| Other current liabilities | - | 75,611 | 117 | - | 75,728 |
| **Total liabilities** | 21,886,671 | 15,300,722 | 354,467 | 4,126,152 | 41,668,012 |
| **Fund Balances (Deficit)** | | | | | |
| Nonspendable - Long-term receivable | - | - | 4,901,451 | - | 4,901,451 |
| Restricted: | | | | | |
| Roads | - | - | - | 4,515,164 | 4,515,164 |
| Police | - | - | - | 1,171,547 | 1,171,547 |
| Debt service | - | - | - | 7,163 | 7,163 |
| Community development | - | 826,744 | - | - | 826,744 |
| Capital projects | - | - | 2,597,719 | - | 2,597,719 |
| Economic development | - | - | - | 258,854 | 258,854 |
| Parks and recreation | - | - | - | 104,110 | 104,110 |
| Building inspections | - | - | - | 400,968 | 400,968 |
| Public safety | - | - | - | 5,063,475 | 5,063,475 |
| Street lighting | - | - | - | 213,421 | 213,421 |
| Unassigned (deficit) | (12,895,642) | - | - | - | (12,895,642) |
| **Total fund balances (deficit)** | (12,895,642) | 826,744 | 7,499,170 | 11,734,702 | 7,164,974 |
| **Total liabilities and fund balances (deficit)** | $ 8,991,029 | $ 16,127,466 | $ 7,853,637 | $ 15,860,854 | $ 48,832,986 |

D-13

The Notes to Financial Statements are an Integral Part of this Statement.     24

**City of Flint, Michigan**

<div style="text-align:right">

**Governmental Funds**
**Reconciliation of the Balance Sheet to the Statement**
**of Net Position**
**June 30, 2013**
</div>

| | |
|---|---|
| **Fund Balance Reported in Governmental Funds** | $ 7,164,974 |
| Amounts reported for governmental activities in the statement of net position are different because: | |
| Capital assets used in governmental activities are not financial resources and are not reported in the funds | 154,143,889 |
| Other long-term assets are not available to pay for current period expenditures and therefore are deferred in the funds | 12,782,344 |
| Bonds payable and capital lease obligations are not due and payable in the current period and are not reported in the funds | (30,007,667) |
| Accrued interest related to governmental activities debt is not reported in the funds | (289,615) |
| Employee compensated absences are payable over a long period of years and do not represent a claim on current financial resources; therefore, they are not reported as fund liabilities | (4,435,256) |
| Net postemployment benefit obligation is not due and payable in the current period and is not reported in the funds | (129,627,657) |
| Internal service funds are included as part of governmental activities | 16,755,698 |
| **Net Position of Governmental Activities** | $ 26,486,710 |

The Notes to Financial Statements are an Integral Part of this Statement.     25

**City of Flint, Michigan**

Governmental Funds
Statement of Revenue, Expenditures, and Changes in
Fund Balances (Deficit)
Year Ended June 30, 2013

| | General Fund | Federal Grants Fund | Public Improvement Fund | Nonmajor Governmental Funds | Total |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| Property taxes | $ 6,011,342 | $ - | $ 2,055,994 | $ 11,145,728 | $ 19,213,064 |
| Income taxes | 14,674,274 | - | - | - | 14,674,274 |
| Licenses and permits | 1,557,320 | - | - | 1,853,188 | 3,410,508 |
| Federal grants | 2,753,854 | 18,400,485 | - | 2,667,702 | 23,822,041 |
| State revenue | 16,003,433 | 33,703 | - | 8,224,888 | 24,262,024 |
| Charges for services | 11,406,946 | 1,209 | - | 186,379 | 11,594,534 |
| Fines and forfeitures | 2,291,325 | - | - | 124,323 | 2,415,648 |
| Investment income (loss) | 261,004 | 247,830 | 719,450 | (13,366) | 1,214,918 |
| Other revenue | 2,770,960 | 58,028 | - | 3,098,994 | 5,927,982 |
| Total revenue | 57,730,458 | 18,741,255 | 2,775,444 | 27,287,836 | 106,534,993 |
| **Expenditures** | | | | | |
| Current: | | | | | |
| General government | 7,999,801 | - | - | - | 7,999,801 |
| Judicial - 68th District Court | 4,955,003 | - | - | - | 4,955,003 |
| Public safety: | | | | | |
| Police safety | 23,404,501 | 51,727 | - | 1,592,621 | 25,048,849 |
| Combined public safety department | - | - | - | 52,296 | 52,296 |
| Fire | 10,682,234 | 5,270,130 | - | - | 15,952,364 |
| Building inspection | 94,170 | - | - | 4,076,364 | 4,170,534 |
| Emergency dispatch | 3,141,130 | - | - | - | 3,141,130 |
| Public works | - | - | - | 5,515,322 | 5,515,322 |
| Legislative | 344,227 | - | - | - | 344,227 |
| Community development | 1,946,636 | 7,425,188 | - | 7,693 | 9,379,517 |
| Parks and recreation | 1,853,475 | 5,318,080 | 481,121 | 675,417 | 8,328,093 |
| Transportation | 861 | - | - | 9,769,670 | 9,770,531 |
| Debt service: | | | | | |
| Principal | - | 343,000 | 185,000 | 368,977 | 896,977 |
| Interest on long-term debt | - | 146,639 | 415,141 | 476,596 | 1,038,376 |
| Total expenditures | 54,422,038 | 18,554,764 | 1,081,262 | 22,534,956 | 96,593,020 |
| **Excess of Revenue Over Expenditures** | 3,308,420 | 186,491 | 1,694,182 | 4,752,880 | 9,941,973 |
| **Other Financing Sources (Uses)** | | | | | |
| Proceeds from sale of capital assets | 100 | - | - | - | 100 |
| Transfers in (Note 7) | 2,990,000 | - | - | 2,528,457 | 5,518,457 |
| Transfers out (Note 7) | (9,312) | - | (726,953) | (292,192) | (1,028,457) |
| Total other financing sources (uses) | 2,980,788 | - | (726,953) | 2,236,265 | 4,490,100 |
| **Net Change in Fund Balances** | 6,289,208 | 186,491 | 967,229 | 6,989,145 | 14,432,073 |
| Fund Balances (Deficit) - As restated - Beginning of year (Note 20) | (19,184,850) | 640,253 | 6,531,941 | 4,745,557 | (7,267,099) |
| **Fund Balances (Deficit) - End of year** | $ (12,895,642) | $ 826,744 | $ 7,499,170 | $ 11,734,702 | $ 7,164,974 |

The Notes to Financial Statements are an
Integral Part of this Statement.            26

---

**City of Flint, Michigan**

Governmental Funds
Reconciliation of the Statement of Revenue, Expenditures,
and Changes in Fund Balances (Deficit) of Governmental Funds
to the Statement of Activities
Year Ended June 30, 2013

| | |
|---|---|
| **Net Change in Fund Balances - Total Governmental Funds** | $ 14,432,073 |
| Amounts reported for governmental activities in the statement of activities are different because: | |
| Governmental funds report capital outlays as expenditures; however, in the statement of activities, these costs are allocated over their estimated useful lives as depreciation: | |
| Capital outlay | 5,063,828 |
| Depreciation expense | (15,579,051) |
| Net book value of assets disposed of | (614,042) |
| Revenues are recorded in the statement of activities when earned; they are not reported in the funds until collected or collectible within 90 days of year end | 462,816 |
| Increase in net postemployment benefit obligation | (1,511,402) |
| Repayment of bond principal is an expenditure in the governmental funds, but not in the statement of activities (where it reduces long-term debt) | 896,977 |
| Change in accrued interest is not reported in the funds | 7,269 |
| Decrease in accumulated employee sick and vacation pay and other similar expenses reported in the statement of activities do not require the use of current resources, and therefore are not reported in the fund statements until they come due for payment | 908,705 |
| Internal service funds are included as part of governmental activities | 3,657,107 |
| **Change in Net Position of Governmental Activities** | $ 7,724,280 |

The Notes to Financial Statements are an
Integral Part of this Statement.            27

# City of Flint, Michigan

### Proprietary Funds
### Statement of Net Position
### June 30, 2013

| | Enterprise Funds | | | Governmental Activities |
|---|---|---|---|---|
| | Water Supply Division | Sewage Disposal Division | Total | Proprietary Internal Service Fund |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents (Note 4) | $ 858,151 | $ - | $ 858,151 | $ 390,634 |
| Receivables: | | | | |
| Receivables from sales to customers on account | 13,118,422 | 9,822,528 | 22,940,950 | - |
| Other receivables | 232 | 155 | 387 | 2,276 |
| Due from other governmental units | - | 109,866 | 109,866 | - |
| Due from other funds (Note 7) | - | - | - | 7,869,795 |
| Inventory | 506,621 | 629,634 | 1,136,255 | 169,903 |
| Prepaid costs | - | - | - | 84,152 |
| Pooled cash and investments (Note 3) | 3,452,162 | 6,956,143 | 10,408,305 | 10,871,699 |
| Total current assets | 17,935,588 | 17,518,326 | 35,453,914 | 19,388,459 |
| Noncurrent assets: | | | | |
| Restricted assets (Note 10) | 4,385,534 | - | 4,385,534 | - |
| Advances to other funds (Note 7) | 1,000,000 | 9,800,000 | 10,800,000 | - |
| Accrued interest receivable | - | 70,654 | 70,654 | - |
| Capital assets (Note 6): | | | | |
| Assets not subject to depreciation | 1,479,998 | 565,363 | 2,045,361 | 132,616 |
| Assets subject to depreciation | 43,845,546 | 56,554,239 | 100,399,785 | 1,248,040 |
| Total noncurrent assets | 50,711,078 | 66,990,256 | 117,701,334 | 1,380,656 |
| Total assets | 68,646,666 | 84,508,582 | 153,155,248 | 20,769,115 |
| **Liabilities** | | | | |
| Current liabilities: | | | | |
| Accounts payable | 4,295,654 | 1,317,392 | 5,613,046 | 863,888 |
| Due to other funds (Note 7) | - | 851,200 | 851,200 | - |
| Deposits and advances | 580,684 | - | 580,684 | - |
| Accrued liabilities and other | 676,926 | 511,645 | 1,188,571 | 243,056 |
| Other payables | - | - | - | 1,035,455 |
| Claims payable - Current (Note 16) | - | - | - | 854,776 |
| Current portion of long-term debt (Note 9) | 2,428,178 | 274,997 | 2,703,175 | 179,854 |
| Total current liabilities | 7,981,442 | 2,955,234 | 10,936,676 | 3,177,029 |
| Noncurrent liabilities: | | | | |
| Claims payable (Note 16) | - | - | - | 641,000 |
| Net OPEB obligation (Note 12) | 12,547,877 | 16,726,180 | 29,274,057 | - |
| Long-term debt (Note 9) | 21,675,336 | - | 21,675,336 | 195,388 |
| Total noncurrent liabilities | 34,223,213 | 16,726,180 | 50,949,393 | 836,388 |
| Total liabilities | 42,204,655 | 19,681,414 | 61,886,069 | 4,013,417 |
| **Net Position** | | | | |
| Net investment in capital assets | 21,222,030 | 56,844,605 | 78,066,635 | 1,005,414 |
| Restricted: | | | | |
| Debt service | 2,384,034 | - | 2,384,034 | - |
| Capital replacement | 2,001,500 | - | 2,001,500 | - |
| Unrestricted | 834,447 | 7,982,563 | 8,817,010 | 15,750,284 |
| Total net position | $ 26,442,011 | $ 64,827,168 | 91,269,179 | $ 16,755,698 |
| **Net Position of Business-type Activities** | | | $ 91,269,179 | |

The Notes to Financial Statements are an Integral Part of this Statement.　28

# City of Flint, Michigan

### Proprietary Funds
### Statement of Revenue, Expenses, and Changes in Net Position
### Year Ended June 30, 2013

| | Enterprise Funds | | | Governmental Activities |
|---|---|---|---|---|
| | Water Supply Division | Sewage Disposal Division | Total | Proprietary Internal Service Fund |
| **Operating Revenue** | | | | |
| Charges for services | $ 49,880,827 | $ 32,025,929 | $ 81,906,756 | $ 40,051,431 |
| Other miscellaneous revenue | 23,041 | - | 23,041 | - |
| Total operating revenue | 49,903,868 | 32,025,929 | 81,929,797 | 40,051,431 |
| **Operating Expenses** | | | | |
| Salaries, wages, and fringe benefits | 10,599,599 | 13,958,050 | 24,557,649 | 3,258,387 |
| Utilities | 691,373 | 2,341,204 | 3,032,577 | 38,373 |
| Equipment operation | 628,541 | 699,565 | 1,328,106 | 496 |
| Claims and settlements | - | - | - | 998,036 |
| Repair and maintenance | 220,696 | 530,681 | 751,377 | 295,887 |
| Supplies | 934,097 | 986,642 | 1,920,739 | 1,516,507 |
| Insurance | - | - | - | 389,879 |
| Professional services | 605,606 | 1,408,472 | 2,014,078 | 2,779,794 |
| Miscellaneous | 749,641 | 1,278,943 | 2,028,584 | 16,848 |
| Costs of materials or services rendered | 23,308,800 | - | 23,308,800 | 25,731,269 |
| Depreciation and amortization | 3,563,937 | 3,974,076 | 7,538,013 | 832,674 |
| Total operating expenses | 41,302,290 | 25,177,633 | 66,479,923 | 35,858,150 |
| **Operating Income** | 8,601,578 | 6,848,296 | 15,449,874 | 4,193,281 |
| **Nonoperating Revenue (Expenses)** | | | | |
| Investment (loss) income | (7,689) | 8,634 | 945 | (28,855) |
| Interest expense | (787,584) | - | (787,584) | (54,309) |
| Miscellaneous expenses | - | (7,772) | (7,772) | - |
| (Loss) gain on disposal of capital assets | - | (1,856,694) | (1,856,694) | 1,046,990 |
| Miscellaneous revenue | 52,537 | - | 52,537 | - |
| Total nonoperating (expenses) revenue | (742,736) | (1,855,832) | (2,598,568) | 963,826 |
| **Income** - Before contributions | 7,858,842 | 4,992,464 | 12,851,306 | 5,157,107 |
| **Capital Contributions** | 99,240 | - | 99,240 | - |
| **Transfers Out** (Note 7) | (1,130,000) | (1,860,000) | (2,990,000) | (1,500,000) |
| **Change in Net Position** | 6,828,082 | 3,132,464 | 9,960,546 | 3,657,107 |
| **Net Position** - Beginning of year | 19,613,929 | 61,694,704 | 81,308,633 | 13,098,591 |
| **Net Position** - End of year | $ 26,442,011 | $ 64,827,168 | $ 91,269,179 | $ 16,755,698 |

The Notes to Financial Statements are an Integral Part of this Statement.　29

**City of Flint, Michigan**

**Proprietary Funds**
**Statement of Cash Flows**
**Year Ended June 30, 2013**

|  | Enterprise Funds | | | Governmental Activities |
|---|---|---|---|---|
|  | Water Supply Division | Sewage Disposal Division | Total | Internal Service Funds |
| **Cash Flows from Operating Activities** |  |  |  |  |
| Receipts from customers and users | $ 47,620,772 | $ 29,290,360 | $ 76,911,132 | $ 40,052,458 |
| Payments to vendors | (26,829,143) | (5,023,121) | (31,852,264) | (30,654,128) |
| Payments to employees | (9,790,742) | (13,485,958) | (23,276,700) | 2,370,631 |
| Internal activity - Payments to other funds | (910,000) | (1,218,300) | (2,128,300) | - |
| Claims paid | - | - | - | (3,470,460) |
| Net cash provided by operating activities | 10,090,887 | 9,562,981 | 19,653,868 | 8,298,501 |
| **Cash Flows from Noncapital Financing Activities** |  |  |  |  |
| Loans related to pooled cash received from other funds | (3,589,658) | - | (3,589,658) | - |
| Repayments of loans related to pooled cash made to other funds | - | 714,681 | 714,681 | - |
| Transfers to other funds | (1,130,000) | (1,860,000) | (2,990,000) | (1,500,000) |
| Repayments of loans from other funds | - | - | - | 871,679 |
| Payments received on long-term note receivable | - | - | - | 130,000 |
| Pooled cash receipts to other funds | - | - | - | 1,940,634 |
| Net cash (used in) provided by noncapital financing activities | (4,719,658) | (1,145,319) | (5,864,977) | 1,442,313 |
| **Cash Flows from Capital and Related Financing Activities** |  |  |  |  |
| Receipt of capital grants | 99,240 | - | 99,240 | - |
| Proceeds from sales of capital assets | 52,538 | - | 52,538 | 1,500,000 |
| Purchase of capital assets | (147,462) | (1,552,815) | (1,700,277) | (132,615) |
| Principal paid on capital debt | (2,115,000) | - | (2,115,000) | (267,795) |
| Interest payments | (787,584) | - | (787,584) | (54,309) |
| Net cash (used in) provided by capital and related financing activities | (2,898,268) | (1,552,815) | (4,451,083) | 1,045,281 |
| **Cash Flows from Investing Activities** - Investment (loss) income | (7,689) | 8,634 | 945 | (28,855) |
| **Net Increase in Cash and Cash Equivalents** | 2,465,272 | 6,873,481 | 9,338,753 | 10,757,240 |
| **Cash and Cash Equivalents** - Beginning of year | 6,230,575 | 82,662 | 6,313,237 | 505,093 |
| **Cash and Cash Equivalents** - End of year | $ 8,695,847 | $ 6,956,143 | $ 15,651,990 | $ 11,262,333 |
| **Balance Sheet Classification of Cash and Cash Equivalents** |  |  |  |  |
| Cash and investments | $ 858,151 | $ - | $ 858,151 | $ 390,634 |
| Restricted cash | 4,385,534 | - | 4,385,534 | - |
| Pooled cash | 3,452,162 | 6,956,143 | 10,408,305 | 10,871,699 |
| Total cash and cash equivalents | $ 8,695,847 | $ 6,956,143 | $ 15,651,990 | $ 11,262,333 |

**City of Flint, Michigan**

**Proprietary Funds**
**Statement of Cash Flows (Continued)**
**Year Ended June 30, 2013**

|  | Enterprise Funds | | | Governmental Activities |
|---|---|---|---|---|
|  | Water Supply Division | Sewage Disposal Division | Total | Internal Service Fund |
| **Reconciliation of Operating Income to Net Cash from Operating Activities** |  |  |  |  |
| Operating income | $ 8,601,578 | $ 6,848,296 | $ 15,449,874 | $ 4,193,281 |
| Adjustments to reconcile operating income to net cash from operating activities: |  |  |  |  |
| Depreciation and amortization | 3,563,937 | 3,974,076 | 7,538,013 | 832,674 |
| Changes in assets and liabilities: |  |  |  |  |
| Receivables | (2,283,096) | (2,735,569) | (5,018,665) | 827 |
| Due from others | - | - | - | 5,264,428 |
| Inventories | (124,767) | - | (124,767) | 27,216 |
| Accounts payable | (538,158) | 1,004,086 | 465,928 | 87,709 |
| Estimated claims liability | - | - | - | (2,472,224) |
| Accrued and other liabilities | 481,712 | 384,141 | 865,853 | 364,590 |
| Customer deposits | 62,536 | - | 62,536 | - |
| Net postemployment benefit obligation | 327,145 | 87,951 | 415,096 | - |
| Net cash provided by operating activities | $ 10,090,887 | $ 9,562,981 | $ 19,653,868 | $ 8,298,501 |

D-16

**City of Flint, Michigan**

<div style="text-align: right">

**Fiduciary Funds**
**Statement of Fiduciary Net Position**
**June 30, 2013**

</div>

| | Pension and Benefit Trust Funds | Agency Funds |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 1,124,296 | $ 1,277,180 |
| Investments: | | |
| U.S. government obligations | 902,130 | - |
| Agency securities | 10,481,869 | - |
| Corporate stocks | 14,002,249 | - |
| Corporate bonds | 11,720,330 | - |
| Receivables: | | |
| Property taxes receivable | - | 3,118,765 |
| Accrued interest receivable | 186,887 | - |
| Other receivables | 77,020 | 30 |
| Pooled cash and investments | 1,828,785 | 1,404,766 |
| Total assets | 40,323,566 | $ 5,800,741 |
| **Liabilities** | | |
| Accounts payable | 675,057 | $ 639,685 |
| Due to other governmental units | - | 4,207,304 |
| Deposits and advances | - | 953,752 |
| Deferred revenue | 86,756 | - |
| Total liabilities | 761,813 | $ 5,800,741 |
| **Net Position Held in Trust for Pension and Other Employee Benefits** | $39,561,753 | |

The Notes to Financial Statements are an Integral Part of this Statement.    32

---

**City of Flint, Michigan**

<div style="text-align: right">

**Fiduciary Funds**
**Statement of Changes in Fiduciary Net Position**
**Year Ended June 30, 2013**

</div>

| | Pension and Benefit Trust Funds |
|---|---|
| **Additions** | |
| Investment income (loss): | |
| Interest and dividends | $ 3,173,659 |
| Net increase in fair value of investments | 23,543,255 |
| Investment-related expenses | (709,589) |
| Net investment income | 26,007,325 |
| Contributions: | |
| Employer | 25,682,439 |
| Employee | 2,592,912 |
| Total contributions | 28,275,351 |
| Total additions | 54,282,676 |
| **Deductions** | |
| Benefit payments | 37,825,250 |
| Refunds of contributions | 413,842 |
| Administrative expenses | 810,119 |
| Transfer to MERS | 476,709,526 |
| Total deductions | 515,758,737 |
| **Net Decrease in Net Position Held in Trust** | (461,476,061) |
| **Net Position Held in Trust for Pension and Other Employee Benefits - Beginning of year** | 501,037,814 |
| **Net Position Held in Trust for Pension and Other Employee Benefits - End of year** | $ 39,561,753 |

The Notes to Financial Statements are an Integral Part of this Statement.    33

# City of Flint, Michigan

**Component Units**
**Statement of Net Position**
**June 30, 2013**

| | Downtown Development Authority | Atwood Stadium Building Authority | Economic Development Corporation | Flint Area Enterprise Community | Hurley Medical Center | Total |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash and cash equivalents (Note 4) | $ 223,416 | $ 9,252 | $ 138,117 | $ 992,318 | $ 10,285,039 | $ 11,648,142 |
| Investments | - | - | - | - | 49,444,802 | 49,444,802 |
| Receivables: | | | | | | |
| Receivables from sales to customers on account | - | - | - | - | 70,201,583 | 70,201,583 |
| Accrued interest receivable | - | - | - | - | 261,587 | 261,587 |
| Accounts (net of allowance of $85,376) | 68,804 | - | 625,533 | - | - | 694,337 |
| Other receivables | - | - | - | - | 704,500 | 704,500 |
| Notes and leases receivable | - | - | - | 288,912 | - | 288,912 |
| Inventory | - | - | - | - | 5,223,959 | 5,223,959 |
| Prepaid costs | 24,979 | - | 10,788 | - | 2,722,102 | 2,757,869 |
| Restricted assets (Note 10) | 246,288 | - | 446,578 | - | 44,029,977 | 44,722,843 |
| Investment in joint ventures | - | - | - | - | 7,029,993 | 7,029,993 |
| Land held for resale | - | - | - | 19,800 | 3,600,177 | 3,619,977 |
| Capital assets (net of depreciation) (Note 6) | 14,364,097 | - | 873,379 | 1,100 | 114,811,228 | 130,049,804 |
| Cash held with agent | - | - | 550,000 | - | - | 550,000 |
| Total assets | 14,927,584 | 9,252 | 2,644,395 | 1,302,130 | 308,314,947 | 327,198,308 |
| **Liabilities** | | | | | | |
| Accounts payable | 43,439 | - | 5,285 | 1,738 | 19,533,503 | 19,583,965 |
| Due to other governmental units | 100,000 | - | - | - | - | 100,000 |
| Due to primary government | 9,167,900 | - | 698,895 | - | - | 9,866,795 |
| Deposits and advances | 30,095 | - | 2,505 | - | - | 32,600 |
| Accrued liabilities and other | 9,229 | - | - | - | 33,384,285 | 33,393,514 |
| Deferred revenue | 3,500 | - | - | - | - | 3,500 |
| Noncurrent liabilities: | | | | | | |
| Due within one year: | | | | | | |
| Payable from restricted assets | - | - | 446,578 | - | - | 446,578 |
| Claims payable - Current (Note 16) | - | - | - | - | 3,779,561 | 3,779,561 |
| Current portion of long-term debt (Note 9) | - | - | - | - | 5,608,530 | 5,608,530 |
| Due in more than one year: | | | | | | |
| Claims payable (Note 16) | - | - | - | - | 38,268,025 | 38,268,025 |
| Other noncurrent liabilities | - | - | - | - | 3,268,705 | 3,268,705 |
| Net OPEB obligation | - | - | - | - | 3,432,051 | 3,432,051 |
| Long-term debt (Note 9) | - | - | - | - | 102,540,405 | 102,540,405 |
| Total liabilities | 9,354,163 | - | 1,153,263 | 1,738 | 209,815,065 | 220,324,229 |
| **Net Position** | | | | | | |
| Net investment in capital assets | 5,449,874 | - | 873,379 | 1,100 | 30,840,844 | 37,165,197 |
| Restricted: | | | | | | |
| Community development | - | - | - | 96,691 | - | 96,691 |
| Revolving loan program | - | - | 759,105 | 1,201,566 | - | 1,960,671 |
| Donor restricted and other | - | - | - | - | 5,618,014 | 5,618,014 |
| Restricted for grants | 37,837 | - | - | - | - | 37,837 |
| Unrestricted | 85,710 | 9,252 | (141,352) | 1,035 | 62,041,024 | 61,995,669 |
| Total net position | $ 5,573,421 | $ 9,252 | $ 1,491,132 | $ 1,300,392 | $ 98,499,882 | $ 106,874,079 |

The Notes to Financial Statements are an Integral Part of this Statement.

34

[THIS PAGE INTENTIONALLY LEFT BLANK]

# City of Flint, Michigan

| Functions/Programs | Expenses | Program Revenues: Charges for Services | Program Revenues: Operating Grants and Contributions | Program Revenues: Capital Grants and Contributions | Downtown Development Authority | Atwood Stadium Building Authority | Economic Development Corporation | Flint Area Enterprise Community | Hurley Medical Center | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Downtown Development Authority:** | | | | | | | | | | |
| Governmental activities - Development administration | $ 306,725 | $ - | $ - | $ - | $ (306,725) | $ - | $ - | $ - | $ - | $ (306,725) |
| Business-type activities - Parking | 2,029,622 | 1,226,697 | - | - | (802,925) | - | - | - | - | (802,925) |
| Atwood Stadium Building Authority | - | - | - | - | - | - | - | - | - | - |
| Economic Development Corporation | 244,042 | 152,092 | - | 47,436 | - | - | (44,514) | - | - | (44,514) |
| Flint Area Enterprise Community | 334,967 | - | 12,876 | - | - | - | - | (322,091) | - | (322,091) |
| Hurley Medical Center | 374,396,459 | 372,503,295 | - | - | - | - | - | - | (1,893,164) | (1,893,164) |
| Total component units | $ 377,311,815 | $ 373,882,084 | $ 12,876 | $ 47,436 | (1,109,650) | - | (44,514) | (322,091) | (1,893,164) | (3,369,419) |
| General revenues: | | | | | | | | | | |
| Property taxes | | | | | 412,068 | - | - | - | - | 412,068 |
| Unrestricted investment earnings | | | | | 300 | - | 39,756 | 70,432 | (1,163,475) | (1,052,987) |
| Unrestricted other revenues | | | | | 25,027 | - | 2,165 | 1,882 | 939,147 | 968,221 |
| Total general revenues | | | | | 437,395 | - | 41,921 | 72,314 | (224,328) | 327,302 |
| **Change in Net Position** | | | | | (672,255) | - | (2,593) | (249,777) | (2,117,492) | (3,042,117) |
| **Net Position** - Beginning of year | | | | | 6,245,676 | 9,252 | 1,493,725 | 1,550,169 | 100,617,374 | 109,916,196 |
| **Net Position** - End of year | | | | | $ 5,573,421 | $ 9,252 | $ 1,491,132 | $ 1,300,392 | $ 98,499,882 | $ 106,874,079 |

The Notes to Financial Statements are an Integral Part of this Statement.

35
36

D-19

**City of Flint, Michigan**

**Note 1 - Nature of Business and Significant Accounting Policies**

The accounting policies of the City of Flint (the "City") conform to accounting principles generally accepted in the United States of America (GAAP) as applicable to governmental units. The following is a summary of the significant accounting policies used by the City of Flint.

**Reporting Entity**

The City of Flint is a municipal corporation currently governed and administered by an emergency manager (EM) appointed pursuant to state statute by the governor of the state of Michigan. The accompanying financial statements present the government and its component units, entities for which the government is considered to be financially accountable. Although blended component units are legally separate entities, in substance they are part of the government's operations. The aggregate discretely presented component units are reported in a separate column in the government-wide financial statements (see note below for description) to emphasize that they are legally separate from the government.

**Blended Component Units**

The Flint Employees' Retirement System (FERS) is a defined benefit pension plan that provides retirement benefits to certain City retirees. The FERS was established and is governed by City ordinance, with the board of trustees comprised of City officials and retirees. The FERS is reported as a Pension Trust Fiduciary Fund. During the year ended June 30, 2013, the board was disbanded and the investments in FERS were transferred out to Municipal Employees' Retirement Systems (MERS). The FERS fund was closed and MERS will not take on the fiduciary responsibility of the plan.

The City of Flint Retirees Health Care Plan and Trust is a defined benefit plan that provides retiree healthcare benefits to certain City retirees. The Health Care Plan and Trust was established and is governed by City ordinance, with the board of trustees comprised of City officials and two members from each participating collective bargaining unit. The plan is reported as a Benefit Trust Fiduciary Fund.

**Discretely Presented Component Units**

The Atwood Stadium Building Authority (the "Stadium Authority") serves all citizens and is responsible for major capital improvements to Atwood Stadium, a recreational facility serving the citizens of the City. The City appoints a majority of the governing board and all surplus funds existing at the termination of the Stadium Authority vest to the City. The Stadium Authority is presented as a governmental activity.

---

**City of Flint, Michigan**

**Note 1 - Nature of Business and Significant Accounting Policies (Continued)**

The Flint Downtown Development Authority (the "DDA") was created under state law to promote and rehabilitate the downtown area. The DDA sponsors downtown events and manages parking facilities. State law provides for a specific tax levy for the operations of the DDA. The City appoints the board and has to approve the annual budget and the issuance of any debt. Any surplus funds remaining at the termination of the DDA vest to the City. The DDA has both governmental and business-type activities.

The City of Flint Economic Development Corporation (the "Corporation") was created under state law to provide financing and development opportunities for businesses located within the City. The City appoints the board. The Corporation provides loans to start-up or expanding businesses and manages rental property that leases space to commercial and light industrial manufacturing companies. Surplus funds existing at the termination of the Corporation vest to the City. The Corporation has both governmental and business-type activities.

The Flint Area Enterprise Community (FAEC) is a non-profit organization, established under state law. FAEC is responsible for coordinating and implementing a strategic plan to advocate and develop business and community development in a federally designated zone that includes portions of Mt. Morris Township and the City of Flint. The City appoints a majority of the board of directors, provides the majority of its funding for operations, and any assets remaining at the cessation of its operating activities would be returned to the City of Flint. The FAEC is presented as a governmental activity. The FAEC plans to cease operations during the fiscal year ending 2014. They are currently working with the State to determine which organization will take over the loans.

Hurley Medical Center (HMC or the "Medical Center") provides inpatient, outpatient, and emergency care services in Genesee and surrounding counties. The financial statements present HMC and its wholly owned subsidiary, Hurley Health Services, Inc., on a consolidated basis. HMC is the sole member of Hurley Health Services, Inc. (HHS), a municipal support organization organized on a non-profit, non-stock membership basis. HHS, on a consolidated basis, is comprised of two non-profit entities (HHS and The Hurley Clinics, THC) and one "for-profit" corporation (Hurley Practice Management Services). HHS began operations January 1, 1998. The City appoints the board of directors and there is an ongoing financial benefit/burden relationship between the City and Hurley Medical Center. HMC is presented as a governmental activity.

D-21

## City of Flint, Michigan

### Note 1 - Nature of Business and Significant Accounting Policies (Continued)

Complete financial statements for the following individual component units may be obtained at the entity's administrative offices. Complete financial statements for Atwood Stadium Building Authority are not available. Due to the nature of the operations of Atwood Stadium Building Authority, there is no difference in the assets and liabilities, and equity reported between the fund and government-wide statements. Therefore, fund financial statements are not presented.

| | | |
|---|---|---|
| Flint Downtown Development Authority Suite 206 412 S. Saginaw Street Flint, Michigan 48502 | Flint Economic Development Corporation 1101 S. Saginaw Street Flint, Michigan 48502 | Flint Area Enterprise Community 805 Welch Boulevard Flint, Michigan 48504 |

Hurley Medical Center
One Hurley Plaza
Flint, MI 48503

#### Government-wide and Fund Financial Statements

The government-wide financial statements (i.e., the statement of net position and the statement of activities) report information on all of the nonfiduciary activities of the primary government and its component units. For the most part, the effect of interfund activity has been removed from these statements. Governmental activities, normally supported by taxes and intergovernmental revenues, are reported separately from business-type activities, which rely to a significant extent on fees and charges for support. Likewise, the primary government is reported separately from certain legally separate component units for which the primary government is financially accountable.

The statement of activities demonstrates the degree to which the direct expenses of a given function or segment are offset by program revenues. Direct expenses are those that are clearly identifiable with a specific function or segment. Program revenues include (1) charges to customers or applicants who purchase, use, or directly benefit from goods, services, or privileges provided by a given function or segment and (2) grants and contributions that are restricted to meeting the operational or capital requirements of a particular function or segment. Taxes and other items not properly included among program revenues are reported instead as general revenue.

Separate financial statements are provided for governmental funds, proprietary funds, and fiduciary funds, even though the latter are excluded from the government-wide financial statements. Major individual governmental funds and major individual enterprise funds are reported as separate columns in the fund financial statements.

39

## City of Flint, Michigan

### Note 1 - Nature of Business and Significant Accounting Policies (Continued)

#### Measurement Focus, Basis of Accounting, and Financial Statement Presentation

The government-wide financial statements are reported using the economic resources measurement focus and the accrual basis of accounting, as are the proprietary fund, pension trust fund, and component unit statement of net position and statement of activities. Revenue is recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. Property taxes are recognized as revenue in the year for which they are levied. Grants and similar items are recognized as revenue as soon as all eligibility requirements imposed by the provider have been met.

Governmental fund financial statements are reported using the current financial resources measurement focus and the modified accrual basis of accounting. Revenue is recognized as soon as it is both measurable and available. Revenue is considered to be available when it is collectible within the current period. For this purpose, the government considers revenues to be available if they are collected within 60 days for property taxes and 90 days of the end of the current fiscal period for all other revenues.

Expenditures generally are recorded when a liability is incurred, as under accrual accounting. However, debt service expenditures, expenditures relating to compensated absences, and claims and judgments are recorded only when payment is due.

Property taxes, income taxes, licenses, and charges for services associated with the current fiscal period are all considered to be susceptible to accrual and so have been recognized as revenues of the current fiscal period. Only the portion of special assessments receivable due within the current fiscal period is considered to be susceptible to accrual as revenue of the current period. All other revenue items are considered to be measurable and available only when cash is received by the government.

The government reports the following major governmental funds:

- The General Fund is the government's primary operating fund. It accounts for all financial resources of the general government, except those required to be accounted for in another fund.

- The Federal Grants Fund accounts for entitlement and specific purpose grants received from the U.S. Department of Housing and Urban Development and other grantors.

- The Public Improvement Fund was established to account for the annual 2 1/2 mill tax levy reserved by Section 7 201 of the City Charter for capital improvements and servicing of general obligation debt.

40

# City of Flint, Michigan

**Notes to Financial Statements**
**June 30, 2013**

**Note 1 – Nature of Business and Significant Accounting Policies (Continued)**

The government reports the following major proprietary fund:

- The Water Supply and Sewer Disposal System are divisions of the City's Department of Public Works. Separate funds are maintained for the operations of the water distribution system and sewage pumping and collection systems and the sewer treatment plant.

Additionally, the government reports the following internal service and fiduciary activities:

- Internal service funds account for data processing, self insurance, fleet, and fringe benefits services provided to other departments or agencies of the government, or to other governments, on a current cost reimbursement basis.

- Pension trust and benefit trust funds account for the activities of the five different funds utilized to pay retirement, death, and healthcare benefits for the City of Flint and Hurley Medical Center retirees. These funds accumulate resources for pension and healthcare benefits financed by both employer and employee contributions.

- Agency funds are custodial in nature (assets equal liabilities) and do not involve the measurement of results of operations.

Pension and benefit trust funds and agency funds are reported as fiduciary funds and are not included in the government-wide statement of net position and statement of activities.

As a general rule, the effect of interfund activity has been eliminated from the government-wide financial statements. Exceptions to this general rule are charges between the City's water and sewer function and various other functions of the City. Elimination of these charges would distort the direct costs and program revenues reported for the various functions concerned.

When an expense is incurred for purposes for which both restricted and unrestricted net position or fund balance are available, the City's policy is to first apply restricted resources. When an expense is incurred for purposes for which amounts in any of the unrestricted fund balance classifications could be used, it is the City's policy to spend funds in this order: restricted, committed, assigned, and unassigned.

Proprietary funds distinguish operating revenue and expenses from nonoperating items. Operating revenue and expenses generally result from providing services in connection with a proprietary fund's principal ongoing operations. Operating expenses for proprietary funds include the cost of sales and services, administrative expenses, and depreciation on capital assets. All revenue and expenses not meeting this definition are reported as nonoperating revenue and expenses.

41

# City of Flint, Michigan

**Notes to Financial Statements**
**June 30, 2013**

**Note 1 – Nature of Business and Significant Accounting Policies (Continued)**

**Property Tax Revenue**

Property taxes are levied on each July 1 on the taxable valuation of property as of the preceding December 31. Taxes are considered delinquent on March 1 of the following year, at which time penalties and interest are assessed.

Taxes on the operating, public improvement, parks, public safety, and neighborhood police levies are billed July 1 and may be paid in three equal installments due by July 31, October 31, and February 28, following the levy date. Taxes on the paramedic service levy are billed on December 1 and due in one installment by February 28. Property tax receivables are recorded as a receivable and offsetting deferred revenue when levied and due. Property taxes are recognized as revenues when collected or when considered measurable and available. The City considers property taxes as available if they are collected within 60 days after year end.

The 2013 taxable valuation of the City totaled $968 million. Taxes were levied as follows:

| Purpose | Millage Rate | Revenue |
|---|---|---|
| General operating | 7.5 | $ 6,000,349 |
| Public improvement | 2.5 | 2,055,994 |
| Parks and recreation | .5 | 406,560 |
| Public safety | 6.0 | 5,130,137 |
| Neighborhood police | 2.0 | 1,644,638 |
| Total | 18.5 | $ 15,237,678 |

**Cash and Cash Equivalents**

The City's cash and cash equivalents include cash on hand, demand deposits, and short-term investments with original maturities of three months or less from the date of acquisition.

**Pooled Cash and Investments**

Cash resources of certain individual funds are combined to form a pool of cash and investments which is managed by the city treasurer. Investments in the pooled cash and investments account consist primarily of certificates of deposit with a maturity date greater than three months from the date acquired by the City, top grade commercial paper and government securities, and money market funds, and are carried at fair value.

42

**City of Flint, Michigan**

**Note 1 – Nature of Business and Significant Accounting Policies (Continued)**

At June 30, 2013, some funds have overdrawn their share of the pooled cash and investments. Fund overdrafts of pooled cash and investments are reported as an interfund liability of that fund. Management has selected the Water Supply Division, Sewage Disposal Division, Major Streets Fund, Local Streets Fund, Neighborhood Policing Fund, Building Department Fund, Data Processing Fund, Fringe Benefits Fund, Central Maintenance Garage Fund, and Self-insurance Fund to report the interfund receivable. Accordingly, the above-mentioned funds' pooled cash and investment balance, as reported on the financial statement, have been decreased by the amounts receivable from the other City funds with an overdraft.

Interest income earned as a result of pooling cash and investments is distributed to the participating funds monthly utilizing a formula based on the average daily balance of each fund's share of the total pooled cash and investments. Funds that have overdrawn their share of pooled cash and investments are charged interest costs.

For the purpose of the statement of cash flows, pooled cash and investments have been considered as cash and cash equivalents.

**Investments**

Investments for the City, as well as for its component units, are stated at fair market value (national or international exchange rates). Investments that do not have an established market are reported at estimated fair market value. Gains or losses on investments sold or exchanged are recognized when the transactions are completed (settlement date). Certificates of deposit with a maturity date of greater than three months at time of purchase are recorded as investments on the financial statements.

**Receivables and Payables**

In general, outstanding balances between funds are reported as "due to/from other funds." Activity between funds that are representative of lending/borrowing arrangements outstanding at the end of the fiscal year is referred to as "advances to/from other funds." Any residual balances outstanding between the governmental activities and business-type activities are reported in the government-wide financial statements as "internal balances."

All trade, notes, contracts, and property tax receivables are shown net of an allowance for uncollectibles.

**Note 1 – Nature of Business and Significant Accounting Policies (Continued)**

**Inventories and Prepaid Items**

Inventories in the enterprise and internal service funds consist of supplies held for use and are valued at the lower of cost or market using the first-in/first-out (FIFO) method. Inventories of governmental funds are valued at cost and are recorded as expenditures when consumed rather than when purchased.

Certain payments to vendors reflect costs applicable to future accounting periods and are recorded as prepaid items in both government-wide and fund financial statements.

**Deferred Revenue**

Deferred revenue represents monies that do not yet meet the criteria for revenue recognition. Unearned amounts are always reported as deferred revenue. In governmental funds, earned amounts are also reported as deferred revenue until they are available to liquidate liabilities of the current period.

**Restricted Assets**

These assets are restricted through bond or grant agreements or represent donated assets whose disposition is specified by the donor. Restricted assets recorded in the Federal Grants Fund are restricted through grant agreements.

Restricted assets recorded in the Hurley Medical Center discretely presented component unit consist of:

- Proceeds of debt issues and funds of HMC deposited with a trustee and limited to use in accordance with the requirements of an indenture

- Assets restricted by outside donors

Restricted assets recorded in the Water Supply Enterprise Fund consist of amounts set aside for equipment replacement and debt service as required by the Drinking Water Revolving Fund Revenue Bonds.

**Capital Assets**

Capital assets, which include property, plant, equipment, and infrastructure assets (e.g., roads, bridges, sidewalks, and similar items), are reported in the applicable governmental or business-type activities columns in the government-wide financial statements. Capital assets are defined by the government as assets with an initial, individual cost of more than $5,000 (amount not rounded) and an estimated useful life in excess of one year. Such assets are recorded at historical cost or estimated historical cost if purchased or constructed. Donated capital assets are recorded at estimated fair market value at the date of donation.

**City of Flint, Michigan**

**Note 1 - Nature of Business and Significant Accounting Policies
(Continued)**

Interest incurred during the construction of capital assets of business-type activities is included as part of the capitalized value of the assets constructed. Hurley Medical Center reported one construction project in progress during the current year, the installation of a new clinical information system.

The costs of normal maintenance and repairs that do not add to the value of the asset or materially extend assets lives are not capitalized.

| | |
|---|---|
| Buildings | 50 years |
| Building improvements | 40 to 50 years |
| Improvements other than buildings | 5 to 50 years |
| Land improvements | 5 to 50 years |
| Public domain infrastructure | 10 to 50 years |
| Water and sewer infrastructure | 10 to 75 years |
| Machinery and equipment | 3 to 20 years |
| Other furnishings | 5 to 7 years |

**Compensated Absences**

It is the government's policy to permit employees to accumulate earned but unused vacation and sick pay benefits. Employees accumulate sick leave credit bi-weekly based on the various bargaining unit agreements. Sick leave may accumulate indefinitely. Upon retirement or death, the first 480 hours of accrued sick leave are paid in full at the employee's current pay rate. The next 480 hours are forfeited by the employee, except for certain police employees who are paid for these hours at half the employee's current rate. All accrued hours in excess of 960 are paid at half the employee's current rate. Employees earn annual vacation leave bi-weekly at various rates based on bargaining unit and seniority. Each bargaining unit and seniority level determines the cap on the number of hours that can be accrued for annual vacation leave. Vacation leave is paid at the employee's current pay rate when used or upon retirement. All vacation pay is accrued when incurred in the government-wide, proprietary, and fiduciary fund financial statements. A liability for these amounts is reported in governmental funds only if they have matured, for example, as a result of employee resignations and retirements.

**City of Flint, Michigan**

**Note 1 - Nature of Business and Significant Accounting Policies
(Continued)**

**Long-term Obligations and Interest Payments**

In the government-wide financial statements and the proprietary fund types in the fund financial statements, long-term debt and other long-term obligations are reported as liabilities in the applicable governmental activities, business-type activities, or proprietary fund-type statement of net position. Bond premiums and discounts, as well as issuance costs, are deferred and amortized over the life of the bonds using the effective interest method. Bonds payable are reported net of the applicable bond premium or discount. Bond issuance costs are reported as deferred charges and amortized over the term of the related debt.

In the fund financial statements, governmental fund types recognize bond premiums and discounts, as well as bond issuance costs, during the current period. The face amount of debt issued is reported as other financing sources. Premiums received on debt issuances are reported as other financing sources. Issuance costs are reported as debt service expenditures.

**Pension and Retiree Healthcare Benefits**

The City offers both pension and retiree healthcare benefits to retirees. The City receives an actuarial valuation to compute the annual required contribution (ARC) necessary to fund the obligations over the remaining amortization period. In the governmental funds, pension and OPEB costs are recognized as contributions are made. For the government-wide statements and proprietary funds, the City reports the full accrual cost equal to the current year required contribution, adjusted for interest and "adjustment to the ARC" on the beginning of year underpaid amount, if any.

**Fund Equity**

In the fund financial statements, governmental funds report the following components of fund balance:

- Nonspendable: Amounts that are not in spendable form or are legally or contractually required to be maintained intact

- Restricted: Amounts that are legally restricted by outside parties, constitutional provisions, or enabling legislation for use for a specific purpose

- Committed: Amounts that have been formally set aside by the City for use for specific purposes. Commitments are made and can be rescinded only by the emergency manager.

- Assigned: Intent to spend resources on specific purposes expressed by the emergency manager

**City of Flint, Michigan**

**Note 1 - Nature of Business and Significant Accounting Policies (Continued)**

- Unassigned:  Amounts that do not fall into any other category above.  This is the residual classification for amounts in the General Fund and represents fund balance that has not been assigned to other funds and has not been restricted, committed, or assigned to specific purposes in the General Fund.  In other governmental funds, only negative unassigned amounts are reported, if any, and represent expenditures incurred for specific purposes exceeding the amounts previously restricted, committed, or assigned to those purposes.

**Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the period.  Actual results could differ from those estimates.

**Hurley Medical Center - Cost-based Reimbursement**

Patient accounts receivable at June 30, 2013 and revenues for the year then ended include estimated amounts due from various third-party payors which are computed in accordance with their respective reimbursement formulas.

In addition, the Medical Center has established an estimated allowance for uncollectible accounts of approximately $41,300,000 for 2013.

**Hurley Medical Center - Revenues and Expenses Accounting Policy**

Net patient service revenue:

Net patient service revenue is reported at the estimated net realized amounts from patients and third-party payors for services rendered, including estimated retroactive adjustments under reimbursement agreements with third-party payors.  Retroactive adjustments are accrued on an estimated basis in the period the related services are rendered and adjusted in future periods as final settlements are determined.  Approximately 79 percent of the Medical Center's revenues are based on participation in the Blue Cross/Blue Shield, Medicare, and Medicaid programs for the year ended June 30, 2013.

Charity care:

The Medical Center provides care without charge to patients who meet certain criteria under its charity care policy.  Because the Medical Center does not pursue collection of amounts determined to qualify as charity care, they are not reported as revenue.  The eligibility criteria are based on levels of income.

47

**City of Flint, Michigan**

**Note 1 - Nature of Business and Significant Accounting Policies (Continued)**

Estimated self-insured malpractice costs:

The provision for estimated self-insured medical malpractice claims includes estimates of the ultimate costs for both reported claims and claims incurred but not reported.  The estimate for claims incurred but not reported is based on an actuarial determination.

**Note 2 - Stewardship, Compliance, and Accountability**

**Budgetary Information**

The City followed these procedures in establishing the budgetary data reflected in the financial statements:

- On April 24, 2012, the emergency manager signed Order No. 17, adopting the operating budget for the fiscal year commencing the following July 1.  The legally adopted operating budget included expenditures and the means of financing them for the General and Special Revenue Funds (these funds are required to have budgets per Michigan law).  Informational summaries of projected revenue and expenditures/ expenses were provided for all City funds, as well as estimated total costs and proposed methods of financing all capital construction projects.

  Department heads are authorized to transfer budgeted amounts with departmental appropriation accounts, except those that affect salaries and wages accounts, and revisions that alter the total expenditures of any budgetary level (as indicated above) were to be approved by the emergency manager and the State of Michigan Department of Treasury.

  Formal budgetary integration was employed as a management control device during the year for all budgetary funds.  Also, all budgets, except for the Federal Grants Fund, were adopted on a basis consistent with generally accepted accounting principles.  The budget for the Federal Grants Fund includes grant revenue and expenditures which were passed through to other City funds and recorded as revenue and expenditures in the grant receiving fund.  For the fund financial statements, the Federal Grants Fund includes only those revenue and expenditures incurred directly by that fund.

- Budget appropriations lapse at year end, except for certain projects which are appropriated on a project length basis.

Encumbrance accounting is employed in governmental funds. Encumbrances (e.g., purchase orders, contracts) outstanding at year end do not constitute expenditures or liabilities because the goods or services have not been received as of year end; the commitments will be reappropriated and honored during the subsequent year.

48

**City of Flint, Michigan**

## Note 2 - Stewardship, Compliance, and Accountability (Continued)

### Noncompliance with Rules and Regulations

In order to maintain operations at the City, various funds have needed to borrow from funds that have restricted sources. Over time, these amounts have accumulated with no plan for repayment.

### Excess of Expenditures Over Appropriations

The following funds incurred significant expenditures in excess of appropriations at the department level during the year (defined as greater than 10 percent over budget):

|  | Final Budget | Actual | Actual Over Amended Budget |
|---|---|---|---|
| Public Improvement Fund - Parks and recreation | $ 230,000 | $ 481,121 | $ 251,121 |

The variances over budget in these departments were caused by expenditures in excess of budget in which the budget was not amended.

### Fund Deficits

The City has accumulated over several years an unassigned fund balance in the following funds:

|  | Unassigned Fund Balance Deficit |
|---|---|
| Primary government - General Fund | $ 12,895,642 |
| Component unit - Downtown Development Authority | 361,674 |

The deficit in these funds was caused by expenditures in excess of revenue.

The following special revenue funds did not adopt a budget: Atwood Stadium Fund, City Park Fund, and Longway Park Fund.

## Note 3 - Pooled Cash and Investments

The City maintains a cash and investment pool that is available for use by all funds. Each fund types' portion of this pool is displayed on the combined balance sheet as "pooled cash and investments."

---

**City of Flint, Michigan**

## Note 3 - Pooled Cash and Investments (Continued)

The pooled cash and investments account at June 30, 2013 is comprised of the following:

| | |
|---|---|
| Cash deposits and restricted cash | $ 25,455,778 |
| Investments | 18,182,519 |
| Total | $ 43,638,297 |

A summary of the amount of equity in the pooled cash and investments account or the amount due to the other funds at June 30, 2013 is as follows:

|  | Pooled Cash and Investments |
|---|---|
| General Fund | $ 642,400 |
| Special Revenue Funds: | |
| Major Streets Fund | 1,553,341 |
| Local Streets Fund | 175,753 |
| Federal Grants Fund | - |
| Public Safety Fund | 5,314,276 |
| Neighborhood Policing Fund | 277,207 |
| Street Light Fund | 674,949 |
| EDA Revolving Loan Fund | 405 |
| Atwood Stadium Fund | 6,788 |
| Parks and Recreation | 178,910 |
| Senior Citizen Center | - |
| City Park Fund | 8,399 |
| Longway Fund | 9,371 |
| Building Department Fund | 452,019 |
| Garbage Fund | 1,161,642 |
| Public Improvement | 2,767,994 |
| State Act 251 Forfeitures | 1,508,591 |
| Debt Service Funds: | |
| Windmill Place Debt Service Fund | 6,520 |
| Buick City Debt Service Fund | 643 |
| Enterprise Funds: | |
| Water Supply Division Fund | 7,837,696 |
| Sewer Fund | 6,956,143 |
| Internal Service Funds: | |
| Fringe Benefit Fund | 5,931,959 |
| Central maintenance garage | 1,302,047 |
| Self-insurance | 1,835,382 |
| Data processing | 1,802,311 |
| Pension Trust Fund - Retiree Health Care Fund | 1,828,785 |
| Agency funds: | |
| County EDA | - |
| Miscellaneous agency funds | 1,404,766 |
| Total | $ 43,638,297 |

**City of Flint, Michigan**

**Note 4 – Deposits and Investments**

Michigan Compiled Laws Section 129.91 (Public Act 20 of 1943, as amended) authorizes local governmental units to make deposits and invest in the accounts of federally insured banks, credit unions, and savings and loan associations that have offices in Michigan. The law also allows investments outside the state of Michigan when fully insured. The local unit is allowed to invest in bonds, securities, and other direct obligations of the United States or any agency or instrumentality of the United States; repurchase agreements; bankers' acceptances of United States banks; commercial paper rated within the two highest classifications, which matures not more than 270 days after the date of purchase; obligations of the State of Michigan or its political subdivisions, which are rated as investment grade; and mutual funds composed of investment vehicles that are legal for direct investment by local units of government in Michigan.

The Pension Trust Fund, whose funds are now with MERS as of June 30, 2013, and the Retiree Health Care Fund are also authorized by Michigan Public Act 314 of 1965, as amended, to invest in certain reverse repurchase agreements, stocks, diversified investment companies, annuity investment contracts, real estate leased to public entities, mortgages, real estate (if the trust fund's assets exceed $250 million), debt or equity of certain small businesses, certain state and local government obligations, and certain other specified investment vehicles.

The investment policy adopted by the City Council, in accordance with Public Act 196 of 1997, is in accordance with statutory authority.

The City's investment policy authorizes the City and its component units to invest in obligations of the U.S. Treasury and obligations of U.S. agencies, whereby the principal and interest are fully guaranteed by the United States, deposit agreements with federally insured financial institutions within the state of Michigan, high grade commercial paper, repurchase agreements secured by obligations of the U.S. government and U.S. agencies, bankers' acceptances of U.S. banks, and mutual funds comprised of the above authorized investments.

The City's investment policy further requires that investments held in the Pooled Investment Fund be limited by the investment type and financial institution. These investment limitations do not affect the investments of the Pension Benefit Trust of the City's component units. The City's pooled cash investments are limited as follows:

- Negotiable certificates of deposit cannot exceed 25 percent of investment holdings.
- Commercial paper cannot exceed 50 percent of investment holdings.
- Bankers' acceptances cannot exceed 10 percent of investment holdings.
- Mutual funds cannot exceed 15 percent of investment holdings.
- Bankers' acceptances cannot exceed a maturity of 270 days.
- Bankers' acceptances in one financial institution cannot exceed 10 percent of investment holdings.

51

**City of Flint, Michigan**

**Note 4 – Deposits and Investments (Continued)**

- Commercial paper holdings of any one corporation cannot exceed 10 percent of investment holdings.

The City was in compliance with all aspects of its investment policy at June 30, 2013.

Hurley Medical Center's chief financial officer controls the Medical Center Enterprise Fund's investing. HMC limits any single investment to 10 percent (except cash or U.S. treasuries) and combined mortgage-backed securities to less than 50 percent of holdings. HMC also must adhere to donor restrictions on the investing of any restricted funds received.

The City deals only with qualified banks and primary investment firms that adhere to the specific guidelines established by industry practice for repurchase agreements. The City's cash and investments are subject to several types of risk, which are examined in more detail below.

No single investment of the City exceeded 5 percent of the investment portfolio at June 30, 2013.

**Custodial Credit Risk of Bank Deposits**

Custodial credit risk is the risk that in the event of a bank failure, the government's deposits may not be returned to it. The City does not have a deposit policy for custodial credit risk. At year end, the City's bank deposits (certificates of deposit, checking, and savings) in the name of the City totaling $34,584,584 were uninsured and uncollateralized. The City believes that due to the dollar amounts of cash deposits and the limits of FDIC insurance, it is impractical to insure all deposits. As a result, the City evaluates each financial institution with which it deposits its funds and assesses the level of risk of each institution; only those institutions with an acceptable estimated risk level are used as depositories.

52

**City of Flint, Michigan**

**Note 4 - Deposits and Investments (Continued)**

**Custodial Credit Risk of Investments**

Custodial credit risk is the risk that, in the event of the failure of the counterparty, the City will not able to recover the value of its investments or collateral securities that are in the possession of an outside party. The City does not have a policy for custodial credit risk. The City's investments are not subject or exposed to custodial credit risk. HMC does have a deposit policy for custodial credit risk that requires the investments be held by a nationally chartered custodian bank. The chief investment officer shall select the custodian bank based on various factors including bank stability. HMC's balance of investment securities that were uninsured and unregistered held by the counterparty or by its trust department is as follows:

| Investment Type | Carrying Value | How Held |
|---|---|---|
| Primary government: | | |
| U.S. government or agency bonds | $ 3,753,392 | Counterparty trust dept. |
| Corporate bonds | 6,190,632 | Counterparty trust dept. |
| Mutual funds | 13,512 | Counterparty |
| Fiduciary fund - Corporate stocks | 558,778 | Counterparty trust dept. |
| Component unit: | | |
| U.S. government or agency bonds | 55,025,765 | Counterparty trust dept. |
| Corporate stocks | 13,443,471 | Counterparty trust dept. |
| Corporate bonds | 11,783,330 | Counterparty trust dept. |
| Repurchase agreements | 14,135 | Counterparty |
| Mutual funds | 342,349 | Counterparty |

---

**City of Flint, Michigan**

**Note 4 - Deposits and Investments (Continued)**

**Interest Rate Risk**

Interest rate risk is the risk that the value of investments will decrease as a result of a rise in interest rates. The City's investment policy for investment of general City monies limits investments in securities with maturities greater than five years to 15 percent of the balance available to invest. Hurley Medical Center's investment policy indicates that each investment account should approximate the duration of its specific benchmark within a range of 80 to 120 percent. As of June 30, 2013, the following securities were subject to interest rate risk:

| Investment | Fair Value | Weighted Average Maturity (Years) |
|---|---|---|
| **Primary Government** | | |
| U.S. government or agency bonds | $ 3,753,392 | 2.24 |
| Corporate bonds | 6,190,632 | 0.06 |
| Money market funds | 4,025,594 | < 1 year |
| Total | $ 13,969,618 | |
| **Component Units** | | |
| U.S. government agency securities | $ 55,025,765 | 3.72 |
| GNMA pool | 34,796 | 7.90 |
| U.S. government CMOs | 21,664,881 | 23.18 |
| Corporate bonds | 11,783,330 | 3.84 |
| Money market funds | 30,146,068 | < 1 year |
| Repurchase agreement | 14,135 | < 1 year |
| Total | $ 118,668,975 | |

**Credit Risk**

Credit risk is the risk that the government will not be able to recover the value of its securities. The City follows State law, which limits investments in commercial paper to the top two ratings issued by nationally recognized statistical rating organizations. The City has no investment policy that would further limit its investment choices for general City funds. The Pension Fund is allowed to invest in longer maturity corporate bonds in accordance with State law.

**City of Flint, Michigan**

**Note 4 – Deposits and Investments (Continued)**

As of June 30, 2013, the following are credit quality ratings of the City's debt securities obtained from the Standard & Poor's rating system:

| Investment | Fair Value | Rating | Rating Organization |
|---|---|---|---|
| **Primary Government** | | | |
| U.S. government bonds | $ 883,623 | AAA | S&P |
| U.S. government bonds | 2,869,769 | AA+ | S&P |
| Corporate bonds | 6,190,632 | AI | S&P |
| Mutual funds | 13,512 | AAA/AA | S&P |
| Fixed income | 73,947 | AAA/AA | S&P |
| Money market | 524,359 | AI/A2 | S&P |
| Money market | 60,396 | AAA | S&P |
| Money market | 3,366,893 | AAA/AA | S&P |
| Total | $ 13,983,131 | | |
| **Component Units** | | | |
| U.S. agency bonds | $ 5,677,688 | AAA | Fitch |
| U.S. government CMOs | 21,664,881 | Not Rated | Not Rated |
| Corporate bonds | 586,593 | AAA | S&P |
| Corporate bonds | 4,181,609 | AA+/A- | S&P |
| Corporate bonds | 5,473,295 | BBB+/B- | S&P |
| Corporate bonds | 297,104 | CCC+/CCC | S&P |
| Corporate bonds | 1,244,729 | Not Rated | Not Rated |
| Money market funds | 30,146,068 | Not Rated | Not Rated |
| Repurchase agreement | 14,135 | Not Rated | Not Rated |
| Total | $ 69,286,102 | | |

**Securities Lending Agreement**

As permitted by State statutes and under the provisions of a securities lending authorization agreement, the City's Pension System (the "System") lends securities to broker dealers and banks for collateral that will be returned for the same securities in the future. The System's custodial bank manages the securities lending program and receives cash as collateral. The custodial bank does not have the ability to pledge or sell collateral securities unless the borrower defaults. Borrowers are required to deliver collateral for each loan equal to not less than 102 percent of the market value of the loaned securities. During fiscal year 2013, prior to the System's assets being transferred to MERS, the System was participating in the securities lending program. As of June 30, 2013, the System is using MERS as the custodian and therefore no longer participates in the securities lending program.

**City of Flint, Michigan**

**Note 4 – Deposits and Investments (Continued)**

The City of Flint Economic Development Corporation's cash is subject to one type of risk, which is examined in more detail below:

Custodial credit risk is the risk that in the event of a bank failure, EDC's deposits may not be returned to it. The government does not have a deposit policy for custodial credit risk. At year end, EDC had no bank deposits (certificates of deposit, checking, and savings accounts) that were uninsured and uncollateralized. As a result, the City evaluates each financial institution with which it deposits funds and assesses the level of risk of each institution; only those institutions with an acceptable estimated risk level are used as depositories.

The Flint Area Enterprise Community's cash is subject to one type of risk, which is examined in more detail below:

Custodial credit risk of bank deposits:

Custodial credit risk is the risk that in the event of a bank failure, FAEC's deposits may not be returned to it. FAEC has a deposit policy for custodial credit risk. At year end, FAEC had $493,243 of bank deposits (checking and savings accounts) that were uninsured and uncollateralized. FAEC believes that due to the dollar amounts of cash deposits and the limits of FDIC insurance, it is impractical to insure all deposits. As a result, FAEC evaluates each financial institution with which it deposits funds and assesses the level of risk of each institution; only those institutions with an acceptable estimated risk level are used as depositories.

The Flint Downtown Development Authority's cash and investments are subject to various types of risk, which are examined in more detail below:

Custodial credit risk of bank deposits:

Custodial credit risk is the risk that in the event of a bank failure, DDA's deposits may not be returned to it. DDA does not have a deposit policy for custodial credit risk. At year end, DDA had no bank deposits (certificates of deposit, checking, and savings accounts) that were uninsured and uncollateralized.

Credit risk:

State law limits investments in commercial paper to the top two ratings issued by nationally recognized statistical rating organizations. DDA has no investment policy that would further limit its investment choices. As of year end, the credit quality ratings of debt securities (other than the U.S. government) are as follows:

| | Fair Value | Rating |
|---|---|---|
| Investment - Money market | $ 238,354 | Not Available |

# City of Flint, Michigan

**Notes to Financial Statements**
**June 30, 2013**

## Note 5 – Receivables and Deferred Revenue

Receivables as of year end for the City's individual major funds and nonmajor, internal service, and fiduciary funds in the aggregate, including the applicable allowances for uncollectible accounts, are as follows:

| Receivables: | General Fund | Federal Grants Fund | Public Improvement Fund | Nonmajor, Internal Service, Fiduciary Funds, and Agency Funds | Total | Water Supply | Sewage Disposal | Total | Component Unit - Hurley Medical Center |
|---|---|---|---|---|---|---|---|---|---|
| Property taxes receivable | $ 2,767,533 | $   - | $  184,192 | $ 3,527,203 | $ 6,478,928 | $   - | $   - | $   - | $   - |
| Receivables from sales to customers on account | - | - | - | - | - | 14,054,422 | 10,597,528 | 24,651,950 | 70,201,583 |
| Accrued interest receivable | - | - | - | 198,082 | 198,082 | - | - | - | 261,587 |
| Gross receivables - Other receivables | 4,114,790 | 7,400 | - | 103,698 | 4,225,888 | 232 | 155 | 387 | 704,500 |
| Due from other governmental units | 3,304,348 | 3,963,428 | 9,167,900 | 1,531,041 | 17,966,717 | - | - | - | - |
| Notes and leases | - | 10,074,000 | - | 486,338 | 10,560,338 | - | 109,866 | 109,866 | - |
| Less allowance for uncollectibles | (2,428,785) | - | (4,266,449) | - | (6,695,234) | (936,000) | (775,000) | (1,711,000) | - |
| Net receivables | $ 7,757,886 | $ 14,044,828 | $ 5,085,643 | $ 5,846,362 | $ 32,734,719 | $ 13,118,654 | $ 9,932,549 | $ 23,051,203 | $ 71,167,670 |

Governmental funds report deferred revenue in connection with receivables for revenues that are not considered to be available to liquidate liabilities of the current period. Governmental funds also defer revenue recognition in connection with resources that have been received, but not yet earned. At the end of the current fiscal year, the various components of deferred revenue and unearned revenue reported in the governmental funds were as follows:

| | Governmental Funds | | |
|---|---|---|---|
| | Unavailable | Unearned | Total |
| Delinquent property taxes receivable (General Fund) | $  870,717 | $   - | $  870,717 |
| Delinquent property taxes receivable | 592,721 | - | 592,721 |
| Long-term notes receivable | 10,370,789 | - | 10,370,789 |
| Grant receivable | 948,117 | - | 948,117 |
| Grant receipts prior to meeting all eligibility requirements | - | 920,414 | 920,414 |
| Total | $ 12,782,344 | $  920,414 | $ 13,702,758 |

57

# City of Flint, Michigan

**Notes to Financial Statements**
**June 30, 2013**

## Note 6 – Capital Assets

Capital asset activity of the City's governmental and business-type activities for the year was as follows:

| Governmental Activities | Balance July 1, 2012 | Additions | Disposals | Balance June 30, 2013 |
|---|---|---|---|---|
| Capital assets not being depreciated: | | | | |
| Land | $ 14,313,536 | $   - | $   - | $ 14,313,536 |
| Construction in progress | - | 132,616 | - | 132,616 |
| Subtotal | 14,313,536 | 132,616 | - | 14,446,152 |
| Capital assets being depreciated: | | | | |
| Roads and sidewalks | 369,668,151 | 3,900,775 | (161,026) | 373,407,900 |
| Buildings and improvements | 22,958,138 | 46,750 | - | 23,004,888 |
| Machinery and equipment | 32,643,402 | 983,687 | (3,330,492) | 30,296,597 |
| Land improvements | 14,605,010 | - | - | 14,605,010 |
| Subtotal | 439,874,701 | 4,931,212 | (3,491,518) | 441,314,395 |
| Accumulated depreciation: | | | | |
| Roads and sidewalks | 233,169,408 | 13,113,510 | (161,025) | 246,121,893 |
| Buildings and improvements | 17,146,379 | 446,904 | - | 17,593,283 |
| Machinery and equipment | 26,817,971 | 1,558,925 | (2,716,451) | 25,660,445 |
| Land improvements | 10,400,669 | 459,712 | - | 10,860,381 |
| Subtotal | 287,534,427 | 15,579,051 | (2,877,476) | 300,236,002 |
| Net capital assets being depreciated | 152,340,274 | (10,647,839) | (614,042) | 141,078,393 |
| Net capital assets | $ 166,653,810 | $ (10,515,223) | $ (614,042) | $ 155,524,545 |

| Business-type Activities | Balance July 1, 2012 | Reclassification | Additions | Disposals | Balance June 30, 2013 |
|---|---|---|---|---|---|
| Capital assets not being depreciated: | | | | | |
| Land | $  762,394 | $   - | $   - | $   - | $  762,394 |
| Construction in progress | 1,336,668 | (53,701) | - | - | 1,282,967 |
| Subtotal | 2,099,062 | (53,701) | - | - | 2,045,361 |
| Capital assets being depreciated: | | | | | |
| Buildings and improvements | 58,270,369 | 53,701 | 22,061 | (55,979) | 58,290,152 |
| Machinery and equipment | 236,967,195 | - | 1,678,217 | (10,129,805) | 228,515,607 |
| Land improvements | 5,406,197 | - | - | - | 5,406,197 |
| Subtotal | 300,643,761 | 53,701 | 1,700,278 | (10,185,784) | 292,211,956 |
| Accumulated depreciation: | | | | | |
| Buildings and improvements | 24,608,545 | - | 2,284,687 | (17,284) | 26,875,948 |
| Machinery and equipment | 166,468,474 | - | 5,052,420 | (8,311,804) | 163,209,090 |
| Land improvements | 1,528,505 | - | 198,628 | - | 1,727,133 |
| Subtotal | 192,605,524 | - | 7,535,735 | (8,329,088) | 191,812,171 |
| Net capital assets being depreciated | 108,038,237 | 53,701 | (5,835,457) | (1,856,696) | 100,399,785 |
| Net capital assets | $ 110,137,299 | $   - | $ (5,835,457) | $ (1,856,696) | $ 102,445,146 |

58

D-30

# City of Flint, Michigan

**Notes to Financial Statements**
**June 30, 2013**

## Note 6 - Capital Assets (Continued)

| Component Units | Balance July 1, 2012 | Additions | Disposals and Transfers | Balance June 30, 2013 |
|---|---|---|---|---|
| Capital assets not being depreciated: | | | | |
| Land | $ 10,423,314 | $ 20,000 | $ (803,734) | $ 9,639,580 |
| Construction in progress | 7,614,005 | 16,885,070 | (11,912,155) | 12,586,920 |
| Subtotal | 18,037,319 | 16,905,070 | (12,715,889) | 22,226,500 |
| Capital assets being depreciated: | | | | |
| Buildings and improvements | 175,900,564 | 3,166,411 | (5,182,663) | 173,884,312 |
| Machinery and equipment | 104,605,413 | 8,809,611 | (7,103,721) | 106,311,303 |
| Vehicles | 354,355 | - | (18,304) | 336,051 |
| Office furnishings | 1,085,861 | 42,108 | (3,499) | 1,124,470 |
| Land improvements | 13,153,256 | 206,602 | (552,109) | 12,807,749 |
| Leasehold improvements | 6,957,930 | 54,187 | (219,992) | 6,792,125 |
| Subtotal | 302,057,379 | 12,278,919 | (13,080,288) | 301,256,010 |
| Accumulated depreciation: | | | | |
| Buildings and improvements | 117,622,455 | 4,972,961 | (5,049,963) | 117,545,453 |
| Machinery and equipment | 61,459,816 | 10,995,528 | (6,790,713) | 65,664,631 |
| Vehicles | 262,273 | 34,988 | (18,304) | 278,957 |
| Office furnishings | 440,836 | 80,041 | (3,441) | 517,436 |
| Land improvements | 3,393,980 | 370,190 | (552,109) | 3,212,061 |
| Leasehold improvements | 6,385,440 | 57,489 | (228,761) | 6,214,168 |
| Subtotal | 189,564,800 | 16,511,197 | (12,643,291) | 193,432,706 |
| Net capital assets being depreciated | 112,492,579 | (4,232,278) | (436,997) | 107,823,304 |
| Net capital assets | $ 130,529,898 | $ 12,672,792 | $ (13,152,886) | $ 130,049,804 |

Depreciation expense was charged to programs of the primary government as follows:

Governmental activities:

| | |
|---|---|
| General government | $ 953,072 |
| Police | 677,967 |
| Judicial | 35,763 |
| Fire | 60,160 |
| Transportation | 13,130,326 |
| Emergency dispatch | 77,289 |
| Parks and recreation | 572,517 |
| Public works | 5,313 |
| Community enrichment and development | 66,644 |
| Total governmental activities | $ 15,579,051 |

# City of Flint, Michigan

**Notes to Financial Statements**
**June 30, 2013**

## Note 6 - Capital Assets (Continued)

Business-type activities:

| | |
|---|---|
| Sewer | $ 3,971,796 |
| Water | 3,563,939 |
| Total business-type activities | $ 7,535,735 |

Component unit activities:

| | |
|---|---|
| Downtown Development Authority | $ 358,474 |
| Hurley Medical Center | 16,109,516 |
| Flint Area Enterprise Community | 3,954 |
| Economic Development Corporation | 39,253 |
| Total component unit activities | $ 16,511,197 |

## Note 7 - Interfund Receivables, Payables, and Transfers

The composition of interfund balances as of June 30, 2013 is as follows:

| Receivable Fund | Payable Fund | Amount |
|---|---|---|
| **Due to/from Other Funds** | | |
| Nonmajor governmental funds | General Fund | $ 1,812,097 |
| Internal service funds | General Fund | 4,500,000 |
| | Federal Grant Fund | 2,492,039 |
| | Nonmajor governmental funds | 26,556 |
| | Sewage Disposal Division Fund | 851,200 |
| | Total internal service funds | 7,869,795 |
| | Total | $ 9,681,892 |

| Receivable Fund | Payable Fund | Amount |
|---|---|---|
| **Advances from/to Other Funds** | | |
| Sewage Disposal Division Fund | General Fund | $ 9,800,000 |
| Water Supply Division Fund | General Fund | 1,000,000 |
| | Total | $ 10,800,000 |

**City of Flint, Michigan**

**Note 7 - Interfund Receivables, Payables, and Transfers (Continued)**

| Receivable Fund | Payable Entity | Amount |
|---|---|---|
| **Due to/from Primary Government and Component Units** | | |
| Public Improvement Fund | Component unit - DDA (1) | $ 9,167,900 |
| General Fund | Component unit - EDC (1) | 148,895 |
| Federal Grants Fund | Component unit - EDC | 550,000 |
| | Total | $ 9,866,795 |

The interfund receivables were created through negative pooled cash in other funds and monies loaned for operating purposes.

The advances were created through negative pooled cash in other funds.

(1) The borrowings between primary government and component units are due to parking debt funding (DDA) and ineligible grant costs (EDC). At June 30, 2013, there was an allowance related to the due from DDA of $4,266,449, which reduces the total due from DDA to a net amount of $4,901,451.

Interfund transfers reported in the fund financial statements are comprised of the following:

| Fund Transferred to | Fund Transferred from | Amount |
|---|---|---|
| General Fund | Sewage Disposal Division Fund (2) | $ 1,860,000 |
| | Water Supply Division Fund (2) | 1,130,000 |
| | Total General Fund | 2,990,000 |
| Nonmajor governmental funds | General Fund (3) | 9,312 |
| | Public Improvement Fund (4) | 726,953 |
| | Internal Service Funds (5) | 1,500,000 |
| | Nonmajor governmental funds (6) | 292,192 |
| | Total nonmajor governmental funds | 2,528,457 |
| | Total | $ 5,518,457 |

---

**City of Flint, Michigan**

**Note 7 - Interfund Receivables, Payables, and Transfers (Continued)**

(2) The transfers from the Sewer and Water Funds to the General Fund represent return on equity.

(3) Transfers between funds were primarily for operating purposes or to cover operating deficits.

(4) The transfer from the Public Improvement Fund to the Central Garage Internal Service Fund was to provide funds for the payment of debt related to capital assets.

(5) The transfer from the Central Maintenance Garage Fund to the Garbage Collection Fund was to transfer the proceeds received to the Garbage Collection Fund, which was related to the sale of City garbage trucks.

(6) Transfers between funds were primarily for operating purposes. The transfer from the Major Streets Fund to the Local Streets Fund is allowable per Act 51.

**Note 8 - Leases**

The City has entered into agreements for the lease of automobiles, water treatment equipment, office equipment, construction equipment, fire equipment, computers, and a fire station. The terms of each agreement provide options to purchase the fixed assets at any time during the lease terms, which range from three to five years. All of the leases meet the criteria of a capital lease as defined by Statement of Financial Accounting Standards No. 13, *Accounting for Leases*, which defines a capital lease generally as one which transfers the benefits and risks of ownership to the lessee. As such, $2,374,857 has been capitalized as equipment, and related accumulated depreciation was $1,108,489.

The following is a schedule of the future minimum lease payments under the capitalized leases together with the present value of the net minimum lease payments as of June 30, 2013:

| Years Ending June 30 | Amount |
|---|---|
| 2014 | $ 194,011 |
| 2015 | 151,834 |
| 2016 | 52,061 |
| Total future minimum lease payments | 397,906 |
| Less amount representing interest | (22,662) |
| Long-term obligation under capital leases | $ 375,244 |

**City of Flint, Michigan**

**Note 8 - Leases (Continued)**

Also, Hurley Medical Center and HHS lease office space under various operating leases. Certain operating leases contain rental escalation clauses that are based on the prime rate at a future date and purchase options at fair market value. The following is a schedule of future minimum lease payments under operating leases that have initial or remaining lease terms in excess of one year:

| Years Ending June 30 | Amount |
|---|---|
| 2014 | $ 1,784,585 |
| 2015 | 1,714,104 |
| 2016 | 1,687,311 |
| 2017 | 1,621,160 |
| 2018 | 1,200,735 |
| Thereafter | 2,205,193 |
| Total minimum payments required | $ 10,213,088 |

Rental expense for all operating leases for the year ended June 30, 2013 was $2,086,648.

**Note 9 - Long-term Debt**

The City issues bonds to provide for the acquisition and construction of major capital facilities. General obligation bonds are direct obligations and pledge the full faith and credit of the City. County contractual agreements and installment purchase agreements are also general obligations of the government. Special assessment bonds provide for capital improvements that benefit specific properties, and will be repaid from amounts levied against those properties benefited from the construction. In the event that a deficiency exists because of unpaid or delinquent special assessments at the time a debt service payment is due, the City is obligated to provide resources to cover the deficiency until other resources (such as tax sale proceeds or a reassessment of the City) are received. All Michigan Municipal Bond Authority debt is secured by future State of Michigan revenue-sharing payments that the City is entitled to receive under State law. Revenue bonds involve a pledge of specific income derived from the acquired or constructed assets to pay debt service.

**City of Flint, Michigan**

**Note 9 - Long-term Debt (Continued)**

Long-term debt activity for the year ended June 30, 2013 can be summarized as follows:

| | Beginning Balance | Additions | Reductions | Ending Balance | Due Within One Year |
|---|---|---|---|---|---|
| **Governmental Activities** | | | | | |
| Section 108 loan | $ 754,000 | $ - | $ 150,000 | $ 604,000 | $ 150,000 |
| Section 108 loan - 500 Block | 3,840,000 | - | - | 3,840,000 | 295,000 |
| Section 108 loan - Ok Industries | 106,000 | - | 21,000 | 85,000 | 21,000 |
| Section 108 loan - Guaranteed Funds | 5,105,000 | - | 75,000 | 5,030,000 | 75,000 |
| Section 108 loan - W. Carpenter Rd. | 1,681,000 | - | 97,000 | 1,584,000 | 98,000 |
| General Obligation Capital Improvement Bonds | 9,490,000 | - | 260,000 | 9,230,000 | 275,000 |
| Local Government Loan Program | 8,000,000 | - | 185,000 | 7,815,000 | 195,000 |
| Total governmental activities SIB 3rd Avenue Reconstruction loan | 1,928,642 | - | 108,977 | 1,819,665 | 109,523 |
| Total bonds payable | 30,904,642 | - | 896,977 | 30,007,665 | 1,218,523 |
| Accumulated compensated absences | 5,343,961 | 2,241,542 | 3,150,247 | 4,435,256 | 3,100,000 |
| Capital lease - Telephone equipment | 140,226 | - | 104,131 | 36,095 | 36,092 |
| Capital lease - Equipment | 27,212 | - | 21,622 | 5,590 | 5,592 |
| Capital lease - Dell equipment | 475,601 | - | 142,042 | 333,559 | 138,171 |
| Total governmental activities | $ 36,891,642 | $ 2,241,542 | $ 4,315,019 | $ 34,818,165 | $ 4,498,378 |

Compensated absences attributable to the governmental activities will be liquidated primarily by the General and Neighborhood Policing Funds. The claims and judgments liability will generally be liquidated through the City's Self-Insurance Internal Service Fund. That fund will finance the payment of those claims by charging the other funds based on management's assessment of the relative insurance risk that should be assumed by individual funds. The net pension obligation and the net OPEB obligation will be liquidated from the funds that the individual employee's salaries are paid from, generally the General Fund and Neighborhood Policing Fund.

D-33

# City of Flint, Michigan

**Notes to Financial Statements**
**June 30, 2013**

## Note 9 - Long-term Debt (Continued)

| | Beginning Balance | Additions | Reductions | Ending Balance | Due Within One Year |
|---|---|---|---|---|---|
| **Business-type Activities** | | | | | |
| Enterprise funds: | | | | | |
| 2001 MMBA Drinking Water Revolving Fund Revenue Bonds | $ 3,303,994 | $ - | $ 375,000 | $ 2,928,994 | $ 385,000 |
| 2002 MMBA Drinking Water Revolving Fund Revenue Bonds | 4,110,000 | - | 410,000 | 3,700,000 | 425,000 |
| 2003 MMBA Drinking Water Revolving Fund Revenue Bonds | 5,196,408 | - | 465,000 | 4,731,408 | 475,000 |
| 2004 MMBA Drinking Water Revolving Fund Revenue Bonds | 13,344,934 | - | 865,000 | 12,479,934 | 880,000 |
| Total business-type activities | 25,955,336 | - | 2,115,000 | 23,840,336 | 2,165,000 |
| Accumulated compensated absences | 625,603 | 602,670 | 690,098 | 538,175 | 538,175 |
| Total business-type activities | $ 26,580,939 | $ 602,670 | $ 2,805,098 | $ 24,378,511 | $ 2,703,175 |

| | Beginning Balance | Additions | Reductions | Ending Balance | Due Within One Year |
|---|---|---|---|---|---|
| **Component Unit Activities** | | | | | |
| Bonds payable: | | | | | |
| Series 1998A | $ 9,705,000 | $ - | $ 7,825,000 | $ 1,880,000 | $ 915,000 |
| Series 1998B | 15,235,000 | - | 13,330,000 | 1,905,000 | 600,000 |
| Series 2003 | 25,590,000 | - | 18,080,000 | 7,510,000 | 2,360,000 |
| Series 2010 | 34,715,000 | - | 500,000 | 34,215,000 | 500,000 |
| Series 2011 | 4,706,476 | - | 597,541 | 4,108,935 | 678,530 |
| Series 2013A | - | 21,940,000 | - | 21,940,000 | - |
| Series 2013B | - | 36,590,000 | - | 36,590,000 | 555,000 |
| Total | 89,951,476 | 58,530,000 | 40,332,541 | 108,148,935 | 5,608,530 |
| Unamortized bond discount | (1,852,720) | 1,642,640 | | (210,080) | |
| Total component unit activities | $ 88,098,756 | $ 60,172,640 | $ 40,332,541 | $ 107,938,855 | $ 5,608,530 |

Annual debt service requirements to maturity for the above bonds and note obligations are as follows:

| Years Ending June 30 | Governmental Activities | | | Business-type Activities | | | Component Unit Activities | | |
|---|---|---|---|---|---|---|---|---|---|
| | Principal | Interest | Total | Principal | Interest | Total | Principal | Interest | Total |
| 2014 | $ 1,398,378 | $ 1,210,607 | $ 2,608,985 | $ 2,165,000 | $ 585,008 | $ 2,750,008 | $ 5,608,530 | $ 5,684,695 | $ 11,293,225 |
| 2015 | 1,383,769 | 1,169,308 | 2,553,077 | 2,220,000 | 530,571 | 2,750,571 | 5,307,431 | 5,391,722 | 10,699,153 |
| 2016 | 1,332,096 | 1,125,420 | 2,457,516 | 2,275,000 | 474,821 | 2,749,821 | 5,792,648 | 5,075,542 | 10,868,190 |
| 2017 | 1,345,175 | 1,082,110 | 2,427,285 | 2,335,000 | 417,633 | 2,752,633 | 6,079,156 | 4,846,484 | 10,925,640 |
| 2018 | 1,234,731 | 1,041,391 | 2,276,122 | 2,395,000 | 358,946 | 2,753,946 | 6,282,010 | 4,610,130 | 10,892,140 |
| 2019-2023 | 6,658,093 | 4,572,001 | 11,230,094 | 9,825,402 | 910,457 | 10,735,859 | 24,519,160 | 19,158,696 | 43,677,856 |
| 2024-2028 | 9,774,412 | 3,128,164 | 12,902,576 | 2,624,934 | 70,435 | 2,695,369 | 15,020,000 | 15,017,750 | 30,037,750 |
| 2029-2033 | 5,613,032 | 1,249,053 | 6,862,085 | - | - | - | 13,680,000 | 10,808,344 | 24,488,344 |
| 2034-2038 | 1,643,223 | 152,850 | 1,796,073 | - | - | - | 17,185,000 | 5,610,282 | 22,795,282 |
| 2039-2041 | | | | - | - | - | 8,675,000 | 315,450 | 8,990,450 |
| Total | $ 30,382,909 | $ 14,730,904 | $ 45,113,813 | $ 23,840,336 | $ 3,347,871 | $ 27,188,207 | $108,148,935 | $ 76,519,095 | $184,668,030 |

65

# City of Flint, Michigan

**Notes to Financial Statements**
**June 30, 2013**

## Note 9 - Long-term Debt (Continued)

**Future Revenues Pledged for Debt Payments**

**Revenue Bond** - The City has pledged substantially all revenue of the Water and Sewer Fund, net of operating expenses, to repay the Drinking Water Revolving Fund Revenue Bonds (DWRF). Financial recovery bonds issued by the State of Michigan and the DWRF Revenue Bonds have been secured with future State revenue-sharing payments to be received by the City's General Fund. The remaining principal and interest to be paid on the bonds are $23,840,336 and $3,347,872, respectively. During the current year, net revenues of the system were $12,165,515 and State revenue-sharing revenues were $13,667,182, as compared to the annual debt requirements of $2,165,000 of principal and $585,008 of interest.

**Revenues Pledged in Connection with Component Unit Debt** - The City has pledged, as security for bonds issued by the City on behalf of the Flint Downtown Development Authority, a portion of the City's state-shared revenues. The bonds issued during 2008 in the amount of $10,000,000 were used to provide funding for the James Rutherford Parking Deck capital project and upgrade of the Riverfront Parking Deck. The bonds are payable through 2033. The Flint Downtown Development Authority has pledged tax increment revenues and net operating revenues of the parking system to repay the obligations. Based upon the amount drawn through June 30, 2013, principal and interest to be paid on the bonds total $14,513,756. During the current year, the net loss from the parking operations was $16. Cash flow projections indicate that the DDA's annual debt service to the City for repayment of the bonds will not coincide with the City's annual debt service obligation.  During the current year, the City has forgiven payment made by the City on behalf of the DDA.

**Section 108 Loans** - The Section 108 loans were obtained through an economic development loan program administered by the U.S. Department of Housing and Urban Development (HUD). The proceeds of the loans were then loaned to private entities for economic development proposes. Loans under the programs are owed to HUD and are secured by future federal grant allocations to the City through the Community Development Block Grant Program. During the current year, net revenues from the Community Development Block Grant Programs were $3,660,688 as compared to the annual debt requirements of $328,507.

**Hurley Medical Center Revenue Refunding Bonds** - The net revenues of the Medical Center are pledged for payment of principal and interest on the variable rate demand revenue rental and revenue refunding bonds. Accordingly, the financial statements of the Medical Center include the facilities as if owned by the Medical Center and the bonds as if issued by the Medical Center.

66

D-34

**City of Flint, Michigan**

## Note 9 – Long-term Debt (Continued)

Section 7-302 of the City Charter, adopted November 4, 1975, limits "net" debt to 7 percent of the assessed value of all real and personal property in the City, but does not define "net" debt. The following computation is based on previous practice and is consistent with the requirements of the State of Michigan Public Act 279 of 1909.

| | | |
|---|---|---|
| Assessed valuation at November 16, 2012 | | $ 918,943,232 |
| Legal debt limit (7 percent of assessed valuation) | | 64,326,026 |
| Total bonded debt at June 30, 2013 | $ 140,194,271 | |
| Less debt not subject to limitation under City charter and state statute: | | |
| Revenue bonds and notes | 130,964,271 | |
| Debt subject to limitation | | 9,230,000 |
| Unused debt limitation | $           - | $  55,096,026 |

## Note 10 – Restricted Assets

The balances of the restricted assets accounts in the governmental, business-type activities, and component units are as follows:

| | Governmental Activities | Business-type Activities | Component Units |
|---|---|---|---|
| Section 108 business loan proceeds | $    380,675 | $             - | $             - |
| Equipment replacement and improvement | - | - | 875,092 |
| Self insurance | - | - | 16,338,354 |
| Revenue bond indenture held by trustee | - | - | 26,816,531 |
| Unspent bond proceeds | - | - | 692,866 |
| Revenue bond equipment replacement account - Pooled cash | - | 2,001,500 | - |
| Debt service reserve - Pooled cash | - | 2,384,034 | - |
| Total restricted assets | $    380,675 | $  4,385,534 | $ 44,722,843 |

**City of Flint, Michigan**

## Note 11 – Retirement Plans

Significant details regarding the City's various retirement plans and other post-employment benefits are presented below:

**Flint Employees' Retirement System**

During the first three months of the fiscal year, the City of Flint Employees' Retirement System (FERS), a single-employer public employee retirement system, covers substantially all employees of the City hired prior to October 1, 2003, including certain employees of Hurley Medical Center. The plan does not cover certain firemen and policemen covered by the Charter Retirement Plan, Hurley Medical Center employees participating in MERS, and those employees that elect to participate in the Employees' Defined Contribution - 401A Plan. The retirement system is a blended component unit of the City of Flint. The plan was established by City ordinance and applicable State law, and is administered by a board of trustees. A separate financial statement for the FERS is not available. The City Council has the authority to amend the benefits offered. Investments of the plan are made through Chase Trust Department and Northern Trust. Employees who retire at or after age 55 (age 60 for certain Hurley Medical Center employees) with 10 years of credited service (eight years for appointed officials), or those members with 25 years of credited service (23 years for police and fire), regardless of their age, are entitled to a retirement benefit. Certain police members can voluntarily retire at age 50 with 25 years of service. The retirement benefit can range from 1.7 percent to 2.6 percent of the participant's final average compensation based on the last three years (five years for certain Hurley Medical Center employees) of credited service multiplied by the years of credit service depending on date of hire, and is payable monthly for life. Benefits fully vest on reaching 10 years of service with the benefit payable at age 55. The plan also provides death and disability benefits.

Beginning in October 2012, the City closed out the single-employer plan and transferred approximately $270 million of assets to the Michigan Municipal Employees' Retirement System (MERS or the "System"), an agent multiple-employer defined benefit pension plan that covers substantially all employees of the City. The new System provides retirement, disability, and death benefits to plan members and their beneficiaries. The Michigan Municipal Employees' Retirement System issues a publicly available financial report that includes financial statements and required supplemental information for the System. That report may be obtained by writing to the System at 1134 Municipal Way, Lansing, Michigan 48917.

Member contributions are recognized when due. Employer contributions to the plan are recognized when due and the employer has made a formal commitment to provide the contributions. Benefits and refunds are recognized when due and payable in accordance with the terms of the plan.

**City of Flint, Michigan**

**Note 11 - Retirement Plans (Continued)**

The investments are recorded on the balance sheet at fair value as determined by the custodian. The custodian utilizes electronic feeds from external pricing vendors for the majority of investments (95 percent). The remaining assets are valued through a variety of external sources. Gains and losses on the exchanges, or "swaps" of securities, are accounted for under the completed transactions method.

During the current year, all assets from FERS were transferred to the Municipal Employees' Retirement System (MERS), which at June 30, 2013 is the sole administrator of the plan. MERS is a multiple-employer retirement agent. MERS issues a publicly available financial report that includes financial statements and required supplemental information for the system. That report may be obtained by writing to MERS at 1134 Municipal Way, Lansing, Michigan 48917.

Membership in the plan at June 30, 2011, the latest date this data was tested in an actuarial valuation, was comprised of 1,276 active plan members, 223 inactive vested members, and 2,894 retirees and beneficiaries receiving payments.

The plan provides that the City and employees contribute amounts necessary to fund the actuarially determined benefits. Employees become members of FERS and are required to deposit amounts into the system based on rates determined by bargaining unit contracts of all compensation, including overtime. The employee contribution rates ranged from 0 to 9 percent. Deposits are accumulated in individual accounts for each member remaining in service. Upon termination, a member may withdraw the accumulated employee contributions plus any interest credited to his or her account.

Administrative costs of the plan are financed through investment earnings.

The City forwarded $3,018,836 of pension contributions withheld from employees during the year ended June 30, 2013. During 2013, employer contributions rates ranged from 12.23 percent to 59.98 percent of covered payroll. Employer contributions are based on an actuarial valuation performed as of June 30, 2011. The employer contribution for the year was $14,909,789, which agreed to the annual required contribution. The employer contributions funded retirement benefits, life insurance benefits, and the administration of the retirement system.

**City of Flint, Michigan**

**Note 11 - Retirement Plans (Continued)**

**Annual Pension Cost**

Six-year trend information regarding the annual pension cost (ARC), percentage of ARC contributed, and net pension obligation (NPO) are summarized as follows:

| Fiscal Year Ended | Actuarial Valuation Date | Annual Required Contribution * | Percentage Contributed | Net Pension Obligation |
|---|---|---|---|---|
| 6/30/08 | 6/30/06 | $ 14,376,558 | 72.0 | $10,805,978 |
| 6/30/09 | 6/30/07 | 14,497,568 | 175.0 | - |
| 6/30/10 | 6/30/08 | 13,394,739 | 100.0 | - |
| 6/30/11 | 6/30/09 | 10,835,308 | 100.0 | - |
| 6/30/12 | 6/30/10 | 14,562,392 | 100.0 | - |
| 6/30/13 | 6/30/11 | 14,909,789 | 100.0 | - |

* The required contribution is expressed to the City as a percentage of payroll.

Funding status and funding progress:

| Actuarial Valuation Year Ended | Actuarial Value of Assets (a) | Actuarial Accrued Liability Individual Entry Age (AAL) (b) | Unfunded (Overfunded) AAL (UAAL) (b-a) | Funded Ratio (a/b) | Covered Payroll (c) | UAAL as % of Covered Payroll ((b-a)/c) |
|---|---|---|---|---|---|---|
| 6/30/06 | $ 782,098 | $ 1,023,599 | $ 241,501 | 76.4 | $ 146,634 | 164.7 |
| 6/30/07 | 801,533 | 1,071,781 | 270,248 | 75.2 | 157,012 | 172.1 |
| 6/30/08 | 670,366 | 841,266 | 170,900 | 79.7 | 89,636 | 190.7 |
| 6/30/09 | 623,292 | 873,088 | 249,796 | 71.4 | 89,636 | 278.7 |
| 6/30/10 | 567,215 | 835,052 | 267,837 | 67.9 | 68,968 | 388.3 |
| 6/30/11 | 506,504 | 829,380 | 322,876 | 61.1 | 63,063 | 512.0 |

The schedule of funding progress, presented as required supplemental information following the notes to the financial statements, presents multiyear trend information about whether the actuarial value of plan assets is increasing or decreasing over time relative to the actuarial accrued liability for benefits.

The actuarial methods used to determine the actuarial accrued liability was the individual entry age actuarial funding methods. Unfunded actuarial accrued liabilities are being amortized as a level percent of projected payroll over 30 years for general, police, and fire. Significant actuarial assumptions used in the computation of the accrued actuarial liability include: (1) a rate of return on the investment or present and future assets of 8.0 percent per year compounded annually, (2) projected salary increases of 3.75 percent to 7.55 percent per year compounded annually, and (3) 3.75 percent inflation.

**City of Flint, Michigan**

Notes to Financial Statements
June 30, 2013

**Note 11 - Retirement Plans (Continued)**

The actuarial value of assets was computed on fair values "smoothed" over a four-year period.

Hurley Medical Center:

During the fiscal year ended June 30, 2004, seven of nine employee unions plus the exempt employees of Hurley Medical Center voted to change participation from the City of Flint FERS to the Michigan Municipal Public Employees' Retirement System (MERS). Benefits under both plans are comparable and approximately half of the employees at the Medical Center are represented in each system. The annual contribution rate for MERS payroll used by the Medical Center in 2012 was 12.23 percent, which is based on the same rate it contributes to FERS.

As of June 30, 2013, $3,268,705 of the net pension obligation represents pension cost from the years 2011, 2012, and 2013 that has not yet been remitted to MERS.

During the current year, all assets from FERS were transferred to MERS, which at June 30, 2013 is the sole administrator of the plan.

The net pension obligation at June 30, 2013 consists solely of amounts owed by Hurley Medical Center.

Annual pension cost and net pension obligation:

| | |
|---|---|
| Annual required contribution/annual pension cost | $ 12,682,496 |
| Contributions made | (10,412,640) |
| **Write-off of excess liability | (5,505,093) |
| Decrease in net pension obligation | (3,235,237) |
| Net pension obligation - Beginning of year | 6,503,942 |
| Net pension obligation - End of year | $ 3,268,705 |

** During the transition from FERS to MERS, the liability was determined by the actuary not to be needed and written off.

D-37

71

---

**City of Flint, Michigan**

Notes to Financial Statements
June 30, 2013

**Note 11 - Retirement Plans (Continued)**

**Annual Pension Cost**

Trend information regarding the annual pension cost (ARC), percentage of ARC contributed, and net pension obligation (NPO) for the years for which HMC approved MERS are summarized as follows:

| | Fiscal Year Ended June 30 | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| Annual pension costs | $ 12,682,496 | $ 11,808,875 | $ 6,059,456 |
| Percentage of pension costs contributed | 82.1 % | 91.5 % | 156.0 % |
| Net pension obligation | $ 3,268,705 | $ 6,503,942 | $ 5,505,003 |

**Charter Retirement Plan**

The Charter Retirement Plan, a single employer defined benefit pension plan, covers firemen and policemen employed by the City prior to July 1, 1947. The plan was adopted under City code. All employees covered by this plan have retired. Benefits are provided under a special City ordinance with retirees receiving a monthly benefit. The current membership of the plan at June 30, 2013 is four members. The City intends to pay retirement benefits as they become due from future years' General Fund revenue. The City's contribution to the plan for the year ended June 30, 2013 was $64,149 and was calculated based on the actual current pension benefits due to be paid. The present value of vested benefits has not been determined. The City has not requested an actuarial valuation of the plan since 1985 because of the decreasing nature and the immateriality of the plan's potential unfunded pension benefit obligation and the fact that the City is paying benefits as they become due. Net position available for pension benefits at June 30, 2013 was $0.

**I.C.M.A. 401A Plan**

The City made available to appointed and elected officials hired through December 31, 2001 an alternative retirement plan to the general retirement pension plan. The plan was a non-contributory defined contribution plan adopted under City ordinance. The City contributes an amount equal to the lesser of 25 percent of the employee's compensation, or $30,000. No employee contributions are required, and employees vest 100 percent immediately. Total contributions required and made by the City during the year ended June 30, 2013 were $63,429, which represented 25 percent of current year covered payroll. The plan trustee is the International City Management Association. Investments are stated at market, which approximates cost. Total payroll and covered payroll for the year ended June 30, 2013 were $33,473,833 and $253,714, respectively.

72

**City of Flint, Michigan**

## Note 11 - Retirement Plans (Continued)

On January 1, 2002, a new plan was adopted for appointed and elected officials. The City contributes 11 percent of employees' gross earnings and employees have a mandatory 4 percent contribution. Employee accounts are fully vested after five years of service. The current year contribution was calculated based on covered payroll of $89, resulting in an employer contribution of $8 and employee contribution of $6.

### Defined Contribution Retirement Plans

On December 3, 2003, a resolution was passed by City Council to establish a defined contribution 401 pension plan for members of AFSCME Local 1600 and Local 1799. Employees hired on or after October 1, 2003 are not eligible to participate in the Flint Employees' Retirement System defined benefit pension plan. Employees hired prior to October 1, 2003 had the option of transferring assets from the defined benefit pension plan upon implementation of the defined contribution plan. The City contributes 10 percent of employees' gross earnings and employees have a mandatory 5 percent contribution. Employee accounts are fully vested after five years of service. The City's total payroll during the current year was $33,473,833. The current year contribution was calculated based on covered payroll of $2,684,880, resulting in an employer contribution of $160,112 and employee contributions of $252,918.

The City provides pension benefits to full-time employees except those participating in the defined benefit plan, members of AFSCME Local 1600 and Local 1799, and individuals participating in the I.C.M.A. plan through a defined contribution plan. In a defined contribution plan, benefits depend solely on amounts contributed to the plan plus investment earnings. Employees are eligible to participate from the date of employment (or other date). As established by City ordinance (authority under which the pension obligation is established), the City contributes 11 percent to 14.5 percent of employees' gross earnings and employee mandatory contributions of 4 percent to 5.5 percent for each employee plus interest allocated to the employee's account are fully vested after five years of service.

The City's total payroll during the current year was $33,473,833. The current year contribution was calculated based on covered payroll of $1,302,083, resulting in an employer contribution of $141,805 and employee contributions of $70,796.

The Medical Center has a defined contribution plan for employees who meet certain requirements as to date of hire. Contributions to the plan are 4.5 percent of the employee's annual compensation. Each employee's interest is vested as specified in the plan. Pension expense included in the statements was $1,179,735.

73

---

**City of Flint, Michigan**

## Note 11 - Retirement Plans (Continued)

### Profit Sharing and 403(b) Plan

Hurley Health Services (HHS), a component unit of Hurley Medical Center, has a qualified 401(k) profit-sharing plan for HPMS employees. Eligible employees, those that have attained the age of 21 and completed 90 days of service, may defer up to 15 percent of their salary. HHS may make a discretionary contribution. HHS' contribution to the 401(k) plan was $32,837. HHS also maintains two tax-deferred annuity plans under Section 403(b) of the Internal Revenue Code. Under the plans, HHS and THC employees may elect to defer up to a specified percentage of their salary, subject to the Internal Revenue Service limits. HHS may make a discretionary contribution. HHS' contribution to the 403(b) plan amounted to $273,651.

### Excess Benefits Pension Plan

The City established the City of Flint Excess Benefits Plan and Trust (the "Plan") for the purpose of providing certain retiring employees with pension benefits in addition to those provided by the Flint Employees' Retirement System (FERS). Certain FERS, now MERS, participants receive an annual pension benefit that exceeds limits included in Section 415 of the Internal Revenue Code of 1986, as amended. Since the contractually required annual benefit exceeds Section 415 limitations, the benefits cannot be funded through the FERS plan. The Excess Benefits Plan and Trust was established as a separate pension trust to accumulate resources to pay these "excess" benefits on an annual basis.

Participation in the Plan is limited to FERS retirees whose benefit under the FERS defined benefit plan is limited by Section 415 of the Code and who retire at any time based on employment as a member of a bargaining unit represented by Local 1600 or Local 1799 of American Federation of State, County, and Municipal Employees. All employees covered by this plan have retired.

The annual benefit provided under the Plan shall be the excess, if any, of each individual participant's benefit over the Section 415 limits in effect that calendar year. All benefits payable under this Plan shall be paid in the same manner and form (using the same actuarial assumptions) as pension benefits paid under the FERS. Benefits shall be paid from the Plan once the member has received the maximum amount permitted within the limits of Code Section 415 during a plan year.

The Plan is intended to be funded on an annual basis via City contributions. There are no employee contributions to the Plan. The annual contribution will be determined by estimating the amount of "excess" benefits that will be paid out that calendar year. During the year ended June 30, 2013, employer contributions of $0 were made to the Plan and benefits of $0 were paid out.

74

**City of Flint, Michigan**

### Note 11 - Retirement Plans (Continued)

The City has not requested an actuarial valuation of the Plan because of the immateriality of the Plan's potential unfunded pension benefit obligation and the fact that the City is paying benefits as they become due. Net position available for pension benefits at June 30, 2013 was $0.

**Retiree Death Benefits Plan**

The City provides postretirement death benefits to certain retirees who retired after July 1, 1978, under the terms of collective bargaining agreements with two employee unions. If the retiree was a member of one of the bargaining units at the time of retirement, his or her designated beneficiary will receive a death benefit at the time of the retiree's death. The death benefit ranges from $2,500 to $10,000 depending on the retirement date.

As of February 9, 2011, the retiree death benefits were changed effective immediately to all 1,600 union employees who were eligible under the previous agreement. The new agreement states that the designated beneficiary will receive $1,000 for everyone who retired since July 1, 1978 (the inception of the death benefit).

The benefits are funded in advance by employee withholdings and a matching employer contribution. The employee contributions are calculated at a set amount for each hour worked by union members during the bi-weekly pay period. The employee withholdings and matching employer contributions are deposited into a separate account for investment purposes. As of June 30, 2012, this benefit is no longer offered to active employees. The investments are administered by a seven-member board appointed by the two unions and the mayor.

As of year end, there were 676 retirees who were eligible for this benefit. Employee contributions for the year ended June 30, 2013 were $0. Net position available for benefits, reported at fair value, was $503,076 at year end. No actuarial valuation has been performed to determine the present value of vested benefits. During 2013, death benefits of $71,000 were paid.

**Health Benefits Plan and Trust**

The City established the City of Flint Retiree Health Care Plan and Trust (the "Trust") for the purpose of providing health insurance benefits adopted by the City or approved by collective bargaining agreements to eligible retirees and their spouses. This is a defined contribution plan administered by the Trust. The benefits are provided to Local 1600 and Local 1799 retirees who retired on or after October 1, 2003 as provided for in collective bargaining agreements. The plan is constituted as a "voluntary employees beneficiary association" (VEBA) under Section 501(c)(9) of the Internal Revenue Code of 1986.

75

---

**City of Flint, Michigan**

### Note 11 - Retirement Plans (Continued)

The collective bargaining agreements require a contribution of 1.5 percent of pre-tax compensation from employees belonging to AFSCME Local 1600 and Local 1799. The Plan does not currently require an employer contribution. The employee contributions and accumulated investment earnings are to be used to provide healthcare benefits above the capped level provided by the City's defined benefit retiree healthcare benefit plan.

During the year ended June 30, 2013, plan members contributed $147,311. Net position available for benefits was $14,237 at June 30, 2013. A total of $300,000 benefit payments were made during 2013.

### Note 12 - Other Postemployment Benefits

**Plan Description** - The City provides retiree healthcare benefits to eligible employees and their spouses through the Retiree Health Care Trust Fund. Benefits are provided to public safety and general employees. Currently, the plan has 2,339 members, including 506 employees in active service, 0 terminated employees not yet receiving benefits, and 1,833 retired employees and beneficiaries currently receiving benefits.

This is a single employer defined benefit plan administered by the City. The benefits are provided under collective bargaining agreements of Local 1799, Local 1600, and Fire Local 352. The plan does not issue a separate stand-alone financial statement. Administrative costs are paid by the plan through employer contributions. The plan does not cover Hurley Medical Center employees.

**Funding Policy** - The collective bargaining agreements require a contribution of $50, $75, or $100 depending on their union contracts toward retiree health plan insurance. Contributions will stop once the retirees have 30 years of service or reach the age of 65. The City has no obligation to make contributions in advance of when the insurance premiums are due for payment. The City recognizes the expenses in the funds on a "pay-as-you-go" basis. The costs of administering the plan are borne by the City's General Fund.

76

# City of Flint, Michigan

## Note 12 - Other Postemployment Benefits (Continued)

**Funding Progress** - For the year ended June 30, 2013, the City has estimated the cost of providing retiree healthcare benefits through an actuarial valuation as of July 1, 2012. The valuation computes an annual required contribution, which represents a level of funding that, if paid on an ongoing basis, is projected to cover normal cost each year and amortize any unfunded actuarial liabilities over a period not to exceed 29 years. This valuation's computed contribution and actual funding are summarized as follows:

| | |
|---|---:|
| Annual required contribution (recommended) | $ 21,789,244 |
| Interest on the prior year's net OPEB obligation | 6,671,460 |
| Less adjustment to the annual required contribution | (9,518,192) |
| Annual OPEB cost | 18,942,512 |
| Amounts contributed - Payments of current premiums | (17,016,014) |
| Increase in net OPEB obligation | 1,926,498 |
| OPEB obligation - Beginning of year | 156,975,216 |
| OPEB obligation - End of year | $ 158,901,714 |

The annual OPEB costs, the percentage contributed to the plan, and the net OPEB obligation for the current year are as follows:

| Fiscal Year Ended | Annual OPEB Costs | Percentage OPEB Costs Contributed | Net OPEB Obligation |
|---|---:|---:|---:|
| 6/30/08 | $ 60,188,371 | 32.0 | $ 40,925,931 |
| 6/30/09 | 55,252,592 | 35.0 | 76,645,627 |
| 6/30/10 | 55,252,592 | 37.0 | 113,615,741 |
| 6/30/11 | 61,351,938 | 32.1 | 155,284,670 |
| 6/30/12 | 22,105,830 | 92.4 | 156,975,216 |
| 6/30/13 | 18,942,499 | 89.8 | 158,901,714 |

The funding progress of the plan as of the most recent valuation data is as follows:

| Actuarial Valuation Date | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) (b) | Unfunded AAL (UAAL) (b-a) | Funded Ratio (Percent) (a/b) | Covered Payroll (c)* | UAAL as a Percentage of Covered Payroll |
|---|---:|---:|---:|---:|---:|---:|
| 7/1/12 | $ 166,903 | $ 320,180,757 | $ 320,013,854 | 0.1 | $ - | - |
| 7/1/11 | - | 366,832,597 | 366,832,597 | - | 37,339,842 | 982.0 |
| 7/1/10 | - | 862,302,934 | 862,302,934 | - | 36,252,274 | 2,379.0 |
| 7/1/09 | - | 774,606,738 | 774,606,738 | - | 41,166,662 | 1,882.0 |

* For actuarial valuation date 7/1/12, the annual required contribution calculation is based on a flat dollar amount.

# City of Flint, Michigan

## Note 12 - Other Postemployment Benefits (Continued)

**Actuarial Methods and Assumptions** - Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment, mortality, and the healthcare cost trend. Amounts determined regarding the funded status of the plan and the annual required contributions of the employer are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future. The schedule of funding progress, presented as required supplemental information following the notes to the financial statements, presents multiyear trend information about whether the actuarial value of plan assets is increasing or decreasing over time relative to the actuarial accrued liabilities for benefits.

Projections of benefits for financial reporting purposes are based on the substantive plan (the plan as understood by the employer and the plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and plan members to that point. The actuarial methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspective of the calculations.

In the July 1, 2012 actuarial valuation, the entry age actuarial cost method was used. The actuarial assumptions included a 4.25 percent investment rate of return (net of administrative expenses), which is a blended rate of the expected long-term investment returns on plan assets and on the employer's own investments calculated based on the funded level of the plan at the valuation date, an annual healthcare cost trend rate of 9 percent initially, reduced by decrements to an ultimate rate of 5 percent after nine years, and an inflation rate of 3 percent. The actuarial value of assets was determined using techniques that spread the effects of short-term volatility in the market value of investments over a five-year period. The UAAL is being amortized as a level percentage dollar on a closed basis. The remaining amortization period at July 1, 2012 was 29 years.

**City of Flint, Michigan**

### Note 13 - Pension and Other Employee Benefit Trust Funds

The following are condensed financial statements for the individual pension plans and postemployment healthcare plans:

| | Flint Employees' Retirement System | Death Benefit | Retiree Health Care | VEBA | Hurley Medical Center Retiree Benefit Trust Fund |
|---|---|---|---|---|---|
| **Statement of Net Position** | | | | | |
| Investments | $ - | $ 558,778 | $ - | $ - | $ 37,342,561 |
| Other assets | - | 15,298 | 1,905,805 | 314,237 | 186,887 |
| Liabilities | - | 71,000 | 390,813 | - | - |
| Net position | $ - | $ 503,076 | $ 1,514,992 | $ 314,237 | $ 37,529,448 |
| **Statement of Changes in Net Position** | | | | | |
| Investment income | $ 23,116,572 | $ 80,273 | $ - | $ 23 | $ 2,810,457 |
| Contributions | 6,028,559 | - | 18,356,884 | 147,311 | 5,898,301 |
| Benefit payments | 16,695,639 | 71,000 | 17,016,014 | 300,000 | 5,898,301 |
| Other deductions | 477,123,368 | 108 | 810,011 | - | - |
| Net change in net position | $ (464,673,876) | $ 9,615 | $ 530,859 | $ (152,666) | $ 2,810,457 |

### Note 14 - Hurley Medical Center Other Postemployment Benefits

Effective for retirements on or after July 1, 1983, Hurley Medical Center (the "Medical Center") provides a portion of health insurance premiums for retired employees. The Medical Center has set aside assets in an irrevocable trust account to be used for payment of its portion of health insurance premiums for retired employees. The activity is reported in the fiduciary fund statements.

**Plan Description** - The Medical Center provides retiree health insurance premiums to eligible retirees and their spouses through the Retiree Health Benefit Plan (the "Plan"). Retirees receive full or partial health insurance coverage depending on the employee's date of employment and union affiliation. During 2007, the Plan was frozen to new participants. During the year ended June 30, 2010, the Plan was amended to eliminate the full coverage benefits to those eligible employees. Eligible retirees prior to December 31, 2009 were grandfathered into the Plan with full health insurance benefits. The number of participants was 508 and 514 in June 30, 2013 and 2012, respectively.

The Plan's activity is accounted for in an irrevocable trust and the activity is reported in the fiduciary fund financial statements. The Plan is a single employer defined benefit plan administered by the Medical Center. The Plan does not issue a separate stand-alone financial statement.

---

**City of Flint, Michigan**

### Note 14 - Hurley Medical Center Other Postemployment Benefits (Continued)

**Funding Policy** - The Medical Center expenses the cost of the Plan in its proprietary fund. The cost of providing retiree healthcare benefits is estimated through an actuarial valuation issued on April 8, 2013 based on participant data as of June 30, 2011. The valuation computes the annual required contribution, which represents a level of funding that, if paid on an ongoing basis, is projected to cover the normal cost each year and amortize any unfunded actuarial liabilities over a period not to exceed 30 years. The Medical Center has no obligation to make contributions in advance of when the insurance premiums are due for payment (in other words, this may be financed on a pay-as-you-go basis). However, as shown below, the Medical Center has made contributions to advance fund certain of these benefits. This valuation's computed contribution and actual funding are summarized as follows for the year ended June 30, 2013:

**Annual Pension Cost and Net Pension Obligation**

| Fiscal Year Ended | Annual OPEB Costs | Percentage OPEB Costs Contributed | Net OPEB Obligation |
|---|---|---|---|
| 6/30/09 | $ 7,737,798 | 100 | $ - |
| 6/30/10 | 7,417,585 | 100 | - |
| 6/30/11 | 7,417,585 | 100 | - |
| 6/30/12 | 7,071,235 | 100 | - |
| 6/30/13 | 7,011,793 | 51 | 3,432,051 |

The funding progress of the plan as of the most recent valuation dates is as follows:

| | June 30 | |
|---|---|---|
| | 2011 | 2009 |
| Actuarial value of assets | $ 28,182,766 | $ 17,143,602 |
| Actuarial accrued liability (AAL) (entry age) | $ 90,042,892 | $ 88,341,116 |
| Unfunded AAL (UAAL) | $ 61,860,126 | $ 71,197,514 |
| Funded ratio | 31.3 % | 19.4 % |
| Covered payroll | $ 119,888,970 | $ 119,888,970 |
| UAAL as a percentage of covered payroll | 51.6 % | 59.4 % |

**City of Flint, Michigan**

**Note 14 - Hurley Medical Center Other Postemployment Benefits (Continued)**

**Actuarial Methods and Assumptions** - Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment, mortality, and the healthcare cost trend. Amounts determined regarding the funded status of the plan and the annual required contributions of the employer are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future.

Projections of benefits for financial reporting purposes are based on the substantive plan (the plan as understood by the employer and the plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and plan members to that point. The actuarial methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets consistent with the long-term perspective of the calculations.

In the June 30, 2011 actuarial valuation, the individual entry age actuarial cost method was used. The actuarial assumptions included an 8 percent investment rate of return (net of administrative expenses), which is a blended rate of the expected long-term investment returns on plan assets and on the Medical Center's own investments calculated based on the funded level of the plan at the valuation date, and an annual healthcare cost trend rate of 9 percent initially, reduced by decrements to an ultimate rate of 3.75 percent after 10 years. Both rates included a 3.75 percent inflation assumption. The unfunded actuarial accrued liability (UAAL) is being amortized as a level percentage of projected payroll on an open basis. The remaining amortization period at June 30, 2011 was 24 years.

**Note 15 - Significant Contingent Liabilities**

Federal, state, and local grants:

The City participates in a number of federal, state, and locally assisted grant programs, principally of which is the federally funded Community Development Block Grant. The programs are subject to compliance audits. In accordance with the Single Audit Act of 1984, compliance audits of federal grants were made during the current year and have been reported under a separate cover. However, specific grantors have yet to make final approval of the compliance audits. The amount of ineligible grant expenses refunded to the grantor by the City during the year ended June 30, 2013 was $91,246, which includes no amounts still owed.

**City of Flint, Michigan**

**Note 15 - Significant Contingent Liabilities (Continued)**

Laws and regulations governing the Medicare and Medicaid programs are complex and subject to interpretation. Hurley Medical Center's management believes that it is in compliance with all applicable laws and regulations. Compliance with such laws and regulations can be subject to future government review and interpretation as well as significant regulatory action including fines, penalties, and exclusion from the Medicare and Medicaid programs.

**Note 16 - Risk Management**

Risk management - Primary government:

The City is exposed to various risks of loss related to property loss, torts, errors and omissions, employee injuries, unemployment benefits, as well as medical and workers' compensation benefits provided to employees. The City has purchased commercial insurance for fleet equipment and tort claims, boiler and machinery, certain property and equipment damage and theft, employee theft, and limited tort claims for specific City facilities or events. See separate disclosures below for Hurley Medical Center Component Unit.

Settled claims for the commercial insurance have not exceeded the amount of coverage in any of the past three years. There was no reduction in coverages obtained through commercial insurance during the past year.

The City is self-insured for workers' compensation on a pay-as-you-go basis for claims up to $500,000, with reinsurance coverage provided once claims exceed $1,000,000 in the aggregate. The self-insurance program is administered by a third-party administrator. All workers' compensation benefits are paid out of the Fringe Benefits Internal Service Fund. The amount of estimated claims payable at June 30, 2013 was not material.

The City is self-insured for active employee dental and eye care benefits on a pay-as-you-go basis. The self-insurance program is administered by a third-party administrator. All claims and benefits are paid out of the Fringe Benefits Internal Service Fund. The amount of estimated claims payable at June 30, 2013 was not material.

The City pays unemployment claims on a reimbursement basis. The amount of estimated claims payable at June 30, 2013 was not material.

D-42

**City of Flint, Michigan**

**Note 16 - Risk Management (Continued)**

The City is self-insured for medical benefits provided to active employees and retirees. The benefits are funded on a pay-as-you-go basis. Claims are being paid out of the Fringe Benefits Internal Service Fund for active employee claims and out of the Retiree Health Care Trust Fund for retirees. The plans are administered by Blue Cross/Blue Shield and HealthPlus of Michigan. Once the individual contract or aggregate stop-loss amount is reached, reinsurance provides the remaining benefits. The City has two health insurance plans that are self-insured, Blue Cross/Blue Shield of Michigan (BCBSM) and HealthPlus. For the year ended June 30, 2013, the City paid out $4,376,750 in claims and administration fees to HealthPlus. The City is protected from catastrophic claims by an excess insurance policy which provides $2,000,000 in coverage per specific contract with a $150,000 self-insured retention (SIR). The City did not have any claims in excess of the stop-loss deductible during the year. The City paid BCBSM $16,482,044 during the year for claims funding and administration. The self-insured coverages provided through BCBSM were protected by specific stop-loss coverage, which provided an unlimited excess with a $100,000 deductible. No claims incurred at June 30, 2013 due to escrowed reserves maintained by the third-party administrators. The City also provides fully insured HMO health insurance coverage to a limited number of employees. At June 30, 2013, there were 676 retirees that were receiving medical benefits.

The City has a commercial insurance policy that covers certain general tort liability. The per-claim limit is $1,000,000 with a $500,000 deductible per occurrence and a $3,000,000 aggregate claim annually. The commercial policy covers public officials, employment practices, employee benefits, law enforcement, and commercial auto.

The City is self-insured for other potential claims not covered by the commercial policies. The Hurley Medical Center Component Unit is also self-insured for a number of risks. The amounts below include all general liability claims against the City except for those related to Hurley Medical Center. Details regarding Hurley Medical Center's self-insurance practices are presented separately. The City has estimated the claims that have been incurred through the end of the year, including both those claims that have been reported as well as those that have not yet been reported to the City. The estimate is based on legal counsel's recommendation and past settlement history. The estimated liability does not include any incremental costs. The amounts below include all general liability claims against the City except for those related to Hurley Medical Center. Hurley Medical Center administers its own risk management program and details regarding Hurley Medical Center's self-insurance practices are presented separately.

**City of Flint, Michigan**

**Note 16 - Risk Management (Continued)**

Risk management - Component units:

The Flint Economic Development Corporation (the "Corporation") is exposed to various risks of loss related to property loss, torts, and error and omissions. The Corporation has purchased commercial insurance for those risks associated with a small business incubator facility which leases commercial and light industrial space to new businesses. Since the Corporation occupies premises located in the City of Flint Municipal Center and all Corporation personnel are employees of the City, any losses related to general liability, employee injuries, workers' compensation, and employee medical benefits are covered by City self-insurance risk management programs. No claims related to Corporation activities have been presented to the City as of June 30, 2013.

The Downtown Development Authority (DDA) is exposed to various risks of loss related to property loss, torts, errors and omissions, and employee injuries (workers' compensation) as well as medical benefits provided to employees. The DDA has purchased insurance for these risks.

The Flint Area Enterprise Community (FAEC) is exposed to various risks of loss related to property loss, torts, and errors and omissions. The FAEC has purchased commercial insurance coverage through various policies for general liability on all FAEC-owned property and workers' compensation. Settled claims for the commercial insurance have not exceeded the amount of coverage in any of the past three years. There were no reductions in coverage during the current year.

Hurley Medical Center is exposed to various risks of loss, including hospital professional and patient general liability claims. The Medical Center has established a trust to assist in accumulating resources to fund excess insurance premiums and to pay claims.

The Medical Center's self-insured retention is $6 million per occurrence annually with excess claims-made coverage up to $15 million annually. Claims in excess of $15 million are to be covered by the Medical Center. The Medical Center employs the use of an actuary to provide an analysis of the existing claims and to estimate the liability for incurred but not reported (IBNR) claims.

Professional liability for claims is reported in accrued expenses, both current and long term, on the statement of net position. The carrying amount of the insurance trust assets (at market) amounted to $16,338,470 at June 30, 2013.

**City of Flint, Michigan**

### Note 16 – Risk Management (Continued)

#### Conditional Asset Retirement Obligation

The Medical Center has an obligation related to the removal of asbestos within various buildings on campus upon reconstruction, demolition, or abandonment of the buildings. The Medical Center has not recorded a liability related to the potential costs associated with the asbestos abatement, as the amount of the liability cannot currently be reasonably estimated. In addition, the range of time over which the Medical Center may settle the obligation is unknown and cannot be estimated. The Medical Center currently has no plans or expectation of plans to undertake a major renovation that would require the removal of the asbestos or demolition of the buildings. The Medical Center will recognize a liability in the period sufficient information is available to reasonably estimate the amount of the liability.

These claim estimates are recorded as accounts payable in the Self Insurance Internal Service Fund. Changes in the estimated liability as well as the total estimated costs (based on prior history and claims presented) of claims for the past fiscal year for the City and Hurley Medical Center Component Unit were as follows:

| | General Liability | | Hurley Medical Center | |
| --- | --- | --- | --- | --- |
| | 2013 | 2012 | 2013 | 2012 |
| Unpaid claims - Beginning of year | $ 3,968,000 | $ 5,768,000 | $ 36,699,882 | $ 34,883,169 |
| Estimated claims incurred, including changes in estimates | (1,493,470) | (738,075) | - | - |
| Increase in claims liability | - | - | 11,204,087 | 6,949,535 |
| Defense costs and other fund expenses | - | - | (2,070,833) | (1,884,655) |
| Excess insurance premium payments | - | - | (1,088,550) | (1,205,667) |
| Claim payments | (978,754) | (1,061,925) | (2,697,000) | (2,042,500) |
| Estimated liability - End of year | $ 1,495,776 | $ 3,968,000 | $ 42,047,586 | $ 36,699,882 |

**City of Flint, Michigan**

### Note 17 – Related Party Transactions

The Medical Center pays subsidies and management fees for services rendered by HHS to the Medical Center. Management fees and contributions from the Medical Center to HHS for the year ended June 30, 2013 amounted to $17,539,750, all of which relates to staff and service contracts. Amounts paid by HHS to the Medical Center for rent and other miscellaneous expenses for the year ended June 30, 2013 totaled $445,644.

As of June 30, 2013, the Medical Center had accounts receivable from HHS of $1,025,291 and accounts payable to HHS of $295,985.

Included in other operating revenues of HHS are management fees and marketing fees for services rendered paid by Hurley/Binson's Medical Equipment, Inc., a related party to HPMS. Management fee and marketing income from Hurley/Binson's Medical Equipment, Inc. for the year ended June 30, 2013 amounted to $0. There were no accounts receivable from Hurley/Binson's Medical Equipment at June 30, 2013. HPMS and HHS purchase courier services from Hurley/Binson's Medical Equipment, Inc. in the amount of $300,000 annually.

### Note 18 – Upcoming Accounting Pronouncements

In March 2012, the GASB issued Statement No. 65, *Items Previously Reported as Assets and Liabilities*, which is required to be implemented for financial statements for periods beginning after December 15, 2012. Statement No. 65 establishes accounting and financial reporting standards that reclassify, as deferred outflows and inflows of resources, certain items that were previously reported as assets and liabilities. This statement also provides other financial reporting guidance related to the impact of the financial statement elements deferred outflows of resources and deferred inflows of resources. Statement No. 65 will be implemented for the City as of June 30, 2014.

In June 2012, the GASB issued Statement No. 68, *Accounting and Financial Reporting for Pensions*. Statement No. 68 requires governments providing defined benefit pensions to recognize their unfunded pension benefit obligation as a liability for the first time and to more comprehensively and comparably measure the annual costs of pension benefits. This net pension liability that will be recorded on the government-wide, proprietary, and discretely presented component units statements will be computed differently than the current unfunded actuarial accrued liability, using specific parameters set forth by the GASB. The statement also enhances accountability and transparency through revised note disclosures and required supplemental information (RSI). The City is currently evaluating the impact this standard will have on the financial statements when adopted. The provisions of this statement are effective for financial statements for the year ending June 30, 2015.

## City of Flint, Michigan

### Note 19 - Subsequent Events

Effective October 1, 2013, the City entered into a contract with the Karegnondi Water Authority (KWA) to provide water treatment services to the authority. As part of this agreement and in order to handle the capacity that this new system will bring, the City will need to make approximately $7 million worth of upgrades to their current water plant and treatment facility.

Effective August 1, 2013, the City entered into an agreement with the KWA and Genesee County to issue debt to acquire, construct, and operate a water supply system. The debt will not exceed $300,000,000. The City's share of the debt is 34.2 percent or an amount not to exceed $102,600,000. As of the date of the audit report, the debt has not been issued.

The City is also a voting member of the KWA. The City joined the KWA in 2013 based on the expectation that the purchase of water for the City will be more economical in the future than continuing to purchase water from its current supplier, the Detroit Water and Sewer Department.

### Note 20 - Prior Period Adjustment

The governmental activities net position and public improvement fund fund balance at June 30, 2012 have been restated in order to record a receivable and corresponding allowance for the due from component unit from the DDA and reverse the previously reported expense related to the payment of related proceeds to the DDA, which decreased the expense recognized in the Public Improvement Fund, and had a net decrease on the net position for governmental activities. The effect of this correction is noted below as follows:

| | Governmental Activities | Public Improvement Fund |
|---|---|---|
| Net position/fund balance - June 30, 2012 - As previously reported | $ 23,028,879 | $ 1,630,490 |
| Adjustment to record receivable net of allowance for the due from component unit (DDA) | - | 4,901,451 |
| Adjustment to record allowance for the due from component unit (DDA) | (4,266,449) | - |
| Net position/fund balance - June 30, 2012 - As restated | $ 18,762,430 | $ 6,531,941 |

## City of Flint, Michigan

### Note 20 - Prior Period Adjustment (Continued)

The effect on the change in net position/fund balance of the prior year is as follows:

| | Governmental Activities | Public Improvement Fund |
|---|---|---|
| Change in net position/fund balance - June 30, 2012 - As previously reported | $ (13,607,341) | $ (1,198,804) |
| Adjustment to record receivable net of allowance for the due from component unit (DDA) | - | 4,901,451 |
| Adjustment to record allowance for the due from component unit (DDA) | (4,266,449) | - |
| Change in net position/fund balance - June 30, 2012 - As restated | $ (17,873,790) | $ 3,702,647 |

**Required Supplemental Information**

D-46

## City of Flint, Michigan

**Required Supplemental Information**
**Budgetary Comparison Schedule – General Fund**
**Year Ended June 30, 2013**

| | Original Budget | Amended Budget | Actual | Variance with Amended Budget |
|---|---|---|---|---|
| **Revenue** | | | | |
| Property taxes | $ 5,725,000 | $ 5,725,000 | $ 6,011,342 | $ 286,342 |
| Income taxes | 14,950,000 | 15,300,000 | 14,674,274 | (625,726) |
| Licenses and permits | 1,287,931 | 1,711,931 | 1,557,320 | (154,611) |
| Federal grants | 594,324 | 3,446,602 | 2,753,854 | (692,748) |
| State revenue | 13,497,585 | 15,125,175 | 16,003,433 | 878,258 |
| Charges for services | 11,944,463 | 11,577,463 | 11,406,946 | (170,517) |
| Fines and forfeitures | 1,394,611 | 1,537,814 | 2,291,325 | 753,511 |
| Interest | 133,400 | 133,400 | 261,004 | 127,604 |
| Other revenue | 3,512,942 | 622,396 | 2,770,960 | 2,148,564 |
| Total revenue | 53,040,256 | 55,179,781 | 57,730,458 | 2,550,677 |
| **Expenditures** | | | | |
| Current: | | | | |
| General government: | | | | |
| Mayor's office | 185,579 | 206,579 | 212,219 | (5,640) |
| Finance | 4,900,717 | 5,009,152 | 4,595,171 | 413,981 |
| Human relations | 40,103 | 40,103 | 22,613 | 17,490 |
| City clerk | 847,899 | 977,906 | 947,225 | 30,681 |
| Law office | 1,053,359 | 1,053,359 | 1,061,401 | (8,042) |
| Human resources | 736,929 | 770,463 | 687,863 | 82,600 |
| Office of the ombudsman | - | 28,577 | 27,837 | 740 |
| City administrator | 711,982 | 614,482 | 445,472 | 169,010 |
| Total general government | 8,476,568 | 8,700,621 | 7,999,801 | 700,820 |
| Judicial - 68th District Court | 5,358,477 | 5,358,479 | 4,955,003 | 403,476 |
| Public safety: | | | | |
| Police department | 20,771,119 | 24,300,987 | 23,404,501 | 896,486 |
| Fire | 11,913,248 | 11,962,638 | 10,682,234 | 1,280,404 |
| Building inspection | 99,120 | 100,120 | 94,170 | 5,950 |
| Emergency dispatch | 3,314,413 | 3,314,413 | 3,141,130 | 173,283 |
| Total public safety | 36,097,900 | 39,678,158 | 37,322,035 | 2,356,123 |
| Legislative - City council | 352,899 | 352,899 | 344,227 | 8,672 |
| Community development | 1,890,694 | 2,062,972 | 1,946,636 | 116,336 |
| Parks and recreation | 1,994,216 | 1,966,574 | 1,853,475 | 113,099 |
| Transportation | 2,850,000 | 1,474 | 861 | 613 |
| Total expenditures | 57,020,754 | 58,121,177 | 54,422,038 | 3,699,139 |
| **Excess of Revenue (Under) Over Expenditures** | (3,980,498) | (2,941,396) | 3,308,420 | 6,249,816 |
| **Other Financing Sources (Uses)** | | | | |
| Proceeds from sale of capital assets | 2,500 | 2,500 | 100 | (2,400) |
| Transfers in | 4,077,998 | 4,077,998 | 2,990,000 | (1,087,998) |
| Transfers out | - | (40,000) | (9,312) | 30,688 |
| Total other financing sources | 4,080,498 | 4,040,498 | 2,980,788 | (1,059,710) |
| **Net Change in Fund Balance** | 100,000 | 1,099,102 | 6,289,208 | 5,190,106 |
| **Fund Balance (Deficit)** - Beginning of year | (19,184,850) | (19,184,850) | (19,184,850) | - |
| **Fund Balance (Deficit)** - End of year | $ (19,084,850) | $ (18,085,748) | $ (12,895,642) | $ 5,190,106 |

89

90

**City of Flint, Michigan**

**Required Supplemental Information**
**Budgetary Comparison Schedule – Major Special Revenue Fund**
**Federal Grants Fund**
**Year Ended June 30, 2013**

| | Original Budget | Amended Budget | Actual | Variance with Amended Budget |
|---|---|---|---|---|
| **Revenue** | | | | |
| Federal grants | $  28,483,591 | $  17,215,927 | $  18,400,485 | $  1,184,558 |
| State revenue | 300,000 | 687,233 | 33,703 | (653,530) |
| Charges for services | 14,625 | 14,625 | 1,209 | (13,416) |
| Interest | 370,541 | 370,541 | 247,830 | (122,711) |
| Other revenue - Local revenue | 22,463 | 64,096 | 58,028 | (6,068) |
| Total revenue | 29,191,220 | 18,352,422 | 18,741,255 | 388,833 |
| **Expenditures** | | | | |
| Current: | | | | |
| Public safety | 4,455,926 | 5,387,004 | 5,321,857 | 65,147 |
| Community development | 15,154,977 | 6,977,213 | 7,425,188 | (447,975) |
| Parks and recreation | 7,887,396 | 5,302,715 | 5,318,080 | (15,365) |
| Debt service | 494,957 | 494,957 | 489,639 | 5,318 |
| Total expenditures | 27,993,256 | 18,161,889 | 18,554,764 | (392,875) |
| **Net Change in Fund Balance** | 1,197,964 | 190,533 | 186,491 | (4,042) |
| **Fund Balance** - Beginning of year | 640,253 | 640,253 | 640,253 | - |
| **Fund Balance** - End of year | $  1,838,217 | $  830,786 | $  826,744 | $  (4,042) |

D-47

91

---

**City of Flint, Michigan**

**Required Supplemental Information**
**Budgetary Comparison Schedule – Major Capital Project Fund**
**Public Improvement**
**Year Ended June 30, 2013**

| | Original Budget | Amended Budget | Actual | Variance with Amended Budget |
|---|---|---|---|---|
| **Revenue** | | | | |
| Property taxes | $  1,930,400 | $  1,930,400 | $  2,055,994 | $  125,594 |
| Interest | 389,480 | 389,480 | 719,450 | 329,970 |
| Total revenue | 2,319,880 | 2,319,880 | 2,775,444 | 455,564 |
| **Expenditures** | | | | |
| Current - Parks and recreation | 230,000 | 230,000 | 481,121 | (251,121) |
| Debt service | 1,147,953 | 1,147,953 | 600,141 | 547,812 |
| Total expenditures | 1,377,953 | 1,377,953 | 1,081,262 | 296,691 |
| **Transfers Out** | (726,953) | (726,953) | (726,953) | - |
| **Net Change in Fund Balance** | 214,974 | 214,974 | 967,229 | 752,255 |
| **Fund Balance** - Beginning of year (as adjusted) | 6,531,941 | 6,531,941 | 6,531,941 | - |
| **Fund Balance** - End of year | $  6,746,915 | $  6,746,915 | $  7,499,170 | $  752,255 |

92

**City of Flint, Michigan**

Required Supplemental Information
Analysis of Funding Progress
Year Ended June 30, 2013

**General, Police, Fire, and Hurley Pension Plans**
**Schedule of Funding Progress**
**($ Amounts in Thousands)**

| Actuarial Valuation Year Ended | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) (b) | Unfunded AAL (UAAL) (b-a) | Funded Ratio (Percent) (a/b) | Covered Payroll (c) | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| 6/30/06 | $ 782,098 | $ 1,023,599 | $ 241,501 | 76.4 | $ 146,634 | 164.7 |
| 6/30/07 | 801,533 | 1,071,781 | 270,248 | 74.8 | 157,012 | 172.1 |
| 6/30/08 | 670,366 | 841,266 | 170,900 | 79.7 | 89,636 | 190.7 |
| 6/30/09 | 623,292 | 873,088 | 249,796 | 71.4 | 89,636 | 278.7 |
| 6/30/10 | 567,215 | 835,052 | 267,837 | 67.9 | 68,968 | 388.3 |
| 6/30/11 | 506,504 | 829,380 | 322,876 | 61.1 | 63,063 | 512.0 |

The actuarial methods used to determine the actuarial accrued liability were the individual entry age actuarial funding methods. Unfunded actuarial accrued liabilities are being amortized as a level percent of projected payroll over 30 years for general, police, fire, and Hurley. Significant actuarial assumptions used in the computation of the accrued actuarial liability include: (1) a rate of return on the investment or present and future assets of 8.0 percent per year compounded annually, (2) projected salary increases of 3.75 percent to 7.55 percent per year compounded annually, and (3) 3.75 percent inflation.

The actuarial value of assets was computed on fair values "smoothed" over a four-year period.

**General, Police, Fire, and Hurley Pension Plans**
**Schedule of Employer Contributions**

| Fiscal Year Ended | Actuarial Valuation Date | Annual Required Contribution ** | Percentage Contributed | Net Pension Obligation (Asset) at June 30 * |
|---|---|---|---|---|
| 6/30/08 | 6/30/06 | $ 14,376,558 | 72.0 | $ 10,805,978 |
| 6/30/09 | 6/30/07 | 14,497,568 | 175.0 | - |
| 6/30/10 | 6/30/08 | 13,394,739 | 100.0 | - |
| 6/30/11 | 6/30/09 | 10,835,308 | 100.0 | - |
| 6/30/12 | 6/30/10 | 14,562,392 | 100.0 | - |
| 6/30/13 | 6/30/11 | 14,909,789 | 100.0 | - |

* All net pension obligation is owed by Hurley Medical Center.
** The required contribution is expressed to the City as a percentage of payroll.

**City of Flint, Michigan**

Required Supplemental Information
Analysis of Funding Progress (Continued)
Year Ended June 30, 2013

**MERS Pension Plan - Hurley**
**Schedule of Employer Contributions**

| Fiscal Year End | Actuarial Valuation Date | Annual Required Contribution | Percentage Contributed | Net Pension Obligation (Asset) at June 30 |
|---|---|---|---|---|
| 6/30/08 | 6/30/06 | $ 6,690,590 | 45.0 | $ 5,711,003 |
| 6/30/09 | 6/30/07 | 8,037,604 | 75.0 | 7,694,335 |
| 6/30/10 | 6/30/07 | 9,160,796 | 87.0 | 8,896,382 |
| 6/30/11 | 6/30/09 | 9,173,538 | 75.8 | 5,505,003 |
| 6/30/12 | 6/30/10 | 11,734,785 | 92.1 | 6,503,942 |
| 6/30/13 | 6/30/10 | 12,682,496 | 82.1 | 3,268,705 |

**City of Flint, Michigan**

**Note to Required Supplemental Information**
**Year Ended June 30, 2013**

**Budgetary Information** - Annual budgets are adopted on a basis consistent with generally accepted accounting principles for the General Fund and special revenue funds. All annual appropriations lapse at fiscal year end.

D-49

[This Page Intentionally Left Blank]

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX E

## FORM OF CONTINUING DISCLOSURE UNDERTAKINGS

## KAREGNONDI WATER AUTHORITY

This Continuing Disclosure Undertaking (the "Undertaking") is executed and delivered by the Karegnondi Water Authority, Counties of Genesee, Lapeer and Sanilac, State of Michigan (the "Authority"), in connection with the issuance of the Authority's Water Supply System Bonds (Karegnondi Water Pipeline), Series 2014A (the "Bonds").  The Authority covenants and agrees for the benefit of the Bondholders, as hereinafter defined, as follows:

(a)  *Definitions*.  The following terms used herein shall have the following meanings:

"Audited Financial Statements" means the annual audited financial statement pertaining to the Authority prepared by an individual or firm of independent certified public accountants as required by Act 2, Public Acts of Michigan, 1968, as amended, which presently requires preparation in accordance with generally accepted accounting principles.

"Bondholders" shall mean the registered owner of any Bond or any person (a) with the power, directly or indirectly, to vote or consent with respect to, or to dispose of ownership of, any Bond (including any person holding a Bond through a nominee, depository or other intermediary) or (b) treated as the owner of any Bond for federal income tax purposes.

"EMMA" shall mean the MSRB's Electronic Municipal Market Access System or such other system, Internet Web Site, or repository hereafter prescribed by the MSRB for the submission of electronic filings pursuant to the Rule.

"MSRB" means the Municipal Securities Rulemaking Board.

"Rule" means Rule 15c2-12 promulgated by the SEC pursuant to the Securities Exchange Act of 1934, as amended.

"SEC" means the United States Securities and Exchange Commission.

(b)  *Continuing Disclosure*.  The Authority hereby agrees, in accordance with the provisions of the Rule, to provide or cause to be provided to the MSRB through EMMA, on or before the last day of the sixth month after the end of its fiscal year, the Audited Financial Statements, or in the event audited financial statements are not available, the Authority agrees to provide unaudited financial statements and to provide audited financial statements immediately after they become available.

Such annual financial information described above is expected to be provided directly by the Authority by specific reference to documents available to the public through EMMA or filed with the SEC.

If the fiscal year of the Authority is changed, the Authority shall send a notice of such change to the MSRB through EMMA, prior to the earlier of the ending date of the fiscal year prior to such change or the ending date of the fiscal year as changed.

(c)     *Notice of Failure to Disclose*.  The Authority agrees to provide or cause to be provided, in a timely manner, to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, notice of a failure by the Authority to provide the annual financial information with respect to the Authority described in subsection (b) above on or prior to the dates set forth in subsection (b) above.

(d)     *Occurrence of Events*.  The Authority agrees to provide or cause to be provided to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, in a timely manner not in excess of ten business days after the occurrence of the event, notice of the occurrence of any of the following events listed in (b)(5)(i)(C) of the Rule with respect to the Bonds:

(1)     principal and interest payment delinquencies;

(2)     non-payment related defaults, if material;

(3)     unscheduled draws on debt service reserves reflecting financial difficulties;

(4)     unscheduled draws on credit enhancements reflecting financial difficulties;

(5)     substitution of credit or liquidity providers, or their failure to perform;

(6)     adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

(7)     modifications to rights of holders of the Bonds, if material;

(8)     bond calls, if material, and tender offers;

(9)     defeasances;

(10)     release, substitution, or sale of property securing repayment of the Bonds, if material;

(11)     rating changes;

(12)     bankruptcy, insolvency, receivership or similar event of the Authority, which is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the Authority in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the Authority, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority

having supervision or jurisdiction over substantially all of the assets or business of the Authority;

(13)    the consummation of a merger, consolidation, or acquisition involving the Authority or the sale of all or substantially all of the assets of the Authority, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; or

(14)    appointment of a successor or additional trustee or the change of name of a trustee, if material.

(e)    *Materiality Determined Under Federal Securities Laws*.  The Authority agrees that its determination of whether any event listed in subsection (c) is material shall be made in accordance with federal securities laws.

(f)    *Termination of Reporting Obligation*.  The Authority reserves the right to terminate its obligation to provide annual financial information and notices of material events, as set forth above, if and when the Authority is no longer an "obligated person" with respect to the Bonds within the meaning of the Rule, including upon legal defeasance of all Bonds.

(g)    *Identifying Information.*  All documents provided to the MSRB through EMMA shall be accompanied by the identifying information prescribed by the MSRB.

(h)    *Benefit of Bondholders*.  The Authority agrees that its undertaking pursuant to the Rule set forth in this Undertaking is intended to be for the benefit of the Bondholders and shall be enforceable by any Bondholder; provided that, the right to enforce the provisions of this Undertaking shall be limited to a right to obtain specific enforcement of the Authority's obligations hereunder and any failure by the Authority to comply with the provisions of this Undertaking shall not constitute a default or an event of default with respect to the Bonds.

(i)    *Municipal Advisory Council of the State of Michigan*.  The Authority shall also file by electronic or other means any information or notice required to be filed with the MSRB through EMMA pursuant to this Undertaking in a timely manner with the Municipal Advisory Council of the State of Michigan.

IN WITNESS WHEREOF, the Authority has caused this Undertaking to be executed by its authorized officer.

KAREGNONDI WATER AUTHORITY
Counties of Genesee, Lapeer and Sanilac
State of Michigan


By: _____
     Its: _____

Dated:  April 16, 2014

## COUNTY OF GENESEE

This Continuing Disclosure Undertaking (the "Undertaking") is executed and delivered by the County of Genesee, State of Michigan (the "County") in connection with the issuance by the Karegnondi Water Authority (the "Authority") of its Water Supply System Bonds (Karegnondi Water Pipeline), Series 2014A (the "Bonds") issued on behalf of the County and the City of Flint, County of Genesee, State of Michigan.  The County covenants and agrees for the benefit of the Bondholders, as hereinafter defined, as follows:

(a)      *Definitions*.  The following terms used herein shall have the following meanings:

"Audited Financial Statements" means the annual audited financial statement pertaining to the County prepared by an individual or firm of independent certified public accountants as required by Act 2, Public Acts of Michigan, 1968, as amended, which presently requires preparation in accordance with generally accepted accounting principles.

"Bondholders" shall mean the registered owner of any Bond or any person (a) with the power, directly or indirectly, to vote or consent with respect to, or to dispose of ownership of, any Bond (including any person holding a Bond through a nominee, depository or other intermediary) or (b) treated as the owner of any Bond for federal income tax purposes.

"EMMA" shall mean the MSRB's Electronic Municipal Market Access System or such other system, Internet Web Site, or repository hereafter prescribed by the MSRB for the submission of electronic filings pursuant to the Rule.

"MSRB" means the Municipal Securities Rulemaking Board.

"Rule" means Rule 15c2-12 promulgated by the SEC pursuant to the Securities Exchange Act of 1934, as amended.

"SEC" means the United States Securities and Exchange Commission.

(b)      *Continuing Disclosure.*   The County hereby agrees, in accordance with the provisions of the Rule, to provide or cause to be provided to the MSRB through EMMA on or before the last day of the sixth month after the end of its fiscal year the following annual financial information and operating data, commencing with the fiscal year ended September 30, 2014 in an electronic format as prescribed by the MSRB:

(1)      Updates of the numerical financial information and operating data included in the official statement of the County relating to the Bonds (the "Official Statement") appearing in the Tables or under the headings in the Official Statement as described below:

a.      Property Valuations;
b.      Major Taxpayers;

E-4

      c.      Tax Rates;
      d.      Tax Rate Limitation;
      e.      Tax Levies and Collections;
      f.      Revenues from the State of Michigan;
      g.      Labor Force;
      h.      Retirement Plans;
      i.      Debt Statement – Direct Debt; and
      j.      Legal Debt Margin.

(2)     Audited Financial Statements, or in the event audited financial statements are not available, the County agrees to provide unaudited financial statements and to provide audited financial statements immediately after they become available.

(3)     Such additional financial information or operating data as may be determined by the County and its advisors as desirable or necessary to comply with the Rule.

Such annual financial information and operating data described above are expected to be provided directly by the County by specific reference to documents available to the public through EMMA or filed with the SEC.

If the fiscal year of the County is changed, the County shall send a notice of such change to the MSRB through EMMA, prior to the earlier of the ending date of the fiscal year prior to such change or the ending date of the fiscal year as changed.

(c)    *Notice of Failure to Disclose*.  The County agrees to provide or cause to be provided, in a timely manner, to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, notice of a failure by the County to provide the annual financial information with respect to the County described in subsection (b) above on or prior to the dates set forth in subsection (b) above.

(d)    *Occurrence of Events*.  The County agrees to provide or cause to be provided to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, in a timely manner not in excess of ten business days after the occurrence of the event, notice of the occurrence of any of the following events listed in (b)(5)(i)(C) of the Rule with respect to the Bonds:

(1)     principal and interest payment delinquencies;
(2)     non-payment related defaults, if material;
(3)     unscheduled draws on debt service reserves reflecting financial difficulties;
(4)     unscheduled draws on credit enhancements reflecting financial difficulties;
(5)     substitution of credit or liquidity providers, or their failure to perform;
(6)     adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of

Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

(7)    modifications to rights of holders of the Bonds, if material;

(8)    bond calls, if material, and tender offers;

(9)    defeasances;

(10)    release, substitution, or sale of property securing repayment of the Bonds, if material;

(11)    rating changes;

(12)    bankruptcy, insolvency, receivership or similar event of the County, which is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the County in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the County, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the County;

(13)    the consummation of a merger, consolidation, or acquisition involving the County or the sale of all or substantially all of the assets of the County, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; or

(14)    appointment of a successor or additional trustee or the change of name of a trustee, if material.

(e)    *Materiality Determined Under Federal Securities Laws.*  The County agrees that its determination of whether any event listed in subsection (d) is material shall be made in accordance with federal securities laws.

(f)    *Termination of Reporting Obligation.*  The County reserves the right to terminate its obligation to provide annual financial information and notices of material events, as set forth above, if and when the County is no longer  an "obligated person" with respect to the Bonds within the meaning of the Rule, including upon legal defeasance of all Bonds.

(g)    *Identifying Information.*  All documents provided to the MSRB through EMMA shall be accompanied by the identifying information prescribed by the MSRB.

(h)    *Benefit of Bondholders.*  The County agrees that its undertaking pursuant to the Rule set forth in this Section is intended to be for the benefit of the Bondholders and shall be enforceable by any Bondholder; provided that, the right to enforce the provisions of this undertaking shall be limited to a right to obtain specific enforcement of the County's obligations

E-6

hereunder and any failure by the County to comply with the provisions of this undertaking shall not constitute a default or an event of default with respect to the Bonds.

(i)     *Amendments to the Undertaking.*  Amendments may be made in the specific types of information provided or the format of the presentation of such information to the extent deemed necessary or appropriate in the judgment of the County, provided that the County agrees that any such amendment will be adopted procedurally and substantively in a manner consistent with the Rule, including any interpretations thereof by the SEC, which, to the extent applicable, are incorporated herein by reference.  Such interpretations currently include the requirements that (a) the amendment may only be made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the County or the type of activities conducted thereby, (b) the undertaking, as amended, would have complied with the requirements of the Rule at the time of the primary offering of the Bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances, and (c) the amendment does not materially impair the interests of Bondholders, as determined by parties unaffiliated with the County (such as independent legal counsel), but such interpretations may be changed in the future.  If the accounting principles to be followed by the County in the preparing of the Audited Financial Statements are modified, the annual financial information for the year in which the change is made shall present a comparison between the financial statements as prepared on the prior basis and the statements as prepared on the new basis, and otherwise shall comply with the requirements of the Rule, in order to provide information to investors to enable them to evaluate the ability of the County to meet its obligations.  A notice of the change in accounting principles shall be sent to the MSRB through EMMA.

(j)     *Municipal Advisory Council of the State of Michigan.*  The County shall also file by electronic or other means any information or notice required to be filed with the MSRB through EMMA pursuant to this Undertaking in a timely manner with the Municipal Advisory Council of the State of Michigan.

COUNTY OF GENESEE
State of Michigan

By:     _____
           Its:     _____

Dated: April 16, 2014

## CITY OF FLINT

This Continuing Disclosure Undertaking (the "Undertaking") is executed and delivered by the City of Flint, County of Genesee, State of Michigan (the "City") in connection with the issuance by the Karegnondi Water Authority (the "Authority") of its Water Supply System Bonds (Karegnondi Water Pipeline), Series 2014A (the "Bonds") issued on behalf of the City and the County of Genesee, State of Michigan.  The City covenants and agrees for the benefit of the Bondholders, as hereinafter defined, as follows:

(a)     *Definitions*.  The following terms used herein shall have the following meanings:

"Audited Financial Statements" means the annual audited financial statement pertaining to the City prepared by an individual or firm of independent certified public accountants as required by Act 2, Public Acts of Michigan, 1968, as amended, which presently requires preparation in accordance with generally accepted accounting principles.

"Bondholders" shall mean the registered owner of any Bond or any person (a) with the power, directly or indirectly, to vote or consent with respect to, or to dispose of ownership of, any Bond (including any person holding a Bond through a nominee, depository or other intermediary) or (b) treated as the owner of any Bond for federal income tax purposes.

"EMMA"  shall mean the MSRB's Electronic Municipal Market Access System or such other system, Internet Web Site, or repository hereafter prescribed by the MSRB for the submission of electronic filings pursuant to the Rule.

"MSRB" means the Municipal Securities Rulemaking Board.

"Rule" means Rule 15c2-12 promulgated by the SEC pursuant to the Securities Exchange Act of 1934, as amended.

"SEC" means the United States Securities and Exchange Commission.

(b)     *Continuing Disclosure*.   The City hereby agrees, in accordance with the provisions of the Rule, to provide or cause to be provided to the MSRB through EMMA on or before the last day of the sixth month after the end of its fiscal year the following annual financial information and operating data, commencing with the fiscal year ending June 30, 2014 in an electronic format as prescribed by the MSRB:

(1)     Updates of the numerical financial information and operating data included in the official statement of the City relating to the Bonds (the "Official Statement") appearing in the Tables or under the headings in the Official Statement as described below:

a.     Property Valuations;
b.     Major Taxpayers;

E-8

c.      Tax Rates (Per $1,000 of Valuation);
d.      Tax Rate Limitation;
e.      Tax Levies and Collections;
f.      Revenues from the State of Michigan;
g.      City Income Tax;
g.      Labor Force;
h.      Pension Fund;
i.      Debt Statement – Direct Debt; and
j.      Legal Debt Margin.

(2)    Audited Financial Statements, or in the event audited financial statements are not available, the City agrees to provide unaudited financial statements and to provide audited financial statements immediately after they become available.

(3)    Such additional financial information or operating data as may be determined by the City and its advisors as desirable or necessary to comply with the Rule.

Such annual financial information and operating data described above are expected to be provided directly by the City by specific reference to documents available to the public through EMMA or filed with the SEC.

If the fiscal year of the City is changed, the City shall send a notice of such change to the MSRB through EMMA, prior to the earlier of the ending date of the fiscal year prior to such change or the ending date of the fiscal year as changed.

(c)    *Notice of Failure to Disclose.*  The City agrees to provide or cause to be provided, in a timely manner, to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, notice of a failure by the City to provide the annual financial information with respect to the City described in subsection (b) above on or prior to the dates set forth in subsection (b) above.

(d)    *Occurrence of Events.*  The City agrees to provide or cause to be provided to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, in a timely manner not in excess of ten business days after the occurrence of the event, notice of the occurrence of any of the following events listed in (b)(5)(i)(C) of the Rule with respect to the Bonds:

(1)    principal and interest payment delinquencies;
(2)    non-payment related defaults, if material;
(3)    unscheduled draws on debt service reserves reflecting financial difficulties;
(4)    unscheduled draws on credit enhancements reflecting financial difficulties;
(5)    substitution of credit or liquidity providers, or their failure to perform;
(6)    adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of

E-9

Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

(7)     modifications to rights of holders of the Bonds, if material;

(8)     bond calls, if material, and tender offers;

(9)     defeasances;

(10)    release, substitution, or sale of property securing repayment of the Bonds, if material;

(11)    rating changes;

(12)    bankruptcy, insolvency, receivership or similar event of the City, which is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the City in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the City, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the City;

(13)    the consummation of a merger, consolidation, or acquisition involving the City or the sale of all or substantially all of the assets of the City, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; or

(14)    appointment of a successor or additional trustee or the change of name of a trustee, if material.

(e)    *Materiality Determined Under Federal Securities Laws*.  The City agrees that its determination of whether any event listed in subsection (d) is material shall be made in accordance with federal securities laws.

(f)    *Termination of Reporting Obligation*.  The City reserves the right to terminate its obligation to provide annual financial information and notices of material events, as set forth above, if and when the City is no longer  an "obligated person" with respect to the Bonds within the meaning of the Rule, including upon legal defeasance of all Bonds.

(g)    *Identifying Information.*  All documents provided to the MSRB through EMMA shall be accompanied by the identifying information prescribed by the MSRB.

(h)    *Benefit of Bondholders*.  The City agrees that its undertaking pursuant to the Rule set forth in this Section is intended to be for the benefit of the Bondholders and shall be enforceable by any Bondholder; provided that, the right to enforce the provisions of this undertaking shall be limited to a right to obtain specific enforcement of the City's obligations

E-10

hereunder and any failure by the City to comply with the provisions of this undertaking shall not constitute a default or an event of default with respect to the Bonds.

(i)      *Amendments to the Undertaking*.  Amendments may be made in the specific types of information provided or the format of the presentation of such information to the extent deemed necessary or appropriate in the judgment of the City, provided that the City agrees that any such amendment will be adopted procedurally and substantively in a manner consistent with the Rule, including any interpretations thereof by the SEC, which, to the extent applicable, are incorporated herein by reference.  Such interpretations currently include the requirements that (a) the amendment may only be made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the City or the type of activities conducted thereby, (b) the undertaking, as amended, would have complied with the requirements of the Rule at the time of the primary offering of the Bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances, and (c) the amendment does not materially impair the interests of Bondholders, as determined by parties unaffiliated with the City (such as independent legal counsel), but such interpretations may be changed in the future.  If the accounting principles to be followed by the City in the preparing of the Audited Financial Statements are modified, the annual financial information for the year in which the change is made shall present a comparison between the financial statements as prepared on the prior basis and the statements as prepared on the new basis, and otherwise shall comply with the requirements of the Rule, in order to provide information to investors to enable them to evaluate the ability of the City to meet its obligations. A notice of the change in accounting principles shall be sent to the MSRB through EMMA.

(j)      *Municipal Advisory Council of the State of Michigan*.  The City shall also file by electronic or other means any information or notice required to be filed with the MSRB through EMMA pursuant to this Undertaking in a timely manner with the Municipal Advisory Council of the State of Michigan.

<div style="margin-left: 30%;">

CITY OF FLINT
County of Genesee
State of Michigan


By: _____
           Its: _____

</div>

Dated: April 16, 2014

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX F**

**FORM OF APPROVING OPINION**

Karegnondi Water Authority
Counties of Genesee, Lapeer and Sanilac
State of Michigan


We have acted as bond counsel to the Karegnondi Water Authority, Counties of Genesee, Lapeer and Sanilac, State of Michigan (the "Issuer") in connection with the issuance by the Issuer of bonds in the aggregate principal sum of $220,500,000 designated Water Supply System Bonds (Karegnondi Water Pipeline), Series 2014A (the "Bonds"). In such capacity, we have examined such law and the transcript of proceedings relating to the issuance of the Bonds and such other proceedings, certifications and documents as we have deemed necessary to render this opinion.

The Bonds are in fully-registered form in the denomination of $5,000 each or multiples thereof, numbered in order of registration, bearing original issue date of April 16, 2014, payable as to principal and interest as provided in the Bonds, subject to redemption prior to maturity in the manner, at the times and at the prices specified in the Bonds.

The Bonds are issued under the provisions of Act 233, Public Acts of Michigan, 1955, as amended, in anticipation of and are payable as to both principal and interest solely from the proceeds of certain specified contractual payments to be made to the Issuer by the County of Genesee ("Genesee") and the City of Flint, County of Genesee ("Flint," and together with Genesee, the "Local Units"), pursuant to a certain contract referred to in the Bonds (the "Contract"). The Issuer has pledged all of such contractual payments for the payment of the principal of and interest on the Bonds.

As to questions of fact material to our opinion, we have relied on the certified proceedings and other certifications of public officials and others furnished to us.

Based upon the foregoing, we are of the opinion that, under existing law:

1.      The Bonds have been duly authorized and executed by the Issuer and are valid and binding obligations of the Issuer, payable as to both principal and interest solely from moneys to be paid under the Contract.

2.      The Contract is a valid and binding obligation of the Issuer and the Local Units. The Local Units have each pledged their full faith and credit for the payment of such moneys to the Issuer as set out in the Contract. Genesee's obligations under the Contract to which Genesee has pledged its full faith and credit include the requirement to make all payments that Flint fails to make to the Issuer under the Contract as described in Exhibit B of the Contract. The full faith and credit pledges of the Local Units are limited tax general obligations of the Local Units, and the Local Units are required to pay their commitments with respect to the Bonds as a first budget obligation from their general funds, including the collection of any ad valorem taxes which they are authorized to levy. However, the ability of the Local Units to levy such taxes is subject to applicable constitutional, statutory, and charter tax rate limitations.

3.      The interest on the Bonds (a) is excludable from gross income for federal income tax purposes and (b) is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. It should be noted, however, that with respect to corporations (as defined for federal income tax purposes), the interest is taken into account in determining adjusted current earnings for the purpose of computing the alternative minimum tax imposed on such corporations.  Further, the Bonds and the interest thereon are exempt from all taxation by the State of Michigan or by any taxing authority within the State of Michigan except inheritance and estate taxes and taxes on gains realized from the sale, payment or other disposition thereof.  The opinions set forth in this paragraph are subject to the condition that the Issuer and the Local Units comply with all requirements of the Internal Revenue Code of 1986, as amended, that must be satisfied subsequent to the issuance of the Bonds in order that interest thereon be (or continue to be) excludable from gross income for federal and Michigan income tax purposes.  The Issuer and the Local Units have covenanted to comply with all such requirements.  Failure to comply with certain of such requirements could cause the interest on the Bonds to be included in gross income retroactively to the date of issuance of the Bonds.

Except as stated in paragraph 3 above, we express no opinion regarding other federal or state tax consequences arising with respect to the Bonds and the interest thereon.

The rights or remedies of bondholders may be affected by bankruptcy, insolvency, fraudulent conveyance or other laws affecting creditors' rights generally, now existing or hereafter enacted, and by the application of general principles of equity, including those relating to equitable subordination.

This opinion is given as of the date hereof, and we assume no obligation to revise or supplement this opinion to reflect any facts or circumstances that may hereafter come to our attention, or any changes in law that may hereafter occur.

Very truly yours,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

F-2

## APPENDIX G

## BOOK-ENTRY ONLY SYSTEM

**General**

The information under "General" in this Appendix G has been furnished by The Depository Trust Company, New York, New York ("DTC"). No representation is made by the Issuer or the Transfer Agent as to the completeness or accuracy of such information or as to the absence of material adverse changes in such information subsequent to the date hereof. No attempt has been made by the Issuer or the Transfer Agent to determine whether DTC is or will be financially or otherwise capable of fulfilling its obligations. Neither the Issuer nor the Transfer Agent will have any responsibility or obligation to Direct Participants, Indirect Participants (both as defined below) or the persons for which they act as nominees with respect to the Bonds, or for any principal, premium, if any, or interest payment thereof.

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each maturity of the Bonds, each in the aggregate principal amount of such maturity and will be deposited with DTC.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a Standard & Poor's rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest

of each actual purchaser of each Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase.   Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.  Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other name as may be requested by an authorized representative of DTC.  The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not affect any change in beneficial ownership.  DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.  Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults and proposed amendments to the Bond documents.  For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners.  In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of the notices be provided directly to them.

Redemption notices shall be sent to DTC.  If less than all of the Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures.  Under its usual procedures, DTC mails an Omnibus Proxy to the Issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Payments of principal, interest and redemption amounts, if any, on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC.  DTC's practice is to credit Direct Participants' accounts, upon DTC's receipt of funds and corresponding detail information from the Issuer or Transfer Agent on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to

Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC (nor its nominee), Transfer Agent, or Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time.  Payments of principal, interest and redemption amounts, if any, to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) are the responsibility of the Issuer or Transfer Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Issuer or Transfer Agent.  Under such circumstances, in the event that a successor securities depository is not obtained, Bond certificates are required to be printed and delivered.

The Issuer may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository).  In that event, Bond certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry-only system has been obtained from sources that the Issuer believes to be reliable, but the Issuer takes no responsibility for the accuracy thereof.

THE ISSUER AND THE TRANSFER AGENT CANNOT AND DO NOT GIVE ANY ASSURANCES THAT DTC, THE DIRECT PARTICIPANTS OR THE INDIRECT PARTICIPANTS WILL DISTRIBUTE TO THE BENEFICIAL OWNERS OF THE BONDS (i) PAYMENTS OF PRINCIPAL OF OR INTEREST AND PREMIUM, IF ANY, ON THE BONDS, (ii) ANY DOCUMENT REPRESENTING OR CONFIRMING BENEFICIAL OWNERSHIP INTERESTS IN BONDS, OR (iii) REDEMPTION OR OTHER NOTICES SENT TO DTC OR CEDE & CO., ITS NOMINEE, AS THE REGISTERED OWNER OF THE BONDS, OR THAT THEY WILL DO SO ON A TIMELY BASIS OR THAT DTC, DIRECT PARTICIPANTS OR INDIRECT PARTICIPANTS WILL SERVE AND ACT IN THE MANNER DESCRIBED IN THIS OFFICIAL STATEMENT.  THE CURRENT "RULES" APPLICABLE TO DTC ARE ON FILE WITH THE SECURITIES AND EXCHANGE COMMISSION, AND THE CURRENT "PROCEDURES" OF DTC TO BE FOLLOWED IN DEALING WITH THE PARTICIPANTS ARE ON FILE WITH DTC.

NEITHER THE ISSUER NOR THE TRANSFER AGENT WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO ANY DIRECT PARTICIPANT, INDIRECT PARTICIPANT OR ANY BENEFICIAL OWNER OR ANY OTHER PERSON WITH RESPECT TO:  (1) THE BONDS; (2) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT; (3) THE PAYMENT BY DTC TO ANY PARTICIPANT, OR BY ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT TO ANY BENEFICIAL OWNER OF ANY AMOUNT DUE WITH RESPECT TO THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE BONDS; (4) THE DELIVERY BY DTC TO ANY PARTICIPANT, OR BY ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT TO ANY BENEFICIAL OWNER OF ANY

NOTICE WHICH IS REQUIRED OR PERMITTED UNDER THE TERMS OF THE RESOLUTION TO BE GIVEN TO BONDHOLDERS; (5) THE SELECTION OF THE BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS; OR (6) ANY CONSENT GIVEN OR OTHER ACTION TAKEN BY DTC AS BONDHOLDER.

**Transfer Agent and Bond Registration**

Principal and interest shall be payable and the Bonds shall be registered and transferred as described under the heading "General" in this Appendix G until the book-entry only system is discontinued. The Issuer has appointed the Transfer Agent shown on the cover. In the event the book-entry only system is discontinued, the Transfer Agent will also act as bond registrar and transfer agent.

**Transfer Outside Book-Entry-Only System**

In the event that the book-entry-only system is discontinued, the following provisions would apply to the Bonds. The Transfer Agent shall keep the registration books for the Bonds (the "Bond Register") at its corporate trust office. Subject to the further conditions contained in the Resolution, the Bonds may be transferred or exchanged for one or more Bonds in different authorized denominations upon surrender thereof at the corporate trust office of the Transfer Agent by the registered owners or their duly authorized attorneys; upon surrender of any Bonds to be transferred or exchanged, the Transfer Agent shall record the transfer or exchange in the Bond Register and shall authenticate replacement bonds in authorized denominations; during the 15 days immediately preceding the date of mailing of any notice of redemption or any time following the mailing of any notice of redemption, the Transfer Agent shall not be required to effect or register the transfer or exchange of any Bond which has been selected for such redemption, except the Bonds properly surrendered for partial redemption may be exchanged for new Bonds in authorized denominations equal in the aggregate to the unredeemed portion; the Issuer and Transfer Agent shall be entitled to treat the registered owners of the Bonds, as their names appear in the Bond Register as of the appropriate dates, as the owners of such Bonds for all purposes under the Resolution. No transfer or exchange made other than as described above in the Resolution shall be valid or effective for any purposes under the Resolution.

**APPENDIX H**

**THE CONTRACT**

[THIS PAGE INTENTIONALLY LEFT BLANK]

## KAREGNONDI WATER AUTHORITY FINANCING CONTRACT

THIS CONTRACT, dated as of August 1, 2013, by and among the Karegnondi Water Authority, a municipal authority and public body corporate of the State of Michigan (hereinafter referred to as the "Authority"), the City of Flint in the County of Genesee and the County of Genesee (collectively, the "Local Units" and each a "Local Unit").

### WITNESSETH:

WHEREAS, the Authority has been incorporated under the provisions of Act No. 233, Public Acts of Michigan, 1955, as amended (hereinafter referred to as "Act 233"), for the purposes set forth in Act 233; and

WHEREAS, the Authority will acquire, construct and operate a water supply system to be known as the Karegnondi Water Supply System that provides untreated water to the Local Units, each of which is a constituent municipality of the Authority; and

WHEREAS, it is immediately necessary and imperative for the public health and welfare of the present and future residents of each of the Local Units that a certain water supply system, as more fully described on Exhibit A hereto, together with all necessary interests in land, appurtenances and attachments thereto (the "System") be acquired, installed and constructed; and

WHEREAS, plans and an estimate of cost of the System have been prepared by the Authority's consulting engineers, Wade Trim (the "Consulting Engineers"), which said estimate of aggregate cost totals an amount not to exceed $300,000,000; and

WHEREAS, each of the Local Units is desirous of having the Authority acquire and own the System in order to continue to operate the System in order to furnish the Local Units with untreated raw water; and

WHEREAS, the parties hereto have determined that the System is essential to the general health, safety and welfare of each of the Local Units; and

WHEREAS, the Authority and each of the Local Units are each agreeable to the execution of this Contract by and among themselves which provides, among other things, for the financing of all or a portion of the cost of the System; and

WHEREAS, this Contract contemplates the issuance of bonds in one or more series by the Authority to pay all or part of the costs of the System; and

WHEREAS, each of the Local Units has or will approve and authorize the execution of this Contract by resolution of its governing body; and

H-1

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

WHEREAS, each of the Local Units has published or will publish, individually or jointly, a notice of intention to enter into this Contract in a newspaper of general circulation in the territory encompassed by each Local Unit; and

WHEREAS, this Contract will become effective for each Local Unit upon expiration of a period of forty-five (45) days following publication by each Local Unit of its notice of intention without filing of a petition for referendum on the question of its entering into this Contract, or if such referendum election be required, then upon approval by the qualified electors of the Local Unit.

NOW, THEREFORE, IN CONSIDERATION OF THE PREMISES AND THE COVENANTS MADE HEREIN, THE PARTIES HERETO AGREE AS FOLLOWS:

SECTION 1. The Authority and the Local Units hereby approve the acquisition, construction and operation of System, together with all necessary interests in land, appurtenances and attachments thereto.

SECTION 2. Each of the Local Units hereby consents to the use by the Authority and any parties contracting with the Authority of the public streets, alleys, lands and rights-of-way in each Local Unit for the purpose of constructing, operating and maintaining the System including any improvements, enlargements and extensions thereto.

SECTION 3. The System is designed to provide and transport untreated raw water to each of the Local Units and the System is immediately necessary to protect and preserve the public health.

SECTION 4. The Authority and each of the Local Units hereby approve and confirm the plans for the System prepared by the Consulting Engineers and the total estimated cost thereof in the sum of not to exceed $300,000,000. Said cost estimate includes all surveys, plans, specifications, acquisition of property for rights-of-way, physical construction necessary to acquire and construct the System, the acquisition of all materials, machinery and necessary equipment, and all engineering, engineering supervision, administrative, legal and financing expenses necessary in connection with the acquisition and construction of the System and the financing thereof.

SECTION 5. The Authority shall not enter into any final contract or contracts for the acquisition and construction of the System if such contract price or prices will be such as to cause the actual cost thereof to exceed the estimated cost as approved in Section 4 of this Contract unless the Authority has sufficient funds to cover such excess, or, each of the Local Units, by resolution of its respective legislative body, (a) approves said increased total cost, and (b) agrees to pay such excess over the estimated cost, either in cash or by specifically authorizing the maximum principal amount of bonds to be issued, as provided in Sections 9 and 14 of this Contract, to be increased to an amount which will provide sufficient funds to meet said increased cost, and approves a similar increase in the installment obligations of each Local Unit, if any, pledged under the terms of this Contract to the payment of such bonds.

SECTION 6. The System shall be acquired and constructed by the Authority substantially in accordance with the plans and specifications therefor approved by this Contract. All matters relating to engineering plans and specifications, together with the making and letting of final construction contracts, the approval of work and materials thereunder, and construction supervision, shall be in the

H-2

control of the Authority.   All acquisition of sites and rights-of-way, if any, shall be done by the Authority.  Each Local Unit's share of the costs of such acquisition in each Local Unit, if any, shall be paid from the Local Unit's share of bond proceeds and, in addition, any costs incurred by any Local Unit in connection with the acquisition or construction of the System, including, but not limited to, engineering expenses, shall be promptly reimbursed to the Local Unit by the Authority from the proceeds of the Authority's Bonds with the approval of the Authority board.

SECTION 7.  The Authority shall operate, maintain and administer the System for and on behalf of the Local Units.  The System shall be maintained in good condition and repair.  The Authority shall provide insurance as part of its obligation to operate the System.  The Authority will furnish reports to the Local Units at periodic intervals corresponding with the reporting periods of the Local Units in detail sufficient to inform the Local Units of the operations of the System and to permit the Local Units to meet their financing requirements hereunder.

SECTION 8.  To provide for the construction and financing of the System in accordance with the provisions of Act 233, the Authority shall take the following steps:

(a)    The Authority will take steps to adopt a resolution or resolutions providing for the issuance of its bonds in one or more series in the principal amount of not to exceed $300,000,000 (except as otherwise authorized pursuant to Section 5 of this Contract) to finance all or part of the costs of the System.  Said bonds shall mature serially or be subject to mandatory sinking fund redemption as authorized by law, and shall be secured by the contractual obligations of each Local Unit in this Contract.  After due adoption of the resolution or resolutions , the Authority will take all necessary legal procedures and steps necessary to effectuate the sale or sales and delivery or deliveries of said bonds.

(b)    The Authority shall take all steps necessary to take bids for and enter into and execute final acquisition and construction contracts for the acquisition and construction of the System as specified and approved hereinbefore in this Contract, in accordance with the plans and specifications therefor based on the plans as approved by this Contract.

(c)    The Authority will require and procure from the contractor or contractors undertaking the actual construction and acquisition of the System necessary and proper bonds to guarantee the performance of the contract or contracts and such labor and material bonds as may be required by law.

(d)    The Authority, upon receipt of the proceeds of sale of each series of bonds, will comply with all provisions and requirements provided for in the resolution authorizing the issuance of such series of bonds and this Contract relative to the disposition and use of the proceeds of sale of such series of bonds.

(e)    The Authority may temporarily invest any bond proceeds or other funds held by it for the benefit of each Local Unit as permitted by law and investment income shall accrue to and follow the fund producing such income.  The Authority shall not, however, invest, reinvest or accumulate any moneys deemed to be proceeds of the bonds pursuant to §148 of the Internal Revenue Code of 1986, as amended, and the applicable regulations thereunder (the "Code"), in such a manner as to cause the bonds to be "arbitrage bonds" within the meaning of Code §

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

103(b)(2) and §148, or otherwise as may jeopardize the tax status of the bonds.

SECTION 9. Each Local Unit irrevocably covenants and agrees to pay to the Authority its Local Unit share of each series of bonds to be issued by the Authority pursuant to this Contract. The share of each Local Unit shall be determined as set forth on Exhibit B hereto.

The cost of the System to be financed with the issuance of bonds of the Authority in the aggregate principal amount of not to exceed $300,000,000 shall be paid in annual installments on the dates and in the amounts as established in the Authority's bond authorizing resolution.

Each Local Unit covenants that it will make or cause to be made its payments as required by this Contract not less than 30 days prior to the dates on which the Authority is required to make payments on the bonds described herein to the transfer agent for the bonds.

It is understood and agreed that the bonds of the Authority hereinbefore referred to will be issued in anticipation of the above contractual obligation, with principal maturities on the dates established by the Authority corresponding to the principal amount of the installments then coming due, and there shall also be paid in addition to said principal installments, on such dates as shall be determined by the Authority, commencing on such date as determined by the Authority, as accrued interest on the principal amount remaining unpaid, an amount sufficient to pay all interest at an interest rate not to exceed ten percent (10%) per annum, due on the next succeeding interest payment date on the bonds from time to time outstanding.

It is further understood and agreed that the bonds of the Authority may be secured by a debt service reserve fund or funds to provide additional security for the timely payment thereof if the Authority determines, in consultation with its financial advisor, that the provision of such debt service reserve fund or funds is advisable. If the bonds of the Authority are secured by a debt service reserve fund or funds, each Local Unit covenants and agrees to provide for the replenishment of such debt service reserve funds as described in Exhibit B.

From time to time as the Authority is billed by the transfer agent for its services for the bonds, and as other costs and expenses accrue to the Authority from handling of the payments made by the Local Units, or from other actions taken in connection with the System, the Authority shall promptly notify the Local Units of the amount of such paying agent fees and other costs and expenses, and the Local Units shall promptly remit to the Authority sufficient funds to meet such fees and other costs and expenses in the proportions hereinabove provided to the extent sufficient funds are not available to the Authority. Each Local Unit warrants and represents that the amount of its obligations under this Contract, when taken together with other indebtedness of such Local Unit, will not cause its obligations under this Contract to exceed any constitutional, statutory or charter debt limitation applicable to such Local Unit.

The Authority shall, within thirty (30) days after the delivery of each series of the bonds of the Authority hereinbefore referred to, furnish each Local Unit with a complete schedule of installments of principal and interest thereon, and the Authority shall also at least sixty (60) days prior to each principal and/or interest installment due date, advise the Local Units, in writing, of the exact amount of principal and interest installments due on each series of bonds on the next succeeding bond principal and/or interest due date, and payable on the first day of the month immediately preceding, as hereinbefore

provided.   Failure of the Authority to notify the Local Units of any such payment shall not relieve the Local Units of the obligation to make such payment.

If any principal installment or interest installment is not paid when due, the amount not so paid shall be subject to a penalty, in addition to interest, of one percent (1%) thereof for each month or fraction thereof that the same remains unpaid after the due date.

SECTION 10.  Each Local Unit states its intention to pay its obligations under this Contract from sources of moneys as are provided by Act 233 and applicable law, including the levy and collection of rates and charges to users of its respective water supply system for operating and maintaining its system provided by each Local Unit to customers in the Local Unit.  Nevertheless, pursuant to the authorization contained in Act 233, each Local Unit hereby irrevocably pledges its full faith and credit for the prompt and timely payment of its obligations pledged for bond payments as expressed in this Contract, and, subject to the provisions of the last sentence of this paragraph, shall each year, commencing with the first tax levy after issuance of the bonds by the Authority, levy an ad valorem tax on all the taxable property in the Local Unit in an amount which, taking into consideration estimated delinquencies in tax collections, will be sufficient to pay such obligations under this Contract becoming due before the time of the following year's tax collections.  Such annual tax levies shall be subject to applicable constitutional, statutory, and charter tax limitations.  Nothing herein contained shall be construed to prevent a Local Unit from using any, or any combination of, the means and methods provided in Section 7 of Act 233, as now or hereafter amended, for the purpose of providing funds to meet its obligations under this Contract, and, if at the time of making the annual tax levy there shall be either other funds on hand earmarked and set aside, or funds provided in the annual budget of the water supply system of the Local Unit, for the payment of the contractual obligations due prior to the next tax collection period, then such annual tax levy may be reduced by such amount.

In the event a Local Unit shall fail for any reason to pay to the Authority at the times specified the amounts required to be paid by the provisions of this Contract, the Authority shall immediately give notice of such default and the amount thereof, to the Treasurer of each Local Unit, the Treasurer of the State of Michigan, and such other officials charged with the disbursement to such Local Unit of funds returned by the State and now or hereafter under Act 233 available for pledge as provided in this Section and in Section 12a of Act 233, and if such default is not corrected within ten (10) days after such notification, the State Treasurer, or other appropriate official charged with disbursement to such Local Unit of the aforesaid funds, is, by these presents, specifically authorized by the Local Unit, to the extent permitted by law, to withhold from the aforesaid funds the maximum amount necessary to cure said deficit and to pay said sums so withheld to the Authority, to apply on the obligations of the Local Unit as herein set forth.  Any such moneys so withheld and paid shall be considered to have been paid to the Local Unit within the meaning of the Michigan Constitution and statutes, the purpose of this provision being voluntarily to pledge and authorize the use of said funds owing to the Local Unit to meet any past-due obligations of such Local Unit due under the provisions of this Contract.  In addition to the foregoing, the Authority shall have all other rights and remedies provided by law to enforce the obligations of the Local Unit to make its payments in the manner and at the times required by this Contract, including the right of the Authority to direct the Local Unit to make a tax levy to reimburse the Authority for any funds advanced.

SECTION 11.  Each Local Unit may pay in advance any of the payments required to be made by this Contract, in which event the Authority shall credit the respective Local Unit with such advance

payment on future due payments to the extent of such advance payment, or use such advances to call bonds without credit to the extent provided in relevant series of bonds.

SECTION 12. Each Local Unit may pay additional moneys over and above any of the payments specified in this Contract, with the written request that such additional funds be used to prepay installments, in which event the Authority shall be obligated to apply and use said moneys for such purpose to the fullest extent possible. Such moneys shall not then be credited as advance payments under the provisions of Section 11 of this Contract.

SECTION 13. It is specifically recognized by each Local Unit that the debt service payments required to be made by each pursuant to the terms of Section 9 of this Contract are to be pledged for and used to pay the principal installments of and interest on with respect to the bonds to be issued by the Authority as provided by this Contract and authorized by law, and each Local Unit covenants and agrees that it will make all required payments to the Authority promptly and at the times herein specified without regard to whether the System is actually completed or placed in operation.

SECTION 14. If the proceeds of the sale of the bonds in one or more series in aggregate amount not to exceed $300,000,000 to be issued by the Authority are for any reason insufficient to complete each Local Unit's share of the cost of the System, subject to each Local Unit's approval required by Section 5 hereof, the Authority shall automatically be authorized to issue additional bonds in an aggregate principal amount sufficient to pay the cost of completing the System and to increase the annual payments required to be made by each Local Unit in an amount so that the total payments required to be made as increased will be sufficient to meet the annual principal and interest requirements on the bonds herein authorized plus the additional bonds to be issued. It is expressly agreed between the parties hereto that the Authority shall issue bonds pursuant to this Contract and each Local Unit shall be committed to retire such amount of bonds as may be necessary to pay each Local Unit's share of the costs of the System whether or not in excess of those presently estimated herein. Any such additional bonds shall comply with the requirements of Act 233 and any increase in the annual payments shall be made in the manner and at the times specified in this Contract. In lieu of such additional bonds, each Local Unit may pay over to the Authority, in cash, sufficient moneys to complete each Local Unit's share of the cost of the System.

SECTION 15. After completion of the System and payment of all costs thereof, any surplus remaining from the proceeds of sale of bonds shall be used by the Authority for either of the following purposes: (a) for improvements or enhancements to the System or for other projects of the Authority undertaken on behalf of the Local Units, subject to approval of the Authority; or (b) credited by the Authority toward the next payments due the Authority by said Local Units hereunder.

SECTION 16. The obligations and undertakings of each of the parties to this Contract shall be conditioned on the successful issuance and sale of the first series of bonds pursuant to Act 233, and if for any reason whatsoever the first series of bonds are not issued and sold within three (3) years from the date of this Contract, this Contract, except for payment of preliminary expenses and ownership of engineering data, shall be considered void and of no force and effect.

SECTION 17. The Authority and each Local Unit each recognize that the owners from time to time of each series of bonds issued by the Authority under the provisions of Act 233 to finance the cost of the System will have contractual rights in this Contract, and it is, therefore, covenanted and agreed by

the Authority and each Local Unit that so long as any of series of bonds shall remain outstanding and unpaid, the provisions of this Contract shall not be subject to any alteration or revision which would in any manner materially affect either the security of such series of bonds or the prompt payment of principal or interest thereon.  Each Local Unit and the Authority each further covenant and agree that each will comply with its respective duties and obligations under the terms of this Contract promptly at the times and in the manner herein set forth, and will not suffer to be done any act which would in any way impair the said bonds, the security therefor, or the prompt payment of principal and interest thereon. It is hereby declared that the terms of this Contract insofar as they pertain to the security of any such bonds shall be deemed to be for the benefit of the owners of said bonds.

SECTION 18.  This Contract shall remain in full force and effect from the effective date hereof (as provided in Section 21) until each series bonds issued by the Authority are paid in full, but in any event not to exceed a period of thirty (30) years for each series of bonds.  At such time within said 30-year term as any of the series of said bonds are paid, this Contract shall be terminated.  In any event, the obligation of each Local Unit to make payments required by this Contract shall be terminated at such time as all of said bonds are paid in full, together with any deficiency or penalty thereon.

SECTION 19.  This Contract shall inure to the benefit of and be binding upon the respective parties hereto, their successors and assigns.

SECTION 20.  This Contract shall become effective upon (i) approval by the legislative body of each Local Unit, (ii) approval by the Board of the Authority and (iii) due execution by authorized officers of each Local Unit and by the Chairman and Secretary of the Authority.

SECTION 21.  This Contract may be executed in several counterparts.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

H-7

SECTION 21.   This Contract may be executed in several counterparts.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed as of the day and year first above written.

In the presence of:

_____

_____
David M. Jansen

In the presence of:

_____
David M. Jansen

_____

In the presence of:

_____

_____

**KAREGNONDI WATER AUTHORITY**

By: _____
                    Chairman

By: _____
                    Secretary

**CITY OF FLINT**

By: _____
                    Mayor

By: _____
                    City Clerk

**COUNTY OF GENESEE**

By: _____
        Chairperson    of    Board    of
        Commissioners

By: _____
                    Clerk

H-8

EXHIBIT A

<u>SYSTEM</u>

The Karegnondi Water System is a raw water supply system.  It will deliver untreated Lake Huron water 65 miles inland to the population centers of Lapeer and Genesee Counties, including the Cities of Lapeer and Flint, and the County Agency of Genesee County with 17 local municipal systems. The system will also be capable of delivering water along the route to customers in Sanilac and Lapeer County, as well as future customers in Saint Clair County.

The system will consist of a lake intake, two pumping stations, and over 65 miles of large diameter transmission watermain.  The system will include fire hydrants, metering stations, reservoirs, and the appurtenances necessary to operate the system efficiently.  The lake intake portion of the project and the land where the two pumping stations are located will be acquired, constructed, designed and financed by the County of Genesee and made available for use by the Karegnondi Water System.

All land and required right-of-ways and easements have been acquired.

EXHIBIT B

LOCAL UNIT ESTIMATED SHARE OF IMPROVEMENT COST

The following is a breakdown of the percent each Local Unit is required to pay of the aggregate debt service, including the obligation to replenish a debt service reserve fund(s), if any, on the Authority's bonds authorized by this Contract:

| Local Unit | Bond Issue |
|---|---|
| County of Genesee | 65.8% |
| City of Flint | 34.2% |

In the event the City of Flint fails to fulfill its payment obligations under this Contract, the County of Genesee irrevocably covenants and agrees to make such missed payment within 15 days of being notified of the missed payment. Further, the Authority covenants and agrees to undertake all legal action and make use of all remedies available under this Contract to enforce the payment obligations of the City of Flint under this Contract. The Authority also covenants and agrees to undertake all legal action and make use of all remedies available to it under the Raw Water Supply Contract between the Authority and the City of Flint dated as of June 28, 2013 ("Raw Water Supply Contract"), as amended, specifically sections 7.08 and 7.09 of such contract. If the County of Genesee is required to make a payment for the City of Flint under this Contract and the Authority recovers any funds from the pursuit of such remedies described above, the Authority shall reimburse the County of Genesee from such funds for any payments made. To the extent permitted by law, the capacity that the City of Flint acquired in the System pursuant to the Raw Water Supply Contract shall be transferred to the County of Genesee until the City of Flint has repaid the County of Genesee for any additional payments made hereunder. The City of Flint shall also pay a penalty of one percent (1%) thereof for each month or fraction thereof that the same remains unpaid after the due date of the amount paid by the County of Genesee as a result of the failure of the City of Flint to fulfill its payment obligations hereunder. Further, if a Local Unit fails to pay its contractual obligation causing a shortfall and the debt service reserve fund(s) is drawn upon to pay the Authority's bonds, the replenishment of such debt service reserve fund shall be an obligation of the Local Unit that failed to pay, as provided in the resolution authorizing the bonds. Provided, however, if the City of Flint fails to fulfill its debt service reserve fund replenishment obligation, as with other payment obligations under the Contract, the County of Genesee agrees to make such payments.

Additionally, if the Authority sells raw untreated water capacity to other parties, to the extent funds are available from payments received from those parties, each Local Unit shall be credited on each day payment is due hereunder as agreed to by the Authority and the Local Units towards each Local Unit's payment obligations hereunder.

21268959.4\152665-00001

# APPENDIX I

## REPORT OF THE ENGINEERING CONSULTANT

[THIS PAGE INTENTIONALLY LEFT BLANK]

# Karegnondi Water Supply System Bonds

# Karegnondi Water Pipeline
# Series 2014 A & B

# Report of the Engineering Consultant



March 17, 2014

Jones & Henry Engineers, Ltd.
3103 Executive Parkway, Suite 300
Toledo, Ohio 43606
419.473.9611
www.jheng.com



Jones & Henry Engineers, Ltd.

Fluid thinking.™

# Table of Contents

Executive Summary ....................................................................................................................... 1

Background .................................................................................................................................... 2

Description of the Systems .......................................................................................................... 4

    Karegnondi Water Authority (KWA) ..................................................................................... 4

        The Project ......................................................................................................................... 4

        Schedule ............................................................................................................................. 5

        Customers .......................................................................................................................... 5

        Expenses ............................................................................................................................ 6

    Genesee County Drain Commissioner- Water & Waste Services (GCDC-WWS) ................. 7

        Water System ..................................................................................................................... 7

        System Deficiencies ........................................................................................................... 7

        Customers .......................................................................................................................... 8

        Revenues and Expenses .................................................................................................... 8

        Rates ................................................................................................................................. 10

    Flint ........................................................................................................................................ 10

        Water System ................................................................................................................... 10

        System Deficiencies ......................................................................................................... 11

        Customers ........................................................................................................................ 11

        Expenses and Revenues .................................................................................................. 11

        Rates ................................................................................................................................. 12

Conclusion ................................................................................................................................... 13

Future Rates ................................................................................................................................ 13

Acknowledgement ...................................................................................................................... 14

Sources/Footnotes ...................................................................................................................... 15

## List of Appendices

**APPENDIX A**

Karegnondi Water Authority (KWA)

Appendix A-1          Work Notes – Report of the Engineering Consultant

Appendix A-2          Project Map


**APPENDIX B**

Genesee County Drain Commissioner - Water & Waste Services (GCDC-WWS)

Appendix B-1          Historical Water Purchased and Sold-Genesee County

Appendix B-2          Genesee County Water Supply Sales, 2011 & 2012

Appendix B-3          GCDC-Water Rates-With KWA

Appendix B-4          Expenses and Revenues for GCDC Water Supply District

Appendix B-5          GCDC-WWS Projected Rates During KWA Phase-In

Appendix B-6          Genesee County Water Supply Rates

Appendix B-7          2011 MDEQ Sanitary Survey

Appendix B-8          Genesee County Water Supply System, Rates for Service for Water Bills
                      Rendered on or after January 2, 2014


**APPENDIX C**

City of Flint (Flint)

Appendix C-1          Flint Water System
                      (Summary from Existing Infrastructure Report, DLZ and Houseal Lavigne)

Appendix C-2          Flint Water System-Historical Customers and Components

Appendix C-3          Flint Water Rates-Post DWSD

Appendix C-4          Flint Water Division Revenues and Expenses

Appendix C-5          Flint Water System Needs and Projects
                      (Summary from Existing Infrastructure Report, DLZ and Houseal Lavigne)

Appendix C-6          Water Rates and Charges for Flint

Jones & Henry Engineers, Ltd.

Fluid thinking.™

## List of Abbreviations

| | | |
|---|---|---|
| ccf | — | hundred cubic feet |
| CCIF | — | County Capital Improvement Fee |
| CIP | | Capital Improvement Plan |
| DWSD | — | Detroit Water and Sewerage Department |
| FY | — | Fiscal Year |
| GCDC-WWS | — | Genesee County Drain Commissioner – Water and Waste Services |
| KWA | — | Karegnondi Water Authority |
| mcf | — | thousand cubic feet |
| MDEQ | — | Michigan Department of Environmental Quality |
| mg | — | million gallons |
| mgd | — | million gallons per day |
| O&M | — | Operation and Maintenance |
| RTS | — | Readiness To Serve |
| WTP | — | Water Treatment Plant |
| ERU | — | Equivalent Residential Units |

# Executive Summary

Jones & Henry Engineers, Ltd. has been retained by the Karegnondi Water Authority (KWA) to review the financial aspects of the KWA water project relative to the water rates for the two initial KWA customers, the City of Flint (Flint) and the Genesee County Drain Commissioner – Water and Wastewater Services (GCDC-WWS) from 2014 through 2018 for the sufficiency of such rates to cover the debt service on the System Bonds and operation and maintenance expenses of the KWA system plus their own systems.

The first step in the review was to project the untreated water volume required for these two initial customers of KWA. Initially, Flint is anticipated to require on average 10.4 million gallons per day and GCDC-WWS is anticipated to require an average 13.5 million gallons per day.

Flint raised its water rates on July 1, 2012, and based on its audit for FY 2013, revenues from Flint customers for such fiscal year totaled approximately $34,600,000. While this level of revenue is sufficient to continue to fund O&M expenses plus fund much of the immediate improvements, additional revenue is projected to be required to reinvest in the systems' infrastructure and establish a sustainable financial condition. Flint is expected to realize a significant near-term financial benefit from its decision to temporarily use (approximately 2 years) the Flint River as a source of raw water which will be treated at Flint's WTP, instead of purchasing significantly higher cost treated water from the Detroit Water and Sewerage Department (DWSD). Once the KWA system is operational, KWA raw water will be used as the raw water source for the Flint WTP. Flint has not recently performed a detailed rate study, but a cost of service study is now being prepared to not only determine rates required to meet immediate and future needs, but establish rates that result in a reinvestment in their infrastructure and establish a more sustainable financial condition in the future. Currently, a Flint residential customer using 1,000 cubic feet per month has a monthly water cost of $96.96. Flint recognizes that using KWA as a raw water source and treating the water at their own water treatment plant is the best long-term option. The City expects to increase rates in the coming years to meet the obligation to KWA and meet the needs for operation and maintenance of the system and make necessary investment in their infrastructure.

GCDC-WWS recently completed a detailed water rate analysis. This analysis was used as the base for projecting the effect of the KWA project on rates and customers. Until the KWA system becomes operational, GCDC-WWS will purchase water directly from DWSD. Additional future expenses for GCDC-WWS were identified to include new capital, operation & maintenance costs for the KWA operation, and GCDC-WWS's new WTP and related facilities which will be necessary to treat the raw water and distribute it. GCDC-WWS's current expense of purchasing water from DWSD was excluded from the projected expenses after the date the KWA pipeline is expected to be operational. Through at least May 1, 2016, with all changes taken into account, including expected

inflationary increases, initial KWA charges, and the increase in DWSD charges
for water purchased directly from DWSD, the GCDC-WWS wholesale water
charge for a residential customer using 1,000 cubic feet per month is projected to
increase from $53.99 to $67.72 per month. Once the KWA project and the
GCDC-WWS's WTP and related facilities are operational, the cost is projected to
increase to $72.27 per month by 2018. GCDC-WWS community customers also
add local charges ranging from 0 percent to 53 percent of GCDC-WWS RTS
charges, and from 0 to 14 percent of GCDC-WWS's commodity charges to their
end users. The need to satisfy ordinance imposed additional bonds tests could
also lead to higher rates.

Long-term rate projections which compare obtaining untreated water from KWA
and treating it themselves vs. obtaining treated water from DWSD, show more
stable rates for both Flint and GCDC-WWS's water customers. In the past,
DWSD's charges to Flint and GCDC-WWS, which historically have constituted
a significant portion of both Flint's and GCDC-WWS's total water expenses,
have increased more than typical inflationary increases. Much of Flint's and
GCDC-WWS's future expenses will be capital which will not increase annually,
with inflationary increases expected for operating costs. Therefore, rates are not
expected to increase under KWA as they have under DWSD, and with
appropriate rate increases, Flint and GCDC-WWS will be able to pay their
respective share of the debt service on the System Bonds, the operation &
maintenance expenses of the KWA project, plus the expenses of their own
systems.

A more comprehensive presentation of the analysis is included in this report. The
document includes additional supporting data and assumptions made in the
analysis to reach the conclusions presented above.

## Background

Flint is supplied treated water from the DWSD, and GCDC-WWS purchases
treated water from Flint. Flint's water is distributed using DWSD line pressure,
including the supply of GCDC-WWS's Henderson Road facility, from where it is
then re-pumped to GCDC-WWS customers.

Flint and GCDC-WWS began to look at alternatives for a new water supply over
ten years ago, and have more recently chosen to move ahead with the
development of a new regional water authority to provide untreated Lake Huron
water for both entities and possibly others.

KWA consists of Genesee County, Lapeer County, Lapeer City, Sanilac County,
and the City of Flint. KWA is a municipal authority incorporated under PA 233
of 1955. KWA was established in October 2010 in order to have a more reliable
supply of untreated water at rates that will be determined exclusively by the local
communities. [1]

KWA will construct a 63 mile long raw water pipeline, the majority being located under or parallel to existing roads or within road rights-of-way. Beginning at Lake Huron, the principal roads along the pipeline are Fisher, Clear Lake, Kings Mill, Norway Lake, Klam, Stanley, Coldwater, Elba, and Millville. The proposed pipeline size changes over the length of the project starting at Lake Huron as a 66 inch diameter pipe and reducing as it continues west, to a 60-inch and then 36-inch diameter pipe. [7] The GCDC-WWS's WTP will be supplied untreated water off of the 60-inch line, and the 36-inch diameter pipe will supply Flint's system. A pump station and intake on Lake Huron in Sanilac County and an intermediate pump station in the northwest corner of St. Clair County are also part of the project.

Flint has a contract with DWSD until April 17, 2014. Starting April 1, 2014, they will start using their own treatment plant and begin treating Flint River water on a temporary basis. Flint will treat KWA water once the KWA system is operational. GCDC-WWS will be required to build a new water treatment plant, with a 150 million gallon earthen reservoir, pump station, and five miles of water main running from the new treatment plant to the Henderson Road facility, at an estimated cost of $60,000,000 to provide treated water to Genesee County's customers. GCDC-WWS has acquired 76 acres approximately 14 miles east of the City of Flint in Oregon Township in Lapeer County, which is expected to serve as the site of the County's new WTP, reservoir and pump station. The new WTP and related facilities are expected to be constructed, and then fully operational between May 1, 2016 and July 1, 2016, with the KWA System expected to be fully operational by the same time. Until then, GCDC-WWS will continue to obtain its water from Flint through April 17, 2014 and then obtain water directly from DWSD.

The purpose of this review is to determine the impact on water rates for Flint and GCDC-WWS customers associated with the financing and operation of the KWA project along with maintaining their current and proposed treatment and distribution systems. To do this, background information on the Flint and GCDC-WWS systems were obtained to determine needed improvements for implementing the KWA project and maintaining Flint and GCDC's current systems. Existing technical reports were reviewed and various financial reports were analyzed, to determine the impact on rates. Before determining the impact on the rates of the two entities, the charges from KWA to Flint and GCDC-WWS were determined. GCDC-WWS recently completed a review of their water rates and, therefore, data is available to make projections on the actual rate components. Flint has not had a recent rate study, so the analysis examined the current revenue and the amount of change in revenue needed to fund the KWA project, in addition to maintaining Flint's current system.

# Description of the Systems

## Karegnondi Water Authority (KWA)

### *The Project*

GCDC-WWS is constructing a lake intake on Lake Huron in Sanilac County, for which it supervised the design of the facility and awarded a construction contract in 2013. The intake will be operated by KWA. KWA is constructing the pipeline from Lake Huron to the Flint area and two pump stations, one of which will be located near the intake facility. These facilities collectively constitute the KWA System. The intake facility was financed with the proceeds of the Series 2013 Bonds sold by Genesee County (the "Intake Bonds"). [1]

KWA contracted with the GCDC-WWS to administer the design and construction of the KWA System. On behalf of KWA, the GCDC-WWS has acquired 40 acres on Lake Huron for the intake and pump station and 40 acres in Lynn Township on the borders of Sanilac, St. Clair, and Lapeer Counties for the second pump station. In anticipation of the construction of the KWA System, the County has obtained a water withdrawal permit of up to 85 million gallons per day (mgd) from Lake Huron. GCDC-WWS hired project managers which have identified the route of the pipe line, identified environmental issues, prepared preliminary permits for the entire 63-mile route, and hired consulting firms to prepare detailed design of the remaining KWA System facilities. [1]

Maps of the KWA project are included in Appendix A-2. The three maps show the Lake Huron Pump Station, Lake Huron Raw Water Transmission Line, Intermediate Pump Station, and the Flint Transmission Line. In addition to the KWA projects, the maps show the Genesee County WTP (Stanley & Marathon) and Genesee County Finished Water Transmission Line, all being constructed by GCDC-WWS. The Lapeer Raw Water Transmission is shown but is not being designed at this time. Also shown on the map, is DWSD 120-inch, 96-inch, and 72-inch water mains that now serve Flint and GCDC-WWS. A portion of the 72-inch line is owned by Flint. The Genesee County Henderson Road Pump Station is an existing facility and will continue to be used by GCDC-WWS.

KWA currently has entered into two water purchase contracts, effective October 1, 2013: one with Flint to supply up to 18 mgd and one with the GCDC-WWS to supply up to 42 mgd. The charges to be paid by Flint and GCDC-WWS in the Water Purchase Contracts are broken down into two distinct portions: an annual fixed or capital fee, and an annual commodity or operations and maintenance fee. [1]

The estimated construction costs for the KWA system, excluding the intake, are $240,000,000 based on water contracts of 60 mgd capacity. KWA, GCDC-WWS and Flint have entered into a contract, under which KWA will issue bonds to finance the remaining facilities for the KWA System, presently estimated to be in

an amount not to exceed $300,000,000, in anticipation of payments to be made by Flint and Genesee County. [8] The bond amount includes the construction cost, capitalized interest, and bond reserves.

Flint is working on the update of its WTP and expects to begin to use Flint River water as a temporary source by April 17, 2014 and is expected to start using KWA water for supply no later than July 1, 2016. Genesee County is expected to begin to purchase water directly from DWSD on April 17, 2014 and will continue with DWSD as a source until July 1, 2016 when they will begin using KWA water.

## Schedule

A schedule of key activities and dates is presented below:

> October 2010 – KWA established

> Summer 2013 – Construction of water intake began

> October 1, 2013 – KWA entered into water purchase contracts with Flint and GCDC-WWS

> April 1, 2014 – Flint to begin treating Flint River water rather than purchasing water from DWSD

> April 17, 2014 – GCDC-WWS will begin purchasing water directly from DWSD

> Summer 2014 – Begin construction of the KWA water pipeline and pump stations

> May 1, 2016 – KWA system in operation (for this review, the KWA operation date is assumed to be July 1, 2016 which is a more conservative financial assumption)

> May 1, 2017 – First debt service payment of KWA bonds

## Customers

KWA will initially have two customers, GCDC-WWS and Flint. Water purchased by Flint from DWSD has averaged 12,219,382 ccf per year between 2010 and 2013. However, the usage trend has been slightly downward. Water sold to Genesee County by Flint increased between 2010 and 2012, but was 6.8 percent lower in 2013 than 2012. It is estimated that Genesee County will deliver 12 mgd to its customers, but due to non-revenue water (8 percent) in the distribution system and at the WTP (3 percent), they will initially need 13.44 mgd of water from KWA. Water usage by City customers has been decreasing, but this trend appears to be subsiding, with estimated usage expected to stabilize

R e p o r t   o f   t h e   E n g i n e e r i n g   C o n s u l t a n t
K a r e g n o n d i   W a t e r   A u t h o r i t y                                               9 0 2 - 6 8 4 3 . 0 0 1
0 3 / 1 7 / 1 4 ,   P a g e  | 5

(Appendix C-2) (3,345,000 ccf). Due to non-revenue water loss in the distribution system (32 percent) and at the WTP (3 percent), the City will need 10.4 mgd to supply its customers. (Non-revenue water is the difference between water purchased and water billed.) Therefore, Genesee County would account for 56.4 percent of the initial need from KWA (13.44 mgd) and Flint would be 43.6 percent (10.39 mgd). Table 1 and Figure 1 in the Work Notes – Report of the Engineering Consultant that is in Appendix A-1 provide a more detailed breakdown of the water needs discussed above.

## Expenses

Operation and maintenance expenses for KWA's two pump stations and the transmission main include labor, chemicals, power, administration, residuals handling and other maintenance cost, and are estimated to average $2,412,063 annually for 2016 to 2018. Based on the 23.83 mgd needed, the average cost per million gallons is $277, or $2.07 per mcf. Operation and maintenance costs will be allocated to Genesee County and Flint based on their proportion of the initial raw water required (56.4 percent vs. 43.6 percent). More detail on the estimated operation expenses can be found in Appendix A-1 in Tables 2 and 3 of the Work Notes – Report of the Engineering Consultant. These cost projections are somewhat sensitive to the actual volume of water purchased. Power and chemicals are 60 percent of the total and are directly related to volume of water pumped. Maintenance is partially related to volume while the other costs are not related to volume of water. Therefore, these other costs will not change due to typical fluctuations in volume.

Nearly $300 million of bonds will be issued for the KWA project. It is anticipated two series of bonds will be issued. The debt service payment from KWA system revenue is expected to begin on May 1, 2017. The annual bond payments, including the Intake Bonds, total an estimated $23 million. This assumes an interest rate of 5 percent on the first series of bonds and 5.25 percent on the second series of bonds issued, with the term for both being 30 years. The first series of bonds is projected to be in the amount of $220 million dollars, and the second series of bonds comprising the remaining $80 million. Based on 60 units, the estimated annual capital cost per unit would be $383,333. A unit is equal to 1 mgd of peak month capacity. A breakdown of the debt service charges between Genesee County and Flint can be found in Table 5 of the Work Notes – Report of the Engineering Consultant in Appendix A-1. Additional entities may be contracted to purchase water from KWA in the future which would lower proportional costs, primarily for GCDC-WWS.

Fluid thinking.™

# Genesee County Drain Commissioner - Water & Waste Services (GCDC-WWS)

## Water System

The GCDC-WWS provides water and sewer service to nearly forty communities, totaling over 200,000 individual residents in parts of Genesee, Lapeer, Saginaw, Shiawassee, Oakland and Livingston counties. GCDC-WWS operates over 135 miles of underground pipeline, twenty major water and wastewater pump stations, and over eighty minor stations are maintained on behalf of local communities, and eleven water storage tanks with over 43,000,000 gallons of storage capacity.[4]

The GCDC-WWS water system includes the Henderson Road facility and Center Road complex which includes 31 mg of storage and over a 50 mgd high service pump station for the majority of the water delivered to GCDC-WWS customers. The distribution (including local municipalities) system includes 1,000 miles of pipeline ranging in size from 6-inch diameter to 48-inch diameter. The system also includes 8 elevated towers for a total volume of 7.5 mg and 4 additional booster pump stations. The system provides services in 18 political entities. GCDC-WWS provides the service as either a master meter customer (water is sold bulk and individual communities provide the distribution system and services) or retail customer basis, whereby GCDC directly provides service to those communities' customers. Eight political entities are served as master metered. While GCDC-WWS serves the individual accounts including billing, the political entities are responsible for overall payment. The individual entities collect the revenues and reimburse GCDC-WWS for its services.

The County will be required to build a new WTP at an estimated cost of $60,000,000 to provide finished water to Genesee County's customers. GCDC-WWS has acquired 76 acres approximately 14 miles east of the City of Flint in Oregon Township in Lapeer County, which is expected to serve as the site of the County's new WTP and related facilities described above. The new WTP and related facilities are expected to be constructed and fully operational by July 1, 2016, the date on which the KWA System is expected to be fully operational (Note:  startup could be as early as May 1, 2016, but July 1, 2016 is used as a more conservative financial review). A five mile pipeline will be needed to convey treated water to the existing Henderson Road facility.

## System Deficiencies

System deficiencies have been identified in GCDC's Sanitary Survey prepared by MDEQ as found in Appendix B-7. Deficiencies are predominately related to the local distribution systems and not the transmission system. The KWA project will address one of the comments by providing more reliability.

## Customers

GCDC-WWS currently purchases water from Flint, which purchases the treated water from DWSD. Genesee County's payment to Flint is a flat rate surcharge, Detroit Readiness to Serve (RTS) based on peak consumption, plus a commodity charge equal to the charge from Detroit to Flint for the water. Through the second half of 2013 and through at least April 1, 2014, the DWSD commodity charge was, and still is $1.301 per metered hundred cubic feet. These charges were set on July 1, 2013 and typically increase annually. [11]

GCDC-WWS purchased 587,285,100 cubic feet of water from Flint in 2013. Purchased water and billed water from 2007 through 2013 can be found in Appendix B-1. The difference in water purchased and water billed is called non-revenue water.

GCDC-WWS's water charges are based on either community master meter readings or the summation of individual water meter readings within each community. Billable metered water volumes by community for 2011 and 2012 for the water supply district are given in Appendix B-2.

No growth in usage was assumed in the last rate study. Limited growth was assumed for the number of equivalent meters in the last rate study, but no growth is assumed in this analysis. [6]

## Revenues and Expenses

GCDC-WWS had $22,997,000 in water revenue in 2013 and $20,524,301 [10] in expenses. In general, according to the last water rate study completed for GCDC-WWS, salaries and wages are expected to increase by 3 percent annually over the next few years, but fringe benefits are expected to increase from 2 percent to 8 percent annually. In general, office supplies, dues and memberships, printing and publishing, professional and contractual services, repair and maintenance, and other operational expenses are projected to increase 2 percent annually. Utilities are expected to increase at 9 percent annually. [6]

GCDC-WWS currently pays a commodity charge, a Flint surcharge and a DWSD Readiness-to-Serve (RTS) charge to Flint for water. Flint passes on the revenue collected from the commodity charge and RTS to DWSD, and retains the surcharge. Starting April 17, 2014, the County will purchase water directly from DWSD until no later than July 1, 2016 when the KWA project and GCDC-WWS WTP project are expected to be finished. The cost of water from DWSD between 2009 and 2013 increased an average of 11.4 percent annually. DWSD rates are expected to increase 10.3 percent starting April 1, 2014, an additional 9 percent starting July 1, 2014, and 10 percent starting July 1, 2015 (discussion by GCDC-WWS with DWSD). Changes in the cost of water from DWSD beyond these levels may further impact water rates to system customers.

The GCDC-WWS WTP is expected to commence operation no later than July 1, 2016. Expenses for the water system have to be adjusted because of the KWA project.

The KWA O&M costs were discussed previously, and the County will be responsible for 56.4 percent of such costs:  $630,469 in 2016 (for a half year); $1,365,707 in 2017; and, $1,454,566 in 2018.

GCDC-WWS will have additional O&M expenses due to a new WTP, expected to begin operation no later than July 1, 2016. Additional O&M costs are anticipated to be:  $1,249,395 in 2016 (half year); $2,574,943 in 2017; and, $2,651,097 in 2018. Calculations for future O&M costs are in Appendix B-3. Annual debt service for the new WTP is estimated as follow:

| | |
|---|---|
| 2015 | $3,978,516 |
| 2016 | $4,027,813 |
| 2017 | $4,028,450 |
| 2018 | $4,026,725 |

Capital Reinvestment/Depreciation on the new WTP is anticipated at $1,500,000 per year starting in 2017.

GCDC-WWS is funding the construction of the new water intake for KWA. The annual debt service will be approximately $2,529,000, beginning in 2014. However, GCDC-WWS will receive a credit equal to Flint's share (30 percent) of the Intake Bonds payments starting in 2016 which will be credited to GCDC-WWS through their KWA capital payment.

GCDC-WWS will also be responsible for 42 of 60 units, or 70 percent, of the annual debt service payments on the bonds. The KWA's total annual debt service payment is estimated to be $23,000,000 which includes KWA projects including the Intake Bonds. GCDC's annual payment will be reduced by the Intake Bonds payments and the annual payment by Flint for their share of the Intake Bonds. Payment will start in 2014 with payments approximately 10 percent of the projected amount. The GCDC-WWS's net annual payment is estimated to be:

| | |
|---|---|
| 2014 | $1,356,600 |
| 2015 | $1,356,600 |
| 2016 | $7,465,800 |
| 2017 | $13,575,000 |
| 2018 | $13,575,000 |

More detail on the expenses and payment can be found in Appendix B-3.

The intake credit will result in GCDC-WWS's share of the KWA bonds being approximately 66 percent, for an allocation of 70 percent of the KWA capacity. GCDC-WWS will pay 100 percent of the Intake Bonds payments.

Jones & Henry Engineers, Ltd.                                    Fluid thinking.™

A more detailed breakdown of the revenues and expenses for 2009 through 2012 can be found in Appendix B-4, along with the budget for 2013 and projections for 2014 through 2018.

### Rates

Water for the GCDC-WWS water system is billed for each customer based on water meter size plus metered consumption, and customers are charged for service on monthly, bi-monthly, or quarterly billings. Water bills are based on a Readiness to Serve (RTS) charge based on meter size and a commodity charge based on volume usage. In addition, each of the individual communities imposes their own rates and charges to recover the cost of local water utility services that they provide. As a result, each community on the system has different rates and charges in place which impact individual customers differently. [1]

Currently, RTS charges start at $14.59 per month for one equivalent meter which is equal to a 5/8-inch meter. Commodity charges are currently $3.94 per 100 cubic feet, or $5.27 per 1,000 gallons of water consumed. These rates went into effect January 2, 2014. [12]

Where community bulk water readings are available, the readings are used as the basis for charges. The rates charged are based on a calculated equivalent meter size calculated on past peak usage for a community plus the actual water consumption measured at the community master meters. More information on rates can be found in Appendix B-6.

The County charges a County Capital Improvement Fee (CCIF) for new connections to the water system of $1,000 per equivalent residential unit (ERU).

The KWA O&M costs and the O&M costs for the new Genesee County WTP will be allocated to the customer's commodity charge. The Capital Reinvestment/ Depreciation expense will be allocated to volume. The annual expense for the KWA purchase, the credit for financing the construction of the water intake, and the GCDC-WWS WTP debt will be allocated 85 percent to the commodity charge and 15 percent the RTS component.

# Flint

### Water System

The Flint Water Department is responsible for its WTP, four pump stations, and water testing laboratory, in addition to the dams, reservoirs, and underground infrastructure associated with those facilities. The total pumping capacity of Flint is 106.8 mgd with a firm capacity of 62.8 mgd. The WTP was put into service in 1954. A service agreement with DWSD was entered into in the mid-1960s to supply water to the City for a 30-year period. The WTP currently provides treated water from the Flint River as a backup to the water provided by DWSD. The plant has historically operated approximately 20 days per year with average

production of 11 mgd, with a capacity of up to 36 mgd. The total source capacity from DWSD is over 70 mgd which includes water going to GCDC-WWS. A significant upgrade ($48 million) to the Flint WTP was completed in 2006 to meet state regulatory requirements. A recent contract agreement with KWA will require additional redundancy and treatment upgrades. In addition, other components of the WTP are in poor condition and in need of maintenance and/or replacement, including various mechanical and electrical equipment; security improvements; building additions and renovations; Heating, Ventilating, and Cooling (HVAC) systems; concrete and asphalt; and roofs. [2]

### System Deficiencies

The City of Flint has been studying its system and determining future needs. A survey of some of the evaluation is included in Appendix C-5. The system does have a higher than normal, non-revenue water amount. The City has developed a Capital Improvement Plan (CIP) which has resulted in identifying the following annual capital needs:  $8,500,000 in FY 2014; $10,500,000 in FY 2015; $9,500,000 in 2016; $6,000,000 in 2017; and $6,500,000 in 2018 [13.]  These funds will be generated through rates (see Appendix C-4). The CIP will help in addressing the aging system and high non-revenue water amount plus address the City's WTP needs.

### Customers

In 2013, Flint billed 32,702 customers and total consumption was 9,470,315 hundred cubic feet of water. The City's population was 101,515 in 2013. [9]  Water usage by City customers has been decreasing in recent years, but this trend is expected to end and hold at 6.85 mgd (3,345,000 ccf). Due to non-revenue water in the distribution system (32 percent) and at the WTP (3 percent), the City would need 10.4 mgd to supply its customers.

Historical information on the City's customers and water supply system components can be found in Appendix C-2.

### Expenses and Revenues

In Fiscal Year (FY) 2013 (July 1, 2012-June 30, 2013), Flint's water system receipts from customers and users totaled $47,620,772. This included $12,957,337 from Genesee County for their commodity, surcharge and DWSD RTS. [9]  Revenue from City customers is estimated at $34,640,394. Revenues the City receives from Genesee County are expected to cease starting April 17, 2014, when Genesee County begins purchasing water directly from DWSD until the KWA and GCDC WTP projects are finished.

Water purchases from DWSD in FY 2013 totaled $23,308,800, and revenues received from GCDC-WWS paid for a portion of this expense. The average cost rate of water from DWSD between 2009 and 2013 increased an average of 11.4 percent annually.

The City has a high delinquency rate on its customers' water bill payments and this is expected to remain the same. The City is assuming non-revenue water will be reduced by 10 percent annually through improvements in the distribution system and enhanced management program.

Salaries, wages and benefits identified in the Flint annual audits are expected to increase 3 percent annually. Utilities are expected to increase 9 percent annually, and other operation and maintenance expenses are expected to increase by 2 percent annually.

It is estimated that the operating expense for the Flint WTP, once it is fully operational, will be $1,762,580 in FY 2014 (one quarter of the year); $7,050,319 in FYs 2015 and 2016; $7,584,319 in FY 2017; and $7,808,582 in FY 2018. [13]

Flint will be responsible for 18 of 60 units (30 percent) of the KWA bond payment. A portion of the payment will go to GCDC-WWS for Flint's share of the Intake Bonds, resulting in Flint's payment being approximately 34 percent of the KWA Bonds and GCDC paying 100 percent of the Intake Bonds. The City will begin paying $6,900,000 annually starting in 2017, but started paying 10 percent of the full annual capital payment, or $690,000 in October 2013 and will continue with $690,000 in 2014, 2015, and 2016.

The City will be responsible for 43.6 percent of the operation and maintenance costs of the KWA system. This will amount to $1,055,760 in FY 2017 and $1,124,451 in FY 2018.

Debt service payments on the City's outstanding water system bonds are estimated at $2,747,946 in FY 2014; $2,742,821 in FY 2015; $2,746,423 in FY 2016; $2,748,446 in FY 2017; and $2,744,008 in FY 2018. A transfer to the General Fund of $1,130,000 was added for FYs 2014 through 2018 [13], as it has been in the past for Return on Equity to the City.

All of the figures and projections can be found in Appendix C-4.

## Rates

Current water rates became effective July 1, 2012. Appendix C-4 provides the projections for revenue and expenses for the water supply system based on current operating procedures and anticipated future projects and timing. Appendix C-4 shows a negative net revenue for the water system, at least through 2018 with existing rates. The projected capital expenditures include in the next 5 years, approximately $20,000,000 to upgrade the WTP and approximately $17,000,000 to upgrade the distribution system. Much of the WTP capital improvements are required to enable the City to treat Flint River raw water and KWA raw water on a continuous basis. The remainder of the capital expenditures signifies a reinvestment in the City's water infrastructure. The Capital expenditures also include setting aside funds for future equipment replacement

Jones & Henry Engineers, Ltd.                                        Fluid thinking.™

and other CIP reserves. These reinvestment expenditures would be required regardless of the water supply.

## Conclusion

The current water supplier to Flint and GCDC-WWS has averaged over an 11 percent annual increase. For the purposes of this review, similar increases are anticipated for the future. KWA only projects a 4 percent to 5 percent annual increase in the operation and maintenance portion of its expenses. GCDC-WWS rates are expected to be competitive compared to the current water supplier's charges and should be more stable in the future as capital costs will remain constant. The City of Flint's total cost in producing water is expected to be less than current costs immediately upon startup, and Flint should see lower increases in the future than what it has been experiencing recently. Future rate increases are forecast for both GCDC-WWS and Flint. However, the increases are projected to be less than if they both continued to purchase treated water from DWSD. Flint has developed a CIP and is working with a consultant to develop a financial plan which will start reinvesting in their water system infrastructure and develop a more sustainable financial condition for the utility.

## Future Rates

The above review focused on the impact of the KWA project in the next five years. Rates beyond the next five years for each entity are discussed below. For all entities, the customer demand is expected to follow historical trends and remain stable.

KWA has no additional capital forecast beyond 2018 at this time. Therefore, future rates will only need to be adjusted for inflationary increases for the O&M expenses. Any new KWA customers will be required to purchase capacity from an existing customer and/or construct new capacity at no cost to existing customers.

GCDC-WWS establishes its rate structure on a five-year cycle. Rates set in 2013 were the beginning of a new cycle. With over 59 percent of the rate related to new or existing debt (fixed costs) less than 41 percent of the expenses are subject to inflationary costs. The 2009 feasibility study assumed an average 5 percent rate increase on that portion of the expenses. GCDC-WWS has no new capital expenditures forecast past 2018.

The City of Flint will need to address its system deficiencies. The analysis done on Flint's rates includes additional funds to start addressing these deficiencies. A significant investment in the WTP is included in the near term analysis, so future needs will be less. The distribution system investment is projected to continue well beyond the near term analysis. Future rates will see inflationary increases, but the capital needs will stabilize.

The above discussion does not include changes in regulatory requirements which could impact rates. No significant changes are anticipated at this time.

Jones & Henry Engineers, Ltd.                                    Fluid thinking.™

## Acknowledgement

The undersigned acknowledges that this report has been prepared under my supervision.

Steven L. Wordelman, P.E., President
Jones & Henry Engineers, Ltd.

Date:   March 17, 2014

Jones & Henry Engineers, Ltd.                                          Fluid thinking.™

## Sources/Footnotes

[1]     County of Genesee, State of Michigan, $35,000,000 Water Supply
        System Revenue Bonds (Limited Tax General Obligation) Series 2013
        Official Statement.

[2]     Existing Infrastructure Condition Report, City of Flint Master Plan, July
        2013, DLZ and Houseal Lavigne.

[3]     Master Plan For a Sustainable Flint – Infrastructure and Community
        Facilities Plan, adopted October 28, 2013.

[4]     Genesee County Drain Commissioner's Office, Division of Water and
        Waste Services, 2014 Budget.

[5]     Wade Trim Report, Preliminary Engineering Report, Lake Huron Water
        Supply, Karegnondi Water Authority, September 2009.

[6]     GCDC-WWS Water Rate Review, Scenario 2, dated April 5, 2013 by
        Jones & Henry Engineers. Historical information provided by GCDC-
        WWS.

[7]     MDEQ Public Notice, December 5, 2013.

[8]     Stauder, Barch & Associates debt service estimate 11/20/13.

[9]     City of Flint, Michigan; Comprehensive Annual Financial Reports
        (Audits), Fiscal Years 2011, 2012, and 2013.

[10]    Genesee County Drain Commissioner – Water and Waste Services
        Financial Reports, Year-End 2013.

[11]    Genesee County Drain Commissioner – Water and Waste Services
        Personnel.

[12]    Genesee County Water Supply System, Rates for Service for Water Bills
        Rendered on or After January 2, 2014 (see Appendix B-8).

[13]    City of Flint (March 6, 2014)

## APPENDIX  A

**KAREGNONDI WATER AUTHORITY**

# APPENDIX   A-1

WORK NOTES - REPORT OF THE ENGINEERING CONSULTANT

**Appendix A-1**

# WORK NOTES

# Report of the
# Engineering Consultant

## Karegnondi Water Authority



March 17, 2014

Jones & Henry Engineers, Ltd.
3103 Executive Parkway, Suite 300
Toledo, Ohio 43606
419.473.9611
www.jheng.com



Jones & Henry Engineers, Ltd.

Fluid thinking.™

# Table of Contents

KWA Water Volume ................................................................................................................. 1

Operation and Maintenance Costs ........................................................................................ 3

Capital Costs ......................................................................................................................... 4

    Total KWA Charges .......................................................................................................... 4

# List of Tables

Table 1 Recently Billed Water By Flint (ccf per year) ......................................................... 1

Table 2 KWA O&M Cost ...................................................................................................... 3

Table 3 Estimated Annual Operation and Maintenance Costs (3-Year Average) ................. 3

Table 4 Breakdown and Allocation of Flint Operating Costs ............................................... 3

Table 5 Estimated Annual Debt Service Costs For Construction .......................................... 4

Table 6 Total KWA Charges (3-Year Average) ................................................................... 4

Jones & Henry Engineers, Ltd.                                    Fluid thinking.™

## KWA Water Volume

Table 1 summarizes the recent water purchases from DWSD and water sold by Flint to Genesee County. The Flint allocation represents the water billed and their non-revenue volume. The trend has been less usage by Flint, but it is anticipated the decline will stop, so an estimated annual usage of 3,345,000 ccf (6.85 mgd) has been used for future projections. Due to the age of the Flint distribution system, an estimated 32 percent of the water produced is currently lost, which is also termed non-revenue water (Source: City of Flint Existing Infrastructure Condition Report, July 2013, DLZ and Houseal Lavigne, Page 11). The calculations below indicate the non-revenue water may be higher. This would require that the water treatment plant (WTP) produce just over 10 mgd to meet Flint's customer demands. However, it is assumed that 3 percent, or 0.31 mgd, of the water is used during the WTP process, so approximately 10.4 mgd would be necessary from KWA to supply Flint's WTP.

It is estimated that Genesee County will deliver 12 mgd of water to its customers. It is estimated that about 8 percent, or 1.04 mgd, is lost in the distribution system. This would mean that the WTP would have to produce 13.04 mgd in order to meet the demands (12 mgd) of Genesee County. However, it is assumed that 3 percent, or 0.40 mgd, of the water is used during the WTP process, so approximately 13.45 mgd would be needed from KWA to supply 12 mgd to Genesee County customers.

Figure 1 provides a graphic representation of the water amounts discussed above. Genesee County would account for 56.4 percent (13.45 mgd) of the initial need, and Flint would be 43.6 percent (10.39 mgd) of the initial need.

| Table 1 Recently Billed Water By Flint (ccf per year) | | | | | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | Future |
| Water Purchased From DWSD | 11,943,961 | 13,108,730 | 11,926,868 | 11,897,969 | |
| Sold To Genesee County [1] | 6,166,322 | 6,211,823 | 6,301,528 | 5,872,851 | |
| Flint Allocation | 5,777,639 | 6,896,907 | 5,625,340 | 6,025,118 | |
| Billed To City of Flint Customers | 3,681,068 | 3,929,083 | 3,348,319 | 3,597,464 | 3,345,000[3] |
| Flint Non-Revenue Water | 2,096,571 | 2,967,824 | 2,277,021 | 2,427,654 | |
| Total Billed [2] | 10,027,390 | 10,140,906 | 9,649,847 | 9,470,315 | |
| | | | | | |
| Flint Non-Revenue % of Flint Allocation | 36.3% | 43.0% | 40.5% | 40.3% | |
| | | | | | |
| [1] Genesee County rate reports | | | | | |
| [2] Flint Annual Audits | | | | | |
| [3] Represents approximate lowest level of water billed to Flint customers in recent years. | | | | | |

It should be noted that even though the KWA fiscal year is October through September, these tables are based on calendar years.

Jones & Henry Engineers, Ltd.                                    Fluid thinking.™



Figure 1
KWA Water Volume – Annual Average

Fluid thinking.™

# Operation and Maintenance Costs

Table 2 provides a summary of the operation and maintenance costs for the KWA project, and calculations show that it costs approximately $277 per million gallons to operate and maintain the pump stations and transmission line.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Table 2** <br> **KWA O&M Cost** | | | | | | | |
| | Maintenance | Labor | Chemicals | Power | Residuals | KWA Admin | Total |
| 2016 | $339,525 | $274,037 | $116,872 | $1,298,879 | $39,226 | $167,167 | $2,235,706 |
| 2017 | $466,281 | $282,258 | $121,964 | $1,337,846 | $40,935 | $172,183 | $2,421,467 |
| 2018 | $562,995 | $290,726 | $127,256 | $1,377,981 | $42,711 | $177,348 | $2,579,017 |
| | | | | | | | |
| Average | $456,267 | $282,340 | $122,030 | $1,338,235 | $40,957 | $172,233 | $2,412,063 |
| | | | | | | | |
| O&M Cost / MG = $2,412,063 / 23.83 MG per day x 365 day per year ~ $277 / MG  ($2.07 per mcf) | | | | | | | |
| | | | | | | | |
| Source: | Table 14-2, 2009 Report by Rowe Professional Services Company except power based on pumps selected during preliminary design of IPS and LHPS and initial operating conditions, and maintenance and KWA Administration reduced to 70 percent of original value due to lower peak demand (60 mgd v. 85 mgd). | | | | | | |

Estimated operation and maintenance costs, based on proportion of water purchased, are presented in Table 3.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Table 3** <br> **Estimated Annual Operation and Maintenance Costs (3-Year Average)** | | | | | | |
| | Annual Water Purchased | Water Purchased | % | Operation & Maintenance Costs | | |
| | | | | **2016** | **2017** | **2018** |
| Genesee County | 655,783 mcf | 13.44 mgd | 56.4 | $1,260,938 | $1,365,707 | $1,454,566 |
| City of Flint | 506,963 mcf | 10.39 mgd | 43.6 | $974,768 | $1,055,760 | $1,124,451 |
| Total | 1,162,746 mcf | 23.83 mgd | 100.0 | $2,235,706 | $2,421,467 | $2,579,017 |

Note:  Based on cost of $277 per mg or $2.07 per mcf. Calculated using an average O&M cost for 2016 to 2018.

The costs calculated above are based on a calendar year, but the City of Flint's fiscal year runs from July to June. Table 4 breaks down the operating costs presented above and allocates the semi-annual amounts to Flint's fiscal year.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Table 4** <br> **Breakdown and Allocation of Flint Operating Costs** | | | | | | |
| | 2016 (Calendar Year) | | 2017 (Calendar Year) | | 2018 (Calendar Year) | |
| KWA Operating Cost | $974,768 | | $1,055,760 | | $1,124,451 | |
| | | | | | | |
| Semi-Annual Breakdown | $487,384 | $487,384 | $527,880 | $527,880 | $562,226 | $562,226 |
| | | | | | | |
| Fiscal Year Allocation | | $1,015,264 FY 2017 | | $1,090,106 FY 2018 | | |

Jones & Henry Engineers, Ltd.

Fluid thinking.™

## Capital Costs

KWA bonds will need to produce $240 million in proceeds for the project. Approximately $300 million of bonds will be issued in two different series of bonds, including fully funded bond reserve and capitalized interest through the November 1, 2016 payments. The first debt service payable from KWA system revenue is May 1, 2017, essentially requiring the project to be in full service by the fall of 2016. The annual bond payments, including the Intake Bonds, total an estimated $23,000,000. This assumes an interest rate of 5 percent for the first series of bonds of $220 million and 5.25 percent for the second series of bonds of $80 million, with both series of bonds being 30 years duration.

Based on 60 units, the estimated annual capital cost per unit would be $383,333 per unit for construction. A unit is equal to 1 mgd of peak month capacity.

Genesee County's portion of the annual payment would be $16,100,000 (42 of 60 units) and Flint's would be $6,900,000 (18 of 60 units), as shown in Table 5.

| Table 5 Estimated Annual Debt Service Costs For Construction | | | | |
|---|---|---|---|---|
| | Units (mgd) | % | Debt Service | % |
| Genesee County | 42 | 70 | $16,100,000 | 70 |
| City of Flint | 18 | 30 | $6,900,000 | 30 |
| Total | 60 | 100 | $23,000,000 | 100 |

## Total KWA Charges

The total KWA charges for Flint and GCDC-WWS will be as shown in Table 6 for 2016 and 2017.

| Table 6 Total KWA Charges (3-Year Average) | | |
|---|---|---|
| | Flint | GCDC-WWS |
| Capacity | 30% | 70% |
| Initial Usage | 43.6% | 56.4% |
| Capital (Annual Payment) | $6,900,000 | $16,100,000 |
| O&M | $1,051,659 | $1,360,404 |
| Total Annual Charge | $7,951,659 | $17,460,404 |

# APPENDIX   A-2

**PROJECT MAPS**

Jones & Henry Engineers, Ltd.                                                    Fluid thinking.™







W o r k   N o t e s   –   R e p o r t   o f   t h e   E n g i n e e r i n g   C o n s u l t a n t
K a r e g n o n d i   W a t e r   A u t h o r i t y

A p p e n d i x   A - 2 ,   9 0 2 - 6 8 4 3 . 0 0 1
0 3 / 1 7 / 1 4 ,   P a g e | 3

# APPENDIX  B

**GENESEE COUNTY DRAIN COMMISSION - WATER AND WASTE SERVICES**

# APPENDIX B-1

HISTORICAL WATER PURCHASED AND SOLD - GENESEE COUNTY

Jones & Henry Engineers, Ltd.

Fluid thinking.™

| Appendix B-1 Historical Water Purchased v. Sold – Genesee County (Cubit Feet) | | | |
|---|---|---|---|
| Year | Water Purchased | Billable Water | % System Loss |
| 2007 | 719,759,400 | 668,814,441 | 7.08% |
| 2008 | 656,343,300 | 643,936,714 | 1.89% |
| 2009 | 616,325,400 | 594,736,958 | 3.50% |
| 2010 | 616,632,200 | 585,092,058 | 5.11% |
| 2011 | 621,182,300 | 581,675,986 | 6.36% |
| 2012 | 630,152,800 | 579,781,667 | 7.99% |
| 2013 | 587,285,100 | 534,000,000 estimated | 9.07% |

Source:   County of Genesee, State of Michigan, $35,000,000 Water Supply System Revenue Bonds (Limited Tax General Obligation) Series 2013 Official Statement; Updates by GCDC-WWS Personnel.

2013 Billable Water Volume subject to minor changes after final meter reads and audit of values.

APPENDIX   B-2

GENESEE COUNTY WATER SUPPLY SALES, 2011 AND 2012

Jones & Henry Engineers, Ltd.

Fluid thinking.™

| Appendix B-2 Genesee County Water Supply Sales | | | |
|---|---|---|---|
| Community | 2011 (cu. ft.) | 2012 (cu. ft.) | Average % Increase Per Year (11-12) |
| Burton City[1] | 60,577,973 | 62,145,013 | 2.59% |
| Clio City[1] | 9,063,800 | 8,916,600 | -1.62% |
| Morris City[1] | 11,257,800 | 11,276,200 | 0.16% |
| Swartz Creek City[1] | 28,734,200 | 27,420,810 | -4.57% |
| Montrose City[1] | 6,093,500 | 6,105,500 | 0.20% |
| Flushing City[1] | 27,988,300 | 27,741,300 | -0.88% |
| Montrose Twp. | 5,131,160 | 4,707,630 | -8.25% |
| Vienna Twp. | 14,096,827 | 15,080,360 | 6.98% |
| Thetford Twp. | 17,000 | 17,100 | 0.59% |
| Flushing Twp. | 22,618,810 | 23,471,530 | 3.77% |
| Mt. Morris Twp. | 33,325,560 | 32,816,330 | -1.53% |
| Genesee Twp.[1] | 36,069,100 | 35,315,900 | -2.09% |
| Richfield Twp. | 6,256,210 | 6,756,480 | 8.00% |
| Clayton Twp. | 7,341,240 | 7,690,860 | 4.76% |
| Flint Twp. | 102,186,779 | 103,711,109 | 1.49% |
| Davidson Twp. | 40,931,444 | 42,314,290 | 3.38% |
| Gaines Twp. | 4,193,600 | 4,250,800 | 1.36% |
| Mundy Twp. | 25,049,868 | 26,866,194 | 7.25% |
| Grand Bl. Twp.[1] | 129,998,237 | 130,167,445 | 0.13% |
| Hydrants | 1,786,526 | 3,010,216 | 68.50% |
|  |  |  |  |
| Total | 572,717,934 | 579,781,667 | 1.23% |
|  |  |  |  |
| [1] Master Meter |  |  |  |

Source:   Updated information provided by Genesee County Drain Commissioner – Water and Waste Service Personnel.

## APPENDIX   B-3

**GCDC Water Rates with KWA**

# Appendix B-3

## GCDC-WWS Water Rates – with KWA

- Analysis started with the recently completed rate study for 2014 to 2018.

- Customer base remained the same.

  o Equivalent Meters – No growth

  o Commodity – No growth

- GCDC-WWS WTP will commence operation on July 1, 2016.

- CCIF Revenue projection has been reduced from the prior rate study of $575,000 per year to:

  | | |
  |---|---|
  | 2014 | $275,000 |
  | 2015 | $300,000 |
  | 2016 | $300,000 |
  | 2017 | $300,000 |
  | 2018 | $300,000 |

- Adjustments to Expenses for 2014, 2015, 2016, 2017, and 2018.

  o Detroit rates are expected to increase by 10.3 percent starting April 1, 2014, an additional 9 percent starting July 1, 2014, and 10 percent starting July 1, 2015. (Discussion by GCDC-WWS with DWSD.)

  o Removed Flint surcharge for water purchase starting April 1, 2014

  o Water Expense to Detroit to continue until June 30, 2016

  o Added KWA O&M (56.4 percent of Total, half year in 2016)

  | Year | Total | GCDC-WWS |
  |---|---|---|
  | 2016 | $1,117,853 | $630,469 |
  | 2017 | $2,421,467 | $1,365,707 |
  | 2018 | $2,579,017 | $1,454,566 |

  All cost allocated to Commodity

  o Add GCDC-WWS  O&M for new WTP

    ▪ $3.60 per 1,000 cubic feet = $481 per mg

- ▪ Inflate 3 percent per year

- ▪ Treated Water Volume = 13.04 mgd

| Year | Rate | Total | |
|------|------|-------|---|
| 2013 | $481 per mg | - - - | |
| 2016 | $525 per mg | $1,249,395 | (half year) |
| 2017 | $541 per mg | $2,574,943 | |
| 2018 | $557 per mg | $2,651,097 | |

All cost allocated to Commodity

- Capital costs were added as follows:

  - o Capital Reinvestment / Depreciation Water Plant - $1,500,000 per year starting in 2017

    All allocated to Volume

  - o Intake Debt Service

    | Year | Amount |
    |------|--------|
    | 2014 | $2,529,423 |
    | 2015 | $2,526,838 |
    | 2016 | $2,527,388 |
    | 2017 | $2,527,188 |
    | 2018 | $2,527,588 |

    All cost is allocated 85 percent to Commodity and 15 percent to RTS

  - o KWA Purchase

    - ▪ $383,333 per unit time 42 units equals $16,100,000 per year starting in 2016.

    - ▪ Starting in 2016, GCDC-WWS will receive a credit from KWA equal to Flint's share of the Intake Bonds – 30 percent of $2,527,188 equals $758,156.

    - ▪ Prior to July 1, 2016, approximately 10 percent will be paid annually to KWA of the net amount.

    - ▪ Annual net expenses will be:

      | Year | Amount |
      |------|--------|
      | 2014 | $1,356,600 |
      | 2015 | $1,356,600 |
      | 2016 | $7,465,800 |
      | 2017 | $13,575,000 |

Jones & Henry Engineers, Ltd.                                    Fluid thinking.™

|  |  |
|---|---|
| 2018 | $13,575,000 |

Net expenses will be allocated 85 percent to Commodity and 15 percent to RTS

o     GCDC-WWS Water Plant and associated facilities Bond ($60,000,000)

|  |  |
|---|---|
| 2015 | $3,978,516 |
| 2016 | $4,027,813 |
| 2017 | $4,028,450 |
| 2018 | $4,026,725 |

Expenses will be allocated 85 percent to Commodity and 15 percent to RTS

o     A KWA bond reserve fund will be established from a portion of the bonds' proceeds. Income from the bond reserve is estimated at an ultimate rate of 3 percent per year, with 1 and 2 percent earned in 2015 and 2016 respectively.

▪     Estimated GCDC-WWS's share is:

|  |  |
|---|---|
| 2015 | $156,800 |
| 2016 | $313,600 |
| 2017 | $470,400 |
| 2018 | $470,400 |

All bond reserve income will be allocated to commodity

o     In the past, an additional 10 percent of the bonds' principal and interest payments were included in determining rates. The additional 10 percent was to assist with bond payments during periods of low revenue. In lieu of the 10 percent add on, GCDC-WWS will be including in the rate determination a non-cash item depreciation to provide adequate coverage for the rates. In addition, the KWA bonds include a bond reserve from the proceeds.

•     Rates – See attached spreadsheet Appendix B-5 for rates per year. Even though future increases in DWSD charges have been projected, GCDC-WWS typically passes through the DWSD actual charges directly to the customers. The need to satisfy ordinance imposed additional bonds tests could also lead to higher rates. The rates in Appendix B-5 are only for the GCDC-WWS charges. GCDC-WWS community customers also add local charges ranging from 0 percent to 53 percent of GCDC-WWS RTS charges, and from 0 to 14 percent of GCDC-WWS commodity charges to their end users.

## APPENDIX   B-4

EXPENSES AND REVENUES FOR GCDC WATER SUPPLY DISTRICT

GCDC-WWS
3/4/2014

### Water Supply District Past & Projected Expenses & Revenues

| Category | 2009 Actual | 2010 Actual | 2011 Actual | 2012 Actual | 2013 Budget | 2014 % Increase | 2015-2018 % Increase | 2014 Projected | 2015 Projected | 2016 Projected | 2017 Projected | 2018 Projected | 2016-1 Projected | 2016-2 Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 702.00 Salaries and Wages | $730,965.84 | $839,286.72 | $846,687.83 | $737,745.13 | $818,067.00 | 3.0% | 3.0% | $842,609 | $867,887 | $893,924 | $920,742 | $948,364 | $446,962 | $446,962 |
| 702.01 Salaries and Wages - Personal Time | $0.00 | $0.00 | $0.00 | $29,716.91 | $38,600.00 | 3.0% | 3.0% | $39,758 | $40,951 | $42,179 | $43,445 | $44,748 | $21,090 | $21,090 |
| 702.02 Salaries and Wages - Vacation Time | $0.00 | $0.00 | $0.00 | $54,869.17 | $57,540.00 | 3.0% | 3.0% | $59,266 | $61,044 | $62,876 | $64,762 | $66,705 | $31,438 | $31,438 |
| 702.03 Salaries and Wages - Holiday | $0.00 | $0.00 | $0.00 | $45,851.84 | $47,800.00 | 3.0% | 3.0% | $49,234 | $50,711 | $52,232 | $53,799 | $55,413 | $26,116 | $26,116 |
| 702.04 Salaries and Wages - Vacation Cash In | $0.00 | $0.00 | $0.00 | $17,516.72 | $360.00 | 3.0% | 3.0% | $371 | $382 | $393 | $405 | $417 | $197 | $197 |
| 702.05 Salaries and Wages - Separation | $130,515.49 | $96,955.59 | $107,960.46 | $112,082.64 | $123,000.00 | 3.0% | 3.0% | $125,460 | $127,969 | $130,529 | $133,139 | $135,802 | $65,264 | $65,264 |
| 709.00 Overtime | $2,025.00 | $1,875.00 | $1,250.00 | $1,400.00 | $3,000.00 | 2.0% | 2.0% | $3,060 | $3,121 | $3,184 | $3,247 | $3,312 | $1,592 | $1,592 |
| 710.00 Bonus | $0.00 | $0.00 | $1,000.00 | $0.00 | $0.00 | 2.0% | 2.0% | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 711.00 Insurance Opt Out | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 2.0% | 2.0% | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 716.01 Fringe Benefits Taxes | $70,693.76 | $69,125.91 | $71,429.55 | $77,216.30 | $83,800.00 | 3.0% | 3.0% | $86,314 | $88,903 | $91,571 | $94,318 | $97,147 | $45,785 | $45,785 |
| 716.02 Fringe Benefits Pension | $152,942.69 | $160,527.84 | $155,939.91 | $144,802.41 | $195,800.00 | 2.0% | 2.0% | $199,716 | $203,710 | $207,785 | $211,940 | $216,179 | $103,892 | $103,892 |
| 716.03 Fringe Benefits Medical - Active | $215,210.29 | $254,870.28 | $242,958.33 | $318,381.26 | $367,500.00 | 7.0% | 7.0% | $393,225 | $420,751 | $450,203 | $481,718 | $515,438 | $225,102 | $225,102 |
| 716.04 Fringe Benefits Dental & Optical - Active | $25,515.52 | $22,926.13 | $24,344.51 | $25,015.57 | $30,500.00 | 7.0% | 7.0% | $32,635 | $34,919 | $37,364 | $39,979 | $42,778 | $18,682 | $18,682 |
| 716.05 Fringe Benefits Life - Active | $8,469.38 | $7,367.02 | $5,871.77 | $10,470.58 | $11,000.00 | 7.0% | 7.0% | $11,770 | $12,594 | $13,475 | $14,419 | $15,428 | $6,738 | $6,738 |
| 716.09 Fringe Benefits Life - Active | $5,919.10 | $8,755.54 | $7,735.49 | $16,714.26 | $22,000.00 | 8.0% | 8.0% | $23,760 | $25,661 | $27,714 | $29,931 | $32,325 | $13,857 | $13,857 |
| 716.11 Fringe Benefits Worker's Compensation | $147,266.10 | $161,047.15 | $346,142.81 | $500,609.13 | $600,000.00 | 2.0% | 2.0% | $612,000 | $624,240 | $636,725 | $649,459 | $662,448 | $318,362 | $318,362 |
| 716.12 Fringe Benefits OPEB | $4,098.28 | $7,096.56 | $4,268.88 | $5,208.20 | $4,600.00 | 2.0% | 2.0% | $4,692 | $4,786 | $4,882 | $4,979 | $5,079 | $2,441 | $2,441 |
| 716.13 Fringe Benefits - Uniforms | | | | $297.79 | $0.00 | 2.0% | 2.0% | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 716.15 Fringe Benefits - Miscellaneous | $856.46 | $693.22 | $626.22 | $735.85 | $0.00 | 2.0% | 2.0% | $1,020 | $1,040 | $1,061 | $1,082 | $1,104 | $531 | $531 |
| 722.00 Clinic Expense | | | | | | | | | | | | | | |
| **Total Payroll Expenses** | **$1,494,477.91** | **$1,630,526.96** | **$1,816,215.76** | **$2,098,633.76** | **$2,404,567.00** | | | **$2,484,890.01** | **$2,568,670.43** | **$2,656,095.48** | **$2,747,364.09** | **$2,842,687.69** | **$1,328,047.74** | **$1,328,047.74** |
| 726.00 Office Supplies | $2,398.59 | $3,881.85 | $3,705.96 | $3,137.31 | $4,000.00 | 2.0% | 2.0% | $4,080 | $4,162 | $4,245 | $4,330 | $4,416 | $2,122 | $2,122 |
| 727.08 Operating Supplies - Diesel | $0.00 | $0.00 | $0.00 | $2,518.85 | $5,000.00 | 2.0% | 2.0% | $5,100 | $5,202 | $5,306 | $5,412 | $5,520 | $2,653 | $2,653 |
| 727.09 Operating Supplies - Meters | $0.00 | $44,554.21 | $24,997.00 | $83,535.43 | $120,000.00 | 2.0% | 2.0% | $122,400 | $124,848 | $127,345 | $129,892 | $132,490 | $63,672 | $63,672 |
| 727.99 Operating Supplies - General | $16,886.79 | $106,637.09 | $52,044.58 | $43,777.77 | $1,000.00 | 2.0% | 2.0% | $1,020 | $1,040 | $1,061 | $1,082 | $1,104 | $531 | $531 |
| 729.00 Lab Supplies | $3,502.32 | $6,604.86 | $7,450.28 | $7,355.42 | $10,000.00 | 2.0% | 2.0% | $10,200 | $10,404 | $10,612 | $10,824 | $11,041 | $5,306 | $5,306 |
| 731.00 Misc. Supplies | $2,047.06 | $1,387.71 | $1,599.62 | $1,448.05 | $500.00 | 2.0% | 2.0% | $510 | $520 | $531 | $541 | $552 | $265 | $265 |
| 733.00 Postage | $52,954.15 | $48,422.10 | $28,577.64 | $377.90 | $500.00 | 3.0% | 3.0% | $515 | $530 | $546 | $563 | $580 | $273 | $273 |
| 734.00 Small Tools | $21,791.25 | $8,740.66 | $10,705.82 | $4,423.84 | $5,000.00 | 2.0% | 2.0% | $5,100 | $5,202 | $5,306 | $5,412 | $5,520 | $2,653 | $2,653 |
| **Total Supply Expenses** | **$99,580.16** | **$220,228.48** | **$129,480.90** | **$146,574.57** | **$146,000.00** | | | **$148,925.00** | **$151,908.65** | **$154,952.13** | **$158,056.63** | **$161,223.39** | **$77,476.06** | **$77,476.06** |
| 740.00 Dues and Membership | $5,598.99 | $6,642.49 | $3,993.24 | $2,598.20 | $4,500.00 | 2.0% | 2.0% | $4,590 | $4,682 | $4,775 | $4,871 | $4,968 | $2,388 | $2,388 |
| 745.00 Printing and Publishing | $1,538.92 | $0.00 | $1,960.70 | $1,211.40 | $1,500.00 | 2.0% | 2.0% | $1,530 | $1,561 | $1,592 | $1,624 | $1,656 | $796 | $796 |
| 760.00 General Insurance | $125,039.14 | $62,745.08 | $71,257.44 | $82,336.10 | $111,000.00 | 3.0% | 3.0% | $114,330 | $117,760 | $121,293 | $124,931 | $128,679 | $60,646 | $60,646 |
| **Total Other Expenses** | **$132,177.05** | **$69,387.57** | **$97,211.38** | **$86,145.70** | **$117,000.00** | | | **$120,450.00** | **$124,002.30** | **$127,659.95** | **$131,426.07** | **$135,303.91** | **$63,829.97** | **$63,829.97** |
| 801.01 Professional and Contractual Service Legal | $62,357.10 | $52,053.93 | $36,092.88 | $40,980.89 | $50,000.00 | 2.0% | 2.0% | $51,000 | $52,020 | $53,060 | $54,122 | $55,204 | $26,530 | $26,530 |
| 801.02 Professional and Contractual Service Engineering | $56,636.75 | $33,573.63 | $78,956.69 | $211,100.14 | $97,500.00 | 2.0% | 2.0% | $99,450 | $101,439 | $103,468 | $105,537 | $107,648 | $51,734 | $51,734 |
| 801.04 Professional and Contractual Services Cleaning | $0.00 | $0.00 | $10,537.67 | $7,220.99 | $7,500.00 | 2.0% | 2.0% | $7,650 | $7,803 | $7,959 | $8,118 | $8,281 | $3,980 | $3,980 |
| 801.05 Professional - Cross Connection Contracts | $84,650.00 | $78,000.00 | $78,000.00 | $78,000.00 | $100,000.00 | 2.0% | 2.0% | $102,000 | $104,040 | $106,121 | $108,243 | $110,408 | $53,060 | $53,060 |
| 801.06 Professional and Contractual Service GIS | $0.00 | $0.00 | $0.00 | $43,300.00 | $45,000.00 | 2.0% | 2.0% | $45,900 | $46,818 | $47,754 | $48,709 | $49,684 | $23,877 | $23,877 |
| 805.00 Permits | $0.00 | $0.00 | $0.00 | $0.00 | $17,000.00 | 2.0% | 2.0% | $17,340 | $17,687 | $18,041 | $18,401 | $18,769 | $9,020 | $9,020 |
| 806.00 Security Expense | $3,688.82 | $3,142.12 | $3,571.08 | $3,413.51 | $5,000.00 | 2.0% | 2.0% | $5,100 | $5,202 | $5,306 | $5,412 | $5,520 | $2,653 | $2,653 |
| 808.00 Taping Service | $46,541.86 | $44,554.52 | $52,471.04 | $36,643.20 | $40,000.00 | 2.0% | 2.0% | $40,800 | $41,616 | $42,448 | $43,297 | $44,163 | $21,224 | $21,224 |
| 810.04 KWA O&M | | | | | | | 3.0% | | | $630,469 | $1,365,707 | $1,454,566 | | $630,469 |
| 810.05 GCDC O&M | | | | | | | | | | $1,249,395 | $2,574,943 | $2,651,097 | | $1,249,395 |
| 810.01 Cost of Water - Commodity | $8,635,352.28 | $8,889,853.59 | $9,461,016.46 | $7,490,389.60 | $7,668,000.00 | 21.7% | 12.0% | $9,328,797 | $10,450,507 | $5,474,075 | $0 | | $5,474,075.00 | |
| 810.02 Cost of Water - Flint Surcharge | $1,392,682.70 | $1,398,666.01 | $1,482,000.00 | $1,254,000.00 | $1,368,000.00 | 0.0% | 0.0% | $342,000 | $0 | $0 | $0 | $0 | | |
| 810.02 Cost of Water - DWSD RTS | $0.00 | $546,936.00 | $2,004,721.00 | $3,035,015.00 | $3,988,000.00 | 17.6% | 12.0% | $4,690,497 | $5,254,490 | $5,253,060 | | | $2,752,352.00 | |
| **Total Contracts** | **$10,281,909.51** | **$11,017,779.79** | **$13,207,366.82** | **$12,200,064.05** | **$13,386,000.00** | | | **$14,730,534.00** | **$16,081,621.80** | **$10,490,448.30** | **$4,332,490.44** | **$4,505,340.25** | **$8,418,505.65** | **$2,071,942.65** |
| 836.00 Rentals | | | | $359.27 | $2,500.00 | 2.0% | 2.0% | $2,550 | $2,601 | $2,653 | $2,706 | $2,760 | $1,327 | $1,327 |
| 845.01 Repairs and Maintenance Infrastructure | $91,201.41 | $123,048.38 | $305,582.48 | $168,615.71 | $200,000.00 | 2.0% | 2.0% | $204,000 | $208,080 | $212,242 | $216,486 | $220,816 | $106,121 | $106,121 |
| 845.02 Repairs and Maintenance Equipment | $18,519.30 | $36,844.17 | $28,379.64 | $17,545.73 | $25,000.00 | 2.0% | 2.0% | $25,500 | $26,010 | $26,530 | $27,061 | $27,602 | $13,265 | $13,265 |
| 845.03 Repairs and Maintenance Equipment | $64,890.20 | $60,681.97 | $62,198.25 | $80,967.76 | $120,000.00 | 2.0% | 2.0% | $122,400 | $124,848 | $127,345 | $129,892 | $132,490 | $63,672 | $63,672 |
| 845.06 Repairs and Maintenance Software | $0.00 | $12,500.00 | $3,670.00 | $86,457.50 | $5,000.00 | 2.0% | 2.0% | $5,100 | $5,202 | $5,306 | $5,412 | $5,520 | $2,653 | $2,653 |
| **Total Repair and Maintenance** | **$174,610.91** | **$233,074.52** | **$399,830.37** | **$282,945.97** | **$352,500.00** | | | **$359,550.00** | **$366,741.00** | **$374,075.82** | **$381,557.34** | **$389,188.48** | **$187,037.91** | **$187,037.91** |
| 845.07 Repairs and Maintenance Vehicles | $6,190,986.66 | $169,205.45 | $197,938.23 | $73,452.29 | $57,500.00 | 2.0% | 2.0% | $58,140 | $59,303 | $60,489 | $61,699 | $62,933 | $30,244 | $30,244 |
| 845.08 Repairs and Maintenance Ground Care | $7,401.88 | $6,226.90 | $15,406.30 | $15,873.43 | $20,000.00 | 2.0% | 2.0% | $20,400 | $20,808 | $21,224 | $21,649 | $22,082 | $10,612 | $10,612 |
| 845.09 Repairs and Maintenance SCADA | | | | $3,659.62 | $5,000.00 | 2.0% | 2.0% | $5,100 | $5,202 | $5,306 | $5,412 | $5,520 | $2,653 | $2,653 |
| 846.01 Vehicles Fuel - Diesel | | | | $0.00 | $8,000.00 | 2.0% | 2.0% | $8,160 | $8,323 | $8,490 | $8,659 | $8,833 | $4,245 | $4,245 |
| 846.02 Vehicles Fuel - Gasoline | | | | $0.00 | $10,000.00 | 2.0% | 2.0% | $10,200 | $10,404 | $10,612 | $10,824 | $11,041 | $5,306 | $5,306 |
| 855.00 Community Utilities | $0.00 | $0.00 | $86,062.82 | $50,600.38 | $50,000.00 | 2.0% | 2.0% | $51,000 | $52,020 | $53,060 | $54,122 | $55,204 | $26,530 | $26,530 |

GCDC-WWS
3/4/2014

| Category | 2009 Actual | 2010 Actual | 2011 Actual | 2012 Actual | 2013 Budget | 2014 % Increase | 2015-2018 % Increase | 2014 Projected | 2015 Projected | 2016 Projected | 2017 Projected | 2018 Projected | 2016-1 Projected | 2016-2 Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Water Supply District Past & Projected Expenses & Revenues** | | | | | | | | | | | | | | |
| 856.01 Utilities - Electric | $388,444.17 | $368,868.30 | $410,085.33 | $366,566.12 | $450,000.00 | 9.0% | 9.0% | $490,500 | $534,645 | $582,763 | $635,212 | $692,381 | $291,382 | $291,382 |
| 856.02 Utilities - Gas | $27,916.68 | $10,890.52 | $14,831.74 | $23,869.08 | $15,000.00 | 9.0% | 9.0% | $16,350 | $17,822 | $19,425 | $21,174 | $23,079 | $9,713 | $9,713 |
| 856.03 Utilities - Sewer & Water | $808.96 | $34,010.73 | $29,878.06 | $7,938.94 | $10,000.00 | 9.0% | 9.0% | $10,900 | $11,881 | $12,950 | $14,116 | $15,386 | $6,475 | $6,475 |
| 854.04 Utilities Communication | $18,137.08 | $26,439.95 | $22,276.59 | $16,598.94 | $20,000.00 | 2.0% | 2.0% | $20,400 | $20,808 | $21,224 | $21,649 | $22,082 | $10,612 | $10,612 |
| 857.00 Trash Removal | $0.00 | $0.00 | $0.00 | $1,707.95 | $1,500.00 | 2.0% | 2.0% | $1,530 | $1,561 | $1,592 | $1,624 | $1,656 | $796 | $796 |
| 864.00 Conferences and Seminars | $1,386.78 | $2,735.66 | $539.50 | $1,989.21 | $2,500.00 | 2.0% | 2.0% | $2,550 | $2,601 | $2,653 | $2,706 | $2,760 | $1,327 | $1,327 |
| 876.00 Safety | $1,143.11 | $4,245.53 | $4,430.01 | $593.54 | $2,500.00 | 2.0% | 2.0% | $2,550 | $2,601 | $2,653 | $2,706 | $2,760 | $1,327 | $1,327 |
| 877.00 Outside Inspections/Testing | $7,440.72 | $9,551.49 | $10,721.38 | $9,740.76 | $15,000.00 | 2.0% | 2.0% | $15,300 | $15,606 | $15,918 | $16,236 | $16,561 | $7,959 | $7,959 |
| 955.00 Misc. Operating Expenses | $14,217.34 | $17,572.36 | $13,767.87 | $18,850.61 | $0.00 | 2.0% | 2.0% | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Operation Services** | **$643,666.04** | **$632,174.53** | **$792,169.96** | **$572,590.26** | **$666,500.00** | | | **$713,080.00** | **$763,584.10** | **$818,360.11** | **$877,787.02** | **$942,277.85** | **$409,180.05** | **$409,180.05** |
| **Administration Expense (Depts: 50,51,52,54)** | **$2,737,766.61** | **$2,798,842.50** | **$2,299,917.46** | **$3,055,779.00** | **$2,899,498.00** | **4.0%** | **4.0%** | **$3,015,478** | **$3,136,097** | **$3,261,541** | **$3,392,003** | **$3,527,683** | **$1,630,770.46** | **$1,630,770.46** |
| 966.00 Easement/ROW Expenses | $0.00 | $2,300.00 | $10,464.70 | $6,000.00 | | | 2.0% | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Capital Projects (91x Funds) | $0.00 | $0.00 | $3,355.02 | $2,401,791.00 | $346,900.00 | | 3.0% | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Capital Reinvestment/Depreciation Water Plant | | | | | | | | | | | $1,500,000 | $1,500,000 | | |
| Capital Reinvestment/Depreciation Recovery | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | 3.0% | $1,962,890 | $1,903,580 | $1,903,580 | $1,898,841 | $1,898,841 | $951,790 | $951,790 |
| **Total Capital Expense** | **$0.00** | **$2,300.00** | **$13,819.72** | **$2,407,791.00** | **$346,900.00** | | | **$1,962,890.16** | **$1,903,579.66** | **$1,903,579.66** | **$3,398,840.66** | **$3,398,840.66** | **$951,789.83** | **$951,789.83** |
| 994.00 Bond Principal Payments | $1,135,000.00 | $1,175,000.00 | $1,210,000.00 | $1,260,000.00 | $1,310,000.00 | | | $1,360,000 | $1,415,000 | $1,470,000 | $1,530,000 | $1,595,000 | $735,000 | $735,000 |
| 995.00 Bond Interest Payments | $1,967,363.76 | $1,928,501.26 | $1,885,338.76 | $1,839,118.78 | $1,794,834.00 | | | $1,737,651 | $1,683,131 | $1,624,571 | $1,562,939 | $1,497,256 | $812,286 | $812,286 |
| Intake Debt Service | | | | | | | | $2,529,423 | $2,526,838 | $2,527,388 | $2,527,188 | $2,527,588 | $1,263,694 | $1,263,694 |
| 42.00 KWA Water Purchase = 42 units | | | | | | | | $1,356,600 | $1,356,600 | $7,465,800 | $13,575,000 | $13,575,000 | $678,300 | $6,787,500 |
| GCDC Water Plant Debt Service | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | | $0 | $3,978,516 | $4,027,813 | $4,028,450 | $4,026,725 | $2,013,907 | $2,013,907 |
| **Total Debt Service** | **$3,102,363.76** | **$3,103,501.26** | **$3,095,338.76** | **$3,099,118.78** | **$3,104,834.00** | | | **$6,983,674.25** | **$10,960,085.26** | **$17,115,572.26** | **$23,223,576.76** | **$23,221,569.13** | **$5,503,186.13** | **$11,612,386.13** |
| **TOTAL EXPENSES** | **$15,928,785.34** | **$16,908,973.11** | **$19,551,433.67** | **$20,893,864.09** | **$23,423,799.00** | | | **$30,519,471.34** | **$36,056,290.24** | **$36,902,284.61** | **$38,643,101.57** | **$39,124,114.03** | **$18,569,823.81** | **$18,332,460.81** |
| **Total without Detroit & Flint** | **$5,900,750.36** | **$6,073,517.52** | **$6,603,696.21** | **$9,114,458.77** | **$10,399,799.00** | | | **$16,158,177.34** | **$20,351,293.24** | **$28,675,857.61** | **$38,643,101.57** | **$39,124,114.03** | **$10,343,396.81** | **$18,332,460.81** |

# APPENDIX   B-5

**GCDC-WWS P**ROJECTED **R**ATES **D**URING **KWA P**HASE-**I**N

3/4/2014

**GCDC-WWS - Projected Rates during KWA phase in**

2/27/2014

Annual Rate

| Expense Item | RTS | Commodity | 2014 Expense | RTS | Commodity | 2015 Expense | RTS | Commodity | 2016-1 Expense | RTS | Commodity | 2016-2 Expense | RTS | Commodity | 2017 Expense | RTS | Commodity | 2018 Expense | RTS | Commodity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Detroit Commodity[1] | | 100% | $ 8,584,763 | $ - | $ 8,584,763 | $ 9,617,009 | $ - | $ 9,617,009 | $ 5,037,481 | $ - | $ 5,037,481 | | $ - | $ - | | $ - | $ - | | $ - | $ - |
| Detroit RTS[1] | | 100% | $ 4,690,497 | $ - | $ 4,690,497 | $ 5,254,490 | $ - | $ 5,254,490 | $ 2,752,352 | $ - | $ 2,752,352 | | $ - | $ - | | $ - | $ - | | $ - | $ - |
| Flint Surcharge | 100% | | $ 342,000 | $ 342,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - | $ - | | $ - | $ - | | $ - | $ - |
| Unaccounted for Water | 90% | 10% | $ 744,034 | $ 669,631 | $ 74,403 | $ 833,498 | $ 750,148 | $ 83,350 | $ 436,594 | $ 392,935 | $ 43,659 | | $ - | $ - | | $ - | $ - | | $ - | $ - |
| Administration | 50% | 50% | $ 3,015,478 | $ 1,507,739 | $ 1,507,739 | $ 3,136,097 | $ 1,568,049 | $ 1,568,049 | $ 1,630,770 | $ 815,385 | $ 815,385 | $ 1,630,770 | $ 815,385 | $ 815,385 | $ 3,392,003 | $ 1,696,002 | $ 1,696,002 | $ 3,527,683 | $ 1,763,842 | $ 1,763,842 |
| Existing Debt | | 100% | $ 3,097,651 | $ - | $ 3,097,651 | $ 3,098,131 | $ - | $ 3,098,131 | $ 1,547,286 | $ - | $ 1,547,286 | $ 1,547,286 | $ - | $ 1,547,286 | $ 3,092,939 | $ - | $ 3,092,939 | $ 3,092,256 | $ - | $ 3,092,256 |
| Intake Debt | 15% | 85% | $ 2,529,423 | $ 379,413 | $ 2,150,010 | $ 2,526,838 | $ 379,026 | $ 2,147,812 | $ 1,263,694 | $ 189,554 | $ 1,074,140 | $ 1,263,694 | $ 189,554 | $ 1,074,140 | $ 2,527,188 | $ 379,078 | $ 2,148,110 | $ 2,527,588 | $ 379,138 | $ 2,148,450 |
| Depreciation | | 100% | $ 1,962,890 | $ - | $ 1,962,890 | $ 1,903,580 | $ - | $ 1,903,580 | $ 951,790 | $ - | $ 951,790 | $ 951,790 | $ - | $ 951,790 | $ 3,398,841 | $ - | $ 3,398,841 | $ 3,398,841 | $ - | $ 3,398,841 |
| Transmission O&M | | 100% | $ 2,127,441 | $ - | $ 2,127,441 | $ 2,206,226 | $ - | $ 2,206,226 | $ 1,144,634 | $ - | $ 1,144,634 | $ 1,144,634 | $ - | $ 1,144,634 | $ 2,376,831 | $ - | $ 2,376,831 | $ 2,469,272 | $ - | $ 2,469,272 |
| O&M Retail | 100% | | $ 2,068,695 | $ 2,068,695 | $ - | $ 2,145,305 | $ 2,145,305 | $ - | $ 1,113,027 | $ 1,113,027 | $ - | $ 1,113,027 | $ 1,113,027 | $ - | $ 2,311,199 | $ 2,311,199 | $ - | $ 2,401,087 | $ 2,401,087 | $ - |
| KWA O&M | | 100% | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 630,469 | $ - | $ 630,469 | $ 1,365,707 | $ - | $ 1,365,707 |
| GCDC WTP O&M | | 100% | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,249,395 | $ - | $ 1,249,395 | $ 2,574,943 | $ - | $ 2,574,943 |
| KWA Purchase/Debt Services | 15% | 85% | $ 1,356,600 | $ 203,490 | $ 1,153,110 | $ 1,356,600 | $ 203,490 | $ 1,153,110 | $ 678,300 | $ 101,745 | $ 576,555 | $ 6,787,500 | $ 1,018,125 | $ 5,769,375 | $ 13,575,000 | $ 2,036,250 | $ 11,538,750 | $ 13,575,000 | $ 2,036,250 | $ 11,538,750 |
| GCDC-WWS WTP Debt | 15% | 85% | $ - | $ - | $ - | $ 3,978,516 | $ 596,777 | $ 3,381,739 | $ 2,013,907 | $ 302,086 | $ 1,711,821 | $ 2,013,907 | $ 302,086 | $ 1,711,821 | $ 4,028,450 | $ 604,268 | $ 3,424,183 | $ 4,026,725 | $ 604,009 | $ 3,422,716 |
| | | | | | | | | | | | | | | | | | | | | |
| **Total Expenses** | | | $ 30,519,472 | $ 5,170,968 | $ 25,348,504 | $ 36,056,290 | $ 5,642,795 | $ 30,413,495 | $ 18,569,835 | $ 2,914,732 | $ 15,655,103 | $ 18,332,472 | $ 3,438,177 | $ 14,894,295 | $ 38,643,101 | $ 7,026,796 | $ 31,616,305 | $ 39,124,115 | $ 7,184,325 | $ 31,939,790 |
| | | | | | | | | | | | | | | | | | | | | |
| **Non-Rate Revenue Deducts** | | | | | | | | | | | | | | | | | | | | |
| KWA Bond Reserve Income | | 100% | $0 | $0 | $0 | ($156,800) | $0 | ($156,800) | ($156,800) | $0 | ($156,800) | ($156,800) | $0 | ($156,800) | ($470,400) | $0 | ($470,400) | ($470,400) | $0 | ($470,400) |
| County Capital Improvements Fee | | 100% | ($275,000) | $0 | ($275,000) | ($300,000) | $0 | ($300,000) | ($150,000) | $0 | ($150,000) | ($150,000) | $0 | ($150,000) | ($300,000) | $0 | ($300,000) | ($300,000) | $0 | ($300,000) |
| Miscellaneous Revenue | 49% | 51% | ($378,000) | ($185,220) | ($192,780) | ($378,000) | ($185,220) | ($192,780) | ($189,000) | ($92,610) | ($96,390) | ($189,000) | ($92,610) | ($96,390) | ($378,000) | ($185,220) | ($192,780) | ($378,000) | ($185,220) | ($192,780) |
| | | | | | | | | | | | | | | | | | | | | |
| **Revenue Needed from Rates** | | | 29,866,472 | 4,985,748 | 24,880,724 | 35,221,490 | 5,457,575 | 29,763,915 | 18,074,035 | 2,822,122 | 15,251,913 | 17,836,672 | 3,345,567 | 14,491,105 | 37,494,701 | 6,841,576 | 30,653,125 | 37,975,715 | 6,999,105 | 30,976,610 |
| | | | | | | | | | | | | | | | | | | | | |
| **Customer Base** | | | | | | | | | | | | | | | | | | | | |
| Equivalent Meters | | | 361,267 | | | 361,267 | | | 180,634 | | | 180,634 | | | 361,267 | | | 361,267 | | |
| Commodity (100 cu ft) | | | | 5,855,610 | | | 5,855,610 | | | 2,927,805 | | | 2,927,805 | | | 5,855,610 | | | 5,855,610 |
| | | | | | | | | | | | | | | | | | | | | |
| **Rate** | | | | | | | | | | | | | | | | | | | | |
| RTS (per ERU) | | | $ 13.80 | | | $ 15.11 | | | $ 15.62 | | | $ 18.52 | | | $ 18.94 | | | $ 19.37 | |
| Commodity per 100 cu ft | | | | $ 4.25 | | | $ 5.08 | | | $ 5.21 | | | $ 4.95 | | | $ 5.23 | | | $ 5.29 |
| | | | | | | | | | | | | | | | | | | | | |
| **Typical Bill** | | | | | | | | | | | | | | | | | | | | |
| 5/8" meter - RTS | 1 | | $ 13.80 | | | $ 15.11 | | | $ 15.62 | | | $ 18.52 | | | $ 18.94 | | | $ 19.37 | |
| cu ft/mo | | 1,000 | | $ 42.49 | | | $ 50.83 | | | $ 52.09 | | | $ 49.49 | | | $ 52.35 | | | $ 52.90 |
| | | | | | | | | | | | | | | | | | | | | |
| **Total** | | | $ 56.29 | | | $ 65.94 | | | $ 67.72 | | | $ 68.02 | | | $ 71.29 | | | $ 72.27 | |

[1] Detroit expenses determined by adding an expected 10.3% in charges starting April 1, 2014, 9% starting July 1, 2014, and adding an additional 10% to then current charges starting July 1, 2015.

| Current Rates | | |
|---|---|---|
| RTS (per ERU) | $14.59 | |
| Commodity per 100 cu ft | $3.94 | |

| Rate | | |
|---|---|---|
| Current Typical Bill | | |
| 5/8" meter - RTS | $ 14.59 | |
| 1,000 cu ft/mo | $ 39.40 | |
| Total | $ 53.99 | |

# APPENDIX   B-6

GENESEE COUNTY WATER SUPPLY RATES

Jones & Henry Engineers, Ltd.

Fluid thinking.™

| Appendix B-6 Genesee Water Supply Minimum Charge Rates | | | |
|---|---|---|---|
| Meter Size (in) | 09/02/2012 - 09/01/2013 Charge | 09/02/2013 Charge | 01/02/2014 Charge |
| **Individual Meters** | | | |
| 5/8 | $13.38 | $14.59 | $14.59 |
| 3/4 | 20.07 | 21.89 | 21.89 |
| 1 | 33.45 | 36.48 | 36.48 |
| 1-1/2 | 66.90 | 72.95 | 72.95 |
| 2 | 107.04 | 116.72 | 116.72 |
| 3 | 200.70 | 218.85 | 218.85 |
| 4 | 334.50 | 364.75 | 364.75 |
| 6 | 669.00 | 729.50 | 729.50 |
| 8 | 1,070.40 | 1,167.20 | 1,167.20 |
| 10 | 1,605.60 | 1,750.80 | 1,750.80 |
| 12 | 2,876.70 | 3,136.85 | 3,136.85 |
| **Indirect Rates** | | | |
| 5/8 | $13.38 | $13.53 | $13.53 |
| 3/4 | 20.07 | 20.30 | 20.30 |
| 1 | 33.45 | 33.83 | 33.83 |
| 1-1/2 | 66.90 | 67.65 | 67.65 |
| 2 | 107.04 | 108.24 | 108.24 |
| 3 | 200.70 | 202.95 | 202.95 |
| 4 | 334.50 | 338.25 | 338.25 |
| 6 | 669.00 | 676.50 | 676.50 |
| 8 | 1,070.40 | 1,082.40 | 1,082.40 |
| | 09/02/2012 - 09/01/2013 Charge/EM | 09/02/2013 Charge/EM | 01/02/2014 Charge/EM |
| **Equivalent Meters** | | | |
| 25 | $3,295.75 | $2,241.75 | $2,241.75 |
| 50 | 6,591.50 | 4,483.50 | 4,483.50 |
| 80 | 10,546.40 | 7,173.60 | 7,173.60 |
| 120 | 15,819.60 | 10,760.40 | 10,760.40 |
| 165 | 21,751.95 | 14,795.55 | 14,795.55 |
| 215 | 28,343.45 | 19,279.05 | 19,279.05 |
| 320 | 42,185.60 | 28,694.40 | 28,694.40 |

| Rate Per 100 cubic feet of consumption | |
|---|---|
| 09/02/09 - 09/01/10 | $2.54 |
| 09/02/10 - 09/01/11 | $2.76 |
| 09/02/11- 09/01/12 | $2.96 |
| 09/02/12 – 09/01/13 | $3.18 |
| 09/02/13- 01/01/14 | $3.53 |
| 01/02/14 | $3.94 |

Source:     GCDC-WWS

# APPENDIX   B-7

**2011 MDEQ Sanitary Survey**





STATE OF MICHIGAN
DEPARTMENT OF ENVIRONMENTAL QUALITY
LANSING

RICK SNYDER
GOVERNOR

DAN WYANT
DIRECTOR

September 7, 2011

Mr. John O'Brien, Director
Genesee County Drain Commissioner                    WSSN: 2615
G-4610 Beecher Road
Flint, Michigan  48532

Dear Mr. O'Brien:

SUBJECT:   2011 Sanitary Survey
           Genesee County Water System

Enclosed is a copy of the sanitary survey completed by this department covering the
Genesee County water system.  This report is being submitted for your review and
comment.

Your attention should be directed to pages 27 through 33, which details our
observations, conclusions, and recommendations.  Also, pages 33 and 34 provide a
brief summary of the individual items that need to be addressed and gives the pages in
the report where those items are discussed.

The items vary in priority and are listed without ranking.  In general, improvement
continues to be taken towards water system preventative maintenance.  The need for
an adequate supply of water for domestic use and fire protection will continue to
increase as long as residential, commercial, and industrial growth continues in Genesee
County.

Item #1 discusses the need to establish adequate stand-by water service for Genesee
County.

Items #2, 3, and 6 discuss preventative maintenance and operational issues.  This
includes the need to continue establishing a prioritized valve turning program.  Next,
any remaining outdated meters should be changed out and the upgrade to a radio-read
system should continue to be promoted among your retail customers.  Finally, the Clio
Road elevated tank should be scheduled for repainting.

Item #4 discusses the need to continue upgrading areas of WWS's water system that
are in poor condition.

Mr. John O'Brien                           2                    September 8, 2011

Item #5 discusses the need to conduct a new water system study and master plan by 2015.

Item #7 discusses the need to operate the stand-by chlorination equipment at the Henderson Road and Center Road pump stations on an occasional basis.

We wish to thank your staff for their time, and for the assistance given, during the survey and preparation of the report.  As always, we are available to meet with you to discuss the report in more detail.

                                      Sincerely,

                                      Michael F. Prysby, P.E., District Engineer
                                      Lansing District Office
                                      Resource Management Division
                                      517-335-6122


Enclosure

cc:   Mr. Dave Jansen
       Mr. Tim Davidek

# GENESEE COUNTY DRAIN COMMISSIONER

# DISTRIBUTION SYSTEM SANITARY SURVEY

# GENESEE COUNTY DRAIN COMMISSIONER DISTRIBUTION SYSTEM SANITARY SURVEY

Report By:

Michigan Department of Environmental Quality

Michael F. Prysby, P.E., District Engineer

September 6, 2011

## Acknowledgments

*The Michigan Department of Environmental Quality wishes to thank those involved in putting this survey together. A special thank-you goes to the Genesee County Drain Commissioner, especially the Division of Waste & Water employees Tim Davidek, Matt Raysin, Mark Horgan, Dave Jansen, and John O'Brien for their time and patience in compiling the requested data.*

# GENESEE COUNTY DRAIN COMMISSIONER DISTRIBUTION SYSTEM SANITARY SURVEY

## TABLE OF CONTENTS

## LIST OF TABLES AND FIGURES

| | |
|---|---|
| Contact Information | 1 |
| Introductory Comments | 2 |
| Water Usage | 3 |
| Water System Storage | 6 |
| Pumping Stations | 9 |
| Interconnections | 17 |
| Distribution Piping | 19 |
| Distribution Appurtenances | 21 |

# TABLE OF CONTENTS CONT.

Customer & Service Information                                      22

Programs and Plans                                                 24


## Discussion, Conclusions, And Recommendations

Water System Viability                                             27

Cross Connection Control                                           28

System Storage                                                     28

Pumping Stations                                                   29

Transmission/Distribution                                          29

Operation/Maintenance                                              30

Bacteriological Monitoring                                         32

Contingency Plan/Source Reliability                                32

Lead & Copper Program                                              33

Closing Remarks                                                    33

# LIST OF TABLES

TABLE  1 – OPERATOR POSITIONS                              2

TABLE  2 – WHOLESALE & RETAIL CUSTOMERS                    2

TABLE  3 – PRODUCTION HISTORY                              3

Page 1

# WATER SYSTEM REVIEW

WSSN <u>2615</u>  Supply <u>Genesee County Drain Commissioner</u>  County <u>Genesee</u>

Dates <u>7/13/2011 & 8/3/2011</u>  Reviewed by <u>MFP</u>  District <u>11</u>

Primary Contact: <u>John O'Brien</u>      Copy To: <u>Tim Davidek</u>
Title:           <u>Director</u>          Title:   <u>Chief of O&M</u>
Telephone:       <u>(810) 732-7870</u>    Telephone: <u>(810) 732-7870</u>

Address:         <u>G-4610 Beecher Road</u>   Address:  <u>Same</u>
                 <u>Flint, MI. 48532</u>

Population: <u>70,500</u>   Year: <u>2011</u>   Basis: <u>MDEQ Est. of retail customers</u>

Distribution Classification:    <u>S-1</u>                    Cert.    ID #

Operator in Charge:  <u>Tim Davidek</u>                 <u>S-1</u>

Other Operators:  <u>Jeffrey Bryson</u>                 <u>S-1</u>
                  <u>Vernon Brenner</u>                 <u>S-2</u>
                  <u>Joe Anklam</u>                     <u>S-2</u>
                  <u>Richard Bysko (Back-up)</u>        <u>S-3</u>
                  <u>Dave Jansen</u>                    <u>S-4</u>
                  <u>Shannon Holder</u>                 <u>S-4</u>
                  <u>Mark Horgan</u>                    <u>S-2</u>
                  <u>Bill Hostetler</u>                 <u>S-3</u>
                  <u>Jan Jones</u>                      <u>S-4</u>
                  <u>Dan Lince</u>                      <u>S-4</u>
                  <u>Ryan Lynn</u>                      <u>S-3</u>
                  <u>Matt McKay</u>                     <u>S-3</u>
                  <u>Martin McCormick</u>               <u>S-4</u>
                  <u>John O'Brien</u>                   <u>S-1</u>
                  <u>Steven Olson</u>                   <u>S-4</u>
                  <u>Steven Pelky</u>                   <u>S-4</u>
                  <u>Leslie Rogers</u>                  <u>S-4</u>
                  <u>Ronald Schroeder</u>               <u>S-4</u>
                  <u>Steven Shaski II</u>               <u>S-4</u>
                  <u>Lony Smith</u>                     <u>S-4</u>
                  <u>James Thompson</u>                 <u>S-3</u>

Treatment Capacity:       <u>55.0 MGD</u>

Treatment Classification:    <u>D-1</u>

Operator in Charge:  <u>Dave Jansen</u>                  <u>D-1, F-1</u>

Other Operators:  <u>Joe Anklam</u>                      <u>D-4</u>
                  <u>Jeffrey Bryson</u>                  <u>F-3</u>
                  <u>Vern Brenner</u>                    <u>D-4, F-4</u>
                  <u>Connie Hohman</u>                   <u>F-4</u>

## Operator Certification Comments:

The Waste & Water Services Division (WWSD), continues a proactive position towards

1

promoting operator certification and maintains incentives for achieving operator certification. The WWSD maintains a mandatory certification requirement for any distribution system employee who wishes to advance from an operator assistant position to an operator position. A bonus incentive program is also in place for operators who obtain distribution system certification above the level required for their specific position. Certified operators help protect the county's investment in the system, and help ensure that the system meets the requirements of the SDWA.

## Table 1.   Operator Positions

| OPERATOR POSITION | REQUIREMENTS |
|---|---|
| Operator Assistant 1 | None |
| Operator Assistant 2 | None |
| Operator | S-4 |
| Maintenance Mechanic Equipment Operator Senior O&M Operator | S-4 or minimum of 4 years experience |
| Supervisory level | S-3 |

### Introductory Comments:

The Genesee County Drain Commissioner serves water to a large percentage of Genesee County directly from the Detroit Water and Sewerage Department (DWSD) or through the city of Flint. Water service is provided to 19 wholesale and retail customers (8 wholesale and 11 retail customers).

The wholesale customers purchase water from the county through master meter(s) and these customers own and maintain the distribution system piping within their local service area. Each wholesale customer has established its own water department.

The retail customers have very little involvement with water utility operation. The WWSD controls design, construction, and operation of the water system for these customers. The retail customers, however, are responsible for collecting the water bills from their individual accounts.   Table 2 below shows the breakdown of the county's wholesale and retail customers.

## Table 2. Wholesale and Retail Customers of Genesee County

| Wholesale Customer | Number of Accounts | Retail Customer | Number of Accounts |
|---|---|---|---|
| City of Burton | 6,656 | Clayton Township | 865 |
| City of Clio | 993 | Davison Township | 2,636 |
| City of Flushing | 3,800 | Flint Township | 7,557 |
| City of Mt. Morris | 1,211 | Flushing Township | 2,538 |
| City of Montrose | 650 | Gaines Township | 487 |
| City of Swartz Cr. | 2,173 | Mt. Morris Twp. | 3,152 |
| Genesee Township | 2,129 | Montrose Township | 284 |
| Grand Blanc Twp. | 6,592 | Mundy Township | 1,365 |
| | | Richfield Township | 667 |
| | | Vienna Township | 1,184 |
| | | Thetford Township | 4 |
| Total Wholesale | 24,204 | Total Retail | 20,739 |

The 2011 population estimate is based our August 3, 2011 sanitary survey meeting. An estimate of 3.4 persons per account was used to obtain the population estimate. Genesee County's estimated retail service area population is approximately 70,500 people.   The combined   wholesale   and   retail   customer   service   area   serves approximately 153,000 people.

## WELL INFORMATION

One 6-inch test/exploration well was constructed at the Henderson Road pump station site. The test-well was constructed to a depth of 365 feet with a 6-inch PVC casing to 200 feet.   The well was pumped at 220 GPM with a drawdown to 60 feet. Layne estimates that the aquifer could support a 350 -400 GPM well for long-term pumpage and possibly above 500 GPM for a short-term emergency supply.   The WWSD has not decided whether to proceed in converting the test well to a production well for additional emergency capacity.

## WATER USAGE

## TABLE 3. – PRODUCTION HISTORY

(units in Million Gallons Per Day MGD)

| YEAR | Avg Day | Max Day | Avg Day/Max Mo. | Max/Avg | G/C/D | % UnAcct H2O * |
|------|---------|---------|-----------------|---------|-------|----------------|
| 1996 | 11.4 | 19.2 | 14.8 | 1.68 | | 1.1 |
| 1997 | 12.8 | 22.8 | 20.1 | 1.78 | | 1.5 |
| 1998 | | 25.3 | 19.7 | | | |
| 1999 | 13.7 | 21.8 | 21.1 | 1.59 | | 3.9 |
| 2000 | 12.9 | NA | 18.3 | | | 1.1 |
| 2001 | 13.8 | 26.5 | 22.0 | 1.92 | | 1.5 |
| 2002 | 14.8 | 27.5 | 21.4 | 1.86 | | |
| 2003 | 14.4 | 26.3 | 20.2 | 1.83 | | |
| 2004 | 14.1 | 22.0 | 17.6 | 1.56 | | |
| 2005 | 15.0 | 24.9 | 19.6 | 1.66 | | |
| 2006 | 12.1 | 24.6 | 20.7 | 2.03 | | |
| 2007 | 14.5 | 19.7 | 18.2 | 1.36 | | |
| 2008 | 13.4 | 19.9 | 18.5 | 1.49 | | |
| 2009 | 12.6 | 18.9 | 16.4 | 1.50 | | |
| 2010 | 12.6 | 22.0 | 18.8 | 1.75 | | |

Five year Max Day   24.6 MGD    Date    Summer 2006
Ten year Max Day    27.5 MGD    Date    Summer 2002
Five year Avg Day   13.0 MGD

Max Day for capacity requirements      27.5 MGD

## Annual Max Day Usage @ each meter pit (2000-2007)

Center Rd in:    Total flow measured at the South Genesee Road meter pit.
Center Rd out:   Total pumpage out from the Center Road North (CRN) Booster Pump
                 station, this will not equal the metered flow in since some the
                 total flow is taken from storage at Center Road.
Total flow:      Sum of the flows measured at Genesee, Belsay, Irish, Oak,
                 Potter Road meter pits.


2000:

    Total flow:     NA - SCADA failure
    Center Rd in:   NA
    Center Rd out: 21.5 MG
    Donaldson:      3.0 MG

2001:

    Total flow:    26.5 MG   - estimated due to SCADA failure
    Center Rd in:  15.7 MG
    Center Rd out: 23.2 MG   (three pumps ran)
    Donaldson:      3.0 MG


2002:

    Total Flow:    27.5 MG
    Center Rd in:  16.3 MG   (three pumps ran)
    Center Rd out: 21.0 MG
    Donaldson:      3.0 MG

2003:

    Total flow:    26.3 MG
    Center Rd in:  15.9 MG
    Center Rd out: 19.3 MG   (three pumps ran)
    Donaldson:        MG

2004:

    Total Flow:    22.0 MG
    Center Rd in:  11.4 MG   (three pumps ran)
    Center Rd out: 16.8 MG
    Donaldson:        MG


2005:

    Total Flow:    24.9 MG
    Center Rd in:     MG   (three pumps ran)
    Center Rd out:    MG
    Donaldson:        MG

```
2006:

Total flow:     24.6 MG
Center Rd in:   15.7 MG
Center Rd out:  17.0 MG    (three pumps ran)
Donaldson:          MG


2007:

Total Flow:     19.7 MG
Center Rd in:   18.2 MG    (three pumps ran)
Center Rd out:  18.0 MG
Donaldson:          MG
```

The Henderson Road pumping station has been in service since 2006.  The new pumping station pumps between 3 and 6 MGD into Genesee County's North Loop and reduces the demand off the Center Road pump station.

The Center Road South (CRS) pump station has been in service since 2007.  The CRS station pumps water to the eastern portion of Grand Blanc Township and to the Vassar Road station.

The WWSD modified their monthly operation report in 2008 to include average day and max day pumpage from each of the major pumping stations as a result of their SCADA system improvements.  Pumpage data from each pump station since 2008 is displayed as follows:

| 2008 | Avg Day | Max Day |
|---|---|---|
| Total Flow: | 13.4 MGD | MGD |
| Henderson Rd: | 5.19 MGD | 7.07 MGD |
| Center Rd North: | 6.83 MGD | 10.54 MGD |
| Center Rd South: | 0.74 MGD | 10.07 MGD |
| Noble Street: | 0.28 MGD | 1.07 MGD |
| Houran Street | 0.00 MGD | 0.00 MGD * |
| Donaldson Rd | 0.00 MGD | 0.00 MGD |

| 2009 | Avg Day | Max Day |
|---|---|---|
| Total Flow: | 12.6 MGD | MGD |
| Henderson Rd: | 3.44 MGD | 6.91 MGD |
| Center Rd North: | 4.66 MGD | 7.00 MGD |
| Center Rd South: | 1.77 MGD | 5.38 MGD |
| Noble Street: | 0.29 MGD | 0.79 MGD |
| Houran Street | 0.00 MGD | 0.00 MGD * |
| Donaldson Rd | 0.00 MGD | 0.00 MGD |

2010

|  | Avg Day | Max Day |
|---|---|---|
| Total Flow: | 12.6 MGD | MGD |
| Henderson Rd: | 3.14 MGD | 7.37 MGD |
| Center Rd North: | 3.83 MGD | 6.19 MGD |
| Center Rd South: | 2.46 MGD | 5.83 MGD |
| Noble Street: | 0.38 MGD | 1.13 MGD |
| Houran Street | 0.00 MGD | 0.00 MGD * |
| Donaldson Rd | 0.00 MGD | 0.00 MGD |

*   The Houran Street station pumps water; however, the station is not metered thus no flow was shown in the pumpage data. Flow through this station is estimated by accounting pump run time with the approximate capacity each pump(s) that is(are) operated.

Pumpage obtained from the SCADA system and reported in the monthly reports is slightly less than the purchased water reported in the annual pumpage report. This is attributed to a portion of the county's customer base being provided water upstream of the Center Road pumping station (direct connections to the 30-inch transmission main).

## WATER SYSTEM STORAGE

|  | Location: Maple & Center Rd North | Location: Houran St & Beecher | Location: Beecher Rd |
|---|---|---|---|
| Volume | 5.0 MG | Two 2.0 MG | 1.0 MG |
| +Type | Ground | St.Ground | Elevated |
| O.F. Elevation | 38.0 ft | 778.5 Ft | 930Ft USGS |
| Date Constructed | 1988 | 1970 | 1970 |
| Date Inspected | 2007 | 2005 | 2005 |
| Date Painted Inside | concrete | 2005 | 1996 |
| Paint System |  |  | 3 coat exp |
| Date Painted Outside |  | 2005 | 1996 |
| Cathodic Protection |  | Yes 1992 | No |
| High Alarm | Yes | Yes | Yes |
| Low Alarm | Yes | Yes | Yes |
| +Type | SCADA | SCADA | SCADA |

|  | Location: Noble St | Location: Orgould AV & Pierson | Location: Clio Rd |
|---|---|---|---|
| Volume | 4.0 MG | 0.50 MG | 1.0 MG |
| +Type | Standpipe | St. ground | Composite |
| O.F. Elevation | 930ft | 793ft | 930ft USGS |
| Date Constructed | 1968 | ? | 1982 |
| Date Inspected | 2011 | ? | 2011 |
| Date Painted Inside | 2000 | 1982 | 1999 |
| Paint System | 3 coat epxy | ? | 3 coat epxy |
| Date Painted Outside | 2000 | | 1999 |
| Cathodic Protection | Yes 1991 | | no |
| High Alarm | Yes | out of ser | Yes |
| Low Alarm | Yes | out of ser | Yes |
| +Type | SCADA | out of ser | SCADA |

|  | Location: McKinley Rd ARTP | Location: Clio Plaza | Location: Pierson Rd & Elms Rd |
|---|---|---|---|
| Volume | 0.5 MG | 0.10 MG | 0.5 MG |
| +Type | Elevated | Elevated | Ground |
| O.F. Elevation | 784ft | 855ft | 770ft |
| Date Constructed | 1975 | 1974 | ? |
| Date Inspected | 2010 -warr | 2009 | ? |
| Date Painted Inside | 1994 | 1974 | |
| Paint System | 3 coat exp | ? | |
| Date Painted Outside | 2009 | 1974 | |
| Cathodic Protection | Yes | ? | |
| High Alarm | Yes | No | out of ser |
| Low Alarm | Yes | No | out of ser |
| +Type | SCADA | Chart Rec | out of ser |

|  | Location: Center Rd South | Location: Vassar Rd | Location: Henderson Rd |
|---|---|---|---|
| Volume | 6.3 MG | 1.0 MG | 2-10.0 MG |
| +Type | Ground | Ground | Ground |
| O.F. Elevation | | | |
| Date Constructed | 2005 | 2003 | 2004 |
| Date Inspected | 2006 | 2003 | 2004 |
| Date Painted Inside | NA | NA | NA |
| Paint System | Concrete | Concrete | Concrete |
| Date Painted Outside | NA | NA | NA |
| Cathodic Protection | NA | NA | NA |
| High Alarm | Yes | Yes | Yes |
| Low Alarm | Yes | Yes | Yes |
| +Type | SCADA | SCADA | SCADA |

Location:
Houran St

| | |
|---|---|
| Volume | 2.0 MG |
| +Type | Elevated/Composite |
| O.F. Elevation | |
| Date Constructed | 2006 |
| Date Inspected | 2006 |
| Date Painted Inside | NA |
| Paint System | 3 coat ep |
| Date Painted Outside | 2006 |
| High Alarm | Yes |
| Low Alarm | Yes |
| +Type | SCADA |

Total Usable Storage          46,400,000 gallons          46.4  mil. gal.

Total Usable Storage/Max Day    168.7  %

Total Usable Storage/Avg Day    331.4 %

Comments:

The Clio Plaza tank is not monitored on the county's SCADA system, instead its status is noted on a chart recorder and the chart is changed on a weekly basis. Repairs to the tank's roof were completed in 2010 and the tank remains in service. Genesee County has determined that they own the Clio Plaza tank.

The Orgould Avenue tank and the ground storage tank at Pierson and Elms Road remain out of service.

The CRN ground storage tank was inspected in 2007 by Dixon and the tank was found to be in good condition. Some minor access hatch repair was recommended.

An adequate air-gap has been provided on the CRS ground storage tank between the terminus of the tank overflow and top of the catch basin drain's impoundment.

The 2-Mgal hydro-pillar at Houran Street houses repair equipment and a portable stand-by power generator at its base. The water level in the tank is controlled by an altitude valve located at its base.   This tank will be due for a routine inspection within the next few years.

The altitude valves at each of the Henderson Road ground storage tanks were replaced with pressure/flow control valves.  The new valves along with the SCADA system upgrades monitor and control flow to each tank.

The Clio Road and Noble Street tanks were recently inspected.  Both tanks were in good structural condition.   The Clio Road tank's exterior and dry interior; however, needs to be repainted.

## Distribution

### Pumping Station   Center Road North (CRN) Booster Pump Station

Location: Center Road and Maple Avenue

Function: Boosts pressures to SW portion of the service area

| Pump number | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Year installed | 1990 | 1990 | 1990 | 1990 |
| +Type | Hor Centr | Hor Centr | Hor Centr | Hor Centr |
| Permit Capacity | 6.7 MGD | 6.7 MGD | 6.7 MGD | 6.7 MGD |
| Permit TDH | | | | |
| Current Capacity | 8.5 MGD | 8.5 MGD | 8.5 MGD | 8.5 MGD |
| +Basis | est. | est. | est. | est. |
| Current TDH | 211 ft | 211 ft | 211 ft | 211 ft |
| HP | 350 | 350 | 350 | 350 |
| Last Complete Inspection | 2007 | 2004 | 2004 | 2004 |
| Last Efficiency Test | ? | ? | ? | ? |

Comments:

The CRN station's main purpose is to pump water to west Grand Blanc Twp and to locations further west in Genesee County (930 Ft press. district). A new pump station (Center Road South – CRS) was recently constructed and WWSD staff continues to determine the most efficient mode of operation between both Center Road pumping stations. Pumpage from each station changes from summer to winter.

The permit capacity of each pump at CRN was 6.7 MGD, however, these pumps are capable of pumping approximately 8.5 – 9.0 MGD. Pumps #1 and #2 are controlled by a variable frequency drive (VFD). Pumps #3 and #4 are constant speed pumps.

Pump #1 or pump #2 operate constantly and are controlled by the water level in the Saginaw Street elevated tank in Grand Blanc Township. WWSD's SCADA system can switch the control point for the CRN station to the elevated tank at Beecher Road. Pumps #3 and #4 serve as back-up pumps for the CRN station.

Pumpage from CRN has decreased with the commissioning of the Henderson Road and the Center Road South (CRS) pump stations.

2002-2005:

Work was completed on upgrading the switch gear for Pumps #3 and #4. An automatic transfer switch was also installed and has improved the reliability of secondary power source at this location. The gas chlorine feed system was replaced with a Accu-Tab Series 30000 tablet feeder by PPG. The system's maximum delivery is 1 PPM chlorine at 21 MGD. The minimum delivery is 0.5 PPM at 15 MGD. The chlorine feed system was provided for emergency use only.

2005-2011:

New VFDs were installed on pumps #1 and #2 in 2008. Also, Pump #1 was re-built in 2007 and included replacement of the pump bearings, volute, motor bindings, etc.

Auxiliary Power

| | |
|---|---|
| +Power Type | 2nd Substation, Stand-by Power Co. Generator |
| +Fuel Type | NA |
| Capacity | NA |
| Starting Frequency | NA |
| Load Testing Frequency | NA |

Total Pump Capacity __34.0__ mgd

Firm Pump Capacity __25.5__ mgd

Aux. Power Capacity __?__ mgd

Max Day Demand This Location __10.5*__ mgd

Avg Day Demand This Location __5.1*__ mgd

Firm Pump Capacity/Max Day __>100 *__%

Aux Power Capacity/Avg Day __*__

Comments:

* Water demands on CRN has decreased further with increasing use of the CRS station. The Henderson Road pump station and North Loop also continues to provide water to the western portion of the county with an average pumping rate between 3 and 6 MGD.

  Water pumpage data specific to each pump station is available since early 2008 with the recent SCADA system upgrades. Pumpage has varied from station to station during this time as the role of operation between each station is adjusted in order to increase the efficiency of operation.

## Pumping Station   Noble Street Booster Pump Station

### Location: South end of Noble Street, Flint Township

### Function: Allows for full use of the 4.0 MGAL Standpipe

| Pump number | 1 | 2 |
|---|---|---|
| Year installed | 2001 | 2001 |
| +Type | Hor Centr | Hor Centr |
| Permit Capacity | 1.0 MGD | 1.0 MGD |
| Permit TDH | 140 FT | 140 FT |
| Current Capacity | 1.08 MGD | 1.08 MGD |
| +Basis | est. | est. |
| Current TDH | | |
| HP | 40 | 40 |
| Last Complete Inspection | 2011* | 2011* |
| Last Efficiency Test | 2001 | 2001 |

Comments:

The Noble Street pumping station was constructed in 2001 and allows for full use
of the adjacent 4.0 MGAL standpipe. The pump station increases the hydraulic grade
line to the Beecher Road tank and reduces the peak demands.  A flow-control valve
is used to control the flow into and from the standpipe.

The pumps and appurtenances are greased and maintained several times per year.
The pumps and appurtenances appear to be in good condition and overall
housekeeping is acceptable.

* The Noble Street standpipe was inspected by Dixon in 2011 and components of the
pump station (piping, pump/motor) were visually inspected and found to be in good
condition.


Total Pump Capacity   2.16      mgd

Firm Pump Capacity  1.08       mgd

Aux. Power Capacity  NA        mgd

Max Day Demand This Location   1.13  mgd  (2010)

Avg Day Demand This Location   0.32 mgd

Firm Pump Capacity/Max Day    96%

Aux Power Capacity/Avg Day    NA

Comments:

The SCADA system continues to provide average and max day pumpage data from this
pump station.  Some of the existing SCADA components are being replaced with newer
equipment.



## Pumping Station    Houran Street Pumping Station

### Location: Houran Street near Beecher Road


| Function: | This station operates as a peaking facility during high demand periods. | | | | |
|---|---|---|---|---|---|
| Pump number | 1 | 2 | 3 | 4 | 5 |
| Year installed | 1970 | 1970 | 1970 | 1970 | 1970 |
| +Type | Hor Centr | Hor Centr | Hor Centr | Hor Centr | Hor Centr |
| Permit Capacity | 3.0 MGD | 2.0 MGD | 2.0 MGD | 3.0 MGD | 3.0 MGD |
| Current Capacity | 3.0 MGD | 2.0 MGD | 2.0 MGD | 3.0 MGD | 3.0 MGD |
| +Basis | est. | est. | est. | est. | est. |
| Current TDH | 200 ft | 225 ft | 225 ft | 225 ft | 225 ft |
| HP | 125 | 125 | 125 | 150 | 150 |
| Complete Insp. | 2004 | 2004 | 2004 | 2004 | 2004 |
| Last Efficiency Test | ? | ? | ? | ? | ? |

Comments:

The Houran Street station's main mode of operation is to pump from the existing ground storage storage tanks to the new 2-Mgal elevated tank. The elevated tank basically "floats" on the system. This mode of operation utilizes Pumps 3-5 and is controlled manually from the SCADA system. The station can also pump water directly to the distribution system through Pumps 1-2. Water can also be obtained through the Donaldson Road pit from the city of Flint; however, this connection is not routinely used. The station can also provide the city of Flint an emergency supply of water through the Donaldson Road connection.

During low demand periods, water re-fills the ground storage reservoirs immediately upstream of the station through a 12-inch main from the county. The station, including the ground storage reservoirs, are typically taken out of service during the winter months.

Overall housekeeping at this facility remains acceptable. All five pumps are maintained including routine greasing of the pump and motor bearings.  Security cameras have been provided at the pump station.


Auxiliary Power  None


Total Pump Capacity  13.0    mgd

Firm Pump Capacity  10.0     mgd

Max Day Demand This Location     mgd   VARIES

Avg Day Demand This Location     mgd   VARIES   (approximately 3.0 MGD)

Firm Pump Capacity/Max Day     ? %

Aux Power Capacity/Avg Day     ? %


## Pumping Station    Henderson Road Booster Pump Station

### Location: Henderson Road

### Function: Boosts pressures to feed North Loop

| Pump number | 1 | 2 | 3 |
|---|---|---|---|
| Year installed | 2004 | 2004 | 2004 |
| +Type | Hor Centr | Hor Centr | Hor Centr |
| Permit Capacity | 8.0 MGD | 8.0 MGD | 14.0 MGD |
| Permit TDH | 255 ft | 255 ft | 255 ft |
| Current Capacity | 8.0 MGD | 8.0 MGD | 14.0 MGD |
| +Basis | | | |
| Current TDH | 255 ft | 255 ft | 255 ft |
| HP | 500 | 500 | 800 |
| Last Complete Inspection | | | |
| Last Efficiency Test | | | |

Comments:

The Henderson Road pumping station was constructed in 2004 and has been in operation since April 2006.  The station's average day pumpage has ranged between 3 and 6 MGD.  Pumps #1 and #2 are equipped with a VFD.

The station has operated on only one pump to maintain system demand. It has not been necessary to operate the larger pump.

Auxiliary Power

| ÷Power Type | 1000 kW minimum rating engine generator |
|---|---|
| ÷Fuel Type | #2 Diesel |
| Capacity | Sized for 24 HR operation of engine under full load |
| Starting Frequency | weekly, auto switch-over upon power loss |
| Load Testing Frequency | 1/yr |

The auxiliary power generator ran under load for several hours in 2010 during an interruption in electrical power.

| Total Pump Capacity | 30.0 | mgd | |
|---|---|---|---|
| Firm Pump Capacity | 16.0 | mgd | |
| Aux. Power Capacity | ? | mgd | |
| Max Day Demand This Location | 7.40 mgd | | (2010) |
| Avg Day Demand This Location | 3.9 mgd | | |
| Firm Pump Capacity/Max Day | >100% | | |
| Aux Power Capacity/Avg Day | >100% | | |

Comments:

The Henderson Road pumping station is equipped with gas chlorination for emergency use only. The feed system consists of two-150 pound cylinders on a direct read scale, two Wallace and Tiernan vacuum operated solution feed pumps with a maximum capacity of 500 pounds per day, and a vacuum regulator with automatic switch-over. Additional application points are provided at the reservoir inlets. A Wallace & Tiernan two point chlorine gas leak detector and gas sensor with a sensitivity to 1.0 part per billion is provided.

An automatic chlorine residual analyzer monitors chlorine residual on the discharge side of the pump station at all times.

WWSD staff should consider operating the emergency chlorination system several times per year to verify that the equipment operates properly and that WWSD staff maintain familiarity with the operating procedure.

**Pumping Station   Vassar Road Booster Pump Station**

Location: Vassar Road, Grand Blanc Township

Function: Provides additional flows and pressure in SE GBL Twp.

| Pump number | 1 | 2 | 3 |
|---|---|---|---|
| Year installed | 2001 | 2001 | 2005 |
| ÷Type | Hor Centr | Hor Centr | Hor Centr |
| Permit Capacity | 1.4 MGD | 0.7 MGD | 1.4 MGD |
| Permit TDH | 275 ft | 275 ft | 275 ft |

| Current Capacity | 1.4 MGD | 0.7 MGD | 1.4 MGD |
|---|---|---|---|
| +Basis | est. | est. | est. |
| Current TDH | | | |
| HP | 125 | 125 | 125 |
| Last Complete Inspection | New in 01 | New in 01 | New in 05 |
| Last Efficiency Test | 2001 | 2001 | 2005 |

Comments:

The Vassar Road pumping station was constructed in 2002. This station pumps water from the Vassar Road ground storage tank located adjacent to the pump station to the Baldwin Road elevated tank (1,125 Ft press district). The station has improved flows and pressure to the SE portion of Grand Blanc Township. The water level in the tank is controlled by an altitude valve and flow from the station is controlled by a flow control valve and an upstream pressure sustaining valve. A third pump was added to the station in 2005. All three pumps are VFD controlled. Security cameras were recently installed.

Total Pump Capacity   3.5   mgd

Firm Pump Capacity   2.1   mgd

Aux. Power Capacity   NA   mgd

Max Day Demand This Location   NA   mgd

Avg Day Demand This Location   NA   mgd

Firm Pump Capacity/Max Day   NA

Aux Power Capacity/Avg Day   NA

Comments:   A portable stand-by power generator is provided and consists of a 206 KVA trailer mounted generator that utilizes diesel fuel. The generator has automatic switch-over and lightning surge protection. The generator starts automatically on a weekly basis under no load.


## Pumping Station   Center Road South (CRS) Booster Pump Station

### Location: Center Road and Maple Avenue

### Function: Boosts pressures to east portion of Grand Blanc Twp

| Pump number | 1 | 2 | 3 |
|---|---|---|---|
| Year installed | 2006 | 2006 | 2006 |
| +Type | Hor Centr | Hor Centr | Hor Centr |
| Permit Capacity | 6.0 MGD | 6.0 MGD | 6.0 MGD |
| Permit TDH | | | |
| Current Capacity | 6.0 MGD | 6.0 MGD | 6.0 MGD |
| +Basis | est. | est. | est. |
| Current TDH | | | |
| HP | 400 | 400 | 400 |
| Last Complete Inspection | 2006 | 2006 | 2006 |
| Last Efficiency Test | 2006 | 2006 | 2006 |

Page 15

Comments:

The current capacity of each pump is approximately 6.0 MGD.  The combined capacity of the station with 2 pumps operating is approximately 11 MGD. All three pumps are VFD controlled.

The CRS station pumps water from the adjacent 6.3 MGAL ground storage tank and distributes it the eastern portion of Grand Blanc Township - Saginaw tank (970 Ft press. district). The ground storage tank is equipped with an altitude valve to control the tank level. A flow control valve is also provided in order to control the upstream pressure in the 30-inch transmission main along Center Road. System status is monitored and controlled at the WWSD administrative office via WWSD's SCADA system.

The station is fenced and security cameras are provided.

Auxiliary Power

| | |
|---|---|
| +Power Type | 1040 KW on-site generator |
| +Fuel Type | Diesel |
| Capacity | Operates 2 pumps |
| Starting Frequency | 1/week under Load |
| Load Testing Frequency | weekly |

Total Pump Capacity  17.0   mgd

Firm Pump Capacity  11.0   mgd

Aux. Power Capacity  11.0   mgd

Max Day Demand This Location   10.1 mgd (2008)

Avg Day Demand This Location   1.66 mgd

Firm Pump Capacity/Max Day   >100 %

Aux Power Capacity/Avg Day   >100 %

The most recent ADD has increased to between 2 and 3 MGD as WWSD staff continue to balance the usage between this station and the CRN station.  The MDD in 2009 and 2010 ranged between 5 and 6 MGD.

### Pumping Station   Orgould Avenue Pumping

Location: Orgould Avenue north of Pierson Road

Function: None

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Pump number | | | | |
| Year installed | 1974 | 1974 | 1974 | 1974 |
| +Type | Hor Centr | Hor Centr | Hor Centr | Hor Centr |
| Permit Capacity | | | | |
| Permit TDH | | | | |
| Current Capacity | 1050 gpm | 1050 gpm | 1000 | 1000 gpm |
| +Basis | est. | est. | est. | est. |
| Current TDH | 200 ft | 200 ft | 200 ft | 200 ft |
| HP | 100 | 100 | 100 | 100 |
| Last Complete Insp. | NA | NA | NA | NA |

15

Page 16

Last Efficiency Test        NA          NA          NA          NA

Comments:

This pumping station remains out of service and there are no plans to bring this
facility back into operation.  All of the pumps are electrically locked out and
the dead piping between the station and the discharge piping to the distribution
system was cut and plugged.


## Pumping Station    Clio Booster Pumping Station

### Location: Clio Road north of Coldwater Road


### Function:  None

| | | |
|---|---|---|
| Pump number | 1 | 2 |
| Year installed | 1984 | 1984 |
| +Type | Hor Centr | Hor Centr |
| Permit Capacity | | |
| Permit TDH | | |
| Current Capacity | 600 gpm | 600 gpm |
| +Basis | est. | est. |
| Current TDH | 92 ft | 92 ft |
| HP | 20 | 20 |
| Last Complete Insp. | Not Rec. | Not Rec. |
| Last Efficiency Test | Not Rec. | Not Rec. |

Comments:

This pumping station remains out of service and there are no plans to bring this
facility back into operation.  Both pumps are electrically locked out and the dead
piping between the station and the active part of the distribution system was cut
and plugged.


## Pumping Station    Van Slyke Booster Pumping Station

### Location: Van Slyke Road north of Bristol Road


### Function:  None

| | | |
|---|---|---|
| Pump number | 1 | 2 |
| Year installed | 1984 | 1984 |
| +Type | Hor Centr | Hor Centr |
| Permit Capacity | | |
| Permit TDH | | |
| Current Capacity | 600 gpm | 600 gpm |
| +Basis | est. | est. |
| Current TDH | 92 ft | 92 ft |
| HP | 30 | 30 |
| Last Complete Insp. | Not Rec. | Not Rec. |
| Last Efficiency Test | Not Rec | Not Rec. |

16

Comments:

This pumping station remains out of service and there are no plans to bring this facility back into operation.  The pumps have been electrically locked out. System pressures can be monitored from this location.

## Pumping Station    City of Flushing Pumping Station

### Location: NE int. of Pierson & Elms Rds.

### Function: PRV and metering station for city of Flushing

| | | |
|---|---|---|
| Pump number | 1 | 2 |
| Year installed | ? | ? |
| +Type | Hor Centr | Hor Centr |
| Permit Capacity | | |
| Permit TDH | | |
| Current Capacity | 700 gpm | 1050 gpm |
| +Basis | est. | est. |
| Current TDH | ? ft | ? ft |
| HP | 40 | 50 |
| Last Complete Insp. | Not rec. | Not rec. |
| Last Efficiency Test | Not rec. | Not rec. |

Comments:

This pumping station originally took suction from the adjacent 0.5 Mgal reservoir and was designed to fill the city of Flushing's elevated tank. The facility was modified when Center Road went on line and now acts as a pressure reducing station. One of three original pumps was removed and replaced with a pressure reducing valve that serves the city of Flushing. The existing pumps are electrically locked out.  Power is supplied to the building for lighting and heat.

## Interconnections with Other Supplies

Is water purchased from other supplies? Yes

If yes, list WSSN number/s:    #2310

| Location | Main Size | Est. Cap. | Metered? |
|---|---|---|---|
| Henderson Rd.** | 36-inch | 30.0 MGD | Yes |
| S. Genesee Pit** | 30-inch | 16.5 MGD | Yes |
| Oak & Potter** | 12-inch | 8.15 MGD | 10-inch |
| Irish & Potter** | 20-inch | 4.46 MGD | 6-inch |
| Belsay & Potter** | 12-inch | 4.46 MGD | 6-inch |
| M-15 & Potter** | 12-inch | 8.15 MGD | 10-inch |
| N. Genesee Pit ** | 12-inch | Not used | 10-inch |
| Francis Rd. | 12-inch | | 2-way |
| Donaldson St* | 12-inch | * | Yes |
| Pierson & Clio | Not used | Not used | Na |
| Carpenter Rd | Not used | Not used | Na |

17

Comments:

* Capacity varies on pressure available from Flint and whether the pit is
  open.

** Direct connection to the Flint 72-inch main upstream of the city of Flint.

The connections upstream of the City of Flint are directly off Flint's 72-inch
supply line. Genesee County pays Flint $125,000 plus the current Detroit rate each
month to purchase water. The estimated capacity of each connection is based on a
Detroit line pressure of 90 psi at the south Genesee pit and 55 psi at the
Henderson Road pit.

Water can also be served to the county through Flint's distribution system from
Donaldson Street through the Houran St. Pumping Station. Genesee County no longer
uses this connection for routine service.  This connection could be used in a
water system emergency.


Total Flow into the Genesee County water system =  Henderson Rd
                                                +  S. Genesee Pit
                                                +  Irish & Potter
                                                +  Belsay & Potter
                                                +  M-15 & Potter
                                                +  Oak & Potter


The majority of flow into Genesee County is through the Henderson Rd pit and the
South Genesee pit.  Four other metered connections off the 72-inch transmission
main along Potter Road provide water service to portions of Davison Township, the
City of Burton, and Richfield Township.

Flow through the Francis Road pit is sold to Genesee Township and is not a direct
connection off the 72-inch transmission main (constitutes a portion of the
Henderson Rd flow).

Are there areas where fire flows cannot be maintained? <u>See comment</u>

Comment:  Less than 1000 gpm fire flow was noted in an existing subdivision in Mundy Twp in vicinity of Linden and Hill Road (Church of God extension). The problem was identified as a partially closed valve at the subdivision entrance.


Which, if any, of the above listed areas has the supply prioritized for main replacement, upgrading or looping?  Also, if a definite schedule for capital improvement has been established, list the proposed completion date.

| Location | Est. Completion Date |
|---|---|
| Bristol Rd. - completed | Completed |
| Linden Rd. - coor. with local twp. | Not completed |
| Pierson Rd. - coor. with local twp. | Not completed |
| Elms & Lennon looping project | Completed |
| Lennon & Dye Rd | Completed |

## General Distribution System Comments:

Consoer Townsend Evirodyne Engineers (CTE) completed the North Loop – Phase III study in 2000 along with a water master plan. Since 2000, the North Loop transmission main project was completed along with completion of the Henderson Road, CRS pumping station, and the Southeast Loop.

The study was updated in 2005 and the updated report is noted as "**Appendix C Update of Final Report North Loop – Phase III Study**".  Given the number of projects that were completed since 2000, the update was performed to reflect current water system conditions and to identify additional future needs.  The 2005 update evaluated alternatives to supply Grand Blanc Township via the new CRS pumping station. The CRN pumping station would be dedicated to supply the service areas further west into the county.  The update also identified other major projects including: the Southeast loop, Thompson Road corridor, and the Coldwater Road transmission main.

The hydraulic model used in the 2005 study was updated in 2011 to revise pressure district boundaries as needed  The model also evaluated the need for further pressure reducing valves and additional water system improvements. An updated water system Master Plan was prepared; however, a discussion (conclusions/recommendations) based on the updated model has not been provided. A new water system study and master plan is expected to be performed in 2015.

Several of the existing meter pits between Genesee County and the City of Flint including Orgould Ave, Clio Rd, and VanSlyke Rd, have been decommissioned. The meter pits along with the pumping, storage facilities have been electrically locked out, and the majority of dead piping eliminated at the facilities. These facilities should be razed if there are no long term plans to re-utilize them.

The county continues to charge its retail customers $35.00 per hydrant to maintain the appurtenance and to conduct routine flushing. Flint Township and Flushing Township  continue to flush and winterize hydrants in order to avoid the $35.00 charge per hydrant.  These activities are conducted by the local fire department within each township. The WWSD continues to review hydrant operation each year with each fire department.  Finally, the WWSD staff complete any hydrant repairs.

## Distribution Appurtenances

### Hydrants

Number of hydrants 3,875
Number without auxiliary shut-off valves      *
Number that are self-draining    *
Number of inoperable hydrants    *

* An exact number of inoperable hydrants cannot be ascertained since this number changes on a weekly basis. WWSD staff repair broken hydrants upon discovery (typ 1-2 per week). WWSD staff obtains authorization from the two townships that maintain their own hydrants prior to completing any repairs. Hydrant inspections are completed each fall and work orders are prepared and completed on any inoperable hydrants that are discovered.

Frequency of hydrant inspection:      1/yr (fall)

Inspection staff: WWSD operators

Are there areas where additional hydrants are needed?  No

Hydrant location system? Yes         Accurate?  Yes

Are hydrants color-coded for capacity? Yes, by main size

Has this information been provided to the fire department?   Yes

Frequency and seasons of hydrant flushing?  1/yr  Fall

Purpose of flushing?     aesthetics, hydrant operation

Is the public notified prior to flushing?  No

Does flushing follow a specific format?    Completed by township

Is the volume of water used during flushing estimated? Starting, est of 150cu.ft/hyd

Is a record maintained of hydrant activities? Yes

Comments:

The WWSD maintains a list of hydrant information. The list provides information for each hydrant including: location, color coding, winterizing,  work order information, etc.  Hydrant records are also maintained in a work-order database by attaching completed work orders as a layer in WWSD's GIS records. Also, all auxiliary shut-off valves are depicted by exact location and stored in a 3-ring binder.

The number of hydrants and valves noted in the 2011 WSR is less than the number depicted in the 2008 WSR. WWSD staff confirmed that the 2008 count was incorrect since it included some of the hydrants and valves from the wholesale customers.

### Valves  (excluding hydrant shut-offs)

Number of valves   3,903
Number of inoperable valves   _repaired or replaced as soon as possible_

Are there areas where additional valves are needed?   Yes

- Irish Rd north of Davison

Valve location system?   Yes, valve log         Accurate?   Yes

Valve Turning Frequencies:  See comments

Records maintained? Yes

Comments:

The WWSD has made some progress towards initiating a valve turning program. Valves along the South Loop transmission line (31 valves) have been exercised. Valve exercising is also performed on valves located at or near water system projects. Valve exercising is also prioritized in areas experiencing more frequent watermain breaks.

A valve log book is also in place that contains valve records. Valve locations are depicted by witness points and are entered into the work-order database. All valve records are also entered into GIS.

## Customer and Service Information

Number of service connections   20,739 retail accounts
                                 44,943 total accounts(retail & wholesale)

Number of metered service connections same

Identify service line materials and estimate percentages:

| | |
|---|---|
| Copper | 100% |
| PVC | None |
| Gal | None |
| Lead | None |

**Meter Change-Out Status:**

Approximately 95% of the existing compound meters were replaced with new turbine meters at all industrial and mobile home park accounts. A testing program remains in place for these new meters.  The testing program is contracted out to a third party (Jim Taylor of Rio-MI Meter).

A small residential area is metered by older Neptune meters that will need to be changed out. The WWSD does not have a change-out program in place for residential accounts. Residential meters are replaced on an "as needed" basis.

WWSD has instituted a pilot radio read program and has upgraded to radio read technology for large customers. The WWSD continues to encourage its retail customers to upgrade to radio read technology for commercial and residential accounts; however this is has not proceeded. The WWSD continues to promote this upgrade with the individual townships since the county wishes to switch from quarterly to monthly billing.

<u>Pumpage Distribution</u>

| | |
|---|---|
| % Residential | 75% |
| % Industrial & Commercial | 25% |

## System Growth - Number of customers

| | Wholesale | Retail | Total |
|---|---|---|---|
| 1998 - | 18,584 | 13,270 | 31,584 |
| 2003 - | 21,609 | 17,265 | 38,874 |
| 2005 - | 23,263 | 18,881 | 42,144 |
| 2006 - | 24,889 | 20,092 | 44,981 |
| 2007 - | 24,726 | 20,621 | 45,347 |
| 2008 - | TBD | TBD | TBD |
| 2009 - | TBD | TBD | TBD |
| 2010 - | TBD | TBD | TBD |

# PROGRAMS AND PLANS

## Cross Connection Program

Ordinance No. <u>73-1</u>          Date <u>03/01/73</u>

Approved Program? <u>Yes</u>  Date <u>07/19/73</u>

Staff assigned to program <u>Hydro-Design, Inc (HDI)</u>

Is Annual Cross Connection Report required? <u>Yes</u>

Was previous year's annual report received? <u>Yes</u>          Date <u>2/18/11</u>

Was previous year's annual report acceptable? <u>Yes</u>

Inspection Status: <u>Satisfactory</u>

Device Testing Frequency: <u>Adequate</u>

Record Keeping: <u>Inspection forms are in place for each account</u>

Comments:

HDI continues to perform the routine inspections for Genesee County and has maintained adequate implementation of their cross connection control program (CCCP). HDI identified 3400 low hazard accounts in 2010 and determined that approximately 680 of these accounts need to be reinspected on an annual basis. 80 high hazard inspections were required in 2010 and 92 inspections were completed. HDI met all re-inspection requirements during the 2008-2010 time period.

Device testing is also being verified as required (approx. 1200 testable devices). Dave Cardinal is the operator from HDI who is responsible for implementing Genesee County's CCCP. Genesee County continues to contract with HDI for CCCP implementation.

## Annual Pumpage Reports

Is Annual Pumpage Report required?  <u>Yes</u>

Was previous year's annual report received? <u>Yes</u>          Date <u>4/01/2011</u>

Comments:

The annual pumpage report is based on the county's total water purchased from the city of Flint. This amount is slightly higher than the total pumpage obtained from SCADA (compiled in the MOR)since a portion of the county's service area is upstream of the Center Road pump station and this usage is not metered through any of the pumping stations.

## Monthly Operation Reports

Are Monthly Operation Reports required?     Yes

Genesee County's monthly operation report (MOR) format was revised in 2008 to include pumpage data from each of the main pumping stations and storage facilities. Bacteriological sample results and chlorine residuals are also included in the report.

Pumpage data from the Vassar Road and Fenton Road pump stations are not included in the MOR.  Pumpage data from each of these stations would further help in determining the distribution of water demand in the southeast portion of Genesee County's service area.

## Contingency Plan    Emergency Response Plan (ERP)

Date of most recent plan _2008_          Acceptable? ERP needed

Filed where? GCDC *

Comments:

Genesee County's water system contingency plan was updated in 2008.

* Genesee County's most recent water system contingency plan (2008 update) is available only at the WWSD's administrative office due to security purposes. The 2008 plan contains all of essential elements required in a water system contingency plan and meets our requirements for use in the event of typical water related emergencies including; large main breaks, pump station failures, loss of water service (limited areas), power outages, contamination, etc. The 2008 plan; however, needs to be updated into an Emergency Response Plan.

The WWSD; however, has yet to fully address the issue of reliability in the event of a significant failure of the 72-inch transmission main. Genesee County continues to pursue their goal of achieving long term reliability through establishment of the Karegnondi Water Authority (Lapeer County, city of Flint). The authority continues to work with Lapeer and Genesee County communities towards committing to the construction a new water treatment plant with raw water piping from Lake Huron.

Completion of the Karegnondi project (3-5 years out) is an acceptable long-term solution for reliability; however, Genesee County has not fully resolved their short-term solution for source reliability.  Two short-term options include utilizing Flint's stand-by WTP for emergency stand-by service or establishing a system of back-up wells.

Our most recent discussion indicates that Genesee County working with the city of Flint towards utilizing Flint's stand-by WTP for short-term reliability. The county has proposed an amendment to their water service contract with Flint to purchase 5.4 MGD of water from the Flint WTP during an emergency.  Details concerning the conveyance of the emergency supply of water from Flint to the county's transmission system are not identified in the proposed contract amendment.

## General Plan

Date of most recent plan  2007        Acceptable?  Yes

Filed where? MDEQ  & GCDC

Comments:
A copy of Genesee County's transmission main plan (2007 update) has been provided to the MDEQ. The transmission main plan shows the size and location of all 12-inch transmission mains and larger, pumping stations, storage facilities, meter pits, and pressure districts. Genesee County also maintains updated distribution system records in GIS. Smaller areas of the distribution system including hydrants, valves, and watermains can be printed from GIS for daily use as needed.

## Reliability Study

Date of most recent study      2011      Acceptable? See comment

Filed where? MDEQ & GCDC

Comments:

Genesee County utilized CTE to prepare the North Loop-Phase III study and to make subsequent updates.  The original study conducted in 2000 was updated in 2005 and was noted as the addendum or "Appendix C of the North Loop-Phase III Study".  The addendum constitutes an acceptable update to Genesee County's water system reliability study.

The hydraulic model used in the 2005 study was updated in 2011 to revise pressure district boundaries as needed  The model also evaluated the need for further pressure reducing valves and transmission system improvements. An updated Master Plan (map), based upon the revised model, was provided to us. A discussion (conclusion/recommendations) needs to be provided with the updated Master Plan. A new water system study and master plan is expected to be conducted in 2015.

## Bacteriological Sample Site Plan

Date of approved plan   2/15/2008

Are samples still being collected in accordance with the plan?     Yes

Comments:

The WWSD completed the most recent revision to the sample site plan in February 2008. WWSD's retail service area population remains above 70,500 thus, a minimum of 80 samples need to be collected from the distribution system on a monthly basis. WWSD's most recent sample site plan reflects the updated minimum monitoring requirement.

## Lead & Copper Program

The WWSD continues to implement their lead and copper program adequately. Both action levels were met in all of the applicable rounds of lead and copper monitoring with the most recent round of monitoring being completed during the summer of 2011.  The next round of samples will need to be collected during 2014 and will include 14 samples for lead and copper.  Water quality parameter monitoring also needs to continue every six months.

## Conclusions and Recommendations

In general, our survey covers the major aspects of a water supply including: stand-by facilities, distribution, source capacity, and storage. Each of the above categories is evaluated on the basis of adequacy, maintenance, reliability, and operation. The evaluation also includes a check on the status of operator certification and the cross connection control program. Finally, water quality and the utility's monitoring programs are reviewed.

Our evaluation reveals that the Genesee County Water System continues to maintain an overall "**SATISFACTORY**" rating. Genesee County continues to maintain a proactive operation and maintenance program as well as continuing with capital improvements. Progress; however, remains slow in establishing adequate source reliability. The county's water system remains "**MARGINAL**" in regard to source reliability and continues to be vulnerable to an interruption in supply. Additional comments are included in the Contingency Plan/Source Reliability section.

As noted above, since the 2008 survey further water system improvements have been completed and/or are proceeding and include:

- Installed the Fenton Road transmission main

- Replaced deteriorated piping along Florine Avenue.

- Completed water system SCADA improvements.

These issues along with other topics including existing facilities, reliability, operation, and maintenance are discussed below in more detail:

### Water System Viability

The Genesee County Drain Commissioner, Division of Waste and Water Services (WWS) currently serve a population of nearly 153,000 through a countywide network of transmission and distribution mains. Additional booster pumping stations and storage facilities have been provided to enhance service. The WWS currently utilizes 23 full-time certified employees for water utility operations. The operator in charge (OIC), Tim Davidek, holds an S-1 license and plays an active role in distribution system operation and maintenance, thus, WWS complies with the operator certification requirement. Also, as part of compliance with the operator certification requirement, Richard Bysko, remains the designated back-up operator.

WWS continues to promote operator certification. Many of the operators have obtained either their S-3 or S-4 licenses and some are pursuing an S-2 license. WWS continues to

require new employees to obtain distribution certification to be eligible for further advancement. WWS continues to maintain the safety and training officer position to assist and promote an adequate level of operator certification. Certified operators help to protect the County's investment in the water system and to meet the requirements of the Safe Drinking Water Act and we encourage the County to continue to promote operator certification.

## Cross Connection Control

Hydro-Design, Inc. (HDI) continues to implement WWS's Cross Connection Control Program (CCCP). Approximately 3500 accounts remain eligible for a routine inspection and this number has held steady since 2008.

Previous site visits with HDI and WWS staff continue to show that adequate cross connection control records are in place and device testing is being verified. Also, our review and discussion of WWS's most recent cross connection reports confirms adequate implementation of the program.

Finally, WWS continues to maintain a contract for service with HDI. We continue to support WWS's commitment towards maintaining an adequate CCCP.

## System Storage

WWS currently has 13 storage facilities available providing approximately 46 million gallons of storage.

The existing Center Road North (CRN) 5 MGAL ground storage tank was inspected by Dixon Engineers, Inc. in 2007 and the tank was found to be in good condition. Minor repairs to the access hatch repair were recommended.

Next, our inspection of the Center Road South (CRS) ground level storage tank revealed that the cross connection between the tank overflow and the sewer catch basin has been corrected. The elevation of the tank overflow opening was increased above the catch basin's containment wall such that an adequate air-gap was achieved.

Next, the Clio Road elevated tank and the Noble Street standpipe were recently inspected. Based upon the inspection reports, the Noble Street tank is in good condition. The Clio Road tank was in good structural condition; however, the tank's exterior and dry interior need to be repainted. We recommend that WWS proceed with this work

Finally, the 2-Mgal hyro-pillar at Houran Street will be due for a routine inspection within the next several years.

## Pumping Stations

WWS has ten booster pumping stations available for use. Six of these stations (CRN, CRS, Henderson Road, Houran Street, Vassar Road, and Noble Street) are operated on a routine basis. The remaining stations, Orgould, Clio, Van Slyke, and City of Flushing are either out of service or function as a pressure reducing/monitoring station.

The Henderson Road pump station has been in operation since 2006 and the station pumps between 3 and 6 MGD of water from the 72-inch transmission main through the County's new North Loop. The station has effectively reduced the demand on the Center Road pump station and the amount of water that needs to be pumped through the County's south system.

Next, the CRS pump station has been in operation since 2007 and was designed to provide additional capacity and pressure to the eastern portion of Grand Blanc Township. The CRN station continues to provide adequate flows and pressure to the western portion of Grand Blanc Township and to locations further west in Genesee County. The most recent monthly operation reports show that the CRS station's use has been increasing (currently pumping between 2.0 and 3.0 MGD).

WWS continues to refine the mode of operation between the CRN and CRS stations to determining the most efficient operation. It would also be worthwhile to record water pumped through the Vassar Road and Fenton Road (Grand Blanc Township) since these stations and their associated storage facilities also play a role in the level of service to southern Genesee County. This information can be added to the monthly operation report.

Next, based upon our inspection, preventative maintenance activities and overall housekeeping is adequate at all of the pump stations. Based upon our discussion, additional improvements are currently underway with the SCADA system at each of the pumping stations.

Finally, WWS staff should consider operating the emergency chlorination equipment (gas chlorination at Henderson Road and erosion feeder at CRN) several times per year to verify that the equipment operates properly. This practice will also allow WWS staff to maintain familiarity with the chemical feed equipment and its operating procedure.

## Transmission/Distribution

Genesee County's water system consists of an extensive county-wide network of transmission and distribution system piping. The majority of this piping is relatively new and is in good condition. Since the 2008 survey, the Fenton Road transmission main was installed and a section of deteriorated piping along Florine Avenue was replaced. There are other areas of existing cast-iron mains which have not been replaced and have had a history of more frequent main breaks. Specific areas are listed below:

1. Dalton Subdivision
2. Portions of Pierson and Linden Roads

It is our understanding that replacement of the watermains in Dalton Subdivision will be completed as part of a future Drinking Water Revolving Loan Fund project. Although the remaining areas do not represent a significant percentage of the system, plans should be made to replace these mains as part of the County's master plan or a capital improvements program.

Next, Genesee County's hydraulic model (from the North Loop Study) was updated in 2011. An updated water system Master Plan, based upon the updated model, was prepared and an electronic copy of the plan was provided to us. A general discussion (conclusions & recommendations); however, was not provided with the master plan. An overall discussion that supports the updated master plan needs to be prepared and a copy sent to our office for review.

Finally, it is our understanding that WWS intends to prepare a new water system study and master plan in 2015. We concur with the timing of this objective since the county's water system reliability study will need to be updated at that time. Finally, we encourage the county to works towards completing the projects that are listed in the master plan.

**Operation/Maintenance (O&M)**

WWS continues to maintain an active O&M program. The status of specific O&M programs are discussed in more detail below:

**Hydrants/Flushing**

WWS maintains approximately 3,900 hydrants. This is a decrease in the total number depicted in the 2008 survey (4,700 hydrants). The revised number of hydrants is based on records obtained from WWS's hydrant recordkeeping system (GPS records). The previous quantity was based upon an estimated number of hydrants and it also included some of the wholesale customer's hydrants.

A total number of inoperable hydrants could not be ascertained; however, hydrants are inspected each fall and any inoperable hydrants are repaired or replaced. Hydrant records including; location, color codes, and operational and maintenance history appear to be adequate and these records are maintained in a work-order database.

Next, retail customers continue to pay WWS a $35.00 charge per hydrant on an annual basis for routine maintenance and flushing. Flint and Flushing Townships however, continue to operate and maintain hydrants within their jurisdiction in order to reduce their O&M costs to the County. The township's O&M responsibilities include flushing and

winterizing hydrants and these activities are performed by the local fire departments. WWS continues to provide annual training for fire department staff on hydrant operation and maintenance. WWS needs to continue this type of on-going training as it appears to have improved hydrant operation and maintenance within these townships.

## Valves

WWS maintains approximately 3900 valves. This is a decrease in the total number depicted in the 2008 survey (5,074 valves). The revised number of valvess is based on records obtained from WWS's valve recordkeeping system (GPS records). The previous quantity was based upon an estimated number of valves and it also included some of the wholesale customer's valves

WWS continues to maintain adequate valve records and also continues to work towards establishing a valve-turning program. Transmission main valves along the south loop were exercised since 2008. Valves are also being exercised at and near watermain projects and in areas where main breaks occur. WWS needs to continue working at expanding the valve turning program to include operating valves in critical locations at least once every several years. A review of all valves should be performed and a determination made as to which valves are most critical and the percentage of these valves that can be exercised each year.

## Program Meter Change-Out

WWS has maintained an active meter change-out program for commercial and industrial accounts. Residential meters are replaced on an "as needed" basis, however, only a small percentage of customers (one subdivision) has older meters in need of replacement. We encourage WWS to maintain an active meter change-out program and to replace remaining meters that have reached the end of their useful service life.

WWS has upgraded to radio read technology for most of its large customers; however, expansion of radio read to commercial and residential customers has not proceeded. We encourage WWS to continue to promote the upgrade to radio read technology among its retail customers.

## Monthly Operation Reports (MORs)

WWS continues to report water use through each of its major pumping stations. Chlorine residual monitoring and bacteriological monitoring results are also included in the report. Water usage through the Vassar Road and Fenton Road pumping station should be added to the MOR.

Finally, a discrepancy was noted between water usage depicted in the MOR verses water usage summarized in the annual pumpage report. The total amount of water purchased

reported in the annual pumpage report is slightly higher than the total pumpage obtained from SCADA (reported in the MOR). The discrepancy is due to a portion of the county's service area being upstream of the Center Road pump station. This portion of the county's purchased water is not metered through the SCADA system.

## Bacteriological Monitoring

WWS continues to maintain an excellent sampling history as part of their monthly bacteriological monitoring program. Specifically, eleven samples are collected twice a week from eleven routine sampling locations in accordance to the sample site plan that was revised earlier in 2008. This sampling protocol results in 88 to 110 samples being collected each month and was based on collecting a minimum of 80 samples per month.

The minimum number of required distribution system samples will remain at 80 samples per month. The monitoring requirement is based on a retail service area population of approximately 70,500.

## Emergency Response Plan/Source Reliability

WWS updated their water system contingency plan in 2008 and, for security purposes, the plan is retained at the administrative office. Our review shows that the plan contains all of the critical elements that we require in a water system contingency plan. Although the county's updated contingency plan meets our requirements for use in the event of a water-related emergency, a recent revision to the Administrative Rules of the Michigan Safe Drinking Water Act now requires an Emergency Response Plan (ERP) in place of the contingency plan. The ERP provides an outline to follow in the event of a water related emergency (loss of pressure, contamination, etc.). The ERP is similar to a water system contingency plan; however, the ERP calls for discussion of various types of water utility operational plans that may be utilized during a water related emergency. An ERP template is enclosed and can be used for preparing Genesee County's ERP. We will review the completed ERP during our next routine surveillance visit.

Next, WWS continues to pursue a long-term solution for reliability in the event of a failure of the 72-inch transmission main through establishment of the Karegnondi Water Authority. The authority continues to work with Genesee and Lapeer county communities towards committing to the construction of a new water treatment plant utilizing Lake Huron as its source.

Completion of the Karegnondi project (3 to 5 years out) will provide Genesee County with adequate source reliability; however, Genesee County has not fully resolved their short-term solution for source reliability. Two short-term options include utilizing the city of Flint's stand-by WTP for emergency stand-by operation or establishing a system of back-up wells.

It is our understanding that Genesee County has a proposed amendment (4th Amendment

to 1973 City/County Water Supply Agreement), pending Flint approval, to purchase 5.4 million gallons per day of stand-by capacity from the Flint WTP under emergency conditions. However, there is no further discussion as to how this emergency supply of water will be conveyed to the Genesee County North Transmission system. It is our understanding that additional pumping provisions will be needed. Please confirm this in writing and provide us with an update concerning the proposal. If a contract for stand-by service is established with the city of Flint, please provide us with a schedule in which the plan for stand-by service can be implemented.

## General Plan

Genesee County's water system general plan was updated in 2007. The updated plan shows the location of county's transmission mains (12-inches and larger), pump stations, storage facilites, meter pits, and pressure districts. Smaller areas of the distribution system including hydrants and valves are stored in the county's GIS and are available for use as needed. The transmission system plan along with the electronic records of the distribution piping and appurtenances meet our requirements for having an acceptable water system general plan.

## Lead & Copper Program

WWS has conducted its Lead and Copper program since 1992 and has completed the most recent round of monitoring (June 1, 2011 through September 30, 2011). The next set of 14 samples needs to be collected between June 1, 2014 and September 30, 2014.

The total number of lead and copper monitoring samples (based on triennial monitoring) remains at 14 samples for each round of monitoring. Water quality parameter monitoring (pH, alkalinity, temperature, and phosphate residual) also remains at two sets of samples from six distribution system sites every six months.

## Closing Remarks

The following is a list of items discussed in this report which must be addressed by the County. No priority is implied by the order. Page references are in parentheses.

As always, we are available to meet with you to discuss these concerns and their priority in more detail.

1. Establish adequate stand-by water service for Genesee County. (25,32)

2. Maintain a prioritized valve turning program.  (22,31)

3. Change out any remaining outdated meters and investigate the possibility of upgrading

to radio read technology. (22,23,31)

4. Upgrade areas of distribution system that are in poor condition. (19,20,29,30)

5. Conduct a new water system study and master plan by 2015. (20, 30)

6. Schedule the Clio Road tank for repainting. (8, 28)

7. Operate the stand-by chlorination equipment at the Henderson Road and CRN pump stations several times per year. (13, 29)

# APPENDIX   B-8

GENESEE COUNTY WATER SUPPLY SYSTEM RATES FOR SERVICE FOR
WATER BILLS RENDERED ON AND AFTER JANUARY 2, 2014

GENESEE COUNTY WATER SUPPLY SYSTEM
RATES FOR SERVICE FOR WATER BILLS RENDERED
ON AND AFTER JANUARY 2, 2014
**********************************************************

The rates to be charged for water furnished by the System shall be as hereinafter set forth.  Water to be furnished by the System shall be measured by a meter or equivalent meters, installed and controlled by the County.  Charges for water service will be made for water furnished based upon monthly, bimonthly, and quarterly billings as set forth herein.

**I.     RATES BASED ON SUMMATION OF INDIVIDUAL METER READINGS (MONTHLY CHARGES)**

| Meter Size - Inches | Readiness to Serve Charge | Irrigation Meters |
|---|---|---|
| 5/8 | $    14.59 | $14.59 |
| 3/4 | $    21.89 | ¾ or larger   $21.89 |
| 1 | $    36.48 | |
| 1-1/2 | $    72.95 | |
| 2 | $  116.72 | |
| 3 | $  218.85 | |
| 4 | $  364.75 | |
| 6 | $  729.50 | |
| 8 | $ 1,167.20 | |
| 10 | $ 1,750.80 | |
| 12 | $ 3,136.85 | |

(Irrigation meters are an automatic charge May 1 through October 31 or any quarter that usage is recorded)  Rate becomes effective on date signed.

**I. A.   Indirect Rates**

| Meter Size - Inches | Readiness to Serve Charge | Irrigation Meters |
|---|---|---|
| 5/8 | $    13.53 | $13.53 |
| 3/4 | $    20.30 | ¾ or larger   $20.30 |
| 1 | $    33.83 | |
| 1-1/2 | $    67.65 | |
| 2 | $  108.24 | |
| 3 | $  202.95 | |
| 4 | $  338.25 | |
| 6 | $  676.50 | |
| 8 | $ 1,082.40 | |

**II.    RATES BASED ON MASTER METER READINGS**

A.    MONTHLY

| Equivalent Meters | Readiness to Serve Charge @ $89.67 / eq. meter |
|---|---|
| 25 | $  2,241.75 |
| 50 | $  4,483.50 |
| 80 | $  7,173.60 |
| 120 | $ 10,760.40 |
| 165 | $ 14,795.55 |
| 215 | $ 19,279.05 |
| 320 | $ 28,694.40 |

The number of equivalent meters is based on the peak monthly flow from the prior calendar year. An equivalent meter size will be determined based on the peak monthly flow being 75% of the meter capacity. The meter capacity and number of capacity equivalent meters will be based on current AWWA standards. The meter size and number of equivalent meters will be based on standard meter sizes, with a minimum of 25 equivalent meters.

**III.   COMMODITY CHARGES** (applies to both Individual and Master Meters):
The total commodity charge is $3.94 per 100 cubic feet.  This sum is the total of $1.86 per 100 cu.ft. plus the DWSD commodity charge ,which is charged via the City of Flint and is currently estimated at $2.08 per 100 cu. ft.

**IV.   QUARTERLY RATES** (applies to Individual Meters):
Multiply readiness to serve charge by three.

**V.    WATER STATION RATES**
The commodity charge for watering is $4.71 per 100 cubic feet (0.25 per 40 gallons).  No Readiness to Serve charge. Accounts shall be billed monthly.

**VI.   HYDRANT METER RATES**
The commodity charge is $4.71 per 100 cubic feet.  No Readiness to Serve charge.  Accounts shall be billed within 30 days of use.

GENESEE COUNTY WATER SUPPLY SYSTEM
RATES FOR SERVICE FOR WATER BILLS RENDERED
ON AND AFTER JANUARY 2, 2014
*************************************************************

**VII.** **COUNTY CAPITAL IMPROVEMENT FEE**
The County will charge a Capital Improvement Fee of $1,000 per unit based upon the Residential Equivalent Units prior to the issuance of a Water Permit (B-Permit).  The County Agency shall collect the fee.

**VIII.** **CITY OF FLINT FRANCHISE RATES**
The County will add $1.00 per month to the amount the City of Flint bills the franchise customers for each ⅝-inch meter equivalence plus $0.10 per each 100 cubic feet of volume used.

The rates are established pursuant to Act 342 Michigan Public Acts of 1939 as amended.

Jeffrey Wright, Drain Commissioner, as County Agency under the provisions of Act 342, Michigan Public Acts of 1939, as amended.

Dated: AUG 4th 2013

JEFFREY WRIGHT
Genesee County Drain Commissioner, the County Agency

# APPENDIX  C

**CITY OF FLINT, MICHIGAN**

# APPENDIX  C-1

## FLINT WATER SYSTEM
### (SUMMARY FROM EXISTING INFRASTRUCTURE REPORT, DLZ AND HOUSEAL LAVIGNE)

**Appendix C-1 Flint Water System**
**(Summary from Existing Infrastructure Report, DLZ, and Houseal Lavigne)**

The Cedar Street Pump Facility is equipped with three single-stage horizontal centrifugal pumps rated at 12 mgd, 9 mgd, and 9 mgd, respectively. There is no standby power provided to this pumping station. These pumps were installed in 1948 and are primarily used as an emergency water supply and pumping source during peak demand events as they have exceeded their design life and are in need of rehabilitation. The pumping capacity of this station is 30 mgd with a normal running capacity of 18 mgd. The pumping station electrical controls have not been updated since their original installation in 1948. This station requires significant upgrades to bring the station up to current automatic operation standards and should be considered in addition to regular maintenance. [2]

Pump Station No. 4 is located at the Dort Reservoir on the WTP grounds, and contains a total of five pumps. Pumps 1 and 2 were installed in 1949 and are considered inoperable with no repair or replacement plans. In 1994, the station was rehabilitated with the addition of two new 20 mgd turbine pumps and one 6 mgd turbine pump to induce turn-over of the Dort Reservoir. The pumping capacity of this station is 46 mgd with a normal running capacity of 26 mgd. [2]

The West Side Pump Station is equipped with two three-stage turbine pumps and two two-stage turbine pumps, all installed in 1970. Pumps 1 and 2 have a capacity of 8 mgd each, and pumps 3 and 4 each have a 4 mgd capacity. The pumping capacity of this station is 24 mgd with a normal running capacity of 16 mgd. The pumping operations and filling of the reservoir are controlled by the WTP or manually at the station. There is no standby power provided to this pumping station. [2]

Constructed in 1954, the Torrey Road Pumping Station is equipped with two centrifugal pumps rated at 2.8 mgd and 4 mgd. The pumping capacity of this station is 6.8 mgd with a normal running capacity of 2.8 mgd. The primary function of the station is an in-line booster pumping station to provide increased pressure to the southwest portion of the City. There is no standby power provided to this pumping station. The existing pumps have exceeded their useful life and the piping and valves are in poor condition. The station has been scheduled for rehabilitation and other improvements. [2]

Dort Reservoir is located at the WTP and is a 20-million gallon (MG) ground storage facility. Constructed in 1966, it is used primarily for emergency water storage and for use during peak water demand periods. [2]

Constructed in 1952, the storage tank located at the WTP is a 2.0 MG elevated tank primarily used for emergency water storage and as a pressure buffer. The tank was last inspected and painted in 2009. [2]

Constructed in 1954, the WTP has a 3.0 MG ground storage tank primarily used as an emergency water supply and pumping source during peak demand events. [2]

The Cedar Street Reservoir is a 20 MG ground storage facility. Constructed in 1948, the reservoir is primarily used as an emergency water supply and pumping source during peak demand events. [2]

The West Side Reservoir is a 12 MG ground storage facility. Constructed in 1970, the reservoir is primarily used as an emergency water supply and pumping source during peak demand events. [2]

APPENDIX   C-2

FLINT WATER SYSTEM
HISTORICAL CUSTOMERS AND COMPONENTS

**Appendix C-2**
**Flint Water Supply System[1]**

|  | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| Customers Billed [1] | 40,191 | 38,977 | 37,437 | 35,833 | 32,702 |
| Total Purchased (ccf) [2] | 13,696,461 | 11,943,961 | 13,108,730 | 11,926,868 | 11,897,969 |
| Total Billed (Flint and GCDC-WWS) |  | 10,027,390 | 10,140,906 | 9,649,847 | 9,470,315 |
| Water Mains (miles) [1] | 540 | 540 | 540 | 540 | 540 |
| Fire Hydrants [1] | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 |
| Storage Capacity (gallons) [1] | 57,000,000 | 57,000,000 | 57,000,000 | 57,000,000 | 57,000,000 |
| Population | 112,857 | 111,475 | 102,434 | 101,558 | 101,515 |

[1] Flint Annual Audits

[2] Howard Croft, City of Flint

# APPENDIX   C-3

### FLINT WATER RATES - POST DWSD

Jones & Henry Engineers, Ltd.                                    Fluid thinking.™

# Appendix C-3

### Flint Water Rates – Post DWSD

- Analysis started with annual audit revenue and expenses. Audit reflects July 1 to June 30 fiscal year.

- Genesee County charges (revenues) were identified and removed starting in July 2014.

- Between 2009 and 2013, the cost of water purchased from DWSD per ccf increased an average of 11.4 percent annually.

- Water usage by customers has been decreasing, but trend appears to be reducing and estimated usage is assumed to stabilize at 3,345,000 ccf annually, beginning in 2014.

- Delinquency Rate is expected to remain the same.

- The City is assuming non-revenue water will be reduced by 10 percent per year through planned programs. No adjustments have been made in this analysis to reflect this potential change, but it could increase revenue and reduce expenses.

- It is assumed that Flint will start operation of their WTP with river water in April 2014 and will start using KWA water supply on July 1, 2016.

- KWA is expected to start operating July 1, 2016.

- Adjustments to Expenses

  o Removed DWSD purchases starting in April 2014.

  o Projected expenses for 2014 to 2018

    ▪ Salaries 3 percent annually

    ▪ Utilities 9 percent annually

    ▪ All others 2 percent annually

  o Added KWA O&M (43.6 percent of Total)

| Fiscal Year | Flint |
|---|---|
| 2017 | $1,015,264 |
| 2018 | $1,090,106 |

Jones & Henry Engineers, Ltd.                                    Fluid thinking.™

- o  If the expected reduction in non-revenue water occurs, it will reduce KWA charges. A 10 percent reduction in non-revenue water is 3.1 percent of total water purchased, but since only chemical and energy cost savings for KWA is anticipated (61 percent of total operating costs), operating cost would go down only 1.9 percent. Capital cost would not go down.

- o  Added $1,762,580 in FY 2014; $7,050,319 in FYs 2015 and 2016; $7,584,319 in FY 2017; and $7,808,582 in FY 2018 to operating expenses of WTP, based on City projections.

- o  City has established a CIP and anticipates the following annual expenditures:

  - ▪  FY 2014    $8,500,000
  - ▪  FY 2015    $10,500,000
  - ▪  FY 2016    $9,500,000
  - ▪  FY 2017    $6,000,000
  - ▪  FY 2018    $6,500,000

  This includes capital improvements required at the WTP plus commencing infrastructure reinvestment in the distribution system, and developing a reserve and equipment replacement fund.

- o  KWA Purchase (Capital)

  - ▪  $383,333 per unit x 18 units = $6,900,000 per year starting July 2016. Prior to that it will be 10 percent of the annual amount.

- •  Debt service was added: $2,747,946 in FY 2014; $2,742,821 in FY 2015; $2,746,423 in FY 2016; $2,748,446 in FY 2017; and $2,744,008 in FY 2018. The last debt service payment will be in 2024. The balance at the end of FY 2013 is $23,378,511.

- •  A transfer to the General Fund which represents a return on equity to the City of $1,130,000 annually was added for FY 2014 through FY 2018 based on City projections. The annual audits for Flint also had $1,130,000 for FY 2011 through FY 2013.

- •  Rates – Current rates became effective July 1, 2012.

|  | Current |
| --- | --- |
| Minimum through | $21.776 per EM |
| Commodity (35 ccf) | $7.518 per 100 cubic feet |

- •  Typical Bills for residential unit and commercial unit:

| Meter Size | Commodity | Monthly Bill |
| --- | --- | --- |
| 5/8-inch | 1,000 cubic feet | $96.96 |
| 1-inch | 2,052 cubic feet | $209.55 |

# APPENDIX   C-4

**FLINT WATER DIVISION REVENUES AND EXPENSES**

Jones & Henry Engineers, Ltd.                                                                 Fluid thinking.™

| | FY2011 | FY2012 | FY2013 | % Change | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 |
|---|---|---|---|---|---|---|---|---|---|
| **Appendix C-4** | | | | | | | | | |
| **Revenues and Expenses** | | | | | | | | | |
| **Flint Water Supply Division** | | | | | | | | | |
| **Operating Revenue** | | | | | | | | | |
| In-City Receipts From Customers | $24,682,954 [1] | $30,596,488 [2] | $34,663,435 [1] | | $34,663,435 [9] | $34,663,435 [9] | $34,663,435 [9] | $34,663,435 [9] | $34,663,435 [9] |
| Genesee County-Commodity | $9,019,685 [2] | $8,206,688 [2] | $7,601,857 [2] | | $6,351,352 [10] | $0 | $0 | $0 | $0 |
| Genesee County-Surcharge | $1,404,648 [2] | $1,349,676 [2] | $1,368,000 [2] | | $1,026,000 [11] | $0 | $0 | $0 | $0 |
| Genesee County-DWSD RTS | $1,093,872 [2] | $2,499,061 [2] | $3,987,480 [2] | | $3,331,540 [10] | $0 | $0 | $0 | $0 |
| Other miscellaneous revenue | $14,830 [3] | $3,761 [3] | $23,041 [3] | | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 |
| Total Estimated Revenue | $36,215,989 | $42,655,674 | $47,643,813 | | $45,385,327 | $34,676,435 | $34,676,435 | $34,676,435 | $34,676,435 |
| **Operating Expenses** | | | | | | | | | |
| DWSD Purchases | $20,919,987 [3] | $21,251,448 [3] | $23,308,800 [3] | 11.4% | $19,357,539 [8,5] | $0 | $0 | $0 | $0 |
| Salaries, wages and fringe benefits | $12,043,462 [3] | $9,613,902 [3] | $10,599,599 [3] | 3% | $10,917,587 | $11,245,115 | $11,582,468 | $11,929,942 | $12,287,840 |
| Utilities | $732,787 [3] | $658,425 [3] | $691,373 [3] | 9% | $753,597 | $821,420 | $895,348 | $975,929 | $1,063,763 |
| Equipment operation | $398,404 [3] | $616,356 [3] | $628,541 [3] | 2% | $641,112 | $653,934 | $667,013 | $680,353 | $693,960 |
| Repair and maintenance | $437,370 [3] | $609,858 [3] | $220,696 [3] | 2% | $225,110 | $229,612 | $234,204 | $238,888 | $243,666 |
| Supplies | $680,635 [3] | $978,916 [3] | $934,097 [3] | 2% | $952,779 | $971,835 | $991,271 | $1,011,097 | $1,031,319 |
| Professional services | $700,728 [3] | $981,440 [3] | $605,606 [3] | 2% | $617,718 | $630,072 | $642,674 | $655,527 | $668,638 |
| Administrative costs | $1,132,511 [3] | $1,215,447 [3] | $0 [3] | | $0 | $0 | $0 | $0 | $0 |
| Miscellaneous costs | $924,319 [3] | $926,460 [3] | $749,641 [3] | 2% | $764,634 | $779,926 | $795,525 | $811,436 | $827,664 |
| Operating WTP | $0 | $0 | $0 | | $1,762,580 [4] | $7,050,319 [4] | $7,050,319 [4] | $7,584,319 [4] | $7,808,582 [4] |
| KWA Capital Cost (Bond, 30%)[7] | $0 | $0 | $0 | | $690,000 | $690,000 | $690,000 | $6,900,000 | $6,900,000 |
| KWA Operating Cost [6] | $0 | $0 | $0 | | $0 | $974,768 | $1,055,760 | $1,124,451 | |
| CIP Financing[4] | $0 | $0 | | | $8,500,000 | $10,500,000 | $9,500,000 | $6,000,000 | $6,500,000 |
| Debt Service[4] | | | | | $2,747,946 | $2,742,821 | $2,746,423 | $2,748,446 | $2,744,008 |
| Transfer to General Fund | $1,130,000 [3] | $1,130,000 [3] | $1,130,000 [3] | | $1,130,000 [4] | $1,130,000 [4] | $1,130,000 [4] | $1,130,000 [4] | $1,130,000 [4] |
| Total operating expenses | $39,100,203 | $37,982,252 | $38,868,353 | | $49,060,601 | $37,445,055 | $37,900,013 | $41,721,697 | $43,023,891 |
| Annual Reserve | ($2,884,214) | $4,673,422 | $8,775,460 | | ($3,675,274) | ($2,768,620) | ($3,223,578) | ($7,045,262) | ($8,347,456) |

[1] Total from annual audits for Receipts From Customers and Users, less Genesee County charges
[2] Genesee County rate studies by Jones & Henry Engineers
[3] Flint annual audits
[4] Provided by City of Flint, March 6, 2014 (one-fourth in FY2014)
[5] Flint to begin treating river water April 1, 2014.
[6] Jones & Henry calculation
[7] Estimate of $383,333 per unit ($23,000,000/60 units), 18 units for Flint
[8] Cost per ccf of purchases from DWSD between 2009-2013 increased by an average of 11.4% annually. This will be the factor that will be used to estimate DWSD purchases in 2014 (9 months)
[9] Based on 2013 revenue levels without taking into account future rate increases
[10] FY2013 expense plus 11.4% increase times 75% (to adjust to coincide with April 1, 2014 GCDC-WWS supply from DWSD)
[11] FY2013 expense times 75% (to adjust to coincide with April 1, 2014 GCDC-WWS supply from DWSD)

# APPENDIX   C-5

**FLINT WATER SYSTEM NEEDS AND PROJECTS
(SUMMARY FROM EXISTING INFRASTRUCTURE REPORT,
DLZ AND HOUSEAL LAVIGNE)**

**Appendix C-5 Flint Water System Needs and Projects**
**(Summary from Existing Infrastructure Report, DLZ and Houseal Lavigne)**

The City does experience problems with a number of existing valves; long-term needs for the system include replacement of existing valves over the next 20 years. The estimated cost for valve replacement is approximately $2,000,000.

The City of Flint's conveyance system consists of water distribution and transmission main ranging in size from 4-inch to 72-inch diameter. The majority of the existing piping is constructed of cast iron or ductile iron pipe up to 24-inch in diameter and exceeds 70 years old. Transmission mains over 24-inch diameter are constructed primarily of steel piping. A significant amount of 4-inch water main is over 70 years old, is prone to breaks, and is unable to provide modern pressures and fire flows. The distribution and transmission system are "old and in serious need of replacement" according to the Water Reliability Study. A six-year Capital Improvement Program was developed by the City's Utilities Department and addresses the below-ground infrastructure issues and a long-term 20-year plan. [2]

The City of Flint's distribution system currently has 3,931 gate valves and 3,327 gate well valves. Critical valves are 16-inch and larger on a primary transmission main that could result in shutting down a significant part of the City in the event of a break. A preliminary evaluation indicated that there are 1,398 critical valves in the system. Subcritical valves are 12-inch valves on minor transmission mains, the failure of which could result in a shutdown of a residential area. There are 1,398 subcritical valves. Normal valves are smaller than 12-inch and the failure of a normal valve would impact a small residential area. There are 4,462 normal valves in the system. Currently the City is operating under a reactionary valve maintenance plan; however, the City has plans to move to a preventative maintenance and replacement operation that includes operating and maintaining 700 critical valves, 280 subcritical valves, and 450 normal valves annually. The Water Reliability Study recommended $500,000 in valve replacements be done annually.

The City of Flint has 3,605 hydrants in the current water distribution system, many of which are in excess of 50 years old. In 2010, the City purchased 80 hydrants to begin replacing old hydrants. The City has plans to analyze and replace hydrants that exceed 50 years of age; over the next 20 years the City plans to create a system that will assess and regularly replace hydrants that reach 25 years of age. The Water Reliability Study recommended $250,000 in hydrant replacements be done annually. [2]

A major problem exists with the efficiency of the water system. According to the Water Reliability Study, the City is operating its water system with 68 percent efficiency, meaning that 32 percent of the water that the City buys from DWSD is not paid for by users of the system. The Water Reliability Study stated that water utilities typically operate at 85 to 90 percent efficiency. Increasing efficiency to 85 percent would result in an increase in revenue of $1.5-2.0 million annually. There are several likely explanations for the unaccounted water (loss of efficiency):

- Water withdrawn from a fire hydrant

- Leaks and water main breaks

- Faulty or inaccurate meters

- Unauthorized connections

- Unmetered municipal water use

J o n e s   &   H e n r y   E n g i n e e r s ,   L t d.                                                              Fluid thinking.™

Given the low efficiency of the City's water system, it is most likely that there is a combination of significant leaks within the system, inaccurate meters, and/or illegal connections. It was recommended in the Water Reliability Study that a high priority should be placed on increasing the water systems' efficiency. This includes testing high volume meters, performing a detailed leak detection study, residential meter replacement, billing system review, and reviewing fire flow estimates. [2]

The exact location, condition, and age of each water line in the City are unknown. [2]

In order to provide finished water to its customers, Flint expects to use an existing water treatment plant, which is currently operating in a back-up role with a capacity of 36 mgd. Flint will be required to make an estimated $8,000,000 in improvements to convert the plant from stand-by to fully operational.

Currently, Flint and Genesee County receive treated water from DWSD. In 2012, Flint and Genesee County combined for a total payment to DWSD of approximately $25,000,000 in both fixed fee and commodity charges for an average water cost of $22.72 per 1,000 cubic feet of water.

The Flint Water Reliability Study includes a number of recommendations that have not been implemented for financial reasons. These improvements include replacement of over 59,000 LFT of major transmission water main (larger than 12-inch), over 5,500 LFT of 6-inch minor transmission water main, and replacement of 3,000 water meters each year. Funding for these improvements to the system is needed to reduce waste and improve efficiency. In addition, the other recommendations for valve and hydrant replacement are in need of funding. Prioritization of funding for the above improvements, as well as for smaller service line replacement, will need to consider redevelopment considerations included in the Master Plan.

## APPENDIX   C-6

WATER RATES AND CHARGES FOR FLINT

Jones & Henry Engineers, Ltd.

Fluid thinking.™

| Appendix C-6 Schedule of Water Rates & Charges for Flint | | |
|---|---|---|
| **Metered Water** | **Rates for Bills Due After July 1, 2012** | |
| **Rates per 100 cubic feet (ccf)** | **Inside City Rate** | **Outside City Rate** |
| Through 35 ccf | 7.518 | 11.259 |
| Next 1,965 ccf | 7.310 | 10.765 |
| Over 2,000 ccf | 5.792 | 8.677 |
| | | |
| **Water Monthly Service Charges** | | |
| **Remote Metered Monthly Charge** | **Rates for Bills Due After July 1, 2012** | |
| **Meter Size** | **Inside City Rate** | **Outside City Rate** |
| 5/8 inch | 21.776 | 32.483 |
| 3/4 inch | 41.861 | 62.706 |
| 1 inch | 55.283 | 82.792 |
| 1-1/2 inch | 55.283 | 82.792 |
| 2 inch | 55.283 | 82.792 |
| **Non-Remote Metered Monthly Charge** | **Rates for Bills Due After July 1, 2012** | |
| **Meter Size** | **Inside City Rate** | **Outside City Rate** |
| 5/8 inch | 26.332 | 39.678 |
| 3/4 inch | 46.664 | 69.976 |
| 1 inch | 59.952 | 90.062 |
| 1-1/2 inch | 59.952 | 90.062 |
| 2 inch | 59.952 | 90.062 |
| **Commercial & Industrial Month Charge** | **Rates for Bills Due After July 1, 2012** | |
| **Meter Size** | **Inside City Rate** | **Outside City Rate** |
| 5/8 inch | 53.385 | 80.134 |
| 3/4 inch | 61.263 | 91.715 |
| 1 inch | 75.103 | 112.673 |
| 1-1/2 inch | 107.756 | 161.785 |
| 2 inch | 150.622 | 226.086 |
| 3 inch | 297.488 | 448.469 |
| 4 inch | 523.495 | 785.366 |
| 6 inch | 1,029.429 | 1,543.867 |
| 8 inch | 1,492.875 | 2,239.473 |
| 10 inch | 2,060.754 | 3,107.476 |
| 12 inch | 2,493.124 | 3,739.505 |
| 16 inch | 3,102.636 | 4,653.867 |
| 20 inch | 3,351.183 | 5,463.817 |

[THIS PAGE INTENTIONALLY LEFT BLANK]

KAREGNONDI WATER AUTHORITY, COUNTIES OF GENESEE, LAPEER AND SANILAC, STATE OF MICHIGAN • WATER SUPPLY SYSTEM BONDS (KAREGNONDI WATER PIPELINE), SERIES 2014A

Mixed Sources
Product group from well managed
forests, controlled sources and
recycled wood or fibers.

Printed by: ImageMaster, LLC
www.imagemaster.com

Exhibit 2 to Exhibit B

**SUPPLEMENT DATED MAY 1, 2014**
**TO OFFICIAL STATEMENT DATED APRIL 1, 2014**
**relating to**


**KAREGNONDI WATER AUTHORITY**
**COUNTIES OF GENESEE, LAPEER AND SANILAC**
**STATE OF MICHIGAN**

**$220,500,000**
**WATER SUPPLY SYSTEM BONDS**
**(KAREGNONDI WATER PIPELINE), SERIES 2014A**


      This Supplement, dated May 1, 2014, supplements and amends the above referenced Official Statement, dated April 1, 2014, relating to the above referenced bonds (the "Bonds"). On April 30, 2014, Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., lowered its rating on the Bonds from "A+" to "A." The outlook is stable.

**NEW ISSUE**                                                                    **Rating:** See "RATING" herein
Book-Entry-Only

*In the opinion of Miller, Canfield, Paddock and Stone, P.L.C., Bond Counsel, under existing law, assuming compliance with certain covenants by the Issuer, the interest on the Bonds is excludable from gross income for federal income tax purposes and the Bonds and the interest thereon are exempt from all taxation by the State of Michigan or by any taxing authority within the State of Michigan, except inheritance and estate taxes and taxes on gains realized from the sale, payment or other disposition thereof. See "TAX MATTERS" and "FORM OF APPROVING OPINION" herein for a description of certain provisions of the Internal Revenue Code of 1986, as amended (the "Code"), which may affect the tax treatment of interest on the Bonds for certain Bondholders.*



<div align="center">

**KAREGNONDI WATER AUTHORITY**
**COUNTIES OF GENESEE, LAPEER AND SANILAC**
**STATE OF MICHIGAN**

**$220,500,000**
**WATER SUPPLY SYSTEM BONDS**
**(KAREGNONDI WATER PIPELINE), SERIES 2014A**

</div>

**Dated: Date of Delivery**                          **Principal Due: November 1, as shown on Inside Cover Page**

The Water Supply System Bonds (Karegnondi Water Pipeline), Series 2014A (the "Bonds") are issued under the provisions of Act 233, Public Acts of Michigan, 1955, as amended,  and a resolution adopted by the Board of Trustees of the Karegnondi Water Authority, Counties of Genesee, Lapeer and Sanilac, State of Michigan (the "Issuer") on November 20, 2013.  The Bonds are being issued for the purpose of paying a portion of the cost of acquiring and constructing the Issuer's Water Supply System (the "System") to serve initially the City of Flint and the County of Genesee (individually a "Local Unit" and collectively, the "Local Units"), funding a debt service reserve account, paying capitalized interest and paying the costs of issuing the Bonds.  The Bonds are to be issued in anticipation of, and are payable primarily as to principal and interest from, payments (the "Contractual Payments")  to be made by the Local Units to the Issuer pursuant to a Contract among the Issuer and the Local Units dated as of August 1, 2013 (the "Contract").  The Contractual Payments will be in installments that will equal the principal and interest payments on the Bonds.  Further, each Local Unit has pledged its limited tax full faith and credit for the payment of its Contractual Payments and  is obligated, to the extent necessary, as a first budget obligation to levy ad valorem taxes on all taxable property within its boundaries for such purpose, subject to applicable constitutional, statutory and charter tax limitations.  Each Local Unit is expected to make its Contractual Payments from revenues collected from charges imposed on the customers of its respective water supply system.  The County of Genesee in the Contract has pledged to make all payments that the City of Flint fails to make to the Issuer under the Contract.  The Issuer has irrevocably pledged the Contractual Payments for the payment of the principal of and interest on the Bonds.

The Bonds are issuable only as fully registered Bonds without coupons, and when issued, will be registered in the name of Cede & Co., as Bondholder and nominee for The Depository Trust Company ("DTC"), New York, New York.  DTC will act as securities depository for the Bonds.  Purchases of beneficial interests in the Bonds will be made in book-entry only form, in the denominations of $5,000 or any integral multiple thereof.  Purchasers will not receive certificates representing their beneficial interest in Bonds purchased.  So long as Cede & Co. is the Bondholder, as nominee of DTC, references herein to the Bondholders or registered owners shall mean Cede & Co., as aforesaid, and shall not mean the Beneficial Owners of the Bonds.  See *BOOK-ENTRY ONLY SYSTEM* herein.

Interest on the Bonds will be payable semiannually on May 1 and November 1 of each year commencing on November 1, 2014.  The Bonds will be registered Bonds, of the denomination of $5,000 or multiples thereof not exceeding for each maturity the principal amount of such maturity.  The principal and interest shall be payable at the corporate trust office of The Huntington National Bank, Grand Rapids, Michigan or such other transfer agent as the Issuer may hereafter designate by notice mailed to the registered owner not less than sixty (60) days prior to any change in interest payment date (the "Transfer Agent").  Interest shall be paid when due by check mailed to the registered owner as shown by the registration books as of the fifteenth day of the month preceding the payment date for each interest payment.  Payment of principal and interest to Beneficial Owners shall be made as described in *BOOK-ENTRY ONLY SYSTEM* herein.

The Bonds are subject to redemption at par, as described herein.

The Bonds are offered when, as and if issued by the Issuer and subject to receipt of the approving opinion of Miller, Canfield, Paddock and Stone, P.L.C., Detroit, Michigan, Bond Counsel.  Certain legal matters will be passed upon for the Underwriters by their counsel, Dickinson Wright PLLC, Troy and Lansing, Michigan.  It is expected that delivery of the Bonds through DTC will be made in New York, New York on or about April 16, 2014.

THIS COVER PAGE CONTAINS CERTAIN INFORMATION FOR QUICK REFERENCE ONLY.  IT IS NOT A SUMMARY OF THIS ISSUE.  INVESTORS MUST READ THE ENTIRE OFFICIAL STATEMENT TO OBTAIN INFORMATION ESSENTIAL TO THE MAKING OF AN INFORMED INVESTMENT.

<div align="center">

**J.P. Morgan**

</div>

**Wells Fargo Securities**                                   **Stifel, Nicolaus & Company, Incorporated**

Dated:  April 1, 2014

**MATURITY SCHEDULE**

**WATER SUPPLY SYSTEM BONDS (KAREGNONDI WATER PIPELINE), SERIES 2014A**

**SERIAL BONDS**
**(Base CUSIP§: 48563U)**

| Year | Amount | Interest Rate | Yield | CUSIP§ | Year | Amount | Interest Rate | Yield | CUSIP§ |
|------|--------|---------------|-------|--------|------|--------|---------------|-------|--------|
| 2017 | $2,000,000 | 3.000% | 1.460% | AA9 | 2024 | $5,595,000 | 5.000% | 3.660%* | AY7 |
| 2017 | $2,105,000 | 5.000% | 1.460% | AR2 | 2025 | $5,875,000 | 5.000% | 3.820%* | AZ4 |
| 2018 | $1,300,000 | 4.000% | 1.870% | AB7 | 2026 | $6,165,000 | 5.000% | 3.940%* | BA8 |
| 2018 | $2,975,000 | 5.000% | 1.870% | AS0 | 2027 | $6,475,000 | 5.250% | 4.050%* | AF8 |
| 2019 | $2,000,000 | 3.000% | 2.320% | AC5 | 2028 | $6,815,000 | 5.250% | 4.110%* | AG6 |
| 2019 | $2,475,000 | 5.000% | 2.320% | AT8 | 2029 | $7,175,000 | 5.250% | 4.200%* | AH4 |
| 2020 | $2,000,000 | 4.000% | 2.780% | AD3 | 2030 | $7,550,000 | 5.250% | 4.290%* | AJ0 |
| 2020 | $2,655,000 | 5.000% | 2.780% | AU5 | 2031 | $7,945,000 | 5.250% | 4.380%* | AK7 |
| 2021 | $2,000,000 | 3.000% | 3.050% | AE1 | 2032 | $8,365,000 | 5.250% | 4.450%* | AL5 |
| 2021 | $2,870,000 | 5.000% | 3.050% | AV3 | 2033 | $8,800,000 | 4.500% | 4.670% | AM3 |
| 2022 | $5,075,000 | 5.000% | 3.310% | AW1 | 2034 | $9,200,000 | 5.250% | 4.570%* | AN1 |
| 2023 | $5,325,000 | 5.000% | 3.490% | AX9 | 2035 | $9,680,000 | 5.250% | 4.620%* | AP6 |

**TERM BONDS**

| Year | Amount | Interest Rate | Yield | CUSIP§ |
|------|--------|---------------|-------|--------|
| 2040 | $56,590,000 | 5.250% | 4.740%* | BB6 |
| 2043 | $41,490,000 | 5.000% | 4.890%* | AQ4 |

*Yield to the November 1, 2023 first call date

---

§ Registered trademark of American Bankers Association.  CUSIP numbers are provided by Standard & Poor's, CUSIP Service Bureau, a division of The McGraw-Hill Companies, Inc. The CUSIP numbers listed above are being provided solely for the convenience of Bondholders only at the time of issuance of the Bonds and the Issuer does not make any representation with respect to such number or undertake any responsibility for its accuracy now or at any time in the future.  The CUSIP number for a specific maturity is subject to being changed after the issuance of the Bonds as a result of various subsequent actions including, but not limited to, a refunding in whole or in part of such maturity.

# KAREGNONDI WATER AUTHORITY
G-4610 Beecher Road
Flint, Michigan 48532-2617
(810) 732-7870
Fax: (810) 732-9773

## BOARD OF TRUSTEES
*Dayne Walling, Chairperson*
*Greg Alexander, Vice Chairperson*
*Jamie Curtis*
*Joshua Freeman*
*Larry Green*
*Richard E. Hammel*
*Ted Henry*
*Marilyn Hoffman*
*Dale Kerbyson*
*Steve Landaal*
*Sheldon Neely*
*Joseph Suma*
*Thomas Svrcek*
*Tracey Tucker*
*Paula Zelenko*

## CHIEF EXECUTIVE OFFICER
*Jeffrey Wright*

## PROFESSIONAL SERVICES

**TRANSFER AGENT** ...........................................................................................*The Huntington National Bank*

**BOND COUNSEL** ...................................................*Miller, Canfield, Paddock and Stone, P.L.C.*

**FINANCIAL ADVISOR** ...................................................................*Stauder, BARCH & ASSOCIATES, Inc.*

iii

No dealer, broker, salesman or other person has been authorized by the Issuer to give any information or to make any representations, other than those contained in this Official Statement, and, if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information set forth in this Official Statement has been obtained from the Issuer, the County of Genesee, the City of Flint and other sources which are believed to be reliable, including The Depository Trust Company with respect to the information contained under the heading BOOK-ENTRY ONLY SYSTEM, but is not guaranteed as to accuracy or completeness by, and is not to be construed as a representation by, the Issuer. The information and expressions of opinion in this Official Statement are subject to change without notice, and neither the delivery of this Official Statement nor any sale made under this Official Statement shall, under any circumstances, create any implication that there has been no change in the affairs of the parties referred to above or that the other information or opinions are correct as of any time subsequent to the date of this Official Statement. The Transfer Agent has not participated in the preparation of this Official Statement and assumes no responsibility for it.

The Underwriters have provided the following sentence for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

**IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY ISSUER. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVER-ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF THE BONDS AT A LEVEL ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.**

―――――――――――

This Official Statement contains forward-looking statements, which can be identified by the use of the future tense or other forward-looking terms such as "may," "intend," "will," "expect," "anticipate," "plan," "management believes," "estimate," "continue," "should," "strategy," or "position" or the negatives of those terms or other variations of them or by comparable terminology. In particular, any statements express or implied, concerning future receipts of federal grants or the ability to generate cash flow to service indebtedness are forward-looking statements. Investors are cautioned that reliance on any of those forward-looking statements involves risks and uncertainties and that, although the Issuer's management believes that the assumptions on which those forward-looking statements are based are reasonable, any of those assumptions could prove to be inaccurate. As a result, the forward-looking statements based on those assumptions also could be incorrect, and actual results may differ materially from any results indicated or suggested by those assumptions. In light of these and other uncertainties, the inclusion of a forward-looking statement in this Official Statement should not be regarded as a representation by the Issuer or that its plans and objectives will be achieved. All forward-looking statements are expressly qualified by the cautionary statements contained in this paragraph. The Issuer undertakes no duty to update any forward-looking statements.

# TABLE OF CONTENTS

PURPOSE ........................................................................................................................... 1

SECURITY .......................................................................................................................... 2
    Contractual Payments ..................................................................................................... 2
    Debt Service Reserve Account ........................................................................................ 2

ESTIMATED SOURCES AND USES OF FUNDS ........................................................... 3

THE BONDS ....................................................................................................................... 4

PRIOR REDEMPTION OF BONDS ................................................................................. 4
    Optional Redemption ...................................................................................................... 4
    Mandatory Redemption of Term Bonds ......................................................................... 4

DEBT SERVICE SCHEDULE ........................................................................................... 6

KAREGNONDI WATER AUTHORITY SYSTEM ........................................................... 6
    The System ...................................................................................................................... 7
    Interim Water Supply Arrangements for Genesee and Flint ......................................... 10
    Related Facilities .......................................................................................................... 11

REPORT OF THE ENGINEERING CONSULTANT ...................................................... 12

BONDHOLDERS' RISKS ................................................................................................ 13
    Assumptions With Regard to Local Unit Revenues ...................................................... 13
    Inability to Finance the System; System Completion Risk ........................................... 13
    Financial Condition of the City of Flint and Genesee for future Obligations to Issuer ......... 15

LITIGATION .................................................................................................................... 16
    Pending Litigation ........................................................................................................ 16
    Other Litigation ............................................................................................................ 16

TAX MATTERS ................................................................................................................ 18
    Tax Treatment of Accruals on Original Issue Discount Bonds .................................... 19
    Amortizable Bond Premium .......................................................................................... 19
    Market Discount ........................................................................................................... 20
    Information Reporting and Backup Withholding ........................................................... 20
    Future Developments .................................................................................................... 20

APPROVAL BY THE MICHIGAN DEPARTMENT OF TREASURY ................................... 21

BOND COUNSEL'S RESPONSIBILITY ......................................................................... 21

CONTINUING DISCLOSURE ........................................................................................ 21

LEGAL OPINION ........................................................................................................ 22

FINANCIAL ADVISOR ............................................................................................. 23

UNDERWRITING ...................................................................................................... 23

RATING ...................................................................................................................... 24

OTHER MATTERS .................................................................................................... 25


APPENDIX A    County of Genesee - General Financial,  Economic and
        Statistical Information ................................................................................ A-1
APPENDIX B    County of Genesee – Audited Financial Statements ..................... B-1
APPENDIX C    City of Flint – General Financial, Economic and
        Statistical Information  .............................................................................. C-1
APPENDIX D    City of Flint – Audited Financial Statements ............................... D-1
APPENDIX E    Form of Continuing Disclosure Undertakings.............................. E-1
APPENDIX F    Form of Approving Opinion........................................................... F-1
APPENDIX G    Book-Entry-Only System .............................................................. G-1
APPENDIX H    Contract .......................................................................................... H-1
APPENDIX I    Report of the Engineering Consultant ............................................ I-1

## OFFICIAL STATEMENT

### KAREGNONDI WATER AUTHORITY
### COUNTIES OF GENESEE, LAPEER AND SANILAC
### STATE OF MICHIGAN
### $220,500,000
### WATER SUPPLY SYSTEM BONDS
### (KAREGNONDI WATER PIPELINE)
### SERIES 2014A

The purpose of this Official Statement, which includes the cover page and Appendices, is to furnish information in connection with the issuance and sale by the Karegnondi Water Authority, Counties of Genesee, Lapeer and Sanilac, State of Michigan (the "Issuer") of its Water Supply System Bonds (Karegnondi Water Pipeline), Series 2014A (the "Bonds") in the aggregate principal amount of $220,500,000.

## PURPOSE

The Bonds are issued under the provisions of Act 233, Public Acts of Michigan, 1955, as amended ("Act 233"), and a resolution authorizing the issuance of the Bonds (the "Resolution") adopted by the Board of Trustees of the Issuer on November 20, 2013. The Bonds are being issued for the purpose of paying a portion of the cost of acquiring and constructing the Issuer's Water Supply System (the "System") that is being established for the purpose of supplying raw water to its member communities, funding the Debt Service Reserve Account as hereinafter described, paying capitalized interest on the Bonds and paying the costs of issuing the Bonds. The Issuer was incorporated in October, 2010 pursuant to Act 233 by the County of Genesee ("Genesee"), the County of Lapeer, the County of Sanilac, the City of Flint ("Flint") and the City of Lapeer for the purpose of providing its member communities with a new source of water. Although the Issuer was incorporated in 2010, planning and design for the System in its present configuration began in 2001.

The System is expected ultimately to supply raw water for the three county area consisting of over 2,232 square miles and a population of over one half million residents, but the System will initially provide raw water to Genesee and Flint (individually a "Local Unit" and collectively, the "Local Units"). Currently, Genesee and Flint receive finished water from the City of Detroit, through its Detroit Water and Sewerage Department ("DWSD"), but Flint expects that it will no longer receive water from DWSD after April 17, 2014 and as a result, Genesee is pursuing a separate contract for an interim water supply from DWSD. Genesee and Flint participated in the establishment of the Issuer in order to have a more reliable supply of water at rates that they expect ultimately to be less than what would otherwise be payable to DWSD. For a description of the proposed System and the interim arrangements for water supply for Genesee and Flint until the System is completed and operational, see the heading KAREGNONDI WATER AUTHORITY SYSTEM herein.

## SECURITY

### *Contractual Payments*

The Bonds are being issued in anticipation of, and are payable primarily as to principal and interest from, payments (the "Contractual Payments") to be made by the Local Units to the Issuer pursuant to the Karegnondi Water Authority Financing Contract among the Issuer and the Local Units dated as of August 1, 2013 (the "Contract"). The Contractual Payments will be in installments that will equal the principal and interest payments on the Bonds. Further, each Local Unit has pledged its limited tax full faith and credit for the payment of its Contractual Payments and is obligated, to the extent necessary, as a first budget obligation to levy ad valorem taxes on all taxable property within its boundaries for such purpose, subject to applicable constitutional, statutory and charter tax limitations as to rate and amount. After credit is given to Genesee for payment of the principal of and interest on the Genesee Bonds (as described under the heading KAREGNONDI WATER AUTHORITY – The System below), Genesee is responsible for paying approximately 66% of the principal of and interest due on the Bonds, and Flint is responsible for paying approximately 34% of the principal of and interest on the Bonds. In addition, pursuant to the Contract, if Flint fails to make any of its Contractual Payments when due, Genesee is obligated under the Contract to make such Contractual Payments within one day of being notified of Flint's failure to pay. Further, the Issuer is obligated under the Contract to undertake all legal action and make use of all remedies available under the Contract to enforce the payment obligations of Flint under the Contract.

Each Local Unit expects to make its Contractual Payments from revenues collected from charges imposed on the customers of its respective water supply system. The water supply system of Genesee is hereinafter referred to as the "Genesee System" and the water supply system of Flint in hereinafter referred to as the "Flint System." The Issuer has irrevocably pledged the Contractual Payments for the payment of the principal of and interest on the Bonds. See The Report of the Engineering Consultant in APPENDIX I for a description of the Genesee System and the Flint System.

The rights or remedies of bondholders may be affected by bankruptcy, insolvency, fraudulent conveyance or other laws affecting creditors' rights generally, now existing or hereafter enacted, and by the application of general principles of equity, including those relating to equitable subordination.

A copy of the Contract is included as APPENDIX H. For additional information on Genesee, see APPENDIX A and APPENDIX B hereto, and for additional information on Flint, see APPENDIX C and APPENDIX D hereto.

### *Debt Service Reserve Account*

Pursuant to the Resolution, the Issuer has established a Debt Retirement Fund, and within the Debt Retirement Fund has established a Debt Service Reserve Account. All Contractual Payments as received are required to be deposited in the Debt Retirement Fund and used to pay the principal of and interest on the Bonds. The Debt Service Reserve Account will be funded from the proceeds of the Bonds in an amount equal to $15,237,437.50, which is equal to the lesser of (1) maximum annual principal and interest requirements during any calendar year on the

Bonds then outstanding, (2) ten percent (10%) of the original principal amount of the Bonds, and (3) one hundred twenty-five percent (125%) of the average annual principal and interest requirements during any calendar year on the Bonds then outstanding (the "Reserve Account Requirement"). Moneys in the Debt Service Reserve Account shall be used solely for the payment of the principal of and interest on the Bonds when due whenever and to the extent that the Contractual Payments being held by the Issuer shall be insufficient for such purposes.

There shall be credited to the Debt Service Reserve Account beginning on the first day of the month following any month in which the amount in the Debt Service Reserve Account shall be less than an amount equal to the Reserve Account Requirement as a result of the failure of a Local Unit to pay its Contractual Payments, and continuing on the first day of each month thereafter, an amount equal to one-thirty-sixth (1/36) of any deficit therein, until the amount on deposit is equal to the Reserve Account Requirement; however, if the amount on deposit in the Debt Service Reserve Account is less than 100% of the Reserve Account Requirement as a result of investment losses with respect to the Debt Service Reserve Account, commencing on the first day of the month following such evaluation, and continuing on the first day of each month thereafter, an amount equal to one-fourth (1/4) of the amount necessary to restore the Debt Service Reserve Account to 100% of the Reserve Account Requirement, unless and until the amount on deposit in the Debt Service Reserve Account shall equal 100% of the Reserve Account Requirement. Further, if a Local Unit fails to pay its Contractual Payment causing a shortfall and the Debt Service Reserve Account is drawn upon to pay the Bonds, the replenishment of such Debt Service Reserve Account shall be an obligation of the Local Unit that failed to pay such Contractual Payment, in the manner described in the preceding sentence; provided, however, if Flint fails to fulfill its obligation to replenish the Debt Service Reserve Account, as with the failure to make Contractual Payments under the Contract, Genesee has agreed in the Contract to make such payments.

### ESTIMATED SOURCES AND USES OF FUNDS

*Sources of Funds*

| | |
|---|---|
| Par amount of Bonds | $220,500,000.00 |
| Net Original Issue Premium | 11,815,544.05 |
| Total Sources | $232,315,544.05 |

*Use of Funds*

| | |
|---|---|
| Deposit to Construction Fund | $187,137,367.59 |
| Capitalized Interest | 28,282,364.06 |
| Deposit to Debt Service Reserve Account | 15,237,437.50 |
| Costs of Issuance | 712,000.00 |
| Underwriters' Discount | 946,374.90 |
| Total Uses | $232,315,544.05 |

3

## THE BONDS

The Bonds will be dated the date of delivery thereof, will bear interest from the date of delivery at the rates and will mature in the amounts and on the dates set forth on the inside cover page of this Official Statement and will be subject to redemption prior to maturity as described below.  Interest on the Bonds will be payable semiannually on May 1 and November 1 of each year commencing on November 1, 2014.  Interest on the Bonds shall be computed using a 360-day year and twelve 30-day months.

The Bonds will be issued as fully registered Bonds as described in APPENDIX G, BOOK-ENTRY-ONLY SYSTEM.  Subject to the provisions for the book-entry system, the principal of and any redemption premium on the Bonds will be payable upon surrender thereof at the designated office of the Transfer Agent, and interest will be payable by check or draft mailed by the Transfer Agent to the registered owners of the Bonds as shown on the registration books of the Issuer maintained by the Transfer Agent as of the close of business on the fifteenth day of the calendar month preceding the month in which the interest payment is due.  The Transfer Agent also may pay interest on Bonds by wire transfer or such other method as is acceptable to the Transfer Agent and the Bondholder to whom payment is being made.

## PRIOR REDEMPTION OF BONDS

### *Optional Redemption*

Bonds maturing in the years 2017 to 2023, inclusive, shall not be subject to redemption prior to maturity.  Bonds or portions of Bonds in multiples of $5,000 maturing in the year 2024 and thereafter shall be subject to redemption prior to maturity, at the option of the Issuer, in any order of maturity and by lot within any maturity, on any date on or after November 1, 2023, at par and accrued interest to the date fixed for redemption.

### *Mandatory Redemption of Term Bonds*

The Bonds maturing in the years 2040 and 2043 (the "Term Bonds") shall be subject to annual mandatory redemption on November 1 of the following years and in the following amounts, at par, plus accrued interest to the date of mandatory redemption.

Term Bonds due November 1, 2040

| Redemption Dates | Principal Amounts |
|---|---|
| November 1, 2036 | $10,190,000 |
| November 1, 2037 | $10,725,000 |
| November 1, 2038 | $11,290,000 |
| November 1, 2039 | $11,880,000 |
| November 1, 2040 (Maturity) | $12,505,000 |
| TOTAL | $56,590,000 |

Term Bonds due November 1, 2043

| Redemption Dates | Principal Amounts |
|---|---|
| November 1, 2041 | $13,160,000 |
| November 1, 2042 | $13,820,000 |
| November 1, 2043 (Maturity) | $14,510,000 |
| TOTAL | $41,490,000 |

When Term Bonds are purchased by the Issuer and delivered to the Transfer Agent for cancellation or are redeemed in a manner other than by mandatory redemption, the principal amount of Term Bonds affected shall be reduced by the principal amount of the Term Bonds so purchased or redeemed in the order determined by the Issuer.

In case less than the full amount of an outstanding Bond is called for redemption, the Transfer Agent, upon presentation of the Bond called for redemption, shall register, authenticate and deliver to the registered owner of record a new Bond in the principal amount of the portion of the original Bond not called for redemption.

Notice of redemption shall be given to the registered owner of any Bond or portion thereof called for redemption by mailing of such notice not less than thirty (30) days prior to the date fixed for redemption to the registered address of the registered owner of record. A Bond or portion thereof so called for redemption shall not bear interest after the date fixed for redemption, whether presented for redemption or not, provided funds are on hand with the Transfer Agent to redeem said Bond or portion thereof.

[The remainder of this page intentionally left blank]

## DEBT SERVICE SCHEDULE

The following schedule sets forth the principal and interest payable with respect to the Bonds.

| Fiscal Year Ended 12/31 | Principal | Interest | Total P&I |
|---|---|---|---|
| 2014 | | $6,027,389* | $6,027,389 |
| 2015 | | 11,127,488* | 11,127,488 |
| 2016 | | 11,127,488* | 11,127,488 |
| 2017 | $4,105,000 | 11,127,488 | 15,232,488 |
| 2018 | 4,275,000 | 10,962,238 | 15,237,238 |
| 2019 | 4,475,000 | 10,761,488 | 15,236,488 |
| 2020 | 4,655,000 | 10,577,738 | 15,232,738 |
| 2021 | 4,870,000 | 10,364,988 | 15,234,988 |
| 2022 | 5,075,000 | 10,161,488 | 15,236,488 |
| 2023 | 5,325,000 | 9,907,738 | 15,232,738 |
| 2024 | 5,595,000 | 9,641,488 | 15,236,488 |
| 2025 | 5,875,000 | 9,361,738 | 15,236,738 |
| 2026 | 6,165,000 | 9,067,988 | 15,232,988 |
| 2027 | 6,475,000 | 8,759,738 | 15,234,738 |
| 2028 | 6,815,000 | 8,419,800 | 15,234,800 |
| 2029 | 7,175,000 | 8,062,013 | 15,237,013 |
| 2030 | 7,550,000 | 7,685,325 | 15,235,325 |
| 2031 | 7,945,000 | 7,288,950 | 15,233,950 |
| 2032 | 8,365,000 | 6,871,838 | 15,236,838 |
| 2033 | 8,800,000 | 6,432,675 | 15,232,675 |
| 2034 | 9,200,000 | 6,036,675 | 15,236,675 |
| 2035 | 9,680,000 | 5,553,675 | 15,233,675 |
| 2036 | 10,190,000 | 5,045,475 | 15,235,475 |
| 2037 | 10,725,000 | 4,510,500 | 15,235,500 |
| 2038 | 11,290,000 | 3,947,438 | 15,237,438 |
| 2039 | 11,880,000 | 3,354,713 | 15,234,713 |
| 2040 | 12,505,000 | 2,731,013 | 15,236,013 |
| 2041 | 13,160,000 | 2,074,500 | 15,234,500 |
| 2042 | 13,820,000 | 1,416,500 | 15,236,500 |
| 2043 | 14,510,000 | 725,500 | 15,235,500 |
| TOTAL | $220,500,000 | $219,133,064 | $439,633,064 |

*Capitalized interest; paid from Bond proceeds.

## KAREGNONDI WATER AUTHORITY SYSTEM

The Issuer is expected ultimately to supply raw water for the three county area (Genesee, Lapeer and Sanilac) consisting of over 2,232 square miles and a population of over one half million residents.   The Issuer will supply metered, untreated water to each contracting member. The actual cost for appurtenances and maintenance of the System will be allocated based on water sold and each contracting member will be responsible for its proportional share of the cost. Each contracting member will be responsible for treating and distributing treated water to its individual customers.

6

The Issuer currently has entered into two water purchase contracts (the "Water Purchase Contracts"), effective October 1, 2013: one with Flint to supply up to 18 mgd and one with the Genesee County Drain Commissioner, as County Agency of Genesee under Act 342, Public Acts of Michigan, 1939, as amended (the "County Agency"), on behalf of Genesee, to supply 42 mgd. The charges to be paid by Flint and the County Agency in the Water Purchase Contracts are broken down into two distinct portions: an annual fixed or capital fee and an annual commodity or operations and maintenance fee. Flint and the County Agency expect to pay such charges from the revenues of their respective water supply systems as an operation and maintenance expense in the same manner that each presently pays for water furnished by DWSD.

The size of the System is based on the volume identified in the Water Purchase Contracts and any additional water purchase contracts entered into with additional parties, up to a maximum of 85 mgd, the Issuer's permit limit. Each contracting party will be responsible for the annual fixed fee regardless of the amount of water taken. The other members of the Issuer had until October 16, 2013 to enter into a water purchase contract with the Issuer at the same rates set forth in the Water Purchase Contracts. No additional water purchase contracts were entered into on or before such date and as a result, members entering into water purchase contracts with the Issuer subsequent to such date will pay any incremental costs associated with accommodating their water purchase contracts.

### The System

To supply water to its contracting members, the Issuer will be required to construct a lake intake on Lake Huron, approximately 63 miles of pipe from the intake plant to the City of Flint and 2 pump stations, one of which will be located near the intake facility. Such facilities collectively constitute the System. The engineering design of the System is to withdraw water from Lake Huron and pump it to a standpipe in Lynn Township in St. Clair County, and from there the water will be pumped to a site in Oregon Township in Lapeer County, approximately 14 miles east of Flint, which site will contain a 150 million gallon earthen reservoir and Genesee's new water treatment plant (discussed below). The reservoir and new treatment plant will be owned by Genesee. Raw water flowing to the site in Oregon Township will be directed to Flint's water treatment plant and to Genesee's water treatment plant and reservoir. Figure 1 shows the location of the System facilities, the Flint water treatment plant and the proposed Genesee treatment plant and reservoir.

[The remainder of this page intentionally left blank]

7

Figure 1





Source: www.karegnondi.com



Source: Water and Waste Advisory Board Meeting Slide Show – April 10, 2013; Genesee County

The intake facility and the site therefor (the "Genesee Project") were financed through the issuance of bonds by Genesee in the principal amount of $35,000,000 in October, 2013 (the "Genesee Bonds"), with the understanding that Genesee would make the Genesee Project available to the Issuer for use by the Issuer as part of the System. Genesee is solely responsible for paying the principal of and interest on the Genesee Bonds from the net revenues derived from the users of the Genesee System and Genesee has pledged its limited tax full faith and credit as additional security for the Genesee Bonds. The lake intake is currently under construction, the County Agency having supervised the design of the facility and the receipt and award of construction bids for the facility. The lake intake is expected to be completed in October, 2014.

The Issuer has retained the services of the County Agency to administer the design and construction of the System. In addition, it is expected that the Issuer will also contract with the County Agency for operation and maintenance of the System after the System is completed and fully operational. The County Agency has significant experience in planning, operating and managing wastewater systems, having been responsible for planning, operating and managing the Genesee System since 1972. The County Agency currently employs approximately 128 people in connection with the operation and management of the Genesee System, and it is

8

expected that from this group, 5 full time equivalent employees will be involved in the operation and maintenance of the System.  The Issuer is not expected to have any full time employees.

On behalf of the Issuer, the County Agency has acquired 40 acres of land with 100 feet of frontage on Lake Huron in Sanilac County for the intake plant and pump station and 40 acres of land on the northwest corner of Martin Road and Hull Road in Lynn Township in St. Clair County for the standpipe and second pump station.  The County Agency has also acquired approximately 76 acres of land on the northeast corner of Marathon Road and Stanley Road in Oregon Township in Lapeer County to serve as the site for Genesee's new water treatment plant and reservoir.

In anticipation of the construction of the System, the County Agency has obtained a permit from the Michigan Department of Environmental Quality ("MDEQ") authorizing the withdrawal of up to 85 million gallons per day ("mgd") from Lake Huron.  Such permit will not need to be renewed at any time while the Bonds are outstanding.  In addition, the County Agency has hired project managers which have to date secured the route of the pipe line, identified all environmental issues and prepared preliminary permits for the entire 63-mile route, and also has retained consulting firms to complete the design of the remaining System facilities.

The County Agency has commissioned the design of the two pump stations and 63 miles of pipeline (36" to 66" in size).  The design and construction is broken up into seven individual projects.  They are as follows:

Lake Huron Pump Station
12 miles of 66-inch transmission main
12 miles of 66-inch transmission main
Intermediate Pump Station and Standpipe
12 miles of 60-inch transmission main
13 miles of 60-inch transmission main
14 miles of 36-inch transmission main

Since the contractor needs 15 months of good weather to complete each pipeline project, the pipeline projects were broken down into projects for a construction period of 15 months each.  The design of the pipelines is 60 percent complete.  The pipelines will be bid in a staggered format beginning in April, 2014 through September, 2014.  Each contract will be awarded within two months of bid opening.  Final pipeline contracts will be awarded no later than November, 2014, and with a 15-month construction period, the final pipeline is expected to be completed on or before March, 2016.

The System facilities call for 63 miles of large diameter piping, and the Issuer recognized that with limited capacity in the United States to produce the needed materials within the necessary time frame for construction, alternative methods of procurement would be required.  In 2013, the Issuer Authority requested proposals for large diameter piping and valves, and in October, 2013, the Issuer entered into a contract with American Cast Iron Pipe Company (ACIPCO) for the delivery of all 66-inch diameter, 60-inch diameter, and 36-inch diameter pipe.  In addition, ACIPCO will provide all large diameter valves for the pipeline and pump station yard piping and valves.

9

The Issuer has acquired all lands and easements necessary for construction of the System. In January 2014, MDEQ held four public hearings with regard to the Issuer's wetland crossing permit.  MDEQ has participated in the 30 percent, 60 percent and 90 percent reviews of the design, and its comments have been incorporated.  Upon 100% design completion of each pipeline project, the Issuer will submit an application to MDEQ for its construction permit for such project.  In addition, the Issuer will submit for its local permits from the local road commissions and soil erosion enforcement agencies. The Issuer expects to receive all such permits for the construction of the System in time to complete the System as anticipated.

The design of the two pump stations is 90 percent complete.  Final site plans have been submitted to the local municipalities, and bids for the pump stations are expected to be received in April, 2014, with the contracts to be awarded no later than June, 2014.  There is a 22-month construction schedule for the pump stations, and they are expected to be completed and in operation on or before May, 2016.

Based upon the foregoing, the System is expected to be available for service no later than May 1, 2016.  Each contract for construction has a completion date of at least 30-days prior to May 1, 2016 and a liquidated damage clause for failure to complete on a timely basis.  Each contract identifies substantial completion (operation of the pipeline) and final completion (pipeline, clean-up, and paperwork).  The County Agency can begin operation of the pipeline on behalf of the Issuer after substantial completion but prior to final completion.

The estimated construction costs for the System, including the lake intake and site financed by Genesee, are $268,844,053 based on water purchase contracts of 60 mgd.  The Issuer and the Local Units have entered into the Contract, whereby the Issuer has agreed to issue the Bonds and other bonds of the Issuer, in an aggregate amount not to exceed $300,000,000 (collectively, the "System Bonds"), to finance the remaining facilities for the System in anticipation of the Contractual Payments to be made by the Local Units as provided therein.  The estimated construction costs of the remaining facilities for the System is $233,725,381, and the amount of System Bonds to be issued to finance the costs of the remaining System facilities, including capitalized interest, amounts to fund the Debt Service Reserve Account, and issuance costs, is estimated to be $300,000,000.  The Contract is contemplated in the Water Purchase Contracts and sets forth the manner in which the capital costs of the System facilities will be allocated.  Under the Contract, Flint and Genesee are responsible for paying 34.2% and 65.8%, respectively, of the debt service on the System Bonds.  This allocation takes into account and credits Genesee for financing and being responsible for the payment of 100% of the costs of the Genesee Project.  In addition, in the event and to the extent that Flint fails to pay its share of the debt service on the System Bonds, Genesee will be responsible for making up the shortfall.  Flint and Genesee each expects to make such payments from the revenues to be derived from the customers of the Genesee System and the Flint System, respectively, but each has pledged its limited tax full faith and credit to the making of such payments.

### Interim Water Supply Arrangements for Genesee and Flint

Flint has purchased treated water from DWSD for approximately 30 years. The County Agency has a contract with Flint that requires Flint to purchase water from DWSD and provide that water to the County Agency.  Historically, the County Agency has not had a contract directly with DWSD.

On April 17, 2013, DWSD notified Flint that it was terminating its contract with Flint for the supply of water in one (1) year as required by the contract. As a result, no later than April 17, 2014, Flint intends to begin withdrawing water from the Flint River, treat the water in its water treatment plant and then make such treated water available to the customers of the Flint System until the System is completed and operational.  After the notification from DWSD, Flint sought another source of water and determined to use its water treatment plant to provide water to its customers.   In order to do so it negotiated an administrative consent order with MDEQ that permitted the temporary use of the Flint River (the "ACO"). The ACO requires Flint to either undertake a public improvement project to connect to the System or undertake other public improvements to continue to use the Flint River. In order to comply with the ACO, Flint has determined that connecting to the System is the most cost effective means to obtain untreated water and to comply with the ACO.

However, the Flint River will not be able to supply the volume of water needed to provide water to the customers of the Genesee System.  Inasmuch as the County Agency has a valid contract with Flint for the supply of water via DWSD, Flint is contractually obligated to continue to purchase water from DWSD in order to supply water to the County Agency. This may be accomplished, notwithstanding Flint utilizing the Flint River for a water source, by Flint continuing to purchase water from DWSD and directing the water to be transmitted directly to the County Agency by isolation valves currently installed in the Flint System.

In January, 2014, the County Agency entered into contract negotiations with DWSD to secure a water supply directly from DWSD for the customers of the Genesee System without using Flint as a pass through, until the System has been completed and is operational.  DWSD representatives have indicated that in the event that an agreement cannot be reached with the County Agency during these negotiations, DWSD will continue to supply water to the County Agency via Flint without a contract in place.  The County Agency and DWSD are negotiating two separate contracts, the first to satisfy Genesee's need for a short-term (3 year) contract for the supply of water during the time in which the System is being constructed, and the second that would require DWSD to provide a long-term emergency stand-by service to ensure the delivery of water to customers of the Genesee System if the System fails at any time in the future. Although no assurances can be made as to the eventual outcome of contract negotiations, both parties are negotiating in good faith.

In the event that the County Agency and DWSD are unable reach agreement on a proposed short-term contract for the supply of water during the construction period for the System, the County Agency has the ability to adjust Genesee's rates to the extent necessary, but cannot predict with certainty the price to be paid by customers of the Genesee System for water from DWSD until the System is completed and operational.  See BONDHOLDERS' RISKS herein.

*Related Facilities*

In order to provide finished water to its customers, Flint expects to utilize its existing water treatment plant, which is currently operating in a back-up role with a capacity of 36 mgd and will be permitted to treat water drawn from the Flint River until the System is operational. Flint will be required to make an estimated $8,000,000 in improvements to convert the plant from stand-by to fully operational and to accommodate the flow of water from the System.

11

Additional improvements to Flint's water treatment plant may be made in the future.  In order to provide finished water to Genesee's customers, the County Agency will be required to build a new water treatment plant, reservoir, pump station and approximately 5 miles of watermain running from the new treatment plant to Genesee's main distribution facility at Henderson Road, at an estimated cost of $60,000,000.  The County Agency has acquired 76 acres approximately 14 miles east of the City of Flint in Oregon Township in Lapeer County, which is expected to serve as the site of Genesee's new water treatment plant, reservoir and pump station.  In addition, on or before April 17, 2014, the County Agency expects to acquire 9 miles of 72-inch watermain from Flint, which will be used to support Genesee's distribution system to its customers.  The new water treatment plant, reservoir, pump station and watermain are expected to be constructed and fully operational on or before May 1, 2016, the date on which the System is expected to be fully operational.

The completion date for the System is projected for May 1, 2016, at which time Flint expects to cease pumping water from the Flint River and the County Agency expects to discontinue purchasing water from DWSD, and Flint and the County Agency expect to begin purchasing water from the Issuer and producing their own water.

## REPORT OF THE ENGINEERING CONSULTANT

Jones & Henry Engineers, Ltd., Toledo, Ohio, has prepared the Report of the Engineering Consultant, dated as of March 17, 2014, a copy of which is attached hereto as Appendix I.  The Report of the Engineering Consultant describes key factors that will affect water rates to be charged by Flint and the County Agency to customers of the Flint System and the Genesee System, respectively, from 2014 through 2018, and sets forth the assumptions on which the conclusions in the Report are based.

As set forth in the Report of the Engineering Consultant, the long term projections comparing the rates to be charged by KWA to Flint and the County Agency for use of the System plus other expenses related to operating, maintaining and improving their current treatment systems compared with rates historically charged to Flint and the County Agency by DWSD for comparable service show more stable rates from KWA for customers of both the Flint System and the Genesee System.  Most of the future expenses for the Flint System and the Genesee System are expected to be capital which will not increase annually and operating costs which will increase annually due to inflation.  DWSD charges to Flint and the County Agency, which historically have constituted a significant portion of both Flint's and the County Agency's total water expenses, have increased annually at a rate greater than the rate of inflation.  Rates are not expected to increase under KWA as they have under DWSD, and with appropriate rate increases Flint and the County Agency will be able to pay their respective share of the debt service on the System Bonds and the operation and maintenance expenses of the System plus other expenses related to operating, maintaining and improving, respectively, the Flint System and the Genesee System.

The Report of the Engineering Consultant should be read in its entirety for a complete understanding of the assumptions and conclusions contained therein.  As noted in the Report of the Engineering Consultant, any conclusions are subject to uncertainties, and some assumptions used to develop the conclusions will not be realized, and unanticipated events and circumstances

12

may occur.  Therefore, there could be differences between the conclusions and the actual results and those differences could be material.

# BONDHOLDERS' RISKS

The following discussion of some of the risk factors associated with the Bonds is not, and is not intended to be, exhaustive, and such risks are not necessarily presented in the order of their magnitude.

This Official Statement does not describe all of the risks of an investment in the Bonds and the Underwriters disclaim any responsibility to advise prospective investors of such risks as they exist at the date of this Official Statement or as they change from time to time.  Prospective investors should consult their own legal and tax advisors as to the risks associated with an investment in the Bonds and the suitability of investing in the Bonds in light of their particular circumstances.  Prospective investors should be able to bear the risks relating to an investment in the Bonds and should carefully consider, among other factors, the matters described below.

## *Assumptions With Regard to Local Unit Revenues*

Certain assumptions have been made with regard to the ability of Genesee and Flint to charge and collect revenues from the customers of the Genesee System and the Flint System, respectively, in amounts sufficient to pay their respective Contractual Payments.  These assumptions are believed to be reasonable, but to the extent that such revenues are not sufficient to enable Genesee and/or Flint to pay their Contractual Payments, the Contractual Payments would nevertheless be required to be paid from the general fund of Genesee and/or Flint, which could strain such general fund.  The assumptions are based on factors beyond Genesee's and Flint's control and there is no assurance that these projections will be achieved.  Many factors may prevent the projections from being achieved.  These include yearly changes in water consumption, population, population growth, household income, competitive facilities, accessibility, absorption, occupancy, vacancy and market penetration.

NO GUARANTEE CAN BE MADE THAT THE PROJECTIONS CONTAINED HEREIN WILL CORRESPOND WITH THE RESULTS ACTUALLY ACHIEVED IN THE FUTURE BECAUSE THERE IS NO ASSURANCE THAT ACTUAL EVENTS WILL CORRESPOND WITH THE ASSUMPTIONS MADE IN FORMULATING THE PROJECTIONS. ACTUAL OPERATING RESULTS MAY BE AFFECTED BY MANY FACTORS, INCLUDING, BUT NOT LIMITED TO, INCREASED COSTS, LOWER THAN ANTICIPATED REVENUES, CHANGES IN EMPLOYEE RELATIONS, APPLICABLE GOVERNMENTAL REGULATION, ECONOMIC AND DEMOGRAPHIC TRENDS, AND COMPETITION.

## *Inability to Finance the System; System Completion Risk*

As described under the heading KAREGNONDI WATER AUTHORITY SYSTEM, the System is intended initially to supply raw water for customers of the Genesee System and the Flint System.   If for any reason the Issuer is unable to acquire, construct, complete or place the System in service, the System facilities to be financed with the proceeds of the Bonds will not be

useful to the Genesee System or the Flint System unless Genesee and/or Flint constructs its own pipeline.  At this time, it is unclear whether Genesee and/or Flint would undertake constructing its own pipeline.

The rates and charges currently established by Genesee and Flint are projected to be sufficient to pay the Contractual Payments and their share of the principal of and interest on the Bonds.  However, if the System is not placed in service, the additional costs associated with paying for the debt service on the Bonds without a tangible benefit to be derived from the System could ultimately have an adverse effect on the ability of Genesee and Flint to generate sufficient revenues from the customers of their respective water supply systems and their ability to pay their share of debt service on the Bonds.

In order to provide customers for the System, the County Agency and Flint have entered into the Water Purchase Contracts.  Genesee and Flint have also entered into the Contract, under which they are responsible for paying their respective share of the Bonds and the second series of the System Bonds to be issued to finance the costs of the remaining System facilities (approximately $80,000,000).  Genesee's share of the Bonds and the approximately $80,000,000 of the second series of the System Bonds will be the entire amount if Flint fails to fulfill its obligation to pay its Contractual Payments under the Contract for any reason.

Genesee and Flint each faces potential exposure to its general fund and to the rates and charges to be paid by its water customers served by the Genesee System and Flint System, respectively, for the debt service associated with the Genesee Bonds (only in the case of Genesee) and up to an estimated $300,000,000 for the System Bonds if for any reason the remaining System facilities are not completed. The remaining System facilities could fail to be completed because of an inability to gain market access for the financing for all or part of such facilities, cost overruns in construction, or acts of God.

Genesee intends for its obligations with respect to the Genesee Bonds and the System to be paid for by rates and charges from the users of the Genesee System.  If Flint fails to pay its share of the System Bonds, either from rates and charges to users of the Flint System or from its general fund, Genesee would be responsible for making up the shortfall.  If Genesee's general fund is needed to pay a significant portion of the System Bonds, it could cause significant financial strain on Genesee.

As noted under the heading KAREGNONDI WATER AUTHORITY SYSTEM, in order for Flint to provide finished water to its customers, it needs to undertake approximately $8,000,000 in improvements to its existing water treatment plant.  If Flint is unable to timely complete such improvements for any reason (including without limitation, a referendum on the financing, an inability to gain market access for the financing for the improvements, cost overruns in construction, or acts of God), Flint may be unable to generate sufficient rates and charges from its customers to cover its share of the debt service on the System Bonds as provided in the Contract.  Without sufficient rates and charges, it is unclear whether Flint's general fund will have sufficient funds to fulfill its obligations under the Contract, which in turn could strain Genesee's general fund or the amount of rates and charges to be charged to Genesee's customers.

14

Finally, similar to Flint, Genesee needs to construct a water treatment plant, reservoir, pump station and 5 miles of watermain at an estimated cost of $60,000,000 as described under the heading KAREGNONDI WATER AUTHORITY SYSTEM in order to provide finished water to its customers.  If Genesee is unable to timely complete the new treatment plant, reservoir, pump station and watermain for any reason (including without limitation, an inability to gain market access for the financing, cost overruns in construction, or acts of God), Genesee may be unable to generate sufficient rates and charges from its customers to cover its share of the debt service on the System Bonds as provided in the Contract, which could strain Genesee's general fund.

***Financial Condition of the City of Flint and Genesee for future Obligations to Issuer***

Flint is currently operating under a State-appointed Emergency Manager under the Local Financial Stability and Choice Act, Act No. 436, Public Acts of Michigan, 2012 ("Act 436").  Flint's options to improve its fiscal health are limited.  The United States Bankruptcy Code, 11 U.S.C. Section 101, *et. seq.* (the "Bankruptcy Code") does not authorize municipalities to be subject to involuntary bankruptcy cases.  Flint must be specifically authorized to be a debtor under chapter 9 of the Bankruptcy Code by State law or by a governmental officer or organization empowered by State law to authorize Flint to be a debtor under chapter 9 of the Bankruptcy Code.  Act 436 provides such authorization after Flint first complies with certain requirements set forth therein.  The effect of a Flint bankruptcy on its obligations to the Issuer is unknown at this time, including without limitation its obligations to continue to make payments to the Issuer under its Water Purchase Contract with the Issuer and under the Contract.  If Flint fails to fulfill its payment obligations under the Contract for any reason, including a bankruptcy filing by Flint, Genesee will be required to pay Flint's share of the debt service on the System Bonds.  While this provides protection for the Issuer, such payments could cause significant financial strain on the general fund of Genesee and the net revenues of the Genesee System, potentially limiting the extent of this protection.  Similarly, if Flint fails to fulfill its payment obligation under its Water Purchase Contract, the Issuer could be obligated to continue supplying raw water to Flint without payment for a period of 60 days, or longer in the event of a Flint bankruptcy case.

For a discussion of litigation that could affect Flint's financial condition and the rates that are charged to customers of the Flint System, see the heading LITIGATION – Other Litigation herein, and for a discussion of the financial condition of Flint see the information under the heading "Update on City of Flint Financial Position" in APPENDIX C.

Although no Act 436 proceedings have ever occurred with respect to Genesee, nor has the Michigan Department of Treasury ever indicated the intent to begin such proceedings, if Genesee were to experience severe financial difficulties, the same analysis that applies to Flint applies with respect to the County Agency's and Genesee's respective obligations under the Water Purchase Contract and the Contract.

# LITIGATION

## *Pending Litigation*

The Issuer has no litigation pending or, to its knowledge, threatened, wherein an unfavorable decision, ruling or finding would adversely affect the issuance of the Bonds or materially affect the Issuer's ability to pay the principal of and interest on the Bonds.

## *Other Litigation*

### *Flint Health Care Retirement Benefits*

Flint's Emergency Manager has issued several orders under Act 436 which modified existing contracts and collective bargaining agreements with respect to health care benefits of municipal retirees. While the modifications stand to save Flint $5 million per year and potentially more in future years, the changes also shift some out-of-pocket medical expenses to retirees.

As a result of such orders, a class action lawsuit has been filed by individual retired municipal workers, their eligible spouses, dependents, and the United Retired Governmental Employees ("URGE"), an organization that represents the interests of municipal retirees (collectively, the "Plaintiffs") seeking injunctive relief and damages under 42 U.S.C. § 1983, against Flint, its current and former Emergency Managers, its Retirement Officer Manager, and its Finance Director (collectively, "Defendants"). (Welch et al v. Brown, et al. Case No.12-13808, Judge Arthur Tarnow, ED Michigan). According to Plaintiffs, Defendants violated the Contract and Bankruptcy Clauses of the United States Constitution and deprived them of a property interest without due process or just compensation. The class has not yet been certified by the federal district court.

Plaintiffs requested a preliminary injunction to enjoin Defendants from modifying the contracts and ordinances governing their health-care benefits and to restore any already modified agreements to the status quo ante. Defendants maintain that reducing retiree benefits is a necessary change to avoid bankruptcy. The federal district court was not persuaded by Defendants' position based on the evidence and argument presented and granted preliminary injunctive relief to the Plaintiffs. Defendants appealed to the United States Court of Appeals for the Sixth Circuit. The Sixth Circuit reviewed the matter and affirmed the district court's order granting preliminary injunctive relief. (COA Case # 13-1476 decided 1/3/14).

The Sixth Circuit made clear the door remains open for Flint to prove its case, stating that "additional fact finding may illuminate whether the orders were indeed appropriate under the circumstances of this case." The Welch case comes down to whether Flint's modifications of retiree healthcare benefits were reasonable and necessary to remedy the economic problems facing Flint. In order to prove that, Flint must show that the modifications were virtually the only choice it had to avoid significant social harm, including:

1. That bankruptcy was/is imminent if the changes were not made;
2. That Flint was/is contemplating bankruptcy if it cannot modify the retiree healthcare benefits;

16

3.  That alternative strategies to addressing the economic problems have been considered and will not work to address the economic problems; and

4.  That the alternatives proposed by the Plaintiffs to address the economic problems will not work.

Flint intends to vigorously contest this litigation and pursue all available remedies to have the orders of the Emergency Manager sustained.  If the Plaintiffs ultimately prevail in this litigation, Flint projects that it will incur an additional $5 million annually for retiree health care costs and that it will be in an extremely precarious financial position, with insufficient resources to meet basic functions.  This projection of $5 million in additional costs could increase significantly based on future increases in premium costs that the City's modifications require be borne by retirees. The health care changes as well as all of the other changes made by the Emergency Manager were deemed to be necessary for Flint to avoid insolvency.  Flint is unable to predict the outcome of this litigation at this time.  See the information under the heading "Update on City of Flint Financial Position" in APPENDIX C.

*Flint Water Rates*

On August 15, 2011, the Mayor of Flint directed a rate increase for Flint's water and sewer rates because the City was spending more to provide water and sewer services than it was receiving in user funds.  Flint increased rates for 2012 by approximately 35 percent.   The President of the Flint Council, William Kincaid, and others filed an original action in the Michigan Court of Appeals, Kincaid v City of Flint, alleging that the fee increases were unconstitutional taxes levied without the approval of the electors of Flint that violated the Headlee Amendment to the Michigan Constitution.  Flint filed a motion for summary disposition, arguing that there was no issue of fact that the fees charged were proportionate to the costs of providing water and sewer service, and as such were valid user fees, not taxes.  Flint introduced evidence that the fee increases were required to pay the projected costs of the water and sewer systems for Fiscal Year 2012.  The Michigan Court of Appeals agreed that the water and sewer fees charged by the City were valid user fees, not disguised taxes, as they were proportionate to the costs of providing service.  As such, the Headlee Amendment did not apply.  The plaintiffs filed an application for leave to appeal the decision to the Michigan Supreme Court, and for peremptory reversal of the Court of Appeals' decision.   The Supreme Court denied the application for leave to appeal.

The plaintiffs then filed an action in Genesee County Circuit Court alleging that water rate increases which were accomplished by a directive dated August 15, 2011 were implemented in a manner that was in violation of a Flint ordinance which required that action to modify water rates be done on or before April 15 of the year in which it was to take effect.  Additionally, the plaintiffs alleged that the City failed to create a first lien in favor of bondholders for water and sewer funds, as required by the Revenue Bond Act (Act 94, Public Acts of Michigan, 1933, as amended).  The Court granted Flint's motion for summary disposition, finding that the powers of the Emergency Manager pursuant to Act 4, Public Acts of Michigan, 2011 rendered the alleged violation of the Flint ordinance moot and dismissed the claim with respect to the Revenue Bond Act.  The plaintiffs have since filed an appeal with the Court of Appeals, which is currently pending.  Flint is unable to predict the outcome of this litigation at this time.

17

## TAX MATTERS

In the opinion of Miller, Canfield, Paddock and Stone, P.L.C., Bond Counsel, under existing law, the interest on the Bonds is excludable from gross income for federal income tax purposes and is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations.  It should be noted, however, that with respect to corporations (as defined for federal income tax purposes) such interest is taken into account in determining adjusted current earnings for the purpose of computing the alternative minimum tax imposed on such corporations.  Bond Counsel is also of the opinion that, under existing law, the Bonds and the interest thereon are exempt from all taxation by the State of Michigan or by any taxing authority within the State of Michigan, except inheritance and estate taxes and taxes on gains realized from the sale, payment or other disposition thereof.  Bond Counsel will express no opinion regarding any other federal or state tax consequences arising with respect to the Bonds and the interest thereon.

The opinion on federal and State of Michigan tax matters is based on the accuracy of certain representations and certifications, and continuing compliance with certain covenants, of the Issuer contained in the transcript of proceedings and which are intended to evidence and assure the foregoing, including that the Bonds are and will remain obligations the interest on which is excludable from gross income for federal and State of Michigan income tax purposes. The Issuer has covenanted to take the actions required of it for the interest on the Bonds to be and to remain excludable from gross income for federal income tax purposes, and not to take any actions that would adversely affect that exclusion.   Bond Counsel's opinion assumes the accuracy of the Issuer's certifications and representations and the continuing compliance with the Issuer's covenants.  Noncompliance with these covenants by the Issuer may cause the interest on the Bonds to be included in gross income for federal income tax purposes retroactively to the date of issuance of the Bonds.  After the date of issuance of the Bonds, Bond Counsel will not undertake to determine (or to so inform any person) whether any actions taken or not taken, or any events occurring or not occurring, or any other matters coming to Bond Counsel's attention, may adversely affect the exclusion from gross income for federal and State of Michigan income tax purposes of interest on the Bonds or the market prices of the Bonds.

The opinion of Bond Counsel is based on current legal authority and covers certain matters not directly addressed by such authority.  It represents Bond Counsel's legal judgment as to the excludability of interest on the Bonds from gross income for federal and State of Michigan income tax purposes but is not a guarantee of that conclusion.  The opinion is not binding on the Internal Revenue Service ("IRS") or any court.  Bond Counsel cannot give and has not given any opinion or assurance about the effect of future changes in the Internal Revenue Code of 1986, as amended (the "Code"), the applicable regulations, the interpretations thereof or the enforcement thereof by the IRS.

Ownership of the Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, corporations subject to the branch profits tax, financial institutions, certain insurance companies, certain S corporations, individual recipients of Social Security or Railroad Retirement benefits and taxpayers who may be deemed to have incurred (or continued) indebtedness to purchase or carry the Bonds.  Bond Counsel will express no opinion regarding any such consequences.

### *Tax Treatment of Accruals on Original Issue Discount Bonds*

Under existing law, if the initial public offering price to the public (excluding bond houses and brokers) of a Bond is less than the stated redemption price of such Bonds at maturity, then such Bond is considered to have "original issue discount" equal to the difference between such initial offering price and the amount payable at maturity (such Bonds are referred to as "OID Bonds"). Such discount is treated as interest excludable from federal gross income to the extent properly allocable to each registered owner thereof. The original issue discount accrues over the term to maturity of each such OID Bond on the basis of a constant interest rate compounded at the end of each six-month period (or shorter period) from the date of original issue with straight-line interpolations between compounding dates. The amount of original issue discount accruing during each period is added to the adjusted basis of such OID Bonds to determine taxable gain upon disposition (including sale, redemption or payment on maturity) of such OID Bonds.

The Code contains certain provisions relating to the accrual of original issue discount in the case of purchasers of OID Bonds who purchase such OID Bonds after the initial offering of a substantial amount thereof. Owners who do not purchase such OID Bonds in the initial offering at the initial offering prices should consult their own tax advisors with respect to the tax consequences of ownership of such OID Bonds.

All holders of the OID Bonds should consult their own tax advisors with respect to the allowance of a deduction for any loss on a sale or other disposition of an OID Bond to the extent such loss is attributable to accrued original issue discount.

### *Amortizable Bond Premium*

For federal income tax purposes, the excess of the initial offering price to the public (excluding bond houses and brokers) at which a Bond is sold over the amount payable at maturity thereof constitutes for the original purchasers of such Bonds (collectively, the "Original Premium Bonds") an amortizable bond premium. Bonds other than Original Premium Bonds may also be subject to an amortizable bond premium determined generally with regard to the taxpayer's basis (for purposes of determining loss on a sale or exchange) and the amount payable on maturity or, in certain cases, on an earlier call date (such bonds being referred to herein collectively with the Original Premium Bonds as the "Premium Bonds"). Such amortizable bond premium is not deductible from gross income. The amount of amortizable bond premium allocable to each taxable year is generally determined on the basis of the taxpayer's yield to maturity determined by using the taxpayer's basis (for purposes of determining loss on sale or exchange) of such Premium Bonds and compounding at the close of each six-month accrual period. The amount of amortizable bond premium allocable to each taxable year is deducted from the taxpayer's adjusted basis of such Premium Bonds to determine taxable gain upon disposition (including sale, redemption or payment at maturity) of such Premium Bonds.

All holders of the Premium Bonds should consult with their own tax advisors as to the amount and effect of the amortizable bond premium.

*Market Discount*

The "market discount rules" of the Code apply to the Bonds. Accordingly, holders acquiring their Bonds subsequent to the initial issuance of the Bonds will generally be required to treat market discount recognized under the provisions of the Code as ordinary taxable income (as opposed to capital gain income). Holders should consult their own tax advisors regarding the application of the market discount provisions of the Code and the advisability of making any of the elections relating to market discount allowed by the Code.

*Information Reporting and Backup Withholding*

Information reporting requirements apply to interest paid after March 31, 2007 on tax-exempt obligations, including the Bonds. In general, such requirements are satisfied if the interest recipient completes, and provides the payor with, a Form W-9, "Request for Taxpayer Identification Number and Certification," or unless the recipient is one of a limited class of exempt recipients, including corporations. A recipient not otherwise exempt from information reporting who fails to satisfy the information reporting requirements will be subject to "backup withholding," which means that the payor is required to deduct and withhold a tax from the interest payment, calculated in the manner set forth in the Code. For the foregoing purpose, a "payor" generally refers to the person or entity from whom a recipient receives its payments of interest or who collects such payments on behalf of the recipient.

If an owner purchasing the Bonds through a brokerage account has executed a Form W-9 in connection with the establishment of such account no backup withholding should occur. In any event, backup withholding does not affect the excludability of the interest on the Bonds from gross income for federal income tax purposes. Any amounts withheld pursuant to backup withholding would be allowed as a refund or a credit against the owner's federal income tax once the required information is furnished to the IRS.

*Future Developments*

Bond Counsel's engagement with respect to the Bonds ends with the issuance of the Bonds and, unless separately engaged, bond counsel is not obligated to defend the Issuer in the event of an audit examination by the IRS. The IRS has a program to audit tax-exempt obligations to determine whether the interest thereon is includible in gross income for federal income tax purposes. If the IRS does audit the Bonds, under current IRS procedures, the IRS will treat the Issuer as the taxpayer and the beneficial owners of the Bonds will have only limited rights, if any, to obtain and participate in judicial review of such audit.

NO ASSURANCE CAN BE GIVEN THAT ANY FUTURE LEGISLATION OR CLARIFICATIONS OR AMENDMENTS TO THE CODE, IF ENACTED INTO LAW, WILL NOT CONTAIN PROPOSALS WHICH COULD CAUSE THE INTEREST ON THE BONDS TO BE SUBJECT DIRECTLY OR INDIRECTLY TO FEDERAL OR STATE OF MICHIGAN INCOME TAXATION, ADVERSELY AFFECT THE MARKET PRICE OR MARKETABILITY OF THE BONDS, OR OTHERWISE PREVENT THE HOLDERS FROM REALIZING THE FULL CURRENT BENEFIT OF THE STATUS OF THE INTEREST THEREON. BOND COUNSEL EXPRESSES NO OPINION REGARDING ANY PENDING OR PROPOSED FEDERAL OR STATE OF MICHIGAN TAX LEGISLATION.

FURTHER, NO ASSURANCE CAN BE GIVEN THAT ANY ACTIONS OF THE INTERNAL REVENUE SERVICE, INCLUDING, BUT NOT LIMITED TO, SELECTION OF THE BONDS FOR AUDIT EXAMINATION, OR THE COURSE OR RESULT OF ANY EXAMINATION OF THE BONDS, OR OTHER BONDS WHICH PRESENT SIMILAR TAX ISSUES, WILL NOT AFFECT THE MARKET PRICE OF THE BONDS.

INVESTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE TAX CONSEQUENCES OF THEIR ACQUISITION, HOLDING OR DISPOSITION OF THE BONDS, INCLUDING THE IMPACT OF ANY PENDING OR PROPOSED FEDERAL OR STATE OF MICHIGAN TAX LEGISLATION.

## APPROVAL BY THE MICHIGAN DEPARTMENT OF TREASURY

The Issuer has received a letter from the Department of Treasury of the State of Michigan, dated February 28, 2014, approving the issuance of the Bonds as provided in the Revised Municipal Finance Act, Act No. 34, Public Acts of Michigan, 2001, as amended.

## BOND COUNSEL'S RESPONSIBILITY

The fees of Miller, Canfield, Paddock and Stone, P.L.C. ("Bond Counsel") for services rendered in connection with its approving opinion are expected to be paid from Bond proceeds. Except to the extent necessary to issue its approving opinion as to the validity of the Bonds and tax matters relating to the Bonds and the interest thereon, and except as stated below, Bond Counsel has not been retained to examine or review, and has not examined or reviewed, any financial documents, statements or materials that have been or may be furnished in connection with the authorization, issuance or marketing of the Bonds and accordingly will not express any opinion with respect to the accuracy or completeness of any such financial documents, statements or materials.

Bond Counsel has reviewed the statements in this Official Statement under the headings entitled "PURPOSE," "SECURITY," "THE BONDS," "PRIOR REDEMPTION OF BONDS," "TRANSFER OUTSIDE BOOK-ENTRY-ONLY SYSTEM," "TAX MATTERS," "APPROVAL   BY THE MICHIGAN DEPARTMENT OF TREASURY," "BOND COUNSEL'S RESPONSIBILITY," and "CONTINUING DISCLOSURE" (first two paragraphs only). Bond Counsel has not been retained to review and has not reviewed any other portions of the Official Statement for accuracy or completeness, and has not made inquiry of any official or employee of the Issuer or any other person and has made no independent verification of such other portions hereof, and further has not expressed and will not express an opinion or belief as to any such other portions hereof.

## CONTINUING DISCLOSURE

Prior to the delivery of the Bonds, the Issuer and each Local Unit will execute a Continuing Disclosure Undertaking (individually an "Undertaking" and collectively, the "Undertakings") for the benefit of the holders of the Bonds or Beneficial Owners to send certain information annually and to provide notice of certain events to certain information repositories pursuant to the requirements of Rule 15c2-12(b)(5) (the "Rule") adopted by the Securities and

Exchange Commission under the Securities Exchange Act of 1934. The information to be provided on an annual basis, the events which will be noticed on an occurrence basis, and the other terms of the Undertaking are set forth in *APPENDIX E-FORM OF CONTINUING DISCLOSURE UNDERTAKINGS* to this Official Statement.

A failure by the Issuer or a Local Unit to comply with its Undertaking will not constitute an event or default under the Resolution authorizing the issuance of the Bonds and holders of the Bonds or Beneficial Owners are limited to the remedies described in the Undertakings.

Genesee discovered in the summer of 2013 it had failed to comply with certain of its continuing disclosure obligations under previous undertakings entered into pursuant to the Rule with respect to annual information filings required for fiscal years 2008-2010. Genesee was required to file this information within a period of time specified in each previous undertaking after the end of the fiscal year which ends on September 30. The filings were subsequently made for fiscal year 2008 in December 2010, for fiscal year 2009 in June 2010 and for fiscal year 2010 in December 2011 for the Genesee's sewer, water supply, capital improvement and general obligation bonds. The filings for fiscal years 2008-2010 were subsequently made for the Issuer's building authority bonds on July 23, 2013. Genesee has filed its annual audited financial statements for fiscal years 2011 and 2012 on a timely basis.

In addition, Genesee failed to provide notice of certain underlying rating changes that occurred in 2010 affecting its sewer, water supply, building authority, capital improvement and general obligation bonds. Genesee subsequently filed notice of these rating changes and the current ratings on those bonds with a filing dated July 16, 2013. Furthermore, Genesee failed to provide notice of certain insured rating downgrades affecting its sewer, water supply and building authority bonds, of which Genesee was not separately notified by the relevant rating agencies, and which resulted from a series of widely reported downgrades of the applicable municipal bond insurer for those bonds. Genesee subsequently filed notice of these rating changes and the current ratings on those bonds with a filing dated July 16, 2013. Genesee has taken steps to assure that it will comply with its Undertaking and its previous undertakings, including the annual filing requirements, in the future. Genesee entered into an agreement in October, 2011 with Stauder, Barch & Associates, Inc. to serve as disclosure agent and assist Genesee in completing all required filings on a timely basis.

Flint has not entered into any previous continuing disclosure undertakings under the Rule.

A failure by the Issuer or either Local Unit to comply with its Undertaking must be reported by the Issuer or such Local Unit in accordance with the Rule and must be considered by any broker, dealer or municipal securities dealer before recommending the purchase or sale of the Bonds in the secondary market. Consequently, such failure may adversely affect the transferability and liquidity of the Bonds and their market price.

## LEGAL OPINION

Legal matters incident to the authorization, issuance and sale of the Bonds are subject to the approval of Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan,

Bond Counsel.  A copy of the opinion of Bond Counsel will be furnished with the Bonds, which opinion will be substantially in the form set forth in APPENDIX F.

## FINANCIAL ADVISOR

Stauder, Barch & Associates, Inc., Ann Arbor, Michigan, (the "Financial Advisor") has been retained by the Issuer to provide certain financial advisory services including, among other things, preparation of portions of the deemed "final" Preliminary Official Statement and the final Official Statement (the "Official Statements"). The information contained in the Official Statements was prepared in part by the Financial Advisor and is based on information supplied by various officials from records, statements and reports required by various local county or state agencies of the State of Michigan in accordance with constitutional or statutory requirements.

To the best of the Financial Advisor's knowledge, all of the information contained in the Official Statements, which it assisted in preparing, while it may be summarized is (i) complete and accurate; (ii) does not contain any untrue statement of material fact; and (iii) does not omit any material fact, or make any statement which would be misleading in light of the circumstances under which these statements are being made.  However, the Financial Advisor has not and will not independently verify the completeness and accuracy of the information contained in the Official Statements.

The Financial Advisor's duties, responsibilities and fees arise solely from that as financial advisor to the Issuer and they have no secondary obligations or other responsibility.   The Financial Advisor's fees are expected to be paid from Bond proceeds.

## UNDERWRITING

The Bonds are being purchased by the Underwriters listed on the cover page of this Official Statement.  The Underwriters have agreed, subject to certain conditions, to purchase all of the Bonds from the Issuer at an underwriters' discount of $946,374.90 from the initial offering prices set forth in this Official Statement. The Underwriters are obligated to purchase all of the Bonds, if any are purchased, the obligation to make such purchase being subject to certain terms and conditions set forth in the Bond Purchase Agreement with respect to the Bonds, the approval of certain legal matters by counsel and certain other conditions.  The initial public offering prices of the Bonds may be changed from time to time by the Underwriters.  The Bonds may be offered and sold by the Underwriters to certain dealers (including dealers depositing the Bonds in unit investment trusts, some of which may be managed by the Underwriters) and certain dealer banks and banks acting as agents at prices lower than the public offering prices set forth in this Official Statement.

J.P. Morgan Securities LLC ("JPMS"), one of the Underwriters of the Bonds, has entered into a negotiated dealer agreement ("Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings, at the original issue prices. Pursuant to the Dealer Agreement (if applicable to this transaction), CS&Co. will purchase Bonds from JPMS at the original issue price less a negotiated portion of the selling concession applicable to any Bonds that CS&Co. sells.

23

Wells Fargo Securities is the trade name for certain securities-related capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Bank, National Association ("WFBNA"). WFBNA, one of the underwriters of the Bonds, has entered into an agreement (the "Distribution Agreement") with its affiliate, Wells Fargo Advisors, LLC ("WFA"), for the distribution of certain municipal securities offerings, including the Bonds.   Pursuant to the Distribution Agreement, WFBNA will share a portion of its underwriting or remarketing agent compensation, as applicable, with respect to the Bonds with WFA.  WFBNA also utilizes the distribution capabilities of its affiliates, Wells Fargo Securities, LLC ("WFSLLC") and Wells Fargo Institutional Securities, LLC ("WFIS"), for the distribution of municipal securities offerings, including the Bonds.   In connection with utilizing the distribution capabilities of WFSLLC, WFBNA pays a portion of WFSLLC's expenses based on its municipal securities transactions.  WFBNA, WFSLLC, WFIS, and WFA are each wholly-owned subsidiaries of Wells Fargo & Company.

The Underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities.  The Underwriters have, from time to time, and may in the future perform, various investment banking services for the Issuer for which it received or will receive customary fees and expenses.

In the ordinary course of its various business activities, the Underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank loans and/or credit default swaps) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities may involve securities and instruments of the Issuer.

## RATING

Moody's Investors Service has assigned the Bonds a rating of "A2," and Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc., has assigned the Bonds a rating of "A+."  No application was made to any other rating agency for the purpose of obtaining an additional rating on the Bonds.  Any explanation of the significance of each such rating may only be obtained from the rating agency.  Generally, a rating agency bases its rating on such information and materials and on investigations, studies and assumptions by the rating agency.  There is no assurance that such rating will continue for any given period of time or that it will not be revised downward or withdrawn entirely by such rating agency, if in the judgment of the rating agency circumstances so warrant.  Any such downward revision or withdrawal of such rating may have an adverse effect on the market price of the Bonds.

## OTHER MATTERS

All information contained in this Official Statement is subject, in all respects, to the complete body of information contained in the original sources thereof.  In particular, no opinion or representation is rendered as to whether any projection will approximate actual results, and all opinions, estimates and assumptions, whether or not expressly identified as such, should not be considered statements of fact.

KAREGNONDI WATER AUTHORITY

By: /s/ Jeffrey Wright
      Jeffrey Wright, Chief Executive Officer

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX A**

**COUNTY OF GENESEE**
**GENERAL FINANCIAL, ECONOMIC AND STATISTICAL INFORMATION**

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX A**

# COUNTY OF GENESEE

# GENERAL FINANCIAL INFORMATION

**AREA**

The County of Genesee covers an area of approximately 643 square miles.

**POPULATION**

The population of the County is as follows:

| | |
|---|---|
| 2010 U.S. Census | 425,790 |
| 2000 U.S. Census | 436,141 |
| 1990 U.S. Census | 430,459 |

**PROPERTY VALUATIONS**

Article IX, Section 3, of the Michigan Constitution, limits the proportion of true cash value at which property can be assessed to a percentage not to exceed 50% of true cash value. The Michigan Legislature by statute has provided that property shall be assessed at 50% of its true cash value, except as described in the paragraphs below. The Michigan Legislature or the electorate may at some future time reduce the percentage below 50% of true cash value.

On March 15, 1994, the electors of the State approved an amendment to the Michigan Constitution permitting the Legislature to authorize ad valorem taxes on a non-uniform basis. The legislation implementing this constitution amendment added a new measure of property value known as "taxable value." Since 1995, taxable property has had two valuations -- State equalized valuation ("SEV") and taxable value. Property taxes are levied on taxable value. Generally, the taxable value of property is the lesser of (a) the taxable value of property in the immediately preceding year, adjusted for losses, multiplied by the lesser of the inflation rate or 1.05, plus additions, or (b) the property's current SEV. Under certain circumstances, therefore, the taxable value of property may be different from the same property's SEV. When property is sold or transferred, taxable value is adjusted to the SEV, which under existing law is 50% of the current true cash value. The taxable value and SEV of new construction is equal to current SEV. The taxable value and SEV of existing property are also adjusted annually for additions and losses.

Responsibility for assessing taxable property rests with the local assessing officer of each township and city. Any property owner may appeal the assessment to the local assessor, the local Board of Review and ultimately to the Michigan Tax Tribunal.

In addition to limiting the annual increase in taxable value, the Michigan Constitution mandates a system of equalization for assessments. Although the assessors for each local unit of government within a county are responsible for actually assessing at 50% of true cash value, adjusted for taxable value purposes, the final SEV and taxable value are arrived at through several steps. Assessments are established initially by the municipal assessor. Municipal assessments are then equalized to the 50% levels as determined by the County Department of Equalization. Thereafter, the State equalizes the various counties in relation to each other. SEV is important, aside from its use in determining taxable value for the purpose of levying ad valorem property taxes, because of its role in the spreading of taxes between overlapping jurisdictions, the distribution of various State aid programs, State revenue sharing and in the calculation of debt limits.

Property that is exempt from property taxes (e.g., churches, governmental property, public schools) is not included in the SEV or taxable value data in this Official Statement. Property granted tax abatements under Act 198, Public Acts of Michigan, 1974, as amended, is recorded on a separate tax roll which is subject to tax abatement. The valuation of tax abated property is based upon SEV but is not included in either the SEV or taxable value data in this Official Statement except as noted.

*Historical Valuation*

| Year | State Equalized Valuation | Taxable Valuation |
|------|---------------------------|-------------------|
| 2013 | $8,996,549,108 | $8,591,144,574 |
| 2012 | 9,183,568,010 | 8,805,229,871 |
| 2011 | 9,950,805,569 | 9,450,208,638 |
| 2010 | 10,798,912,285 | 10,135,718,671 |
| 2009 | 12,466,321,796 | 11,386,079,390 |
| 2008 | 13,698,999,172 | 11,829,074,332 |
| 2007 | 14,156,934,349 | 11,849,655,646 |
| 2006 | 13,695,827,367 | 11,320,948,189 |

| | | |
|---|---|---|
| 2013 Taxable Valuation | | $8,591,144,574 |
| Plus: 2013 IFT Valuation | | 62,645,572* |
| 2013 Total Taxable Valuation | | $8,653,790,146 |

\* Millage is levied at half rate against the IFT Taxable Valuation. See "Tax Abatements" below
Source: Genesee County Equalization Dept

*Per Capita Valuation*

| | |
|---|---|
| 2013 Per Capita Taxable Valuation | $20,176.95 |
| 2013 Per Capita State Equalized Valuation | $21,129.08 |
| 2013 Per Capita Estimated True Cash Valuation | $42,258.15 |

*Tax Abatements*

Under the provisions of Act 198 of the Public Acts of Michigan, 1978 ("Act 198"), plant rehabilitation districts and/or industrial development districts may be established. Businesses in these districts are offered certain property tax incentives to encourage restoration or replacement of obsolete facilities and to attract new facilities in the area. The industrial facilities tax ("IFT") is paid, at a lesser effective rate and in lieu of ad valorem property taxes, in such facilities for a period of up to 12 years. Qualifying facilities are issued abatement certificates for this period.

After expiration of the abatement certificate, the then-current SEV of the facility is returned to the ad valorem tax roll. The owner of such facility may obtain a new certificate, provided it has complied with the provisions of Act 198.

The 2013 Taxable Value for all IFT abated property within the County is $62,645,572. The total for new IFT Taxable Valuation is $57,658,772 and $4,986,800 is new Renaissance Zone IFT Taxable Valuation; millage is levied at half the rate on the new amount. The total for rehab IFT Taxable Valuation is $3,100,000; millage is levied at full rate on this amount.

*Tax Increment Authorities*

Act 450 of the Public Acts of Michigan, 1980, as amended, (the "TIFA Act"), Act 197 of the Public Acts of Michigan, 1975, as amended, (the "DDA Act"), Act 281 of the Public Acts of Michigan, 1986, as amended, (the "LDFA Act") and Act 381 of the Public Acts of Michigan, 1996, as amended (the "BRDA Act") (together the "TIF Acts") authorize the designation of specific districts known as Tax Increment Finance Authority ("TIFA") Districts, Downtown Development Authority ("DDA") Districts, Local Development Finance Authority ("LDFA") Districts or Brownfield Redevelopment Authority ("BRDA") Districts. Such districts are authorized to formulate tax increment financing plans for public improvements, economic development, neighborhood revitalization and historic preservation within the district.

Tax increment financing permits the TIFA, DDA, LDFA, or BRDA to capture tax revenues attributable to increases in value ("TIF Captured Value") of real and personal property located within an approved development area while any tax increment financing plans by an established district are in place. These captured revenues are used by the districts and are not passed on to the local taxing jurisdictions.

***Tax Base Composition***

A breakdown of the County's 2013 Taxable Valuation by class and use is as follows:

| By Class | Valuation | Total |
|---|---|---|
| Real Property | $7,922,862,283 | 92.22% |
| Personal Property | 668,282,291 | 7.78 |
| TOTAL | $8,591,144,574 | 100.00% |

| By Use | | |
|---|---|---|
| Agricultural | $122,092,317 | 1.42% |
| Commercial | 1,712,997,352 | 19.94 |
| Industrial | 250,527,317 | 2.92 |
| Residential | 5,837,245,297 | 67.94 |
| Personal Commercial | 299,882,029 | 3.49 |
| Personal Industrial | 140,761,800 | 1.64 |
| Personal/Utility | 227,638,462 | 2.65 |
| TOTAL | $8,591,144,574 | 100.00% |

Source: Genesee County Equalization Dept

## Property Tax Reform Proposals

On December 20, 2012, Governor Snyder signed into law a package of bills reforming personal property tax in Michigan. The legislation exempts commercial and industrial personal property of each owner with a combined taxable value in a local taxing unit of less than $40,000 from ad valorem taxes beginning in 2014. All eligible manufacturing personal property purchased or put into service beginning in 2013 and used more than 50% of the time in industrial processing or direct integrated support becomes exempt beginning in 2016. The legislation extends certain personal property tax exemptions and tax abatements for technology parks, industrial facilities and enterprise zones that were to expire after 2012, until the newly enacted personal property tax exemptions take effect. The legislation authorizes local units to specially assess commercial and industrial real property to replace revenue lost due to the personal property tax exemptions for police, fire, ambulance and jail operations. The legislation also includes a formula to reimburse certain local governments for a portion of lost personal property tax revenue from use tax moneys to the extent the local unit has a reduction in taxable value of more than 2.3% as a result of the personal property tax exemption. For such reimbursement provisions to become effective, however voters would need to approve a change in the state distribution of use tax in the August 2014 primary election. If voters approve the redistribution, a portion of the use tax would be directed to a newly created statewide Metropolitan Areas Metropolitan Authority which would redistribute that revenue to qualifying local units. If voters fail to approve the use tax redistribution, the above personal property tax reform acts will be repealed and the local reimbursement act and the special assessment act will not go into effect. The final impact of this legislation cannot be determined at this time.

The ultimate nature, extent and impact of any other future amendments to Michigan's property tax laws on the County's finances cannot be predicted. Purchasers of the Bonds should consult with their legal counsel and financial advisors as to the consequences of any such legislation on the market price or marketability of the Bonds, the security therefor and the operations of the County.

**MAJOR TAXPAYERS**

The ten major taxpayers in the County and their 2013 Taxable Valuation and Industrial Facilities Tax valuations are as follows:

| Taxpayer | Product/Service | Taxable Valuation | + | IFT Valuation | = | Total Valuation |
|---|---|---|---|---|---|---|
| Consumers Energy | Utility | $221,742,449 | | $0 | | $221,742,449 |
| General Motors Corp. | Automotive | 96,569,800 | | 9,386,600 | | 105,956,400 |
| Genesee Valley Partners LP | Investments | 49,129,300 | | 0 | | 49,129,300 |
| Wal-Mart/Sam's Club | Retail/grocery | 41,076,788 | | 0 | | 41,076,788 |
| Edward Rose Assoc. ETAL | Construction | 25,660,242 | | 0 | | 25,660,242 |
| Meijer Inc./Goodwill Co., Inc. | Retail/grocery | 25,407,943 | | 0 | | 25,407,943 |
| Comcast | Retail cable | 19,356,902 | | 0 | | 19,356,902 |
| Magna | Automotive | 6,770,800 | | 11,123,600 | | 17,894,400 |
| Michigan Electric Trans. Co. | Utility | 15,979,400 | | 0 | | 15,979,400 |
| Kroger | Grocery | 14,617,238 | | 0 | | 14,617,238 |
| TOTAL | | $516,310,862 | | $20,510,200 | | $536,821,062 |

The 2013 Taxable Valuations of the above taxpayers excluding IFT valuation represent 6.01% of the County's 2013 Taxable Valuation of $8,591,144,574. The Total Valuations including IFT valuation represent 6.20% of the 2013 Total Taxable Valuation of $8,653,790,146.

**TAX RATES (Per $1,000 of Valuation)**

Each school district, county, township, special authority and city has a geographical definition which constitutes a tax district. Since local school districts and the county overlap either a township or a city, and intermediate school districts overlap local school districts and county boundaries, the result is many different tax rate districts.

| *Genesee County* | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 |
|---|---|---|---|---|---|---|---|
| County Operating | 5.5072 | 5.5072 | 5.5072 | 5.5072 | 5.5072 | 5.5072 | 5.5072 |
| County Parks & Recreation | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 |
| County Paramedics | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 |
| Senior Services | 0.7000 | 0.7000 | 0.7000 | 0.7000 | 0.7000 | 0.7000 | 0.7000 |
| Uninsured Health Care | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| Veterans | 0.1000 | 0.1000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| COUNTY'S TOTAL | 8.2766 | 8.2766 | 8.1766 | 8.1766 | 8.1766 | 8.1766 | 8.1766 |

| *Other Tax Rates:* | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 |
|---|---|---|---|---|---|---|---|
| Airport Authority | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 | 0.4847 |
| District Library | 0.9981 | 0.9981 | 0.9981 | 0.7481 | 0.7481 | 0.7481 | 0.7481 |
| Genesee ISD | 3.5341 | 3.5341 | 3.5341 | 3.5341 | 3.5341 | 3.5341 | 3.5341 |
| Mott Community College | 2.8596 | 2.8596 | 2.8596 | 2.6796 | 2.6796 | 2.6796 | 2.6796 |

**TAX RATE LIMITATION**

Article IX, Section 6, of the Michigan Constitution of 1963 provides in part:

"Except as otherwise provided in this Constitution, the total amount of general ad valorem taxes imposed upon real and tangible personal property for all purposes in any one year shall not exceed 15 mills on each dollar of the assessed valuation of property as finally equalized."

Section 6 further provides that, by a majority vote of the qualified electors of a county, the 15 mill limitation may be increased to a total not to exceed 18 mills, and that the millages of the local units involved shall then be permanently fixed within that greater millage rate limitation.

Act 62, Public Acts of Michigan, 1933, as amended, defines "local units" as "counties, townships, villages, cities, a first class school district (only Detroit schools), community college districts, intermediate school district, and all other divisions, districts, and organizations of government that are or may be established by law and that have the power to levy taxes against property located within their respective areas, except villages and cities for which there are provisions in their charters or general law fixing maximum limits on the power to levy taxes against property."

A-4

The amount of mills allocated to the County, townships in the County and the intermediate school districts have been fixed by vote as follows:

| Units of Government | Rates |
|---|---|
| County of Genesse | 5.6800 |
| Townships | 1.0000 |
| Intermediate School District | 0.2000 |
| TOTAL | 6.8800 |

In addition, Article IX, Section 6, permits the levy of millage in excess of the above for operating purposes for a specified period of time provided that said increase is approved by a majority of the qualified electors of the local unit.

The County is authorized to levy the following tax rates:

|  | Millage Authorized | 2013 Maximum Allowable Millage after Rollback* | Expiration Date of Levy |
|---|---|---|---|
| Operating | 5.6800 | 5.5072 | n/a |
| County Parks | 0.4847 | 0.4847 | 12/31/2016 |
| County Paramedics | 0.4847 | 0.4847 | 12/31/2016 |
| Senior Services | 0.7000 | 0.7000 | 12/31/2015 |
| Uninsured Health Care | 1.0000 | 1.0000 | 12/31/2019 |
| Veterans | 0.1000 | 0.1000 | 12/31/2021 |

*  See "CONSTITUTIONAL ROLLBACK AND ASSESSMENT CAPS" herein.
Source: Genesee County

**CONSTITUTIONAL ROLLBACK AND ASSESSMENT CAPS**

Article IX, Section 31 of the Michigan Constitution requires that if the total value of existing taxable property (State Equalized Valuation) in a local taxing unit, exclusive of new construction and improvements, increases faster than the U.S. Consumer Price Index from one year to the next, the maximum authorized tax rate for that local taxing unit must be reduced through a Millage Reduction Fraction unless new millage is authorized by a vote of the electorate of the local taxing unit.

**TAX LEVIES AND COLLECTIONS**

The County's fiscal year begins October 1 and ends September 30.  Its property taxes are due July 1 and December 1 of each fiscal year and are payable without penalty or interest on or before the following September 14 and February 14, respectively.  All real property taxes remaining unpaid on March 1st of the year following the levy are turned over to the County Treasurer for collection.  Genesee County annually pays from its 100% Tax Payment Fund delinquent taxes on real property to all taxing units in the County, including the County's, shortly after the date delinquent taxes are returned to the County Treasurer for collection.

A history of tax levies and collections for the County are as follows:

| Fiscal Year | Total Tax Levy | Collections to March 1, of Following Year | | Collections Plus Funding to September 30, of Following Year | |
|---|---|---|---|---|---|
| 2012 | $77,487,325 | $72,746,879 | 93.88% | $77,487,325 | 100.00% |
| 2011 | 83,767,765 | 78,101,948 | 93.24 | 83,767,765 | 100.00 |
| 2010 | 93,767,535 | 86,508,053 | 92.26 | 93,767,535 | 100.00 |
| 2009 | 97,004,331 | 90,979,934 | 93.79 | 97,004,331 | 100.00 |
| 2008 | 96,962,513 | 91,098,930 | 93.95 | 96,962,513 | 100.00 |

The 100% Tax Payment Fund is financed through the issuance of General Obligation Limited Tax Notes (GOLTNs) by the County.  The ability of the County to issue such GOLTNs is subject to market conditions at the time of offering. In addition, Act 206 of 1893, as amended, provides in part that: "The primary obligation to pay to the county the amount of taxes and interest thereon shall rest with the local taxing units, and if the delinquent taxes which are due and payable to the county are not received by the county for any reason, the county has full right of recourse against the taxing unit to recover the amount thereof and interest thereon..." Each year, a tax sale is held by the County at which lands delinquent for taxes assessed in the third year preceding the sale, or in a prior year, are sold for the total of the unpaid taxes of those years.
Source:  Comprehensive Annual Financial Report and County of Genesee

**REVENUES FROM THE STATE OF MICHIGAN**

The County receives revenue sharing payments from the State of Michigan under the State Revenue Sharing Act of 1971, as amended (the "Revenue Sharing Act"), on a per capita basis.  The County's revenue sharing distribution is subject to annual legislative appropriation and may be reduced or delayed by Executive Order during any State fiscal year in which the Governor, with the approval of the State Legislature's appropriation committees, determines that actual revenues will be less than the revenue estimates on which appropriations were based.

The State's ability to make revenue sharing payments to the County in the amounts and at the times specified in the Revenue Sharing Act is subject to the State's overall financial condition and its ability to finance any temporary cash flow deficiencies.  Act 357, Public Acts of Michigan, 2004 ("Act 357") amended the General Property Tax Act to temporarily eliminate statutory revenue sharing payments to counties by creating a reserve fund, against which counties could draw in lieu of annual revenue sharing payments, paid for by the permanent advancement of the counties' property tax levy from December to July each year, beginning in 2005.  ("Revenue Sharing Reserve Fund") Under Act 357, a county would resume receiving state revenue sharing payments in the first year in which the county's property tax revenue reserve was less than the amount the county would have otherwise received in state revenue sharing payments.  The County resumed receiving revenue sharing payments during its fiscal year ended September 30, 2012.

Under the fiscal year 2014 budget, signed into law on June 13, 2013 by Governor Snyder, 80% of county revenue sharing payment distributions are made pursuant to the Revenue Sharing Act and 20% are distributed through an incentive-based program similar to the Economic Vitality Incentive Program established in fiscal year 2012 for cities, villages and townships.  The county program is known as the County Incentive Program ("CIP"), under which eligible counties may receive distributions for complying with "best practices" such as increasing transparency and consolidating services.  Eligible counties are those that would be eligible to resume receiving state revenue sharing payments under Act 357.  Under the fiscal year 2014 CIP, an eligible county can receive (i) one-third of the money it is eligible for if it meets requirements for accountability and transparency, including making a citizen's guide to its finances, a performance dashboard and a debt service report available for public viewing; (ii) another one-third if it develops plans to increase its existing level of collaboration and consolidation, both internally and with neighboring jurisdictions; and (iii) a final third if it develops and certifies an unfunded accrued liability plan.  The unfunded accrued liability plan, which replaced the requirement in fiscal year 2013 to modify employee compensation plans, must be certified by June 1, 2014 for the County to receive all of the money that it is eligible for from the final component in clause (iii) above.  Any portion of the CIP that the County would be eligible to receive would be subject to certain benchmarks that the County would need to meet, and there can be no assurance of what amount, if any, the County would receive under the CIP program.  The County anticipates meeting the requirements for clauses i, ii, and iii to receive fiscal year 2014 payments.

**General Fund Revenues From the State**

Prior to 2013 the County exhausted its Revenue Sharing Reserve Fund during the 2011/2012 fiscal year. The County received $7,541,499 in State Revenue Sharing payments during FY 2012/2013 and will rely on the State of Michigan for future Revenue Sharing payments for 2014 year estimates.

| Fiscal Year Ended September 30 | Revenue Sharing Payments** |
|---|---|
| 2014 Estimate [1] | $7,901,562 |
| 2013 | 7,541,499 |
| 2012 | 7,487,510 |
| 2011 | 9,847,817 |
| 2010[2] | 10,548,185 |

** Amounts do not include state gas and weight tax distributions.

[1] Estimate from the State of Michigan

[2] The County's fiscal year revenues include draws from the revenue generated from the State-created reserve fund.  See "County Reserve Fund" above.
Source: Web site http://treasury.state.mi.us

**Purchasers of the Bonds should be alert to further modifications to revenue sharing payments to Michigan local governmental units, to the potential consequent impact upon the County's general fund condition, and to the potential impact upon the market price or marketability of the Bonds resulting from changes in revenues received by the County from the State.**

A-6

**LABOR FORCE**

A breakdown of the number of employees of the County and their affiliation with organized groups is as follows:

| Bargaining Unit | Number | Contract Expiration |
|---|---|---|
| AFSCME | | |
| 496-00 Clerical | 239 | 09/30/2015 |
| 496-01 Technical | 143 | 09/30/2015 |
| 496-02 GVRC Workers | 20 | 04/01/2015 |
| 496-03 Drain Service | 5 | 12/31/2015 |
| 496-10 Mobile Meals | 17 | 09/30/2010* |
| 916-05 & 916-06 Sheriff Supervisory | 28 | 12/31/2014 |
| 916-01, 02, 03, 04, 08, 09, 10 Supervisors | 38 | 06/30/2015 |
| P.O.A.M. | | |
| (Police Officers & Jail Security) | 208 | 06/30/2014 |
| Judicial Secretaries Association | 9 | 12/31/2014 |
| Teamsters | | |
| Local 214 (Park Maintenance) | 7 | 06/30/2015 |
| Local 214 (Friend of the Court) | 6 | 12/31/2013* |
| Professional Court Officers Association | 34 | 12/31/2015 |
| Non Union | | |
| Full-Time Employees | 102 | n/a |
| Seasonal Employees | 206 | n/a |
| Elected Officials | 31 | n/a |
| TOTAL | 1,093 | |

*In negotiations.

**RETIREMENT PLANS**

The County maintains two distinct retirement plans for its employees. A defined benefit plan is available in accordance with the Genesee County Employees Retirement System Ordinance (the "*GCERS Plan*"). A defined contribution plan is available in accordance with the Genesee County Defined Contribution Pension Plan (the *"DC Plan"*). All County employees, except members of AFSCME Mobile Meals Drivers and AFSCME Seasonal Parks Employees, are participants in either the GCERS Plan or the DC Plan. Employees hired prior to the effective date of the DC plan to their respective employee group, which for most employees was July 1, 1996, were permitted to elect between the GCERS Plan and the DC Plan. Most employees hired between 1996 and 2006 had the option of selecting the GCERS Plan or the DC Plan. All employees hired after 2006 must select the DC Plan for retirement. For information regarding retirement plans, see APPENDIX B.

*GCERS Plan* - This is a contributory multi-employer defined benefit pension plan. County employees represented by the various bargaining units are required to contribute from 0.5% to 9.0% of all compensation, including overtime. The County provides contributions at actuarially determined rates. During 2013, employer contribution rates ranged from 16.87% to 53.48% of covered payroll. For the year ending December 31, 2012, contributions from the multi-employers totaled $14,398,417 and affected employees contributed $2,321,841 for an aggregate multi-employer/employee total of $16,720,258.

*DC Plan* - This is a contributory, single employer defined contribution plan with assets of $104,345,310 as of September 30, 2012. County employees are required to contribute between 3.0% and 7.0% of covered payroll. The County offers a defined contribution pension plan as an alternative to the defined benefit pension plan. The International City Managers Association (ICMA) Retirement Corporation administers the plan, and the County Board of Commissioners has authority over plan provisions and contribution requirements. All employees are eligible to participate in this plan, if not participating in the Defined Benefit Plan. The County is required to contribute 8 to 10% of eligible employees' annual covered payroll, and employees are required to contribute between 3% and 7% of covered payroll. Employees are vested after 5 years of service. During the year ended September 30, 2013, employer and employee contributions to the plan were $2,705,916 and $1,617,428, respectively.

*Other Post-Retirement Benefits* - The County performed an actuarial valuation of the other post-retirement benefits liability for the year ended September 30, 2012. At that time the actuarial accrued liability was determined to be $308,208,023 and the funding value assets was $43,313,587, resulting in an unfunded actuarial accrued liability of $264,894,436. The annual required contribution (ARC) as a percentage of payroll (based on 30-year amortization of the unfunded liability) was 50.15% or $18,549,049.

The County has been working to systematically increase contributions into the VEBA to eventually equal the ARC. Beginning in fiscal year 2002/2003, the County began contributing 3% of gross payroll into a fund designated for retiree health care. This was increased to 5% in the 2003/2004 fiscal year, to 10% in the 2006/2007 fiscal year, 20% in the 2007/2008 fiscal year, 22.5% in the 2008/2009 fiscal year, 20% in the 2009/2010 fiscal year, 24% in the 2010/2011 fiscal year and 24% in the 2011/2012 fiscal year. In 2004, the County created a VEBA trust to specifically designate the funds that had been contributed for retiree health care. Also, all collective bargaining agreements as well as the non-union personnel policies include a provision that requires all employees to make a contribution of 1% to 3% of pre-tax gross wages, which is paid to the VEBA as employer contributions for the funding of retiree health care benefits (OPEB). These contributions resulted in an OPEB obligation for the period ending September 30, 2013 in an amount of $29,409,706. The OPEB obligation is the cumulative difference between the ARC and the actual amount contributed.

**DEBT STATEMENT** (as of April 2, 2014 and including the Bonds described herein)

Each series of bonds marked "LT" is payable in the first instance from a specified source and is payable from the general funds of the County in the event of insufficiency of the specified source. The County is not authorized to levy taxes beyond constitutional and statutory tax rate limitations with respect to the bonds marked "LT".

DIRECT DEBT

| *General Obligation Bonds* | Dated Date | Outstanding Gross Amount | Unit Share Amount | County's Share |
|---|---|---|---|---|
| Sewer, Fenton Twp.-Rolston/Ripley, LT | 11/01/96 | $400,000 | $400,000 | 0 |
| Drain, Atlas Twp. Project A#1610, LT | 12/01/00 | 150,000 | 150,000 | 0 |
| Capital Improvement, LT | 11/01/04 | 1,765,000 | 0 | $1,765,000 |
| Sewer Fenton Twp. Ser A&B, LT | 12/01/04 | 550,000 | 550,000 | 0 |
| Sewer Refunding, LT | 02/01/05 | 4,000,000 | 4,000,000 | 0 |
| Sewer Refunding, Lt. Morris, LT | 12/22/05 | 1,695,000 | 1,695,000 | 0 |
| Drain, Meyers, LT | 08/01/06 | 375,000 | 248,400 | 126,600 |
| Sewer, Western Trunk No. 1, LT | 09/01/06 | 2,775,000 | 2,775,000 | 0 |
| Sewer Refunding No. 3, LT | 11/16/07 | 4,305,000 | 4,305,000 | 0 |
| Qual. Energy Conservation Bonds, LT | 12/01/10 | 7,175,784 | 0 | 7,175,784 |
| Gilkey Creek and Branch Drain Drainage District, LT | 12/01/11 | 2,395,000 | 2,343,268 | 51,732 |
| Water, Fenton Rd. Watermain Project, LT | 04/08/11 | 859,000 | 859,000 | 0 |
| SUB-TOTAL GENERAL OBLIGATION BONDS | | $26,444,784 | $17,325,668 | $9,119,116 |
| *Building Authority Bonds* | | | | |
| Refunding, Series 1998, LT | 07/01/98 | $   155,000 | 0 | $   155,000 |
| Building Authority, Refunding, LT | 06/23/05 | 8,415,000 | 0 | 8,415,000 |
| Brownfield Redev. Ref. LT | 11/20/07 | 12,110,000 | 0 | 12,110,000 |
| Refunding, LT | 04/12/12 | 4,430,000 | 0 | 4,430,000 |
| SUB-TOTAL BUILDING AUTHORITY BONDS | | $25,110,000 | $0 | $25,110,000 |
| *Revenue Bonds with GO Pledge* | | | | |
| Sewer, Western Trunk Relief, LT | 08/01/03 | $2,585,000 | $0 | $2,585,000 |
| Water, LT | 08/01/03 | 3,585,000 | 0 | 3,585,000 |
| Water, LT | 10/01/03 | 15,730,000 | 0 | 15,730,000 |
| Water, LT | 09/01/04 | 13,260,000 | 0 | 13,260,000 |
| NE Sewer, Series 2005A - SRF, LT | 06/23/05 | 15,210,000 | 0 | 15,210,000 |
| NE Sewer, Series 2005B - SRF, LT | 09/22/05 | 10,640,000 | 0 | 10,640,000 |
| NE Sewer, Series 2006A - SRF, LT | 09/21/06 | 2,065,000 | 0 | 2,065,000 |
| NE Sewer, Series 2006B - SRF, LT | 12/14/06 | 5,650,000 | 0 | 5,650,000 |
| NE Sewer, Series 2006C - SRF, LT | 12/14/06 | 3,175,000 | 0 | 3,175,000 |
| Water, Series 2007, LT | 01/01/07 | 5,100,000 | 0 | 5,100,000 |
| Sewer, Northeast Ext., Series B, LT | 09/01/07 | 6,665,000 | 0 | 6,665,000 |
| Sewer, Northeast Ext., 2007A, LT | 09/20/07 | 8,180,000 | 0 | 8,180,000 |
| Sewer District No. 3, LT | 12/01/07 | 4,920,000 | 0 | 4,920,000 |
| Sewer, Sewage Disposal, LT | 02/12/09 | 13,075,000 | 0 | 13,075,000 |

A-8

| | | | | |
|---|---|---:|---:|---:|
| NE Sewer, LT | 01/22/10 | 12,790,000 | 0 | 12,790,000 |
| Sewer No. 3 Revenue Bonds, LT | 01/22/10 | 955,000 | 0 | 955,000 |
| Sewer, Interceptors and Treatment Facilities LT (Ser A) | 04/08/11 | 1,330,000 | 0 | 1,330,000 |
| Sewer, Interceptors and Treatment Facilities LT (Ser B) | 07/28/11 | 4,825,000 | 0 | 4,825,000 |
| Sewage Disp. Series C, Refunding, LT | 09/14/11 | 4,965,000 | 0 | 4,965,000 |
| Water Supply System Revenue Bonds, LT | 10/03/13 | 35,000,000 | 0 | 35,000,000 |
| | | | | |
| **TOTAL REVENUE BONDS** | | $169,705,000 | $0 | $169,705,000 |

*Michigan Transportation Fund Bonds*

| | | | | |
|---|---|---:|---:|---:|
| MTF Notes, NO COUNTY CREDIT | 11/01/06 | $580,000 | 0 | $580,000 |
| MTF Notes, NO COUNTY CREDIT | 10/01/07 | 1,970,000 | 0 | 1,970,000 |
| MTF Notes, NO COUNTY CREDIT | 08/01/08 | 2,305,000 | 0 | 2,305,000 |
| MTF Notes, NO COUNTY CREDIT | 09/01/09 | 2,085,000 | 0 | 2,085,000 |
| | | | | |
| **TOTAL MICHIGAN TRANSPORTATION FUND BONDS** | | $6,940,000 | $0 | $6,940,000 |

Share of Authority Issued Bonds:

| | | | | |
|---|---|---:|---:|---:|
| Water Supply System Bonds, Series 2014 A, LT | 04/16/14 | 220,500,000 | 0 | 220,500,000 |

Share of County Issued Bonds:

| | | | | |
|---|---|---:|---:|---:|
| Utilities Drainage | 12/01/11 | 46,656 | 0 | 46,656 |
| | | | | |
| **TOTAL DIRECT DEBT** | | $448,746,440 | $17,325,668 | $431,420,772 |

| | |
|---|---:|
| LESS: Self Supporting Authority Contract Bonds | (220,500,000) |
| Revenue Bonds | (169,705,000) |
| Michigan Transportation Fund Bonds/Notes | (6,940,000) |
| | ($397,145,000) |
| | |
| **TOTAL NET DIRECT DEBT** | $34,275,772 |

OVERLAPPING DEBT

| Municipality | County's Share |
|---|---:|
| Cities | $42,414,877 |
| Townships | 43,954,796 |
| Villages | 1,089,013 |
| School Districts | 365,853,767 |
| Intermediate School Districts | 17,060 |
| Community College | 42,960,045 |
| Bishop Airport Authority | 10,430,000 |
| | |
| **NET OVERLAPPING DEBT** | $506,719,558 |
| | |
| **NET DIRECT & OVERLAPPING DEBT** | $540,995,330 |

Source: Municipal Advisory Council of Michigan

## DEBT RATIOS

*Per Capita (425,790)*

| | |
|---|---:|
| Net Direct Debt | $80.50 |
| Net Direct and Overlapping Debt | $1,270.57 |

*Ratio to 2013 Taxable Valuation ($8,591,144,574)*

| | |
|---|---:|
| Net Direct Debt | 0.40% |
| Net Direct and Overlapping Debt | 6.30% |

A-9

*Ratio to 2013 State Equalized Valuation ($8,996,549,108)*

| | |
|---|---|
| Net Direct Debt | 0.38% |
| Net Direct and Overlapping Debt | 6.01% |

*Ratio to 2013 Estimated True Cash Value ($17,993,098,216)*

| | |
|---|---|
| Net Direct Debt | 0.19% |
| Net Direct and Overlapping Debt | 3.01% |

**DEBT HISTORY**

 The County has no record of default.

**FUTURE FINANCING**

 The County has entered into a contract with the Karegnondi Water Authority and the City of Flint pursuant to which the Authority will issue an additional $80,000,000 of bonds over the next 3 to 15 months in anticipation of payments to be made by the County and the City of Flint to finance a raw water supply project to serve the County, the City of Flint and several other municipalities. The County will make a limited tax general obligation pledge of the County on 100% of these bonds. The County also anticipates issuance of approximately $60,000,000 of water revenue bonds with a limited tax general obligation pledge of the County to finance construction of a new water treatment plant and related facilities to treat water from the new raw water supply within the next 6 to 12 months.  The County may issue an estimated $18,000,000 to $31,000,000 of water revenue refunding bonds with a limited tax general obligation pledge in the next 6 to 12 months to refund certain outstanding water revenue bond issues for debt service savings.

**COMPENSATED ABSENCES**

 As of September 30, 2013, the County's governmental activities statement of net position included a liability for vacation and other employee compensated absences of $4,217,266.

**SHORT TERM BORROWING**

 The County has in the years 1974 through 2013 issued short-term notes in order to establish the 100% Tax Payment Fund. Notes issued in each of the above years have been in a face amount which has been less than the actual  real property tax delinquency.  The primary security for these notes is the collection of the delinquent taxes pledged to the payment of principal of and interest on the notes issued.  The County has pledged its full faith and credit and limited taxing power to the payment of the principal and interest on notes issued since 1975. Notes in the amount of $39.9 million were issued by the County during the fiscal year ended September 30, 2013.

 The County Landbank Authority has entered into a $3,000,000 line of credit with a bank and the County has pledged its limited tax full faith and credit on the line.

**LEASE OBLIGATIONS**

 The County is party to numerous operating leases and aggregate rental expenses which were approximately $74,535 during the year ended September 30, 2013, exclusive of the amount paid to a related organization.

**LEGAL DEBT MARGIN\*** (as of April 2, 2014 and including the Bonds described herein)

| | | |
|---|---|---|
| 2013 State Equalized Valuation - excluding IFT values | | $8,996,549,108 |
| Debt Limit - 10% of State Equalized Valuation | | 899,654,911 |
| Amount of Direct Debt Outstanding | $448,746,440 | |
|  Less: No County Credit Pledged Bonds/Notes | (6,940,000) | |
| Total Subject to Debt Limit | | 441,806,440 |
| Additional Debt Which Could Be Legally Incurred | | $457,848,471 |

A-10

# GENERAL ECONOMIC INFORMATION

**LOCATION AND AREA**

Genesee County is located in the central-eastern portion of Michigan's lower peninsula, and covers an area of 643 square miles.  The City of Flint is the county seat.

The County is located the following distances from these commercial and industrial areas:

|     |                          |
|-----|--------------------------|
| 36  | miles south of Bay City  |
| 50  | miles north of Ann Arbor |
| 67  | miles west of Port Huron |
| 104 | miles east of Grand Rapids |

**FORM OF GOVERNMENT**

The County is governed by a legislative body consisting of nine members forming the County Board of Commissioners, each of whom is elected for terms of two years from districts of approximately equal population. County officials include the County Treasurer, County Clerk/Register, Prosecuting Attorney, Drain Commissioner, and Sheriff. These officials are elected at large for four-year terms.

Administration of the County is divided by the State of Michigan Constitution (the "State Constitution") among various officials all elected at large according to purpose and by various appointed officials. The County Treasurer is the chief custodian of the County moneys, collector of County taxes, Treasurer for the County Drainage Districts, disbursing agent for certain tax funds to local communities and school districts. The duties of the County Clerk/Register are primarily record keeping in nature and include such duties as clerk of the Circuit Court and Board of Commissioners and keeping and maintaining records of births, deaths, marriages, discharges of military personnel, records of deeds, mortgages, surveys, recording of plats, notices of liens and bills of sales. The Prosecuting Attorney prosecutes violations of state criminal law within the County. The County Drain Commissioner administers the location, construction and maintenance of drains in the County. The Sheriff's duties involve the charge and custody of the County jail, the serving of processes, and law enforcement in unincorporated areas. The Board of Commissioners has created the office of County Controller. The County Controller is appointed by the Board of Commissioners and the responsibilities of the office include, but are not limited to: budget preparation and control; all accounting and auditing.

**POPULATION BY AGE**

The 2010 U.S. Census estimate of population by age for Genesee County is as follows:

|                     | Number   | Percent  |
|---------------------|----------|----------|
| Total Population    | 425,790  | 100.00%  |
| 0 through 19 years  | 118,966  | 27.94    |
| 20 through 64 years | 248,630  | 58.39    |
| 65 years and over   | 58,194   | 13.67    |
|                     |          |          |
| Median Age          | 38.5 years |        |

**INCOME**

The 2010 U.S. Census estimate of household income for Genesee County is as follows:

|                        | Number   | Percent  |
|------------------------|----------|----------|
| HOUSEHOLDS BY INCOME   | 166,539  | 100.00%  |
| Less than $10,000      | 20,651   | 12.40    |
| $10,000 to $14,999     | 11,491   | 6.90     |
| $15,000 to $24,999     | 22,982   | 13.80    |
| $25,000 to $34,999     | 21,150   | 12.70    |
| $35,000 to $49,999     | 26,313   | 15.80    |
| $50,000 to $74,999     | 30,810   | 18.50    |
| $75,000 to $99,999     | 14,989   | 9.00     |
| $100,000 to $149,999   | 13,823   | 8.30     |
| $150,000 to $199,999   | 2,665    | 1.60     |
| $200,000 or more       | 1,665    | 1.00     |
|                        |          |          |
| Median Income          | $41,951  |          |
| Mean Income            | $49,079  |          |

A-11

**EMPLOYMENT CHARACTERISTICS\***

The following companies located in the County offer employment opportunities for residents.

| Company | Product/Service | No. of Employed [1] |
|---|---|---|
| *Within Genesee County (500 or more employees)* | | |
| Genesys Health Care System | Health care | 3,265 |
| McLaren Health Care Corporation | Hospital & other health care | 3,014 |
| General Motors Corp. Assembly | Automotive parts & bodies | 2,821 |
| Hurley Medical Center | Medical center | 2,811 |
| Baker College | Higher Education | 2,800 |
| Square D | Computer programming services | 2,500 |
| Flint Metal Center, Vehicle Mfg. Operating Div. | Metal fabrication | 2,180 |
| A I Flint LLC | Car Parts and accessories | 1,500 |
| General Motors Corp. (Stamping facility) | Stamping plant | 1,415 |
| United States Postal Service | US Postal Service | 1,200 |
| Genesee County (full time employees) | Government | 1,093 |
| Delphi Corp. | Spark plugs & odometers | 1,000 |
| Meijer Inc. | Retail | 1,000 |
| General Motors Corp., Powertrain Div. | Engines & gears & transmissions | 961 |
| Genesee Intermediate Schools | Education | 950 |
| Mott Community College | Higher education | 949 |
| Flint Community Schools | Educational services | 820 |
| JPMorgan Chase Bank | Finance | 800 |
| FirstMerit Bank | Banking | 780 |
| Nu Vision Inc. | Optical goods retail | 766 |
| Carman-Ainsworth Community Schools | Education | 706 |
| Peregrine | Manufacturing | 684 |
| E L Hollingsworth & CO | Freight and logistics | 646 |
| Sears, Roebuck & Co. | Retail sales | 600 |
| United Retired Govt. Employees | Labor Organizations | 600 |
| Creative Foam Corp. | Plastic products | 600 |
| Flint, City of | Municipality | 596 |
| Genova Products (HQ) | Plastic pipes | 570 |
| Vemco, Inc. | Automobile parts & accessories | 500 |
| TRW Automotive | Brake systems | 500 |
| Flint Specialty Services | Freight and logistics | 500 |

[1] The approximate number of employees listed are as reported in these sources: 2013 Michigan Manufacturers Directory, Manta Company Intelligence website, the Michigan Economic Development Council ("MEDC"), and individual employers.

\*Due to reporting time lags and other factors inherent in collecting and reporting such information, the numbers may not reflect recent changes in employment levels, if any.

**EMPLOYMENT BREAKDOWN**

The 2010 U. S. Census reports the occupational breakdown of persons 16 years and over for Genesee County is as follows:

| PERSONS BY OCCUPATION | Number | Percent |
|---|---|---|
| PERSONS BY OCCUPATION | 151,813 | 100.00% |
| Professional Specialty Occupations | 45,895 | 30.23 |
| Service Occupations | 31,444 | 20.71 |
| Sales & Office Occupations | 40,133 | 26.44 |
| Natural Resources, Construction, and Maintenance Occupations | 10,498 | 6.92 |
| Transportation & Material Moving Occupations | 23,843 | 15.71 |

The breakdown by industry for persons 16 years and over for Genesee County is as follows:

| PERSONS BY INDUSTRY | Number | Percent |
|---|---|---|
| | 151,813 | 100.00% |
| Agriculture, Forestry, Fishing, Hunting & Mining | 607 | 0.40 |
| Construction | 6,528 | 4.30 |
| Manufacturing | 20,950 | 13.80 |
| Wholesale Trade | 4,099 | 2.70 |
| Retail Trade | 21,861 | 14.40 |
| Transportation | 7,591 | 5.00 |
| Information | 1,366 | 0.90 |
| Finance, Insurance, & Real Estate | 7,894 | 5.20 |
| Professional & Management Services | 12,145 | 8.00 |
| Educational, Health & Social Services | 39,320 | 25.90 |
| Arts, Entertainment, Recreation and Food Services | 15,333 | 10.10 |
| Other Professional and Related Services | 8,350 | 5.50 |
| Public Administration | 5,769 | 3.80 |

## UNEMPLOYMENT

The Michigan Employment Security Commission, Research and Statistical Division, reports unemployment averages for the County of Genesee (not seasonally adjusted) as compared to the State of Michigan as follows:

| | County of Genesee | State of Michigan |
|---|---|---|
| 2014 Year to Date (January) | 9.5% | 8.1% |
| 2013 Annual Average | 9.7 | 8.8 |
| 2012 Annual Average | 9.5 | 9.1 |
| 2011 Annual Average | 11.5 | 10.4 |
| 2010 Annual Average | 14.0 | 12.5 |

## TRANSPORTATION

The Genesee County region provides maximum accessibility by freeway, rail and air.  Four multi-lane expressways converge in the City of Flint.  Interstate 75 is a direct route between northern Michigan and Florida, while I-69 provides direct connections to Canada and Chicago.  I-475 provides a north-south link between Mount Morris and Grand Blanc.  US-23 provides a direct route to Ann Arbor and the Ohio State line as well as the Upper Peninsula.  The ease of travel provided by these major highways has resulted in 24 of the 35 major motor freight carriers who serve Genesee County establishing local terminals.

Rail passenger service is provided daily by Amtrak, freight service is provided by CSX Transportation Line for north-south service, and the CN North America/Grand Trunk for east-west service.  Truck freight service is furnished by 36 commercial trucking companies.  Greyhound and Indian Trails Bus Lines offer nationwide passenger service to areas outside of the Mass Transportation Authorities service area.

Bishop International Airport provides regularly scheduled jet service by various airlines.

Source:  Flint Area Chamber of Commerce and Bishop International Airport Authority.

## HIGHER EDUCATION

Several colleges offer a wide range of educational opportunities to area residents.

*C. S. Mott Community College*, established in 1923, was named after Flint's greatest philanthropist, automotive pioneer Charles Stewart Mott.  It is the largest higher education institution in Genesee County.  Through Mott, students may select from 100 career and transfer programs.  Advanced degrees from Wayne State, Ferris State, Central Michigan and Eastern Michigan universities are available on the Mott Campus.  The main campus is in Flint.  Fenton is the site of Southern Lakes Campus.

*Baker College of Flint* is the largest of seven schools in the statewide Baker College system, offering both two-and four-year degrees in accounting, business management, drafting, electronic engineering, fashion merchandising and interior design among many others.

A-13

*Detroit College of Business-Flint* is part of the Davenport/Detroit College Education System, comprising the largest independent college system in the State of Michigan.  Both bachelor and associate degrees are offered, with many students obtaining professional work experience in their chosen field while qualifying for a degree.

*Kettering University* is a technical university offering bachelor's and master's degrees in engineering and management.

*Spring Arbor College-Flint*, a private Christian liberal arts institution, offers bachelor degrees in management of human resources, health services and gerontology.  Its programs are set up around the students' family and work hours and grants credits for work experience, thus attracting many older students and business people.

*The University of Michigan-Flint* is a satellite campus of the University of Michigan. The University offers a traditional college setting with nearly 60 baccalaureate programs and masters degrees in art and business. One of the nation's most modern urban campuses, UM-Flint has expanded its facilities through the addition of a $20 million, state-of-the art Frances Wilson Thompson Library which opened in 1994.

*Michigan State University-College of Human Medicine, Flint Campus,* blends the academic resources of a major land-grant university medical school with the educational and clinical resources of four major community based teaching hospitals, Hurley Medical Center, McLaren Regional Medical Center, Genesys Regional Medical Center and St. Joseph Campus.

Flint serves as the home of Hurley Medical Center School of Nursing and the Michigan School for the Deaf.

Source: City of Flint, Genesee Economic Area Revitalization, Inc., and the Flint Area Chamber of Commerce.

## CULTURAL/RECREATIONAL

The area has numerous recreational facilities for its residents, including golf courses, a soap-box derby facility, artificial ice rinks, stadiums, soccer fields, ball fields, tennis courts, basketball courts, horseshoe courts, shuffleboard courts, a lawn bowling green, football fields, playgrounds, and a rugby field.  Parks of various sizes provide picnic areas as well as play fields.

**The Cultural Center**, located just two blocks east of downtown Flint, consists of a group of eight buildings which bring together the area's cultural, educational, performance, and literary heritage.  Most of the buildings were built in the 1950's with donations from area residents.  Included in the Center are the following:

**DeWaters Art Center** houses the Flint Institute of Arts with paintings, sculpture, Renaissance tapestries and antique French paper weights among the many items displayed.

**Robert T. Longway Planetarium** has astronomy exhibits, ultraviolet and fluorescent murals, and provides stargazing under the dome in its Star Theater.

**Sloan Museum** has a variety of permanent and changing exhibits.  One section portrays the settlement of Genesee County with dioramas of historical scenes.  Another section is devoted to the automotive history of Flint and features more than 60 cars and carriages.  The health section explains functions of the human body through audiovisual presentations.  Also featured is a doll gallery with over 200 dolls displayed.

The 2001-seat **Whiting Auditorium** hosts the Flint Symphony Orchestra and stage presentations from abroad, as well as from this country.

A variety of theater, music, special exhibits and attractions are provided through the University of Michigan, the Flint Community Players, Center Stage Productions and other community groups.  Of special interest is the Children's Museum, a hands-on learning center that offers 50 career related exhibits and the Labor Museum and Learning Center of Michigan.  The Labor Museum presents an interpretation of the story of labor from its nineteenth century roots to the present with special emphasis on Flint's role in Michigan's labor history.

Other major attractions located within the County include the Antique World Mall, a special gallery of antiques and collectibles, Riverbank Park, a project which has transformed 4-1/2 blocks of downtown (Flint) river frontage into a landscaped community park featuring a 750-seat amphitheater, grand fountain, fish ladder, Archimedes' screw, flowing water walls, islands, flower gardens, picnic sites, and walking and biking paths.  Windmill Place houses ethnic foods from around the world in addition to craft and retail shops.

Carriage Town is a 35 square block area whose streets and buildings span the incredible careers of a group of men. The area is a step back into history with a lesson for tomorrow.

Located throughout the County are lakes, picnic, and play areas, local museums and shops of interest to area travelers including Crossroads Village and Huckleberry Railroad, which features daily demonstrations of blacksmithing, wood-carving, yarn spinning and other activities performed by artisans, craftsmen and townspeople, as our ancestors did more than 100 years ago.  The Genesee Belle, a paddlewheel boat is in service on Mott Lake, at Crossroads Village. Pennywhistle Place, a fascinating children's creative play center is adjacent to Crossroads Village as is the Mott Children's Farm.  Operated by the Genesee County Parks and Recreation Commission from May through September, this park has become a favorite of local residents and travelers alike.

**UTILITIES**

Telephone service is provided  by AT&T, Century and Verizon.  Water and sewer service is provided through municipal systems in the cities and individual systems in the rural areas.

**BANKING**

The following banks have branches located within the County according to the Accuity American Financial Directory, July - December 2013.

| Bank | Main Office | Total State-Wide Deposits |
|---|---|---|
| Bank of America | Charlotte, NC | N/A |
| Fifth Third Bank | Cincinnati, OH | N/A |
| First Merit Bank | Akron, OH | N/A |
| BestBank, A Division of Guaranty Bank | Milwaukee, WI | N/A |
| Comerica Bank | Dallas, TX | N/A |
| Flagstar Bank, FSB | Troy, MI | $8,771,046,000 |
| First Michigan Bank | Troy, MI | 1,755,761,000 |
| Chemical Bank | Midland, MI | 4,921,683,000 |
| The State Bank | Fenton, MI | 278,800,000 |
| Community State Bank | St. Charles, MI | 180,284,000 |
| Hantz Bank | Southfield, MI | 108,093,000 |
| JPMorgan Chase Bank, National Association | Columbus, OH | N/A |
| PNC Bank | Pittsburgh, PA | N/A |
| Independent Bank | Ionia, MI | 2,193,408,000 |
| Oxford Bank | Oxford, MI | 243,627,000 |

A-15

**Genesee County, Michigan**
**Summaries of General Fund Adopted Revenue and Expenditure Budget**
**Fiscal Year 2012/2013 and 2013/2014**

|  | 2012/13 Amended Budget | 2013/14 Adopted Budget |
|---|---|---|
| **REVENUE** |  |  |
| Taxes | $44,470,857 | $43,314,532 |
| Licenses and Permits | 1,027,414 | 1,027,000 |
| Intergovernmental Revenue (Note A) | 8,873,830 | 17,243,913 |
| Charges for Services | 8,760,228 | 8,618,079 |
| Fines & Forfeitures | 1,723,439 | 1,775,250 |
| Miscellaneous Revenue (Note A) | 14,792,146 | 7,582,457 |
| **TOTAL REVENUE** | $79,647,914 | $79,561,231 |
| **EXPENDITURES** |  |  |
| Management & Planning | $10,866,324 | $9,826,592 |
| Administration of Justice | 24,185,011 | 26,050,375 |
| Law Enforcement & Community Protection | 18,517,307 | 18,505,960 |
| Human Services | 15,965,900 | 16,034,421 |
| General Support | 10,113,372 | 9,143,883 |
| **TOTAL EXPENDITURES** | $79,647,914 | $79,561,231 |
| **REVENUE OVER (UNDER) EXPENDITURES** | **$0** | **$0** |
| FUND BALANCE BEGINNING OF YEAR | $11,809,385 | $11,746,279 |
| FUND BALANCE END OF YEAR | $11,809,385 * | $11,746,279 * |

Note A - State revenue sharing of $7,620,146 was included in miscellaneous revenue in the 2012/13 amended budget.

*There is an obligation due to the general fund as reported by the Controller in an amount of $7,830,989 as shown in the County's most recent annual financial statements. The County Treasurer will make a determination on an annual basis of the surplus funds held in the Delinquent Tax Fund. Based on historical determinations of surplus, the County Controller has determined that there should be sufficient surplus to repay the general fund in four years.

A-16

**APPENDIX B**

**GENESEE COUNTY DRAIN COMMISSIONER
DIVISION OF WATER AND WASTE SERVICES
AUDITED FINANCIAL STATEMENTS**

**COUNTY OF GENESEE
AUDITED FINANCIAL STATEMENTS**

*Attached are the audited financial statements for the Genesee County Drain Commissioner, Division of Water and Waste Services (the "Division") for the fiscal year ended December 31, 2012, and the audited financial statements for the County of Genesee (the "County") for the fiscal year ended September 30, 2013. The auditors for the Division and the County have not been asked to consent to the use of information from such financial statements in either the Preliminary Official Statement or the Official Statement and have not conducted any subsequent review of such financial statements.*

[THIS PAGE INTENTIONALLY LEFT BLANK]



Independent Auditor's Report

To the Board of Directors
Genesee County Drain Commissioner
    Division of Water and Waste Services

**Report on the Financial Statements**

We have audited the accompanying financial statements of the Enterprise Fund, Internal Service Funds, and business-type activities of the Genesee County Drain Commissioner Division of Water and Waste Services (the "Division") as of and for the year ended December 31, 2012 and the related notes to the financial statements, which collectively comprise the Genesee County Drain Commissioner Division of Water and Waste Services' basic financial statements as listed in the table of contents.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditor's Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Opinion*

In our opinion, the financial statements referred to above present fairly, in all material respects, the respective financial position of the Enterprise Fund, Internal Service Funds, and business-type activities of the Genesee County Drain Commissioner Division of Water and Waste Services as of December 31, 2012 and the respective changes in its financial position and, where applicable, cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

B-1

1

To the Board of Directors
Genesee County Drain Commissioner
    Division of Water and Waste Services

*Other Matters*

*Required Supplemental Information*

Accounting principles generally accepted in the United States of America require that the management's discussion and analysis on pages 3-11 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board, which considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplemental information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

*Supplemental Information*

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise the Genesee County Drain Commissioner Division of Water and Waste Services' basic financial statements. The supplemental information, as identified in the table of contents, is presented for the purpose of additional analysis and is not a required part of the basic financial statements.

The supplemental information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the basic financial statements or to the basic financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the other supplemental information is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

**Report on Summarized Comparative Information**

We have previously audited the Genesee County Drain Commissioner Division of Water and Waste Services' December 31, 2011 financial statements, and we expressed an unmodified audit opinion on those audited financial statements in our report dated June 25, 2012. In our opinion, the summarized comparative information presented herein as of and for the year ended December 31, 2011 is consistent, in all material respects, with the audited financial statements from which it has been derived.



May 14, 2013

2

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Management's Discussion and Analysis

The County established a County Agency through the County Improvement Act (Public Act 342). The County designated the Drain Commissioner as the County Agency. The County Agency created the Division of Water and Waste Services (the "Division") as its vehicle to perform required duties. The Division provides public utility services of water and wastewater treatment in parts of Genesee, Saginaw, Shiawassee, Oakland, Lapeer, and Livingston counties. The Division's mission is to distribute water and collect and treat wastewater in such a manner that is in compliance with all state and federal regulations and to maintain the lowest cost to customers. Additionally, the Genesee County Board of Commissioners designated the Division as the county enforcing agency for soil erosion in Genesee County.

The Division is responsible for the administration, operation, maintenance, and construction of infrastructure and treatment facilities for the communities located in Genesee County for the sanitary system and water supply. The Division is divided into four distinct cost centers. These cost centers, which include Interceptor and Treatment, Water, District No. 3, and District No. 7, have been developed based upon revenue, responsibility, and definable core functions. In addition, the Division offers construction management and system operation and maintenance services to local communities.

Some of the key administrative and engineering duties of both the sanitary sewer operation and the water department operation include comprehensive system planning, interaction and regulation of development, implementing capital improvement projects, and system budget management. The administration team is responsible for the overall operation of the utility's services, engineering, and soil erosion in Genesee County. It is this department's responsibility to secure, allocate, and monitor funding, personnel, and equipment resources for the Division to ensure safe, reliable, and efficient operation of the utility.

The primary functions of the support services area are to efficiently and uniformly provide support to the various operations departments. These services are grouped into categories as follows: safety, human resources, finance, permits, soil erosion, construction, inspection, and information technology.

**The Operation and Maintenance Department** - The Operation and Maintenance (O&M) department has two primary functions: sanitary sewer interception and transportation and water transmission. It also performs contracted O&M for the local communities. To ensure that these primary functions are met, O&M performs the following tasks:

- Preventive maintenance of the water and sewer infrastructure and appurtenances
- Staking of water and sewer infrastructure (Miss Dig)
- Jetting/Televising of sanitary sewers
- Inspection of water and sewer infrastructure
- Responds to customer complaints (i.e., plugged sewers, high bills, etc.)
- Installs, reads, and repairs water meters, repairs broken water mains, and coordinates the repair of sanitary sewers, sewer main taps, and cut and cap water and sewer services
- Provides after-hours emergency response as needed

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Management's Discussion and Analysis (Continued)

**Sewage Treatment Facilities** - The core function of all treatment facilities is to effectively and efficiently treat sewage in compliance with regulations established by their NPDES (National Pollutant Discharge Elimination System) permit. The facilities maintain good working relationships with customers and elected officials of the districts to achieve the goals of accountability, transparency, and credibility. These activities include the following:

- Facility operation and maintenance
- Analytical support to ensure compliance with discharge limits and industrial pretreatment
- Providing training in plant operation, maintenance, safety, and regulatory compliance
- Residuals management
- Addition of various treatment chemicals and/or use of other treatment alternatives
- Planning for plant improvements, equipment replacement, and upgrades
- Emergency response planning
- Storage lagoon operation and maintenance
- Discharge limitations and monitoring
- Pollutant minimization
- Operation of an Industrial Pretreatment Program (IPP)

The sanitary sewer treatment operations are responsible for the collection and transmission of effluent through the sewer interceptor lines to the three disposal plants under the Division's jurisdiction. These plants are the Linden Facility (District No. 3), the Bird Road Lagoons (District No. 7), and the Anthony Ragnone Treatment Plant (ARTP) (Districts No. 1, 2, 5, and 6). In addition to serving large portions of Genesee County, the Division has contracts for sewer treatment outside of its jurisdiction with Shiawassee, Lapeer, Saginaw, Oakland, and Livingston counties.

ARTP provides sewage treatment for the majority of the Division's service area, with Districts No. 3 and No. 7 providing service for several outlying areas. And while the District No. 3 and No. 7 facilities are two distinctly separate operations, they are combined administratively due to their proximity to one another.

The Division also manages two programs that impact its treatment facilities:

- **Biosolids Disposal** - Each treatment plant is responsible for disposing wastewater treatment plant biosolids in a manner that is considered beneficial reuse, in particular, biosolids application on farmland. The ARTP accomplished this goal in 2012 by applying 6,473 dry tons of stabilized biosolids on approximately 2,500 acres of approved fields. In 2012, District No. 3 applied 1,145 dry tons of stabilized biosolids on approximately 900 acres of approved fields.

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

<div align="right">Management's Discussion and Analysis (Continued)</div>

- **Industrial Pretreatment Program** - The Division regulates and monitors industrial and nondomestic dischargers to the wastewater system. The Division reviews applications, issues discharge permits, verifies compliance, calculates fees and surcharge bills for the customers, as well as enforces regulations through discharge permits, which protect the wastewater treatment facilities and the environment. An arsenic program for drinking water systems was implemented to ensure compliance with MDEQ regulations. The ordinance also allows for best management practices (BMP) in regulating silver and mercury from over 750 physician and dental offices and grease and oil from approximately 1,400 restaurants. Inter-jurisdictional agreements and the sewer use ordinance have been distributed to the municipalities, and the local unit of government approval process is ongoing. At this time, there are approximately 15 significant industrial facilities and one categorical user that pay surcharges for the cost of treating various substances they discharge to the Division.

**Water Supply** - The water supply department is responsible for acquisition of water from the Detroit Water and Sewerage department via the City of Flint. The Division transmits potable water to local communities, which in turn supply their residential, commercial, and industrial customers. The Division also contracts with certain local municipalities to operate and maintain their water systems, as well as provide billing services.

The Division maintains a distribution system consisting of over 600 miles of water mains. It also installs water connections and performs turn-ons/offs at the request of its communities, services and changes water meters, and oversees the backflow prevention program. In order to provide an uninterruptible supply of safe drinking water, this department provides forward thought to:

- Identify and evaluate water supply alternatives to meet normal and emergency needs
- Prepare cost estimates to construct, operate, and maintain selected alternatives
- Determine water treatment and pumping requirements

**Objectives and Achievements**

The main objectives of the Division are to maintain high quality services along with residential and commercial water and sewer rates that are fair and cost effective to all concerned. Although not required by law, the Division maintains a yearly budget of income and expenses for all cost centers. The budget is reviewed and approved by an advisory board. Each community that is a customer of the Division has a seat on the advisory board, which meets monthly to provide guidance to the Division.

The rising cost of water from the Detroit Water and Sewerage Department (DWSD) to the City of Flint, and there in turn to the Division and its community customers, continues to be of great concern. From 2002 to 2013, the average yearly DWSD cost of water increased 9.06 percent. This cost from Detroit is passed through to the Division with no markup from the City of Flint. Instead, a monthly flat rate of $114,000 is paid to the City of Flint which also provides for up to 5.2 million gallons per day in emergency backup water supply.

<div align="center">5</div>

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

<div align="right">Management's Discussion and Analysis (Continued)</div>

Due to concern over reliability and this rising cost of water from DWSD, the Division has been coordinating an interjurisdictional initiative for developing an alternative water supply system from Lake Huron. Communities currently supplied by DWSD that are participating in this initiative include the City of Flint, Genesee County, Sanilac County, and the Greater Lapeer County Utilities Authority (GLCUA).

As such, a new governmental entity, the Karegnondi Water Authority (KWA), was incorporated on October 1, 2010, with the purpose of developing this new water supply. At formation, it was comprised of the following five governmental units: Genesee County Drain Commissioner, Lapeer County, the City of Lapeer, Sanilac County, and the City of Flint. After construction of a new pipeline, it will then be KWA's responsibility to provide a supply of untreated Lake Huron water to all contracting municipalities.

As of December 31, 2012, KWA has not incurred any transactions that would have a financial impact on the Division. At the time of this report, both the City of Flint and the Advisory Board of the Genesee County Drain Commissioner Division of Water and Waste Services have voted to sign capacity contracts with KWA.

**Rate Structure**

During 2012, the Division continued a review of its rate structure, with the goal of adjusting rates beginning in 2013. A Division goal is to review and set water and sewer rates on a five-year basis in order to maintain stable and fiscally responsible utility rates. The Division has been able to keep its portion of water and sewer rates constant since its last rate increases in 2008 and 2009. Part of the rate structure requires automatic adjustments based upon DWSD's rate increases to the City of Flint, which are typically passed on to the Division's customers in September of each year.

**Grant Acquisitions**

- The Division was allocated funds of $863,500 for the Vortex Grit Tank No. 2 Project at District No. 3 in September 2011. The funds were allocated from the Department of the Army under Section 219 of the Water Resources Development Act of 1992. Public Law 102-580, as amended, specifies the cost-sharing requirements applicable. During 2012, the Division received $289,991 of contributed capital toward the project.

<div align="center">6</div>

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Management's Discussion and Analysis (Continued)

- The Division was allocated funds as part of the Kearsley Creek Interceptor Project in 2006 and in 2008. The Department of the Army and the Division entered into a project cooperation agreement for the design of approximately 22 miles of interceptor sanitary sewer lines, associated to pump stations and associated appurtenances pursuant to Section 219(f)(59) of the Water Resources Development Act of 1992, Public Law 102-580 as amended, which authorized the Secretary of the Army to provide design and construction assistance for environmental infrastructure improvements to Genesee County, Michigan. During 2012, the Division made the decision not to move forward with the construction of this project, expensed the project to date, and made a final recording of $218,434 for contributed capital.

- State of Michigan Revolving Fund Program loans were approved in prior years for $1,445,000 to fund the ARTP Switchgear project, $14,544,000 to fund the Pump Station #1 and ARTP Blowers and Clarifiers projects, and $933,515 to fund the Fenton Road Water Main Project. A total of $345,440, $2,382,209, and $29,111 was collected, respectively, for these projects during 2012.

**Using this Annual Report**

This annual report consists of a series of financial statements. The statement of net position, the statement of revenue, expenses, and changes in net position, and the statement of cash flows provide information about the activities of the Division as a whole and assist in presenting a longer-term view of its finances.

B-4

7

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Management's Discussion and Analysis (Continued)

**Condensed Financial Information**

The following tables present condensed information about the Division's financial position compared to the prior year:

| | December 31 | | Increase | |
| | 2012 | 2011 | (Decrease) | Percent Change |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets | $ 26,350,746 | $ 24,633,437 | $ 1,717,309 | 7.0 % |
| Restricted assets | 543,333 | 5,459,054 | (4,915,721) | (90.0) |
| Noncurrent lease receivable | 25,759,265 | 28,668,516 | (2,909,251) | (10.1) |
| Capital assets | 322,899,623 | 321,952,707 | 946,916 | 0.3 |
| Other noncurrent assets | 835,548 | 2,169,783 | (1,334,235) | (61.5) |
| Total assets | 376,388,515 | 382,883,497 | (6,494,982) | (1.7) |
| **Liabilities** | | | | |
| Current liabilities | 16,269,157 | 15,420,478 | 848,679 | 5.5 |
| Liabilities payable from restricted assets | 243,008 | 3,509,475 | (3,266,467) | (93.1) |
| Other noncurrent liabilities | 5,832,566 | 7,276,880 | (1,444,314) | (19.8) |
| Long-term debt | 159,837,896 | 167,452,099 | (7,614,203) | (4.5) |
| Total liabilities | 182,182,627 | 193,658,932 | (11,476,305) | (5.9) |
| **Net Position** | | | | |
| Net investment in capital assets | 181,595,040 | 178,661,325 | 2,933,715 | 1.6 |
| Restricted | 3,098,940 | 3,098,052 | 888 | - |
| Unrestricted | 9,511,908 | 7,465,188 | 2,046,720 | 27.4 |
| Total net position | $ 194,205,888 | $ 189,224,565 | $ 4,981,323 | 2.6 |

| | December 31 | | Increase | |
| | 2012 | 2011 | (Decrease) | Percent Change |
|---|---|---|---|---|
| Revenue from operations | $ 52,560,768 | $ 50,021,535 | $ 2,539,233 | 5.1 % |
| Interest on operating cash and receivables | 43,217 | 35,427 | 7,790 | 22.0 |
| Total revenue | 52,603,985 | 50,056,962 | 2,547,023 | 5.1 |
| Sludge disposal charges | 1,228,262 | 1,098,897 | 129,365 | 11.8 |
| Cost of water | 11,779,406 | 12,947,738 | (1,168,332) | (9.0) |
| Operating and maintenance | 21,825,607 | 18,853,461 | 2,972,146 | 15.8 |
| Administrative and depreciation | 12,208,067 | 12,283,110 | (75,043) | (0.6) |
| Total operating expenses | 47,041,342 | 45,183,206 | 1,858,136 | 4.1 |
| Other nonoperating expense | 2,201,438 | 2,432,996 | (231,558) | (9.5) |
| Change in net position - Before capital contributions | 3,361,205 | 2,440,760 | 920,445 | 37.7 |
| Capital contributions | 1,620,118 | 268,228 | 1,351,890 | 504.0 |
| Change in net position | $ 4,981,323 | $ 2,708,988 | $ 2,272,335 | 83.9 |

8

**Genesee County Drain Commissioner
Division of Water and Waste Services**

*Management's Discussion and Analysis (Continued)*

**Major Capital Assets and Debt Activity**

Construction projects completed by the Division totaled $36,835,568 during 2012. This resulted in a reclassification of the construction costs of this amount from a nondepreciable to depreciable asset. The ARTP Clarifiers Project was the largest completed during 2012, valued at $11,924,394.

The Division also increased its capital assets by $1,111,693 due to the completion of the Fenton Road Water Main project, which was funded by two local community customers.

Use of restricted County Capital Improvement Fees (CCIF) to pay debt service and the reduction of restricted receivables from other governmental entities has been the past practice of the Division. Underfunding has occurred and was considered in the initial planning of the CCIF program. CCIF will continue to be collected after retirement of the bond to restitute the fund in full.

**Financial Review**

In analyzing the Genesee County Drain Commissioner Division of Water and Waste Services' financial position, it is important to recognize the mission of the agency, which has been previously stated. A discussion of the significant financial activity during the current year is as follows:

**Statement of Net Position**

- Current assets increased by $1.7 million in the current year due to an increase in cash and equivalents, current accounts receivable, and prepaid expenses.

- Current liabilities increased by approximately $850,000 from the prior year. The main portion of this increase is due to a rise in the current portion of long-term debt, while a smaller amount is due to the timing of accounts payable transactions.

- Liabilities payable from restricted assets decreased significantly again in 2012, from $3.5 million in 2011 to $243,000 at the end of 2012. This continued decrease once again is due to several projects being completed during the year.

- Other noncurrent liabilities decreased by approximately $9.0 million. This was primarily due to a reduction in long-term debt of approximately $7.6 million.

- Combined unrestricted net position increased by approximately $2.0 million, with increases occurring in each of the four divisions. Of significant note, District No. 3 moved from an unrestricted deficit position in 2011 to ($252,524) to a positive ending 2012 position of $130,124.

9

**Genesee County Drain Commissioner
Division of Water and Waste Services**

*Management's Discussion and Analysis (Continued)*

**Statement of Revenue, Expenses, and Changes in Net Assets**

- Operating revenue increased by 5.1 percent during 2012, with water sales accounting for the majority of this increase. The increase in water sales is largely due to the increase in the pass-through rate from DWSD, while a warm and dry summer did produce an increase in water demand. Operating expenses increased slightly less, at a 4.1 percent rate.

- Two of the Division's largest expenses, water costs and utilities, were reduced on a fiscal basis in 2012. However, this calendar year reduction in costs does not fully represent the true yearly ongoing cost of these two expenses. As noted in last year's audit report letter dated June 25, 2012, the Division made a change to accounts payable invoice timing which resulted in an overstatement of expenses for 2011. After review by the Division's new finance officer, the Division concurred with the auditors and moved to correct the situation in 2012. To do so required a subsequent understatement in expenses for both the cost of water and for utilities in 2012. Going forward, a policy has been put in place which will ensure that 12 months of expenses are properly incurred in each calendar year.

- Contractual services increased by approximately $4.0 million in 2012, primarily due to increased engineering and legal work performed for the interceptor and treatment, and water supply divisions. In particular, the Division decided not to move forward with a construction project for interceptor and treatment which resulted in a reclassification of CIP to contractual services, accounting for $2.5 million of the overall increase.

- Depreciation increased by approximately $770,000 due to project completion in 2012 and the associated CIP having been converted to depreciable assets.

The following table shows the trend in interceptor and treatment sewage disposal revenue compared to total flow volumes for the Division's main ARTP treatment facility:

| | Year Ended December 31 | | | |
| | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| I&T sewage disposal revenue | $ 22,579,898 | $ 22,596,773 | $ 22,014,199 | $ 22,785,153 |
| Total flow (thousands of gallons) | 11,979,000 | 9,518,000 | 11,726,740 | 9,540,064 |
| Average revenue per thousands of gallons trated | $ 1.88 | $ 2.37 | $ 1.88 | $ 2.39 |

10

B-5

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Management's Discussion and Analysis (Continued)

The following table shows the trend in water sales compared to volume of water purchased and volume of water sold, with the resulting water efficiency rate:

| | Year Ended December 31 | | | |
| | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Water sales revenue (wholesale and retail) | $ 19,809,718 | $ 21,202,820 | $ 21,697,903 | $ 23,012,087 |
| Volume of water purchased (cu. ft.) | 616,325,400 | 616,632,200 | 621,182,300 | 630,152,800 |
| Volume of water sold (cu. ft.) | 594,736,958 | 585,092,058 | 581,675,986 | 551,198,996 |
| Water efficiency rate | 96% | 95% | 94% | 87% |

### Contacting the Division's Management

This financial report is intended to provide our constituents, sewer/water users, and bondholders with a general overview of the Genesee County Drain Commissioner Division of Water and Waste Services' accountability for the money it receives.  These financial statements are included as a component unit of Genesee County and should be viewed as part of the government-wide financial statements. If there are questions about this report or if additional information is needed, we welcome anyone to contact the Drain Commissioner or the director of the Division.

B-6

11

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Statement of Net Position - Proprietary Fund Types

| | December 31, 2012 | | | December 31, 2011 |
| | Enterprise Fund | Internal Service Fund | Total | Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents (Note 2) | $ 12,796,815 | $ 1,139,582 | $ 13,936,397 | $ 13,380,794 |
| Accounts receivable | 8,812,458 | - | 8,812,458 | 8,255,907 |
| Current portion of leases receivable | 2,940,000 | - | 2,940,000 | 2,825,000 |
| Due from other governmental units | - | - | - | 2,000 |
| Inventory | 75,625 | - | 75,625 | 52,658 |
| Prepaid expenses and other assets | 493,266 | - | 493,266 | 87,078 |
| Other assets | 93,000 | - | 93,000 | 30,000 |
| Total current assets | 25,211,164 | 1,139,582 | 26,350,746 | 24,633,437 |
| Noncurrent assets: | | | | |
| Restricted cash and cash equivalents | - | - | - | 4,592,588 |
| Restricted accounts receivable | 243,008 | - | 243,008 | 532,653 |
| Restricted - Due from other governmental units | 300,325 | - | 300,325 | 333,813 |
| Leases receivable - Net of current portion | 25,759,265 | - | 25,759,265 | 28,668,516 |
| Local unit construction in progress | 156,500 | - | 156,500 | 1,413,161 |
| Capital assets (Note 3): | | | | |
| Assets not subject to depreciation | 55,779,523 | - | 55,779,523 | 86,934,064 |
| Assets subject to depreciation - Net of depreciation | 264,520,174 | 2,599,926 | 267,120,100 | 235,018,643 |
| Unamortized bond issuance costs | 679,048 | - | 679,048 | 756,622 |
| Total noncurrent assets | 347,437,843 | 2,599,926 | 350,037,769 | 358,250,060 |
| Total assets | 372,649,007 | 3,739,508 | 376,388,515 | 382,883,497 |
| **Liabilities** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued expenses | 5,031,387 | 1,472 | 5,032,859 | 4,823,168 |
| Due to other governmental units | 241,300 | - | 241,300 | 237,310 |
| Due to State of Michigan | 149,998 | - | 149,998 | - |
| Current portion of long-term debt (Note 4) | 10,845,000 | - | 10,845,000 | 10,360,000 |
| Total current liabilities | 16,267,685 | 1,472 | 16,269,157 | 15,420,478 |
| Noncurrent liabilities: | | | | |
| Liabilities related to restricted assets | 243,008 | - | 243,008 | 3,509,475 |
| Unearned leases | 156,500 | - | 156,500 | 1,524,185 |
| Other postemployment benefit obligation (Note 6) | 5,676,066 | - | 5,676,066 | 5,752,695 |
| Long-term debt - Net of current portion (Note 4) | 159,837,896 | - | 159,837,896 | 167,452,099 |
| Total noncurrent liabilities | 165,913,470 | - | 165,913,470 | 178,238,454 |
| Total liabilities | 182,181,155 | 1,472 | 182,182,627 | 193,658,932 |
| **Equity** - Net position | | | | |
| Net investment in capital assets | 178,995,114 | 2,599,926 | 181,595,040 | 178,661,325 |
| Restricted | 3,098,052 | - | 3,098,052 | 3,098,052 |
| Unrestricted | 8,374,686 | 1,138,110 | 9,512,796 | 7,465,188 |
| Total net position | $ 190,467,852 | $ 3,738,036 | $ 194,205,888 | $ 189,224,565 |

The Notes to Financial Statements are an
Integral Part of this Statement.

12

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Statement of Revenue, Expenses, and Changes in Net Position
### Proprietary Fund Types

B-7

| | Enterprise Fund | Internal Service Fund | Total | December 31, 2011 Total |
|---|---|---|---|---|
| | December 31, 2012 | | | |
| **Operating Revenue** | | | | |
| Charges for sales and service: | | | | |
| Sale of water | $ 23,104,124 | $ - | $ 23,104,124 | $ 21,697,903 |
| Sewage disposal charges | 26,708,222 | - | 26,708,222 | 26,028,846 |
| Billing services | 146,171 | - | 146,171 | - |
| Water meter sales | 46,694 | - | 46,694 | 64,662 |
| Sewer and pumping station - Operation and maintenance | 1,197,219 | - | 1,197,219 | 1,197,219 |
| Other operating revenue | 1,358,338 | - | 1,358,338 | 1,032,905 |
| Total operating revenue | 52,560,768 | - | 52,560,768 | 50,021,535 |
| **Operating Expenses** | | | | |
| Cost of water | 11,779,406 | - | 11,779,406 | 12,947,738 |
| Sludge disposal service | 1,228,262 | - | 1,228,262 | 1,098,897 |
| Cost of insurance claims and expenses | 277,414 | - | 277,414 | 388,005 |
| Repairs and maintenance | 2,314,611 | 65,905 | 2,380,516 | 1,584,188 |
| Personnel services | 15,207,816 | - | 15,207,816 | 16,672,169 |
| Other supplies and expenses | 995,794 | - | 995,794 | 1,044,117 |
| Contractual services | 4,620,263 | - | 4,620,263 | 622,620 |
| Utilities | 3,241,481 | - | 3,241,481 | 4,288,957 |
| Depreciation | 6,849,102 | 461,288 | 7,310,390 | 6,536,515 |
| Total operating expenses | 46,514,149 | 527,193 | 47,041,342 | 45,183,206 |
| **Operating Income (Loss)** | 6,046,619 | (527,193) | 5,519,426 | 4,838,329 |
| **Nonoperating Revenue (Expenses)** | | | | |
| Community bond interest income | 1,263,136 | - | 1,263,136 | 1,356,456 |
| Community bond interest expense | (1,263,136) | - | (1,263,136) | (1,356,456) |
| Miscellaneous income | 930,054 | - | 930,054 | 635,689 |
| Miscellaneous expense | (45,582) | (1,756) | (47,338) | (158,115) |
| Capital interest and fee expense | (3,103,857) | - | (3,103,857) | (2,910,570) |
| Investment income | 43,217 | - | 43,217 | 35,427 |
| Gain on sale of assets | - | 19,703 | 19,703 | - |
| Total nonoperating (expense) revenue | (2,176,168) | 17,947 | (2,158,221) | (2,397,569) |
| **Income (Loss)** - Before capital contributions and operating transfers | 3,870,451 | (509,246) | 3,361,205 | 2,440,760 |
| **Capital Contributions** | 1,620,118 | - | 1,620,118 | 268,228 |
| **Transfers In** | 45,632,133 | - | 45,632,133 | 37,662,791 |
| **Transfers Out** | (45,518,311) | (113,822) | (45,632,133) | (37,662,791) |
| **Increase (Decrease) in Net Position** | 5,604,391 | (623,068) | 4,981,323 | 2,708,988 |
| **Net Position** - Beginning of year | 184,863,461 | 4,361,104 | 189,224,565 | 186,515,577 |
| **Net Position** - End of year | $ 190,467,852 | $ 3,738,036 | $ 194,205,888 | $ 189,224,565 |

The Notes to Financial Statements are an Integral Part of this Statement.     13

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Statement of Cash Flows - Proprietary Fund Types

| | Enterprise Fund | Internal Service Fund | Total | December 31, 2011 Total |
|---|---|---|---|---|
| | December 31, 2012 | | | |
| **Cash Flows from Operating Activities** | | | | |
| Receipts from customers | $ 52,079,220 | $ 28,183 | $ 52,107,403 | $ 56,647,903 |
| Payments to suppliers and others for goods and services | (25,544,057) | (295,873) | (25,839,930) | (32,126,627) |
| Payments for salaries and employee benefits | (14,771,454) | - | (14,771,454) | (9,449,173) |
| Net cash provided by (used in) operating activities | 11,763,709 | (267,690) | 11,496,019 | 15,072,103 |
| **Cash Flows from Capital and Related Financing Activities** | | | | |
| Purchases of capital assets | (8,722,477) | (476,857) | (9,199,334) | (17,995,616) |
| Contribution from local units for construction | - | - | - | 1,219,720 |
| County capital improvements fee | 968,219 | - | 968,219 | 630,783 |
| Collections of leases receivable from municipalities | 4,030,844 | - | 4,030,844 | 4,014,604 |
| Proceeds from issuance of bonded debt | 3,418,569 | - | 3,418,569 | 24,872,946 |
| Principal paid on bond maturities | (10,534,250) | - | (10,534,250) | (17,708,000) |
| Interest paid on bonds and other long-term liabilities | (4,371,165) | - | (4,371,165) | (4,277,392) |
| Operating transfer | 113,822 | (113,822) | - | - |
| Net cash used in capital and related financing activities | (15,096,438) | (590,679) | (15,687,117) | (9,242,955) |
| **Cash Flows from Investing Activities** - Investment income | 154,113 | - | 154,113 | 56,557 |
| **Net (Decrease) Increase in Cash and Cash Equivalents** | (3,178,616) | (858,369) | (4,036,985) | 5,885,705 |
| **Cash and Cash Equivalents** - Beginning of year | 15,975,431 | 1,997,951 | 17,973,382 | 12,087,677 |
| **Cash and Cash Equivalents** - End of year | $ 12,796,815 | $ 1,139,582 | $ 13,936,397 | $ 17,973,382 |
| **Balance Sheet Classification of Cash and Cash Equivalents** | | | | |
| Cash and cash equivalents | $ 12,796,815 | $ 1,139,582 | $ 13,936,397 | $ 13,380,794 |
| Restricted cash and cash equivalents | - | - | - | 4,592,588 |
| Total cash and cash equivalents | $ 12,796,815 | $ 1,139,582 | $ 13,936,397 | $ 17,973,382 |
| **Reconciliation of Operating Income (Loss) to Net Cash from Operating Activities** | | | | |
| Operating income (loss) | $ 6,046,619 | $ (527,193) | $ 5,519,426 | $ 4,838,329 |
| Depreciation | 6,849,102 | 461,288 | 7,310,390 | 6,536,515 |
| Write-off of construction in progress | 2,369,806 | - | 2,369,806 | - |
| Changes in assets and liabilities: | | | | |
| Receivables | (457,645) | 1,998 | (455,647) | 2,154,890 |
| Other | - | (1,756) | (1,756) | - |
| Inventories | (22,967) | - | (22,967) | (9,359) |
| Prepaid and other assets | (550,877) | 81,689 | (469,188) | 106,151 |
| Accounts payable | (2,874,252) | (309,901) | (3,184,153) | 1,374,259 |
| Internal balances | (26,185) | 26,185 | - | - |
| Due from other governmental units - Net | (30,292) | - | (30,292) | 71,318 |
| Accrued and other liabilities | 460,400 | - | 460,400 | - |
| Net cash provided by (used in) operating activities | $ 11,763,709 | $ (267,690) | $ 11,496,019 | $ 15,072,103 |

**Noncash Investing, Capital, and Financing Activities** - During the year ended December 31, 2012, the Enterprise Fund had $1,111,693 and $508,425 contributed to the water and sewer systems by local communities and a grant, respectively.

14

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

**Note 1 - Summary of Significant Accounting Policies**

The Genesee County Drain Commissioner Division of Water and Waste Services (the "Division") was organized in September 1965 under Public Act No. 342 of 1939 of the State of Michigan (amended in 1967). The Division's major operations are the construction and operation of water and waste systems in Genesee County, Michigan (the "County") and certain areas in surrounding counties. Construction is financed with proceeds from the sale of bonds and federal and state grants. The operating activities are financed primarily through user charges to municipalities in the systems.

The financial statements of the Division have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) as applied to governmental units. The Governmental Accounting Standards Board (GASB) is the accepted standard-setting body for establishing governmental accounting and financial reporting principles. The more significant of the Division's accounting policies are described below:

**Reporting Entity** - Included within the reporting entity are the following:

- Genesee County Sewage Disposal Systems Nos. 1, 2, 5, and 6 (interceptors and treatment facilities)
- Genesee County Sanitary Sewage Disposal Systems Nos. 3 and 7
- Genesee County water supply systems
- Genesee County Division of Water and Waste Services - Vehicle and Equipment Fund (Internal Service Fund)
- Genesee County Division of Water and Waste Services - Insurance Fund (Internal Service Fund)

15

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

**Note 1 - Summary of Significant Accounting Policies (Continued)**

In evaluating how to define the Division for financial reporting purposes, management has considered all potential component units. The decision to include a potential component unit in the reporting entity was made by applying the criteria set forth in GAAP. The basic, but not the only, criterion for including a potential component unit within the reporting entity is the governmental body's ability to exercise oversight responsibility. The most significant manifestation of this ability is financial interdependency. Other manifestations of the ability to exercise oversight responsibility include, but are not limited to, the selection of governing authority, the designation of management, the ability to significantly influence operations, and accountability for fiscal matters. The other criterion used to evaluate potential component units for inclusion or exclusion from the reporting entity is the existence of special financing relationships, regardless of whether the Division is able to exercise oversight responsibilities. Based on the application of these criteria, there are no component units to be included in these basic financial statements.

**Measurement Focus, Basis of Accounting, and Financial Statement Presentation** - The basic financial statements are reported using the economic resources measurement focus and the accrual basis of accounting. Revenue is recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. Grants and similar items are recognized as revenue as soon as all eligibility requirements imposed by the provider have been met.

The Division reports the following major proprietary fund:

- The Enterprise Fund is used to account for operations that are financed and operated in a manner similar to private business enterprises, where the costs (expenses, including depreciation) of providing water and sewer services to the general public on a continuing basis are financed through user charges.

Additionally, the Division reports the following Internal Service Fund:

- The Internal Service Fund accounts for financing of goods and services provided by one department to other departments of the Division on a cost-plus basis as well as risk management services provided to other departments on a cost-reimbursement basis.

As a general rule, the effect of interfund activity has been eliminated from the basic financial statements. Exceptions to this general rule are charges between the Division's water and sewer function and various other functions of the Division. Eliminations of these charges would distort the direct costs and program revenue reported for the various functions concerned.

16

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

**Notes to Financial Statements**
**December 31, 2012**

**Note 1 - Summary of Significant Accounting Policies (Continued)**

Proprietary funds distinguish operating revenue and expenses from nonoperating items. Operating revenue and expenses generally result from providing services and producing and delivering goods in connection with a proprietary fund's principal ongoing operations. The principal operating revenue of the Division's proprietary fund relates to charges to customers for sales and services. Operating expenses for proprietary funds include the cost of sales and services, administrative expenses, and depreciation on capital assets. All revenue and expenses not meeting this definition are reported as nonoperating revenue and expenses.

**Bank Deposits and Investments** - Cash and cash equivalents are considered to be cash on hand, demand deposits, and short-term investments with a maturity of three months or less when acquired. Investments are stated at fair value, based on quoted market prices.

**Short-term Financial Instruments** - The fair value of short-term financial instruments, including cash and cash equivalents, trade accounts receivable and payable, accrued receivables, and accrued liabilities, is equal to the carrying amounts in the accompanying basic financial statements due to the short maturity of such instruments.

**Receivables and Payables** - Outstanding balances between funds are reported in the basic financial statements as "internal balances." All trade receivables are shown as net of an allowance for uncollectible amounts.

**Inventories** - Inventories consist primarily of water meters and grinder pumps, valued at cost, using the first-in, first-out method. The cost of supply inventory is recorded as an expense when consumed rather than when purchased.

**Leases Receivable** - Leases receivable consist of amounts due to the Division from various municipalities for construction activity. The Division constructs assets for various municipalities under Act 342.  Under this act, the County issues bonds and constructs assets on behalf of municipalities. These assets are then leased by the municipalities over the life of the bonds. Lease payments approximate the debt service requirements of the associated bonds.

**Local Unit Construction in Progress** - Local unit construction in progress represents construction of water and sewer distribution and collection systems performed by the Division for local communities. The projects are recorded as an asset during the construction phase and are offset by an unearned lease. When the projects are substantially complete, the asset and unearned lease are removed from the basic financial statements and an asset is recorded by the local community.

17

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

**Notes to Financial Statements**
**December 31, 2012**

**Note 1 - Summary of Significant Accounting Policies (Continued)**

**Restricted Assets** - Certain assets are restricted by the Division's bond ordinances for capital outlay. In addition, unspent bond proceeds and County capital improvement fees are restricted for the construction of water collection and sewage disposal systems projects. When an expense is incurred that allows the use of restricted assets (such as bond debt principal and interest), those assets are applied before utilizing any unrestricted assets.

In 2011, of the total restricted cash and cash equivalents of $4,592,588, $3,384,138 was restricted for construction and $1,208,450 was restricted for debt service.  Of the total restricted accounts receivable of $532,653, $264,688 was county capital improvement fees restricted for construction and $267,965 was interest receivable from communities restricted for debt service.  The total amount restricted due from other governmental units of $333,813 was restricted for construction.

In 2012, there are no restrictions on cash.

**Postemployment Benefits** - In addition to the pension benefits described in Note 5, the Division provides postemployment health care, dental, and life insurance benefits after retirement through a contractual agreement. The Division is responsible for 100 percent of the cost of postemployment benefits and funds these costs as they are incurred. Postemployment benefits for retired employees were $1,514,865 and $1,426,481 for the years ended December 31, 2012 and 2011, respectively.  The total number of eligible retirees amounted to 82 and 83 individuals during December 31, 2012 and 2011, respectively.

**Compensated Absences** - The Division's employees are granted vacation leave bi-annually based on length of service and 80 hours of personal leave each January 1.  Upon termination or resignation, employees are paid accumulated vacation at current salary rates.  Upon retirement, employees are paid accumulated vacation and up to 112 hours of personal leave at current salary rates.  At December 31, 2012 and 2011, the Division has recorded a liability of approximately $431,000 and $426,000, respectively, for accumulated vacation leave.

**Unearned Leases** - Unearned leases represent cash and investments and construction in progress recorded on the Division's books belonging to the municipalities participating in the water collection and sewage disposal system.

**Use of Estimates** - The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect certain reported amounts and disclosures.  Accordingly, actual results could differ from those estimates.

18

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

**Note 1 – Summary of Significant Accounting Policies (Continued)**

**Property, Plant, and Equipment** - Additions to property, plant, and equipment are recorded at cost or, if donated, at their estimated fair value at the time of donation. Repairs and maintenance are recorded as expenses; renewals and betterments are capitalized. The sale or disposal of fixed assets is recorded by removing cost and accumulated depreciation from the accounts and charging the resulting gain or loss to income. Depreciation has been calculated on each class of property using the straight-line method based on the estimated useful lives of the assets, as follows:

| | |
|---|---|
| Land improvements and underground networks | 25-100 years |
| Buildings | 10-50 years |
| Machinery and equipment | 3-25 years |

**Comparative Data/Reclassifications** - Comparative total data for the prior year has been presented in the financial statements in order to provide an understanding of the changes in the financial position and operations. Certain amounts presented in the prior year data have been reclassified in order to be consistent with the current year's presentation.

**Reporting Change** - During the year, the Division adopted GASB Statement No. 63, *Financial Reporting of Deferred Outflows of Resources, Deferred Inflows of Resources, and Net Position*. The statement incorporates deferred outflows of resources and deferred inflows of resources, as defined by GASB Concepts Statement No. 4, into the definitions of the required components of the residual measure of net position, formerly net assets. The statement also provides a new statement of net position format to report all assets, deferred outflows of resources, liabilities, deferred inflows of resources, and net position. The statement impacts the format and reporting of the balance sheet.

**Note 2 – Deposits and Investments**

Michigan Compiled Laws Section 129.91 (Public Act 20 of 1943, as amended) authorizes local governmental units to make deposits and invest in the accounts of federally insured banks, credit unions, and savings and loan associations that have offices in Michigan. The law also allows investments outside the state of Michigan when fully insured. The local unit is allowed to invest in bonds, securities, and other direct obligations of the United States or any agency or instrumentality of the United States; repurchase agreements; bankers' acceptances of United States banks; commercial paper rated within the two highest classifications, which mature not more than 270 days after the date of purchase; obligations of the State of Michigan or its political subdivisions, which are rated as investment grade; and mutual funds composed of investment vehicles that are legal for direct investment by local units of government in Michigan.

**Note 2 – Deposits and Investments (Continued)**

The Division has designated one bank for the deposit of its funds. The investment policy adopted by the board in accordance with Public Act 196 of 1997 has authorized investment in bonds and securities of the United States government and bank accounts and CDs, but not the remainder of state statutory authority as listed above. The Division's deposits and investment policies are in accordance with statutory authority.

The Division's cash and investments are subject to custodial credit risk, which are examined in more detail below:

**Custodial Credit Risk of Bank Deposits** - Custodial credit risk is the risk that in the event of a bank failure, the Division's deposits may not be returned to it. The Division does not have a deposit policy for custodial credit risk. At year end, the Division had $1,092,031 of bank deposits (certificates of deposit, checking, and savings accounts) that were uninsured and uncollateralized. The Division believes that due to the dollar amounts of cash deposits and the limits of FDIC insurance, it is impractical to insure all deposits. As a result, the Division evaluates each financial institution with which it deposits funds and assesses the level of risk of each institution; only those institutions with an acceptable estimated risk level are used as depositories.

The unlimited FDIC insurance program expired on December 31, 2012. Starting January 1, 2013, the Division's uninsured deposits increased significantly.

B-11

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Notes to Financial Statements
December 31, 2012

## Note 3 - Capital Assets

Capital asset activity of the Division's proprietary fund type at December 31, 2012 was as follows:

| | Balance January 1, 2012 | Reclassifications* | Additions | Disposals | Balance December 31, 2012 |
|---|---|---|---|---|---|
| **Enterprise Fund:** | | | | | |
| Capital assets not being depreciated: | | | | | |
| Land | $ 871,021 | $ - | $ - | $ - | $ 871,021 |
| Construction in progress | 86,046,793 | (36,835,568) | 8,097,276 | (2,399,999) | 54,908,502 |
| Subtotal | 86,917,814 | (36,835,568) | 8,097,276 | (2,399,999) | 55,779,523 |
| Capital assets being depreciated: | | | | | |
| Distribution and collections system | 278,985,859 | 29,806,472 | 1,895,257 | - | 310,687,588 |
| Buildings and equipment | 5,419,064 | 7,045,346 | 435,029 | - | 12,899,439 |
| Vehicles | 382,261 | - | - | - | 382,261 |
| Subtotal | 284,787,184 | 36,851,818 | 2,330,286 | - | 323,969,288 |
| Accumulated depreciation: | | | | | |
| Distribution and collections system | (48,921,258) | - | (6,327,670) | - | (55,248,928) |
| Buildings and equipment | (3,423,902) | - | (406,918) | - | (3,830,820) |
| Vehicles | (254,852) | - | (114,514) | - | (369,366) |
| Subtotal | (52,600,012) | - | (6,849,102) | - | (59,449,114) |
| Net capital assets being depreciated | 232,187,172 | 36,851,818 | (4,518,816) | - | 264,520,174 |
| Net capital assets | $ 319,104,986 | $ 16,250 | $ 3,578,460 | $ (2,399,999) | $ 320,299,697 |

| | Balance January 1, 2012 | Reclassifications | Additions | Disposals | Balance December 31, 2012 |
|---|---|---|---|---|---|
| **Internal Service Funds:** | | | | | |
| Capital assets not being depreciated - | | | | | |
| Construction in progress | $ 16,250 | $ (16,250) | $ - | $ - | $ - |
| Capital assets being depreciated - | | | | | |
| Buildings and equipment | 8,628,852 | - | 229,743 | (352,730) | 8,505,865 |
| Accumulated depreciation - Buildings and improvements | (5,797,381) | - | (461,288) | 352,730 | (5,905,939) |
| Net capital assets being depreciated | 2,831,471 | - | (231,545) | - | 2,599,926 |
| Net capital assets | 2,847,721 | (16,250) | (231,545) | - | 2,599,926 |
| Total proprietary funds capital assets | $ 321,952,707 | $ - | $ 3,346,915 | $ (2,399,999) | $ 322,899,623 |

* $16,250 in renovations on an office building were originally recorded as construction in progress in the Internal Service Fund. Subsequent to completion, the amount was reclassed from the Internal Service Fund to the Enterprise Fund.

21

---

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Notes to Financial Statements
December 31, 2012

## Note 3 - Capital Assets (Continued)

**Construction Commitments** - The Division has active construction projects at year end. The projects include improvements and extensions to the water and sewage disposal systems. At year end, the Division's commitments with contractors are as follows:

| | Spent to Date | Remaining Commitment |
|---|---|---|
| Interceptor and treatment facilities | $ 35,147,898 | $ 544,915 |
| Sewage disposal system - District No. 3 | 1,835,728 | 10,541 |
| Sewage disposal system - District No. 7 | 24,394 | 20,075 |
| Water supply system | 4,001,252 | 2,193,395 |
| Total | $ 41,009,272 | $ 2,768,926 |

## Note 4 - Long-term Debt

The Division issues bonds to provide for the construction of water and waste systems in Genesee County and certain areas in surrounding counties. General obligation bonds are direct obligations and pledge the full faith and credit of the Division. Revenue bonds involve a pledge of specific income derived from the acquired or constructed assets to pay debt service and require certain financial covenants to be met.

Long-term debt activity for the year ended December 31, 2012 can be summarized as follows:

| | Number of Issues | Interest Rate Ranges | Principal Maturity Ranges | Beginning Balance * | Additions | Reductions | Ending Balance * | Due Within One Year |
|---|---|---|---|---|---|---|---|---|
| **Genesee County Drain Commissioner bonds payable:** | | | | | | | | |
| Interceptor and treatment facilities | 13 | 1.625%-5.00% | 2031 | $ 99,311,556 | $ 3,388,570 | $ (6,180,000) | $ 96,520,126 | $ 6,310,000 |
| District No. 3 | 2 | 2.50%-4.50% | 2030 | 6,430,000 | - | (270,000) | 6,160,000 | 285,000 |
| Water supply system | 4 | 2.50%-5.125% | 2033 | 40,245,000 | - | (1,260,000) | 38,985,000 | 1,310,000 |
| | | | | 145,986,556 | 3,388,570 | (7,710,000) | 141,665,126 | 7,905,000 |
| **Community-related bonds payable:** | | | | | | | | |
| Interceptor and treatment facilities | 2 | 4.00%-4.35% | 2026 | 5,235,000 | - | (375,000) | 4,860,000 | 390,000 |
| District No. 3 | 6 | 2.50%-7.375% | 2024 | 25,355,000 | - | (2,415,000) | 22,940,000 | 2,510,000 |
| Water supply system | 1 | 2.50 | 2031 | 903,516 | 29,999 | (34,250) | 899,265 | 40,000 |
| Subtotal | | | | 31,493,516 | 29,999 | (2,824,250) | 28,699,265 | 2,940,000 |
| Total bonds payable | | | | $ 177,480,072 | $ 3,418,569 | $ (10,534,250) | $ 170,364,391 | $ 10,845,000 |

* Long-term debt balance excludes bond discount/premium of $318,505 and $332,027 at December 31, 2012 and 2011, respectively.

22

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Note 4 – Long-term Debt (Continued)

Total interest expense for the year was approximately $5.8 million, of which approximately $1.5 million was capitalized as part of construction in progress. Annual debt service requirements to maturity for the above obligations are as follows:

| Years Ending December 31 | Business-type Activities | | |
|---|---|---|---|
| | Principal | Interest | Total |
| 2013 | $ 10,845,000 | $ 5,654,333 | $ 16,499,333 |
| 2014 | 11,180,000 | 5,317,264 | 16,497,264 |
| 2015 | 11,540,000 | 4,966,431 | 16,506,431 |
| 2016 | 11,645,000 | 4,604,434 | 16,249,434 |
| 2017 | 10,830,000 | 4,250,159 | 15,080,159 |
| 2018-2022 | 48,350,000 | 16,663,484 | 65,013,484 |
| 2023-2027 | 46,570,000 | 8,859,989 | 55,429,989 |
| 2028-2032 | 17,869,391 | 2,250,274 | 20,119,665 |
| 2033 | 1,535,000 | 75,406 | 1,610,406 |
| Total | $ 170,364,391 | $ 52,641,774 | $ 223,006,165 |

**Future Revenue Pledged for Debt Payment**

**Revenue Bond** - The Division has pledged substantially all revenue, net of operating expenses, to repay the above Genesee County Drain Commissioner water and sewer revenue bonds. Proceeds from the bonds provided financing for the construction of the water and waste systems described above. The bonds are payable solely from the net revenue of the water and sewer system. The remaining principal and interest to be paid on the bonds total $115,370,449. During the current year, net revenue of the system was $12,895,721 compared to the annual debt requirements of $7,623,037.

### Note 5 – Defined Benefit Pension Plan

**Plan Description** - The Division participates in the Genesee County Employees' Retirement System (GCERS), which is a contributory agent multiple-employer defined benefit plan for pension and disability benefits that covers substantially all employees of Genesee County. Each employer has the ability to negotiate and/or establish benefits through personal policies. The authority to establish and amend the benefit provisions of the plan is governed by Act No. 156, Public Acts of 1851, as amended by the State of Michigan. GCERS issues a publicly available financial report that includes financial statements and required supplemental information for the Division. That report may be obtained by writing to Genesee County Employees' Retirement System, 1101 Beach, Flint, MI 48502 or by calling 1-800-949-2627.

23

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Note 5 – Defined Benefit Pension Plan (Continued)

**Funding Policy** - The County's funding policy provides for periodic employer contributions at actuarially determined rates that, expressed as percentages of annual covered payroll, are designed to accumulate sufficient assets to pay benefits when due. The normal cost is determined using an attained age actuarial funding method.

**Annual Pension Cost** - For the years ended December 31, 2012 and 2011, the Division's annual pension cost of $1,531,645 and $1,763,782, respectively, was equal to the Division's required and actual contribution. The annual required contributions were determined as part of the actuarial valuations at December 31, 2010 and December 31, 2009 using the individual entry age actuarial cost method.

**Actuarial Methods and Assumptions** - In the December 31, 2011 actuarial valuation, the individual entry age actuarial cost method was used. Significant actuarial assumptions used include (a) a rate of return on the investment of present and future assets of 8.00 percent per year compounded annually and (b) projected salary increases of 3.00 percent to 7.03 percent per year compounded annually. Both (a) and (b) included an inflation component of 3.00 percent. The actuarial value of the Division's assets was determined using techniques that smooth the effects of short-term volatility in the market value of investments over a four-year period. The Division's unfunded actuarial accrued liability is being amortized as a level percentage of projected payroll on an open basis, with the remaining amortization period of 25 years at December 31, 2011.

**Schedule of Funding Progress**

| Actuarial Valuation Date | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) (b) | Unfunded AAL (UAAL) (b-a) | Funded Ratio (Percent) (a/b) | Covered Payroll (c) | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| 12/31/06 | $ 37,578,528 | $ 42,770,145 | $ 5,191,617 | 87.9 % | $ 8,245,848 | 63.0 % |
| 12/31/07 | 38,979,791 | 44,748,462 | 5,768,671 | 87.1 | 7,823,724 | 73.7 |
| 12/31/08 | 37,329,643 | 46,855,482 | 9,525,839 | 79.7 | 8,420,060 | 113.1 |
| 12/31/09 | 36,627,952 | 49,055,966 | 12,428,014 | 74.7 | 8,130,143 | 152.9 |
| 12/31/10 | 35,600,950 | 50,285,901 | 14,684,951 | 70.8 | 7,610,890 | 192.9 |
| 12/31/11 | 32,632,128 | 48,896,200 | 16,264,072 | 66.7 | 7,312,770 | 222.4 |

24

B-12

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

**Note 5 – Defined Benefit Pension Plan (Continued)**

**Schedule of Employer Contributions**

| Fiscal Year Ended | Actuarial Valuation Date | Contribution Rate as Percentage of Valuation Payroll | Annual Pension Cost (APC) | Actual Reported Contribution | Percentage of ARC Contributed |
|---|---|---|---|---|---|
| 12/31/10 | 12/31/08 | 17.76 % | $ 1,744,861 | $ 1,744,861 | 100 % |
| 12/31/11 | 12/31/09 | 18.81 | 1,763,782 | 1,763,782 | 100 |
| 12/31/12 | 12/31/10 | 16.62 | 1,531,645 | 1,531,645 | 100 |

**Note 6 – Other Postemployment Benefits**

**Plan Description** - The Division provides retiree health care, dental, life, and vision benefits to eligible employees and their spouses and dependents through the Municipal Employees' Retirement System. This is an agent multiple-employer defined benefit plan administered by the Division. The benefits are provided under collective bargaining agreements.

**Funding Policy** - The collective bargaining agreements do not require employee contributions. The Division has no obligation to make contributions in advance of when the insurance premiums are due for payment (in other words, this may be financed on a "pay-as-you-go" basis). However, as shown below, the Division has made contributions to advance-fund these benefits, as determined by the Division.

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

**Note 6 – Other Postemployment Benefits (Continued)**

**Funding Progress** - For the year ended December 31, 2012, the Division has estimated the cost of providing retiree healthcare benefits through an actuarial valuation as of December 31, 2010. The valuation computes an annual required contribution, which represents a level of funding that, if paid on an ongoing basis, is projected to cover normal cost each year and amortize any unfunded actuarial liabilities over a period not to exceed 30 years. This valuation's computed contribution and actual funding are summarized as follows:

|  | 2012 | 2011 |
|---|---|---|
| Annual required contribution (recommended) | $ 3,818,480 | $ 3,933,831 |
| Interest on the prior year's net OPEB obligation | 230,108 | 127,528 |
| Less adjustment to the annual required contribution | (101,338) | (78,511) |
| Annual OPEB cost | 3,947,250 | 3,982,848 |
| Amounts contributed: |  |  |
| Payments of current premiums | (1,523,879) | (1,337,004) |
| Advance funding | (2,500,000) | (81,360) |
| Total contributions | (4,023,879) | (1,418,364) |
| (Decrease) increase in net OPEB obligation | (77,629) | 2,564,484 |
| OPEB obligation - Beginning of year | 5,752,695 | 3,188,211 |
| OPEB obligation - End of year | $ 5,675,066 | $ 5,752,695 |

The net OPEB obligation is recorded in the basic financial statements as part of noncurrent liabilities.

The annual OPEB costs, the percentage contributed to the plan, and the net OPEB obligation for the current and preceding year were as follows:

| Fiscal Year Ended | Annual OPEB Costs | Percentage Contributed | Net OPEB Obligation |
|---|---|---|---|
| 12/31/10 | $ 2,641,753 | 55.87 % | $ 3,188,211 |
| 12/31/11 | 3,982,848 | 35.61 | 5,752,695 |
| 12/31/12 | 3,947,250 | 101.94 | 5,676,066 |

The Division approved a prefunding plan in 2012 and remitted $2.5 million to the trust during the year. Going forward, $1.2 million will be remitted to the trust per year until the liability is funded.

B-13

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Notes to Financial Statements
December 31, 2012

**Note 6 – Other Postemployment Benefits (Continued)**

The funding progress of the plan is as follows:

| Actuarial Valuation Date | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) (b) | Unfunded AAL (UAAL) (b-a) | Funded Ratio (Percent) (a/b) | Covered Payroll (c) | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| 12/31/08 | $ - | $ 35,394,879 | $ 35,394,879 | - | $ 8,420,060 | 420.36 % |
| 12/31/10 | - | 51,474,408 | 51,474,408 | - | 7,610,890 | 676.33 |
| 9/30/12 | 2,333,369 | 37,819,976 | 35,486,607 | 6.17 % | 7,312,770 | 485.27 |

The schedule of employer contributions is as follows:

| Fiscal Year Ended | Actuarial Valuation Date | Annual Required Contribution (ARC) | Percentage of ARC Contributed | Contribution Rate as Percentage of Valuation Payroll |
|---|---|---|---|---|
| 12/31/10 | 12/31/08 | $ 2,641,753 | 55.87 % | 32.43 % |
| 12/31/11 | 12/31/10 | 3,982,848 | 35.61 | 50.59 |
| 12/31/12 | 12/31/10 | 3,947,250 | 101.94 | 50.59 |

**Actuarial Methods and Assumptions** - Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment, mortality, and the healthcare cost trend. Amounts determined regarding the funded status of the plan and the annual required contributions of the employer are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future.

Projections of benefits for financial reporting purposes are based on the substantive plan (the plan as understood by the employer and the plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and plan members to that point. The actuarial methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspective of the calculations.

In the December 31, 2010 actuarial valuation, the individual entry age actuarial cost method was used. The actuarial assumptions included a 4.0 percent investment rate of return (net of administrative expenses) and an annual healthcare cost trend rate of 5.0 percent. The UAAL is being amortized as a level percentage of projected payroll over 30 years.

27

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

Notes to Financial Statements
December 31, 2012

**Note 7 – Risk Management**

The Division is exposed to various risks of loss related to property loss, torts, errors and omissions, and employee injuries (workers' compensation), as well as medical benefits provided to employees. The Division is partially self-insured for medical benefits and has purchased commercial insurance for the remaining medical benefits and other risks of loss. Settled claims relating to the commercial insurance have not exceeded the amount of insurance coverage in any of the past three fiscal years.

The Division estimates the liability for medical claims that have been incurred through the end of the fiscal year, including claims that have been reported as well as those that have not yet been reported. The liability is included with accounts payable and other accrued expenses in the statement of net position. Changes in the estimated liability for the past two fiscal years were as follows:

|  | 2012 | 2011 |
|---|---|---|
| Unpaid claims - Beginning of year | $ 290,676 | $ 261,162 |
| Incurred claims, including claims incurred but not reported | 2,208,189 | 2,559,231 |
| Claim payments | (2,038,825) | (2,529,717) |
| Unpaid claims - End of year | $ 460,040 | $ 290,676 |

**Note 8 – Upcoming Accounting Pronouncements**

In March 2012, the GASB issued Statement No. 65, *Items Previously Reported as Assets and Liabilities*, which is required to be implemented for financial statements for periods beginning after December 15, 2012. Statement No. 65 establishes accounting and financial reporting standards that reclassify, as deferred outflows and inflows of resources, certain items that were previously reported as assets and liabilities. This statement also provides other financial reporting guidance related to the impact of the financial statement elements deferred outflows of resources and deferred inflows of resources. Statement No. 65 will be implemented for the Division as of December 31, 2013.

28

B-14

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

**Notes to Financial Statements**
**December 31, 2012**

**Note 8 – Upcoming Accounting Pronouncements (Continued)**

In June 2012, the GASB issued two new pension standards, GASB Statement No. 67, *Financial Reporting for Pension Plans*, and No. 68, *Accounting and Financial Reporting for Pensions*. These new standards significantly revise the current accounting and reporting for pensions, both from an employer perspective as well as from a plan perspective. Employers providing defined benefit pensions to its employees must now, under these new standards, recognize their unfunded pension benefit obligation as a liability for the first time, and to more comprehensively and comparably measure the annual costs of pension benefits. This net pension liability that will be recorded on the government-wide, proprietary, and discretely presented component units statements will be computed differently than the current unfunded actuarial accrued liability, using specific parameters set forth by the GASB. The statement also enhances accountability and transparency through revised and expanded note disclosures and required supplemental information (RSI). Statement No. 67 is required to be adopted for December 31, 2013 and Statement No. 68 one year later.

B-15

**Supplemental Information**

B-16

## Genesee County Drain Commissioner
## Division of Water and Waste Services

### Statement of Net Position – Proprietary Fund Types

| | Interceptor and Treatment Facilities | Sewage Disposal Systems District No. 3 | Sewage Disposal Systems District No. 7 | Water Supply Systems | Total | December 31, 2011 Total |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ 3,364,946 | $ 269,995 | $ 80,105 | $ 9,081,769 | $ 12,796,815 | $ 11,382,843 |
| Accounts receivable | 5,062,899 | 314,269 | 154,197 | 3,281,093 | 8,812,458 | 8,253,909 |
| Current portion of leases receivable | 390,000 | 2,510,000 | - | 40,000 | 2,940,000 | 2,825,000 |
| Due from other governmental units | - | - | - | - | - | 2,000 |
| Inventory | - | - | - | 75,625 | 75,625 | 52,658 |
| Prepaid expenses | 236,811 | 39,375 | 5,419 | 211,661 | 493,266 | 5,389 |
| Other assets | - | - | - | 93,000 | 93,000 | 30,000 |
| Total current assets | 9,054,656 | 3,133,639 | 239,721 | 12,783,148 | 25,211,164 | 22,551,799 |
| Noncurrent assets: | | | | | | |
| Restricted cash and cash equivalents | - | - | - | - | - | 4,592,588 |
| Restricted accounts receivable | 33,615 | 203,770 | - | 5,623 | 243,008 | 532,653 |
| Restricted – Due from other governmental units | - | 300,325 | - | - | 300,325 | 333,813 |
| Leases receivable – Net of current portion | 4,470,000 | 20,430,000 | - | 859,265 | 25,759,265 | 28,648,516 |
| Local unit construction in progress | - | - | - | 156,500 | 156,500 | 1,413,161 |
| Capital assets: | | | | | | |
| Assets not subject to depreciation | 52,813,000 | 604,823 | 1,415 | 2,360,285 | 55,779,523 | 86,917,814 |
| Assets subject to depreciation - Net of depreciation | 172,348,963 | 28,322,095 | 414,484 | 63,434,632 | 264,520,174 | 232,187,172 |
| Unamortized bond issuance costs | 657,879 | 21,169 | - | - | 679,048 | 756,622 |
| Total noncurrent assets | 230,323,457 | 49,882,182 | 415,899 | 66,816,305 | 347,437,843 | 355,402,339 |
| Total assets | 239,378,113 | 53,015,821 | 655,620 | 79,599,453 | 372,649,007 | 377,954,138 |
| **Liabilities** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable and accrued expenses | 2,017,833 | 240,188 | 22,066 | 2,751,300 | 5,031,387 | 4,228,728 |
| Due to other governmental units | 241,300 | - | - | - | 241,300 | 237,310 |
| Internal balances | - | - | - | - | - | 26,185 |
| Due to State of Michigan | 149,998 | - | - | - | 149,998 | - |
| Current portion of long-term debt | 6,700,000 | 2,795,000 | - | 1,350,000 | 10,845,000 | 10,360,000 |
| Total current liabilities | 9,109,131 | 3,035,188 | 22,066 | 4,101,300 | 16,267,685 | 14,852,223 |
| Noncurrent liabilities: | | | | | | |
| Liabilities related to restricted assets | 33,615 | 203,770 | - | 5,623 | 243,008 | 3,509,475 |
| Unearned leases | - | - | - | 156,500 | 156,500 | 1,524,185 |
| Other postemployment benefit obligation | 3,483,846 | 553,652 | 94,518 | 1,544,050 | 5,676,066 | 5,752,695 |
| Long-term debt - Net of current portion | 94,808,826 | 26,328,956 | - | 38,700,114 | 159,837,896 | 167,452,099 |
| Total noncurrent liabilities | 98,326,287 | 27,086,378 | 94,518 | 40,406,287 | 165,913,470 | 178,238,454 |
| Total liabilities | 107,435,418 | 30,121,566 | 116,584 | 44,507,587 | 182,181,155 | 193,090,677 |
| **Equity - Net position** | | | | | | |
| Invested in capital assets - Net of related debt | 129,171,016 | 22,764,131 | 415,899 | 26,644,068 | 178,995,114 | 175,813,604 |
| Restricted | 2,771,679 | 130,124 | 123,137 | 3,098,052 | 3,098,052 | 3,098,052 |
| Unrestricted | 2,771,679 | 130,124 | 123,137 | 5,349,766 | 8,374,686 | 5,951,805 |
| Total net position | $ 131,942,695 | $ 22,894,255 | $ 539,036 | $ 35,091,866 | $ 190,467,852 | $ 184,863,461 |

31

## Genesee County Drain Commissioner
## Division of Water and Waste Services

### Statement of Revenue, Expenses, and Changes in Net Position (Divisional Detail) - Enterprise Fund

| | Interceptor and Treatment Facilities | Sewage Disposal Systems District No. 3 | Sewage Disposal Systems District No. 7 | Water Supply Systems | Total | December 31, 2011 Total |
|---|---|---|---|---|---|---|
| **Operating Revenue** | | | | | | |
| Charges for sales and service: | | | | | | |
| Sale of water | $ - | $ - | $ - | $ 23,104,124 | $ 23,104,124 | $ 21,697,903 |
| Sewage disposal charges | 22,785,153 | 3,201,467 | 721,602 | - | 26,708,222 | 26,028,846 |
| Billing service | 146,171 | - | - | - | 146,171 | - |
| Water meter sales | - | - | - | 46,694 | 46,694 | 64,662 |
| Sewer and pumping station - Operation and maintenance | 1,197,219 | - | - | - | 1,197,219 | 1,197,219 |
| Other operating revenue | 484,869 | 162,795 | 1,447 | 709,227 | 1,358,338 | 880,452 |
| Total operating revenue | 24,613,412 | 3,364,262 | 723,049 | 23,860,045 | 52,560,768 | 49,869,082 |
| **Operating Expenses** | | | | | | |
| Cost of water | - | - | - | 11,779,406 | 11,779,406 | 12,947,738 |
| Sludge disposal service | 986,087 | 242,175 | - | - | 1,228,262 | 1,098,897 |
| Cost of insurance claims and expenses | 125,273 | 29,052 | 4,608 | 118,481 | 277,414 | 237,060 |
| Repairs and maintenance | 1,383,070 | 299,042 | 172,738 | 459,761 | 2,314,611 | 2,367,433 |
| Personnel services | 8,915,314 | 1,590,428 | 227,729 | 4,474,345 | 15,207,816 | 16,672,169 |
| Other supplies and expenses | 665,619 | 44,321 | 30,610 | 255,244 | 995,794 | 1,033,489 |
| Contractual services | 3,437,616 | 129,178 | 26,770 | 1,026,699 | 4,620,263 | 622,620 |
| Utilities | 2,196,573 | 389,106 | 145,146 | 510,656 | 3,241,481 | 4,288,957 |
| Depreciation | 4,258,784 | 717,785 | 22,722 | 1,849,811 | 6,849,102 | 6,142,303 |
| Total operating expenses | 21,968,336 | 3,441,087 | 630,323 | 20,474,403 | 46,514,149 | 45,410,666 |
| **Operating Income (Loss)** | 2,645,076 | (76,825) | 92,726 | 3,385,642 | 6,046,619 | 4,458,416 |
| **Nonoperating Revenue (Expenses)** | | | | | | |
| Community bond interest income | 207,194 | 1,031,715 | - | 24,227 | 1,263,136 | 1,356,456 |
| Community bond interest expense | (207,194) | (1,031,715) | - | (24,227) | (1,263,136) | (1,356,456) |
| Miscellaneous income | 250,899 | - | - | 679,155 | 930,054 | 635,689 |
| Miscellaneous expense | (45,582) | - | - | - | (45,582) | (158,115) |
| Capital interest and fee expense | (1,060,572) | (222,242) | - | (1,821,043) | (3,103,857) | (2,910,570) |
| Investment income | 13,622 | 1,102 | 145 | 28,348 | 43,217 | 33,575 |
| Total nonoperating (expense) revenue | (841,633) | (221,140) | 145 | (1,113,540) | (2,176,168) | (2,399,421) |
| **Income (Loss) - Before capital contributions and operating transfers** | 1,803,443 | (297,965) | 92,871 | 2,272,102 | 3,870,451 | 2,058,995 |
| **Capital Contributions** | 218,434 | 289,991 | - | 1,111,693 | 1,620,118 | 268,228 |
| **Transfers In** | 41,889,990 | 1,759,884 | 1,138 | 1,981,121 | 45,632,133 | 37,559,040 |
| **Transfers Out** | (41,835,356) | (1,751,915) | - | (1,931,040) | (45,518,311) | (37,662,791) |
| **Increase (Decrease) in Net Position** | 2,076,511 | (5) | 94,009 | 3,433,876 | 5,604,391 | 2,223,472 |
| **Net Position - Beginning of year** | 129,866,184 | 22,894,260 | 445,027 | 31,657,990 | 184,863,461 | 182,639,989 |
| **Net Position - End of year** | $ 131,942,695 | $ 22,894,255 | $ 539,036 | $ 35,091,866 | $ 190,467,852 | $ 184,863,461 |

32

B-17

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Statement of Cash Flows (Divisional Detail) - Enterprise Fund

| | Interceptor and Treatment Facilities | Sewage Disposal Systems District No. 3 | District No. 7 | Water Supply Systems | Total December 31, 2012 | Total December 31, 2011 |
|---|---|---|---|---|---|---|
| **Cash Flows from Operating Activities** | | | | | | |
| Receipts from customers | $ 24,357,589 | $ 3,349,295 | $ 689,402 | $ 23,682,934 | $ 52,079,220 | $ 52,060,797 |
| Payments to suppliers and others for goods and services | (9,209,198) | (1,281,626) | (393,676) | (14,659,557) | (25,544,057) | (28,444,732) |
| Payments for salaries and employee benefits | (8,551,259) | (1,590,520) | (251,767) | (4,377,908) | (14,771,454) | (9,449,173) |
| Net cash provided by operating activities | 6,597,132 | 477,149 | 43,959 | 4,645,469 | 11,763,709 | 14,166,892 |
| **Cash Flows from Capital and Related Financing Activities** | | | | | | |
| Purchases of capital assets | (5,813,739) | (132,755) | (5,660) | (2,770,323) | (8,722,477) | (17,461,991) |
| Contribution from local units for construction | - | - | - | - | - | 1,219,720 |
| County capital improvement fees | 250,899 | - | - | 717,320 | 968,219 | 630,783 |
| Collections of leases receivable from municipalities | - | - | - | 29,999 | 29,999 | - |
| Proceeds from issuance of bonded debt | 581,769 | 3,444,824 | - | 4,251 | 4,030,844 | 4,014,604 |
| Principal paid on bond maturities | 3,388,570 | - | - | - | 3,418,569 | 24,872,946 |
| Interest paid on bonds | (6,555,000) | (2,685,000) | - | (1,294,250) | (10,534,250) | (17,708,000) |
| Operating transfer | (1,282,408) | (1,254,377) | - | (1,834,380) | (4,371,165) | (4,277,392) |
| | 54,634 | 7,969 | 1,138 | 50,081 | 113,822 | (103,751) |
| Net cash used in capital and related financing activities | (9,375,275) | (619,339) | (4,522) | (5,097,302) | (15,096,438) | (8,813,081) |
| **Cash Flows from Investing Activities -** Investment income | 16,161 | 1,102 | 145 | 136,705 | 154,113 | 54,705 |
| **Net (Decrease) Increase in Cash and Cash Equivalents** | (2,761,982) | (141,088) | 39,582 | (315,128) | (3,178,616) | 5,408,516 |
| **Cash and Cash Equivalents -** Beginning of year | 6,126,928 | 411,083 | 40,523 | 9,396,897 | 15,975,431 | 10,566,915 |
| **Cash and Cash Equivalents -** End of year | $ 3,364,946 | $ 269,995 | $ 80,105 | $ 9,081,769 | $ 12,796,815 | $ 15,975,431 |
| **Balance Sheet Classification of Cash and Cash Equivalents** | | | | | | |
| Cash and investments | $ 3,364,946 | $ 269,995 | $ 80,105 | $ 9,081,769 | $ 12,796,815 | $ 11,382,843 |
| Restricted cash and cash equivalents | - | - | - | - | - | 4,592,588 |
| Total cash and cash equivalents | $ 3,364,946 | $ 269,995 | $ 80,105 | $ 9,081,769 | $ 12,796,815 | $ 15,975,431 |
| **Reconciliation of Operating Income (Loss) to Net Cash from Operating Activities** | | | | | | |
| Operating income (loss) | $ 2,645,076 | $ (76,825) | $ 92,726 | $ 3,385,642 | $ 6,046,619 | $ 4,458,416 |
| Depreciation | 4,258,784 | 717,785 | 22,722 | 1,849,811 | 6,849,102 | 6,142,303 |
| Write-off of construction in progress | 2,369,806 | - | - | - | 2,369,806 | - |
| Changes in assets and liabilities: | | | | | | |
| Receivables | (398,295) | 289,034 | (33,269) | (315,115) | (457,645) | 2,122,207 |
| Inventories | - | - | - | (22,967) | (22,967) | (9,359) |
| Prepaid and other assets | (235,536) | (39,200) | (5,268) | (270,873) | (550,877) | (34,320) |
| Accounts payable | (2,549,230) | (109,552) | - | (215,470) | (2,874,252) | 1,418,138 |
| Due to (from) other governmental units - Units | 155,998 | (41,794) | (32,574) | (111,922) | (30,292) | 71,318 |
| Accrued and other liabilities | 364,055 | (92) | - | 96,437 | 460,400 | - |
| Internal balances | (13,526) | (262,207) | (378) | 249,926 | (26,185) | (1,811) |
| Net cash provided by operating activities | $ 6,597,132 | $ 477,149 | $ 43,959 | $ 4,645,469 | $ 11,763,709 | $ 14,166,892 |

**Noncash Investing, Capital, and Financing Activities -** During the year ended December 31, 2012, the Enterprise Fund had $1,111,693 and $508,425 contributed to the water and sewer systems by local communities and a grant, respectively.

**Genesee County Drain Commissioner**
**Division of Water and Waste Services**

### Statement of Net Position - Internal Service Funds

| | Equipment Fund December 31, 2012 | Insurance Fund | Total | Total December 31, 2011 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ 1,138,432 | $ 1,150 | $ 1,139,582 | $ 1,997,951 |
| Accounts receivable | - | - | - | 1,998 |
| Prepaid expenses | - | - | - | 81,689 |
| Total current assets | 1,138,432 | 1,150 | 1,139,582 | 2,081,638 |
| Noncurrent assets - Capital assets - Assets subject to depreciation - Net of depreciation | 2,599,926 | - | 2,599,926 | 2,847,721 |
| Total assets | 3,738,358 | 1,150 | 3,739,508 | 4,929,359 |
| **Liabilities** - Current liabilities | | | | |
| Accounts payable and accrued expenses | 322 | 1,150 | 1,472 | 594,440 |
| Internal balances | - | - | - | (26,185) |
| Total liabilities | 322 | 1,150 | 1,472 | 568,255 |
| **Equity** - Net position | | | | |
| Invested in capital assets - Net of related debt | 2,599,926 | - | 2,599,926 | 2,847,721 |
| Unrestricted | 1,138,110 | - | 1,138,110 | 1,513,383 |
| Total net position | $ 3,738,036 | $ - | $ 3,738,036 | $ 4,361,104 |

## Genesee County Drain Commissioner
## Division of Water and Waste Services

### Statement of Revenue, Expenses, and Changes in Net Position
### Internal Service Funds

| | December 31, 2012 | | | December 31, 2011 |
|---|---|---|---|---|
| | Equipment Fund Combined | Insurance Fund Combined | Total | Total |
| **Operating Revenue** | | | | |
| Other operating revenue | $ - | $ - | $ - | $ 152,453 |
| Billing to Enterprise Fund | - | - | - | 4,400,159 |
| Total operating revenue | - | - | - | 4,552,612 |
| **Operating Expenses** | | | | |
| Cost of insurance claims and expenses | - | - | - | 3,767,859 |
| Repairs and maintenance | 65,905 | - | 65,905 | - |
| Other supplies and expenses | - | - | - | 10,628 |
| Depreciation | 461,288 | - | 461,288 | 394,212 |
| Total operating expenses | 527,193 | - | 527,193 | 4,172,699 |
| **Operating (Loss) Income** | (527,193) | - | (527,193) | 379,913 |
| **Nonoperating Revenue** | | | | |
| Miscellaneous expense | (1,756) | - | (1,756) | - |
| Investment income | - | - | - | 1,852 |
| Gain on sale of assets | 19,703 | - | 19,703 | - |
| Total nonoperating revenue | 17,947 | - | 17,947 | 1,852 |
| **(Loss) Income** - Before operating transfers | (509,246) | - | (509,246) | 381,765 |
| **Transfers In** | - | - | - | 103,751 |
| **Transfers Out** | (16,250) | (97,572) | (113,822) | - |
| **(Decrease) Increase in Net Position** | (525,496) | (97,572) | (623,068) | 485,516 |
| **Net Position** - Beginning of year | 4,263,532 | 97,572 | 4,361,104 | 3,875,588 |
| **Net Position** - End of year | $ 3,738,036 | $ - | $ 3,738,036 | $ 4,361,104 |

## Genesee County Drain Commissioner
## Division of Water and Waste Services

### Statement of Cash Flows - Internal Service Funds

| | December 31, 2012 | | | December 31, 2011 |
|---|---|---|---|---|
| | Equipment Fund | Insurance Fund | Total | Total |
| **Cash Flows from Operating Activities** | | | | |
| Receipts from customers | $ 26,185 | $ 1,998 | $ 28,183 | $ 4,587,106 |
| Payments to suppliers and others for goods and services | (67,339) | (228,534) | (295,873) | (3,681,895) |
| Net cash (used in) provided by operating activities | (41,154) | (226,536) | (267,690) | 905,211 |
| **Cash Flows from Capital and Related Financing Activities** | | | | |
| Purchase of capital assets | (476,857) | - | (476,857) | (533,625) |
| Operating transfer | (16,250) | (97,572) | (113,822) | 103,751 |
| Net cash used in capital and related financing activities | (493,107) | (97,572) | (590,679) | (429,874) |
| **Cash Flows from Investing Activities** - Investment income | - | - | - | 1,852 |
| **Net (Decrease) Increase in Cash and Cash Equivalents** | (534,261) | (324,108) | (858,369) | 477,189 |
| **Cash and Cash Equivalents** - Beginning of year | 1,672,693 | 325,258 | 1,997,951 | 1,520,762 |
| **Cash and Cash Equivalents** - End of year | $ 1,138,432 | $ 1,150 | $ 1,139,582 | $ 1,997,951 |
| **Balance Sheet Classification of Cash and Cash Equivalents** | $ 1,138,432 | $ 1,150 | $ 1,139,582 | $ - |
| **Reconciliation of Operating (Loss) Income to Net Cash from Operating Activities** | | | | |
| Operating (loss) income | $ (527,193) | $ - | $ (527,193) | $ 379,913 |
| Depreciation | 461,288 | - | 461,288 | 394,212 |
| Changes in assets and liabilities: | | | | |
| Receivables | - | 1,998 | 1,998 | 32,683 |
| Other | (1,756) | - | (1,756) | - |
| Prepaid and other assets | - | 81,689 | 81,689 | 140,471 |
| Accounts payable, accrued expenses, and deferred revenue | 322 | (310,223) | (309,901) | (43,879) |
| Internal balances | 26,185 | - | 26,185 | 1,811 |
| Net cash (used in) provided by operating activities | $ (41,154) | $ (226,536) | $ (267,690) | $ 905,211 |

B-18

35    36

# Genesee County Drain Commissioner
# Division of Water and Waste Services

B-19

| Description of Issue | Principal Outstanding January 1, 2012 | Issued During the Year | Retired During the Year | Principal Outstanding December 31, 2012 | 2013 Principal | 2013 Interest | 2014 Principal | 2014 Interest | 2015 Principal | 2015 Interest | 2016 Principal | 2016 Interest | 2017 Principal | 2017 Interest | Later Principal | Later Interest | Total Principal | Total Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Facilities and Treatment Facilities** | | | | | | | | | | | | | | | | | | |
| **Genesee County Drain Commissioner Bonds Payable:** | | | | | | | | | | | | | | | | | | |
| Series 2003 $9,000,000 Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Division Western Trunk Relief project. Due serially in various amounts ranging from $350,000 to $2,350,000 through 2018 with interest rates from 2.00% to 4.50% | 3,485,000 | - | (440,000) | 3,045,000 | 440,000 | 132,288 | 480,000 | 113,880 | 490,000 | 93,488 | 515,000 | 72,450 | 535,000 | 49,275 | 560,000 | 25,200 | 3,045,000 | 486,589 |
| Series 2005A $22,180,000 State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Northeast Extension Sewer project. Fully drawn May 2007. Due in amounts ranging from $950,000 to $1,285,000 through 2026 with interest rate of 1.625% | 17,280,000 | - | (1,025,000) | 16,255,000 | 1,045,000 | 264,144 | 1,060,000 | 247,163 | 1,080,000 | 229,938 | 1,095,000 | 212,388 | 1,115,000 | 194,394 | 10,860,000 | 901,145 | 16,255,000 | 2,049,372 |
| Series 2005B $15,505,000 State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee for Division project. Fully drawn May 2007. Due in amounts ranging from $660,000 to $900,000 through 2026 with interest rate of 1.625% | 12,090,000 | - | (720,000) | 11,370,000 | 730,000 | 178,831 | 740,000 | 166,888 | 755,000 | 154,741 | 765,000 | 142,391 | 780,000 | 129,838 | 7,600,000 | 569,075 | 11,370,000 | 1,341,764 |
| Series 2006A $3,015,000 State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Division Northeast Extension Sewer project. Fully drawn October 2007. Due in amounts ranging from $120,000 to $160,000 through 2027 with interest rate of 1.625% | 2,325,000 | - | (130,000) | 2,195,000 | 130,000 | 35,669 | 130,000 | 33,556 | 135,000 | 31,444 | 135,000 | 29,250 | 140,000 | 27,056 | 1,525,000 | 139,749 | 2,195,000 | 296,724 |
| Series 2006B $7,705,000 State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Division Northeast Extension Sewer project. Fully drawn July 2008. Due in amounts ranging from $330,000 to $445,000 through 2027 with interest rate of 1.625% | 6,355,000 | - | (350,000) | 6,005,000 | 355,000 | 97,581 | 365,000 | 91,813 | 370,000 | 85,881 | 375,000 | 79,869 | 380,000 | 73,775 | 4,160,000 | 380,737 | 6,005,000 | 809,656 |

# Genesee County Drain Commissioner
## Division of Water and Waste Services

**Summary of Bonds Payable (Continued)**
**Year Ended December 31, 2012**

| Description of Issue | Principal Outstanding January 1, 2012 | Issued During the Year | Retired During the Year | Principal Outstanding December 31, 2012 | 2013 Principal | 2013 Interest | 2014 Principal | 2014 Interest | 2015 Principal | 2015 Interest | 2016 Principal | 2016 Interest | 2017 Principal | 2017 Interest | Later Principal | Later Interest | Total Principal | Total Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Series 2004C $4,235,000** State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Division Northeast Extension Sewer project. Fully drawn January 2008. Due in amounts ranging from $185,000 to $250,000 through 2027 with interest rate of 1.625%. | $ 3,575,000 | $ - | $ (200,000) | $ 3,375,000 | 200,000 | 54,844 | 205,000 | 51,394 | $ 200,000 | 48,263 | $ 210,000 | 44,901 | $ 215,000 | 41,319 | $ 2,340,000 | 214,500 | 3,375,000 | 455,651 |
| **Series 2007 $10,500,000** State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Division Northeast Extension Sewer project. Fully drawn in December 2010. Due in amounts ranging from $450,000 to $610,000 through 2028 with interest rate of 1.625%. | 9,130,000 | - | (470,000) | 8,660,000 | 480,000 | 136,825 | 480,000 | 128,984 | 495,000 | 121,022 | 500,000 | 112,938 | 510,000 | 104,731 | 6,190,000 | 569,482 | 8,660,000 | 1,173,982 |
| **Series 2007B $8,000,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Division Northeast Extension Sewer project. Due serially and term in amounts ranging from $240,000 to $605,000 through 2028 with interest rates from 4.00% to 4.40%. | 7,240,000 | - | (280,000) | 6,960,000 | 295,000 | 289,578 | 310,000 | 277,778 | 320,000 | 265,378 | 340,000 | 252,378 | 360,000 | 238,778 | 5,330,000 | 1,479,235 | 6,960,000 | 2,803,125 |
| **Series 2009A $15,000,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Division Northeast Extension Sewer project. Due serially and term in amounts ranging from $475,000 to $1,150,000 through 2029 with interest rates from 2.75% to 5.00%. | 14,050,000 | - | (475,000) | 13,575,000 | 500,000 | 607,188 | 525,000 | 593,438 | 525,000 | 577,688 | 600,000 | 561,281 | 625,000 | 541,031 | 10,800,000 | 3,768,282 | 13,575,000 | 6,648,906 |
| **Series 2010A $14,544,000** State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Pump Station #1, ARTP Blower Revamp, and ARTP Clarifiers. $794,876 remaining to be drawn. Due in amounts ranging from $569,000 to $910,000 through 2030 with interest rate of 2.50%. | 10,508,950 | 2,521,176 | (585,000) | 12,445,126 | 600,000 | 314,223 | 615,000 | 299,878 | 630,000 | 284,503 | 645,000 | 268,753 | 660,000 | 252,628 | 9,295,126 | 1,618,911 | 12,445,126 | 3,040,896 |
| **Series 2011A $1,445,000** State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for ARTP Switchgears. Fully drawn in October 2012. Due in amounts ranging from $55,000 to $90,000 through 2031 with interest rate of 2.50%. | 577,606 | 867,394 | (55,000) | 1,390,000 | 60,000 | 34,685 | 60,000 | 33,250 | 60,000 | 31,750 | 60,000 | 30,250 | 65,000 | 28,750 | 1,085,000 | 214,500 | 1,390,000 | 373,185 |
| **Series 2011B $4,825,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for N&EES 3E. Due serially and term in amounts ranging from $180,000 to $405,000 through 2031 with interest rates from 3.00% to 5.00%. | 4,825,000 | - | - | 4,825,000 |  | 201,500 | - | 201,500 | - | 201,500 | 180,000 | 198,800 | 185,000 | 193,325 | 4,460,000 | 1,550,820 | 4,825,000 | 2,547,445 |
| **Refunding Series 2011C $7,870,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Refunded Series 2000, $6,000,000 ARTP Grit Removal bond and Series 2002A, $11,500,000 ARTP Enhancement bond. Due in amounts ranging from $1,000,000 to $1,500,000 through 2017 with interest rates from 3.00% to 2.25%. | 7,870,000 | - | (1,450,000) | 6,420,000 | 1,455,000 | 116,250 | 1,465,000 | 87,150 | 1,500,000 | 57,500 | 1,000,000 | 32,500 | 1,000,000 | 11,250 | - | - | 6,420,000 | 304,750 |
| Total Genesee County Drain Commission bonds payable | 99,311,556 | 3,388,570 | (6,180,000) | 96,520,126 | 6,310,000 | 2,965,796 | 6,440,000 | 2,326,880 | 6,575,000 | 2,183,096 | 6,420,000 | 2,038,179 | 6,370,000 | 1,886,350 | 64,205,126 | 11,451,636 | 96,520,126 | 22,332,047 |

B-20

# Genesee County Drain Commissioner
# Division of Water and Waste Services

## Summary of Bonds Payable (Continued)
## Year Ended December 31, 2012

| Description of Issue | Principal Outstanding January 1, 2012 | Issued During the Year | Retired During the Year | Principal Outstanding December 31, 2012 | 2013 Principal | 2013 Interest | 2014 Principal | 2014 Interest | 2015 Principal | 2015 Interest | 2016 Principal | 2016 Interest | 2017 Principal | 2017 Interest | Later Principal | Later Interest | Total Principal | Total Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Intercept and Treatment Facilities** | | | | | | | | | | | | | | | | | | |
| **Community-related Bonds Payable:** | | | | | | | | | | | | | | | | | | |
| **Refunding Series 2003 $2,900,000** County of Genesee Limited Tax General Obligation Bonds. Refunded Series 1999, $3,800,000 Bonds for Mt. Morris Township Sanitary Sewer System project. Due serially in amounts ranging from $15,000 to $315,000 through 2019 with interest rates from 4.00% to 4.25% $ | 2,175,000 $ | - $ | (235,000) | 1,940,000 $ | 245,000 $ | 75,433 $ | 255,000 $ | 65,183 $ | 265,000 $ | 54,523 $ | 275,000 $ | 43,453 $ | 285,000 $ | 31,901 $ | 615,000 $ | 24,382 $ | 1,940,000 $ | 294,875 |
| **Series 2006 $3,665,000** County of Genesee Limited Tax General Obligation Bonds for Community Western Trunk Extension Sewer Phase II project. Due serially in amounts ranging from $110,000 to $285,000 through 2026 with interest rates from 4.00% to 4.35% | 3,060,000 | - | (140,000) | 2,920,000 | 145,000 | 118,335 | 155,000 | 112,335 | 165,000 | 105,935 | 170,000 | 99,235 | 180,000 | 92,235 | 2,105,000 | 435,276 | 2,920,000 | 963,351 |
| Total community-related bonds payable | 5,235,000 | - | (375,000) | 4,860,000 | 390,000 | 193,768 | 410,000 | 177,518 | 430,000 | 160,458 | 445,000 | 142,688 | 465,000 | 124,136 | 2,720,000 | 461,658 | 4,860,000 | 1,260,226 |
| Total intercept and treatment facilities bonds payable | 104,546,556 | 3,388,570 | (6,553,000) | 101,380,126 | 4,700,000 | 2,659,474 | 4,850,000 | 2,504,398 | 7,005,000 | 2,342,554 | 6,865,000 | 2,100,867 | 7,835,000 | 2,010,686 | 64,925,126 | 11,893,294 | 101,380,126 | 23,592,273 |
| **District No. 3** | | | | | | | | | | | | | | | | | | |
| **Genesee County Drain Commissioner Bonds Payable:** | | | | | | | | | | | | | | | | | | |
| **Series 2007 $6,000,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Treatment Plant Improvement project. Due serially in various amounts ranging from $195,000 to $470,000 through 2027 with interest rates from 4.00% to 4.90% $ | 5,385,000 $ | - $ | (225,000) | 5,160,000 $ | 240,000 $ | 214,538 $ | 250,000 $ | 204,738 $ | 265,000 $ | 194,438 $ | 275,000 $ | 183,638 $ | 290,000 $ | 172,338 $ | 3,840,000 $ | 918,095 $ | 5,160,000 $ | 1,887,785 |
| **Series 2010A $1,089,000** State Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for District #3 Digester Phase I. Fully drawn in September 2011. Due in amounts ranging from $44,000 to $70,000 through 2030 with interest rate of 2.50% | 1,045,000 | - | (45,000) | 1,000,000 | 45,000 | 25,000 | 45,000 | 23,875 | 45,000 | 22,750 | 50,000 | 21,625 | 50,000 | 20,375 | 765,000 | 140,875 | 1,000,000 | 254,500 |
| Total Genesee County Drain Commission bonds payable | 6,430,000 | - | (270,000) | 6,160,000 | 285,000 | 239,538 | 295,000 | 228,613 | 310,000 | 217,188 | 325,000 | 205,263 | 340,000 | 192,713 | 4,605,000 | 1,058,970 | 6,160,000 | 2,142,285 |

# Genesee County Drain Commissioner
# Division of Water and Waste Services

**Summary of Bonds Payable (Continued)**
**Year Ended December 31, 2012**

**B-22**

| Description of Issue | Principal Outstanding January 1, 2012 | Issued During the Year | Retired During the Year | Principal Outstanding December 31, 2012 | 2013 Principal | 2013 Interest | 2014 Principal | 2014 Interest | 2015 Principal | 2015 Interest | 2016 Principal | 2016 Interest | 2017 Principal | 2017 Interest | Later Principal | Later Interest | Total Principal | Total Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **District No. 3** **Community-related Bonds Payable:** | | | | | | | | | | | | | | | | | | |
| **Series 1996 $1,240,000** County of Genesee Limited Tax General Obligation Bonds for Fenton Township Rolston and Ripley Road Arms project. Due serially in amounts ranging from $25,000 to $100,000 through 2017 with interest rates from 5.00% to 7.375% | $ 575,000 | $ - | $ (75,000) | 500,000 | $ 100,000 | $ 24,750 | $ 100,000 | $ 19,250 | $ 100,000 | $ 13,750 | 100,000 | $ 8,250 | - | $ - | 100,000 | 2,750 | 500,000 | 68,750 |
| **Refunding Series 1996A $12,940,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Refunded Series 2005, $6,000,000 District No. 3 Treatment Plant Improvement bond. Due serially in various amounts ranging from $75,000 to $1,355,000 through 2016 with interest rates from 2.50% to 5.00% | 6,705,000 | - | (1,350,000) | 5,355,000 | 1,355,000 | 228,819 | 1,345,000 | 164,694 | 1,330,000 | 99,500 | 1,325,000 | 33,125 | - | - | - | - | 5,355,000 | 526,138 |
| **Series 2003 $4,000,000** County of Genesee Limited Tax General Obligation Bonds for Fenton Township Sewage Disposal System project. Due serially in amounts ranging from $125,000 to $250,000 through 2024 with interest rates from 2.50% to 4.50% | 2,925,000 | - | (200,000) | 2,725,000 | 200,000 | 109,775 | 200,000 | 102,775 | 200,000 | 95,775 | 225,000 | 88,525 | 225,000 | 80,088 | 1,675,000 | 297,425 | 2,725,000 | 774,363 |
| **Series 2004A $8,000,000** County of Genesee Limited Tax General Obligation Bonds for Fenton Township Sewage Disposal System project. Due serially in amounts ranging from $250,000 to $700,000 through 2024 with interest rates from 4.00% to 5.00% | 6,250,000 | - | (350,000) | 5,900,000 | 350,000 | 244,500 | 400,000 | 225,750 | 400,000 | 207,750 | 400,000 | 191,750 | 450,000 | 174,750 | 3,900,000 | 650,125 | 5,900,000 | 1,694,625 |
| **Series 2004B $4,600,000** County of Genesee Limited Tax General Obligation Bonds for Fenton Township Sewage Disposal System project. Due serially in amounts ranging from $100,000 to $400,000 through 2024 with interest rates from 4.00% to 5.00% | 3,950,000 | - | (150,000) | 3,800,000 | 150,000 | 157,250 | 150,000 | 149,750 | 200,000 | 142,000 | 300,000 | 132,000 | 300,000 | 120,000 | 2,700,000 | 421,000 | 3,800,000 | 1,122,000 |
| **Refunding Series 2007 $5,615,000** County of Genesee Limited Tax General Obligation Bonds. Partially refunded Series 1998, $7,140,000 Bonds for City of Fenton, Fenton Township, and City of Linden Sewage Disposal System project. Due serially in amounts ranging from $20,000 to $915,000 through 2019 with interest rate of 4.00% | 4,950,000 | - | (290,000) | 4,660,000 | 350,000 | 179,300 | 440,000 | 163,400 | 540,000 | 143,800 | 395,000 | 121,100 | 910,000 | 91,000 | 1,820,000 | 72,600 | 4,660,000 | 771,200 |
| Total community-related bonds payable | 25,355,000 | - | (2,415,000) | 22,940,000 | 2,510,000 | 944,394 | 2,635,000 | 825,619 | 2,770,000 | 702,575 | 2,940,000 | 574,750 | 1,885,000 | 465,838 | 10,195,000 | 1,443,900 | 22,940,000 | 4,957,076 |
| Total District No. 3 bonds payable | $ 31,785,000 | $ - | $ (2,685,000) | 29,100,000 | $ 2,795,000 | $ 1,183,933 | $ 2,930,000 | $ 1,054,232 | $ 3,080,000 | $ 919,743 | $ 3,270,000 | $ 780,013 | $ 2,225,000 | $ 658,551 | 14,800,000 | 2,502,670 | 29,100,000 | $ 7,094,361 |

# Genesee County Drain Commissioner
# Division of Water and Waste Services

B-23

| Description of Issue | Principal Outstanding January 1, 2012 | Issued During the Year | Retired During the Year | Principal Outstanding December 31, 2012 | 2013 Principal | 2013 Interest | 2014 Principal | 2014 Interest | 2015 Principal | 2015 Interest | 2016 Principal | 2016 Interest | 2017 Principal | 2017 Interest | Later Principal | Later Interest | Total Principal | Total Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Water Supply Systems** | | | | | | | | | | | | | | | | | | |
| **Genesee County Drain Commissioner Bonds Payable:** | | | | | | | | | | | | | | | | | | |
| **Series 2003 $9,000,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Water Tower project. Due serially in various amounts ranging from $435,000 to $775,000 through 2018 with interest rates from 3.50% to 4.375% | $ 4,835,000 | $ - | $ (615,000) | $ 4,220,000 | $ 635,000 | $ 163,361 | $ 660,000 | $ 137,461 | $ 690,000 | $ 110,116 | $ 715,000 | $ 80,956 | $ 745,000 | $ 49,924 | $ 775,000 | $ 16,953 | $ 4,220,000 | $ 558,771 |
| **Series 2003B $18,000,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for North Water Loop III project. Due serially and term in various amounts ranging from $175,000 to $10,085,000 through 2033 with interest rates from 4.00% to 5.125% | 16,290,000 | - | (270,000) | 16,020,000 | 290,000 | 783,763 | 310,000 | 772,163 | 325,000 | 759,763 | 345,000 | 746,763 | 365,000 | 732,963 | 14,385,000 | 6,964,662 | 16,020,000 | 10,760,077 |
| **Series 2004 $14,960,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for North Water Loop III project. Due serially in various amounts ranging from $200,000 to $1,000,000 through 2020 with interest rates from 3.00% to 5.00% | 13,720,000 | - | (225,000) | 13,495,000 | 235,000 | 614,338 | 240,000 | 606,700 | 240,000 | 598,300 | 250,000 | 588,700 | 260,000 | 578,700 | 12,270,000 | 4,348,300 | 13,495,000 | 7,335,038 |
| **Series 2007 $6,000,000** Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for North Water Loop III project. Due serially and term in various amounts ranging from $150,000 to $450,000 through 2033 with interest rates from 4.00% to 4.40% | 5,400,000 | - | (150,000) | 5,250,000 | 150,000 | 227,478 | 150,000 | 221,328 | 160,000 | 214,953 | 160,000 | 208,153 | 160,000 | 201,353 | 4,470,000 | 1,994,696 | 5,250,000 | 3,067,961 |
| Total Genesee County Drain Commission bonds payable | 40,245,000 | - | (1,260,000) | 38,985,000 | 1,310,000 | 1,788,940 | 1,360,000 | 1,737,652 | 1,415,000 | 1,683,132 | 1,470,000 | 1,624,572 | 1,530,000 | 1,562,940 | 31,900,000 | 13,304,611 | 38,985,000 | 21,721,847 |
| **Community-related Bonds Payable:** | | | | | | | | | | | | | | | | | | |
| **Series 2011 $933,515** Drinking Water Revolving Fund Program Revenue Bonds backed by the full faith and credit of the County of Genesee. Bond proceeds used for Fenton Road Watermain - Bristol to Maple. Fully drawn in July 2012. Due in amounts ranging from $34,250 to $59,365 through 2031 with interest rates of 2.50% | 903,516 | 29,999 | (34,250) | 899,265 | 40,000 | 21,987 | 40,000 | 20,982 | 40,000 | 19,982 | 40,000 | 18,982 | 40,000 | 17,982 | 699,265 | 128,378 | 899,265 | 228,293 |
| Total water supply systems bonds payable | $ 41,148,516 | $ 29,999 | $ (1,294,250) | $ 39,884,265 | $ 1,350,000 | $ 1,810,927 | $ 1,400,000 | $ 1,758,634 | $ 1,455,000 | $ 1,703,114 | $ 1,510,000 | $ 1,643,554 | $ 1,570,000 | $ 1,580,922 | $ 32,599,265 | $ 13,432,989 | $ 39,884,265 | $ 21,950,140 |
| Total Genesee County Drain Commission bonds payable | 145,986,556 | 3,388,570 | (7,710,000) | 141,665,126 | 7,905,000 | 4,494,184 | 8,095,000 | 4,293,145 | 8,300,000 | 4,083,416 | 8,215,000 | 3,868,014 | 8,440,000 | 3,642,203 | 100,710,126 | 25,815,217 | 141,665,126 | 46,196,179 |
| Total community-related bonds payable | 31,493,316 | 29,999 | (2,824,250) | 28,699,065 | 2,940,000 | 1,160,149 | 3,085,000 | 1,024,119 | 3,240,000 | 883,015 | 3,430,000 | 736,420 | 2,390,000 | 607,956 | 13,614,265 | 2,033,936 | 28,699,065 | 6,445,594 |
| Total - All bonds payable | $ 177,480,072 | $ 3,418,569 | $ (10,534,250) | $ 170,364,391 | $ 10,845,000 | $ 5,654,333 | $ 11,180,000 | $ 5,317,264 | $ 11,540,000 | $ 4,966,431 | $ 11,645,000 | $ 4,604,434 | $ 10,830,000 | $ 4,250,159 | $ 114,324,391 | $ 27,849,153 | $ 170,364,391 | $ 52,641,773 |



Plante & Moran, PLLC
27-00 Northwestern Highway
P.O. Box 307
Southfield, MI 48037-0307
Tel: 248.352.2500
Fax: 248.352.0018
plantemoran.com

May 14, 2013

Mr. Jeff Wright
Genesee County Drain Commissioner
    Division of Water and Waste Services
G-4608 Beecher Road
Flint, Michigan 48532

We have audited the financial statements of the Enterprise Fund and Internal Service Fund of the Genesee County Drain Commissioner Division of Water and Waste Services (a component unit of Genesee County, Michigan) (the "Division") as of and for the year ended December 31, 2012 and have issued our report thereon dated May 14, 2013. We have also audited the federal awards of the Division for the year ended December 31, 2011 and issued our report dated May 14, 2013. Professional standards require that we provide you with the following information related to our audit.

**Our Responsibility Under U.S. Generally Accepted Auditing Standards**

As stated in our engagement letter dated November 12, 2012, our responsibility, as described by professional standards, is to express an opinion about whether the financial statements prepared by management with your oversight are fairly presented, in all material respects, in conformity with U.S. generally accepted accounting principles. Our audit of the financial statements does not relieve you or management of your responsibilities. Our responsibility is to plan and perform the audit to obtain reasonable, but not absolute, assurance that the financial statements are free of material misstatement.

As part of our audit, we considered the internal control of Genesee County Drain Commissioner Division of Water and Waste Services (the "Division"). Such considerations were solely for the purpose of determining our audit procedures and not to provide any assurance concerning such internal control.

We are responsible for communicating significant matters related to the audit that are, in our professional judgment, relevant to your responsibilities in overseeing the financial reporting process. However, we are not required to design procedures specifically to identify such matters.

Our audit of the Division's 2011 financial statements has been conducted in accordance with *Government Auditing Standards*, issued by the Comptroller General of the United States. Under *Government Auditing Standards*, we are obligated to communicate certain matters that come to our attention related to our audit to those responsible for the governance of the Division, including compliance with certain provisions of laws, regulations, contracts, grant agreements, certain instances of error or fraud, illegal acts applicable to government agencies, and significant deficiencies in internal control that we identify during our audit. Toward this end, we issued a separate letter dated June 25, 2012 regarding our consideration of Division's internal control over financial reporting and separate letter dated May 14, 2013 regarding our consideration on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements.

1

Praxity
GLOBAL ALLIANCE OF
INDEPENDENT FIRMS

---

Mr. Jeff Wright                                                            May 14, 2013
Genesee County Drain Commissioner
    Division of Water and Waste Services

**Planned Scope and Timing of the Audit**

We performed the audit according to the planned scope and timing previously communicated to you in our meeting about planning matters on December 12, 2012.

**Significant Audit Findings**

*Qualitative Aspects of Accounting Practices*

Management is responsible for the selection and use of appropriate accounting policies. In accordance with the terms of our engagement letter, we will advise management about the appropriateness of accounting policies and their application. The significant accounting policies used by the Division are described in Note 1 to the financial statements. No new accounting policies were adopted and the application of existing policies was not changed during 2012 other than that the Division adopted GASB Statement No. 63, *Financial Reporting of Deferred Outflows of Resources, Deferred Inflows of Resources, and Net Position*. As a result, there were very minor revisions to the terminology and reporting of the statement of net position.

We noted no transactions entered into by the Division during the year for which there is a lack of authoritative guidance or consensus.

There are no significant transactions that have been recognized in the financial statements in a different period than when the transaction occurred.

Accounting estimates are an integral part of the financial statements prepared by management and are based on management's knowledge and experience about past and current events and assumptions about future events. Certain accounting estimates are particularly sensitive because of their significance to the financial statements and because of the possibility that future events affecting them may differ significantly from those expected. The most sensitive estimates affecting the financial statements were the recording of unbilled revenue, the postemployment benefit liability calculation, the pension disclosures, and the calculation of the self-insurance (IBNR) liability.

Management's estimate of the unbilled revenue is based on amounts billed subsequent to year end. We evaluated the key factors and assumptions used to develop the unbilled revenue in determining that it is reasonable in relation to the financial statements taken as a whole.

Management's estimate of the postemployment benefit liability and defined benefit pension costs is based on certain assumptions made by the actuary. We evaluated the key factors and assumptions used to calculate the liability in determining that it is reasonable in relation to the financial statements taken as a whole.

Management's estimate of the self-insurance liability is based on the quarterly billings received from BCBS. We evaluated the key factors and assumptions used to calculate the receivable in determining that it is reasonable in relation to the financial statements taken as a whole.

2

B-25

Mr. Jeff Wright                                                  May 14, 2013
Genesee County Drain Commissioner
   Division of Water and Waste Services

The disclosures in the financial statements are neutral, consistent, and clear.

*Difficulties Encountered in Performing the Audit*

We encountered no significant difficulties in dealing with management in performing and completing our audit.

*Disagreements with Management*

For the purpose of this letter, professional standards define a disagreement with management as a financial accounting, reporting, or auditing matter, whether or not resolved to our satisfaction, that could be significant to the financial statements or the auditor's report

We are pleased to report that no such disagreements arose during the course of our audit.

*Corrected and Uncorrected Misstatements*

Professional standards require us to accumulate all known and likely misstatements identified during the audit, other than those that are trivial, and communicate them to the appropriate level of management.

We did not detect any misstatements as a result of audit procedures.

*Significant Findings or Issues*

We generally discuss a variety of matters, including the application of accounting principles and auditing standards, business conditions affecting the Division, and business plans and strategies that may affect the risks of material misstatement with management each year prior to retention as the Division's auditors. However, these discussions occurred in the normal course of our professional relationship and our responses were not a condition of our retention.

*Management Representations*

We have requested certain representations from management that are included in the management representation letter dated May 14, 2013.

*Management Consultations with Other Independent Accountants*

In some cases, management may decide to consult with other accountants about auditing and accounting matters, similar to obtaining a "second opinion" on certain situations. If a consultation involves application of an accounting principle to the Division's financial statements or a determination of the type of auditor's opinion that may be expressed on those statements, our professional standards require the consulting accountant to check with us to determine that the consultant has all the relevant facts. To our knowledge, there were no such consultations with other accountants.

3

Mr. Jeff Wright                                                  May 14, 2013
Genesee County Drain Commissioner
   Division of Water and Waste Services

This information is intended solely for the use of Mr. Jeff Wright, Genesee County Drain Commissioner, and management of Genesee County Drain Commissioner Division of Water and Waste Services and is not intended to be and should not be used by anyone other than these specified parties.

**Other Information** - Per Bulletin 6 issued by the State Department of Treasury, the State made some revisions to the Michigan qualifying statement as well as changes to the filing process. It is our understanding that the Division is considering issuing debt in the coming year, and would need to file a qualifying statement in order to initiate the process.

The bulletin details the revisions made to the form, changes in the electronic filing process, and provides information on the new process to submit a reconsideration request.

The qualifying statement is now Form 5047. The new form and link to the online filing are available at www.michigan.gov/municipalfinance. You can also find Bulletin 6 by following this same link.

Very truly yours,

**Plante & Moran, PLLC**

*Leslie J. Pulver*

Leslie J. Pulver

4

[THIS PAGE INTENTIONALLY LEFT BLANK]



Plante & Moran, PLLC
Suite 1A
111 E. Court St.
Flint, MI 48502
Tel: 810.767.5830
Fax: 810.767.8150
plantemoran.com

B-27

Independent Auditor's Report

To the Board of Commissioners
Genesee County
Flint, Michigan

**Report on the Financial Statements**

We have audited the accompanying financial statements of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of Genesee County, Michigan (the "County") as of and for the year ended September 30, 2013, and the related notes to the financial statements, which collectively comprise Genesee County's basic financial statements as listed in the table of contents.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditor's Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America and in accordance with the standards applicable to financial audits contained in *Government Auditing Standards* issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement. The financial statements of the following entities were not audited in accordance with *Government Auditing Standards*: Economic Development Corporation of the County of Genesee and Genesee County Storm Water Management System.

Our responsibility is to express opinions on these financial statements based on our audit. We did not audit the financial statements of Genesee County Community Mental Health Services, a major governmental fund of the County, which represents 37.6 and 15.1 percent of the assets and revenue, respectively, of the governmental funds. We also did not audit the financial statements of Genesee County Planning Commission, a non-major governmental fund of the County, which represents less than 1 percent of both the assets and revenues of the governmental funds. We also did not audit the financial statements of Genesee County Road Commission, a discretely presented component unit of the County, which represents 30.5 percent and 19.6 percent, respectively, of the assets and revenues of the component units. We also did not audit the financial statements of the Economic Development Corporation, a discretely presented component unit of the County, which represents less than 1 percent of both the assets and revenues of the component units.  We also did not audit the financial statements of Genesee Health Systems Authority, a discretely presented component unit of the County, which represents 9.6 and 62.5 percent of the assets and revenue, respectively, of the component units. Those financial statements were audited by other auditors, whose report has been furnished to us, and our opinion, insofar as it relates to the amounts included for Genesee County Community Mental Health Services, Genesee County Planning Commission, Genesee County Road Commission, the Economic Development Corporation, and the Genesee Health Systems Authority, is based solely on the report of the other auditors.

To the Board of Commissioners
Genesee County

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinions.

*Opinions*

In our opinion, based on our audit and the report of other auditors, the financial statements referred to above present fairly, in all material respects, the respective financial position of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of Genesee County as of September 30, 2013 and the respective changes in its financial position and, where applicable, cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

*Emphasis of Matter*

As explained in Note C, the financial statements include investments valued at $191,881,667 (41 percent of total investments for the aggregate remaining funds) at September 30, 2013 and at $156,308,416 (34 percent of total investments for the aggregate remaining funds) at September 30, 2012, whose fair values have been estimated by management in the absence of readily determinable market values. Management's estimates are based on information provided by fund managers and the partnership general partners. Our opinion has not been modified with respect to this matter.

*Other Matters*

*Required Supplemental Information*

Accounting principles generally accepted in the United States of America require that the management's discussion and analysis and the major fund budgetary comparison schedules, as identified in the table of contents, be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board, which considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplemental information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

11

12

Praxity
GLOBAL ALLIANCE OF
INDEPENDENT FIRMS

To the Board of Commissioners
Genesee County

*Other Information*

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise Genesee County's basic financial statements. The combining statements, as identified in the table of contents as other supplemental information, are presented for the purpose of additional analysis and are not a required part of the basic financial statements.

The combining statements, identified in the table of contents as other supplementary information, are the responsibility of management and were derived from and relate directly to the underlying accounting and other records used to prepare the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the basic financial statement or to the basic financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the basic financial statements as a whole.

The introductory section and statistical section, as identified in the table of contents, have not been subjected to the auditing procedures applied in the audit of the basic financial statements and, accordingly, we do not express an opinion or provide any assurance on them.

**Other Reporting Required by *Government Auditing Standards***

In accordance with *Government Auditing Standards*, we have also issued our report dated March 18, 2014 on our consideration of Genesee County's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, grant agreements, and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering Genesee County's internal control over financial reporting and compliance.

*Plante & Moran, PLLC*

March 18, 2014

---

## MANAGEMENT'S DISCUSSION AND ANALYSIS

## GENESEE COUNTY

As management of Genesee County, we offer readers of the Genesee County's financial statements this narrative overview and analysis of the financial activities of Genesee County for the fiscal year ended September 30, 2013. We encourage readers to consider the information presented here in conjunction with additional information that we have furnished in our letter of transmittal, which can be found at the beginning of this report.

**Financial Highlights**

- The assets of Genesee County exceeded its liabilities at the close of the most recent fiscal year by $119,467,297 (net position). Of this amount, $13,493,362 (unrestricted net position) may be used to meet the government's ongoing obligations to citizens and creditors.
- The government's total net position decreased by $25,645,496. Governmental activities decreased by $28,366,573 while Business-type activities increased by $2,721,077; the overall decrease is attributed to a decrease in Primary Government revenues, resulting primarily from the transfer of Mental Health operations to Genesee Health Services, a newly established Mental Health Authority.
- As of the close of the current fiscal year, Genesee County's governmental funds reported combined ending fund balances of $29,977,381 a decrease of $15,853,798 in comparison with the prior year. Approximately 21% of this total amount, $6,300,649, is available for spending at the government's discretion (unassigned fund balance).
- At the end of the current fiscal year, unassigned fund balance for the General Fund was $9,455,182, 16% of total General Fund expenditures.
- Genesee County's total debt was increased by the issuance of delinquent tax notes in the amount of $39,900,000 during the current fiscal year for various projects and refunding issues which was offset by total payments of $54,381,571.

**Overview of the Financial Statements**

This discussion and analysis is intended to serve as an introduction to Genesee County's basic financial statements. Genesee County's basic financial statements included three components: 1) government-wide financial statements, 2) fund financial statements, and 3) notes to the financial statements. This report also contains other supplementary information in addition to the basic financial statements themselves.

**Government-wide Financial Statements.** The government-wide financial statements are designed to provide readers with a broad overview of Genesee County's finances, in a manner similar to a private-sector business.

The statement of net position presents information on all Genesee County's assets and liabilities, with the difference between the two reported as net position. Over time, increases or decreases in net position may serve as a useful indicator of whether the financial position of Genesee County is improving or deteriorating.

The statement of activities presents information showing how the government's net position changed during the most recent fiscal year. All changes in net position are reported as soon as the underlying event giving rise to the change occurs, regardless of the timing of related cash flows. Thus, revenues and expenses are reported in this statement for some items that will only result in cash flows in future fiscal periods (e.g., uncollected taxes and earned but unused vacation leave).

Both of the government-wide financial statements distinguish functions of Genesee County that are principally supported by taxes and intergovernmental revenues (government activities) from other functions that are intended to recover all or a significant portion of their costs through user fees and charges (business-type activities). The governmental activities of Genesee County include legislative, management and planning, administration of justice, law enforcement, human services, community enrichment, general support, and other. The business-type activities of Genesee County include Parks and Recreation System, Jail Commissary, Parking Meter and Delinquent Tax Revolving Fund.

The government-wide financial statements include not only Genesee County itself (known as the primary government), but also eight legally separated component units for which Genesee County is financially accountable. Financial information for these component units is reported separately from the financial information presented for the primary government itself.

The government-wide financial statements can be found as Exhibit A-1 and A-2 of this report.

**Fund Financial Statements.** A fund is a grouping of related accounts that is used to maintain control over resources that have been segregated for specific activities or objectives. Genesee County, like other state and local governments, uses fund accounting to ensure and demonstrate compliance with finance-related legal requirements. All of the funds of Genesee County can be divided into three categories: governmental funds, proprietary funds, and fiduciary funds.

**Governmental Funds.** Governmental funds are used to account for essentially the same functions reported as governmental activities in the government-wide financial statements. However, unlike the government-wide financial statements, governmental fund financial statements focus on near-term inflows and outflows of spendable resources, as well as on balances of spendable resources available at the end of the fiscal year. Such information may be useful in evaluating a government's near-term financing requirements.

Because the focus of governmental funds is narrower than that of the government-wide financial statements, it is useful to compare the information presented for governmental funds with similar information presented for governmental activities in the government-wide financial statements. By doing so, readers may better understand the long-term impact of the government's near-term financing decisions. Both the governmental fund balance sheet and the governmental fund statement of revenues, expenditures, and changes in fund balances provide a reconciliation to facilitate this comparison between governmental funds and governmental activities.

Genesee County maintains individual governmental funds. Information is presented separately in the governmental fund balance sheet and in the governmental fund statement of revenues, expenditures, and changes in fund balances for the General Fund and four special revenue funds, all of which are considered to be major funds. Data from the other governmental funds are combined into a single, aggregated presentation. Individual fund data for each of these non-major governmental funds is provided in the form of combining statements elsewhere in this report.

B-28

## MANAGEMENT'S DISCUSSION AND ANALYSIS

## GENESEE COUNTY

Genesee County adopts an annual appropriated budget for its General Fund. A budgetary comparison statement has been provided for the General Fund to demonstrate compliance with this budget.

The basic governmental fund financial statements can be found on Exhibit A-3 and A-4 of this report.

**Proprietary Funds.** Genesee County maintains two different types of proprietary funds. Enterprise funds are used to report the same functions presented as business-type activities in the government-wide financial statements. Genesee County uses enterprise funds to account for its Parks and Recreation System, Jail Commissary, Parking Meter and Delinquent Tax Revolving Fund. Internal service funds are an accounting device used to accumulate and allocate costs internally among Genesee County's various functions. Genesee County uses internal service funds to account for its fleet of vehicles, building and grounds maintenance, Self Insured Medicals, Property and Casualty and other Administrative Services. Because all of these services predominantly benefit governmental rather than business-type functions, they have been included within governmental activities in the government-wide financial statements.

Proprietary funds provide the same type of information as the government-wide financial statements, only in more detail. The proprietary fund financial statements provide separate information for the Parks and Recreation System, Jail Commissary, Parking Meter and Delinquent Tax Revolving Fund. Conversely, all internal service funds are combined into a single, aggregated presentation in the proprietary fund financial statements. Individual fund data for the internal service funds is provided in the form of combining statements elsewhere in this report.

The basic proprietary fund financial statements can be found on Exhibit A-6, A-7, and A-8 of this report.

**Fiduciary Funds.** Fiduciary funds are used to account for resources held for the benefit of parties outside the government. Fiduciary funds are not reflected in the government-wide financial statement because the resources of those funds are not available to support Genesee County's own programs. The accounting used for fiduciary funds is much like that used for proprietary funds.

The basic fiduciary fund financial statements can be found on Exhibit A-9 and A-10 of this report.

**Component Units Presented.** The government-wide financial statements include not only Genesee County itself (known as the primary government), but also eight legally separated component units for which Genesee County is financially accountable. Financial information for these component units is reported separately from the financial information presented for the primary government itself.

The basic component unit financial statements can be found on Exhibit A-11 and A-12 of this report.

**Notes to the Financial Statements.** The notes provide additional information that is essential to a full understanding of the data provided in the government-wide and fund financial statements. The notes to the financial statements can be found on Exhibit A-13 of this report.

**Other Information.** In addition to the basic financial statements and accompanying notes, this report also presents certain required supplementary information concerning Genesee County's progress in funding its obligation to provide pension benefits to its employees. Required supplementary information can be found in Exhibit A-13 of this report.

The combining statements referred to earlier in connection with non-major governmental funds and internal service funds are presented immediately following the required supplementary information on pensions. Combining and individual fund statements and schedules can be found on Exhibit C of this report.

**Government-wide Financial Analysis**

As noted earlier, net position may serve overtime as a useful indicator of a government's financial position. In the case of Genesee County, assets exceeded liabilities by $119,467,297 at the close of the most recent fiscal year.

A significant portion of Genesee County's net position (63%) reflects its investment in capital assets (e.g., land, buildings, machinery, and equipment), less any related debt used to acquire those assets that is still outstanding. Genesee County uses these capital assets to provide services to citizens; consequently, these assets are not available for future spending. Although Genesee County's investments in its capital assets are reported net of related debt, it should be noted that the resources needed to repay this debt must be provided from other sources, since the capital assets themselves cannot be used to liquidate these liabilities.

### GENESEE COUNTY'S NET POSITION

| | Governmental Activities | | Business-type Activities | | Total | |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 | 2013 | 2012 |
| Current and other assets | $76,130,833 | $134,990,452 | $55,608,797 | $59,154,978 | $131,739,630 | $194,145,430 |
| Capital assets | 95,124,850 | 95,495,274 | 3,359,580 | 3,887,056 | 98,484,430 | 99,382,330 |
| Total assets | 171,255,683 | 230,485,726 | 58,968,377 | 63,042,034 | 230,224,060 | 293,527,760 |
| Long-term liabilities outstanding | 61,161,047 | 55,397,578 | 36,161,184 | 42,569,174 | 97,322,231 | 97,966,752 |
| Other liabilities | 12,501,025 | 49,127,964 | 933,507 | 1,320,251 | 13,434,532 | 50,448,215 |
| Total liabilities | 73,662,072 | 104,525,542 | 37,094,691 | 43,889,425 | 110,756,763 | 148,414,967 |

| | Governmental Activities | | Business-type Activities | | Total | |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 | 2013 | 2012 |
| Net position: | | | | | | |
| Net investment in capital assets | $71,579,693 | $69,930,626 | $3,313,080 | $3,815,056 | $74,892,773 | $73,745,682 |
| Restricted | 19,786,947 | 23,334,199 | 11,294,215 | 10,816,391 | 31,081,162 | 34,150,590 |
| Unrestricted | 6,226,971 | 32,695,359 | 7,266,391 | 4,521,162 | 13,493,362 | 37,216,521 |
| Total net position | $97,593,611 | $125,960,184 | $21,873,686 | $19,152,609 | $119,467,297 | $145,112,793 |

An additional portion of Genesee County's net position (26%) represents resources that are subject to external restrictions on how they may be used. The remaining balance of unrestricted net position ($13,493,362) may be used to meet the government's ongoing obligations to citizens and creditors.

At the end of the current fiscal year, Genesee County is able to report positive balances in all three categories of net position, both for the government as a whole, as well as for its separate governmental and business-type activities. The same situation held true for the prior fiscal year.

The government's total net position decreased by $25,645,496. This decrease represents Governmental activities which is attributed primarily to the transfer of Mental Health operations to Genesee Health Services, a newly established Mental Health Authority.

**Governmental Activities.** Governmental activities decreased Genesee County's net position by $28,366,573, key elements affecting this change are as follows:

### Genesee County's Change in Net position

| | Governmental Activities | | Business-type Activities | | Total | |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 | 2013 | 2012 |
| Revenues: | | | | | | |
| Program revenues: | | | | | | |
| Charges for services (A) | $43,056,628 | $127,332,255 | $13,937,979 | $14,179,074 | $56,994,607 | $141,511,329 |
| Operating grants and contributions (A) | 81,285,904 | 113,688,537 | - | - | 81,285,904 | 113,688,537 |
| Capital grants and contributions | | | | | | |
| General revenues: | | | | | | |
| Taxes | 72,790,031 | 81,473,016 | - | - | 72,790,031 | 81,473,016 |
| Use of money and investments | 504,347 | 988,717 | 71,437 | 117,882 | 575,784 | 1,106,599 |
| Other intergovernmental revenues | 16,031,090 | 3,915,651 | - | - | 16,031,090 | 3,915,651 |
| Other unrestricted revenues | 8,173,635 | 8,398,465 | - | - | 8,173,635 | 8,398,465 |
| Total revenues | 221,841,635 | 335,796,641 | 14,009,416 | 14,296,956 | 235,851,051 | 350,093,597 |
| Expenses: | | | | | | |
| Legislative | 981,519 | 1,023,886 | - | - | 981,519 | 1,023,886 |
| Management and planning | 12,901,085 | 5,302,148 | - | - | 12,901,085 | 5,302,148 |
| Administration of justice | 38,949,070 | 40,587,961 | - | - | 38,949,070 | 40,587,961 |
| Law enforcement/commun. protec. | 36,508,812 | 32,423,243 | - | - | 36,508,812 | 32,423,243 |
| Human services (A) | 130,931,244 | 242,432,706 | - | - | 130,931,244 | 242,432,706 |
| Community enrichment/develop | 16,255,901 | 17,005,313 | - | - | 16,255,901 | 17,005,313 |
| General support services | - | - | - | - | - | - |
| Other | - | - | - | - | - | - |
| Interest on long-term debt | 1,101,895 | 1,361,032 | - | - | 1,101,895 | 1,361,032 |
| Commissary | - | - | 340,779 | 323,556 | 340,779 | 323,556 |
| Delinquent Tax | - | - | 4,757,339 | 5,113,306 | 4,757,339 | 5,113,306 |
| Parks & Recreation Enterprise | - | - | 951,103 | 888,622 | 951,103 | 888,622 |
| Parking Meter | - | - | 349,854 | 65,795 | 349,854 | 65,795 |
| Total Expenses | 237,629,526 | 340,136,289 | 6,399,075 | 6,391,279 | 244,028,601 | 346,527,568 |
| Increase (decrease) in net position before transfers | (14,608,480) | (4,339,648) | 7,610,341 | 7,905,677 | (6,998,139) | 3,566,029 |
| Transfers | 4,889,264 | 5,687,129 | (4,889,264) | (5,687,129) | - | - |
| Special item – transfer of operations to Genesee Health Systems | (17,467,946) | | | | (17,467,946) | 20,349,315 |
| Change in net position | (28,366,573) | 1,347,481 | 2,721,077 | 2,218,548 | (25,645,496) | 3,566,029 |
| Beginning of year net position (as restated) | 125,960,184 | 124,612,703 | 19,152,609 | 16,934,061 | 145,112,793 | 141,546,764 |
| End of year net position | $97,593,611 | $125,960,184 | $21,873,686 | $19,152,609 | $119,467,297 | $145,112,793 |

(A) Decrease due primarily to reporting Genesee Health Services as a discretely presented component unit effective January 1, 2013.

- Implementation of GASB 34 requirements has changed the presentation of this report and is reflected in the net asset balances.
- Reductions in tax revenue collections and program grants has forced cutbacks in many areas.

## MANAGEMENT'S DISCUSSION AND ANALYSIS

### GENESEE COUNTY

- Due to careful budgeting and a transfer from the Delinquent Tax Fund, Genesee County's General Fund has seen a $570,402 increase in fund balance.
- Taxes decreased by $8,682,985 during the year.  Most of this decrease is property taxes due to weak residential growth and a weak housing market.
- Operating grants for governmental activities remain a large part of the overall budget.  These grants support a variety of community services in the county.

**Business-type activities.**  The net position for business-type activities increased by $2,721,077.  Key elements of this increase are as follows.

- The decrease in transfer of funds to Governmental activities for support of general operating expenditures and debt service requirements are reflected in this increase.

#### Financial Analysis of the Government's Funds

As noted earlier, Genesee County uses fund accounting to ensure and demonstrate compliance with finance-related legal requirements.

**Governmental funds.**  The focus of Genesee County's governmental funds is to provide information on near-term inflows, outflows, and balances of available resources.  Such information is useful in assessing Genesee County's financing requirements.  In particular, unassigned fund balance may serve as a useful measure of a government's net resources available for spending at the end of the fiscal year.

As of the end of the current fiscal year, Genesee County's governmental funds reported combined ending fund balances of $29,977,381, an increase of $15,853,798 in comparison with the prior year.  Approximately 21% of this total amount, ($6,300,649) constitutes unassigned fund balance, which is available for spending at the government's discretion.

The General Fund unassigned fund balance totaled $9,455,182, while total fund balance increased to $12,316,681.  As a measure of the General Fund's liquidity, it may be useful to compare both unassigned fund balance and total fund balance to total fund expenditures.  Unassigned fund balance represents 16% of total General Fund expenditures, while total fund balance represents 21% of that same amount.

At the end of the current fiscal year, the total fund balance of county health was increased to $2,539,048.  The fund balance represents 19% of total county health expenditures.

The increase in the fund balances of Genesee County's governmental funds were as the result of the following:

- General Fund - The Genesee County Board of Commissioner passed a 2012/2013 General Fund budget anticipating the use of $0 of fund balance.  During 2012/2013 General Fund revenues were more than budgeted revenues by $712,096 while expenditures exceeded the budget by $313,364.
- County Health - In the 2012/2013 fiscal year, the County Health Department anticipated expenditures of $15,432,755.  The actual amount of expenditures was $13,566,386.  This variance, combined with other variances in revenue items resulted in the Health Department fund balance increasing by $1,278,936.
- Community Action Resource Department – The fund balance of the Community Action Resource Department decreased during the 2012/2013 fiscal year by a total of $544,196.  This decrease was attributable to maximus changes in the funding levels from the Federal and State governments throughout the fiscal year.

**Proprietary funds.**  Genesee County's proprietary funds provide the same type of information found in the government-wide financial statements, but in more detail.

Unrestricted net position at the end of the year amounted to $7,266,391.  The total increase in net position for all proprietary funds was $2,721,077.  Other factors concerning the finances of these funds have already been addressed in the discussion of Genesee County's business-type activities.

#### General Fund Budgetary Highlights

During the year, the County board amended the budget to take into account events during the year.  General Fund's expenditures and appropriations budget was increased in total by $1,292,729.  The major budgetary increases/decreases are summarized as follows:

- A negative variance of $197,065 in various General Fund revenues occurred due to the anticipated revenue increase for fines and forfeitures and uses of money.

- A $213,240 increase was allocated to the Board of Commissioners department to cover costs of attorney fees related to discussions of union contract changes and usage of delinquent tax funds.

- A total increase of 3,531,270 was allocated to Other expenses to cover furlough days savings being less than anticipated due to delays in union contract settlements.

- A $261,459 increase was allocated to various departments to cover Capital Outlay which is allocated during the year on an as needed basis.

- A $193,701 increase was appropriated to the various Internal Service departments to cover additional costs of overtime which is budgeted in the General Fund and allocated on a monthly basis based on departmental need.

Overall during the year, actual General Fund revenues were more than the amended budgetary estimates and expenditures exceeded the amended budget, resulting in a small increase in fund balance that was less than the final amended budget amount.

#### Capital Asset and Debt Administration

**Capital assets.**  Genesee County's investment in capital assets for its governmental and business type activities as of September 30, 2013, amounts to $98,484,430 (net of accumulated depreciation).  This investment in capital assets included land, buildings and system, improvements, machinery and equipment, and park facilities.

Additional information on Genesee County's capital assets can be found in Note D in Exhibit A-13 of this report.

**Debt.**  At the end of the current fiscal year, Genesee County had total bonded debt outstanding of $260,287,117.  Of this amount, $116,886,416 comprises debt backed by the full faith and credit of the government, $318,505 is special assessment debt for which the government is liable in the event of default by the property owners subject to the assessment and $7,210,000 is Michigan Transportation bonds for which are payable with Act 51 money.

Genesee County's total debt, including component units, decreased by $12,564,144 during the current fiscal year.  The key factor in this decrease was due to normal debt retirement in the fiscal years budget.  Genesee County maintains an "A+" rating from Standard & Poor's and an "A2" rating from Moody's for general obligation debt.

State statutes limit the amount of general obligation debt a governmental entity may issue to 10 percent of its total assessed valuation.  The current debt limitation for Genesee County is $899,354,911, which is significantly in excess of Genesee County's outstanding general obligation debt.

Additional information on Genesee County's long-term debt can be found in Note E of Exhibit A-13 of this report.

#### Economic Factors and Next Year's Budgets and Rates
- The unemployment rate for Genesee County is currently 8.4 percent, which is an decrease from a rate of 11.2 percent a year ago.  This decrease is attributed to local conditions and is reflective of state and national trends.
- The government expects to see reduced funding from State agencies due to a reduction in tax collections as seen in a nation-wide trend of state and local revenues.
- Inflationary trends in the region compare favorably to national indices.
- Goals to achieve concessions in current union negotiations continue (decreases in longevity wages and changes to co-pays for health care).
- Continuation of the instituted hiring freeze.

All of these factors were considered in preparing Genesee County's budget for the 2013 fiscal year.

#### Request for Information

The financial report is designed to provide a general overview of Genesee County's finances for all those with an interest in the government's finances.  Questions concerning any of the information provided in this report or requests for additional financial information should be addressed to the Office of the Controller, County of Genesee, 1101 Beach Street, Flint, MI  48502.

B-30

**This Page was Intentionally Left Blank**

# BASIC
# FINANCIAL STATEMENTS

B-31

STATEMENT OF NET POSITION

SEPTEMBER 30, 2013

GENESEE COUNTY                                                 Exhibit A-1

| | Governmental Activities | Business-type Activities | Total | Component Units |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash and cash equivalents........................... | $ 5,258,652 | $ 1,906,853 | $ 7,165,505 | $ 70,731,664 |
| Investments......................................... | 15,354,194 | 7,359,519 | 22,713,713 | 32,777,451 |
| Current and delinquent taxes receivable | | | | |
| (net allowance $1,116,143).................... | 13,998,293 | 43,643,971 | 57,642,264 | |
| Special assessments receivable................... | | | | 43,744,763 |
| Interest and accounts receivable | | | | |
| (net allowance $2,994,243)................... | 14,736,768 | 4,579,064 | 19,315,832 | 12,177,670 |
| Due from other governmental units................. | 14,931,026 | 4,260,328 | 19,191,354 | 9,395,089 |
| Due from component unit............................ | 520,076 | 466,518 | 986,594 | 225,000 |
| Due from primary government....................... | | | | 26,359 |
| Internal balances.................................. | 6,665,352 | (6,665,352) | | |
| Inventory.......................................... | 1,305,644 | 34,448 | 1,340,092 | 2,498,017 |
| Prepayments........................................ | 1,148,212 | 23,448 | 1,171,660 | 1,548,042 |
| Unamortized cost of issuance....................... | | | | 679,048 |
| Other assets....................................... | 114,307 | | 114,307 | 2,581,801 |
| Restricted assets: | | | | |
| Cash............................................ | | | | 4,850,094 |
| Deposits and employee advances................. | 333,309 | | 333,309 | 1,604,423 |
| Net OPEB asset.................................. | | | | 658,197 |
| Long term advances to component unit............... | 1,765,000 | | 1,765,000 | |
| Local unit construction in progress................ | | | | 156,500 |
| Investment in joint venture........................ | | | | 3,893,843 |
| Intangible assets - Net............................ | | | | 12,188 |
| Capital assets not being depreciated.............. | 11,398,753 | 3,145,718 | 14,544,471 | 57,804,898 |
| Capital assets (net of accumulated depreciation)... | 83,726,097 | 213,862 | 83,939,959 | 480,248,309 |
| **Total assets** | 171,255,683 | 58,968,377 | 230,224,060 | 725,613,356 |
| **LIABILITIES** | | | | |
| Accounts payable................................... | 4,291,505 | 398,736 | 4,690,241 | 23,104,542 |
| Accrued payroll.................................... | 3,439,970 | 13,980 | 3,453,950 | 106,485 |
| Other accrued liabilities and deposits............ | 440,281 | 520,786 | 961,067 | 3,183,974 |
| Accrued interest payable........................... | 287,815 | | 287,815 | 277,286 |
| Due to other governmental units................... | 3,805,586 | 5 | 3,805,591 | 21,376,428 |
| Due to primary government.......................... | | | | 986,594 |
| Due to component unit.............................. | 26,359 | | 26,359 | 225,000 |
| Long-term advances from primary government......... | | | | 1,765,000 |
| Unearned revenue................................... | 209,509 | | 209,509 | 11,126,145 |
| Liabilities from restricted assets: | | | | |
| Accounts payable................................ | | | | 759,195 |
| Noncurrent liabilities: | | | | |
| Net OPEB obligation............................. | 29,095,022 | 314,684 | 29,409,706 | 5,676,066 |
| Current portion debt........................... | 7,635,759 | 8,928,500 | 16,564,259 | 14,587,242 |
| Long term debt................................. | 24,430,266 | 26,918,000 | 51,348,266 | 187,781,313 |
| **Total liabilities** | 73,662,072 | 37,094,691 | 110,756,763 | 270,955,270 |
| **NET POSITION** | | | | |
| Net investment in capital assets.................. | 71,579,693 | 3,313,080 | 74,892,773 | 378,952,538 |
| Restricted: | | | | |
| Special Revenue: | | | | |
| Community development........................... | 14,305,564 | | 14,305,564 | |
| Community enrichment and development............ | 356,692 | | 356,692 | |
| Drug forfeiture................................. | 43,759 | | 43,759 | |
| Emergency medical services...................... | 720,963 | | 720,963 | |
| Health care services........................... | 571,809 | | 571,809 | |
| Planning-solid waste activities................ | 296,065 | | 296,065 | |
| Senior services................................ | 2,904,020 | | 2,904,020 | |
| Social services................................ | 116,299 | | 116,299 | |
| Veterans millage............................... | 471,776 | | 471,776 | |
| Retirement of delinquent tax notes payable....... | | 10,345,404 | 10,345,404 | |
| Parks & recreation non expendable.............. | | 948,811 | 948,811 | |
| Programs.......................................... | | | | 10,649,495 |
| Debt service...................................... | | | | 3,158,668 |
| Unrestricted...................................... | 6,226,971 | 7,266,391 | 13,493,362 | 61,897,385 |
| **Total net position** | $ 97,593,611 | $ 21,873,686 | $ 119,467,297 | $ 454,658,086 |

The notes to the financial statements are an integral part of this statement    21

[THIS PAGE INTENTIONALLY LEFT BLANK]

**STATEMENT OF ACTIVITIES - GOVERNMENTAL, BUSINESS-TYPE,
AND COMPONENT UNITS
FOR THE YEAR ENDED SEPTEMBER 30, 2013**

**GENESEE COUNTY**                                                           Exhibit A-2

| | | Program Revenues | | | Net (Expense) Revenue and Changes in Net Position | | | |
| | | | | | | Primary Government | | |
| Functions/Programs | Expenses | Charges for Services | Operating Grants and Contributions | Capital Grants and Contributions | Governmental Activities | Business-type Activities | Total | Component Units |
|---|---|---|---|---|---|---|---|---|
| **Primary government:** | | | | | | | | |
| *Governmental activities:* | | | | | | | | |
| Legislative | $ 981,519 | 51,762 | | | $ (929,757) | | $ (929,757) | |
| Management and planning | 12,901,085 | 4,993,877 | 1,247,126 | | (6,660,082) | | (6,660,082) | |
| Administration of justice | 38,949,070 | 4,853,624 | 9,505,889 | | (24,589,557) | | (24,589,557) | |
| Law enforcement and community protection | 36,508,812 | 1,775,139 | 2,470,462 | | (32,263,211) | | (32,263,211) | |
| Human services | 130,931,244 | 26,945,416 | 64,863,400 | | (39,122,428) | | (39,122,428) | |
| Community enrichment and development | 16,255,901 | 4,436,810 | 3,199,027 | | (8,620,064) | | (8,620,064) | |
| Interest on long-term debt | 1,101,895 | | | | (1,101,895) | | (1,101,895) | |
| **Total governmental activities** | 237,629,526 | 43,056,628 | 81,285,904 | $ 0 | (113,286,994) | $ 0 | (113,286,994) | $ 0 |
| *Business-type Activities:* | | | | | | | | |
| Commissary | 340,779 | 534,689 | | | | 193,910 | 193,910 | |
| Delinquent Tax | 4,757,339 | 12,727,040 | | | | 7,969,701 | 7,969,701 | |
| Parks and Recreation Enterprise | 951,103 | 353,734 | | | | (597,369) | (597,369) | |
| Parking Meter | 349,854 | 322,516 | | | | (27,338) | (27,338) | |
| **Total business-type activities** | 6,399,075 | 13,937,979 | 0 | 0 | 0 | 7,538,904 | 7,538,904 | 0 |
| **Total primary government** | $ 244,028,601 | $ 56,994,607 | $ 81,285,904 | $ 0 | (113,286,994) | 7,538,904 | (105,748,090) | 0 |
| **Component units:** | | | | | | | | |
| Road Commission | 38,229,602 | 8,067,639 | 28,955,789 | | | | | (1,206,174) |
| Water and Waste Services | 51,455,673 | 52,560,768 | | $ 1,620,118 | | | | 2,725,213 |
| Economic Development Corporation | 22,087 | | | | | | | (22,087) |
| Drains | 4,267,568 | 646,792 | | 1,650,770 | | | | (1,970,006) |
| Land Bank Authority | 8,778,607 | 5,796,756 | 4,136,740 | 26,892 | | | | 1,181,781 |
| Brownfield Authority | 577,222 | 270,004 | | | | | | (307,218) |
| Storm Water Management System | 407,292 | | 290,269 | | | | | (117,023) |
| Genesee Health System Authority | 106,718,421 | 4,143,468 | 97,587,625 | 2,775,000 | | | | (2,212,328) |
| Total Component Units | $ 172,226,470 | $ 63,417,788 | $ 102,014,634 | $ 6,072,780 | | | | (1,927,842) |
| | | General Revenues: | | | | | | |
| | | Current property taxes | | | 69,503,562 | | 69,503,562 | |
| | | State liquor tax | | | 3,263,945 | | 3,263,945 | |
| | | State cigarette tax | | | 22,524 | | 22,524 | |
| | | Use of money and investments | | | 504,347 | 71,437 | 575,784 | 1,757,481 |
| | | Other unrestricted intergovernmental revenues | | | 16,031,090 | | 16,031,090 | 1,808,843 |
| | | Other unrestricted revenues | | | 8,173,635 | | 8,173,635 | |
| | | Unrestricted contributions | | | | | | 4,797,438 |
| | | Transfers | | | 4,889,264 | (4,889,264) | | |
| | | Total general revenues and transfers | | | 102,388,367 | (4,817,827) | 97,570,540 | 8,363,762 |
| | | Special item - transfer of operations to Genesee Health Services | | | (17,467,946) | | (17,467,946) | 20,349,315 |
| | | Change in net position | | | (28,366,573) | 2,721,077 | (25,645,496) | 6,435,920 |
| | | Net position - beginning | | | 125,960,184 | 19,152,609 | 145,112,793 | 427,872,851 |
| | | Net position - ending | | | $ 97,593,611 | $ 21,873,686 | $ 119,467,297 | 454,658,086 |

The notes to the financial statements are an integral part of this statement.

**BALANCE SHEET - ASSETS**
**GOVERNMENTAL FUNDS**

**GENESEE COUNTY**                                               **Exhibit A-3-1**

|  | General | Mental Health 12/31/12 | | County Health | Community Action Resource Department | Community Development | Other Governmental Funds | Total Governmental Funds |
|---|---|---|---|---|---|---|---|---|
| | | | September 30, 2013 | | | | | |
| Cash and cash equivalents - Note C | $ | $ | | $ | $ | $ 347,110 | $ 4,199,477 | $ 4,546,587 |
| Current and delinquent taxes receivable | 13,998,293 | | | | | | | 13,998,293 |
| Investments - Note C | | | | | | | 6,252,595 | 6,252,595 |
| Interest and accounts receivable | 585,722 | | | 230,823 | | 13,674,560 | 167,401 | 14,658,506 |
| Due from other governmental units | 2,195,233 | | | 141,407 | 3,362,789 | 418,437 | 8,544,324 | 14,662,190 |
| Due from other county funds -- Note L | 15,473,922 | | | 3,294,333 | 134,334 | | 7,291,712 | 26,194,301 |
| Due from component unit -- Note L | 500,000 | | | 19,040 | | 311 | 725 | 520,076 |
| Inventory | | | | | 485,062 | 638,400 | 137,018 | 1,260,480 |
| Prepayments | 20,690 | | | 22,020 | | | 4,173 | 46,883 |
| Other assets | | | | | 109,080 | | 5,227 | 114,307 |
| Deposits and employee advances | 333,309 | | | | | | | 333,309 |
| Long term advance to component unit | | | | | | | 1,765,000 | 1,765,000 |
| Long-term advances | 1,840,809 | | | | | | | 1,840,809 |
| TOTAL ASSETS | $ 34,947,978 | $ 0 | | $ 3,707,623 | $ 4,091,265 | $ 15,078,818 | $ 28,367,652 | $ 86,193,336 |

The notes to the financial statements are an integral part of this statement.

24                                                               25

**BALANCE SHEET - LIABILITIES AND FUND EQUITIES**
**GOVERNMENTAL FUNDS**

**GENESEE COUNTY**                                    **Exhibit A-3-2**

September 30, 2013

| | General | Mental Health 12/31/12 | County Health | Community Action Resource Department | Community Development | Other Governmental Funds | Total Governmental Funds |
|---|---|---|---|---|---|---|---|
| Accounts payable.................................. | $      588,249 | $ | $      153,228 | $      863,019 | 255,556 | $   1,876,403 | $   3,736,455 |
| Accrued payroll................................... | 966,327 | | 424,675 | 111,270 | | 555,007 | 2,057,279 |
| Other accrued liabilities and deposits............. | 5,245 | | | | | 256,261 | 261,506 |
| Due to other governmental units.................... | 0 | | 211,665 | | 358,714 | 2,470,429 | 3,040,808 |
| Due to other county funds -- Note L................ | 16,222,684 | | 297,525 | 3,412,680 | 132,625 | 5,271,713 | 25,337,227 |
| Due to component unit -- Note L.................... | | | | | 26,359 | | 26,359 |
| Deferred revenue................................... | 4,848,792 | | 81,482 | 147,962 | 13,667,164 | 3,010,921 | 21,756,321 |
| TOTAL LIABILITIES | 22,631,297 | 0 | 1,168,575 | 4,534,931 | 14,440,418 | 13,440,734 | 56,215,955 |
| Fund equities: | | | | | | | |
| Fund balances - Notes F, G and S: | | | | | | | |
| Nonspendable....................................... | 1,861,499 | | 22,020 | 485,062 | 638,400 | 1,906,041 | 4,913,022 |
| Restricted......................................... | | | | | | 5,481,383 | 5,481,383 |
| Committed.......................................... | | | | | | 74,994 | 74,994 |
| Assigned........................................... | 1,000,000 | | 2,517,028 | | | 9,690,305 | 13,207,333 |
| Unassigned......................................... | 9,455,182 | | | (928,728) | | (2,225,805) | 6,300,649 |
| TOTAL FUND EQUITIES | 12,316,681 | 0 | 2,539,048 | (443,666) | 638,400 | 14,926,918 | 29,977,381 |
| TOTAL LIABILITIES AND FUND EQUITIES | $  34,947,978 | $          0 | $  3,707,623 | $  4,091,265 | $  15,078,818 | $  28,367,652 | $  86,193,336 |

The notes to the financial statements are an integral part of this statement.

B-35

26                                                                27

**RECONCILIATION OF THE BALANCE SHEET OF GOVERNMENTAL FUNDS
TO THE STATEMENT OF NET POSITON**

**GENESEE COUNTY**                                          **Exhibit A-3-3**

|  | September 30, 2013 |
|---|---|
| Fund balances of governmental funds | $ 29,977,381 |
| Amounts reported for governmental activities in the statement of net position are different because: | |
| Capital assets used in governmental activities are not financial resources and, therefore are not reported in the funds | 95,124,850 |
| Other long-term assets are not available to pay for current-period expenditures and, therefore, are deferred in the funds: | |
| Property taxes | 4,763,452 |
| Grant receivable | 15,018,360 |
| Rental income from component units | 1,765,000 |
| Net position held in internal service funds are classified as held for governmental activities but are not reported in the funds.  This amount is the net position exclusive of capital assets and long-term debt which are reported elsewhere in this reconciliation | 8,815,004 |
| Net OPEB asset | 0 |
| Net OPEB liability | (29,095,022) |
| Long-term liabilities, including long-term notes, bonds payable and accrued interest payable are not due in the current period, and therefore, are not reported in the funds | (28,775,414) |
| Net position of governmental activities | $ 97,593,611 |

The notes to the financial statements are an integral part of this statement.

**This Page was Intentionally Left Blank**

B-37

**STATEMENT OF REVENUES, EXPENDITURES AND CHANGES IN FUND BALANCES**
**GOVERNMENTAL FUNDS**

**GENESEE COUNTY**                    **Exhibit A-4**

| | General | Mental Health 12/31/12 | County Health | Community Action Resource Department | Community Development | Other Governmental Funds | Total Governmental Funds |
|---|---|---|---|---|---|---|---|
| | | | *Fiscal Year Ended September 30, 2013* | | | | |
| **Revenues:** | | | | | | | |
| Taxes—Note H | $ 45,261,951 | $ | $ | $ | $ | $ 24,439,051 | $ 69,701,002 |
| Licenses and permits | 909,814 | | 1,031,767 | | | 6,740 | 1,948,321 |
| Fines and forfeitures | 1,564,789 | | | | | 104,845 | 1,669,634 |
| Use of money and property | 58,600 | | | | | 445,747 | 504,347 |
| Federal grants—Note G | 223,108 | 1,231,478 | 5,262,724 | 22,841,798 | 3,366,735 | 25,517,422 | 58,443,265 |
| State grants—Note G | | 4,477,801 | 2,770,726 | 1,403,379 | | 10,890,711 | 19,542,617 |
| Other intergovernmental revenues | 14,276,577 | | 527,339 | | | 5,391,666 | 20,195,582 |
| Charges for services | 10,721,032 | 27,841,645 | 355,765 | | | 7,096,472 | 46,014,914 |
| Other | 813,083 | 785,018 | 1,817,978 | 4,039,962 | 109,446 | 1,143,816 | 8,709,303 |
| TOTAL REVENUES | 73,828,954 | 34,335,942 | 11,766,299 | 28,285,139 | 3,476,181 | 75,036,470 | 226,728,985 |
| **Expenditures:** | | | | | | | |
| Current operations: | | | | | | | |
| Legislative | 922,513 | | | | | | 922,513 |
| Management and planning | 7,693,035 | | | | | | 7,693,035 |
| Administration of justice | 22,747,986 | | | | | 12,428,509 | 35,176,495 |
| Law enforcement and community protection | 21,577,256 | | | | | 11,871,620 | 33,448,876 |
| Human services | 1,234,017 | 35,247,757 | 13,566,386 | 28,857,356 | | 40,103,507 | 119,009,023 |
| Community enrichment and development | | | | | 4,362,381 | 14,687,753 | 19,050,134 |
| General support services | | | | | | | 0 |
| Other | 2,696,188 | | | | | 638,458 | 3,334,646 |
| Capital outlay | 235,905 | 81,028 | | | 250,810 | 2,981,819 | 3,549,562 |
| Contribution to Component Units-Mental Health Services | 2,775,000 | | | | | | 2,775,000 |
| Debt service: | | | | | | | |
| Principal payments | | | | | | 2,365,000 | 2,365,000 |
| Interest | | | | | | 1,249,358 | 1,249,358 |
| TOTAL EXPENDITURES | 59,881,900 | 35,328,785 | 13,566,386 | 29,108,166 | 4,362,381 | 86,326,024 | 228,573,642 |
| REVENUES OVER (UNDER) EXPENDITURES | 13,947,054 | (992,843) | (1,800,087) | (823,027) | (886,200) | (11,289,554) | (1,844,657) |
| **Other financing sources (uses):** | | | | | | | |
| Transfers-In | 6,723,572 | 925,000 | 3,079,023 | 640,742 | | 17,591,779 | 28,960,116 |
| Transfers-Out | (20,100,224) | | | (361,911) | | (5,039,176) | (25,501,311) |
| TOTAL OTHER FINANCING SOURCES (USES) | (13,376,652) | 925,000 | 3,079,023 | 278,831 | 0 | 12,552,603 | 3,458,805 |
| Special item - transfer of operations to Genesee Health Services | | (17,467,946) | | | | | (17,467,946) |
| NET CHANGE IN FUND BALANCES | 570,402 | (17,535,789) | 1,278,936 | (544,196) | (886,200) | 1,263,049 | (15,853,798) |
| Fund balance at beginning of year | 11,746,279 | 17,535,789 | 1,260,112 | 100,530 | 1,524,600 | 13,663,869 | 45,831,179 |
| FUND BALANCE AT END OF YEAR | $ 12,316,681 | $ 0 | $ 2,539,048 | $ (443,666) | $ 638,400 | $ 14,926,918 | $ 29,977,381 |

The notes to the financial statements are an integral part of this statement.

**RECONCILIATION OF THE STATEMENT OF REVENUES, EXPENDITURES,
AND CHANGES IN FUND BALANCES OF GOVERNMENTAL FUNDS
TO THE STATEMENT OF ACTIVITIES**

**GENESEE COUNTY**                                         Exhibit A-5

**Fiscal Year Ended September 30, 2013**

| | |
|---|---:|
| Net change in fund balances--total governmental funds | $        (15,853,798) |
| Amounts reported for governmental activities in the statement of activities are different because: | |
| Governmental funds report capital outlay as expenditures, however, in the statement of activities the cost of assets is allocated over their useful lives and reported as depreciation expense.  Details of the difference are: | |
| -Capital outlay | 3,706,103 |
| -Loss on Disposals | (198,029) |
| -Depreciation expense | (4,138,670) |
| Decrease in net OPEB asset | (1,604,133) |
| Increase in net OPEB liability | (9,100,225) |
| Revenues in the statement of activities that do not provide current financial resources are not reported as revenues in the funds | (3,672,558) |
| Change in accrued interest | 153,399 |
| The payment of principal on long-term debt consumes current financial resources of the governmental funds.  However, on the statement of net position, repayment of principal is recorded as a reduction to long-term debt payable and does not have any effect on net position | 2,339,500 |
| The activities of the internal service funds are considered part of governmental activities on the statement of changes in net position but are not reported in the funds | 1,838 |
| Change in net position of governmental activities | $        (28,366,573) |

The notes to the financial statements are an integral part of this statement.

32

**This Page was Intentionally Left Blank**

33

BALANCE SHEET--PROPRIETARY FUNDS

GENESEE COUNTY                                    Exhibit A-6

September 30, 2013

| | Business Type Activities - Delinquent Taxes | Enterprise Funds Non-Major Enterprise Funds | Total | Governmental Activities- Internal Service Funds |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **CURRENT ASSETS** | | | | |
| Cash and cash equivalents......................... | $ 509,189 | $ 1,397,664 | $ 1,906,853 | $ 712,065 |
| Investments......................................... | 6,410,708 | 948,811 | 7,359,519 | 9,101,599 |
| Current and delinquent property taxes receivable, | | | | |
| less allowance for uncollectibles of $1,050,316 ... | 43,643,971 | | 43,643,971 | |
| Interest and accounts receivable, less allowance $2,338,560... | 4,579,064 | | 4,579,064 | 78,262 |
| Due from other governmental units.................. | 4,186,972 | 73,356 | 4,260,328 | 268,836 |
| Due from other county funds....................... | 1,215,270 | | 1,215,270 | 7,073,878 |
| Due from component unit........................... | 466,518 | | 466,518 | |
| Supplies inventory.................................. | | 34,448 | 34,448 | 45,164 |
| Prepayments....................................... | 23,448 | 23,448 | 23,448 | 1,101,329 |
| TOTAL CURRENT ASSETS | 61,011,692 | 2,477,727 | 63,489,419 | 18,381,133 |
| | | | | |
| **CAPITAL ASSETS** | | | | |
| Construction in progress............................ | | | | 40,938 |
| Land................................................ | 2,439,608 | 706,110 | 3,145,718 | 193,496 |
| Land improvements................................. | | 3,086,571 | 3,086,571 | |
| Buildings and improvements........................ | | 1,181,214 | 1,181,214 | 2,481,824 |
| Equipment.......................................... | 507,486 | 3,920,856 | 4,428,342 | 10,293,291 |
| TOTAL CAPITAL ASSETS | 2,947,094 | 8,894,751 | 11,841,845 | 13,009,549 |
| Less allowances for depreciation.................... | 444,960 | 8,037,305 | 8,482,265 | 10,225,664 |
| TOTAL CAPITAL ASSETS, NET | 2,502,134 | 857,446 | 3,359,580 | 2,783,885 |
| TOTAL ASSETS | $ 63,513,826 | $ 3,335,173 | $ 66,848,999 | $ 21,165,018 |
| | | | | |
| **LIABILITIES** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Accounts payable................................... | $ 346,562 | $ 52,174 | $ 398,736 | $ 555,050 |
| Accrued payroll..................................... | | 13,980 | 13,980 | 1,382,691 |
| Other accrued liabilities and deposits............... | 464,663 | 56,123 | 520,786 | 178,775 |
| Due to other governmental units.................... | 5 | 0 | 5 | 764,778 |
| Due to other county funds.......................... | 7,862,897 | 17,725 | 7,880,622 | 1,265,600 |
| Compensated absences............................. | | | | 3,578,426 |
| Current portion of notes/bonds payable.............. | 8,900,000 | 28,500 | 8,928,500 | 1,567,058 |
| TOTAL CURRENT LIABILITIES | 17,574,127 | 168,502 | 17,742,629 | 9,292,378 |
| **LONG-TERM DEBT** | | | | |
| Net OPEB obligation................................ | 100,934 | 213,750 | 314,684 | |
| General and workers' compensation claim/Liability... | | | | 2,561,998 |
| Long-term advance................................. | | | | 1,840,809 |
| Notes/bonds payable exclusive of current portion... | 26,900,000 | 18,000 | 26,918,000 | 650,483 |
| TOTAL LONG-TERM DEBT | 27,000,934 | 231,750 | 27,232,684 | 5,053,290 |
| TOTAL LIABILITIES | 44,575,061 | 400,252 | 44,975,313 | 14,345,668 |
| | | | | |
| **NET POSITION:** | | | | |
| Restricted for: | | | | |
| Retirement of delinquent tax notes payable........ | 10,345,404 | | 10,345,404 | |
| Parks & recreation non-expendable................. | | 948,811 | 948,811 | |
| Capital improvement................................ | | | | 89,786 |
| Net investment in capital assets.................... | 2,502,134 | 810,946 | 3,313,080 | 2,768,013 |
| Unrestricted......................................... | 6,091,227 | 1,175,164 | 7,266,391 | 3,961,551 |
| TOTAL Net Position | $ 18,938,765 | $ 2,934,921 | $ 21,873,686 | $ 6,819,350 |

The notes to the financial statements are an integral part of this statement.

B-39

34                                                                                    35

**STATEMENT OF REVENUES, EXPENSES AND CHANGES IN
FUND NET POSITION--PROPRIETARY FUNDS**

**GENESEE COUNTY**                              **Exhibit A-7**

| | Fiscal Business Delinquent Taxes | Year Ended September 30, 2013 Type Activities - Enterprise Funds Non-Major Enterprise Funds | Total | Governmental Activities- Internal Service Funds |
|---|---|---|---|---|
| Operating revenues: | | | | |
| Charges for sales and services………………………………… | $  12,727,040 | $ | $  12,727,040 | $  25,099,514 |
| Ticket, permit & concession sales………………………… | | 1,210,939 | 1,210,939 | |
| TOTAL OPERATING REVENUES | 12,727,040 | 1,210,939 | 13,937,979 | 25,099,514 |
| | | | | |
| Operating expenses: | | | | |
| Salaries and fringe benefits……………………………… | 437,897 | 612,655 | 1,050,552 | 5,182,498 |
| Supplies and other operating expenses………………… | 3,955,036 | 922,706 | 4,877,742 | 20,340,732 |
| Depreciation…………………………………………… | 101,497 | 102,775 | 204,272 | 1,085,240 |
| TOTAL OPERATING EXPENSES | 4,494,430 | 1,638,136 | 6,132,566 | 26,608,470 |
| OPERATING INCOME (LOSS) | 8,232,610 | (427,197) | 7,805,413 | (1,508,956) |
| | | | | |
| Non-operating revenues (expenses): | | | | |
| Investment earnings…………………………………… | 4,050 | 67,387 | 71,437 | 199,343 |
| Interest expense………………………………………… | (262,909) | (3,600) | (266,509) | (1,099) |
| Gain (loss) on sale of property and equipment………… | | | | 552,091 |
| Contribution to Component Units-Land Bank Authority & Brownfield……… | (670,000) | | (670,000) | |
| TOTAL NON-OPERATING REVENUES (EXPENSES) | (928,859) | 63,787 | (865,072) | 750,335 |
| INCOME (LOSS) BEFORE TRANSFERS | 7,303,751 | (363,410) | 6,940,341 | (758,621) |
| | | | | |
| Transfers-in…………………………………………… | | 545,000 | 545,000 | 760,459 |
| Transfers-out………………………………………… | (4,735,164) | (29,100) | (4,764,264) | |
| TOTAL TRANSFERS | (4,735,164) | 515,900 | (4,219,264) | 760,459 |
| CHANGE IN NET POSITION | 2,568,587 | 152,490 | 2,721,077 | 1,838 |
| | | | | |
| Net position at beginning of year……………………… | 16,370,178 | 2,782,431 | 19,152,609 | 6,817,512 |
| NET POSITION  AT END OF YEAR | $  18,938,765 | $  2,934,921 | $  21,873,686 | $  6,819,350 |

B--40

The notes to the financial statements are an integral part of this statement.

## STATEMENT OF CASH FLOWS-
## PROPRIETARY FUNDS

**GENESEE COUNTY**                                        **Exhibit A-8**

|  | Business Type Delinquent Taxes | Non-Major Enterprise Funds | Total | Governmental Activities- Internal Service Funds |
|---|---|---|---|---|
| | | *Fiscal Year Ended September 30, 2013 Activities - Enterprise Funds* | | |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | |
| Cash received from customers | $ 39,151,903 | $ 1,211,388 | $ 40,363,291 | $ 24,974,703 |
| Cash payment for delinquent taxes | (24,818,278) | | (24,818,278) | |
| Cash payments to suppliers for goods and services | (4,709,998) | (902,189) | (5,612,187) | (21,088,027) |
| Cash payments to employees for services | | (530,590) | (530,590) | (4,701,583) |
| Other operating revenues | 1,108,676 | | 1,108,676 | |
| NET CASH PROVIDED (USED) FOR OPERATING ACTIVITIES | 10,732,303 | (221,391) | 10,510,912 | (814,907) |
| **CASH FLOWS FROM NONCAPITAL FINANCING ACTIVITIES:** | | | | |
| Borrowing under delinquent tax notes payable | 39,900,000 | | 39,900,000 | |
| Repayments under delinquent tax notes payable | (46,400,000) | | (46,400,000) | |
| Interest paid on delinquent tax notes payable | (273,278) | | (273,278) | |
| Advances (repayments) to other governmental units, County units and funds | 2,670,798 | | 2,670,798 | 1,544,909 |
| Transfer to component unit | (670,000) | | (670,000) | |
| Transfers-in from other funds | | 545,000 | 545,000 | 760,459 |
| Transfers-out to other funds | (4,735,164) | (29,100) | (4,764,264) | |
| NET CASH PROVIDED BY NONCAPITAL FINANCING ACTIVITIES | (9,507,644) | 515,900 | (8,991,744) | 2,305,368 |
| **CASH FLOWS FROM CAPITAL AND RELATED FINANCING ACTIVITIES:** | | | | |
| Acquisition and construction of capital assets | 344,220 | | 344,220 | (1,169,857) |
| Principal paid on long-term debt | | (25,500) | (25,500) | (501,929) |
| Interest paid on long-term debt | | | | (1,099) |
| Proceeds from sale of long-term debt | | | | 46,935 |
| NET CASH PROVIDED BY (USED FOR) CAPITAL AND RELATED FINANCING ACTIVITIES | 344,220 | (25,500) | 318,720 | (1,625,950) |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | |
| Purchase of investment securities | (59,401,349) | | (59,401,349) | (5,536,260) |
| Proceeds from sale and maturities of investment securities | 56,500,000 | | 56,500,000 | 5,784,484 |
| Interest and dividends on investments earnings (loss) | 4,050 | (4,761) | (711) | 199,681 |
| NET CASH PROVIDED BY (USED FOR) INVESTING ACTIVITIES | (2,897,299) | (4,761) | (2,902,060) | 447,905 |
| NET DECREASE IN CASH AND CASH EQUIVALENTS | (1,328,420) | 264,248 | (1,064,172) | 312,416 |
| Cash and cash equivalents at beginning of year | 1,837,609 | 1,133,416 | 2,971,025 | 399,649 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 509,189 | $ 1,397,664 | $ 1,906,853 | $ 712,065 |
| **RECONCILIATION OF OPERATING INCOME (LOSS) TO NET CASH PROVIDED BY (USED FOR) OPERATING ACTIVITIES:** | | | | |
| Operating income (loss) | $ 8,232,610 | $ (427,196) | $ 7,805,414 | $ (1,508,958) |
| Adjustments to reconcile operating income (loss) to net cash provided by (used for) operating activities: | | | | |
| Depreciation | 101,497 | 102,775 | 204,272 | 1,085,239 |
| Provision for uncollectible accounts | (63,456) | | (63,456) | |
| Change in assets and liabilities: | | | | |
| (Increase) decrease in current and delinquent property taxes receivable | 2,700,320 | | 2,700,320 | (180,234) |
| (Increase) decrease in interest and accounts receivable | 78,397 | | 78,397 | 327,931 |
| (Increase) decrease in supplies inventory | | (1,649) | (1,649) | (7,449) |
| Increase in net OPEB liability | 34,745 | 82,765 | 117,510 | |
| (Increase) decrease in prepayment and other current assets | | | | 16,533 |
| Increase (decrease) in accounts payable and related items | (351,810) | (31,616) | (383,426) | (249,978) |
| Increase (decrease) in accrued payroll | | (22,335) | (22,335) | 480,379 |
| Increase (decrease) in other accrued liabilities and deposits | | 75,865 | 75,865 | (778,370) |
| Net cash provided by (used for) operating activities | $ 10,732,303 | $ (221,391) | $ 10,510,912 | $ (814,907) |
| Noncash investing activities - increase in fair value of investments | | 72,148 | 72,148 | |

The notes to the financial statements are an integral part of this statement.

B-41

B-42

**GENESEE COUNTY EMPLOYEES' FIDUCIARY FUNDS**
**STATEMENT OF FIDUCIARY NET POSITION**
**FIDUCIARY FUNDS**

**GENESEE COUNTY**                                                      Exhibit A-9

|  | September 30, 2013 | |
|---|---|---|
|  | Total Pension and Employee Fringe Benefit (VEBA) Trust Fund | Agency Funds |
| ASSETS |  |  |
| Cash and short-term cash investments | $ 31,225,499 | $ 22,028,939 |
| Cash and investments held as collateral for securities lending | 3,211,330 |  |
| TOTAL CASH AND CASH EQUIVALENTS | 34,436,829 | 22,028,939 |
| Receivables: |  |  |
| Prepaid expenses | 176,214 |  |
| Other receivables | 565,862 | 3,655 |
| Accrued interest and dividends | 2,392,777 |  |
| TOTAL RECEIVABLES | 3,134,853 | 3,655 |
| Investments at fair value: |  |  |
| U.S. government securities | 72,917,991 |  |
| Foreign govts. and agencies | 99,630,175 |  |
| Corporate bonds | 48,582,942 |  |
| Common stocks | 73,783,276 |  |
| Preferred stocks | 112,496 |  |
| Money market | 570,065 |  |
| Mutual funds | 97,357,238 |  |
| Real estate | 23,839,634 |  |
| Hedge fund of funds | 40,017,051 |  |
| TOTAL INVESTMENTS | 456,810,868 |  |
| TOTAL ASSETS | 494,382,550 | 22,032,594 |
| LIABILITIES |  |  |
| Accounts payable | 28,759,578 | 22,032,594 |
| IBNR liability | 501,818 |  |
| Amounts due broker under securities lending agreement | 3,231,440 |  |
| TOTAL LIABILITIES | 32,492,836 | 22,032,594 |
| NET POSITION |  |  |
| Held in trust for pension benefits |  |  |
| and other purposes | $ 461,889,714 | $ |

The notes to the financial statements are an integral part of this statement.

40

**GENESEE COUNTY**
**STATEMENT OF CHANGES IN FIDUCIARY NET POSITION**

**GENESEE COUNTY**                                                      Exhibit A-10

|  | Fiscal Year Ended September 30, 2013 Total Pension and Employee Benefit Trust Fund |
|---|---|
| ADDITIONS |  |
| Contributions: |  |
| Employer | $ 23,922,670 |
| Plan members | 3,463,274 |
| Total contributions | 27,385,944 |
| Investment earnings: |  |
| Net increase |  |
| in fair value of investments | 44,560,920 |
| Interest | 5,273,920 |
| Dividends | 3,145,251 |
| Total investment earnings | 52,980,091 |
| Less investment expense | 2,254,321 |
| Net investment earnings | 50,725,770 |
| Total additions | 78,111,714 |
| Securities lending income: |  |
| Interest and fees | 27,341 |
| Borrower rebates and bank fees | 27,159 |
| Net securities lending income | 54,500 |
| Total additions | 78,166,214 |
| DEDUCTIONS |  |
| Benefits | 53,979,220 |
| Refunds of contributions | 270,198 |
| Administrative expenses | 314,672 |
| Transfer to other pensions plans | 3,090,929 |
| Total deductions | 57,655,019 |
| Change in net position | 20,511,195 |
| Net position - Held in trust for pension benefits and other purposes - beginning of the year | 441,378,519 |
| Net position - Held in trust for pension benefits and other purposes - end of the year | $ 461,889,714 |

The notes to the financial statements are an integral part of this statement.

41

**STATEMENT OF NET POSITION**
**COMPONENT UNITS**

**GENESEE COUNTY**                                    Exhibit A-11

| | Road Commission 9/30/12 | Water and Waste Services 12/31/12 | Economic Development Corporation 09/30/13 | Drains 9/30/13 | Land Bank Authority 9/30/13 | Brownfield Authority 09/30/13 | Storm Water Management System Authority 09/30/13 | Genesee Health System Authority 09/30/13 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | |
| Cash and cash equivalents | $ 8,490,782 | $ 13,936,397 | $ 648,407 | $ 4,238,997 | $ 1,656,186 | $ 18,155 | $ 473,477 | $ 41,269,263 | $ 70,731,664 |
| Investments | 15,190,537 | | | | 201,629 | 970,000 | 100,000 | 16,315,285 | 32,777,451 |
| Special Assessments and Lease Receivable | 4,667,139 | 28,699,265 | | 4,846,447 | 5,531,912 | | | | 43,744,763 |
| Interest and accounts receivable | 81,465 | 8,812,458 | | 697,274 | | | | 2,479,240 | 12,177,670 |
| Due from other governmental units | 6,781,036 | 300,325 | 107,233 | | 418,866 | | 929 | 1,893,933 | 9,395,089 |
| Current portion of land contract | | | | | | 225,000 | | | 225,000 |
| Due from primary government | | | | | 26,359 | | | | 26,359 |
| Advances to other funds | | | | | 1,604,423 | | | | 1,604,423 |
| Inventory | 1,284,832 | 75,625 | | 60,812 | 1,076,748 | | | | 2,498,017 |
| Prepayments | 322,098 | 493,266 | | | 740 | | | 731,938 | 1,548,042 |
| Unamortized cost of issuance | | 679,048 | | | | | | | 679,048 |
| Other assets | | 93,000 | | | 13,801 | 2,475,000 | | | 2,581,801 |
| Restricted Assets: | | | | | | | | | |
| Cash and cash equivalents | 4,546,470 | 243,008 | | | 60,616 | | | | 4,850,094 |
| Local unit construction in progress | | 156,500 | | | | | | | 156,500 |
| Net OPEB asset | 56,123 | | | | | | | 602,074 | 658,197 |
| Investment in joint venture | | | | | 3,893,843 | | | | 3,893,843 |
| Intangible Assets - Net | | | | | 12,188 | | | | 12,188 |
| Capital assets not being depreciated | 959,211 | 55,779,523 | | | 84,308 | | | 981,856 | 57,804,898 |
| Capital assets net of depreciation | 180,023,271 | 267,120,100 | | 22,778,909 | 7,347,345 | | | 2,978,684 | 480,248,309 |
| TOTAL ASSETS | 222,402,964 | 376,388,515 | 755,640 | 32,126,794 | 22,424,609 | 3,688,155 | 574,406 | 67,252,273 | 725,613,356 |
| | | | | | | | | | |
| **LIABILITIES** | | | | | | | | | |
| Accounts payable | 1,673,037 | 5,032,859 | 1,798 | 83,544 | 351,826 | | 66,881 | 15,894,597 | 23,104,542 |
| Accrued payroll | | | | 11,125 | 95,360 | | | | 106,485 |
| Other accrued liabilities and deposits | 680,744 | | | 582,970 | 46,785 | | | 642,190 | 1,952,689 |
| Accrued interest payable | | | | 29,453 | | 247,833 | | | 277,286 |
| Due to other governmental units | | 391,298 | | | | | | 20,985,130 | 21,376,428 |
| Due to Primary Government | | | | 500,000 | 467,554 | | | 19,040 | 986,594 |
| Funds held in escrow | | | | | | 225,000 | | | 225,000 |
| Advances from other funds | | | | | 1,231,285 | | | | 1,231,285 |
| Unamortized note premium | | | | | | 389,289 | | | 389,289 |
| Unearned revenue | 2,244,190 | 156,500 | | | 61,660 | | | 8,663,795 | 11,126,145 |
| Payable from restricted assets: | | | | | | | | | |
| Accounts payable | 509,507 | 243,008 | | 6,680 | | | | | 759,195 |
| Long-term advance from primary government | | | | | 1,765,000 | | | | 1,765,000 |
| Net OPEB obligation | | 5,676,066 | | | | | | | 5,676,066 |
| Current portion debt | 2,180,798 | 10,845,000 | | | 443,296 | 255,000 | | 863,148 | 14,587,242 |
| Long-term debt | 10,412,741 | 159,837,896 | | 3,165,437 | 1,498,267 | 12,110,000 | | 367,683 | 187,392,024 |
| TOTAL LIABILITIES | 17,701,017 | 182,182,627 | 1,798 | 4,379,209 | 5,961,033 | 13,227,122 | 66,881 | 47,435,583 | 270,955,270 |
| | | | | | | | | | |
| **NET POSITION** | | | | | | | | | |
| Net investment in capital assets | 169,457,482 | 181,595,040 | | 19,613,472 | 4,326,004 | | | 3,960,540 | 378,952,538 |
| Restricted for: | | | | | | | | | |
| Programs | | | 736,680 | 60,812 | 229,750 | | 507,525 | 9,114,728 | 10,649,495 |
| Debt service | | 3,098,052 | | | | 60,616 | | | 3,158,668 |
| Unrestricted (deficit) | 35,244,465 | 9,512,796 | 17,162 | 8,073,301 | 11,847,206 | (9,538,967) | | 6,741,422 | 61,897,385 |
| TOTAL NET POSITION (DEFICIT) | $ 204,701,947 | $ 194,205,888 | $ 753,842 | $ 27,747,585 | $ 16,463,576 | $ (9,538,967) | $ 507,525 | $ 19,816,690 | $ 454,658,086 |

The notes to the financial statements are an integral part of this statement.

**STATEMENT OF ACTIVITIES**
**COMPONENT UNITS**

**GENESEE COUNTY**                                                                 Exhibit A-12

| | Expenses | Program Revenues — Charges for Services | Program Revenues — Operating Grants and Contributions | Program Revenues — Capital Grants and Contributions | Road Commission 9/30/13 | Water and Waste Services 12/31/12 | Economic Development Corporation 9/30/13 | Drains 09/30/13 | Land Bank Authority 9/30/13 | Brownfield Authority 09/30/13 | Storm Water Management System 09/30/13 | Genesee Health System Authority 09/30/13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Component units:** | | | | | | | | | | | | | |
| Road Commission | $ 38,229,602 | $ 8,067,639 | $ 28,955,789 | $ | $ (1,206,174) | $ | $ | $ | $ | $ | $ | $ | $ (1,206,174) |
| Water and Waste Services | 51,455,673 | 52,560,768 | | 1,620,118 | | 2,725,213 | | | | | | | 2,725,213 |
| Economic Development Corporation | 22,087 | | | | | | (22,087) | | | | | | (22,087) |
| Drains | 4,267,568 | 646,792 | | 1,650,770 | | | | (1,970,006) | | | | | (1,970,006) |
| Land Bank Authority | 8,778,607 | 5,796,756 | 4,136,740 | 26,892 | | | | | 1,181,781 | | | | 1,181,781 |
| Brownfield Authority | 577,222 | 270,004 | | | | | | | | (307,218) | | | (307,218) |
| Storm Water Management System | 407,292 | | 290,269 | | | | | | | | (117,023) | | (117,023) |
| Genesee Health System Authority | 106,718,421 | 4,143,468 | 97,587,625 | 2,775,000 | | | | | | | | (2,212,328) | (2,212,328) |
| **Total Component Units** | $ 172,226,870 | $ 63,417,788 | $ 102,014,634 | $ 6,072,780 | (1,206,174) | 2,725,213 | (22,087) | (1,970,006) | 1,181,781 | (307,218) | (117,023) | (2,212,328) | (1,927,842) |
| **Revenues:** | | | | | | | | | | | | | |
| Taxes: | | | | | | | | | | | | | |
| Use of money and investments | | | | | 383,791 | 1,326,056 | 4,301 | 1,054 | 717 | 2,620 | 1,114 | 37,828 | 1,757,481 |
| Other intergovernmental revenues | | | | | | | | | 1,808,843 | | | | 1,808,843 |
| Unrestricted contributions | | | | | 1,215,798 | 930,054 | | | 1,009,711 | | | 1,641,875 | 4,797,438 |
| Total general revenues and transfers | | | | | 1,599,589 | 2,256,110 | 4,301 | 1,054 | 2,819,271 | 2,620 | 1,114 | 1,679,703 | 8,363,762 |
| Special item - transfer of operations to Genesee Health Services | | | | | | | | | | | | 20,349,315 | 20,349,315 |
| Change in net position | | | | | 393,415 | 4,981,323 | (17,786) | (1,968,952) | 4,001,052 | (304,598) | (115,909) | 19,816,690 | 26,785,235 |
| Net position - beginning of the year (deficit) as restated | | | | | 204,308,532 | 189,224,565 | 771,628 | 29,716,537 | 12,462,524 | (9,234,369) | 623,434 | | 427,872,851 |
| Net position - end of year (deficit) | | | | | $ 204,701,947 | $ 194,205,888 | $ 753,842 | $ 27,747,585 | $ 16,463,576 | $ (9,538,967) | $ 507,525 | $ 19,816,690 | $ 454,658,086 |

The notes to the financial statements are an integral part of this statement.

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                                                          **EXHIBIT A-13**

**NOTE A – DESCRIPTION OF COUNTY OPERATIONS, REPORTING ENTITY, AND FUND TYPES**

The County of Genesee, Michigan was incorporated on March 18, 1835 and covers an area of approximately 642 square miles with the county seat located in the City of Flint. The County operates under an elected Board of Commissioners (9 members) and provides services to its more than 425,000 residents in many areas including law enforcement, administration of justice, community enrichment and development, and human services. Education services are provided to citizens through more than 198 schools in 21 local school districts, 5 colleges, and a district library; such districts, colleges, and library are separate governmental entities whose financial statements are not included herein, in accordance with The Governmental Accounting Standards Board Codification Section 2100.

As required by generally accepted accounting principles, these financial statements represent Genesee County (the primary government) and its component units. The component units discussed below are included in the County's reporting entity because of the significance of their operational or financial relationships with the County.

Blended Component Units:

Genesee County Building Authority - Legally separate entity established for the sole purpose of issuing bonded debt to finance construction of County buildings. The entire Building Authority is appointed by the County Board of Commissioners.

Genesee County Employees Retirement System - Legally separate entity established to account for employee and employer contributions, investment income, accumulated assets and payments to beneficiaries. The Pension board has five ex-official Commissioners due to their positions held in the county and five elected employee Commissioners, with services provided almost exclusively for the County and its employees. The Retirement System has a calendar fiscal year end. It was determined by the County that it would be extremely impractical for the Retirement System to change to a September 30th fiscal year end.

Discretely Presented Component Units:

Genesee County Road Commission - An entity responsible for constructing and maintaining the primary and local road system within the County. Its three-member board is appointed by the County Board. The County Board can significantly influence the operations of the Road Commission Board.

Water and Waste Services - An entity established by the County pursuant to State law to provide for water and waste management services. The County appoints the lone board member/member-director and has the ability to remove the manager-director if they so choose. The County approves and would be secondarily liable for any debt issuances. Water and Waste Services has a calendar year. The County has determined that it would be impractical for Water and Waste Services to change to a September 30th fiscal year end.

Economic Development Corporation - An entity responsible for the administration of the Revolving Loan Program. This loan program makes low interest loans available to businesses located within Genesee County. The Board of the Economic Development Corporation (EDC) is appointed by the County Board of Commissioners. The Board of Commissioners can remove Board members of the EDC if they so choose. The Corporation has converted to a September 30th fiscal year end from a calendar year end.

Drains - These separate legal entities represent drainage districts established pursuant to Act 40, P.A. 1956, as amended, the Michigan Drain Code. The oversight of these districts is the responsibility of the Genesee County Drain Commissioner, an elected position that is funded by Genesee County. The County lends its full faith and credit towards payment of the Special Assessment bonds issued for the projects. The County can significantly influence the operations of the Drain Commission since the County Board of Commissioners approves the Drains budgets.

Genesee County Land Bank Authority – An entity which accounts for the activities of the Authority consisting of acquisition of properties via the delinquent tax state statute sales of property to individuals, commercial entities and nonprofit organizations, rental of properties to individuals, rehabilitation and demolition of properties in preparation for sale or future development. The entity is comprised of seven members appointed by the County Board. The County Board can significantly influence the operations of the Land Bank Authority Board.

Brownfield Authority – An entity governed by a nine-member Board. The Board is appointed by each member of the County Board. The Brownfield Authority was created to provide a means for financing remediation of Brownfield (environmentally contaminated) sites within the County. The County issued bonds to provide capital for the revitalization of environmentally distressed, blighted, and functionally obsolete properties within the County. The County approves and would be secondarily liable for any debt issuances.

Storm Water Management System – An entity established by the County pursuant to Act 342, Public Acts of Michigan, 1939. Genesee County Storm Water Management System is responsible for administration services necessary to enable the County and the cities, villages, townships, and charter townships located within the County to comply with the Phase II Regulations established by the United States Environmental Protection Agency (EPA) in the Federal Register on December 8, 1999. The Drain Commissioner's Office was designated and appointed as the "County Agency" for the System to manage and operate the System.

Genesee Health Services (Agency), formerly known as Genesee County Community Mental Health Authority - On August 29, 2012, the Board of Commissioners of Genesee County, Michigan approved a resolution to establish a community mental health authority (a separate entity) to assume the activities of the Agency, effective January 1, 2013. The Agency is reported as a discretely presented component unit effective January 1, 2013.

Complete financial statements of the individual component units (excluding Drains, Brownfield Authority and Building Authority which are included in this financial report) can be obtained from their respective administrative offices.

46

**NOTE B – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Government-wide and fund financial statements:** The County is following GASB Statement No. 34, *Basic Financial Statements and Management's Discussion and Analysis – for State and Local Governments*. The standard requires government-wide and fund financial statements. The government-wide financial statements (i.e., the statement of net position and the statement of changes in net position) report information on all of the non-fiduciary activities of the primary government and its component units. For the most part, the effect of inter fund activity has been removed from these statements. Governmental activities, which normally are supported by taxes and intergovernmental revenues, are reported separately from business-type activities, which rely to a significant extent on fees and charges for support. Likewise, the primary government is reported separately from certain legally separate component units for which the primary government is financially accountable.

The statement of activities demonstrates the degree to which the direct expenses of a given function or segment are offset by program revenues. Direct expenses are those that are clearly identifiable with a specific function or segment. Program revenues include 1) charges to customers or applicants who purchase, use, or directly benefit from goods, services, or privileges provided by a given function or segment and 2) grants and contributions that are restricted to meeting the operational or capital requirements of a particular function or segment. Taxes and other items not properly included among program revenues are reported instead as general revenues.

Separate financial statements are provided for governmental funds, proprietary funds, fiduciary funds, and the component units even though the fiduciary fund statements are excluded from the government-wide financial statements. Major individual governmental funds and major individual enterprise funds are reported as separate columns in the fund financial statements.

**Measurement focus, basis of accounting and financial statement presentation:** The government-wide financial statements are reported using the economic resources measurement focus and the accrual basis of accounting, as are the proprietary fund and fiduciary fund financial statements. Revenue is recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. Property taxes are recognized as revenue in the year for which they are levied. Grants and similar items are recognized as revenue as soon as all eligibility requirements imposed by the provider have been met.

**Revenue recognition policies:** Governmental fund financial statements are reported using the current financial resources measurement focus and the modified accrual basis of accounting. Revenue is recognized as soon as it is both measurable and available. Revenue is considered to be available if it is collected within the current period or soon enough thereafter to pay liabilities of the current period. For this purpose, the County considers revenues to be available if they are collected within sixty (60) days of the end of the current fiscal period with the exception of the Special Revenue funds Genesee County Community Action Resources Department (GCCARD), Health Department and Community Development which are ninety (90) days. Expenditures generally are recorded when a liability is incurred, as under accrual accounting. However, debt service expenditures, as well as expenditures related to compensated absences and claims and judgments, are recorded only when payment is due. Revenues, which are considered measurable, but not available, are recorded as a receivable and deferred revenue. Revenues for 2013 include property taxes levied principally on December 1, 2012 and substantially collected in early 2013. The "2012 property taxes" assessed on December 31, 2012, become a lien on December 1, 2012, and are to be collected principally by February 28, 2013. Also, for the year ended September 30, 2007 the state legislature eliminated state-shared revenues to Counties. As a compromise, the legislature allowed counties to move the property tax levy to a July 1 date. As a result, the July 1, 2013 levy is also recognized as revenue for the year ended September 30, 2013 to the extent that it is available. Other significant revenue susceptible to accrual include expenditure reimbursement type grants, certain inter-governmental revenues and operating transfers.

The government reports the following major governmental funds:

The General Fund is the government's primary operating fund. It accounts for all financial resources of the general government, except those required to be accounted for in another fund.

The Mental Health Fund accounts for the operations of the County's Mental Health services, the main revenue sources are State grants and charges for services. On August 29, 2012, the Board of Commissioners of Genesee County, Michigan approved a resolution to establish a community mental authority (a separate entity) to assume the activities of the Agency, effective January 1, 2013. The Agency is reported as a major fund for 3 months ending December 31, 2012 then as a discretely presented component unit effective January 1- September 30, 2013.

The County Health Fund accounts for the operations of providing health protection and health services, the main revenue sources are Federal and State grants.

The Community Action Resource Department Fund accounts for the programs designed to provide health and human services to low income individuals, the main revenue source is federal grants.

The Community Development Fund accounts for Housing and Urban Development grant awards that are allocated to all local units of government (excluding City of Flint) for projects benefiting low and moderate income persons or projects defined as having an urgent need.

The government reports the following major enterprise funds:

The Delinquent Tax Revolving Enterprise Fund accounts for the activities of the Authority for taxes purchase program whereby the County purchases the outstanding taxes from each local taxing unit. The County, in turn collects those delinquent taxes along with penalties and interest.

The government reports the following fiduciary funds:

47

B-45

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                    **EXHIBIT A-13**

The Pension Trust Fund accounts for employee and employer pension contributions, investment income, accumulated assets, and payments to beneficiaries.

The Trust and Agency Funds account for assets held by the County as an agent for individuals, private organizations, other governments, and other funds.

The Employees' Fringe Benefits (VEBA) Fund accounts for employee and employer contributions, investment income, accumulated assets, set aside with the intent to accumulate adequate funds to defray part of the cost of retiree medical benefits in future years.

Additionally, the government reports the following fund types:

Internal service fund account for various services such as data processing, purchasing, and other administrative services, fleet management, buildings and grounds maintenance, the self funded property/casualty program and the self funded prescription drug and medical program.  These services are provided to other County departments on a cost reimbursement basis.

Agency Funds account for assets held by the County in an agency capacity.

As a general rule, the effect of inter fund activity has been eliminated from the government-wide financial statements.

Proprietary funds distinguish operating revenue and expenses from non-operating items.  Operating revenue and expenses generally result from providing services and producing and delivering goods in connection with a proprietary fund's principal ongoing operations.  The principal operating revenue of the proprietary funds relates to charges to customers for sales and services.  Operating expenses for proprietary funds include the cost of sales and services, administrative expenses, and depreciation on capital assets.  All revenue and expenses not meeting this definition are reported as non-operating revenue and expenses.

Fiduciary funds are used to account for resources held for the benefit of parties outside the government.  Fiduciary funds are not reflected in the government-wide financial statements because the resources of those funds are not available to support Genesee County's own programs.  The accounting used for fiduciary funds is much like that used for proprietary funds.

**Employee Vacation:**  County employees are granted vacation in varying amounts based on length of service.  Vacation pay is accrued and fully vested when earned; upon termination, with a few bargaining unit exceptions, employees are paid accumulated vacation at full rates to a limit of 150% of their current annual earned vacation.

**Long-term Advances:**  Long-term advances from the General Fund to other funds are commonly made to finance new activities during their initial operations.  General Fund fund balance is reserved for such advances to reflect the amount of fund balance not currently available for expenditure.
.

**Budgets and Budgetary Accounting:**  Budgets shown in the financial statements were prepared on the same modified accrual basis used to reflect actual results.  The County employs the following procedures in establishing the budgetary data reflected in the financial statements:

- Prior to July 1, County departments, in conjunction with the Controller's Office, prepare and submit their proposed operating budgets for the fiscal year commencing October 1.  The operating budget includes proposed expenditures and resources to finance them.

- A public hearing is conducted to obtain taxpayers comments.

- Prior to September 30, the budget is legally enacted through passage of a resolution.

- After the budget is adopted, the Finance Committee of the Board of Commissioners is authorized to transfer budgeted amounts between accounts within a department.  However, any revisions that alter the total expenditures of a department or fund must be approved by the Board of Commissioners.

- Formal budgetary integration is employed as a management control device during the year for the General Fund and the Special Revenue Funds.  Formal budgetary integration is not employed for other governmental type funds as effective management control is achieved through alternative procedures.

- Budgets for the General and Special Revenue Funds are adopted on a basis consistent with generally accepted accounting principles (GAAP).  Budgeted amounts are as originally adopted, or as amended by the Board of Commissioners during the year.  Individual amendments were not material in relation to the original appropriations, which were amended.  Appropriations unused at September 30 are not carried forward to the following year.  The budgets for the General and Special Revenue Funds are adopted at the departmental level, and total fund level, respectively.  For the Special Revenue Fund budget presentations in Exhibits B3-B4 and D3-D4 more detail is presented than required by the adopted budget.

| General Fund | Total<br>Total Revenue | Expenditures |
|---|---|---|
| Amounts per operating statement | $73,828,952 | $59,881,900 |
| Animal Shelter Fund budgeted separately from the General Fund | (2,747) | (967,582) |
| Medical Examiner Fund budgeted separately from the General Fund | (189,769) | (1,181,652) |
| Amounts per budget statements | $73,636,438 | $57,732,666 |

**Cash and Cash Equivalents:**  The County considers cash equivalents as short-term highly liquid investments that are both readily convertible to cash and have maturities of 90 days or less when purchased to minimize the risk of changes in value due to interest rate changes.

**Investments:**  Investments are stated at fair values.  Fair value is determined based on quoted market prices except for money market funds, which are valued at amortized cost.  Unrealized appreciation or depreciation on investments due to changes in market value are recognized in fund operations each year.

**Inventories/Prepaids:**  Inventories are stated at cost on a first-in, first-out basis for governmental funds and the lower of cost on a first-in, first-out basis or market for proprietary funds.  The cost of inventory items in governmental funds is recorded as an expenditure at the time of purchase, except for certain Special Revenue Funds, and the Water and Waste Services component unit where inventories are expensed when used.  Inventory in the Land Bank Authority represents land inventory held for resale.

**Encumbrances:**  Encumbrance accounting, under which purchase orders, contracts, and other commitments for the expenditure of monies are recorded in order to reserve that portion of the applicable appropriation, is employed as an extension of formal budgetary integration in the governmental funds.  There were no encumbrances at the end of the year since there were no outstanding amounts due on contracts or other commitments for the current year and the small number of purchase orders that were outstanding at the end of the year were cancelled and reissued in the subsequent year.

**Restricted Assets:**  When both restricted and unrestricted resources are available for use, it is the County's policy to use restricted resources first, then unrestricted resources as they are needed.

**Capital Assets:**  Capital assets, which include property, plant, equipment, infrastructure assets (e.g., roads, bridges, sidewalks, and similar items), are reported in the applicable governmental or business-type activities column in the government-wide financial statements.  Capital assets are defined by the government as assets with an initial individual cost of more than $1,000 and an estimated useful life in excess of one year.  Such assets are recorded at historical cost or estimated historical cost if purchased or constructed.  Donated capital assets are recorded at estimated fair market value at the date of donation.

Interest incurred during the construction of capital assets of business type activities is included as part of the capitalized value of the assets constructed.  During the current year, no interest expense was capitalized as part of the cost of assets under construction.

Capital assets are depreciated using the straight-line method over the estimated useful lives of the related assets.  The estimated useful lives are:

| | |
|---|---|
| Land Improvements | 10 years |
| Buildings and Improvements | 25-50 years |
| Equipment | 3-20 years |
| Infrastructure | 20-50 years |

**Long-term Obligations:**  In the government-wide financial statements and proprietary fund types in the fund financial statements, long-term debt and other long-term obligations are reported as liabilities in the applicable governmental activities, business type activities or proprietary fund type statement of net position.  Bond premiums and discounts, as well as issuance costs, are deferred and amortized over the life of the bonds using the effective interest method.  Bonds payable are reported net of the applicable bond premium or discount.  Bond issuance costs are reported as deferred charges and amortized over the term of the related debt.  In the fund financial statements, governmental fund types recognize bond premiums and discounts, as well as bond issuance costs, during the current period.  The face amount of debt issued is reported as other financing sources.  Premiums received on debt issuance are reported as other financing sources while discounts are reported as other financing uses.  Issuance costs are reported as debt service expenditures.

In the fund financial statements, governmental funds report the following components of fund balance:

- Nonspendable – Amounts that are not in spendable form or are legally or contractually required to be maintained intact.

- Restricted – Reservations of fund balance for amounts that are not available for appropriation or are legally restricted by outside parties, constitutional provisions, or enabling legislation for use for a specific purpose.

- Committed – Amounts that have been formally set aside by the Board of Commissioners for use for specific purposes.  Commitments are made and can be rescinded only via resolution of the Board.

- Assigned – Intent to spend resources on specific purposes expressed by the Board of Commissioners.

- Unassigned – Amounts not otherwise categorized above and available to be spent for any purpose.

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY** 　　　　　　　　　　　　　　　　　　　　　　　　**EXHIBIT A-13**

When an expense is incurred for purposes for which both restricted and unrestricted net position or fund balance are available, the County's policy is to first apply restricted resources. When an expense is incurred for purposes for which amounts in any of the unrestricted fund balance classifications could be used, it is the County's policy to spend funds in this order: committed, assigned and unassigned.

**NOTE C – DEPOSITS AND INVESTMENTS**

Michigan Compiled Laws Section 129.91 (Public Act 20 of 1943, as amended), authorizes local governmental units to make deposits and invest in the accounts of federally insured banks, credit unions, and savings and loan associations that have offices in Michigan. The local unit is allowed to invest in bonds, securities, and other direct obligations of the United States; repurchase agreements, bankers' acceptances of United States banks; commercial paper rated within the two highest classifications, which mature not more than 270 days after the date of purchase; obligations of the State of Michigan or its political subdivisions, which are rated as investment grade; and mutual funds composed of investment vehicles that are legal for direct investment by local units of government in Michigan.

The Pension Trust Fund is also authorized by Michigan Public Act 314 of 1965, as amended, to invest in certain reverse repurchase agreements, stocks, diversified investment companies, annuity investment contracts, real estate leased to public entities, mortgages, real estate, debt or equity of certain small businesses, certain state and local government obligations and certain other specified investment vehicles. The Employees' Fringe Benefit (VEBA) Fund is authorized by Michigan Public Act 149 of 1999 to invest in similar types of investments as the pension fund.

State statutes as they relate to group Self-Insurance Pools (Public Act 218 of 1956, as amended) authorizes the Pool to invest in obligations of the U.S. Treasury and U.S. agencies, deposit agreements with federally insured financial institutions within the State of Michigan, commercial paper, common stocks, real estate, repurchase obligations of the U.S. Government and U.S. agencies, banker's acceptances of U.S. banks, common stocks, and mutual funds composed of the above authorized investments. The Pool has adopted the above as its investment policy and has authorized the following depositories: FirstMerit Bank and Beacon Investment Company.

The County has designated three banks for the deposit of its funds. The investment policy adopted by the Board in accordance with Public Act 196 of 1997 has authorized investments as allowed under State statutory authority as listed above. The County's cash and investments are subject to several types of risk which are examined in more detail as follows:

　　　**Custodial credit risk of bank deposits –** Custodial credit risk is the risk that in the event of a bank failure, the government's deposits may not be returned to it. The government does not have a deposit policy for custodial credit risk. At year end, the County had $10,013,070 of bank deposits (certificates of deposit, checking and savings accounts) that were uninsured and uncollateralized. The County believes that due to the dollar amounts of cash deposits and the limits of FDIC insurance, it is impractical to insure all deposits. Insuring or collateralizing all cash deposits would also result in a significant decrease in the investment returns for the County. Consistent with the investment policy that is prepared by the County Treasurer's Office and approved by the County Board of Commissioners, the County evaluates each financial institution it deposits funds with and assesses the level of risk of each institution; only those institutions with an acceptable estimated risk level are used as depositories.

　　　**Custodial credit risk of investments –** Custodial credit risk is the risk that, in the event of the failure of the counterparty, the County will not be able to recover the value of its investments or collateral securities that are in the possession of an outside party. The County does not have a policy for custodial credit risk. At year end, the following investment securities were uninsured and unregistered, with securities held by the counterparty or by its trust department or agent but not in the County's name:

| Investment Type | Carrying Value | How Held |
|---|---|---|
| U.S. gov or agency bond or note (self insurance) | $ 1,439,473 | Counterparty's trust dept |
| Corporate bonds (self insurance) | 1,690,364 | Counterparty's trust dept |
| Corporate stocks (self insurance) | 3,560,920 | Counterparty's trust dept |
| Mutual funds (self insurance) | 483,104 | Counterparty's trust dept |
| U.S. gov or agency bond or note (VEBA) | 6,239,499 | Counterparty's trust dept |
| Corporate bonds (VEBA) | 8,100,735 | Counterparty's trust dept |
| Corporate stock (VEBA) | 7,091,313 | Counterparty's trust dept |
| Foreign gov and agency (VEBA) | 24,191,655 | Counterparty's trust dept |
| U.S. gov or agency bond or note (pension) | 66,678,492 | Counterparty's trust dept |
| Foreign gov and agency (pension) | 75,438,520 | Counterparty's trust dept |
| Corporate bonds (pension) | 40,482,207 | Counterparty's trust dept |
| Corporate stocks (pension) | 66,751,963 | Counterparty's trust dept |

　　　**Interest rate risk –** Interest rate risk is the risk that the value of investments will decrease as a result of a rise in interest rates. The County's investment policy does not restrict investment maturities, other than commercial paper which can only be purchased with a 270-day maturity. At year end, the average maturities of investments are as follows:

| Type of Investment | Fair Value | Less than One Year | 1-10 Years | Over Ten Years |
|---|---|---|---|---|
| U.S. gov or agency bond or notes (self insurance) | $1,439,473 | $589,104 | $850,369 | |
| Corporate bonds (self insurance) | 1,690,364 | 156,164 | 1,534,200 | |
| Money market funds (self insurance) | 384,652 | 384,652 | | |
| U.S. gov or agency bond or notes (VEBA) | 1,850,428 | 1,352,963 | 497,465 | |
| Corporate bonds (VEBA) | 6,132,648 | | 6,132,648 | |
| Foreign gov (VEBA) | 523,050 | | 523,050 | |
| Asset backed (pension) | 1,771,067 | | | 1,771,067 |

50

| Type of Investment | Fair Value | Less than One Year | 1-10 Years | Over Ten Years |
|---|---|---|---|---|
| U.S. gov or agency bond or notes (pension) | $1,996,146 | | 1,804,434 | 191,712 |
| U.S. gov mortgage backed (pension) | 1,751,441 | | | 1752,441 |
| U.S. gov tips | 1,700,730 | | 1,700,730 | |
| Corporate bonds (pension) | 30,113,931 | 309,640 | 21,170,016 | 8,634,276 |
| Foreign corporate (pension) | 8,890,792 | 948,795 | 7,083,737 | 858,264 |
| Foreign gov (pension) | 3,605,883 | | 2,823,433 | 782,450 |
| Private placement (pension) | 8,597,210 | 66,831 | 7,452,964 | 1,077,414 |

　　　**Credit risk –** Credit risk is the risk that the government will not be able to recover the value of its securities. The County follows state law which limits investments in commercial paper to the top two ratings issued by nationally recognized statistical rating organizations. The County has no investment policy that would further limit its investment choices for general County funds. The pension funds are allowed to invest in longer maturity corporate bonds in accordance with state law. As of year end, the credit quality ratings of debt securities not explicitly guaranteed by the U.S. Government are as follows:

| Investment | Fair Value | Rating | Rating Organization |
|---|---|---|---|
| U.S. gov agency securities (self insurance) | $1,439,473 | AA+ | S&P |
| Money Market (self insurance) | 743,923 | Not Rated | N/A |
| Corporate bonds (self insurance) | 356,733 | A- | S&P |
| Corporate bonds (self insurance) | 578,058 | BBB+ | S&P |
| Corporate bonds (self insurance) | 413,244 | BBB | S&P |
| Corporate bonds (self insurance) | 341,328 | BBB- | S&P |
| Corporate bonds (VEBA) | 489,995 | AA | S&P |
| Corporate bonds (VEBA) | 1,900,217 | A | S&P |
| Corporate bonds (VEBA) | 2,899,011 | BBB | S&P |
| Corporate bonds (VEBA) | 843,125 | BB | S&P |
| Private Placement (VEBA) | 250,000 | A | S&P |
| Foreign government bonds (VEBA) | 227,250 | BB | S&P |
| Foreign government bonds (VEBA) | 295,800 | Not Rated | N/A |
| U.S. gov agency securities (VEBA) | 801,329 | AA | S&P |
| U.S. gov agency securities (VEBA) | 1,049,099 | Not Rated | N/A |
| Asset backed (pension) | 186,298 | AAA | S&P |
| Asset backed (pension) | 231,038 | AA | S&P |
| Asset backed (pension) | 342,822 | A | S&P |
| Asset backed (pension) | 82,007 | BB | S&P |
| Asset backed (pension) | 86,460 | B | S&P |
| Asset backed (pension) | 842,441 | CCC and Below | S&P |
| Corporate bonds (pension) | 1,791,871 | AA | S&P |
| Corporate bonds (pension) | 9,678,165 | A | S&P |
| Corporate bonds (pension) | 13,079,008 | BBB | S&P |
| Corporate bonds (pension) | 4,269,674 | BB | S&P |
| Corporate bonds (pension) | 1,040,498 | B | S&P |
| Corporate bonds (pension) | 250,425 | CCC and Below | S&P |
| Corporate CMO (pension) | 4,291 | Not Rated | N/A |
| Corporate CMO (pension) | 1,280,414 | AAA | S&P |
| Corporate CMO (pension) | 1,751,643 | BBB | S&P |
| Corporate CMO (pension) | 150,916 | BB | S&P |
| Corporate CMO (pension) | 158,811 | B | S&P |
| Corporate CMO (pension) | 950,462 | CCC and Below | S&P |
| Corporate CMO (pension) | 2,532,038 | Not Rated | N/A |
| Private placements (pension) | 507,860 | AAA | S&P |
| Private placements (pension) | 422,908 | AA | S&P |
| Private placements (pension) | 1,814,891 | A | S&P |
| Private placements (pension) | 1,946,055 | BBB | S&P |
| Private placements (pension) | 1,192,037 | BB | S&P |
| Private placements (pension) | 634,089 | B | S&P |
| Private placements (pension) | 2,079,370 | Not Rated | N/A |
| Foreign corporate bonds (pension) | 382,740 | AAA | S&P |
| Foreign corporate bonds (pension) | 382,454 | AA | S&P |
| Foreign corporate bonds (pension) | 1,737,429 | A | S&P |
| Foreign corporate bonds (pension) | 3,166,474 | BBB | S&P |
| Foreign corporate bonds (pension) | 421,724 | BB | S&P |
| Foreign corporate bonds (pension) | 252,787 | B | S&P |
| Foreign corporate bonds (pension) | 2,547,184 | Not Rated | N/A |
| Foreign government bonds (pension) | 651,345 | A | S&P |
| Foreign government bonds (pension) | 1,257,176 | BBB | S&P |
| Foreign government bonds (pension) | 1,697,362 | Not Rated | N/A |

51

B–47

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                                 **EXHIBIT A-13**

| Investment | Fair Value | Rating | Rating Organization |
|---|---|---|---|
| U.S. government agency (pension) | 1,872,855 | AA | S&P |
| U.S. government agency (pension) | 52,528 | BBB | S&P |
| U.S. government agency (pension) | 70,764 | Not Rated | N/A |
| U.S. government mortgage backed (pension) | 1,752,441 | Not Rated | N/A |
| U.S. government other (pension) | 1,213,547 | Not Rated | N/A |
| U.S. government TIPS (pension) | 1,700,730 | Not Rated | N/A |
| U.S. government treasuries, notes and bonds (pension) | 53,191,344 | Not Rated | N/A |

**Foreign currency risk** – Foreign currency risk is the risk that an investment denominated in the currency of a foreign country could reduce its U.S. dollar value, as a result of changes in foreign currency exchange rates.  The pension system does not restrict the amount of investments in foreign currency.  The following securities are subject to foreign currency risk:

| | Fair Value (in $) |
|---|---|
| Euro | $     35,453 |
| Canadian Dollar | 192,117 |
| Great British Pounds | 10,493,792 |
| Mexican Peso | 61,930 |
| Norwegian Krones | 2 |
| Hong Kong Dollar | 3,360,395 |
| Philippine Peso | 164,323 |
| South African Rand | 18 |
| Swedish Krona | 150,810 |
| Taiwan Dollar | 234,117 |
| Turkish Lira | 200,332 |

All of the System's investment subject to foreign currency risk relate to a single comingled fund which held many different foreign currency securities. The system owns a portion of the comingled fund.

**Securities lending** – As permitted by State statutes and under the provisions of a securities lending authorization agreement, the System lends securities to broker-dealers and banks for collateral that will be returned for the same securities in the future.  The System's custodial bank manages the securities lending program and receives cash as collateral.  Borrowers are required to deliver collateral for each loan equal to not less than 100 percent of the market value of the loaned securities.  During the year ended December 31, 2012, only United States currency was received as collateral.

The System did not impose any restrictions during the fiscal year on the amount of loans made on its behalf by the custodial bank.  The System presently owns $246,496 of Sigma Finance Medium Term Note which is a defaulted investment.  The System elected to repay the liability over a five-year period.  There were no other failures by any borrowers to return loaned securities or pay distributions thereon during the fiscal year.

The Genesee County Employees' Retirement System and the borrower maintain the right to terminate all securities lending transactions on demand.  The cash collateral received on each loan was invested, together with the cash collateral of other lenders, in an investment pool.  The average duration of the investments in the cash collateral pool are deemed to mature on the cash collateral pool's next business day as per the Reinvestment Guidelines, with the exception of the Sigma Medium Term Note (Impaired).  Because the loans are terminable on demand, their duration did not generally match the duration of the investments made with cash collateral.  On December 31, 2012, the System had no credit risk exposure to borrowers with the exception of Sigma Finance.  The collateral based on cost and the fair market value of the underlying securities on loan for the System as of December 31, 2012 was $3,211,330 and $3,194,952 respectively, which consisted of short-term money market mutual funds and U.S. corporate commercial paper.

**NOTE D–CAPITAL ASSETS**

Capital asset activity at September 30, 2013 is summarized as follows:

| Governmental activities: | Balance Oct. 1, 2012 | Additions | Disposals | Reclassifications and Adjustments | Balance Sept. 30, 2013 |
|---|---|---|---|---|---|
| Capital assets not being depreciated | | | | | |
| Land | $ 11,349,565 | $ | $ | $ | $ 11,349,565 |
| Construction in progress | 15,572 | 49,188 | 15,572 | | 49,188 |
| Subtotal | 11,365,137 | 49,188 | 15,572 | | 11,398,753 |
| Capital assets being depreciated: | | | | | |
| Land improvements | 8,806,199 | 110,473 | | | 8,916,672 |
| Buildings and improvements | 120,714,083 | 1,806,847 | | (154,076) | 122,520,930 |
| Machinery and equipment | 27,585,901 | 2,925,491 | 650,819 | (154,076) | 29,706,497 |
| Subtotal | 157,106,183 | 4,842,811 | 650,819 | (154,076) | 161,144,099 |

52

| Governmental activities: | Balance Oct. 1, 2012 | Additions | Disposals | Reclassifications and Adjustments | Balance Sept. 30, 2013 |
|---|---|---|---|---|---|
| Less accumulated depreciation for: | | | | | |
| Land improvements | 36,702 | 3,022 | | | 39,724 |
| Buildings | 52,787,550 | 3,435,939 | | | 56,223,489 |
| Machinery and equipment | 20,151,794 | 1,784,949 | 627,878 | (154,076) | 21,154,789 |
| Subtotal | 72,976,046 | 5,223,910 | 627,878 | (154,076) | 77,418,002 |
| Governmental activities | | | | | |
| Capital assets, net of depreciation | $ 95,495,274 | $ (331,911) | $ 38,513 | $ | $ 95,124,850 |

| Business type activities: | Balance Oct. 1, 2012 | Additions | Disposals | Reclassifications | Balance Sept. 30, 2013 |
|---|---|---|---|---|---|
| Capital assets not being depreciated: | | | | | |
| Land | $ 3,502,006 | $ | $ 344,210 | $ (12,078) | $ 3,145,718 |
| Capital assets being depreciated: | | | | | |
| Buildings | 1,181,215 | | | | 1,181,215 |
| Land improvements | 3,074,493 | | | 12,078 | 3,086,571 |
| Machinery and equipment | 4,274,265 | | | 154,076 | 4,428,341 |
| Subtotal | 8,529,973 | | | 166,154 | 8,696,127 |
| Less accumulated depreciation for: | | | | | |
| Buildings | 1,107,483 | 23,013 | | | 1,130,496 |
| Land improvements | 3,074,493 | | | 12,078 | 3,086,571 |
| Machinery and equipment | 3,962,947 | 148,175 | | 154,076 | 4,265,198 |
| Subtotal | 8,144,923 | 171,188 | | 166,154 | 8,482,265 |
| Business type activities | | | | | |
| Capital assets, net of depreciation | $ 3,887,056 | $ (171,188) | $ 344,210 | $ (120,078) | $ 3,359,580 |

Depreciation expense was charged to programs of the primary government as follows:

Governmental activities:

| | |
|---|---|
| Administration of Justice | $ 1,153,244 |
| Law Enforcement and Community Protection | 923,508 |
| Human Services | 556,295 |
| Community Enrichment and Development | 373,845 |
| General Support Services | 127,328 |
| Other | 1,004,450 |
| Internal service fund depreciation is charged to the various functions based on their usage of the assets | 1,085,240 |
| Total governmental activities | $ 5,223,910 |

Business type activities:

| | |
|---|---|
| Delinquent tax revolving | $ 101,497 |
| Parks and Recreation | 69,691 |
| Total business type activities | $ 171,188 |

In addition, land with an approximate value of $5,000,000 used by Parks and Recreation is leased at nominal costs from the Nature Conservatory and the City of Flint under long-term arrangements.

**NOTE E – DEBT (including current portions)**

Long-term debt of the County is as follows:

| Government Activities: | Balance Oct. 1, 2012 | Additions | Reductions | Balance Sept 30, 2013 | Due within One Year |
|---|---|---|---|---|---|
| Internal Service Fund Equipment Notes | $   19,491 | $ | $ (3,618) | $   15,873 | $   4,189 |
| Capital Improvement Bonds 2011, Proceeds were used to Renovate various County Buildings | 845,000 | | (240,000) | 605,000 | 65,000 |
| 2.9% Genesee County Refunding Bonds, Bonds maturing on or prior to May 1, 2022 shall not be subject to redemption prior to maturity.  Bonds maturing on or after May 1, 2022 may be subject to prior redemption | 4,830,000 | | (400,000) | 4,430,000 | 440,000 |
| JCI Energy Bonds 2010, Debt was issued to perform numerous Energy efficiency improvements on most County Buildings | 7,815,784 | | (300,000) | 7,515,784 | 340,000 |
| 3.7% to 5.0% Genesee County Building Authority Bonds, Series 2000, Callable after May 1, 2008, | 168,000 | | (59,500) | 108,500 | 66,500 |
| 4.75% to 5.7% Genesee County Bonds Series 2004-B Capital Improvement Bonds, Bonds maturing before April 1, 2014 not subject to redemption prior to maturity | 1,810,000 | | (45,000) | 1,765,000 | 45,000 |

53

B–48

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**
**EXHIBIT A-13**

Long-term debt of the County is as follows continues:

| | Balance Oct. 1, 2012 | Additions | Reductions | Balance Sept 30, 2013 | Due within One Year |
|---|---|---|---|---|---|
| 3.00% to 5.00% Genesee County Refunding Bonds | | | | | |
| Bonds maturing on or prior to May 1, 2015 shall not be subject to redemption prior to maturity.  Bonds maturing on or after May1, 2016 may be subject to prior redemption.. | 9,595,000 | | (1,180,000) | 8,415,000 | 1,240,000 |
| 6.34% Capital Improvement Bonds, Series 2008 maturing on or prior to November 1, 2018 not be subject to | | | | | |
| Redemption prior to maturity................................................ | 805,000 | | (115,000) | 690,000 | 115,000 |
| Total Bonds and Notes ............................................... | 25,888,275 | | (2,343,118) | 23,545,157 | 2,315,689 |
| Self-Insurance Claim Liability.................................................. | 4,549,999 | 1,527,914 | (1,953,046) | 4,124,867 | 1,562,869 |
| Self-Insured Medicals ............................................................. | 248,971 | 11,285 | (81,481) | 178,775 | 178,775 |
| Compensated absences ........................................................... | 4,715,536 | 3,080,116 | (3,578,426) | 4,217,226 | 3,578,426 |
| Total Governmental Activities ..................................... | 35,402,781 | 4,619,315 | (7,956,071) | 32,066,025 | 7,635,759 |
| Business Type Activities | | | | | |
| Parks and Recreation Fund: | | | | | |
| 3.7% to 5.0% Genesee County Building Authority Bonds, Series 1998, Callable after May 1, 2008, at par plus accrued interest to date .................................... | 72,000 | | (25,500) | 46,500 | 28,500 |
| Delinquent Tax Fund: | | | | | |
| 5.0% to 9.7% Delinquent tax notes ...................................... | 42,300,000 | 39,900,000 | (46,400,000) | 35,800,000 | 8,900,000 |
| Total Business-type Activities ..................................... | 42,372,000 | 39,900,000 | (46,425,500) | 35,846,500 | 8,928,500 |
| Total Long-term Debt ................................................. | $ 77,774,781 | $44,519,315 | $(54,381,571) | $67,912,525 | $16,564,269 |

Genessee County lends its full faith and credit for bond issues that are repaid through special assessments.  The County is not obligated in any manner for special assessment debt.  The amount of special assessment debt is detailed within the notes for the Component Unit under which the projects originated.

Delinquent property taxes receivable are pledged as collateral for the repayment of the outstanding delinquent tax notes – (See Note H).

Typically, the General Fund and all Special Revenue Funds liquidate liability for compensated absences.

The annual requirements to pay principal and interest on the obligations outstanding at September 30, 2013 are as follows:

| | Governmental Activities | | Business-Type Activities | |
|---|---|---|---|---|
| | Principal | Interest | Principal | Interest |
| 2014 ............................................................ | $2,315,689 | $ 1,129,243 | $28,500 | $ 2,325 |
| 2015 ............................................................ | 2,406,457 | 1,018,522 | 18,000 | 900 |
| 2016 ............................................................ | 2,494,742 | 903,097 | | |
| 2017 ............................................................ | 2,617,485 | 783,381 | | |
| 2018 ............................................................ | 2,745,000 | 657,725 | | |
| 2019/2023 .................................................. | 7,470,000 | 1,651,633 | | |
| 2024/2028 .................................................. | 2,765,784 | 485,091 | | |
| 2029/2033 .................................................. | 590,000 | 144,501 | | |
| 2034/2038 .................................................. | 140,000 | 7,980 | | |
| TOTALS ............................................... | $23,545,157 | $ 6,781,173 | $46,500 | $ 3,225 |

By statute, the County general obligation debt is restricted to 10% of the equalized value of all property in the County.  Certain obligations, such as special assessment notes, are not subject to this limitation.  At September 30, 2013, the County's debt limit amounted to $899,354,911 and indebtedness subject to the limitation aggregated $117,204,921.

**NOTE F – CONTINGENCIES, CLAIMS, RISK MANAGEMENT, AND LITIGATION**

There are various legal actions pending against the County.  Management has evaluated the likely outcome of various actions and has concluded that it is not appropriate to record any amount as a liability at September 30, 2013.

The County is totally self-insured for workers' compensation for all losses, up to $500,000 each occurrence, and self-insured for property and liability insurance claims up to $50,000 and $350,000, respectively, for specific losses.  The County is insured for the amount of claims in excess of such limitation to a maximum of replacement cost for property and $20,000,000 for liability claims.  The County is self-insured for its first $50,000 of catastrophic coverage for auto physical damage per location.  The County is exposed to various risks of loss related to property loss, torts, errors and omissions, and employee injuries (workers' compensation), as well as medical benefits provided to employees.

The County paid losses within its self-insured retention through an Internal Service Fund.  Net position for this fund as of September 30, 2013 was $10,015,263 with $4,124,867 accrued as a liability for incurred losses and expenses.  An actuarial study projected a required reserve of $0.0 million for 2013.  The County's Risk Manager provides employee accident prevention training and various risk control techniques through a

54

continuing education program.  There were no reductions in reinsurance coverage or settlements in excess of insurance coverage over the past three years.

A reconciliation of the claims liability for the years ended September 30, 2013 and 2012 is as follows:

| | Year Ended 9/30/13 | Year Ended 9/30/12 |
|---|---|---|
| Claims Liability (beginning of year)................................ | $4,549,999 | $3,682,890 |
| Claims incurred during the period.................................. | 1,851,619 | 2,212,643 |
| Changes in estimate for claims of prior periods............. | (323,705) | 11,646 |
| Payments on claims...................................................... | (1,953,046) | (1,357,180) |
| Claims liability (end of year)......................................... | $4,124,867 | $4,549,999 |

Several complaints for alleged discriminatory employment practices have also been filed against the County.

A portion of the fund balance of the General Fund has been assigned to provide for a possible loss resulting from the unfavorable outcome of any claims and litigation.  See Note G, which follows.

The County provides a funding mechanism for the payment of the costs of pharmaceuticals and medical insurance for employees.  The County contracts with a third party administrator to provide claims processing with the cost of the claims reimbursed from these funds.  Net position for this fund as of September 30, 2013 was $2,378,404 with $178,775 accrued as a liability for incurred losses and expenses.

A reconciliation of the claims liability (workers compensation, property & liability, and auto claims) for the years ended September 30, 2013 is as follows:

| | Pharmaceuticals | Medical | Total Insurance |
|---|---|---|---|
| Claims Liability (beginning of year)................................ | $ 18,915 | $ 230,056 | $ 248,971 |
| Claims incurred during the period.................................. | 37,657 | (26,372) | 11,285 |
| Changes in estimate for claims of prior periods............. | | | |
| Payments on claims...................................................... | (27,936) | (53,545) | (81,481) |
| | $ 28,636 | $ 150,139 | $ 178,775 |

**NOTE G – GENERAL FUND  FUND BALANCE CLASSIFICATIONS AND DEFICITS**

The County receives funds from various federal and state units to finance specific grants.  The final determination of revenue amounts is subject to audit by the responsible agencies.  Grant fund balance deficits, to the extent not liquidated by future operations, will be absorbed by the General Fund.  Additionally, the County is a defendant in numerous legal actions of which Corporation Counsel is not able to provide information as to the probable outcome and extent of potential liability, if any.  As a result of these and other matters discussed in Note F, above, the County has established an assignment of fund balance in the General Fund in the amount of $1,000,000 to provide for any audit adjustments of grant revenues, grant fund balance deficits and possible losses resulting from other contingencies, claims, and litigation.

The fund balance of the General Fund has also been classified as nonspendable for a long-term receivable due from the Vehicles and Equipment Internal Service Fund in the amount of $1,840,809 and prepaids in the amount of $20,690.

The following funds were in a deficit at year end:

| | |
|---|---|
| Component Unit: | |
| Brownfield Authority | $9,538,967 |
| Major Special Revenue: | |
| Community Action Resource Department | 443,666 |
| Nonmajor Special Revenue: | |
| Administration of Justice | 583,117 |
| Internal Service Funds: | |
| Administrative Services | 1,954,981 |
| Vehicles and Equipment | 804,008 |

**NOTE H – PROPERTY TAXES**

The County property tax is levied each July 1 on the assessed valuation of property located in the County as of the preceding December 31.  On December 1, the property tax attachment is an enforceable lien on property and is payable by the last day of the next February following.  Assessed values are established annually by the County and are equalized by the State at an estimated 50% of current market value.  Real property in Genesee County for the 2012 levy was assessed at $8,996,549,108 and equalized at $8,996,549,108 representing 50% of estimated current market value.  The County operating tax rate is currently 5.5072 mills with an additional 0.4847 mills voted each for parks and paramedics 0.7 mills for senior services 1 mill for health services and 0.1 mills for veterans.

55

B-49

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                      **EXHIBIT A-13**

By agreement with various taxing authorities, the County purchases at face value the real property taxes receivable returned delinquent each March 1. These receivables ($46,643,971 at September 30, 2013) are pledged to a bank for payment of notes payable, the proceeds of which were used to liquidate the amounts due the General Fund and various other funds and governmental agencies for purchase of the receivables and to provide funds for current operations. Subsequent collections on delinquent taxes receivable, plus interest and collection fees thereon and investment earnings, are used to extinguish the debt.

Collections of delinquent taxes, which include interest, penalties, fees and investment earnings, amounting to $39,151,903 in 2013, are used to service the notes payable. Principal and interest paid on the notes payable in 2013 amounted to $46,673,278.

**NOTE I – RETIREMENT PLANS**

**DEFINED BENEFIT PLAN - -**

**PLAN DESCRIPTION AND PROVISIONS**

The County administers a contributory agent multi-employer defined benefit pension plan known as the Genesee County Employees Retirement System (GCERS). The plan is included as a pension trust fund in the County's Comprehensive Annual Financial Report. GCERS issues a publicly available annual financial report that includes financial statements and required supplementary information for the system as a whole. This report can be obtained from the Retirement Coordinator at the County's administrative offices, located at 1101 Beach Street, Flint, MI 48502.

GCERS was organized pursuant to Section 12a of Act 156, State of Michigan Public Acts of 1851 (MSA 5.33(1); MCLA 46.12a) as amended. GCERS was established by ordinance in 1946, beginning with general County employees and the County Road Commission. Genesee County Water and Waste Services joined the system in 1956, Genesee County Community Mental Health joined in 1966, the City of Mt. Morris in 1969, and the Genesee District Library in 1980. The GCERS is regulated under the Genesee County Employees' Retirement System Ordinance, the sections of which have been approved by the State of Michigan Pension Commission. All new-hire general County and Community Mental Health employees may only join the defined contribution plan.

The plan provides for vesting of benefits after 8 years of service. Generally, participants may elect normal retirement with 20 to 25 years of credited service, regardless of age, or at age 60 with 8 or more years of credited service. Retirement benefits vary by employer group, and are payable monthly. Generally, the retirement benefit is equal to the employee's final average compensation times the sum of 2.5% for each year of credited service. All employers allow members to elect a deferred annuity providing a lifetime benefit. The length of service required to elect the deferred annuity is either 8 or 15 years, depending on the date of employment and employer group.

Membership in the plan at December 31, 2012, the date of the latest actuarial valuation, was comprised of 840 active plan members, 82 inactive vested members and 1,638 retirees and beneficiaries.

**ANNUAL PENSION COST**

The annual pension cost (APC), percentage of APC contributed, and net pension obligation (NPO), for the fiscal years ended September 30, 2013, 2012, and 2011, are summarized as follows:

| Fiscal Year End | Annual Pension Costs (APC) | % of APC Contributed | Net Pension Obligation (Asset) |
|---|---|---|---|
| 09/30/11 | $12,390,596 | 100.0% | 0 |
| 09/30/12 | 12,232,054 | 100.0% | 0 |
| 09/30/13 | 14,736,420 | 86.4% | 0 |

**ACTUARIAL METHODS AND ASSUMPTIONS**

In the December 31, 2012 actuarial valuation (the most recent actuarial valuation) the individual entry age cost method was used. Significant actuarial assumptions used include an (1) 8.0% investment rate of return, (2) projected salary increases of 3.0% - 7.03% that includes inflation at 3.0%, and (3) postretirement benefit increases depending on benefit group. The actuarial value of assets was determined using techniques that smooth the effects of short-term volatility over a four-year period. The amortization method being used is a level percentage-of-payroll on an open basis. The remaining amortization period for unfunded actuarial accrued liability is 25 years.

**FUNDING PROGRESS**

| | 12/31/2010 | 12/31/2011 | 12/31/2012 |
|---|---|---|---|
| Actuarial Valuation as of | $401,700,454 | $365,262,318 | $387,979,375 |
| Actuarial Value of Assets | 564,033,044 | 549,929,631 | 559,390,939 |
| Actuarial Accrued Liability (Entry Age) | 162,332,590 | 184,667,313 | 171,411,564 |
| Unfunded AAL | 71.2% | 66.4% | 69.4% |
| Funded Ratio | 57,794,546 | 52,236,539 | 49,736,813 |
| Covered Payroll | 280.9% | 353.5% | 344.6% |
| UAAL as a % of Covered Payroll | | | |

**DEFINED CONTRIBUTION PLAN - -**

The County offers a defined contribution pension plan as an alternative to the defined benefit pension plan. The International City Managers Association (ICMA) Retirement Corporation administers the plan, and the County Board of Commissioners has authority over plan provisions and contribution requirements. All benefit employees are eligible to participate in this plan, if not participating in the Defined Benefit Plan. The County is required to contribute 8% to 10% of eligible employees' annual covered payroll, and employees are required to contribute between 3% and 7% of covered payroll. Employees are fully vested after 5 years of service. During the year ended September 30, 2013, employer and employee contributions to the plan were $2,705,916 and $1,617,428, respectively.

**HEALTH BENEFITS PLAN AND TRUST - -**

**PLAN DESCRIPTION AND PROVISIONS – Genesee County OPEB**

Genesee County provides other post-employment benefits (medical, optical, dental and life insurance) to County retirees who meet eligibility requirements. This is a single employer defined benefit plan administered by the County. The benefits are provided under collective bargaining agreements to union employees and by resolution of the County Board of Commissioners for employees not covered under collective bargaining agreements. The valuation for this benefit plan has been conducted in accordance with generally accepted actuarial principles and practices. Data concerning active members, retirees and beneficiaries was provided by Genesee County. This plan does not issue separate stand alone financial statements.

**FUNDING POLICY**

The County performed an actuarial valuation of the other post-retirement benefits liability for the year ended September 30, 2012. At that time the liability was determined to be $308,208,023 with the computed contribution as a percentage of payroll (based on 30-year amortization of the unfunded liability) to be 34.32% or $18,549,049.

The County has been working to systematically increase contributions to the VEBA to eventually equal the ARC (annual required contribution). Beginning in fiscal year 2002/2003, the County began contributing 3% of gross payroll into a fund designated for retiree health care. This was increased to 5% in the 2003/2004 fiscal year, to 10% in the 2006/2007 fiscal year, 20% in the 2007/2008 fiscal year, 22.5% in the 2008/2009 fiscal year, 20% in the 2009/2010 fiscal year, 24% in the 2010/2011, 2011/2012 and 2012/2013 fiscal years. In 2004 the County created a VEBA trust to specifically designate the funds that had been contributed for retiree health care. Also, in 2005 and 2006, all collective bargaining agreements as well as the non-union personnel policies included a provision that requires all employees to make a contribution of 1%-3% of pre-tax gross wages, which is paid to the VEBA as employer contributions for the funding of retiree health care benefits (OPEB). These contributions resulted in an OPEB obligation for the period ending September 30, 2013 in an amount of $29,409,706.

**FUNDING PROGRESS**

| | Fiscal Year Ended September 30 | | |
|---|---|---|---|
| | 2011 | 2012 | 2013 |
| Annual required contribution (recommended) | $ 18,708,000 | $18,549,049 | $18,549,049 |
| Interest on the prior year's net OPEB obligation | 317,634 | 797,853 | 1,211,518 |
| Adjustment to the annual required contribution | | (443,250) | (1,018,580) |
| Annual OPEB cost | 19,025,634 | 18,903,652 | 18,741,987 |
| Amount contributed | 9,698,547 | 12,009,195 | 9,524,252 |
| (Increase) in net OPEB Liability | (9,327,087) | (6,894,457) | (9,217,735) |
| OPEB Liability – beginning of year | (3,970,427) | (13,297,514) | (20,191,971) |
| OPEB Asset (obligation) – end of year | $ (13,297,514) | $(20,191,971) | $(29,409,706) |

| | Fiscal Year Ended September 30 | | |
|---|---|---|---|
| | 2011 | 2012 | 2013 |
| Annual OPEB Costs | $19,025,634 | $18,903,652 | $18,741,987 |
| Percentage contributed | 51% | 64% | 51% |
| Net OPEB obligation | (13,297,514) | (20,191,971) | (29,409,706) |

| | Plan Year Ended September 30 | | |
|---|---|---|---|
| Valuation Date September 30 | 2007 | 2010 | 2012 |
| Value of Assets at September 30 | $ 30,427,079 | $ 41,579,396 | $43,313,587 |
| Actuarial Accrued Liability | 179,150,908 | 286,696,396 | 308,208,023 |
| Unfunded AAL | 148,723,829 | 245,117,000 | 264,894,436 |
| Funded Ratio | 17% | 15% | 19% |
| Annual Covered Payroll | $ 58,387,145 | 58,028,000 | 36,987,137 |
| Ratio of UAAL to Covered Payroll | 2.55% | 422.41% | 716.18% |

**ACTUARIAL METHODS AND ASSUMPTIONS**

Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employments, mortality, and healthcare cost trends. Amounts determined regarding the funded status of the plan and the annual required contributions of the employer are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future.

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                          **EXHIBIT A-13**

Projections of benefits for financial reporting purposes are based on the substantive plan (the plan as understood by the employer and the plan member) which is formally detailed in the collective bargaining agreements and County Board resolutions.  These collective bargaining agreements and resolutions include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and plan members to that point.  The actuarial methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspectives of the calculations.

In the September 30, 2012 actuarial valuation, the individual entry age actuarial cost method was used.  The actuarial assumptions included a 6% investment rate of return (net of expenses), which is the expected long-term investment return on plan assets, and an annual healthcare cost trend rate of 8% in first year, decreasing by 0.5% annually until year 7 and then remaining at 5%.  The UAAL is being amortized as a level percentage of projected payroll on an open basis.  The remaining amortization period at September 30, 2013 was 30 years.

**PLAN DESCRIPTION AND PROVISIONS – Genesee County Community Mental Health**

The Genesee County Community Mental Health Retiree Health Care Plan (the "Plan") is a single-employer defined benefit healthcare plan administered by Mental Health (the "Agency") a major fund included Genesee County's financial report.  The Plan provides health insurance benefits, including medical, prescription, dental, and optical coverage to certain retirees and their beneficiaries, which are advance-funded on a discretionary basis.  The Plan was closed to new hires as of May 2008.  The valuation for this benefit plan has been conducted in accordance with generally accepted actuarial principles and practices.  Data concerning active members, retirees and beneficiaries was provided by Genesee County Community Mental Health.  This plan does not issue separate stand alone financial statements.

**FUNDING POLICY**

The contribution requirements of Plan members and the Agency are established and may be amended by the Agency Board of Directors.  The required contribution is based on actuarially determined finance rates, with an additional amount to prefund benefits as determined annually by the Agency.  For the three month period ended December 31, 2012, the Agency contributed $1,316,026 to the Plan, $483,524 of which was to fund current year benefits.  Plan members receiving benefits contributed $0.

**ACTUARIAL METHODS AND ASSUMPTIONS**

Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future.  Examples include assumptions about future employment, mortality, and the healthcare cost trend.  Actuarially determined amounts are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future.

Projections of benefits for financial reporting purposes are based on the substantive plan (the Plan as understood by the employer and Plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and Plan members to that point.  The actuarial methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspective of the calculations.

In the December 31, 2012 actuarial valuation, the individual unit credit actuarial cost method was used.  The actuarial assumptions include:  (a) a rate of return on investments of 8.0%: (b) projected salary increases of 5.0% attributable to inflation: (c) additional projected salary increases ranging form 0.0% to 4.03%, depending on age, attributable to seniority/merit; and (d) projected healthcare benefit increases of 4.5% to 9.0%.  The actuarial value of assets was determined based on market value.  The unfunded actuarial accrued liability is being amortized as a level dollar amount over 30 years on a closed basis.  The remaining amortization period at December 31, 2012, the date of the latest actuarial valuation, was 10 years.

On August 29, 2012, the Board of Commissioners of Genesee County, Michigan approved a resolution to establish a community mental authority (a separate entity) to assume the activities of the Agency, effective January 1, 2013.  The Agency is reported as a discretely presented component unit effective January 1, 2013.

**NOTE J – LEASES**

The County is party to numerous operating leases, aggregate rental expenses which were approximately $74,535 for the year ended September 30, 2013 exclusive of the amount paid to a related organization described below.  Minimum future rental payments under existing leases are not significant.

The Genesee County Community Mental Health Services is committed under various leases for building and office space and vehicles.  These leases are considered for accounting purposes to be operating leases and contain renewal options of two to three years.  Rental expenditures for the three month period ended December 31, 2012 was $93,127.

**NOTE K – RECEIVABLES**

Governmental funds report deferred revenue in connection with receivables for revenues that are not considered to be available to liquidate liabilities of the current period.  Governmental funds also defer revenue recognition in connection with resources that have been received, but not yet earned.  At the end of the current fiscal year, the various components of deferred revenue and unearned revenue reported in the governmental funds were as follows:

| Primary Government | Unavailable | Unearned |
|---|---|---|
| Property taxes | $4,763,452 | |
| Grant revenue | 15,018,360 | $209,509 |
| Long-term receivable | 1,765,000 | |

| Component units | | Unearned |
|---|---|---|
| Road projects | | $2,244,190 |
| Unearned leases | | 156,500 |
| Grant revenue | | 8,725,455 |

**NOTE L – INDIVIDUAL FUND INTERFUND RECEIVABLE AND PAYABLE BALANCES AND TRANSFERS**

Interfund Receivable and Payables:

| | Interfund Receivable | Interfund Payable |
|---|---|---|
| **Government Funds:** | | |
| **General Fund:** | | |
| County Health | | $ 2,453,920 |
| Genesee County Community Action Resource Department | 3,217,961 | |
| Enterprise | 7,830,989 | 1,003,685 |
| Non-major Special Revenue | 3,203,774 | 7,042,704 |
| Debt Service | 18,019 | |
| Capital Projects | 84,355 | |
| Internal Service | 1,118,824 | 5,722,375 |
| Total General Fund | 15,473,922 | 16,222,684 |
| **County Health:** | | |
| General Fund | 2,453,920 | |
| Genesee County Community Action Resource Department | | 7,751 |
| Non-major Special Revenue | 840,413 | |
| Internal Service | | 289,774 |
| Total County Health | 3,294,333 | 297,525 |
| **Genesee County Community Action Resource Department:** | | |
| General Fund | | 3,217,961 |
| County Health | 7,751 | |
| Non-major Special Revenue | 126,583 | |
| Internal Service | | 194,719 |
| Total Genesee County Community Action Resource Department | 134,334 | 3,412,680 |
| **Community Development:** | | |
| General Fund | | |
| Non-major Special Revenue | | 132,296 |
| Internal Service | | 329 |
| Total Community Development | | 132,625 |
| **Non-major Special Revenue Funds:** | | |
| General Fund | 7,042,704 | 3,203,774 |
| County Health | | 840,413 |
| Genesee County Community Action Resource Department | | 126,583 |
| Community Development | 132,296 | |
| Non-major Special Revenue | 103,310 | 103,310 |
| Enterprise | | 211,585 |
| Internal Service | | 509,087 |
| Total Non-major Special Revenue Funds | 7,278,310 | 4,994,752 |
| **Non-major Debt Service:** | | |
| General Fund | | 18,019 |
| Debt Service | 1,605 | 1,605 |
| Capital Project | 9,283 | |
| General Fund | 2,514 | 0 |
| Total Non-major Debt Service Funds | 13,402 | 19,624 |

B-52

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                        **EXHIBIT A-13**

Interfund Receivable and Payables continued:

| | Interfund Receivable | Interfund Payable |
|---|---|---|
| Capital Projects: | | |
| General Fund | | 84,355 |
| Debt Service | | 9,283 |
| Internal Service | | 163,699 |
| Total Non-major Debt Service Funds | | 257,337 |
| Total Governmental Funds | 26,194,301 | 25,337,227 |
| | | |
| Enterprise: | | |
| Delinquent Tax: | | |
| General Fund | 1,003,685 | 7,830,989 |
| Non-major Special Revenue | 211,585 | |
| Internal Service | | 49,633 |
| Total Delinquent Tax | 1,215,270 | 7,880,622 |
| Total Business Type Activity | 1,215,270 | 7,880,622 |
| | | |
| Internal Service Funds: | | |
| General Fund | 5,722,375 | 1,118,824 |
| County Health | 289,774 | |
| Genesee Community Action Resource Department | 194,719 | |
| Community Development | 329 | |
| Non-major Special Revenue | 509,087 | 2,514 |
| Debt Service | 163,699 | |
| Capital Projects | 49,633 | |
| Enterprise | 49,633 | |
| Internal Service | 144,262 | 144,262 |
| Total Internal Service Funds | 7,073,878 | 1,265,600 |
| Total Interfund Receivables/Payables | $34,483,449 | $34,483,449 |

Due to/from primary government and component units:

| | Interfund Receivable | Interfund Payable |
|---|---|---|
| Component unit Land Bank Authority | $ 26,359 | $ 466,518 |
| Primary government Non-major Special Revenue Community Development | | 26,359 |
| Primary government Delinquent Taxes | 466,518 | 0 |
| Total Primary Government and Component Unit Interfund Receivables/Payables | $ 492,877 | $ 492,877 |

Note —The inter fund receivables/payables exist due to the fact that the County uses a pooled cash management account for substantially all funds.

Long-term Advances:

| | | |
|---|---|---|
| Primary Government - Hughes & Hatcher Debt Service Fund | $1,765,000 | $ |
| Component unit – Land Bank Authority | | 1,765,000 |
| Primary Government – General Fund | 1,804,809 | |
| Primary Government – Vehicles and Equipment | | 1,804,809 |
| Total Primary Government and Component Unit Long-term Advances | $3,569,809 | $3,569,809 |

Interfund Transfers In and Out

| | Transfers In | Transfers Out |
|---|---|---|
| Major Funds: | | |
| General: | | |
| Mental Health | $ | $ 925,000 |
| County Health | | 2,658,158 |
| Enterprise | 4,734,725 | |
| Non-major Special Revenue | 1,956,569 | 13,623,786 |
| Debt | 18 | 2,751,216 |
| Capital | 32,260 | 18 |
| Internal | | 142,064 |
| Total General Fund | 6,723,572 | 20,100,224 |
| | | |
| Mental Health: | | |
| General | 925,000 | |
| Total Mental Health | 925,000 | |
| | | |
| County Health: | | |
| General | 2,658,158 | |
| Non-major Special Revenue | 420,865 | |
| Total County Health | 3,079,023 | 0 |

Interfund Transfers In and Out

| | Transfers In | Transfers Out |
|---|---|---|
| Genesee County Community Action Resource Department (GCCARD) | | |
| County Health | | |
| GCCARD | | |
| Non-major Special Revenue | 640,742 | 361,911 |
| Debt | | 361,911 |
| Total GCCARD | 640,742 | 361,911 |
| | | |
| Non-major Special Revenue: | | |
| General | 13,623,786 | 1,956,569 |
| County Health | | 420,865 |
| GCCARD | | 640,742 |
| Enterprise | | 545,000 |
| Debt | | 17,460 |
| Capital | 197,412 | |
| Non-major Special Revenue | 610,894 | 610,894 |
| Internal | | 454,257 |
| Total Non-major Governmental Funds | 14,432,092 | 4,645,787 |
| | | |
| Debt: | | |
| General | 2,751,216 | 18 |
| County Health | | |
| GCCARD | 361,911 | |
| Debt | | |
| Capital | | |
| Non-major Special Revenue | 17,460 | |
| Enterprise | 29,100 | |
| Total Debt Service Funds | 3,159,687 | 18 |
| | | |
| Capital Project: | | |
| General | | 32,260 |
| Non-major Special Revenue | | 197,412 |
| Debt | 393,371 | |
| Total Capital Projects Funds | 393,371 | |
| Total Governmental Funds | 28,960,116 | 25,501,311 |
| | | |
| Enterprise: | | |
| General | | 4,734,725 |
| Debt | | 29,100 |
| Non-major Special Revenue | 545,000 | |
| Enterprise | | |
| Internal | | 439 |
| Total Enterprise Funds | 545,000 | 4,764,264 |
| | | |
| Internal Services: | | |
| General | 142,064 | |
| Debt | 439 | |
| Non-major Special Revenue | 454,258 | |
| Capital Projects | 163,699 | |
| Total Internal Service Funds | 760,459 | |
| Total Transfers In/Out | $30,265,575 | $30,265,575 |

Transfers between funds were primarily for operating purposes.  Other transfers were made to close funds.

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                                                 **EXHIBIT A-13**

**NOTE M - EXCESSES OF EXPENDITURES OVER APPROPRIATIONS**

Excesses of expenditures over appropriations in individual funds are presented below:

| Fund | Excess Expenditures |
|---|---|
| **General Fund** | |
| Board of Commissioners | $ 4,170 |
| Treasurer | 20,979 |
| Drain Commission | 2,777 |
| Equalization | 4,465 |
| Circuit Court | 62,639 |
| District Court | 87,939 |
| Probate Court | 11,245 |
| Prosecutor | 19,597 |
| Sheriff Administration | 22,903 |
| Sheriff Marine Division | 858 |
| Detective Division | 7,177 |
| Other: | |
| Other | 416,700 |
| Appropriations: | |
| Administration of Justice Funds | 11,473 |
| Law Enforcement Funds | 60,000 |
| Debt Service | 61,879 |
| **Community Action Resource Department** | 537,565 |
| **Other Non-major Governmental Funds** | |
| Accommodation Ordinance Tax | 290,905 |
| Community Enrichment and Development | 2,454,239 |
| Drug Forfeitures | 53,744 |
| Health Care Services | 1,781,687 |
| Law Enforcement | 1,067,263 |
| Parks and Recreation | 930,818 |

**NOTE N - COMPONENT UNIT DISCLOSURES**

**Deposits and investments:**

All of the County's component unit deposits and investments are governed by the following:

Michigan Compiled Laws Section 129.91 (Public Act 20 of 1943, as amended) authorizes local governmental units to make deposits and invest in the accounts of federally insured banks, credit unions, and savings and loan associations that have offices in Michigan. The County's component units are allowed to invest in bonds, securities, and other direct obligations of the State of Michigan or any agency or instrumentality of the United States; repurchase agreements; bankers' acceptances of United States banks; commercial paper rated within the two highest classifications, which mature not more that 270 days after the date of purchase; obligations of the State of Michigan or its political subdivisions, which are rated as investment grade; and mutual funds composed of investment vehicles that are legal for direct investment by local units of government in Michigan.

The Road Commission has designated two banks for the deposit of its funds. The investment policy adopted by the Board of each component unit is in accordance with Public Act 196 of 1997. All component unit deposits and investment policies are in accordance with statutory authority. The cash and investments of component units are subject to the same types of risks as detailed in Note C. These risks are examined in more detail below:

Custodial credit risk of bank deposits - None of the component units have a deposit policy for custodial credit risk. At year end, the Road Commission had $28,728,590 of bank deposits (checking and high balance savings accounts) that were uninsured and uncollateralized. At year end, the Economic Development Corporation had $91,932 of bank deposits (checking and high balance savings accounts) that were uninsured and uncollateralized. At year end, the Water and Waste Services Division had $1,092,031 of bank deposits (checking and high balance savings accounts) that were fully insured. At year end, the Drain Commission had $393,059 of bank deposits (checking and high balance savings accounts) that were uninsured and uncollateralized. At year end, the Land Bank Authority had $1,531,245 of bank deposits (checking and savings accounts) that were uninsured and uncollateralized. At year end, the Brownfield Authority did not have any bank deposits (checking and savings accounts) that were uninsured and uncollateralized. At year end, the Storm Water Management System had $223,477 of bank deposits (checking and savings accounts) that were uninsured and uncollateralized. At year end, the Genesee Health System had $41,283,786 of bank deposits (checking and savings accounts) that were uninsured and uncollateralized.

Interest rate risk - Interest rate risk is the risk that the value of investments will decrease as a result of a rise in interest rates. The Commission's investment policy does not restrict investment maturities, other than commercial paper which can only be purchased with a 270-day maturity. At year end, the average maturities of investments are as follows:

| Road Commission: | | |
|---|---|---|
| Investment | Fair Value | Less than one year |
| Mutual funds | $19,430,602 | $19,430,602 |
| | | |
| Land Bank Authority: | | |
| Investment | Fair Value | Less than one year |
| Governmental security pooled fund | $1,531,245 | $1,531,245 |
| | | |
| Genesee Health System: | | |
| Investment | Fair Value | Less than one year |
| Governmental security pooled fund | $8,564,000 | $8,564,000 |
| Mutual funds | 7,751,285 | 7,751,285 |

Credit risk – State law limits investments in commercial paper to the top two ratings issued by nationally recognized statistical rating organizations. The Commission has no investment policy that would further limit its investment choices. As of year end, the credit quality ratings of debt securities (other than the U.S. government) are as follows:

| Road Commission: | | | |
|---|---|---|---|
| Investment | Fair Value | Rating | Rating Organization |
| MERS total Market Fund | $19,430,602 | N/A | N/A |
| | | | |
| Land Bank Authority: | | | |
| Investment | Fair Value | Rating | Rating Organization |
| Governmental security pool | $1,531,245 | N/A | N/A |
| | | | |
| Genesee Health System: | | | |
| | Fair Value | Rating | Rating Organization |
| Governmental security pooled fund | $8,564,000 | N/A | N/A |
| Mutual funds | 7,751,285 | N/A | N/A |

**ROAD COMMISSION:**
**Long-term Debt:** The long-term debt for the Genesee County Road Commission is presented below:

| | Balance October 1, 2012 | Additions | Reductions | Balance September 30, 2013 |
|---|---|---|---|---|
| MTF notes | $ 8,710,000 | $ | $(1,500,000) | $ 7,210,000 |
| SIB Loan | 249,092 | | ( 249,092) | |
| Recovery Zone Bond | 4,880,000 | | ( 565,000) | 4,615,000 |
| Total notes and leases | 13,839,902 | | (2,314,092) | 11,525,000 |
| Compensated absences | 1,074,030 | | ( 5,491) | 1,068,539 |
| Total long-term debt | $14,913,122 | $ | $(2,319,583) | $12,593,539 |

The outstanding bonds and notes payable at September 30, 2013, and matured interest thereon, are payable to the State of Michigan from the proceeds of state-collected taxes returned to the Road Commission via Act 51 monies. In the case of default, the state treasurer is authorized to withhold future disbursements of Act 51 monies due the Road Commission until the defaulted payments are recovered by the State.

For certain outstanding notes, special assessments have also been levied on specific properties abutting certain road improvements. The collection of the assessments has been pledged as additional security for the payment of the bonds. The detail of general obligation bonds and loans payable are shown below:

| Obligation Payables | Final Payment Due | Interest Rate or Range | Annual Principal Payment or Range | Outstanding Balance Sept. 30, 2013 | Due Within One Year |
|---|---|---|---|---|---|
| Michigan Transportation Fund notes: | | | | | |
| 2006A Issue | August 1, 2016 | 4.00% | $270,000-295,000 | $ 850,000 | $270,000 |
| 2007 Issue | September 30, 2017 | 3.70-4.00 | 465,000-525,000 | 1,970,000 | 465,000 |
| 2008 Issue | August 1, 2018 | 3.00-4.00 | 410,000-515,000 | 2,305,000 | 410,000 |
| 2009 Issue | August 1, 2019 | 2.00-3.30 | 320,000-380,000 | 2,085,000 | 320,000 |
| Total Notes | | | | 7,210,000 | 1,465,000 |
| Recovery Zone Bond 2010 Issue | August 1, 2020 | 4.34 | 575,000-665,000 | 4,315,000 | 575,000 |
| Compensated absences | | | | 1,068,539 | 140,798 |
| | | | | $12,593,539 | $2,180,798 |

B-53

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                                          **EXHIBIT A-13**

Annual requirements to pay principal and interest on the outstanding obligations at September 30, 2013, are as follows:

|  | Long-term debt |
|---|---|
| Year Ended 9-30-2014 ............................................ | $2,487,493 |
| 9-30-2015 ............................................................... | 2,486,748 |
| 9-30-2016 ............................................................... | 2,486,197 |
| 9-30-2017 ............................................................... | 2,181,607 |
| 09-30-2018 ............................................................. | 1,639,016 |
| 09-30-2019 – 09-30-2020........................................ | 1,788,255 |
| Amount representing interest .................................. | (1,544,316) |
|  | $11,525,000 |

Act 143, Public Acts of State 1943, provides that total bonds and notes outstanding under this Act cannot exceed 40% of the sum of the revenues derived from state collected taxes returned to the county for county road purposes for the last preceding five calendar years and not specifically allocated for other purposes. As of September 30, 2012, the Road Commission is within the statutory limit of Act 143.

**Future Revenues Pledged for Debt Payment:** The Road Commission Board has irrevocably appropriated and pledged the money received and to be received by the County from the Michigan Transportation Fund (the "Transportation Fund") for highway and road purposes pursuant to Act 51, Public Acts of Michigan, 1951, as amended ("Act 51") to the extent necessary to pay the above principal of and interest on the Michigan Transportation Notes. Proceeds from the bonds provided financing for the construction of the road projects. During the current year, Act 51 revenues were $20,688,883 compared to the annual debt requirements of $2,881,580.

**Property and Equipment:** The following table summarizes the changes in the components of the Road Commission's capital assets:

|  | Balance Oct. 1, 2012 | Additions | Deletions | Balance Sept. 30, 2013 |
|---|---|---|---|---|
| Capital assets not being depreciated: |  |  |  |  |
| Land and improvements ................. | $  478,816 | $ | $ | $  478,816 |
| Construction in progress ................ | 152,523 | 479,185 | 152,523 | 479,185 |
| Depletable assets ............................ | 1,210 |  |  | 1,210 |
| Subtotal ....................................... | 632,549 | 479,185 | 152,523 | 959,211 |
| Capital assets being depreciated: |  |  |  |  |
| Land improvements ......................... | 2,150,742 | 105,340 |  | 2,256,082 |
| Buildings and improvements.......... | 9,633,661 | 118,443 |  | 9,752,104 |
| Equipment: |  |  |  |  |
| Road............................................... | 26,327,112 | 1,900,296 | 1,644,128 | 26,583,280 |
| Shop............................................... | 497,410 | 77,603 |  | 575,013 |
| Engineering .................................... | 92,577 | 34,077 |  | 126,654 |
| Yard and Storage ........................... | 557,311 | 47,727 |  | 605,038 |
| Office .............................................. | 1,322,627 | 165,904 | 48,602 | 1,439,929 |
| Total............................................ | 40,581,440 | 2,449,390 | 1,692,730 | 41,338,100 |
| Capital assets not being depreciated continued: |  |  |  |  |
| Infrastructure-Roads....................... | 352,102,236 | 16,215,462 |  | 368,317,698 |
| Infrastructure-Bridges.................... | 29,504,795 | 762,207 |  | 30,267,002 |
| Subtotal ....................................... | 422,188,471 | 19,427,059 | 1,692,730 | 439,922,800 |
| Less accumulated depreciation for: |  |  |  |  |
| Land improvements ......................... | (544,911) | (106,703) |  | (651,614) |
| Buildings and improvements.......... | (6,346,475) | (312,254) |  | (6,658,729) |
| Equipment: |  |  |  |  |
| Road............................................... | (20,566,710) | (2,154,796) | (1,448,470) | (21,273,036) |
| Shop............................................... | (363,780) | (20,398) |  | (384,178) |
| Engineering .................................... | (81,242) | (5,027) |  | (86,269) |
| Yard and storage............................ | (501,266) | (6,481) |  | (507,747) |
| Office .............................................. | (894,645) | (129,762) | (48,602) | (975,805) |
| Subtotal ....................................... | (29,299,029) | (2,735,421) | (1,497,072) | (30,537,378) |
| Infrastructure-Bridges .................... | (7,639,854) | (753,228) |  | (8,393,082) |
| Infrastructure-Roads....................... | (208,646,967) | (12,332,102) |  | (220,969,069) |
| Subtotal ....................................... | (245,585,850) | (15,810,751) | (1,497,072) | (259,899,529) |
| Total net capital assets................... | $177,235,170 | $ 4,095,493 | $  348,181 | $180,982,482 |

**POST-EMPLOYMENT BENEFITS—**

**PLAN DESCRIPTION**

The Road Commission provides retiree health-care benefits to eligible employees and their spouses. This is a single employer defined benefit plan administered by the Road Commission. The benefits are provided under collective bargaining agreements.

**FUND POLICY**

The collective bargaining agreements require the Road Commission to pay the insurance premium/claim costs of the retiree and spouse until death. The Commission obtains health care coverage for retirees through private insurers. Upon eligibility for Medicare, the Road Commission will pay the difference between the plan costs and the amount covered by Medicare. The Road Commission has no obligation to make contributions in advance of when the insurance premiums or claims are due for payment (in other words, this may be financed on a "pay-as-you-go" basis).

**FUNDING PROGRESS**

For the year ended September 30, 2012, the Road Commission has estimated the cost of providing retiree health-care benefits through an actuarial valuation as of September 30, 2012. The valuation computes an annual required contribution, which represents a level of funding that, if paid on an ongoing basis, is projected to cover normal cost each year and amortize any unfunded actuarial liabilities over a period not to exceed 30 years. This valuation's computed contribution and actual funding are summarized as follows:

|  | Fiscal Year Ended September 30 | | |
|---|---|---|---|
|  | 2011 | 2012 | 2013 |
| Annual required contribution (recommended) | $4,494,838 | $4,536,548 | $4,501,630 |
| Interest on the prior year's net OPEB obligation | 131,731 | 102,137 | 88,459 |
| Less adjustment to the annual required contribution | (218,502) | (165,462) | (141,299) |
| Annual OPEB cost | $4,408,069 | $4,473,223 | $4,448,790 |
| Amount contributed: |  |  |  |
| Payments of current premiums | (2,611,228) | (2,708,943) | (2,684,373) |
| Advance funding | (2,191,456) | (2,000,000) | (3,000,000) |
| Decrease in net OPEB obligation | (394,615) | (235,720) | (1,235,583) |
| OPEB obligation – beginning of year | 1,756,446 | 1,361,831 | 1,179,459 |
| OPEB obligation (asset) – end of year | $ 1,361,831 | $1,126,111 | $ (56,124) |

|  | Fiscal Year Ended September 30 | | |
|---|---|---|---|
|  | 2011 | 2012 | 2013 |
| Annual OPEB Costs | $4,408,069 | $4,473,223 | $4,448,790 |
| Percentage contributed | 107% | 104% | 128% |
| Net OPEB obligation | $1,361,831 | $1,126,111 | $ (56,124) |

The funding progress of the plan as of the most recent valuation date is as follows:

|  | Fiscal Year Ended September 30 | | |
|---|---|---|---|
|  | 2011 | 2012 | 2013 |
| Unfunded AAL | $44,716,286 | $42,584,913 | $56,659,252 |
| Actuarial value of plan assets | 7,998,488 | 14,074,339 | 14,074,339 |
| Actuarial accrued liability | 52,714,774 | 56,659,252 | 42,584,913 |
| Funded | 15% | 25% | 25% |
| Annual covered payroll – December 31, | $9,023,093 | $8,713,876 | $8,713,876 |
| Ratio of UAAL to covered payroll | 496% | 489% | 489% |

**ACTUARIAL METHODS AND ASSUMPTIONS**

Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment, mortality, and the healthcare cost trend. Amounts determined regarding the funded status of the plan and the annual required contributions of the employer are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future. The schedule of funding progress, presented as required supplementary information following the notes to the financial statements, presents multiyear trend information about whether the actuarial value of plan assets is increasing or decreasing over time relative to the actuarial accrued liabilities for benefits.

Projections of benefits for financial reporting purposes are based on the substantive plan (the plan as understood by the employer and the plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and plan members to that point. The actuarial methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspective of the calculations.

In the September 30, 2012, actuarial valuation, the projected unit credit actuarial cost method was used. The actuarial assumptions included a 7.5 percent investment rate of return (net of administrative expenses), which is a blended rate of the expected long-term investment returns on plan assets and on the employer's own investments calculated based on the funded level of the plan at the valuation date, and an annual healthcare cost trend rate of 8.5 percent initially, reduced by decrements to an ultimate rate of 4.5 percent after four years. Both rates included a 4.0 percent inflation assumption. At the point in time that the Road Commission begins funding the plan, the actuarial value of assets will be determined using techniques that spread the effects of short-term volatility in the market value of investments over a multiple year period. The UAAL was amortized as a level percentage of projected payroll on a closed 30-year basis. The remaining amortization period at September 30, 2012 was 26 years.

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                                       **EXHIBIT A-13**

**WATER AND WASTE SERVICES:**

**Long-term Debt:** The summary of long-term debt transactions for the Water and Waste Services for the year ended December 31, 2012 is presented below:

|  | Balance Jan. 1, 2012 | Additions (Reductions) | Balance Dec. 31, 2012 | Due In One Year |
|---|---|---|---|---|
| 1.625% to 6.0% Interceptor and treatment facilities | $ 104,546,556 | $ 3,388,570 (6,555,000) | $101,380,126 | $6,700,000 |
| 2.5% to 7.375% District No. 3 | 32,688,516 | 29,999 (2,719,250) | 29,999,265 | 2,835,000 |
| 2.50% to 5.00% Water supply system | 40,245,000 | (1,260,000) | 38,985,000 | 1,310,000 |
| Subtotal | 177,480,072 | (7,115,681) | 170,364,391 | 10,845,000 |
| Unamortized note premium | 408,948 | ( 90,443) | 318,505 | 22,584 |
|  | $177,889,020 | $ 7,206,124 | $170,682,896 | $10,867,584 |

The annual requirements to pay principal and interest on the outstanding obligations for Water and Waste Services at December 31, 2012 are as follows:

|  | Principal | Interest | Total |
|---|---|---|---|
| 2013 | $ 10,845,000 | $5,654,333 | $16,499,333 |
| 2014 | 11,180,000 | 5,317,264 | 16,497,264 |
| 2015 | 11,540,000 | 4,966,431 | 16,506,431 |
| 2016 | 11,645,000 | 4,604,434 | 16,249,434 |
| 2017 | 10,830,000 | 4,250,159 | 15,080,159 |
| 2018-2022 | 48,350,000 | 16,663,484 | 65,013,484 |
| 2023-2027 | 46,570,000 | 8,859,989 | 55,429,989 |
| 2028-2032 | 17,869,391 | 2,250,274 | 20,119,665 |
| 2033 | 1,535,000 | 75,406 | 1,610,406 |
| Total | $170,364,391 | $52,641,774 | $223,006,165 |

**Future Revenues Pledged for Debt Payment:** The Water and Waste Services Division has pledged substantially all revenue of the Water and Sewer Fund, net of operating expenses, to repay the above Genesee County Drain Commissioner water and sewer revenue bonds. Proceeds from the bonds provided financing for the construction of the water and waste systems described above. The bonds are payable solely from the net revenues of the water and sewer system. The remaining principal and interest to be paid on the bonds total $115,370,449. For the year ended December 31, 2012, net revenues of the system were $12,895,721 compared to the annual debt requirements of $7,623,037.

In the next 6 to 12 months the County may issue an estimated $18,000,000 to $31,000,000 of water revenue refunding bonds with a limited tax general obligation pledge to refund certain outstanding water revenue bond issues for debt service savings.

Karegnondi Water Authority – See Note Q

**Capital Assets -** The summary of capital assets for Water and Waste Services at December 31, 2012 is displayed on the following page:

|  | Balance Jan. 1, 2012 | Additions | Reclassifications | Balance Dec. 31, 2012 |
|---|---|---|---|---|
| Proprietary fund capital assets |  |  |  |  |
| Enterprise Funds: |  |  |  |  |
| Capital assets not being depreciated: |  |  |  |  |
| Land | $ 871,021 | $ | $ | $ 871,021 |
| Construction in progress | 86,046,793 | 5,697,277 | (36,835,568) | 54,908,502 |
| Subtotal | 86,917,814 | 5,697,277 | (36,835,568) | 55,779,523 |
| Capital assets being depreciated: |  |  |  |  |
| Distribution & collections systems | 278,985,859 | 1,895,257 | 29,806,472 | 310,687,588 |
| Vehicles | 382,261 |  |  | 382,261 |
| Buildings and equipment | 5,419,064 | 435,029 | 7,045,346 | 12,899,439 |
| Subtotal | 284,787,187 | 8,027,563 | 36,851,818 | 323,969,288 |
| Proprietary fund capital assets |  |  |  |  |
| Less accumulated depreciation for: |  |  |  |  |
| Distribution & collections systems | (48,921,258) | (6,327,670) |  | (55,248,928) |
| Vehicles | (254,852) | (114,514) |  | (369,366) |
| Buildings and equipment | (3,423,902) | (406,918) |  | (3,830,820) |
| Subtotal | (52,600,012) | (6,849,102) |  | (59,449,114) |
| Net capital assets being depreciated | 232,187,172 | (4,518,816) | 36,851,818 | 264,520,174 |
| Total capital assets – Net of depreciation | 319,104,986 | 1,178,461 | 16,250 | 320,299,697 |

|  | Balance Jan. 1, 2012 | Additions | Reclassifications | Balance Dec. 31, 2012 |
|---|---|---|---|---|
| Internal Service Funds: |  |  |  |  |
| Capital assets not being depreciated- |  |  |  |  |
| Construction in progress | 16,250 |  | (16,250) |  |
| Capital assets being depreciated – |  |  |  |  |
| Buildings and equipment | 8,628,852 | (122,987) |  | 8,505,865 |
| Less accumulated depreciation – |  |  |  |  |
| Buildings and equipment | (5,797,381) | (108,558) |  | (5,905,939) |
| Net capital assets being depreciated | 2,831,471 | (231,545) | (16,250) | 2,599,926 |
| Total proprietary fund capital assets | $321,952,707 | $ 946,916 | $ 0 | $322,899,623 |

**POST-EMPLOYMENT BENEFITS—**

**PLAN DESCRIPTION**

The Water and Waste Services Division provides retiree healthcare, dental, life, and vision benefits to eligible employees and their spouses through the Municipal Employees' Retirement System. This is an agent multiple employer defined benefit plan administered by the Division. The benefits are provided under collective bargaining agreements.

**FUND POLICY**

The collective bargaining agreements do not require employee contributions. The Division has no obligation to make contributions in advance of when the insurance premiums are due for payment (in other words, this may be financed on a "pay-as-you-go" basis). However, as shown below, the Division has made contributions to advance-fund these benefits, as determined by the Division.

**FUNDING PROGRESS**

For the year ended December 31, 2012, the Division has estimated the cost of providing retiree healthcare benefits through an actuarial valuation as of December 31, 2010. The valuation computes an annual required contribution, which represents a level of funding that, if paid on an ongoing basis, is projected to cover normal cost each year and amortize any unfunded actuarial liabilities over a period not to exceed 30 years. This valuation's computed contribution and actual funding are summarized as follows:

|  | Fiscal Year Ended December 31 | | |
|---|---|---|---|
|  | 2010 | 2011 | 2012 |
| Annual required contribution (recommended) | $2,587,823 | $3,933,831 | $3,818,480 |
| Interest on the prior year's net OPEB obligation | 121,341 | 127,528 | 230,108 |
| Less adjustment to the annual required contribution | (67,411) | (78,511) | (101,338) |
| Annual OPEB cost | 2,641,753 | 3,982,848 | 3,947,250 |

|  | Fiscal Year Ended December 31 | | |
|---|---|---|---|
|  | 2010 | 2011 | 2012 |
| Amount contributed: |  |  |  |
| Payments of current premiums | (1,395,270) | (1,337,004) | (1,523,879) |
| Advance funding | (80,595) | (81,360) | (2,500,000) |
| (Increase) Decrease in net OPEB obligation | (1,165,888) | (2,564,484) | 76,629 |
| OPEB obligation – Beginning of year | (2,022,323) | (3,188,211) | (5,752,695) |
| OPEB obligation – end of year | $(3,188,211) | $(5,752,695) | $(5,676,066) |

|  | Fiscal Year Ended December 31 | | |
|---|---|---|---|
|  | 2010 | 2011 | 2012 |
| Annual OPEB Costs | $2,641,753 | $3,982,848 | $3,947,250 |
| Percentage contributed | 55.87% | 35.61% | 101.94% |
| Net OPEB obligation | $3,188,211 | $5,752,695 | $5,676,066 |

The funding progress of the plan as of the most recent valuation date is as follows:

|  | Fiscal Year Ended December 31 | | |
|---|---|---|---|
|  | 2010 | 2011 | 2012 |
| Unfunded AAL | $35,394,879 | $51,474,408 | $35,486,607 |
| Actuarial value of assets | 0 | 0 | 2,333,369 |
| Actuarial accrued liability | 25,394,879 | 51,474,408 | 37,819,976 |
| Funded | 0% | 0% | 6.17% |
| Annual covered payroll – December 31 | $8,420,060 | $7,610,890 | $7,312,770 |
| Ratio of UAAL to covered payroll | 420.36% | 676.33% | 485.27% |

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                        **EXHIBIT A-13**

**ACTURIAL METHOD AND ASSUMPTIONS**

Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment, mortality, and healthcare cost trend. Amounts determined regarding the funded status of the plan and the annual required contributions of the employer are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future.

Projections of benefits for financial reporting purposes are based on the substantive plan (the plan as understood by the employer and the plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and plan members to that point.  The actuarial methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspective of the calculations.

In the December 31, 2010 actuarial valuation, the individual entry age actuarial cost method was used.  The actuarial assumptions included an 4.0 percent investment rate of return (net of administrative expenses) and an annual healthcare cost trend rate of 5.0 percent.  The UAAL is being amortized as a level percentage of projected payroll over 30 years.

In 2012, the Division approved a prefunding plan and per the plan $2,500,000 was remitted to the trust in 2012 and $1,200,000 per year will be remitted starting in 2013.

**DRAIN COMMISSION:**

The summary of long-term debt transactions for the Drain funds for the year ended September 30, 2013, is presented below:

| | Balance Oct. 1, 2012 | Additions (Reductions) | Balance Sept. 30, 2013 | Due in One Year |
|---|---|---|---|---|
| Citizens Bank | $ 200,000 | $ (50,000) | $ 150,000 | $ 50,000 |
| 3.69% to 6.85% Genesee County Special Assessment debt with governmental commitment | 292,926 | 335,097 (147,586) | 480,437 | 146,546 |
| 4.0 to 4.25% Genesee County Drainage District #408 Series 2006 Bonds | 500,000 | (125,000) | 375,000 | 125,000 |
| 2.0% to 3.15% Genesee County Drainage District Bonds #0017 Series 2011 Bonds | 2,395,000 | (235,000) | 2,160,000 | 235,000 |
| | $3,387,926 | $ (222,489) | $3,165,437 | $ 556,546 |

The annual requirements to pay principal and interest on the outstanding obligations for the Drain funds at September 30, 2013, are as follows:

| | |
|---|---|
| 2013/2014 | $641,679 |
| 2014/2015 | 593,601 |
| 2015/2016 | 557,656 |
| 2016/2017 | 347,453 |
| 2017/2018 | 340,395 |
| 2019-2022 | 1,024,411 |
| | 3,505,195 |
| Amount representing interest | (339,758) |
| | $3,165,437 |

The following is a summary of capital assets for the Drain fund at September 30, 2013:

| | Balance Oct. 1, 2012 | Additions | Deletions | Balance Sept. 30, 2013 |
|---|---|---|---|---|
| Capital assets being depreciated: | | | | |
| Equipment | $1,540,647 | $ 55,791 | $ | $ 1,596,438 |
| Infrastructure | 24,848,689 | 58,327 | | 24,907,016 |
| Drain System Retrospective | 29,376,026 | | | 29,376,026 |
| Capital assets not being depreciated: | | | | |
| Construction in Progress | 750,989 | 826,564 | (42,273) | 1,535,280 |
| Subtotal | 56,516,351 | 940,682 | (42,271) | 57,414,760 |
| Less Allowance for Depreciation .. | | | | |
| Equipment | (1,440,040) | (102,501) | | (1,542,541) |
| Infrastructure | (10,781,114) | (2,180,308) | | (12,961,422) |
| Drain System Retrospective | (20,131,888) | | | (20,131,888) |
| Subtotal | (32,353,402) | (2,282,809) | | (34,635,851) |
| Net capital assets being depreciated | 23,411,960 | (2,168,391) | | 21,243,629 |
| Total Capital Assets | | | | |
| Net of depreciation | $24,163,309 | $ (1,342,127) | $ (42,273) | $ 22,778,909 |

During 2006, the Drain Commission complied with the provisions of GASB Statement 34 relative to the retroactive adjustment to capitalize infrastructure back to 1980.

68

**LAND BANK AUTHORITY:**

The summary of long-term debt transactions for the Genesee County Land Bank Authority for the year ended September 30, 2013, is presented below:

| | Balance Oct.1, 2012 | Additions | (Reductions) | Balance Sept. 30, 2013 | Due in One Year |
|---|---|---|---|---|---|
| Promissory Note – Genesee County | $ 510,742 | $ | $ (102,149) | $ 408,593 | $ 102,149 |
| Berridge Place Project | 540,000 | | (260,000) | 280,000 | 280,000 |
| Land Bank Center | 1,810,000 | | (45,000) | 1,765,000 | 45,000 |
| GCLB-Berridge Planc, LLC LISC note payable | 1,360,475 | | (138,709) | 1,221,766 | 16,147 |
| Line of credit | 200,000 | | (200,000) | 0 | |
| Total note leases | 4,421,217 | | (745,858) | 3,675,359 | 443,296 |
| Compensated absences | 36,338 | | (5,134) | 31,204 | |
| Total long-term | $4,457,555 | $ | $ (750,992) | $3,706,563 | $ 443,296 |
| | | | | $3,675,359 | |

The annual requirements to pay principal and interest on the outstanding obligations at September 30, 2013, are as follows:

| | |
|---|---|
| 2014 | $ 662,959 |
| 2015 | 1,549,682 |
| 2016 | 249,022 |
| 2017 | 249,950 |
| 2018 | 143,598 |
| 2019-2023 | 723,805 |
| 2024-2028 | 737,830 |
| 2029-2033 | 734,055 |
| 2034 | 147,977 |
| | 5,198,878 |
| Amount representing interest | (1,523,519) |
| | $3,675,359 |

The following is a summary of capital assets for the Genesee County Land Bank Authority at September 30, 2013:

| | Balance Oct. 1, 2012 | Additions | Disposals | Balance Sept. 30, 2013 |
|---|---|---|---|---|
| Capital assets not being depreciated: | | | | |
| Land | $ 84,308 | $ | $ | $ 84,308 |
| Construction in progress-Bldgs | | | | |
| Subtotal | 84,308 | | | 84,308 |
| Capital assets being depreciated: | | | | |
| Buildings and improvements | 8,946,972 | 4,792 | (149,835) | 8,801,929 |
| Machinery and equipment | 166,024 | | | 166,024 |
| Office equipment | 197,239 | | | 197,239 |
| Vehicles | 150,524 | 10,523 | | 161,047 |
| Subtotal | 9,460,759 | 15,315 | (149,835) | 9,326,239 |
| Less Accumulated depreciation: | | | | |
| Buildings and improvements | (1,340,153) | (312,199) | 83,251 | (1,569,101) |
| Maintenance and equipment | (96,812) | (72,938) | | (169,750) |
| Office equipment | (95,632) | (4,160) | | (99,792) |
| Vehicles | (103,346) | (36,905) | | (140,251) |
| Subtotal | (1,635,943) | (426,202) | 83,251 | (1,978,894) |
| Net capital assets being depreciated | 7,824,816 | (410,887) | 66,584 | 7,437,345 |
| Total capital assets – Net of depreciation | $ 7,909,124 | $ (410,887) | $ (66,584) | $ 7,431,653 |

The Authority's 1 percent ownership interest in 607 East Second Avenue, LLC (LLC) is accounted for in the statement of net assets as an equity investment. 607 East Second Avenue, LLC was created to account for the redevelopment of the old Durant Hotel.  The total projected cost of the development was approximately $35,590,000, with a total contribution of $18,380,819 from the Authority.  The Authority's capital contributions sources were from grants, Brownfield TIF bonds, and sale of state historic and state Brownfield tax credits.  The Authority has recorded a loss on impairment of the fair value of its investment below cost in the amount of $16,441,819 to bring the investment balance to $1,939,000.

Subsequent to September 30, 2013, the Authority entered into a $3,000,000 line of credit with a bank and the County has pledged its limited tax full faith and credit on the line.

69

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                    **EXHIBIT A-13**

**BROWNFIELD AUTHORITY:**

The summary of long-term debt transactions for the Genesee County Brownfield Authority for the year ended September 30, 2013 is presented below:

|  | Balance Oct. 1, 2012 | Additions | (Reductions) | Balance Sept. 30, 2013 | Due In One Year |
|---|---|---|---|---|---|
| Unamortized note premium ......................................... | $ 406,984 | | ($ 17,695) | $ 389,289 | $17,695 |
| 3.0% to 5.0% Genesee County Brownfield Authority . Series 2005 Tax Increment Bonds, Subject to redemption prior to maturity............................................ | 12,610,000 | | (245,000) | 12,265,000 | 255,000 |
| Total............................................................................... | $13,016,984 | $ | ($ 262,695) | $12,754,289 | $272,695 |

The annual requirements to pay principal and interest on the outstanding obligations at September 30, 2013, are as follows:

| | |
|---|---|
| 2014 ................................................ | $ 843,500 |
| 2015 ................................................ | 852,900 |
| 2016 ................................................ | 861,500 |
| 2017 ................................................ | 874,200 |
| 2018 ................................................ | 880,575 |
| 2019-2023 ........................................ | 4,523,500 |
| 2024-2028 ........................................ | 4,747,125 |
| 2029-2033 ........................................ | 4,980,500 |
| 2034-2035 ........................................ | 2,059,500 |
| | 20,623,300 |
| Amount representing interest................. | (8,258,300) |
| | $12,365,000 |

**GENESEE HEALTH SYSTEM:**

**Property and Equipment:**  The following table summarizes the changes in the components of the Genesee Health Systems capital assets:

|  | Transfer of Beginning Balance | Additions | Deletions | Ending Balance |
|---|---|---|---|---|
| Capital assets not being depreciated: | | | | |
| Construction in progress.............................................. | $ 34,888 | $ 946,968 | $ | $ 981,856 |
| Capital assets being depreciated: | | | | |
| Building improvements ................................................ | 2,225,580 | 677,627 | | 2,903,207 |
| Vehicles and equipment .............................................. | 2,046,565 | 147,830 | (24,680) | 2,169,715 |
| Subtotal.................................................................. | 4,226,005 | 825,457 | (24,680) | 5,072,922 |
| Less accumulated depreciation for: | | | | |
| Building improvements ................................................ | (474,137) | (137,416) | | (611,553) |
| Vehicles and equipment .............................................. | (1,413,050) | (94,315) | 24,680 | (1,482,685) |
| Subtotal.................................................................. | (1,817,430) | (231,731) | 24,680 | (2,094,238) |
| Net capital assets being depreciated ............................. | 2,384,958 | 593,726 | | 2,978,684 |
| Total capital assets, net of depreciation........................ | $ 2,419,846 | $ 1,540,694 | $ | $ 3,960,540 |

During the nine month period ended September 30, 2013, all the assets of Genesee County Community Mental Health Agency were transferred to the authority.  This transfer is reflected above as a transfer of beginning balances.

**POST-EMPLOYMENT BENEFITS-**

**PLAN DESCRIPTION**

The Genesee Health System retiree healthcare plan (the "Plan") is a single-employer defined benefit healthcare plan provides health insurance benefits, including medical, prescriptions, dental, and optical coverage to certain retirees and their beneficiaries, which are advance-funded on a discretionary basis.  It is a single-employer defined benefit healthcare plan administered by the Authority, which was closed to new hires as of May 2008.  Plan assets are held in trust by a third party administrator.

**FUND POLICY**

The contribution requirements of Plan members and the Authority are established and may be amended by the Authority Board of Directors. The required contribution is based on actuarially determined financed rates, with an additional amount to prefund benefits as determined annually by the Agency.  For the nine month period ended September 30, 2013, the Authority contributed $7,729,092 to the Plan, while plan members receiving benefits contributed $0.

**FUNDING PROGRESS**

The Authority's annual other postemployment benefit (OPEB) cost (expense) is calculated based on the annual required contribution of the employer (ARC).  The ARC was calculated using the projected unit credit actuarial cost method.  The ARC represents a level of finding that, if paid on an ongoing basis, is projected to cover normal cost each year and amortize any unfunded actuarial liabilities (or funding excess) over a period not to exceed thirty years.

The following table shows the components of the Authority's annual OPEB cost for the nine month period, the amount actually contributed to the Plan, and changes in the Authority's net OPEB asset:

| | |
|---|---|
| Annual required contribution | $ 7,437,503 |
| Interest on net OPEB cost | (96,248) |
| Adjustment to annual required contribution | 247,286 |
| Net OPEB cost (expense) | $ 7,588,541 |
| Amount contributed: | |
| Payment of current premiums | 7,729,092 |
| Change in net OPEB obligation | 140,551 |
| Net OPEB asset, beginning of the year | 461,523 |
| Net OPEB asset, end of the year | $ 602,074 |

|  |  | Fiscal Year Ended September 30 | | |
|---|---|---|---|---|
| | 2011 | 2012* | 2012** | 2013*** |
| Annual OPEB costs | $5,308,643 | $8,772,109 | $1,740,748 | $7,377,734 |
| Percentage contributed | 151.5% | 73.4% | 75.6% | 104.8% |
| Net OPEB asset | $1,179,411 | $1,604,133 | $1,179,411 | $ 602,074 |

*During the year ended September 30, 2012, the Authority switched from a 30 year amortization period to a 10 year amortization period.
**This represents the three month period ended December 31, 2012.
*** This represents the nine month period ended September 30, 2013.

The funding progress of the plan as of the most recent valuation date is as follows:

| | |
|---|---|
| Unfunded AAL | $56,477,931 |
| Actuarial value of plan assets | 14,599,442 |
| Actuarial accrued liability | 41,878,489 |
| Funded | 25.8% |
| Annual covered payroll | $17,335,736 |
| Ratio of UAAL to covered payroll | 242% |

**ACTUARIAL METHODS AND ASSUMPTIONS**

Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future.  Examples include assumptions about future employment, mortality, and the healthcare cost trend. Actuarially determined amounts are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future.

Projections of benefits for financial reporting purposes are based on the substantive plan (the Plan as understood by the employer and Plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and Plan members to the point.  The actuarial methods and assumptions used to include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspective of the calculations.

In the December 31, 2011 actuarial valuation, the projected unit credit actuarial cost method was used.  The actuarial assumptions includes: (a) a rate of return on investments of 8.0%; (b) projected salary increases of 5.0% attributable to inflation: (c) additional projected salary increases ranging from 0.0% to 4.03%, depending on age, attributable to seniority/merit; and (d) projected healthcare benefit increases of 4.5% to 9.0%.  The actuarial value of assets was determined based on market value.  The unfunded actuarial accrued liability is being amortized on a level dollar basis over 25 years on a closed basis.  The remaining amortization period at December 31, 2011, the date of the latest actuarial valuation, was 10 years.

B-57

70

71

**NOTES TO FINANCIAL STATEMENTS**

**GENESEE COUNTY**                                                    **EXHIBIT A-13**

**NOTE O - RESTATEMENT OF NET POSITION**

**Restatement:**  Net position and fund balances at September 30, 2012, were restated to correct beginning balances.  Net position and fund balances were restated for the following reasons:

1)   To properly account for the year end change from December to September.
2)   To properly account for refund of payments for special assessments, overpayment received from the State, and an adjustment to the net OPEB obligation to reflect the balance in the actuarial valuation.

|  | As Previously Reported | Adjustments | Restated Amounts |
|---|---|---|---|
| Component units: | | | |
| Net Position | | | |
| Economic Development | $    813,204 | $    (41,576) [1] | $    771,628 |
| | | | |
| Road Commission | $ 204,416,884 | $ (108,352) [2] | $ 204,308,532 |

**NOTE P - GASB UPCOMING ACCOUNTING PRONOUNCEMENTS DISCLOSURE**

In March 2012, the GASB issued GASB Statement No. 65, *Items Previously Reported as Assets and Liabilities*, which is required to be implemented for financial statements for periods beginning after December 15, 2012.  Statement No. 65 establishes accounting and financial reporting standards that reclassify, as deferred outflows and inflows of resources, certain items that were previously reported as assets and liabilities.  This statement also provides other financial reporting guidance related to the impact of the financial statement elements deferred outflows of resources and deferred inflows of resources.  Statement No. 65 will be implemented for the County's 2014 fiscal year.

In June 2012, GASB Statement No. 67, *Financial Reporting for Pension Plans*, was issued by the Governmental Accounting Standards Board.  This new standard, which replaces the requirements of GASB Statements No. 25, *Financial Reporting for Defined Benefit Pension Plans and Note Disclosures for Defined Contribution Plans* and No. 50, *Pension Disclosures*, establishes standards for financial reporting that outline the basic framework for separately-issued pension plan financial reports and specifies the required approach to measuring the liability of employers and certain non-employer contributing entities, about which information is required to be disclosed.  GASB Statement No. 67 is required to be adopted for years beginning after June 15, 2013.  For the County, this standard will be adopted for the year ended September 30, 2014.

In June 2012, the GASB issued GASB Statement No. 68, *Accounting and Financial Reporting for Pensions*.  Statement No. 68 requires governments providing defined benefit pensions to recognize their unfunded pension benefit obligation as a liability for the first time, and to more comprehensively and completely measure the annual costs of pension benefits.  This net pension liability that will be recorded on the government-wide, proprietary and discretely presented component units statements will be computed differently than the current unfunded actuarial accrued liability, using specific parameters set forth by the GASB.  The statement also enhances accountability and transparency through revised note disclosures and required supplementary information (RSI).  The County is currently evaluating the impact this standard will have on the financial statements when adopted.  The provisions of the statement are effective for financial statements for the year ended September 30, 2015.

**NOTE Q – KAREGNONDI WATER AUTHORITY**

Effective August 1, 2013, the County entered into an agreement with the Karegnondi Water Authority (KWA) and the City of Flint to issue debt to acquire, construct, and operate a water supply system (System).   The debt will not exceed $300,000,000.  The County's share of the debt is 65.8 percent or an amount not to exceed $197,400,000.  As of the date of the audit report, the debt has not been issued.

The intake facility and the site for the System were financed through the issuance of bonds by the County in the principal amount of $35,000,000 in October, 2013, with the understanding that the County would make the intake facility available to KWA for use by KWA as part of the System.  The County has pledged its limited tax full faith and credit as additional security for the bonds.  The intake facility is currently under construction and is expected to be completed in October, 2014.

In order to provide finished water to the County's customers, the County will be required to build a new water treatment plant, reservoir, pump station and approximately 5 miles of water main.  To finance the construction cost, the County anticipates issuance of approximately $60,000,000 of water revenue bonds with a limited tax general obligation pledge of the County.  The new water treatment plant, reservoir, pump station and water main are expected to be constructed and fully operational on or before May 1, 2016, the date on which the System is expected to be fully operational.

Effective October 1, 2013 the County entered into a contract with KWA to supply up to 42 million gallons per day of untreated water. The charges to be paid by the County consist of an annual fixed or capital fee and an annual commodity or operations and maintenance fee.  The County expects to pay such charges from the revenues of its water supply system as an operation and maintenance expense in the same manner that it presently pays for water furnished by the Detroit Water and Sewerage Department (DWSD).

The County is also a voting member of KWA.  The County joined KWA in 2013 based on the expectation that the purchase of water for the County will be more economical in the future than continuing to purchase water from the DWSD.

**Note R - PENSION, EMPLOYEES' FRINGE BENEFIT (VEBA) AND QUALIFIED EXCESS BENEFIT ARRANGEMENT (QEBA) TRUST FUNDS**

|  | General Employees Retirement System | Employees' Qualified Excess Benefit Arrangement (QEBA) | Employees' Fringe Benefit (VEBA) | Total |
|---|---|---|---|---|
| Statement of Net Position: | | | | |
| Cash and investments | $ 444,425,721 | $ | $ 46,821,976 | $ 491,247,697 |
| Other assets | 2,854,857 | | 279,996 | 3,134,853 |
| Liabilities | (28,328,589) | | (4,164,247) | (32,492,836) |
| Net Position | 418,951,989 | | 42,937,725 | 461,889,714 |
| Statement of Changes in Net Position: | | | | |
| Investment Income | 47,787,800 | | 2,992,469 | 50,780,269 |
| Contributions | 16,720,259 | | 10,665,685 | 27,385,944 |
| Benefit payments | (40,062,306) | | (13,916,914) | (53,979,220) |
| Other decreases | (3,632,436) | (983) | (42,379) | (3,675,798) |
| Change in Net Position | $  20,813,317 | $    (983) | $  (301,139) | $ (20,511,195) |

NOTES TO FINANCIAL STATEMENTS

**GENESEE COUNTY**                                                                    **EXHIBIT A-13**

NOTE S - FUND BALANCE CONSTRAINTS

The detail of the various components of fund balance is as follows:

| | General Fund | County Health | Community Action Resource Department | Community Development | Other Governmental Funds | Total |
|---|---|---|---|---|---|---|
| **Fund Balances:** | | | | | | |
| **Nonspendable:** | | | | | | |
| Long-term advance to Internal Service Fund | $ 1,840,809 | | | | | $ 1,840,809 |
| Long-term advance to Component Unit | | | | | $ 1,765,000 | 1,765,000 |
| Prepayments: | 20,690 | $ 22,020 | | | 4,023 | 46,733 |
| Inventory: | | | $ 485,062 | $ 638,400 | 137,018 | 1,260,480 |
| **Restricted for:** | | | | | | |
| Non-Major Special Revenue: | | | | | | |
| Community Enrichment and Development | | | | | 356,692 | 356,692 |
| Drug Forfeiture | | | | | 43,759 | 43,759 |
| Emergency Medical Services | | | | | 720,963 | 720,963 |
| Health Care Services | | | | | 571,809 | 571,809 |
| Solid Waste Planning Activities | | | | | 296,065 | 296,065 |
| Senior Services | | | | | 2,904,020 | 2,904,020 |
| Social Services | | | | | 116,299 | 116,299 |
| Veterans Millage | | | | | 471,776 | 471,776 |
| **Committed to:** | | | | | | |
| Non-Major Special Revenue: | | | | | | |
| Planning Commission: | | | | | | |
| Contractual disallowances | | | | | 59,994 | 59,994 |
| Local match on grant | | | | | 15,000 | 15,000 |
| **Assigned to:** | | | | | | |
| Costs and settlements of contractual | | | | | | |
| disallowances, claims and litigation | 1,000,000 | | | | | 1,000,000 |
| Programs: | | | | | | |
| Mental Health | | | | | | - |
| County Health | | 2,517,028 | | | | 2,517,028 |
| Non-Major Special Revenue: | | | | | | |
| Child Care | | | | | 3,873,041 | 3,873,041 |
| Community Enrichment and Development | | | | | 588 | 588 |
| Law Enforcement | | | | | 205,835 | 205,835 |
| Parks and Recreation | | | | | 4,816,894 | 4,816,894 |
| Planning Commission | | | | | | |
| -Compensated absences | | | | | 65,346 | 65,346 |
| Capital Projects: | | | | | | |
| Capital Improvement | | | | | 721,280 | 721,280 |
| Jail Site Remediation | | | | | 7,321 | 7,321 |
| **Unassigned:** | $ 9,455,182 | | $ (928,728) | | | 8,526,454 |
| Administration of Justice | | | | | (583,117) | (583,117) |
| Law Enforcement | | | | | (29,900) | (29,900) |
| Planning | | | | | 97,322 | 97,322 |
| Hughes & Hatcher Center Debt Service | | | | | (1,710,110) | (1,710,110) |
| Total fund balances | $ 12,316,681 | $ 2,539,048 | $ (443,666) | $ 638,400 | $ 14,926,918 | $ 29,977,381 |

REQUIRED

SUPPLEMENTARY

INFORMATION

GENERAL AND MAJOR FUNDS

This Page was Intentionally Left Blank

B-60

**SCHEDULE OF REVENUES AND TRANSFERS IN
BUDGET AND ACTUAL -- GENERAL FUND
REQUIRED SUPPLEMENTARY INFORMATION**

**GENESEE COUNTY**

Exhibit B-1

| | Fiscal Year Ended September 30, 2013 | | | |
|---|---|---|---|---|
| | Original Budgeted Amounts | Final Budgeted Amounts | Actual | Variance with Final Budget Positive (Negative) |
| **OPERATING REVENUE** | | | | |
| **TAXES** | | | | |
| Current property taxes.............................. | $ 43,459,630 | $ 44,652,148 | $ 45,261,951 | $ 609,803 |
| **LICENSES AND PERMITS** | | | | |
| Dog licenses ............................................. | 710,000 | 617,448 | 666,466 | 49,018 |
| Other....................................................... | 158,050 | 248,676 | 243,348 | (5,328) |
| TOTALS | 868,050 | 866,124 | 909,814 | 43,690 |
| **FINES AND FORFEITURES** | | | | |
| Ordinance fines and costs.......................... | 1,980,993 | 1,738,676 | 1,538,459 | (200,217) |
| Bond forfeitures ........................................ | 39,500 | 23,090 | 26,330 | 3,240 |
| TOTALS | 2,020,493 | 1,761,766 | 1,564,789 | (196,977) |
| **USE OF MONEY AND PROPERTY** | | | | |
| Interest earned ......................................... | 245,000 | 58,688 | 58,600 | (88) |
| **OTHER INTERGOVERNMENTAL REVENUES** | | | | |
| Federal revenue........................................ | 235,000 | 216,615 | 223,108 | 6,493 |
| Probate judges salaries ............................. | 285,010 | 188,390 | 206,271 | 17,881 |
| Revenue sharing....................................... | 7,620,146 | 7,541,499 | 7,541,499 | |
| State liquor tax.......................................... | 2,943,273 | 3,125,820 | 3,263,945 | 138,125 |
| State cigarette tax..................................... | 2,640 | 22,524 | 22,524 | |
| Other....................................................... | 3,530,264 | 3,241,981 | 3,239,591 | (2,390) |
| TOTALS | 14,616,333 | 14,336,829 | 14,496,938 | 160,109 |
| **CHARGES FOR SERVICES** | | | | |
| Animal Shelter .......................................... | 81,400 | 52,311 | 55,193 | 2,882 |
| District Court............................................ | 3,486,279 | 2,630,706 | 2,693,118 | 62,412 |
| Friend of the Court.................................... | 679,971 | 679,971 | 679,971 | |
| Probate Court ........................................... | 145,200 | 148,806 | 148,529 | (277) |
| Probation fees .......................................... | 33,000 | 33,698 | 33,490 | (208) |
| County Treasurer....................................... | 584,500 | 903,327 | 899,203 | (4,124) |
| County Clerk ............................................. | 1,212,470 | 1,266,056 | 1,282,100 | 16,044 |
| Register of Deeds ..................................... | 1,550,700 | 1,724,931 | 1,683,310 | (41,621) |
| Sheriff ..................................................... | 1,665,062 | 1,857,664 | 1,902,480 | 44,816 |
| Other services .......................................... | 2,019,461 | 1,297,544 | 1,311,818 | 14,274 |
| TOTALS | 11,458,043 | 10,595,014 | 10,689,212 | 94,198 |
| OTHER REVENUE ....................................... | 593,249 | 572,483 | 655,134 | 82,651 |
| TOTAL OPERATING REVENUE | 73,260,798 | 72,843,052 | 73,636,438 | 793,386 |
| **TRANSFERS IN** | | | | |
| Enterprise Funds....................................... | 3,622,642 | 4,868,642 | 4,734,725 | (133,917) |
| Special Revenue Funds............................... | 1,719,604 | 1,936,203 | 1,956,570 | 20,367 |
| Capital Projects Funds............................... | | | 32,259 | 32,259 |
| Debt Service Funds.................................... | | 17 | 18 | 1 |
| TOTAL TRANSFERS IN | 5,342,246 | 6,804,862 | 6,723,572 | (81,290) |
| | $ 78,603,044 | $ 79,647,914 | $ 80,360,010 | $ 712,096 |

NOTE - The budgetary basis is the same as reported by generally accepted accounting principles.

**SCHEDULE OF EXPENDITURES AND APPROPRIATIONS**
**BUDGET AND ACTUAL -- GENERAL FUND**
**REQUIRED SUPPLEMENTARY INFORMATION**

**GENESEE COUNTY**                                                             Exhibit B-2

B-61

### Fiscal Year Ended September 30, 2013

| | Original Budgeted Amounts | Final Budgeted Amounts | Actual | Variance with Final Budget Positive (Negative) |
|---|---|---|---|---|
| **LEGISLATIVE** | | | | |
| Board of Commissioners | $ 705,103 | $ 918,343 | $ 922,513 | $ (4,170) |
| **MANAGEMENT AND PLANNING** | | | | |
| Board Coordinator | 247,778 | 244,208 | 241,514 | 2,694 |
| Boundary Commission | 200 | | | |
| County Clerk | 2,749,011 | 2,435,402 | 2,345,564 | 89,838 |
| County Treasurer | 1,489,518 | 1,442,774 | 1,463,753 | (20,979) |
| Drain Commission | 1,246,486 | 1,210,390 | 1,213,167 | (2,777) |
| Elections Clerk | 672,516 | 740,468 | 724,161 | 16,307 |
| Equalization | 1,069,270 | 913,157 | 917,622 | (4,465) |
| GIS | 187,473 | 174,192 | 170,580 | 3,612 |
| Register of Deeds | 564,609 | 635,418 | 616,674 | 18,744 |
| TOTALS | 8,226,861 | 7,796,009 | 7,693,035 | 102,974 |
| **ADMINISTRATION OF JUSTICE** | | | | |
| Adult Probation | 339,656 | 330,006 | 329,855 | 151 |
| Circuit Court | 10,625,168 | 9,924,755 | 9,987,394 | (62,639) |
| District Court | 6,188,268 | 5,385,439 | 5,473,378 | (87,939) |
| Jury Board | 278,581 | 259,093 | 258,148 | 945 |
| Probate Court | 2,137,938 | 2,046,618 | 2,057,863 | (11,245) |
| Prosecutor | 4,437,370 | 4,436,214 | 4,455,811 | (19,597) |
| Court Services | 200,384 | 185,620 | 185,537 | 83 |
| TOTALS | 24,207,365 | 22,567,745 | 22,747,986 | (180,241) |
| **LAW ENFORCE/ COMMUNITY PROTECTION** | | | | |
| Office of Emergency Preparedness | 166,373 | 154,685 | 154,330 | 355 |
| Sheriff Administration | 2,882,042 | 2,892,873 | 2,915,776 | (22,903) |
| Sheriff Marine Division | 45,675 | 24,228 | 25,086 | (858) |
| Detective Division | 524,011 | 879,553 | 886,730 | (7,177) |
| Sheriff Security | 17,763,165 | 16,885,505 | 16,627,752 | 257,753 |
| TOTALS | 21,381,266 | 20,836,844 | 20,609,674 | 227,170 |
| **HUMAN SERVICES** | | | | |
| Veterans Burial | 46,276 | 15,716 | 15,716 | |
| Veterans Information Center | 129,157 | 36,735 | 36,649 | 86 |
| TOTALS | 175,433 | 52,451 | 52,365 | 86 |

NOTE - The budgetary basis is the same as the basis required by generally accepted accounting principles.

### Fiscal Year Ended September 30, 2013

| | Original Budgeted Amounts | Final Budgeted Amounts | Actual | Variance with Final Budget Positive (Negative) |
|---|---|---|---|---|
| **OTHER** | | | | |
| Other | $ (1,251,782) | $ 2,279,488 | $ 2,696,188 | $ (416,700) |
| Contribution to Component Unit - Mental Health Servic | 2,775,000 | 2,775,000 | 2,775,000 | |
| TOTALS | 1,523,218 | 5,054,488 | 5,471,188 | (416,700) |
| **CAPITAL OUTLAY** | | | | |
| Circuit Court | | 200,609 | 200,605 | 4 |
| County Sheriff | | 9,450 | 6,172 | 3,278 |
| District Court | | 22,600 | | 22,600 |
| Prosecutors | | 28,800 | 27,903 | 897 |
| All others | | | 1,225 | (1,225) |
| TOTALS | | 261,459 | 235,905 | 25,554 |
| **TOTAL EXPENDITURES** | 56,219,246 | 57,487,339 | 57,732,666 | (245,327) |
| **APPROPRIATIONS** | | | | |
| Special Revenue: | | | | |
| Administration of Justice Funds | 3,435,597 | 3,465,203 | 3,476,676 | (11,473) |
| Child Care | 9,627,151 | 9,550,470 | 9,550,470 | |
| Community Enrichment and Development Funds | 104,966 | 36,385 | 22,710 | 13,675 |
| County Health | 2,680,597 | 2,658,158 | 2,658,158 | |
| Law Enforcement Funds | 98,375 | 103,850 | 103,847 | 3 |
| Mental Health | 925,000 | 865,000 | 925,000 | (60,000) |
| Parks and Recreation | 61,011 | 61,011 | 61,011 | |
| Planning Commission | 408,572 | 393,572 | 393,572 | |
| Social Services | 15,500 | 15,500 | 15,500 | |
| TOTALS | 17,356,769 | 17,149,149 | 17,206,944 | (57,795) |
| Debt Service and Capital Projects: | | | | |
| Debt Service Funds | 2,650,782 | 2,689,337 | 2,751,216 | (61,879) |
| | 2,650,782 | 2,689,337 | 2,751,216 | (61,879) |
| Internal Service: | | | | |
| Administrative Services | | 85,513 | 67,133 | 18,380 |
| Vehicles and Equipment | | 5,410 | 4,489 | 921 |
| Building and Grounds | | 102,778 | 70,442 | 32,336 |
| TOTALS | | 193,701 | 142,064 | 51,637 |
| **TOTAL APPROPRIATIONS** | 20,007,551 | 20,032,187 | 20,100,224 | (68,037) |
| **TOTAL EXPENDITURES AND APPROPRIATIONS** | $ 76,226,797 | $ 77,519,526 | $ 77,832,890 | $ (313,364) |

NOTE - The County implemented GASB No. 54 in the current year, refer to Note B. As a result, the Animal Shelter and Medical Examiner Funds merged with the General Fund for reporting purposes but are budgeted as separate funds.

SCHEDULE OF REVENUES AND OTHER SOURCES--BUDGET AND ACTUAL--
MAJOR SPECIAL REVENUE FUNDS
REQUIRED SUPPLEMENTARY INFORMATION

**GENESEE COUNTY**                                                                 Exhibit B-3

| | Fiscal Year Ended September 30, 2013 | | | |
| --- | --- | --- | --- | --- |
| | Original Budgeted Amounts | Final Budgeted Amounts | Actual | Variance with Final Budget Positive (Negative) |
| **GENESEE HEALTH SERVICES 12/31/12** | | | | |
| General Fund appropriation | $ 3,700,000 | $ 3,700,000 | $ 925,000 | $ (2,775,000) |
| Federal grants | 6,214,695 | 6,253,628 | 1,231,478 | (5,022,150) |
| State grants | 21,277,601 | 21,277,601 | 4,477,801 | (16,799,800) |
| Charges for services | 119,886,149 | 120,891,957 | 27,841,645 | (93,050,312) |
| Other | 1,382,000 | 1,364,000 | 785,018 | (578,982) |
| TOTALS | $ 152,460,445 | $ 153,487,186 | $ 35,260,942 | $ (118,226,244) |
| **COUNTY HEALTH** | | | | |
| General Fund appropriation | $ 3,147,478 | $ 3,125,039 | $ 3,079,023 | $ (46,016) |
| Licenses and permits | 992,630 | 992,630 | 1,031,768 | 39,138 |
| Federal grants | 1,009,430 | 5,304,849 | 5,262,724 | (42,125) |
| State grants | 8,477,053 | 4,265,613 | 2,770,726 | (1,494,887) |
| Charges for services | 160,313 | 217,313 | 355,765 | 138,452 |
| Other | 945,111 | 1,359,838 | 2,345,317 | 985,479 |
| TOTALS | $ 14,732,015 | $ 15,265,282 | $ 14,845,323 | $ (419,959) |
| **COMMUNITY ACTION RESOURCE DEPARTMENT** | | | | |
| Federal grants | $ 24,477,400 | $ 24,477,400 | $ 22,841,798 | $ (1,635,602) |
| State grants | 654,697 | 654,697 | 1,403,379 | 748,682 |
| Other | 3,131,758 | 3,131,758 | 4,039,962 | 908,204 |
| Transfers in | | | 640,742 | 640,742 |
| TOTALS | $ 28,263,855 | $ 28,263,855 | $ 28,925,881 | $ 662,026 |
| **COMMUNITY DEVELOPMENT** | | | | |
| Federal grants | $ 3,366,735 | $ 3,366,735 | $ 3,366,735 | $ — |
| Other | 109,446 | 109,446 | 109,446 | |
| TOTALS | $ 3,476,181 | $ 3,476,181 | $ 3,476,181 | $ — |

NOTE - The budgetary basis is the same as the basis required by generally accepted accounting principles.

SCHEDULE OF EXPENDITURES AND OTHER USES--BUDGET AND ACTUAL--
MAJOR SPECIAL REVENUE FUNDS
REQUIRED SUPPLEMENTARY INFORMATION

**GENESEE COUNTY**                                                                 Exhibit B-4

| | Fiscal Year Ended September 30, 2013 | | | |
| --- | --- | --- | --- | --- |
| | Original Budgeted Amounts | Final Budgeted Amounts | Actual | Variance with Final Budget Positive (Negative) |
| **GENESEE HEALTH SERVICES 12/31/12** | | | | |
| Board administration | $ 11,165,232 | $ 11,616,649 | $ 2,891,772 | $ 8,724,877 |
| Managed care | 23,299,672 | 22,142,242 | 2,088,620 | 20,053,622 |
| Residential services | 30,398,585 | 30,398,585 | 7,442,990 | 22,955,595 |
| Adult services | 29,025,515 | 29,240,791 | 7,337,280 | 21,903,511 |
| Clinical services | 7,436,792 | 7,479,885 | 1,315,059 | 6,164,826 |
| State hospitals | 8,079,896 | 8,079,896 | 1,883,559 | 6,196,337 |
| Developmental disabilities | 25,040,498 | 25,407,114 | 5,341,139 | 20,065,975 |
| Inpatient services | 9,160,857 | 9,160,857 | 3,493,016 | 5,667,841 |
| Substance abuse services | 9,872,886 | 10,043,218 | 2,380,671 | 7,662,547 |
| Employee benefits | | 1,073,561 | 1,073,651 | |
| Capital outlay | | 81,028 | 81,028 | |
| TOTALS | $ 153,479,435 | $ 154,723,826 | $ 35,328,785 | $ 119,395,131 |
| **COUNTY HEALTH** | | | | |
| Personnel services | $ 5,877,507 | $ 5,857,075 | $ 5,308,506 | $ 548,569 |
| Fringe benefits | 4,105,071 | 4,081,949 | 3,375,957 | 705,992 |
| Supplies and services | 4,858,859 | 5,478,409 | 4,881,923 | 596,486 |
| Capital outlay | 14,322 | 15,322 | | 15,322 |
| TOTALS | $ 14,855,759 | $ 15,432,755 | $ 13,566,386 | $ 1,866,369 |
| **COMMUNITY ACTION RESOURCE DEPARTMENT** | | | | |
| Personnel services | $ 12,168,622 | $ 12,168,622 | $ 6,819,016 | $ 5,349,606 |
| Fringe benefits | 6,394,700 | 6,394,700 | 3,971,261 | 2,423,439 |
| Supplies and services | 10,314,488 | 10,314,488 | 18,067,079 | (7,752,591) |
| Capital outlay | 55,437 | 55,437 | 250,810 | (195,373) |
| Transfers out | | | 361,911 | (361,911) |
| TOTALS | $ 28,933,247 | $ 28,933,247 | $ 29,470,077 | $ (536,830) |
| **COMMUNITY DEVELOPMENT** | | | | |
| Supplies and services | $ 891,494 | $ 891,494 | $ 891,494 | $ — |
| Program grants | 3,470,886 | 3,470,886 | 3,470,886 | |
| TOTALS | $ 4,362,380 | $ 4,362,380 | $ 4,362,380 | $ — |

NOTE - The budgetary basis is the same as the basis required by generally accepted accounting principles.

B-62

**PENSION AND OPEB SYSTEM SCHEDULE OF FUNDING PROGRESS
REQUIRED SUPPLEMENTARY INFORMATION**

**GENESEE COUNTY**                                                                                              Exhibit B-5

The schedule of funding progress for the Pension System as of December 31st is as follows:

| Actuarial Valuation Date | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded AAL (UAAL) | Funded Ratio (Percent) | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| 2007 | $ 461,349,321 | $ 514,859,339 | $ 53,510,018 | 89.6% | $ 68,341,150 | 78.3% |
| 2008 | $ 439,812,757 | $ 527,639,697 | $ 87,826,940 | 83.4% | $ 67,720,817 | 129.69% |
| 2009 | $ 424,482,866 | $ 543,307,372 | $ 118,824,506 | 78.1% | $ 65,511,481 | 181.38% |
| 2010 | $ 401,700,454 | $ 564,033,044 | $ 162,332,590 | 71.2% | $ 57,794,546 | 280.88% |
| 2011 | $ 365,262,318 | $ 549,929,631 | $ 184,667,313 | 66.4% | $ 52,236,539 | 353.52% |
| 2012 | $ 387,979,375 | $ 559,390,939 | $ 171,411,564 | 69.4% | $ 49,736,813 | 344.64% |

The schedule of employer contributions for the Pension System as of December 31st is as follows:

| Fiscal Year Ended | Actuarial Valuation Date | Annual Required Contribution | Percentage Contributed |
|---|---|---|---|
| 2007 | 2005 | $12,696,937 | 100% |
| 2008 | 2006 | $11,949,881 | 100% |
| 2009 | 2007 | $12,096,241 | 100% |
| 2010 | 2008 | $12,727,882 | 100% |
| 2011 | 2009 | $11,942,380 | 100% |
| 2012 | 2010 | $14,354,446 | 100% |

The information presented above was determined as part of the actuarial valuations at the dates indicated. Additional information as of December 31, 2012, the latest actuarial valuation, follows:

| | |
|---|---|
| Amortization method | Level percent-of-payroll, Open |
| Amortization period | 25 years |
| Asset valuation method | 4-year smoothed market |
| Actuarial assumptions: | |
| Investment rate of return | 8.00% |
| Projected salary increases | 3.00% to 7.03% |
| Includes inflation at | 3% |
| Cost of living adjustments | None |

The schedule of funding progress for the OPEB System as of September 30th is as follows:

| Actuarial Valuation Date | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded AAL (UAAL) | Funded Ratio (Percent) | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| 2007 | $ 30,427,079 | $ 179,150,908 | $ 148,723,829 | 17.0% | $ 58,387,145 | 2.55% |
| 2010 | $ 41,579,396 | $ 286,696,396 | $ 245,117,000 | 15.0% | $ 58,028,000 | 422.41% |
| 2012 | $ 43,313,587 | $ 308,208,023 | $ 264,894,436 | 9.0% | $ 36,987,137 | 716.18% |

The schedule of employer contributions for the OPEB System as of September 30th is as follows:

| Fiscal Year Ended | Actuarial Valuation Date | Annual Required Contribution | Percentage Contributed |
|---|---|---|---|
| 2011 | 2010 | $18,708,000 | 52% |
| 2012 | 2012 | $18,549,049 | 65% |
| 2013 | 2012 | $18,549,049 | 51% |

The information presented above was determined as part of the actuarial valuations at the dates indicated. Additional information as of September 30, 2012, the latest actuarial valuation, follows:

| | |
|---|---|
| Amortization method | Level percent-of-payroll |
| Amortization period | 30 years |
| Actuarial assumptions: | |
| Investment rate of return | 8.00% |
| Projected salary increases | 3% |
| Medical inflation rate | 8%, Graded down to 5% in 0.5% increments over 7 years |
| Cost of living adjustments | None |

82

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX C**

**CITY OF FLINT
GENERAL FINANCIAL, ECONOMIC AND STATISTICAL INFORMATION**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# APPENDIX C

# CITY OF FLINT

# GENERAL FINANCIAL INFORMATION

**UPDATE ON CITY OF FLINT FINANCIAL POSITION**

On December 1, 2011, five months into fiscal year 2012, Michigan's Governor placed the City of Flint (the "City") under the operation of an emergency manager (the "Emergency Manager") pursuant to former Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"). This decision was based on the recommendation of a state appointed review team, whose recommendation was made in part because of a consistent deficit in the General Fund, the decline in pooled cash, unrealistic budgeting, and unfunded liabilities for postemployment benefits.

In 2012, the Legislature enacted Act 436, Public Acts of Michigan, 2012 ("Act 436"), which repealed Act 72 and provides that an emergency manager appointed under Act 72, or any other former Act authorizing the state appointment of emergency managers, and serving immediately prior to the effective date of Act 436 shall continue to fulfill his or her powers and duties under Act 436.  Despite changes in the laws providing for the appointment of an emergency manager since December 2011, and the appointment of three different emergency managers since then, the City remains under the control of a state appointed manager.

Emergency managers exercise direct control over the City's financial and operational matters and are authorized to "act for and in the place and stead of the governing body and the office of chief administrative officer" of the City of Flint. This status is expected to continue for at least the next twelve months, or until the Governor, acting on the recommendation of the Emergency Manager, determines that the financial emergency is over. In that event, governance and management of the City would be returned to the locally elected officials. However, governance and management of the City by the locally elected officials will be overseen by a Transition Advisory Board, who will be charged with assuring that the plans and operations put into place by the Emergency Manager to restore financial solvency - including a two year budget - are followed.  An emergency manager who has served for at least 18 months under Act 436 may also be removed by a two-thirds vote of the City Council and approval of the Mayor.  A local government whose emergency manager is removed by City Council action and which remains in a state of financial emergency will be placed in a mediation process with creditors and other interested parties pursuant to Act 436.

Fiscal year 2012 financial statements showed a General Fund deficit of $19.2 million, and the goal of the Emergency Manager has been to formulate plans and implement actions that eliminate the deficit and restructure the City's cost base to allow for future financial solvency.

Preparation of the fiscal year 2013 budget began with an initial projected gap of more than $25 million and acknowledgment of a $19.2 million General Fund deficit. The FY13 budget was ultimately balanced through a mixture of significant revenue increases, significant expenditure decreases, and steps taken to reduce legacy costs. Revenue increase included a 25 percent increase in water and sewer rates, passage of a 6 mill property tax increase for police and fire, establishment of a special assessment district for street lighting, and implementation of a fee sufficient to cover the cost of waste collection. Expenditure reductions included elimination of 20 percent of the City's workforce, compensation decreases equivalent to a 20 percent wage reduction for remaining employees, and the restructuring of health and retirement benefits for current employees and retirees necessary to develop a credibly balanced spending plan.

The goal of the Emergency Manager was more than achieved, as the financial statements as of June 30, 2013 show that revenues exceeded expenses in the General Fund by $6.3 million. This resulted in the City's accumulated $19.2 million deficit as of June 30, 2012 being reduced to less than $12.9 million as of June 30, 2013.

In addition, the actions taken to restructure healthcare benefits for current employees and retirees had a significant impact on reducing both current costs and long-term liabilities. The 20 percent reduction in the workforce required significant reorganizational activities focused on reducing current costs. Long term liabilities were reduced by eliminating traditional defined benefit pension programs for new employees in favor of hybrid plans; by moving the City's retirement system into a state wide retirement system; by restructuring health insurance benefits for current employees and placing retirees into those same plans; and by eliminating the promise of retiree health care for new employees in favor of providing retiree medical

savings accounts. Much of the positive financial result in FY13 came from these actions. The restructuring, which was implemented during the course of FY12, reduced the City's OPEB liabilities alone from nearly $900 million to less than $325 million.

The City's cash flow also improved significantly. Cash flow in December 2011 was projected at approximately $13 million in comparison to current cash on hand on as of June 30, 2013 in excess of $43 million.

The FY14 budget was designed and implemented with the same goals in mind - operating within the constraints of available revenues; restructuring operations and cost factors to enhance future financial stability and continuing to reduce the remaining $12.9 million deficit. The FY14 budget was constructed with the specific intent of further reducing the deficit by a minimum of $1 million, by budgeting expenses at $1 million less than projected revenues. As of January 31, 2014, seven months into the FY14 year, revenues and expenses are on target.

Efforts are ongoing to reduce the deficit by more than $1 million in the current year and to finalize a plan to eliminate the remaining deficit within the next five years. A draft deficit elimination plan to accomplish this is currently under review by the Michigan Department of Treasury.

The efforts of the City to regain financial solvency have been aided by support from the State of Michigan. State police troopers have been placed in the City to support local law enforcement efforts, and funds have been allocated to enhance prosecution activities and to operate the City's lock up. The Governor's recently released proposed budget continues this support.

The work of the emergency managers has not been without conflict. A significant legal challenge has been made to the decision to move retirees from their historical health insurance plans into the same plans offered current employees. This action resulted in an initial cost reduction of $3.5 million to the City and imposed deductibles and co-pays on retirees. This challenge is currently pending in federal court. If the challenge is ultimately upheld, it will pose a significant challenge to the City in its efforts to regain and maintain financial solvency. See "Litigation" in the Official Statement.

The future financial solvency of the City may also be challenged by a continuing structural deficit. An independent assessment by independent financial consultants in draft form, concluded that the City faced significant legacy and other structural challenges. As part of the planning for future financial solvency, five year projections and a strategic plan were developed. This exercise indicated a significant financial challenge forthcoming in FY15, due primarily to the possible ending of a major grant supporting fire fighting resources. Years after FY16 continue to show a continuing gap between revenues and projections. Should those projections come to pass, there will be a significant challenge. However, should the major grant be continued in 2015, should the impact of the structural changes made continue to have impact, and should the economy improve more than projected (in terms of property values, income tax, and state shared revenues), the gap will be more manageable.

The most important challenge to be addressed will be instituting structural changes in the organization of the City to foster financial solvency as a core value and to assure that future governance and management of the City is conducted in a financially responsible manner. To this end, the current Emergency Manager has created a Governance Task Force, charged with developing recommended changes to current ordinances, procedures, and the Charter. The recommendations of the Task Force are anticipated within six months.

If the City's financial status were to deteriorate further, the City's options to improve its fiscal health may be limited. The United States Bankruptcy Code, 11 U.S.C. Section 101, et. seq. (the "Bankruptcy Code") does not authorize municipalities to be subject to involuntary bankruptcy. The City must be specifically authorized to be a debtor under chapter 9 of the Bankruptcy Code by state law or by a governmental officer or organization empowered by state law to authorize the City to be a debtor under chapter 9 of the Bankruptcy Code.

Act 436 provides such authorization after the City first complies with certain requirements set forth therein, and only with the approval of the Emergency Manager (if one is currently serving) and the Governor. Specifically, Act 436 provides that if, "in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and the state treasurer that the local government be authorized to proceed under chapter 9. If the governor approves of the recommendation, the governor shall inform the state treasurer and the emergency manager in writing of the decision…. The governor may place contingencies on a local government in order to proceed under chapter 9. Upon receipt of the written approval, the emergency manager is authorized to proceed under chapter 9."

C-2

**AREA**

The City covers an area of approximately 32.8 square miles.

**POPULATION**

The population for the City of Flint is as follows:

| | |
|---|---|
| 2010 U.S. Census | 102,434 |
| 2000 U.S. Census | 124,943 |
| 1990 U.S. Census | 140,761 |

**PROPERTY VALUATIONS**

Article IX, Section 3, of the Michigan Constitution, limits the proportion of true cash value at which property can be assessed to a percentage not to exceed 50% of true cash value. The Michigan Legislature by statute has provided that property shall be assessed at 50% of its true cash value, except as described in the paragraphs below. The Michigan Legislature or the electorate may at some future time reduce the percentage below 50% of true cash value.

On March 15, 1994, the electors of the State approved an amendment to the Michigan Constitution permitting the Legislature to authorize ad valorem taxes on a non-uniform basis. The legislation implementing this constitution amendment added a new measure of property value known as "taxable value." Since 1995, taxable property has had two valuations -- State equalized valuation ("SEV") and taxable value. Property taxes are levied on taxable value. Generally, the taxable value of property is the lesser of (a) the taxable value of property in the immediately preceding year, adjusted for losses, multiplied by the lesser of the inflation rate or 1.05, plus additions, or (b) the property's current SEV. Under certain circumstances, therefore, the taxable value of property may be different from the same property's SEV. When property is sold or transferred, taxable value is adjusted to the SEV, which under existing law is 50% of the current true cash value. The taxable value and SEV of new construction is equal to current SEV. The taxable value and SEV of existing property are also adjusted annually for additions and losses.

Responsibility for assessing taxable property rests with the local assessing officer of each township and city. Any property owner may appeal the assessment to the local assessor, the local Board of Review and ultimately to the Michigan Tax Tribunal.

In addition to limiting the annual increase in taxable value, the Michigan Constitution mandates a system of equalization for assessments. Although the assessors for each local unit of government within a county are responsible for actually assessing at 50% of true cash value, adjusted for taxable value purposes, the final SEV and taxable value are arrived at through several steps. Assessments are established initially by the municipal assessor. Municipal assessments are then equalized to the 50% levels as determined by the Genesee County Department of Equalization. Thereafter, the State equalizes the various counties in relation to each other. SEV is important, aside from its use in determining taxable value for the purpose of levying ad valorem property taxes, because of its role in the spreading of taxes between overlapping jurisdictions, the distribution of various State aid programs, State revenue sharing and in the calculation of debt limits.

Property that is exempt from property taxes (e.g., churches, governmental property, public schools) is not included in the SEV or taxable value data in this Official Statement. Property granted tax abatements under Act 198, Public Acts of Michigan, 1974, as amended, is recorded on a separate tax roll which is subject to tax abatement. The valuation of tax abated property is based upon SEV but is not included in either the SEV or taxable value data in this Official Statement except as noted.

C-3

*Historical Valuation*

| Year | State Equalized Valuation | Taxable Value |
|------|---------------------------|---------------|
| 2013 | $795,172,400 | $776,654,903 |
| 2012 | 969,129,800 | 917,513,440 |
| 2011 | 1,191,515,300 | 1,112,393,943 |
| 2010 | 1,393,042,600 | 1,274,306,976 |
| 2009 | 1,648,408,800 | 1,452,387,463 |

| | |
|---|---|
| 2013 Taxable Value | $776,654,903 |
| Plus:  2013 IFT | 33,149,000 |
| Total Estimated Equivalent Value | $809,803,903 |
| Less:  2013 DDA Captured Value | (579,595) |
| Net Estimated 2013 Valuation | $808,065,118 |

Source: City of Flint

*Per Capita Valuation*

| | |
|---|---|
| 2013 Per Capita Taxable Value | $7,582.00 |
| 2013 Per Capita State Equalized Valuation | $7,762.78 |
| 2013 Per Capita Estimated True Cash Value | $15,525.56 |

*Tax Abatements*

Under the provisions of Act 198 of the Public Acts of Michigan, 1974 ("Act 198"), plant rehabilitation districts and/or industrial development districts may be established. Businesses in these districts are offered certain property tax incentives to encourage restoration or replacement of obsolete facilities and to attract new facilities to the area. An industrial facilities tax ("IFT") is paid, at a lesser effective rate and in lieu of ad valorem property taxes, on such facilities for a period of up to 12 years. Qualifying facilities are issued abatement certificates for specific periods.

After expiration of the abatement certificate, the then-current SEV of the facility is returned to the ad valorem tax roll. The owner of such facility may obtain a new certificate, provided it has complied with the provisions of Act 198.

The 2013 Taxable Value for the properties which have been granted IFT abatements within the School District's boundaries is $33,149,000 which is subsequently taxed at half rate.  For further information see "PROPERTY VALUATIONS - Historical Valuations" herein.

*Tax Increment Authorities*

Act 450 of the Public Acts of Michigan, 1980 (the "TIFA Act"), Act 197 of the Public Acts of Michigan, 1975 (the "DDA Act"), Act 281 of the Public Acts of Michigan, 1986 (the "LDFA Act") and Act 381, of the Public Acts of Michigan, 1996 (the "Brownfield Act") (together the "TIF Acts") authorize the designation of specific districts known as Tax Increment Finance Authority ("TIFA") Districts, Downtown Development Authority ("DDA") Districts, Local Development Finance Authority ("LDFA") Districts or Brownfield Redevelopment Authority ("BRDA") Districts, authorized to formulate tax increment financing plans for public improvements, economic development, neighborhood revitalization, historic preservation and environmental cleanup with the district.

Tax increment financing permits the TIFA, DDA, LDFA, or BRDA to capture tax revenues attributable to increases in value ("TIF Captured Value") of real and personal property located within an approved development area while any tax increment financing plans by an established district are in place.  These captured revenues are used by the District and are not passed on to the local taxing jurisdictions.

The City of Flint has one DDA district that captures operating millage. The 2013 captured taxable value is $579,595.

***Tax Base Composition***

A breakdown of the City's 2013 Taxable Value by class and use is as follows:

| **By Class** | **Taxable Value** | **Percent of Total** |
|---|---|---|
| Real Property | $622,052,503 | 80.09% |
| Personal Property | 154,602,400 | 19.91 |
| | | |
| TOTAL | $776,654,903 | 100.00% |

| **By Use** | | |
|---|---|---|
| Commercial | $181,351,218 | 23.35% |
| Industrial | 77,833,577 | 10.02 |
| Residential | 362,867,708 | 46.72 |
| Personal Commercial | 54,273,600 | 6.99 |
| Personal Industrial | 52,558,400 | 6.77 |
| Personal Utility | 47,770,400 | 6.15 |
| | | |
| TOTAL | $776,654,903 | 100.00% |

Source: City of Flint

**Property Tax Reform Proposals**

On December 20, 2012, Governor Snyder signed into law a package of bills reforming personal property tax in Michigan. The legislation exempts commercial and industrial personal property of each owner with a combined taxable value in a local taxing unit of less than $40,000 from ad valorem taxes beginning in 2014. All eligible manufacturing personal property purchased or put into service beginning in 2013 and used more than 50% of the time in industrial processing or direct integrated support becomes exempt beginning in 2016. The legislation extends certain personal property tax exemptions and tax abatements for technology parks, industrial facilities and enterprise zones that were to expire after 2012, until the newly enacted personal property tax exemptions take effect. The legislation authorizes local units to specially assess commercial and industrial real property to replace revenue lost due to the personal property tax exemptions for police, fire, ambulance and jail operations. The legislation also includes a formula to reimburse certain local governments for a portion of lost personal property tax revenue from use tax moneys to the extent the local unit has a reduction in taxable value of more than 2.3% as a result of the personal property tax exemption. For such reimbursement provisions to become effective, however voters would need to approve a change in the state distribution of use tax in the August 2014 primary election. If voters approve the redistribution, a portion of the use tax would be directed to a newly created statewide Metropolitan Areas Metropolitan Authority which would redistribute that revenue to qualifying local units. If voters fail to approve the use tax redistribution, the above personal property tax reform acts will be repealed and the local reimbursement act and the special assessment act will not go into effect. The final impact of this legislation cannot be determined at this time.

The ultimate nature, extent and impact of any other future amendments to Michigan's property tax laws on the City's finances cannot be predicted. Purchasers of the Bonds should consult with their legal counsel and financial advisors as to the consequences of any such legislation on the market price or marketability of the Bonds, the security therefor and the operations of the City.

C-5

## MAJOR TAXPAYERS

The ten largest taxpayers in the City of Flint and their 2013 Taxable Value totals and Industrial Facilities Tax Valuation totals are as follows:

| Taxpayer | Product/Service | Taxable Value | + | IFT Valuation | = | Total Valuation |
|---|---|---|---|---|---|---|
| Consumers* | Utility | $51,454,247 | | $0 | | $51,454,247 |
| General Motors | Automotive | 47,820,558 | | 9,386,600 | | 57,207,158 |
| Delphi | Automotive | 12,067,500 | | 0 | | 12,067,500 |
| Barrette | Outdoor living | 10,102,700 | | 0 | | 10,102,700 |
| 4405 Continental | Distribution center | 6,418,860 | | 0 | | 6,418,860 |
| IINN | Office space | 5,251,400 | | 0 | | 5,251,400 |
| Comcast | Cable operator | 5,106,000 | | 0 | | 5,106,000 |
| Saginaw & Court | Office/Finance | 4,160,735 | | 0 | | 4,160,735 |
| Citizens Bank | Finance | 3,363,904 | | 0 | | 3,363,904 |
| PPG | Manufacturing | 3,201,900 | | 0 | | 3,201,900 |
| TOTAL | | $148,947,804 | | $9,386,600 | | $158,334,404 |

\* Consumers Energy is contesting the multipliers used for assessing their personal property taxes with the State Tax Tribunal. The City has determined that the outcome will have little effect on City revenue. See "PERSONAL PROPERTY TAX ASSESSMENTS AND APPEALS" below.

The 2013 Taxable Valuations of the above taxpayers excluding IFT valuation represent 19.18% of the City's 2013 Taxable Valuation of $776,654,903. The Total Valuations including IFT valuation represent 6.20% of the 2013 Total Taxable Valuation of $809,803,903.

Source: City of Flint

## PERSONAL PROPERTY TAX ASSESSMENTS AND APPEALS

Since the 1960's, Michigan personal property tax assessments have been based on the use of one or more of several different multiplier tables formulated by the State Tax Commission against taxpayer reported original cost, depending on the assessor's view of the average life of the personal property. The Michigan State Tax Commission has approved revisions to the State's personal property tax tables which are effective for the year 2000 and which may reduce overall personal property tax revenues in some jurisdictions. The State Tax Tribunal has informally indicated that it may allow the new multipliers to be applied retroactively in pending personal property tax appeals. In anticipation of the new multipliers, many personal property taxpayers filed appeals of their existing tax assessments. In an unpublished, non-precedential opinion, the Michigan Court of Appeals, in *Valassis Communications v. City of Livonia*, recently affirmed a decision of the Michigan Tax Tribunal that the personal property multipliers, which became effective in 2000, could be used to determine the true cash value of the subject property for the 1999 tax year. In its unpublished opinion, the Michigan Court of Appeals held that the controlling factor is whether the method used most accurately reflects the property's true cash value. The Court of Appeals determined that based on the facts of the case, the old multipliers (in effect for the 1999 tax year) did not accurately reflect the property's true cash value and that the 2000 multipliers more accurately reflected the property's true cash value.

## CONSTITUTIONAL ROLLBACK AND ASSESSMENT CAPS

Article IX, Section 31 of the Michigan Constitution requires that if the total value of existing taxable property (State Equalized Valuation) in a local taxing unit, exclusive of new construction and improvements, increases faster than the U.S. Consumer Price Index from one year to the next, the maximum authorized tax rate for that local taxing unit must be reduced through a Millage Reduction Fraction unless new millage is authorized by a vote of the electorate of the local taxing unit.

## TAX RATES (Per $1,000 of Valuation)

Under Michigan statutes, the property tax base used for levies authorized for the City is the same as that used for school district, county, township, special authority, and city levies. Each school district, county, township, special authority and city has a geographical definition which constitutes a tax district. Since local school districts and the county overlap either a township or a city, and intermediate school districts overlap local school districts and county boundaries, the result is many different tax rate districts.

C-6

| *City of Flint* | 2013 | 2012 | 2011 | 2010** | 2009 |
|---|---|---|---|---|---|
| Operating | 7.5000 | 7.5000 | 7.5000 | 7.5000 | 7.5000 |
| Neighborhood Police | 2.0000 | 2.0000 | 2.0000 | 2.0000 | 2.0000 |
| Paramedic Service | 0.5000 | 0.5000 | 0.5000 | 0.5000 | 0.5000 |
| Refuse*** | 0.0000 | 3.0000 | 3.0000 | 3.0000 | 3.0000 |
| Public Improvements | 2.5000 | 2.5000 | 2.5000 | 2.5000 | 2.5000 |
| Parks & Recreation | 0.5000 | 0.5000 | 0.5000 | 0.5000 | 0.5000 |
| Police and Fire | 6.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| City of Flint Total Millage | 19.0000* | 16.0000 | 16.0000 | 16.0000 | 16.0000 |

Note: The City's property tax rates may be increased only by a majority vote of the City's electors voting in a City election.

* Under Charter & Applicable State Law - Under the Michigan Home Rule Cities Act, a Home Rule City is allowed to extend the operating millage not to exceed two percent (2% or 20 mills) of assessed value of all real and personal property in the City.

** An additional 6.7100 mills was placed on the 2010-11 winter roll as a one-time Court -Ordered Levy to pay the Genesee Towers judgment.

*** The Direct City Taxes increased by 6.0 mills with the addition of the Public Safety Millage and decreased by 3.000 mills with the elimination of the Waste Collection Millage.

Source: City Audit Dept. / City Assessor

**TAX RATE LIMITATION**

The City is authorized to levy the following tax rates:

| | Millage Authorized | Maximum Allowable Millage after Rollback | Expiration Date of Levy |
|---|---|---|---|
| Operating | 7.5000 | 7.5000 | Indefinite |
| Police | 2.0000 | 2.0000 | 06/30/2017 |
| Public Improvements | 2.5000 | 2.5000 | Indefinite |
| Paramedic Service | 0.5000 | 0.5000 | 06/30/2016 |
| Parks & Recreation | 0.5000 | 0.5000 | 12/31/2016 |
| Police & Fire | 6.0000 | 6.0000 | 07/02/2016 |

**TAX LEVIES AND COLLECTIONS**

The City's fiscal year begins July 1 and ends June 30. City property taxes are due in three equal installments on July 1, October 1 and February 1. The installments bear a penalty and begin to accrue interest if not paid by August 1, November 1 and March 1 respectively. All real property taxes remaining unpaid on March 1st of the year following the levy are turned over to the County Treasurer for collection. Genesee County annually pays from its Tax Revolving Fund delinquent taxes on real property to all taxing units in the County, including the City's, shortly after the date delinquent taxes are returned to the County Treasurer for collection. The payments from this fund have resulted in collections of taxes approaching 100% for all taxing units.

A history of tax levies and collections for the City for the last five completed years is as follows:

| Year Ending | Total Tax Levy | Collections to March 1, of Following Year | | Collections to June 30, of Following Year | |
|---|---|---|---|---|---|
| 2013 | $28,192,664 | $19,113,565 | 67.80%* | $24,134,164 | 85.60% |
| 2012 | 18,022,915 | 14,245,037 | 79.04 | 15,866,017 | 88.03 |
| 2011 | 21,029,361 | 16,565,947 | 78.78 | 19,431,043 | 92.40 |
| 2010 | 22,864,857 | 18,580,520 | 81.26 | 21,950,721 | 96.00 |
| 2009 | 25,297,684 | 20,838,394 | 82.37 | 24,075,213 | 95.17 |

*partial year as of March 1.

The Tax Revolving Fund is financed through the issuance of Delinquent Tax Anticipation Notes (DTANs).  Although the County anticipates the continuance of this program, the ability to issue such DTANs is subject to Michigan Department of Treasury approval and market conditions at the time of offering.  In addition, Act 206 of 1893, as amended, provides in part that:  "The primary obligation to pay to the County the amount of taxes and interest thereon shall rest with the local taxing units, and if the delinquent taxes which are due and payable to the County are not received by the County for any reason, the County has full right of recourse against the taxing unit to recover the amount thereof and interest thereon..."  On the first Tuesday in May in each year, a tax sale is held by the County at which lands delinquent for taxes assessed in the third year, preceding the sale, or in a prior year are sold for the total of the unpaid taxes of those years.

The General Property Tax Act was amended by Act 123, Public Acts of Michigan of 1999 ("Act 123") which made extensive revision to the procedures for collection of delinquent real property taxes.  In general, for real property taxes levied after December 31, 1998, all County Treasurers hold a tax lien sale on the second Monday in May (26 months after taxes were returned as delinquent).  Act 123 has the effect of shortening the process for collection of delinquent real property taxes from approximately six years (including statutory redemption periods) to approximately two years from the date taxes are returned to the County Treasurer as delinquent.

**FEES AND CHARGES**

In fiscal year 2013, the City of Flint implemented a special assessment for street lighting and an annual fee for garbage collection.  The street light assessment is projected to generate $2.85 million and is expected to continue into the future.  The $2.85 million pays for the cost of the City's street lighting program and frees up revenue for use for public safety expenses of the City.  The City also eliminated its 3 mill rubbish collection millage and replaced the property tax with an annual fee of $143.  This fee based system is designed to cover the costs of rubbish collection whereas the 3 mill property tax required unplanned transfers from the general fund by as much as $1.5 million a year.  This new fee, coupled with the outsourcing of the City's rubbish collection, is projected to eliminate the general fund subsidy of rubbish collection.

**REVENUES FROM THE STATE OF MICHIGAN**

The City receives revenue sharing payments from the State of Michigan under the State Constitution and the State Revenue Sharing Act of 1971, as amended.  The revenue sharing payments are composed of two components - a constitutional distribution and a statutory distribution.  The constitutional distribution is mandated by the State Constitution and distributed on a per capita basis to townships, cities and villages.  The amount of the constitutionally mandated revenue sharing component distributed to the City can vary depending on the population of the City and the receipt of sales tax revenues by the State.

The statutory distribution is authorized by legislative action and distribution is subject to annual State appropriation by the State Legislature.  Statutory distributions may be reduced or delayed by Executive Order during any State fiscal year in which the Governor, with the approval of the State Legislature's appropriations committees, determines that actual revenues will be less than the revenue estimates on which appropriations were based.

On June 13, 2013, Governor Snyder signed into law the budget for fiscal year 2014.  Similar to fiscal year 2013, the budget replaces the statutory distribution for cities, villages and townships with an incentive-based revenue sharing program known as the Economic Vitality Incentive Program ("EVIP"), that will be distributed to municipalities that comply with "best practices" such as increasing transparency and consolidating services.  The fiscal year 2014 budget does not alter the constitutional component, and includes an increased constitutional revenue sharing distribution to cities, villages and townships of approximately $737,000,000 from the fiscal year 2013 distribution of $722,000,000.  Under the EVIP program, an eligible municipality such as the City can receive (i) one-third of the money it is eligible for if it meets requirements for accountability and transparency, including making a citizen's guide to its finances, a performance dashboard and a debt service report available for public viewing; (ii) another third if it develops plans to increase its existing level of cooperation, collaboration and consolidation, both internally and with neighboring jurisdictions; and (iii) a final third if it develops and certifies an unfunded accrued liability plan.  The unfunded accrued liability plan, which replaced the requirement in fiscal year 2013 to modify employee compensation plans, must be certified by June 1, 2014 for the City to receive all of the money that it is eligible for from the final component described in clause (iii) above.  Any portion of the EVIP that the City would be eligible to receive would be subject to certain benchmarks that the City would need to meet, and there can be no assurance of what amount, if any, the City would receive under the proposed EVIP program.  The City received EVIP payments totaling $6,182,769 for fiscal year 2013, and is anticipating it will receive $6,182,769 for fiscal year 2014 payments.

Purchasers of the Bonds should be alerted to further modifications to revenue sharing payments to Michigan local governmental units, to potential consequent impact on the City's general fund condition, and to the potential impact upon the market price or marketability of the Bonds resulting from changes in revenues received by the City from the State.

The following table sets forth the annual revenue sharing payments and other moneys received by the City for the fiscal years ended June 30, 2010 through June 30, 2013, and the estimated revenue sharing payments to be received in the fiscal year ending June 30, 2014.

| Fiscal Year Ended June 30 | Constitutional Revenue Sharing Payments | Statutory Revenue Sharing/EVIP Payments | Total |
|---|---|---|---|
| 2014 (estimate) | $7,640,908 | $6,480,642 | $14,121,550 |
| 2013 | 7,484,413 | 6,182,769 | 13,667,182 |
| 2012 | 7,332,602 | 5,770,584 | 13,103,186 |
| 2011 | 6,888,992 | 9,535,096 | 16,424,088 |
| 2010 | 7,917,588 | 8,506,500 | 16,424,088 |

Source: Web site http://treasury.state.mi.us

## CITY INCOME TAX

On January 1, 1965, a local income tax at a rate of 1% on all income of residents and corporations and 1/2% on income earned in the City by nonresident became effective through the enactment of the Uniform City Income Tax Ordinance, as prescribed by Act 248, Public Acts of Michigan, 1964.  The income tax is imposed for general revenue purposes and may be used for general governmental functions or capital improvement expenditures.

The following is the amount of City income tax collected annually for the last five years.

| Fiscal Year Ended June 30 | Net Income Tax |
|---|---|
| 2013 | $14,674,274 |
| 2012 | $14,839,999 |
| 2011 | $14,396,346 |
| 2010 | $13,551,247 |
| 2009 | $14,277,939 |

## LABOR FORCE

The City of Flint has a history of contract settlement without strikes.  A breakdown of the number of employees of the City of Flint and their affiliation with organized groups is as follows:

| Employees | Full Time Number | Part Time Number | Affiliation | Contract Expiration |
|---|---|---|---|---|
| Clerical/Labor | 224 | 18 | AFSCME Local 1600 | 06/30/2014 |
| Supervisory/Professional | 47 | 0 | AFSCME Local 1799 | 06/30/2014 |
| Police Patrol | 84 | 0 | Flint Police Officers Assn. | 06/30/2014* |
| Police Sergeants | 36 | 0 | Teamsters Local 129 | 06/30/2014 |
| Police Captains & Lieutenants | 8 | 0 | Flint Police Cap'ts & L'ts. Assn. | 06/30/2014 |
| Firefighters | 114 | 6 | Int'l. Assn. of Firefighters No. 352 | 06/30/2014 |
| Exempt Employees | 38 | 5 | Non-Affiliated | |
| Appointees/Elect | 16 | 0 | Non-Affiliated | |
| TOTAL | 567 | 29 | | |

* Contract terms imposed per PA4

## PENSION FUND

The Flint Employees' Retirement System (FERS) is a defined benefit pension plan that provides retirement benefits to certain City retirees. The FERS was established and is governed by City ordinance, with the board of trustees comprised of City officials and retirees. The FERS is reported as a Pension Trust Fiduciary Fund. During the year ended June 30, 2013, the board was disbanded and the investments in FERS were transferred out to Municipal Employees' Retirement Systems (MERS). The FERS fund was closed and MERS will now take on the fiduciary responsibility of the plan.

C-9

Contributions to the plans for the last five years are as follows:

| Year Ended June 30 | General, Police and Fire Benefit Groups | Year Ended June 30 | Hurley Medical Center Benefit Group* |
|---|---|---|---|
| 2013 | $11,641,714 | 2013 | $3,268,075 |
| 2012 | 8,058,450 | 2012 | 6,503,942 |
| 2011 | 5,505,305 | 2011 | 5,505,003 |
| 2010 | 3,889,397 | 2010 | 8,896,382 |
| 2009 | 6,803,233 | 2009 | 7,694,335 |

Funding status and funding progress:

| Actuarial Valuation Year Ended | Actuarial Value of Assets (a) | Actuarial Accrued Liability Individual Entry Age (AAL) (b) | Unfunded (Overfunded) AAL (UAAL) (b-a) | Funded Ratio (a/b) | Covered Payroll (c) | UAAL as % of Covered Payroll ((b-a)/c) |
|---|---|---|---|---|---|---|
| 6/30/2006 | 782,098 | 1,023,599 | 241,501 | 76.4 | 146,634 | 164.7 |
| 6/30/2007 | 801,533 | 1,071,781 | 270,248 | 75.2 | 157,012 | 172.1 |
| 6/30/2008 | 670,366 | 841,266 | 170,900 | 79.7 | 89,636 | 190.7 |
| 6/30/2009 | 623,292 | 873,088 | 249,796 | 71.4 | 89,636 | 278.7 |
| 6/30/2010 | 567,215 | 835,052 | 267,837 | 67.9 | 68,968 | 388.3 |
| 6/30/2011 | 506,504 | 829,380 | 322,876 | 61.1 | 63,063 | 512.0 |

See Appendix D - See City of Flint Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2013, Note 11 - Retirement Plans

**Other Post Employment Benefits (OPEB)**

The City provides retiree healthcare benefits to eligible employees and their spouses through the Retiree Health Care Trust Fund. Benefits are provided to public safety and general employees. Currently, the plan has 2,339 members, including 506 employees in active service, 0 terminated employees not yet receiving benefits, and 1,833 retired employees and beneficiaries currently receiving benefits.

The funding progress of the plan as of the most recent valuation data is as follows:

| Actuarial Valuation Date | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) (b) | Unfunded AAL (UAAL) (b-a) | Funded Ratio (Percent) (a/b) | Covered Payroll (c)* | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| 7/1/2012 | $ 166,903 | $320,180,757 | $320,013,854 | 0.1 | $ - | - |
| 7/1/2011 | - | 366,832,597 | 366,832,597 | - | 37,339,842 | 982.0 |
| 7/1/2010 | - | 862,302,934 | 862,302,934 | - | 36,252,274 | 2,379.0 |
| 7/1/2009 | - | 774,606,738 | 774,606,738 | - | 41,166,662 | 1,882.0 |

* For actuarial valuation date 7/1/12, the annual required contribution calculation is based on a flat dollar amount.

See Appendix D - City of Flint Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2013, Note 12 - Other Postemployment Benefits

**DEBT STATEMENT** (as of April 2, 2014 and including the Bonds described herein)

Each series of bonds marked "LT" is payable in the first instance from a specified source and is payable from the general funds of the City in the event of insufficiency of the specified source. The City is not authorized to levy taxes beyond constitutional and statutory tax rate limitations with respect to the bonds marked "LT".

DIRECT DEBT

| | Dated Date | Amount Outstanding | |
|---|---|---|---|
| *General Obligation Bonds* | | | |
| Fiscal Stabilization Bonds, LT | 04/13/11 | $7,620,000 | |
| Capital Improvement, Public Garage/Parking, LT | 12/28/07 | 8,955,000 | $16,575,000 |
| *Authority Revenue Bonds - No City Pledge* | | | |
| Hurley Medical Center, Refunding, SSAuth | 06/11/03 | 5,150,000 | |
| Hurley Medical Center, Series 2010, SSAuth | 03/25/10 | 33,215,000 | |
| Health Care Faciliites, Equipment | 09/30/11 | 3,716,906 | |
| Hurley Medical Center, Series 2013A, SSAuth | 04/02/13 | 21,940,000 | |
| Hurley Medical Center, Series 2013B, SSAuth | 04/02/13 | 36,035,000 | 100,056,906 |
| *City Revenue Bonds* | | | |
| MI Bond Bank - Water  DWRF Series 1999 | 09/30/99 | 2,928,994 | |
| MI Bond Bank - Water  DWRF Series 2000 | 09/28/00 | 3,700,000 | |
| MI Bond Bank - Water  DWRF Series 2001 | 09/28/01 | 4,731,408 | |
| MI Bond Bank - Water  DWRF Series 2003 | 09/25/03 | 11,599,934 | 22,960,336 |
| | | | |
| *Share of Authority Issued Bonds* | | | |
| Water Supply System Bonds, Series 2014 A, LT | 04/16/14 | 75,411,000 | $75,411,000 |

| | | | |
|---|---|---|---|
| TOTAL DIRECT DEBT | | | $215,003,242 |
| Less: | Revenue Bonds | (123,017,242) | |
| | Revenue Supported Authority Bonds | (75,411,000) | (198,428,242) |

| | | |
|---|---|---|
| NET DIRECT DEBT | | $16,575,000 |

OVERLAPPING DEBT

| **Percent** | **Municipality** | **Amount Outstanding** | **City's Share** |
|---|---|---|---|
| 7.68% | Carman Ainsworth S/D | $40,208,000 | $3,087,974 |
| 100.00 | Flint S/D | 12,760,000 | 12,760,000 |
| 1.33 | Swartz Creek S/D | 12,615,000 | 167,780 |
| 8.81 | Genesee County | 74,170,696 | 6,534,438 |
| 8.32 | Genesee ISD | 46,050,000 | 3,831,360 |
| 8.81 | Mott Community College | 10,430,000 | 918,883 |

| | |
|---|---|
| NET OVERLAPPING DEBT | 27,300,435 |
| NET DIRECT AND OVERLAPPING DEBT | $43,875,435 |

Source:  Municipal Advisory Council of Michigan

**DEBT RATIOS**

| | |
|---|---|
| *Per Capita (102,434)* | |
| Net Direct Debt | $161.81 |
| Net Direct and Overlapping Debt | $428.33 |
| | |
| *Ratio to 2013 Taxable Value ($776,654,903)* | |
| Net Direct Debt | 2.13% |
| Net Direct and Overlapping Debt | 5.65% |

C-11

*Ratio to 2013 State Equalized Valuation ($795,172,400)*

| | |
|---|---:|
| Net Direct Debt | 2.08% |
| Net Direct and Overlapping Debt | 5.52% |

*Ratio to 2013 Estimated True Cash Value ($1,590,344,800)*

| | |
|---|---:|
| Net Direct Debt | 1.04% |
| Net Direct and Overlapping Debt | 2.76% |

\* Preliminary, subject to change.

## DEBT HISTORY

The City has no record of default.

## FUTURE FINANCING

The City has entered into a contract with the Karegnondi Water Authority and the County of Genesee pursuant to which the Authority will issue an additional $80,000,000 of bonds over the next 3 to 15 months in anticipation of payments to be made by the County and the City to finance a raw water supply project to serve the County, the City and several other municipalities. The City will make a limited tax general obligation pledge of the City on approximately 30% of these bonds.

## LEGAL DEBT MARGIN

Section 7-302 of the City Charter, adopted November 4, 1975, limits "net" debt to 7% of the assessed value of all real and personal property in the City, but does not define "net" debt. The following computation is based on previous practice and is consistent with the requirements of State of Michigan Public Act 279 of 1909.

| | | |
|---|---:|---:|
| 2013 State Equalized Valuation - excluding IFT values | | $795,172,400 |
| Debt Limit - 10 % of State Equalized Valuation | | $79,517,240 |
| | | |
| Amount of Direct Debt Outstanding | $215,003,242 | |
| | | |
| Less: Revenue Bonds and Exempt Authority Bonds | (198,428,242) | |
| | | |
| Total Subject to Debt Limit | | 16,575,000 |
| | | |
| Additional Debt Which Could Be Legally Incurred | | $62,942,240 |

C-12

# GENERAL ECONOMIC INFORMATION

**LOCATION AND AREA**

The City of Flint, county seat of Genesee County, has a land area of approximately 32.8 square miles and is located in the southeastern portion of Michigan's Lower Peninsula, 70 miles northwest of the City of Detroit.  Lake Huron lies approximately 65 miles to the east of the City, while the Saginaw Bay is about 40 miles to the north.

As an important durable goods producer, the City is located the following distances from these commercial and industrial areas of Michigan:

| | |
|---|---|
| 35 | miles northwest of Pontiac |
| 36 | miles south of Saginaw |
| 50 | miles northeast of Lansing |
| 54 | miles north of Ann Arbor |
| 70 | miles northwest of Detroit |
| 99 | miles east of Grand Rapids |

**EMPLOYMENT CHARACTERISTICS\***

The following companies located in the City and surrounding communities offer employment opportunities for residents.

| <u>Company</u> | <u>Product/Service</u> | No. of <u>Employed</u> |
|---|---|---|
| ***Within City of Flint*** | | |
| McLaren Health Care Corporation | Hospital & other health care | 3,014 |
| Hurley Medical Center | Medical center | 2,811 |
| Baker College | Higher education | 2,800 |
| General Motors Corp. /Assembly | Truck & bus assembly | 2,100 |
| A I Flint LLC | Car parts and accessories | 1,500 |
| Genesys Health Care System | Health care | 1,000 |
| General Motors Corp., Powertrain Div. | Engines & gears & transmissions | 961 |
| Genesee Intermediate Schools | Education | 950 |
| Mott Community College | Higher education | 949 |
| Flint Community Schools | Educational services | 820 |
| Meijer Inc. (2 stores) | Department store | 800 |
| First Merit Bank | Banking | 780 |
| Carman Ainsworth | Education | 706 |
| General Motors Corp./ South Flint | Automotive engines | 663 |
| E L Hollingsworth & CO | Freight and logistics | 646 |
| Creative Foam Corp. | Plastic products | 600 |
| City of Flint | Municipality | 596 |
| Genova Products (HQ) | Plastic pipes | 570 |
| General Motors Corporation | Customer care center | 500 |
| Flint Special Services, Inc. | Freight and logistics | 500 |
| Kettering University | Higher education | 425 |
| Sears, Roebuck & Co. | Retail sales | 400 |
| Home Depot (3 stores) | Home center | 350 |
| Kroger (3 stores) | Supermarket | 350 |
| Coca Cola Bottling | Bottling facility | 300 |
| Lowe's (2 stores) | Home center | 300 |

| | | |
|---|---|---|
| Oakley Industries Sub Assembly (HQ) | Auto parts | 300 |
| Cable TV-Flint | Cable service | 250 |
| Goodwill Industries Of Mid-Michigan (HQ) | Job training/ vocational | 250 |
| Bill Thomas' Halo Burger, Inc. (HQ) | Restaurant | 230 |
| United States Postal Service | US Postal Service | 210 |
| Target (2 Stores) | Department store | 200 |
| The Flint Journal | Newpaper | 180 |
| Corsair Engineering | Shipping containers | 150 |
| Allied Waste Service | Waste management | 150 |
| Mott Children's Health Center | Healthcare | 150 |
| Beecher Community Schools | Education | 135 |
| Barrette Outdoor Living, Inc. | Lattice panels | 125 |
| Koegel Meats, Inc. | Meat processing | 100 |
| Monroe Truck Equipment | Truck equipment | 100 |
| Genesee Packaging, Inc. | Light assembly | 100 |
| H-Care | Durable medical equipment | 100 |
| Comcast Cable | Cable service | 100 |

The approximate number of employees listed are as reported in these sources: 2013 Michigan Manufacturers Directory, Manta Company Intelligence website, the Michigan Economic Development Council ("MEDC"), and individual employers.

 *Due to reporting time lags and other factors inherent in collecting and reporting such information, the numbers may not reflect recent changes in employment levels, if any.

## POPULATION BY AGE

The 2010 U.S. Census estimate of population by age for the City of Flint is as follows:

| | **Number** | **Percent** |
|---|---|---|
| Total Population | 102,434 | 100.00% |
| 0 through 19 years | 31,750 | 31.00 |
| 20 through 64 years | 59,685 | 58.26 |
| 65 years and over | 10,999 | 10.74 |
| Median age | 33.6 years | |

## INCOME

The 2010 U.S. Census estimate of household income for the City of Flint is as follows:

| | **Number** | **Percent** |
|---|---|---|
| HOUSEHOLDS BY INCOME | 41,175 | 100.00% |
| Less than $10,000 | 8,864 | 21.53 |
| $10,000 to $14,999 | 3,797 | 9.22 |
| $15,000 to $24,999 | 7,060 | 17.15 |
| $25,000 to $34,999 | 5,452 | 13.24 |
| $35,000 to $49,999 | 5,988 | 14.54 |
| $50,000 to $74,999 | 5,260 | 12.77 |
| $75,000 to $99,999 | 2,751 | 6.68 |
| $100,000 to $149,999 | 1,597 | 3.88 |
| $150,000 to $199,999 | 299 | 0.73 |
| $200,000 or more | 107 | 0.26 |
| Median Income | $26,621 | |
| Mean Income | $35,631 | |

**EMPLOYMENT BREAKDOWN**

The 2010 U. S. Census reports the occupational breakdown of persons 16 years and over for the City of Flint as follows:

|  | Number | Percent |
|---|---|---|
| PERSONS BY OCCUPATION | 30,196 | 100.00% |
| Professional Specialty Occupations | 6,801 | 20.97 |
| Service Occupations | 8,819 | 23.70 |
| Sales & Office Occupations | 7,334 | 22.44 |
| Construction & Maintenance Occupations | 1,815 | 8.18 |
| Transportation & Material Moving Occupations | 5,427 | 24.57 |

The breakdown by industry for persons 16 years and over for the City of Flint is as follows:

|  | Number | Percent |
|---|---|---|
| PERSONS BY INDUSTRY | 30,196 | 100.00% |
| Agriculture, Forestry, Fishing, Hunting & Mining | 160 | 0.53 |
| Construction | 1,155 | 3.83 |
| Manufacturing | 4,354 | 14.42 |
| Wholesale Trade | 613 | 2.03 |
| Retail Trade | 3,852 | 12.76 |
| Transportation | 1,318 | 4.36 |
| Information | 550 | 1.82 |
| Finance, Insurance, & Real Estate | 1,323 | 4.38 |
| Professional & Management Services | 2,168 | 7.18 |
| Educational, Health & Social Services | 8,853 | 29.32 |
| Arts, Entertainment, Recreation & Food Services | 3,079 | 10.20 |
| Other Professional and Related Services | 1,409 | 4.67 |
| Public Administration | 1,362 | 4.51 |

**UNEMPLOYMENT**

The Michigan Employment Security Commission, Research and Statistical Division, reports unemployment averages for the City of Flint as follows:

|  | City of Flint |
|---|---|
| 2014 YTD (January) | 16.7% |
| 2013 Annual Average | 17.0 |
| 2012 Annual Average | 16.6 |
| 2011 Annual Average | 19.0 |
| 2010 Annual Average | 23.5 |

**BANKING**

The following banks have branches located within the City according to the Accuity American Financial Directory, July - December 2013.

| Bank | Main Office | Total State-Wide Deposits |
|---|---|---|
| First Place Bank | Warren, OH | N/A |
| The Huntington National Bank | Columbus, OH | N/A |
| Bank of America | Charlotte, NC | N/A |
| Fifth Third Bank | Cincinnati, OH | N/A |
| First Merit Bank | Akron, OH | N/A |
| Flagstar Bank, FSB | Troy, MI | $8,771,046,000 |
| Chemical Bank | Midland, MI | 4,921,683,000 |
| JPMorgan Chase Bank, National Association | Columbus, OH | N/A |

C-15

**City of Flint**
**Summary of General Fund Adopted Revenue and Expenditure Budget**
**Fiscal Year Ending June 30, 2014**

| Revenue | FY14 Amended 11/1/2013 | FY14 Amended 2/17/2014 |
|---|---|---|
| Property Tax | $4,619,941 | $4,719,941 |
| Income Tax | 14,210,000 | 14,210,000 |
| Federal Revenue | - | - |
| State Revenue | 15,375,985 | 14,986,814 |
| Licensing and Permits | 1,303,626 | 1,303,626 |
| Fines and Forfeitures | 1,677,550 | 2,041,635 |
| Charges for Services | 9,090,867 | 10,434,516 |
| Other Revenue | 6,676,498 | 6,851,584 |
| **Total Revenue** | $52,954,467 | $54,548,116 |
| | | |
| **Expenditures** | | |
| | | |
| General Government | $8,295,108 | $8,229,910 |
| District Court | 5,194,307 | 5,194,307 |
| Public Safety | 35,035,993 | 36,694,840 |
| Infrastructure | 2,889,889 | 2,889,889 |
| Governance | 539,170 | 539,170 |
| Other Expenditures | - | - |
| **Total Expenditures** | $51,954,467 | $53,548,116 |
| | | |
| **Revenue Over (Under) Expenditures** | $1,000,000 | $1,000,000 |
| | | |
| Fund Balance Beginning of Year | ($12,895,642) | ($12,895,642) |
| | | |
| **Fund Balance End of Year** | ($11,895,642) | ($11,895,642) |

Note: Flint reduced its expected expenditures by $1,000,000 as a budget control mechanism to help ensure that the City reduces its structural deficit.

C-16

**APPENDIX D**

**CITY OF FLINT**
**AUDITED FINANCIAL STATEMENTS**

*Attached are the audited financial statements for the City of Flint for the fiscal year ended June 30, 2013. The auditors for the City have not been asked to consent to the use of information from such financial statements in either the Preliminary Official Statement or the Official Statement and have not conducted any subsequent review of such financial statements.*

[THIS PAGE INTENTIONALLY LEFT BLANK]



Plante & Moran, PLLC
Suite 1A
111 E. Court St.
Flint, MI 48502
Te: 810.767.5910
Fax 810.767.3430
pltetsroman.com

D-1

Independent Auditor's Report

To the Emergency Manager, Honorable Mayor,
    and Members of the City Council
City of Flint
Flint, Michigan

**Report on the Financial Statements**

We have audited the accompanying financial statements of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of the City of Flint (the "City") as of and for the year ended June 30, 2013 and the related notes to the financial statements, which collectively comprise the City's basic financial statements as listed in the table of contents.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditor's Responsibility*

Our responsibility is to express opinions on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.   The financial statements of Hurley Medical Center, the Downtown Development Authority, the Economic Development Corporation, and the Flint Area Enterprise Community were not audited under *Government Auditing Standards*.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinions.

1



To the Emergency Manager, Honorable Mayor,
    and Members of the City Council
City of Flint
Flint, Michigan

*Opinions*

In our opinion, the financial statements referred to above present fairly, in all material respects, the respective financial position of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of the City as of June 30, 2013 and the respective changes in its financial position and cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

*Emphasis of Matter*

As discussed in Note 20 to the basic financial statements, the beginning net position/fund balance has been restated to correct a misstatement. Our opinion is not modified with respect to this matter.

*Other Matters*

*Required Supplemental Information*

Accounting principles generally accepted in the United States of America require that the management's discussion and analysis, pension system schedules of funding progress and employer contributions, and the major fund budgetary comparison schedules, as identified in the table of contents, be presented to supplement the basic financial statements.  Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board, which considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplemental information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

*Other Supplemental Information*

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise the City's basic financial statements. The other supplemental information, introductory section, and statistical section, as identified in the table of contents, are presented for the purpose of additional analysis and are not a required part of the basic financial statements.

The other supplemental information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the basic financial statements or to the basic financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America.  In our opinion, the other supplemental information is fairly stated in all material respects in relation to the basic financial statements as a whole.

The introductory and statistical sections have not been subjected to the auditing procedures applied in the audit of the basic financial statements and, accordingly, we do not express an opinion or provide any assurance on it.

2

To the Emergency Manager, Honorable Mayor,
   and Members of the City Council
City of Flint
Flint, Michigan

**Other Reporting Required by *Government Auditing Standards***

In accordance with *Government Auditing Standards*, we have also issued our report dated December 17, 2013 on our consideration of the City of Flint, Michigan's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, grant agreements, and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance.  That report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the City's internal control over financial reporting and compliance.

*Plante & Moran, PLLC*

December 17, 2013

## Management's Discussion and Analysis

**City of Flint, Michigan**

*Management's Discussion and Analysis*

Following is a brief overview and analysis of the financial statements for the City of Flint, Michigan (the "City") for the 2013 fiscal year, which began on July 1, 2012 and ended on June 30, 2013. The reader is encouraged to not only consider the comments made here but to review the statements in their entirety.

The City provides a full range of municipal services, including police and fire protection, construction and maintenance of streets, sidewalks, and other infrastructure, maintenance and operation of water and sewer systems, maintenance of parks, and waste collection. These activities comprise the majority of the City's governmental and business-type activities.

In addition to governmental and business-type activities, the financial statements include the activities of Hurley Medical Center, Flint Downtown Development Authority, Flint Economic Development Corporation, and Flint Area Enterprise Community. While part of the City government, these entities are presented as "discrete component units" because of their independent management authority. In previous years, Hurley Medical Center has been included as a business-type activity of the City government, but a review of its status has concluded that it can be more appropriately presented as a discrete component unit.

**Financial Highlights**

In fiscal year 2013, the City billed $187.7 million in taxes, fees, and grants for governmental and business-type activities, and spent $170.0 million to provide the services. During the course of the year, the City acquired capital assets totaling $5.1 million in governmental activities and $1.7 million in building improvements and equipment in business-type activities. At the end of the year, the assets of the City governmental and business-type activities totaled $356.4 million and liabilities totaled $238.6 million, for net position totaling $117.8 million. However, net unrestricted net position totaled a negative $150.1 million. The majority of the negative unrestricted net position reflects the $158.9 million liability for unfunded retiree healthcare liabilities; the business-type activities reflected $8.3 million in unrestricted net position.

On December 1, 2011, five months into fiscal year 2012, the governor of the state of Michigan placed the City of Flint into state receivership and appointed an emergency manager. This decision was based on the recommendation of a state appointed review team, whose recommendation was made in part because of a consistent deficit in the General Fund, the decline in pooled cash, unrealistic budgeting, and unfunded liabilities for postemployment benefits.

Although there have been several changes since December 2011, in the laws providing for the appointment of an emergency manager, and there have been three different emergency managers since then, the City has remained under the control of a state appointed manager. These managers exercise direct control of the City's financial and operational matters and have been authorized to "act for and in the place and stead of the governing body and the office of chief administrative officer of the City of Flint."

**City of Flint, Michigan**

*Management's Discussion and Analysis (Continued)*

With the fiscal year 2012 half complete at the time the emergency manager was appointed, it was clear that significant long-term solutions to the City's financial condition could not be achieved in the remainder of that fiscal year. Addressing any significant reductions at that time would have required unthinkable reductions in the level of public safety and other essential City services, and would have been done in an atmosphere of crisis. As a result, it was determined to contain spending as much as possible for the balance of fiscal year 2012, while building a credible spending plan for fiscal year 2013 and laying the necessary groundwork for substantially reducing the City's cost base for fiscal year 2013 and beyond. Consequently, the fiscal year 2012 financial statements showed a $19.2 million General Fund deficit, an increase of $11.9 million.

Faced with an initial projected gap of more than $25 million, the fiscal year 2013 budget was balanced through a mixture of significant revenue increases, significant expenditure decreases, and steps taken to reduce legacy costs. Reports submitted to the state treasurer detailed the 25 percent increase in water and sewer rates, passage of a 6 mill property tax increase for police and fire, which is recorded in a separate public safety special revenue fund and the monies are restricted as such on the government-wide statement of net position, establishment of a special assessment district for street lighting, elimination of 20 percent of the City's workforce, compensation decreases equivalent to a 20 percent wage reduction for remaining employees, and the restructuring of health and retirement benefits for current employees and retirees necessary to develop a credibly balanced spending plan.

The efforts of the emergency managers and City staff were focused on assuring that, at the end of fiscal year 2013, expenses would not exceed revenues. This goal was more than achieved, as the financial statements as of June 30, 2013 show that revenues exceeded expenses in the General Fund by $6.3 million. This will result in the City's accumulated $19.2 million deficit as of June 30, 2012 being reduced to less than $13 million as of June 30, 2013.

Additionally, the City's cash flow improved significantly. Cash flow in December 2011 was projected at approximately $13 million in comparison to current cash on hand as of June 30, 2013 in excess of $43 million.

Finally, the actions taken to restructure healthcare benefits for current employees and retirees have had a significant impact on current costs and long-term liabilities. Much of the positive financial result in FY13 came from these actions. The restructuring, which was implemented during the course of FY12, had the additional benefit of reducing the City's OPEB liabilities by more than $500 million, as reflected in 2012 financial statements.

As spending patterns have been revised to be in accord with available revenues, it has also become possible to focus on additional efforts to reduce and quickly eliminate the accumulated deficit. A formal plan to eliminate the remaining deficit within the next few years will be submitted shortly to the Department of Treasury for consideration.

D-3

**City of Flint, Michigan**

*Management's Discussion and Analysis (Continued)*

**Overview of the Financial Statements**

This discussion and analysis is intended to serve as an introduction to the City's basic financial statements. The City's basic financial statements comprise three components: (1) government-wide financial statements, (2) fund financial statements, and (3) notes to the financial statements. This report also contains other supplemental information in addition to the basic financial statements themselves.

Table I summarizes the major features of the City's financial statements, including the portion of the City government they cover and the types of information they contain. The remainder of this overview section of management's discussion and analysis explains the structure and contents of each of the statements.

D-4

**City of Flint, Michigan**

*Management's Discussion and Analysis (Continued)*

Table I - Major Features of the City of Flint, Michigan's Government-wide and Fund Financial Statements

| Type of Statements | Government-wide | Governmental Funds | Proprietary Funds | Fiduciary Funds |
|---|---|---|---|---|
| Scope | Entire City government (except fiduciary funds) and the City's component units | The activities of the City that are not proprietary or fiduciary, such as police, fire, and parks | Activities the City operates similar to private businesses: the water and sewer system | Instances in which the City is the trustee or agent for someone else's resources, such as the retirement plan for City employees |
| Required financial statements | • Statement of net position<br><br>• Statement of activities | • Balance sheet<br><br>• Statement of revenues, expenditures, and changes in fund balances | • Statement of net position<br><br>• Statement of revenues, expenses, and changes in fund net position<br><br>• Statement of cash flows | • Statement of fiduciary net position<br><br>• Statement of changes in fiduciary net position |
| Accounting basis and measurement focus | Accrual accounting and economic resources focus | Modified accrual accounting and current financial resources focus | Accrual accounting and economic resources focus | Accrual accounting and economic resources focus |
| Type of asset/liability information | All assets and liabilities, both financial and capital, short term and long term | Only assets expected to be used up and liabilities that come due during the year or soon thereafter, no capital assets included | All assets and liabilities, both financial and capital, and short term and long term | All assets and liabilities, both short term and long term; the City's funds do not currently contain capital assets, although they can |
| Type of inflow/outflow information | All revenues and expenses during year, regardless of when cash is received or paid | Revenues for which cash is received during or soon after the end of the year, expenditures when goods or services have been received and payment is due during the year or soon thereafter | All revenues and expenses during year, regardless of when cash is received or paid | All revenues and expenses during year, regardless of when cash is received or paid |

## City of Flint, Michigan

### Management's Discussion and Analysis (Continued)

**Government-wide Financial Statements**

The government-wide financial statements are designed to provide readers with a broad overview of the City's finances, in a manner similar to a private sector business.

The statement of net position presents information on all of the City's assets and liabilities, with the difference between the two reported as net position. Over time, increases or decreases in net position may serve as a useful indicator of whether the financial position of the City is improving or deteriorating.

The statement of activities presents information showing how the City's net position changed during the most recent fiscal year. All changes in net position are reported as soon as the underlying event giving rise to the change occurs, regardless of the timing of related cash flows. Thus, revenues and expenses are reported in this statement for some items that will only result in cash flows in future fiscal periods (e.g., uncollected taxes and earned but unused vacation leave).

Both of the government-wide financial statements distinguish functions of the City that are principally supported by taxes and intergovernmental revenues (governmental activities) from other functions that are intended to recover all or a significant portion of their costs through user fees and charges (business-type activities). The governmental activities of the City include general government, police, fire, transportation, public works, parks and recreation, and community enrichment and development. The business-type activities of the City include the water system and sewer system.

The government-wide financial statements include not only the City itself (known as the primary government), but also the legally separate component units of Hurley Medical Center, Downtown Development Authority, Economic Development Corporation, Atwood Stadium Building Authority, and the Flint Area Enterprise Community, for which the City is financially accountable. Financial information for these component units is reported separately from the financial information presented for the primary government itself. The government-wide financial statements can be found on pages 20-23 of this report.

**Fund Financial Statements** - A fund is a grouping of related accounts that is used to maintain control over resources that have been segregated for specific activities or objectives. The City of Flint, like other state and local governments, uses fund accounting to ensure and demonstrate compliance with finance-related legal requirements. All of the funds of the City can be divided into three categories: governmental funds, proprietary funds, and fiduciary funds.

## City of Flint, Michigan

### Management's Discussion and Analysis (Continued)

**Governmental Funds** - Governmental funds are used to account for essentially the same functions reported as governmental activities in the government-wide financial statements. However, unlike the government-wide financial statements, governmental fund statements focus on near-term inflows and outflows of spendable resources, as well as on balances of spendable resources available at the end of the fiscal year. Such information may be useful in evaluating a government's near-term financing requirements. Because the focus of governmental funds is narrower than that of the government-wide financial statements, it is useful to compare the information presented for governmental funds with similar information presented for governmental activities in the government-wide financial statements. By doing so, readers may better understand the long-term impact of the government's near-term financing decisions. Both the governmental fund balance sheet and the governmental fund statement of revenues, expenditures, and changes in fund balances provide a reconciliation to facilitate this comparison between governmental funds and governmental activities.

The City maintains 20 individual governmental funds. Information is presented separately in the governmental fund balance sheet and in the governmental fund statement of revenues, expenditures, and changes in fund balances for the General Fund, Federal Grants Fund, and the Public Improvement Fund. Data from the other 17 governmental funds are combined into a single, aggregated presentation. Individual fund data for each of these nonmajor governmental funds is provided in the form of combining statements elsewhere in this report.

The City adopts an annual appropriated budget for its General Fund. A budgetary comparison statement has been provided for the General Fund to demonstrate compliance with this budget.

The basic governmental fund financial statements can be found on pages 24-27 of this report.

**Proprietary Funds** - The City maintains two different types of proprietary funds. Enterprise funds are used to report the same functions presented as business-type activities in the government-wide financial statements. The City uses enterprise funds to account for its water and sewer activities. Internal service funds are an accounting device used to accumulate and allocate costs internally among the City's funds. The City uses internal service funds to account for its data processing, central maintenance garage, fringe benefits, and self-insurance activities. Because these services predominantly benefit governmental rather than business-type activities, they have been included within governmental activities in the government-wide financial statements.

Proprietary funds provide the same type of information as the government-wide financial statements, only in more detail. The proprietary fund financial statements provide separate information for the Water and the Sewer Funds, both of which are considered to be major funds of the City. Conversely, the internal service funds are combined into a single, aggregated presentation in the proprietary fund financial statements. Individual fund data for the internal service funds is provided in the form of combining statements elsewhere in this report. The basic proprietary fund financial statements can be found on pages 28-31 of this report.

**City of Flint, Michigan**

## Management's Discussion and Analysis (Continued)

**Fiduciary Funds** - Fiduciary funds are used to account for resources held for the benefit of parties outside the government. Fiduciary funds are not reflected in the government-wide financial statements because the resources of those funds are not available to support the City's own programs. The accounting used for fiduciary funds is much like that used for proprietary funds. The basic fiduciary fund financial statements can be found on pages 32 and 33 of this report.

**Notes to the Financial Statements** - The notes provide additional information that is essential to a full understanding of the data provided in the government-wide and fund financial statements. The notes to the financial statements can be found on pages 37-88 of this report.

**Other Information** - In addition to the basic financial statements and accompanying notes, this report also presents certain required supplemental information concerning the City's progress in funding its obligation to provide pension benefits to its employees. Required supplemental information can be found on pages 89-95 of this report.

The combining statements referred to earlier in connection with nonmajor governmental funds and internal service funds are presented immediately following the required supplemental information on pensions. Combining and individual fund statements and schedules can be found on pages 97-122 of this report.

### Government-wide Financial Analysis

Net position may serve, over time, as a useful indicator of a government's financial position (see Table 2). Total assets of the City are $356.4 million. Total net position (total assets less total liabilities) is $117.8 million, of which the largest portion of $231.9 million reflects its net investment in capital assets (e.g., land, buildings, streets, sidewalks, machinery, and equipment), less depreciation and any related debt used to acquire those assets that is still outstanding. The City uses these capital assets to provide services to citizens; consequently, these assets are not available for future spending. Although the City's net investment in its capital assets is reported net of related debt, it should be noted that the resources needed to repay this debt must be provided from other sources, since the capital assets themselves cannot be used to liquidate these liabilities.

Of the remaining portion of the City's total net position, $36.0 million represents resources which are subject to external restrictions on how they may be used. The unrestricted deficit at year end was $150.1 million, which is down from 2012 deficit of $178.6 million. There is no remaining balance of unrestricted net position that may be used to meet the government's ongoing obligations to citizens and creditors. Net position is divided between governmental activities and business-type activities. Governmental activities show a $158.4 million deficit in unrestricted net position. The $158.4 million deficit results from the increase in the short-term and long-term liabilities, mainly $129.6 million in postemployment healthcare liability, which increased by $1.9 million in total from 2012.

| | Governmental Activities | | Business-type Activities | | Total Primary Government | |
|---|---|---|---|---|---|---|
| Table 2-City of Flint's Net Position (in Millions) | 2012 | 2013 | 2012 | 2013 | 2012 | 2013 |
| Current and other assets | $ 32.1 | $ 48.6 | $ 32.5 | $ 49.9 | $ 64.6 | $ 98.5 |
| Capital assets | 166.7 | 155.5 | 110.1 | 102.4 | 276.8 | 257.9 |
| Total assets | $ 198.8 | $ 204.1 | $ 142.6 | $ 152.3 | $ 341.4 | $ 356.4 |
| Long-term liabilities outstanding | $ 160.9 | $ 160.5 | $ 52.7 | $ 50.9 | $ 213.6 | $ 211.4 |
| Other liabilities | 19.1 | 17.1 | 8.6 | 10.1 | 27.7 | 27.2 |
| Total liabilities | $ 180.0 | $ 177.6 | $ 61.3 | $ 61.0 | $ 241.3 | $ 238.6 |
| Net position: | | | | | | |
| Net investment in capital assets | $ 164.5 | $ 153.3 | $ 84.2 | $ 78.6 | $ 248.7 | $ 231.9 |
| Restricted | 24.4 | 31.6 | 5.6 | 4.4 | 30.0 | 36.0 |
| Unrestricted | (170.1) | (158.4) | (8.5) | 8.3 | (178.6) | (150.1) |
| Total net position | $ 18.8 | $ 26.5 | $ 81.3 | $ 91.3 | $ 100.1 | $ 117.8 |

Business-type activities have $91.3 million of total net position. Business-type activities do not encumber at year end and normally do not appropriate net position as part of the budget process.

**Governmental Activities** - Changes in net position (see Table 3) provide some insight into current year activities as compared to those of the prior year. Total net position for governmental activities increased by $7.7 million. Revenues in 2013 were $12.7 million higher than in 2012. This increase in revenue is mainly due to a public safety millage passed by the voters and increase in state grant revenues in 2013. The 2013 expenses were $8.6 million lower than in 2012. The decrease in expenses was largely in part due to reduction in the cost of healthcare expenses.

**Business-type Activities** - Total net position increased by $10.0 million in business-type activities. The main reason for the increase was due to the City increasing the water and sewer user rates in the latter part of fiscal year 2012. The increased rates, along with a delay in making budgeted capital improvements, have played a vital role in sustaining the fiscal year's budget.

**City of Flint, Michigan**

### Management's Discussion and Analysis (Continued)

Table 3-City of Flint's Changes in Net Position
(in Millions)

| | Governmental Activities | | Business-type Activities | | Total Primary Government | |
|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2012 | 2013 | 2012 | 2013 |
| **Revenues** | | | | | | |
| Program Revenues: | | | | | | |
| Charges for services | $ 16.5 | $ 17.6 | $ 68.0 | $ 80.1 | $ 84.5 | $ 97.7 |
| Operating grants and contributions | 20.9 | 14.2 | 0.0 | 0.0 | 20.9 | 14.2 |
| Capital grants and contributions | 13.3 | 21.9 | 0.0 | 0.0 | 13.3 | 21.9 |
| General revenues: | | | | | | |
| Income taxes | 14.8 | 14.7 | 0.0 | 0.0 | 14.8 | 14.7 |
| Property taxes | 14.3 | 21.7 | 0.0 | 0.0 | 14.3 | 21.7 |
| State shared revenues | 13.1 | 13.7 | 0.0 | 0.0 | 13.1 | 13.7 |
| Other | 1.9 | 3.7 | 0.3 | 0.1 | 2.2 | 3.8 |
| Total revenues | 94.8 | 107.5 | 68.3 | 80.2 | 163.1 | 187.7 |
| **Expenses** | | | | | | |
| Legislative | 1.2 | 0.3 | 0.0 | 0.0 | 1.2 | 0.3 |
| Judicial | 3.7 | 5.1 | 0.0 | 0.0 | 3.7 | 5.1 |
| General government | 10.8 | 7.5 | 0.0 | 0.0 | 10.8 | 7.5 |
| Public safety | 49.1 | 43.0 | 0.0 | 0.0 | 49.1 | 43.0 |
| Public works | 26.0 | 23.0 | 0.0 | 0.0 | 26.0 | 23.0 |
| Parks and recreation | 4.5 | 2.9 | 0.0 | 0.0 | 4.5 | 2.9 |
| Community development | 14.7 | 20.0 | 0.0 | 0.0 | 14.7 | 20.0 |
| Interest on long-term debt | 1.4 | 1.0 | 0.0 | 0.0 | 1.4 | 1.0 |
| Water | 0.0 | 0.0 | 42.5 | 42.0 | 42.5 | 42.0 |
| Sewer | 0.0 | 0.0 | 25.3 | 25.2 | 25.3 | 25.2 |
| Total Expenses | 111.4 | 102.8 | 67.8 | 67.2 | 179.2 | 170.0 |
| Transfers | 3.0 | 3.0 | (3.0) | (3.0) | 0.0 | 0.0 |
| Changes in net position | (13.6) | 7.7 | (2.5) | 10.0 | (16.1) | 17.7 |
| Net position - Beginning - as restated | 32.4 | 18.8 | 83.8 | 81.3 | 263.0 | 246.9 |
| Net position - End | $ 18.8 | $ 26.5 | $ 81.3 | $ 91.3 | $ 246.9 | $ 264.6 |

**Analysis of Fund Financial Statements**

As noted earlier, the City uses fund accounting to ensure and demonstrate compliance with finance-related legal requirements.

**Governmental Funds** - The focus of the City's governmental funds is to provide information on near-term inflows, outflows, and balances of expendable resources. Such information is useful in assessing the City's financing requirements. In particular, unreserved fund balance may serve as a useful measure of a government's net resources available for spending at the end of the fiscal year.

The City's governmental funds show an operating surplus (or fund balance) of $7.2 million as of June 30, 2013. This is a significant turnaround from the deficit of $7.3 million. During the year, the City residents voted and approved a public safety millage that generated $5.6 million to stabilize staffing for the police and fire departments. In addition, the energy company conducted a three-year audit of the City's streetlights bill; the results of the audit were a $1 million credit back to the City. In 2012, the emergency manager ratified new changes to employee and retiree benefits that took full effect in fiscal year 2013. These changes resulted in a significant decrease in healthcare costs. The reduction in costs was credited back across all funds to departmental budgets.

The reduction of the $19.2 million deficit for the General Fund in fiscal year 2012 to $12.9 million in 2013 was a result of projecting a realistic budget and managing it. Managing the General Fund has been difficult due to significant reductions in property tax revenues, income tax revenues, and state-shared revenues. However, the emergency manager and his team took the necessary and difficult steps needed to reduce costs.

The remaining governmental funds have a fund balance of $20.1 million, of which virtually all is invested in infrastructure and equipment or restricted for specific purposes. The largest fund balances among the governmental funds are the public safety, $5.1 million, and local and major streets, $4.5 million. Other special revenue funds are maintained primarily to demonstrate accountability. Federal and state laws place restrictions on how these funds can be spent.

State law requires the preparation of a deficit elimination plan for all fund deficits, unless current assets of the fund exceed current liabilities. While the past two deficit elimination plans have addressed deficits in the General Fund, Water Supply Fund, Downtown Development Authority, and Economic Development Authority, it will only be necessary for the City to address in the 2013 plan, the remaining $12.9 million deficit in the General Fund. A plan is being prepared and will be submitted to the Department of Treasury when this report is filed. However, the Economic Development Corporation will be filing its own deficit elimination plan to address the $148,895 deficit.

**Proprietary Funds** - The City's proprietary funds provide the same type of information found in the government-wide financial statements, but in more detail.

Total net position in the Water Fund is $26.4 million, an increase of $6.8 million from the previous year. Unrestricted net position is no longer negative. Net operating income is also improved from $2.3 million to $8.6 million. The positive change is attributable mostly to increases in rates. The Water Fund has a bond reserve account of $2.4 million and an equipment reserve account of $2.0 million.

Net position in the Sewer Fund is $64.8 million, an increase of $3.1 million from 2012. Net operating income was a positive $6.8 million.

Additional rate increases averaging 25 percent were implemented as part of the fiscal year 2013 budget in order to improve the financial solvency of the water and sewer systems.

# City of Flint, Michigan

## Management's Discussion and Analysis (Continued)

**Capital Assets and Debt Administration**

**Capital Assets** - The City's net investment in capital assets for its governmental and business-type activities as of June 30, 2013 amounts to $257.9 million (net of accumulated depreciation), a net decrease of $18.8 million. This net investment in capital assets includes land, buildings and system improvements, machinery and equipment, park facilities, roads, highways, and bridges (see Table 4). Additional information on the City's capital assets can be found in Note 6.

Table 4-City of Flint's Capital Assets - net of depreciation
(in Millions)

| | Governmental Activities | | Business-type Activities | | Total Primary Government | |
|---|---|---|---|---|---|---|
| | **2012** | **2013** | **2012** | **2013** | **2012** | **2013** |
| Land | $ 14.3 | $ 14.3 | $ 0.8 | $ 0.8 | $ 15.1 | $ 15.1 |
| Construction in progress | - | 0.1 | 1.3 | 1.3 | 1.3 | 1.4 |
| Building and system | 5.8 | 5.4 | 33.7 | 31.4 | 39.5 | 36.8 |
| Improvements other than buildings | 4.2 | 3.8 | 3.9 | 3.6 | 8.1 | 7.4 |
| Machinery and equipment | 5.8 | 4.6 | 70.4 | 65.3 | 76.2 | 69.9 |
| Roads and sidewalks | 136.5 | 127.3 | - | - | 136.5 | 127.3 |
| Total | $ 166.6 | $ 155.5 | $ 110.1 | $ 102.4 | $ 276.7 | $ 257.9 |

The City governmental activities made major capital improvements during 2013:

- Streets and enhancement                  $ 2.9 million
- Trails                                                    0.1 million
- Signs and signals                                 0.7 million

Total capital improvements, as a result of governmental activities, were $5.1 million. Depreciation was $15.6 million.

The City's business-type activities also made very little capital improvements during 2013. This was due to reduced available funds.

**Debt Administration** - Debt is administered through three debt service funds and the Public Improvement Fund. In addition, the Water Fund services debt for bonds issued for plant improvements (see Table 5).

**General Obligation Bonds** - The City issued $10 million in General Obligation Bonds in fiscal year 2008 on behalf of the Flint Downtown Development Authority for construction of the new Rutherford parking structure. The DDA has pledged a portion of state-shared revenue as security for the bond. The DDA has pledged net revenue from the parking operations for the repayment of the bond. However, in the City's approved deficit elimination plan, it was determined by the City that the DDA's commitment to funding its portion of the debt service for the parking ramp was unrealistic given the decline in property values and revenues expected to be received through operations were not realized. The City as the guarantor is making the debt service payments.

**Long-term Debt** - At year end, the City had $34.8 million in bonds and notes and compensated absences outstanding for governmental activities and $24.4 million in bonds and notes and compensated absences outstanding for business-type activities. Additional information on the City's long-term debt can be found in Note 9.

Table 5-City of Flint's Long-term Debt
(in millions)

| | Governmental Activities | | Business-type Activities | | Total Primary Government | |
|---|---|---|---|---|---|---|
| | **2012** | **2013** | **2012** | **2013** | **2012** | **2013** |
| General Obligation Bonds | $ 9.5 | $ 9.2 | $ - | $ - | $ 9.5 | $ 9.2 |
| Revenue Bonds and Notes | - | - | 25.9 | 23.8 | 25.9 | 23.8 |
| Other Notes | 21.4 | 20.8 | - | - | 21.4 | 20.8 |
| Capital Leases | 0.7 | 0.4 | - | - | 0.7 | 0.4 |
| Accrued Annual and Sick Pay | 5.3 | 4.4 | 0.6 | 0.6 | 5.9 | 5.0 |
| Total | $ 36.9 | $ 34.8 | $ 28.5 | $ 24.4 | $ 63.4 | $ 59.2 |

**Limitations on Debt** - The State limits the amount of general obligation debt the City can issue to 7 percent of the assessed value of all taxable property within the City's corporate limits. The City's legal debt limit is $115.4 million. The amount of debt available to the City (unused portion of the debt limitation) is $102.6 million. The City can issue bonds through the Michigan Municipal Bonding Authority's state-shared revenue program. The program pledges the City's future state-shared revenues.

**Bond Ratings** - There are no current ratings for the City. Prior ratings were withdrawn as the City's financial position led to consideration of the City being placed into receivership. Moody's Investors Service last rated the City's general obligation unlimited bonds at Ba1, with a stable outlook in February 2006.

**City of Flint, Michigan**

### Economic Factors and Next Year's Budget and Rates

Flint and Genesee County are moving aggressively to restore our region's position as a center of innovation and entrepreneurship in the public and private sectors. Our new leadership is partnering to engage our strong anchor assets in higher education, life sciences/health care, and advanced manufacturing to make our region a superior place for business investment, policy experimentation, and multi-sector partnerships. We are starting to be recognized for our growth and reinvention. Kiplinger referred to Flint in April 2011 *"For some particularly hard-hit metro areas, 2011 will bring a dramatic turnaround -- new investment by businesses, growth in the number of jobs, and a reblooming of hope."*

Our overall objective is to create a sustainable region with new jobs, strong neighborhoods, and great schools. This will be achieved through private and public collaboration and harnessing of the community's capacity for diversification, innovation, and entrepreneurship.

Flint and Genesee County aim to be one of Michigan's major success stories by moving from prolonged recession to rapid recovery and growth. Our region intends to lead the way with measurable achievements over the next three to five years as follows:

- Doubling export activity and generating new jobs
  - As GM truck and engine sales increase, a portion is destined for international markets
  - Area manufacturers have increased exporting in 2012-2013 with funding support from the Michigan State Trade Export Program (STEP)
- Increasing enrollments across our higher education institutions
  - The University of Michigan - Flint has achieved record enrollment in 2012 and 2013 with dramatic increases in international students
  - Kettering University, Mott Community College, and Baker College - Flint have received national recognition
- Attracting and retaining mobile talent and young families
  - Downtown Flint is reported as the fastest growing neighborhood in Genesee County
- Stabilizing property values and local tax revenues
- Reducing unemployment and poverty
  - Flint and Genesee County saw some of the fastest decline in unemployment in the state of Michigan in 2013
- Improving health outcomes, quality of life, and environmental sustainability
  - Commit to Fit is a growing Flint-based initiative that promotes "healthy habits."

*"Steady Job Growth Will Continue for Genesee, Lapeer, Livingston, Macomb, Oakland, St. Clair, and Shiawassee Counties"* according to the February 2013 economic forecast by the University of Michigan Institute for Research on Labor, Employment and the Economy. The report forecasted job growth of approximately 78,000 from 2013-2015 and highlighted the creation of 75,000 new jobs in the past three years. The study predicts new jobs in professional services and trade/ transportation/utilities, as well as private education and health. Many of these positions will be within commute distance from Flint and Genesee County. The report also predicted 0.9 percent job growth per year for Flint and Genesee County.

Jobs and business opportunities are increasing because of the continued collaboration among our key economic sectors, governments, and non-profits. Despite the ongoing recession, last year the region created and retained 569 jobs through the direct efforts of the Flint and Genesee Chamber of Commerce, our lead economic development agency. In fact, public and private joint efforts have supported:

- More than $1 billion in General Motors investment in the past three years

- Over $500 million in new non-GM investment in the past three years

- Continuing investment in downtown Flint with announcements of more than $200 million from 2011-2013, including over $100 million in new higher education assets

Further, City suppliers have increased their federal contracting wins over 1,300 percent in the last five years. Finally, federal investment is also growing. Recent awards include $20 million for blight elimination from the U.S. Troubled Asset Relief Program, $550,000 from EPA for Chevy in the Hole site clean-up and environmental remediation training at Mott Community College, and $140,000 for a four-county regional CEDS plan. These combine with $33 million from the EPA to clean up the Buick City Brownfield, a HUD challenge planning grant, a SAFER grant, and several research and development grants.

At the core of our region, the City has restored some of its manufacturing strength while expanding its institutions of higher education and health care. Recently, a milestone was reached by the area's colleges and universities. Total enrollment is now nearly 34,000 students in undergraduate through doctoral programs. Many new businesses, housing options, and restaurants have been created as part of the downtown Flint investments. The formerly all-commuter downtown has been transformed into a vibrant scene where 3,600 college students are living in newly developed multi-institution residence halls and lofts. Notably, two landmark hotels that had been closed for business (the Hyatt Regency and Durant) are fully renovated and now house college students, faculty, and professionals.

Flint and Genesee County have attracted strong new businesses such as Rassini Brakes, Senderra RX, Environmental Wood Solutions, and most recently, American Cast Iron Pipe, the last two of which are locating in the City. American has announced plans to build a facility on the northern portion of the former Buick City complex and create 60 new jobs.

**City of Flint, Michigan**

City of Flint staff have collaborated with the economic development team at the Flint and Genesee Chamber to support the growth of area businesses including: Powers Catholic High School (private), CFI Medical, Sustainable Environmental Technologies, McLaren Flint Proton Beam, McLaren Flint Laboratory, and Barrette Outdoor Living, as well as General Motors Truck Assembly and General Motors Flint Engine South.

Diplomat Specialty Pharmacy, the fastest growing firm of its type in the United States, continues to grow ahead of plans at their new corporate headquarters in Flint. Plans include the creation of 1,100 new jobs by 2016. The company produces, packages, and distributes pharmaceutical products to chronically ill patients across the country. Diplomat and the Insight Institute for Neurosurgery and Neuroscience acquired the entirety of the former GM Great Lakes Technology Center, a 1,000,000 square foot complex in Flint.

In health care, Genesys Health System recently established a new $3 million clinic in downtown Flint with 10 new jobs and 60 transferred from a neighboring municipality. The main campus of Genesys continues to be a significant medical asset in Grand Blanc. Hurley Hospital established a new children's hospital and completed a $30 million new emergency and trauma care facility. McLaren Health System expanded its destination medicine offerings by investing over $78 million in a new proton beam cancer treatment facility and patient residence. All three hospitals are actively engaged in medical education and research activities at their facilities.

The Flint and Genesee Chamber of Commerce, formerly the Genesee Regional Chamber of Commerce, was tapped to lead tourism efforts in Flint and Genesee County in 2012. In order to expand community marketing to appeal to both investors and visitors, the Chamber led a market research project and developed a new campaign to shape the image of the area. The conclusion: Flint and Genesee need a partner brand that highlights the strengths of both. March 2013 marked the culmination of the Chamber's efforts to build a brand partnership between Flint and Genesee. They have created a campaign to market the region as a desirable destination for events, vacation, or business. *"See what's possible"* is a rallying cry that invites travelers and investors to see what the County has to offer. The campaign plays off the word "see" and features iconic destinations and human moments through compelling imagery.

**Budgets** - The placement of the City into state receivership emphasizes the City's precarious financial position. Flint is an urban center which has been faced with a very significant loss in employment base in addition to the well-known problems of all mature urban centers. The City will be challenged for several more years to determine how it can restore its financial solvency and provide at least a basic level of City services while at the same time participating in the activities which will result in Flint being an attractive place for residents, students, businesses, and visitors.

**City of Flint, Michigan**

The challenges are many, including:

- Continuing decline in property values, made more dire by the phase-out of personal property tax
- Minimal increases in income tax revenues as unemployment and poverty remain high
- An aging and reduced workforce, resulting in an increase in the ratio of retirees to active employees, affecting pension and health care costs
- Aging sewer, water, street, and sidewalk infrastructure
- Continuing high levels of crime
- Reduced population

There are, however, many positive steps being taken which give strong hope that the City will regain its financial solvency and be a key part of restoring the community of Flint, including:

- Strong partnership with entities such as the Greater Regional Flint Chamber of Commerce, Prima Civitas, and the State of Michigan to promote economic development
- Strong support - financial and otherwise - from the Mott Foundation to support many activities helping to restore Flint
- Diversification of Flint's economic base, especially in higher education and health care
- Support of city residents to financially support city initiatives, as evidenced by recent passage of a 6 mill public safety stabilization millage
- Support from the State of Michigan to assist the City, including increases in state trooper presence and assisting financially in reopening the City's lockup
- Willingness by those managing the City to make the necessary decisions to restore financial solvency, as evidenced by the implementation of a fiscal year 2013 budget which raised revenues and cut expenses sufficiently to assure that expenses will not exceed revenues
- Taking steps to improve and maintain long-term financial solvency, including reducing the workforce by nearly 20 percent; restructuring health benefits in a manner which reduced OPEB liabilities by nearly 2/3; reduced pension benefits; significantly raised water and sewer rates while implementing new fees for trash pick-up and street lights; and restructuring the way in which City services are provided
- Working collaboratively with other municipalities to consider sharing of services, as evidenced by five recent applications to the State for financial support in implementing shared services
- Completed a five-year strategic plan and budget in conjunction with the City's fiscal year 2015 budget.

**Requests for Information** - This financial report is designed to provide a general overview of the City of Flint, Michigan's finances for all those with an interest in the government's finances. Questions concerning any of the information provided in this report or requests for additional financial information should be addressed to the Office of the Finance Director, City of Flint, 1101 South Saginaw Street, Room #203, Flint, Michigan 48502.

**City of Flint, Michigan**

Statement of Net Position
June 30, 2013

| | Primary Government | | | Component Units |
|---|---|---|---|---|
| | Governmental Activities | Business-type Activities | Total | |
| **Assets** | | | | |
| Pooled cash and investments (Note 3) | $ 25,610,907 | $ 10,408,305 | $ 36,019,212 | $ - |
| Cash and cash equivalents (Note 4) | 1,305,461 | 858,151 | 2,163,612 | 11,648,142 |
| Investments (Note 4) | 937,543 | - | 937,543 | 49,444,802 |
| Receivables (net of allowance, where applicable) (Note 5): | | | | |
| Property taxes receivable | 1,461,019 | - | 1,461,019 | - |
| Receivables from sales to customers on account | - | 22,940,950 | 22,940,950 | 70,201,583 |
| Accrued interest receivable | 11,195 | - | 11,195 | 261,587 |
| Accounts (net of allowance of $85,376) | - | - | - | 694,337 |
| Other receivables | 3,619,197 | 387 | 3,619,584 | 704,500 |
| Due from other governmental units | 8,798,817 | 109,866 | 8,908,683 | - |
| Due from component units (Note 7) | 5,600,346 | - | 5,600,346 | - |
| Internal balances (Note 7) | (9,948,800) | 9,948,800 | - | - |
| Inventory | 169,903 | 1,136,255 | 1,306,158 | 5,223,959 |
| Prepaid costs | 84,152 | - | 84,152 | 2,757,869 |
| Restricted assets (Note 10) | 380,675 | 4,385,534 | 4,766,209 | 44,722,843 |
| Investment in joint ventures | - | - | - | 7,029,993 |
| Other assets | - | 70,654 | 70,654 | 3,619,977 |
| Capital assets (Note 6): | | | | |
| Assets not subject to depreciation | 14,446,152 | 2,045,361 | 16,491,513 | 22,226,500 |
| Assets subject to depreciation | 141,078,393 | 100,399,785 | 241,478,178 | 107,823,304 |
| Cash held with agent | - | - | - | 550,000 |
| **Total assets** | 204,115,298 | 152,304,048 | 356,419,346 | 327,198,308 |

The Notes to Financial Statements are an Integral Part of this Statement.   20

---

**City of Flint, Michigan**

Statement of Net Position (Continued)
June 30, 2013

| | Primary Government | | | Component Units |
|---|---|---|---|---|
| | Governmental Activities | Business-type Activities | Total | |
| **Liabilities** | | | | |
| Accounts payable | $ 4,569,703 | $ 5,613,046 | $ 10,182,749 | $ 19,583,965 |
| Due to other governmental units | 454,952 | - | 454,952 | 100,000 |
| Due to primary government (Note 7) | - | - | - | 9,866,795 |
| Deposits and advances | 559,723 | 580,684 | 1,140,407 | 32,600 |
| Accrued liabilities and other | 4,071,015 | 1,188,571 | 5,259,586 | 33,393,514 |
| Unearned revenue (Note 5) | 920,414 | - | 920,414 | 3,500 |
| Other current liabilities | 1,111,183 | - | 1,111,183 | - |
| Noncurrent liabilities: | | | | |
| Due within one year: | | | | |
| Payable from restricted assets | - | - | - | 446,578 |
| Claims payable - Current (Note 16) | 854,776 | - | 854,776 | 3,779,561 |
| Current portion of long-term debt (Note 9) | 4,498,378 | 2,703,175 | 7,201,553 | 5,608,530 |
| Due in more than one year: | | | | |
| Claims payable (Note 16) | 641,000 | - | 641,000 | 38,268,025 |
| Net pension obligation | - | - | - | 3,268,705 |
| Net OPEB obligation (Note 12) | 129,627,657 | 29,274,057 | 158,901,714 | 3,432,051 |
| Long-term debt (Note 9) | 30,319,787 | 21,675,336 | 51,995,123 | 102,540,405 |
| **Total liabilities** | 177,628,588 | 61,034,869 | 238,663,457 | 220,324,229 |
| **Net Position** | | | | |
| Net investment in capital assets | 153,329,640 | 78,604,810 | 231,934,450 | 37,165,197 |
| Restricted for: | | | | |
| Roads | 4,515,164 | - | 4,515,164 | - |
| Capital projects | 7,683,362 | - | 7,683,362 | - |
| Street lighting | 213,421 | - | 213,421 | - |
| Revolving loan program | - | - | - | 1,960,671 |
| Police | 1,299,438 | - | 1,299,438 | - |
| Public safety | 5,118,343 | - | 5,118,343 | - |
| Community development | 11,619,405 | - | 11,619,405 | 96,691 |
| Parks and recreation | 136,003 | - | 136,003 | - |
| Economic development | 555,643 | - | 555,643 | - |
| Building inspection | 400,968 | - | 400,968 | - |
| Debt service | 7,163 | 2,384,034 | 2,391,197 | - |
| Capital replacement | - | 2,001,500 | 2,001,500 | - |
| Donor restricted and other | - | - | - | 5,618,014 |
| Unrestricted | (158,391,840) | 8,278,835 | (150,113,005) | 62,033,506 |
| **Total net position** | $ 26,486,710 | $ 91,269,179 | $ 117,755,889 | $ 106,874,079 |

The Notes to Financial Statements are an Integral Part of this Statement.   21

D-11

# City of Flint, Michigan

**Statement of Activities**
**Year Ended June 30, 2013**

| | Expenses | Program Revenues: Charges for Services | Program Revenues: Operating Grants and Contributions | Program Revenues: Capital Grants and Contributions | Net (Expense) Revenue and Changes in Net Position — Primary Government: Governmental Activities | Business-type Activities | Total | Component Units |
|---|---|---|---|---|---|---|---|---|
| **Functions/Programs** | | | | | | | | |
| **Primary government:** | | | | | | | | |
| **Governmental activities:** | | | | | | | | |
| General government | $ 7,533,423 | $ 10,652,009 | $ 776,454 | $ 3,818 | $ 3,898,858 | $ - | $ 3,898,858 | $ - |
| Judicial | 5,095,682 | 1,696,157 | 228,170 | - | (3,171,355) | - | (3,171,355) | - |
| Public safety: | | | | | | | | |
| Police | 25,078,577 | 1,724,215 | 916,145 | 4,672,971 | (17,765,246) | - | (17,765,246) | - |
| Fire | 10,713,612 | 154,096 | - | - | (10,559,516) | - | (10,559,516) | - |
| Building inspection | 4,017,923 | 2,062,378 | 134,287 | 1,733,108 | (88,150) | - | (88,150) | - |
| Emergency dispatch | 3,230,298 | 1,301,826 | 13,763 | - | (1,914,709) | - | (1,914,709) | - |
| Public works | 5,543,366 | 940 | - | - | (5,542,426) | - | (5,542,426) | - |
| Legislative | 347,098 | - | - | - | (347,098) | - | (347,098) | - |
| Community development | 19,981,427 | 1,659 | 3,206,127 | 15,187,633 | (1,586,008) | - | (1,586,008) | - |
| Parks and recreation | 2,864,223 | 10,075 | 233,743 | - | (2,620,405) | - | (2,620,405) | - |
| Transportation | 17,434,875 | 64,085 | 8,704,549 | 274,530 | (8,391,711) | - | (8,391,711) | - |
| Interest on long-term debt | 1,021,815 | - | - | - | (1,021,815) | - | (1,021,815) | - |
| Total governmental activities | 102,862,319 | 17,667,440 | 14,213,238 | 21,872,060 | (49,109,581) | - | (49,109,581) | - |
| **Business-type activities:** | | | | | | | | |
| Water | 42,089,874 | 49,903,868 | - | 99,240 | - | 7,913,234 | 7,913,234 | - |
| Sewage Disposal Division | 25,185,405 | 30,169,235 | - | - | - | 4,983,830 | 4,983,830 | - |
| Total business-type activities | 67,275,279 | 80,073,103 | - | 99,240 | - | 12,897,064 | 12,897,064 | - |
| Total primary government | $ 170,137,598 | $ 97,740,543 | $ 14,213,238 | $ 21,971,300 | (49,109,581) | 12,897,064 | (36,212,517) | - |
| **Component units:** | | | | | | | | |
| Downtown Development Authority | $ 2,336,347 | $ 1,226,697 | $ - | $ - | | | | (1,109,650) |
| Atwood Stadium Building Authority | - | - | - | - | | | | - |
| Economic Development Corporation | 244,042 | 108,343 | 43,749 | 47,436 | | | | (44,514) |
| Flint Area Enterprise Community | 334,967 | - | 12,876 | - | | | | (322,091) |
| Hurley Medical Center | 374,396,459 | 372,503,295 | - | - | | | | (1,893,164) |
| Total component units | $ 377,311,815 | $ 373,838,335 | $ 56,625 | $ 47,436 | - | | | (3,369,419) |
| **General revenues:** | | | | | | | | |
| Property taxes | | | | | 21,722,352 | - | 21,722,352 | 412,068 |
| Income taxes | | | | | 14,674,274 | - | 14,674,274 | - |
| State-shared revenue (unrestricted) | | | | | 13,667,182 | - | 13,667,182 | - |
| Interest (unrestricted) | | | | | 445,325 | 945 | 446,270 | (1,052,987) |
| Cable franchise fees (unrestricted) | | | | | 1,084,668 | - | 1,084,668 | - |
| Other miscellaneous income (unrestricted) | | | | | 1,203,070 | 52,537 | 1,255,607 | 968,221 |
| Gain on sale of fixed assets | | | | | 1,046,990 | - | 1,046,990 | - |
| Total general revenues | | | | | 53,843,861 | 53,482 | 53,897,343 | 327,302 |
| **Transfers** | | | | | 2,990,000 | (2,990,000) | - | - |
| **Change in Net Position** | | | | | 7,724,280 | 9,960,546 | 17,684,826 | (3,042,117) |
| **Net Position** - As restated - Beginning of year (Note 20) | | | | | 18,762,430 | 81,308,633 | 100,071,063 | 109,916,196 |
| **Net Position** - End of year | | | | | $ 26,486,710 | $ 91,269,179 | $ 117,755,889 | $ 106,874,079 |

The Notes to Financial Statements are an
Integral Part of this Statement.          22          23

# City of Flint, Michigan

**Governmental Funds**
**Balance Sheet**
**June 30, 2013**

| Assets | General Fund | Federal Grants Fund | Public Improvement Fund | Nonmajor Funds | Total |
|---|---|---|---|---|---|
| Cash and cash equivalents (Note 4) | $ 441,848 | $ 214,420 | $ - | $ 258,559 | $ 914,827 |
| Investments (Note 4) | - | 937,543 | - | - | 937,543 |
| Receivables (Notes 5): | | | | | |
| Property taxes receivable | 868,389 | - | 184,192 | 408,438 | 1,461,019 |
| Accrued interest receivable | - | - | - | 11,195 | 11,195 |
| Other receivables | 3,585,149 | 7,400 | - | 24,372 | 3,616,921 |
| Due from other governmental units | 3,304,348 | 3,963,428 | - | 1,531,041 | 8,798,817 |
| Notes and leases receivable | - | 10,074,000 | - | 486,338 | 10,560,338 |
| Due from component units net of allowance (Note 7) | 148,895 | 550,000 | 4,901,451 | - | 5,600,346 |
| Due from other funds (Note 7) | - | - | - | 1,812,097 | 1,812,097 |
| Restricted assets (Note 10) | - | 380,675 | - | - | 380,675 |
| Pooled cash and investments (Note 3) | 642,400 | - | 2,767,994 | 11,328,814 | 14,739,208 |
| **Total assets** | $ 8,991,029 | $ 16,127,466 | $ 7,853,637 | $ 15,860,854 | $ 48,832,986 |
| **Liabilities and Fund Balances (Deficit)** | | | | | |
| **Liabilities** | | | | | |
| Accounts payable | $ 1,873,197 | $ 951,137 | $ 3,517 | $ 877,964 | $ 3,705,815 |
| Due to other governmental units | 454,952 | - | - | - | 454,952 |
| Due to other funds (Note 7) | 6,312,097 | 2,492,039 | - | 26,556 | 8,830,692 |
| Advances from other funds (Note 7) | 10,800,000 | - | - | - | 10,800,000 |
| Deposits and advances | - | - | - | 559,723 | 559,723 |
| Accrued liabilities and other | 1,346,253 | 86,521 | 166,641 | 1,938,929 | 3,538,344 |
| Deferred revenue (Note 5) | 1,100,172 | 11,695,414 | 184,192 | 722,980 | 13,702,758 |
| Other current liabilities | - | 75,611 | 117 | - | 75,728 |
| **Total liabilities** | 21,886,671 | 15,300,722 | 354,467 | 4,126,152 | 41,668,012 |
| **Fund Balances (Deficit)** | | | | | |
| Nonspendable - Long-term receivable | - | - | 4,901,451 | - | 4,901,451 |
| Restricted: | | | | | |
| Roads | - | - | - | 4,515,164 | 4,515,164 |
| Police | - | - | - | 1,171,547 | 1,171,547 |
| Debt service | - | - | - | 7,163 | 7,163 |
| Community development | - | 826,744 | - | - | 826,744 |
| Capital projects | - | - | 2,597,719 | - | 2,597,719 |
| Economic development | - | - | - | 258,854 | 258,854 |
| Parks and recreation | - | - | - | 104,110 | 104,110 |
| Building inspections | - | - | - | 400,968 | 400,968 |
| Public safety | - | - | - | 5,063,475 | 5,063,475 |
| Street lighting | - | - | - | 213,421 | 213,421 |
| Unassigned (deficit) | (12,895,642) | - | - | - | (12,895,642) |
| Total fund balances (deficit) | (12,895,642) | 826,744 | 7,499,170 | 11,734,702 | 7,164,974 |
| Total liabilities and fund balances (deficit) | $ 8,991,029 | $ 16,127,466 | $ 7,853,637 | $ 15,860,854 | $ 48,832,986 |

The Notes to Financial Statements are an Integral Part of this Statement.    24

---

# City of Flint, Michigan

**Governmental Funds**
**Reconciliation of the Balance Sheet to the Statement of Net Position**
**June 30, 2013**

| | |
|---|---|
| **Fund Balance Reported in Governmental Funds** | $ 7,164,974 |
| Amounts reported for governmental activities in the statement of net position are different because: | |
| Capital assets used in governmental activities are not financial resources and are not reported in the funds | 154,143,889 |
| Other long-term assets are not available to pay for current period expenditures and therefore are deferred in the funds | 12,782,344 |
| Bonds payable and capital lease obligations are not due and payable in the current period and are not reported in the funds | (30,007,667) |
| Accrued interest related to governmental activities debt is not reported in the funds | (289,615) |
| Employee compensated absences are payable over a long period of years and do not represent a claim on current financial resources; therefore, they are not reported as fund liabilities | (4,435,256) |
| Net postemployment benefit obligation is not due and payable in the current period and is not reported in the funds | (129,627,657) |
| Internal service funds are included as part of governmental activities | 16,755,698 |
| **Net Position of Governmental Activities** | $ 26,486,710 |

The Notes to Financial Statements are an Integral Part of this Statement.    25

D-13

**City of Flint, Michigan**

<div style="text-align:right">

**Governmental Funds**
**Statement of Revenue, Expenditures, and Changes in**
**Fund Balances (Deficit)**
**Year Ended June 30, 2013**

</div>

| | General Fund | Federal Grants Fund | Public Improvement Fund | Nonmajor Governmental Funds | Total |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| Property taxes | $ 6,011,342 | $ - | $ 2,055,994 | $ 11,145,728 | $ 19,213,064 |
| Income taxes | 14,674,274 | - | - | - | 14,674,274 |
| Licenses and permits | 1,557,320 | - | - | 1,853,188 | 3,410,508 |
| Federal grants | 2,753,854 | 18,400,485 | - | 2,667,702 | 23,822,041 |
| State revenue | 16,003,433 | 33,703 | - | 8,224,888 | 24,262,024 |
| Charges for services | 11,406,946 | 1,209 | - | 186,379 | 11,594,534 |
| Fines and forfeitures | 2,291,325 | - | - | 124,323 | 2,415,648 |
| Investment income (loss) | 261,004 | 247,830 | 719,450 | (13,366) | 1,214,918 |
| Other revenue | 2,770,960 | 58,028 | - | 3,098,994 | 5,927,982 |
| | | | | | |
| Total revenue | 57,730,458 | 18,741,255 | 2,775,444 | 27,287,836 | 106,534,993 |
| **Expenditures** | | | | | |
| Current: | | | | | |
| General government | 7,999,801 | - | - | - | 7,999,801 |
| Judicial - 68th District Court | 4,955,003 | - | - | - | 4,955,003 |
| Public safety: | | | | | |
| Police department | 23,404,501 | 51,727 | - | 1,592,621 | 25,048,849 |
| Combined public safety department | - | - | - | 52,296 | 52,296 |
| Fire | 10,682,234 | 5,270,130 | - | - | 15,952,364 |
| Building inspection | 94,170 | - | - | 4,076,364 | 4,170,534 |
| Emergency dispatch | 3,141,130 | - | - | - | 3,141,130 |
| Public works | - | - | - | 5,515,322 | 5,515,322 |
| Legislative | 344,227 | - | - | - | 344,227 |
| Community development | 1,946,636 | 7,425,188 | - | 7,693 | 9,379,517 |
| Parks and recreation | 1,853,475 | 5,318,080 | 481,212 | 675,417 | 8,328,093 |
| Transportation | 861 | - | - | 9,769,670 | 9,770,531 |
| Debt service: | | | | | |
| Principal | - | 343,000 | 185,000 | 368,977 | 896,977 |
| Interest on long-term debt | - | 146,639 | 415,141 | 476,596 | 1,038,376 |
| | | | | | |
| Total expenditures | 54,422,038 | 18,554,764 | 1,081,262 | 22,534,956 | 96,593,020 |
| **Excess of Revenue Over Expenditures** | 3,308,420 | 186,491 | 1,694,182 | 4,752,880 | 9,941,973 |
| **Other Financing Sources (Uses)** | | | | | |
| Proceeds from sale of capital assets | 100 | - | - | - | 100 |
| Transfers in (Note 7) | 2,990,000 | - | - | 2,528,457 | 5,518,457 |
| Transfers out (Note 7) | (9,312) | - | (726,953) | (292,192) | (1,028,457) |
| | | | | | |
| Total other financing sources (uses) | 2,980,788 | - | (726,953) | 2,236,265 | 4,490,100 |
| **Net Change in Fund Balances** | 6,289,208 | 186,491 | 967,229 | 6,989,145 | 14,432,073 |
| **Fund Balances (Deficit)** - As restated - Beginning of year (Note 20) | (19,184,850) | 640,253 | 6,531,941 | 4,745,557 | (7,267,099) |
| **Fund Balances (Deficit)** - End of year | $ (12,895,642) | $ 826,744 | $ 7,499,170 | $ 11,734,702 | $ 7,164,974 |

D-14

---

**City of Flint, Michigan**

<div style="text-align:right">

**Governmental Funds**
**Reconciliation of the Statement of Revenue, Expenditures,**
**and Changes in Fund Balances (Deficit) of Governmental Funds**
**to the Statement of Activities**
**Year Ended June 30, 2013**

</div>

| | |
|---|---|
| **Net Change in Fund Balances - Total Governmental Funds** | $ 14,432,073 |
| Amounts reported for governmental activities in the statement of activities are different because: | |
| Governmental funds report capital outlays as expenditures; however, in the statement of activities, these costs are allocated over their estimated useful lives as depreciation: | |
| Capital outlay | 5,063,828 |
| Depreciation expense | (15,579,051) |
| Net book value of assets disposed of | (614,042) |
| Revenues are recorded in the statement of activities when earned; they are not reported in the funds until collected or collectible within 90 days of year end | 462,816 |
| Increase in net postemployment benefit obligation | (1,511,402) |
| Repayment of bond principal is an expenditure in the governmental funds, but not in the statement of activities (where it reduces long-term debt) | 896,977 |
| Change in accrued interest is not reported in the funds | 7,269 |
| Decrease in accumulated employee sick and vacation pay and other similar expenses reported in the statement of activities do not require the use of current resources, and therefore are not reported in the fund statements until they come due for payment | 908,705 |
| Internal service funds are included as part of governmental activities | 3,657,107 |
| **Change in Net Position of Governmental Activities** | $ 7,724,280 |

D-15

## City of Flint, Michigan

### Proprietary Funds
### Statement of Net Position
### June 30, 2013

| | Enterprise Funds | | | Governmental Activities |
|---|---|---|---|---|
| | Water Supply Division | Sewage Disposal Division | Total | Proprietary Internal Service Fund |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents (Note 4) | $ 858,151 | $ - | $ 858,151 | $ 390,634 |
| Receivables: | | | | |
| Receivables from sales to customers on account | 13,118,422 | 9,822,528 | 22,940,950 | - |
| Other receivables | 232 | 155 | 387 | 2,276 |
| Due from other governmental units | - | 109,866 | 109,866 | - |
| Due from other funds (Note 7) | - | - | - | 7,869,795 |
| Inventory | 506,621 | 629,634 | 1,136,255 | 169,903 |
| Prepaid costs | - | - | - | 84,152 |
| Pooled cash and investments (Note 3) | 3,452,162 | 6,956,143 | 10,408,305 | 10,871,699 |
| Total current assets | 17,935,588 | 17,518,326 | 35,453,914 | 19,388,459 |
| Noncurrent assets: | | | | |
| Restricted assets (Note 10) | 4,385,534 | - | 4,385,534 | - |
| Advances to other funds (Note 7) | 1,000,000 | 9,800,000 | 10,800,000 | - |
| Accrued interest receivable | - | 70,654 | 70,654 | - |
| Capital assets (Note 6): | | | | |
| Assets not subject to depreciation | 1,479,998 | 565,363 | 2,045,361 | 132,616 |
| Assets subject to depreciation | 43,845,546 | 56,554,239 | 100,399,785 | 1,248,040 |
| Total noncurrent assets | 50,711,078 | 66,990,256 | 117,701,334 | 1,380,656 |
| Total assets | 68,646,666 | 84,508,582 | 153,155,248 | 20,769,115 |
| **Liabilities** | | | | |
| Current liabilities: | | | | |
| Accounts payable | 4,295,654 | 1,317,392 | 5,613,046 | 863,888 |
| Due to other funds (Note 7) | - | 851,200 | 851,200 | - |
| Deposits and advances | 580,684 | - | 580,684 | - |
| Accrued liabilities and other | 676,926 | 511,645 | 1,188,571 | 243,056 |
| Other payables | - | - | - | 1,035,455 |
| Claims payable - Current (Note 16) | - | - | - | 854,776 |
| Current portion of long-term debt (Note 9) | 2,428,178 | 274,997 | 2,703,175 | 179,854 |
| Total current liabilities | 7,981,442 | 2,955,234 | 10,936,676 | 3,177,029 |
| Noncurrent liabilities: | | | | |
| Claims payable (Note 16) | - | - | - | 641,000 |
| Net OPEB obligation (Note 12) | 12,547,877 | 16,726,180 | 29,274,057 | - |
| Long-term debt (Note 9) | 21,675,336 | - | 21,675,336 | 195,388 |
| Total noncurrent liabilities | 34,223,213 | 16,726,180 | 50,949,393 | 836,388 |
| Total liabilities | 42,204,655 | 19,681,414 | 61,886,069 | 4,013,417 |
| **Net Position** | | | | |
| Net investment in capital assets | 21,222,030 | 56,844,605 | 78,066,635 | 1,005,414 |
| Restricted: | | | | |
| Debt service | 2,384,034 | - | 2,384,034 | - |
| Capital replacement | 2,001,500 | - | 2,001,500 | - |
| Unrestricted | 834,447 | 7,982,563 | 8,817,010 | 15,750,284 |
| Total net position | $ 26,442,011 | $ 64,827,168 | 91,269,179 | $ 16,755,698 |
| **Net Position of Business-type Activities** | | | $ 91,269,179 | |

The Notes to Financial Statements are an Integral Part of this Statement.

28

## City of Flint, Michigan

### Proprietary Funds
### Statement of Revenue, Expenses, and Changes in Net Position
### Year Ended June 30, 2013

| | Enterprise Funds | | | Governmental Activities |
|---|---|---|---|---|
| | Water Supply Division | Sewage Disposal Division | Total | Proprietary Internal Service Fund |
| **Operating Revenue** | | | | |
| Charges for services | $ 49,880,827 | $ 32,025,929 | $ 81,906,756 | $ 40,051,431 |
| Other miscellaneous revenue | 23,041 | - | 23,041 | - |
| Total operating revenue | 49,903,868 | 32,025,929 | 81,929,797 | 40,051,431 |
| **Operating Expenses** | | | | |
| Salaries, wages, and fringe benefits | 10,599,599 | 13,958,050 | 24,557,649 | 3,258,387 |
| Utilities | 691,373 | 2,341,204 | 3,032,577 | 38,373 |
| Equipment operation | 628,541 | 699,565 | 1,328,106 | 496 |
| Claims and settlements | - | - | - | 998,036 |
| Repair and maintenance | 220,696 | 530,681 | 751,377 | 295,887 |
| Supplies | 934,097 | 986,642 | 1,920,739 | 1,516,507 |
| Insurance | - | - | - | 389,879 |
| Professional services | 605,606 | 1,408,472 | 2,014,078 | 2,779,794 |
| Miscellaneous | 749,641 | 1,278,943 | 2,028,584 | 16,848 |
| Costs of materials or services rendered | 23,308,800 | - | 23,308,800 | 25,731,269 |
| Depreciation and amortization | 3,563,937 | 3,974,076 | 7,538,013 | 832,674 |
| Total operating expenses | 41,302,290 | 25,177,633 | 66,479,923 | 35,858,150 |
| **Operating Income** | 8,601,578 | 6,848,296 | 15,449,874 | 4,193,281 |
| **Nonoperating Revenue (Expenses)** | | | | |
| Investment (loss) income | (7,689) | 8,634 | 945 | (28,855) |
| Interest expense | (787,584) | - | (787,584) | (54,309) |
| Miscellaneous expenses | - | (7,772) | (7,772) | - |
| (Loss) gain on disposal of capital assets | - | (1,856,694) | (1,856,694) | 1,046,990 |
| Miscellaneous revenue | 52,537 | - | 52,537 | - |
| Total nonoperating (expenses) revenue | (742,736) | (1,855,832) | (2,598,568) | 963,826 |
| **Income** - Before contributions | 7,858,842 | 4,992,464 | 12,851,306 | 5,157,107 |
| **Capital Contributions** | 99,240 | - | 99,240 | - |
| **Transfers Out** (Note 7) | (1,130,000) | (1,860,000) | (2,990,000) | (1,500,000) |
| **Change in Net Position** | 6,828,082 | 3,132,464 | 9,960,546 | 3,657,107 |
| **Net Position** - Beginning of year | 19,613,929 | 61,694,704 | 81,308,633 | 13,098,591 |
| **Net Position** - End of year | $ 26,442,011 | $ 64,827,168 | $ 91,269,179 | $ 16,755,698 |

The Notes to Financial Statements are an Integral Part of this Statement.

29

**City of Flint, Michigan**

**Proprietary Funds**
**Statement of Cash Flows**
**Year Ended June 30, 2013**

| | Enterprise Funds | | | Governmental Activities |
| --- | --- | --- | --- | --- |
| | Water Supply Division | Sewage Disposal Division | Total | Internal Service Funds |
| **Cash Flows from Operating Activities** | | | | |
| Receipts from customers and users | $ 47,620,772 | $ 29,290,360 | $ 76,911,132 | $ 40,052,458 |
| Payments to vendors | (26,829,143) | (5,023,121) | (31,852,264) | (30,654,128) |
| Payments to employees | (9,790,742) | (13,485,958) | (23,276,700) | 2,370,631 |
| Internal activity - Payments to other funds | (910,000) | (1,218,300) | (2,128,300) | - |
| Claims paid | - | - | - | (3,470,460) |
| Net cash provided by operating activities | 10,090,887 | 9,562,981 | 19,653,868 | 8,298,501 |
| **Cash Flows from Noncapital Financing Activities** | | | | |
| Loans related to pooled cash received from other funds | (3,589,658) | - | (3,589,658) | - |
| Repayments of loans related to pooled cash made to other funds | - | 714,681 | 714,681 | - |
| Transfers to other funds | (1,130,000) | (1,860,000) | (2,990,000) | (1,500,000) |
| Repayments of loans from other funds | - | - | - | 871,679 |
| Payments received on long-term note receivable | - | - | - | 130,000 |
| Pooled cash receipts to other funds | - | - | - | 1,940,634 |
| Net cash (used in) provided by noncapital financing activities | (4,719,658) | (1,145,319) | (5,864,977) | 1,442,313 |
| **Cash Flows from Capital and Related Financing Activities** | | | | |
| Receipt of capital grants | 99,240 | - | 99,240 | - |
| Proceeds from sales of capital assets | 52,538 | - | 52,538 | 1,500,000 |
| Purchase of capital assets | (147,462) | (1,552,815) | (1,700,277) | (132,615) |
| Principal paid on capital debt | (2,115,000) | - | (2,115,000) | (267,795) |
| Interest payments | (787,584) | - | (787,584) | (54,309) |
| Net cash (used in) provided by capital and related financing activities | (2,898,268) | (1,552,815) | (4,451,083) | 1,045,281 |
| **Cash Flows from Investing Activities** - Investment (loss) income | (7,689) | 8,634 | 945 | (28,855) |
| **Net Increase in Cash and Cash Equivalents** | 2,465,272 | 6,873,481 | 9,338,753 | 10,757,240 |
| **Cash and Cash Equivalents** - Beginning of year | 6,230,575 | 82,662 | 6,313,237 | 505,093 |
| **Cash and Cash Equivalents** - End of year | $ 8,695,847 | $ 6,956,143 | $ 15,651,990 | $ 11,262,333 |
| **Balance Sheet Classification of Cash and Cash Equivalents** | | | | |
| Cash and investments | $ 858,151 | $ - | $ 858,151 | $ 390,634 |
| Restricted cash | 4,385,534 | - | 4,385,534 | - |
| Pooled cash | 3,452,162 | 6,956,143 | 10,408,305 | 10,871,699 |
| Total cash and cash equivalents | $ 8,695,847 | $ 6,956,143 | $ 15,651,990 | $ 11,262,333 |

The Notes to Financial Statements are an Integral Part of this Statement.   30

**City of Flint, Michigan**

**Proprietary Funds**
**Statement of Cash Flows (Continued)**
**Year Ended June 30, 2013**

| | Enterprise Funds | | | Governmental Activities |
| --- | --- | --- | --- | --- |
| | Water Supply Division | Sewage Disposal Division | Total | Internal Service Fund |
| **Reconciliation of Operating Income to Net Cash from Operating Activities** | | | | |
| Operating income | $ 8,601,578 | $ 6,848,296 | $ 15,449,874 | $ 4,193,281 |
| Adjustments to reconcile operating income to net cash from operating activities: | | | | |
| Depreciation and amortization | 3,563,937 | 3,974,076 | 7,538,013 | 832,674 |
| Changes in assets and liabilities: | | | | |
| Receivables | (2,283,096) | (2,735,569) | (5,018,665) | 827 |
| Due from others | - | - | - | 5,264,428 |
| Inventories | (124,767) | - | (124,767) | 27,216 |
| Accounts payable | (538,158) | 1,004,086 | 465,928 | 87,709 |
| Estimated claims liability | - | - | - | (2,472,224) |
| Accrued and other liabilities | 481,712 | 384,141 | 865,853 | 364,590 |
| Customer deposits | 62,536 | - | 62,536 | - |
| Net postemployment benefit obligation | 327,145 | 87,951 | 415,096 | - |
| Net cash provided by operating activities | $ 10,090,887 | $ 9,562,981 | $ 19,653,868 | $ 8,298,501 |

The Notes to Financial Statements are an Integral Part of this Statement.   31

D-16

**City of Flint, Michigan**

<div style="text-align:right">

**Fiduciary Funds**
**Statement of Fiduciary Net Position**
**June 30, 2013**

</div>

| | Pension and Benefit Trust Funds | Agency Funds |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $   1,124,296 | $   1,277,180 |
| Investments: | | |
| U.S. government obligations | 902,130 | - |
| Agency securities | 10,481,869 | - |
| Corporate stocks | 14,002,249 | - |
| Corporate bonds | 11,720,330 | - |
| Receivables: | | |
| Property taxes receivable | - | 3,118,765 |
| Accrued interest receivable | 186,887 | - |
| Other receivables | 77,020 | 30 |
| Pooled cash and investments | 1,828,785 | 1,404,766 |
| Total assets | 40,323,566 | $ 5,800,741 |
| **Liabilities** | | |
| Accounts payable | 675,057 | $   639,685 |
| Due to other governmental units | - | 4,207,304 |
| Deposits and advances | - | 953,752 |
| Deferred revenue | 86,756 | - |
| Total liabilities | 761,813 | $ 5,800,741 |
| **Net Position Held in Trust for Pension and Other Employee Benefits** | $39,561,753 | |

**City of Flint, Michigan**

<div style="text-align:right">

**Fiduciary Funds**
**Statement of Changes in Fiduciary Net Position**
**Year Ended June 30, 2013**

</div>

| | Pension and Benefit Trust Funds |
|---|---|
| **Additions** | |
| Investment income (loss): | |
| Interest and dividends | $   3,173,659 |
| Net increase in fair value of investments | 23,543,255 |
| Investment-related expenses | (709,589) |
| Net investment income | 26,007,325 |
| Contributions: | |
| Employer | 25,682,439 |
| Employee | 2,592,912 |
| Total contributions | 28,275,351 |
| Total additions | 54,282,676 |
| **Deductions** | |
| Benefit payments | 37,825,250 |
| Refunds of contributions | 413,842 |
| Administrative expenses | 810,119 |
| Transfer to MERS | 476,709,526 |
| Total deductions | 515,758,737 |
| **Net Decrease in Net Position Held in Trust** | (461,476,061) |
| **Net Position Held in Trust for Pension and Other Employee Benefits - Beginning of year** | 501,037,814 |
| **Net Position Held in Trust for Pension and Other Employee Benefits - End of year** | $   39,561,753 |

D-17

The Notes to Financial Statements are an
Integral Part of this Statement.     32

The Notes to Financial Statements are an
Integral Part of this Statement.     33

# City of Flint, Michigan

**Component Units**
**Statement of Net Position**
**June 30, 2013**

| | Downtown Development Authority | Atwood Stadium Building Authority | Economic Development Corporation | Flint Area Enterprise Community | Hurley Medical Center | Total |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash and cash equivalents (Note 4) | $ 223,416 | $ 9,252 | $ 138,117 | $ 992,318 | $ 10,285,039 | $ 11,648,142 |
| Investments | - | - | - | - | 49,444,802 | 49,444,802 |
| Receivables: | | | | | | |
| Receivables from sales to customers on account | - | - | - | - | 70,201,583 | 70,201,583 |
| Accrued interest receivable | - | - | - | - | 261,587 | 261,587 |
| Accounts (net of allowance of $85,376) | 68,804 | - | 625,533 | - | - | 694,337 |
| Other receivables | - | - | - | - | 704,500 | 704,500 |
| Notes and leases receivable | - | - | - | 288,912 | - | 288,912 |
| Inventory | - | - | - | - | 5,223,959 | 5,223,959 |
| Prepaid costs | 24,979 | - | 10,788 | - | 2,722,102 | 2,757,869 |
| Restricted assets (Note 10) | 246,288 | - | 446,578 | - | 44,029,977 | 44,722,843 |
| Investment in joint ventures | - | - | - | - | 7,029,993 | 7,029,993 |
| Land held for resale | - | - | - | 19,800 | 3,600,177 | 3,619,977 |
| Capital assets (net of depreciation) (Note 6) | 14,364,097 | - | 873,379 | 1,100 | 114,811,228 | 130,049,804 |
| Cash held with agent | - | - | 550,000 | - | - | 550,000 |
| Total assets | 14,927,584 | 9,252 | 2,644,395 | 1,302,130 | 308,314,947 | 327,198,308 |
| **Liabilities** | | | | | | |
| Accounts payable | 43,439 | - | 5,285 | 1,738 | 19,533,503 | 19,583,965 |
| Due to other governmental units | 100,000 | - | - | - | - | 100,000 |
| Due to primary government | 9,167,900 | - | 698,895 | - | - | 9,866,795 |
| Deposits and advances | 30,095 | - | 2,505 | - | - | 32,600 |
| Accrued liabilities and other | 9,229 | - | - | - | 33,384,285 | 33,393,514 |
| Deferred revenue | 3,500 | - | - | - | - | 3,500 |
| Noncurrent liabilities: | | | | | | |
| Due within one year: | | | | | | |
| Payable from restricted assets | - | - | 446,578 | - | - | 446,578 |
| Claims payable - Current (Note 16) | - | - | - | - | 3,779,561 | 3,779,561 |
| Current portion of long-term debt (Note 9) | - | - | - | - | 5,608,530 | 5,608,530 |
| Due in more than one year: | | | | | | |
| Claims payable (Note 16) | - | - | - | - | 38,268,025 | 38,268,025 |
| Other noncurrent liabilities | - | - | - | - | 3,268,705 | 3,268,705 |
| Net OPEB obligation | - | - | - | - | 3,432,051 | 3,432,051 |
| Long-term debt (Note 9) | - | - | - | - | 102,540,405 | 102,540,405 |
| Total liabilities | 9,354,163 | - | 1,153,263 | 1,738 | 209,815,065 | 220,324,229 |
| **Net Position** | | | | | | |
| Net investment in capital assets | 5,449,874 | - | 873,379 | 1,100 | 30,840,844 | 37,165,197 |
| Restricted: | | | | | | |
| Community development | - | - | - | 96,691 | - | 96,691 |
| Revolving loan program | - | - | 759,105 | 1,201,566 | - | 1,960,671 |
| Donor restricted and other | - | - | - | - | 5,618,014 | 5,618,014 |
| Restricted for grants | 37,837 | - | - | - | - | 37,837 |
| Unrestricted | 85,710 | 9,252 | (141,352) | 1,035 | 62,041,024 | 61,995,669 |
| Total net position | $ 5,573,421 | $ 9,252 | $ 1,491,132 | $ 1,300,392 | $ 98,499,882 | $ 106,874,079 |

The Notes to Financial Statements are an Integral Part of this Statement.

34

[This Page Intentionally Left Blank]

## City of Flint, Michigan

D-19

| Functions/Programs | Expenses | Program Revenues | | | Net (Expense) Revenue and Changes in Net Assets | | | | | |
| | | Charges for Services | Operating Grants and Contributions | Capital Grants and Contributions | Downtown Development Authority | Atwood Stadium Building Authority | Economic Development Corporation | Flint Area Enterprise Community | Hurley Medical Center | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Downtown Development Authority: | | | | | | | | | | |
| Governmental activities - | | | | | | | | | | |
| Development administration | $ 306,725 | $ - | $ - | $ - | $ (306,725) | $ - | $ - | $ - | $ - | $ (306,725) |
| Business-type activities - Parking | 2,029,622 | 1,226,697 | - | - | (802,925) | - | - | - | - | (802,925) |
| Atwood Stadium Building Authority | - | - | - | - | - | - | - | - | - | - |
| Economic Development Corporation | 244,042 | 152,092 | - | 47,436 | - | - | (44,514) | - | - | (44,514) |
| Flint Area Enterprise Community | 334,967 | - | 12,876 | - | - | - | - | (322,091) | - | (322,091) |
| Hurley Medical Center | 374,396,459 | 372,503,295 | - | - | - | - | - | - | (1,893,164) | (1,893,164) |
| Total component units | $ 377,311,815 | $ 373,882,084 | $ 12,876 | $ 47,436 | (1,109,650) | - | (44,514) | (322,091) | (1,893,164) | (3,369,419) |
| General revenues: | | | | | | | | | | |
| Property taxes | | | | | 412,068 | - | - | - | - | 412,068 |
| Unrestricted investment earnings | | | | | 300 | - | 39,756 | 70,432 | (1,163,475) | (1,052,987) |
| Unrestricted other revenues | | | | | 25,027 | - | 2,165 | 1,882 | 939,147 | 968,221 |
| Total general revenues | | | | | 437,395 | - | 41,921 | 72,314 | (224,328) | 327,302 |
| Change in Net Position | | | | | (672,255) | - | (2,593) | (249,777) | (2,117,492) | (3,042,117) |
| Net Position - Beginning of year | | | | | 6,245,676 | 9,252 | 1,493,725 | 1,550,169 | 100,617,374 | 109,916,196 |
| Net Position - End of year | | | | | $ 5,573,421 | $ 9,252 | $ 1,491,132 | $ 1,300,392 | $ 98,499,882 | $ 106,874,079 |

**City of Flint, Michigan**

**Note 1 – Nature of Business and Significant Accounting Policies**

The accounting policies of the City of Flint (the "City") conform to accounting principles generally accepted in the United States of America (GAAP) as applicable to governmental units.  The following is a summary of the significant accounting policies used by the City of Flint.

**Reporting Entity**

The City of Flint is a municipal corporation currently governed and administered by an emergency manager (EM) appointed pursuant to state statute by the governor of the state of Michigan.  The accompanying financial statements present the government and its component units, entities for which the government is considered to be financially accountable.  Although blended component units are legally separate entities, in substance they are part of the government's operations.  The aggregate discretely presented component units are reported in a separate column in the government-wide financial statements (see note below for description) to emphasize that they are legally separate from the government.

**Blended Component Units**

The Flint Employees' Retirement System (FERS) is a defined benefit pension plan that provides retirement benefits to certain City retirees.  The FERS was established and is governed by City ordinance, with the board of trustees comprised of City officials and retirees.  The FERS is reported as a Pension Trust Fiduciary Fund.  During the year ended June 30, 2013, the board was disbanded and the investments in FERS were transferred out to Municipal Employees' Retirement Systems (MERS).  The FERS fund was closed and MERS will not take on the fiduciary responsibility of the plan.

The City of Flint Retirees Health Care Plan and Trust is a defined benefit plan that provides retiree healthcare benefits to certain City retirees.  The Health Care Plan and Trust was established and is governed by City ordinance, with the board of trustees comprised of City officials and two members from each participating collective bargaining unit.  The plan is reported as a Benefit Trust Fiduciary Fund.

**Discretely Presented Component Units**

The Atwood Stadium Building Authority (the "Stadium Authority") serves all citizens and is responsible for major capital improvements to Atwood Stadium, a recreational facility serving the citizens of the City.  The City appoints a majority of the governing board and all surplus funds existing at the termination of the Stadium Authority vest to the City.  The Stadium Authority is presented as a governmental activity.

**City of Flint, Michigan**

**Note 1 – Nature of Business and Significant Accounting Policies
(Continued)**

The Flint Downtown Development Authority (the "DDA") was created under state law to promote and rehabilitate the downtown area.  The DDA sponsors downtown events and manages parking facilities.   State law provides for a specific tax levy for the operations of the DDA.  The City appoints the board and has to approve the annual budget and the issuance of any debt.  Any surplus funds remaining at the termination of the DDA vest to the City.  The DDA has both governmental and business-type activities.

The City of Flint Economic Development Corporation (the "Corporation") was created under state law to provide financing and development opportunities for businesses located within the City.  The City appoints the board.  The Corporation provides loans to start-up or expanding businesses and manages rental property that leases space to commercial and light industrial manufacturing companies.  Surplus funds existing at the termination of the Corporation vest to the City.  The Corporation has both governmental and business-type activities.

The Flint Area Enterprise Community (FAEC) is a non-profit organization, established under state law.  FAEC is responsible for coordinating and implementing a strategic plan to advocate and develop business and community development in a federally designated zone that includes portions of Mt. Morris Township and the City of Flint.  The City appoints a majority of the board of directors, provides the majority of its funding for operations, and any assets remaining at the cessation of its operating activities would be returned to the City of Flint.  The FAEC is presented as a governmental activity.  The FAEC plans to cease operations during the fiscal year ending 2014.  They are currently working with the State to determine which organization will take over the loans.

Hurley Medical Center (HMC or the "Medical Center") provides inpatient, outpatient, and emergency care services in Genesee and surrounding counties. The financial statements present HMC and its wholly owned subsidiary, Hurley Health Services, Inc., on a consolidated basis. HMC is the sole member of Hurley Health Services, Inc. (HHS), a municipal support organization organized on a non-profit, non-stock membership basis.  HHS, on a consolidated basis, is comprised of two non-profit entities (HHS and The Hurley Clinics, THC) and one "for-profit" corporation (Hurley Practice Management Services).  HHS began operations January 1, 1998. The City appoints the board of directors and there is an ongoing financial benefit/burden relationship between the City and Hurley Medical Center.  HMC is presented as a governmental activity.

**Note 1 - Nature of Business and Significant Accounting Policies (Continued)**

Complete financial statements for the following individual component units may be obtained at the entity's administrative offices. Complete financial statements for Atwood Stadium Building Authority are not available. Due to the nature of the operations of Atwood Stadium Building Authority, there is no difference in the assets and liabilities, and equity reported between the fund and government-wide statements. Therefore, fund financial statements are not presented.

| | | |
|---|---|---|
| Flint Downtown<br>Development Authority<br>Suite 206<br>412 S. Saginaw Street<br>Flint, Michigan 48502 | Flint Economic<br>Development Corporation<br>1101 S. Saginaw Street<br>Flint, Michigan 48502 | Flint Area<br>Enterprise Community<br>805 Welch Boulevard<br>Flint, Michigan 48504 |
| Hurley Medical Center<br>One Hurley Plaza<br>Flint, MI 48503 | | |

**Government-wide and Fund Financial Statements**

The government-wide financial statements (i.e., the statement of net position and the statement of activities) report information on all of the nonfiduciary activities of the primary government and its component units. For the most part, the effect of interfund activity has been removed from these statements. Governmental activities, normally supported by taxes and intergovernmental revenues, are reported separately from business-type activities, which rely to a significant extent on fees and charges for support. Likewise, the primary government is reported separately from certain legally separate component units for which the primary government is financially accountable.

The statement of activities demonstrates the degree to which the direct expenses of a given function or segment are offset by program revenues. Direct expenses are those that are clearly identifiable with a specific function or segment. Program revenues include (1) charges to customers or applicants who purchase, use, or directly benefit from goods, services, or privileges provided by a given function or segment and (2) grants and contributions that are restricted to meeting the operational or capital requirements of a particular function or segment. Taxes and other items not properly included among program revenues are reported instead as general revenue.

Separate financial statements are provided for governmental funds, proprietary funds, and fiduciary funds, even though the latter are excluded from the government-wide financial statements. Major individual governmental funds and major individual enterprise funds are reported as separate columns in the fund financial statements.

**Note 1 - Nature of Business and Significant Accounting Policies (Continued)**

**Measurement Focus, Basis of Accounting, and Financial Statement Presentation**

The government-wide financial statements are reported using the economic resources measurement focus and the accrual basis of accounting, as are the proprietary fund, pension trust fund, and component unit statement of net position and statement of activities. Revenue is recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. Property taxes are recognized as revenue in the year for which they are levied. Grants and similar items are recognized as revenue as soon as all eligibility requirements imposed by the provider have been met.

Governmental fund financial statements are reported using the current financial resources measurement focus and the modified accrual basis of accounting. Revenue is recognized as soon as it is both measurable and available. Revenue is considered to be available when it is collectible within the current period. For this purpose, the government considers revenues to be available if they are collected within 60 days for property taxes and 90 days of the end of the current fiscal period for all other revenues.

Expenditures generally are recorded when a liability is incurred, as under accrual accounting. However, debt service expenditures, expenditures relating to compensated absences, and claims and judgments are recorded only when payment is due.

Property taxes, income taxes, licenses, and charges for services associated with the current fiscal period are all considered to be susceptible to accrual and so have been recognized as revenues of the current fiscal period. Only the portion of special assessments receivable due within the current fiscal period is considered to be susceptible to accrual as revenue of the current period. All other revenue items are considered to be measurable and available only when cash is received by the government.

The government reports the following major governmental funds:

- The General Fund is the government's primary operating fund. It accounts for all financial resources of the general government, except those required to be accounted for in another fund.
- The Federal Grants Fund accounts for entitlement and specific purpose grants received from the U.S. Department of Housing and Urban Development and other grantors.
- The Public Improvement Fund was established to account for the annual 2 1/2 mill tax levy reserved by Section 7 201 of the City Charter for capital improvements and servicing of general obligation debt.

**City of Flint, Michigan**

<div align="right">

**Notes to Financial Statements**
**June 30, 2013**

</div>

**Note 1 - Nature of Business and Significant Accounting Policies (Continued)**

The government reports the following major proprietary fund:

- The Water Supply and Sewer Disposal System are divisions of the City's Department of Public Works. Separate funds are maintained for the operations of the water distribution system and sewage pumping and collection systems and the sewer treatment plant.

Additionally, the government reports the following internal service and fiduciary activities:

- Internal service funds account for data processing, self insurance, fleet, and fringe benefits services provided to other departments or agencies of the government, or to other governments, on a current cost reimbursement basis.

- Pension trust and benefit trust funds account for the activities of the five different funds utilized to pay retirement, death, and healthcare benefits for the City of Flint and Hurley Medical Center retirees. These funds accumulate resources for pension and healthcare benefits financed by both employer and employee contributions.

- Agency funds are custodial in nature (assets equal liabilities) and do not involve the measurement of results of operations.

Pension and benefit trust funds and agency funds are reported as fiduciary funds and are not included in the government-wide statement of net position and statement of activities.

As a general rule, the effect of interfund activity has been eliminated from the government-wide financial statements. Exceptions to this general rule are charges between the City's water and sewer function and various other functions of the City. Elimination of these charges would distort the direct costs and program revenues reported for the various functions concerned.

When an expense is incurred for purposes for which both restricted and unrestricted net position or fund balance are available, the City's policy is to first apply restricted resources. When an expense is incurred for purposes for which amounts in any of the unrestricted fund balance classifications could be used, it is the City's policy to spend funds in this order: restricted, committed, assigned, and unassigned.

Proprietary funds distinguish operating revenue and expenses from nonoperating items. Operating revenue and expenses generally result from providing services in connection with a proprietary fund's principal ongoing operations. Operating expenses for proprietary funds include the cost of sales and services, administrative expenses, and depreciation on capital assets. All revenue and expenses not meeting this definition are reported as nonoperating revenue and expenses.

<div align="center">41</div>

**City of Flint, Michigan**

<div align="right">

**Notes to Financial Statements**
**June 30, 2013**

</div>

**Note 1 - Nature of Business and Significant Accounting Policies (Continued)**

**Property Tax Revenue**

Property taxes are levied on each July 1 on the taxable valuation of property as of the preceding December 31. Taxes are considered delinquent on March 1 of the following year, at which time penalties and interest are assessed.

Taxes on the operating, public improvement, parks, public safety, and neighborhood police levies are billed July 1 and may be paid in three equal installments due by July 31, October 31, and February 28, following the levy date. Taxes on the paramedic service levy are billed on December 1 and due in one installment by February 28. Property tax receivables are recorded as a receivable and offsetting deferred revenue when levied and due. Property taxes are recognized as revenues when collected or when considered measurable and available. The City considers property taxes as available if they are collected within 60 days after year end.

The 2013 taxable valuation of the City totaled $968 million. Taxes were levied as follows:

| Purpose | Millage Rate | Revenue |
|---|---|---|
| General operating | 7.5 | $ 6,000,349 |
| Public improvement | 2.5 | 2,055,994 |
| Parks and recreation | .5 | 406,560 |
| Public safety | 6.0 | 5,130,137 |
| Neighborhood police | 2.0 | 1,644,638 |
| Total | 18.5 | $ 15,237,678 |

**Cash and Cash Equivalents**

The City's cash and cash equivalents include cash on hand, demand deposits, and short-term investments with original maturities of three months or less from the date of acquisition.

**Pooled Cash and Investments**

Cash resources of certain individual funds are combined to form a pool of cash and investments which is managed by the city treasurer. Investments in the pooled cash and investments account consist primarily of certificates of deposit with a maturity date greater than three months from the date acquired by the City, top grade commercial paper and government securities, and money market funds, and are carried at fair value.

<div align="center">42</div>

**City of Flint, Michigan**

## Note 1 – Nature of Business and Significant Accounting Policies (Continued)

At June 30, 2013, some funds have overdrawn their share of the pooled cash and investments. Fund overdrafts of pooled cash and investments are reported as an interfund liability of that fund. Management has selected the Water Supply Division, Sewage Disposal Division, Major Streets Fund, Local Streets Fund, Neighborhood Policing Fund, Building Department Fund, Data Processing Fund, Fringe Benefits Fund, Central Maintenance Garage Fund, and Self-insurance Fund to report the interfund receivable. Accordingly, the above-mentioned funds' pooled cash and investment balance, as reported on the financial statement, have been decreased by the amounts receivable from the other City funds with an overdraft.

Interest income earned as a result of pooling cash and investments is distributed to the participating funds monthly utilizing a formula based on the average daily balance of each fund's share of the total pooled cash and investments. Funds that have overdrawn their share of pooled cash and investments are charged interest costs.

For the purpose of the statement of cash flows, pooled cash and investments have been considered as cash and cash equivalents.

### Investments

Investments for the City, as well as for its component units, are stated at fair market value (national or international exchange rates). Investments that do not have an established market are reported at estimated fair market value. Gains or losses on investments sold or exchanged are recognized when the transactions are completed (settlement date). Certificates of deposit with a maturity date of greater than three months at time of purchase are recorded as investments on the financial statements.

### Receivables and Payables

In general, outstanding balances between funds are reported as "due to/from other funds." Activity between funds that are representative of lending/borrowing arrangements outstanding at the end of the fiscal year is referred to as "advances to/from other funds." Any residual balances outstanding between the governmental activities and business-type activities are reported in the government-wide financial statements as "internal balances."

All trade, notes, contracts, and property tax receivables are shown net of an allowance for uncollectibles.

43

**City of Flint, Michigan**

## Note 1 – Nature of Business and Significant Accounting Policies (Continued)

### Inventories and Prepaid Items

Inventories in the enterprise and internal service funds consist of supplies held for use and are valued at the lower of cost or market using the first-in/first-out (FIFO) method. Inventories of governmental funds are valued at cost and are recorded as expenditures when consumed rather than when purchased.

Certain payments to vendors reflect costs applicable to future accounting periods and are recorded as prepaid items in both government-wide and fund financial statements.

### Deferred Revenue

Deferred revenue represents monies that do not yet meet the criteria for revenue recognition. Unearned amounts are always reported as deferred revenue. In governmental funds, earned amounts are also reported as deferred revenue until they are available to liquidate liabilities of the current period.

### Restricted Assets

These assets are restricted through bond or grant agreements or represent donated assets whose disposition is specified by the donor. Restricted assets recorded in the Federal Grants Fund are restricted through grant agreements.

Restricted assets recorded in the Hurley Medical Center discretely presented component unit consist of:

- Proceeds of debt issues and funds of HMC deposited with a trustee and limited to use in accordance with the requirements of an indenture

- Assets restricted by outside donors

Restricted assets recorded in the Water Supply Enterprise Fund consist of amounts set aside for equipment replacement and debt service as required by the Drinking Water Revolving Fund Revenue Bonds.

### Capital Assets

Capital assets, which include property, plant, equipment, and infrastructure assets (e.g., roads, bridges, sidewalks, and similar items), are reported in the applicable governmental or business-type activities columns in the government-wide financial statements. Capital assets are defined by the government as assets with an initial, individual cost of more than $5,000 (amount not rounded) and an estimated useful life in excess of one year. Such assets are recorded at historical cost or estimated historical cost if purchased or constructed. Donated capital assets are recorded at estimated fair market value at the date of donation.

44

**City of Flint, Michigan**

**Note 1 – Nature of Business and Significant Accounting Policies (Continued)**

Interest incurred during the construction of capital assets of business-type activities is included as part of the capitalized value of the assets constructed. Hurley Medical Center reported one construction project in progress during the current year, the installation of a new clinical information system.

The costs of normal maintenance and repairs that do not add to the value of the asset or materially extend assets lives are not capitalized.

| | |
|---|---|
| Buildings | 50 years |
| Building improvements | 40 to 50 years |
| Improvements other than buildings | 5 to 50 years |
| Land improvements | 5 to 50 years |
| Public domain infrastructure | 10 to 50 years |
| Water and sewer infrastructure | 10 to 75 years |
| Machinery and equipment | 3 to 20 years |
| Other furnishings | 5 to 7 years |

**Compensated Absences**

It is the government's policy to permit employees to accumulate earned but unused vacation and sick pay benefits. Employees accumulate sick leave credit bi-weekly based on the various bargaining unit agreements. Sick leave may accumulate indefinitely. Upon retirement or death, the first 480 hours of accrued sick leave are paid in full at the employee's current pay rate. The next 480 hours are forfeited by the employee, except for certain police employees who are paid for these hours at half the employee's current rate. All accrued hours in excess of 960 are paid at half the employee's current rate. Employees earn annual vacation leave bi-weekly at various rates based on bargaining unit and seniority. Each bargaining unit and seniority level determines the cap on the number of hours that can be accrued for annual vacation leave. Vacation leave is paid at the employee's current pay rate when used or upon retirement. All vacation pay is accrued when incurred in the government-wide, proprietary, and fiduciary fund financial statements. A liability for these amounts is reported in governmental funds only if they have matured, for example, as a result of employee resignations and retirements.

**City of Flint, Michigan**

**Note 1 – Nature of Business and Significant Accounting Policies (Continued)**

**Long-term Obligations and Interest Payments**

In the government-wide financial statements and the proprietary fund types in the fund financial statements, long-term debt and other long-term obligations are reported as liabilities in the applicable governmental activities, business-type activities, or proprietary fund-type statement of net position. Bond premiums and discounts, as well as issuance costs, are deferred and amortized over the life of the bonds using the effective interest method. Bonds payable are reported net of the applicable bond premium or discount. Bond issuance costs are reported as deferred charges and amortized over the term of the related debt.

In the fund financial statements, governmental fund types recognize bond premiums and discounts, as well as bond issuance costs, during the current period. The face amount of debt issued is reported as other financing sources. Premiums received on debt issuances are reported as other financing sources. Issuance costs are reported as debt service expenditures.

**Pension and Retiree Healthcare Benefits**

The City offers both pension and retiree healthcare benefits to retirees. The City receives an actuarial valuation to compute the annual required contribution (ARC) necessary to fund the obligations over the remaining amortization period. In the governmental funds, pension and OPEB costs are recognized as contributions are made. For the government-wide statements and proprietary funds, the City reports the full accrual cost equal to the current year required contribution, adjusted for interest and "adjustment to the ARC" on the beginning of year underpaid amount, if any.

**Fund Equity**

In the fund financial statements, governmental funds report the following components of fund balance:

- Nonspendable: Amounts that are not in spendable form or are legally or contractually required to be maintained intact

- Restricted: Amounts that are legally restricted by outside parties, constitutional provisions, or enabling legislation for use for a specific purpose

- Committed: Amounts that have been formally set aside by the City for use for specific purposes. Commitments are made and can be rescinded only by the emergency manager.

- Assigned: Intent to spend resources on specific purposes expressed by the emergency manager

**Note 1 - Nature of Business and Significant Accounting Policies (Continued)**

- Unassigned: Amounts that do not fall into any other category above. This is the residual classification for amounts in the General Fund and represents fund balance that has not been assigned to other funds and has not been restricted, committed, or assigned to specific purposes in the General Fund. In other governmental funds, only negative unassigned amounts are reported, if any, and represent expenditures incurred for specific purposes exceeding the amounts previously restricted, committed, or assigned to those purposes.

**Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the period. Actual results could differ from those estimates.

**Hurley Medical Center - Cost-based Reimbursement**

Patient accounts receivable at June 30, 2013 and revenues for the year then ended include estimated amounts due from various third-party payors which are computed in accordance with their respective reimbursement formulas.

In addition, the Medical Center has established an estimated allowance for uncollectible accounts of approximately $41,300,000 for 2013.

**Hurley Medical Center - Revenues and Expenses Accounting Policy**

Net patient service revenue:

Net patient service revenue is reported at the estimated net realized amounts from patients and third-party payors for services rendered, including estimated retroactive adjustments under reimbursement agreements with third-party payors. Retroactive adjustments are accrued on an estimated basis in the period the related services are rendered and adjusted in future periods as final settlements are determined. Approximately 79 percent of the Medical Center's revenues are based on participation in the Blue Cross/Blue Shield, Medicare, and Medicaid programs for the year ended June 30, 2013.

Charity care:

The Medical Center provides care without charge to patients who meet certain criteria under its charity care policy. Because the Medical Center does not pursue collection of amounts determined to qualify as charity care, they are not reported as revenue. The eligibility criteria are based on levels of income.

47

**Note 1 - Nature of Business and Significant Accounting Policies (Continued)**

Estimated self-insured malpractice costs:

The provision for estimated self-insured medical malpractice claims includes estimates of the ultimate costs for both reported claims and claims incurred but not reported. The estimate for claims incurred but not reported is based on an actuarial determination.

**Note 2 - Stewardship, Compliance, and Accountability**

**Budgetary Information**

The City followed these procedures in establishing the budgetary data reflected in the financial statements:

- On April 24, 2012, the emergency manager signed Order No. 17, adopting the operating budget for the fiscal year commencing the following July 1. The legally adopted operating budget included expenditures and the means of financing them for the General and Special Revenue Funds (these funds are required to have budgets per Michigan law). Informational summaries of projected revenue and expenditures/ expenses were provided for all City funds, as well as estimated total costs and proposed methods of financing all capital construction projects.

  Department heads are authorized to transfer budgeted amounts with departmental appropriation accounts, except those that affect salaries and wages accounts, and revisions that alter the total expenditures of any budgetary level (as indicated above) were to be approved by the emergency manager and the State of Michigan Department of Treasury.

  Formal budgetary integration was employed as a management control device during the year for all budgetary funds. Also, all budgets, except for the Federal Grants Fund, were adopted on a basis consistent with generally accepted accounting principles. The budget for the Federal Grants Fund includes grant revenue and expenditures which were passed through to other City funds and recorded as revenue and expenditures in the grant receiving fund. For the fund financial statements, the Federal Grants Fund includes only those revenue and expenditures incurred directly by that fund.

- Budget appropriations lapse at year end, except for certain projects which are appropriated on a project length basis.

Encumbrance accounting is employed in governmental funds. Encumbrances (e.g., purchase orders, contracts) outstanding at year end do not constitute expenditures or liabilities because the goods or services have not been received as of year end; the commitments will be reappropriated and honored during the subsequent year.

48

**City of Flint, Michigan**

## Note 2 - Stewardship, Compliance, and Accountability (Continued)

### Noncompliance with Rules and Regulations

In order to maintain operations at the City, various funds have needed to borrow from funds that have restricted sources. Over time, these amounts have accumulated with no plan for repayment.

### Excess of Expenditures Over Appropriations

The following funds incurred significant expenditures in excess of appropriations at the department level during the year (defined as greater than 10 percent over budget):

|  | Final Budget | Actual | Actual Over Amended Budget |
|---|---|---|---|
| Public Improvement Fund - Parks and recreation | $   230,000 | $   481,121 | $   251,121 |

The variances over budget in these departments were caused by expenditures in excess of budget in which the budget was not amended.

### Fund Deficits

The City has accumulated over several years an unassigned fund balance in the following funds:

|  | Unassigned Fund Balance Deficit |
|---|---|
| Primary government - General Fund | $   12,895,642 |
| Component unit - Downtown Development Authority | 361,674 |

The deficit in these funds was caused by expenditures in excess of revenue.

The following special revenue funds did not adopt a budget: Atwood Stadium Fund, City Park Fund, and Longway Park Fund.

## Note 3 - Pooled Cash and Investments

The City maintains a cash and investment pool that is available for use by all funds. Each fund types' portion of this pool is displayed on the combined balance sheet as "pooled cash and investments."

---

**City of Flint, Michigan**

## Note 3 - Pooled Cash and Investments (Continued)

The pooled cash and investments account at June 30, 2013 is comprised of the following:

|  |  |
|---|---|
| Cash deposits and restricted cash | $   25,455,778 |
| Investments | 18,182,519 |
| Total | $   43,638,297 |

A summary of the amount of equity in the pooled cash and investments account or the amount due to the other funds at June 30, 2013 is as follows:

|  | Pooled Cash and Investments |
|---|---|
| General Fund | $   642,400 |
| Special Revenue Funds: |  |
| Major Streets Fund | 1,553,341 |
| Local Streets Fund | 175,753 |
| Federal Grants Fund | - |
| Public Safety Fund | 5,314,276 |
| Neighborhood Policing Fund | 277,207 |
| Street Light Fund | 674,949 |
| EDA Revolving Loan Fund | 405 |
| Atwood Stadium Fund | 6,788 |
| Parks and Recreation | 178,910 |
| Senior Citizen Center | - |
| City Park Fund | 8,399 |
| Longway Fund | 9,371 |
| Building Department Fund | 452,019 |
| Garbage Fund | 1,161,642 |
| Public Improvement | 2,767,994 |
| State Act 251 Forfeitures | 1,508,591 |
| Debt Service Funds: |  |
| Windmill Place Debt Service Fund | 6,520 |
| Buick City Debt Service Fund | 643 |
| Enterprise Funds: |  |
| Water Supply Division Fund | 7,837,696 |
| Sewer Fund | 6,956,143 |
| Internal Service Funds: |  |
| Fringe Benefit Fund | 5,931,959 |
| Central maintenance garage | 1,302,047 |
| Self-insurance | 1,835,382 |
| Data processing | 1,802,311 |
| Pension Trust Fund - Retiree Health Care Fund | 1,828,785 |
| Agency funds: |  |
| County EDA | - |
| Miscellaneous agency funds | 1,404,766 |
| Total | $   43,638,297 |

**City of Flint, Michigan**

**Note 4 – Deposits and Investments**

Michigan Compiled Laws Section 129.91 (Public Act 20 of 1943, as amended) authorizes local governmental units to make deposits and invest in the accounts of federally insured banks, credit unions, and savings and loan associations that have offices in Michigan. The law also allows investments outside the state of Michigan when fully insured. The local unit is allowed to invest in bonds, securities, and other direct obligations of the United States or any agency or instrumentality of the United States; repurchase agreements; bankers' acceptances of United States banks; commercial paper rated within the two highest classifications, which matures not more than 270 days after the date of purchase; obligations of the State of Michigan or its political subdivisions, which are rated as investment grade; and mutual funds composed of investment vehicles that are legal for direct investment by local units of government in Michigan.

The Pension Trust Fund, whose funds are now with MERS as of June 30, 2013, and the Retiree Health Care Fund are also authorized by Michigan Public Act 314 of 1965, as amended, to invest in certain reverse repurchase agreements, stocks, diversified investment companies, annuity investment contracts, real estate leased to public entities, mortgages, real estate (if the trust fund's assets exceed $250 million), debt or equity of certain small businesses, certain state and local government obligations, and certain other specified investment vehicles.

The investment policy adopted by the City Council, in accordance with Public Act 196 of 1997, is in accordance with statutory authority.

The City's investment policy authorizes the City and its component units to invest in obligations of the U.S. Treasury and obligations of U.S. agencies, whereby the principal and interest are fully guaranteed by the United States, deposit agreements with federally insured financial institutions within the state of Michigan, high grade commercial paper, repurchase agreements secured by obligations of the U.S. government and U.S. agencies, bankers' acceptances of U.S. banks, and mutual funds comprised of the above authorized investments.

The City's investment policy further requires that investments held in the Pooled Investment Fund be limited by the investment type and financial institution. These investment limitations do not affect the investments of the Pension Benefit Trust of the City's component units. The City's pooled cash investments are limited as follows:

- Negotiable certificates of deposit cannot exceed 25 percent of investment holdings.
- Commercial paper cannot exceed 50 percent of investment holdings.
- Bankers' acceptances cannot exceed 10 percent of investment holdings.
- Mutual funds cannot exceed 15 percent of investment holdings.
- Bankers' acceptances cannot exceed a maturity of 270 days.
- Bankers' acceptances in one financial institution cannot exceed 10 percent of investment holdings.

51

**City of Flint, Michigan**

**Note 4 – Deposits and Investments (Continued)**

- Commercial paper holdings of any one corporation cannot exceed 10 percent of investment holdings.

The City was in compliance with all aspects of its investment policy at June 30, 2013.

Hurley Medical Center's chief financial officer controls the Medical Center Enterprise Fund's investing. HMC limits any single investment to 10 percent (except cash or U.S. treasuries) and combined mortgage-backed securities to less than 50 percent of holdings. HMC also must adhere to donor restrictions on the investing of any restricted funds received.

The City deals only with qualified banks and primary investment firms that adhere to the specific guidelines established by industry practice for repurchase agreements. The City's cash and investments are subject to several types of risk, which are examined in more detail below.

No single investment of the City exceeded 5 percent of the investment portfolio at June 30, 2013.

**Custodial Credit Risk of Bank Deposits**

Custodial credit risk is the risk that in the event of a bank failure, the government's deposits may not be returned to it. The City does not have a deposit policy for custodial credit risk. At year end, the City's bank deposits (certificates of deposit, checking, and savings) in the name of the City totaling $34,584,584 were uninsured and uncollateralized. The City believes that due to the dollar amounts of cash deposits and the limits of FDIC insurance, it is impractical to insure all deposits. As a result, the City evaluates each financial institution with which it deposits its funds and assesses the level of risk of each institution; only those institutions with an acceptable estimated risk level are used as depositories.

52

**City of Flint, Michigan**

### Note 4 - Deposits and Investments (Continued)

#### Custodial Credit Risk of Investments

Custodial credit risk is the risk that, in the event of the failure of the counterparty, the City will not able to recover the value of its investments or collateral securities that are in the possession of an outside party. The City does not have a policy for custodial credit risk. The City's investments are not subject or exposed to custodial credit risk. HMC does have a deposit policy for custodial credit risk that requires the investments be held by a nationally chartered custodian bank. The chief investment officer shall select the custodian bank based on various factors including bank stability. HMC's balance of investment securities that were uninsured and unregistered held by the counterparty or by its trust department is as follows:

| Investment Type | Carrying Value | How Held |
|---|---|---|
| Primary government: | | |
| U.S. government or agency bonds | $   3,753,392 | Counterparty trust dept. |
| Corporate bonds | 6,190,632 | Counterparty trust dept. |
| Mutual funds | 13,512 | Counterparty |
| Fiduciary fund - Corporate stocks | 558,778 | Counterparty trust dept. |
| Component unit: | | |
| U.S. government or agency bonds | 55,025,765 | Counterparty trust dept. |
| Corporate stocks | 13,443,471 | Counterparty trust dept. |
| Corporate bonds | 11,783,330 | Counterparty trust dept. |
| Repurchase agreements | 14,135 | Counterparty |
| Mutual funds | 342,349 | Counterparty |

**City of Flint, Michigan**

### Note 4 - Deposits and Investments (Continued)

#### Interest Rate Risk

Interest rate risk is the risk that the value of investments will decrease as a result of a rise in interest rates. The City's investment policy for investment of general City monies limits investments in securities with maturities greater than five years to 15 percent of the balance available to invest. Hurley Medical Center's investment policy indicates that each investment account should approximate the duration of its specific benchmark within a range of 80 to 120 percent. As of June 30, 2013, the following securities were subject to interest rate risk:

| Investment | Fair Value | Weighted Average Maturity (Years) |
|---|---|---|
| **Primary Government** | | |
| U.S. government or agency bonds | $   3,753,392 | 2.24 |
| Corporate bonds | 6,190,632 | 0.06 |
| Money market funds | 4,025,594 | < 1 year |
| Total | $  13,969,618 | |
| **Component Units** | | |
| U.S. government agency securities | $ 55,025,765 | 3.72 |
| GNMA pool | 34,796 | 7.90 |
| U.S. government CMOs | 21,664,881 | 23.18 |
| Corporate bonds | 11,783,330 | 3.84 |
| Money market funds | 30,146,068 | < 1 year |
| Repurchase agreement | 14,135 | < 1 year |
| Total | $ 118,668,975 | |

#### Credit Risk

Credit risk is the risk that the government will not be able to recover the value of its securities. The City follows State law, which limits investments in commercial paper to the top two ratings issued by nationally recognized statistical rating organizations. The City has no investment policy that would further limit its investment choices for general City funds. The Pension Fund is allowed to invest in longer maturity corporate bonds in accordance with State law.

## City of Flint, Michigan

**Notes to Financial Statements**
**June 30, 2013**

### Note 4 – Deposits and Investments (Continued)

As of June 30, 2013, the following are credit quality ratings of the City's debt securities obtained from the Standard & Poor's rating system:

| Investment | Fair Value | Rating | Rating Organization |
|---|---|---|---|
| **Primary Government** | | | |
| U.S. government bonds | $      883,623 | AAA | S&P |
| U.S. government bonds | 2,869,769 | AA+ | S&P |
| Corporate bonds | 6,190,632 | AI | S&P |
| Mutual funds | 13,512 | AAA/AA | S&P |
| Fixed income | 73,947 | AAA/AA | S&P |
| Money market | 524,359 | A1/A2 | S&P |
| Money market | 60,396 | AAA | S&P |
| Money market | 3,366,893 | AAA/AA | S&P |
| Total | $    13,983,131 | | |
| **Component Units** | | | |
| U.S. agency bonds | $    5,677,688 | AAA | Fitch |
| U.S. government CMOs | 21,664,881 | Not Rated | Not Rated |
| Corporate bonds | 586,593 | AAA | S&P |
| Corporate bonds | 4,181,609 | AA+/A- | S&P |
| Corporate bonds | 5,473,295 | BBB+/B- | S&P |
| Corporate bonds | 297,104 | CCC+/CCC | S&P |
| Corporate bonds | 1,244,729 | Not Rated | Not Rated |
| Money market funds | 30,146,068 | Not Rated | Not Rated |
| Repurchase agreement | 14,135 | Not Rated | Not Rated |
| Total | $    69,286,102 | | |

### Securities Lending Agreement

As permitted by State statutes and under the provisions of a securities lending authorization agreement, the City's Pension System (the "System") lends securities to broker dealers and banks for collateral that will be returned for the same securities in the future. The System's custodial bank manages the securities lending program and receives cash as collateral. The custodial bank does not have the ability to pledge or sell collateral securities unless the borrower defaults. Borrowers are required to deliver collateral for each loan equal to not less than 102 percent of the market value of the loaned securities. During fiscal year 2013, prior to the System's assets being transferred to MERS, the System was participating in the securities lending program. As of June 30, 2013, the System is using MERS as the custodian and therefore no longer participates in the securities lending program.

55

## City of Flint, Michigan

**Notes to Financial Statements**
**June 30, 2013**

### Note 4 – Deposits and Investments (Continued)

The City of Flint Economic Development Corporation's cash is subject to one type of risk, which is examined in more detail below:

Custodial credit risk is the risk that in the event of a bank failure, EDC's deposits may not be returned to it. The government does not have a deposit policy for custodial credit risk. At year end, EDC had no bank deposits (certificates of deposit, checking, and savings accounts) that were uninsured and uncollateralized. As a result, the City evaluates each financial institution with which it deposits funds and assesses the level of risk of each institution; only those institutions with an acceptable estimated risk level are used as depositories.

The Flint Area Enterprise Community's cash is subject to one type of risk, which is examined in more detail below:

Custodial credit risk of bank deposits:

Custodial credit risk is the risk that in the event of a bank failure, FAEC's deposits may not be returned to it. FAEC has a deposit policy for custodial credit risk. At year end, FAEC had $493,243 of bank deposits (checking and savings accounts) that were uninsured and uncollateralized. FAEC believes that due to the dollar amounts of cash deposits and the limits of FDIC insurance, it is impractical to insure all deposits. As a result, FAEC evaluates each financial institution with which it deposits funds and assesses the level of risk of each institution; only those institutions with an acceptable estimated risk level are used as depositories.

The Flint Downtown Development Authority's cash and investments are subject to various types of risk, which are examined in more detail below:

Custodial credit risk of bank deposits:

Custodial credit risk is the risk that in the event of a bank failure, DDA's deposits may not be returned to it. DDA does not have a deposit policy for custodial credit risk. At year end, DDA had no bank deposits (certificates of deposit, checking, and savings accounts) that were uninsured and uncollateralized.

Credit risk:

State law limits investments in commercial paper to the top two ratings issued by nationally recognized statistical rating organizations. DDA has no investment policy that would further limit its investment choices. As of year end, the credit quality ratings of debt securities (other than the U.S. government) are as follows:

| | Fair Value | Rating |
|---|---|---|
| Investment - Money market | $      238,354 | Not Available |

56

# City of Flint, Michigan

**Notes to Financial Statements**
**June 30, 2013**

## Note 5 – Receivables and Deferred Revenue

Receivables as of year end for the City's individual major funds and nonmajor, internal service, and fiduciary funds in the aggregate, including the applicable allowances for uncollectible accounts, are as follows:

| Receivables: | General Fund | Federal Grants Fund | Public Improvement Fund | Nonmajor, Internal Service, Fiduciary Funds, and Agency Funds | Total | Water Supply | Sewage Disposal | Total | Component Unit - Hurley Medical Center |
|---|---|---|---|---|---|---|---|---|---|
| Property taxes receivable | $ 2,767,533 | $ - | $ 184,192 | $ 3,527,203 | $ 6,478,928 | $ - | $ - | $ - | $ - |
| Receivables from sales to customers on account | - | - | - | - | - | 14,054,422 | 10,597,528 | 24,651,950 | 70,201,583 |
| Accrued interest receivable | - | - | - | 198,082 | 198,082 | - | - | - | 261,587 |
| Gross receivables - Other receivables | 4,114,790 | 7,400 | - | 103,698 | 4,225,888 | 232 | 155 | 387 | 704,500 |
| Due from other governmental units | 3,304,348 | 3,963,428 | 9,167,900 | 1,531,041 | 17,966,717 | - | - | - | - |
| Notes and leases | - | 10,074,000 | - | 486,338 | 10,560,338 | - | - | - | - |
| Less allowance for uncollectibles | (2,428,785) | - | (4,266,449) | - | (6,695,234) | (936,000) | (775,000) | (1,711,000) | - |
| Net receivables | $ 7,757,886 | $ 14,044,828 | $ 5,085,643 | $ 5,846,362 | $ 32,734,719 | $ 13,118,654 | $ 9,932,549 | $ 23,051,203 | $ 71,167,670 |

Governmental funds report deferred revenue in connection with receivables for revenues that are not considered to be available to liquidate liabilities of the current period. Governmental funds also defer revenue recognition in connection with resources that have been received, but not yet earned. At the end of the current fiscal year, the various components of deferred revenue and unearned revenue reported in the governmental funds were as follows:

| | Governmental Funds | | |
|---|---|---|---|
| | Unavailable | Unearned | Total |
| Delinquent property taxes receivable (General Fund) | $ 870,717 | $ - | $ 870,717 |
| Delinquent property taxes receivable | 592,721 | - | 592,721 |
| Long-term notes receivable | 10,370,789 | - | 10,370,789 |
| Grant receivable | 948,117 | - | 948,117 |
| Grant receipts prior to meeting all eligibility requirements | - | 920,414 | 920,414 |
| Total | $ 12,782,344 | $ 920,414 | $ 13,702,758 |

# City of Flint, Michigan

**Notes to Financial Statements**
**June 30, 2013**

## Note 6 – Capital Assets

Capital asset activity of the City's governmental and business-type activities for the year was as follows:

| Governmental Activities | Balance July 1, 2012 | Additions | Disposals | Balance June 30, 2013 |
|---|---|---|---|---|
| Capital assets not being depreciated: | | | | |
| Land | $ 14,313,536 | $ - | $ - | $ 14,313,536 |
| Construction in progress | - | 132,616 | - | 132,616 |
| Subtotal | 14,313,536 | 132,616 | - | 14,446,152 |
| Capital assets being depreciated: | | | | |
| Roads and sidewalks | 369,668,151 | 3,900,775 | (161,026) | 373,407,900 |
| Buildings and improvements | 22,958,138 | 46,750 | - | 23,004,888 |
| Machinery and equipment | 32,643,402 | 983,687 | (3,330,492) | 30,296,597 |
| Land improvements | 14,605,010 | - | - | 14,605,010 |
| Subtotal | 439,874,701 | 4,931,212 | (3,491,518) | 441,314,395 |
| Accumulated depreciation: | | | | |
| Roads and sidewalks | 233,169,408 | 13,113,510 | (161,025) | 246,121,893 |
| Buildings and improvements | 17,146,379 | 446,904 | - | 17,593,283 |
| Machinery and equipment | 26,817,971 | 1,558,925 | (2,716,451) | 25,660,445 |
| Land improvements | 10,400,669 | 459,712 | - | 10,860,381 |
| Subtotal | 287,534,427 | 15,579,051 | (2,877,476) | 300,236,002 |
| Net capital assets being depreciated | 152,340,274 | (10,647,839) | (614,042) | 141,078,393 |
| Net capital assets | $ 166,653,810 | $ (10,515,223) | $ (614,042) | $ 155,524,545 |

| Business-type Activities | Balance July 1, 2012 | Reclassification | Additions | Disposals | Balance June 30, 2013 |
|---|---|---|---|---|---|
| Capital assets not being depreciated: | | | | | |
| Land | $ 762,394 | $ - | $ - | $ - | $ 762,394 |
| Construction in progress | 1,336,668 | (53,701) | - | - | 1,282,967 |
| Subtotal | 2,099,062 | (53,701) | - | - | 2,045,361 |
| Capital assets being depreciated: | | | | | |
| Buildings and improvements | 58,270,369 | 53,701 | 22,061 | (55,979) | 58,290,152 |
| Machinery and equipment | 236,967,195 | - | 1,678,217 | (10,129,805) | 228,515,607 |
| Land improvements | 5,406,197 | - | - | - | 5,406,197 |
| Subtotal | 300,643,761 | 53,701 | 1,700,278 | (10,185,784) | 292,211,956 |
| Accumulated depreciation: | | | | | |
| Buildings and improvements | 24,608,545 | - | 2,284,687 | (17,284) | 26,875,948 |
| Machinery and equipment | 166,468,474 | - | 5,052,420 | (8,311,804) | 163,209,090 |
| Land improvements | 1,528,505 | - | 198,628 | - | 1,727,133 |
| Subtotal | 192,605,524 | - | 7,535,735 | (8,329,088) | 191,812,171 |
| Net capital assets being depreciated | 108,038,237 | 53,701 | (5,835,457) | (1,856,696) | 100,399,785 |
| Net capital assets | $ 110,137,299 | $ - | $ (5,835,457) | $ (1,856,696) | $ 102,445,146 |

**City of Flint, Michigan**

## Note 6 - Capital Assets (Continued)

| Component Units | Balance July 1, 2012 | Additions | Disposals and Transfers | Balance June 30, 2013 |
|---|---|---|---|---|
| Capital assets not being depreciated: | | | | |
| Land | $ 10,423,314 | $ 20,000 | $ (803,734) | $ 9,639,580 |
| Construction in progress | 7,614,005 | 16,885,070 | (11,912,155) | 12,586,920 |
| Subtotal | 18,037,319 | 16,905,070 | (12,715,889) | 22,226,500 |
| Capital assets being depreciated: | | | | |
| Buildings and improvements | 175,900,564 | 3,166,411 | (5,182,663) | 173,884,312 |
| Machinery and equipment | 104,605,413 | 8,809,611 | (7,103,721) | 106,311,303 |
| Vehicles | 354,355 | - | (18,304) | 336,051 |
| Office furnishings | 1,085,861 | 42,108 | (3,499) | 1,124,470 |
| Land improvements | 13,153,256 | 206,602 | (552,109) | 12,807,749 |
| Leasehold improvements | 6,957,930 | 54,187 | (219,992) | 6,792,125 |
| Subtotal | 302,057,379 | 12,278,919 | (13,080,288) | 301,256,010 |
| Accumulated depreciation: | | | | |
| Buildings and improvements | 117,622,455 | 4,972,961 | (5,049,963) | 117,545,453 |
| Machinery and equipment | 61,459,816 | 10,995,528 | (6,790,713) | 65,664,631 |
| Vehicles | 262,273 | 34,988 | (18,304) | 278,957 |
| Office furnishings | 440,836 | 80,041 | (3,441) | 517,436 |
| Land improvements | 3,393,980 | 370,190 | (552,109) | 3,212,061 |
| Leasehold improvements | 6,385,440 | 57,489 | (228,761) | 6,214,168 |
| | 189,564,800 | 16,511,197 | (12,643,291) | 193,432,706 |
| Net capital assets being depreciated | 112,492,579 | (4,232,278) | (436,997) | 107,823,304 |
| Net capital assets | $ 130,529,898 | $ 12,672,792 | $ (13,152,886) | $ 130,049,804 |

Depreciation expense was charged to programs of the primary government as follows:

Governmental activities:

| | |
|---|---|
| General government | $ 953,072 |
| Police | 677,967 |
| Judicial | 35,763 |
| Fire | 60,160 |
| Transportation | 13,130,326 |
| Emergency dispatch | 77,289 |
| Parks and recreation | 572,517 |
| Public works | 5,313 |
| Community enrichment and development | 66,644 |
| Total governmental activities | $ 15,579,051 |

---

**City of Flint, Michigan**

## Note 6 - Capital Assets (Continued)

Business-type activities:

| | |
|---|---|
| Sewer | $ 3,971,796 |
| Water | 3,563,939 |
| Total business-type activities | $ 7,535,735 |

Component unit activities:

| | |
|---|---|
| Downtown Development Authority | $ 358,474 |
| Hurley Medical Center | 16,109,516 |
| Flint Area Enterprise Community | 3,954 |
| Economic Development Corporation | 39,253 |
| Total component unit activities | $ 16,511,197 |

## Note 7 - Interfund Receivables, Payables, and Transfers

The composition of interfund balances as of June 30, 2013 is as follows:

| Receivable Fund | Payable Fund | Amount |
|---|---|---|
| **Due to/from Other Funds** | | |
| Nonmajor governmental funds | General Fund | $ 1,812,097 |
| Internal service funds | General Fund | 4,500,000 |
| | Federal Grant Fund | 2,492,039 |
| | Nonmajor governmental funds | 26,556 |
| | Sewage Disposal Division Fund | 851,200 |
| | Total internal service funds | 7,869,795 |
| | Total | $ 9,681,892 |

| Receivable Fund | Payable Fund | Amount |
|---|---|---|
| **Advances from/to Other Funds** | | |
| Sewage Disposal Division Fund | General Fund | $ 9,800,000 |
| Water Supply Division Fund | General Fund | 1,000,000 |
| | Total | $ 10,800,000 |

**City of Flint, Michigan**

**Note 7 - Interfund Receivables, Payables, and Transfers (Continued)**

| Receivable Fund | Payable Entity | Amount |
|---|---|---|
| **Due to/from Primary Government and Component Units** | | |
| Public Improvement Fund | Component unit - DDA (1) | $ 9,167,900 |
| General Fund | Component unit - EDC (1) | 148,895 |
| Federal Grants Fund | Component unit - EDC | 550,000 |
| | Total | $ 9,866,795 |

The interfund receivables were created through negative pooled cash in other funds and monies loaned for operating purposes.

The advances were created through negative pooled cash in other funds.

(1) The borrowings between primary government and component units are due to parking debt funding (DDA) and ineligible grant costs (EDC). At June 30, 2013, there was an allowance related to the due from DDA of $4,266,449, which reduces the total due from DDA to a net amount of $4,901,451.

Interfund transfers reported in the fund financial statements are comprised of the following:

| Fund Transferred to | Fund Transferred from | Amount |
|---|---|---|
| General Fund | Sewage Disposal Division Fund (2) | $ 1,860,000 |
| | Water Supply Division Fund (2) | 1,130,000 |
| | Total General Fund | 2,990,000 |
| Nonmajor governmental funds | General Fund (3) | 9,312 |
| | Public Improvement Fund (4) | 726,953 |
| | Internal Service Funds (5) | 1,500,000 |
| | Nonmajor governmental funds (6) | 292,192 |
| | Total nonmajor governmental funds | 2,528,457 |
| | Total | $ 5,518,457 |

**City of Flint, Michigan**

**Note 7 - Interfund Receivables, Payables, and Transfers (Continued)**

(2) The transfers from the Sewer and Water Funds to the General Fund represent return on equity.

(3) Transfers between funds were primarily for operating purposes or to cover operating deficits.

(4) The transfer from the Public Improvement Fund to the Central Garage Internal Service Fund was to provide funds for the payment of debt related to capital assets.

(5) The transfer from the Central Maintenance Garage Fund to the Garbage Collection Fund was to transfer the proceeds received to the Garbage Collection Fund, which was related to the sale of City garbage trucks.

(6) Transfers between funds were primarily for operating purposes. The transfer from the Major Streets Fund to the Local Streets Fund is allowable per Act 51.

**Note 8 - Leases**

The City has entered into agreements for the lease of automobiles, water treatment equipment, office equipment, construction equipment, fire equipment, computers, and a fire station. The terms of each agreement provide options to purchase the fixed assets at any time during the lease terms, which range from three to five years. All of the leases meet the criteria of a capital lease as defined by Statement of Financial Accounting Standards No. 13, *Accounting for Leases*, which defines a capital lease generally as one which transfers the benefits and risks of ownership to the lessee. As such, $2,374,857 has been capitalized as equipment, and related accumulated depreciation was $1,108,489.

The following is a schedule of the future minimum lease payments under the capitalized leases together with the present value of the net minimum lease payments as of June 30, 2013:

| Years Ending June 30 | Amount |
|---|---|
| 2014 | $ 194,011 |
| 2015 | 151,834 |
| 2016 | 52,061 |
| Total future minimum lease payments | 397,906 |
| Less amount representing interest | (22,662) |
| Long-term obligation under capital leases | $ 375,244 |

**City of Flint, Michigan**

## Note 8 - Leases (Continued)

Also, Hurley Medical Center and HHS lease office space under various operating leases. Certain operating leases contain rental escalation clauses that are based on the prime rate at a future date and purchase options at fair market value.  The following is a schedule of future minimum lease payments under operating leases that have initial or remaining lease terms in excess of one year:

| Years Ending June 30 | Amount |
|---|---|
| 2014 | $ 1,784,585 |
| 2015 | 1,714,104 |
| 2016 | 1,687,311 |
| 2017 | 1,621,160 |
| 2018 | 1,200,735 |
| Thereafter | 2,205,193 |
| Total minimum payments required | $ 10,213,088 |

Rental expense for all operating leases for the year ended June 30, 2013 was $2,086,648.

## Note 9 - Long-term Debt

The City issues bonds to provide for the acquisition and construction of major capital facilities.  General obligation bonds are direct obligations and pledge the full faith and credit of the City.  County contractual agreements and installment purchase agreements are also general obligations of the government.  Special assessment bonds provide for capital improvements that benefit specific properties, and will be repaid from amounts levied against those properties benefited from the construction.  In the event that a deficiency exists because of unpaid or delinquent special assessments at the time a debt service payment is due, the City is obligated to provide resources to cover the deficiency until other resources (such as tax sale proceeds or a reassessment of the City) are received. All Michigan Municipal Bond Authority debt is secured by future State of Michigan revenue-sharing payments that the City is entitled to receive under State law. Revenue bonds involve a pledge of specific income derived from the acquired or constructed assets to pay debt service.

**City of Flint, Michigan**

## Note 9 - Long-term Debt (Continued)

Long-term debt activity for the year ended June 30, 2013 can be summarized as follows:

| | Beginning Balance | Additions | Reductions | Ending Balance | Due Within One Year |
|---|---|---|---|---|---|
| **Governmental Activities** | | | | | |
| Section 108 loan | $ 754,000 | $ - | $ 150,000 | $ 604,000 | $ 150,000 |
| Section 108 loan - 500 Block | 3,840,000 | - | - | 3,840,000 | 295,000 |
| Section 108 loan - Ok Industries | 106,000 | - | 21,000 | 85,000 | 21,000 |
| Section 108 loan - Guaranteed Funds | 5,105,000 | - | 75,000 | 5,030,000 | 75,000 |
| Section 108 loan - W. Carpenter Rd. | 1,681,000 | - | 97,000 | 1,584,000 | 98,000 |
| General Obligation Capital Improvement Bonds | 9,490,000 | - | 260,000 | 9,230,000 | 275,000 |
| Local Government Loan Program | 8,000,000 | - | 185,000 | 7,815,000 | 195,000 |
| Total governmental activities SIB 3rd Avenue Reconstruction loan | 1,928,642 | - | 108,977 | 1,819,665 | 109,523 |
| Total bonds payable | 30,904,642 | - | 896,977 | 30,007,665 | 1,218,523 |
| Accumulated compensated absences | 5,343,961 | 2,241,542 | 3,150,247 | 4,435,256 | 3,100,000 |
| Capital lease - Telephone equipment | 140,226 | - | 104,131 | 36,095 | 36,092 |
| Capital lease - Equipment | 27,212 | - | 21,622 | 5,590 | 5,592 |
| Capital lease - Dell equipment | 475,601 | - | 142,042 | 333,559 | 138,171 |
| Total governmental activities | $ 36,891,642 | $ 2,241,542 | $ 4,315,019 | $ 34,818,165 | $ 4,498,378 |

Compensated absences attributable to the governmental activities will be liquidated primarily by the General and Neighborhood Policing Funds.  The claims and judgments liability will generally be liquidated through the City's Self-Insurance Internal Service Fund.  That fund will finance the payment of those claims by charging the other funds based on management's assessment of the relative insurance risk that should be assumed by individual funds. The net pension obligation and the net OPEB obligation will be liquidated from the funds that the individual employee's salaries are paid from, generally the General Fund and Neighborhood Policing Fund.

## City of Flint, Michigan

### Note 9 - Long-term Debt (Continued)

| Business-type Activities | Beginning Balance | Additions | Reductions | Ending Balance | Due Within One Year |
|---|---|---|---|---|---|
| Enterprise funds: | | | | | |
| 2001 MMBA Drinking Water Revolving Fund Revenue Bonds | $ 3,303,994 | $ - | $ 375,000 | $ 2,928,994 | $ 385,000 |
| 2002 MMBA Drinking Water Revolving Fund Revenue Bonds | 4,110,000 | - | 410,000 | 3,700,000 | 425,000 |
| 2003 MMBA Drinking Water Revolving Fund Revenue Bonds | 5,196,408 | - | 465,000 | 4,731,408 | 475,000 |
| 2004 MMBA Drinking Water Revolving Fund Revenue Bonds | 13,344,934 | - | 865,000 | 12,479,934 | 880,000 |
| Total business-type activities | 25,955,336 | - | 2,115,000 | 23,840,336 | 2,165,000 |
| Accumulated compensated absences | 625,603 | 602,670 | 690,098 | 538,175 | 538,175 |
| Total business-type activities | $ 26,580,939 | $ 602,670 | $ 2,805,098 | $ 24,378,511 | $ 2,703,175 |

| Component Unit Activities | Beginning Balance | Additions | Reductions | Ending Balance | Due Within One Year |
|---|---|---|---|---|---|
| Bonds payable: | | | | | |
| Series 1998A | $ 9,705,000 | $ - | $ 7,825,000 | $ 1,880,000 | $ 915,000 |
| Series 1998B | 15,235,000 | - | 13,330,000 | 1,905,000 | 600,000 |
| Series 2003 | 25,590,000 | - | 18,080,000 | 7,510,000 | 2,360,000 |
| Series 2010 | 34,715,000 | - | 500,000 | 34,215,000 | 500,000 |
| Series 2011 | 4,706,476 | - | 597,541 | 4,108,935 | 678,530 |
| Series 2013A | - | 21,940,000 | - | 21,940,000 | - |
| Series 2013B | - | 36,590,000 | - | 36,590,000 | 555,000 |
| Total | 89,951,476 | 58,530,000 | 40,332,541 | 108,148,935 | 5,608,530 |
| Unamortized bond discount | (1,852,720) | 1,642,640 | | (210,080) | |
| Total component unit activities | $ 88,098,756 | $ 60,172,640 | $ 40,332,541 | $ 107,938,855 | $ 5,608,530 |

Annual debt service requirements to maturity for the above bonds and note obligations are as follows:

| Years Ending June 30 | Governmental Activities | | | Business-type Activities | | | Component Unit Activities | | |
|---|---|---|---|---|---|---|---|---|---|
| | Principal | Interest | Total | Principal | Interest | Total | Principal | Interest | Total |
| 2014 | $ 1,398,378 | $ 1,210,607 | $ 2,608,985 | $ 2,165,000 | $ 585,008 | $ 2,750,008 | $ 5,608,530 | $ 5,684,695 | $ 11,293,225 |
| 2015 | 1,383,769 | 1,169,308 | 2,553,077 | 2,220,000 | 530,571 | 2,750,571 | 5,307,431 | 5,391,722 | 10,699,153 |
| 2016 | 1,332,096 | 1,125,420 | 2,457,516 | 2,275,000 | 474,821 | 2,749,821 | 5,792,648 | 5,075,542 | 10,868,190 |
| 2017 | 1,345,175 | 1,082,110 | 2,427,285 | 2,335,000 | 417,633 | 2,752,633 | 6,079,156 | 4,846,484 | 10,925,640 |
| 2018 | 1,234,731 | 1,041,391 | 2,276,122 | 2,395,000 | 358,946 | 2,753,946 | 6,282,010 | 4,610,130 | 10,892,140 |
| 2019-2023 | 6,658,093 | 4,572,001 | 11,230,094 | 9,825,402 | 910,457 | 10,735,859 | 24,519,160 | 19,158,696 | 43,677,856 |
| 2024-2028 | 9,774,412 | 3,128,164 | 12,902,576 | 2,624,934 | 70,435 | 2,695,369 | 15,020,000 | 15,017,750 | 30,037,750 |
| 2029-2033 | 5,613,032 | 1,249,053 | 6,862,085 | - | - | - | 13,680,000 | 10,808,344 | 24,488,344 |
| 2034-2038 | 1,643,223 | 152,850 | 1,796,073 | - | - | - | 17,185,000 | 5,610,282 | 22,795,282 |
| 2039-2041 | - | - | - | - | - | - | 8,675,000 | 315,450 | 8,990,450 |
| Total | $ 30,382,909 | $ 14,730,904 | $ 45,113,813 | $ 23,840,336 | $ 3,347,871 | $ 27,188,207 | $ 108,148,935 | $ 76,519,095 | $ 184,668,030 |

## City of Flint, Michigan

### Note 9 - Long-term Debt (Continued)

**Future Revenues Pledged for Debt Payments**

**Revenue Bond** - The City has pledged substantially all revenue of the Water and Sewer Fund, net of operating expenses, to repay the Drinking Water Revolving Fund Revenue Bonds (DWRF). Financial recovery bonds issued by the State of Michigan and the DWRF Revenue Bonds have been secured with future State revenue-sharing payments to be received by the City's General Fund. The remaining principal and interest to be paid on the bonds are $23,840,336 and $3,347,872, respectively. During the current year, net revenues of the system were $12,165,515 and State revenue-sharing revenues were $13,667,182, as compared to the annual debt requirements of $2,165,000 of principal and $585,008 of interest.

**Revenues Pledged in Connection with Component Unit Debt** - The City has pledged, as security for bonds issued by the City on behalf of the Flint Downtown Development Authority, a portion of the City's state-shared revenues. The bonds issued during 2008 in the amount of $10,000,000 were used to provide funding for the James Rutherford Parking Deck capital project and upgrade of the Riverfront Parking Deck. The bonds are payable through 2033. The Flint Downtown Development Authority has pledged tax increment revenues and net operating revenues of the parking system to repay the obligations. Based upon the amount drawn through June 30, 2013, principal and interest to be paid on the bonds total $14,513,756. During the current year, the net loss from the parking operations was $16. Cash flow projections indicate that the DDA's annual debt service to the City for repayment of the bonds will not coincide with the City's annual debt service obligation. During the current year, the City has forgiven payment made by the City on behalf of the DDA.

**Section 108 Loans** - The Section 108 loans were obtained through an economic development loan program administered by the U.S. Department of Housing and Urban Development (HUD). The proceeds of the loans were then loaned to private entities for economic development proposes. Loans under the programs are owed to HUD and are secured by future federal grant allocations to the City through the Community Development Block Grant Program. During the current year, net revenues from the Community Development Block Grant Programs were $3,660,688 as compared to the annual debt requirements of $328,507.

**Hurley Medical Center Revenue Refunding Bonds** - The net revenues of the Medical Center are pledged for payment of principal and interest on the variable rate demand revenue rental and revenue refunding bonds. Accordingly, the financial statements of the Medical Center include the facilities as if owned by the Medical Center and the bonds as if issued by the Medical Center.

## City of Flint, Michigan

### Note 9 - Long-term Debt (Continued)

Section 7-302 of the City Charter, adopted November 4, 1975, limits "net" debt to 7 percent of the assessed value of all real and personal property in the City, but does not define "net" debt. The following computation is based on previous practice and is consistent with the requirements of the State of Michigan Public Act 279 of 1909.

| | | |
|---|---:|---:|
| Assessed valuation at November 16, 2012 | | $ 918,943,232 |
| Legal debt limit (7 percent of assessed valuation) | | 64,326,026 |
| Total bonded debt at June 30, 2013 | $ 140,194,271 | |
| Less debt not subject to limitation under City charter and state statute: | | |
| Revenue bonds and notes | 130,964,271 | |
| Debt subject to limitation | | 9,230,000 |
| Unused debt limitation | $        - | $ 55,096,026 |

### Note 10 - Restricted Assets

The balances of the restricted assets accounts in the governmental, business-type activities, and component units are as follows:

| | Governmental Activities | Business-type Activities | Component Units |
|---|---:|---:|---:|
| Section 108 business loan proceeds | $ 380,675 | $        - | $        - |
| Equipment replacement and improvement | - | - | 875,092 |
| Self insurance | - | - | 16,338,354 |
| Revenue bond indenture held by trustee | - | - | 26,816,531 |
| Unspent bond proceeds | - | - | 692,866 |
| Revenue bond equipment replacement account - Pooled cash | - | 2,001,500 | - |
| Debt service reserve - Pooled cash | - | 2,384,034 | - |
| Total restricted assets | $ 380,675 | $ 4,385,534 | $ 44,722,843 |

## City of Flint, Michigan

### Note 11 - Retirement Plans

Significant details regarding the City's various retirement plans and other post-employment benefits are presented below:

**Flint Employees' Retirement System**

During the first three months of the fiscal year, the City of Flint Employees' Retirement System (FERS), a single-employer public employee retirement system, covers substantially all employees of the City hired prior to October 1, 2003, including certain employees of Hurley Medical Center. The plan does not cover certain firemen and policemen covered by the Charter Retirement Plan, Hurley Medical Center employees participating in MERS, and those employees that elect to participate in the Employees' Defined Contribution - 401A Plan. The retirement system is a blended component unit of the City of Flint. The plan was established by City ordinance and applicable State law, and is administered by a board of trustees. A separate financial statement for the FERS is not available. The City Council has the authority to amend the benefits offered. Investments of the plan are made through Chase Trust Department and Northern Trust. Employees who retire at or after age 55 (age 60 for certain Hurley Medical Center employees) with 10 years of credited service (eight years for appointed officials), or those members with 25 years of credited service (23 years for police and fire), regardless of their age, are entitled to a retirement benefit. Certain police members can voluntarily retire at age 50 with 25 years of service. The retirement benefit can range from 1.7 percent to 2.6 percent of the participant's final average compensation based on the last three years (five years for certain Hurley Medical Center employees) of credited service multiplied by the years of credit service depending on date of hire, and is payable monthly for life. Benefits fully vest on reaching 10 years of service with the benefit payable at age 55. The plan also provides death and disability benefits.

Beginning in October 2012, the City closed out the single-employer plan and transferred approximately $270 million of assets to the Michigan Municipal Employees' Retirement System (MERS or the "System"), an agent multiple-employer defined benefit pension plan that covers substantially all employees of the City. The new System provides retirement, disability, and death benefits to plan members and their beneficiaries. The Michigan Municipal Employees' Retirement System issues a publicly available financial report that includes financial statements and required supplemental information for the System. That report may be obtained by writing to the System at 1134 Municipal Way, Lansing, Michigan 48917.

Member contributions are recognized when due. Employer contributions to the plan are recognized when due and the employer has made a formal commitment to provide the contributions. Benefits and refunds are recognized when due and payable in accordance with the terms of the plan.

**City of Flint, Michigan**

**Note 11 - Retirement Plans (Continued)**

The investments are recorded on the balance sheet at fair value as determined by the custodian. The custodian utilizes electronic feeds from external pricing vendors for the majority of investments (95 percent). The remaining assets are valued through a variety of external sources. Gains and losses on the exchanges, or "swaps" of securities, are accounted for under the completed transactions method.

During the current year, all assets from FERS were transferred to the Municipal Employees' Retirement System (MERS), which at June 30, 2013 is the sole administrator of the plan. MERS is a multiple-employer retirement agent. MERS issues a publicly available financial report that includes financial statements and required supplemental information for the system. That report may be obtained by writing to MERS at 1134 Municipal Way, Lansing, Michigan 48917.

Membership in the plan at June 30, 2011, the latest date this data was tested in an actuarial valuation, was comprised of 1,276 active plan members, 223 inactive vested members, and 2,894 retirees and beneficiaries receiving payments.

The plan provides that the City and employees contribute amounts necessary to fund the actuarially determined benefits. Employees become members of FERS and are required to deposit amounts into the system based on rates determined by bargaining unit contracts of all compensation, including overtime. The employee contribution rates ranged from 0 to 9 percent. Deposits are accumulated in individual accounts for each member remaining in service. Upon termination, a member may withdraw the accumulated employee contributions plus any interest credited to his or her account.

Administrative costs of the plan are financed through investment earnings.

The City forwarded $3,018,836 of pension contributions withheld from employees during the year ended June 30, 2013. During 2013, employer contributions rates ranged from 12.23 percent to 59.98 percent of covered payroll. Employer contributions are based on an actuarial valuation performed as of June 30, 2011. The employer contribution for the year was $14,909,789, which agreed to the annual required contribution. The employer contributions funded retirement benefits, life insurance benefits, and the administration of the retirement system.

---

**City of Flint, Michigan**

**Note 11 - Retirement Plans (Continued)**

**Annual Pension Cost**

Six-year trend information regarding the annual pension cost (ARC), percentage of ARC contributed, and net pension obligation (NPO) are summarized as follows:

| Fiscal Year Ended | Actuarial Valuation Date | Annual Required Contribution * | Percentage Contributed | Net Pension Obligation |
|---|---|---|---|---|
| 6/30/08 | 6/30/06 | $ 14,376,558 | 72.0 | $10,805,978 |
| 6/30/09 | 6/30/07 | 14,497,568 | 175.0 | - |
| 6/30/10 | 6/30/08 | 13,394,739 | 100.0 | - |
| 6/30/11 | 6/30/09 | 10,835,308 | 100.0 | - |
| 6/30/12 | 6/30/10 | 14,562,392 | 100.0 | - |
| 6/30/13 | 6/30/11 | 14,909,789 | 100.0 | - |

* The required contribution is expressed to the City as a percentage of payroll.

Funding status and funding progress:

| Actuarial Valuation Year Ended | Actuarial Value of Assets (a) | Actuarial Accrued Liability Individual Entry Age (AAL) (b) | Unfunded (Overfunded) AAL (UAAL) (b-a) | Funded Ratio (a/b) | Covered Payroll (c) | UAAL as % of Covered Payroll ((b-a)/c) |
|---|---|---|---|---|---|---|
| 6/30/06 | $ 782,098 | $ 1,023,599 | $ 241,501 | 76.4 | $ 146,634 | 164.7 |
| 6/30/07 | 801,533 | 1,071,781 | 270,248 | 75.2 | 157,012 | 172.1 |
| 6/30/08 | 670,366 | 841,266 | 170,900 | 79.7 | 89,636 | 190.7 |
| 6/30/09 | 623,292 | 873,088 | 249,796 | 71.4 | 89,636 | 278.7 |
| 6/30/10 | 567,215 | 835,052 | 267,837 | 67.9 | 68,968 | 388.3 |
| 6/30/11 | 506,504 | 829,380 | 322,876 | 61.1 | 63,063 | 512.0 |

The schedule of funding progress, presented as required supplemental information following the notes to the financial statements, presents multiyear trend information about whether the actuarial value of plan assets is increasing or decreasing over time relative to the actuarial accrued liability for benefits.

The actuarial methods used to determine the actuarial accrued liability was the individual entry age actuarial funding methods. Unfunded actuarial accrued liabilities are being amortized as a level percent of projected payroll over 30 years for general, police, and fire. Significant actuarial assumptions used in the computation of the accrued actuarial liability include: (1) a rate of return on the investment or present and future assets of 8.0 percent per year compounded annually, (2) projected salary increases of 3.75 percent to 7.55 percent per year compounded annually, and (3) 3.75 percent inflation.

**City of Flint, Michigan**

## Note 11 - Retirement Plans (Continued)

The actuarial value of assets was computed on fair values "smoothed" over a four-year period.

Hurley Medical Center:

During the fiscal year ended June 30, 2004, seven of nine employee unions plus the exempt employees of Hurley Medical Center voted to change participation from the City of Flint FERS to the Michigan Municipal Public Employees' Retirement System (MERS). Benefits under both plans are comparable and approximately half of the employees at the Medical Center are represented in each system. The annual contribution rate for MERS payroll used by the Medical Center in 2012 was 12.23 percent, which is based on the same rate it contributes to FERS.

As of June 30, 2013, $3,268,705 of the net pension obligation represents pension cost from the years 2011, 2012, and 2013 that has not yet been remitted to MERS.

During the current year, all assets from FERS were transferred to MERS, which at June 30, 2013 is the sole administrator of the plan.

The net pension obligation at June 30, 2013 consists solely of amounts owed by Hurley Medical Center.

Annual pension cost and net pension obligation:

| | |
|---|---:|
| Annual required contribution/annual pension cost | $ 12,682,496 |
| Contributions made | (10,412,640) |
| **Write-off of excess liability | (5,505,093) |
| Decrease in net pension obligation | (3,235,237) |
| Net pension obligation - Beginning of year | 6,503,942 |
| Net pension obligation - End of year | $ 3,268,705 |

** During the transition from FERS to MERS, the liability was determined by the actuary not to be needed and written off.

---

**City of Flint, Michigan**

## Note 11 - Retirement Plans (Continued)

**Annual Pension Cost**

Trend information regarding the annual pension cost (ARC), percentage of ARC contributed, and net pension obligation (NPO) for the years for which HMC approved MERS are summarized as follows:

| | Fiscal Year Ended June 30 | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| Annual pension costs | $ 12,682,496 | $ 11,808,875 | $ 6,059,456 |
| Percentage of pension costs contributed | 82.1 % | 91.5 % | 156.0 % |
| Net pension obligation | $ 3,268,705 | $ 6,503,942 | $ 5,505,003 |

**Charter Retirement Plan**

The Charter Retirement Plan, a single employer defined benefit pension plan, covers firemen and policemen employed by the City prior to July 1, 1947. The plan was adopted under City code. All employees covered by this plan have retired. Benefits are provided under a special City ordinance with retirees receiving a monthly benefit. The current membership of the plan at June 30, 2013 is four members. The City intends to pay retirement benefits as they become due from future years' General Fund revenue. The City's contribution to the plan for the year ended June 30, 2013 was $64,149 and was calculated based on the actual current pension benefits due to be paid. The present value of vested benefits has not been determined. The City has not requested an actuarial valuation of the plan since 1985 because of the decreasing nature and the immateriality of the plan's potential unfunded pension benefit obligation and the fact that the City is paying benefits as they become due. Net position available for pension benefits at June 30, 2013 was $0.

**I.C.M.A. 401A Plan**

The City made available to appointed and elected officials hired through December 31, 2001 an alternative retirement plan to the general retirement pension plan. The plan was a non-contributory defined contribution plan adopted under City ordinance. The City contributes an amount equal to the lesser of 25 percent of the employee's compensation, or $30,000. No employee contributions are required, and employees vest 100 percent immediately. Total contributions required and made by the City during the year ended June 30, 2013 were $63,429, which represented 25 percent of current year covered payroll. The plan trustee is the International City Management Association. Investments are stated at market, which approximates cost. Total payroll and covered payroll for the year ended June 30, 2013 were $33,473,833 and $253,714, respectively.

D-38

**City of Flint, Michigan**

**Note 11 - Retirement Plans (Continued)**

On January 1, 2002, a new plan was adopted for appointed and elected officials. The City contributes 11 percent of employees' gross earnings and employees have a mandatory 4 percent contribution. Employee accounts are fully vested after five years of service. The current year contribution was calculated based on covered payroll of $89, resulting in an employer contribution of $8 and employee contribution of $6.

**Defined Contribution Retirement Plans**

On December 3, 2003, a resolution was passed by City Council to establish a defined contribution 401 pension plan for members of AFSCME Local 1600 and Local 1799. Employees hired on or after October 1, 2003 are not eligible to participate in the Flint Employees' Retirement System defined benefit pension plan. Employees hired prior to October 1, 2003 had the option of transferring assets from the defined benefit pension plan upon implementation of the defined contribution plan. The City contributes 10 percent of employees' gross earnings and employees have a mandatory 5 percent contribution. Employee accounts are fully vested after five years of service. The City's total payroll during the current year was $33,473,833. The current year contribution was calculated based on covered payroll of $2,684,880, resulting in an employer contribution of $160,112 and employee contributions of $252,918.

The City provides pension benefits to full-time employees except those participating in the defined benefit plan, members of AFSCME Local 1600 and Local 1799, and individuals participating in the I.C.M.A. plan through a defined contribution plan. In a defined contribution plan, benefits depend solely on amounts contributed to the plan plus investment earnings. Employees are eligible to participate from the date of employment (or other date). As established by City ordinance (authority under which the pension obligation is established), the City contributes 11 percent to 14.5 percent of employees' gross earnings and employee mandatory contributions of 4 percent to 5.5 percent for each employee plus interest allocated to the employee's account are fully vested after five years.

The City's total payroll during the current year was $33,473,833. The current year contribution was calculated based on covered payroll of $1,302,083, resulting in an employer contribution of $141,805 and employee contributions of $70,796.

The Medical Center has a defined contribution plan for employees who meet certain requirements as to date of hire. Contributions to the plan are 4.5 percent of the employee's annual compensation. Each employee's interest is vested as specified in the plan. Pension expense included in the statements was $1,179,735.

73

**City of Flint, Michigan**

**Notes to Financial Statements
June 30, 2013**

**Note 11 - Retirement Plans (Continued)**

**Profit Sharing and 403(b) Plan**

Hurley Health Services (HHS), a component unit of Hurley Medical Center, has a qualified 401(k) profit-sharing plan for HPMS employees. Eligible employees, those that have attained the age of 21 and completed 90 days of service, may defer up to 15 percent of their salary. HHS may make a discretionary contribution. HHS' contribution to the 401(k) plan was $32,837. HHS also maintains two tax-deferred annuity plans under Section 403(b) of the Internal Revenue Code. Under the plans, HHS and THC employees may elect to defer up to a specified percentage of their salary, subject to the Internal Revenue Service limits. HHS may make a discretionary contribution. HHS' contribution to the 403(b) plan amounted to $273,651.

**Excess Benefits Pension Plan**

The City established the City of Flint Excess Benefits Plan and Trust (the "Plan") for the purpose of providing certain retiring employees with pension benefits in addition to those provided by the Flint Employees' Retirement System (FERS). Certain FERS, now MERS, participants receive an annual pension benefit that exceeds limits included in Section 415 of the Internal Revenue Code of 1986, as amended. Since the contractually required annual benefit exceeds Section 415 limitations, the benefits cannot be funded through the FERS plan. The Excess Benefits Plan and Trust was established as a separate pension trust to accumulate resources to pay these "excess" benefits on an annual basis.

Participation in the Plan is limited to FERS retirees whose benefit under the FERS defined benefit plan is limited by Section 415 of the Code and who retire at any time based on employment as a member of a bargaining unit represented by Local 1600 or Local 1799 of American Federation of State, County, and Municipal Employees. All employees covered by this plan have retired.

The annual benefit provided under the Plan shall be the excess, if any, of each individual participant's benefit over the Section 415 limits in effect that calendar year. All benefits payable under this Plan shall be paid in the same manner and form (using the same actuarial assumptions) as pension benefits paid under the FERS. Benefits shall be paid from the Plan once the member has received the maximum amount permitted within the limits of Code Section 415 during a plan year.

The Plan is intended to be funded on an annual basis via City contributions. There are no employee contributions to the Plan. The annual contribution will be determined by estimating the amount of "excess" benefits that will be paid out that calendar year. During the year ended June 30, 2013, employer contributions of $0 were made to the Plan and benefits of $0 were paid out.

74

**City of Flint, Michigan**

**Note 11 - Retirement Plans (Continued)**

The City has not requested an actuarial valuation of the Plan because of the immateriality of the Plan's potential unfunded pension benefit obligation and the fact that the City is paying benefits as they become due.  Net position available for pension benefits at June 30, 2013 was $0.

**Retiree Death Benefits Plan**

The City provides postretirement death benefits to certain retirees who retired after July 1, 1978, under the terms of collective bargaining agreements with two employee unions. If the retiree was a member of one of the bargaining units at the time of retirement, his or her designated beneficiary will receive a death benefit at the time of the retiree's death.  The death benefit ranges from $2,500 to $10,000 depending on the retirement date.

As of February 9, 2011, the retiree death benefits were changed effective immediately to all 1,600 union employees who were eligible under the previous agreement.  The new agreement states that the designated beneficiary will receive $1,000 for everyone who retired since July 1, 1978 (the inception of the death benefit).

The benefits are funded in advance by employee withholdings and a matching employer contribution.  The employee contributions are calculated at a set amount for each hour worked by union members during the bi-weekly pay period.   The employee withholdings and matching employer contributions are deposited into a separate account for investment purposes.  As of June 30, 2012, this benefit is no longer offered to active employees.  The investments are administered by a seven-member board appointed by the two unions and the mayor.

As of year end, there were 676 retirees who were eligible for this benefit.  Employee contributions for the year ended June 30, 2013 were $0.  Net position available for benefits, reported at fair value, was $503,076 at year end.  No actuarial valuation has been performed to determine the present value of vested benefits. During 2013, death benefits of $71,000 were paid.

**Health Benefits Plan and Trust**

The City established the City of Flint Retiree Health Care Plan and Trust (the "Trust") for the purpose of providing health insurance benefits adopted by the City or approved by collective bargaining agreements to eligible retirees and their spouses.  This is a defined contribution plan administered by the Trust.  The benefits are provided to Local 1600 and Local 1799 retirees who retired on or after October 1, 2003 as provided for in collective bargaining agreements.  The plan is constituted as a "voluntary employees beneficiary association" (VEBA) under Section 501(c)(9) of the Internal Revenue Code of 1986.

**City of Flint, Michigan**

**Note 11 - Retirement Plans (Continued)**

The collective bargaining agreements require a contribution of 1.5 percent of pre-tax compensation from employees belonging to AFSCME Local 1600 and Local 1799.  The Plan does not currently require an employer contribution.  The employee contributions and accumulated investment earnings are to be used to provide healthcare benefits above the capped level provided by the City's defined benefit retiree healthcare benefit plan.

During the year ended June 30, 2013, plan members contributed $147,311.  Net position available for benefits was $14,237 at June 30, 2013.  A total of $300,000 benefit payments were made during 2013.

**Note 12 - Other Postemployment Benefits**

**Plan Description** - The City provides retiree healthcare benefits to eligible employees and their spouses through the Retiree Health Care Trust Fund. Benefits are provided to public safety and general employees. Currently, the plan has 2,339 members, including 506 employees in active service, 0 terminated employees not yet receiving benefits, and 1,833 retired employees and beneficiaries currently receiving benefits.

This is a single employer defined benefit plan administered by the City.  The benefits are provided under collective bargaining agreements of Local 1799, Local 1600, and Fire Local 352. The plan does not issue a separate stand-alone financial statement. Administrative costs are paid by the plan through employer contributions. The plan does not cover Hurley Medical Center employees.

**Funding Policy** - The collective bargaining agreements require a contribution of $50, $75, or $100 depending on their union contracts toward retiree health plan insurance.  Contributions will stop once the retirees have 30 years of service or reach the age of 65. The City has no obligation to make contributions in advance of when the insurance premiums are due for payment. The City recognizes the expenses in the funds on a "pay-as-you-go" basis. The costs of administering the plan are borne by the City's General Fund.

**City of Flint, Michigan**

## Note 12 - Other Postemployment Benefits (Continued)

**Funding Progress** - For the year ended June 30, 2013, the City has estimated the cost of providing retiree healthcare benefits through an actuarial valuation as of July 1, 2012. The valuation computes an annual required contribution, which represents a level of funding that, if paid on an ongoing basis, is projected to cover normal cost each year and amortize any unfunded actuarial liabilities over a period not to exceed 29 years. This valuation's computed contribution and actual funding are summarized as follows:

| | |
|---|---:|
| Annual required contribution (recommended) | $ 21,789,244 |
| Interest on the prior year's net OPEB obligation | 6,671,460 |
| Less adjustment to the annual required contribution | (9,518,192) |
| Annual OPEB cost | 18,942,512 |
| Amounts contributed - Payments of current premiums | (17,016,014) |
| Increase in net OPEB obligation | 1,926,498 |
| OPEB obligation - Beginning of year | 156,975,216 |
| OPEB obligation - End of year | $ 158,901,714 |

The annual OPEB costs, the percentage contributed to the plan, and the net OPEB obligation for the current year are as follows:

| Fiscal Year Ended | Annual OPEB Costs | Percentage OPEB Costs Contributed | Net OPEB Obligation |
|---|---:|---:|---:|
| 6/30/08 | $ 60,188,371 | 32.0 | $ 40,925,931 |
| 6/30/09 | 55,252,592 | 35.0 | 76,645,627 |
| 6/30/10 | 55,252,592 | 37.0 | 113,615,741 |
| 6/30/11 | 61,351,938 | 32.1 | 155,284,670 |
| 6/30/12 | 22,105,830 | 92.4 | 156,975,216 |
| 6/30/13 | 18,942,499 | 89.8 | 158,901,714 |

The funding progress of the plan as of the most recent valuation data is as follows:

| Actuarial Valuation Date | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) (b) | Unfunded AAL (UAAL) (b-a) | Funded Ratio (Percent) (a/b) | Covered Payroll (c)* | UAAL as a Percentage of Covered Payroll |
|---|---:|---:|---:|---:|---:|---:|
| 7/1/12 | $ 166,903 | $ 320,180,757 | $ 320,013,854 | 0.1 | $ - | - |
| 7/1/11 | - | 366,832,597 | 366,832,597 | - | 37,339,842 | 982.0 |
| 7/1/10 | - | 862,302,934 | 862,302,934 | - | 36,252,274 | 2,379.0 |
| 7/1/09 | - | 774,606,738 | 774,606,738 | - | 41,166,662 | 1,882.0 |

\* For actuarial valuation date 7/1/12, the annual required contribution calculation is based on a flat dollar amount.

77

**City of Flint, Michigan**

## Note 12 - Other Postemployment Benefits (Continued)

**Actuarial Methods and Assumptions** - Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment, mortality, and the healthcare cost trend. Amounts determined regarding the funded status of the plan and the annual required contributions of the employer are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future. The schedule of funding progress, presented as required supplemental information following the notes to the financial statements, presents multiyear trend information about whether the actuarial value of plan assets is increasing or decreasing over time relative to the actuarial accrued liabilities for benefits.

Projections of benefits for financial reporting purposes are based on the substantive plan (the plan as understood by the employer and the plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and plan members to that point. The actuarial methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspective of the calculations.

In the July 1, 2012 actuarial valuation, the entry age actuarial cost method was used. The actuarial assumptions included a 4.25 percent investment rate of return (net of administrative expenses), which is a blended rate of the expected long-term investment returns on plan assets and on the employer's own investments calculated based on the funded level of the plan at the valuation date, an annual healthcare cost trend rate of 9 percent initially, reduced by decrements to an ultimate rate of 5 percent after nine years, and an inflation rate of 3 percent. The actuarial value of assets was determined using techniques that spread the effects of short-term volatility in the market value of investments over a five-year period. The UAAL is being amortized as a level percentage dollar on a closed basis. The remaining amortization period at July 1, 2012 was 29 years.

78

**City of Flint, Michigan**

## Note 13 - Pension and Other Employee Benefit Trust Funds

The following are condensed financial statements for the individual pension plans and postemployment healthcare plans:

| | Flint Employees' Retirement System | Death Benefit | Retiree Health Care | VEBA | Hurley Medical Center Retiree Benefit Trust Fund |
|---|---|---|---|---|---|
| **Statement of Net Position** | | | | | |
| Investments | $ - | $ 558,778 | $ - | $ - | $ 37,342,561 |
| Other assets | - | 15,298 | 1,905,805 | 314,237 | 186,887 |
| Liabilities | - | 71,000 | 390,813 | - | - |
| Net position | $ - | $ 503,076 | $ 1,514,992 | $ 314,237 | $ 37,529,448 |
| **Statement of Changes in Net Position** | | | | | |
| Investment income | $ 23,116,572 | $ 80,273 | $ - | $ 23 | $ 2,810,457 |
| Contributions | 6,028,559 | - | 18,356,884 | 147,311 | 5,898,301 |
| Benefit payments | 16,695,639 | 71,000 | 17,016,014 | 300,000 | 5,898,301 |
| Other deductions | 477,123,368 | 108 | 810,011 | - | - |
| Net change in net position | $ (464,673,876) | $ 9,615 | $ 530,859 | $ (152,666) | $ 2,810,457 |

## Note 14 - Hurley Medical Center Other Postemployment Benefits

Effective for retirements on or after July 1, 1983, Hurley Medical Center (the "Medical Center") provides a portion of health insurance premiums for retired employees. The Medical Center has set aside assets in an irrevocable trust account to be used for payment of its portion of health insurance premiums for retired employees. The activity is reported in the fiduciary fund statements.

**Plan Description** - The Medical Center provides retiree health insurance premiums to eligible retirees and their spouses through the Retiree Health Benefit Plan (the "Plan"). Retirees receive full or partial health insurance coverage depending on the employee's date of employment and union affiliation. During 2007, the Plan was frozen to new participants. During the year ended June 30, 2010, the Plan was amended to eliminate the full coverage benefits to those eligible employees. Eligible retirees prior to December 31, 2009 were grandfathered into the Plan with full health insurance benefits. The number of participants was 508 and 514 in June 30, 2013 and 2012, respectively.

The Plan's activity is accounted for in an irrevocable trust and the activity is reported in the fiduciary fund financial statements. The Plan is a single employer defined benefit plan administered by the Medical Center. The Plan does not issue a separate stand-alone financial statement.

**City of Flint, Michigan**

## Note 14 - Hurley Medical Center Other Postemployment Benefits (Continued)

**Funding Policy** - The Medical Center expenses the cost of the Plan in its proprietary fund. The cost of providing retiree healthcare benefits is estimated through an actuarial valuation issued on April 8, 2013 based on participant data as of June 30, 2011. The valuation computes the annual required contribution, which represents a level of funding that, if paid on an ongoing basis, is projected to cover the normal cost each year and amortize any unfunded actuarial liabilities over a period not to exceed 30 years. The Medical Center has no obligation to make contributions in advance of when the insurance premiums are due for payment (in other words, this may be financed on a pay-as-you-go basis). However, as shown below, the Medical Center has made contributions to advance fund certain of these benefits. This valuation's computed contribution and actual funding are summarized as follows for the year ended June 30, 2013:

**Annual Pension Cost and Net Pension Obligation**

| Fiscal Year Ended | Annual OPEB Costs | Percentage OPEB Costs Contributed | Net OPEB Obligation |
|---|---|---|---|
| 6/30/09 | $ 7,737,798 | 100 | $ - |
| 6/30/10 | 7,417,585 | 100 | - |
| 6/30/11 | 7,417,585 | 100 | - |
| 6/30/12 | 7,071,235 | 100 | - |
| 6/30/13 | 7,011,793 | 51 | 3,432,051 |

The funding progress of the plan as of the most recent valuation dates is as follows:

| | June 30 | |
|---|---|---|
| | 2011 | 2009 |
| Actuarial value of assets | $ 28,182,766 | $ 17,143,602 |
| Actuarial accrued liability (AAL) (entry age) | $ 90,042,892 | $ 88,341,116 |
| Unfunded AAL (UAAL) | $ 61,860,126 | $ 71,197,514 |
| Funded ratio | 31.3 % | 19.4 % |
| Covered payroll | $ 119,888,970 | $ 119,888,970 |
| UAAL as a percentage of covered payroll | 51.6 % | 59.4 % |

**City of Flint, Michigan**

**Note 14 - Hurley Medical Center Other Postemployment Benefits
(Continued)**

**Actuarial Methods and Assumptions** - Actuarial valuations of an ongoing plan involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future.  Examples include assumptions about future employment, mortality, and the healthcare cost trend.  Amounts determined regarding the funded status of the plan and the annual required contributions of the employer are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future.

Projections of benefits for financial reporting purposes are based on the substantive plan (the plan as understood by the employer and the plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and plan members to that point.  The actuarial methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets consistent with the long-term perspective of the calculations.

In the June 30, 2011 actuarial valuation, the individual entry age actuarial cost method was used.  The actuarial assumptions included an 8 percent investment rate of return (net of administrative expenses), which is a blended rate of the expected long-term investment returns on plan assets and on the Medical Center's own investments calculated based on the funded level of the plan at the valuation date, and an annual healthcare cost trend rate of 9 percent initially, reduced by decrements to an ultimate rate of 3.75 percent after 10 years. Both rates included a 3.75 percent inflation assumption.  The unfunded actuarial accrued liability (UAAL) is being amortized as a level percentage of projected payroll on an open basis.  The remaining amortization period at June 30, 2011 was 24 years.

**Note 15 - Significant Contingent Liabilities**

Federal, state, and local grants:

The City participates in a number of federal, state, and locally assisted grant programs, principally of which is the federally funded Community Development Block Grant.  The programs are subject to compliance audits.  In accordance with the Single Audit Act of 1984, compliance audits of federal grants were made during the current year and have been reported under a separate cover.  However, specific grantors have yet to make final approval of the compliance audits. The amount of ineligible grant expenses refunded to the grantor by the City during the year ended June 30, 2013 was $91,246, which includes no amounts still owed.

**City of Flint, Michigan**

**Note 15 - Significant Contingent Liabilities (Continued)**

Laws and regulations governing the Medicare and Medicaid programs are complex and subject to interpretation.  Hurley Medical Center's management believes that it is in compliance with all applicable laws and regulations.  Compliance with such laws and regulations can be subject to future government review and interpretation as well as significant regulatory action including fines, penalties, and exclusion from the Medicare and Medicaid programs.

**Note 16 - Risk Management**

Risk management - Primary government:

The City is exposed to various risks of loss related to property loss, torts, errors and omissions, employee injuries, unemployment benefits, as well as medical and workers' compensation benefits provided to employees.  The City has purchased commercial insurance for fleet equipment and tort claims, boiler and machinery, certain property and equipment damage and theft, employee theft, and limited tort claims for specific City facilities or events.  See separate disclosures below for Hurley Medical Center Component Unit.

Settled claims for the commercial insurance have not exceeded the amount of coverage in any of the past three years.  There was no reduction in coverages obtained through commercial insurance during the past year.

The City is self-insured for workers' compensation on a pay-as-you-go basis for claims up to $500,000, with reinsurance coverage provided once claims exceed $1,000,000 in the aggregate.  The self-insurance program is administered by a third-party administrator.  All workers' compensation benefits are paid out of the Fringe Benefits Internal Service Fund.  The amount of estimated claims payable at June 30, 2013 was not material.

The City is self-insured for active employee dental and eye care benefits on a pay-as-you-go basis.  The self-insurance program is administered by a third-party administrator.  All claims and benefits are paid out of the Fringe Benefits Internal Service Fund.  The amount of estimated claims payable at June 30, 2013 was not material.

The City pays unemployment claims on a reimbursement basis. The amount of estimated claims payable at June 30, 2013 was not material.

**City of Flint, Michigan**

**Note 16 - Risk Management (Continued)**

The City is self-insured for medical benefits provided to active employees and retirees. The benefits are funded on a pay-as-you-go basis. Claims are being paid out of the Fringe Benefits Internal Service Fund for active employee claims and out of the Retiree Health Care Trust Fund for retirees. The plans are administered by Blue Cross/Blue Shield and HealthPlus of Michigan. Once the individual contract or aggregate stop-loss amount is reached, reinsurance provides the remaining benefits. The City has two health insurance plans that are self-insured, Blue Cross/Blue Shield of Michigan (BCBSM) and HealthPlus. For the year ended June 30, 2013, the City paid out $4,376,750 in claims and administration fees to HealthPlus. The City is protected from catastrophic claims by an excess insurance policy which provides $2,000,000 in coverage per specific contract with a $150,000 self-insured retention (SIR). The City did not have any claims in excess of the stop-loss deductible during the year. The City paid BCBSM $16,482,044 during the year for claims funding and administration. The self-insured coverages provided through BCBSM were protected by specific stop-loss coverage, which provided an unlimited excess with a $100,000 deductible. No claims related exist at June 30, 2013 due to escrowed reserves maintained by the third-party administrators. The City also provides fully insured HMO health insurance coverage to a limited number of employees. At June 30, 2013, there were 676 retirees that were receiving medical benefits.

The City has a commercial insurance policy that covers certain general tort liability. The per-claim limit is $1,000,000 with a $500,000 deductible per occurrence and a $3,000,000 aggregate claim annually. The commercial policy covers public officials, employment practices, employee benefits, law enforcement, and commercial auto.

The City is self-insured for other potential claims not covered by the commercial policies. The Hurley Medical Center Component Unit is also self-insured for a number of risks. The amounts below include all general liability claims against the City except for those related to Hurley Medical Center. Details regarding Hurley Medical Center's self-insurance practices are presented separately. The City has estimated the claims that have been incurred through the end of the year, including both those claims that have been reported as well as those that have not yet been reported to the City. The estimate is based on legal counsel's recommendation and past settlement history. The estimated liability does not include any incremental costs. The amounts below include all general liability claims against the City except for those related to Hurley Medical Center. Hurley Medical Center administers its own risk management program and details regarding Hurley Medical Center's self-insurance practices are presented separately.

**City of Flint, Michigan**

**Note 16 - Risk Management (Continued)**

Risk management - Component units:

The Flint Economic Development Corporation (the "Corporation") is exposed to various risks of loss related to property loss, torts, and error and omissions. The Corporation has purchased commercial insurance for those risks associated with a small business incubator facility which leases commercial and light industrial space to new businesses. Since the Corporation occupies premises located in the City of Flint Municipal Center and all Corporation personnel are employees of the City, any losses related to general liability, employee injuries, workers' compensation, and employee medical benefits are covered by City self-insurance risk management programs. No claims related to Corporation activities have been presented to the City as of June 30, 2013.

The Downtown Development Authority (DDA) is exposed to various risks of loss related to property loss, torts, errors and omissions, and employee injuries (workers' compensation) as well as medical benefits provided to employees. The DDA has purchased insurance for these risks.

The Flint Area Enterprise Community (FAEC) is exposed to various risks of loss related to property loss, torts, and errors and omissions. The FAEC has purchased commercial insurance coverage through various policies for general liability on all FAEC-owned property and workers' compensation. Settled claims for the commercial insurance have not exceeded the amount of coverage in any of the past three years. There were no reductions in coverage during the current year.

Hurley Medical Center is exposed to various risks of loss, including hospital professional and patient general liability claims. The Medical Center has established a trust to assist in accumulating resources to fund excess insurance premiums and to pay claims.

The Medical Center's self-insured retention is $6 million per occurrence annually with excess claims-made coverage up to $15 million annually. Claims in excess of $15 million are to be covered by the Medical Center. The Medical Center employs the use of an actuary to provide an analysis of the existing claims and to estimate the liability for incurred but not reported (IBNR) claims.

Professional liability for claims is reported in accrued expenses, both current and long term, on the statement of net position. The carrying amount of the insurance trust assets (at market) amounted to $16,338,470 at June 30, 2013.

**City of Flint, Michigan**

### Note 16 - Risk Management (Continued)

#### Conditional Asset Retirement Obligation

The Medical Center has an obligation related to the removal of asbestos within various buildings on campus upon reconstruction, demolition, or abandonment of the buildings. The Medical Center has not recorded a liability related to the potential costs associated with the asbestos abatement, as the amount of the liability cannot currently be reasonably estimated. In addition, the range of time over which the Medical Center may settle the obligation is unknown and cannot be estimated. The Medical Center currently has no plans or expectation of plans to undertake a major renovation that would require the removal of the asbestos or demolition of the buildings. The Medical Center will recognize a liability in the period sufficient information is available to reasonably estimate the amount of the liability.

These claim estimates are recorded as accounts payable in the Self Insurance Internal Service Fund. Changes in the estimated liability as well as the total estimated costs (based on prior history and claims presented) of claims for the past fiscal year for the City and Hurley Medical Center Component Unit were as follows:

| | General Liability | | Hurley Medical Center | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| Unpaid claims - Beginning of year | $ 3,968,000 | $ 5,768,000 | $ 36,699,882 | $ 34,883,169 |
| Estimated claims incurred, including changes in estimates | (1,493,470) | (738,075) | - | - |
| Increase in claims liability | - | - | 11,204,087 | 6,949,535 |
| Defense costs and other fund expenses | - | - | (2,070,833) | (1,884,655) |
| Excess insurance premium payments | - | - | (1,088,550) | (1,205,667) |
| Claim payments | (978,754) | (1,061,925) | (2,697,000) | (2,042,500) |
| Estimated liability - End of year | $ 1,495,776 | $ 3,968,000 | $ 42,047,586 | $ 36,699,882 |

**City of Flint, Michigan**

### Note 17 - Related Party Transactions

The Medical Center pays subsidies and management fees for services rendered by HHS to the Medical Center. Management fees and contributions from the Medical Center to HHS for the year ended June 30, 2013 amounted to $17,539,750, all of which relates to staff and service contracts. Amounts paid by HHS to the Medical Center for rent and other miscellaneous expenses for the year ended June 30, 2013 totaled $445,644.

As of June 30, 2013, the Medical Center had accounts receivable from HHS of $1,025,291 and accounts payable to HHS of $295,985.

Included in other operating revenues of HHS are management fees and marketing fees for services rendered paid by Hurley/Binson's Medical Equipment, Inc., a related party to HPMS. Management fee and marketing income from Hurley/Binson's Medical Equipment, Inc. for the year ended June 30, 2013 amounted to $0. There were no accounts receivable from Hurley/Binson's Medical Equipment at June 30, 2013. HPMS and HHS purchase courier services from Hurley/Binson's Medical Equipment, Inc. in the amount of $300,000 annually.

### Note 18 - Upcoming Accounting Pronouncements

In March 2012, the GASB issued Statement No. 65, *Items Previously Reported as Assets and Liabilities*, which is required to be implemented for financial statements for periods beginning after December 15, 2012. Statement No. 65 establishes accounting and financial reporting standards that reclassify, as deferred outflows and inflows of resources, certain items that were previously reported as assets and liabilities. This statement also provides other financial reporting guidance related to the impact of the financial statement elements deferred outflows of resources and deferred inflows of resources. Statement No. 65 will be implemented for the City as of June 30, 2014.

In June 2012, the GASB issued Statement No. 68, *Accounting and Financial Reporting for Pensions*. Statement No. 68 requires governments providing defined benefit pensions to recognize their unfunded pension benefit obligation as a liability for the first time and to more comprehensively and comparably measure the annual costs of pension benefits. This net pension liability that will be recorded on the government-wide, proprietary, and discretely presented component units statements will be computed differently than the current unfunded actuarial accrued liability, using specific parameters set forth by the GASB. The statement also enhances accountability and transparency through revised note disclosures and required supplemental information (RSI). The City is currently evaluating the impact this standard will have on the financial statements when adopted. The provisions of this statement are effective for financial statements for the year ending June 30, 2015.

**City of Flint, Michigan**

## Note 19 - Subsequent Events

Effective October 1, 2013, the City entered into a contract with the Karegnondi Water Authority (KWA) to provide water treatment services to the authority. As part of this agreement and in order to handle the capacity that this new system will bring, the City will need to make approximately $7 million worth of upgrades to their current water plant and treatment facility.

Effective August 1, 2013, the City entered into an agreement with the KWA and Genesee County to issue debt to acquire, construct, and operate a water supply system. The debt will not exceed $300,000,000. The City's share of the debt is 34.2 percent or an amount not to exceed $102,600,000. As of the date of the audit report, the debt has not been issued.

The City is also a voting member of the KWA. The City joined the KWA in 2013 based on the expectation that the purchase of water for the City will be more economical in the future than continuing to purchase water from its current supplier, the Detroit Water and Sewer Department.

## Note 20 - Prior Period Adjustment

The governmental activities net position and public improvement fund fund balance at June 30, 2012 have been restated in order to record a receivable and corresponding allowance for the due from component unit from the DDA and reverse the previously reported expense related to the payment of related proceeds to the DDA, which decreased the expense recognized in the Public Improvement Fund, and had a net decrease on the net position for governmental activities. The effect of this correction is noted below as follows:

|  | Governmental Activities | Public Improvement Fund |
|---|---|---|
| Net position/fund balance - June 30, 2012 - As previously reported | $ 23,028,879 | $ 1,630,490 |
| Adjustment to record receivable net of allowance for the due from component unit (DDA) | - | 4,901,451 |
| Adjustment to record allowance for the due from component unit (DDA) | (4,266,449) | - |
| Net position/fund balance - June 30, 2012 - As restated | $ 18,762,430 | $ 6,531,941 |

**City of Flint, Michigan**

## Note 20 - Prior Period Adjustment (Continued)

The effect on the change in net position/fund balance of the prior year is as follows:

|  | Governmental Activities | Public Improvement Fund |
|---|---|---|
| Change in net position/fund balance - June 30, 2012 - As previously reported | $ (13,607,341) | $ (1,198,804) |
| Adjustment to record receivable net of allowance for the due from component unit (DDA) | - | 4,901,451 |
| Adjustment to record allowance for the due from component unit (DDA) | (4,266,449) | - |
| Change in net position/fund balance - June 30, 2012 - As restated | $ (17,873,790) | $ 3,702,647 |

D-45

**Required Supplemental Information**

D-46

**City of Flint, Michigan**

**Required Supplemental Information**
**Budgetary Comparison Schedule – General Fund**
**Year Ended June 30, 2013**

| | Original Budget | Amended Budget | Actual | Variance with Amended Budget |
|---|---|---|---|---|
| **Revenue** | | | | |
| Property taxes | $ 5,725,000 | $ 5,725,000 | $ 6,011,342 | $ 286,342 |
| Income taxes | 14,950,000 | 15,300,000 | 14,674,274 | (625,726) |
| Licenses and permits | 1,287,931 | 1,711,931 | 1,557,320 | (154,611) |
| Federal grants | 594,324 | 3,446,602 | 2,753,854 | (692,748) |
| State revenue | 13,497,585 | 15,125,175 | 16,003,433 | 878,258 |
| Charges for services | 11,944,463 | 11,577,463 | 11,406,946 | (170,517) |
| Fines and forfeitures | 1,394,611 | 1,537,814 | 2,291,325 | 753,511 |
| Interest | 133,400 | 133,400 | 261,004 | 127,604 |
| Other revenue | 3,512,942 | 622,396 | 2,770,960 | 2,148,564 |
| Total revenue | 53,040,256 | 55,179,781 | 57,730,458 | 2,550,677 |
| **Expenditures** | | | | |
| Current: | | | | |
| General government: | | | | |
| Mayor's office | 185,579 | 206,579 | 212,219 | (5,640) |
| Finance | 4,900,717 | 5,009,152 | 4,595,171 | 413,981 |
| Human relations | 40,103 | 40,103 | 22,613 | 17,490 |
| City clerk | 847,899 | 977,906 | 947,225 | 30,681 |
| Law office | 1,053,359 | 1,053,359 | 1,061,401 | (8,042) |
| Human resources | 736,929 | 770,463 | 687,863 | 82,600 |
| Office of the ombudsman | - | 28,577 | 27,837 | 740 |
| City administrator | 711,982 | 614,482 | 445,472 | 169,010 |
| Total general government | 8,476,568 | 8,700,621 | 7,999,801 | 700,820 |
| Judicial - 68th District Court | 5,358,477 | 5,358,479 | 4,955,003 | 403,476 |
| Public safety: | | | | |
| Police department | 20,771,119 | 24,300,987 | 23,404,501 | 896,486 |
| Fire | 11,913,248 | 11,962,638 | 10,682,234 | 1,280,404 |
| Building inspection | 99,120 | 100,120 | 94,170 | 5,950 |
| Emergency dispatch | 3,314,413 | 3,314,413 | 3,141,130 | 173,283 |
| Total public safety | 36,097,900 | 39,678,158 | 37,322,035 | 2,356,123 |
| Legislative - City council | 352,899 | 352,899 | 344,227 | 8,672 |
| Community development | 1,890,694 | 2,062,972 | 1,946,636 | 116,336 |
| Parks and recreation | 1,994,216 | 1,966,574 | 1,853,475 | 113,099 |
| Transportation | 2,850,000 | 1,474 | 861 | 613 |
| Total expenditures | 57,020,754 | 58,121,177 | 54,422,038 | 3,699,139 |
| **Excess of Revenue (Under) Over Expenditures** | (3,980,498) | (2,941,396) | 3,308,420 | 6,249,816 |
| **Other Financing Sources (Uses)** | | | | |
| Proceeds from sale of capital assets | 2,500 | 2,500 | 100 | (2,400) |
| Transfers in | 4,077,998 | 4,077,998 | 2,990,000 | (1,087,998) |
| Transfers out | - | (40,000) | (9,312) | 30,688 |
| Total other financing sources | 4,080,498 | 4,040,498 | 2,980,788 | (1,059,710) |
| **Net Change in Fund Balance** | 100,000 | 1,099,102 | 6,289,208 | 5,190,106 |
| **Fund Balance (Deficit)** - Beginning of year | (19,184,850) | (19,184,850) | (19,184,850) | - |
| **Fund Balance (Deficit)** - End of year | $ (19,084,850) | $ (18,085,748) | $ (12,895,642) | $ 5,190,106 |

89

90

**City of Flint, Michigan**

<div align="right">

**Required Supplemental Information**
**Budgetary Comparison Schedule – Major Special Revenue Fund**
**Federal Grants Fund**
**Year Ended June 30, 2013**

</div>

| | Original Budget | Amended Budget | Actual | Variance with Amended Budget |
|---|---|---|---|---|
| **Revenue** | | | | |
| Federal grants | $ 28,483,591 | $ 17,215,927 | $ 18,400,485 | $ 1,184,558 |
| State revenue | 300,000 | 687,233 | 33,703 | (653,530) |
| Charges for services | 14,625 | 14,625 | 1,209 | (13,416) |
| Interest | 370,541 | 370,541 | 247,830 | (122,711) |
| Other revenue - Local revenue | 22,463 | 64,096 | 58,028 | (6,068) |
| Total revenue | 29,191,220 | 18,352,422 | 18,741,255 | 388,833 |
| **Expenditures** | | | | |
| Current: | | | | |
| Public safety | 4,455,926 | 5,387,004 | 5,321,857 | 65,147 |
| Community development | 15,154,977 | 6,977,213 | 7,425,188 | (447,975) |
| Parks and recreation | 7,887,396 | 5,302,715 | 5,318,080 | (15,365) |
| Debt service | 494,957 | 494,957 | 489,639 | 5,318 |
| Total expenditures | 27,993,256 | 18,161,889 | 18,554,764 | (392,875) |
| **Net Change in Fund Balance** | 1,197,964 | 190,533 | 186,491 | (4,042) |
| **Fund Balance** - Beginning of year | 640,253 | 640,253 | 640,253 | - |
| **Fund Balance** - End of year | $ 1,838,217 | $ 830,786 | $ 826,744 | $ (4,042) |

**City of Flint, Michigan**

<div align="right">

**Required Supplemental Information**
**Budgetary Comparison Schedule – Major Capital Project Fund**
**Public Improvement**
**Year Ended June 30, 2013**

</div>

| | Original Budget | Amended Budget | Actual | Variance with Amended Budget |
|---|---|---|---|---|
| **Revenue** | | | | |
| Property taxes | $ 1,930,400 | $ 1,930,400 | $ 2,055,994 | $ 125,594 |
| Interest | 389,480 | 389,480 | 719,450 | 329,970 |
| Total revenue | 2,319,880 | 2,319,880 | 2,775,444 | 455,564 |
| **Expenditures** | | | | |
| Current - Parks and recreation | 230,000 | 230,000 | 481,121 | (251,121) |
| Debt service | 1,147,953 | 1,147,953 | 600,141 | 547,812 |
| Total expenditures | 1,377,953 | 1,377,953 | 1,081,262 | 296,691 |
| **Transfers Out** | (726,953) | (726,953) | (726,953) | - |
| **Net Change in Fund Balance** | 214,974 | 214,974 | 967,229 | 752,255 |
| **Fund Balance** - Beginning of year (as adjusted) | 6,531,941 | 6,531,941 | 6,531,941 | - |
| **Fund Balance** - End of year | $ 6,746,915 | $ 6,746,915 | $ 7,499,170 | $ 752,255 |

**City of Flint, Michigan**

Required Supplemental Information
Analysis of Funding Progress
Year Ended June 30, 2013

General, Police, Fire, and Hurley Pension Plans
Schedule of Funding Progress
($ Amounts in Thousands)

| Actuarial Valuation Year Ended | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) (b) | Unfunded AAL (UAAL) (b-a) | Funded Ratio (Percent) (a/b) | Covered Payroll (c) | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| 6/30/06 | $ 782,098 | $ 1,023,599 | $ 241,501 | 76.4 | $ 146,634 | 164.7 |
| 6/30/07 | 801,533 | 1,071,781 | 270,248 | 74.8 | 157,012 | 172.1 |
| 6/30/08 | 670,366 | 841,266 | 170,900 | 79.7 | 89,636 | 190.7 |
| 6/30/09 | 623,292 | 873,088 | 249,796 | 71.4 | 89,636 | 278.7 |
| 6/30/10 | 567,215 | 835,052 | 267,837 | 67.9 | 68,968 | 388.3 |
| 6/30/11 | 506,504 | 829,380 | 322,876 | 61.1 | 63,063 | 512.0 |

The actuarial methods used to determine the actuarial accrued liability were the individual entry age actuarial funding methods.  Unfunded actuarial accrued liabilities are being amortized as a level percent of projected payroll over 30 years for general, police, fire, and Hurley.  Significant actuarial assumptions used in the computation of the accrued actuarial liability include: (1) a rate of return on the investment or present and future assets of 8.0 percent per year compounded annually, (2) projected salary increases of 3.75 percent to 7.55 percent per year compounded annually, and (3) 3.75 percent inflation.

The actuarial value of assets was computed on fair values "smoothed" over a four-year period.

General, Police, Fire, and Hurley Pension Plans
Schedule of Employer Contributions

| Fiscal Year Ended | Actuarial Valuation Date | Annual Required Contribution ** | Percentage Contributed | Net Pension Obligation (Asset) at June 30 * |
|---|---|---|---|---|
| 6/30/08 | 6/30/06 | $ 14,376,558 | 72.0 | $ 10,805,978 |
| 6/30/09 | 6/30/07 | 14,497,568 | 175.0 | - |
| 6/30/10 | 6/30/08 | 13,394,739 | 100.0 | - |
| 6/30/11 | 6/30/09 | 10,835,308 | 100.0 | - |
| 6/30/12 | 6/30/10 | 14,562,392 | 100.0 | - |
| 6/30/13 | 6/30/11 | 14,909,789 | 100.0 | - |

* All net pension obligation is owed by Hurley Medical Center.
** The required contribution is expressed to the City as a percentage of payroll.

93

**City of Flint, Michigan**

Required Supplemental Information
Analysis of Funding Progress (Continued)
Year Ended June 30, 2013

MERS Pension Plan - Hurley
Schedule of Employer Contributions

| Fiscal Year End | Actuarial Valuation Date | Annual Required Contribution | Percentage Contributed | Net Pension Obligation (Asset) at June 30 |
|---|---|---|---|---|
| 6/30/08 | 6/30/06 | $ 6,690,590 | 45.0 | $ 5,711,003 |
| 6/30/09 | 6/30/07 | 8,037,604 | 75.0 | 7,694,335 |
| 6/30/10 | 6/30/07 | 9,160,796 | 87.0 | 8,896,382 |
| 6/30/11 | 6/30/09 | 9,173,538 | 75.8 | 5,505,003 |
| 6/30/12 | 6/30/10 | 11,734,785 | 92.1 | 6,503,942 |
| 6/30/13 | 6/30/10 | 12,682,496 | 82.1 | 3,268,705 |

94

D-48

**City of Flint, Michigan**

**Note to Required Supplemental Information**
**Year Ended June 30, 2013**

**Budgetary Information** - Annual budgets are adopted on a basis consistent with generally accepted accounting principles for the General Fund and special revenue funds. All annual appropriations lapse at fiscal year end.

D-49

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX E**

**FORM OF CONTINUING DISCLOSURE UNDERTAKINGS**

**KAREGNONDI WATER AUTHORITY**

This Continuing Disclosure Undertaking (the "Undertaking") is executed and delivered by the Karegnondi Water Authority, Counties of Genesee, Lapeer and Sanilac, State of Michigan (the "Authority"), in connection with the issuance of the Authority's Water Supply System Bonds (Karegnondi Water Pipeline), Series 2014A (the "Bonds"). The Authority covenants and agrees for the benefit of the Bondholders, as hereinafter defined, as follows:

(a) *Definitions*. The following terms used herein shall have the following meanings:

"Audited Financial Statements" means the annual audited financial statement pertaining to the Authority prepared by an individual or firm of independent certified public accountants as required by Act 2, Public Acts of Michigan, 1968, as amended, which presently requires preparation in accordance with generally accepted accounting principles.

"Bondholders" shall mean the registered owner of any Bond or any person (a) with the power, directly or indirectly, to vote or consent with respect to, or to dispose of ownership of, any Bond (including any person holding a Bond through a nominee, depository or other intermediary) or (b) treated as the owner of any Bond for federal income tax purposes.

"EMMA" shall mean the MSRB's Electronic Municipal Market Access System or such other system, Internet Web Site, or repository hereafter prescribed by the MSRB for the submission of electronic filings pursuant to the Rule.

"MSRB" means the Municipal Securities Rulemaking Board.

"Rule" means Rule 15c2-12 promulgated by the SEC pursuant to the Securities Exchange Act of 1934, as amended.

"SEC" means the United States Securities and Exchange Commission.

(b) *Continuing Disclosure.* The Authority hereby agrees, in accordance with the provisions of the Rule, to provide or cause to be provided to the MSRB through EMMA, on or before the last day of the sixth month after the end of its fiscal year, the Audited Financial Statements, or in the event audited financial statements are not available, the Authority agrees to provide unaudited financial statements and to provide audited financial statements immediately after they become available.

Such annual financial information described above is expected to be provided directly by the Authority by specific reference to documents available to the public through EMMA or filed with the SEC.

If the fiscal year of the Authority is changed, the Authority shall send a notice of such change to the MSRB through EMMA, prior to the earlier of the ending date of the fiscal year prior to such change or the ending date of the fiscal year as changed.

(c)     *Notice of Failure to Disclose.*  The Authority agrees to provide or cause to be provided, in a timely manner, to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, notice of a failure by the Authority to provide the annual financial information with respect to the Authority described in subsection (b) above on or prior to the dates set forth in subsection (b) above.

(d)     *Occurrence of Events.*  The Authority agrees to provide or cause to be provided to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, in a timely manner not in excess of ten business days after the occurrence of the event, notice of the occurrence of any of the following events listed in (b)(5)(i)(C) of the Rule with respect to the Bonds:

(1)     principal and interest payment delinquencies;

(2)     non-payment related defaults, if material;

(3)     unscheduled draws on debt service reserves reflecting financial difficulties;

(4)     unscheduled draws on credit enhancements reflecting financial difficulties;

(5)     substitution of credit or liquidity providers, or their failure to perform;

(6)     adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

(7)     modifications to rights of holders of the Bonds, if material;

(8)     bond calls, if material, and tender offers;

(9)     defeasances;

(10)     release, substitution, or sale of property securing repayment of the Bonds, if material;

(11)     rating changes;

(12)     bankruptcy, insolvency, receivership or similar event of the Authority, which is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the Authority in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the Authority, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority

having supervision or jurisdiction over substantially all of the assets or business of the Authority;

(13)    the consummation of a merger, consolidation, or acquisition involving the Authority or the sale of all or substantially all of the assets of the Authority, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; or

(14)    appointment of a successor or additional trustee or the change of name of a trustee, if material.

(e)    *Materiality Determined Under Federal Securities Laws*.  The Authority agrees that its determination of whether any event listed in subsection (c) is material shall be made in accordance with federal securities laws.

(f)    *Termination of Reporting Obligation*.  The Authority reserves the right to terminate its obligation to provide annual financial information and notices of material events, as set forth above, if and when the Authority is no longer  an "obligated person" with respect to the Bonds within the meaning of the Rule, including upon legal defeasance of all Bonds.

(g)    *Identifying Information.*  All documents provided to the MSRB through EMMA shall be accompanied by the identifying information prescribed by the MSRB.

(h)    *Benefit of Bondholders*.  The Authority agrees that its undertaking pursuant to the Rule set forth in this Undertaking is intended to be for the benefit of the Bondholders and shall be enforceable by any Bondholder; provided that, the right to enforce the provisions of this Undertaking shall be limited to a right to obtain specific enforcement of the Authority's obligations hereunder and any failure by the Authority to comply with the provisions of this Undertaking shall not constitute a default or an event of default with respect to the Bonds.

(i)    *Municipal Advisory Council of the State of Michigan*.  The Authority shall also file by electronic or other means any information or notice required to be filed with the MSRB through EMMA pursuant to this Undertaking in a timely manner with the Municipal Advisory Council of the State of Michigan.

IN WITNESS WHEREOF, the Authority has caused this Undertaking to be executed by its authorized officer.

KAREGNONDI WATER AUTHORITY
Counties of Genesee, Lapeer and Sanilac
State of Michigan

By: _____
    Its: _____

Dated:  April 16, 2014

E-3

## COUNTY OF GENESEE

This Continuing Disclosure Undertaking (the "Undertaking") is executed and delivered by the County of Genesee, State of Michigan (the "County") in connection with the issuance by the Karegnondi Water Authority (the "Authority") of its Water Supply System Bonds (Karegnondi Water Pipeline), Series 2014A (the "Bonds") issued on behalf of the County and the City of Flint, County of Genesee, State of Michigan.  The County covenants and agrees for the benefit of the Bondholders, as hereinafter defined, as follows:

     (a)    *Definitions*.  The following terms used herein shall have the following meanings:

     "Audited Financial Statements" means the annual audited financial statement pertaining to the County prepared by an individual or firm of independent certified public accountants as required by Act 2, Public Acts of Michigan, 1968, as amended, which presently requires preparation in accordance with generally accepted accounting principles.

     "Bondholders" shall mean the registered owner of any Bond or any person (a) with the power, directly or indirectly, to vote or consent with respect to, or to dispose of ownership of, any Bond (including any person holding a Bond through a nominee, depository or other intermediary) or (b) treated as the owner of any Bond for federal income tax purposes.

     "EMMA" shall mean the MSRB's Electronic Municipal Market Access System or such other system, Internet Web Site, or repository hereafter prescribed by the MSRB for the submission of electronic filings pursuant to the Rule.

     "MSRB" means the Municipal Securities Rulemaking Board.

     "Rule" means Rule 15c2-12 promulgated by the SEC pursuant to the Securities Exchange Act of 1934, as amended.

     "SEC" means the United States Securities and Exchange Commission.

     (b)    *Continuing Disclosure.*  The County hereby agrees, in accordance with the provisions of the Rule, to provide or cause to be provided to the MSRB through EMMA on or before the last day of the sixth month after the end of its fiscal year the following annual financial information and operating data, commencing with the fiscal year ended September 30, 2014 in an electronic format as prescribed by the MSRB:

     (1)    Updates of the numerical financial information and operating data included in the official statement of the County relating to the Bonds (the "Official Statement") appearing in the Tables or under the headings in the Official Statement as described below:

     a.    Property Valuations;
     b.    Major Taxpayers;

      c.      Tax Rates;
      d.      Tax Rate Limitation;
      e.      Tax Levies and Collections;
      f.      Revenues from the State of Michigan;
      g.      Labor Force;
      h.      Retirement Plans;
      i.      Debt Statement – Direct Debt; and
      j.      Legal Debt Margin.

(2)     Audited Financial Statements, or in the event audited financial statements are not available, the County agrees to provide unaudited financial statements and to provide audited financial statements immediately after they become available.

(3)     Such additional financial information or operating data as may be determined by the County and its advisors as desirable or necessary to comply with the Rule.

Such annual financial information and operating data described above are expected to be provided directly by the County by specific reference to documents available to the public through EMMA or filed with the SEC.

If the fiscal year of the County is changed, the County shall send a notice of such change to the MSRB through EMMA, prior to the earlier of the ending date of the fiscal year prior to such change or the ending date of the fiscal year as changed.

(c)    *Notice of Failure to Disclose*.  The County agrees to provide or cause to be provided, in a timely manner, to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, notice of a failure by the County to provide the annual financial information with respect to the County described in subsection (b) above on or prior to the dates set forth in subsection (b) above.

(d)    *Occurrence of Events*.  The County agrees to provide or cause to be provided to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, in a timely manner not in excess of ten business days after the occurrence of the event, notice of the occurrence of any of the following events listed in (b)(5)(i)(C) of the Rule with respect to the Bonds:

(1)     principal and interest payment delinquencies;
(2)     non-payment related defaults, if material;
(3)     unscheduled draws on debt service reserves reflecting financial difficulties;
(4)     unscheduled draws on credit enhancements reflecting financial difficulties;
(5)     substitution of credit or liquidity providers, or their failure to perform;
(6)     adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of

Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

(7)     modifications to rights of holders of the Bonds, if material;

(8)     bond calls, if material, and tender offers;

(9)     defeasances;

(10)    release, substitution, or sale of property securing repayment of the Bonds, if material;

(11)    rating changes;

(12)    bankruptcy, insolvency, receivership or similar event of the County, which is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the County in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the County, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the County;

(13)    the consummation of a merger, consolidation, or acquisition involving the County or the sale of all or substantially all of the assets of the County, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; or

(14)    appointment of a successor or additional trustee or the change of name of a trustee, if material.

(e)     *Materiality Determined Under Federal Securities Laws.*  The County agrees that its determination of whether any event listed in subsection (d) is material shall be made in accordance with federal securities laws.

(f)     *Termination of Reporting Obligation*.  The County reserves the right to terminate its obligation to provide annual financial information and notices of material events, as set forth above, if and when the County is no longer  an "obligated person" with respect to the Bonds within the meaning of the Rule, including upon legal defeasance of all Bonds.

(g)     *Identifying Information.*  All documents provided to the MSRB through EMMA shall be accompanied by the identifying information prescribed by the MSRB.

(h)     *Benefit of Bondholders*.  The County agrees that its undertaking pursuant to the Rule set forth in this Section is intended to be for the benefit of the Bondholders and shall be enforceable by any Bondholder; provided that, the right to enforce the provisions of this undertaking shall be limited to a right to obtain specific enforcement of the County's obligations

hereunder and any failure by the County to comply with the provisions of this undertaking shall not constitute a default or an event of default with respect to the Bonds.

(i)      *Amendments to the Undertaking.*  Amendments may be made in the specific types of information provided or the format of the presentation of such information to the extent deemed necessary or appropriate in the judgment of the County, provided that the County agrees that any such amendment will be adopted procedurally and substantively in a manner consistent with the Rule, including any interpretations thereof by the SEC, which, to the extent applicable, are incorporated herein by reference.  Such interpretations currently include the requirements that (a) the amendment may only be made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the County or the type of activities conducted thereby, (b) the undertaking, as amended, would have complied with the requirements of the Rule at the time of the primary offering of the Bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances, and (c) the amendment does not materially impair the interests of Bondholders, as determined by parties unaffiliated with the County (such as independent legal counsel), but such interpretations may be changed in the future.  If the accounting principles to be followed by the County in the preparing of the Audited Financial Statements are modified, the annual financial information for the year in which the change is made shall present a comparison between the financial statements as prepared on the prior basis and the statements as prepared on the new basis, and otherwise shall comply with the requirements of the Rule, in order to provide information to investors to enable them to evaluate the ability of the County to meet its obligations.  A notice of the change in accounting principles shall be sent to the MSRB through EMMA.

(j)      *Municipal Advisory Council of the State of Michigan.*  The County shall also file by electronic or other means any information or notice required to be filed with the MSRB through EMMA pursuant to this Undertaking in a timely manner with the Municipal Advisory Council of the State of Michigan.

COUNTY OF GENESEE
State of Michigan


By: _____
         Its: _____


Dated: April 16, 2014

E-7

**CITY OF FLINT**

This Continuing Disclosure Undertaking (the "Undertaking") is executed and delivered by the City of Flint, County of Genesee, State of Michigan (the "City") in connection with the issuance by the Karegnondi Water Authority (the "Authority") of its Water Supply System Bonds (Karegnondi Water Pipeline), Series 2014A (the "Bonds") issued on behalf of the City and the County of Genesee, State of Michigan.  The City covenants and agrees for the benefit of the Bondholders, as hereinafter defined, as follows:

(a)     *Definitions.*  The following terms used herein shall have the following meanings:

"Audited Financial Statements" means the annual audited financial statement pertaining to the City prepared by an individual or firm of independent certified public accountants as required by Act 2, Public Acts of Michigan, 1968, as amended, which presently requires preparation in accordance with generally accepted accounting principles.

"Bondholders" shall mean the registered owner of any Bond or any person (a) with the power, directly or indirectly, to vote or consent with respect to, or to dispose of ownership of, any Bond (including any person holding a Bond through a nominee, depository or other intermediary) or (b) treated as the owner of any Bond for federal income tax purposes.

"EMMA"  shall mean the MSRB's Electronic Municipal Market Access System or such other system, Internet Web Site, or repository hereafter prescribed by the MSRB for the submission of electronic filings pursuant to the Rule.

"MSRB" means the Municipal Securities Rulemaking Board.

"Rule" means Rule 15c2-12 promulgated by the SEC pursuant to the Securities Exchange Act of 1934, as amended.

"SEC" means the United States Securities and Exchange Commission.

(b)     *Continuing Disclosure.*   The City hereby agrees, in accordance with the provisions of the Rule, to provide or cause to be provided to the MSRB through EMMA on or before the last day of the sixth month after the end of its fiscal year the following annual financial information and operating data, commencing with the fiscal year ending June 30, 2014 in an electronic format as prescribed by the MSRB:

(1)     Updates of the numerical financial information and operating data included in the official statement of the City relating to the Bonds (the "Official Statement") appearing in the Tables or under the headings in the Official Statement as described below:

a.     Property Valuations;
b.     Major Taxpayers;

E-8

c.      Tax Rates (Per $1,000 of Valuation);
d.      Tax Rate Limitation;
e.      Tax Levies and Collections;
f.      Revenues from the State of Michigan;
g.      City Income Tax;
g.      Labor Force;
h.      Pension Fund;
i.      Debt Statement – Direct Debt; and
j.      Legal Debt Margin.

(2)    Audited Financial Statements, or in the event audited financial statements are not available, the City agrees to provide unaudited financial statements and to provide audited financial statements immediately after they become available.

(3)    Such additional financial information or operating data as may be determined by the City and its advisors as desirable or necessary to comply with the Rule.

Such annual financial information and operating data described above are expected to be provided directly by the City by specific reference to documents available to the public through EMMA or filed with the SEC.

If the fiscal year of the City is changed, the City shall send a notice of such change to the MSRB through EMMA, prior to the earlier of the ending date of the fiscal year prior to such change or the ending date of the fiscal year as changed.

(c)    *Notice of Failure to Disclose.*  The City agrees to provide or cause to be provided, in a timely manner, to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, notice of a failure by the City to provide the annual financial information with respect to the City described in subsection (b) above on or prior to the dates set forth in subsection (b) above.

(d)    *Occurrence of Events.*  The City agrees to provide or cause to be provided to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, in a timely manner not in excess of ten business days after the occurrence of the event, notice of the occurrence of any of the following events listed in (b)(5)(i)(C) of the Rule with respect to the Bonds:

(1)    principal and interest payment delinquencies;
(2)    non-payment related defaults, if material;
(3)    unscheduled draws on debt service reserves reflecting financial difficulties;
(4)    unscheduled draws on credit enhancements reflecting financial difficulties;
(5)    substitution of credit or liquidity providers, or their failure to perform;
(6)    adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of

E-9

Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

(7) modifications to rights of holders of the Bonds, if material;

(8) bond calls, if material, and tender offers;

(9) defeasances;

(10) release, substitution, or sale of property securing repayment of the Bonds, if material;

(11) rating changes;

(12) bankruptcy, insolvency, receivership or similar event of the City, which is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the City in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the City, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the City;

(13) the consummation of a merger, consolidation, or acquisition involving the City or the sale of all or substantially all of the assets of the City, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; or

(14) appointment of a successor or additional trustee or the change of name of a trustee, if material.

(e) *Materiality Determined Under Federal Securities Laws*. The City agrees that its determination of whether any event listed in subsection (d) is material shall be made in accordance with federal securities laws.

(f) *Termination of Reporting Obligation*. The City reserves the right to terminate its obligation to provide annual financial information and notices of material events, as set forth above, if and when the City is no longer an "obligated person" with respect to the Bonds within the meaning of the Rule, including upon legal defeasance of all Bonds.

(g) *Identifying Information.* All documents provided to the MSRB through EMMA shall be accompanied by the identifying information prescribed by the MSRB.

(h) *Benefit of Bondholders*. The City agrees that its undertaking pursuant to the Rule set forth in this Section is intended to be for the benefit of the Bondholders and shall be enforceable by any Bondholder; provided that, the right to enforce the provisions of this undertaking shall be limited to a right to obtain specific enforcement of the City's obligations

E-10

hereunder and any failure by the City to comply with the provisions of this undertaking shall not constitute a default or an event of default with respect to the Bonds.

(i)    *Amendments to the Undertaking.*  Amendments may be made in the specific types of information provided or the format of the presentation of such information to the extent deemed necessary or appropriate in the judgment of the City, provided that the City agrees that any such amendment will be adopted procedurally and substantively in a manner consistent with the Rule, including any interpretations thereof by the SEC, which, to the extent applicable, are incorporated herein by reference.  Such interpretations currently include the requirements that (a) the amendment may only be made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the City or the type of activities conducted thereby, (b) the undertaking, as amended, would have complied with the requirements of the Rule at the time of the primary offering of the Bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances, and (c) the amendment does not materially impair the interests of Bondholders, as determined by parties unaffiliated with the City (such as independent legal counsel), but such interpretations may be changed in the future.  If the accounting principles to be followed by the City in the preparing of the Audited Financial Statements are modified, the annual financial information for the year in which the change is made shall present a comparison between the financial statements as prepared on the prior basis and the statements as prepared on the new basis, and otherwise shall comply with the requirements of the Rule, in order to provide information to investors to enable them to evaluate the ability of the City to meet its obligations. A notice of the change in accounting principles shall be sent to the MSRB through EMMA.

(j)    *Municipal Advisory Council of the State of Michigan.*  The City shall also file by electronic or other means any information or notice required to be filed with the MSRB through EMMA pursuant to this Undertaking in a timely manner with the Municipal Advisory Council of the State of Michigan.

CITY OF FLINT
County of Genesee
State of Michigan

By:    _____
          Its:    _____

Dated: April 16, 2014

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX F**

**FORM OF APPROVING OPINION**

Karegnondi Water Authority
Counties of Genesee, Lapeer and Sanilac
State of Michigan

We have acted as bond counsel to the Karegnondi Water Authority, Counties of Genesee, Lapeer and Sanilac, State of Michigan (the "Issuer") in connection with the issuance by the Issuer of bonds in the aggregate principal sum of $220,500,000 designated Water Supply System Bonds (Karegnondi Water Pipeline), Series 2014A (the "Bonds"). In such capacity, we have examined such law and the transcript of proceedings relating to the issuance of the Bonds and such other proceedings, certifications and documents as we have deemed necessary to render this opinion.

The Bonds are in fully-registered form in the denomination of $5,000 each or multiples thereof, numbered in order of registration, bearing original issue date of April 16, 2014, payable as to principal and interest as provided in the Bonds, subject to redemption prior to maturity in the manner, at the times and at the prices specified in the Bonds.

The Bonds are issued under the provisions of Act 233, Public Acts of Michigan, 1955, as amended, in anticipation of and are payable as to both principal and interest solely from the proceeds of certain specified contractual payments to be made to the Issuer by the County of Genesee ("Genesee") and the City of Flint, County of Genesee ("Flint," and together with Genesee, the "Local Units"), pursuant to a certain contract referred to in the Bonds (the "Contract"). The Issuer has pledged all of such contractual payments for the payment of the principal of and interest on the Bonds.

As to questions of fact material to our opinion, we have relied on the certified proceedings and other certifications of public officials and others furnished to us.

Based upon the foregoing, we are of the opinion that, under existing law:

1.      The Bonds have been duly authorized and executed by the Issuer and are valid and binding obligations of the Issuer, payable as to both principal and interest solely from moneys to be paid under the Contract.

2.      The Contract is a valid and binding obligation of the Issuer and the Local Units. The Local Units have each pledged their full faith and credit for the payment of such moneys to the Issuer as set out in the Contract. Genesee's obligations under the Contract to which Genesee has pledged its full faith and credit include the requirement to make all payments that Flint fails to make to the Issuer under the Contract as described in Exhibit B of the Contract. The full faith and credit pledges of the Local Units are limited tax general obligations of the Local Units, and the Local Units are required to pay their commitments with respect to the Bonds as a first budget obligation from their general funds, including the collection of any ad valorem taxes which they are authorized to levy. However, the ability of the Local Units to levy such taxes is subject to applicable constitutional, statutory, and charter tax rate limitations.

3.      The interest on the Bonds (a) is excludable from gross income for federal income tax purposes and (b) is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. It should be noted, however, that with respect to corporations (as defined for federal income tax purposes), the interest is taken into account in determining adjusted current earnings for the purpose of computing the alternative minimum tax imposed on such corporations.  Further, the Bonds and the interest thereon are exempt from all taxation by the State of Michigan or by any taxing authority within the State of Michigan except inheritance and estate taxes and taxes on gains realized from the sale, payment or other disposition thereof.  The opinions set forth in this paragraph are subject to the condition that the Issuer and the Local Units comply with all requirements of the Internal Revenue Code of 1986, as amended, that must be satisfied subsequent to the issuance of the Bonds in order that interest thereon be (or continue to be) excludable from gross income for federal and Michigan income tax purposes.  The Issuer and the Local Units have covenanted to comply with all such requirements.  Failure to comply with certain of such requirements could cause the interest on the Bonds to be included in gross income retroactively to the date of issuance of the Bonds.

Except as stated in paragraph 3 above, we express no opinion regarding other federal or state tax consequences arising with respect to the Bonds and the interest thereon.

The rights or remedies of bondholders may be affected by bankruptcy, insolvency, fraudulent conveyance or other laws affecting creditors' rights generally, now existing or hereafter enacted, and by the application of general principles of equity, including those relating to equitable subordination.

This opinion is given as of the date hereof, and we assume no obligation to revise or supplement this opinion to reflect any facts or circumstances that may hereafter come to our attention, or any changes in law that may hereafter occur.

Very truly yours,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

# APPENDIX G

## BOOK-ENTRY ONLY SYSTEM

**General**

The information under "General" in this Appendix G has been furnished by The Depository Trust Company, New York, New York ("DTC"). No representation is made by the Issuer or the Transfer Agent as to the completeness or accuracy of such information or as to the absence of material adverse changes in such information subsequent to the date hereof. No attempt has been made by the Issuer or the Transfer Agent to determine whether DTC is or will be financially or otherwise capable of fulfilling its obligations. Neither the Issuer nor the Transfer Agent will have any responsibility or obligation to Direct Participants, Indirect Participants (both as defined below) or the persons for which they act as nominees with respect to the Bonds, or for any principal, premium, if any, or interest payment thereof.

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each maturity of the Bonds, each in the aggregate principal amount of such maturity and will be deposited with DTC.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a Standard & Poor's rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest

of each actual purchaser of each Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase.  Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.  Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other name as may be requested by an authorized representative of DTC.  The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not affect any change in beneficial ownership.  DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.  Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults and proposed amendments to the Bond documents.  For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners.  In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of the notices be provided directly to them.

Redemption notices shall be sent to DTC.  If less than all of the Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures.  Under its usual procedures, DTC mails an Omnibus Proxy to the Issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Payments of principal, interest and redemption amounts, if any, on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC.  DTC's practice is to credit Direct Participants' accounts, upon DTC's receipt of funds and corresponding detail information from the Issuer or Transfer Agent on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to

Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC (nor its nominee), Transfer Agent, or Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time.  Payments of principal, interest and redemption amounts, if any, to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) are the responsibility of the Issuer or Transfer Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Issuer or Transfer Agent.  Under such circumstances, in the event that a successor securities depository is not obtained, Bond certificates are required to be printed and delivered.

The Issuer may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository).  In that event, Bond certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry-only system has been obtained from sources that the Issuer believes to be reliable, but the Issuer takes no responsibility for the accuracy thereof.

THE ISSUER AND THE TRANSFER AGENT CANNOT AND DO NOT GIVE ANY ASSURANCES THAT DTC, THE DIRECT PARTICIPANTS OR THE INDIRECT PARTICIPANTS WILL DISTRIBUTE TO THE BENEFICIAL OWNERS OF THE BONDS (i) PAYMENTS OF PRINCIPAL OF OR INTEREST AND PREMIUM, IF ANY, ON THE BONDS, (ii) ANY DOCUMENT REPRESENTING OR CONFIRMING BENEFICIAL OWNERSHIP INTERESTS IN BONDS, OR (iii) REDEMPTION OR OTHER NOTICES SENT TO DTC OR CEDE & CO., ITS NOMINEE, AS THE REGISTERED OWNER OF THE BONDS, OR THAT THEY WILL DO SO ON A TIMELY BASIS OR THAT DTC, DIRECT PARTICIPANTS OR INDIRECT PARTICIPANTS WILL SERVE AND ACT IN THE MANNER DESCRIBED IN THIS OFFICIAL STATEMENT.  THE CURRENT "RULES" APPLICABLE TO DTC ARE ON FILE WITH THE SECURITIES AND EXCHANGE COMMISSION, AND THE CURRENT "PROCEDURES" OF DTC TO BE FOLLOWED IN DEALING WITH THE PARTICIPANTS ARE ON FILE WITH DTC.

NEITHER THE ISSUER NOR THE TRANSFER AGENT WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO ANY DIRECT PARTICIPANT, INDIRECT PARTICIPANT OR ANY BENEFICIAL OWNER OR ANY OTHER PERSON WITH RESPECT TO:  (1) THE BONDS; (2) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT; (3) THE PAYMENT BY DTC TO ANY PARTICIPANT, OR BY ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT TO ANY BENEFICIAL OWNER OF ANY AMOUNT DUE WITH RESPECT TO THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE BONDS; (4) THE DELIVERY BY DTC TO ANY PARTICIPANT, OR BY ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT TO ANY BENEFICIAL OWNER OF ANY

NOTICE WHICH IS REQUIRED OR PERMITTED UNDER THE TERMS OF THE RESOLUTION TO BE GIVEN TO BONDHOLDERS; (5) THE SELECTION OF THE BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS; OR (6) ANY CONSENT GIVEN OR OTHER ACTION TAKEN BY DTC AS BONDHOLDER.

**Transfer Agent and Bond Registration**

Principal and interest shall be payable and the Bonds shall be registered and transferred as described under the heading "General" in this Appendix G until the book-entry only system is discontinued. The Issuer has appointed the Transfer Agent shown on the cover. In the event the book-entry only system is discontinued, the Transfer Agent will also act as bond registrar and transfer agent.

**Transfer Outside Book-Entry-Only System**

In the event that the book-entry-only system is discontinued, the following provisions would apply to the Bonds. The Transfer Agent shall keep the registration books for the Bonds (the "Bond Register") at its corporate trust office. Subject to the further conditions contained in the Resolution, the Bonds may be transferred or exchanged for one or more Bonds in different authorized denominations upon surrender thereof at the corporate trust office of the Transfer Agent by the registered owners or their duly authorized attorneys; upon surrender of any Bonds to be transferred or exchanged, the Transfer Agent shall record the transfer or exchange in the Bond Register and shall authenticate replacement bonds in authorized denominations; during the 15 days immediately preceding the date of mailing of any notice of redemption or any time following the mailing of any notice of redemption, the Transfer Agent shall not be required to effect or register the transfer or exchange of any Bond which has been selected for such redemption, except the Bonds properly surrendered for partial redemption may be exchanged for new Bonds in authorized denominations equal in the aggregate to the unredeemed portion; the Issuer and Transfer Agent shall be entitled to treat the registered owners of the Bonds, as their names appear in the Bond Register as of the appropriate dates, as the owners of such Bonds for all purposes under the Resolution. No transfer or exchange made other than as described above in the Resolution shall be valid or effective for any purposes under the Resolution.

**APPENDIX H**

**THE CONTRACT**

[THIS PAGE INTENTIONALLY LEFT BLANK]

## KAREGNONDI WATER AUTHORITY FINANCING CONTRACT

THIS CONTRACT, dated as of August 1, 2013, by and among the Karegnondi Water Authority, a municipal authority and public body corporate of the State of Michigan (hereinafter referred to as the "Authority"), the City of Flint in the County of Genesee and the County of Genesee (collectively, the "Local Units" and each a "Local Unit").

### WITNESSETH:

WHEREAS, the Authority has been incorporated under the provisions of Act No. 233, Public Acts of Michigan, 1955, as amended (hereinafter referred to as "Act 233"), for the purposes set forth in Act 233; and

WHEREAS, the Authority will acquire, construct and operate a water supply system to be known as the Karegnondi Water Supply System that provides untreated water to the Local Units, each of which is a constituent municipality of the Authority; and

WHEREAS, it is immediately necessary and imperative for the public health and welfare of the present and future residents of each of the Local Units that a certain water supply system, as more fully described on Exhibit A hereto, together with all necessary interests in land, appurtenances and attachments thereto (the "System") be acquired, installed and constructed; and

WHEREAS, plans and an estimate of cost of the System have been prepared by the Authority's consulting engineers, Wade Trim (the "Consulting Engineers"), which said estimate of aggregate cost totals an amount not to exceed $300,000,000; and

WHEREAS, each of the Local Units is desirous of having the Authority acquire and own the System in order to continue to operate the System in order to furnish the Local Units with untreated raw water; and

WHEREAS, the parties hereto have determined that the System is essential to the general health, safety and welfare of each of the Local Units; and

WHEREAS, the Authority and each of the Local Units are each agreeable to the execution of this Contract by and among themselves which provides, among other things, for the financing of all or a portion of the cost of the System; and

WHEREAS, this Contract contemplates the issuance of bonds in one or more series by the Authority to pay all or part of the costs of the System; and

WHEREAS, each of the Local Units has or will approve and authorize the execution of this Contract by resolution of its governing body; and

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

WHEREAS, each of the Local Units has published or will publish, individually or jointly, a notice of intention to enter into this Contract in a newspaper of general circulation in the territory encompassed by each Local Unit; and

WHEREAS, this Contract will become effective for each Local Unit upon expiration of a period of forty-five (45) days following publication by each Local Unit of its notice of intention without filing of a petition for referendum on the question of its entering into this Contract, or if such referendum election be required, then upon approval by the qualified electors of the Local Unit.

NOW, THEREFORE, IN CONSIDERATION OF THE PREMISES AND THE COVENANTS MADE HEREIN, THE PARTIES HERETO AGREE AS FOLLOWS:

SECTION 1.  The Authority and the Local Units hereby approve the acquisition, construction and operation of System, together with all necessary interests in land, appurtenances and attachments thereto.

SECTION 2.  Each of the Local Units hereby consents to the use by the Authority and any parties contracting with the Authority of the public streets, alleys, lands and rights-of-way in each Local Unit for the purpose of constructing, operating and maintaining the System including any improvements, enlargements and extensions thereto.

SECTION 3.  The System is designed to provide and transport untreated raw water to each of the Local Units and the System is immediately necessary to protect and preserve the public health.

SECTION 4.  The Authority and each of the Local Units hereby approve and confirm the plans for the System prepared by the Consulting Engineers and the total estimated cost thereof in the sum of not to exceed $300,000,000.  Said cost estimate includes all surveys, plans, specifications, acquisition of property for rights-of-way, physical construction necessary to acquire and construct the System, the acquisition of all materials, machinery and necessary equipment, and all engineering, engineering supervision, administrative, legal and financing expenses necessary in connection with the acquisition and construction of the System and the financing thereof.

SECTION 5.  The Authority shall not enter into any final contract or contracts for the acquisition and construction of the System if such contract price or prices will be such as to cause the actual cost thereof to exceed the estimated cost as approved in Section 4 of this Contract unless the Authority has sufficient funds to cover such excess, or, each of the Local Units, by resolution of its respective legislative body, (a) approves said increased total cost, and (b) agrees to pay such excess over the estimated cost, either in cash or by specifically authorizing the maximum principal amount of bonds to be issued, as provided in Sections 9 and 14 of this Contract, to be increased to an amount which will provide sufficient funds to meet said increased cost, and approves a similar increase in the installment obligations of each Local Unit, if any, pledged under the terms of this Contract to the payment of such bonds.

SECTION 6.  The System shall be acquired and constructed by the Authority substantially in accordance with the plans and specifications therefor approved by this Contract.  All matters relating to engineering plans and specifications, together with the making and letting of final construction contracts, the approval of work and materials thereunder, and construction supervision, shall be in the

control of the Authority.   All acquisition of sites and rights-of-way, if any, shall be done by the Authority.  Each Local Unit's share of the costs of such acquisition in each Local Unit, if any, shall be paid from the Local Unit's share of bond proceeds and, in addition, any costs incurred by any Local Unit in connection with the acquisition or construction of the System, including, but not limited to, engineering expenses, shall be promptly reimbursed to the Local Unit by the Authority from the proceeds of the Authority's Bonds with the approval of the Authority board.

SECTION 7.  The Authority shall operate, maintain and administer the System for and on behalf of the Local Units.  The System shall be maintained in good condition and repair.  The Authority shall provide insurance as part of its obligation to operate the System.  The Authority will furnish reports to the Local Units at periodic intervals corresponding with the reporting periods of the Local Units in detail sufficient to inform the Local Units of the operations of the System and to permit the Local Units to meet their financing requirements hereunder.

SECTION 8.  To provide for the construction and financing of the System in accordance with the provisions of Act 233, the Authority shall take the following steps:

(a)    The Authority will take steps to adopt a resolution or resolutions providing for the issuance of its bonds in one or more series in the principal amount of not to exceed $300,000,000 (except as otherwise authorized pursuant to Section 5 of this Contract) to finance all or part of the costs of the System.  Said bonds shall mature serially or be subject to mandatory sinking fund redemption as authorized by law, and shall be secured by the contractual obligations of each Local Unit in this Contract.  After due adoption of the resolution or resolutions , the Authority will take all necessary legal procedures and steps necessary to effectuate the sale or sales and delivery or deliveries of said bonds.

(b)    The Authority shall take all steps necessary to take bids for and enter into and execute final acquisition and construction contracts for the acquisition and construction of the System as specified and approved hereinbefore in this Contract, in accordance with the plans and specifications therefor based on the plans as approved by this Contract.

(c)    The Authority will require and procure from the contractor or contractors undertaking the actual construction and acquisition of the System necessary and proper bonds to guarantee the performance of the contract or contracts and such labor and material bonds as may be required by law.

(d)    The Authority, upon receipt of the proceeds of sale of each series of bonds, will comply with all provisions and requirements provided for in the resolution authorizing the issuance of such series of bonds and this Contract relative to the disposition and use of the proceeds of sale of such series of bonds.

(e)    The Authority may temporarily invest any bond proceeds or other funds held by it for the benefit of each Local Unit as permitted by law and investment income shall accrue to and follow the fund producing such income.  The Authority shall not, however, invest, reinvest or accumulate any moneys deemed to be proceeds of the bonds pursuant to §148 of the Internal Revenue Code of 1986, as amended, and the applicable regulations thereunder (the "Code"), in such a manner as to cause the bonds to be "arbitrage bonds" within the meaning of Code §

103(b)(2) and §148, or otherwise as may jeopardize the tax status of the bonds.

SECTION 9.  Each Local Unit irrevocably covenants and agrees to pay to the Authority its Local Unit share of each series of bonds to be issued by the Authority pursuant to this Contract.  The share of each Local Unit shall be determined as set forth on Exhibit B hereto.

The cost of the System to be financed with the issuance of bonds of the Authority in the aggregate principal amount of not to exceed $300,000,000 shall be paid in annual installments on the dates and in the amounts as established in the Authority's bond authorizing resolution.

Each Local Unit covenants that it will make or cause to be made its payments as required by this Contract not less than 30 days prior to the dates on which the Authority is required to make payments on the bonds described herein to the transfer agent for the bonds.

It is understood and agreed that the bonds of the Authority hereinbefore referred to will be issued in anticipation of the above contractual obligation, with principal maturities on the dates established by the Authority corresponding to the principal amount of the installments then coming due, and there shall also be paid in addition to said principal installments, on such dates as shall be determined by the Authority, commencing on such date as determined by the Authority, as accrued interest on the principal amount remaining unpaid, an amount sufficient to pay all interest at an interest rate not to exceed ten percent (10%) per annum, due on the next succeeding interest payment date on the bonds from time to time outstanding.

It is further understood and agreed that the bonds of the Authority may be secured by a debt service reserve fund or funds to provide additional security for the timely payment thereof if the Authority determines, in consultation with its financial advisor, that the provision of such debt service reserve fund or funds is advisable.  If the bonds of the Authority are secured by a debt service reserve fund or funds, each Local Unit covenants and agrees to provide for the replenishment of such debt service reserve funds as described in Exhibit B.

From time to time as the Authority is billed by the transfer agent for its services for the bonds, and as other costs and expenses accrue to the Authority from handling of the payments made by the Local Units, or from other actions taken in connection with the System, the Authority shall promptly notify the Local Units of the amount of such paying agent fees and other costs and expenses, and the Local Units shall promptly remit to the Authority sufficient funds to meet such fees and other costs and expenses in the proportions hereinabove provided to the extent sufficient funds are not available to the Authority.  Each Local Unit warrants and represents that the amount of its obligations under this Contract, when taken together with other indebtedness of such Local Unit, will not cause its obligations under this Contract to exceed any constitutional, statutory or charter debt limitation applicable to such Local Unit.

The Authority shall, within thirty (30) days after the delivery of each series of the bonds of the Authority hereinbefore referred to, furnish each Local Unit with a complete schedule of installments of principal and interest thereon, and the Authority shall also at least sixty (60) days prior to each principal and/or interest installment due date, advise the Local Units, in writing, of the exact amount of principal and interest installments due on each series of bonds on the next succeeding bond principal and/or interest due date, and payable on the first day of the month immediately preceding, as hereinbefore

H-4

provided.    Failure of the Authority to notify the Local Units of any such payment shall not relieve the Local Units of the obligation to make such payment.

If any principal installment or interest installment is not paid when due, the amount not so paid shall be subject to a penalty, in addition to interest, of one percent (1%) thereof for each month or fraction thereof that the same remains unpaid after the due date.

SECTION 10.  Each Local Unit states its intention to pay its obligations under this Contract from sources of moneys as are provided by Act 233 and applicable law, including the levy and collection of rates and charges to users of its respective water supply system for operating and maintaining its system provided by each Local Unit to customers in the Local Unit.  Nevertheless, pursuant to the authorization contained in Act 233, each Local Unit hereby irrevocably pledges its full faith and credit for the prompt and timely payment of its obligations pledged for bond payments as expressed in this Contract, and, subject to the provisions of the last sentence of this paragraph, shall each year, commencing with the first tax levy after issuance of the bonds by the Authority, levy an ad valorem tax on all the taxable property in the Local Unit in an amount which, taking into consideration estimated delinquencies in tax collections, will be sufficient to pay such obligations under this Contract becoming due before the time of the following year's tax collections.  Such annual tax levies shall be subject to applicable constitutional, statutory, and charter tax limitations.  Nothing herein contained shall be construed to prevent a Local Unit from using any, or any combination of, the means and methods provided in Section 7 of Act 233, as now or hereafter amended, for the purpose of providing funds to meet its obligations under this Contract, and, if at the time of making the annual tax levy there shall be either other funds on hand earmarked and set aside, or funds provided in the annual budget of the water supply system of the Local Unit, for the payment of the contractual obligations due prior to the next tax collection period, then such annual tax levy may be reduced by such amount.

In the event a Local Unit shall fail for any reason to pay to the Authority at the times specified the amounts required to be paid by the provisions of this Contract, the Authority shall immediately give notice of such default and the amount thereof, to the Treasurer of each Local Unit, the Treasurer of the State of Michigan, and such other officials charged with the disbursement to such Local Unit of funds returned by the State and now or hereafter under Act 233 available for pledge as provided in this Section and in Section 12a of Act 233, and if such default is not corrected within ten (10) days after such notification, the State Treasurer, or other appropriate official charged with disbursement to such Local Unit of the aforesaid funds, is, by these presents, specifically authorized by the Local Unit, to the extent permitted by law, to withhold from the aforesaid funds the maximum amount necessary to cure said deficit and to pay said sums so withheld to the Authority, to apply on the obligations of the Local Unit as herein set forth.  Any such moneys so withheld and paid shall be considered to have been paid to the Local Unit within the meaning of the Michigan Constitution and statutes, the purpose of this provision being voluntarily to pledge and authorize the use of said funds owing to the Local Unit to meet any past-due obligations of such Local Unit due under the provisions of this Contract.  In addition to the foregoing, the Authority shall have all other rights and remedies provided by law to enforce the obligations of the Local Unit to make its payments in the manner and at the times required by this Contract, including the right of the Authority to direct the Local Unit to make a tax levy to reimburse the Authority for any funds advanced.

SECTION 11.  Each Local Unit may pay in advance any of the payments required to be made by this Contract, in which event the Authority shall credit the respective Local Unit with such advance

payment on future due payments to the extent of such advance payment, or use such advances to call bonds without credit to the extent provided in relevant series of bonds.

SECTION 12.  Each Local Unit may pay additional moneys over and above any of the payments specified in this Contract, with the written request that such additional funds be used to prepay installments, in which event the Authority shall be obligated to apply and use said moneys for such purpose to the fullest extent possible.  Such moneys shall not then be credited as advance payments under the provisions of Section 11 of this Contract.

SECTION 13.  It is specifically recognized by each Local Unit that the debt service payments required to be made by each pursuant to the terms of Section 9 of this Contract are to be pledged for and used to pay the principal installments of and interest on with respect to the bonds to be issued by the Authority as provided by this Contract and authorized by law, and each Local Unit covenants and agrees that it will make all required payments to the Authority promptly and at the times herein specified without regard to whether the System is actually completed or placed in operation.

SECTION 14.  If the proceeds of the sale of the bonds in one or more series in aggregate amount not to exceed $300,000,000 to be issued by the Authority are for any reason insufficient to complete each Local Unit's share of the cost of the System, subject to each Local Unit's approval required by Section 5 hereof, the Authority shall automatically be authorized to issue additional bonds in an aggregate principal amount sufficient to pay the cost of completing the System and to increase the annual payments required to be made by each Local Unit in an amount so that the total payments required to be made as increased will be sufficient to meet the annual principal and interest requirements on the bonds herein authorized plus the additional bonds to be issued.  It is expressly agreed between the parties hereto that the Authority shall issue bonds pursuant to this Contract and each Local Unit shall be committed to retire such amount of bonds as may be necessary to pay each Local Unit's share of the costs of the System whether or not in excess of those presently estimated herein.  Any such additional bonds shall comply with the requirements of Act 233 and any increase in the annual payments shall be made in the manner and at the times specified in this Contract.  In lieu of such additional bonds, each Local Unit may pay over to the Authority, in cash, sufficient moneys to complete each Local Unit's share of the cost of the System.

SECTION 15.  After completion of the System and payment of all costs thereof, any surplus remaining from the proceeds of sale of bonds shall be used by the Authority for either of the following purposes:  (a) for improvements or enhancements to the System or for other projects of the Authority undertaken on behalf of the Local Units, subject to approval of the Authority; or (b) credited by the Authority toward the next payments due the Authority by said Local Units hereunder.

SECTION 16.  The obligations and undertakings of each of the parties to this Contract shall be conditioned on the successful issuance and sale of the first series of bonds pursuant to Act 233, and if for any reason whatsoever the first series of bonds are not issued and sold within three (3) years from the date of this Contract, this Contract, except for payment of preliminary expenses and ownership of engineering data, shall be considered void and of no force and effect.

SECTION 17.  The Authority and each Local Unit each recognize that the owners from time to time of each series of bonds issued by the Authority under the provisions of Act 233 to finance the cost of the System will have contractual rights in this Contract, and it is, therefore, covenanted and agreed by

the Authority and each Local Unit that so long as any of series of bonds shall remain outstanding and unpaid, the provisions of this Contract shall not be subject to any alteration or revision which would in any manner materially affect either the security of such series of bonds or the prompt payment of principal or interest thereon. Each Local Unit and the Authority each further covenant and agree that each will comply with its respective duties and obligations under the terms of this Contract promptly at the times and in the manner herein set forth, and will not suffer to be done any act which would in any way impair the said bonds, the security therefor, or the prompt payment of principal and interest thereon. It is hereby declared that the terms of this Contract insofar as they pertain to the security of any such bonds shall be deemed to be for the benefit of the owners of said bonds.

SECTION 18. This Contract shall remain in full force and effect from the effective date hereof (as provided in Section 21) until each series bonds issued by the Authority are paid in full, but in any event not to exceed a period of thirty (30) years for each series of bonds. At such time within said 30-year term as any of the series of said bonds are paid, this Contract shall be terminated. In any event, the obligation of each Local Unit to make payments required by this Contract shall be terminated at such time as all of said bonds are paid in full, together with any deficiency or penalty thereon.

SECTION 19. This Contract shall inure to the benefit of and be binding upon the respective parties hereto, their successors and assigns.

SECTION 20. This Contract shall become effective upon (i) approval by the legislative body of each Local Unit, (ii) approval by the Board of the Authority and (iii) due execution by authorized officers of each Local Unit and by the Chairman and Secretary of the Authority.

SECTION 21. This Contract may be executed in several counterparts.

SECTION 21.   This Contract may be executed in several counterparts.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed as of the day and year first above written.

In the presence of:

_____

David M. Jansen

**KAREGNONDI WATER AUTHORITY**

By: _____
          Chairman

By: _____
          Secretary

In the presence of:

David M. Jansen

Keren Seiphts

**CITY OF FLINT**

By: _____
          Mayor

By: _____
          City Clerk

In the presence of:

_____

_____

**COUNTY OF GENESEE**

By: _____
          Chairperson   of   Board   of
          Commissioners

By: _____
          Clerk

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

H-8

EXHIBIT A

SYSTEM

The Karegnondi Water System is a raw water supply system.  It will deliver untreated Lake Huron water 65 miles inland to the population centers of Lapeer and Genesee Counties, including the Cities of Lapeer and Flint, and the County Agency of Genesee County with 17 local municipal systems. The system will also be capable of delivering water along the route to customers in Sanilac and Lapeer County, as well as future customers in Saint Clair County.

The system will consist of a lake intake, two pumping stations, and over 65 miles of large diameter transmission watermain.  The system will include fire hydrants, metering stations, reservoirs, and the appurtenances necessary to operate the system efficiently.  The lake intake portion of the project and the land where the two pumping stations are located will be acquired, constructed, designed and financed by the County of Genesee and made available for use by the Karegnondi Water System.

All land and required right-of-ways and easements have been acquired.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

EXHIBIT B

LOCAL UNIT ESTIMATED SHARE OF IMPROVEMENT COST

The following is a breakdown of the percent each Local Unit is required to pay of the aggregate debt service, including the obligation to replenish a debt service reserve fund(s), if any, on the Authority's bonds authorized by this Contract:

| Local Unit | Bond Issue |
|---|---|
| County of Genesee | 65.8% |
| City of Flint | 34.2% |

In the event the City of Flint fails to fulfill its payment obligations under this Contract, the County of Genesee irrevocably covenants and agrees to make such missed payment within 15 days of being notified of the missed payment. Further, the Authority covenants and agrees to undertake all legal action and make use of all remedies available under this Contract to enforce the payment obligations of the City of Flint under this Contract. The Authority also covenants and agrees to undertake all legal action and make use of all remedies available to it under the Raw Water Supply Contract between the Authority and the City of Flint dated as of June 28, 2013 ("Raw Water Supply Contract"), as amended, specifically sections 7.08 and 7.09 of such contract. If the County of Genesee is required to make a payment for the City of Flint under this Contract and the Authority recovers any funds from the pursuit of such remedies described above, the Authority shall reimburse the County of Genesee from such funds for any payments made. To the extent permitted by law, the capacity that the City of Flint acquired in the System pursuant to the Raw Water Supply Contract shall be transferred to the County of Genesee until the City of Flint has repaid the County of Genesee for any additional payments made hereunder. The City of Flint shall also pay a penalty of one percent (1%) thereof for each month or fraction thereof that the same remains unpaid after the due date of the amount paid by the County of Genesee as a result of the failure of the City of Flint to fulfill its payment obligations hereunder. Further, if a Local Unit fails to pay its contractual obligation causing a shortfall and the debt service reserve fund(s) is drawn upon to pay the Authority's bonds, the replenishment of such debt service reserve fund shall be an obligation of the Local Unit that failed to pay, as provided in the resolution authorizing the bonds. Provided, however, if the City of Flint fails to fulfill its debt service reserve fund replenishment obligation, as with other payment obligations under the Contract, the County of Genesee agrees to make such payments.

Additionally, if the Authority sells raw untreated water capacity to other parties, to the extent funds are available from payments received from those parties, each Local Unit shall be credited on each day payment is due hereunder as agreed to by the Authority and the Local Units towards each Local Unit's payment obligations hereunder.

21268959.4\152665-00001

H-10

**APPENDIX I**

**REPORT OF THE ENGINEERING CONSULTANT**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# Karegnondi Water Supply System Bonds

# Karegnondi Water Pipeline
# Series 2014 A & B

# Report of the Engineering Consultant



March 17, 2014

Jones & Henry Engineers, Ltd.
3103 Executive Parkway, Suite 300
Toledo, Ohio 43606
419.473.9611
www.jheng.com



Jones & Henry Engineers, Ltd.

Fluid thinking.™

# Table of Contents

Executive Summary ................................................................................................................. 1

Background .............................................................................................................................. 2

Description of the Systems ..................................................................................................... 4

   Karegnondi Water Authority (KWA) ................................................................................... 4

      The Project ..................................................................................................................... 4

      Schedule ........................................................................................................................ 5

      Customers ...................................................................................................................... 5

      Expenses ........................................................................................................................ 6

   Genesee County Drain Commissioner- Water & Waste Services (GCDC-WWS) ................ 7

      Water System ................................................................................................................. 7

      System Deficiencies ....................................................................................................... 7

      Customers ...................................................................................................................... 8

      Revenues and Expenses ................................................................................................. 8

      Rates ............................................................................................................................ 10

   Flint ................................................................................................................................... 10

      Water System ............................................................................................................... 10

      System Deficiencies ..................................................................................................... 11

      Customers .................................................................................................................... 11

      Expenses and Revenues .............................................................................................. 11

      Rates ............................................................................................................................ 12

Conclusion ............................................................................................................................ 13

Future Rates ......................................................................................................................... 13

Acknowledgement ............................................................................................................... 14

Sources/Footnotes .............................................................................................................. 15

## List of Appendices

**APPENDIX A**

Karegnondi Water Authority (KWA)

Appendix A-1        Work Notes – Report of the Engineering Consultant

Appendix A-2        Project Map

**APPENDIX B**

Genesee County Drain Commissioner - Water & Waste Services (GCDC-WWS)

Appendix B-1        Historical Water Purchased and Sold-Genesee County

Appendix B-2        Genesee County Water Supply Sales, 2011 & 2012

Appendix B-3        GCDC-Water Rates-With KWA

Appendix B-4        Expenses and Revenues for GCDC Water Supply District

Appendix B-5        GCDC-WWS Projected Rates During KWA Phase-In

Appendix B-6        Genesee County Water Supply Rates

Appendix B-7        2011 MDEQ Sanitary Survey

Appendix B-8        Genesee County Water Supply System, Rates for Service for Water Bills
                    Rendered on or after January 2, 2014

**APPENDIX C**

City of Flint (Flint)

Appendix C-1        Flint Water System
                    (Summary from Existing Infrastructure Report, DLZ and Houseal Lavigne)

Appendix C-2        Flint Water System-Historical Customers and Components

Appendix C-3        Flint Water Rates-Post DWSD

Appendix C-4        Flint Water Division Revenues and Expenses

Appendix C-5        Flint Water System Needs and Projects
                    (Summary from Existing Infrastructure Report, DLZ and Houseal Lavigne)

Appendix C-6        Water Rates and Charges for Flint

Jones & Henry Engineers, Ltd.

Fluid thinking.™

# List of Abbreviations

| | | |
|---|---|---|
| ccf | — | hundred cubic feet |
| CCIF | — | County Capital Improvement Fee |
| CIP | | Capital Improvement Plan |
| DWSD | — | Detroit Water and Sewerage Department |
| FY | — | Fiscal Year |
| GCDC-WWS | — | Genesee County Drain Commissioner – Water and Waste Services |
| KWA | — | Karegnondi Water Authority |
| mcf | — | thousand cubic feet |
| MDEQ | — | Michigan Department of Environmental Quality |
| mg | — | million gallons |
| mgd | — | million gallons per day |
| O&M | — | Operation and Maintenance |
| RTS | — | Readiness To Serve |
| WTP | — | Water Treatment Plant |
| ERU | — | Equivalent Residential Units |

J o n e s   &   H e n r y   E n g i n e e r s ,   L t d .

Fluid thinking.™

# Executive Summary

Jones & Henry Engineers, Ltd. has been retained by the Karegnondi Water Authority (KWA) to review the financial aspects of the KWA water project relative to the water rates for the two initial KWA customers, the City of Flint (Flint) and the Genesee County Drain Commissioner – Water and Wastewater Services (GCDC-WWS) from 2014 through 2018 for the sufficiency of such rates to cover the debt service on the System Bonds and operation and maintenance expenses of the KWA system plus their own systems.

The first step in the review was to project the untreated water volume required for these two initial customers of KWA. Initially, Flint is anticipated to require on average 10.4 million gallons per day and GCDC-WWS is anticipated to require an average 13.5 million gallons per day.

Flint raised its water rates on July 1, 2012, and based on its audit for FY 2013, revenues from Flint customers for such fiscal year totaled approximately $34,600,000. While this level of revenue is sufficient to continue to fund O&M expenses plus fund much of the immediate improvements, additional revenue is projected to be required to reinvest in the systems' infrastructure and establish a sustainable financial condition. Flint is expected to realize a significant near-term financial benefit from its decision to temporarily use (approximately 2 years) the Flint River as a source of raw water which will be treated at Flint's WTP, instead of purchasing significantly higher cost treated water from the Detroit Water and Sewerage Department (DWSD). Once the KWA system is operational, KWA raw water will be used as the raw water source for the Flint WTP. Flint has not recently performed a detailed rate study, but a cost of service study is now being prepared to not only determine rates required to meet immediate and future needs, but establish rates that result in a reinvestment in their infrastructure and establish a more sustainable financial condition in the future. Currently, a Flint residential customer using 1,000 cubic feet per month has a monthly water cost of $96.96. Flint recognizes that using KWA as a raw water source and treating the water at their own water treatment plant is the best long-term option. The City expects to increase rates in the coming years to meet the obligation to KWA and meet the needs for operation and maintenance of the system and make necessary investment in their infrastructure.

GCDC-WWS recently completed a detailed water rate analysis. This analysis was used as the base for projecting the effect of the KWA project on rates and customers. Until the KWA system becomes operational, GCDC-WWS will purchase water directly from DWSD. Additional future expenses for GCDC-WWS were identified to include new capital, operation & maintenance costs for the KWA operation, and GCDC-WWS's new WTP and related facilities which will be necessary to treat the raw water and distribute it. GCDC-WWS's current expense of purchasing water from DWSD was excluded from the projected expenses after the date the KWA pipeline is expected to be operational. Through at least May 1, 2016, with all changes taken into account, including expected

J o n e s   &   H e n r y   E n g i n e e r s ,   L t d .

Fluid thinking.™

inflationary increases, initial KWA charges, and the increase in DWSD charges for water purchased directly from DWSD, the GCDC-WWS wholesale water charge for a residential customer using 1,000 cubic feet per month is projected to increase from $53.99 to $67.72 per month. Once the KWA project and the GCDC-WWS's WTP and related facilities are operational, the cost is projected to increase to $72.27 per month by 2018. GCDC-WWS community customers also add local charges ranging from 0 percent to 53 percent of GCDC-WWS RTS charges, and from 0 to 14 percent of GCDC-WWS's commodity charges to their end users. The need to satisfy ordinance imposed additional bonds tests could also lead to higher rates.

Long-term rate projections which compare obtaining untreated water from KWA and treating it themselves vs. obtaining treated water from DWSD, show more stable rates for both Flint and GCDC-WWS's water customers. In the past, DWSD's charges to Flint and GCDC-WWS, which historically have constituted a significant portion of both Flint's and GCDC-WWS's total water expenses, have increased more than typical inflationary increases. Much of Flint's and GCDC-WWS's future expenses will be capital which will not increase annually, with inflationary increases expected for operating costs. Therefore, rates are not expected to increase under KWA as they have under DWSD, and with appropriate rate increases, Flint and GCDC-WWS will be able to pay their respective share of the debt service on the System Bonds, the operation & maintenance expenses of the KWA project, plus the expenses of their own systems.

A more comprehensive presentation of the analysis is included in this report. The document includes additional supporting data and assumptions made in the analysis to reach the conclusions presented above.

## Background

Flint is supplied treated water from the DWSD, and GCDC-WWS purchases treated water from Flint. Flint's water is distributed using DWSD line pressure, including the supply of GCDC-WWS's Henderson Road facility, from where it is then re-pumped to GCDC-WWS customers.

Flint and GCDC-WWS began to look at alternatives for a new water supply over ten years ago, and have more recently chosen to move ahead with the development of a new regional water authority to provide untreated Lake Huron water for both entities and possibly others.

KWA consists of Genesee County, Lapeer County, Lapeer City, Sanilac County, and the City of Flint. KWA is a municipal authority incorporated under PA 233 of 1955. KWA was established in October 2010 in order to have a more reliable supply of untreated water at rates that will be determined exclusively by the local communities. [1]

KWA will construct a 63 mile long raw water pipeline, the majority being located under or parallel to existing roads or within road rights-of-way. Beginning at Lake Huron, the principal roads along the pipeline are Fisher, Clear Lake, Kings Mill, Norway Lake, Klam, Stanley, Coldwater, Elba, and Millville. The proposed pipeline size changes over the length of the project starting at Lake Huron as a 66 inch diameter pipe and reducing as it continues west, to a 60-inch and then 36-inch diameter pipe. [7] The GCDC-WWS's WTP will be supplied untreated water off of the 60-inch line, and the 36-inch diameter pipe will supply Flint's system. A pump station and intake on Lake Huron in Sanilac County and an intermediate pump station in the northwest corner of St. Clair County are also part of the project.

Flint has a contract with DWSD until April 17, 2014. Starting April 1, 2014, they will start using their own treatment plant and begin treating Flint River water on a temporary basis. Flint will treat KWA water once the KWA system is operational. GCDC-WWS will be required to build a new water treatment plant, with a 150 million gallon earthen reservoir, pump station, and five miles of water main running from the new treatment plant to the Henderson Road facility, at an estimated cost of $60,000,000 to provide treated water to Genesee County's customers. GCDC-WWS has acquired 76 acres approximately 14 miles east of the City of Flint in Oregon Township in Lapeer County, which is expected to serve as the site of the County's new WTP, reservoir and pump station. The new WTP and related facilities are expected to be constructed, and then fully operational between May 1, 2016 and July 1, 2016, with the KWA System expected to be fully operational by the same time. Until then, GCDC-WWS will continue to obtain its water from Flint through April 17, 2014 and then obtain water directly from DWSD.

The purpose of this review is to determine the impact on water rates for Flint and GCDC-WWS customers associated with the financing and operation of the KWA project along with maintaining their current and proposed treatment and distribution systems. To do this, background information on the Flint and GCDC-WWS systems were obtained to determine needed improvements for implementing the KWA project and maintaining Flint and GCDC's current systems. Existing technical reports were reviewed and various financial reports were analyzed, to determine the impact on rates. Before determining the impact on the rates of the two entities, the charges from KWA to Flint and GCDC-WWS were determined. GCDC-WWS recently completed a review of their water rates and, therefore, data is available to make projections on the actual rate components. Flint has not had a recent rate study, so the analysis examined the current revenue and the amount of change in revenue needed to fund the KWA project, in addition to maintaining Flint's current system.

# Description of the Systems

## Karegnondi Water Authority (KWA)

### *The Project*

GCDC-WWS is constructing a lake intake on Lake Huron in Sanilac County, for which it supervised the design of the facility and awarded a construction contract in 2013. The intake will be operated by KWA. KWA is constructing the pipeline from Lake Huron to the Flint area and two pump stations, one of which will be located near the intake facility. These facilities collectively constitute the KWA System. The intake facility was financed with the proceeds of the Series 2013 Bonds sold by Genesee County (the "Intake Bonds"). [1]

KWA contracted with the GCDC-WWS to administer the design and construction of the KWA System. On behalf of KWA, the GCDC-WWS has acquired 40 acres on Lake Huron for the intake and pump station and 40 acres in Lynn Township on the borders of Sanilac, St. Clair, and Lapeer Counties for the second pump station. In anticipation of the construction of the KWA System, the County has obtained a water withdrawal permit of up to 85 million gallons per day (mgd) from Lake Huron. GCDC-WWS hired project managers which have identified the route of the pipe line, identified environmental issues, prepared preliminary permits for the entire 63-mile route, and hired consulting firms to prepare detailed design of the remaining KWA System facilities. [1]

Maps of the KWA project are included in Appendix A-2. The three maps show the Lake Huron Pump Station, Lake Huron Raw Water Transmission Line, Intermediate Pump Station, and the Flint Transmission Line. In addition to the KWA projects, the maps show the Genesee County WTP (Stanley & Marathon) and Genesee County Finished Water Transmission Line, all being constructed by GCDC-WWS. The Lapeer Raw Water Transmission is shown but is not being designed at this time. Also shown on the map, is DWSD 120-inch, 96-inch, and 72-inch water mains that now serve Flint and GCDC-WWS. A portion of the 72-inch line is owned by Flint. The Genesee County Henderson Road Pump Station is an existing facility and will continue to be used by GCDC-WWS.

KWA currently has entered into two water purchase contracts, effective October 1, 2013: one with Flint to supply up to 18 mgd and one with the GCDC-WWS to supply up to 42 mgd. The charges to be paid by Flint and GCDC-WWS in the Water Purchase Contracts are broken down into two distinct portions: an annual fixed or capital fee, and an annual commodity or operations and maintenance fee. [1]

The estimated construction costs for the KWA system, excluding the intake, are $240,000,000 based on water contracts of 60 mgd capacity. KWA, GCDC-WWS and Flint have entered into a contract, under which KWA will issue bonds to finance the remaining facilities for the KWA System, presently estimated to be in

an amount not to exceed $300,000,000, in anticipation of payments to be made by Flint and Genesee County. [8] The bond amount includes the construction cost, capitalized interest, and bond reserves.

Flint is working on the update of its WTP and expects to begin to use Flint River water as a temporary source by April 17, 2014 and is expected to start using KWA water for supply no later than July 1, 2016. Genesee County is expected to begin to purchase water directly from DWSD on April 17, 2014 and will continue with DWSD as a source until July 1, 2016 when they will begin using KWA water.

### Schedule

A schedule of key activities and dates is presented below:

October 2010 – KWA established

Summer 2013 – Construction of water intake began

October 1, 2013 – KWA entered into water purchase contracts with Flint and GCDC-WWS

April 1, 2014 – Flint to begin treating Flint River water rather than purchasing water from DWSD

April 17, 2014 – GCDC-WWS will begin purchasing water directly from DWSD

Summer 2014 – Begin construction of the KWA water pipeline and pump stations

May 1, 2016 – KWA system in operation (for this review, the KWA operation date is assumed to be July 1, 2016 which is a more conservative financial assumption)

May 1, 2017 – First debt service payment of KWA bonds

### Customers

KWA will initially have two customers, GCDC-WWS and Flint. Water purchased by Flint from DWSD has averaged 12,219,382 ccf per year between 2010 and 2013. However, the usage trend has been slightly downward. Water sold to Genesee County by Flint increased between 2010 and 2012, but was 6.8 percent lower in 2013 than 2012. It is estimated that Genesee County will deliver 12 mgd to its customers, but due to non-revenue water (8 percent) in the distribution system and at the WTP (3 percent), they will initially need 13.44 mgd of water from KWA. Water usage by City customers has been decreasing, but this trend appears to be subsiding, with estimated usage expected to stabilize

(Appendix C-2) (3,345,000 ccf). Due to non-revenue water loss in the distribution system (32 percent) and at the WTP (3 percent), the City will need 10.4 mgd to supply its customers. (Non-revenue water is the difference between water purchased and water billed.) Therefore, Genesee County would account for 56.4 percent of the initial need from KWA (13.44 mgd) and Flint would be 43.6 percent (10.39 mgd). Table 1 and Figure 1 in the Work Notes – Report of the Engineering Consultant that is in Appendix A-1 provide a more detailed breakdown of the water needs discussed above.

## Expenses

Operation and maintenance expenses for KWA's two pump stations and the transmission main include labor, chemicals, power, administration, residuals handling and other maintenance cost, and are estimated to average $2,412,063 annually for 2016 to 2018. Based on the 23.83 mgd needed, the average cost per million gallons is $277, or $2.07 per mcf. Operation and maintenance costs will be allocated to Genesee County and Flint based on their proportion of the initial raw water required (56.4 percent vs. 43.6 percent). More detail on the estimated operation expenses can be found in Appendix A-1 in Tables 2 and 3 of the Work Notes – Report of the Engineering Consultant. These cost projections are somewhat sensitive to the actual volume of water purchased. Power and chemicals are 60 percent of the total and are directly related to volume of water pumped. Maintenance is partially related to volume while the other costs are not related to volume of water. Therefore, these other costs will not change due to typical fluctuations in volume.

Nearly $300 million of bonds will be issued for the KWA project. It is anticipated two series of bonds will be issued. The debt service payment from KWA system revenue is expected to begin on May 1, 2017. The annual bond payments, including the Intake Bonds, total an estimated $23 million. This assumes an interest rate of 5 percent on the first series of bonds and 5.25 percent on the second series of bonds issued, with the term for both being 30 years. The first series of bonds is projected to be in the amount of $220 million dollars, and the second series of bonds comprising the remaining $80 million. Based on 60 units, the estimated annual capital cost per unit would be $383,333. A unit is equal to 1 mgd of peak month capacity. A breakdown of the debt service charges between Genesee County and Flint can be found in Table 5 of the Work Notes – Report of the Engineering Consultant in Appendix A-1. Additional entities may be contracted to purchase water from KWA in the future which would lower proportional costs, primarily for GCDC-WWS.

Jones & Henry Engineers, Ltd.

Fluid thinking.™

# Genesee County Drain Commissioner - Water & Waste Services (GCDC-WWS)

## *Water System*

The GCDC-WWS provides water and sewer service to nearly forty communities, totaling over 200,000 individual residents in parts of Genesee, Lapeer, Saginaw, Shiawassee, Oakland and Livingston counties. GCDC-WWS operates over 135 miles of underground pipeline, twenty major water and wastewater pump stations, and over eighty minor stations are maintained on behalf of local communities, and eleven water storage tanks with over 43,000,000 gallons of storage capacity.[4]

The GCDC-WWS water system includes the Henderson Road facility and Center Road complex which includes 31 mg of storage and over a 50 mgd high service pump station for the majority of the water delivered to GCDC-WWS customers. The distribution (including local municipalities) system includes 1,000 miles of pipeline ranging in size from 6-inch diameter to 48-inch diameter. The system also includes 8 elevated towers for a total volume of 7.5 mg and 4 additional booster pump stations. The system provides services in 18 political entities. GCDC-WWS provides the service as either a master meter customer (water is sold bulk and individual communities provide the distribution system and services) or retail customer basis, whereby GCDC directly provides service to those communities' customers. Eight political entities are served as master metered. While GCDC-WWS serves the individual accounts including billing, the political entities are responsible for overall payment. The individual entities collect the revenues and reimburse GCDC-WWS for its services.

The County will be required to build a new WTP at an estimated cost of $60,000,000 to provide finished water to Genesee County's customers. GCDC-WWS has acquired 76 acres approximately 14 miles east of the City of Flint in Oregon Township in Lapeer County, which is expected to serve as the site of the County's new WTP and related facilities described above. The new WTP and related facilities are expected to be constructed and fully operational by July 1, 2016, the date on which the KWA System is expected to be fully operational (Note:  startup could be as early as May 1, 2016, but July 1, 2016 is used as a more conservative financial review). A five mile pipeline will be needed to convey treated water to the existing Henderson Road facility.

## *System Deficiencies*

System deficiencies have been identified in GCDC's Sanitary Survey prepared by MDEQ as found in Appendix B-7. Deficiencies are predominately related to the local distribution systems and not the transmission system. The KWA project will address one of the comments by providing more reliability.

## Customers

GCDC-WWS currently purchases water from Flint, which purchases the treated water from DWSD. Genesee County's payment to Flint is a flat rate surcharge, Detroit Readiness to Serve (RTS) based on peak consumption, plus a commodity charge equal to the charge from Detroit to Flint for the water. Through the second half of 2013 and through at least April 1, 2014, the DWSD commodity charge was, and still is $1.301 per metered hundred cubic feet. These charges were set on July 1, 2013 and typically increase annually. [11]

GCDC-WWS purchased 587,285,100 cubic feet of water from Flint in 2013. Purchased water and billed water from 2007 through 2013 can be found in Appendix B-1. The difference in water purchased and water billed is called non-revenue water.

GCDC-WWS's water charges are based on either community master meter readings or the summation of individual water meter readings within each community. Billable metered water volumes by community for 2011 and 2012 for the water supply district are given in Appendix B-2.

No growth in usage was assumed in the last rate study. Limited growth was assumed for the number of equivalent meters in the last rate study, but no growth is assumed in this analysis. [6]

## Revenues and Expenses

GCDC-WWS had $22,997,000 in water revenue in 2013 and $20,524,301 [10] in expenses. In general, according to the last water rate study completed for GCDC-WWS, salaries and wages are expected to increase by 3 percent annually over the next few years, but fringe benefits are expected to increase from 2 percent to 8 percent annually. In general, office supplies, dues and memberships, printing and publishing, professional and contractual services, repair and maintenance, and other operational expenses are projected to increase 2 percent annually. Utilities are expected to increase at 9 percent annually. [6]

GCDC-WWS currently pays a commodity charge, a Flint surcharge and a DWSD Readiness-to-Serve (RTS) charge to Flint for water. Flint passes on the revenue collected from the commodity charge and RTS to DWSD, and retains the surcharge. Starting April 17, 2014, the County will purchase water directly from DWSD until no later than July 1, 2016 when the KWA project and GCDC-WWS WTP project are expected to be finished. The cost of water from DWSD between 2009 and 2013 increased an average of 11.4 percent annually. DWSD rates are expected to increase 10.3 percent starting April 1, 2014, an additional 9 percent starting July 1, 2014, and 10 percent starting July 1, 2015 (discussion by GCDC-WWS with DWSD). Changes in the cost of water from DWSD beyond these levels may further impact water rates to system customers.

The GCDC-WWS WTP is expected to commence operation no later than July 1, 2016. Expenses for the water system have to be adjusted because of the KWA project.

The KWA O&M costs were discussed previously, and the County will be responsible for 56.4 percent of such costs: $630,469 in 2016 (for a half year); $1,365,707 in 2017; and, $1,454,566 in 2018.

GCDC-WWS will have additional O&M expenses due to a new WTP, expected to begin operation no later than July 1, 2016. Additional O&M costs are anticipated to be: $1,249,395 in 2016 (half year); $2,574,943 in 2017; and, $2,651,097 in 2018. Calculations for future O&M costs are in Appendix B-3. Annual debt service for the new WTP is estimated as follow:

| | |
|---|---|
| 2015 | $3,978,516 |
| 2016 | $4,027,813 |
| 2017 | $4,028,450 |
| 2018 | $4,026,725 |

Capital Reinvestment/Depreciation on the new WTP is anticipated at $1,500,000 per year starting in 2017.

GCDC-WWS is funding the construction of the new water intake for KWA. The annual debt service will be approximately $2,529,000, beginning in 2014. However, GCDC-WWS will receive a credit equal to Flint's share (30 percent) of the Intake Bonds payments starting in 2016 which will be credited to GCDC-WWS through their KWA capital payment.

GCDC-WWS will also be responsible for 42 of 60 units, or 70 percent, of the annual debt service payments on the bonds. The KWA's total annual debt service payment is estimated to be $23,000,000 which includes KWA projects including the Intake Bonds. GCDC's annual payment will be reduced by the Intake Bonds payments and the annual payment by Flint for their share of the Intake Bonds. Payment will start in 2014 with payments approximately 10 percent of the projected amount. The GCDC-WWS's net annual payment is estimated to be:

| | |
|---|---|
| 2014 | $1,356,600 |
| 2015 | $1,356,600 |
| 2016 | $7,465,800 |
| 2017 | $13,575,000 |
| 2018 | $13,575,000 |

More detail on the expenses and payment can be found in Appendix B-3.

The intake credit will result in GCDC-WWS's share of the KWA bonds being approximately 66 percent, for an allocation of 70 percent of the KWA capacity. GCDC-WWS will pay 100 percent of the Intake Bonds payments.

Jones & Henry Engineers, Ltd.

Fluid thinking.™

A more detailed breakdown of the revenues and expenses for 2009 through 2012 can be found in Appendix B-4, along with the budget for 2013 and projections for 2014 through 2018.

### Rates

Water for the GCDC-WWS water system is billed for each customer based on water meter size plus metered consumption, and customers are charged for service on monthly, bi-monthly, or quarterly billings. Water bills are based on a Readiness to Serve (RTS) charge based on meter size and a commodity charge based on volume usage. In addition, each of the individual communities imposes their own rates and charges to recover the cost of local water utility services that they provide. As a result, each community on the system has different rates and charges in place which impact individual customers differently. [1]

Currently, RTS charges start at $14.59 per month for one equivalent meter which is equal to a 5/8-inch meter. Commodity charges are currently $3.94 per 100 cubic feet, or $5.27 per 1,000 gallons of water consumed. These rates went into effect January 2, 2014. [12]

Where community bulk water readings are available, the readings are used as the basis for charges. The rates charged are based on a calculated equivalent meter size calculated on past peak usage for a community plus the actual water consumption measured at the community master meters. More information on rates can be found in Appendix B-6.

The County charges a County Capital Improvement Fee (CCIF) for new connections to the water system of $1,000 per equivalent residential unit (ERU).

The KWA O&M costs and the O&M costs for the new Genesee County WTP will be allocated to the customer's commodity charge. The Capital Reinvestment/Depreciation expense will be allocated to volume. The annual expense for the KWA purchase, the credit for financing the construction of the water intake, and the GCDC-WWS WTP debt will be allocated 85 percent to the commodity charge and 15 percent the RTS component.

## Flint

### Water System

The Flint Water Department is responsible for its WTP, four pump stations, and water testing laboratory, in addition to the dams, reservoirs, and underground infrastructure associated with those facilities. The total pumping capacity of Flint is 106.8 mgd with a firm capacity of 62.8 mgd. The WTP was put into service in 1954. A service agreement with DWSD was entered into in the mid-1960s to supply water to the City for a 30-year period. The WTP currently provides treated water from the Flint River as a backup to the water provided by DWSD. The plant has historically operated approximately 20 days per year with average

production of 11 mgd, with a capacity of up to 36 mgd. The total source capacity from DWSD is over 70 mgd which includes water going to GCDC-WWS. A significant upgrade ($48 million) to the Flint WTP was completed in 2006 to meet state regulatory requirements. A recent contract agreement with KWA will require additional redundancy and treatment upgrades. In addition, other components of the WTP are in poor condition and in need of maintenance and/or replacement, including various mechanical and electrical equipment; security improvements; building additions and renovations; Heating, Ventilating, and Cooling (HVAC) systems; concrete and asphalt; and roofs. [2]

### System Deficiencies

The City of Flint has been studying its system and determining future needs. A survey of some of the evaluation is included in Appendix C-5. The system does have a higher than normal, non-revenue water amount. The City has developed a Capital Improvement Plan (CIP) which has resulted in identifying the following annual capital needs:  $8,500,000 in FY 2014; $10,500,000 in FY 2015; $9,500,000 in 2016; $6,000,000 in 2017; and $6,500,000 in 2018 [13.]  These funds will be generated through rates (see Appendix C-4). The CIP will help in addressing the aging system and high non-revenue water amount plus address the City's WTP needs.

### Customers

In 2013, Flint billed 32,702 customers and total consumption was 9,470,315 hundred cubic feet of water. The City's population was 101,515 in 2013. [9]  Water usage by City customers has been decreasing in recent years, but this trend is expected to end and hold at 6.85 mgd (3,345,000 ccf). Due to non-revenue water in the distribution system (32 percent) and at the WTP (3 percent), the City would need 10.4 mgd to supply its customers.

Historical information on the City's customers and water supply system components can be found in Appendix C-2.

### Expenses and Revenues

In Fiscal Year (FY) 2013 (July 1, 2012-June 30, 2013), Flint's water system receipts from customers and users totaled $47,620,772. This included $12,957,337 from Genesee County for their commodity, surcharge and DWSD RTS. [9]  Revenue from City customers is estimated at $34,640,394. Revenues the City receives from Genesee County are expected to cease starting April 17, 2014, when Genesee County begins purchasing water directly from DWSD until the KWA and GCDC WTP projects are finished.

Water purchases from DWSD in FY 2013 totaled $23,308,800, and revenues received from GCDC-WWS paid for a portion of this expense. The average cost rate of water from DWSD between 2009 and 2013 increased an average of 11.4 percent annually.

The City has a high delinquency rate on its customers' water bill payments and this is expected to remain the same. The City is assuming non-revenue water will be reduced by 10 percent annually through improvements in the distribution system and enhanced management program.

Salaries, wages and benefits identified in the Flint annual audits are expected to increase 3 percent annually. Utilities are expected to increase 9 percent annually, and other operation and maintenance expenses are expected to increase by 2 percent annually.

It is estimated that the operating expense for the Flint WTP, once it is fully operational, will be $1,762,580 in FY 2014 (one quarter of the year); $7,050,319 in FYs 2015 and 2016; $7,584,319 in FY 2017; and $7,808,582 in FY 2018. [13]

Flint will be responsible for 18 of 60 units (30 percent) of the KWA bond payment. A portion of the payment will go to GCDC-WWS for Flint's share of the Intake Bonds, resulting in Flint's payment being approximately 34 percent of the KWA Bonds and GCDC paying 100 percent of the Intake Bonds. The City will begin paying $6,900,000 annually starting in 2017, but started paying 10 percent of the full annual capital payment, or $690,000 in October 2013 and will continue with $690,000 in 2014, 2015, and 2016.

The City will be responsible for 43.6 percent of the operation and maintenance costs of the KWA system. This will amount to $1,055,760 in FY 2017 and $1,124,451 in FY 2018.

Debt service payments on the City's outstanding water system bonds are estimated at $2,747,946 in FY 2014; $2,742,821 in FY 2015; $2,746,423 in FY 2016; $2,748,446 in FY 2017; and $2,744,008 in FY 2018. A transfer to the General Fund of $1,130,000 was added for FYs 2014 through 2018 [13], as it has been in the past for Return on Equity to the City.

All of the figures and projections can be found in Appendix C-4.

### Rates

Current water rates became effective July 1, 2012. Appendix C-4 provides the projections for revenue and expenses for the water supply system based on current operating procedures and anticipated future projects and timing. Appendix C-4 shows a negative net revenue for the water system, at least through 2018 with existing rates. The projected capital expenditures include in the next 5 years, approximately $20,000,000 to upgrade the WTP and approximately $17,000,000 to upgrade the distribution system. Much of the WTP capital improvements are required to enable the City to treat Flint River raw water and KWA raw water on a continuous basis. The remainder of the capital expenditures signifies a reinvestment in the City's water infrastructure. The Capital expenditures also include setting aside funds for future equipment replacement

and other CIP reserves. These reinvestment expenditures would be required regardless of the water supply.

## Conclusion

The current water supplier to Flint and GCDC-WWS has averaged over an 11 percent annual increase. For the purposes of this review, similar increases are anticipated for the future. KWA only projects a 4 percent to 5 percent annual increase in the operation and maintenance portion of its expenses. GCDC-WWS rates are expected to be competitive compared to the current water supplier's charges and should be more stable in the future as capital costs will remain constant. The City of Flint's total cost in producing water is expected to be less than current costs immediately upon startup, and Flint should see lower increases in the future than what it has been experiencing recently. Future rate increases are forecast for both GCDC-WWS and Flint. However, the increases are projected to be less than if they both continued to purchase treated water from DWSD. Flint has developed a CIP and is working with a consultant to develop a financial plan which will start reinvesting in their water system infrastructure and develop a more sustainable financial condition for the utility.

## Future Rates

The above review focused on the impact of the KWA project in the next five years. Rates beyond the next five years for each entity are discussed below. For all entities, the customer demand is expected to follow historical trends and remain stable.

KWA has no additional capital forecast beyond 2018 at this time. Therefore, future rates will only need to be adjusted for inflationary increases for the O&M expenses. Any new KWA customers will be required to purchase capacity from an existing customer and/or construct new capacity at no cost to existing customers.

GCDC-WWS establishes its rate structure on a five-year cycle. Rates set in 2013 were the beginning of a new cycle. With over 59 percent of the rate related to new or existing debt (fixed costs) less than 41 percent of the expenses are subject to inflationary costs. The 2009 feasibility study assumed an average 5 percent rate increase on that portion of the expenses. GCDC-WWS has no new capital expenditures forecast past 2018.

The City of Flint will need to address its system deficiencies. The analysis done on Flint's rates includes additional funds to start addressing these deficiencies. A significant investment in the WTP is included in the near term analysis, so future needs will be less. The distribution system investment is projected to continue well beyond the near term analysis. Future rates will see inflationary increases, but the capital needs will stabilize.

The above discussion does not include changes in regulatory requirements which could impact rates. No significant changes are anticipated at this time.

Jones & Henry Engineers, Ltd.

Fluid thinking.™

## Acknowledgement

The undersigned acknowledges that this report has been prepared under my supervision.

*(signature)*

Steven L. Wordelman, P.E., President
Jones & Henry Engineers, Ltd.

Date: March 17, 2014

Jones & Henry Engineers, Ltd.                                          Fluid thinking.™

## Sources/Footnotes

[1]     County of Genesee, State of Michigan, $35,000,000 Water Supply
        System Revenue Bonds (Limited Tax General Obligation) Series 2013
        Official Statement.

[2]     Existing Infrastructure Condition Report, City of Flint Master Plan, July
        2013, DLZ and Houseal Lavigne.

[3]     Master Plan For a Sustainable Flint – Infrastructure and Community
        Facilities Plan, adopted October 28, 2013.

[4]     Genesee County Drain Commissioner's Office, Division of Water and
        Waste Services, 2014 Budget.

[5]     Wade Trim Report, Preliminary Engineering Report, Lake Huron Water
        Supply, Karegnondi Water Authority, September 2009.

[6]     GCDC-WWS Water Rate Review, Scenario 2, dated April 5, 2013 by
        Jones & Henry Engineers. Historical information provided by GCDC-
        WWS.

[7]     MDEQ Public Notice, December 5, 2013.

[8]     Stauder, Barch & Associates debt service estimate 11/20/13.

[9]     City of Flint, Michigan; Comprehensive Annual Financial Reports
        (Audits), Fiscal Years 2011, 2012, and 2013.

[10]    Genesee County Drain Commissioner – Water and Waste Services
        Financial Reports, Year-End 2013.

[11]    Genesee County Drain Commissioner – Water and Waste Services
        Personnel.

[12]    Genesee County Water Supply System, Rates for Service for Water Bills
        Rendered on or After January 2, 2014 (see Appendix B-8).

[13]    City of Flint (March 6, 2014)

# APPENDIX  A

**KAREGNONDI WATER AUTHORITY**

# APPENDIX   A-1

---

**WORK NOTES - REPORT OF THE ENGINEERING CONSULTANT**

**Appendix A-1**

# WORK NOTES

# Report of the
# Engineering Consultant

## Karegnondi Water Authority



March 17, 2014

Jones & Henry Engineers, Ltd.
3103 Executive Parkway, Suite 300
Toledo, Ohio 43606
419.473.9611
www.jheng.com



J o n e s   &   H e n r y   E n g i n e e r s ,   L t d .

Fluid thinking.™

# Table of Contents

KWA Water Volume ................................................................................................................. 1

Operation and Maintenance Costs .......................................................................................... 3

Capital Costs ............................................................................................................................ 4

    Total KWA Charges ............................................................................................................ 4

# List of Tables

Table 1 Recently Billed Water By Flint (ccf per year) ............................................................. 1

Table 2 KWA O&M Cost ......................................................................................................... 3

Table 3 Estimated Annual Operation and Maintenance Costs (3-Year Average) ..................... 3

Table 4 Breakdown and Allocation of Flint Operating Costs.................................................. 3

Table 5 Estimated Annual Debt Service Costs For Construction ............................................. 4

Table 6 Total KWA Charges (3-Year Average) ....................................................................... 4

Jones & Henry Engineers, Ltd.                                   Fluid thinking.™

## KWA Water Volume

Table 1 summarizes the recent water purchases from DWSD and water sold by Flint to Genesee County. The Flint allocation represents the water billed and their non-revenue volume. The trend has been less usage by Flint, but it is anticipated the decline will stop, so an estimated annual usage of 3,345,000 ccf (6.85 mgd) has been used for future projections. Due to the age of the Flint distribution system, an estimated 32 percent of the water produced is currently lost, which is also termed non-revenue water (Source:  City of Flint Existing Infrastructure Condition Report, July 2013, DLZ and Houseal Lavigne, Page 11). The calculations below indicate the non-revenue water may be higher. This would require that the water treatment plant (WTP) produce just over 10 mgd to meet Flint's customer demands. However, it is assumed that 3 percent, or 0.31 mgd, of the water is used during the WTP process, so approximately 10.4 mgd would be necessary from KWA to supply Flint's WTP.

It is estimated that Genesee County will deliver 12 mgd of water to its customers. It is estimated that about 8 percent, or 1.04 mgd, is lost in the distribution system. This would mean that the WTP would have to produce 13.04 mgd in order to meet the demands (12 mgd) of Genesee County. However, it is assumed that 3 percent, or 0.40 mgd, of the water is used during the WTP process, so approximately 13.45 mgd would be needed from KWA to supply 12 mgd to Genesee County customers.

Figure 1 provides a graphic representation of the water amounts discussed above. Genesee County would account for 56.4 percent (13.45 mgd) of the initial need, and Flint would be 43.6 percent (10.39 mgd) of the initial need.

| Table 1 Recently Billed Water By Flint (ccf per year) | | | | | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | Future |
| Water Purchased From DWSD | 11,943,961 | 13,108,730 | 11,926,868 | 11,897,969 | |
| Sold To Genesee County [1] | 6,166,322 | 6,211,823 | 6,301,528 | 5,872,851 | |
| Flint Allocation | 5,777,639 | 6,896,907 | 5,625,340 | 6,025,118 | |
| Billed To City of Flint Customers | 3,681,068 | 3,929,083 | 3,348,319 | 3,597,464 | 3,345,000[3] |
| Flint Non-Revenue Water | 2,096,571 | 2,967,824 | 2,277,021 | 2,427,654 | |
| Total Billed [2] | 10,027,390 | 10,140,906 | 9,649,847 | 9,470,315 | |
| | | | | | |
| Flint Non-Revenue % of Flint Allocation | 36.3% | 43.0% | 40.5% | 40.3% | |
| | | | | | |
| [1]  Genesee County rate reports | | | | | |
| [2]  Flint Annual Audits | | | | | |
| [3]  Represents approximate lowest level of water billed to Flint customers in recent years. | | | | | |

It should be noted that even though the KWA fiscal year is October through September, these tables are based on calendar years.

Figure 1
KWA Water Volume – Annual Average



Jones & Henry Engineers, Ltd.                                          Fluid thinking.™

## Operation and Maintenance Costs

Table 2 provides a summary of the operation and maintenance costs for the KWA project, and calculations show that it costs approximately $277 per million gallons to operate and maintain the pump stations and transmission line.

| | Maintenance | Labor | Chemicals | Power | Residuals | KWA Admin | Total |
|---|---|---|---|---|---|---|---|
| **Table 2 — KWA O&M Cost** | | | | | | | |
| 2016 | $339,525 | $274,037 | $116,872 | $1,298,879 | $39,226 | $167,167 | $2,235,706 |
| 2017 | $466,281 | $282,258 | $121,964 | $1,337,846 | $40,935 | $172,183 | $2,421,467 |
| 2018 | $562,995 | $290,726 | $127,256 | $1,377,981 | $42,711 | $177,348 | $2,579,017 |
| | | | | | | | |
| Average | $456,267 | $282,340 | $122,030 | $1,338,235 | $40,957 | $172,233 | $2,412,063 |

O&M Cost / MG = $2,412,063 / 23.83 MG per day x 365 day per year ~ $277 / MG  ($2.07 per mcf)

| Source: | Table 14-2, 2009 Report by Rowe Professional Services Company except power based on pumps selected during preliminary design of IPS and LHPS and initial operating conditions, and maintenance and KWA Administration reduced to 70 percent of original value due to lower peak demand (60 mgd v. 85 mgd). |
|---|---|

Estimated operation and maintenance costs, based on proportion of water purchased, are presented in Table 3.

**Table 3 — Estimated Annual Operation and Maintenance Costs (3-Year Average)**

| | Annual Water Purchased | Water Purchased | % | Operation & Maintenance Costs | | |
|---|---|---|---|---|---|---|
| | | | | **2016** | **2017** | **2018** |
| Genesee County | 655,783 mcf | 13.44 mgd | 56.4 | $1,260,938 | $1,365,707 | $1,454,566 |
| City of Flint | 506,963 mcf | 10.39 mgd | 43.6 | $974,768 | $1,055,760 | $1,124,451 |
| Total | 1,162,746 mcf | 23.83 mgd | 100.0 | $2,235,706 | $2,421,467 | $2,579,017 |

Note:  Based on cost of $277 per mg or $2.07 per mcf. Calculated using an average O&M cost for 2016 to 2018.

The costs calculated above are based on a calendar year, but the City of Flint's fiscal year runs from July to June. Table 4 breaks down the operating costs presented above and allocates the semi-annual amounts to Flint's fiscal year.

**Table 4 — Breakdown and Allocation of Flint Operating Costs**

| | 2016 (Calendar Year) | | 2017 (Calendar Year) | | 2018 (Calendar Year) | |
|---|---|---|---|---|---|---|
| KWA Operating Cost | $974,768 | | $1,055,760 | | $1,124,451 | |
| | | | | | | |
| Semi-Annual Breakdown | $487,384 | $487,384 | $527,880 | $527,880 | $562,226 | $562,226 |
| | | | | | | |
| Fiscal Year Allocation | | $1,015,264 FY 2017 | | $1,090,106 FY 2018 | | |

## Capital Costs

KWA bonds will need to produce $240 million in proceeds for the project. Approximately $300 million of bonds will be issued in two different series of bonds, including fully funded bond reserve and capitalized interest through the November 1, 2016 payments. The first debt service payable from KWA system revenue is May 1, 2017, essentially requiring the project to be in full service by the fall of 2016. The annual bond payments, including the Intake Bonds, total an estimated $23,000,000. This assumes an interest rate of 5 percent for the first series of bonds of $220 million and 5.25 percent for the second series of bonds of $80 million, with both series of bonds being 30 years duration.

Based on 60 units, the estimated annual capital cost per unit would be $383,333 per unit for construction. A unit is equal to 1 mgd of peak month capacity.

Genesee County's portion of the annual payment would be $16,100,000 (42 of 60 units) and Flint's would be $6,900,000 (18 of 60 units), as shown in Table 5.

| Table 5 Estimated Annual Debt Service Costs For Construction | | | | |
|---|---|---|---|---|
| | Units (mgd) | % | Debt Service | % |
| Genesee County | 42 | 70 | $16,100,000 | 70 |
| City of Flint | 18 | 30 | $6,900,000 | 30 |
| Total | 60 | 100 | $23,000,000 | 100 |

## Total KWA Charges

The total KWA charges for Flint and GCDC-WWS will be as shown in Table 6 for 2016 and 2017.

| Table 6 Total KWA Charges (3-Year Average) | | |
|---|---|---|
| | Flint | GCDC-WWS |
| Capacity | 30% | 70% |
| Initial Usage | 43.6% | 56.4% |
| Capital (Annual Payment) | $6,900,000 | $16,100,000 |
| O&M | $1,051,659 | $1,360,404 |
| Total Annual Charge | $7,951,659 | $17,460,404 |

# APPENDIX   A-2

**PROJECT MAPS**

Jones & Henry Engineers, Ltd.

Fluid thinking.™





LAKE HURON WATER INITIATIVE
ROAD MATERIAL TYPE
GENESEE COUNTY
JANUARY 2014

Legend
— PROPOSED RAW WATER ROUTE
■—■—■ EXISTING WATER LINE

WADETRIM

Jones & Henry Engineers, Ltd.

Fluid thinking.™



# APPENDIX  B

GENESEE COUNTY DRAIN COMMISSION - WATER AND WASTE SERVICES

## APPENDIX   B-1

HISTORICAL WATER PURCHASED AND SOLD - GENESEE COUNTY

J o n e s   &   H e n r y   E n g i n e e r s ,   L t d .

Fluid thinking.™

| Appendix B-1 Historical Water Purchased v. Sold – Genesee County (Cubit Feet) | | | |
|---|---|---|---|
| Year | Water Purchased | Billable Water | % System Loss |
| 2007 | 719,759,400 | 668,814,441 | 7.08% |
| 2008 | 656,343,300 | 643,936,714 | 1.89% |
| 2009 | 616,325,400 | 594,736,958 | 3.50% |
| 2010 | 616,632,200 | 585,092,058 | 5.11% |
| 2011 | 621,182,300 | 581,675,986 | 6.36% |
| 2012 | 630,152,800 | 579,781,667 | 7.99% |
| 2013 | 587,285,100 | 534,000,000 estimated | 9.07% |

Source:   County of Genesee, State of Michigan, $35,000,000 Water Supply System Revenue Bonds (Limited Tax General Obligation) Series 2013 Official Statement; Updates by GCDC-WWS Personnel.

2013 Billable Water Volume subject to minor changes after final meter reads and audit of values.

# APPENDIX   B-2

### GENESEE COUNTY WATER SUPPLY SALES, 2011 AND 2012

Jones & Henry Engineers, Ltd.

Fluid thinking.™

| Appendix B-2 Genesee County Water Supply Sales | | | |
|---|---|---|---|
| Community | 2011 (cu. ft.) | 2012 (cu. ft.) | Average % Increase Per Year (11-12) |
| Burton City[1] | 60,577,973 | 62,145,013 | 2.59% |
| Clio City[1] | 9,063,800 | 8,916,600 | -1.62% |
| Morris City[1] | 11,257,800 | 11,276,200 | 0.16% |
| Swartz Creek City[1] | 28,734,200 | 27,420,810 | -4.57% |
| Montrose City[1] | 6,093,500 | 6,105,500 | 0.20% |
| Flushing City[1] | 27,988,300 | 27,741,300 | -0.88% |
| Montrose Twp. | 5,131,160 | 4,707,630 | -8.25% |
| Vienna Twp. | 14,096,827 | 15,080,360 | 6.98% |
| Thetford Twp. | 17,000 | 17,100 | 0.59% |
| Flushing Twp. | 22,618,810 | 23,471,530 | 3.77% |
| Mt. Morris Twp. | 33,325,560 | 32,816,330 | -1.53% |
| Genesee Twp.[1] | 36,069,100 | 35,315,900 | -2.09% |
| Richfield Twp. | 6,256,210 | 6,756,480 | 8.00% |
| Clayton Twp. | 7,341,240 | 7,690,860 | 4.76% |
| Flint Twp. | 102,186,779 | 103,711,109 | 1.49% |
| Davidson Twp. | 40,931,444 | 42,314,290 | 3.38% |
| Gaines Twp. | 4,193,600 | 4,250,800 | 1.36% |
| Mundy Twp. | 25,049,868 | 26,866,194 | 7.25% |
| Grand Bl. Twp.[1] | 129,998,237 | 130,167,445 | 0.13% |
| Hydrants | 1,786,526 | 3,010,216 | 68.50% |
| | | | |
| Total | 572,717,934 | 579,781,667 | 1.23% |
| | | | |
| [1] Master Meter | | | |

Source:    Updated information provided by Genesee County Drain Commissioner – Water and Waste Service Personnel.

# APPENDIX   B-3

**GCDC WATER RATES WITH KWA**

Jones & Henry Engineers, Ltd.                                      Fluid thinking.™

# Appendix B-3

## GCDC-WWS Water Rates – with KWA

- Analysis started with the recently completed rate study for 2014 to 2018.

- Customer base remained the same.

  o    Equivalent Meters – No growth

  o    Commodity – No growth

- GCDC-WWS WTP will commence operation on July 1, 2016.

- CCIF Revenue projection has been reduced from the prior rate study of $575,000 per year to:

  | | |
  |---|---|
  | 2014 | $275,000 |
  | 2015 | $300,000 |
  | 2016 | $300,000 |
  | 2017 | $300,000 |
  | 2018 | $300,000 |

- Adjustments to Expenses for 2014, 2015, 2016, 2017, and 2018.

  o    Detroit rates are expected to increase by 10.3 percent starting April 1, 2014, an additional 9 percent starting July 1, 2014, and 10 percent starting July 1, 2015. (Discussion by GCDC-WWS with DWSD.)

  o    Removed Flint surcharge for water purchase starting April 1, 2014

  o    Water Expense to Detroit to continue until June 30, 2016

  o    Added KWA O&M (56.4 percent of Total, half year in 2016)

  | Year | Total | GCDC-WWS |
  |---|---|---|
  | 2016 | $1,117,853 | $630,469 |
  | 2017 | $2,421,467 | $1,365,707 |
  | 2018 | $2,579,017 | $1,454,566 |

  All cost allocated to Commodity

  o    Add GCDC-WWS  O&M for new WTP

    ▪    $3.60 per 1,000 cubic feet = $481 per mg

Jones & Henry Engineers, Ltd.                                    Fluid thinking.™

- ▪ Inflate 3 percent per year

- ▪ Treated Water Volume = 13.04 mgd

| Year | Rate | Total | |
|------|------|-------|---|
| 2013 | $481 per mg | - - - | |
| 2016 | $525 per mg | $1,249,395 | (half year) |
| 2017 | $541 per mg | $2,574,943 | |
| 2018 | $557 per mg | $2,651,097 | |

All cost allocated to Commodity

- • Capital costs were added as follows:

  - o Capital Reinvestment / Depreciation Water Plant - $1,500,000 per year starting in 2017

    All allocated to Volume

  - o Intake Debt Service

| | |
|------|------|
| 2014 | $2,529,423 |
| 2015 | $2,526,838 |
| 2016 | $2,527,388 |
| 2017 | $2,527,188 |
| 2018 | $2,527,588 |

All cost is allocated 85 percent to Commodity and 15 percent to RTS

  - o KWA Purchase

    - ▪ $383,333 per unit time 42 units equals $16,100,000 per year starting in 2016.

    - ▪ Starting in 2016, GCDC-WWS will receive a credit from KWA equal to Flint's share of the Intake Bonds – 30 percent of $2,527,188 equals $758,156.

    - ▪ Prior to July 1, 2016, approximately 10 percent will be paid annually to KWA of the net amount.

    - ▪ Annual net expenses will be:

| | |
|------|------|
| 2014 | $1,356,600 |
| 2015 | $1,356,600 |
| 2016 | $7,465,800 |
| 2017 | $13,575,000 |

Jones & Henry Engineers, Ltd.                                    Fluid thinking.™

|      |             |
|------|-------------|
| 2018 | $13,575,000 |

Net expenses will be allocated 85 percent to Commodity and 15 percent to RTS

o   GCDC-WWS Water Plant and associated facilities Bond ($60,000,000)

|      |            |
|------|------------|
| 2015 | $3,978,516 |
| 2016 | $4,027,813 |
| 2017 | $4,028,450 |
| 2018 | $4,026,725 |

Expenses will be allocated 85 percent to Commodity and 15 percent to RTS

o   A KWA bond reserve fund will be established from a portion of the bonds' proceeds. Income from the bond reserve is estimated at an ultimate rate of 3 percent per year, with 1 and 2 percent earned in 2015 and 2016 respectively.

▪   Estimated GCDC-WWS's share is:

|      |          |
|------|----------|
| 2015 | $156,800 |
| 2016 | $313,600 |
| 2017 | $470,400 |
| 2018 | $470,400 |

All bond reserve income will be allocated to commodity

o   In the past, an additional 10 percent of the bonds' principal and interest payments were included in determining rates. The additional 10 percent was to assist with bond payments during periods of low revenue. In lieu of the 10 percent add on, GCDC-WWS will be including in the rate determination a non-cash item depreciation to provide adequate coverage for the rates. In addition, the KWA bonds include a bond reserve from the proceeds.

•   Rates – See attached spreadsheet Appendix B-5 for rates per year. Even though future increases in DWSD charges have been projected, GCDC-WWS typically passes through the DWSD actual charges directly to the customers. The need to satisfy ordinance imposed additional bonds tests could also lead to higher rates. The rates in Appendix B-5 are only for the GCDC-WWS charges. GCDC-WWS community customers also add local charges ranging from 0 percent to 53 percent of GCDC-WWS RTS charges, and from 0 to 14 percent of GCDC-WWS commodity charges to their end users.

# APPENDIX   B-4

EXPENSES AND REVENUES FOR GCDC WATER SUPPLY DISTRICT

GCDC-WWS
3/4/2014

| Category | 2009 Actual | 2010 Actual | 2011 Actual | 2012 Actual | 2013 Budget | 2014 % Increase | 2015-2018 % Increase | 2014 Projected | 2015 Projected | 2016 Projected | 2017 Projected | 2018 Projected | 2016-1 Projected | 2016-2 Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Water Supply District Past & Projected Expenses & Revenues | | | | | | | | | |
| 702.00 Salaries and Wages | $730,965.84 | $839,286.72 | $846,687.83 | $737,745.13 | $818,067.00 | 3.0% | 3.0% | $842,609 | $867,887 | $893,924 | $920,742 | $948,364 | $446,962 | $446,962 |
| 702.01 Salaries and Wages - Personal Time | $0.00 | $0.00 | $0.00 | $29,716.91 | $38,600.00 | 3.0% | 3.0% | $39,758 | $40,951 | $42,179 | $43,445 | $44,748 | $21,090 | $21,090 |
| 702.02 Salaries and Wages - Vacation Time | $0.00 | $0.00 | $0.00 | $54,869.17 | $57,540.00 | 3.0% | 3.0% | $59,266 | $61,044 | $62,876 | $64,762 | $66,705 | $31,438 | $31,438 |
| 702.03 Salaries and Wages - Holiday | $0.00 | $0.00 | $0.00 | $45,851.84 | $47,800.00 | 3.0% | 3.0% | $49,234 | $50,711 | $52,232 | $53,799 | $55,413 | $26,116 | $26,116 |
| 702.04 Salaries and Wages - Vacation Cash In | $0.00 | $0.00 | $0.00 | $17,516.72 | $360.00 | 3.0% | 3.0% | $371 | $382 | $393 | $405 | $417 | $197 | $197 |
| 702.05 Salaries and Wages - Separation | $130,515.49 | $96,955.59 | $107,960.46 | $112,082.64 | $123,000.00 | 3.0% | 3.0% | $125,460 | $127,969 | $130,529 | $133,139 | $135,802 | $65,264 | $65,264 |
| 709.00 Overtime | $2,025.00 | $1,875.00 | $1,250.00 | $1,400.00 | $3,000.00 | 2.0% | 2.0% | $3,060 | $3,121 | $3,184 | $3,247 | $3,312 | $1,592 | $1,592 |
| 710.00 Bonus | | | $0.00 | $1,000.00 | $0.00 | 2.0% | 2.0% | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 711.00 Insurance Opt Out | $70,693.76 | $69,125.91 | $71,429.55 | $77,216.30 | $83,800.00 | 3.0% | 3.0% | $86,314 | $88,903 | $91,571 | $94,318 | $97,147 | $45,785 | $45,785 |
| 716.01 Fringe Benefits Pension | $152,942.69 | $160,527.84 | $155,939.91 | $144,802.41 | $195,800.00 | 2.0% | 2.0% | $199,716 | $203,710 | $207,785 | $211,940 | $216,179 | $103,892 | $103,892 |
| 716.02 Fringe Benefits Taxes | $215,210.29 | $254,870.28 | $242,958.33 | $318,381.26 | $367,500.00 | 7.0% | 7.0% | $393,225 | $420,751 | $450,203 | $481,718 | $515,438 | $225,102 | $225,102 |
| 716.03 Fringe Benefits Medical - Active | $25,515.52 | $22,926.13 | $24,344.51 | $25,015.57 | $30,500.00 | 7.0% | 7.0% | $32,635 | $34,919 | $37,364 | $39,979 | $42,778 | $18,682 | $18,682 |
| 716.05 Fringe Benefits Dental & Optical - Active | $8,469.38 | $7,367.02 | $5,871.77 | $10,470.58 | $11,000.00 | 7.0% | 7.0% | $11,770 | $12,594 | $13,475 | $14,419 | $15,428 | $6,738 | $6,738 |
| 716.09 Fringe Benefits Life - Active | $5,919.10 | $8,755.54 | $7,735.49 | $16,714.26 | $22,000.00 | 8.0% | 8.0% | $23,760 | $25,661 | $27,714 | $29,931 | $32,325 | $13,857 | $13,857 |
| 716.11 Fringe Benefits Worker's Compensation | $147,266.10 | $161,047.15 | $346,142.81 | $500,609.13 | $600,000.00 | 2.0% | 2.0% | $612,000 | $624,240 | $636,725 | $649,459 | $662,448 | $318,362 | $318,362 |
| 716.12 Fringe Benefits OPEB | $4,098.28 | $7,096.56 | $4,268.88 | $5,208.20 | $4,600.00 | 2.0% | 2.0% | $4,692 | $4,786 | $4,882 | $4,979 | $5,079 | $2,441 | $2,441 |
| 716.13 Fringe Benefits - Uniforms | | | | $297.79 | $0.00 | 2.0% | 2.0% | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 716.15 Fringe Benefits - Miscellaneous | $856.46 | $693.22 | $626.22 | $735.85 | $1,000.00 | 2.0% | 2.0% | $1,020 | $1,040 | $1,061 | $1,082 | $1,104 | $531 | $531 |
| 722.00 Clinic Expense | | | | | | | | | | | | | | |
| **Total Payroll Expenses** | **$1,494,477.91** | **$1,630,526.96** | **$1,816,215.76** | **$2,098,633.76** | **$2,404,567.00** | | | **$2,484,890.01** | **$2,568,670.43** | **$2,656,095.48** | **$2,747,364.09** | **$2,842,687.69** | **$1,328,047.74** | **$1,328,047.74** |
| 726.00 Office Supplies | $2,398.59 | $3,881.85 | $3,705.96 | $3,137.31 | $4,000.00 | 2.0% | 2.0% | $4,080 | $4,162 | $4,245 | $4,330 | $4,416 | $2,122 | $2,122 |
| 727.08 Operating Supplies - Diesel | $0.00 | $0.00 | $0.00 | $2,518.85 | $5,000.00 | 2.0% | 2.0% | $5,100 | $5,202 | $5,306 | $5,412 | $5,520 | $2,653 | $2,653 |
| 727.09 Operating Supplies - Meters | $0.00 | $44,554.21 | $24,997.00 | $83,535.43 | $120,000.00 | 2.0% | 2.0% | $122,400 | $124,848 | $127,345 | $129,892 | $132,490 | $63,672 | $63,672 |
| 727.99 Operating Supplies - General | $16,886.79 | $106,637.09 | $52,044.58 | $43,777.77 | $1,000.00 | 2.0% | 2.0% | $1,020 | $1,040 | $1,061 | $1,082 | $1,104 | $531 | $531 |
| 729.00 Lab Supplies | $3,502.32 | $6,604.86 | $7,450.28 | $7,355.42 | $10,000.00 | 2.0% | 2.0% | $10,200 | $10,404 | $10,612 | $10,824 | $11,041 | $5,306 | $5,306 |
| 731.00 Misc. Supplies | $2,047.06 | $1,387.71 | $1,999.62 | $1,448.05 | $500.00 | 2.0% | 2.0% | $510 | $520 | $531 | $541 | $552 | $265 | $265 |
| 733.00 Postage | $52,954.15 | $48,422.10 | $28,577.64 | $377.90 | $500.00 | 3.0% | 3.0% | $515 | $530 | $546 | $563 | $580 | $273 | $273 |
| 734.00 Small Tools | $21,791.25 | $8,740.66 | $10,705.82 | $4,423.84 | $5,000.00 | 2.0% | 2.0% | $5,100 | $5,202 | $5,306 | $5,412 | $5,520 | $2,653 | $2,653 |
| **Total Supply Expenses** | **$99,580.16** | **$220,228.48** | **$129,480.90** | **$146,574.57** | **$146,000.00** | | | **$148,925.00** | **$151,908.65** | **$154,952.13** | **$158,056.63** | **$161,223.39** | **$77,476.06** | **$77,476.06** |
| 740.00 Dues and Membership | $5,598.99 | $6,642.49 | $3,993.24 | $2,598.20 | $4,500.00 | 2.0% | 2.0% | $4,590 | $4,682 | $4,775 | $4,871 | $4,968 | $2,388 | $2,388 |
| 745.00 Printing and Publishing | $1,538.92 | $0.00 | $2,960.70 | $1,211.40 | $1,500.00 | 2.0% | 2.0% | $1,530 | $1,561 | $1,592 | $1,624 | $1,656 | $796 | $796 |
| 760.00 General Insurance | $125,039.14 | $62,745.08 | $71,257.44 | $82,336.10 | $111,000.00 | 3.0% | 3.0% | $114,330 | $117,760 | $121,293 | $124,931 | $128,679 | $60,646 | $60,646 |
| **Total Other Expenses** | **$132,177.05** | **$69,387.57** | **$97,211.38** | **$86,145.70** | **$117,000.00** | | | **$120,450.00** | **$124,002.30** | **$127,659.95** | **$131,426.07** | **$135,303.91** | **$63,829.97** | **$63,829.97** |
| 801.01 Professional and Contractual Service Legal | $62,357.10 | $52,053.93 | $36,092.88 | $40,980.89 | $50,000.00 | 2.0% | 2.0% | $51,000 | $52,020 | $53,060 | $54,122 | $55,204 | $26,530 | $26,530 |
| 801.02 Professional and Contractual Service Engineering | $56,636.75 | $3,573.63 | $78,956.69 | $211,100.14 | $97,500.00 | 2.0% | 2.0% | $99,450 | $101,439 | $103,468 | $105,537 | $107,648 | $51,734 | $51,734 |
| 801.04 Professional and Contractual Services Cleaning | | $0.00 | $10,537.67 | $7,220.99 | $7,500.00 | 2.0% | 2.0% | $7,650 | $7,803 | $7,959 | $8,118 | $8,281 | $3,980 | $3,980 |
| 801.05 Professional - Cross Connection Contracts | $84,650.00 | $78,000.00 | $78,000.00 | $78,000.00 | $100,000.00 | 2.0% | 2.0% | $102,000 | $104,040 | $106,121 | $108,243 | $110,408 | $53,060 | $53,060 |
| 801.06 Professional and Contractual Service GIS | $0.00 | | | $43,300.00 | $45,000.00 | 2.0% | 2.0% | $45,900 | $46,818 | $47,754 | $48,709 | $49,684 | $23,877 | $23,877 |
| 805.00 Permits | $0.00 | $0.00 | | $0.00 | $17,000.00 | 2.0% | 2.0% | $17,340 | $17,687 | $18,041 | $18,401 | $18,769 | $9,020 | $9,020 |
| 806.00 Security Expense | $3,688.82 | $3,142.12 | $3,571.08 | $3,413.51 | $5,000.00 | 2.0% | 2.0% | $5,100 | $5,202 | $5,306 | $5,412 | $5,520 | $2,653 | $2,653 |
| 808.00 Taping Service | $46,541.86 | $44,554.52 | $52,471.04 | $36,643.20 | $40,000.00 | 2.0% | 2.0% | $40,800 | $41,616 | $42,448 | $43,297 | $44,163 | $21,224 | $21,224 |
| 810.04 KWA O&M | | | | | | | 3.0% | | | | $630,469 | $1,365,707 | $1,454,566 | $630,469 |
| 810.05 GCDC O&M | | | | | | | | | | | $1,249,395 | $2,574,943 | $2,651,097 | $1,249,395 |
| 810.01 Cost of Water - Commodity | $8,635,352.28 | $8,889,853.59 | $9,461,016.46 | $7,490,389.60 | $7,668,000.00 | 21.7% | 12.0% | $9,328,797 | $10,450,507 | $5,474,075 | $0 | $0 | $5,474,075.00 | |
| 810.03 Cost of Water - Flint Surcharge | $1,392,682.70 | $1,398,666.90 | $1,482,000.00 | $1,254,000.00 | $1,368,000.00 | 0.0% | 0.0% | $342,000 | $0 | $0 | $0 | $0 | | |
| 810.02 Cost of Water - DWSD RTS | $0.00 | $546,936.00 | $2,004,721.00 | $3,035,015.72 | $3,988,000.00 | 17.6% | 12.0% | $4,690,497 | $5,254,490 | $0 | $0 | $0 | $2,752,352.00 | |
| **Total Contracts** | **$10,281,909.51** | **$11,017,779.79** | **$13,207,366.82** | **$12,200,064.05** | **$13,386,000.00** | | | **$14,730,534.00** | **$16,081,621.80** | **$10,490,448.30** | **$4,332,490.44** | **$4,505,340.25** | **$8,418,505.65** | **$2,071,942.65** |
| 836.00 Rentals | | | | $359.27 | $2,500.00 | 2.0% | 2.0% | $2,550 | $2,601 | $2,653 | $2,706 | $2,760 | $1,327 | $1,327 |
| 845.01 Repairs and Maintenance Infrastructure | $91,201.41 | $123,048.38 | $305,582.48 | $168,615.71 | $200,000.00 | 2.0% | 2.0% | $204,000 | $208,080 | $212,242 | $216,486 | $220,816 | $106,121 | $106,121 |
| 845.02 Repairs and Maintenance Building | $18,519.30 | $36,844.17 | $28,379.64 | $17,545.73 | $25,000.00 | 2.0% | 2.0% | $25,500 | $26,010 | $26,530 | $27,061 | $27,602 | $13,265 | $13,265 |
| 845.05 Repairs and Maintenance Equipment | $64,890.20 | $60,681.97 | $62,198.25 | $89,967.76 | $120,000.00 | 2.0% | 2.0% | $122,400 | $124,848 | $127,345 | $129,892 | $132,490 | $63,672 | $63,672 |
| 845.06 Repairs and Maintenance Software | $0.00 | $12,500.00 | $3,670.00 | $6,457.50 | $5,000.00 | 2.0% | 2.0% | $5,100 | $5,202 | $5,306 | $5,412 | $5,520 | $2,653 | $2,653 |
| **Total Repair and Maintenance** | **$174,610.91** | **$233,074.52** | **$399,830.37** | **$282,945.97** | **$352,500.00** | | | **$359,550.00** | **$366,741.00** | **$374,075.82** | **$381,557.34** | **$389,188.48** | **$187,037.91** | **$187,037.91** |
| 845.07 Repairs and Maintenance Vehicles | $190,986.66 | $169,205.45 | $197,938.23 | $73,452.29 | $57,500.00 | 2.0% | 2.0% | $58,140 | $59,303 | $60,489 | $61,699 | $62,933 | $30,244 | $30,244 |
| 845.08 Repairs and Maintenance Ground Care | $7,401.88 | $6,226.90 | $15,406.30 | $15,873.43 | $20,000.00 | 2.0% | 2.0% | $20,400 | $20,808 | $21,224 | $21,649 | $22,082 | $10,612 | $10,612 |
| 845.09 Repairs and Maintenance SCADA | | | | $3,659.62 | $5,000.00 | 2.0% | 2.0% | $5,100 | $5,202 | $5,306 | $5,412 | $5,520 | $2,653 | $2,653 |
| 846.01 Vehicles Fuel - Diesel | | | | $0.00 | $8,000.00 | 2.0% | 2.0% | $8,160 | $8,323 | $8,490 | $8,659 | $8,833 | $4,245 | $4,245 |
| 846.02 Vehicles Fuel - Gasoline | | | | $0.00 | $10,000.00 | 2.0% | 2.0% | $10,200 | $10,404 | $10,612 | $10,824 | $11,041 | $5,306 | $5,306 |
| 855.00 Community Utilities | $0.00 | $0.00 | $86,062.82 | $50,600.38 | $50,000.00 | 2.0% | 2.0% | $51,000 | $52,020 | $53,060 | $54,122 | $55,204 | $26,530 | $26,530 |

GCDC-WWS
3/4/2014

| Category | 2009 Actual | 2010 Actual | 2011 Actual | 2012 Actual | 2013 Budget | 2014 % Increase | 2015-2018 % Increase | 2014 Projected | 2015 Projected | 2016 Projected | 2017 Projected | 2018 Projected | 2016-1 Projected | 2016-2 Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 856.01 Utilities - Electric | $388,444.17 | $368,868.30 | $410,085.33 | $366,566.12 | $450,000.00 | 9.0% | 9.0% | $490,500 | $534,645 | $582,763 | $635,212 | $692,381 | $291,382 | $291,382 |
| 856.02 Utilities - Gas | $27,916.68 | $10,890.52 | $14,831.74 | $23,869.08 | $15,000.00 | 9.0% | 9.0% | $16,350 | $17,822 | $19,425 | $21,174 | $23,079 | $9,713 | $9,713 |
| 856.03 Utilities - Sewer & Water | $808.96 | $34,010.73 | $29,878.06 | $7,938.94 | $10,000.00 | 9.0% | 9.0% | $10,900 | $11,881 | $12,950 | $14,116 | $15,386 | $6,475 | $6,475 |
| 854.04 Utilities Communication | $18,137.08 | $26,439.95 | $22,276.59 | $16,598.94 | $20,000.00 | 2.0% | 2.0% | $20,400 | $20,808 | $21,224 | $21,649 | $22,082 | $10,612 | $10,612 |
| 857.00 Trash Removal | $0.00 | $0.00 | $0.00 | $1,707.95 | $1,500.00 | 2.0% | 2.0% | $1,530 | $1,561 | $1,592 | $1,624 | $1,656 | $796 | $796 |
| 864.00 Conferences and Seminars | $1,386.78 | $2,735.66 | $539.50 | $1,989.21 | $2,500.00 | 2.0% | 2.0% | $2,550 | $2,601 | $2,653 | $2,706 | $2,760 | $1,327 | $1,327 |
| 876.00 Safety | $1,143.11 | $4,245.53 | $4,430.01 | $593.54 | $2,500.00 | 2.0% | 2.0% | $2,550 | $2,601 | $2,653 | $2,706 | $2,760 | $1,327 | $1,327 |
| 877.00 Outside Inspections/Testing | $7,440.72 | $9,551.49 | $10,721.38 | $9,740.76 | $15,000.00 | 2.0% | 2.0% | $15,300 | $15,606 | $15,918 | $16,236 | $16,561 | $7,959 | $7,959 |
| 955.00 Misc. Operating Expenses | $14,217.34 | $17,572.36 | $13,767.87 | $18,850.61 | $0.00 | 2.0% | 2.0% | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Operation Services** | **$643,666.04** | **$632,174.53** | **$792,169.96** | **$572,590.26** | **$666,500.00** | | | **$713,080.00** | **$763,584.10** | **$818,360.11** | **$877,787.02** | **$942,277.85** | **$409,180.05** | **$409,180.05** |
| **Administration Expense (Depts: 50,51,52,54)** | **$2,737,766.61** | **$2,798,842.50** | **$2,299,917.46** | **$3,055,779.00** | **$2,899,498.00** | 4.0% | 4.0% | **$3,015,478** | **$3,136,097** | **$3,261,541** | **$3,392,003** | **$3,527,683** | **$1,630,770.46** | **$1,630,770.46** |
| 966.00 Easement/ROW Expenses | $0.00 | $2,300.00 | $10,464.70 | $6,000.00 | | | 2.0% | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Capital Projects (91xx Funds) | $0.00 | $0.00 | $3,355.02 | $2,401,791.00 | $346,900.00 | | 3.0% | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Capital Reinvestment/Depreciation Water Plant | | | | | | | | | | | $1,500,000 | $1,500,000 | | |
| Capital Reinvestment/Depreciation Recovery | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | 3.0% | $1,962,890 | $1,903,580 | $1,903,580 | $1,898,841 | $1,898,841 | $951,790 | $951,790 |
| **Total Capital Expense** | **$0.00** | **$2,300.00** | **$13,819.72** | **$2,407,791.00** | **$346,900.00** | | | **$1,962,890.16** | **$1,903,579.66** | **$1,903,579.66** | **$3,398,840.66** | **$3,398,840.66** | **$951,789.83** | **$951,789.83** |
| 994.00 Bond Principal Payments | $1,135,000.00 | $1,175,000.00 | $1,210,000.00 | $1,260,000.00 | $1,310,000.00 | | | $1,360,000 | $1,415,000 | $1,470,000 | $1,530,000 | $1,595,000 | $735,000 | $735,000 |
| 995.00 Bond Interest Payments | $1,967,363.76 | $1,928,501.26 | $1,885,338.76 | $1,839,118.78 | $1,794,834.00 | | | $1,737,651 | $1,683,131 | $1,624,571 | $1,562,939 | $1,497,256 | $812,286 | $812,286 |
| Intake Debt Service | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | | $2,529,423 | $2,526,838 | $2,527,388 | $2,527,188 | $2,527,588 | $1,263,694 | $1,263,694 |
| 42.00 KWA Water Purchase = 42 units | | | | | | | | $1,356,600 | $1,356,600 | $7,465,800 | $13,575,000 | $13,575,000 | $678,300 | $6,787,500 |
| GCDC Water Plant Debt Service | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | | $0 | $3,978,516 | $4,027,813 | $4,028,456 | $4,026,725 | $2,013,907 | $2,013,907 |
| **Total Debt Service** | **$3,102,363.76** | **$3,103,501.26** | **$3,095,338.76** | **$3,099,118.78** | **$3,104,834.00** | | | **$6,983,674.25** | **$10,960,085.26** | **$17,115,572.26** | **$23,223,576.76** | **$23,221,569.13** | **$5,503,186.13** | **$11,612,386.13** |
| **TOTAL EXPENSES** | **$15,928,785.34** | **$16,908,973.11** | **$19,551,433.67** | **$20,893,864.09** | **$23,423,799.00** | | | **$30,519,471.34** | **$36,056,290.24** | **$36,902,284.61** | **$38,643,101.57** | **$39,124,114.03** | **$18,569,823.81** | **$18,332,460.81** |
| Total without Detroit & Flint | $5,900,750.36 | $6,073,517.52 | $6,603,696.21 | $9,114,458.77 | $10,399,799.00 | | | $16,158,177.34 | $20,351,293.24 | $28,675,857.61 | $38,643,101.57 | $39,124,114.03 | $10,343,396.81 | $18,332,460.81 |

# APPENDIX   B-5

**GCDC-WWS PROJECTED RATES DURING KWA PHASE-IN**

3/4/2014

**GCDC-WWS - Projected Rates during KWA phase in**

2/27/2014

Annual Rate

| Expense Item | RTS | Commodity | 2014 | | | 2015 | | | 2016-1 | | | 2016-2 | | | 2017 | | | 2018 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Expense | RTS | Commodity | Expense | RTS | Commodity | Expense | RTS | Commodity | Expense | RTS | Commodity | Expense | RTS | Commodity | Expense | RTS | Commodity |
| Detroit Commodity¹ | | 100% | 8,584,763 | - | 8,584,763 | 9,617,009 | - | 9,617,009 | 5,037,481 | - | 5,037,481 | - | - | | - | - | | - | - | |
| Detroit RTS¹ | 100% | | 4,690,497 | 4,690,497 | - | 5,254,490 | 5,254,490 | - | 2,752,352 | 2,752,352 | - | - | - | | - | - | | - | - | |
| Flint Surcharge | 100% | | 342,000 | 342,000 | - | - | - | | - | - | | - | - | | - | - | | - | - | |
| Unaccounted for Water | 90% | 10% | 744,034 | 669,631 | 74,403 | 833,498 | 750,148 | 83,350 | 436,594 | 392,935 | 43,659 | - | - | | - | - | | - | - | |
| Administration | 50% | 50% | 3,015,478 | 1,507,739 | 1,507,739 | 3,136,097 | 1,568,049 | 1,568,049 | 1,630,770 | 815,385 | 815,385 | 3,392,003 | 1,696,002 | 1,696,002 | 3,527,683 | 1,763,842 | 1,763,842 | 3,527,683 | 1,763,842 | 1,763,842 |
| Existing Debt | | 100% | 3,097,651 | - | 3,097,651 | 3,098,131 | - | 3,098,131 | 1,547,286 | - | 1,547,286 | 3,092,939 | - | 3,092,939 | 3,092,939 | - | 3,092,939 | 3,092,256 | - | 3,092,256 |
| Intake Debt | 15% | 85% | 2,529,423 | 379,413 | 2,150,010 | 2,526,838 | 379,026 | 2,147,812 | 1,263,694 | 189,554 | 1,074,140 | 2,527,188 | 379,078 | 2,148,110 | 2,527,588 | 379,138 | 2,148,450 | 2,527,588 | 379,138 | 2,148,450 |
| Depreciation | | 100% | 1,962,890 | - | 1,962,890 | 1,903,580 | - | 1,903,580 | 951,790 | - | 951,790 | 3,398,841 | - | 3,398,841 | 3,398,841 | - | 3,398,841 | 3,398,841 | - | 3,398,841 |
| Transmission O&M | | 100% | 2,127,441 | - | 2,127,441 | 2,206,226 | - | 2,206,226 | 1,144,634 | - | 1,144,634 | 2,376,831 | - | 2,376,831 | 2,376,831 | - | 2,376,831 | 2,469,272 | - | 2,469,272 |
| O&M Retail | 100% | | 2,068,695 | 2,068,695 | - | 2,145,305 | 2,145,305 | - | 1,113,027 | 1,113,027 | - | 2,311,199 | 2,311,199 | - | 2,401,087 | 2,401,087 | - | 2,401,087 | 2,401,087 | - |
| KWA O&M | 100% | | - | - | | - | - | | - | - | | 630,469 | - | 630,469 | 1,365,707 | - | 1,365,707 | 1,454,566 | - | 1,454,566 |
| GCDC WTP O&M | 100% | | - | - | | - | - | | - | - | | 1,249,395 | - | 1,249,395 | 2,574,943 | - | 2,574,943 | 2,651,097 | - | 2,651,097 |
| KWA Purchase/Debt Services | 15% | 85% | 1,356,600 | 203,490 | 1,153,110 | 1,356,600 | 203,490 | 1,153,110 | 678,300 | 101,745 | 576,555 | 6,787,500 | 1,018,125 | 5,769,375 | 13,575,000 | 2,036,250 | 11,538,750 | 13,575,000 | 2,036,250 | 11,538,750 |
| GCDC-WWS WTP Debt | 15% | 85% | - | - | | 3,978,516 | 596,777 | 3,381,739 | 2,013,907 | 302,086 | 1,711,821 | 2,013,907 | 302,086 | 1,711,821 | 4,028,450 | 604,268 | 3,424,183 | 4,026,725 | 604,009 | 3,422,716 |
| | | | | | | | | | | | | | | | | | | | | |
| Total Expenses | | | 30,519,472 | 5,170,968 | 25,348,504 | 36,056,290 | 5,642,795 | 30,413,495 | 18,569,835 | 2,914,732 | 15,655,103 | 18,332,472 | 3,438,177 | 14,894,295 | 38,643,101 | 7,026,796 | 31,616,305 | 39,124,115 | 7,184,325 | 31,939,790 |
| | | | | | | | | | | | | | | | | | | | | |
| Non-Rate Revenue Deducts | | | | | | | | | | | | | | | | | | | | |
| KWA Bond Reserve Income | | 100% | $0 | $0 | $0 | (156,800) | $0 | (156,800) | (156,800) | $0 | (156,800) | (156,800) | $0 | (156,800) | (470,400) | $0 | (470,400) | (470,400) | $0 | (470,400) |
| County Capital Improvements Fee | | 100% | (275,000) | $0 | (275,000) | (300,000) | $0 | (300,000) | (150,000) | $0 | (150,000) | (150,000) | $0 | (150,000) | (300,000) | $0 | (300,000) | (300,000) | $0 | (300,000) |
| Miscellaneous Revenue | 49% | 51% | (378,000) | (185,220) | (192,780) | (378,000) | (185,220) | (192,780) | (189,000) | (92,610) | (96,390) | (189,000) | (92,610) | (96,390) | (378,000) | (185,220) | (192,780) | (378,000) | (185,220) | (192,780) |
| | | | | | | | | | | | | | | | | | | | | |
| Revenue Needed from Rates | | | 29,866,472 | 4,985,748 | 24,880,724 | 35,221,490 | 5,457,575 | 29,763,915 | 18,074,035 | 2,822,122 | 15,251,913 | 17,836,672 | 3,345,567 | 14,491,105 | 37,494,701 | 6,841,576 | 30,653,125 | 37,975,715 | 6,999,105 | 30,976,610 |
| | | | | | | | | | | | | | | | | | | | | |
| Customer Base | | | | | | | | | | | | | | | | | | | | | |
| Equivalent Meters | | | | 361,267 | | | 361,267 | | | 180,634 | | | 180,634 | | | 361,267 | | | 361,267 | |
| Commodity (100 cu ft) | | | | | 5,855,610 | | | 5,855,610 | | | 2,927,805 | | | 2,927,805 | | | 5,855,610 | | | 5,855,610 |
| | | | | | | | | | | | | | | | | | | | | |
| Rate | | | | | | | | | | | | | | | | | | | | | |
| RTS (per ERU) | | | 13.80 | | | 15.11 | | | 15.62 | | | 18.52 | | | 18.94 | | | 19.37 | | |
| Commodity per 100 cu ft | | | | 4.25 | | | 5.08 | | | 5.21 | | | 4.95 | | | 5.23 | | | 5.29 | |
| | | | | | | | | | | | | | | | | | | | | |
| Typical Bill | | | | | | | | | | | | | | | | | | | | | |
| 5/8" meter - RTS | 1 | | 13.80 | | | 15.11 | | | 15.62 | | | 18.52 | | | 18.94 | | | 19.37 | | |
| cu ft/mo | | 1,000 | | 42.49 | | | 50.83 | | | 52.09 | | | 49.49 | | | 52.35 | | | 52.90 | |
| | | | | | | | | | | | | | | | | | | | | |
| Total | | | 56.29 | | | 65.94 | | | 67.72 | | | 68.02 | | | 71.29 | | | 72.27 | | |

¹ Detroit expenses determined by adding an expected 10.3% in charges starting April 1, 2014, 9% starting July 1, 2014, and adding an additional 10% to then current charges starting July 1, 2015.

**Current Rates**

| | |
|---|---|
| RTS (per ERU) | $14.59 |
| Commodity per 100 cu ft | $3.94 |

Rate

| Current Typical Bill | |
|---|---|
| 5/8" meter - RTS | $ 14.59 |
| 1,000 cu ft/mo | $ 39.40 |
| Total | $ 53.99 |

# APPENDIX   B-6

GENESEE COUNTY WATER SUPPLY RATES

Jones & Henry Engineers, Ltd.

Fluid thinking.™

| Appendix B-6 Genesee Water Supply Minimum Charge Rates | | | |
|---|---|---|---|
| Meter Size (in) | 09/02/2012 - 09/01/2013 Charge | 09/02/2013 Charge | 01/02/2014 Charge |
| **Individual Meters** | | | |
| 5/8 | $13.38 | $14.59 | $14.59 |
| 3/4 | 20.07 | 21.89 | 21.89 |
| 1 | 33.45 | 36.48 | 36.48 |
| 1-1/2 | 66.90 | 72.95 | 72.95 |
| 2 | 107.04 | 116.72 | 116.72 |
| 3 | 200.70 | 218.85 | 218.85 |
| 4 | 334.50 | 364.75 | 364.75 |
| 6 | 669.00 | 729.50 | 729.50 |
| 8 | 1,070.40 | 1,167.20 | 1,167.20 |
| 10 | 1,605.60 | 1,750.80 | 1,750.80 |
| 12 | 2,876.70 | 3,136.85 | 3,136.85 |
| **Indirect Rates** | | | |
| 5/8 | $13.38 | $13.53 | $13.53 |
| 3/4 | 20.07 | 20.30 | 20.30 |
| 1 | 33.45 | 33.83 | 33.83 |
| 1-1/2 | 66.90 | 67.65 | 67.65 |
| 2 | 107.04 | 108.24 | 108.24 |
| 3 | 200.70 | 202.95 | 202.95 |
| 4 | 334.50 | 338.25 | 338.25 |
| 6 | 669.00 | 676.50 | 676.50 |
| 8 | 1,070.40 | 1,082.40 | 1,082.40 |
| | 09/02/2012 - 09/01/2013 Charge/EM | 09/02/2013 Charge/EM | 01/02/2014 Charge/EM |
| **Equivalent Meters** | | | |
| 25 | $3,295.75 | $2,241.75 | $2,241.75 |
| 50 | 6,591.50 | 4,483.50 | 4,483.50 |
| 80 | 10,546.40 | 7,173.60 | 7,173.60 |
| 120 | 15,819.60 | 10,760.40 | 10,760.40 |
| 165 | 21,751.95 | 14,795.55 | 14,795.55 |
| 215 | 28,343.45 | 19,279.05 | 19,279.05 |
| 320 | 42,185.60 | 28,694.40 | 28,694.40 |

| Rate Per 100 cubic feet of consumption | |
|---|---|
| 09/02/09 - 09/01/10 | $2.54 |
| 09/02/10 - 09/01/11 | $2.76 |
| 09/02/11- 09/01/12 | $2.96 |
| 09/02/12 – 09/01/13 | $3.18 |
| 09/02/13- 01/01/14 | $3.53 |
| 01/02/14 | $3.94 |

Source:     GCDC-WWS

**APPENDIX   B-7**

**2011 MDEQ SANITARY SURVEY**



STATE OF MICHIGAN
DEPARTMENT OF ENVIRONMENTAL QUALITY
LANSING



RICK SNYDER
GOVERNOR

DAN WYANT
DIRECTOR

September 7, 2011

Mr. John O'Brien, Director
Genesee County Drain Commissioner          WSSN: 2615
G-4610 Beecher Road
Flint, Michigan 48532

Dear Mr. O'Brien:

SUBJECT:    2011 Sanitary Survey
            Genesee County Water System

Enclosed is a copy of the sanitary survey completed by this department covering the
Genesee County water system. This report is being submitted for your review and
comment.

Your attention should be directed to pages 27 through 33, which details our
observations, conclusions, and recommendations. Also, pages 33 and 34 provide a
brief summary of the individual items that need to be addressed and gives the pages in
the report where those items are discussed.

The items vary in priority and are listed without ranking. In general, improvement
continues to be taken towards water system preventative maintenance. The need for
an adequate supply of water for domestic use and fire protection will continue to
increase as long as residential, commercial, and industrial growth continues in Genesee
County.

Item #1 discusses the need to establish adequate stand-by water service for Genesee
County.

Items #2, 3, and 6 discuss preventative maintenance and operational issues. This
includes the need to continue establishing a prioritized valve turning program. Next,
any remaining outdated meters should be changed out and the upgrade to a radio-read
system should continue to be promoted among your retail customers. Finally, the Clio
Road elevated tank should be scheduled for repainting.

Item #4 discusses the need to continue upgrading areas of WWS's water system that
are in poor condition.

Mr. John O'Brien                         2                    September 8, 2011

Item #5 discusses the need to conduct a new water system study and master plan by 2015.

Item #7 discusses the need to operate the stand-by chlorination equipment at the Henderson Road and Center Road pump stations on an occasional basis.

We wish to thank your staff for their time, and for the assistance given, during the survey and preparation of the report.  As always, we are available to meet with you to discuss the report in more detail.

Sincerely,

Michael F. Prysby, P.E., District Engineer
Lansing District Office
Resource Management Division
517-335-6122

Enclosure

cc:   Mr. Dave Jansen
      Mr. Tim Davidek

# GENESEE COUNTY DRAIN COMMISSIONER

# DISTRIBUTION SYSTEM SANITARY SURVEY

# GENESEE COUNTY DRAIN COMMISSIONER DISTRIBUTION SYSTEM SANITARY SURVEY

Report By:

### Michigan Department of Environmental Quality

Michael F. Prysby, P.E., District Engineer

September 6, 2011

## Acknowledgments

The Michigan Department of Environmental Quality wishes to thank those involved in putting this survey together. A special thank-you goes to the Genesee County Drain Commissioner, especially the Division of Waste & Water employees Tim Davidek, Matt Raysin, Mark Horgan, Dave Jansen, and John O'Brien for their time and patience in compiling the requested data.

# GENESEE COUNTY DRAIN COMMISSIONER DISTRIBUTION SYSTEM SANITARY SURVEY

## TABLE OF CONTENTS

### LIST OF TABLES AND FIGURES

Contact Information                                          1

Introductory Comments                                       2

Water Usage                                                 3

Water System Storage                                        6

Pumping Stations                                            9

Interconnections                                            17

Distribution Piping                                         19

Distribution Appurtenances                                  21

# TABLE OF CONTENTS CONT.

Customer & Service Information                                  22

Programs and Plans                                             24

## Discussion, Conclusions, And Recommendations

Water System Viability                                         27

Cross Connection Control                                       28

System Storage                                                 28

Pumping Stations                                               29

Transmission/Distribution                                      29

Operation/Maintenance                                          30

Bacteriological Monitoring                                     32

Contingency Plan/Source Reliability                            32

Lead & Copper Program                                          33

Closing Remarks                                                33

# LIST OF TABLES

TABLE 1 – OPERATOR POSITIONS                    2

TABLE 2 – WHOLESALE & RETAIL CUSTOMERS          2

TABLE 3 – PRODUCTION HISTORY                    3

# WATER SYSTEM REVIEW

WSSN <u>2615</u>   Supply <u>Genesee County Drain Commissioner</u>   County <u>Genesee</u>

Dates <u>7/13/2011 & 8/3/2011</u>      Reviewed by <u>MFP</u>            District <u>11</u>

| | | | |
|---|---|---|---|
| Primary Contact: | <u>John O'Brien</u> | Copy To: | <u>Tim Davidek</u> |
| Title: | <u>Director</u> | Title: | <u>Chief of O&M</u> |
| Telephone: | <u>(810) 732-7870</u> | Telephone: | <u>(810) 732-7870</u> |
| Address: | <u>G-4610 Beecher Road</u> | Address: | <u>Same</u> |
| | <u>Flint, MI. 48532</u> | | |

Population: <u>70,500</u>    Year: <u>2011</u>    Basis: <u>MDEQ Est. of retail customers</u>

Distribution Classification:    <u>S-1</u>                    Cert.    ID #

        Operator in Charge:   <u>Tim Davidek</u>            <u>S-1</u>

        Other Operators:

| | |
|---|---|
| <u>Jeffrey Bryson</u> | <u>S-1</u> |
| <u>Vernon Brenner</u> | <u>S-2</u> |
| <u>Joe Anklam</u> | <u>S-2</u> |
| <u>Richard Bysko (Back-up)</u> | <u>S-3</u> |
| <u>Dave Jansen</u> | <u>S-4</u> |
| <u>Shannon Holder</u> | <u>S-4</u> |
| <u>Mark Horgan</u> | <u>S-2</u> |
| <u>Bill Hostetler</u> | <u>S-3</u> |
| <u>Jan Jones</u> | <u>S-4</u> |
| <u>Dan Lince</u> | <u>S-4</u> |
| <u>Ryan Lynn</u> | <u>S-3</u> |
| <u>Matt McKay</u> | <u>S-3</u> |
| <u>Martin McCormick</u> | <u>S-4</u> |
| <u>John O'Brien</u> | <u>S-1</u> |
| <u>Steven Olson</u> | <u>S-4</u> |
| <u>Steven Pelky</u> | <u>S-4</u> |
| <u>Leslie Rogers</u> | <u>S-4</u> |
| <u>Ronald Schroeder</u> | <u>S-4</u> |
| <u>Steven Shaski II</u> | <u>S-4</u> |
| <u>Lony Smith</u> | <u>S-4</u> |
| <u>James Thompson</u> | <u>S-3</u> |

      Treatment Capacity:      55.0 MGD

Treatment Classification:    <u>D-1</u>

        Operator in Charge:   <u>Dave Jansen</u>            <u>D-1, F-1</u>

        Other Operators:

| | |
|---|---|
| <u>Joe Anklam</u> | <u>D-4</u> |
| <u>Jeffrey Bryson</u> | <u>F-3</u> |
| <u>Vern Brenner</u> | <u>D-4, F-4</u> |
| <u>Connie Hohman</u> | <u>F-4</u> |

## Operator Certification Comments:

The Waste & Water Services Division (WWSD), continues a proactive position towards

promoting operator certification and maintains incentives for achieving operator certification. The WWSD maintains a mandatory certification requirement for any distribution system employee who wishes to advance from an operator assistant position to an operator position. A bonus incentive program is also in place for operators who obtain distribution system certification above the level required for their specific position. Certified operators help protect the county's investment in the system, and help ensure that the system meets the requirements of the SDWA.

## Table 1.  Operator Positions

| OPERATOR POSITION | REQUIREMENTS |
|---|---|
| Operator Assistant 1 | None |
| Operator Assistant 2 | None |
| Operator | S-4 |
| Maintenance Mechanic<br>Equipment Operator<br>Senior O&M Operator | S-4 or minimum of 4 years experience |
| Supervisory level | S-3 |

### Introductory Comments:

The Genesee County Drain Commissioner serves water to a large percentage of Genesee County directly from the Detroit Water and Sewerage Department (DWSD) or through the city of Flint. Water service is provided to 19 wholesale and retail customers (8 wholesale and 11 retail customers).

The wholesale customers purchase water from the county through master meter(s) and these customers own and maintain the distribution system piping within their local service area. Each wholesale customer has established its own water department.

The retail customers have very little involvement with water utility operation. The WWSD controls design, construction, and operation of the water system for these customers. The retail customers, however, are responsible for collecting the water bills from their individual accounts.  Table 2 below shows the breakdown of the county's wholesale and retail customers.

## Table 2. Wholesale and Retail Customers of Genesee County

| Wholesale Customer | Number of Accounts | Retail Customer | Number of Accounts |
|---|---|---|---|
| City of Burton | 6,656 | Clayton Township | 865 |
| City of Clio | 993 | Davison Township | 2,636 |
| City of Flushing | 3,800 | Flint Township | 7,557 |
| City of Mt. Morris | 1,211 | Flushing Township | 2,538 |
| City of Montrose | 650 | Gaines Township | 487 |
| City of Swartz Cr. | 2,173 | Mt. Morris Twp. | 3,152 |
| Genesee Township | 2,129 | Montrose Township | 284 |
| Grand Blanc Twp. | 6,592 | Mundy Township | 1,365 |
| | | Richfield Township | 667 |
| | | Vienna Township | 1,184 |
| | | Thetford Township | 4 |
| Total Wholesale | 24,204 | Total Retail | 20,739 |

The 2011 population estimate is based our August 3, 2011 sanitary survey meeting. An estimate of 3.4 persons per account was used to obtain the population estimate. Genesee County's estimated retail service area population is approximately 70,500 people. The combined wholesale and retail customer service area serves approximately 153,000 people.

## WELL INFORMATION

One 6-inch test/exploration well was constructed at the Henderson Road pump station site. The test-well was constructed to a depth of 365 feet with a 6-inch PVC casing to 200 feet. The well was pumped at 220 GPM with a drawdown to 60 feet. Layne estimates that the aquifer could support a 350-400 GPM well for long-term pumpage and possibly above 500 GPM for a short-term emergency supply. The WWSD has not decided whether to proceed in converting the test well to a production well for additional emergency capacity.

## WATER USAGE

## TABLE 3. – PRODUCTION HISTORY

(units in Million Gallons Per Day MGD)

| YEAR | Avg Day | Max Day | Avg Day/Max Mo. | Max/Avg | G/C/D | % UnAcct H2O * |
|------|---------|---------|-----------------|---------|-------|----------------|
| 1996 | 11.4 | 19.2 | 14.8 | 1.68 | | 1.1 |
| 1997 | 12.8 | 22.8 | 20.1 | 1.78 | | 1.5 |
| 1998 | | 25.3 | 19.7 | | | |
| 1999 | 13.7 | 21.8 | 21.1 | 1.59 | | 3.9 |
| 2000 | 12.9 | NA | 18.3 | | | 1.1 |
| 2001 | 13.8 | 26.5 | 22.0 | 1.92 | | 1.5 |
| 2002 | 14.8 | 27.5 | 21.4 | 1.86 | | |
| 2003 | 14.4 | 26.3 | 20.2 | 1.83 | | |
| 2004 | 14.1 | 22.0 | 17.6 | 1.56 | | |
| 2005 | 15.0 | 24.9 | 19.6 | 1.66 | | |
| 2006 | 12.1 | 24.6 | 20.7 | 2.03 | | |
| 2007 | 14.5 | 19.7 | 18.2 | 1.36 | | |
| 2008 | 13.4 | 19.9 | 18.5 | 1.49 | | |
| 2009 | 12.6 | 18.9 | 16.4 | 1.50 | | |
| 2010 | 12.6 | 22.0 | 18.8 | 1.75 | | |

Five year Max Day   24.6 MGD   Date   Summer 2006
Ten year Max Day    27.5 MGD   Date   Summer 2002
Five year Avg Day   13.0 MGD

Max Day for capacity requirements      27.5 MGD

## Annual Max Day Usage @ each meter pit (2000-2007)

```
Center Rd in:   Total flow measured at the South Genesee Road meter pit.
Center Rd out:  Total pumpage out from the Center Road North (CRN) Booster Pump
                station, this will not equal the metered flow in since some the
                total flow is taken from storage at Center Road.
Total flow:     Sum of the flows measured at Genesee, Belsay, Irish, Oak,
                Potter Road meter pits.
```

**2000:**

```
Total flow:    NA - SCADA failure
Center Rd in:  NA
Center Rd out: 21.5 MG
Donaldson:      3.0 MG
```

**2001:**

```
Total flow:    26.5 MG  -  estimated due to SCADA failure
Center Rd in:  15.7 MG
Center Rd out: 23.2 MG  (three pumps ran)
Donaldson:      3.0 MG
```

**2002:**

```
Total Flow:    27.5 MG
Center Rd in:  16.3 MG  (three pumps ran)
Center Rd out: 21.0 MG
Donaldson:      3.0 MG
```

**2003:**

```
Total flow:    26.3 MG
Center Rd in:  15.9 MG
Center Rd out: 19.3 MG  (three pumps ran)
Donaldson:        MG
```

**2004:**

```
Total Flow:    22.0 MG
Center Rd in:  11.4 MG  (three pumps ran)
Center Rd out: 16.8 MG
Donaldson:        MG
```

**2005:**

```
Total Flow:    24.9 MG
Center Rd in:     MG  (three pumps ran)
Center Rd out:    MG
Donaldson:        MG
```

Page 5

2006:

```
Total flow:      24.6 MG
Center Rd in:    15.7 MG
Center Rd out:   17.0 MG   (three pumps ran)
Donaldson:            MG
```

2007:

```
Total Flow:      19.7 MG
Center Rd in:    18.2 MG   (three pumps ran)
Center Rd out:   18.0 MG
Donaldson:            MG
```

The Henderson Road pumping station has been in service since 2006. The new pumping station pumps between 3 and 6 MGD into Genesee County's North Loop and reduces the demand off the Center Road pump station.

The Center Road South (CRS) pump station has been in service since 2007. The CRS station pumps water to the eastern portion of Grand Blanc Township and to the Vassar Road station.

The WWSD modified their monthly operation report in 2008 to include average day and max day pumpage from each of the major pumping stations as a result of their SCADA system improvements. Pumpage data from each pump station since 2008 is displayed as follows:

| 2008 | Avg Day | Max Day |
|---|---|---|
| Total Flow: | 13.4 MGD | MGD |
| Henderson Rd: | 5.19 MGD | 7.07 MGD |
| Center Rd North: | 6.83 MGD | 10.54 MGD |
| Center Rd South: | 0.74 MGD | 10.07 MGD |
| Noble Street: | 0.28 MGD | 1.07 MGD |
| Houran Street | 0.00 MGD | 0.00 MGD * |
| Donaldson Rd | 0.00 MGD | 0.00 MGD |

| 2009 | Avg Day | Max Day |
|---|---|---|
| Total Flow: | 12.6 MGD | MGD |
| Henderson Rd: | 3.44 MGD | 6.91 MGD |
| Center Rd North: | 4.66 MGD | 7.00 MGD |
| Center Rd South: | 1.77 MGD | 5.38 MGD |
| Noble Street: | 0.29 MGD | 0.79 MGD |
| Houran Street | 0.00 MGD | 0.00 MGD * |
| Donaldson Rd | 0.00 MGD | 0.00 MGD |

2010

| | Avg Day | Max Day |
|---|---|---|
| Total Flow: | 12.6 MGD | MGD |
| Henderson Rd: | 3.14 MGD | 7.37 MGD |
| Center Rd North: | 3.83 MGD | 6.19 MGD |
| Center Rd South: | 2.46 MGD | 5.83 MGD |
| Noble Street: | 0.38 MGD | 1.13 MGD |
| Houran Street | 0.00 MGD | 0.00 MGD * |
| Donaldson Rd | 0.00 MGD | 0.00 MGD |

\*  The Houran Street station pumps water; however, the station is not metered thus no flow was shown in the pumpage data. Flow through this station is estimated by accounting pump run time with the approximate capacity each pump(s) that is(are) operated.

Pumpage obtained from the SCADA system and reported in the monthly reports is slightly less than the purchased water reported in the annual pumpage report. This is attributed to a portion of the county's customer base being provided water upstream of the Center Road pumping station (direct connections to the 30-inch transmission main).

## WATER SYSTEM STORAGE

| | Location:<br>Maple &<br>Center Rd<br>North | Location:<br>Houran St<br>& Beecher | Location:<br>Beecher Rd |
|---|---|---|---|
| Volume | 5.0 MG | Two 2.0 MG | 1.0 MG |
| +Type | Ground | St.Ground | Elevated |
| O.F. Elevation | 38.0 ft | 778.5 Ft | 930Ft USGS |
| Date Constructed | 1988 | 1970 | 1970 |
| Date Inspected | 2007 | 2005 | 2005 |
| Date Painted Inside | concrete | 2005 | 1996 |
| Paint System | | | 3 coat exp |
| Date Painted Outside | | 2005 | 1996 |
| Cathodic Protection | | Yes 1992 | No |
| High Alarm | Yes | Yes | Yes |
| Low Alarm | Yes | Yes | Yes |
| +Type | SCADA | SCADA | SCADA |

Page   7

| | Location: Noble St | Location: Orgould AV & Pierson | Location: Clio   Rd |
|---|---|---|---|
| Volume | 4.0 MG | 0.50 MG | 1.0 MG |
| +Type | Standpipe | St. ground | Composite |
| O.F. Elevation | 930ft | 793ft | 930ft USGS |
| Date Constructed | 1968 | ? | 1982 |
| Date Inspected | 2011 | ? | 2011 |
| Date Painted Inside | 2000 | 1982 | 1999 |
| Paint System | 3 coat epxy | ? | 3 coat epxy |
| Date Painted Outside | 2000 | | 1999 |
| Cathodic Protection | Yes 1991 | | no |
| High Alarm | Yes | out of ser | Yes |
| Low Alarm | Yes | out of ser | Yes |
| +Type | SCADA | out of ser | SCADA |

| | Location: McKinley Rd ARTP | Location: Clio Plaza | Location: Pierson Rd & Elms Rd |
|---|---|---|---|
| Volume | 0.5 MG | 0.10 MG | 0.5 MG |
| +Type | Elevated | Elevated | Ground |
| O.F. Elevation | 784ft | 855ft | 770ft |
| Date Constructed | 1975 | 1974 | ? |
| Date Inspected | 2010 -warr | 2009 | ? |
| Date Painted Inside | 1994 | 1974 | |
| Paint System | 3 coat exp | ? | |
| Date Painted Outside | 2009 | 1974 | |
| Cathodic Protection | Yes | ? | |
| High Alarm | Yes | No | out of ser |
| Low Alarm | Yes | No | out of ser |
| +Type | SCADA | Chart Rec | out of ser |

| | Location: Center Rd South | Location: Vassar Rd | Location: Henderson Rd |
|---|---|---|---|
| Volume | 6.3 MG | 1.0  MG | 2-10.0 MG |
| +Type | Ground | Ground | Ground |
| O.F. Elevation | | | |
| Date Constructed | 2005 | 2003 | 2004 |
| Date Inspected | 2006 | 2003 | 2004 |
| Date Painted Inside | NA | NA | NA |
| Paint System | Concrete | Concrete | Concrete |
| Date Painted Outside | NA | NA | NA |
| Cathodic Protection | NA | NA | NA |
| High Alarm | Yes | Yes | Yes |
| Low Alarm | Yes | Yes | Yes |
| +Type | SCADA | SCADA | SCADA |

Location:
Houran St

| | |
|---|---|
| Volume | 2.0 MG |
| +Type | Elevated/Composite |
| O.F. Elevation | |
| Date Constructed | 2006 |
| Date Inspected | 2006 |
| Date Painted Inside | NA |
| Paint System | 3 coat ep |
| Date Painted Outside | 2006 |
| High Alarm | Yes |
| Low Alarm | Yes |
| +Type | SCADA |

Total Usable Storage            46,400,000 gallons        46.4  mil. gal.

Total Usable Storage/Max Day    168.7  %

Total Usable Storage/Avg Day    331.4 %

Comments:

The Clio Plaza tank is not monitored on the county's SCADA system, instead its status is noted on a chart recorder and the chart is changed on a weekly basis. Repairs to the tank's roof were completed in 2010 and the tank remains in service. Genesee County has determined that they own the Clio Plaza tank.

The Orgould Avenue tank and the ground storage tank at Pierson and Elms Road remain out of service.

The CRN ground storage tank was inspected in 2007 by Dixon and the tank was found to be in good condition. Some minor access hatch repair was recommended.

An adequate air-gap has been provided on the CRS ground storage tank between the terminus of the tank overflow and top of the catch basin drain's impoundment.

The 2-Mgal hydro-pillar at Houran Street houses repair equipment and a portable stand-by power generator at its base. The water level in the tank is controlled by an altitude valve located at its base.  This tank will be due for a routine inspection within the next few years.

The altitude valves at each of the Henderson Road ground storage tanks were replaced with pressure/flow control valves.  The new valves along with the SCADA system upgrades monitor and control flow to each tank.

The Clio Road and Noble Street tanks were recently inspected.  Both tanks were in good structural condition.  The Clio Road tank's exterior and dry interior; however, needs to be repainted.

## Distribution

**Pumping Station**   Center Road North (CRN) Booster Pump Station

Location: Center Road and Maple Avenue

Function: Boosts pressures to SW portion of the service area

| Pump number | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Year installed | 1990 | 1990 | 1990 | 1990 |
| +Type | Hor Centr | Hor Centr | Hor Centr | Hor Centr |
| Permit Capacity | 6.7 MGD | 6.7 MGD | 6.7 MGD | 6.7 MGD |
| Permit TDH | | | | |
| Current Capacity | 8.5 MGD | 8.5 MGD | 8.5 MGD | 8.5 MGD |
| +Basis | est. | est. | est. | est. |
| Current TDH | 211 ft | 211 ft | 211 ft | 211 ft |
| HP | 350 | 350 | 350 | 350 |
| Last Complete Inspection | 2007 | 2004 | 2004 | 2004 |
| Last Efficiency Test | ? | ? | ? | ? |

Comments:

The CRN station's main purpose is to pump water to west Grand Blanc Twp and to locations further west in Genesee County (930 Ft press. district).  A new pump station (Center Road South – CRS) was recently constructed and WWSD staff continues to determine the most efficient mode of operation between both Center Road pumping stations.  Pumpage from each station changes from summer to winter.

The permit capacity of each pump  at CRN was 6.7 MGD, however, these pumps are capable of pumping approximately 8.5 – 9.0 MGD.  Pumps #1 and #2 are controlled by a variable frequency drive (VFD). Pumps #3 and #4 are constant speed pumps.

Pump #1 or pump #2 operate constantly and are controlled by the water level in the Saginaw Street elevated tank in Grand Blanc Township. WWSD's SCADA system can switch the control point for the CRN station to the elevated tank at Beecher Road. Pumps #3 and #4 serve as back-up pumps for the CRN station.

Pumpage from CRN has decreased with the commissioning of the Henderson Road and the Center Road South (CRS) pump stations.

2002-2005:

Work was completed on upgrading the switch gear for Pumps #3 and #4. An automatic transfer switch was also installed and has improved the reliability of secondary power source at this location.  The gas chlorine feed system was replaced with a Accu-Tab Series 30000 tablet feeder by PPG. The system's maximum delivery is 1 PPM chlorine at 21 MGD. The minimum delivery is 0.5 PPM at 15 MGD. The chlorine feed system was provided for emergency use only.

2005-2011:

New VFDs were installed on pumps #1 and #2 in 2008. Also, Pump #1 was re-built in 2007 and included replacement of the pump bearings, volute, motor bindings, etc.

## Auxiliary Power

| | |
|---|---|
| +Power Type | 2nd Substation, Stand-by Power Co. Generator |
| +Fuel Type | NA |
| Capacity | NA |
| Starting Frequency | NA |
| Load Testing Frequency | NA |

Total Pump Capacity  34.0    mgd

Firm Pump Capacity  25.5    mgd

Aux. Power Capacity  ?    mgd

Max Day Demand This Location  10.5* mgd

Avg Day Demand This Location  5.1* mgd

Firm Pump Capacity/Max Day  >100 *%

Aux Power Capacity/Avg Day  *

Comments:

*   Water demands on CRN has decreased further with increasing use of the CRS
    station.  The Henderson Road pump station and North Loop also continues to
    provide water to the western portion of the county with an average pumping rate
    between 3 and 6 MGD.

    Water pumpage data specific to each pump station is available since early 2008
    with the recent SCADA system upgrades.  Pumpage has varied from station to
    station during this time as the role of operation between each station is
    adjusted in order to increase the efficiency of operation.


## Pumping Station   Noble Street Booster Pump Station

### Location: South end of Noble Street, Flint Township

### Function: Allows for full use of the 4.0 MGAL Standpipe

| Pump number | 1 | 2 |
|---|---|---|
| Year installed | 2001 | 2001 |
| +Type | Hor Centr | Hor Centr |
| Permit Capacity | 1.0 MGD | 1.0 MGD |
| Permit TDH | 140 FT | 140 FT |
| Current Capacity | 1.08 MGD | 1.08 MGD |
| +Basis | est. | est. |
| Current TDH | | |
| HP | 40 | 40 |
| Last Complete Inspection | 2011* | 2011* |
| Last Efficiency Test | 2001 | 2001 |

Comments:

The Noble Street pumping station was constructed in 2001 and allows for full use of the adjacent 4.0 MGAL standpipe. The pump station increases the hydraulic grade line to the Beecher Road tank and reduces the peak demands.  A flow-control valve is used to control the flow into and from the standpipe.

The pumps and appurtenances are greased and maintained several times per year. The pumps and appurtenances appear to be in good condition and overall housekeeping is acceptable.

* The Noble Street standpipe was inspected by Dixon in 2011 and components of the pump station (piping, pump/motor) were visually inspected and found to be in good condition.

Total Pump Capacity  2.16    mgd

Firm Pump Capacity  1.08     mgd

Aux. Power Capacity  NA     mgd

Max Day Demand This Location   1.13  mgd  (2010)

Avg Day Demand This Location   0.32 mgd

Firm Pump Capacity/Max Day    96%

Aux Power Capacity/Avg Day    NA

Comments:

The SCADA system continues to provide average and max day pumpage data from this pump station.  Some of the existing SCADA components are being replaced with newer equipment.


## Pumping Station    Houran Street Pumping Station

### Location: Houran Street near Beecher Road

Function:  This station operates as a peaking facility during high demand periods.

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Pump number | 1 | 2 | 3 | 4 | 5 |
| Year installed | 1970 | 1970 | 1970 | 1970 | 1970 |
| +Type | Hor Centr | Hor Centr | Hor Centr | Hor Centr | Hor Centr |
| Permit Capacity | 3.0 MGD | 2.0 MGD | 2.0 MGD | 3.0 MGD | 3.0 MGD |
| Current Capacity | 3.0 MGD | 2.0 MGD | 2.0 MGD | 3.0 MGD | 3.0 MGD |
| +Basis | est. | est. | est. | est. | est. |
| Current TDH | 200 ft | 225 ft | 225 ft | 225 ft | 225 ft |
| HP | 125 | 125 | 125 | 150 | 150 |
| Complete Insp. | 2004 | 2004 | 2004 | 2004 | 2004 |
| Last Efficiency Test | ? | ? | ? | ? | ? |

Comments:

The Houran Street station's main mode of operation is to pump from the existing ground storage storage tanks to the new 2-Mgal elevated tank. The elevated tank basically "floats" on the system. This mode of operation utilizes Pumps 3-5 and is controlled manually from the SCADA system. The station can also pump water directly to the distribution system through Pumps 1-2. Water can also be obtained through the Donaldson Road pit from the city of Flint; however, this connection is not routinely used. The station can also provide the city of Flint an emergency supply of water through the Donaldson Road connection.

During low demand periods, water re-fills the ground storage reservoirs immediately upstream of the station through a 12-inch main from the county. The station, including the ground storage reservoirs, are typically taken out of service during the winter months.

Overall housekeeping at this facility remains acceptable. All five pumps are maintained including routine greasing of the pump and motor bearings. Security cameras have been provided at the pump station.


Auxiliary Power   None

Total Pump Capacity   13.0    mgd

Firm Pump Capacity   10.0    mgd

Max Day Demand This Location    ___mgd   VARIES

Avg Day Demand This Location    ___mgd   VARIES   (approximately 3.0 MGD)

Firm Pump Capacity/Max Day    ? %

Aux Power Capacity/Avg Day    ? %


## Pumping Station   Henderson Road Booster Pump Station

### Location: Henderson Road

### Function: Boosts pressures to feed North Loop

| Pump number | 1 | 2 | 3 |
|---|---|---|---|
| Year installed | 2004 | 2004 | 2004 |
| +Type | Hor Centr | Hor Centr | Hor Centr |
| Permit Capacity | 8.0 MGD | 8.0 MGD | 14.0 MGD |
| Permit TDH | 255 ft | 255 ft | 255 ft |
| Current Capacity | 8.0 MGD | 8.0 MGD | 14.0 MGD |
| +Basis | | | |
| Current TDH | 255 ft | 255 ft | 255 ft |
| HP | 500 | 500 | 800 |
| Last Complete Inspection | | | |
| Last Efficiency Test | | | |

Comments:

The Henderson Road pumping station was constructed in 2004 and has been in operation since April 2006. The station's average day pumpage has ranged between 3 and 6 MGD. Pumps #1 and #2 are equipped with a VFD.

The station has operated on only one pump to maintain system demand. It has not been necessary to operate the larger pump.

Auxiliary Power

| | |
|---|---|
| ÷Power Type | 1000 kW minimum rating engine generator |
| ÷Fuel Type | #2 Diesel |
| Capacity | Sized for 24 HR operation of engine under full load |
| Starting Frequency | weekly, auto switch-over upon power loss |
| Load Testing Frequency | 1/yr |

The auxiliary power generator ran under load for several hours in 2010 during an interruption in electrical power.

| | | |
|---|---|---|
| Total Pump Capacity | 30.0 | mgd |
| Firm Pump Capacity | 16.0 | mgd |
| Aux. Power Capacity | ? | mgd |
| Max Day Demand This Location | 7.40 mgd | (2010) |
| Avg Day Demand This Location | 3.9 mgd | |
| Firm Pump Capacity/Max Day | >100% | |
| Aux Power Capacity/Avg Day | >100% | |

Comments:

The Henderson Road pumping station is equipped with gas chlorination for emergency use only.  The feed system consists of two-150 pound cylinders on a direct read scale, two Wallace and Tierman vacuum operated solution feed pumps with a maximum capacity of 500 pounds per day, and a vacuum regulator with automatic switch-over. Additional application points are provided at the reservoir inlets.  A Wallace & Tierman two point chlorine gas leak detector and gas sensor with a sensitivity to 1.0 part per billion is provided.

An automatic chlorine residual analyzer monitors chlorine residual on the discharge side of the pump station at all times.

WWSD staff should consider operating the emergency chlorination system several times per year to verify that the equipment operates properly and that WWSD staff maintain familiarity with the operating procedure.

## Pumping Station   Vassar Road Booster Pump Station

### Location: Vassar Road, Grand Blanc Township

### Function: Provides additional flows and pressure in SE GBL Twp.

| Pump number | 1 | 2 | 3 |
|---|---|---|---|
| Year installed | 2001 | 2001 | 2005 |
| ÷Type | Hor Centr | Hor Centr | Hor Centr |
| Permit Capacity | 1.4 MGD | 0.7 MGD | 1.4 MGD |
| Permit TDH | 275 ft | 275 ft | 275 ft |

Page 14

| | | | |
|---|---|---|---|
| Current Capacity | 1.4 MGD | 0.7 MGD | 1.4 MGD |
| +Basis | est. | est. | est. |
| Current TDH | | | |
| HP | 125 | 125 | 125 |
| Last Complete Inspection | New in 01 | New in 01 | New in 05 |
| Last Efficiency Test | 2001 | 2001 | 2005 |

Comments:

The Vassar Road pumping station was constructed in 2002.  This station pumps water from the Vassar Road ground storage tank located adjacent to the pump station to the Baldwin Road elevated tank (1,125 Ft press district). The station has improved flows and pressure to the SE portion of Grand Blanc Township.  The water level in the tank is controlled by an altitude valve and flow from the station is controlled by a flow control valve and an upstream pressure sustaining valve. A third pump was added to the station in 2005. All three pumps are VFD controlled. Security cameras were recently installed.

Total Pump Capacity  3.5    mgd

Firm Pump Capacity  2.1    mgd

Aux. Power Capacity  NA    mgd

Max Day Demand This Location   NA  mgd

Avg Day Demand This Location   NA  mgd

Firm Pump Capacity/Max Day   NA

Aux Power Capacity/Avg Day   NA

Comments:   A portable stand-by power generator is provided and consists of a 206 KVA trailer mounted generator that utilizes diesel fuel.  The generator has automatic switch-over and lightning surge protection.  The generator starts automatically on a weekly basis under no load.

## Pumping Station   Center Road South (CRS) Booster Pump Station

### Location: Center Road and Maple Avenue

### Function: Boosts pressures to east portion of Grand Blanc Twp

| Pump number | 1 | 2 | 3 |
|---|---|---|---|
| Year installed | 2006 | 2006 | 2006 |
| +Type | Hor Centr | Hor Centr | Hor Centr |
| Permit Capacity | 6.0 MGD | 6.0 MGD | 6.0 MGD |
| Permit TDH | | | |
| Current Capacity | 6.0 MGD | 6.0 MGD | 6.0 MGD |
| +Basis | est. | est. | est. |
| Current TDH | | | |
| HP | 400 | 400 | 400 |
| Last Complete Inspection | 2006 | 2006 | 2006 |
| Last Efficiency Test | 2006 | 2006 | 2006 |

14

Comments:

The current capacity of each pump is approximately 6.0 MGD.  The combined capacity
of the station with 2 pumps operating is approximately 11 MGD. All three pumps are
VFD controlled.

The CRS station pumps water from the adjacent 6.3 MGAL ground storage tank and
distributes it the eastern portion of Grand Blanc Township - Saginaw tank (970 Ft
press. district). The ground storage tank is equipped with an altitude valve to
control the tank level. A flow control valve is also provided in order to control
the upstream pressure in the 30-inch transmission main along Center Road. System
status is monitored and controlled at the WWSD administrative office via WWSD's
SCADA system.

The station is fenced and security cameras are provided.

Auxiliary Power

| | |
|---|---|
| +Power Type | 1040 KW on-site generator |
| +Fuel Type | Diesel |
| Capacity | Operates 2 pumps |
| Starting Frequency | 1/week under load |
| Load Testing Frequency | weekly |

Total Pump Capacity  17.0   mgd

Firm Pump Capacity  11.0   mgd

Aux. Power Capacity  11.0   mgd

Max Day Demand This Location   10.1 mgd (2008)

Avg Day Demand This Location   1.66 mgd

Firm Pump Capacity/Max Day   >100 %

Aux Power Capacity/Avg Day   >100 %

The most recent ADD has increased to between 2 and 3 MGD as WWSD staff continue to
balance the usage between this station and the CRN station.  The MDD in 2009 and
2010 ranged between 5 and 6 MGD.

## Pumping Station   Orgould Avenue Pumping

### Location: Orgould Avenue north of Pierson Road

### Function: None

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Pump number | | | | |
| Year installed | 1974 | 1974 | 1974 | 1974 |
| +Type | Hor Centr | Hor Centr | Hor Centr | Hor Centr |
| Permit Capacity | | | | |
| Permit TDH | | | | |
| Current Capacity | 1050 gpm | 1050 gpm | 1000 | 1000 gpm |
| +Basis | est. | est. | est. | est. |
| Current TDH | 200 ft | 200 ft | 200 ft | 200 ft |
| HP | 100 | 100 | 100 | 100 |
| Last Complete Insp. | NA | NA | NA | NA |

Page 16

Last Efficiency Test        NA        NA        NA        NA

Comments:

This pumping station remains out of service and there are no plans to bring this
facility back into operation.  All of the pumps are electrically locked out and
the dead piping between the station and the discharge piping to the distribution
system was cut and plugged.


## Pumping Station    Clio Booster Pumping Station

### Location: Clio Road north of Coldwater Road

### Function:  None

| Pump number | 1 | 2 |
|---|---|---|
| Year installed | 1984 | 1984 |
| +Type | Hor Centr | Hor Centr |
| Permit Capacity | | |
| Permit TDH | | |
| Current Capacity | 600 gpm | 600 gpm |
| +Basis | est. | est. |
| Current TDH | 92 ft | 92 ft |
| HP | 20 | 20 |
| Last Complete Insp. | Not Rec. | Not Rec. |
| Last Efficiency Test | Not Rec. | Not Rec. |

Comments:

This pumping station remains out of service and there are no plans to bring this
facility back into operation.  Both pumps are electrically locked out and the dead
piping between the station and the active part of the distribution system was cut
and plugged.


## Pumping Station    Van Slyke Booster Pumping Station

### Location: Van Slyke Road north of Bristol Road

### Function:  None

| Pump number | 1 | 2 |
|---|---|---|
| Year installed | 1984 | 1984 |
| +Type | Hor Centr | Hor Centr |
| Permit Capacity | | |
| Permit TDH | | |
| Current Capacity | 600 gpm | 600 gpm |
| +Basis | est. | est. |
| Current TDH | 92 ft | 92 ft |
| HP | 30 | 30 |
| Last Complete Insp. | Not Rec. | Not Rec. |
| Last Efficiency Test | Not Rec | Not Rec. |

Comments:

This pumping station remains out of service and there are no plans to bring this facility back into operation.  The pumps have been electrically locked out. System pressures can be monitored from this location.


**Pumping Station**    City of Flushing Pumping Station

Location: NE int. of Pierson & Elms Rds.


Function: PRV and metering station for city of Flushing

| | 1 | 2 |
|---|---|---|
| Pump number | | |
| Year installed | ? | ? |
| +Type | Hor Centr | Hor Centr |
| Permit Capacity | | |
| Permit TDH | | |
| Current Capacity | 700 gpm | 1050 gpm |
| +Basis | est. | est. |
| Current TDH | ? ft | ? ft |
| HP | 40 | 50 |
| Last Complete Insp. | Not rec. | Not rec. |
| Last Efficiency Test | Not rec. | Not rec. |

Comments:

This pumping station originally took suction from the adjacent 0.5 Mgal reservoir and was designed to fill the city of Flushing's elevated tank. The facility was modified when Center Road went on line and now acts as a pressure reducing station. One of three original pumps was removed and replaced with a pressure reducing valve that serves the city of Flushing. The existing pumps are electrically locked out.  Power is supplied to the building for lighting and heat.


**Interconnections with Other Supplies**

Is water purchased from other supplies? Yes

If yes, list WSSN number/s:    #2310

| Location | Main Size | Est. Cap. | Metered? |
|---|---|---|---|
| Henderson Rd.** | 36-inch | 30.0 MGD | Yes |
| S. Genesee Pit** | 30-inch | 16.5 MGD | Yes |
| Oak & Potter** | 12-inch | 8.15 MGD | 10-inch |
| Irish & Potter** | 20-inch | 4.46 MGD | 6-inch |
| Belsay & Potter** | 12-inch | 4.46 MGD | 6-inch |
| M-15 & Potter** | 12-inch | 8.15 MGD | 10-inch |
| N. Genesee Pit ** | 12-inch | Not used | 10-inch |
| Francis Rd. | 12-inch | | 2-way |
| Donaldson St* | 12-inch | * | Yes |
| Pierson & Clio | Not used | Not used | Na |
| Carpenter Rd | Not used | Not used | Na |

Comments:

* Capacity varies on pressure available from Flint and whether the pit is
  open.

** Direct connection to the Flint 72-inch main upstream of the city of Flint.

The connections upstream of the City of Flint are directly off Flint's 72-inch
supply line. Genesee County pays Flint $125,000 plus the current Detroit rate each
month to purchase water. The estimated capacity of each connection is based on a
Detroit line pressure of 90 psi at the south Genesee pit and 55 psi at the
Henderson Road pit.

Water can also be served to the county through Flint's distribution system from
Donaldson Street through the Houran St. Pumping Station. Genesee County no longer
uses this connection for routine service.  This connection could be used in a
water system emergency.


Total Flow into the Genesee County water system =  Henderson Rd
                                                 + S. Genesee Pit
                                                 + Irish & Potter
                                                 + Belsay & Potter
                                                 + M-15 & Potter
                                                 + Oak & Potter


The majority of flow into Genesee County is through the Henderson Rd pit and the
South Genesee pit.  Four other metered connections off the 72-inch transmission
main along Potter Road provide water service to portions of Davison Township, the
City of Burton, and Richfield Township.

Flow through the Francis Road pit is sold to Genesee Township and is not a direct
connection off the 72-inch transmission main (constitutes a portion of the
Henderson Rd flow).

Are there areas where fire flows cannot be maintained? <u>See comment</u>

Comment:   Less than 1000 gpm fire flow was noted in an existing subdivision in Mundy Twp in vicinity of Linden and Hill Road (Church of God extension). The problem was identified as a partially closed valve at the subdivision entrance.

Which, if any, of the above listed areas has the supply prioritized for main replacement, upgrading or looping?  Also, if a definite schedule for capital improvement has been established, list the proposed completion date.

| Location | Est. Completion Date |
|---|---|
| Bristol Rd. - completed | Completed |
| Linden Rd. - coor. with local twp. | Not completed |
| Pierson Rd. - coor. with local twp. | Not completed |
| Elms & Lennon looping project | Completed |
| Lennon & Dye Rd | Completed |

## General Distribution System Comments:

Consoer Townsend Evirodyne Engineers (CTE) completed the North Loop – Phase III study in 2000 along with a water master plan. Since 2000, the North Loop transmission main project was completed along with completion of the Henderson Road, CRS pumping station, and the Southeast Loop.

The study was updated in 2005 and the updated report is noted as "**Appendix C Update of Final Report North Loop - Phase III Study**". Given the number of projects that were completed since 2000, the update was performed to reflect current water system conditions and to identify additional future needs. The 2005 update evaluated alternatives to supply Grand Blanc Township via the new CRS pumping station. The CRN pumping station would be dedicated to supply the service areas further west into the county. The update also identified other major projects including: the Southeast loop, Thompson Road corridor, and the Coldwater Road transmission main.

The hydraulic model used in the 2005 study was updated in 2011 to revise pressure district boundaries as needed  The model also evaluated the need for further pressure reducing valves and additional water system improvements. An updated water system Master Plan was prepared; however, a discussion (conclusions/recommendations) based on the updated model has not been provided. A new water system study and master plan is expected to be performed in 2015.

Several of the existing meter pits between Genesee County and the City of Flint including Orgould Ave, Clio Rd, and VanSlyke Rd, have been decommissioned. The meter pits along with the pumping, storage facilities have been electrically locked out, and the majority of dead piping eliminated at the facilities. These facilities should be razed if there are no long term plans to re-utilize them.

The county continues to charge its retail customers $35.00 per hydrant to maintain the appurtenance and to conduct routine flushing. Flint Township and Flushing Township  continue to flush and winterize hydrants in order to avoid the $35.00 charge per hydrant.  These activities are conducted by the local fire department within each township. The WWSD continues to review hydrant operation each year with each fire department.  Finally, the WWSD staff complete any hydrant repairs.

Page 21

## Distribution Appurtenances

### Hydrants

Number of hydrants 3,875
Number without auxiliary shut-off valves    *
Number that are self-draining    *
Number of inoperable hydrants    *

* An exact number of inoperable hydrants cannot be ascertained since this number changes on a weekly basis. WWSD staff repair broken hydrants upon discovery (typ 1-2 per week).  WWSD staff obtains authorization from the two townships that maintain their own hydrants prior to completing any repairs.  Hydrant inspections are completed each fall and work orders are prepared and completed on any inoperable hydrants that are discovered.

Frequency of hydrant inspection:     1/yr (fall)

Inspection staff: WWSD operators

Are there areas where additional hydrants are needed?  No

Hydrant location system? Yes        Accurate?   Yes

Are hydrants color-coded for capacity? Yes, by main size

Has this information been provided to the fire department?    Yes

Frequency and seasons of hydrant flushing?  1/yr  Fall

Purpose of flushing?     aesthetics, hydrant operation

Is the public notified prior to flushing?   No

Does flushing follow a specific format?    Completed by township

Is the volume of water used during flushing estimated? Starting, est of 150cu.ft/hyd

Is a record maintained of hydrant activities? Yes

Comments:

The WWSD maintains a list of hydrant information. The list provides information for each hydrant including: location, color coding, winterizing,  work order information, etc.  Hydrant records are also maintained in a work-order database by attaching completed work orders as a layer in WWSD's GIS records. Also, all auxiliary shut-off valves are depicted by exact location and stored in a 3-ring binder.

The number of hydrants and valves noted in the 2011 WSR is less than the number depicted in the 2008 WSR. WWSD staff confirmed that the 2008 count was incorrect since it included some of the hydrants and valves from the wholesale customers.

### Valves  (excluding hydrant shut-offs)

21

Page 22

Number of valves  3,903
Number of inoperable valves    repaired or replaced as soon as possible

Are there areas where additional valves are needed?    Yes

  • Irish Rd north of Davison

Valve location system?  Yes, valve log          Accurate?    Yes

Valve Turning Frequencies:  See comments

Records maintained? Yes

Comments:

The WWSD has made some progress towards initiating a valve turning program. Valves along the South Loop transmission line (31 valves) have been exercised. Valve exercising is also performed on valves located at or near water system projects. Valve exercising is also prioritized in areas experiencing more frequent watermain breaks.

A valve log book is also in place that contains valve records. Valve locations are depicted by witness points and are entered into the work-order database. All valve records are also entered into GIS.

## Customer and Service Information

Number of service connections  20,739 retail accounts
                                44,943 total accounts(retail & wholesale)

Number of metered service connections same

Identify service line materials and estimate percentages:

| Copper | 100% |
|--------|------|
| PVC | None |
| Gal | None |
| Lead | None |

**Meter Change-Out Status:**

Approximately 95% of the existing compound meters were replaced with new turbine meters at all industrial and mobile home park accounts. A testing program remains in place for these new meters.  The testing program is contracted out to a third party (Jim Taylor of Rio-MI Meter).

A small residential area is metered by older Neptune meters that will need to be changed out. The WWSD does not have a change-out program in place for residential accounts. Residential meters are replaced on an "as needed" basis.

22

WWSD has instituted a pilot radio read program and has upgraded to radio read technology for large customers. The WWSD continues to encourage its retail customers to upgrade to radio read technology for commercial and residential accounts; however this is has not proceeded. The WWSD continues to promote this upgrade with the individual townships since the county wishes to switch from quarterly to monthly billing.

<u>Pumpage Distribution</u>

| | |
|---|---|
| % Residential | <u>75%</u> |
| % Industrial & Commercial | <u>25%</u> |

**<u>System Growth</u> - Number of customers**

| | <u>Wholesale</u> | <u>Retail</u> | <u>Total</u> |
|---|---|---|---|
| 1998 – | 18,584 | 13,270 | 31,584 |
| 2003 – | 21,609 | 17,265 | 38,874 |
| 2005 – | 23,263 | 18,881 | 42,144 |
| 2006 – | 24,889 | 20,092 | 44,981 |
| 2007 – | 24,726 | 20,621 | 45,347 |
| 2008 – | TBD | TBD | TBD |
| 2009 – | TBD | TBD | TBD |
| 2010 – | TBD | TBD | TBD |

# PROGRAMS AND PLANS

## Cross Connection Program

Ordinance No. 73-1               Date   03/01/73

Approved Program?  Yes  Date   07/19/73

Staff assigned to program Hydro-Design, Inc (HDI)

Is Annual Cross Connection Report required? Yes

Was previous year's annual report received? Yes        Date   2/18/11

Was previous year's annual report acceptable? Yes

Inspection Status: Satisfactory

Device Testing Frequency: Adequate

Record Keeping: Inspection forms are in place for each account

Comments:

HDI continues to perform the routine inspections for Genesee County and has maintained adequate implementation of their cross connection control program (CCCP).    HDI identified 3400 low hazard accounts in 2010 and determined that approximately 680 of these accounts need to be reinspected on an annual basis.   80 high hazard inspections were required in 2010 and 92 inspections were completed. HDI met all re-inspection requirements during the 2008-2010 time period.

Device testing is also being verified as required (approx. 1200 testable devices). Dave Cardinal is the operator from HDI who is responsible for implementing Genesee County's CCCP. Genesee County continues to contract with HDI for CCCP implementation.

## Annual Pumpage Reports

Is Annual Pumpage Report required?   Yes

Was previous year's annual report received? Yes        Date   4/01/2011

Comments:

The annual pumpage report is based on the county's total water purchased from the city of Flint. This amount is slightly higher than the total pumpage obtained from SCADA (compiled in the MOR) since a portion of the county's service area is upstream of the Center Road pump station and this usage is not metered through any of the pumping stations.

## Monthly Operation Reports

Are Monthly Operation Reports required?   Yes

Genesee County's monthly operation report (MOR) format was revised in 2008 to include pumpage data from each of the main pumping stations and storage facilities. Bacteriological sample results and chlorine residuals are also included in the report.

Pumpage data from the Vassar Road and Fenton Road pump stations are not included in the MOR.  Pumpage data from each of these stations would further help in determining the distribution of water demand in the southeast portion of Genesee County's service area.

## Contingency Plan   Emergency Response Plan (ERP)

Date of most recent plan  2008        Acceptable?  ERP needed

Filed where?  GCDC *

Comments:

Genesee County's water system contingency plan was updated in 2008.

* Genesee County's most recent water system contingency plan (2008 update) is available only at the WWSD's administrative office due to security purposes. The 2008 plan contains all of essential elements required in a water system contingency plan and meets our requirements for use in the event of typical water related emergencies including; large main breaks, pump station failures, loss of water service (limited areas), power outages, contamination, etc. The 2008 plan; however, needs to be updated into an Emergency Response Plan.

The WWSD; however, has yet to fully address the issue of reliability in the event of a significant failure of the 72-inch transmission main. Genesee County continues to pursue their goal of achieving long term reliability through establishment of the Karegnondi Water Authority (Lapeer County, city of Flint). The authority continues to work with Lapeer and Genesee County communities towards committing to the construction a new water treatment plant with raw water piping from Lake Huron.

Completion of the Karegnondi project (3-5 years out) is an acceptable long-term solution for reliability; however, Genesee County has not fully resolved their short-term solution for source reliability.  Two short-term options include utilizing Flint's stand-by WTP for emergency stand-by service or establishing a system of back-up wells.

Our most recent discussion indicates that Genesee County working with the city of Flint towards utilizing Flint's stand-by WTP for short-term reliability. The county has proposed an amendment to their water service contract with Flint to purchase 5.4 MGD of water from the Flint WTP during an emergency.  Details concerning the conveyance of the emergency supply of water from Flint to the county's transmission system are not identified in the proposed contract amendment.

## General Plan

Date of most recent plan  2007  Acceptable?  Yes

Filed where? MDEQ & GCDC

Comments:
A copy of Genesee County's transmission main plan (2007 update) has been provided
to the MDEQ. The transmission main plan shows the size and location of all 12-inch
transmission mains and larger, pumping stations, storage facilities, meter pits,
and pressure districts. Genesee County also maintains updated distribution system
records in GIS. Smaller areas of the distribution system including hydrants,
valves, and watermains can be printed from GIS for daily use as needed.

## Reliability Study

Date of most recent study  2011  Acceptable? See comment

Filed where? MDEQ & GCDC

Comments:

Genesee County utilized CTE to prepare the North Loop-Phase III study and to make
subsequent updates. The original study conducted in 2000 was updated in 2005 and
was noted as the addendum or "Appendix C of the North Loop-Phase III Study". The
addendum constitutes an acceptable update to Genesee County's water system
reliability study.

The hydraulic model used in the 2005 study was updated in 2011 to revise pressure
district boundaries as needed. The model also evaluated the need for further
pressure reducing valves and transmission system improvements. An updated Master
Plan (map), based upon the revised model, was provided to us. A discussion
(conclusion/recommendations) needs to be provided with the updated Master Plan. A
new water system study and master plan is expected to be conducted in 2015.

## Bacteriological Sample Site Plan

Date of approved plan  2/15/2008

Are samples still being collected in accordance with the plan?  Yes

Comments:

The WWSD completed the most recent revision to the sample site plan in February
2008. WWSD's retail service area population remains above 70,500 thus, a minimum
of 80 samples need to be collected from the distribution system on a monthly
basis. WWSD's most recent sample site plan reflects the updated minimum monitoring
requirement.

## Lead & Copper Program

The WWSD continues to implement their lead and copper program adequately. Both
action levels were met in all of the applicable rounds of lead and copper
monitoring with the most recent round of monitoring being completed during the
summer of 2011. The next round of samples will need to be collected during 2014
and will include 14 samples for lead and copper. Water quality parameter
monitoring also needs to continue every six months.

## Conclusions and Recommendations

In general, our survey covers the major aspects of a water supply including: stand-by facilities, distribution, source capacity, and storage. Each of the above categories is evaluated on the basis of adequacy, maintenance, reliability, and operation. The evaluation also includes a check on the status of operator certification and the cross connection control program. Finally, water quality and the utility's monitoring programs are reviewed.

Our evaluation reveals that the Genesee County Water System continues to maintain an overall **"SATISFACTORY"** rating. Genesee County continues to maintain a proactive operation and maintenance program as well as continuing with capital improvements. Progress; however, remains slow in establishing adequate source reliability. The county's water system remains **"MARGINAL"** in regard to source reliability and continues to be vulnerable to an interruption in supply. Additional comments are included in the Contingency Plan/Source Reliability section.

As noted above, since the 2008 survey further water system improvements have been completed and/or are proceeding and include:

- Installed the Fenton Road transmission main
- Replaced deteriorated piping along Florine Avenue.
- Completed water system SCADA improvements.

These issues along with other topics including existing facilities, reliability, operation, and maintenance are discussed below in more detail:

### Water System Viability

The Genesee County Drain Commissioner, Division of Waste and Water Services (WWS) currently serve a population of nearly 153,000 through a countywide network of transmission and distribution mains. Additional booster pumping stations and storage facilities have been provided to enhance service. The WWS currently utilizes 23 full-time certified employees for water utility operations. The operator in charge (OIC), Tim Davidek, holds an S-1 license and plays an active role in distribution system operation and maintenance, thus, WWS complies with the operator certification requirement. Also, as part of compliance with the operator certification requirement, Richard Bysko, remains the designated back-up operator.

WWS continues to promote operator certification. Many of the operators have obtained either their S-3 or S-4 licenses and some are pursuing an S-2 license. WWS continues to

require new employees to obtain distribution certification to be eligible for further advancement. WWS continues to maintain the safety and training officer position to assist and promote an adequate level of operator certification. Certified operators help to protect the County's investment in the water system and to meet the requirements of the Safe Drinking Water Act and we encourage the County to continue to promote operator certification.

## Cross Connection Control

Hydro-Design, Inc. (HDI) continues to implement WWS's Cross Connection Control Program (CCCP). Approximately 3500 accounts remain eligible for a routine inspection and this number has held steady since 2008.

Previous site visits with HDI and WWS staff continue to show that adequate cross connection control records are in place and device testing is being verified. Also, our review and discussion of WWS's most recent cross connection reports confirms adequate implementation of the program.

Finally, WWS continues to maintain a contract for service with HDI. We continue to support WWS's commitment towards maintaining an adequate CCCP.

## System Storage

WWS currently has 13 storage facilities available providing approximately 46 million gallons of storage.

The existing Center Road North (CRN) 5 MGAL ground storage tank was inspected by Dixon Engineers, Inc. in 2007 and the tank was found to be in good condition. Minor repairs to the access hatch repair were recommended.

Next, our inspection of the Center Road South (CRS) ground level storage tank revealed that the cross connection between the tank overflow and the sewer catch basin has been corrected. The elevation of the tank overflow opening was increased above the catch basin's containment wall such that an adequate air-gap was achieved.

Next, the Clio Road elevated tank and the Noble Street standpipe were recently inspected. Based upon the inspection reports, the Noble Street tank is in good condition. The Clio Road tank was in good structural condition; however, the tank's exterior and dry interior need to be repainted. We recommend that WWS proceed with this work

Finally, the 2-Mgal hyro-pillar at Houran Street will be due for a routine inspection within the next several years.

## Pumping Stations

WWS has ten booster pumping stations available for use. Six of these stations (CRN, CRS, Henderson Road, Houran Street, Vassar Road, and Noble Street) are operated on a routine basis. The remaining stations, Orgould, Clio, Van Slyke, and City of Flushing are either out of service or function as a pressure reducing/monitoring station.

The Henderson Road pump station has been in operation since 2006 and the station pumps between 3 and 6 MGD of water from the 72-inch transmission main through the County's new North Loop. The station has effectively reduced the demand on the Center Road pump station and the amount of water that needs to be pumped through the County's south system.

Next, the CRS pump station has been in operation since 2007 and was designed to provide additional capacity and pressure to the eastern portion of Grand Blanc Township. The CRN station continues to provide adequate flows and pressure to the western portion of Grand Blanc Township and to locations further west in Genesee County. The most recent monthly operation reports show that the CRS station's use has been increasing (currently pumping between 2.0 and 3.0 MGD).

WWS continues to refine the mode of operation between the CRN and CRS stations to determining the most efficient operation. It would also be worthwhile to record water pumped through the Vassar Road and Fenton Road (Grand Blanc Township) since these stations and their associated storage facilities also play a role in the level of service to southern Genesee County. This information can be added to the monthly operation report.

Next, based upon our inspection, preventative maintenance activities and overall housekeeping is adequate at all of the pump stations. Based upon our discussion, additional improvements are currently underway with the SCADA system at each of the pumping stations.

Finally, WWS staff should consider operating the emergency chlorination equipment (gas chlorination at Henderson Road and erosion feeder at CRN) several times per year to verify that the equipment operates properly. This practice will also allow WWS staff to maintain familiarity with the chemical feed equipment and its operating procedure.

## Transmission/Distribution

Genesee County's water system consists of an extensive county-wide network of transmission and distribution system piping. The majority of this piping is relatively new and is in good condition. Since the 2008 survey, the Fenton Road transmission main was installed and a section of deteriorated piping along Florine Avenue was replaced. There are other areas of existing cast-iron mains which have not been replaced and have had a history of more frequent main breaks. Specific areas are listed below:

1. Dalton Subdivision
2. Portions of Pierson and Linden Roads

It is our understanding that replacement of the watermains in Dalton Subdivision will be completed as part of a future Drinking Water Revolving Loan Fund project. Although the remaining areas do not represent a significant percentage of the system, plans should be made to replace these mains as part of the County's master plan or a capital improvements program.

Next, Genesee County's hydraulic model (from the North Loop Study) was updated in 2011. An updated water system Master Plan, based upon the updated model, was prepared and an electronic copy of the plan was provided to us. A general discussion (conclusions & recommendations); however, was not provided with the master plan. An overall discussion that supports the updated master plan needs to be prepared and a copy sent to our office for review.

Finally, it is our understanding that WWS intends to prepare a new water system study and master plan in 2015. We concur with the timing of this objective since the county's water system reliability study will need to be updated at that time. Finally, we encourage the county to works towards completing the projects that are listed in the master plan.

### Operation/Maintenance (O&M)

WWS continues to maintain an active O&M program. The status of specific O&M programs are discussed in more detail below:

### Hydrants/Flushing

WWS maintains approximately 3,900 hydrants. This is a decrease in the total number depicted in the 2008 survey (4,700 hydrants). The revised number of hydrants is based on records obtained from WWS's hydrant recordkeeping system (GPS records). The previous quantity was based upon an estimated number of hydrants and it also included some of the wholesale customer's hydrants.

A total number of inoperable hydrants could not be ascertained; however, hydrants are inspected each fall and any inoperable hydrants are repaired or replaced. Hydrant records including; location, color codes, and operational and maintenance history appear to be adequate and these records are maintained in a work-order database.

Next, retail customers continue to pay WWS a $35.00 charge per hydrant on an annual basis for routine maintenance and flushing. Flint and Flushing Townships however, continue to operate and maintain hydrants within their jurisdiction in order to reduce their O&M costs to the County. The township's O&M responsibilities include flushing and

winterizing hydrants and these activities are performed by the local fire departments. WWS continues to provide annual training for fire department staff on hydrant operation and maintenance. WWS needs to continue this type of on-going training as it appears to have improved hydrant operation and maintenance within these townships.

## Valves

WWS maintains approximately 3900 valves. This is a decrease in the total number depicted in the 2008 survey (5,074 valves). The revised number of valvess is based on records obtained from WWS's valve recordkeeping system (GPS records). The previous quantity was based upon an estimated number of valves and it also included some of the wholesale customer's valves

WWS continues to maintain adequate valve records and also continues to work towards establishing a valve-turning program. Transmission main valves along the south loop were exercised since 2008. Valves are also being exercised at and near watermain projects and in areas where main breaks occur. WWS needs to continue working at expanding the valve turning program to include operating valves in critical locations at least once every several years. A review of all valves should be performed and a determination made as to which valves are most critical and the percentage of these valves that can be exercised each year.

## Program Meter Change-Out

WWS has maintained an active meter change-out program for commercial and industrial accounts. Residential meters are replaced on an "as needed" basis, however, only a small percentage of customers (one subdivision) has older meters in need of replacement. We encourage WWS to maintain an active meter change-out program and to replace remaining meters that have reached the end of their useful service life.

WWS has upgraded to radio read technology for most of its large customers; however, expansion of radio read to commercial and residential customers has not proceeded. We encourage WWS to continue to promote the upgrade to radio read technology among its retail customers.

## Monthly Operation Reports (MORs)

WWS continues to report water use through each of its major pumping stations. Chlorine residual monitoring and bacteriological monitoring results are also included in the report. Water usage through the Vassar Road and Fenton Road pumping station should be added to the MOR.

Finally, a discrepancy was noted between water usage depicted in the MOR verses water usage summarized in the annual pumpage report. The total amount of water purchased

reported in the annual pumpage report is slightly higher than the total pumpage obtained from SCADA (reported in the MOR). The discrepancy is due to a portion of the county's service area being upstream of the Center Road pump station. This portion of the county's purchased water is not metered through the SCADA system.

## Bacteriological Monitoring

WWS continues to maintain an excellent sampling history as part of their monthly bacteriological monitoring program. Specifically, eleven samples are collected twice a week from eleven routine sampling locations in accordance to the sample site plan that was revised earlier in 2008. This sampling protocol results in 88 to 110 samples being collected each month and was based on collecting a minimum of 80 samples per month.

The minimum number of required distribution system samples will remain at 80 samples per month. The monitoring requirement is based on a retail service area population of approximately 70,500.

## Emergency Response Plan/Source Reliability

WWS updated their water system contingency plan in 2008 and, for security purposes, the plan is retained at the administrative office. Our review shows that the plan contains all of the critical elements that we require in a water system contingency plan. Although the county's updated contingency plan meets our requirements for use in the event of a water-related emergency, a recent revision to the Administrative Rules of the Michigan Safe Drinking Water Act now requires an Emergency Response Plan (ERP) in place of the contingency plan. The ERP provides an outline to follow in the event of a water related emergency (loss of pressure, contamination, etc.). The ERP is similar to a water system contingency plan; however, the ERP calls for discussion of various types of water utility operational plans that may be utilized during a water related emergency. An ERP template is enclosed and can be used for preparing Genesee County's ERP. We will review the completed ERP during our next routine surveillance visit.

Next, WWS continues to pursue a long-term solution for reliability in the event of a failure of the 72-inch transmission main through establishment of the Karegnondi Water Authority. The authority continues to work with Genesee and Lapeer county communities towards committing to the construction of a new water treatment plant utilizing Lake Huron as its source.

Completion of the Karegnondi project (3 to 5 years out) will provide Genesee County with adequate source reliability; however, Genesee County has not fully resolved their short-term solution for source reliability. Two short-term options include utilizing the city of Flint's stand-by WTP for emergency stand-by operation or establishing a system of back-up wells.

It is our understanding that Genesee County has a proposed amendment (4th Amendment

to 1973 City/County Water Supply Agreement), pending Flint approval, to purchase 5.4 million gallons per day of stand-by capacity from the Flint WTP under emergency conditions. However, there is no further discussion as to how this emergency supply of water will be conveyed to the Genesee County North Transmission system. It is our understanding that additional pumping provisions will be needed. Please confirm this in writing and provide us with an update concerning the proposal. If a contract for stand-by service is established with the city of Flint, please provide us with a schedule in which the plan for stand-by service can be implemented.

### General Plan

Genesee County's water system general plan was updated in 2007. The updated plan shows the location of county's transmission mains (12-inches and larger), pump stations, storage facilites, meter pits, and pressure districts. Smaller areas of the distribution system including hydrants and valves are stored in the county's GIS and are available for use as needed. The transmission system plan along with the electronic records of the distribution piping and appurtenances meet our requirements for having an acceptable water system general plan.

### Lead & Copper Program

WWS has conducted its Lead and Copper program since 1992 and has completed the most recent round of monitoring (June 1, 2011 through September 30, 2011). The next set of 14 samples needs to be collected between June 1, 2014 and September 30, 2014.

The total number of lead and copper monitoring samples (based on triennial monitoring) remains at 14 samples for each round of monitoring. Water quality parameter monitoring (pH, alkalinity, temperature, and phosphate residual) also remains at two sets of samples from six distribution system sites every six months.

### Closing Remarks

The following is a list of items discussed in this report which must be addressed by the County. No priority is implied by the order. Page references are in parentheses.

As always, we are available to meet with you to discuss these concerns and their priority in more detail.

1. Establish adequate stand-by water service for Genesee County. (25,32)

2. Maintain a prioritized valve turning program.    (22,31)

3. Change out any remaining outdated meters and investigate the possibility of upgrading

to radio read technology. (22,23,31)

4. Upgrade areas of distribution system that are in poor condition.   (19,20,29,30)

5. Conduct a new water system study and master plan by 2015.  (20, 30)

6. Schedule the Clio Road tank for repainting.   (8, 28)

7. Operate the stand-by chlorination equipment at the Henderson Road and CRN pump stations several times per year.  (13, 29)

# APPENDIX   B-8

**GENESEE COUNTY WATER SUPPLY SYSTEM RATES FOR SERVICE FOR WATER BILLS RENDERED ON AND AFTER JANUARY 2, 2014**

GENESEE COUNTY WATER SUPPLY SYSTEM
RATES FOR SERVICE FOR WATER BILLS RENDERED
ON AND AFTER JANUARY 2, 2014
************************************************************

The rates to be charged for water furnished by the System shall be as hereinafter set forth.  Water to be furnished by the System shall be measured by a meter or equivalent meters, installed and controlled by the County.  Charges for water service will be made for water furnished based upon monthly, bimonthly, and quarterly billings as set forth herein.

**I.      RATES BASED ON SUMMATION OF INDIVIDUAL METER READINGS (MONTHLY CHARGES)**

| Meter Size - Inches | Readiness to Serve Charge | Irrigation Meters | |
|---|---|---|---|
| 5/8 | $ 14.59 | | $14.59 |
| 3/4 | $ 21.89 | ¾ or larger | $21.89 |
| 1 | $ 36.48 | | |
| 1-1/2 | $ 72.95 | | |
| 2 | $ 116.72 | | |
| 3 | $ 218.85 | | |
| 4 | $ 364.75 | | |
| 6 | $ 729.50 | | |
| 8 | $ 1,167.20 | | |
| 10 | $ 1,750.80 | | |
| 12 | $ 3,136.85 | | |

(Irrigation meters are an automatic charge May 1 through October 31 or any quarter that usage is recorded)  Rate becomes effective on date signed.

**I. A.  Indirect Rates**

| Meter Size - Inches | Readiness to Serve Charge | Irrigation Meters | |
|---|---|---|---|
| 5/8 | $ 13.53 | | $13.53 |
| 3/4 | $ 20.30 | ¾ or larger | $20.30 |
| 1 | $ 33.83 | | |
| 1-1/2 | $ 67.65 | | |
| 2 | $ 108.24 | | |
| 3 | $ 202.95 | | |
| 4 | $ 338.25 | | |
| 6 | $ 676.50 | | |
| 8 | $ 1,082.40 | | |

**II.     RATES BASED ON MASTER METER READINGS**

A.     MONTHLY

| Equivalent Meters | Readiness to Serve Charge @ $89.67 / eq. meter |
|---|---|
| 25 | $ 2,241.75 |
| 50 | $ 4,483.50 |
| 80 | $ 7,173.60 |
| 120 | $ 10,760.40 |
| 165 | $ 14,795.55 |
| 215 | $ 19,279.05 |
| 320 | $ 28,694.40 |

The number of equivalent meters is based on the peak monthly flow from the prior calendar year. An equivalent meter size will be determined based on the peak monthly flow being 75% of the meter capacity. The meter capacity and number of capacity equivalent meters will be based on current AWWA standards. The meter size and number of equivalent meters will be based on standard meter sizes, with a minimum of 25 equivalent meters.

**III.    COMMODITY CHARGES** (applies to both Individual and Master Meters):
The total commodity charge is $3.94 per 100 cubic feet.  This sum is the total of $1.86 per 100 cu.ft. plus the DWSD commodity charge ,which is charged via the City of Flint and is currently estimated at $2.08 per 100 cu. ft.

**IV.    QUARTERLY RATES** (applies to Individual Meters):
Multiply readiness to serve charge by three.

**V.     WATER STATION RATES**
The commodity charge for watering is $4.71 per 100 cubic feet (0.25 per 40 gallons).  No Readiness to Serve charge.  Accounts shall be billed monthly.

**VI.    HYDRANT METER RATES**
The commodity charge is $4.71 per 100 cubic feet.  No Readiness to Serve charge.  Accounts shall be billed within 30 days of use.

GENESEE COUNTY WATER SUPPLY SYSTEM
RATES FOR SERVICE FOR WATER BILLS RENDERED
ON AND AFTER JANUARY 2, 2014
**************************************************************

**VII.** **COUNTY CAPITAL IMPROVEMENT FEE**
    The County will charge a Capital Improvement Fee of $1,000 per unit based upon the Residential Equivalent Units prior to the
    issuance of a Water Permit (B-Permit).  The County Agency shall collect the fee.

**VIII.** **CITY OF FLINT FRANCHISE RATES**
    The County will add $1.00 per month to the amount the City of Flint bills the franchise customers for each $^5/_8$-inch meter
    equivalence plus $0.10 per each 100 cubic feet of volume used.

The rates are established pursuant to Act 342 Michigan Public Acts of 1939 as amended.

Jeffrey Wright, Drain Commissioner, as County Agency under the provisions of Act 342, Michigan Public Acts of 1939, as amended.

Dated: AUG 4th 2013

JEFFREY WRIGHT
Genesee County Drain Commissioner, the County Agency

# APPENDIX  C

**CITY OF FLINT, MICHIGAN**

# APPENDIX   C-1

### FLINT WATER SYSTEM
### (SUMMARY FROM EXISTING INFRASTRUCTURE REPORT, DLZ AND HOUSEAL LAVIGNE)

**Appendix C-1 Flint Water System**
**(Summary from Existing Infrastructure Report, DLZ, and Houseal Lavigne)**

The Cedar Street Pump Facility is equipped with three single-stage horizontal centrifugal pumps rated at 12 mgd, 9 mgd, and 9 mgd, respectively. There is no standby power provided to this pumping station. These pumps were installed in 1948 and are primarily used as an emergency water supply and pumping source during peak demand events as they have exceeded their design life and are in need of rehabilitation. The pumping capacity of this station is 30 mgd with a normal running capacity of 18 mgd. The pumping station electrical controls have not been updated since their original installation in 1948. This station requires significant upgrades to bring the station up to current automatic operation standards and should be considered in addition to regular maintenance. [2]

Pump Station No. 4 is located at the Dort Reservoir on the WTP grounds, and contains a total of five pumps. Pumps 1 and 2 were installed in 1949 and are considered inoperable with no repair or replacement plans. In 1994, the station was rehabilitated with the addition of two new 20 mgd turbine pumps and one 6 mgd turbine pump to induce turn-over of the Dort Reservoir. The pumping capacity of this station is 46 mgd with a normal running capacity of 26 mgd. [2]

The West Side Pump Station is equipped with two three-stage turbine pumps and two two-stage turbine pumps, all installed in 1970. Pumps 1 and 2 have a capacity of 8 mgd each, and pumps 3 and 4 each have a 4 mgd capacity. The pumping capacity of this station is 24 mgd with a normal running capacity of 16 mgd. The pumping operations and filling of the reservoir are controlled by the WTP or manually at the station. There is no standby power provided to this pumping station. [2]

Constructed in 1954, the Torrey Road Pumping Station is equipped with two centrifugal pumps rated at 2.8 mgd and 4 mgd. The pumping capacity of this station is 6.8 mgd with a normal running capacity of 2.8 mgd. The primary function of the station is an in-line booster pumping station to provide increased pressure to the southwest portion of the City. There is no standby power provided to this pumping station. The existing pumps have exceeded their useful life and the piping and valves are in poor condition. The station has been scheduled for rehabilitation and other improvements. [2]

Dort Reservoir is located at the WTP and is a 20-million gallon (MG) ground storage facility. Constructed in 1966, it is used primarily for emergency water storage and for use during peak water demand periods. [2]

Constructed in 1952, the storage tank located at the WTP is a 2.0 MG elevated tank primarily used for emergency water storage and as a pressure buffer. The tank was last inspected and painted in 2009. [2]

Constructed in 1954, the WTP has a 3.0 MG ground storage tank primarily used as an emergency water supply and pumping source during peak demand events. [2]

The Cedar Street Reservoir is a 20 MG ground storage facility. Constructed in 1948, the reservoir is primarily used as an emergency water supply and pumping source during peak demand events. [2]

The West Side Reservoir is a 12 MG ground storage facility. Constructed in 1970, the reservoir is primarily used as an emergency water supply and pumping source during peak demand events. [2]

# APPENDIX   C-2

**FLINT WATER SYSTEM**
**HISTORICAL CUSTOMERS AND COMPONENTS**

Jones & Henry Engineers, Ltd.

Fluid thinking.™

**Appendix C-2**
**Flint Water Supply System[1]**

|  | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| Customers Billed [1] | 40,191 | 38,977 | 37,437 | 35,833 | 32,702 |
| Total Purchased (ccf) [2] | 13,696,461 | 11,943,961 | 13,108,730 | 11,926,868 | 11,897,969 |
| Total Billed (Flint and GCDC-WWS) |  | 10,027,390 | 10,140,906 | 9,649,847 | 9,470,315 |
| Water Mains (miles) [1] | 540 | 540 | 540 | 540 | 540 |
| Fire Hydrants [1] | 5,200 | 5,200 | 5,200 | 5,200 | 5,200 |
| Storage Capacity (gallons) [1] | 57,000,000 | 57,000,000 | 57,000,000 | 57,000,000 | 57,000,000 |
| Population | 112,857 | 111,475 | 102,434 | 101,558 | 101,515 |

[1] Flint Annual Audits

[2] Howard Croft, City of Flint

# APPENDIX   C-3

FLINT WATER RATES - POST DWSD

Jones & Henry Engineers, Ltd.                                    Fluid thinking.™

# Appendix C-3

### Flint Water Rates – Post DWSD

- Analysis started with annual audit revenue and expenses. Audit reflects July 1 to June 30 fiscal year.

- Genesee County charges (revenues) were identified and removed starting in July 2014.

- Between 2009 and 2013, the cost of water purchased from DWSD per ccf increased an average of 11.4 percent annually.

- Water usage by customers has been decreasing, but trend appears to be reducing and estimated usage is assumed to stabilize at 3,345,000 ccf annually, beginning in 2014.

- Delinquency Rate is expected to remain the same.

- The City is assuming non-revenue water will be reduced by 10 percent per year through planned programs. No adjustments have been made in this analysis to reflect this potential change, but it could increase revenue and reduce expenses.

- It is assumed that Flint will start operation of their WTP with river water in April 2014 and will start using KWA water supply on July 1, 2016.

- KWA is expected to start operating July 1, 2016.

- Adjustments to Expenses

  o Removed DWSD purchases starting in April 2014.

  o Projected expenses for 2014 to 2018

    ▪ Salaries 3 percent annually

    ▪ Utilities 9 percent annually

    ▪ All others 2 percent annually

  o Added KWA O&M (43.6 percent of Total)

| Fiscal Year | Flint |
|---|---|
| 2017 | $1,015,264 |
| 2018 | $1,090,106 |

Jones & Henry Engineers, Ltd.                                    Fluid thinking.™

○    If the expected reduction in non-revenue water occurs, it will reduce KWA charges. A 10 percent reduction in non-revenue water is 3.1 percent of total water purchased, but since only chemical and energy cost savings for KWA is anticipated (61 percent of total operating costs), operating cost would go down only 1.9 percent. Capital cost would not go down.

○    Added $1,762,580 in FY 2014;  $7,050,319 in FYs 2015 and 2016;  $7,584,319 in FY 2017;  and $7,808,582 in FY 2018 to operating expenses of WTP, based on City projections.

○    City has established a CIP and anticipates the following annual expenditures:

- FY 2014        $8,500,000
- FY 2015        $10,500,000
- FY 2016        $9,500,000
- FY 2017        $6,000,000
- FY 2018        $6,500,000

This includes capital improvements required at the WTP plus commencing infrastructure reinvestment in the distribution system, and developing a reserve and equipment replacement fund.

○    KWA Purchase (Capital)

- $383,333 per unit x 18 units = $6,900,000 per year starting July 2016. Prior to that it will be 10 percent of the annual amount.

• Debt service was added:  $2,747,946 in FY 2014;  $2,742,821 in FY 2015;  $2,746,423 in FY 2016;  $2,748,446 in FY 2017;  and $2,744,008 in FY 2018. The last debt service payment will be in 2024. The balance at the end of FY 2013 is $23,378,511.

• A transfer to the General Fund which represents a return on equity to the City of $1,130,000 annually was added for FY 2014 through FY 2018 based on City projections. The annual audits for Flint also had $1,130,000 for FY 2011 through FY 2013.

• Rates – Current rates became effective July 1, 2012.

|  | Current |
|---|---|
| Minimum through | $21.776 per EM |
| Commodity (35 ccf) | $7.518 per 100 cubic feet |

• Typical Bills for residential unit and commercial unit:

| Meter Size | Commodity | Monthly Bill |
|---|---|---|
| 5/8-inch | 1,000 cubic feet | $96.96 |
| 1-inch | 2,052 cubic feet | $209.55 |

## APPENDIX   C-4

FLINT WATER DIVISION REVENUES AND EXPENSES

Jones & Henry Engineers, Ltd.

Fluid thinking.™

| | FY2011 | FY2012 | FY2013 | % Change | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 |
|---|---|---|---|---|---|---|---|---|---|
| **Appendix C-4** | | | | | | | | | |
| **Revenues and Expenses** | | | | | | | | | |
| **Flint Water Supply Division** | | | | | | | | | |
| **Operating Revenue** | | | | | | | | | |
| In-City Receipts From Customers | $24,682,954 [1] | $30,596,488 [2] | $34,663,435 [1] | | $34,663,435 [9] | $34,663,435 | $34,663,435 [9] | $34,663,435 [9] | $34,663,435 |
| Genesee County-Commodity | $9,019,685 [2] | $8,206,688 [2] | $7,601,857 [2] | | $6,351,352 [10] | $0 | $0 | $0 | $0 |
| Genesee County-Surcharge | $1,404,648 [2] | $1,349,676 [2] | $1,368,000 [2] | | $1,026,000 [11] | $0 | $0 | $0 | $0 |
| Genesee County-DWSD RTS | $1,093,872 [2] | $2,499,061 [2] | $3,987,480 [2] | | $3,331,540 [10] | $0 | $0 | $0 | $0 |
| Other miscellaneous revenue | $14,830 [3] | $3,761 [3] | $23,041 [3] | | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 |
| Total Estimated Revenue | $36,215,989 | $42,655,674 | $47,643,813 | | $45,385,327 | $34,676,435 | $34,676,435 | $34,676,435 | $34,676,435 |
| **Operating Expenses** | | | | | | | | | |
| DWSD Purchases | $20,919,987 [3] | $21,251,448 [3] | $23,308,800 [3] | 11.4% | $19,357,539 [8,5] | $0 | $0 | $0 | $0 |
| Salaries, wages and fringe benefits | $12,043,462 [3] | $9,613,902 [3] | $10,599,599 [3] | 3% | $10,917,587 | $11,245,115 | $11,582,468 | $11,929,942 | $12,287,840 |
| Utilities | $732,787 [3] | $658,425 [3] | $691,373 [3] | 9% | $753,597 | $821,420 | $895,348 | $975,929 | $1,063,763 |
| Equipment operation | $398,404 [3] | $616,356 [3] | $628,541 [3] | 2% | $641,112 | $653,934 | $667,013 | $680,353 | $693,960 |
| Repair and maintenance | $437,370 [3] | $609,858 [3] | $220,696 [3] | 2% | $225,110 | $229,612 | $234,204 | $238,888 | $243,666 |
| Supplies | $680,635 [3] | $978,916 [3] | $934,097 [3] | 2% | $952,779 | $971,835 | $991,271 | $1,011,097 | $1,031,319 |
| Professional services | $700,728 [3] | $981,440 [3] | $605,606 [3] | 2% | $617,718 | $630,072 | $642,674 | $655,527 | $668,638 |
| Administrative costs | $1,132,511 [3] | $1,215,447 [3] | $0 [3] | | $0 | $0 | $0 | $0 | $0 |
| Miscellaneous costs | $924,319 [3] | $926,460 [3] | $749,641 [3] | 2% | $764,634 | $779,926 | $795,525 | $811,436 | $827,664 |
| Operating WTP | $0 | $0 | $0 | | $1,762,580 [4] | $7,050,319 [4] | $7,050,319 [4] | $7,584,319 [4] | $7,808,582 [4] |
| KWA Capital Cost (Bond, 30%)[7] | $0 | $0 | $0 | | $690,000 | $690,000 | $690,000 | $6,900,000 | $6,900,000 |
| KWA Operating Cost [6] | $0 | $0 | $0 | | $0 | $0 | $974,768 | $1,055,760 | $1,124,451 |
| CIP Financing[4] | $0 | $0 | | | $8,500,000 | $10,500,000 | $9,500,000 | $6,000,000 | $6,500,000 |
| Debt Service[4] | | | | | $2,747,946 | $2,742,821 | $2,746,423 | $2,748,446 | $2,744,008 |
| Transfer to General Fund | $1,130,000 [3] | $1,130,000 [3] | $1,130,000 [3] | | $1,130,000 [3] | $1,130,000 [4] | $1,130,000 [4] | $1,130,000 [4] | $1,130,000 [4] |
| Total operating expenses | $39,100,203 | $37,982,252 | $38,868,353 | | $49,060,601 | $37,445,055 | $37,900,013 | $41,721,697 | $43,023,891 |
| Annual Reserve | ($2,884,214) | $4,673,422 | $8,775,460 | | ($3,675,274) | ($2,768,620) | ($3,223,578) | ($7,045,262) | ($8,347,456) |

[1] Total from annual audits for Receipts From Customers and Users, less Genesee County charges
[2] Genesee County rate studies by Jones & Henry Engineers
[3] Flint annual audits
[4] Provided by City of Flint, March 6, 2014 (one-fourth in FY2014)
[5] Flint to begin treating river water April 1, 2014.
[6] Jones & Henry calculation
[7] Estimate of $383,333 per unit ($23,000,000/60 units), 18 units for Flint
[8] Cost per ccf of purchases from DWSD between 2009-2013 increased by an average of 11.4% annually. This will be the factor that will be used to estimate DWSD purchases in 2014 (9 months)
[9] Based on 2013 revenue levels without taking into account future rate increases
[10] FY2013 expense plus 11.4% increase times 75% (to adjust to coincide with April 1, 2014 GCDC-WWS supply from DWSD)
[11] FY2013 expense times 75% (to adjust to coincide with April 1, 2014 GCDC-WWS supply from DWSD)

# APPENDIX   C-5

### FLINT WATER SYSTEM NEEDS AND PROJECTS
### (SUMMARY FROM EXISTING INFRASTRUCTURE REPORT,
### DLZ AND HOUSEAL LAVIGNE)

**Appendix C-5 Flint Water System Needs and Projects**
**(Summary from Existing Infrastructure Report, DLZ and Houseal Lavigne)**

The City does experience problems with a number of existing valves; long-term needs for the system include replacement of existing valves over the next 20 years. The estimated cost for valve replacement is approximately $2,000,000.

The City of Flint's conveyance system consists of water distribution and transmission main ranging in size from 4-inch to 72-inch diameter. The majority of the existing piping is constructed of cast iron or ductile iron pipe up to 24-inch in diameter and exceeds 70 years old. Transmission mains over 24-inch diameter are constructed primarily of steel piping. A significant amount of 4-inch water main is over 70 years old, is prone to breaks, and is unable to provide modern pressures and fire flows. The distribution and transmission system are "old and in serious need of replacement" according to the Water Reliability Study. A six-year Capital Improvement Program was developed by the City's Utilities Department and addresses the below-ground infrastructure issues and a long-term 20-year plan. [2]

The City of Flint's distribution system currently has 3,931 gate valves and 3,327 gate well valves. Critical valves are 16-inch and larger on a primary transmission main that could result in shutting down a significant part of the City in the event of a break. A preliminary evaluation indicated that there are 1,398 critical valves in the system. Subcritical valves are 12-inch valves on minor transmission mains, the failure of which could result in a shutdown of a residential area. There are 1,398 subcritical valves. Normal valves are smaller than 12-inch and the failure of a normal valve would impact a small residential area. There are 4,462 normal valves in the system. Currently the City is operating under a reactionary valve maintenance plan; however, the City has plans to move to a preventative maintenance and replacement operation that includes operating and maintaining 700 critical valves, 280 subcritical valves, and 450 normal valves annually. The Water Reliability Study recommended $500,000 in valve replacements be done annually.

The City of Flint has 3,605 hydrants in the current water distribution system, many of which are in excess of 50 years old. In 2010, the City purchased 80 hydrants to begin replacing old hydrants. The City has plans to analyze and replace hydrants that exceed 50 years of age; over the next 20 years the City plans to create a system that will assess and regularly replace hydrants that reach 25 years of age. The Water Reliability Study recommended $250,000 in hydrant replacements be done annually. [2]

A major problem exists with the efficiency of the water system. According to the Water Reliability Study, the City is operating its water system with 68 percent efficiency, meaning that 32 percent of the water that the City buys from DWSD is not paid for by users of the system. The Water Reliability Study stated that water utilities typically operate at 85 to 90 percent efficiency. Increasing efficiency to 85 percent would result in an increase in revenue of $1.5-2.0 million annually. There are several likely explanations for the unaccounted water (loss of efficiency):

- Water withdrawn from a fire hydrant

- Leaks and water main breaks

- Faulty or inaccurate meters

- Unauthorized connections

- Unmetered municipal water use

Given the low efficiency of the City's water system, it is most likely that there is a combination of significant leaks within the system, inaccurate meters, and/or illegal connections. It was recommended in the Water Reliability Study that a high priority should be placed on increasing the water systems' efficiency. This includes testing high volume meters, performing a detailed leak detection study, residential meter replacement, billing system review, and reviewing fire flow estimates. [2]

The exact location, condition, and age of each water line in the City are unknown. [2]

In order to provide finished water to its customers, Flint expects to use an existing water treatment plant, which is currently operating in a back-up role with a capacity of 36 mgd. Flint will be required to make an estimated $8,000,000 in improvements to convert the plant from stand-by to fully operational.

Currently, Flint and Genesee County receive treated water from DWSD. In 2012, Flint and Genesee County combined for a total payment to DWSD of approximately $25,000,000 in both fixed fee and commodity charges for an average water cost of $22.72 per 1,000 cubic feet of water.

The Flint Water Reliability Study includes a number of recommendations that have not been implemented for financial reasons. These improvements include replacement of over 59,000 LFT of major transmission water main (larger than 12-inch), over 5,500 LFT of 6-inch minor transmission water main, and replacement of 3,000 water meters each year. Funding for these improvements to the system is needed to reduce waste and improve efficiency. In addition, the other recommendations for valve and hydrant replacement are in need of funding. Prioritization of funding for the above improvements, as well as for smaller service line replacement, will need to consider redevelopment considerations included in the Master Plan.

# APPENDIX   C-6

WATER RATES AND CHARGES FOR FLINT

Jones & Henry Engineers, Ltd.

Fluid thinking.™

| Appendix C-6 Schedule of Water Rates & Charges for Flint | | |
|---|---|---|
| **Metered Water** | **Rates for Bills Due After July 1, 2012** | |
| Rates per 100 cubic feet (ccf) | Inside City Rate | Outside City Rate |
| Through 35 ccf | 7.518 | 11.259 |
| Next 1,965 ccf | 7.310 | 10.765 |
| Over 2,000 ccf | 5.792 | 8.677 |
| | | |
| **Water Monthly Service Charges** | | |
| Remote Metered Monthly Charge | **Rates for Bills Due After July 1, 2012** | |
| Meter Size | Inside City Rate | Outside City Rate |
| 5/8 inch | 21.776 | 32.483 |
| 3/4 inch | 41.861 | 62.706 |
| 1 inch | 55.283 | 82.792 |
| 1-1/2 inch | 55.283 | 82.792 |
| 2 inch | 55.283 | 82.792 |
| **Non-Remote Metered Monthly Charge** | **Rates for Bills Due After July 1, 2012** | |
| Meter Size | Inside City Rate | Outside City Rate |
| 5/8 inch | 26.332 | 39.678 |
| 3/4 inch | 46.664 | 69.976 |
| 1 inch | 59.952 | 90.062 |
| 1-1/2 inch | 59.952 | 90.062 |
| 2 inch | 59.952 | 90.062 |
| **Commercial & Industrial Month Charge** | **Rates for Bills Due After July 1, 2012** | |
| Meter Size | Inside City Rate | Outside City Rate |
| 5/8 inch | 53.385 | 80.134 |
| 3/4 inch | 61.263 | 91.715 |
| 1 inch | 75.103 | 112.673 |
| 1-1/2 inch | 107.756 | 161.785 |
| 2 inch | 150.622 | 226.086 |
| 3 inch | 297.488 | 448.469 |
| 4 inch | 523.495 | 785.366 |
| 6 inch | 1,029.429 | 1,543.867 |
| 8 inch | 1,492.875 | 2,239.473 |
| 10 inch | 2,060.754 | 3,107.476 |
| 12 inch | 2,493.124 | 3,739.505 |
| 16 inch | 3,102.636 | 4,653.867 |
| 20 inch | 3,351.183 | 5,463.817 |

[This Page Intentionally Left Blank]

Mixed Sources
Product group from well managed
forests, controlled sources and
recycled wood or fibre.

Printed by: ImageMaster, LLC
www.imagemaster.com

Exhibit 3 to Exhibit B

December Execution Copy

## THREE PARTY AGREEMENT

This Three Party Agreement ("Agreement") between Karegnondi Water Authority, a municipal authority and public body corporate organized pursuant the provisions of Act 233, Public Acts of Michigan, 1955, as amended, whose address is 4610 Beecher Road, Flint, Michigan 48532, Great Lakes Water Authority, a municipal authority and public body corporate organized pursuant to Act 233, Public Acts of Michigan, 1955, as amended, whose address is 735 Randolph Street, Detroit, Michigan 48226, and the City of Flint, a Michigan municipal corporation, whose address is 1101 South Saginaw Street, Flint, Michigan 48502, effective as of December 1, 2017.

## RECITALS

**WHEREAS,** in 1964, Detroit and Flint entered into an agreement, as amended, whereby Detroit provided Flint with treated water ("1964 Agreement"). The 1964 Agreement allowed Flint to resell Detroit water to other communities in Genesee County;

**WHEREAS,** in 2010, Flint along with the Counties of Genesee, Lapeer, and Sanilac and the City of Lapeer, formed KWA to, among other things, supply raw water to its Members;

**WHEREAS,** Flint entered into a Raw Water Supply Contract with KWA. In the Raw Water Supply Contract Flint purchased and agreed to finance the construction cost of 18 MGD of capacity in the KWA System. Flint's rights included the right to up to 18 MGD of raw water capacity, delivery of that raw water and its use;

**WHEREAS,** on August 1, 2013, Flint, executed a Financing Contract with KWA and Genesee County in which Flint pledged its full faith and credit to pay for its pro-rata share of the estimated cost of the construction of the KWA System; the construction cost was not to exceed Three Hundred Million Dollars ($300,000,000). Flint's rights included the right to up to 18 MGD of raw water capacity, delivery of that raw water and its use that are conditioned upon Flint's performance under the Financing Contract;

**WHEREAS,** in April of 2014, pursuant to the Financing Contract, KWA issued Series 2014 Bonds to construct the KWA System ("2014 Bonds");

**WHEREAS,** on April 30, 2014, Flint ceased purchasing water from Detroit;

**WHEREAS,** in April of 2014, Flint began operation of the Flint water treatment plant to treat water from the Flint River while the KWA System was being constructed;

**WHEREAS,** in 2014 and 2015, Flint, MDEQ and the Environmental Protection Agency discovered that the water being provided to Flint residents originating from the Flint River contained levels of lead which threatened their health and safety;

**WHEREAS,** in October of 2015, Detroit contracted with Flint to again provide Flint with treated water and on January 1, 2016, GLWA assumed Detroit's obligation to provide Flint water;

1

**WHEREAS,** in June of 2016, pursuant to the Financing Contract, KWA issued Series 2016 Bonds to complete the construction of the KWA System;

**WHEREAS,** in April of 2017, the Parties along with GCDC and the State executed a Statement of Principles, which provides in part that GLWA will provide Flint with treated water under the terms of the Flint Contract;

**WHEREAS,** the Parties agree that Flint remains responsible to pay its portion of the Construction Debt;

**WHEREAS,** Flint desires to transfer to GLWA and GLWA desires to accept the transfer of an irrevocable grant of an exclusive license of 18 MGD raw water capacity, delivery of that raw water and its use as more fully described in Article 25 of the of the Flint Contract and the License;

**WHEREAS,** At such time as the Construction Debt is paid in full and is no longer outstanding Flint also desires to transfer to GLWA and GLWA desires to accept the transfer of Flint's remaining interest in 17.46 MGD of Flint's capacity; and

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements herein contained, the Parties agree as follows, to wit:

## ARTICLE I
## DEFINITIONS

The following words and expressions, or pronouns used in their stead, shall be construed as follows:

"Agreement" shall mean each of the various provisions and parts of this document, including all attached Exhibits and any amendments thereto, as may be executed and approved by the Parties hereto.

"Agreement Term" shall have the meaning ascribed in Article II herein.

"Annual Requirement" shall have the same meaning as this term is defined in the Raw Water Supply Contract.

"Capacity Fee" shall have the same meaning as this term is defined in the Raw Water Supply Contract.

"Construction Debt" shall mean the debt associated with the construction of the KWA System as set forth in the Financing Contract and Section 2.07 of the Raw Water Supply Contract, including, but not limited to the 2014 Bonds, 2016 Bonds, and any future refunding of the 2014 Bonds and the 2016 Bonds or any refundings thereof (exclusive of new money components).

2

"Detroit" shall mean the City of Detroit, a Michigan municipal corporation, located in Wayne County.

"Debt Fund" shall have the same meaning as this term is defined in the Raw Water Supply Contract.

"Effective Date" shall mean the effective date of this Agreement which shall be the Effective Date of the Master Agreement to which this Agreement is attached as Exhibit D.

"Financing Contract" shall mean the Karegnondi Water Authority Financing Contract dated August 1, 2013, between KWA, Flint, and the County of Genesee (as the same maybe amended or supplemented) in which Flint pledged its full faith and credit to pay for its pro-rata share of the estimated cost of the construction of the KWA System; the construction cost was not to exceed Three Hundred Million Dollars ($300,000,000).

"Flint" shall mean the City of Flint, a Michigan municipal corporation, located in Genesee County.

"Flint Contract" shall mean the Water Service Contract between GLWA and Flint.

"GCDC" shall mean the Genesee County Drain Commissioner, as Michigan county agency, organized pursuant to Act 342, Public Acts of Michigan, 1939, as amended, including its successors in interest.

"GLWA" shall mean the Great Lakes Water Authority, a Michigan municipal authority and public body corporate organized pursuant to the provisions of Act 233, Public Acts of Michigan, 1955, as amended, governed by its Board of Directors and its day-to-day operations conducted by its Chief Executive Officer, including its successors in interest.

"KWA" shall mean the Karegnondi Water Authority, a Michigan municipal authority and public body corporate organized pursuant to the provisions of Act 233, Public Acts of Michigan, 1955, as amended, governed by its Board of Directors and its day-to-day operations conducted by its Chief Executive Officer, including its successors in interest.

"KWA Refunding Bonds" means any bonds issued by KWA pursuant to the KWA Financing Contract (including any future supplement or amendment thereto) to refund, directly or indirectly through a series of refundings, all or any portion of the KWA System Bonds.

"KWA System" shall have the same meaning as the term "System" as defined in the Raw Water Supply Contract.

"KWA System Bonds" means, collectively, the Series 2014 Bonds and the Series 2016 Bonds.

"KWA System Improvement Bonds" shall have the same meaning as the term "System Improvement Bonds" as defined in the Raw Water Supply Contract.

"License" shall mean the Irrevocable Assignment of Essential Water Mains and Raw Water Rights by Flint to GLWA that was effective as of December 1, 2017.

"Master Agreement" shall mean the Master Agreement effective as of December 1, 2017, between and among Flint, MDEQ, GCDC, GLWA, and the KWA.

"Members" shall have the same meaning as this term is defined in the Raw Water Supply Contract.

"MGD" shall mean One (1) Million Gallons Per Day, U.S. Standard Liquid Measure.

"MDEQ" shall mean the Michigan Department of Environmental Quality.

"New KWA Bonds" means any bonds issued after the Effective Date (as defined in Section 2.01) by KWA for which Flint has agreed or agrees, by contract or otherwise, to pay all or a portion of the debt service on such bonds. For the avoidance of doubt, "New KWA Bonds" does not include the KWA System Bonds or the KWA Refunding Bonds.

"Party" shall mean KWA, GLWA, or Flint individually.

"Parties"  shall mean KWA, GLWA, and Flint collectively.

"Point or Points of Delivery" shall mean the point or points in Michigan designated by a Party where raw water from the KWA System will be delivered.

"Raw Water Main" shall have the same meaning as this term is defined in the defined in Article 4 of the Flint Contract.

"Raw Water Supply Contract" means the Raw Water Supply Contract between the KWA and Flint dated June 28, 2013, and effective on October 1, 2013 that was amended by the First Addendum effective March 6, 2014, the Second Addendum effective December 1, 2017, and all future amendments thereto.

"Reciprocal Backup Agreement" shall mean the Reciprocal Backup Agreement between GLWA and GCDC.

"Security Deposit Account" shall have the same meaning as the term is defined in Article 12 of the Flint Contract.

"Series 2014 Bonds" means the $220,500,000 original principal amount Water Supply System Bonds (Karegnondi Water Pipeline), Series 2014A, issued by KWA pursuant to the Financing Contract.

4

"Series 2016 Bonds" means the $74,370,000 original principal amount Water Supply System Bonds (Karegnondi Water Pipeline), Series 2016, issued by KWA pursuant to the Financing Contract.

"State" shall mean the State of Michigan.

"Trust Agreement" shall mean the Baseline and All Receipts Trust Agreement among Flint, GLWA, KWA, GCDC, and U.S. Bank National Association, as Trustee effective December 1, 2017.

"Volume for Exempt Purposes" shall have the same meaning as this term is defined in the Raw Water Supply Contract.

"Water Transmission Fee" shall have the same meaning as this term is defined in the Raw Water Supply Contract.

<div align="center">

## ARTICLE II
## AGREEMENT TERM

</div>

The term of this Agreement shall be from the Effective Date and shall remain in effect until the Construction Debt is paid in full and no longer outstanding.

<div align="center">

## ARTICLE III
## RECEIPT OF RAW WATER

</div>

This Article III shall not apply to any raw water received and the use of that raw water by the GLWA pursuant to the Reciprocal Backup Agreement.

KWA acknowledges that Flint has transferred a portion of its right to delivery and use of *raw* water to GLWA during the Agreement Term.  GLWA and Flint each agree to pay KWA for the *raw* water each may use that is received from the Raw Water Main at the then current rates established by the KWA Board pursuant to the Raw Water Supply Contract.

Neither GLWA nor Flint shall transmit any *raw* water purchased from KWA outside of the corporate limits of Flint without the prior written consent of KWA.  Neither GLWA nor Flint shall transmit *raw* water purchased from KWA beyond the watershed as set forth in the Permit.

## ARTICLE IV
## APPROVAL OF TRANSFER OF REMAINING RIGHTS TO CAPACITY WHEN DEBT PAID

Pursuant to the Flint Contract and the License, Flint has provided GLWA with certain rights of raw water.  The Flint Contract and the License further provide that Flint's rights licensed to GLWA and the remaining rights transfer after the Construction Debt is paid in full and no longer outstanding, and GLWA has purchased such remaining rights in accordance with the Flint Contract.  KWA approves this transfer.

When Flint's remaining rights have transferred to GLWA, GLWA shall provide notice to KWA at the time established by Section 25.03 of the Flint Contract.  KWA shall set the price per MGD, for purpose of Exhibit D of the Raw Water Supply Contract, at its then current price, on the date it receives this notice.

As between GLWA and Flint, consideration is deemed paid pursuant to the credits granted under Section 12.05 of the Flint Contract.

Upon the expiration of the Agreement Term, in order for GLWA to continue to receive raw water from KWA, GLWA shall enter into a Water Purchase Contract with KWA.

## ARTICLE V
## RAW WATER SUPPLY CONTRACT AND KWA INDEBTEDNESS

**Section 5.01.   Flint's Obligation to Support Refunding of Bonds.** Flint acknowledges its continuing obligation to support the issuance of the KWA Refunding Bonds. Flint's continuing obligation includes, without limitation, participation and assistance in the issuance of the KWA Refunding Bonds, including: preparation of appropriate disclosure regarding Flint, its financial condition and operations as may be requested by KWA, the bond underwriter or as otherwise required by applicable federal securities laws; the signing of all documents requested by the bond underwriter and KWA; and, when requested by them, using reasonable efforts to provide them with all information and documents within Flint's control necessary to effectuate the purposes of the bond transaction.  Flint's continuing obligation also includes taking all actions within its control necessary to maintain the exclusion of the interest on the KWA System Bonds and KWA Refunding Bonds from adjusted gross income for federal income purposes under the Internal Revenue Code of 1986, as amended; and providing and complying with its continuing disclosure obligations related to the KWA System Bonds and the KWA Refunding Bonds.

**Section 5.02.   Flint's Obligation to Pay.** In accordance with Article II of the Raw Water Supply Contract, the bonds described on **Exhibit A** attached hereto have been issued by KWA and are and will continue to be payable from and secured by the Capacity Fee payments (to the extent previously payable from and secured by such fees), the Financing Contract payments and the payments to KWA under the Trust Agreement.  For the avoidance of doubt, KWA and GLWA acknowledge and agree that the Financing Contract, and Flint's obligations thereunder, (a) remain in full force and effect, and (b) payments related thereto shall be payable thereunder and pursuant to the Trust Agreement.

6

**Section 5.03.  Issuance of KWA Refunding Bonds.**  In addition to the provisions of Section 2.05 of the Raw Water Supply Contract entitling KWA to issue KWA Refunding Bonds, the provisions of Article 26 of the Flint Contract impact the issuance of KWA Refunding Bonds by affecting the rights between the Flint and GLWA with respect thereto.  KWA has no obligation to inquire as to or verify compliance by Flint with the Flint Contract, including, but not limited, Article 26.  For the avoidance of doubt, GLWA (a) is not financially obligated, directly or indirectly, under the Financing Contract, the Raw Water Supply Contract, or otherwise, for payment of KWA System Bonds or KWA Refunding Bonds or other obligations of Flint thereunder, and (b) is not a material obligated person with respect to such bonds, and has no obligation under federal securities laws or otherwise related to offering or disclosure documents for such bonds.

**Section 5.04.  Issuance of KWA System Improvement Bonds.**  In addition to the provisions of Section 2.05 of the Raw Water Supply Contract entitling KWA to issue one or more series or issues of KWA System Improvement Bonds, the provisions of Article 26 of the Flint Contract impact the issuance of KWA System Improvement Bonds by affecting the rights between Flint and GLWA with respect thereto.  KWA has no obligation to inquire as to or verify compliance by Flint with the Flint Contract, including, but not limited, Article 26.  For the avoidance of doubt, GLWA (a) is not financially obligated, directly or indirectly, under the Financing Contract, the Raw Water Supply Contract, or otherwise, for payment of KWA System Bonds or KWA Refunding Bonds or other obligations of Flint thereunder, and (b) is not a material obligated person with respect to such bonds, and has no obligation under federal securities laws or otherwise related to offering or disclosure documents for such bonds.

**Section 5.05.  Payments of Capacity Fee and applicable Debt Fund fee.**  In accordance with Article III of the Raw Water Supply Contract, as of the Effective Date, Flint is obligated to continue to pay its Capacity Fee and any applicable Debt Fund fee to KWA, to the extent that Flint's obligations for its share of the debt service on the bonds described on **Exhibit A** is not paid with payments to KWA from the Trust Agreement or otherwise.  Additionally,  Flint will also pay operating and maintenance fees to GCDC, which are paid as the GCDC pass-through charges under the Reciprocal Backup Agreement, the Flint Contract and the Trust Agreement.  Notwithstanding any other provisions of the Raw Water Supply Contract as originally drafted, in light of the transactions contemplated by the Master Agreement, KWA (a) does not currently anticipate charging Flint or GLWA an Annual Requirement fee, a Water Transmission Fee (other than with respect to the 0.54 MGD), a fee for Volume for Exempt Purposes or any other fee authorized by the Raw Water Supply Contract, and (b) shall not impose any such fee on Flint without prior written notice to GLWA;

**Section 5.06.  Point or Points of Delivery.**  In addition to the provisions of Article IV of the Raw Water Supply Contract, with respect to any raw water to be purchased by GLWA pursuant to its rights received under the License, the obligations of KWA to deliver raw water would be to a Point or Points of Delivery set forth on Exhibit B of the Flint Contract, attached hereto, or such other Point or Points of Delivery established by agreement.

**Section 5.07.  GLWA not a Successor to Flint.**  KWA agrees, for the benefit of GLWA, to comply with its obligations to Flint under the Raw Water Supply Contract.  For the avoidance of doubt, GLWA shall not constitute a successor to Flint under the Raw Water Supply Contract or the Financing Agreement, but shall have such obligations as set forth herein and in the documents and agreements executed by it pursuant to the Master Agreement.

**Section 5.08.  Remaining KWA System Costs.**  KWA represents that the remaining costs to complete the KWA System are not expected to exceed $4,000,000.00, which is expected to be financed as part of the refinancing of the Series 2016 Bonds.

## ARTICLE VI
## SECURITY DEPOSIT ACCOUNT

**Section 6.01  Establishment of Security Deposit Account.**  Flint has established a Security Deposit Account with GLWA pursuant to the Flint Contract.  GLWA is the sole owner of the Security Deposit Account and, except as set forth in this Agreement, GLWA shall have the sole and exclusive rights in and to the Security Deposit Account in accordance with the terms of the Flint Contract.

**Section 6.02  KWA Rights to Pro-Rata Application of Security Deposit Account Balance.**  In the event of an ongoing failure of Flint to pay its obligations to GLWA under the Flint Contract and to KWA under the Financing Contract and the Raw Water Supply Contact, all pursuant to the Trust Agreement, then following:

(i) the Conversion Date (as defined in the Trust Agreement);

(ii) the application of the entire portion of any available debt service reserve fund monies available for payment of the bonds as listed on **Exhibit A**, which portion was funded by or is allocable to Flint, to Flint's obligations under the Financing Contract as the same become due in accordance with the terms of the applicable KWA bond indentures and/or resolutions, all as evidenced by written certification by the applicable paying agent, financial institution, and/or other third party acceptable to the Parties; and

(iii) commencement by KWA (itself or by and through its applicable bond trustee(s)) and pursuit of its available remedies for collection from Flint under the terms of the applicable KWA bond indentures and/or resolutions, including commencement of legal action in the appropriate forum, all as evidenced by written certification of the KWA and a copy of the filing(s);

GLWA and KWA agree that any then-remaining balance in the Security Deposit Account shall be split pro-rata between GLWA and KWA for application to Flint's respective financial obligations then due and payable to GLWA under the Flint Contract and to KWA under the Financing Agreement.

## ARTICLE VII

## ACKNOWLEDGEMENT OF ADDENDUM TO RAW WATER SUPPLY CONTRACT

Flint and KWA shall at the time of execution of this Agreement, execute the SECOND ADDENDUM TO RAW WATER SUPPLY CONTRACT BETWEEN THE KAREGNONDI WATER AUTHORITY AND THE CITY OF FLINT DATED JUNE 28, 2013, AND EFFECTIVE ON OCTOBER 1, 2013 attached hereto as **Exhibit B**.

## ARTICLE VIII
## DEFAULT AND REMEDIES

**Section 8.01.   Monetary Default.**  All amounts owed to KWA by GLWA or Flint shall, if not paid when due, bear interest at the maximum rate allowed by applicable law from the due date until paid in full.  In any collection action for a monetary default, the non-prevailing party shall pay all of the prevailing party's expenses, including, but not limited to, awards of reasonable attorney fees and costs, court costs, and all other costs incurred by the prevailing party in such action.

**Section 8.02.   Non-Monetary Default.**  If a Party is alleged to be in non-monetary default under this Agreement, the non-defaulting Party shall send written notice to the alleged defaulting Party specifying in detail the nature of the alleged default.  The alleged defaulting Party shall have five (5) days to cure the alleged default, provided that if the nature of the alleged default is such that more than five (5) days are required to cure the alleged default, then the alleged defaulting Party shall not be in default if it begins to cure within five (5) days and thereafter diligently pursues the cure to completion.  The non-defaulting Party shall be entitled to all of its remedies as allowed by applicable law.  In any legal action resulting from a non-monetary default, the non-prevailing party shall pay all of the prevailing party's expenses, including, but not limited to, awards of reasonable attorney fees and costs, court costs, and all other costs incurred by the prevailing party in such action.

## ARTICLE IX
## GENERAL PROVISIONS

**Section 9.01.   Force Majeure.**  If by reason of Force Majeure occurrence any Party shall be rendered unable wholly or in part to carry out its obligations under this Agreement, other than the obligation of the GLWA or Flint to make the payments as required under this Agreement, then if such Party shall give notice and detail of such Force Majeure occurrence in writing to each other Party within a reasonable time after the onset of the Force Majeure occurrence, the obligation of the Party giving such notice, so far as it is affected by such Force Majeure occurrence, shall be suspended during the continuance of the inability then claimed, but for no longer period, and any such Party shall endeavor to remove or overcome such inability with all reasonable dispatch.  The term "Force Majeure" as used herein shall mean acts of God, strikes, lockouts or other industrial disturbances, acts of public enemy, orders of any kind of the Government of the United States or the State, or any civil or military authority, insurrection, riots, epidemics, landslides, lightning, earthquake, fires, hurricanes, storms, floods, washouts, arrests, restraint of government and people, civil disturbances, explosions, breakage or accidents to machinery, pipelines or canals, partial or

9

entire failure of treated water supply, or on account of any other causes not reasonably within the control of the Party claiming such inability.

Section 9.02.  **Severability.**  In case any one or more of the sections, subsections, provisions, clauses or words of this Agreement or the application of such sections, subsections, provisions, clauses or words to any situation or circumstance shall be, or shall be held to be, for any reason, invalid or unconstitutional, under the laws or constitutions of the State or the United States of America, or in contravention of any such laws or constitutions, such invalidity, unconstitutionality or contravention shall not affect any other sections, subsections, provisions, clauses or words of this Agreement or the application of such sections, subsections, provisions, clauses or words to any other situation or circumstance, and it is intended that this Agreement shall be severable and shall be construed and applied as if any such invalid or unconstitutional section, subsection, provision, clause or word had not been included herein, and the rights and obligations of the Parties shall be construed and remain in force accordingly.

Section 9.03.  **Governing Law**.  The rights and remedies set forth in this Agreement are not exclusive and are in addition to any of the rights or remedies provided by law or equity.  This Agreement and all actions arising under it shall be governed by, subject to, and construed according to the laws of the State.

Section 9.04.  **Benefits to Inure.**  The rights and benefits under this Agreement shall inure to the benefit of and be binding upon the respective parties hereto, their agents, successors and assigns.

Section 9.05.  **Waiver.**  No Party shall be deemed to have waived any of its rights under this Agreement unless such waiver is in writing and signed by the other Parties.  No delay or omission on the part of a Party in exercising any right shall operate as a waiver of such right or any other right.  A waiver on any one occasion shall not be construed as a waiver of any right on any future occasion.

Section 9.06.  **Assignability.**  This Agreement may not be assigned by any Party without the prior written consent of all Parties.

Section 9.07.  **Construction.**  This Agreement has been prepared and negotiations have occurred in connection with said preparation pursuant to the joint efforts of the Parties.  This Agreement therefore shall not be construed against any Party to this Agreement.

Section 9.08.  **Modification.**  This Agreement may not be modified without the consent of all Parties.  A Party must give no less than 45 days' written notice to all Parties.  Modifications to this Agreement may not be done without the agreement of all Parties.  Consent to a modification by any Party shall not be unreasonably withheld.

Section 9.09.  **No Third Party Beneficiaries.**  In case of a conflict between this Section 7.07 and the Master Agreement, the Master Agreement shall control.  Nothing in this clause shall be read to create a third party beneficiary right or to allow enforcement of third party beneficiary rights by an individual or entity that is not a Party, successor to a Party to this Agreement.  Nothing

in this clause shall be read to allow enforcement of third party beneficiary rights if such enforcement would abridge, impair, or destroy the rights which the promisee of a promise made for the benefit of another person or would otherwise have as a result of such promise.

**Section 9.10.  Counterparts.**  This Agreement may be executed in several counterparts each of which shall be deemed one and the same Agreement.  It shall be binding upon and inure to the benefit of the Parties.

**Section 9.11.  Headings and Captions.**  The headings and captions used in this Agreement are for the convenience of reference only and in no way define, limit or describe the scope of intent of any provision of this Agreement.

**Section 9.12.  Addresses and Notice.**  Unless otherwise provided herein, any notice, communication, request, reply or advice (herein severally and collectively, for convenience, called "Notice") herein provided or permitted to be given, made or accepted by any Party to any other Party, shall be in writing and shall be given or be served by depositing the same in the United States mail postpaid and registered and certified and addressed to the Party to be notified, with return receipt requested.  Notice deposited in the mail in the manner described above shall be conclusively deemed to be effective, unless otherwise stated herein, from and after the expiration of three (3) days after it is so deposited.  For the purposes of notice, the addresses of the Parties shall, until changed as hereinafter provided, be as follows:

If to GLWA, to:

    Great Lakes Water Authority
    Attn:  Chief Executive Officer
    735 Randolph Street, Suite 1900
    Detroit, Michigan 48226

If to Flint, to:

    City of Flint
    Attn: Mayor
    1101 South Saginaw Street
    Flint, Michigan 48502

If to KWA, to:

    Karegnondi Water Authority
    Attn:  Chief Executive Officer
    G-4610 Beecher Road
    Flint, Michigan 48532

Each Party shall have the right from time to time and at any time to change their respective addresses and each shall have the right to specify as its address any other address by at least fifteen (15) days written notice to each other Party.

**Section 9.13.  Exhibits.**  All Exhibits attached to this Agreement are incorporated into this Agreement by reference as though fully set forth herein.

**Section 9.14.  Survival.**  The terms of the purchase price calculation as set forth in Article IV above shall survive the expiration or termination of this Agreement.

11

**IN WITNESS WHEREOF,** the Parties acting under the authority of their respective governing bodies have caused this Agreement to be duly executed as of the Effective Date.

<u>**GLWA:**</u>

By: _____     _____
     Sue McCormick, Chief Executive Officer     Date    *12.15.17*

<u>**KWA:**</u>

By: ___Executed in Counterpart___     _____
     John F. O'Brien, Deputy Chief Executive Officer     Date

<u>**Flint:**</u>

By: _____     _____
     Karen Weaver, Mayor     Date    *12-21-17*

<u>**ATTEST:**</u>

By: _____     _____
     Inez Brown, City Clerk     Date    *12-21-17*
     City of Flint

IN WITNESS WHEREOF, the Parties acting under the authority of their respective governing bodies have caused this Agreement to be duly executed as of the Effective Date.

GLWA:

By: _Executed in Counterpart_____    _____
        Sue McCormick, Chief Executive Officer        Date

KWA:

By: _[signature]_____    _12/22/17_____
        John F. O'Brien, Deputy Chief Executive Officer     Date

Flint:

By: _Executed in Counterpart_____    _____
        Karen Weaver, Mayor                              Date

ATTEST:

By: _Executed in Counterpart_____    _____
        Inez Brown, City Clerk                           Date
        City of Flint

12

Exhibit A

**Flint's obligations for its share of the debt service on the bonds**

## KWA Bond $220,500,000 Series 2014A (TIC 4.69%)

| Payment Date | Payment Amount | Total Annual Payment | GCDC Portion 70% | Flint Portion 30% |
|---|---|---|---|---|
| 11/1/2014 | $6,027,389.06 | $6,027,389.06 | Capitalized Interest | |
| 11/1/2015 | $5,563,743.75 | | Capitalized Interest | |
| 5/1/2016 | $5,563,743.75 | $11,127,487.50 | Capitalized Interest | |
| 11/1/2016 | $5,563,743.75 | | Capitalized Interest | |
| 5/1/2017 | $5,563,743.75 | | | |
| 11/1/2017 | $9,668,743.75 | $15,232,487.50 | $10,662,741.25 | $4,569,746.25 |
| 5/1/2018 | $5,481,118.75 | | | |
| 11/1/2018 | $9,756,118.75 | $15,237,237.50 | $10,666,066.25 | $4,571,171.25 |
| 5/1/2019 | $5,380,743.75 | | | |
| 11/1/2019 | $9,855,743.75 | $15,236,487.50 | $10,665,541.25 | $4,570,946.25 |
| 5/1/2020 | $5,288,868.75 | | | |
| 11/1/2020 | $9,943,868.75 | $15,232,737.50 | $10,662,916.25 | $4,569,821.25 |
| 5/1/2021 | $5,182,493.75 | | | |
| 11/1/2021 | $10,052,493.75 | $15,234,987.50 | $10,664,491.25 | $4,570,496.25 |
| 5/1/2022 | $5,080,743.75 | | | |
| 11/1/2022 | $10,155,743.75 | $15,236,487.50 | $10,665,541.25 | $4,570,946.25 |
| 5/1/2023 | $4,953,868.75 | | | |
| 11/1/2023 | $10,278,868.75 | $15,232,737.50 | $10,662,916.25 | $4,569,821.25 |
| 5/1/2024 | $4,820,743.75 | | | |
| 11/1/2024 | $10,415,743.75 | $15,236,487.50 | $10,665,541.25 | $4,570,946.25 |
| 5/1/2025 | $4,680,868.75 | | | |
| 11/1/2025 | $10,555,868.75 | $15,236,737.50 | $10,665,716.25 | $4,571,021.25 |
| 5/1/2026 | $4,533,993.75 | | | |
| 11/1/2026 | $10,698,993.75 | $15,232,987.50 | $10,663,091.25 | $4,569,896.25 |
| 5/1/2027 | $4,379,868.75 | | | |
| 11/1/2027 | $10,854,868.75 | $15,234,737.50 | $10,664,316.25 | $4,570,421.25 |
| 5/1/2028 | $4,209,900.00 | | | |
| 11/1/2028 | $11,024,900.00 | $15,234,800.00 | $10,664,360.00 | $4,570,440.00 |
| 5/1/2029 | $4,031,006.25 | | | |
| 11/1/2029 | $11,206,006.25 | $15,237,012.50 | $10,665,908.75 | $4,571,103.75 |
| 5/1/2030 | $3,842,662.50 | | | |
| 11/1/2030 | $11,392,662.50 | $15,235,325.00 | $10,664,727.50 | $4,570,597.50 |
| 5/1/2031 | $3,644,475.00 | | | |
| 11/1/2031 | $11,589,475.00 | $15,233,950.00 | $10,663,765.00 | $4,570,185.00 |
| 5/1/2032 | $3,435,843.75 | | | |
| 11/1/2032 | $11,800,918.75 | $15,236,837.50 | $10,665,786.25 | $4,571,051.25 |
| 5/1/2033 | $3,216,337.50 | | | |
| 11/1/2033 | $12,016,337.50 | $15,232,675.00 | $10,662,872.50 | $4,569,802.50 |
| 5/1/2034 | $3,018,337.50 | | | |
| 11/1/2034 | $12,218,337.50 | $15,236,675.00 | $10,665,672.50 | $4,571,002.50 |
| 5/1/2035 | $2,776,837.50 | | | |
| 11/1/2035 | $12,456,837.50 | $15,233,675.00 | $10,663,572.50 | $4,570,102.50 |
| 5/1/2036 | $2,522,737.50 | | | |
| 11/1/2036 | $12,712,737.50 | $15,235,475.00 | $10,664,832.50 | $4,570,642.50 |
| 5/1/2037 | $2,255,250.00 | | | |
| 11/1/2037 | $12,980,250.00 | $15,235,500.00 | $10,664,850.00 | $4,570,650.00 |
| 5/1/2038 | $1,973,718.75 | | | |
| 11/1/2038 | $13,263,718.75 | $15,237,437.50 | $10,666,206.25 | $4,571,231.25 |
| 5/1/2039 | $1,677,356.25 | | | |
| 11/1/2039 | $13,557,356.25 | $15,234,712.50 | $10,664,298.75 | $4,570,413.75 |
| 5/1/2040 | $1,365,506.25 | | | |
| 11/1/2040 | $13,870,506.25 | $15,236,012.50 | $10,665,208.75 | $4,570,803.75 |
| 5/1/2041 | $1,037,500.00 | | | |
| 11/1/2041 | $14,197,500.00 | $15,235,000.00 | $10,664,500.00 | $4,570,500.00 |
| 5/1/2042 | $708,250.00 | | | |
| 11/1/2042 | $14,528,250.00 | $15,236,500.00 | $10,665,550.00 | $4,570,950.00 |
| 5/1/2043 | $362,750.00 | | | |
| 11/1/2043 | $14,872,750.00 | $15,235,500.00 | $10,664,850.00 | $4,570,650.00 |
| | $439,633,064.06 | $439,633,064.06 | $287,945,490.00 | $123,405,210.00 |
| - Capitalized Interest | -$28,282,364.06 | | | |
| Calculation check: | $411,350,700.00 | $287,945,490.00 =70.0% | $123,405,210.00 =30.0% | |

## KWA Bond $76,710,000 Series 2017/18 (ESTIMATED 28 Year, TIC = 5.04%)

| Payment Date | Payment Amount | Total Annual Payment | GCDC Portion 70% | Flint Portion 30% |
|---|---|---|---|---|
| 5/1/2018 | $1,917,750.00 | | | |
| 11/1/2018 | $3,232,750.00 | $5,150,500.00 | $3,605,350.00 | $1,545,150.00 |
| 5/1/2019 | $1,884,875.00 | | | |
| 11/1/2019 | $3,264,875.00 | $5,149,750.00 | $3,604,825.00 | $1,544,925.00 |
| 5/1/2020 | $1,850,375.00 | | | |
| 11/1/2020 | $3,300,375.00 | $5,150,750.00 | $3,605,525.00 | $1,545,225.00 |
| 5/1/2021 | $1,814,125.00 | | | |
| 11/1/2021 | $3,334,125.00 | $5,148,250.00 | $3,603,775.00 | $1,544,475.00 |
| 5/1/2022 | $1,776,125.00 | | | |
| 11/1/2022 | $3,371,125.00 | $5,147,250.00 | $3,603,075.00 | $1,544,175.00 |
| 5/1/2023 | $1,736,250.00 | | | |
| 11/1/2023 | $3,411,250.00 | $5,147,500.00 | $3,603,250.00 | $1,544,250.00 |
| 5/1/2024 | $1,694,375.00 | | | |
| 11/1/2024 | $3,454,375.00 | $5,148,750.00 | $3,604,125.00 | $1,544,625.00 |
| 5/1/2025 | $1,650,375.00 | | | |
| 11/1/2025 | $3,500,375.00 | $5,150,750.00 | $3,605,525.00 | $1,545,225.00 |
| 5/1/2026 | $1,604,125.00 | | | |
| 11/1/2026 | $3,544,125.00 | $5,148,250.00 | $3,603,775.00 | $1,544,475.00 |
| 5/1/2027 | $1,555,625.00 | | | |
| 11/1/2027 | $3,590,625.00 | $5,146,250.00 | $3,602,375.00 | $1,543,875.00 |
| 5/1/2028 | $1,504,750.00 | | | |
| 11/1/2028 | $3,644,750.00 | $5,149,500.00 | $3,604,650.00 | $1,544,850.00 |
| 5/1/2029 | $1,451,250.00 | | | |
| 11/1/2029 | $3,696,250.00 | $5,147,500.00 | $3,603,250.00 | $1,544,250.00 |
| 5/1/2030 | $1,395,125.00 | | | |
| 11/1/2030 | $3,755,125.00 | $5,150,250.00 | $3,605,175.00 | $1,545,075.00 |
| 5/1/2031 | $1,336,125.00 | | | |
| 11/1/2031 | $3,811,125.00 | $5,147,250.00 | $3,603,075.00 | $1,544,175.00 |
| 5/1/2032 | $1,274,250.00 | | | |
| 11/1/2032 | $3,874,250.00 | $5,148,500.00 | $3,603,950.00 | $1,544,550.00 |
| 5/1/2033 | $1,209,250.00 | | | |
| 11/1/2033 | $3,939,250.00 | $5,148,500.00 | $3,603,950.00 | $1,544,550.00 |
| 5/1/2034 | $1,141,000.00 | | | |
| 11/1/2034 | $4,011,000.00 | $5,152,000.00 | $3,606,400.00 | $1,545,600.00 |
| 5/1/2035 | $1,069,250.00 | | | |
| 11/1/2035 | $4,079,250.00 | $5,148,500.00 | $3,603,950.00 | $1,544,550.00 |
| 5/1/2036 | $994,000.00 | | | |
| 11/1/2036 | $4,154,000.00 | $5,148,000.00 | $3,603,600.00 | $1,544,400.00 |
| 5/1/2037 | $915,000.00 | | | |
| 11/1/2037 | $4,235,000.00 | $5,150,000.00 | $3,605,000.00 | $1,545,000.00 |
| 5/1/2038 | $832,000.00 | | | |
| 11/1/2038 | $4,317,000.00 | $5,149,000.00 | $3,604,300.00 | $1,544,700.00 |
| 5/1/2039 | $744,875.00 | | | |
| 11/1/2039 | $4,404,875.00 | $5,149,750.00 | $3,604,825.00 | $1,544,925.00 |
| 5/1/2040 | $653,375.00 | | | |
| 11/1/2040 | $4,493,375.00 | $5,146,750.00 | $3,602,725.00 | $1,544,025.00 |
| 5/1/2041 | $557,375.00 | | | |
| 11/1/2041 | $4,592,375.00 | $5,149,750.00 | $3,604,825.00 | $1,544,925.00 |
| 5/1/2042 | $456,500.00 | | | |
| 11/1/2042 | $4,691,500.00 | $5,148,000.00 | $3,603,600.00 | $1,544,400.00 |
| 5/1/2043 | $350,625.00 | | | |
| 11/1/2043 | $4,795,625.00 | $5,146,250.00 | $3,602,375.00 | $1,543,875.00 |
| 5/1/2044 | $239,500.00 | | | |
| 11/1/2044 | $4,909,500.00 | $5,149,000.00 | $3,604,300.00 | $1,544,700.00 |
| 5/1/2045 | $122,750.00 | | | |
| 11/1/2045 | $5,032,750.00 | $5,155,500.00 | $3,608,850.00 | $1,546,650.00 |
| | $144,172,000.00 | $144,172,000.00 | $100,920,400.00 | $43,251,600.00 |
| Calculation check: | $144,172,000.00 | $100,920,400.00 =70.0% | $43,251,600.00 =30.0% | |

## GCDC Intake Bond $35,000,000 Series 2013 (TIC 5.04%)

| Payment Date | Payment Amount | Total Annual Payment | GCDC Portion 70% | Flint Portion 30% |
|---|---|---|---|---|
| 5/1/2014 | $996,803.89 | | | |
| 11/1/2014 | $1,532,618.75 | $2,529,422.64 | $2,529,422.64 | To Be Paid in Years 2039 thru 2041 Below |
| 11/1/2015 | $885,918.75 | | 100.0% | |
| 11/1/2015 | $1,670,918.75 | $2,526,837.50 | $2,526,837.50 | |
| 11/1/2016 | $843,693.75 | | 100.0% | |
| 11/1/2016 | $1,683,693.75 | $2,527,387.50 | $2,527,387.50 | |
| 5/1/2017 | $831,093.75 | | | |
| 11/1/2017 | $1,696,093.75 | $2,527,187.50 | $1,769,031.25 | $758,156.25 |
| 5/1/2018 | $813,793.75 | | | |
| 11/1/2018 | $1,713,793.75 | $2,527,587.50 | $1,769,311.25 | $758,276.25 |
| 5/1/2019 | $795,793.75 | | | |
| 11/1/2019 | $1,730,793.75 | $2,526,587.50 | $1,768,611.25 | $757,976.25 |
| 5/1/2020 | $777,093.75 | | | |
| 11/1/2020 | $1,752,093.75 | $2,529,187.50 | $1,770,431.25 | $758,756.25 |
| 5/1/2021 | $752,718.75 | | | |
| 11/1/2021 | $1,772,718.75 | $2,525,437.50 | $1,767,806.25 | $757,631.25 |
| 5/1/2022 | $727,218.75 | | | |
| 11/1/2022 | $1,802,218.75 | $2,529,437.50 | $1,770,606.25 | $758,831.25 |
| 5/1/2023 | $700,343.75 | | | |
| 11/1/2023 | $1,825,343.75 | $2,525,687.50 | $1,767,981.25 | $757,706.25 |
| 5/1/2024 | $694,375.00 | | | |
| 11/1/2024 | $1,857,343.75 | $2,529,437.50 | $1,770,606.25 | $758,831.25 |
| 5/1/2025 | $662,550.75 | | | |
| 11/1/2025 | $1,882,050.75 | $2,525,187.50 | $1,767,631.25 | $757,556.25 |
| 5/1/2026 | $611,593.75 | | | |
| 11/1/2026 | $1,916,593.75 | $2,528,187.50 | $1,769,731.25 | $758,456.25 |
| 5/1/2027 | $577,337.50 | | | |
| 11/1/2027 | $1,952,337.50 | $2,529,675.00 | $1,770,772.50 | $758,902.50 |
| 5/1/2028 | $541,243.75 | | | |
| 11/1/2028 | $1,986,243.75 | $2,527,487.50 | $1,769,241.25 | $758,246.25 |
| 5/1/2029 | $503,312.50 | | | |
| 11/1/2029 | $2,023,312.50 | $2,526,625.00 | $1,768,637.50 | $757,987.50 |
| 5/1/2030 | $465,312.50 | | | |
| 11/1/2030 | $2,060,312.50 | $2,525,625.00 | $1,767,937.50 | $757,687.50 |
| 5/1/2031 | $425,437.50 | | | |
| 11/1/2031 | $2,100,437.50 | $2,525,875.00 | $1,768,112.50 | $757,762.50 |
| 5/1/2032 | $383,562.50 | | | |
| 11/1/2032 | $2,143,562.50 | $2,527,125.00 | $1,768,987.50 | $758,137.50 |
| 5/1/2033 | $338,462.50 | | | |
| 11/1/2033 | $2,188,462.50 | $2,526,925.00 | $1,768,847.50 | $758,077.50 |
| 5/1/2034 | $291,056.25 | | | |
| 11/1/2034 | $2,236,056.25 | $2,527,112.50 | $1,768,978.75 | $758,133.75 |
| 5/1/2035 | $238,784.38 | | | |
| 11/1/2035 | $2,288,784.38 | $2,527,568.76 | $1,769,298.13 | $758,270.63 |
| 5/1/2036 | $183,690.63 | | | |
| 11/1/2036 | $2,343,690.63 | $2,527,381.26 | $1,769,166.88 | $758,214.38 |
| 5/1/2037 | $125,640.63 | | | |
| 11/1/2037 | $2,400,640.63 | $2,526,281.26 | $1,768,396.88 | $757,884.38 |
| 5/1/2038 | $64,500.00 | | | |
| 11/1/2038 | $2,464,500.00 | $2,529,000.00 | $1,770,300.00 | $758,700.00 |
| 5/1/2039 | | | -$758,826.79 | $758,826.79 |
| 5/1/2040 | | | -$758,051.25 | $758,051.25 |
| 5/1/2041 | | | -$758,216.25 | $758,216.25 |
| | $63,184,253.92 | $63,184,253.92 | $44,228,977.74 | $18,955,276.18 |
| Calculation check: | $63,184,253.92 | $44,228,977.74 =70.0% | $18,955,276.18 =30.0% | |

## Total Payments due from GCDC and City of Flint

| Payment Billing Period | Total Annual Payment | GCDC Portion 70% | Flint Portion 30% |
|---|---|---|---|
| Oct. 2013 - | | 100.0% | |
| Sept. 2014 | $2,529,422.64 | $2,529,422.64 | To Be Paid in Years 2039 thru 2041 Below |
| Oct. 2014 - | | 100.0% | |
| Sept. 2015 | $2,526,837.50 | $2,526,837.50 | |
| Oct. 2015 - | | 100.0% | |
| Sept. 2016 | $2,527,387.50 | $2,527,387.50 | |
| Oct. 2016 - | | | |
| Sept. 2017 | $17,759,675.00 | $12,431,772.50 | $5,327,902.50 |
| Oct. 2017 - | Monthly = | $1,336,727.29 | $572,883.13 |
| Sept. 2018 | $22,915,325.00 | $16,040,727.50 | $6,874,597.50 |
| Oct. 2018 - | Monthly = | $1,336,581.46 | $572,820.63 |
| Sept. 2019 | $22,912,825.00 | $16,038,977.50 | $6,873,847.50 |
| Oct. 2019 - | Monthly = | $1,336,572.71 | $572,816.88 |
| Sept. 2020 | $22,912,675.00 | $16,038,872.50 | $6,873,802.50 |
| Oct. 2020 - | Monthly = | $1,336,339.38 | $572,716.88 |
| Sept. 2021 | $22,908,675.00 | $16,036,072.50 | $6,872,602.50 |
| Oct. 2021 - | Monthly = | $1,336,601.88 | $572,829.38 |
| Sept. 2022 | $22,913,175.00 | $16,039,222.50 | $6,873,952.50 |
| Oct. 2022 - | Monthly = | $1,336,178.96 | $572,648.13 |
| Sept. 2023 | $22,905,925.00 | $16,034,147.50 | $6,871,777.50 |
| Oct. 2023 - | Monthly = | $1,336,689.38 | $572,866.88 |
| Sept. 2024 | $22,914,675.00 | $16,040,272.50 | $6,874,402.50 |
| Oct. 2024 - | Monthly = | $1,336,572.71 | $572,816.88 |
| Sept. 2025 | $22,912,675.00 | $16,038,872.50 | $6,873,802.50 |
| Oct. 2025 - | Monthly = | $1,336,455.31 | $572,766.56 |
| Sept. 2026 | $22,910,662.50 | $16,037,463.75 | $6,873,198.75 |
| Oct. 2026 - | Monthly = | $1,336,504.21 | $572,787.52 |
| Sept. 2027 | $22,910,662.50 | $16,038,251.25 | $6,873,198.75 |
| Oct. 2027 - | Monthly = | $1,336,520.94 | $572,794.69 |
| Sept. 2028 | $22,911,787.50 | $16,038,251.25 | $6,873,536.25 |
| Oct. 2028 - | Monthly = | $1,336,483.02 | $572,778.44 |
| Sept. 2029 | $22,911,137.50 | $16,037,796.25 | $6,873,341.25 |
| Oct. 2029 - | Monthly = | $1,336,486.67 | $572,780.00 |
| Sept. 2030 | $22,911,200.00 | $16,037,840.00 | $6,873,360.00 |
| Oct. 2030 - | Monthly = | $1,336,246.04 | $572,676.88 |
| Sept. 2031 | $22,907,075.00 | $16,034,952.50 | $6,872,122.50 |
| Oct. 2031 - | Monthly = | $1,336,560.31 | $572,811.56 |
| Sept. 2032 | $22,912,462.50 | $16,038,723.75 | $6,873,738.75 |
| Oct. 2032 - | Monthly = | $1,336,305.83 | $572,702.50 |
| Sept. 2033 | $22,908,100.00 | $16,035,670.00 | $6,872,430.00 |
| Oct. 2033 - | Monthly = | $1,336,754.27 | $572,894.69 |
| Sept. 2034 | $22,915,787.50 | $16,041,051.25 | $6,874,736.25 |
| Oct. 2034 - | Monthly = | $1,336,401.72 | $572,743.59 |
| Sept. 2035 | $22,909,743.76 | $16,036,820.63 | $6,872,923.13 |
| Oct. 2035 - | Monthly = | $1,336,466.62 | $572,771.41 |
| Sept. 2036 | $22,910,856.26 | $16,037,599.38 | $6,873,256.88 |
| Oct. 2036 - | Monthly = | $1,336,560.31 | $572,811.56 |
| Sept. 2037 | $22,911,781.26 | $16,038,246.88 | $6,873,534.38 |
| Oct. 2037 - | Monthly = | $1,336,733.85 | $572,885.93 |
| Sept. 2038 | $22,915,437.50 | $16,040,806.25 | $6,874,631.25 |
| Oct. 2038 - | Monthly = | $1,125,858.08 | $572,847.13 |
| Sept. 2039 | $20,384,462.50 | $13,510,296.96 | $6,874,165.54 |
| Oct. 2039 - | Monthly = | $1,125,823.54 | $572,740.00 |
| Sept. 2040 | $20,382,762.50 | $13,509,882.50 | $6,872,880.00 |
| Oct. 2040 - | Monthly = | $1,125,896.56 | $572,790.94 |
| Sept. 2041 | $20,384,500.00 | $13,510,758.75 | $6,873,491.25 |
| Oct. 2041 - | Monthly = | $1,189,095.83 | $509,612.50 |
| Sept. 2042 | $20,384,500.00 | $14,269,150.00 | $6,115,350.00 |
| Oct. 2042 - | Monthly = | $1,189,047.50 | $509,583.75 |
| Sept. 2043 | $20,381,750.00 | $14,267,225.00 | $6,114,525.00 |
| Oct. 2043 - | Monthly = | $300,358.33 | $128,725.00 |
| Sept. 2044 | $5,149,000.00 | $3,604,300.00 | $1,544,700.00 |
| Oct. 2044 - | Monthly = | $300,737.50 | $128,887.50 |
| Sept. 2045 | $5,155,500.00 | $3,608,850.00 | $1,546,650.00 |
| | $618,706,953.92 | $433,094,867.74 | $185,612,086.18 |
| Calculation check: | $618,706,953.92 | $433,094,867.74 =70.0% | $185,612,086.18 =30.0% |

**Exhibit B**

Second Addendum to Raw Water Supply Contract between the Karegnondi Water Authority and the City of Flint dated June 28, 2013, and effective on October 1, 2013

SECOND ADDENDUM TO
<u>RAW WATER SUPPLY CONTRACT BETWEEN THE KAREGNONDI WATER
AUTHORITY AND THE CITY OF FLINT EFFECTIVE ON OCTOBER 1, 2013, AS
AMENDED BY THE FIRST ADDENDUM EFFECTIVE MARCH 6, 2014</u>

THIS SECOND ADDENDUM ("Addendum") to the **RAW WATER SUPPLY
CONTRACT BETWEEN THE KAREGNONDI WATER AUTHORITY AND THE CITY
OF FLINT EFFECTIVE ON OCTOBER 1, 2013,** as amended by the **FIRST ADDENDUM,
EFFECTIVE MARCH 6, 2014** (hereafter the "Agreement") is executed and delivered as of the
Effective Date of the Master Agreement to which this Addendum is attached as Exhibit G, by and
between the Karegnondi Water Authority, a Michigan Public Authority created pursuant to Act
233 of the Michigan Public Acts of 1955, as amended (hereinafter "KWA"), whose address is G-
4610 Beecher Road, Flint, Michigan 48532 and the City of Flint, a municipal corporation, of the
State of Michigan (hereinafter "Flint"), whose address is 1101 South Saginaw Street, Flint,
Michigan 48502.  KWA and Flint are sometimes hereafter each referred to as a "Party" and
collectively as the "Parties."

WITNESSETH:

WHEREAS, the Parties entered into a <u>Raw Water Supply Contract</u>, dated the 28th day of
June, 2013, and effective on October 1, 2013;

WHEREAS, the Parties entered into a <u>First Addendum to Raw Water Supply Contract</u>,
effective on March 6, 2014;

WHEREAS, the Parties have agreed to enter into this Addendum for the purpose of
modifying ARTICLE II, Section 2.05; ARTICLE V, Section 5.07; and ARTICLE VII, Section
7.15 of the Agreement.

NOW THEREFORE, it is hereby agreed by the Parties as follows:

1.     **Amendment to the ARTICLE II, Section 2.05 of the Agreement.**  ARTICLE II,
Section 2.05 of the Agreement is hereby deleted in its entirety and replaced with the following:

"**Section 2.05.  Repair and Replacement of Components-Government
Required Enhancements.**  It is anticipated that repair and replacement of
components of the System and enhancements required by government
regulations will be in incremental, finite projects and that each such project
will be financed by the Authority through operating revenues, the issuance
of one or more series or issues of System Improvement Bonds, or any other
lawful sources.  Also, on its own initiative or at the request of the Buyer,
the Authority may refund any Bonds that were issued to construct, equip,
operate, maintain and otherwise improve the System and any System
facilities.  The Authority agrees that such improvements for the System will
be made in accordance with generally accepted engineering practices.  It is

anticipated that such improvements will be financed by the Authority through operating revenues, the issuance of one or more series or issues of System Improvement Bonds. or any other lawful sources, payable from and secured by the payments made under this Contract and/or any other lawful sources."

2.     **Amendment to the ARTICLE V, Section 5.07 of the Agreement.** ARTICLE V, Section 5.07 of the Agreement is hereby deleted in its entirety and replaced with the following:

"**Section 5.07 <u>Prompt Payment/Disputed Bills.</u>** The Buyer hereby agrees that unless otherwise specified it will make payments required by this Contract to the Authority on or before the 30th day of each month immediately following the month in which the applicable monthly statement date occurs except for the month of February, in which case the monthly due day is the last date of the month of February. For example, if the applicable monthly statement date for water supplied in January is February 20 then the due date for such payment would be March 30. If the Buyer, at any time, disputes the amount to be paid by it to the Authority, the Buyer shall nevertheless promptly make such payment or payments; but, if it is determined by agreement or court decision that such disputed payments should have been less, or more, the Authority shall promptly revise and reallocate the charges in such manner that the Buyer will recover its overpayment or the Authority will recover the amount due it. All amounts due and owing to the Authority by Buyer , or due and owing to the Buyer by the Authority, shall, if not paid when due, bear interest per annum at the maximum rate allowed by law from the date when due until paid."

3.     **Amendment to ARTICLE VII, Section 7.15 of the Agreement.** ARTICLE VII, Section 7.15 of the Agreement is hereby deleted in its entirety.

4.     **Notices.** Any notice, demand, or communication required, permitted or desired to be given under this Addendum shall be deemed effectively given pursuant to ARTICLE VII, Section 7.24 the Agreement.

5.     **Headings.** The headings of the sections set forth in this Addendum are inserted for the convenience of reference only and shall be disregarded when construing or interpreting any of the provisions of this Addendum.

6.     **Complete Agreement.** This Addendum, the Agreement and any additional or supplementary documents incorporated by specific reference contain all of the terms and conditions agreed upon by the Parties and no other agreements, oral or otherwise, regarding the subject matter of this Addendum or any part thereof shall have any validity or bind either of the Parties.

**7.      Severability.**  If any provision of this Addendum is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of this Addendum which shall remain in full force and effect and enforceable in accordance with its terms.

**8.      Waiver.**  No waiver of any of the obligations contained herein shall be effective for any purpose unless the same shall be in writing signed by the Chairperson of the Incorporating Board of the Karegnondi Water Authority and by Mayor or Emergency Manager, or both upon the Flint City Council or Emergency Manager's approval, whichever is applicable.

**9.      Construction.**  This Addendum has been prepared and negotiations have occurred in connection with said preparation pursuant to the joint efforts of the Parties.  This Addendum therefore shall not be construed against either Party.

**10.      Amendment.**  This Addendum may not be amended or modified except for by written agreement signed by both Parties.

**11.      Certification of Authority to Sign Addendum.**  The persons signing on behalf of each of the Parties certify by their signatures that they are authorized to sign the Addendum on behalf of such Party and that this Addendum has been authorized by such Party.

**12.      Remainder of Agreement.**  Except as modified by this Addendum, the terms of the Agreement shall remain in full force and effect.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the Parties hereto have caused this Addendum to be executed and delivered by their respective duly authorized representatives as of the Effective Date of the Master Agreement to which this Addendum is attached as Exhibit G.

**KAREGNONDI WATER AUTHORITY**

By: _____ 12/22/17
John F. O'Brien, Deputy Chief Executive Officer

ATTEST:

_____ 12/22/17
Kevin Sylvester, Deputy Drain Commissioner

**CITY OF FLINT**

By: ___Executed in Counterpart_____
Karen Weaver, Mayor

ATTEST:

___Executed in Counterpart_____
Inez Brown, Clerk of the City of Flint

4

**IN WITNESS WHEREOF**, the Parties hereto have caused this Addendum to be executed and delivered by their respective duly authorized representatives as of the Effective Date of the Master Agreement to which this Addendum is attached as Exhibit G.

<u>**KAREGNONDI WATER AUTHORITY**</u>

Executed in Counterpart

By: _____

John F. O'Brien, Deputy Chief Executive Officer

**ATTEST:**

_____

<u>**CITY OF FLINT**</u>

By: _____

Karen Weaver, Mayor

**ATTEST:**

_____

Inez Brown, Clerk of the City of Flint