## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| *In Re* Flint Water Cases, | No.5:16-cv-10444-JEL-MKM (consolidated)<br><br>Hon. Judith E. Levy |
| LeeAnne Walters, as Next of Friend for Two Minor Children, G.W. 1 and G.W. 2, et al.,<br><br>     *Plaintiffs,*<br>v.<br><br>J.P. Morgan Chase & Co.; Wells Fargo Bank, National Association; and Stifel, Nicolaus & Company, Incorporated,<br><br>     *Defendants.* | Case No. 5:20-cv-12726 |

## MOTION TO DISMISS BY DEFENDANTS
## J.P. MORGAN SECURITIES LLC, WELLS FARGO BANK, N.A., AND STIFEL, NICOLAUS & COMPANY, INC.

1. The undersigned counsel certifies that counsel personally spoke to opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; concurrence was not obtained.

2.  Defendants J.P. Morgan Securities LLC, Wells Fargo Bank, N.A., and Stiefel, Nicolaus & Company, Inc., move this Court to dismiss all claims in Plaintiffs' Complaint under Federal Rule of Civil Procedure 12(b)(6).[1]

3.  Plaintiffs' Complaint fails to make sufficient allegations to state a claim upon which relief can be granted.

4.  In support of this Motion, Defendants incorporate by reference the arguments in their accompanying Brief in Support.

5.  Defendants further request oral argument and a hearing to further elaborate upon or clarify their arguments.

**Therefore**, for the reasons stated herein and in their supporting brief, Defendants therefore moves this court to Dismiss Plaintiffs' Complaint, with prejudice, in its entirety and for other such relief as this Court deems appropriate.

Dated: December 18, 2020              Respectfully submitted,

                                      /s/ Louis P. Gabel
                                      Louis P. Gabel (P80365)
                                      JONES DAY
                                      150 W. Jefferson Ave., Suite 2100
                                      Detroit, MI 42226
                                      P: (313) 733-3939
                                      lpgabel@jonesday.com

---

[1] Plaintiffs named the incorrect entity in their complaint.  Pursuant to the parties' November 9, 2020 stipulation (PageID.805), Plaintiffs were permitted to amend their complaint to substitute in the entity involved in the KWA underwriting—J.P. Morgan Securities LLC. To date, Plaintiffs have not amended the complaint. The instant motion is thus brought on behalf of J.P. Morgan Securities LLC as well as the improperly-named J.P. Morgan Chase & Co

Charlotte H. Taylor (DC 1024658)
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
P: (202) 879-3939
ctaylor@jonesday.com

*Counsel for Defendants J.P. Morgan Securities
LLC, Wells Fargo Bank, N.A., and Stifel,
Nicolaus & Company, Inc.*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| *In Re* Flint Water Cases, | No. 5:16-cv-10444-JEL-MKM (consolidated) |
| | Hon. Judith E. Levy |
| LeeAnne Walters, as Next of Friend for Two Minor Children, G.W. 1 and G.W. 2, et al., | Case No. 5:20-cv-12726 |
| *Plaintiffs,* | |
| v. | |
| J.P. Morgan Chase & Co.; Wells Fargo Bank, National Association; and Stifel, Nicolaus & Company, Incorporated, | |
| *Defendants.* | |

## BRIEF IN SUPPORT OF THE MOTION TO DISMISS BY DEFENDANTS J.P. MORGAN SECURITIES LLC, WELLS FARGO BANK, N.A., <u>AND STIFEL, NICOLAUS & COMPANY, INC.</u>

# **TABLE OF CONTENTS**

**Page**

ISSUES PRESENTED, PURSUANT TO L.R. 7.1(D)(2) ...........................................viii

MOST RELEVANT AUTHORITY, PURSUANT TO L.R. 7.1(D)(2) .....................x

INTRODUCTION...................................................................................... 1

BACKGROUND........................................................................................ 3

I.   FACTUAL BACKGROUND ............................................................. 3

    A.   The Karegnondi Water Authority............................................. 3

    B.   The KWA Bond Underwriting.................................................. 3

    C.   The MSRB Regulatory Scheme ............................................... 4

    D.   The Flint Water Treatment Plant ............................................. 6

    E.   The Flint Water Crisis.............................................................. 7

II.  PROCEDURAL HISTORY................................................................. 9

LEGAL STANDARD.............................................................................. 10

ARGUMENT ........................................................................................... 10

I.   PLAINTIFFS' § 1983 CIVIL CONSPIRACY CLAIM FAILS AS A
    MATTER OF LAW......................................................................... 10

    A.   Plaintiffs Fail to Meet the Heightened Pleading Standard for
        Conspiracy Claims................................................................. 11

    B.   Plaintiffs Fail to Allege That the Underwriters Acted "Under Color
        of" State Law. ........................................................................ 12

        1.   Plaintiffs Fail to Allege a "Single Plan."................................... 13

        2.   Plaintiffs Fail to Allege a Shared Conspiratorial Objective. ................ 14

        3.   A Defendant Cannot Conspire to Commit a Reckless Act. ............... 15

    C.   Plaintiffs Fail to Allege Conscience-Shocking Behavior. ............................. 16

    D.   Plaintiffs Fail to Allege Proximate Causation. ................................. 17

    E.   Plaintiffs' § 1983 Conspiracy Claim Is Precluded by the Federal
        Securities Laws...................................................................... 18

II.  PLAINTIFFS' MICHIGAN NEGLIGENCE CLAIM FAILS AS A
    MATTER OF LAW......................................................................... 19

## <u>TABLE OF CONTENTS</u>
(continued)

**Page**

A.   The Underwriters Had No Duty To Protect Plaintiffs. .............................. 19

    1.   The Underwriters Did Not Have a Special Relationship with Plaintiffs Obliging Them to Protect Them from Harm. ..................... 19

    2.   Even on a Theory of Direct Harm, Tort Law Does Not Recognize a Duty Owed by Defendants on These Facts.................... 20

    3.   Professional Negligence Law Does Not Supply a Duty....................... 21

B.   The Underwriters Did Not Proximately Cause Plaintiffs' Injuries............. 22

C.   Plaintiffs' State-Law Claim Is Also Preempted. ............................................ 23

CONCLUSION ........................................................................................................ 25

CERTIFICATE OF SERVICE ....................................................................... 26

# <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Adickes v. S. H. Kress & Co.,*
    398 U.S. 144 (1970) ............................................................... 11

*Arnold v. Int'l Bus. Machines Corp.,*
    637 F.2d 1350 (9th Cir. 1981) ................................................ 17

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .......................................................... 10, 14

*Bazzi v. Dearborn,*
    658 F.3d 598 (6th Cir. 2011) ................................................. 14

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) .............................................................. 10

*Boler v. Early,*
    No. 5:16-cv-10323, 2016 WL 1573272 (E.D. Mich. Apr. 19, 2016) ......................... 9

*Broz v. Plante & Moran, PLLC,*
    951 N.W.2d 64 (Mich. Ct. App. 2020) ................................... 21

*Collyer v. Darling,*
    98 F.3d 211 (6th Cir. 1996) .................................................. 15

*Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.,*
    508 F.3d 327 (6th Cir. 2007) ................................................... 3

*Comstock v. Gen. Motors Corp.,*
    358 Mich. 163 (1959) .......................................................... 23

*Credit Suisse First Bos. Corp. v. Grunwald,*
    400 F.3d 1119 (9th Cir. 2005) .......................................... passim

*Credit Suisse Sec. (USA) LLC v. Billing,*
    551 U.S. 264 (2007) ................................................................ 18

*Elbert v. City of Saginaw,*
    363 Mich. 463 (1961) ............................................................... 19

*Guertin v. State,*
    912 F.3d 907 (6th Cir. 2019) ...........................................passim

*Gutierrez v. Lynch,*
    826 F.2d 1534 (6th Cir. 1987) ............................................ 11, 12

*Hooks v. Hooks,*
    771 F.2d 935 (6th Cir. 1985) .............................................. 13, 14

*Huron Valley Hosp., Inc. v. Pontiac,*
    650 F. Supp. 1325 (E.D. Mich. 1986), *aff'd*, 849 F.2d 262 (6th Cir.
    1988) ...................................................................................... 14

*Hyde Park Partners, L.P. v. Connolly,*
    839 F.2d 837 (1st Cir. 1988) ................................................. 24

*In re Biozoom, Inc. Sec. Litig.,*
    93 F. Supp. 3d 801 (N.D. Ohio 2015) ..................................... 25

*In re Certified Question from Fourteenth Dist. Court of Appeals of Texas,*
    479 Mich. 498 (2007) ............................................................. 20

*In re Flint Water Cases,*
    384 F. Supp. 3d at 842 (E.D. Mich. 2019) ....................14, 16, 18

*In re Flint Water Cases,*
    453 F. Supp. 3d 970 (E.D. Mich. 2020) ..........................11, 12, 16

*In re Flint Water Cases,*
    969 F. 3d 298 (6th Cir. 2020) ................................................. 9

*Johnson v. Botsford Gen. Hosp.,*
    278 Mich. App. 146 (2008) ..................................................... 21

*Lantz v. Private Satellite Television, Inc.*,
    813 F. Supp. 554 (E.D. Mich. 1993) ............................................................................ 21

*Loweke v. Ann Arbor Ceiling & Partition Co.*,
    489 Mich. 157 (2011) ...................................................................................................... 19

*Marvaso v. Sanchez*,
    971 F.3d 599 (6th Cir. 2020) ................................................................................. 11, 17

*McDaniel v. Upsher-Smith Labs., Inc.*,
    893 F.3d 941 (6th Cir. 2018), *cert. denied*, No. 19-1246, 2020 WL
    5882237 (U.S. Oct. 5, 2020) ........................................................................... 23, 24

*McDaniel v. Wells Fargo Investments, LLC*,
    717 F.3d 668 (9th Cir. 2013) ........................................................................... 24, 25

*Midwest Mem'l Grp. LLC v. Citigroup Glob. Markets Inc.*,
    No. 322338, 2015 WL 5519398 (Mich. Ct. App. Sept. 17, 2015) ........................... 22

*Mitchell-Crenshaw v. Joe*,
    No. 263057, 2006 WL 287434 (Mich. Ct. App. Feb. 7, 2006) ................................. 22

*Mut. Pharm. Co. v. Bartlett*,
    570 U.S. 472 (2013) ................................................................................................ 24

*N. Trust Co. v. VIII S. Mich. Assocs.*,
    276 Ill. App. 3d 355 (1995) ................................................................................... 21

*Nymark v. Heart Fed. Sav. & Loan Assn.*,
    231 Cal. App. 3d 1089 (1991) ............................................................................... 21

*People v. Hammond*,
    187 Mich. App. 105 (1991) ................................................................................... 15

*Powers v. Hamilton Cty. Pub. Def. Comm'n*,
    501 F.3d 592 (6th Cir. 2007) ................................................................................. 17

*Ray v. Swager*,
    501 Mich. 52 (2017) ............................................................................................... 23

*Reinert v. Dolezel*,
    147 Mich. App. 149 (1985) ................................................................... 19, 20

*Rochester Endoscopy & Surgery Ctr., LLC v. Desrosiers Architects, PC*,
    No. 349952, 2020 WL 6231823 (Mich. Ct. App. Oct. 22, 2020) ............................ 22

*Sam v. Balardo*,
    411 Mich. 405 (1981) ......................................................................... 21

*Smith v. Robinson*,
    468 U.S. 992 (1984) .......................................................................... 18

*State of Michigan v. Prysby*,
    No. 16-TB-0927 (Mich. Dist. Ct., Dec. 26, 2018) ........................................... 7

*State v. Donohue*,
    834 A.2d 253 (N.H. 2003) ................................................................... 15

*Tahfs v. Proctor*,
    316 F.3d 584 (6th Cir. 2003) ............................................................... 12

*United States v. Price*,
    383 U.S. 787 (1966) .......................................................................... 12

*Williams v. Cunningham Drug Stores, Inc.*,
    429 Mich. 495 (1988) ........................................................................ 19

**STATUTES**

15 U.S.C. §§ 78c(a)(26) ......................................................................... 4

15 U.S.C. §§ 78o–4(b) .......................................................................... 4

15 U.S.C. §§ 78o-4(b)(2)(C) ..................................................................... 4

15 U.S.C. §§ 78s(b) ............................................................................ 4

42 U.S.C. § 1983 ........................................................................passim

Home Rule City Act ............................................................................ 6

## OTHER AUTHORITIES

77 Fed. Reg. 27,509 ............................................................................... 5

77 Fed. Reg. 27,514 ............................................................................... 5

Model Penal Code ................................................................................ 15

MSRB interpretive guidance on Rule G-17........................................ 5

MSRB Interpretive Notice Concerning the Application of MSRB Rule
  G-17 to Underwriters of Municipal Securities (August 2, 2012) ............................... 5

MSRB, Issuer Considerations for Selecting the Underwriting Team and
  Understanding the Pre-Marketing Process .................................... 4

MSRB, Reminder of Customer Protection Obligations in Connection
  with Sales of Municipal Securities (March 30, 2007)................... 5

Prosser & Keeton, The Law of Torts (5th ed.), § 44, 201.............................. 23

Federal Rule of Civil Procedure 12(b)(6).......................................... 10

Rule G-17 ....................................................................................4, 5, 24, 25

W. LaFave, Substantive Criminal Law § 12.2(c) at 278 (2d ed. 2003) .......................... 15

## <u>ISSUES PRESENTED, PURSUANT TO L.R. 7.1(D)(2)</u>

**FIRST ISSUE**: Defendants underwrote bonds issued to finance a new water system for a group of municipalities, including the City of Flint. On the facts pleaded, did Defendants thereby conspire with state and local officials to recklessly cause the physical injuries sustained by Plaintiff residents of the City, in violation of Plaintiffs' constitutional right to bodily integrity, when the City chose to make interim use of a different water source, inadequately treated that water, and then concealed and failed to prevent the resulting hazards to residents' health?

