## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

WALTERS, et al.,

        Plaintiffs,

v.

CITY OF FLINT, et al.,

        Defendants.

_____

LeeAnne Walters, as Next of Friend for Two
Minor Children, G.W.1 and G.W.2, et al.,

    *Plaintiffs*,

v.

J.P. Morgan Chase & Co., Wells Fargo Bank,
National Association, and Stifel, Nicolaus
& Company, Incorporated,

    *Defendants*.

Civil Case No. 17-10444
(consolidated)

Hon. Judith E. Levy
Mag. Mona K. Majzoub

Case No. 5:20-cv-12726

---

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO THE MOTION TO DISMISS BY DEFENDANTS
## J.P. MORGAN SECURITIES LLC, WELLS FARGO BANK, N.A.,
## AND STIFEL, NICOLAUS & COMPANY, INC.

**TABLE OF CONTENTS**

Introduction ...........................................................................................................1

Factual Background...............................................................................................3

   A. Without the Underwriters agreement to finance Flint's participation in the
      KWA, no one would have been poisoned ........................................................3

   B. The Series 2014A bond sale was a "negotiated bond sale," which gave the
      Underwriters vast negotiating power and access to information ...................4

   C. The Underwriters had internal expertise in the details of municipal water
      infrastructure ..................................................................................................5

   D. Crucial facts regarding the City of Flint and the Flint River were publicly
      known, and the Underwriters were made aware of those facts during the
      meeting with the Government Defendants......................................................8

   E. The Underwriters knew the March 20, 2014 ACO, which permitted the
      Series 2014A bond sale, was a fraudulent pretext, which strongly suggests
      bad faith on their part ...................................................................................10

Legal Standard....................................................................................................14

Argument............................................................................................................14

I.  Plaintiffs' Complaint states a valid claim for conspiracy under 42 U.S.C. § 1983
    against the Underwriter Defendants ...............................................................14

   A. It is well established that § 1983 can apply to private actors........................14

   B. Plaintiffs' conspiracy claim is sufficiently pled...........................................16

   C. The Underwriter Defendants acted with conscience-shocking deliberate
      indifference ...................................................................................................18

   D. The Underwriter Defendants' acted "under color of" state law...................20

      1.  A single plan existed..............................................................................20

      2.  The Underwriters shared a conspiratorial objective ...............................21

i

3.  No rule of law precludes a conspiracy to act with deliberate indifference .................................................................................22

E.  The bond issuance is a proximate cause of Plaintiffs' injuries ....................23

F.  Federal securities law does not preclude § 1983 liability ............................25

II.  Plaintiffs have sufficiently pled a claim of professional negligence against the Underwriter Defendants ..........................................................................27

A.  Under these unique facts, the Underwriters had a duty to avoid harming Plaintiffs .........................................................................................................27

B.  The bond issuance is a proximate cause of Plaintiffs' injuries ....................33

C.  Federal law does not preempt Plaintiffs' state law tort claim ......................33

Conclusion .........................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) ...............................................15

*Am. Postal Workers Union, Local 96 v. Memphis*,
   361 F.3d 898 (6th Cir. 2004)..................................................................15, 22

*Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350 (9th Cir. 1981)..........................24

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)....................................................................14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)....................................................14

*Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017)........................................................25

*Byrne v. CSX Transp., Inc.*, 541 F. App'x 672 (6th Cir. 2013)...............................33

*Campbell v. Nationstar Mortg.*, 611 F. App'x 288 (6th Cir. 2015) .......................14

*Cataldo v. U.S. Steel Corp.*,676 F.3d 542 (6th Cir. 2012) .....................................34

*Charvat v. E. Ohio Reg'l Wastewater Auth.*, 246 F.3d 607 (6th Cir. 2001)............26

*Clark v. Dalman*, 379 Mich. 251 (1967) ................................................................31

*Cleveland Indians Baseball Co., L.P. v. N.H. Ins. Co.*,
   727 F.3d 633 (6th Cir. 2013)........................................................................31

*Connor v. Great Western Sav. & Loan Ass'n*, 69 Cal. 2d 850 (1969) .............27, 28

*Cooper v. Parrish*, 203 F.3d 937 (6th Cir. 2000)...................................................20

*Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264 (2007)........................25, 26

*Dennis v. Sparks*, 449 U.S. 24 (1980) ...................................................................15

*Desiano v. Warner-Lambert & Co.*, 467 F.3d 85 (2d Cir. 2006) ...........................34

*Dismukes v. Michigan Express, Inc.*, 368 Mich. 197 (1962)....................................33

*Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634 (D.C. Cir. 2008) ........................30

*Downhour v. Somani*, 85 F.3d 261 (6th Cir. 1996) ................................................34

*Dyer v. Trachtman*, 470 Mich. 45 (2004)................................................................30

*Estate of Shinholster v. Annapolis Hosp.*, 471 Mich. 540 (2004) ..........................33

*Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002)...................................23

*Farmer v. Brennan*, 511 U.S. 825 (1994)................................................................23

*Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009) ..................................26

*Fredrickson v. GM Corp.*, 411 Mich. 712 (1981) ..............................................31, 32

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992)................................35

*Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir. 1999) .................16, 21, 22

*Gordon v. NYSE*, 422 U.S. 659 (1975)....................................................................26

*Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019) ..........................................21, 23

*Gutierrez v. Lynch*, 826 F.2d 1534 (6th Cir. 1987) ................................................17

*Hanly v. SEC,* 415 F.2d 589 (2d Cir. 1969) ...........................................................30

*Hausrath v. New York C.R. Co.*, 401 F.2d 634 (6th Cir. 1968)..............................24

*Hill v. Snyder*, 878 F.3d 193 (6th Cir. 2017)...........................................................14

*Hooks v. Hooks*, 771 F.2d 935 (6th Cir. 1985)........................................................20

*In re Nat'l Prescription Opiate Litig. v. Purdue Pharma. L.P.*,
      MDL No. 1:17-md-02804; Case No. 1:18-op-45459,
      2019 U.S. Dist. LEXIS 101660 (N.D. Ohio Apr. 1, 2019)...........................25

*Jones v. Block*, 549 U.S. 199 (2007) ...................................................................34

*Jolley v. Chase Home Finance, LLC*, 213 Cal. App. 4th 872 (2013)...............28, 32

*Larsen v. United Fed. Sav. & Loan Ass'n*, 300 N.W.2d 281 (Iowa 1981)..............27

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ...............................................15

*Marble v. Snyder*, 453 F. Supp. 3d 970 (E.D. Mich. 2020).......................16, 17, 18

*Marvaso v. Sanchez*, 971 F.3d 599 (6th Cir. 2020)................................................24

*Matthew N. Fulton, D.D.S., P.C. v. Enclarity, Inc.*,
   962 F.3d 882 (6th Cir. 2020)........................................................................14

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
   453 U.S. 1 (1981) .........................................................................................26

*Miller v. Ford Motor Co.*, 479 Mich. 498 (2007)......................................31, 32, 33

*Moning v. Alfono*, 400 Mich. 425 (1977) ...............................................................32

*Murdock v. Higgins*, 454 Mich. 46 (1997) ......................................................30, 31

*NOW v. Scheidler*, 510 U.S. 249 (1994)................................................................24

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493 (1989)...............34

*Nymark v. Heart Fed. Sav. & Loan Ass'n*, 231 Cal. App. 3d 1089 (1991).......27, 28

*Ottolini v. Bank of Am.*, No. C-11-0477 EMC,
   2011 U.S. Dist. LEXIS 92900 (N.D. Cal. Aug. 19, 2011)...........................27

