## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| *In Re* Flint Water Cases, | No. 5:16-cv-10444-JEL-MKM (consolidated) <br><br> Hon. Judith E. Levy |
| LeeAnne Walters, as Next of Friend for Two Minor Children, G.W. 1 and G.W. 2, et al., <br><br>      *Plaintiffs*, <br> v. <br><br> J.P. Morgan Chase & Co.; Wells Fargo Bank, National Association; and Stifel, Nicolaus & Company, Incorporated, <br><br>      *Defendants*. | Case No. 5:20-cv-12726 |

## REPLY IN SUPPORT OF THE MOTION TO DISMISS BY DEFENDANTS J.P. MORGAN SECURITIES LLC, WELLS FARGO BANK, N.A., AND STIFEL, NICOLAUS & COMPANY, INC.

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ii

I.  PLAINTIFFS' FACTUAL THEORY IS INADEQUATE ....................................2

II. THE § 1983 CONSPIRACY CLAIM FAILS AS A MATTER OF LAW............5

    A.  Plaintiffs Inadequately Plead Their Conspiracy Claim.....................................6

    B.  The Pleadings Provide No Basis To Find Deliberate Indifference ...............7

    C.  Plaintiffs' Allegations do not Establish State Action ......................................8

    D.  Plaintiffs Fail To Allege Facts Supporting Proximate Causation.................10

    E.  Federal Securities Law Displaces Plaintiffs' § 1983 Claim ...........................11

III. PLAINTIFFS' MICHIGAN TORT CLAIM IS DEFICIENT ...........................12

    A.  Plaintiffs Identify No Applicable Duty Owed by the Underwriters............13

    B.  The Underwriters Did Not Proximately Cause Plaintiffs' Injuries..............16

    C.  Plaintiffs' State-Law Claim Is Preempted ......................................................16

CONCLUSION ................................................................................................17

CERTIFICATE OF SERVICE.........................................................................19

# TABLE OF AUTHORITIES

**Page**

CASES

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
526 U.S. 40 (1999) ............................................................................8

*Arnold v. IBM Corp.,*
637 F.2d 1350 (9th Cir. 1981) ........................................................11

*Bazzi v. Dearborn,*
658 F.3d 598 (6th Cir. 2011) ...................................................... 9, 10

*Bennett v. Russell,*
322 Mich. App. 638 (2018).............................................................16

*Bickerstaff v. Lucarelli,*
830 F.3d 388 (6th Cir. 2016) ..........................................................11

*Boler v. Early,*
865 F.3d 391 (6th Cir. 2017) ..........................................................12

*Cleveland Indians Baseball Co., L.P. v. N.H. Ins. Co.,*
727 F.3d 633 (6th Cir. 2013) ..........................................................15

*Connor v. Great W. Sav. & Loan Ass'n,*
69 Cal. 2d 850 (1968) .....................................................................13

*Credit Suisse Sec. (USA) LLC v. Billing,*
551 U.S. 264 (2007) ................................................................. 11, 12

*Dolphin & Bradbury, Inc. v. S.E.C.,*
512 F.3d 634 (D.C. Cir. 2008) ........................................................13

*Gordon v. New York Stock Exch., Inc.,*
422 U.S. 659 (1975) ........................................................................12

*Graves v. Warner Bros.*,
    253 Mich. App. 486 (2002)............................................................................12

*Guertin v. State*,
    912 F.3d 907 (6th Cir. 2019) ...............................................................8, 9, 10

*Hooks v. Hooks*,
    771 F.2d 935 (6th Cir. 1985) ........................................................................9

*Huron Valley Hosp., Inc. v. City of Pontiac*,
    650 F. Supp. 1325 (E.D. Mich. 1986), *aff'd*, 849 F.2d 262 (6th Cir.
    1988) ..........................................................................................................10

*In re Certified Question from Fourteenth Dist. Court of Appeals of Texas*,
    479 Mich. 498 (2007) ................................................................................14

*In re Flint Water Cases*,
    384 F. Supp. 3d 825, *aff'd and remanded*, 960 F.3d 303 (6th Cir. 2020) ........7

*In re Flint Water Cases*,
    453 F. Supp. 3d 970 (E.D. Mich. 2020) ...................................................6, 8

