## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

*In re* Flint Water Cases.

Judith E. Levy
United States District Judge

_____/

This Order Relates To:

*Walters, et al. v. J.P. Morgan*
*Chase & Co., et al.,*
Case No. 20-12726

_____/

## OPINION AND ORDER GRANTING MOTION TO DISMISS [14]

This is one of the many cases stemming from the Flint Water Crisis and it is before the Court on Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 14.) Plaintiffs brought this case against three financial institutions that acted as underwriters for approximately $300 million in municipal bonds used to fund the infrastructure behind the Karegnondi Water Authority ("KWA"). The KWA is a municipal water supply system, incorporated under Michigan law, whose formation required the installation of a water intake structure, pipelines, and multiple pumping stations to process and distribute raw water to an area in the State of Michigan including the

City of Flint. *See About*, The Karegnondi Water Authority (Oct. 7, 2021) *https://www.karegnondi.com/about* [https://perma.cc/T7ST-JJDN]. Defendants are J.P. Morgan Securities LLC,[1] Wells Fargo Bank N.A., and Stifel, Nicolaus & Company, Inc. Plaintiffs were minors, residents, and water users in the City of Flint during the time that the Flint River was used as a primary water source. Plaintiffs sustained injuries resulting from their exposure to lead and other toxins in the water.

For the reasons set forth below, Defendants' motion to dismiss is granted.

## I.   BACKGROUND

Plaintiffs allege that Defendants conspired with various governmental officials to violate Plaintiffs' bodily integrity when Defendants underwrote[2] the bonds that funded the KWA project. (ECF No. 1-2, PageID.98.)[3] They also allege that Defendants were

---

[1] Plaintiffs' complaint named the incorrect J.P. Morgan entity. (*See* ECF Nos. 1, 1-2.) The parties stipulated to permitting Plaintiffs to amend their complaint to substitute the J.P. Morgan entity involved in KWA underwriting. (ECF No. 8, PageID.805.)

[2] To underwrite is generally defined in Black's Law Dictionary as: "To undertake to pay (a pledge of money, a subscription, etc.)." *Underwrite*, Black's Law Dictionary (11th ed. 2019).

[3] For reference purposes, when the Court sets forth facts alleged in the Master Complaint in *Walters*, it will precede its citation with the *Walters* case number (i.e.,

professionally negligent when they failed to require that the Flint Water Treatment Plant ("FWTP") be upgraded or that there exist a feasible funding mechanism to pay for the necessary upgrades. (*Id.* at PageID.101–103.) Without Defendants' funding, Plaintiffs argue that the Flint Water Crisis would have been averted. Plaintiffs attach approximately 700 pages of exhibits to their Complaint, including the KWA Official Statement and its appendices.[4] (*See* ECF No. 1-2.)

As an initial matter, the KWA issued the bonds that Defendants underwrote on or about April 4, 2014. (ECF No. 1-2, PageID.93.) Defendants are not alleged to have been involved with any decisions or

---

No. 17-10164). Citations to docket entries without a leading case number refer to this case.

[4] Plaintiffs' Short Form Complaint has the boxes checked for two counts, which do not match the two counts set forth in their Addendum. On the Short Form itself, they checked the boxes alleging that Defendants: (1) violated Plaintiffs' clearly established right to bodily integrity protected by the Fourth Amendment's Due Process Clause under 42 U.S.C. § 1983; and (2) are liable for punitive damages. (ECF No. 1, PageID.5–6.) Their Short Form Complaint states: "This Count and the facts pled in the Master Long Form Complaint associated therewith are adopted as to the newly named Defendants as more fully pled in Exhibit B." (*Id.* at PageID.6.)

Exhibit B then sets forth claims only for: (1) conspiracy to violate Plaintiffs' bodily integrity under 42 U.S.C. § 1983; and (2) professional negligence. (ECF No. 1-2, PageID.98, 101.). There is no count alleging a violation of Plaintiffs' right to bodily integrity aside from the conspiracy count and no further mention of an independent claim for punitive damages. In the briefing on this motion, the parties only address the two counts in the Addendum and thus the Court will do the same.

actions related to Flint water after they underwrote the bonds. (*See, generally*, ECF No. 1-2.) Accordingly, when evaluating the claims against Defendants, the Court will focus on the events leading up to April 4, 2014.

The Court has previously set forth general background regarding the City of Flint's water supply system. *See, e.g.*, *Walters v. Flint*, No. 17-10164, 2019 WL 3530874, at *4–*11 (E.D. Mich. Aug. 2, 2019). For the purposes of this case, the Court will summarize the historical background of the Flint Water Crisis, along with Plaintiffs' allegations regarding these specific Defendants.

## A. City of Flint's Pre-Crisis Water Supply and Exploration of KWA

The Flint River cuts though the City of Flint and, for much of the early twentieth century, it was the City's primary water source. (*Walters*, No. 17-10164, ECF No. 185-2, PageID.5115.) The FWTP, constructed in 1917, was built to enable the City of Flint to safely distribute treated Flint River water to the City's residents and businesses for their use and consumption. (*Id*.)

In 1964, the United States Geological Survey noted that the Flint River contained high levels of chloride. (*Id*.) Chloride reacts with trace metals found in river water to form certain salts, making the water

4

corrosive and difficult to process. As a result of this problem and others, the City of Flint stopped using the Flint River as a water source in the 1960s and the City began purchasing its water from the Detroit Water and Sewerage Department ("DWSD"). Unlike Flint River water, DWSD water was not raw; it was pre-treated. So, by the time the City of Flint received water under its contract with DWSD, the water was safe for immediate use and consumption. Once the City began purchasing finished water from DWSD, it no longer needed to keep the FWTP active. The City deactivated the FWTP and "mothballed" it in 1965. (*Id.* at PageID.5115–5116.)

The City of Flint's contract with DWSD also gave it the exclusive right to distribute DWSD water throughout Genesee County. (*Id.* at PageID.5115.) The City and the Genesee County Drain Commission ("GCDC") entered into a contract in 1973, whereby the GCDC accepted all of its water from the City. This arrangement provided clean and safe water to the City and the GCDC for several decades. (*Id.*) Indeed, the City and GCDC received DWSD water from the 1960s until 2014.

In the 1990s, the City of Flint and other Genesee County communities "had growing concerns over the cost of DWSD water." (*Id.*

5

at PageID.5117.) They commissioned studies to look at alternative water sources such as the Flint River. (*Id*.) However, a 2004 technical assessment of the Flint River prepared by the United States Geological Survey, the Michigan Department of Environmental Quality ("MDEQ"), and the Flint Water Utilities Department, raised concerns over the use of the Flint River as a drinking water source, finding it was susceptible to contamination. (*Id*.)

In 2009, several engineering firms (including Lockwood, Andrews & Newnam, P.C., which is a Defendant in other Flint Water Cases but not this case, and Rowe Engineering, Inc., which was a Defendant in other Flint Water cases and is a former Defendant in other Flint Water cases and a party to the partial settlement agreement[5]) prepared a study for the City of Flint, Genesee County, Sanilac County, and Lapeer County, which examined the feasibility of constructing a new water supply pipeline to draw raw water from Lake Huron. (*Id*. at PageID.5117–5118.) The City of Flint, Genesee County, Sanilac County, Lapeer County, and the City of Lapeer formed the KWA "to explore the

---

[5] *See In re Flint Water Cases*, --- F. Supp. 3d.---, No. 16-10444 2021 WL 5237198 (E.D. Mich. Nov. 20, 2021) (granting final approval to a partial settlement).