**FIRST ANSWER**: No, for five reasons: (1) Plaintiffs have not pleaded with specificity a conspiratorial agreement between Defendants' employees and government officials. (2) Plaintiffs have alleged no facts showing that Defendants acted "under color of" state law for § 1983 purposes. (3) Plaintiffs have pleaded no facts showing that Defendants displayed "deliberate indifference" in a manner that shocks the conscience. (4) Defendants did not proximately cause Plaintiffs' injuries, which were the result of independent decisions and malfeasance by government officials. (5) Plaintiffs' § 1983 claim is precluded by federal securities laws.

**SECOND ISSUE:** Did Defendants commit a Michigan state-law tort of professional negligence when they did not affirmatively prevent the City from pursuing its separate and independent decision to utilize Flint River water while the new water system funded by the bonds was being constructed, where the interim use of this water and the decisions on how to treat (or not treat) this water ultimately injured Plaintiffs?

**SECOND ANSWER:** No, for at least three reasons. (1) Defendants had no duty to protect Plaintiffs from environmental harms, as they did not have a special relationship (or any relationship) with Plaintiffs that would impose such a duty. (2) Defendants did not proximately cause Plaintiffs' injuries. (3) Any such claim is preempted by the federal securities laws.

## <u>MOST RELEVANT AUTHORITY, PURSUANT TO L.R. 7.1(D)(2)</u>

*Authority For First Issue*

**<u>Cases</u>**

*Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987)

*Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020)

*In re Flint Water Cases*, 453 F. Supp. 3d 970, 985 (E.D. Mich. 2020)

*Arnold v. Int'l Bus. Machines Corp.*, 637 F.2d 1350, 1358 (9th Cir. 1981)


**<u>Statutes</u>**

42 U.S.C. § 1983.

*Authority for Second Issue*

**<u>Cases</u>**

*Reinert v. Dolezel*, 147 Mich. App. 149, 157 (1985).

*In re Certified Question from Fourteenth Dist. Court of Appeals of Texas*, 479 Mich. 498, 515 (2007).

*Lantz v. Private Satellite Television, Inc.*, 813 F. Supp. 554, 556 (E.D. Mich. 1993).

*Comstock v. Gen. Motors Corp.*, 358 Mich. 163, 179 (1959).

*Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1133 (9th Cir. 2005).

*McDaniel v. Wells Fargo Investments, LLC*, 717 F.3d 668, 676 (9th Cir. 2013).

Defendants J.P. Morgan Securities LLC, Wells Fargo Bank, N.A, and Stifel, Nicolaus & Company, Inc. ("Defendants" or "Underwriters") submit this brief in support of their motion to dismiss.[1]

## INTRODUCTION

The tragic facts of the Flint water crisis are well known. As the Complaint alleges, the City of Flint's drinking water first showed signs of contamination in 2014. The subsequent actions (and inaction) of government officials led to the poisoning of Flint residents. Thousands have justly sought recompense from responsible parties.

But as this Court has recognized in other Flint water cases, the law does not allow recovery from every party whose past actions indirectly relate to these events— especially not parties, like the Underwriters, who are only remotely associated with the operative events. Nearly five years after the first Flint water lawsuits, Plaintiffs here sue three banks that underwrote the bonds that financed the Karegnondi Water Authority ("KWA") system—which would have delivered *safe* water to Flint. But Plaintiffs do not even allege that the Underwriters financed, recommended, or had any say in either the City's use of Flint River water while the KWA system was constructed or its use of the Flint Water Treatment Plant ("WTP") to process that water. There is no allegation that

---

[1] Plaintiffs named the incorrect entity in their complaint. Pursuant to the parties' November 9, 2020 stipulation (PageID.805), Plaintiffs were permitted to amend their complaint to substitute in the entity involved in the KWA underwriting—J.P. Morgan Securities LLC. To date, Plaintiffs have not amended the complaint. The instant motion is thus brought on behalf of J.P. Morgan Securities LLC as well as the improperly-named J.P. Morgan Chase & Co.

1

they collaborated or even *communicated* with public officials when contamination was discovered and then concealed. The pleadings simply do not support a cause of action.

In the face of these deficiencies, Plaintiffs offer two novel theories of liability. They first assert a 42 U.S.C. § 1983 claim, alleging that the Underwriters conspired with officials to violate Plaintiffs' right to bodily integrity. This Court should not be the first to allow such a claim against underwriters of bonds that fund public projects. *First*, Plaintiffs fail to plead adequately that bank employees and public officials formed a conspiracy. *Second*, Plaintiffs allege no facts showing the Underwriters acted "under color of" state law. *Third*, Plaintiffs plead no facts showing "deliberate indifference" on the Underwriters' part. *Fourth*, the bond issuance for the KWA did not proximately cause Plaintiffs' injuries. *Fifth*, federal securities laws preclude § 1983 liability.

Plaintiffs also rely on a state-law "professional negligence" theory. But no court has held underwriters liable in negligence for harms to third parties arising out of issuers' use of funds—let alone for harms arising from actions taken by issuers *separate* from their use of funds. Nor can the allegations here support this theory. *First*, the facts alleged do not establish a duty on the Underwriters' part to guard the general public from harm. *Second*, the Underwriters' actions did not proximately cause Plaintiffs' injuries. *Third*, federal law preempts Plaintiffs' state-law claim.

Moreover, Plaintiffs' theories would upend the market for municipal bonds by imposing a new and costly species of liability on underwriters. The financial effects for municipalities could be devastating. This Court should not allow these novel claims.

2

# BACKGROUND

## I.   FACTUAL BACKGROUND

### A.   The Karegnondi Water Authority

For decades, Flint, Genesee County, and neighboring municipalities received water from the Detroit Water and Sewerage Department ("DWSD"). (PageID.68, ¶ 21.) But as early as 2004, they began to consider alternatives (*see* PageID.660, 423), and in 2010 formed the KWA, a municipal authority under Michigan law that would build a regional water system drawing from Lake Huron, (PageID.660; 5:17-cv-10164 PageID.5068, ¶¶ 78–79). The needed infrastructure investments were estimated at $300 million. (PageID.69, ¶¶ 24–25.) Though Flint considered proposals to stay on the DWSD system into early 2013 (5:17-cv-10164 PageID.5070, ¶¶ 87–89; PageID.5072, ¶ 94), it finally committed to purchase KWA water in June 2013 (PageID.123, 782).[2]

### B.   The KWA Bond Underwriting

The KWA obtained financing from a negotiated bond sale through the Underwriters on April 1, 2014. (PageID.70, ¶ 34, PageID.107–37.) A "negotiated sale" is a common form of municipal bond offering in which the underwriter works with an

---

[2] Solely for purposes of this motion, the Underwriters accept as true all allegations in the Complaint and in the Proposed Amended Master Long Form Complaint and Jury Demand ("Master Complaint") filed in 5:17-cv-10164, No. 185, which Plaintiffs incorporate by reference. (PageID.65, ¶ 8; 5:17-cv-10164, PageID.5042-5248.) "[D]ocuments attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007).