*Powers v. Hamilton Cty. Pub. Defender Comm'n*,
   501 F.3d 592 (6th Cir. 2007)..............................................................23, 24, 25

*Ray v. Swager*, 501 Mich. 52 (2017) ......................................................................33

*Revis v. Meldrum*, 489 F.3d 273 (6th Cir. 2007).........................................15, 16, 20

*Roberts v. Kathryn Salmi, LPC*, 308 Mich. App. 305 (2014) ..................................30

*Sacramento v. Lewis*, 523 U.S. 833 (1998) ..............................................................23

*Sanders v. John Nuveen & Co.*, 554 F.2d 790 (7th Cir. 1977)..............................30

*SEC v. Glt Dain Rauscher, Inc.*, 254 F.3d 852 (9th Cir. 2001)..............................30

*Spadafore v. Gardner*, 330 F.3d 849 (6th Cir. 2003) ........................................15, 16

*Tahfs v. Proctor*, 316 F.3d 584 (6th Cir. 2003)........................................................17

*Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602 (6th Cir. 2004) ..............................24

*United States v. Burgos*, 94 F.3d 849 (4th Cir. 1996) ................................16, 21, 22

*Weberg v. Franks*, 229 F.3d 514 (6th Cir. 2000) ...............................15, 16, 21, 22

*Wimbush v. Wyeth*, 619 F.3d 632 (6th Cir. 2010) ..................................................34

*Wyeth v. Levine*, 555 U.S. 555 (2009)....................................................................34

**Statutes**

42 U.S.C. § 1983 ...............................................................................*passim*

Fed. R. Civ. P. 10(c) ..........................................................................................14

Fed R. Civ. P. 12(b)(6) ...............................................................................14, 34

MSRB Rule G-17 ................................................................................*passim*

**Other Authorities**

Harper & Kime, *The Duty to Control the Conduct of Another*,
     43 Yale L.J. 886 (1934).................................................................................32

## INTRODUCTION

America's municipal water infrastructure is aging. Old systems need to be upgraded; old (lead) pipes need to be replaced. Yet, the very municipalities who need to undertake these necessary modernizations and improvements cannot do so on their own. It is a fact of modern life that governments, like any other entities, need funding to take action. Without it, they can accomplish very little, whether good or bad. One method of raising funds is to sell municipal bonds. This case is, then, about how to treat a trio of bond underwriters whose participation, assistance, and buy-in was essential to bringing about the Flint Water Crisis.

When various governmental entities, including the City of Flint, sought to finance Flint's participation in the Karegnondi Water Authority ("KWA"), they worked closely with Defendants J.P. Morgan Securities LLC, Wells Fargo Bank, N.A, and Stifel, Nicolaus & Company, Inc. (collectively, the "Underwriters" or "Underwriter Defendants") to issue the municipal bonds necessary to fund Flint's participation in the KWA. Indeed, without the Underwriters' agreement, Flint would not have been able to join the KWA and would have had no choice but to continue receiving water from the Detroit Water and Sewerage Department ("DWSD"). Thousands of Flint citizens and water users would not have been poisoned.

It is inconceivable that the Underwriters would not have understood the risks. Investment banks rarely outlay millions of dollars without doing their due diligence.

They rarely finance multimillion-dollar infrastructure projects without asking the difficult questions. It goes without saying they don't finance those projects without asking the easy questions, either.

The bond sale was—top to bottom—built on a lie. It would not have happened without a "sweetheart" Administrative Consent Order ("ACO") that manufactured a "calamity" to permit Flint to take on debt under Michigan's Home Rule City Act. Plaintiffs have, moreover, pled that the Underwriters knew this and agreed to the gist of the scheme; and, what's more, that the Underwriters didn't even finance the improvements the ACO contemplated ($8 million in upgrades to the Flint Water Treatment Plant ("WTP") and $3 million in upgrades to a lime sludge lagoon that was the "calamity" underlying the whole bond issuance). Foreseeably, thousands of Flint's children suffered life-altering lead poisoning as a result of the switch in water sources, which would not have happened but for the Underwriters' agreement to underwrite the Series 2014A bond issuance.

Under the unique circumstances of this case, Plaintiffs have sufficiently pled a claim for conspiracy against the Underwriter Defendants under 42 U.S.C. § 1983. Furthermore, Plaintiffs sufficiently pled that the Underwriters breached a duty to avoid causing foreseeable harm under Michigan common law. Accordingly, Plaintiffs respectfully request that the Court deny the Underwriters' motion to dismiss.

## FACTUAL BACKGROUND

**A.    Without the Underwriters' agreement to finance Flint's participation in the KWA, no one would have been poisoned.**

This case, like other cases growing out of the Flint Water Crisis, begins with the effort to create "a water delivery system that would draw water from Lake Huron and serve as an alternative to water delivered by the DWSD." Compl. ¶ 22; *see also* ¶ 21.[1] "All parties to the KWA knew that the cost and amount of construction would be significant." *Id.* ¶ 23; *see also* ¶ 24. Flint would be responsible for approximately $85 million of the $300 million cost for the KWA's construction. *Id.* ¶¶ 25, 66.[2]

By the spring of 2013, the KWA had secured commitments from all potential communities—with the exception of Flint. *Id.* ¶ 26. At that time, several state and local government officials "reached out to [the Underwriters] to secure financing through a bond sale for the KWA's construction and a meeting was scheduled to discuss the viability of the project and Defendant Underwriters' participation in bonding to help fund it." *Id.* ¶ 27. "Without the financing from [the Underwriters], the City of Flint would not have been able to pay its portion to join the KWA and therefore would have had no choice but to continue purchasing water from the DWSD." *Id.* ¶ 29. The Underwriters were "made aware of this fact during the

---

[1]    All references to "Plaintiffs' Complaint" and citations to "Compl." refer to ECF No. 1-2.

[2]    As well as about 34.2% of the debt service on the KWA's construction. Compl. ¶ 67; *see also id.* ¶ 65 & n.7.

meeting." *Id.* ¶¶ 30–32; *see also id.* ¶¶ 77–79. The Underwriters "agreed to underwrite the bond sale," which ultimately became known as the "Series 2014A" bond sale. *Id.* ¶¶ 33, 34.

> **B.** **The Series 2014A bond sale was a "negotiated bond sale," which gave the Underwriters vast negotiating power and access to information.**

There are several methods a municipality can use when it issues bonds. One common method is called a "negotiated dealer agreement," also called a "negotiated sale," in which the issuing government "and the underwriter work closely together and privately negotiate the terms of the bond sale." *Id.* ¶¶ 35, 36. This close working relationship "fosters confidentiality" and permits the free and frank exchange of confidential information—whether fiscal, infrastructural, or otherwise. *Id.* ¶ 37.

In a negotiated sale, the issuing government sells all of the bonds to the underwriter, which in turn sells them either to clients or on the open securities market. *Id.* ¶ 38. The underwriter is motivated and interested—and has a "goal of attracting investors . . . ." *Id.* ¶ 39; *see also id.* ¶ 40 ("Part of what the underwriter does in working with the issuer is to tailor the bond sale's terms to the interests of the underwriter's institutional investor clients."). Indeed, "[a]n underwriter in a negotiated sale typically purchases the bonds on a discount and becomes an interested party to the transaction." *Id.* ¶ 44.