*Johnson v. Botsford Gen. Hosp.*,
    278 Mich. App. 146 (2008)........................................................................14

*Marvaso v. Sanchez*,
    971 F.3d 599 (6th Cir. 2020) ......................................................................8

*Powers v. Hamilton County Public Defender Commission*,
    501 F.3d 592 (6th Cir. 2007) ....................................................................11

*Ray v. Swager*,
    501 Mich. 52 (2017)..................................................................................16

*Roberts v. Salmi*,
    308 Mich. App. 605 (2014)........................................................................14

*Tropical Paradise Resorts, LLC v. JBSHBM, LLC*,
    No. 18-CV-60912, 2019 WL 78983 (S.D. Fla. Jan. 2, 2019).......................17

*United States v. Childress*,
   58 F.3d 693 (D.C. Cir. 1995) ........................................................................10

**STATUTES**

42 U.S.C. § 1983 .........................................................................................*passim*

**OTHER AUTHORITIES**

2 Subst. Crim. L. § 12.2(c)(2) (3d ed.) ...............................................................10

Investigation, Michigan.gov, January 14, 2021,
   https://www.michigan.gov/som/0,4669,7-192-47796-549541--
   ,00.html ......................................................................................................3

Rule 12(b)(6) ....................................................................................................11

Plaintiffs' Response confirms that their theory is simply this: (1) the Underwriters agreed to underwrite the bonds that financed the Karegnondi Water Authority ("KWA") pipeline; and (2) if they had not, Flint would not have switched water sources in the interim, and there would have been no crisis. In other words, Plaintiffs assert that the *agreement to underwrite itself* renders the Underwriters liable for injuries purportedly caused by the bond issuance. That theory is untenable as a matter of law.

*First*, far more is required to plead a conspiracy to violate § 1983. A plaintiff must plead with specificity an agreement to violate constitutional rights, and Plaintiffs identify no such allegations in their Complaint. Even on the most generous reading of the Complaint, the Underwriters did not intend (and certainly did not agree) that government officials would fail to address, and even cover up, evidence of contamination. Nor have Plaintiffs pleaded proximate causation; in fact, their own allegations of official malfeasance render implausible any inference that the Underwriters could have foreseen these harms. And if a cause of action *could* somehow be conjured up under § 1983, it would be displaced by federal securities law.

*Second*, as Plaintiffs all but admit, Michigan tort law has never recognized liability for an underwriter or lender when injuries are caused by subsequent independent actions of a borrower—let alone when those actions were separate from the use of the borrowed funds. Plaintiffs show no basis for creating a duty on the facts here, where imposing liability would upend municipal bond markets and make it harder for municipalities, particularly distressed ones, to borrow funds to update their aging

infrastructure. Plaintiffs also have not pleaded proximate causation. And their state tort claim is preempted because it would conflict with the Underwriters' federal-law duty to deal fairly with issuers and investors in an "arm's length" commercial transaction.

*In the end*, though "approximately $400,000,000,000 in municipal bonds are issued annually," (PageID.893), Plaintiffs cite *not one* analogous case—whether applying § 1983 or any state's tort law—endorsing their theory of liability for underwriters (or any lender). They admit they ask this Court to recognize a brand new species of claim because of the "unique facts" of this case. But they ignore that this Court has repeatedly declined to endorse sweeping new theories of liability on precisely the same set of "unique facts," including for state actors who were far more closely connected to the operative events. This Court should dismiss the Complaint in its entirety.

## I. PLAINTIFFS' FACTUAL THEORY IS INADEQUATE.

Plaintiffs' fact discussion reveals how shaky a foundation underlies their claims. Plaintiffs rely on the following: (1) In spring 2013, the KWA had commitments from all participants but Flint; (2) unidentified state and local officials asked unidentified individuals at the Underwriters "to secure financing [for the KWA] through a bond sale," and "a meeting was scheduled"; (3) without financing, Flint would have stayed on Detroit Water and Sewerage Department ("DWSD") water; and (4) aware of these facts, the Underwriters "agreed to underwrite" the sale. (PageID.891-92.)