6

development of a water delivery system that would draw water from Lake Huron and serve as an alternative to water delivered by DWSD." (ECF No. 1-2, PageID.68.)

In order to achieve its goal, the KWA would need to: (1) construct a raw water intake system on Lake Huron; (2) build and place over sixty miles of pipeline from Lake Huron to the City of Flint and other KWA members; and (3) construct two pumping stations. (*Id.* at PageID.69.)

## B. City of Flint's Financial Crisis

At the same time the City of Flint and its neighboring communities were exploring alternative water sources to the DWSD, the City was facing a financial crisis. (*Id.* at PageID.75.) In 2011, then-Governor Richard D. Snyder (who is not a defendant in this case but is a defendant in many of the other Flint Water Cases) declared the City of Flint to be in a state of financial emergency and appointed an emergency manager to manage Flint's finances. (*Id.*)

It was clear from the beginning of the emergency manager's tenure that a solution to the City's financial condition would not be found in the short term. (*See id.* at PageID.245.) Rather, as stated by the City's auditor at the time, "Addressing any significant reductions at that time

[fiscal year 2011] would have required unthinkable reductions in the level of public safety and other essential City services, and would have been done in an atmosphere of crisis." (*Id.*) Moreover, the auditor wrote that the City would be "challenged for several more years" and would need to sort out how to "provide at least a basic level of City services." (*Id.* at PageID.252.) The auditor also noted that the City had many obstacles, including "[a]ging sewer, water, street, and sidewalk infrastructure." (*Id.*)

## C. The KWA Commitment

Then-City Emergency Manager Edward Kurtz evaluated the fiscal prudence of the KWA project. In November 2012, Kurtz wrote to the State Treasurer, Andy Dillon, to suggest that the City of Flint commit to the KWA project because it would result in the City saving money. (No. 17-10164, ECF No. 185-2, PageID.5070.) This was an opinion shared by Jeffrey Wright, who was the Genesee County Drain Commissioner, Chief Executive Officer of the KWA, and a vocal opponent of purchasing water from the DWSD.[6] (*Id.*)

---

[6] Kurtz, Dillon, and Wright were Defendants in many of the other Flint Water Cases, but they are not defendants in this case.

8

The DWSD disagreed with Kurtz's evaluation. Throughout 2012, it presented cost studies to Kurtz, Wright, Dillon, and Snyder that refuted Kurtz's position. These studies demonstrated that from a cost and reliability standpoint the City of Flint was better off continuing to buy DWSD water rather than committing to the KWA project. (*Id*.) Seeking additional input, Dillon commissioned an independent cost study. (*Id*. at PageID.5070–5071.) In February 2013, this study concluded that it would be more economical for the City of Flint to continue to purchase DWSD water on both a short- and long-term basis. (*Id*. at PageID.5071.)

Throughout 2013, the City of Flint continued to negotiate with the DWSD while weighing the benefits of joining the KWA project. In April 2013, the DWSD presented a proposal that purported to save the City twenty percent over a thirty-year period when compared to the KWA project. (*Id*. at PageID.5072.) This offer got the attention of senior state officials, including Dillon, who questioned why the City of Flint would proceed with the KWA project in the face of such savings. (*Id*. at PageID.5072–5073.) Despite this, the City of Flint continued to evaluate the KWA project.

Several KWA member-communities committed to the KWA project by the spring of 2013. (*Id*. at PageID.5074.) But Wright believed that it would be difficult to finance the cost of the project without having the City of Flint's participation and financial support. Wright therefore turned his attention to securing the City's participation. He "aggressively argued" the case for the City's involvement in the KWA to senior government officials and to the media, and he contradicted claims that staying with DWSD would be a sound financial choice for the City. (*Id*.)

In March 2013, Dillon recommended to Snyder that the City of Flint commit to the KWA project, despite Dillon recognizing that several studies and the last DWSD proposal counseled against it from a cost perspective. (*Id*. at PageID.5071, 5073–5074.) In response, Snyder ordered the DWSD to submit a final proposal to continue as the City of Flint's water supplier. As directed, the DWSD issued its final offer in April of 2013, which the City rejected. (*Id*. at PageID.5075.) Snyder then authorized Kurtz to bind the City to the KWA project. (*Id*. at PageID.5075–5076.) Kurtz did so soon after. (*Id*. at PageID.5121–5122.) The DWSD contract with the City was to terminate in April 2014. (*Id*. at PageID.5122.)

### D. Funding the KWA Project and Defendants' Role

The projected cost of the KWA project was approximately $300 million in total. (*Id.* at PageID.74.) Each member-community of the KWA would be required to pay a share of the construction costs for the entire project. (*Id.*) Because of the City's dire financial circumstances, the only way it could participate in building the 65-mile-long KWA pipeline was if the KWA engaged in the issuance of municipal bonds. Municipal bonds provide an avenue to finance certain types of government projects. They "enable[] governmental entities to fund essential civic projects when those projects are most critical, without waiting to accumulate sufficient taxpayer revenue." (ECF No. 22, PageID.1013.) They represent a promise by the issuer/governmental entity (in this case, the KWA) to repay the amount of money borrowed from lenders, with interest, according to a fixed schedule. (*Id.*)

The first time Defendants are alleged to have been involved in these events was in spring of 2013. Plaintiffs allege that in spring of 2013, officials from the KWA reached out to Defendants to schedule a meeting to discuss financing the project through a bond sale. (ECF No. 1-2, PageID.69.)

11

The municipal bonds involved in the KWA offering were part of a "negotiated sale," which allows underwriters to "work closely with the issuer's financing team to determine the financing parameters with the goal of attracting investors to meet the issuer's requirements, and tailor the bond sale's terms to the interests of the underwriter's institutional investor clients." (*Id*. at PageID.71.)

But the City faced a major hurdle to borrowing its share of the money to participate in the KWA construction[7] because, as set forth above, it was under emergency state management at the time. Under the Michigan Home Rule City Act, Mich. Comp. Laws §§ 117.1 *et seq*., the City, while under emergency management, was limited to borrowing funds only "in case of fire, flood, or other calamity. . . and for the preservation of municipal property." *See* Mich. Comp. Laws § 117.4a. (ECF No. 185-2, PageID.5173.) At the time, the City's desire to participate in the KWA did not fall within this statutory restriction, particularly because it was already receiving safe finished water from the DWSD.

---

[7] To be more precise, the City of Flint's share was 34% of the bonds. (*See* ECF No. 1-2, PageID.74.)

12

The City of Flint and the State of Michigan negotiated an Administrative Consent Order ("ACO"), which would allow the City to take on debt as a member of the KWA despite the statutory restrictions in the Home Rule City Act. In addition to allowing the City to take on debt to pay its share of the KWA project's construction, the ACO also permitted temporary use of the Flint River as a water source from the time the DWSD water would be shut off in April 2014 through the estimated completion date of the KWA infrastructure in the spring of 2016.

Plaintiffs allege that the ACO required the City to undertake updates to the FWTP:

> The Administrative Consent Order was signed by Peter Bade, Chief Legal Officer of the City of Flint, and Bryan Feighner, Chief of the Michigan Department of Environmental Quality's Office of Waste Management and Radiological Protection on or about March 20, 2014.