3

issuer to structure an offer, purchases the bonds, and resells them to investors.[3] Here the Underwriters bought from the KWA, and then sold, bonds totaling $220,500,000 in principal value. (PageID.113.) The bonds were issued for the "purpose of paying a portion of the cost of acquiring and constructing [KWA's] Water Supply System" and "supplying raw water to its member communities." (PageID.113.)

## C.     The MSRB Regulatory Scheme

The KWA bond issue took place under a detailed federal regulatory scheme. The Municipal Securities Rulemaking Board ("MSRB"), a self-regulatory organization chartered by Congress, is the main regulator of the municipal securities market. *See* 15 U.S.C. §§ 78o–4(b), 78c(a)(26). It proposes, for SEC adoption, rules governing municipal securities transactions and parties to them. 15 U.S.C. §§ 78o-4(b)(2)(C), 78s(b). Rule violations are prohibited by statute and enforced by the SEC (or related agencies). *Id.* §§ 78s(b),78o-4(c)(2)–(4).

Federal regulations establish carefully calibrated duties for municipal bond underwriters. On the one hand, underwriters owe duties of fair dealing and disclosure to bond *purchasers*. Under MSRB Rule G-17, dealers in municipal securities "shall deal fairly with all persons and shall not engage in any deceptive, dishonest, or unfair practice." This requires underwriters to disclose to investors "[known] material facts

---

[3] *See generally* MSRB, Issuer Considerations for Selecting the Underwriting Team and Understanding the Pre-Marketing Process, *available at* http://www.msrb.org/msrb1/pdfs/selecting-Underwriting-Team.pdf.

about the transaction." MSRB, Reminder of Customer Protection Obligations in Connection with Sales of Municipal Securities (March 30, 2007). Rule G-17 also requires underwriters to sell municipal securities at "fair and reasonable" prices. MSRB Interpretive Notice Concerning the Application of MSRB Rule G-17 to Underwriters of Municipal Securities (August 2, 2012) ("2012 Interpretive Notice").[4]

On the other hand, underwriters also owe duties to municipal bond *issuers*. Rule G-17's duty of fair dealing "includes an implied representation that the price an underwriter pays to an issuer is" based on "the best judgment of the underwriter as to the fair market value of the issue." 2012 Interpretive Notice. In negotiated sales, "the underwriter has a duty . . . to negotiate in good faith with the issuer," including by "ensur[ing] the accuracy of representations made during the course of such negotiations." *Id.* But underwriters owe no *fiduciary* duty to issuers, *see* 77 Fed. Reg. 27,514; rather, underwriters and issuers are counterparties in an "arm's-length" transaction. 2012 Interpretive Notice. Accordingly, underwriters must disclose to issuers that (1) "the underwriter's primary role is to purchase securities [for] distribution in an arm's-length commercial transaction with the issuer"; (2) "the underwriter does not have a fiduciary duty to the issuer"; and (3) the underwriter's "duty to purchase

---

[4]     MSRB interpretive guidance on Rule G-17 is available at http://www.msrb.org/Rules-and-Interpretations/MSRB-Rules/General/Rule-G-17.aspx?tab=2. The SEC adopts such guidance by notice-and-comment rulemaking. *E.g.*, 77 Fed. Reg. 27,509 (May 4, 2012) (adopting 2012 Interpretive Notice).

securities from the issuer at a fair and reasonable price" must be balanced with its "duty to sell . . . securities to investors at [fair] prices." *See* 2012 Interpretive Notice.

### D.     The Flint Water Treatment Plant

Between the April 2014 expiration of its contract with DWSD and the completion of the KWA system, Flint planned to treat Flint River water at the Flint WTP. The bond offering was not contingent on this choice, however; Genesee County used the DWSD system as its interim water supply. (PageID.113, 123.)

For years, the WTP had served as a backup to supply drinking water, treating Flint River water several weeks each year. (*See* PageID.338.) In 2006, the WTP underwent a $48 million upgrade to "meet state regulatory requirements." (PageID.339.) An engineering assessment disclosed by the KWA with its "Official Statement" on the March 2014 offering confirmed the WTP was treating drinking water, but noted that it required additional $8 million worth of renovations to its electrical equipment, building security, building renovations, roof, and HVAC systems. (PageID.123–24, 339.) The engineers noted that Flint had a capital improvement plan in place and planned to fund the updates with revenue from water rates. (PageID.339.)[5]

---

[5] The Master Complaint states that the Home Rule City Act precluded the City, then in receivership, from issuing bonds. (5:17-cv-10164, PageID.5173 ¶ 413.) Plaintiffs allege that Flint officials and their counsel worked with the Michigan Department of Environmental Quality to get a "bogus" Administrative Consent Order ("ACO") and qualify for an exception. (5:17-cv-10164, PageID.5173–75 ¶¶ 414–15, 418–19.) While Plaintiffs allege that the Underwriters "understood that the [ACO] was a pretext," they plead no specific facts in support. (*See* PageID.90-91, ¶¶ 187, 191, 193–94.) Nor do they allege any Underwriter involvement in securing the ACO.

To update its WTP and use the Flint River as an interim water source, Flint obtained approval from the Michigan Department of Environmental Quality ("MDEQ") in April 2014. (5:17-cv-10164, PageID.5127, ¶ 282; PageID.5179, ¶¶ 428–29.) Plaintiffs allege that the MDEQ issued this permit in violation of Michigan law (5:17-cv-10164, PageID.5180, ¶¶ 431–32), and one MDEQ official has pleaded no contest to a crime in connection with this process, *State of Michigan v. Prysby*, No. 16-TB-0927 (Mich. Dist. Ct., Dec. 26, 2018) (Ex. A). Plaintiffs allege no Underwriter involvement therein.

Flint hired engineering firm Lockwood, Andrews and Newnam, P.C. ("LAN") for advice on the WTP's "design and upgrade," and LAN claimed to have "the knowledge, expertise and the technical professionals to handle" the task. (5:17-cv-10164, PageID.5122-3.) Flint "relied upon" LAN's identification of WTP items needing upgrades, and officials "relied upon [the firm's] advice in pronouncing the City's water to be safe." (5:17-cv-10164, PageID.5123-4, ¶¶ 267–69.) Flint also obtained a proposal from Rowe Professional Services Company ("Rowe"), its City Engineer. (5:17-cv-10164, PageID.5120, ¶ 257.) Neither firm urged use of corrosion control. (5:17-cv-10164, PageID.5120, ¶ 259; PageID.5128, ¶ 285.)

### E.     The Flint Water Crisis

On April 25, 2014, after the KWA bond sale, Flint stopped purchasing treated water from DWSD and began treating raw Flint River water at the WTP. (5:17-cv-10164, PageID.5081, ¶ 126.) Within a month, citizens began complaining about water

quality. (5:17-cv-10164, PageID.5085, ¶ 142, n.4.) The discovery of E. Coli in the water led to a "boil water" advisory in August and September. (5:17-cv-10164, PageID.5130, ¶ 290.) By the end of 2014, Flint children were registering elevated lead levels. (5:17-cv-10164, PageID.5135, ¶¶ 314–15.) The incidence of Legionella also grew between October 2014 and January 2015. (5:17-cv-10164, PageID.5087, ¶ 152, PageID.5089, ¶ 158.) Flint River water had corroded a protective layer within Flint's pipes, causing lead to leach into the drinking water and elevating the risk of bacterial contamination. (5:17-cv-10164, PageID.5133–34, ¶¶ 306–08; PageID.5131, ¶ 296.)