Often, a distressed municipality has little choice among bond sale alternatives: "One reason for using a negotiated sale instead of other sales methods, such as a competitive sale, is because of the poor credit and limited financial solvency of the issuer of the bonds." *Id.* ¶ 41. "[B]ecause there is an absence of competitive bidding by potential underwriters, the [municipality] in a negotiated sale typically has less negotiating power." *Id.* ¶ 43. In 2013 and 2014, Flint was a quintessential distressed municipality. *See id.* ¶¶ 73, 74. It had "poor credit and limited (if any) financial solvency." *Id.* ¶ 42; *see also* ¶ 76 (Underwriters had "unfettered access to Flint's financial records"). Flint's weakened tax base following deindustrialization meant that it had "little if any financial ability" to pay for its KWA commitments on its own. *See id.* ¶¶ 70, 73, 75. After all, it had been under emergency management since 2011. *Id.* ¶ 71; *see also* ¶ 72. Unsurprisingly, the Series 2014A bond sale was a negotiated bond sale. *Id.* ¶ 62. The Underwriters purchased all of the bonds at a substantial discount. *Id.* ¶¶ 63–64.

## C.    The Underwriters had internal expertise in the details of municipal water infrastructure.

Municipal bonding is big business. "In the United States, approximately $400,000,000,000 in municipal bonds are issued annually." *Id.* ¶ 48. "A sizeable portion of these municipal bonds go to infrastructure projects, including water

utilities." *Id*. ¶ 49.[3] In 2016, for example, "nearly $38,000,000,000 in municipal bonds were issued for water infrastructure projects." Compl. ¶ 50.[4] Municipal bonds are crucial to maintaining and hopefully improving America's decaying water infrastructure, and underwriters are integral parts of the process. And financing even a small part of the $38 billion dollars of projects through underwritten bonds requires a detailed working knowledge of America's infrastructure.

Consequently, "[a]ny reasonable underwriter either employs an internal public water expert or else retains a consultant with significant public water expertise. The expert has an intimate knowledge of regional water hydrology, public water systems, engineering, water treatment, and water chemistry, among other things." *Id*. ¶ 56. This was true of each of J.P. Morgan, Wells Fargo, and Stifel. *Id*. ¶¶ 58–60. The Underwriters' water infrastructure experts were "aware that America has an aging public water infrastructure, which often means a significant amount of lead pipes and water service lines." *Id*. ¶ 51. They were also "familiar with the centralized water distribution that is common to public water utilities." *Id*. ¶ 55.

---

[3]     Indeed, "70% of U.S. [water] utilities rely on them to some degree." *See* American Water Works Ass'n & Water Env't Fed., *Water Infrastructure Bonds Need Protection* (2013), attached hereto as **Exhibit A**.

[4]     *See also* Nat'l Ass'n of Clean Water Agencies*, Tax Exempt Municipal Bonds*, available at: https://www.nacwa.org/advocacy-analysis/campaigns/tax-exempt-municipal-bond-resource-hub.

This expertise necessarily would have impacted negotiations for the Series 2014A bond sale. After all, at a minimum an underwriter is looking for potential risks that may threaten a full return on the investment, including "potential litigation." *Id.* ¶ 61.[5] Therefore, for example, the Underwriters "would [have] inquire[d] into what upgrades had been made to the Flint WTP or what concrete plans were in the works to upgrade the Flint WTP in anticipation of utilizing the Flint River as a water source." *Id.* ¶ 114. This inquiry would have included "Flint's plan to implement corrosion control . . . in anticipation of utilizing the Flint River as a water source." *Id.* ¶ 119. The Underwriters and their experts, like "[a]ny reasonable water expert," understood that "without appropriate corrosion control technology or methods, highly corrosive water would strip away protective biofilm in lead pipes and cause lead to leach into the drinking water." *Id.* ¶ 124.

---

[5]    Under MSRB Rule G-17, underwriters of municipal bonds have a duty to deal fairly with all persons and not engage in deceptive, dishonest, or unfair practices. *See* Compl. ¶ 45. An underwriter implicitly represents that there is a reasonable basis for the opinions the underwriter offers, and implicitly represents that the underwritten project will be completed, including all subsidiary actions necessary for the completion of the larger project. *See id.* ¶ 46. "Dealing fairly with all persons requires conducting a reasonable investigation and determining reasonably ascertainable facts about the municipal bond sale." *Id.* ¶ 47.

    **D.**    **Crucial facts regarding the City of Flint and the Flint River were publicly known, and the Underwriters were made aware of those facts during the meeting with the Government Defendants.**

When the Underwriters first met with the state and government officials, and over the course of the negotiation of the bond sale's terms culminating in the April 2014 bond sale, the Underwriters were made privy to the following key pieces of information. Other key pieces of information were public.

First, the Underwriters were "aware that the Flint River would be utilized as an interim water source beginning in April 2014 through completion of the KWA."[6] *Id.* ¶¶ 83–85. "Unlike the finished water from DWSD, the water to be delivered to Flint from the Flint River would be raw, requiring considerable treatment at the Flint WTP." *Id.* ¶¶ 86–89. The Flint WTP was not prepared to treat the raw water and so "if Flint went with KWA, the Flint WTP would have to be upgraded."[7] *See id.* ¶¶ 91, 93, 95, 96. "[T]he Flint WTP could not handle the raw Flint River water without substantial upgrades."[8] *Id.* ¶¶ 97–100.

The incapacity of the Flint WTP was significant. The Flint River water was "seriously corrosive due in part to pollution from industrial discharges and runoff

---

[6]    The KWA's anticipated completion was the "end of 2016," and it was ultimately completed in November 2017. *Id.* ¶¶ 80, 81.

[7]    It was known that the Flint WTP had been mothballed in 1965 and not upgraded since. *Id.* ¶ 101; *see also id.* ¶¶ 102–04, 115.

[8]    No upgrade to the Flint WTP would be necessary if it remained with the DWSD. *See id.* ¶ 90, 92, 94.

from Flint's roads," and "Flint had an aging network of predominately lead piping and service lines," which flowed through the Flint WTP in a centralized fashion. *See id.* ¶¶ 105–08, 109–13, 153–55. Indeed, "Flint had originally started purchasing water from DWSD because of the corrosivity of the Flint River." *Id.* ¶¶ 156–58. The Flint River actually been recently rejected as a source of drinking water in 2011. *Id.* ¶¶ 133–36; *see also id.* ¶¶ 128–32 (Underwriters were provide with 2011 report showing Flint River water was unsafe).

Furthermore, not only were the Underwriters understood the hazards the corrosive Flint River water presented (particularly in light of Flint's aging lead-based water distribution system and grossly inadequate WTP), they were made "aware that necessary upgrades to the Flint WTP had not been made and could not be made in time for the City's utilization of the Flint River as a water source." *Id.* ¶¶ 116–18.[9] Moreover, they were "made aware, through [their] internal public water

---

[9] Not only did the Underwriters know, as above, that Flint was a financially distressed city with little ability to pay its own debts, and that its aged and lead-based water infrastructure could not handle the seriously corrosive Flint River water, the Underwriters learned of several facts that showed that the KWA was not even an economic winner for the City of Flint. For instance, a 2013 study by TYJT "concluded that it would be more cost-effective for Flint on both a short term and long-term basis to continue to be supplied with water from DWSD." *See id.* ¶¶ 142–45. Thus, the Underwriters were provided with the 2013 TYJT study and "became aware that it was actually in Flint's financial best interest to remain with DWSD and not participate in the KWA or the municipal bond sale that would finance the KWA's construction." *Id.* ¶¶ 165–67.

expert[s] or . . . external public water consultant[s], that there was no practical way to implement proper corrosion controls to treat water from the Flint River, in the short time before the Flint WTP was to become fully operational utilizing the Flint River as the primary water source for the citizens of Flint." *Id.* ¶¶ 120–22.

In short, throughout the negotiation process, the Underwriters were provided with all the key facts necessary to know that approving the Series 2014A bond sale would result in Flint's citizens would in all certainty consume water contaminated with lead leached from Flint's pipes—and therefore that Flint's children would suffer life-altering effects of lead poisoning as a result of water switch made directly possible by the bond sale. *See id.* ¶¶ 150–64.