Plaintiffs attempt to buttress this theory of but-for causation with the allegation that the Underwriters knew of the obstacles faced by Flint's interim plan to use the Flint

WTP to treat Flint River water. (PageID.896-98.) They then make the unsupported and untenable inferential leap that Underwriters *knew* that "Flint's citizens would in all certainty consume water contaminated with lead" once Flint made that switch. (PageID.898.) But this conveniently ignores Plaintiffs' own allegations contradicting the theory that the Underwriters could have foreseen the water crisis. Even if they *had* adequately alleged that the Underwriters could have anticipated the upgrades to the WTP might not happen, Plaintiffs do not explain how the Underwriters could have foreseen (1) that the MDEQ would illegally issue a permit allowing Flint to switch to the WTP when that was unsafe; (2) that engineering firms engaged to advise on the WTP upgrade would allegedly overlook corrosion control; or (3) that local, state, and federal officials, as well as the MDEQ and the EPA, would fail to intervene—or worse, actively engage in a cover-up—once contamination emerged.[1] (*See* PageID.840-41.)

The rest of Plaintiffs' factual account aims to create an impression of improper dealing by the Underwriters, but its points are misleading and irrelevant to their claims.

*First*, Plaintiffs emphasize that the KWA bond issuance was a "negotiated sale" and assert that the Underwriters thus had "vast negotiating power and access to information." (PageID.892.) But a "negotiated sale" is, as Plaintiffs indirectly acknowledge, an "arm's length" transaction in which an underwriter purchases bonds

---

[1] New criminal indictments were recently filed against nine state and local officials. *See* Attorney General, Nine Indicted on Criminal Charges in Flint Water Crisis Investigation, Michigan.gov, January 14, 2021, https://www.michigan.gov/som/0,4669,7-192-47796-549541--,00.html.

from an issuer to sell to investors. (*See* PageID.838-40; PageID.892 (noting that issuer sells bonds to underwriter "which in turn sells them" to investors).) It creates no fiduciary relationship or joint venture between underwriter and issuer. (*See* PageID.838-40.) Trying to make this ordinary transaction appear nefarious, Plaintiffs suggest the Underwriters took advantage of Flint's distressed finances. (PageID.893.) This is implausible: the Underwriters negotiated the sale not with Flint but with the KWA— which was led by Genesee County and included multiple municipalities not similarly distressed. (5:17-cv-10164 PageID.5068, ¶ 78.) But even if credited, this would show at most that the Underwriters could negotiate favorable economic terms *in the KWA bond transaction*, not that they obtained power over the City of Flint's water delivery plans.

*Second*, Plaintiffs declare that "any reasonable underwriter either employs an internal public water expert or else retains a consultant with significant public water expertise," and state that the Underwriters did so. (PageID.894.) The Underwriters are not aware of any good-faith factual basis for this allegation. But even if true, that would not establish that the Underwriters, in financing the *KWA pipeline*, performed or should have performed an engineering evaluation of the City of Flint's *separate* interim water supply plans.

*Third*, Plaintiffs emphasize their conclusory allegation that the Underwriters knew the Administrative Consent Order ("ACO") was "fraudulent." But according to Plaintiffs' own allegations in the Master Complaint, the Underwriters had no role in procuring the ACO. (5:17-cv-10164 PageID.5173–76, ¶¶ 413–22.) In any event,

Plaintiffs' discussion of the ACO makes little sense. Even if the Underwriters knew the ACO was improper, that would show only irregularities in Flint's participation in the KWA's financing. It says nothing about the Underwriters' culpability regarding Flint's separate decisions on interim water supply. As Plaintiffs themselves emphasize, the KWA bonds did not finance renovations to the Flint WTP. (*See* PageID.900-01.)

Plaintiffs fault the Underwriters for "setting the [bond issuance's] terms to exclude financing the necessary improvements to the Flint WTP." (PageID.901.) But Plaintiffs do not explain how the Underwriters could have forced the *KWA*—formed by multiple local governments and responsible for disposition of the bond proceeds— to pay for infrastructure work needed for Flint to pursue its separate decisions respecting interim water supply. The KWA project clearly did not *require* Flint to make any interim change; Genesee County, for example, remained on DWSD water until it connected to the finished KWA pipeline. (*See* PageID.113.) In the end, Plaintiffs use the ACO to try to smear the Underwriters with other actors' alleged fraud. That is insufficient to salvage their inadequate theory of the case against the Underwriters.