> The Administrative Consent Order purported to require Flint to use raw water from the Flint River and to undertake an $8,000,000 upgrade to the Flint WTP to safely handle the Flint River water.

(ECF No. 1-2, PageID.89.) Plaintiffs also allege that the ACO's issuance's timing further connects it to the KWA bond sale:

13

When the process slowed, KWA's bond attorney, David Massaron, emailed to [sic] Flint-finance director Gerald Ambrose and [then-Flint Emergency Manager Darnell] Earl[e]y to emphasize the urgency of obtaining the ACO. He explained that KWA was ready to proceed with a $220-million bond issue so it could continue pipeline construction. "However, we cannot take that step until the [ACO] . . . is effective," Massaron wrote, and "the City needs the ACO in place by the end of this week . . . In order to ensure that the entire project can be financed. . . and that the City will have some debt capacity in the future, the ACO is a condition precedent to proceeding. . . ." Unless the MDEQ and the City moved quickly to get the ACO, Massaron continued, "the KWA will have expended its initial resources and be forced to stop construction and the project will be delayed for at least one construction cycle."

(No. 17-10164, ECF No. 185-2, PageID.5175–5176.) The ACO was executed on March 20, 2014. (*Id.* at PageID.5176.) This set the stage for the KWA bonds to be issued.

The purpose of the bond issuance is set forth in the KWA Official Statement[8] ("Official Statement") as: "to pay [ ] a portion of the cost of acquiring and constructing [KWA's] Water Supply System," for the

---

[8] The Official Statement contains detailed financial records of both the City of Flint and Genesee County, an engineering consultant report regarding the KWA system's feasibility, discussion of tax matters, and a debt service schedule, among other things. (*See* ECF No. 1-2, PageID.111–726.)

purpose of "supplying raw water to [KWA's] member[-] communities." (ECF No. 1-2, PageID.113.)

Each KWA member was required to make its own determination on how to implement two aspects of the project. First, each member would be responsible for determining how to treat the raw water before delivering it to customers. As set forth above, the proposed KWA plan contemplated that the Lake Huron water drawn through the pipeline would be raw, untreated water. As stated in the Official Statement, "[e]ach contracting member will be responsible for treating and distributing treated water to its individual customers." (*Id.* at PageID.118.) Second, each member-community needed to determine an interim plan for providing water to its customers between the time that DWSD was shut off until the KWA pipeline was fully constructed.

The City of Flint determined that it would treat water from the KWA pipeline using the FWTP and that its interim water plan was to draw water from the Flint River, which would also be treated using the FWTP. The FWTP, which was mothballed in 1967, would need upgrading to process the water drawn from the KWA pipeline. The City estimated that the improvements would cost approximately $8 million in order "to

convert the plant from stand-by to fully operational." (*Id*. at PageID.123.) As set forth above, the *KWA* was not responsible for paying the $8 million; rather, the *City* was responsible for funding these necessary upgrades on its own. (*Id*. at PageID.90.)

As to the interim water plan, the relevant provisions in the Official Statement setting forth the interim arrangements for the City are the following:

### Interim Water Supply Arrangements for Genesee and Flint

[N]o later than April 17, 2014, Flint intends to begin withdrawing water from the Flint River, treat[ing] the water in its water treatment plant and then mak[ing] such treated water available to the customers of the Flint System until the System is completed and operational. After the notification from DWSD, Flint sought another source of water and determined to use its water treatment plant to provide water to its customers. In order to do so it negotiated an administrative consent order with MDEQ that permitted the temporary use of the Flint River (the "ACO"). The ACO requires Flint to either undertake a public improvement project to connect to the System or undertake other public improvements to continue to use the Flint River. In order to comply with the ACO, Flint has determined that connecting to the System is the most cost[-]effective means to obtain untreated water and to comply with the ACO.

. . .

16

**Related Facilities**

In order to provide finished water to its customers, Flint expects to utilize its existing water treatment plant, which is currently operating in a back-up role with a capacity of 36 [million gallons per day (mgd)] and will be permitted to treat water drawn from the Flint River until the System is operational. Flint will be required to make an estimated $8,000,000 in improvements to convert the plant from stand-by to fully operational and to accommodate the flow of water from the System.

. . .

The completion date for the System is projected for May 1, 2016, at which time Flint expects to cease pumping water from the Flint River and . . . Flint and the County Agency expect to begin purchasing water from the Issuer and producing their own water.

(*Id*. at PageID.123–124.)

One of the appendices to the Official Statement includes a report from an engineering consultant, Jones & Henry Engineers, Ltd. (*Id*. at PageID.325.) The executive summary in the engineering report indicates that the KWA retained Jones & Henry to review the financial aspects of the KWA project relative to KWA's then-two customers—the City of Flint and GCDC—to determine the sufficiency of water rates to cover the debt service on the KWA system bonds. (*Id*. at PageID.329.) The report states

17

that "the Flint Water Department is responsible for its [water treatment plant]" (*id*. at PageID.338), and describes the City's "System Deficiencies" as follows:

> The City of Flint has been studying its system and determining its future needs . . . . The City has developed a Capital Improvement Plan (CIP) which has resulted in identifying the following annual capital needs: $8,500,000 in FY 2014; $10,500,000 in FY 2015; . . . . These funds will be generated through rates . . . . The CIP will help in addressing the aging system and high non-revenue water amount plus address the City's WTP needs.

(*Id*. at PageID.339.) Later, in the section entitled "Future Rates," the Jones & Henry report states:

> The City of Flint will need to address its system deficiencies. The analysis done on Flint's rates includes additional funds to start addressing these deficiencies. A significant investment in the WTP is included in the near[-]term analysis, so future needs will be less. The distribution system investment is projected to continue well beyond the near[-]term analysis. Future rates will see inflationary increases, but the capital needs will stabilize.

(*Id*. at PageID.341.)

Thus, the Complaint indicates that so far as Defendants were aware when they underwrote the bonds, the City of Flint "[would] be required to make an estimated $8,000,000 in improvements to the

18

[FWTP] from stand-by to fully operational" (ECF No. 1-2, PageID.123), and the City had a capital improvement plan in place to address this upgrade which would be funded largely through water rates. (*Id.* at PageID.339). The Complaint asserts that Defendants knew or should have known that the funds did not exist for the City to complete these upgrades in time for the water source switch.[9]   (*See* ECF No. 1-2, PageID.92–93.)

### E. Underwriters and Municipal Bonds

In its amicus brief, the Securities Industry and Financial Markets Association ("SIFMA")[10] sets forth an overview of the municipal bond market:

> State and local governmental entities issue municipal bonds to finance capital projects such as highways, airports, hospitals, schools, and other infrastructure. Municipal bonds represent a promise by the governmental entity (the *issuer*) "to repay to lenders (*investors*) an amount of money borrowed,

---

[9] Plaintiffs allege that Defendants knew the ACO was a "farce," and knew other facts such as the City's "inability to pay for necessary upgraded to the Flint WTP" and "the lack of even a plan to upgrade the Flint WTP." (ECF No. 1-2, PageID.64.) However, for the reasons explained in the Analysis section, these allegations are not sufficient to allege a conspiracy claim.