Throughout this period, officials at all levels allegedly were aware of contamination. The Michigan Department of Health and Human Services ("MDHHS") observed increased lead levels among Flint children in the summer of 2014. (5:17-cv-10164, ¶ 297.) By October, the County Health Department found a potential connection between the Legionnaire's increase and the new water source. (PageID.5086, ¶ 146, n.6.) EPA studies shared with the MDEQ showed high lead levels by February 2015. (5:17-cv-10164, PageID.5091, ¶¶ 166–67.)

But key actors were allegedly derelict in their duties. As alleged in the Master Complaint, two engineering firms failed to identify the problems with Flint's drinking water. (*See* 5:17-cv-10164, PageID.5141–52, ¶¶ 337–59.) The City rejected DWSD's offer in January 2015 to reconnect to its system even though DWSD waived any reconnection fee. (5:17-cv-10164, PageID.5090–91, ¶ 160.) Worse, public officials concealed evidence of contamination. The Master Complaint alleges that a "cover-up"

8

soon began in the Governor's office. (PageID.5090, ¶ 162.) It asserts that MDEQ officials misled federal regulators about Flint's failure to use anti-corrosion chemicals. (5:17-cv-10164, PageID.5092, ¶¶ 168–69.) And it claims that county officials tracing a Legionnaire's outbreak were "stonewalled by the State and City." (5:17-cv-10164, PageID.5093-5, ¶¶ 172–76.) State and local leaders even tried to undermine independent research on the safety of Flint's water, accusing local doctors of misleading the public for publishing test results and maligning a Virginia Tech professor whose tests showed lead in the water. (5:17-cv-10164, PageID.5102–04, ¶¶ 197–8, ¶¶ 202–03.)

Not until a year after receiving the first complaints did officials take action, with Flint issuing a lead advisory in September 2015, (5:17-cv-10164, PageID.5203, ¶ 475), and reconnecting to the DWSD that October. (5:17-cv-10164, PageID.5105, ¶ 209.)

## II.   PROCEDURAL HISTORY

Individuals harmed by Flint water first filed suit in 2016. *E.g.*, *Boler v. Early*, No. 5:16-cv-10323, 2016 WL 1573272 (E.D. Mich. Apr. 19, 2016). On January 18, 2017, individual minor residents of Flint sued state and local officials and engineering firms, alleging that they were harmed by the City's use of Flint River water. (No. 5:17-cv-10164, PageID.1–6, ¶¶ 1–14.) After this Court resolved those defendants' motions to dismiss, two of those plaintiffs' claims survived: a § 1983 claim that the government defendants violated their right to bodily integrity, and a professional negligence claim against the engineering firms. (5:17-cv-10164, PageID.7209–12.) The Sixth Circuit largely affirmed. *In re Flint Water Cases*, 969 F. 3d 298, 304 (2020).

On October 7, 2020, Plaintiffs filed a Complaint against the Underwriters, incorporating by reference the Master Complaint filed in *Walters* (No. 5:17-cv-10164). Plaintiffs assert (1) a claim under § 1983 that the Underwriters conspired to violate their substantive due process right to bodily integrity, and (2) a state-law negligence claim that the Underwriters breached a professional duty of care to Plaintiffs. (PageID.5–6.)

## LEGAL STANDARD

Courts reviewing a Rule 12(b)(6) assume that the plaintiff's factual allegations are true in order to determine whether the complaint states a valid claim for relief. *See Guertin v. State*, 912 F.3d 907, 916 (6th Cir. 2019). This Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, claims must be "plausible on [their] face," *id.*, and contain "more than labels and conclusions or a formulaic recitation of the elements of a cause of action," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ARGUMENT

## I.   PLAINTIFFS' § 1983 CIVIL CONSPIRACY CLAIM FAILS AS A MATTER OF LAW.

Plaintiffs' § 1983 claim is wholly unsupported by law. Section 1983 provides remedies against "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any [federal] rights." The deprivation alleged here is violation of a substantive due process right to bodily integrity. To make out this claim against a government official, a plaintiff must

10

show government conduct that "shocks the conscience" by displaying "deliberate indifference" to her injuries. *Guertin*, 912 F.3d at 922, 926.

To be liable under § 1983, a party must have acted "under color of" state law. *See, e.g., Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150 (1970). For a private party, a conspiracy with state actors will establish this element only if a plaintiff pleads with particularity that "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the injury." *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020); *see also, e.g., Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987) ("[V]ague and conclusory allegations unsupported by material facts will not be sufficient."). Plaintiffs' § 1983 claim flouts almost all of these requirements.

### A.   Plaintiffs Fail to Meet the Heightened Pleading Standard for Conspiracy Claims.

At the threshold, Plaintiffs' § 1983 claim is inadequately pleaded. To meet the heightened pleading standard for conspiracy, Plaintiffs must allege specific actions by particular individuals. *See Gutierrez*, 826 F.2d at 1538–39. Mere "generalized references" to groups of defendants are inadequate. *In re Flint Water Cases*, 453 F. Supp. 3d 970, 985 (E.D. Mich. 2020). And Plaintiffs must "identify *behavior*, as opposed to *outcomes*, suggesting corruption." *Id.* (citing *Tahfs v. Proctor*, 316 F.3d 584 (6th Cir. 2003)).

Here "Plaintiffs identify no single person" who entered agreements or "took any overt actions in furtherance of a conspiracy. They simply make the kinds of allegations

11

that the law forbids: vague and conclusory." *In re Flint Water Cases*, 453 F. Supp. 3d 970, 985 (E.D. Mich. 2020). The Complaint identifies no call, meeting, or message by which an unlawful agreement was formed. It relies on broad assertions about groups—for example, that "*everyone* involved on the underwriting side, including executives, agents and employees of" the Underwriters "knew that it was doubtful that the [WTP renovation] could be financed" (PageID.75-76, ¶¶ 77–79). These generalized group allegations are deficient. *See Gutierrez*, 826 F.2d at 1538–39; *Tahfs*, 316 F.3d at 592.

This Court found similarly vague allegations insufficient for conspiracy claims against private actors in other Flint water cases, including engineering firms hired to assess water safety. *See In re Flint Water Cases*, 453 F. Supp. 3d at 985 (dismissing § 1983 conspiracy claims against VNA, LAN and McLaren). Those plaintiffs had improperly "designated an entire group of people as part of a conspiracy without specifying individual actions." *Id.* Because "Plaintiffs identif[ied] no single person at" the firms "who took any overt actions in furtherance of a conspiracy," they stated no conspiracy-based claim under § 1983. *Id.* at 985. The same is true here.