### E.   The Underwriters knew the March 20, 2014 ACO, which permitted the Series 2014A bond sale, was a fraudulent pretext, which strongly suggests bad faith on their part.

It doesn't stop there. "[T]he terms of the dubious March 20, 2014 [ACO] were made known to J.P. Morgan Chase, Wells Fargo, and Stifel." *Id.* ¶ 168. The ACO, which was "negotiated" by Jeff Wright, an architect of the switch in Flint's water source, "required Flint to upgrade the WTP and eventually become part of the KWA." Amended Master Compl. ("AMC") ¶ 135.[10] At its core, the ACO— described by those negotiated it as a "sweetheart" deal—was an unnecessary

---

[10]   Plaintiffs incorporated the Amended Master Complaint (*Walters*, ECF No. 186) by reference into the Complaint here (ECF Doc. 1-2). Compl. ¶ 8.

response to a manufactured "emergency." *Id.* ¶ 137; *see also id.* ¶¶ 414–15. Since Flint was under emergency management, "the Home Rule City Act limited the City's ability to borrow funds," subject to an "exception . . . that would allow the City to borrow additional funds" for, among other things, a catch-all "calamity." *Id.* ¶ 413. "Taking advantage of this provision, however, required the City to obtain an [ACO] from a State Agency attesting to some sort of 'calamity.'" *Id.*[11]

The gravamen of the ACO was that the City of Flint maintained a lime sludge dump on Bray Road. Municipalities, including Flint, often use lime to soften water, but it creates a byproduct (lime sludge) that requires certain long-term disposal options. Compl. ¶¶ 169–71. The ACO targeted the "open dump," as if it were a "calamity," even though "little to no sludge was being dumped there at any point relative in time" to the bond issuance. *Id.* ¶ 172.[12] Yet, the ACO "purported to require

---

[11]    The fraudulent nature of the ACO is well known. "The State of Michigan has alleged in criminal indictments that the ACO process was a fraudulent scheme designed to move Flint into Wright's KWA project and to permit the issuance of bonds to cover Flint's share of the debt service." AMC ¶ 138. The gist of the scheme was that "[t]he City of Flint, with MDEQ approval, used an exception to state law by claiming the bonds were needed to fund an emergency cleanup of a retention pond, when in fact the funds were intended to pay for Wright's KWA project." *Id.* ¶ 140. "According to the criminal indictment of Emergency Manager's Darnell Early and Gerald Ambrose, they allegedly participated in a process that allowed the use of bonds to fund the construction of the KWA pipeline despite Flint's problem with its high debt level." *Id.* ¶ 139.

[12]    After all, Flint received fully treated, safe-to-drink water from DWSD at the time.

Flint to use raw water from the Flint River and to undertake an $8,000,000 upgrade to the Flint WTP to safely handle the Flint River water." *Id.* ¶ 178.

On the surface, the Official Statement for the Series 2014A bond issuance appears to track this requirement, noting "Flint will be required to make an estimated $8,000,000 in improvements to convert the plant from stand-by to fully operational and to accommodate the flow of water from the System." *See id.* ¶ 182 (quoting 2014 Official Statement, annexed to the Complaint as Exhibit 1, at 11). "However, the $8,000,000 worth of required upgrades to the Flint WTP were not being financed through the Series 2014A municipal bond sale . . . ." *Id.* ¶ 183. Moreover, when the Underwriters agreed to finance the sale, they knew that there was not "enough time to begin, let alone complete and implement, the upgrades before the end of April 2014, nor could Flint afford the upgrades without taking on more debt." *See id.* ¶¶ 183–86. In point of fact, when they "were determining whether to underwrite the KWA Series 2014A bond sale, no credible information was received to suggest that Flint had any intention of expeditiously upgrading the Flint WTP." *Id.* ¶ 201.

An even odder fact is that the "anticipated cost of making necessary improvements to the lime sludge lagoon was actually a mere $3 million," but the "portion of the bond financing for Flint was for more than $85 million dollars— approximately the cost of Flint's anticipated share of construction of the KWA

pipeline." *Id.* ¶¶ 191–92.[13] *Even more oddly*, the Series 2014A bond sale, which was made possible by the fraudulent ACO, "did not pay for the $3 million lime sludge lagoon." *Id.* ¶ 193.

In short, the ACO "was used as a pretext for the issuance of bonds," and the Underwriters knew that. *Id.* ¶¶ 173–76, 194. By deliberately financing the bond sale (and setting its terms to exclude financing the necessary improvements to the Flint WTP), the Underwriters joined a conspiracy and all but guaranteed that Flint's water would begin poisoning children within the month. *See id.* ¶ 199 (the Underwriters were "aware that no later than April 30, 2014, the FWTP was going to become fully operational for the purpose of utilizing the Flint River as a primary water source, without the necessary upgrades to do so safely and without the proper corrosion controls"). The Underwriters "understood at the time they approved financing that there were no plans to adequately upgrade the Flint WTP prior to the switch, and that consumption of water by end users, and in particular children, including Plaintiffs, would result in serious, irreversible bodily harm." *Id.* ¶ 203.

---

[13]     In contrast to the upgrades to the Flint WTP, an MDEQ permit acknowledged that "Flint's application proposed various '[i]mprovements to the City of Flint Lime Sludge Lagoons . . . to allow lime sludge from the Flint WTP to be stored during the interim period when the plant [would] be treating Flint River water.'" *Id.* ¶ 187. The Underwriters were privy to this information. *Id.* ¶¶ 188–90.

## LEGAL STANDARD

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[14] "A claim is facially plausible when a plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matthew N. Fulton, D.D.S., P.C. v. Enclarity, Inc.*, 962 F.3d 882, 887 (6th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). A court must "construe the complaint in the light most favorable to the plaintiff[] [and] accept all well-pleaded factual allegations as true." *Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017).

## ARGUMENT

I.     **Plaintiffs' Complaint states a valid claim for conspiracy under 42 U.S.C. § 1983 against the Underwriter Defendants.**

A.     **It is well established that § 1983 can apply to private actors.**

42 U.S.C. § 1983 imposes civil liability on a defendant who deprives another of their constitutional rights "under color of" state law. Primarily, then, § 1983 applies to government actors. However, § 1983 "does not require that the defendant

---

[14]     "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c); *see Campbell v. Nationstar Mortg.*, 611 F. App'x 288, 292 (6th Cir. 2015).

be an officer of the State," *Dennis v. Sparks*, 449 U.S. 24, 28 (1980), if they "willfully participate in joint action with state agents," *Am. Postal Workers Union, Local 96 v. Memphis*, 361 F.3d 898, 905 (6th Cir. 2004); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970). In other words, the "conduct of private parties may be deemed to be state action when the 'conduct allegedly causing the deprivation of a federal right may be fairly attributable to the State.'" *Revis v. Meldrum*, 489 F.3d 273, 289 (6th Cir. 2007) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

The Sixth Circuit has defined conspiracy in the § 1983 context:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Local 96*, 361 F.3d at 905 (quotation omitted).

The Sixth Circuit "has acknowledged that because 'rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, . . . circumstantial evidence may provide adequate proof of conspiracy.'" *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (quoting *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000)). "Circumstantial evidence tending to prove a conspiracy may consist of a defendant's relationship with other members of the

conspiracy, the length of this association, [the defendant's] attitude [and] conduct, and the nature of the conspiracy." *United States v. Burgos*, 94 F.3d 849, 848 (4th Cir. 1996) (quotation omitted). "A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions." *Gilbrook v. City of Westminster*, 177 F.3d 839, 856–57 (9th Cir. 1999). Likewise, a putative conspirator's lie, deceit, or pretextual action constitutes circumstantial evidence of their agreement to participate in the conspiracy. *See, e.g.*, *Wehberg*, 229 F.3d at 527.