## II.   THE § 1983 CONSPIRACY CLAIM FAILS AS A MATTER OF LAW.

Plaintiffs' theory of § 1983 liability rests on the core allegation that the Underwriters participated in the KWA bond sale knowing Flint would use Flint River water on an interim basis. Plaintiffs offer no legal authority to support the proposition that the bare facts alleged could be the basis of § 1983 liability.

### A.    Plaintiffs Inadequately Plead Their Conspiracy Claim.

As Plaintiffs do not dispute, "vague references to co-conspiratorial actors and aims do not meet the pleading requirements for a conspiracy." *In re Flint Water Cases*, 453 F. Supp. 3d 970, 985 (E.D. Mich. 2020) ("*Marble*"); *see* PageID.845-46. Applying this rule in *Marble*, this Court dismissed claims against two engineering firms when plaintiffs did no more than "identify the overall contracting work that the companies performed for the City of Flint throughout the years to argue that they were part of a conspiracy to give assurances to Flint residents and businesses that their water was safe." *Id.* Plaintiffs allege even less here: they rely on the overall work the Underwriters performed (underwriting the bonds) for *the KWA*. In contrast to *Marble*, the Underwriters here are not even alleged to have "performed work . . . related to Flint's transition to the Flint River [or] to advise Flint on water quality issues," *Id.* at 981.

Plaintiffs try to distinguish *Marble* on the ground that they identify "behavior," rather than "outcomes," "suggesting corruption." (PageID.905.) But this "behavior" is a vaguely alleged meeting "with several government officials"—they identify no date, attendees, or specific communications. *See Id.*; (PageID.69-70.) As in *Marble*, these allegations are legally insufficient because "Plaintiffs identify no single person" who entered agreements or "took any overt actions in furtherance of a conspiracy," *id.* at 985, content instead to gesture at groups ("everyone involved on the underwriting side"). (PageID.75-76, ¶¶ 77–79.) In any event, the upshot of the "meeting," as alleged in the Complaint, was simply that the Underwriters "agreed to underwrite the bond

sale" (PageID.70, ¶ 33)—in other words, to work with the City on the KWA, which is, again, the type of allegation this Court has already held inadequate.

Finally, Plaintiffs suggest there is a salient difference between the alleged conspiracy *not* to act in *Marble* and the "affirmative act" of financing the KWA, but again, the KWA pipeline caused no harm. Plaintiffs' real complaint is that the Underwriters did not use their supposed leverage to *prevent* Flint from switching water sources (*see, e.g.*, PageID.898, 901); and in that way this case is no different from *Marble*.

## B.    The Pleadings Provide No Basis To Find Deliberate Indifference.

Under this Court's and the Sixth Circuit's holdings in other Flint water cases, Plaintiffs' allegations fail to plead deliberate indifference. At most, Plaintiffs allege the Underwriters financed the KWA knowing that the City would use Flint River water during construction, that this water was "corrosive," and that "proper corrosion controls" were not in place. (PageID.897-98.) This Court deemed similar allegations insufficient to show deliberate indifference in officials directly responsible for Flint water—like MDEQ director Daniel Wyant. *See In re Flint Water Cases*, 384 F. Supp. 3d 825, 859–60, *aff'd and remanded*, 960 F.3d 303 (6th Cir. 2020). This Court granted Wyant was "likely aware of the health risks" of the water and even found "some indication that he knew the [WTP] was not utilizing . . . corrosion control . . . and that Flint's water was contaminated." *Id.* at 859. Yet the Court found no deliberate indifference, because there was no suggestion that Wyant "publicly denied [the] problem" or "encouraged Flint residents to use the contaminated water." *Id.* at 859-60. So too here.