[10] SIFMA "is a securities industry trade association representing the interests of hundreds of securities firms, banks, and asset managers." (ECF No. 22, PageID.1010.) SIFMA requested leave to file an amicus brief, which the Court granted. (ECF Nos. 19, 22.)

called *principal*, along with *interest* according to a fixed schedule." Judy Wesalo Temel, The Fundamentals of Municipal Bonds 1 (5th ed. 2001). The issuer generally agrees to repay municipal bonds anywhere from one to 40 years after the date they were issued. *Id*. Thus, the municipal bond market enables governmental entities to fund essential civic projects when those projects are most critical, without waiting to accumulate sufficient taxpayer revenue.

(ECF No. 22, PageID.1013 (emphasis in original).) Additionally, SIFMA provides the following explanation of the various roles related to the KWA project:

A municipal bond offering involves many participants. The underline issuer plans a project and sells bonds, counseled by a underline financial advisor who assesses funding needs and structures the securities and underline issuer's counsel who advise on securities, tax, and similar matters. underline Bond counsel represents the interests of the bondholders, including by opining that the bonds are valid; underline rating agencies rate the bonds based on credit quality; and underline trustees carry out administrative functions such as holding invested funds. For infrastructure projects like the KWA pipeline, an underline engineer engaged by the municipal issuer produces a report that estimates the functioning and profitability of the project. (PageID.124.) In this case, the engineer's report explained that Flint's water treatment plant "currently provides treated water from the Flint River as a backup" water source and that "[a] significant upgrade ($48 million) . . . was completed in 2006[11] to meet state regulatory

_____

[11] It is unclear from the Complaint whether these were multi-phased upgrades that totaled $48 million by 2006, or whether there was a single upgrade ending in 2006, however, this fact does not impact the outcome. (*See* ECF No. 1-2, PageID.339.)

requirements," with additional upgrades planned. (PageID.338-39.)

(*Id.* at PageID.1014–1015 (emphasis in original).)

Underwriters such as Defendants are one of the many participants in a municipal bond offering. SIFMA explains that the underwriter's role generally involves:

> reviewing an issuer's federally required "official statement" about the bonds and the issuer, marketing the bonds to investors, negotiating the price with the issuer, and ultimately purchasing the bonds and offering them for resale.

(*Id.* at PageID.1015.) SIFMA further explains:

> [The underwriter's role] is carefully circumscribed by law and regulation . . . . [U]nderwriters must deal at arm's length with the issuer, to which they owe no fiduciary duties, and instead owe their primary responsibilities to investors who purchase municipal bonds. Thus, although underwriters review statements made by municipal issuers in connection with bond offerings, they play no role in planning the underlying municipal projects, nor do they exercise any oversight or control over the execution of those projects after purchasing the bonds. Instead, "[s]uccessful underwriters master the delicate balance of finding the yield that produces not only the lowest borrower cost for the issuer but also the highest yield for the investor consistent with the issuer's credit and deal structure."

(*Id.* at PageID.1015–1016 (*quoting* Judy Wesalo Temel, *Commentary: The Role of Issuer's Counsel in a Municipal Bond Offering*, The Bond

21

Buyer                    (Nov.                    8,                    2013),

*https://www.bondbuyer.com/opinion/commentary-the-role-of-issuers-*

*counsel-in-a-municipal-bond-offering%20*          [https://perma.cc/5CWZ-

Y9E9].) Thus, in accordance with their role as underwriters, Defendants

were aware of the contents of the Official Statement, including those

provisions related to Flint's interim water supply plan set forth above.

In addition, in a typical municipal bond sale, municipal

underwriters are "[h]eavily [r]egulated" such that their ability to act is

restricted. (*Id.* at PageID.1016.) Underwriters of municipal securities

register with the Securities and Exchange Commission ("SEC"), the

Municipal Securities Rulemaking Board ("MSRB"), and typically also

with the Financial Industry Regularity Authority ("FINRA"). (*Id.* at

PageID.1016–1017.) These registrations subject underwriters to various

regulations of recordkeeping, compliance, and reporting duties. (*Id.* at

PageID.1017.)

Many of the MSRB rules "govern the relationship between

underwriters and investors, i.e., the end-customers that purchase

municipal bonds from the underwriters." (*Id.*) For example, MSRB Rule

G-17 states: "In the conduct of its municipal securities or municipal

advisory activities, each broker, dealer, municipal securities dealer, and municipal advisor shall deal fairly with all persons and shall not engage in any deceptive, dishonest, or unfair practice." MSRP Rule G-17, *Conduct of Municipal Securities and Municipal Advisory Activities*, 154– 189 (Oct. 1, 2021), *https://www.msrb.org/- /media/Files/Resources/MSRB-Rule-Book-Current-Version.ashx?* [https://perma.cc/GD8L-GU68]. Additionally, MSRB Rule G-30 requires that transactions with investors be at "fair and reasonable" prices. MSRB Rule G-30, *Prices and Commissions*, 258–266 (Oct. 1, 2021), *https://www.msrb.org/-/media/Files/Resources/MSRB-Rule-Book- Current-Version.ashx?* [https://perma.cc/GD8L-GU68].

The MSRB rules also "dictate[] narrowly circumscribed obligations that underwriters owe to municipal issuers." (ECF No. 22, PageID.1018.) Specifically, as set forth by SIFMA,

> Rule G-17 requires the underwriter to "deal fairly" with issuers, and to disclose its limited role and potential conflicts of interest. Among other things, underwriters must disclose to issuers that:
>
> - "the underwriter's primary role is to purchase securities with a view to distribution in an arm's-length commercial transaction with the issuer and it has financial and other interests that differ from those of the issuer;"

- "unlike a municipal advisor, the underwriter does not have a fiduciary duty to the issuer under the federal securities laws and is, therefore, not required by federal law to act in the best interests of the issuer without regard to its own financial or other interests;"

- "the underwriter has a duty to purchase securities from the issuer at a fair and reasonable price, but must balance that duty with its duty to sell municipal securities to investors at prices that are fair and reasonable; and"

- "the underwriter will review the official statement for the issuer's securities in accordance with, and as part of, its responsibilities to investors under the federal securities laws, as applied to the facts and circumstances of the transaction."

(*Id.* at PageID.1018–1019 (quoting MSRB Rule G-17 Interpretations, *Interpretive Notice Concerning the Application of MSRB Rule G-17 to Underwriters of Municipal Securities*, 180 (Aug. 2, 2012), *https://www.msrb.org/msrb1/pdfs/MSRB-Rule-Book-April-2014.pdf* [https://perma.cc/CH4F-PN99] ("2012 Interpretive Notice").[12])

---

[12] The 2012 Interpretive Notice has been superseded by the March 31, 2021 Interpretive Notice Concerning the Application of MSRB Rule G-17 to Underwriters of Municipal Securities, but only as to underwriting relationships commencing after March 31, 2021. *See* MSRB Rule G-17 Interpretations, *Interpretive Notice Concerning the Application of MSRB Rule G-17 to Underwriters of Municipal Securities*, 179 (Oct. 1, 2021), *https://www.msrb.org/-/media/Files/Resources/MSRB-Rule-Book-Current-Version.ashx?* [https://perma.cc/GD8L-GU68]. Accordingly, the 2012 Interpretive Notice applies to the relationships in this case.