## B.  Plaintiffs Fail to Allege That the Underwriters Acted "Under Color of" State Law.

Nor do the pleadings show that the Underwriters acted "under color of" state law. Private parties do so only by "willful[ly] participat[ing] in joint activity with the State or its agents." *United States v. Price*, 383 U.S. 787, 794 (1966); *see also Tahfs*, 316 F.3d at 590–91. But Plaintiffs allege neither the single plan nor the shared conspiratorial

objective required for such joint activity. As a general principle, moreover, it is impossible to conspire to commit a reckless act.

### 1.     Plaintiffs Fail to Allege a "Single Plan."

Under longstanding Sixth Circuit precedent, there is no "single plan" if the alleged private conspirator could not have foreseen the public official's constitutional violation. *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). So, in *Hooks*, where two private actors allegedly conspired with the plaintiff's husband to wrongfully take her children to Texas, and then she "surreptitious[ly] remov[ed]" the children to Tennessee, the private actors did not share a "single plan" with Tennessee officials who, she alleged, unconstitutionally took her children after she returned home. There was "no way they could have anticipated [that] chain of events," and so there was no single plan. *Id.*

Here, even granting Plaintiffs all reasonable inferences, they have not plausibly alleged a foreseeable chain of events linking the Underwriters to their injuries or establishing a "single plan." Plaintiffs allege that when the bonds were issued, the Underwriters knew that Flint planned to use the WTP to treat Flint River water while the KWA system was being built. (*See* PageID.98, ¶ 226; PageID.338–39.) But as in *Hooks*, the Underwriters are not alleged to (and could not) have foreseen that, as alleged by Plaintiffs, (1) the MDEQ would issue a permit for full-time use of the WTP in violation of Michigan law; (2) Flint officials and certain consultants would ignore evidence of health hazards, mislead the public, and refuse to take action; or (3) City, state, and federal officials would suppress evidence of contamination. *See supra* at 6–9.

13

Yet these latter, conscience-shocking actions—which led to criminal charges against some officials—constitute the rights violation alleged here. *See Guertin*, 912 F.3d at 922, 926. In fact, as this Court and the Sixth Circuit have held, Plaintiffs pleaded viable constitutional claims against certain officials *precisely because* their conduct was shocking. *See, e.g., Guertin*, 912 F.3d at 928 ("[Government officials] created the Flint Water environmental disaster and then intentionally attempted to cover[]up their grievous decision. Their actions shock our conscience."); *In re Flint Water Cases*, 384 F. Supp. 3d at 842 (similar). Plaintiffs offer no "plausible," "nonconclusory" allegations that the Underwriters could have anticipated any such stunning behavior. *Iqbal*, 556 U.S. at 678, 680. Because these acts were unforeseeable at the time of the underwriting, it is impossible as a matter of law for the Underwriters to have been part of a "single plan" to violate Plaintiffs' constitutional rights. *Hooks*, 771 F.2d at 944.

## 2. Plaintiffs Fail to Allege a Shared Conspiratorial Objective.

The Complaint also cannot support a finding of a shared "conspiratorial objective" to "deprive" Plaintiffs of their constitutional rights. *See Revis*, 489 F.3d at 290–91. "It is not sufficient to allege that the [private and state] defendants merely acted in concert or with a common goal. [Defendants must have allegedly] *directed themselves towards an unconstitutional action by virtue of a mutual understanding.*" *Huron Valley Hosp., Inc. v. Pontiac*, 650 F. Supp. 1325, 1344–45 (E.D. Mich. 1986), *aff'd*, 849 F.2d 262 (6th Cir. 1988) (emphasis added) (cleaned up); *see also Bazzi v. Dearborn*, 658 F.3d 598, 603 (6th Cir. 2011) (faulting plaintiff for providing "no evidence that [defendant] shared the

14

conspiratorial objective of violating [plaintiff's constitutional] rights by issuing a false police report"); *Collyer v. Darling*, 98 F.3d 211, 230–31 (6th Cir. 1996) (similar).

Nothing of the sort has been pleaded here. The Complaint alleges that the Underwriters were *aware* that Flint would use the Flint River as an interim water source; and that they "simply did not care" about the attendant risks. (PageID.95, ¶ 210.) Even if true (which it is not), that does not establish that the Underwriters had the *objective* of depriving Flint residents of their right to bodily integrity, nor that there was a "mutual understanding" between the Underwriters and the government officials that the officials would callously disregard a known risk of bodily harm to Flint residents.

### 3. A Defendant Cannot Conspire to Commit a Reckless Act.

More fundamentally, conspiracy liability for the constitutional violation alleged is impossible. Conspiracy requires a shared unlawful intent ("conspiratorial objective"); but here the alleged violation is deliberate or reckless indifference in causing bodily harm. *See Guertin*, 912 F.3d at 923–24. And "there is no such thing as a conspiracy to commit a [wrong] which is defined in terms of recklessly or negligently causing a result." W. LaFave, Substantive Criminal Law § 12.2(c) at 278 (2d ed. 2003); *see also, e.g., People v. Hammond*, 187 Mich. App. 105, 107–09 (1991) (no conspiracy possible for second-degree murder); *State v. Donohue*, 834 A.2d 253, 256 (N.H. 2003) ("[O]ne cannot conspire to commit a crime where mere recklessness or negligence with respect to a result element suffices for the actor's culpability") (citing Model Penal Code).

## C.   Plaintiffs Fail to Allege Conscience-Shocking Behavior.

Plaintiffs also do not allege that the Underwriters acted with deliberate indifference. As this Court and the Sixth Circuit have held in related cases, officials who lacked authority over key decisions regarding the response to (and cover up of) contamination evidence did not have the required mental state for a constitutional violation. *See Guertin*, 912 F.3d at 932 (Individual does not "violate[] the right to bodily integrity just because he failed to 'blow the whistle.'"); *In re Flint Water Cases*, 453 F. Supp. 3d at 995 (dismissing § 1983 claim against defendant not alleged to have "any authority over the switch to using Flint River water in April 2014," even though he "was involved in developing the interim plan" and "may have set in motion the chain of events that led to the transition to the Flint River"); *In re Flint Water Cases*, 384 F. Supp. 3d 802, 859–60 (E.D. Mich. 2019), *aff'd and remanded*, 960 F.3d 303 (6th Cir. 2020) (no § 1983 claim against defendant who may have known "the [WTP] was not utilizing the proper corrosion control techniques," because he neither "publicly denied there was a problem with Flint's water," nor "otherwise encouraged Flint residents to use the contaminated water"). Far from pleading that the Underwriters participated in unlawful decisions, Plaintiffs confirm that those decisions were made by public officials. (*See, e.g.,* PageID.64, ¶ 5 (authorities had no plan to "implement corrosion control").)

It cannot be that the mental state needed for private actors to be liable for conspiracy with public officials is *less* demanding than that required for the officials. Applying a looser standard when plaintiffs sue private parties for § 1983 conspiracy

would turn the Due Process Clause "into a font of tort law," and ordinary negligence into a constitutional violation. *See Guertin*, 912 F.3d at 918. Simply put, if officials *involved in* developing Flint's plan to use the Flint River, and *aware of* the WTP's deficient corrosion controls, lack the mental state for a § 1983 claim, so must the Underwriters of the KWA bonds—because they had *no role* in switching water sources, assessing corrosion controls, or communicating with the public about water quality.