### B.   Plaintiffs' conspiracy claim is sufficiently pled.

The Underwriters contend that Plaintiffs' complaint does not satisfy the heightened pleading standard for conspiracy. As this Court stated in *Marble v. Snyder*, "[i]t is "well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." 453 F. Supp. 3d 970, 985 (E.D. Mich. 2020) (quoting *Spadafore*, 330 F.3d at 854). Still, the Sixth Circuit has observed that a private defendant's "role in [an] alleged conspiracy [can] not ordinarily be resolved at the pleading stage." *Revis*, 489 F.3d at 292.

The Underwriter Defendants' main contention is that Sixth Circuit precedent requires Plaintiffs to identify which staff members at J.P. Morgan, Wells Fargo, and

Stifel participated in the bond sale's negotiations and consummation.[15] Underwriters Br. at 11 (citing *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)).[16] While one case does discuss a plaintiff's failure to identify specific actions and behavior by particular individuals, *see Tahfs v. Proctor*, 316 F.3d 584, 592 (6th Cir. 2003) (cited and discussed in *Marble*), it is meaningfully distinct from this case, as is *Marble*. As *Marble* itself pointed out, the key point in *Tahfs* was that "'even with discovery, Tahfs could not identify these supposedly corrupt individuals because nowhere in her complaint can she identify *behavior*, as opposed to *outcomes*, suggesting corruption.'" *See Marble*, 453 F. Supp. 3d at 985 (quoting *Tahfs*, 316 F.3d at 592). But here, Plaintiffs *have* identified behavior: The Underwriters met with several government officials who represented the various governments participating in the KWA and ultimately (and publicly) agreed to finance the KWA, including Flint's participation in it. All of that is behavior—not an outcome.

The nature of the conspiracy is important as well. While the conspiracy in *Marble* was a conspiracy "not to inform the public of the threat of Legionnaires'

---

[15]     As a backup, the Underwriters argue that "[t]he Complaint identifies no call, meeting, or message by which an unlawful agreement was formed." Underwriters Br. at 12. This is straightforwardly false. First, Plaintiffs point to a meeting that occurred in 2013 during which negotiations commenced, ultimately culminating in the Series 2014A bond sale. Second, Plaintiffs annexed (and incorporated by reference) the Underwriters' own 2014 Official Statement in support the Complaint.

[16]     *Gutierrez* doesn't say that; rather, it just contains the same general rule the Court identified in *Marble*.

17

disease being contracted from the Flint water supply," *see id*. at 984, the conspiracy here is to take an affirmative act: Flint's participation in the KWA, a necessary component of which is the switch of Flint's water source and poisoning of Flint's residents. It is doubtful that discovery would unearth the participants of the conspiracy of silence in *Marble* (as opposed to those who did not reveal the threat for some other reason[17]), but discovery here will plainly identify participants. There will no doubt be emails, drafts of the agreement, drafts of the 2014 Official Notice, meeting logs and notes. Any of these documents—the kind routinely turned over in discovery—will identify the specific individuals.

### C.    The Underwriter Defendants acted with conscience-shocking deliberate indifference.

The Underwriters contend that Plaintiffs' allegations do not amount to deliberate indifference on their part.[18] No so. As set forth above, the Underwriters greenlit the Series 2014A bond sale, knowing that it would necessarily entail a lengthy period of use of the Flint River as an interim water source, even though the Flint River water was dangerously corrosive and would likely leach lead out of

---

[17]    Even if the silence was culpable in *Marble*, culpable silence by many individuals is entirely consistent with mere "parallel conduct." *Id*. at 986. Not so with a discrete agreement to perform an affirmative act.

[18]    Actually, the Underwriter Defendants claim that the Plaintiffs "do not allege that the Underwriters acted with deliberate indifference." Underwriters Br. at 16. That contention is demonstrably false. *See* Compl. ¶ 223.

Flint's aging pipes.[19] On top of all of this is the fact that the ACO—the document which allowed Flint to take on debt at all—was premised on a fraud, and Plaintiffs have plausibly alleged that the Underwriters understood this and facilitated it.

The nub of the Underwriter Defendants' argument here is the notion that they "lacked authority" over the 2014 water switch and had "no role" in it. *See* Underwriters Br. at 16–17. But that's preposterous. The Complaint alleges that the Underwriters financing of Flint's participation in the KWA was necessary and that it was well known that without the 2014 bond sale, no switch of Flint's water source would have ever occurred. As the entities who controlled the financing of the KWA (and thus Flint's participation in it), the Underwriters plainly had authority over the water switch and played a role in bringing it about. Their agreement unlocked the funds necessary to finance Flint's participation in the KWA. If the Underwriters had refused to agree and withheld funds, Flint's participation in the KWA (and therefore, likely the KWA itself) would have been impossible. Lenders have the power to contractually require certain actions by borrowers, and they easily could have done so here. The ability to impose conditions as a prerequisite for obtaining necessary funding is a classic example of control.

---

[19]     Contrary to the Underwriter Defendants' erroneous contention, these allegations are comparable to allegations that this Court and the Sixth Circuit have held state a claim for deliberate indifference. This is in short not, as the Underwriters baselessly claim, an attempt to impose a "less demanding" standard for private defendants than public ones.

**D.     The Underwriter Defendants acted "under color of" state law.**

The Underwriter Defendants argue they did not act "under color of" state law,[20] making three discrete challenges along the way. Each is incorrect.

### 1.     A single plan existed.

First, the Underwriter Defendants contend that no "single plan" existed, arguing they "could not have foreseen the public official's constitutional violation." Underwriter Br. at 13 (citing quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). However, this case is unlike *Hooks*, where there was "no way that [two alleged co-conspirators] could have anticipated the chain of events that would be triggered by plaintiff's surreptitious removal of the children from Texas back to Tennessee." 771 F.2d at 944. Here, Plaintiffs have alleged that the Underwriters (i) were plainly aware of the impending switch in Flint's water and that it would be used an interim source for years, (ii) that there was no plan to implement corrosion control or otherwise upgrade the Flint WTP, (iii) that Flint could not afford to

---

[20]     To be sure, the Sixth Circuit does not require a plaintiff to prove that *all* members of the conspiracy acted under color of state law in the same way a public official does. *See Revis*, 489 F.3d at 291 (regarding a § 1983 conspiracy claim, "[t]he district court properly concluded that Deputy Eaton's eviction of Revis constituted state action" for the private defendants); *see also Cooper v. Parrish*, 203 F.3d 937, 952 n.2 (6th Cir. 2000) ("If a private party has conspired with state officials to violate constitutional rights, then that party qualifies as a state actor and may be held liable pursuant to § 1983 . . . .").

implement those upgrades and that the bond sale was not financing any such upgrades.[21]

But there's more: Plaintiffs adequately alleged that the bond issuance—top to bottom—was premised on a lie; *and* that the Underwriters knew of the lie and facilitated the fraud anyway. The Underwriters entered into a negotiated bond sale, which fosters confidentiality and worked closely with the issuers for approximately a year, all while learning not only of the essential facts demonstrating the hazardous nature of the Flint River, but of the issuers' fraud as well. *See Gilbrook*, 177 F.3d at 856–57; *Burgos*, 94 F.3d at 848. In point of fact, the Sixth Circuit has relied on the putative conspirator's "deceitful" conduct as circumstantial evidence of willful participation in the conspiracy. *Wehberg*, 229 F.3d at 527.