Indeed, even allegations of *more* egregious behavior would not suffice. The Sixth Circuit found no deliberate indifference where officials had *direct* knowledge of *actual* contamination and "failed to blow the whistle." *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019). And this Court held inadequate allegations that a defendant was "involved in developing the interim plan" and "may have set in motion the chain of events that led to the transition to the Flint River." *Marble*, 453 F. Supp. 3d at 995. Here the allegation—mere knowledge of the transition—is even weaker. Plaintiffs do claim, without citing the Complaint, that the Underwriters could have contractually required the issuer to take certain actions. (PageID.907.) But even if properly alleged, this would show only that the Underwriters failed to prevent wrongdoing—which is inadequate. *See, e.g.*, *Guertin*, 912 F.3d at 932. In the end, Plaintiffs provide no factually analogous authority. (*See, e.g.* PageID.907, n.19 (relying on conclusory assertions).)

## C.    Plaintiffs' Allegations do not Establish State Action.

"[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999); *see* PageID.845. Plaintiffs seek to overcome this rule by alleging that the Underwriters conspired with state actors. *See Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020). But for conspiracy liability under § 1983, private actors and public officials must share a single plan and a conspiratorial objective to engage in a rights-violating course of conduct. *Id.* Plaintiffs allege neither. Nor do they explain how a conspiracy to be deliberately indifferent is even logically possible.

8

*Single Plan*:   Under circuit precedent, there is no "single plan" between officials and a private party if the latter could not have foreseen the officials' constitutional violation. (PageID.847 (discussing *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985).) Plaintiffs' only answer is to rehash their allegation that the Underwriters knew the City would use the WTP without adequate corrosion controls. (PageID.908.) But if true, this would be irrelevant, because the switch was not itself the constitutional violation. The violation came later, when government officials, with "deliberate indifference," ignored health hazards, deceived the public, and failed to take remedial action. *See Guertin*, 912 F.3d at 922–32. Plaintiffs never explain how the Underwriters could have foreseen all— or indeed *any*—of that misconduct. Plaintiffs therefore allege no "single plan."

*Shared conspiratorial objective*: It is not enough for a § 1983 conspiracy to allege that the private actors shared a goal of *some* sort with state officials. (PageID.848-49.) Rather, defendants must be alleged to "share[] the conspiratorial objective *of violating [constitutional] rights*," *Bazzi v. Dearborn*, 658 F.3d 598, 603 (6th Cir. 2011) (emphasis added). For instance, in *Bazzi*, the plaintiff alleged a conspiracy between a private actor and two police officers to deny him due process of law. The Sixth Circuit held that while a jury could infer that one officer had conspired to unlawfully stop plaintiff's vehicle, that "[did] not permit the *additional* inference that [he] agreed to the *greater* harm of having [plaintiff] arrested and his supervised release revoked without due process." *Id.* at 603. So even wrongful participation in a related conspiracy is not enough; the conspirator must agree to *the specific conduct that effectuated the rights violation.*

9

Plaintiffs do not argue the Underwriters intended officials to ignore evidence of contamination and deceive the public. Instead, they assert that having the "general conspiratorial objective [of] financing Flint's participation in the KWA" is enough. (PageID.910.) But there is nothing unconstitutional about providing financing to build a functioning water system; so to share the goal of facilitating such a project is not to "direct[] [oneself] towards an unconstitutional action." *See Huron Valley Hosp., Inc. v. City of Pontiac*, 650 F. Supp. 1325, 1345 (E.D. Mich. 1986), *aff'd*, 849 F.2d 262 (6th Cir. 1988).[2]

*Conspiracy to be reckless*: Conspiracy also requires a common "specific intent" or purpose, *see United States v. Childress*, 58 F.3d 693, 707 (D.C. Cir. 1995); *Bazzi* 658 F.3d at 603—and recklessness falls short. (*See* PageID.849.) Plaintiffs attempt to distinguish recklessness from deliberate indifference. (PageID.910-911; *but see Guertin*, 912 F.3d at 926.) But both mental states lack purpose or intent, and that makes it impossible to conspire to commit a tort defined by either. *See* 2 Subst. Crim. L. § 12.2(c)(2) (3d ed.) ("[T]here is no such thing as a conspiracy to commit a crime which is defined in" *any* non-purposive terms—whether "*knowingly, recklessly or negligently*.") (emphasis added).