24

## F. Aftermath

As is now well known, after the KWA bonds were issued in April of 2014, Flint stopped receiving water from DWSD and the City switched to the Flint River as its interim water source. The FWTP was not adequately upgraded and necessary corrosion controls were not put into place. (ECF No. 1-2, PageID.93.)

Almost immediately after the switch to the Flint River as a water source, City water users began to complain about the water quality. (*See* No. 17-10164, ECF No. 185-2, PageID.5085.) And within a few months' time, Flint water was testing above the legal limit for coliform and E. coli bacteria. (*Id.* at PageID.5130.) By the end of the summer of 2014, the Michigan Department of Health and Human Services reported an outbreak of Legionnaires' disease and increased lead poisoning rates. (*Id.* at PageID.5131.)

---

[12] And indeed, the Complaint correctly notes that Defendants were not signatories to the ACO. Rather, the signatories to the ACO were entirely separate from Underwriters and the KWA. The ACO was signed by "Peter Bade, Chief Legal Officer of the City of Flint, and Bryan Feighner, Chief of the Michigan Department of Environmental Quality's Office of Waste Management and Radiological Protection." (ECF No. 1-2, PageID.89.)

## II.   LEGAL STANDARD

When deciding a motion to dismiss under Federal Rule of Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff's claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

## III.   ANALYSIS

### A. Conspiracy Claim

Plaintiffs allege that Defendants conspired to violate Plaintiffs' clearly established right to bodily integrity under the Due Process Clause

of the Fourteenth Amendment, under 42 U.S.C. § 1983. (ECF No. 1-2, PageID.98.) For the reasons set forth below, this claim is dismissed.

### 1. Legal Standard

The Court has addressed the right to bodily integrity on several previous occasions in the Flint Water Cases. "The right to bodily integrity is a fundamental interest protected by the Due Process Clause of the Fourteenth Amendment." *Sirls v. Michigan*, No. 17-10342, 2019 WL 3530874, at *14–15 (E.D. Mich. Aug. 2, 2019) (citing *Guertin v. Michigan*, 912 F.3d 907, 918–19 (6th Cir. 2017); *Guertin v. Michigan*, No. 16-12412, 2017 WL 2418007, at *21 (E.D. Mich. June 5, 2017) (citing *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891))). In previous Flint Water Cases, the Court has held that Plaintiffs plausibly alleged that their involuntary exposure to lead, Legionella, and other toxins stemming from the Flint River water after the April 2014 switch from the DWSD sets forth a claim that supports Plaintiffs' right to bodily integrity. *See Marble v. Snyder*, 453 F. Supp. 3d 970, 993 (E.D. Mich. 2020).

The claim in this case, however, takes it one step further: it is a claim for *conspiracy* to violate bodily integrity, so Plaintiffs must not only plead a section 1983 violation, they *also* must plead a claim for conspiracy

27

to violate their rights. To be pleaded sufficiently, the conspiracy must be to commit an unlawful act, which Plaintiffs have not adequately alleged. *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007) (section 1983 conspiracy is "an agreement between two or more persons to injure another by unlawful action").

A civil conspiracy claim under section 1983 requires a plaintiff to allege facts that, "when accepted as true, would allow a juror to find that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the injury." *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020); *see also Hooks v. Hooks*, 771 F.2d 935, 944–45 (6th Cir. 1985) ("A civil conspiracy is an agreement between two or more persons to injure another *by unlawful action*." (emphasis added)).

Conspiracy claims must be plead "with some degree of specificity and [ ] vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Marvaso*, 971 F.3d at 606; *see also, Webb v. U.S.*, 789 F.3d 647, 670–71 (6th Cir. 2015).

In other words, plaintiffs bringing a conspiracy claim shoulder a heavy burden at the pleading stage.

Generally, section 1983 constitutional claims can only be brought against defendants who act under color of state law, and Defendants here are not state actors. However, private parties can act under color of state law if their conduct is "fairly attributable to the state." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982). The Sixth Circuit has held that if a private party conspires with state officials to violate a plaintiff's constitutional rights, that party can qualify as a state actor under section 1983. *Moore v. City of Paducah*, 890 F.2d 831, 834 (6th Cir. 1989) (analyzing the Supreme Court's articulation in *United States v. Price*, 383 U.S. 787, 794 (1966) that an individual need not be an officer of the state to act under color of state law, and concluding that "a private party may conspire with the state and be liable under § 1983" if that individual "is a willful participant in joint activity with the State or its agents.").

### 2.    Analysis

The core of Plaintiffs' complaint is that Defendants underwrote the KWA bonds despite knowing that the FWTP upgrades would be impossible to finance and complete. The conspiracy, Plaintiffs allege,

29

involved a single plan for the KWA project to move forward while ignoring the health and safety risks to City of Flint. (*See* ECF No. 16, PageID.908–909.)

Plaintiffs' conspiracy claim fails. Plaintiffs do not allege that Defendants acted with the purpose of violating their constitutional rights, nor do they plead the alleged conspiracy with sufficient specificity. Moreover, Plaintiffs do not adequately plead that Defendants acted under color of state law. Accordingly, Plaintiffs' claim that there was a conspiracy to violate their rights under section 1983 is dismissed.

### *Plan to Violate Plaintiffs' Rights*

Plaintiffs' complaint insufficiently alleges that Defendants engaged in any plan with the objective of violating Plaintiffs' constitutional right to bodily integrity. *Marvaso*, 971 F.3d at 606. Even construing the complaint in the light most favorable to Plaintiffs, there is no allegation that Defendants planned to poison Flint water users (i.e. to unlawfully violate their bodily integrity).

Plaintiffs allege that (1) the financial records of the City of Flint showed the City was unable to pay for the necessary upgrades to the FWTP (ECF No. 1-2, PageID.64); (2) any reasonable water expert would

have determined there was not enough time to complete the upgrades before the water switch and "[a]ny reasonable underwriter either employs an internal public water expert or else retains a consultant with significant public water expertise." (*Id*. at PageID.73; *and see, id*. at PageID.90, 94; ECF No. 24, PageID.1047). Plaintiffs further allege that the manner of the bond sale—negotiated—required Defendants to work closely (or as Plaintiffs allege, too closely) with the KWA before the bonds were issued. (*Id*.) According to Plaintiffs, Defendants had the objective to "finance[] Flint's participation in the KWA." (*Id*. at PageID.910.)

Defendants ultimately aimed to secure a deal and sell the bonds at a favorable rate. To be sure, Defendants' conduct was one step in the causal chain that ultimately led to the violation of Plaintiffs' rights. But even as Plaintiffs tell the story, Defendants did not have the *objective* of violating Plaintiffs' rights. At most, Defendants acted without considering the possible harm to Plaintiffs. A section 1983 conspiracy claim requires a "single plan" with the "objective to deprive plaintiffs of their constitutional rights," *Marvaso*, 971 F.3d at 606. To the extent it is possible to conspire to be careless, such a conspiracy would be legally insufficient to make out a claim under section 1983.