### D.   Plaintiffs Fail to Allege Proximate Causation.

The facts alleged also do not show proximate causation. "Like a tort plaintiff, a § 1983 plaintiff must establish both causation in fact and proximate causation." *Marvaso*, 971 F.3d at 606–07. So Plaintiffs must allege that an official's unconstitutional conduct was a *foreseeable* effect of the banks' conduct. *Id.* And private actors do not proximately cause a constitutional injury if they lack "control over the decision making" of the official tortfeasors. *Arnold v. Int'l Bus. Machines Corp.*, 637 F.2d 1350, 1358 (9th Cir. 1981).

Again, the Complaint offers no support for the notion that the Underwriters could have foreseen the officials' alleged misconduct. *See supra* at 6–9. Rather, the actions of public officials—all unforeseeable, and many criminal—constitute numerous intervening causes that preclude liability. *See Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 610 (6th Cir. 2007) (third-party's intervening act a "superseding cause which prevents the first person from being liable") (cleaned up). Nor does the Complaint allege that the Underwriters could control the relevant government actors. *See Arnold*, 637 F.2d at 1358; *cf. In re Flint Water Cases*, 384 F. Supp. 3d at 861 (no claim

17

where official "had no oversight" over switch to Flint River). This defeats § 1983 liability for the Underwriters.

### E.     Plaintiffs' § 1983 Conspiracy Claim Is Precluded by the Federal Securities Laws.

The wholly novel species of § 1983 liability proposed here is also precluded by federal securities laws. The latter can implicitly preclude the application of other federal law to activities that are "central to the proper functioning of well-regulated" securities markets. *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 276–82 (2007); *see also Smith v. Robinson*, 468 U.S. 992, 1012 (1984) (Section 1983 remedies for constitutional violation may be displaced by later-enacted federal statute). As *Credit Suisse* held, if agencies have exercised their "authority under the securities law" to regulate "underwriters' efforts to promote and to sell" bonds, the application of other federal laws (here § 1983) to those efforts will be precluded to avoid any "risk" of "conflicting guidance" for underwriters. 551 U.S. at 275–76. Here the SEC and MSRB, at Congress's direction, have adopted rules specifically defining the duties of underwriters to issuers in a negotiated sale. *See supra* at pp. 4–6. Yet Plaintiffs' § 1983 claim hangs on the "*plan . . . to finance* Flint's participation in the KWA," and makes this agreement *to enter into the underwriting transaction itself* the basis of a § 1983 conspiracy. (PageID.98, ¶ 226 (emphasis added).) Under Plaintiffs' theory, every underwriting is a potential conspiracy, and bond underwriters may be liable for any injury caused by the use of the proceeds. This would undercut Congress's design. *See Credit Suisse*, 551 U.S. at 282.

## II.   PLAINTIFFS' MICHIGAN NEGLIGENCE CLAIM FAILS AS A MATTER OF LAW.

Plaintiffs' state-law claim is also baseless. In Michigan, negligence claims require duty, breach, and proximate causation. *Loweke v. Ann Arbor Ceiling & Partition Co.*, 489 Mich. 157, 162 (2011). Plaintiffs cannot establish duty or proximate causation. Their claim is also preempted.

### A.   The Underwriters Had No Duty To Protect Plaintiffs.

"Duty" is the "*sine qua non* of negligence law." *Elbert v. City of Saginaw*, 363 Mich. 463, 475 (1961). The Underwriters have every sympathy for the terrible injuries Plaintiffs have suffered. But the Underwriters simply had no legal duty to prevent them.

#### 1.   The Underwriters Did Not Have a Special Relationship with Plaintiffs Obliging Them to Protect Them from Harm.

Tort law creates no "affirmative duty" to protect another, absent a "special relationship," like that between "a common carrier [and] its passengers, an innkeeper [and] his guests, [or] an employer [and] his employees." *Williams v. Cunningham Drug Stores, Inc.*, 429 Mich. 495, 498–99 (1988). "The rationale behind imposing a duty to protect in these special relationships" is that "one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself." *Id.* Without such a relationship, "[t]here is no duty to control . . . a third party . . . to prevent him from causing . . . harm." *Reinert v. Dolezel*, 147 Mich. App. 149, 157 (1985).

Plaintiffs complain that the Underwriters did not "require" the issuers to "agree immediately to upgrade the Flint WTP," or "disclose" the shortcomings of Flint's

interim water plan. (PageID.102–03, ¶¶ 247–50.) But even setting aside the unforeseeable chain of events that led to their injuries, they do not allege any "special relationship" between the Underwriters and Flint residents that could conceivably give rise to a duty to protect them from harm. There is no sense in which Flint residents "entrust[ed] [themselves] to the control and protection of" the Underwriters. Accordingly the Underwriters had no legal duty to take affirmative steps to stop government officials from causing Plaintiffs harm. *Reinert*, 147 Mich. App. at 157.

### 2.   Even on a Theory of Direct Harm, Tort Law Does Not Recognize a Duty Owed by Defendants on These Facts.

Even if Plaintiffs alleged *direct* harm by the Underwriters, there is still no applicable duty. "[T]he ultimate inquiry" in creating a new legal duty "is whether the social benefits . . . outweigh the social costs," balancing "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." *In re Certified Question from Fourteenth Dist. Court of Appeals of Texas*, 479 Mich. 498, 505 (2007g). "[M]ost important" is the parties' "relationship." *Id.*

The Underwriters owed no duty to Plaintiffs because the parties had *no* relationship, the events causing injury were unforeseeable, and the risks posed by the execution of municipal projects (such as power plants, roads, schools) bear no relation to underwriting. And to hold underwriters liable for municipalities' use of bond proceeds would be massively burdensome and greatly inhibit municipal bond offerings. Even in the lending context, the general rule is that lenders owe no duty to borrowers—

much less third parties—because a "strong public policy exists, if our financial institutions are to remain solvent, to prevent a conventional money lender from having to insure [every investment's success]." *Nymark v. Heart Fed. Sav. & Loan Assn.*, 231 Cal. App. 3d 1089, 1099 (1991) (alteration in original); *see also N. Trust Co. v. VIII S. Mich. Assocs.*, 276 Ill. App. 3d 355, 365 (1995)(similar).

### 3. Professional Negligence Law Does Not Supply a Duty.

Plaintiffs get no help from their "professional negligence" label. Professional negligence "arises from the breach of a duty owed by one rendering professional services to a person who has contracted for [them]." *Broz v. Plante & Moran, PLLC*, 951 N.W.2d 64, 72 (Mich. Ct. App. 2020). Professionals like doctors and lawyers "make decisions that involve…independent professional judgment." *Sam v. Balardo*, 411 Mich. 405, 435 (1981). A duty arises because lay clients contract for, and must rely on, their judgment and skill. *See Johnson v. Botsford Gen. Hosp.*, 278 Mich. App. 146, 151–52 (2008).