## 2. The Underwriters shared a conspiratorial objective.

Next, the Underwriters' assert that Plaintiffs have not shown that they formed an agreement to perform an unconstitutional act. To hear the Underwriters tell it, there can be no conspiracy unless they had the "objective" of depriving Flint residents of their "constitutional rights." Underwriters Br. at 14. It appears that the Underwriters' conception of the law would require the conspirators not only to agree

---

[21]    It is true that the various Government Defendants' behavior was held to be conscience shocking. *See Guertin v. Michigan*, 912 F.3d 907, 928 (6th Cir. 2019). Yet, Plaintiffs do feel the need to point out that the Underwriters misleadingly conflate the standard of conscience shocking behavior with "shocking" in the sense of being surprising. *See* Underwriters Br. at 14.

to take an action, *but also* that that action is against the law. To be clear, a hazy agreement as to a value judgment concerning the legality of action is not a necessary element of a claim for civil conspiracy. Rather, the Sixth Circuit speaks of a "general conspiratorial objective." *Local 96*, 361 F.3d at 905. And Plaintiffs have sufficiently pled that the Underwriters agreed to a general conspiratorial objective—financing Flint's participation in the KWA—part and parcel of which was the switch in Flint's water source as a subcomponent, which all parties knew would result in the catastrophic poisoning of Flint's citizens. Indeed, given the Underwriters' complicity in facilitating the fraudulent enterprise of the ACO, it is reasonable to infer that the Underwriters shared in the conscience-shocking objective. *See Wehberg*, 229 F.3d at 527; *Gilbrook*, 177 F.3d at 856–57; *Burgos*, 94 F.3d at 848.

### 3. No rule of law precludes a conspiracy to act with deliberate indifference.

Next, the Underwriter Defendants contend that "a defendant cannot conspire to commit a reckless act." Underwriters Br. at 15. However, the Underwriter Defendants point to no case concluding there can be no conspiracy to commit a deliberately indifferent act as a matter of law. Rather, the Underwriter Defendants rely on cases speaking of *recklessness and negligence*. But this argument noticeably swaps out the "deliberate indifference" standard for recklessness in other contexts.

The point is fine-grained, but important. In the § 1983 context, the two culpable mental states are deliberate indifference and intent to harm. *See Sacramento*

*v. Lewis*, 523 U.S. 833, 849–50 (1998). And while the minimum bar for a finding of deliberate indifference has been equated to subjective recklessness, *see Farmer v. Brennan*, 511 U.S. 825, 836–37 (1994), cases that mention recklessness in passing in other contexts aren't comparable. After all, deliberate indifference is actually a very high bar that necessarily takes into account a defendant's "actual deliberation," *Guertin*, 912 F.3d at 924, including "the opportunity for reflection and unhurried judgments," *Ewolski v. City of Brunswick*, 287 F.3d 492, 511 n.5 (6th Cir. 2002).

Thus, here the Underwriters agreed to finance a larger scheme that necessarily the deliberate and intentional occurrence of a specific act: The April 2014 switch of Flint's water source, which all parties knew would result in seriously corrosive and untreated water leaching lead from aging pipes and poisoning Flint's residents. There was plenty of opportunity for reflection and analysis; the negotiations may have taken as much as a year. Cases about agreeing to act recklessly just don't apply.

### E.   The bond issuance is a proximate cause of Plaintiffs' injuries.

The Underwriter Defendants also argue that they are not a proximate cause of Plaintiffs' injuries.[22] Proximate cause turns on foreseeability: It exists where it is "reasonably foreseeable that the complained of harm would befall the § 1983

---

[22]   However, they do *not* contend that they are not a cause in fact of Plaintiffs' injuries. In other words, they do not deny that Plaintiffs would not have been injured "but for" their conduct. *Powers v. Hamilton Cty. Pub. Defender Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007).

plaintiff as a result of the defendant's conduct." *Powers*, 501 F.3d at 609. "Even if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable." *Id*. Moreover, "[t]here may . . . be more than one proximate cause." *Hausrath v. New York C.R. Co.*, 401 F.2d 634, 637 (6th Cir. 1968).

The gist of the Underwriter's argument here is their claim that they lacked the power to control the decision-making of the Government Defendants. *See* Underwriters Br. at 17 (citing *Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350, 1358 (9th Cir. 1981)). However, a lack of ability to control the other Defendants is not the standard, particularly in the context of a conspiracy; rather, at all times, the standard is whether the injuries were "foreseeable," *Powers*, 501 F.3d at 609, which the Plaintiffs more than sufficiently pled. *See* Compl. ¶ 213.

The Sixth Circuit has consistently recognized that proximate cause is necessarily a thorny, fact-intensive issue—it is usually best resolved by a jury, not a court—and so arguments about proximate cause are particularly ill-suited to a motion to dismiss. *See Marvaso v. Sanchez*, 971 F.3d 599, 607 (6th Cir. 2020); *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004); *see also NOW v. Scheidler*, 510 U.S. 249, 256 (1994). In this regard, it is notable that the Underwriter Defendants' lead case—*Arnold*—is a summary judgment decision, *see* 637 F.3d at 1352, and the power and ability to control another actor are "questions of fact

24

inappropriate for resolution on a motion to dismiss." *In re Nat'l Prescription Opiate Litig. v. Purdue Pharma. L.P.*, MDL No. 1:17-md-02804; Case No. 1:18-op-45459, 2019 U.S. Dist. LEXIS 101660, at *155 (N.D. Ohio Apr. 1, 2019).

The Underwriter Defendants rely on *Powers* for their invocation of an intervening, superseding cause. *See* Underwriter Br. at 17. But *Powers* actually supports Plaintiffs here. There, although the public defender did not have the power to control the judge, a question of fact existed as to whether the judge's actions were foreseeable, such that the public defender could be held liable. 501 F.3d at 610–11. Nevertheless, there is ample reason to doubt the Underwriters' contention that they lacked the power to control the Government Defendants. As above, the Underwriters controlled access to funding for the KWA (and Flint's participation in it), without which there were never have been any water switch.

### F.    Federal securities law does not preclude § 1983 liability.

Finally, securities law does not preclude Plaintiffs' § 1983 claim. Preclusion is an affirmative defense upon which the Underwriters bore the burden of proof, *see Boler v. Earley*, 865 F.3d 391, 403 (6th Cir. 2017), and the Underwriters' cursory invocation of *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264 (2007) is insufficient. Rather than attempt to shoulder that burden, they simply take for granted that securities law precludes § 1983 claim here.

25

Moreover, *Credit Suisse* does not even supply the applicable standard. Rather, it applies a specific standard for the displacement of antitrust law. *See Credit Suisse*, 551 U.S. at 267, 270, 272–73; *see also Gordon v. NYSE*, 422 U.S. 659, 682 (1975). In the § 1983 context, courts inquire whether the "'remedial devices provided in the particular Act are sufficiently comprehensive.'" *Boler*, 865 F.3d at 401 (quoting *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981)). Stated differently, courts infer Congress's intent to preclude § 1983 liability (or not) by comparing "'the rights and protections of the statute and those existing under the Constitution." *Id.* at 402 (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 252 (2009)).[23] "'Where the contours of such rights and protections diverge in significant ways, it is not likely that Congress intended to displace § 1983 suits enforcing constitutional rights.'" *Id.* (quoting *Fitzgerald*, 555 U.S. at 252–53).

Neither Rule G-17 nor any other federal statutory or regulatory provision provides Plaintiffs any statutory remedy at all.[24] Congress did not intend federal securities law to preclude § 1983 claims.