### D.   Plaintiffs Fail To Allege Facts Supporting Proximate Causation.

Plaintiffs do not and cannot plead proximate causation. Plaintiffs do not remotely explain how the Underwriters could have foreseen intervening actions like the

---

[2] Unable to point to adequate allegations of the requisite shared objective, Plaintiffs resort to a straw man, claiming the Underwriters contend they must have known that the conduct complained of was, as a legal matter, unconstitutional. (PageID.909-10.) The Underwriters made no such argument. (*See* PageID848-49.)

allegedly illegal MDEQ permit; the alleged failure of two engineering firms to urge corrosion control; or the actions—some criminal—of local, state, and federal officials who ignored or concealed the problem. *See supra*, p. 3. They suggest that this Court defer the issue until summary judgment. (PageID912-13.) But their burden now is to at least *plead* facts supporting foreseeability; and their allegations, including in the Master Complaint, actually *undermine* this crucial element of their claim. This fails Rule 12(b)(6)'s plausibility requirement. *See Bickerstaff v. Lucarelli*, 830 F.3d 388, 401 (6th Cir. 2016).

Plaintiffs attempt to sidestep the Ninth Circuit case *Arnold v. IBM Corp.*, 637 F.2d 1350, 1358 (9th Cir. 1981), which held that proximate cause in a § 1983 conspiracy case demands that the private actors exert some control over the official decision-makers' misconduct. *Arnold* appropriately limits private defendants' liability under § 1983, to prevent the statute from being used to constitutionalize ordinary tort litigation. Plaintiffs assert that foreseeability alone is enough to establish proximate causation. But the case they rely on, *Powers v. Hamilton County Public Defender Commission*, 501 F.3d 592 (6th Cir. 2007), is not a § 1983 conspiracy case and does not speak to this issue.

### E.    Federal Securities Law Displaces Plaintiffs' § 1983 Claim.

Plaintiffs offer no real answer to the Underwriters' argument that federal securities law displaces their § 1983 claim. Their Response confirms that their theory is that *the agreement to underwrite itself* renders the Underwriters liable. (*E.g.*, PageID.901 ("By deliberately financing the bond sale, . . . the Underwriters joined a conspiracy . . . .").) But as in *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 277 (2007), because the

11

SEC and MSRB regulate this heartland securities activity, the dispositive question is whether a "suit such as this one [is] likely to prove practically incompatible with the [agencies'] administration of the Nation's securities laws." And as in *Credit Suisse*, allowing a § 1983 conspiracy claim based on the agreement to underwrite "means that underwriters must act in ways that will avoid not simply conduct that the securities law forbids . . . , but also . . . conduct that the securities law permits or encourages (but which they fear could lead to [a] lawsuit and the risk of . . . damages). And therein lies the problem." *Id.* at 282. Plaintiffs complain that *Credit Suisse* concerned antitrust, but its "plain repugnancy" standard derives from the general test for repeals by implication. *See Gordon v. New York Stock Exch., Inc.*, 422 U.S. 659, 682–83 (1975) (citing, inter alia, *United States v. Borden Co.*, 308 U.S. 188, 198–199 (1939)). Even if § 1983 otherwise offered remedies on facts like these, the securities laws displace it.[3]

## III.   PLAINTIFFS' MICHIGAN TORT CLAIM IS DEFICIENT.

Plaintiffs admit that the "general rule" is that lenders have no tort duty to insure the success of investments. (PageID.915.) Nor do they contest that, generally, "there is no legal duty obligating one person to aid or protect another," *Graves v. Warner Bros.*,

---

[3] Plaintiffs rely on the *Sea Clammers* line of cases addressing when a statutory remedial scheme is exclusive of § 1983 remedies for a violation of the *same* statute. (PageID.914.) Those cases are inapposite, because Plaintiffs do not seek remedies for a federal securities law violation via § 1983—rather, they propose a new form of liability. They also assert preclusion is an "affirmative defense," (PageID.913), but the Sixth Circuit has never held that this legal argument is any such thing, *see Boler v. Early*, 865 F.3d 391, 403 (6th Cir. 2017) (discussing only "burden" of legal persuasion).

253 Mich. App. 486, 493 (2002). But they still urge the Court to recognize a cause of action on the "unique facts" here. (PageID.915.) This Court should decline to do so.