Nor do Plaintiffs plead the nature of the alleged conspiracy with sufficient particularity. *See id.* Plaintiffs allege that one meeting occurred (in spring of 2013) between Defendants and KWA officials. (ECF No. 1-2, PageID.69.) They allege that this meeting occurred for the purpose of determining "the viability of the project and Defendant Underwriters' participation in bonding to help finance it." (*Id.*) This is insufficient to show that there was a plan between specific individuals to act in concert for the purpose of violating Plaintiffs' rights. The Sixth Circuit has consistently held that Plaintiffs must "allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right." *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011) (dismissing the plaintiff's conspiracy claim as vague and nonspecific). Plaintiffs do not do so.

Plaintiffs argue that they have identified "behaviors" as opposed to "outcomes," *see Marble*, 453 F. Supp. 3d at 985 (quoting *Tahfs v. Proctor*, 316 F.3d 584, 592 (6th Cir. 2003)), when they specified that: "The Underwriters met with several government officials who represented the various governments participating in the KWA and ultimately (and publicly) agreed to finance the KWA[.]" (ECF No. 16, PageID.905.) But

"vague references to co-conspiratorial actors . . . do not meet the pleading requirements for a conspiracy." *Marble*, 453 F. Supp. 3d at 985. And knowing what we now know—that the water switch led to poisoning and even death—does not turn Defendants' funding of the KWA into an unlawful conspiracy to bring those harms about.

Plaintiffs' allegations that a reasonable underwriter would not have funded the KWA project in light of the City's finances and the condition of the FWTP may be more properly understood as an argument that underwriters have a duty to evaluate the externalities of the municipal projects they fund before they fund them. But even if the Court were to accept this as true, which it does not, it does not follow that Defendants here conspired with state actors to violate Plaintiffs' rights.

Additionally, Plaintiffs allege that Defendants knew that the ACO was "used as a pretext for the issuance of bonds." (ECF No. 1-2, PageID.89; *see also, id.* at PageID.91 ("J.P. Morgan Chase, Wells Fargo, and Stifel all understood that the Administrative Consent Order was a pretext to permit Flint to be part of the KWA Series 2014A bond sale.").) Plaintiffs do not plead any details to reveal how Defendants "all

understood" this alleged pretext.[13] There are no allegations that connect Defendants to the formation of the ACO. Moreover, even if this allegation were true, it still would not show that Defendants acted with the purpose of violating Plaintiffs' rights.

For these reasons, Plaintiffs do not sufficiently plead the existence of a plan to violate their constitutional rights. *A fortiori*, they have not sufficiently plead that Defendants undertook unlawful actions in furtherance of such a plan.

### *Acting Under Color of Law*

Plaintiffs also insufficiently allege that Defendants acted under color of state law. For private-actor Defendants to qualify as state actors under a section 1983 conspiracy claim, Plaintiffs must plead that the Defendants acted as "willful participant[s] in joint activity with the State or its agents" to violate Plaintiffs' constitutional rights. *Moore*, 890 F.2d at 834.

---

[13] And indeed, the Complaint correctly notes that Defendants were not signatories to the ACO. Rather, the signatories to the ACO were entirely separate from Underwriters and the KWA. The ACO was signed by "Peter Bade, Chief Legal Officer of the City of Flint, and Bryan Feighner, Chief of the Michigan Department of Environmental Quality's Office of Waste Management and Radiological Protection." (ECF No. 1-2, PageID.89.)

It is not clear which state actors or agents, specifically, Defendants are alleged to have conspired with. Plaintiffs state that "Government Defendants" were part of the conspiracy. (ECF No. 1-2, PageID.98–100.) They define "Government Defendants" in their Complaint as "various government officials involved in the decision to switch Flint's drinking water source." (*Id.* at PageID.62.) This does not reach the level of specificity required to identify who the state actors are, much less who the specific Defendants are whom they allegedly conspired with. There were many "government officials" who are alleged to have had a critical role in the decision to switch Flint's drinking water source. *See Marble*, 453 F. Supp. 3d at 985 (stating that generalized references to groups of defendants are insufficient to meet the heightened pleading standard for conspiracy claims). This is not an issue that the Court can overlook in the hopes that later discovery will fill in more details. Pleading conspiracy claims with particularity and specificity is a well-settled requirement in the Sixth Circuit. *See Webb*, 789 F.3d at 670–71.

One person who Plaintiffs identify with particularity is Jeffrey Wright. (*See* ECF No. 1-2, PageID.68–69, 83, 94.) Wright wore multiple hats during the Flint Water Crisis. He was both the Genesee County

35

Drain Commissioner and the CEO of the KWA. Plaintiffs allege that Wright was a key person in the effort to form the KWA. (ECF No. 1-2, PageID.68.) The Court has analyzed similar allegations against Wright in other Flint Water Cases and has concluded that Plaintiffs failed to allege that Wright had the ability to make the City of Flint's final decision to switch to the Flint River as its water source, or that he ultimately had a plan with Defendants to poison Flint water users. In *Walters*, the Court stated:

> [P]laintiffs do not plausibly allege that Wright caused their exposure because he had no oversight over Flint's transition to the Flint River. Plaintiffs argue that Flint and Genesee County's water systems were unified, suggesting that Wright's position as Genesee County's Drain Commissioner gave him the means to affect the choice of Flint's water. But the fourth amended complaint reveals that the arrangement between Flint and Genesee County was a standard contractual relationship. Those in charge of Flint's system purchased water and then sold it to Genesee County. And although Genesee County was required to buy it, the County had no say in where it came from. In other words, Wright was in charge of Genesee County's water system, but not Flint's.
>
> Second, Wright did not prolong [P]laintiffs' exposure to the contaminated water.

No. 17-10164, 2019 WL 3530874, at *38 (quoting *Carthan v. Snyder*, 329 F. Supp. 3d 369 (E.D. Mich. 2018), vacated, No. 16-CV-10444, 2018 WL

36

11290626 (E.D. Mich. Nov. 9, 2018)). If Wright was dismissed as a defendant in *Walters* because his role leading up to (and after) the switch to the Flint River was inadequate to state a claim against him, then Defendants here, whose role as alleged was more attenuated than that of Wright, must also be dismissed.[14]

In contrast to Wright, Defendants' role (as alleged by Plaintiffs) was limited to actions *before* the switch to the Flint River on April 24, 2014. Defendant's role must be understood in the context of what they were actually doing at that time: underwriting *the KWA project*. When Defendants underwrote the bonds in early April 2014, the Official Statement—reviewed by Defendants—indicated that the City of Flint knew it would be required to upgrade the FWTP at a cost of approximately $8 million, and it indicated that the City had a plan to pay for those upgrades through its water rate revenues. (*See* ECF No. 1-2, PageID.399.) It was, after all, *the City's* responsibility to "treat[] and distribut[] treated water to its individual customers." (*Id.* at PageID.118.)

---

[14] Moreover, if Wright is the state actor the Defendants allegedly conspired with, the claim fails since the Court has already determined that the long-form complaint Plaintiffs rely upon did not set forth a claim against Wright for violation of their right to bodily integrity. *See Walters*, 2019 WL 3530874.

Moreover, there is very little that ties *Defendants* to the *City of Flint's* decision to use the Flint River as an interim source of water and to use the FWTP without necessary upgrades. (*See* ECF No. 16, PageID.908–909.) There is not, for example, an allegation that Defendants had more knowledge than what was set forth in the Official Statement. In fact, it appears from the facts alleged that the City of Flint assured the KWA and Defendants that the City had studied its own system, determined its financial needs, and had a plan for addressing and improving the FWTP in time for the switch to the Flint River when it had not. This does not implicate Defendants. (*See, e.g.,* ECF No. 1-2, PageID.339.) Accordingly, Plaintiffs have not sufficiently alleged that Defendants acted under color of state law.