Professional negligence law imposes no duty on municipal bond underwriters toward third parties. First, the underwriter-issuer relationship itself involves an "arm's-length" purchase and entails no fiduciary duty. *See supra* at 4–6. So even *issuers* are not entitled to rely on underwriters' "skill" or professional "judgment" in the way that patients rely on doctors. *See Brownwell*, 199 Mich. App at 524; *Friedman*, 412 Mich. at 28 ("[R]eliance is an appropriate factor to be considered in decided whether a duty is owed to another by a professional."); *Lantz v. Private Satellite Television, Inc.*, 813 F. Supp. 554, 556 (E.D. Mich. 1993) (Broker dealers are not "called upon to make decisions that

involve the exercise of independent professional judgment of essentially the same serious quality as those made by a physician or an attorney.").

Even if underwriters were "professionals" in the tort-law sense, their expertise is in finance: how to structure and sell bonds. Thus, Plaintiffs' allegations do not "raise questions involving [Defendants' expert] judgment." *See Mitchell-Crenshaw v. Joe*, No. 263057, 2006 WL 287434, at *2 (Mich. Ct. App. Feb. 7, 2006). And even if Plaintiffs were correct in alleging that the Underwriters retain experts on "municipal water infrastructure as part of a municipal bond underwriting," (PageID.73–74, ¶¶ 58–60), that would not give rise to a duty (or even an ability) to give the issuer engineering advice, especially where the issuer is a public body that has retained its own engineers.

Finally, and decisively, even if the underwriter-issuer relationship could ground a professional negligence claim *by the issuer*, it would not cover Plaintiffs, who are third parties: "[A] professional's duty to perform within a standard of care extends only to the client, and a third party cannot sue in malpractice for derivative damages arising from the professional's negligence." *Rochester Endoscopy & Surgery Ctr., LLC v. Desrosiers Architects, PC*, No. 349952, 2020 WL 6231823, at *2 (Mich. Ct. App. Oct. 22, 2020).

## B.   The Underwriters Did Not Proximately Cause Plaintiffs' Injuries.

Even were there an applicable duty, there can be no proximate cause without "foreseeability of consequences," *Midwest Mem'l Grp. LLC v. Citigroup Glob. Markets Inc.*, No. 322338, 2015 WL 5519398, at *12 (Mich. Ct. App. Sept. 17, 2015). The Underwriters could not have anticipated criminal actions regarding the MDEQ permit,

the alleged and repeated disregard of evidence of contamination, officials' outright lies, and the other conscience-shocking behavior alleged. *See supra* at 6–9. Underwriting is so far removed from the injury that no plausible view of the facts assigns "any legal responsibility" to the Underwriters. *Ray v. Swager*, 501 Mich. 52, 74 (2017).

Indeed, the public officials' misdeeds are intervening causes breaking any causal chain from the Underwriters to Plaintiffs. Intervening causes preclude liability unless "the actor at the time of his negligent conduct should have realized that a third person might so act." *Comstock v. Gen. Motors Corp.*, 358 Mich. 163, 179 (1959); *cf.* Prosser & Keeton, The Law of Torts (5th ed.), § 44, 201 (intervening criminal acts generally preclude proximate causation). But as explained, this Court and the Sixth Circuit held that Plaintiffs had pleaded constitutional claims against certain officials *precisely because* their alleged conduct was shocking. *See supra* at 16–17. This defeats proximate causation.

## C.   Plaintiffs' State-Law Claim Is Also Preempted.

Even if Michigan tort law recognized liability in such cases, Plaintiffs' claim would conflict with, and thus be preempted by, federal securities laws. Conflict preemption applies when compliance with both state and federal law is impossible ("impossibility preemption"), or state law is an obstacle to Congress's objectives ("obstacle preemption"). *See McDaniel,* 893 F.3d 941, 944. Rules proposed by a self-regulatory organization (like the MSRB) and adopted by the SEC have preemptive force. *See Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1133 (9th Cir. 2005).

23

Plaintiffs' negligence claim imposes duties incompatible with MSRB Rule G-17, triggering both forms of conflict preemption.

*First*, where a party must take specific actions to comply with a state-law standard of care, and those actions will violate federal law, impossibility preemption applies. *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 488 (2013); *Credit Suisse*, 400 F.3d at 1133. That is true here: On Plaintiffs' theory, the Underwriters had to "require that the bond issuer . . . agree to immediately upgrade the Flint WTP." (PageID.102, ¶ 247.) But had the Underwriters done so, they would no longer be transacting at arms' length with the issuers, as federal law demands. And once the underwriters became entangled in managing issuers' public works projects, they would be allied with the issuers and could no longer deal fairly with bond purchasers, as required by Rule G-17, *see supra* at 4–6.

*Second*, obstacle preemption also applies. This doctrine precludes state laws posing "an obstacle to the purposes and objectives embodied in a federal law," *McDaniel v. Upsher-Smith Labs., Inc.*, 893 F.3d 941, 944 (6th Cir. 2018), *cert. denied*, No. 19-1246, 2020 WL 5882237 (U.S. Oct. 5, 2020), and it applies to state laws that upset a balance deliberately struck by Congress and the SEC in the regulation of securities transactions. *E.g.*, *McDaniel v. Wells Fargo Investments, LLC*, 717 F.3d 668, 676 (9th Cir. 2013) (finding obstacle preemption where state law disrupted balance struck by federal law in regulating employee trading); *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 852 (1st Cir. 1988) (state-law rules favoring management in hostile takeovers preempted by federal policy of evenhandedness).

24

Rule G-17 imposes carefully calibrated duties on underwriters, and by design gives them no fiduciary duty toward issuers. *See supra* at 4–6. Nor does it create duties of disclosure or protection to the public. Plaintiffs' claim injects a novel and disruptive obligation into this scheme. Indeed, if allowed, it would play havoc with municipal securities markets, increasing financing costs for issuers and creating significant disincentives to underwrite municipal bonds. It is preempted. *See Credit Suisse*, 400 F.3d at 1133; *McDaniel*, 717 F.3d at 676; *In re Biozoom, Inc. Sec. Litig.*, 93 F. Supp. 3d 801, 825 (N.D. Ohio 2015).

## CONCLUSION

The Court should dismiss the Complaint against the Underwriters in its entirety.

Dated: December 18, 2020

Respectfully submitted,

/s/ Louis P. Gabel
Louis P. Gabel (P80365)
JONES DAY
150 W. Jefferson Ave., Suite 2100
Detroit, MI 42226
P: (313) 733-3939
lpgabel@jonesday.com

Charlotte H. Taylor (DC 1024658)
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
P: (202) 879-3939
ctaylor@jonesday.com

*Counsel for Defendants J.P. Morgan Securities LLC, Wells Fargo Bank, N.A., and Stifel, Nicolaus & Company, Inc.*

25

## CERTIFICATE OF SERVICE

I certify that on December 18, 2020. I caused the above Notice of Appearance to be electronically filed with the Clerk of the Court through the CM/ECF system, which will effectuate service upon all counsel of record.

/s/ Louis P. Gabel
Louis P. Gabel

*Counsel for Defendants J.P. Morgan Securities LLC, Wells Fargo Bank, N.A., and Stifel, Nicolaus & Company, Inc.*