---

[23]     In this Sixth Circuit, this review is careful and avoids broad invocations of federal statutory protections. *See Charvat v. E. Ohio Reg'l Wastewater Auth.*, 246 F.3d 607, 615 (6th Cir. 2001) (rejecting argument that a federal statute's protection of whistleblowers from adverse employment action does not preclude a § 1983 claim to vindicate first amendment rights).

[24]     Even if *Credit Suisse* did supply the correct standard, the Underwriters made no attempt to show (via several factors) that application of § 1983 would be "plain[ly] repugnan[t]" to federal securities law. *Credit Suisse*, 551 U.S. at 267.

II.  **Plaintiffs have sufficiently pled a claim of professional negligence against the Underwriter Defendants.**

A.  **Under these unique facts, the Underwriters had a duty to avoid harming Plaintiffs.**

The main thrust of the Underwriter Defendants' argument against Plaintiffs' professional negligence claim is that they did not owe Plaintiffs a duty. However, that isn't true. The Underwriters are merely a subspecies of lenders, which have a duty under certain circumstances to avoid causing foreseeable harm to third parties. *See Connor v. Great Western Sav. & Loan Ass'n*, 69 Cal. 2d 850, 864 (1969).

It is true, as the Underwriters point out, that an oft-stated "general rule" is that lenders do not have a duty "'to insure [every investment's success].'" Underwriter Br. at 21 (quoting *Nymark v. Heart Fed. Sav. & Loan Ass'n*, 231 Cal. App. 3d 1089, 1099 (1991) (alteration in original)).[25] Yet, the Underwriter Defendants' heavy reliance on *Nymark* is misplaced. "*Nymark* and the cases cited therein do not purport to state a legal principle that a lender can never be held liable for negligence in its handling of a loan transaction within its conventional role as a lender of money." *Ottolini v. Bank of Am.*, No. C-11-0477 EMC, 2011 U.S. Dist. LEXIS 92900, at *16–17 (N.D. Cal. Aug. 19, 2011). After all, "[e]ven when the lender is acting as a conventional lender, the no-duty rule is only a general rule." *Jolley v. Chase Home*

---

[25]  Some decisions of other courts appear to disagree with point outright. *See Larsen v. United Fed. Sav. & Loan Ass'n*, 300 N.W.2d 281, 284–88 (Iowa 1981) (holding bank liable for negligent appraisal).

*Finance, LLC*, 213 Cal. App. 4th 872, 901 (2013). Rather, the inquiry at all times, is

whether a duty would apply under the specific facts of the case. *See Connor*, 69 Cal.

2d at 865; *Nymark*, 231 Cal. App. 3d at 1098.

Thus, in *Connor*, for example, the lender "had a duty to exercise reasonable

care to prevent the construction and sale of seriously defective homes to plaintiffs."

*Connor*, 69 Cal. 2d at 867. There, the lender provided a construction loan to a

developer who negligently constructed tract housing, which were damaged in

subsequent rainstorms. *Id.* at 856–57. The California Supreme Court held that lender

owed the third parties a duty because the lender went beyond acting as a

conventional lender and became "an active participant" in the enterprise, over which

it had "the right to exercise extensive control." *Id.* at 864. "Its financing, which made

the enterprise possible, took on ramifications beyond the domain of the usual money

lender. It received not only interest on its construction loans, but also substantial fees

for making them . . . ." *Id.* It was plausibly alleged[26] there that the lender "knew or

should have known that the developers were inexperienced, undercapitalized, and

operating on a dangerously thin capitalization. [The lender] therefore knew or should

have known that damage from attempts to cut corners in construction was a risk

reasonably to be foreseen." *Id.* "The fact that [the lender] was not in privity of

---

[26]     *Connor* involved an appeal from a "nonsuit," an older term for a
procedural posture comparable to a motion to dismiss.

contract with any of the plaintiffs except as a lender does not absolve it of liability for its own negligence in creating an unreasonable risk of harm to them." *Id.* at 865.

This case is closely comparable to *Connor*, and the Court should similarly deny the Underwriter Defendants' motion to dismiss. As above, the negotiated bond sale made the Underwriters active and interested parties, and they had power to control the terms of the financing. They knew that approving the KWA financing would result in the seriously corrosive (and untreated) water from the Flint River being used as an interim water source for Flint, and that it would cause lead to leach out of the aging network of Flint's distribution lines. Moreover, they knew that Flint did not have the financial means to perform the necessary upgrades to the Flint WTP without their assistance and they did not finance any such upgrades. In point of fact, the Underwriters knew there was no plan or intention to actually perform the upgrades, and yet financed the bond sale anyway. They also knew that the entire conceit making the bond sale possible was a fraud, and yet they knowingly facilitated it. Those allegations are more than sufficient to survive a motion to dismiss here.

Michigan law has likewise countenanced broad impositions of duty.[27] "Courts have recognized that a professional may be liable in malpractice to a third party for harms caused by his or her breach of the applicable standard of care notwithstanding

---

[27]    The Underwriters evidently believe that ordinary, as opposed to professional, negligence principles should govern the scope of their duty. *See* Underwriters' Br. at 21–22.

the lack of a professional-client relationship with the third-party." *Roberts v. Kathryn Salmi, LPC*, 308 Mich. App. 305, 315 (2014) (citing *Dyer v. Trachtman*, 470 Mich. 45, 51–54 (2004)).[28] "Moreover, even in the absence of a professional-patient relationship, Michigan's common law imposes on every person a general obligation to refrain from taking actions that unreasonably endanger others: 'every person engaged in the prosecution of any undertaking [has] an obligation to use due care, or to so govern his [or her] actions as not to unreasonably endanger the person

---

[28]     The Underwriters' belief that they had "no special relationship" between themselves and the people of Flint is irrelevant. Michigan broadly conceives of the special relationship inquiry: It is not limited to Plaintiffs; it also includes the issuers. *See Murdock v. Higgins*, 454 Mich. 46, 54 (1997) ("Where there is a duty to protect an individual from a harm by a third person, that duty to exercise reasonable care arises from a 'special relationship' either between the defendant and the victim, *or the defendant and the third party who caused the injury*." (emphasis added)).

And, for sure, federal law makes clear that underwriters are in a special relationship with issuers of municipal securities. *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 641 (D.C. Cir. 2008) ("A securities dealer occupies a special relationship to a buyer of securities in that by his position he implicitly represents he has an adequate basis for the opinions he renders." (quoting *Hanly v. SEC,* 415 F.2d 589, 596 (2d Cir. 1969))). An underwriter occupies a "vital position" in an offering because "[b]y participating in [it], an underwriter makes an implied recommendation about the securities [that the underwriter] . . . has a reasonable basis for belief in the truthfulness and *completeness* of the key representations made in any disclosure documents used in the offerings." *Id.* (emphasis in original) "An underwriter must investigate and disclose material facts that are known or 'reasonably ascertainable'" and "may not 'blindly' rely on information provided by the issuer." *Id.* at 641, 642 (quotations omitted); *see also SEC v. Glt Dain Rauscher, Inc.*, 254 F.3d 852, 858 (9th Cir. 2001); *cf. Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977) (recognizing that an underwriter has a duty to investigate an issuer, and that reckless failure to do so can give rise to liability under 10b-5).

or property of others.'" *Id.* (quoting *Clark v. Dalman*, 379 Mich. 251, 261 (1967)). "This rule of the common law arises out of the concept that every person is under the general duty to so act, or to use that which he controls, as not to injure another." *Clark*, 379 Mich. at 261. "Such duty of care may be a specific duty owing to the plaintiff by the defendant, or it may be a general one owed by the defendant to the public, of which the plaintiff is a part." *Id.* No link of privity is required. *Cleveland Indians Baseball Co., L.P. v. N.H. Ins. Co.*, 727 F.3d 633, 638 (6th Cir. 2013). On the contrary: "[A] contracting party owes a separate and distinct common law duty of care to all those whom the party knew or reasonably should have foreseen would be injured by the party's negligent acts or omissions." *Id.* at 638–39.