### A. Plaintiffs Identify No Applicable Duty Owed by the Underwriters.

Plaintiffs do not identify or define, much less establish, a duty on the part of the Underwriters to protect Plaintiffs from water contaminants.

*First*, Plaintiffs rely on a fifty-year-old out-of-state case, *Connor v. Great W. Sav. & Loan Ass'n*, 69 Cal. 2d 850, 863 (1968), to support a duty of lenders to prevent harm to third parties. (PageID.915-16.) But *Connor* involved a bank and a developer that "combined their property, skill, and knowledge to carry out the tract development" over which "each shared . . . control." *Id.* The bank became "an *active participant* in a home construction enterprise." *Id.* at 864 (emphasis added). And even then, it was only potentially liable for defects in the *financed* enterprise, with respect to plaintiffs to whom it lent money. *Id.* at 864. The bank was not held liable for actions of the borrowers *outside* of the development, with respect to parties having *no relationship* to the lender.[4]

*Second*, Plaintiffs suggest that a duty exists because of underwriters' "special relationship with issuers." (PageID.918, n.28.) This argument is meritless. To start, Plaintiffs' cited cases recognize a relationship between underwriters *and investors*, not issuers. E.g., *Dolphin & Bradbury, Inc. v. S.E.C.*, 512 F.3d 634, 641 (D.C. Cir. 2008) (noting

---

[4] Plaintiffs assert (without authority) that, because the Underwriters engaged in a "negotiated bond sale," they were "active and interested parties."(PageID.917.) But as already explained, *supra* at p. 3, a negotiated sale is a common "arm's length" transaction.

a "special relationship to a buyer of securities"). And even if the Underwriters had a professional relationship with the KWA, that would only be the *starting point* for deciding whether there was any duty to third parties. *See, e.g.*, *Roberts v. Salmi*, 308 Mich. App. 605, 613-14 (2014). And Plaintiffs offer no reason a duty to third parties would go beyond forestalling *financial* harm—the area of the Underwriters' special expertise. *See, e.g.*, *Johnson v. Botsford Gen. Hosp.*, 278 Mich. App. 146, 151–52 (2008) ("A claim sounds in medical malpractice . . . [when it] raises questions of medical judgment.").

*Third*, Plaintiffs fall back on the overbroad theory that *every* person owes a "general [duty of care] to the public." (PageID.918-19.) But the law does not recognize a duty not to cause *any* injuries to *anyone*. "[T]he ultimate inquiry" in defining a duty "is whether the social benefits . . . outweigh the social costs," balancing "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk." *In re Certified Question from Fourteenth Dist. Court of Appeals of Texas*, 479 Mich. 498, 505 (2007). This test precludes a duty here. (PageID.854-55.)

Plaintiffs' discussion of these factors is limited to conclusory assertions largely buried in footnotes. Plaintiffs say it is "false" that the Underwriters had no relationship with Plaintiffs but give no explanation. (PageID.919, n.30.) They assert that there is no need to "create" a "new duty" because the "duty to avoid causing foreseeable harm is well established." (PageID.919, n.29.) But this broad assertion begs the question, as foreseeability is only *part of* the test for whether to impose a duty. *See In re Certified Questions*, 479 Mich. at 505. A business that entices a customer away from a competitor

14

has "foreseeably harmed" the other business; an activist who reveals an entity's unsavory business practices has "foreseeably harmed" that entity; but tort law does not make such conduct actionable. The "duty" analysis is meant to determine *whether* to require an actor to prevent a given harm; Plaintiffs cite no case establishing a duty here.[5]

As for balancing burdens and benefits, Plaintiffs say the incremental burden on the Underwriters of recognizing a duty would be "slight," because they supposedly "already . . . tak[e] into account" the possibility that municipal entities might do harm with the bond proceeds; while the risk of harm here is great. (PageID.920-21, n.31–32.) That is mistaken. On the one hand, because there is *no authority* establishing that underwriters might be liable in these circumstances, they do *not* already factor this risk into bond transactions. Imposing a duty on them to prevent issuers from harming third parties would increase lending costs for municipalities and shock municipal bond markets. On the other hand, while the Underwriters have no wish to minimize the past harms to Plaintiffs, recognizing a duty here would increase borrowing costs for all municipalities—especially those attempting, amid economic distress, to update an aging infrastructure. Far from preventing harm, it would set the stage for further crises.