For the reasons set forth above, Plaintiffs have not sufficiently plead any of the elements of a 1983 conspiracy claim. It is therefore dismissed.

## IV.   NEGLIGENCE CLAIM

Defendants also move to dismiss Plaintiffs' negligence claim. For the reasons set forth below, Plaintiffs have not alleged a relationship

between Plaintiffs and Defendants that is adequate to impose a legal duty. Absent a duty, Plaintiffs' negligence claim fails.

## 1. Professional Negligence and Ordinary Negligence

As an initial matter, Plaintiffs bring this claim against Defendants for "professional negligence." (ECF No. 1-2, PageID.101.) However, Michigan's professional negligence statute, Mich. Comp. Laws § 600.5839, specifically addresses claims "arising out of the defective or unsafe condition of an improvement to real property, . . . against any state licensed architect or professional engineer performing or furnishing the design or supervision of construction of the improvement, or against any contractor making the improvement . . . ." Plaintiffs agreed during the oral argument on this motion that they intended to bring a claim for ordinary, and not professional, negligence. (*See* ECF No. 24, PageID.1071–1073.)

## 2. Legal Standard for Ordinary Negligence

In Michigan, to establish a prima facie case of negligence, a plaintiff must prove the following elements: "(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was the proximate

39

cause of the plaintiff's damages." *Loweke v. Ann Arbor Ceiling & Partition Co., L.L.C.*, 489 Mich. 157, 162 (2011) (citations omitted). A defendant "is not liable to a plaintiff unless the defendant owed a legal duty to the plaintiff." *Id.* (citations omitted). Whether a duty exists is a question of law. *Id.* Since Defendants' main argument is that Plaintiffs failed to establish that Defendants owe a duty to Plaintiffs, this opinion focuses on whether a legal duty has been adequately plead under Michigan law.

### 3. Legal Duty in Michigan

Plaintiffs argue that once Defendants undertook to underwrite the KWA bonds, they had a duty to avoid foreseeable physical harms arising out of that undertaking. According to Plaintiffs, Defendants knew or should have known that (1) the City of Flint could not afford the appropriate the upgrades to the FWTP (ECF No. 1-2, PageID.64); and (2) it was impossible to upgrade the FWTP in time for the switch to the Flint River. (*Id.* at PageID.73). Because Defendants nevertheless undertook to underwrite the KWA bonds, they failed to take reasonable care in that undertaking, foreseeably causing harm to Flint water users such as Plaintiffs. Accordingly, Plaintiffs argue, Defendants owed them a duty

either to "require that the bond issuers…agree immediately to upgrade the Flint WTP so it could function safely," (ECF No. 1-2, PageID.102), or to refuse to underwrite the KWA bonds altogether.

Defendants respond that they could not owe Plaintiffs any legal duty because they did not have any relationship with Plaintiffs and the harm to Plaintiffs was not a reasonably foreseeable consequence of their conduct. (ECF No. 14, PageID.854.)

In Michigan, "the question whether the defendant owes an actionable legal duty to the plaintiff is one of law which the court decides after assessing the competing policy considerations for and against recognizing the asserted duty." *In re Certified Question*, 479 Mich. 498, 505 (quoting *Friedman v. Dozorc*, 412 Mich. 1, 22 (1981)). In considering whether the imposition of a duty is appropriate, courts must consider "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." *Id.* (quoting *Dyer v. Trachtman*, 470 Mich. 45, 49 (2004)). If there is no relationship to ground a duty, no duty may be imposed, and the other factors need not be considered. *Id.* at 508-509. Similarly, if the harm was not foreseeable, no duty may be imposed, and the other factors need not be considered. *Id.*

As this Court has recently explained, the required relationship need not be between the litigating parties. *In re Flint Water Cases*, No. 17-11726, 2021 WL 5237197, at *3-4 (E.D. Mich., Nov. 10, 2021) ("Lee"). Instead, those who undertake to perform a service for a third party thereby take on a duty to use ordinary care to avoid physical harm to all foreseeable persons and property. *Id.* at *3 (collecting cases). *See In re Flint Water Cases*, No. 17-10164, 2022 WL 94899 at * 4 (E.D. Mich. Jan. 10, 2022). ("Bellwether I Opinion"). *Hill v. Sears, Roebuck and Co.*, 492 Mich. 651, 660 ("Every person engaged in the performance of an undertaking has a duty to use due care or to not unreasonably endanger the person or property of others"); *Loweke*, 489 Mich. at 166 (2011) (recognizing "preexisting common-law duty to use ordinary care in order to avoid physical harm to foreseeable persons and property in the execution of its undertakings").

Beginning an undertaking does not create a duty "to protect everybody from all foreseeable harms." *In re Certified Question*, 479 Mich. at 508. Instead, the extent of one's duty depends on the nature of the undertaking and the foreseeability of the harm. *See generally Bellwether I Opinion, at* *5–6 and *6–9 (discussing two distinct

undertakings, only one of which gave rise to legal duty to Flint water users).

The only undertaking in this case is Defendants' underwriting of the KWA bonds. It is well-accepted across jurisdictions that lenders ordinarily do not owe a duty of reasonable care to non-borrowers. *See, e.g., Gilbert Tuscany Lender, LLC, v. Wells Fargo Bank*, 232 Ariz. 598, 601 (2013) ("Courts in several jurisdictions…have rejected the argument that banks owe a duty to non-customers") (collecting cases); *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002) ("Courts in numerous jurisdictions have held that a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship") (collecting cases); *Nymark v. Heart Fed. Sav. & Loan Ass'n.*, 231 Cal. Ap. 3d 1089, 1099 (1991) (public policy disfavors imposing duty on lenders). Indeed, lenders often do not even owe a duty of reasonable care to their own clients. *Cenatiempo v. Bank of America, N.A.*, 333 Conn. 769, 792 (2019) ("As a general matter, the law does not impose a duty on lenders to use reasonable care in its commercial transactions with borrowers"); *Nymark*, 231 Cal. App. at 1096 (same).

Michigan law is sparse on this issue. In *Portage Aluminum*, however, the Michigan Court of Appeals held that banks do not have a duty of reasonable care to non-clients. *Portage Aluminum Co. v. Kentwood Nat. Bank*, 106 Mich. App. 290, 293–94 (1981). In *Portage*, a bank's services were used to perpetrate a fraud on the plaintiff. Plaintiff sued the bank, alleging that it owed plaintiff a legal duty because it "knew or should have known" that its accounts were being used to defraud the plaintiff. *Id.* at 292–93. The Court rejected this argument, explaining that:

> [T]here was no relationship whatsoever between the plaintiffs and defendant bank. Defendant bank did not even know the identity of the plaintiffs…While it is true that the defendant bank could have learned the identity of the customers…such an investigation would neither have been proper nor required. It is generally no business of a bank to pry into the affairs of depository customers to determine who the customers of the depositor are or to act on behalf of such persons.

*Id.* at 294–95. *Portage Aluminum* suggests that Michigan courts would follow the general rule that lenders do not owe non-customers a duty of reasonable care.