The tort of negligent entrustment provides a helpful analogy here.[29] That tort requires a plaintiff to "prove that defendant knew or should have known of the unreasonable risk propensities of the entrustee." *Fredrickson v. GM Corp.*, 411 Mich. 712, 719 (1981).[30] "To prove an entrustor should have known an entrustee was likely to use the entrusted chattel in an unsafe manner, peculiarities of the entrustee sufficient to put the entrustor on notice of that likelihood must be

---

[29]    The Underwriters are simply incorrect that resolving this issue requires defining a new duty. The duty to avoid causing foreseeable harm is well established. Nevertheless, under the factors considered in *Miller v. Ford Motor Co.*, it would be appropriate to do so here. 479 Mich. 498, 515 (2007).

[30]    As above, the Underwriters' contention that they have "no relationship" with Plaintiffs is false and, in any event, a red herring. *See Miller*, 479 Mich. at 515. They had an actionable relationship with the issuers. *See Murdock*, 454 Mich. at 54.

demonstrated."[31] *Id.* These cases also show that the Underwriters assumption that there is no direct harm is misplaced. In cases of negligent entrustment, [l]iability 'arises from [the defendant's] active misconduct; he has actually created an unreasonable risk to others by placing a chattel in the hands of a person whose use thereof is likely to create a recognizable risk to third persons.'" *Moning v. Alfono*, 400 Mich. 425, 444 (1977) (quoting Harper & Kime, *The Duty to Control the Conduct of Another*, 43 Yale L.J. 886, 894 (1934)). That is precisely the case here.[32]

In the end, the crocodile tears the Underwriters shed for the people of Flint— in their words, they give "every sympathy"—are unpersuasive in light of the brisk and immediate denial of any duty to prevent the eminently foreseeable harm they directly facilitated. The words of *Jolley* are striking here: "We live . . . in a world dramatically rocked in the past few years by lending practices perhaps too much colored by shortsighted self-interest. . . . There is, to be sure, blame enough to go around. And banks are hardly to be excluded." 213 Cal. App. 4th at 902. *Jolley*

---

[31]     In this regard, the "burden on the defendant" is slight. *See Miller*, 479 Mich. at 515. Since "[o]ne risk an underwriter considers is potential litigation," since litigation could directly and materially affect the return on investment, underwriters are necessarily already taking this information into account in most instances.

[32]     "The doctrine of negligent entrustment is not peculiar to automobiles but rather an ordinary application of general principles for determining whether a person's conduct was reasonable in light of the apparent risk." *Moning*, 400 Mich. at 445; *see also Fredrickson*, 411 Mich. at 719. In this regard, the "nature of the risk" here—the poisoning of children, resulting in lifelong and unalterable brain damage—also forcefully militates in favor of recognizing that the Underwriters owed Plaintiffs a duty under these circumstances. *See Miller*, 479 Mich. at 515.

spoke of the banks' reckless role in bringing about a financial and foreclosure crisis. Those words are all the more poignant here. Indeed, the "social costs" of denying any duty at all are felt painfully, acutely, and in many cases permanently by the people of Flint. *See Miller*, 479 Mich. at 515. The "social benefits" of encouraging a modicum of safety in at least the most extreme situations, like this one, cannot be understated.

**B.    The bond issuance is a proximate cause of Plaintiffs' injuries.**

The Underwriter Defendants' tortious actions were a proximate cause of Plaintiffs' injuries. *Ray v. Swager*, 501 Mich. 52, 65 (2017) ("It is not uncommon that more than one proximate cause contributes to an injury."). It was "foreseeable, natural, and probable" that approving the financing of the KWA would result in the poisoning thousands of Flint's children. *See Estate of Shinholster v. Annapolis Hosp.*, 471 Mich. 540, 546 (2004). The Underwriter Defendants' bare denial of "any legal responsibility" has no place in a motion to dismiss. *See Dismukes v. Michigan Express, Inc.*, 368 Mich. 197, 203 (1962) ("[P]roximate cause is ordinarily a question of fact for the jury.").

**C.    Federal law does not preempt Plaintiffs' state law tort claim.**

Finally, MSRB Rule G-17 does not preempt Plaintiffs' state law tort claim. At the outset, "[f]ederal preemption is an affirmative defense" and the Underwriters "bear[] the burden of proof." *Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 674–75

(6th Cir. 2013). Since 12(b)(6) is generally an "inappropriate vehicle" for asserting an affirmative defense, a defendant must prove that the complaint "affirmatively show[s]" that the defense applies. *See Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012); *see also Jones v. Block*, 549 U.S. 199, 215 (2007). It does not.

Moreover, there is a "presumption that Congress did not intend to preempt state [tort] law." *Wimbush v. Wyeth*, 619 F.3d 632, 642 (6th Cir. 2010). After all, "state-based tort liability falls squarely within [a state's] prerogative to regulate matters of health and safety, which is a sphere in which the presumption against preemption applies, indeed, stands at its strongest." *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 94 (2d Cir. 2006). In this regard, a court's conflict preemption analysis "should be narrow and precise, 'to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role.'" *See Downhour v. Somani*, 85 F.3d 261, 266 (6th Cir. 1996) (quoting *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 515 (1989)). It is, in short, a "demanding defense." *Wyeth v. Levine*, 555 U.S. 555, 573 (2009).

The Underwriters have not carried this heavy burden. They offer only self-serving spin as to why avoiding causing foreseeable harm would undermine their duty to negotiate at arm's length with bond issuers. However, given the broad scope of duties under G-17, *see supra* at 30 n.28, there is no reason to believe that state tort

34

law would modify them.[33] Indeed, although the Underwriters claim Rule G-17 creates "carefully calibrated" duties, they are consistent with Michigan law; and nothing suggests Congress intended "to subject [underwriters] to only one set of regulations." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99 (1992).[34]

## CONCLUSION

Accordingly, Plaintiffs respectfully request that the Court deny the Underwriter Defendants' motion to dismiss.

Dated:          January 29, 2021

                                        Respectfully submitted,

                                        **LEVY KONIGSBERG LLP**

                                        /s/ Renner K. Walker
                                        Renner K. Walker
                                        Corey M. Stern
                                        800 Third Ave., 11th Fl.
                                        New York, New York 10022
                                        T: (212) 605-6200
                                        rwalker@levylaw.com
                                        cstern@levylaw.com

---

[33]     The Underwriters also take an unduly narrow view of the duty Plaintiffs assert they breached. *See* Underwriters Br. at 24 (citing Compl. ¶ 274). Plaintiffs identified several ways the Underwriters could have discharged their duty, *see* Compl. ¶¶ 248–50, and the Underwriters do not challenge those other formulations.

[34]     Lost in the Underwriters' preemption argument is any appreciation that the SEC appears to acknowledge state law regulation of bonds as valid: "The laws of the relevant state or local government, including state constitutions, statutes, city and county charters, and municipal codes, govern all borrowing, including the issuance of municipal securities." U.S. Secs. & Exchange Comm'n, *Investor Bulletin: The Municipal Securities Market* (Feb. 1, 2018), https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_munibondsmarket.

## CERTIFICATE OF SERVICE

I, Renner K. Walker, hereby certify that on February 5, 2021, the foregoing

document was served on all counsel of record via the court's ECF system.

/s/ Renner K. Walker
Renner K. Walker