Finally, Plaintiffs "negligent entrustment" analogy is unpersuasive and offensive. That tort imposes liability for entrusting "a chattel" to one "whom the supplier knows

---

[5] *Cleveland Indians Baseball Co., L.P. v. N.H. Ins. Co.*, 727 F.3d 633, 639–40 (6th Cir. 2013), held only that it is "permi[ssible]" in some circumstances to impose duties to protect third parties; it did not hold that there is a duty to prevent all foreseeable harm.

or has reason to know is, because of youth, inexperience, or otherwise, likely to use it in a manner involving unreasonable risk of physical harm." *Bennett v. Russell*, 322 Mich. App. 638, 643 (2018) (citation omitted). Plaintiffs' analogy assumes the Underwriters had reason to expect Flint officials would stand by while residents were poisoned. But the facts known to the Underwriters gave no hint of such extreme dereliction of duty by government officials. This Court should reject a rule that would require underwriters to presume misconduct by municipal borrowers such as the City of Flint.

### B.    The Underwriters Did Not Proximately Cause Plaintiffs' Injuries.

Plaintiffs suggest that proximate cause is ordinarily a question for the jury, but "[i]f reasonable minds could not differ regarding the proximate cause of a plaintiff's injury, courts should decide the issue as a matter of law." *Ray v. Swager*, 501 Mich. 52, 76 n. 61 (2017). And for the reasons already stated, Plaintiffs fail to explain how any reasonable mind could hold that the intervening malfeasance of numerous local, state, and federal officials was foreseeable. *See supra* at p. 3; (PageID.856-57.)

### C.    Plaintiffs' State-Law Claim Is Preempted.

Now that Plaintiffs' legal theory is clear, their tort claim is all the more plainly preempted. Plaintiffs would require underwriters to stop borrowers from causing non-financial harms to third parties, where the only link to the underwriter is that the funding of a separate, successful public works project was allegedly a but-for cause of the harms. On this view, an underwriter must act as a shadow government, somehow "controlling" what a city does. But overseeing a city's projects would destroy the arms-length nature

16

of the transaction and undercut underwriters' ability to deal fairly with investors. Plaintiffs themselves point out the "broad scope of duties under G-17," as well as underwriters' federal duties to investors. (PageID.918, n.28; PageID.922.) These duties are legally incompatible with Plaintiffs' tort-based demands. (*See* PageID.857-59.)[6]

## CONCLUSION

The Court should dismiss the Complaint against the Underwriters in its entirety.

Dated: March 5, 2021                    Respectfully submitted,

                                        */s/ Louis P. Gabel*
                                        Louis P. Gabel (P80365)
                                        JONES DAY
                                        150 W. Jefferson Ave., Suite 2100
                                        Detroit, MI 42226
                                        P: (313) 733-3939
                                        lpgabel@jonesday.com

                                        Charlotte H. Taylor (DC 1024658)
                                        JONES DAY
                                        51 Louisiana Ave., N.W.
                                        Washington, DC 20001
                                        P: (202) 879-3939
                                        ctaylor@jonesday.com

                                        *Counsel for Defendants J.P. Morgan Securities LLC, Wells Fargo Bank, N.A., and Stifel, Nicolaus & Company, Inc.*

---

[6] Plaintiffs assert that that preemption is an "affirmative defense," (PageID.921-922), but "State law claims are routinely dismissed due to conflict preemption at the motion to dismiss stage." *Tropical Paradise Resorts, LLC v. JBSHBM, LLC*, No. 18-CV-60912, 2019 WL 78983, at *3 (S.D. Fla. Jan. 2, 2019).

## <u>Certificate Of Service</u>

I certify that on March 5, 2021, I caused the above Reply Brief to be electronically filed with the Clerk of the Court through the CM/ECF system, which will effectuate service upon all counsel of record.

/s/ *Louis P. Gabel*
Louis P. Gabel

*Counsel for Defendants J.P. Morgan Securities LLC, Wells Fargo Bank, N.A., and Stifel, Nicolaus & Company, Inc.*