The issuing of a loan is therefore not an undertaking that ordinarily gives rise to a duty of due care to third parties. As Plaintiffs acknowledge,

the underwriting of a municipal bond is a kind of lending. (ECF No. 16, PageID.915.) Accordingly, Plaintiffs have not shown that Defendants' underwriting of the KWA bonds gave rise to a duty of reasonable care to avoid harms to Plaintiffs.

Plaintiffs appeal to *Connor v. Great Western Sav. & Loan Ass'n* to argue that, despite this general rule, the Court should nevertheless impose a duty on Defendants under the unique facts of this case. *Connor v. Great Western Sav. & Loan Ass'n*, 69 Cal. 2d. 850 (1969). In *Connor*, the California Supreme Court applied California tort law to find that a lender who effectively created a joint venture with its borrowers was liable to non-customers for foreseeable harms arising out of that venture. *Id. Connor* illustrates the outer reach of California's general rule that a financial institution may owe a duty of reasonable care when it "exceed[s] the scope of its conventional role as a mere lender of money." *See, e.g., Meixner v. Wells Fargo Bank, N.A.*, 101 F.Supp.3d 938, 951–52 (E.D. Calif. 2015) (explaining this rule and collecting cases).

It is far from clear that the even the California courts would apply the rule of *Connor* to the underwriters of municipal bonds. As *amicus* persuasively argues, the public policy considerations that inform the

general rule against imposing a duty on lenders apply with redoubled force in the case of *governmental* lending. (ECF No. 19-1, PageID.972–973.) Nor have Plaintiffs pointed to anything in Michigan law suggesting that the Michigan Supreme Court would be likely to adopt—let alone extend—the rationale of *Connors*.

In any event, Plaintiffs have not plead that Defendants exceeded the scope of their "conventional role as a mere lender of money." *Meixner*, 101 F.Supp.3d at 951. Plaintiffs argue that Defendants exceeded the scope of their ordinary status as underwriters when they engaged in a negotiated bond sale. (ECF No. 16, PageID.917.) But as Plaintiffs themselves point out, negotiated bond sales are in fact a "common method" of bond sale. (*Id.* at PageID.892.) The mere fact that Defendants participated in such a sale therefore does not show that they acted outside of their ordinary scope as underwriters. Hence, Plaintiffs have not shown that the rule of *Connors* would apply to Defendants even if that rule existed in Michigan.

Accordingly, Defendants' undertaking—underwriting the KWA bonds—did not give rise to a duty of reasonable care to third parties. For this reason, it did not give rise to any duties to Plaintiffs.

46

### b. Public Policy

Even if the Court had found that Plaintiffs had adequately pleaded that a legal duty existed to sustain this claim, it fails on public policy grounds.    Michigan law requires that the Court consider the issue of the burdens and benefits of imposing a legal duty on Defendants. *In re Certified Question,* 479 Mich. at 505. Ultimately, the burdens outweigh the benefits of imposing a legal duty on Defendants.

Defendants argue that the risk of harm to themselves, other underwriters, and the many cities, counties, and other governmental entities they fund, would be great. It would "increase lending costs for municipalities and shock municipal bond markets," which could have the effect of "set[ting] the stage for further crises." (ECF No. 17, PageID.946.)

Plaintiffs address the burden and benefit portion of their argument indirectly where they ask the Court to look to the law of negligent entrustment as an analogy. (ECF No. 16, PageID.919.) Defendants argue that the burden on Defendants in holding them liable to third parties such as Plaintiffs is "slight," because one of the risks that underwriters already consider "in most instances" is potential litigation, which "could

directly and materially affect the return on investment." (*Id.* at PageID.920.)

While it is true that Defendants considered potential litigation in their decision to underwrite the KWA bonds, the litigation they evaluated involved the KWA and its members' ability to repay their loan (which would affect investors). (*See* ECF No. 1-2, PageID.128.) Litigation between *the public* and Defendants was not part of this consideration. As the law currently stands, Defendants' duty was to their investors, not the members of the public that are impacted by the projects they fund.

SIFMA persuasively argues that under Plaintiffs' theory, "[u]nderwriters would suddenly be responsible to a municipality's residents for judgments made by elected officials as to how best to govern, manage, and operate their own city, town, or state—matters over which the underwriters have no control." (ECF No. 22, PageID.1025.) They set forth a set of hypotheticals, including the following:

> A city raises funds to upgrade its power lines because the existing lines create a wildfire risk. Could the underwriter be liable for damages from a fire that occurs because the upgrade plan did not include a provision to secure the power lines in the interim? What if the upgrade turns out to be insufficient to eliminate the risk and a fire later occurs?

(ECF No. 22, PageID.1025.) This hypothetical reveals the rationale for not holding underwriters such as Defendants liable for the subsequent conduct of the bond issuer: there are related sub-questions about the possibly limitless extent of liability imposed on underwriters in financing such municipal undertakings that Plaintiffs do not address.[15]

---

[15] There is a line of conspiracy cases against financial institutions that survive the motion to dismiss hurdle, where the plaintiffs allege a financial institution funded terrorist activity. However, these, too, are distinguishable from the facts and law here. For example, in the case *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2nd Cir. 2021), the plaintiffs were American citizens in Israel who were injured in the summer 2006 rocket attacks carried out by Hezbollah, which had been designated by the United States as a Foreign Terrorist Organization ("FTO"). Hezbollah was subject to economic sanctions and its ability to access banking services is limited due to this FTO designation. *Id.* at 848. The plaintiffs alleged that the defendant bank knew that Hezbollah required banking services in order to carry out terrorist attacks, and provided such services to a Hezbollah sub-sect notwithstanding this knowledge. *Id.* at 849. The primary claim alleged that the defendant bank aided and abetted Hezbollah under the Justice Against Sponsors of Terrorism Act ("JASTA"), which creates a private right of action against a co-conspirator or aider and abettor of terrorist attacks. The district court granted the defendants' motion to dismiss, finding that the plaintiffs' allegations of the defendant's knowledge were not factually specific and were conclusory. The Second Circuit reversed. First, it found that JASTA was enacted to be broadly interpreted. *Id.* at 855. Also, the Second Circuit applied a legal framework that Congress indicated should be followed in assessing JASTA claims, which weighed in favor of the plaintiffs. *Id.* at 856. JASTA is distinguishable from the legal framework of Michigan negligence law (e.g., requiring assessments under an aiding-and-abetting liability framework). Additionally, there is no precedent indicating that this Court should look to such cases in the context of a state law negligence case.

KWA is a municipal entity. Those who determined whether and how to build the KWA project were elected officials and individuals appointed by elected officials. Those officials answer to the public through the political process, and in this case, some of them answer through the judicial process. Imposing a duty on Defendants could result in our nation's banks making decisions on behalf of municipalities. Banks are not accountable to the public in the voting booth. On balance, the burdens and benefits weigh against imposing a duty on Defendants in this case.

For the reasons set forth, Plaintiffs' negligence claim is dismissed.

### 4. Preemption

Because the claims are dismissed, the Court need not reach Defendants' preemption argument.

## VI. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is GRANTED. This case is dismissed with prejudice.

Dated: March 29, 2022                    s/Judith E. Levy
Ann Arbor, Michigan                      JUDITH E. LEVY
                                         United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 29, 2022.

<u>s/William Barkholz</u>
WILLIAM BARKHOLZ
Case Manager